## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | |
|---|---|
| SPECTRUM WT, BARRETT BRIGHT, and LAUREN STOVALL, <br><br> Plaintiffs, <br><br> v. <br><br> WALTER WENDLER, in his individual capacity and his official capacity as the President of West Texas A&M University, <br><br> CHRISTOPHER THOMAS, in his official capacity as Vice President for Student Affairs at West Texas A&M University, <br><br> JOHN SHARP, in his official capacity as Chancellor of the Texas A&M University System, <br><br> ROBERT L. ALBRITTON, JAMES R. BROOKS, JAY GRAHAM, MICHAEL A. HERNANDEZ III, TIM LEACH, BILL MAHOMES, ELAINE MENDOZA, MICHAEL J. PLANK, CLIFF THOMAS, and DEMETRIUS L. HARRELL, JR., in their official capacities as members of the Board of Regents of the Texas A&M University System, <br><br> Defendants. | Case No.: 2:23-cv-00048 <br><br><br> **VERIFIED COMPLAINT FOR CIVIL RIGHTS VIOLATIONS** <br><br><br><br><br><br> **JURY TRIAL DEMANDED** |

## INTRODUCTION

1.     Walter Wendler, President of West Texas A&M University, is openly
defying the Constitution. In a published edict, President Wendler barred a recognized
student group, Spectrum WT, from exercising its clear First Amendment right to put
on a PG-13 charity drag show at a campus event hall with the aim of raising funds
for LGBTQ+ suicide prevention. In his edict, President Wendler confessed he is
censoring Spectrum WT based on his personal views, and unabashedly admitted that
doing so violates the Constitution: "A harmless drag show? Not possible. I will not

appear to condone the diminishment of any group at the expense of impertinent gestures toward another group for any reason, ***even when the law of the land appears to require it***."[1]

2.      That "law of the land" is the First Amendment to the United States Constitution. And our Constitution prohibits public officials, including public university presidents, from silencing Americans because a public official dislikes certain points of view. Whether students gather on campus to study the Bible, host a political talk, or put on a drag show for charity, the First Amendment prohibits public university officials from suppressing the students' expression simply because the administrator (or anyone else) finds the message offensive. *Papish v. Bd. of Curators of the Univ. of Mo.*, 410 U.S. 667, 670 (1973).

3.      President Wendler's edict canceling the student group's charity drag show is textbook viewpoint discrimination. Of course, as a private citizen, President Wendler enjoys the First Amendment right to criticize expression he finds offensive, distasteful, or immoral. But as a public official, he cannot bar Spectrum WT and its members from exercising their First Amendment rights merely because he believes his personal opinions override the Constitution. They don't. The notion that universities "do not endorse everything they fail to censor is not complicated." *Bd. of Educ. of the Westside Cmty. Schs. v. Mergens By & Through Mergens*, 496 U.S. 226, 250 (1990) (plurality op.).

---

[1] A true and correct copy of President Wendler's edict emailed to the campus is attached to this Verified Complaint as **Exhibit A** (emphasis added).

4.     President Wendler's betrayal of the First Amendment is causing Spectrum WT and its members immediate and irreparable harm. Not only did President Wendler block Spectrum WT's show just eleven days before its March 31 scheduled date—after Spectrum WT carefully followed the University's requirements for campus events—but his edict also makes clear: "West Texas A&M University will not host a drag show on campus." And President Wendler's superiors, including the Texas A&M University System Board of Regents and its Chancellor, John Sharp, have not stopped President Wendler from continuing to spurn the First Amendment.

5.     And not only does the First Amendment prohibit President Wendler's censorship, so too does the State of Texas, which mandates that a university not "deny [a student] organization any benefit generally available to other student organizations at the institution," on the basis of the "political, religious, philosophical, ideological, or academic viewpoint expressed by the organization or any expressive activities of the organization." Tex. Educ. Code § 51.9315(g).

6.     Without immediate relief from the Court, Spectrum WT will continue to suffer irreparable harm, as to both its planned March 31 event and its First Amendment right to use campus facilities for future expressive activity just like other student groups do. The group wishes to proceed with both its March 31 event and future events that convey a political, ideological, or academic message, but fear President Wendler will again silence protected speech that he disagrees with or finds offensive.

7.     Section 1983 empowers federal courts to bring brazen constitutional violations like President Wendler's to a swift end. Plaintiffs file this lawsuit under Section 1983 to protect their expressive freedoms, enjoin Defendants from violating those freedoms, and remedy the constitutional harm Plaintiffs have endured and continue to endure.

## PARTIES

**The Plaintiffs**

8.     Plaintiff Spectrum WT is a recognized student organization in good standing at West Texas A&M University (West Texas A&M). Spectrum WT has around 20 members who are undergraduates and graduate students enrolled at West Texas A&M, and has existed since around 2009.

9.     Spectrum WT's mission is to "provide a safe space for LGBT+ students and allies to come together," to "raise awareness of the LGBT+ community," and to "promote diversity, support, and acceptance on campus and in the surrounding community."

10.     Spectrum WT is recognized as a student organization on West Texas A&M's website:[2]

---

[2] W. Tex. A&M Univ., *Spectrum GSA*, https://www.wtamu.edu/student-support/buff-allies/spectrum-gsa.html [https://perma.cc/E3P9-792Q].



11.     In furtherance of its mission, Spectrum WT hosts periodic events, including Lavender Prom, Queer History Night, and Queer Movie Night. In November 2022, Spectrum WT began planning a drag show to raise funds for an LGBTQ+ charity, scheduled for March 31, 2023, and which Defendants have now banned from the West Texas A&M campus.

12.     Plaintiff Barrett "Bear" Bright, an undergraduate student enrolled at West Texas A&M, is the President of Spectrum WT and thus is the principal student organizer of the charity drag show that West Texas A&M is censoring. Bear intends to perform in the charity drag show.

13.     Plaintiff Lauren "Laur" Stovall is an undergraduate student enrolled at West Texas A&M. Stovall is the Vice President of Spectrum WT and a primary organizer of the charity drag show that West Texas A&M is censoring. Stovall also intends to perform in the charity drag show.

**The Defendants**

14.    Defendant Walter Wendler is the President of West Texas A&M University, a governmental entity under the laws of the State of Texas and governed by the Board of Regents of the Texas A&M University System. As President, Wendler is responsible for administering West Texas A&M and supervising all student programs and services.[3] Plaintiffs sue President Wendler in his individual capacity as to Plaintiffs' Third Cause of Action for damages. Plaintiffs sue President Wendler in his official capacity as President of West Texas A&M as to the rest of Plaintiffs' claims.

15.    Defendant Christopher Thomas is the Vice President of Student Affairs at West Texas A&M. As Vice President, Thomas is the principal authority for the administration of student conduct. In his capacity as Vice President of Student Affairs, Thomas implemented President Wendler's directive canceling Plaintiffs' event and on-campus drag shows generally. Plaintiffs sue Vice President Thomas in his official capacity as Vice President of Student Affairs at West Texas A&M.

16.    Defendant John Sharp is the Chancellor of the Texas A&M University System, a governmental entity under the laws of the State of Texas. As Chancellor, Sharp is the chief executive officer of the Texas A&M University System, endowed with the authority to "do all the things necessary" to ensure the "general management and success of the system," including delegating such duties to subordinate system

---

[3] Tex. A&M Univ. Sys., Sys. Pol'y 02.05, *Presidents of Sys. Member Univs.* (Aug. 26, 2021), https://policies.tamus.edu/02-05.pdf [https://perma.cc/M73K-SDTL].

members. In that role, he is President Wendler's superior and has the power and duty to stop President Wendler from continuing to violate Plaintiffs' constitutional rights, yet he has not done so. Plaintiffs sue Chancellor Sharp in his official capacity as Chancellor of the Texas A&M University System.

17.     The Board of Regents of the Texas A&M University System is empowered to make "bylaws, rules, and regulations it deems necessary and proper for the government of the university system and its institutions, agencies, and services." Tex. Educ. Code § 85.21(a).  In that role, the Board has the power and duty to stop President Wendler from continuing to violate Plaintiffs' constitutional rights, yet it has not done so.

18.     Defendant Tim Leach is Chairman, presiding officer, and a member of the Board of Regents of the Texas A&M University System. Plaintiffs sue Defendant Leach in his official capacity.

19.     Defendant Bill Mahomes is Vice Chairman and a member of the Board of Regents of the Texas A&M University System. Plaintiffs sue Defendant Mahomes in his official capacity.

20.     Defendants Robert L. Albritton, James R. Brooks, Jay Graham, Michael A. Hernandez III, Elaine Mendoza, Michael J. Plank, Cliff Thomas, and Demetrius L. Harrell, Jr., are the remaining members of the Board of Regents of the Texas A&M University System. Plaintiffs sue each of these members in their official capacities.

21.     At all times relevant to the actions in the Complaint, Defendants acted under color of state law.

## JURISDICTION AND VENUE

22.   This action arises under the First and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, and the Declaratory Judgments Act, 28 U.S.C. §§ 2201 & 2202. Thus, this Court has subject matter jurisdiction over these federal causes of action under 28 U.S.C. §§ 1331 and 1343.

23.   This Court has personal jurisdiction over all defendants because they reside in the State of Texas.

24.   Venue is proper in this Court under 28 U.S.C. § 1391(b) because the acts and injuries alleged occurred in and continue to occur in this judicial district, at least one defendant resides in this district, and all defendants are residents of the State of Texas.

## FACTUAL ALLEGATIONS

***West Texas A&M provides venues, funding, and resources to recognized student organizations.***

25.   West Texas A&M has established a system for the formal recognition of student organizations.

26.   Recognized student organizations are entitled to use university facilities, organizational funds, and administrative support.

27.   These facilities include the Jack B. Kelley Student Center, "the heart of campus life" at West Texas A&M and a "gathering place for students" and student events.[4]

---

[4] W. Tex. A&M Univ., *Jack B. Kelley Student Ctr.*, https://www.wtamu.edu/student-life/jbk-student-center/index.html [https://perma.cc/L9UR-H5MB].

28.     West Texas A&M represents that the "venue spaces" in the Jack B. Kelley Student Center are for "student-centered programs and services."[5]

29.     The university also holds out these spaces as "ideal for events, large and small," including "wedding ceremonies and receptions, rehearsal dinners, milestone celebrations, corporate receptions and conferences, holiday parties, board meetings, and much more."[6]

30.     To facilitate student and public events in these spaces, West Texas A&M provides resources like audio-visual support, including "light programming, concert sound and more" for "events like[ ] concerts, press conferences, proms and weddings."[7]

31.     Among the Jack B. Kelley Student Center venue spaces available for use by student organizations (or rental by members of the public) is Legacy Hall, a "multi-purpose room capable of seating" 700 people for theatrical performances.[8]

32.     West Texas A&M holds Legacy Hall out as "great for events with bands or live music" or to otherwise "entertain" others.[9]

33.     West Texas A&M Policy No. 24.01.01.W0.01 ("Facility Use Request Procedure") makes these spaces available for "any special event," including "social

---

[5] W. Tex. A&M Univ., *Mission Statement*, https://www.wtamu.edu/student-life/jbk-student-center/jbk-about-us.html [https://perma.cc/W8WJ-MRTS].

[6] W. Tex. A&M Univ., *Events at WTAMU*, https://www.wtamu.edu/student-life/jbk-student-center/jbk-events.html [https://perma.cc/GX9F-EKG9].

[7] W. Tex. A&M Univ., *Production Servs.*, https://www.wtamu.edu/student-life/jbk-student-center/JBK%20Production%20Services.html [https://perma.cc/V897-DMLB].

[8] *Supra* note 5.

[9] W. Tex. A&M Univ., *Events at WTAMU*, https://www.wtamu.edu/student-life/jbk-student-center/jbk-events.html [https://perma.cc/RK7N-BU9M].

gatherings or functions." A true and correct copy of the policy is attached to this Verified Complaint as **Exhibit B**.

34.     As required by Texas state law, West Texas A&M policy prohibits the university from "deny[ing a student] organization any benefit generally available to other student organizations at the institution," including use of university facilities, based on the "political, religious, philosophical, ideological, or academic viewpoint expressed by the organization or any expressive activities of the organization." West Texas A&M Policy No. 08.99.99.W1 ("Expressive Activity on Campus"), Rule 1.3;[10] Tex. Educ. Code § 51.9315(g).

35.     To Plaintiffs' knowledge, West Texas A&M does not maintain any written policy purporting to limit the persons or groups who may utilize these event spaces (including Legacy Hall), or the subject matters for which they can use them.

***Spectrum WT plans "A Fool's Drag Race."***

36.     As a recognized student organization, Spectrum WT and its members are within the class of persons or groups for which West Texas A&M makes the event spaces in the Jack B. Kelley Student Center available.

37.     In November 2022, Spectrum WT began to plan a charity drag show event, aiming to hold the show on April Fool's Day (April 1, 2023), calling it "A Fool's Drag Race."

---

[10] W. Tex. A&M Univ. Sys., *Expressive Activity on Campus* at 2 (May 14, 2020), https://www.wtamu.edu/webres/File/About/Administration/Rules/08.99.99.w1_final_200514.pdf [https://perma.cc/4PB9-V65S].

38.     But because the university was holding an event on April 1, Spectrum WT agreed to hold the charity drag show one day earlier.

39.     Spectrum WT intended to use the facilities and resources available to all recognized student groups for expressive activities.

40.     So, Spectrum WT reserved Legacy Hall for the evening of Friday, March 31, 2023.

41.     Spectrum WT's intended use of Legacy Hall is consistent with Legacy Hall's past uses and the uses for which West Texas A&M makes the space available.

42.     In recent years, Legacy Hall hosted student group events including a "Day of the Dead" event featuring people wearing makeup, a student singing competition where more than a dozen singers performed at a time, and a Halloween event with a prize for the best costume.

43.     From the time in January 2023 that Spectrum WT applied to use Legacy Hall, West Texas A&M's administration and staff knew that Spectrum WT intended to host a drag show.

44.     Drag performances encompass a range of expressive conduct taking different forms depending on the relevant audience, venue, or performer. With origins at least as old as Shakespearean-era theater—when only men were permitted to perform onstage—drag has since been a recurring genre of theatrical performance.

45.     Drag performances have, in the current political climate, taken on a renewed political tone, offering counter-messaging against efforts to ban or regulate expression relating to gender or sexual identity.

46.     In the current political climate, drag offers, in a sense, a visual or performative representation of a common protest chant: "We're here; we're queer; get used to it."

47.     Drag performances also carry an ideological message of support and acceptance for the LGBTQ+ community.

48.     For Spectrum WT, putting on a charity drag show is important to convey both an ideological message and to show support for the LGBTQ+ community. The proceeds from the drag show are earmarked for donation to an LGBTQ+ suicide-prevention group.

49.     Some drag performances are intentionally risqué, some comedic, some outlandish, and some would not give a moment's pause to a Motion Picture Association reviewer.

50.     Spectrum WT planned and intended its charity drag show to be "PG-13."

51.     Spectrum WT informed West Texas A&M's administration and staff that the planned drag show would be "PG-13."

52.     West Texas A&M's administration and staff understood that Spectrum WT planned and intended a "PG-13" drag show.

53.     Consistent with its commitment to a "PG-13" show, Spectrum WT instructed performers not to engage in any "lewd" conduct.

54.     Even so, Spectrum WT is forbidding anyone under 18 from attending the event unless accompanied by a parent or guardian (intended for family members

of students who want to come with students' parents to show their support). And Spectrum WT is committed to having an alcohol-free event.

55.    Spectrum WT has gone so far as to instruct performers not to use music containing profanity at the planned event.

56.    Indeed, on Friday, March 17, nearly two weeks before the planned show, Spectrum WT submitted a list of planned songs to West Texas A&M's administration.

***West Texas A&M helps Spectrum WT navigate the event approval process.***

57.    West Texas A&M's "Campus Organizations Handbook" informs student groups that the campus event approval process encompasses three stages: (1) the "Request," during which spaces are temporarily reserved; (2) the "Tentative Confirmation," during which the significant logistics requirements (such as time, date, location, and audio-visual requirements) are arranged; and (3) "Confirmed," which reflects "all details have been confirmed for the event[.]"[11]

58.    Plaintiffs submitted a formal request to reserve Legacy Hall on or about January 27, 2023, identifying the event as "A Fool's Drag Race."

59.    Throughout the planning of the event, West Texas A&M's administration expressed support for the planning of the charity drag show and helped Plaintiffs navigate the logistical hurdles needed for the event to receive approval.

---

[11] W. Tex. A&M Univ., *Campus Orgs. Handbook* at 4, https://www.wtamu.edu/_files/docs/student-life/Campus%20Org%20Handbook.pdf [https://perma.cc/FX4R-P5VQ].

60.    On February 21, Dr. Shawn M. Fouts, a senior staff director at the Jack B. Kelley Student Center, praised Bright's work in an email, writing, "I appreciate your attention to the event as you navigate everything else a college student has going on. We want to help ensure you have a great event."

61.    The following day, Dr. Fouts shared again that the university was eager to "get this event through all the approval processes," thanking Bright for "leading the event process."

62.    Under West Texas A&M policy, an event receives a "Tentative Confirmation" only after the university has confirmed logistical details, including the time, date, and audio-visual needs, and the event has passed a "risk assessment."[12]

63.    To move the approval process along, Bright also agreed that student participants would be required to sign a waiver, provided by West Texas A&M, acknowledging that their participation was voluntary and that they could avoid any "risks . . . by simply not participating," and that their participation "will in no way hinder" their "ability to obtain" educational benefits from the Texas A&M University System.

64.    On February 27, staff from the Jack B. Kelley Student Center issued Spectrum WT a "Tentative Confirmation" that the event was ready to move forward.

65.    Only after an event's organizer receives a "Tentative Confirmation" can they begin advertising for the event.

66.    An event is moved into a final "Confirmed" status once "all details have

---

[12] *Supra* note 11.

been confirmed for the event."[13]

67.     During the first week of March, West Texas A&M staff helped Bright and other event organizers put together flyers to promote the event:



68.     Soon, Spectrum WT put up posters in the Jack B. Kelley Student Center and shared the poster on Instagram.

69.     Spectrum WT also set up an Eventbrite page where attendees could purchase tickets and tables for the charity drag show. One person even purchased six tables for $300.

70.     Spectrum WT anticipates expenses for concessions and other event items.

---

[13] *Supra* note 11.

71.    On March 14, Dr. Fouts informed Bright the event was "scheduled and approved as 'Tentative' as we await your performance verification and music."

72.    On March 17, Bright emailed Dr. Fouts with a list of planned songs. Dr. Fouts did not object to any song on the list, and instead encouraged Bright to share the list of songs with the staff member in charge of helping groups present performances at Legacy Hall.

73.    On information and belief, the "performance verification" refers to a final list of anticipated performers. Spectrum WT was prepared to provide that list and remains prepared to provide that list.

74.    But President Wendler prevented Spectrum WT from completing that final step needed to hold the charity drag show at Legacy Hall, when he issued his edict banning drag shows at West Texas A&M.

***President Wendler spurns the approval process, cancelling and condemning the charity drag show.***

75.    Shortly after noon on March 20, Bright received an email from Vice President for Student Affairs Thomas, asking to "meet with you and discuss your upcoming event."

76.    Bright met with Dr. Thomas at approximately 4:15 p.m. Dr. Thomas told Bright that West Texas A&M was cancelling the charity drag show. When Bright asked why, Dr. Thomas said President Wendler did not like the idea of the drag show, believing it discriminated against women.

77.    Half an hour later, President Wendler sent an email to West Texas A&M's students, faculty, and staff announcing that West Texas A&M "will not host

a drag show on campus." Wendler's email denounced drag as "divisive and demoralizing misogyny" for, in his view, "portraying women as objects," and condemned any group that would "elevate itself or a cause by mocking another person or group." (Ex. A, Wendler Email).

78.   President Wendler also posted the announcement on his personal blog.

79.   President Wendler's statement is unambiguous that he cancelled the charity drag show because he personally opposes Plaintiffs' expression. For instance, Wendler opined that drag shows are contrary to the "basis of Natural Law," which "declared the Creator's origin as the foundational fiber in the fabric of our nation," because "every human being is created in the image of God and, therefore, a person of dignity." (*Id.*)

80.   President Wendler also claimed that drag shows are a form of humor (a "slapstick sideshow") that "becomes harassment" because, in his view, it is "sexism" and results in "[m]ocking or objectifying in any way members of any group." (*Id.*)

81.   Upon information and belief, West Texas A&M had not received any formal or informal complaints from students or staff that a drag show would constitute harassment of any individual or group.

82.   Indeed, in 2012, West Texas A&M hosted a drag show in the Jack B. Kelley Student Center without incident.

83.   Finally, President Wendler acknowledged that even though "the law of the land appears to require" him not to censor the charity drag show, allowing the

event would create the appearance that President Wendler "condone[s] the diminishment" of women. (*Id.*)

84. When President Wendler sent the email canceling the event, Spectrum WT had completed, or was prepared to complete, all necessary steps for the event to move forward as planned.

85. Other than the assertions made in President Wendler's March 20 statement, neither President Wendler, the other Defendants, nor any other staff member at West Texas A&M, offered an explanation or rationale for cancelling the charity drag show.

86. At no time did President Wendler—or any other West Texas A&M employee or Defendant—indicate Spectrum WT had failed to comply with university policy or any other condition necessary to proceed with the event.

87. On March 21, the Foundation for Individual Rights and Expression (FIRE), which now represents Plaintiffs, sent a letter to President Wendler, explaining that his conduct violated the First Amendment and calling on West Texas A&M to confirm that it would reinstate the event.

88. The same day, President Wendler acknowledged the letter, copying the general counsel for the Texas A&M University System.

89. But neither President Wendler, West Texas A&M, nor the Texas A&M University System responded substantively to FIRE's letter.

## INJURIES TO PLAINTIFFS

90. Plaintiffs are injured by President Wendler and West Texas A&M canceling the planned March 31, 2023, charity drag show—and all similar events—

18

based on his personal disagreement with the messaging he believes drag shows convey. Viewpoint discrimination violates the First Amendment, and "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

91.     In addition, Plaintiffs Bright and Stovall are West Texas A&M students. They pay tuition and student fees to West Texas A&M, which promises—as does the State of Texas[14]—Plaintiffs the ability to use venues on campus for expressive activities.

92.     Thus, Defendants' drag show ban has also injured Plaintiffs because they cannot use a campus venue for First Amendment expressive activity, despite those promises.

93.     Plaintiffs are also injured because they invested substantial time and organizational resources into planning and promoting the charity drag show and obtaining approval for the event from West Texas A&M staff, following the university's approval procedures. If Plaintiffs remain barred from holding the show on campus, those investments will be lost.

94.     In addition, Plaintiffs have already had to remove all the posters they placed in the Jack B. Kelley Student Center promoting the charity drag show. And if the show remains canceled, Plaintiffs will have to refund or pay out of pocket for the poster vendors and ticket and table purchasers. Not only are Plaintiffs thus injured

---

[14] Tex. Educ. Code § 51.9315(g).

financially, they are suffering harm to their charitable goal in organizing the drag show and their mission overall.

95.     But for the ban against drag shows, Spectrum WT would put on their March 31, 2023, charity drag show. West Texas A&M staff provided Spectrum WT with "Tentative Confirmation" for the event, and just hours before President Wendler vetoed the event, Spectrum WT had submitted the final details that university staff confirmed were necessary for the event to be moved to the "Confirmed" stage. And on March 23, 2023, the University approved Spectrum WT's requested "catering exemption," "in the event that this event does occur."

96.     Thus, Plaintiffs have been injured because President Wendler's refusal to permit the event to move forward defied West Texas A&M campus policy and deprived Plaintiffs of the benefits the policy confers to all student groups.

97.     Plaintiffs Bright and Stovall have been injured because they can no longer exercise their First Amendment right to engage in protected expression by performing at the charity drag show event.

98.     Even if Plaintiffs were able to locate, on short notice, an alternative venue, President Wendler's abrupt veto of their event and edict banning drag shows on campus has injured—and will continue to injure—Plaintiffs. For example:

   a) Spectrum WT's mission is to help LGBTQ+ students feel welcome at West Texas A&M, as well as to promote diversity and acceptance on campus. Exiling Plaintiffs' expressive activities to off-campus locations both burdens the students' ability to reach their intended audience and sends the message—as President Wendler intends—that their message is unwelcome.

   b) A new venue may cost significant money. Sam Houston Park, which Plaintiffs are seeking to reserve as an alternate venue, costs $1,200.

Another alternative venue, the Amarillo Convention Center, requires $1,000.00. Either amount will consume most of the organization's current funds—a cost they would not incur but for President Wendler's denial of access to the facilities made available at no cost to student organizations whose message he approves.

c) Alternative venues now being explored by Plaintiffs do not have the audio-visual capabilities of the intended venue, creating the imminent risk that Plaintiffs will be forced to acquire—through purchase or rental—the audio-visual equipment necessary for the show's production at an alternative venue.

d) Because Plaintiffs must be prepared to move forward with the event if this Court vindicates their First Amendment rights, while also working on an alternative event in case President Wendler's censorship is successful, the time, energy, and resources required of Plaintiffs have been multiplied.

e) To organize a new event off-campus, where they would not have the security of West Texas A&M's on-campus police force, they would be forced to retain private security at their own expense.

99. Plaintiffs are also injured in their ability to exercise their First Amendment rights by holding similar events in the future. Absent the prohibition on drag performances, Plaintiffs would host not only the March 31 event, but would continue with plans and investments for a similar event, held at least annually, with the next drag show in spring 2024.

100. Further, because President Wendler's prohibition is ambiguous, any student participant in Plaintiffs' future events—including, for example, its annual Lavender Prom—could dress in a manner President Wendler deems to be "drag." Thus, Plaintiffs are injured from being forced to choose between not organizing future events or compelling its members and event attendees to express themselves only as President Wendler deems fit.

101.    President Wendler's blanket prohibition on "drag" chills Plaintiffs from planning and scheduling expressive events and activities on campus. For example:

    a) Last semester, Plaintiffs held an event for National Coming Out Day, recognized each October 11. Because President Wendler unilaterally cancelled Spectrum WT's March 31 event, Plaintiffs are apprehensive about hosting National Coming Out day this year, for fear of similar treatment by President Wendler or his administration.

    b) Plaintiffs intended the March 31 drag show to be the inaugural iteration of an annual event. While President Wendler's ban remains in place, Plaintiffs cannot begin to plan or organize the next event.

### FIRST CAUSE OF ACTION
**First Amendment Violation (Injunctive and Declaratory Relief)**
**Freedom of Speech - Viewpoint Discrimination**
**(42 U.S.C. § 1983)**
**(All Plaintiffs against all Defendants in their official capacities)**

102.    Plaintiffs re-allege and re-incorporate paragraphs 1–101 as though fully set forth herein.

103.    It is clearly established that the First Amendment protects expressive conduct, including performance theater (like drag shows), whether held in high regard by supporters or low esteem by detractors. *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (burning the American flag); *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 633–34 (1943) (saluting or refusing to salute the American flag); *Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386, 387 (4th Cir. 1993) (university fraternity's "ugly woman" contest).

104.    It is clearly established that student and student group expression at public universities is entitled to robust protection under the First Amendment, which applies with no "less force on college campuses than in the community at large." *Healy v. James*, 408 U.S. 169, 180 (1972).

105.   It is clearly established that an official acting under the color of state law cannot censor or restrict speech based on "its message" or the viewpoint expressed, regardless of the forum. *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 828–30 (1995); *R.A.V. v. St. Paul,* 505 U.S. 377, 391–92 (1992).

106.   It is clearly established that university officials cannot suppress student expression at public universities because they or others find it derisive, "no matter how offensive" others might find that expression. *Papish*, 410 U.S. at 670.

107.   Plaintiffs sought and are seeking to exercise their First Amendment right to engage in on-campus expression—organizing and putting on a charity drag show—but cannot do so because of President Wendler's personal objections to their message.

108.   President Wendler is engaging in unconstitutional viewpoint discrimination by prohibiting Plaintiffs from putting on a charity drag show because Wendler disagrees with the expressive message of the show and believes it is offensive.

109.   President Wendler's condemnation of drag shows makes clear that he understands drag shows convey a particularized message, as he identifies them as "artistic expression which denigrates others—in this case, women" and which amount to "ridicule."  (Ex. A.)

110.   Vice President Thomas is engaging in unconstitutional viewpoint discrimination by enforcing President Wendler's viewpoint-driven directive.

111.   By not putting an end to President Wendler's actions, the Board of Regents and Chancellor Sharp evidence an intent to let Wendler's viewpoint discrimination against on-campus drag shows continue.

112.   In addition to the immediate impending harm on Plaintiffs' expressive freedoms if the March 31 charity drag show does not go forward, the general harm of the policy remaining in place will continue beyond that date. President Wendler's promise to ignore "the law of the land" and his establishment of a policy that "West Texas A&M University will not host a drag show on campus" is chilling and will continue to chill Plaintiffs' ability to organize similar events—whether or not styled as a "drag show"—if they convey a political, ideological, or academic message that President Wendler believes to be demeaning. These include Plaintiffs' intended future drag shows, including one Plaintiffs are planning for spring 2024.

113.   Plaintiffs have no adequate legal, administrative, or other remedy by which to prevent or minimize the immediate, irreparable, and ongoing harm to their First Amendment rights from Defendants' unconstitutional viewpoint discrimination.

114.   Thus, Plaintiffs require immediate injunctive relief, permanent injunctive relief, and declaratory relief to protect their fundamental expressive rights from ongoing harm.

115.   Absent injunctive and declaratory relief upholding Plaintiffs' First Amendment rights and returning President Wendler's focus to his constitutional obligations, President Wendler's pledge to continue to violate the constitutional

24

rights of West Texas A&M's students will have ongoing chilling effects on Plaintiffs' protected expression.

116.    Plaintiffs are likely to succeed on the merits of their claims. Moreover, there is substantial public interest in ensuring Defendants cease engaging in viewpoint-based restriction and censorship of speech on Texas's college campuses, where "the vigilant protection of constitutional freedoms is nowhere more vital[.]" *Healy*, 408 U.S. at 180 (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)).

117.    Recognizing this vital public interest, the Texas Legislature has codified the First Amendment's prohibition on viewpoint discrimination, barring public universities from "tak[ing] action against a student organization or deny[ing] the organization any benefit generally available to other student organizations at the institution on the basis of a political, religious, philosophical, ideological, or academic viewpoint expressed by the organization or of any expressive activities of the organization." Tex. Educ. Code § 51.9315(g).

118.    Because a justiciable controversy exists over Defendants' viewpoint-based discrimination against Plaintiffs' protected expression, Plaintiffs also seek declaratory relief against Defendants. A declaratory judgment will further resolve and clarify the parties' legal relationship.

## SECOND CAUSE OF ACTION
**First Amendment Violation (Injunctive and Declaratory Relief)**
**Freedom of Speech – Exclusion from a Public Forum**
**(42 U.S.C. § 1983)**
**(All Plaintiffs against all Defendants in their official capacities)**

119.    Plaintiffs re-allege and re-incorporate paragraphs 1–118 as though fully set forth herein.

120.    West Texas A&M routinely provides facilities, funding, and resources for expressive activities of registered student organizations like Spectrum WT.

121.    By recognizing student organizations and providing them facilities, funding, and resources, West Texas A&M has created a public forum. *Widmar v. Vincent*, 454 U.S. 263, 267–70 (1981).

122.    Legacy Hall is a public forum that West Texas A&M makes available to student organizations, as well as the general public.

123.    President Wendler's prohibition on student organizations' "drag shows" in university facilities is a content-based and viewpoint-based restriction.

124.    Because West Texas A&M's content- and viewpoint-based restrictions on drag shows do not satisfy strict scrutiny—*i.e.*, "necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end"—they are unconstitutional restrictions on speech in public forums. *Id.* at 270.

125.    President Wendler's prohibition on student drag shows in campus public forums does not serve a compelling state interest nor is it the least restrictive means of achieving such an interest.

26

126.    President Wendler's prohibition on student drag shows in campus public forums is not narrowly drawn to achieve a compelling state interest.

127.    President Wendler's claim that his drag show ban prevents the appearance that he, or the university he shepherds, endorses that expressive activity is not a legitimate state interest, let alone a compelling one. *Id.* at 274 (a public university's "open forum . . . does not confer any imprimatur of state approval" on expression occurring within that forum).

128.    President Wendler's claim that the drag show ban is necessary to prevent the creation of a hostile environment is not narrowly drawn because it is a prohibition on expressive activity voluntarily encountered in enclosed spaces and because President Wendler had no evidence suggesting Plaintiffs' charity drag show would create a "hostile environment."

129.    Nor is the prohibition on drag shows reasonably related to the purpose of campus forums like Legacy Hall, which West Texas A&M holds out as available for a wide range of events, like weddings, parties, concerts, press conferences, and entertainment.

130.    The content-based and viewpoint-based prohibition, reflected in President Wendler's edict, excludes Plaintiffs from engaging in protected First Amendment activity in on-campus public forums, violating their First Amendment rights.

131.   Vice President Thomas is also violating Plaintiffs' First Amendment rights by enforcing President Wendler's content- and viewpoint-based prohibition on student groups that would hold drag shows in campus public forums.

132.   By not putting an end to President Wendler's actions, the Board of Regents and Chancellor Sharp evidence an intent to let the unconstitutional prohibition against student groups holding drag shows in campus forums continue.

133.   President Wendler's edict reflects an ongoing ban against present and future drag shows on campus as well as similar events if they convey a political, ideological, or academic content that President Wendler believes to be demeaning. These include Plaintiffs' intended future drag shows, including one Plaintiffs are planning for spring 2024.

134.   Plaintiffs have no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to their First Amendment right to use campus forums for First Amendment activity.

135.   Thus, Plaintiffs require immediate injunctive relief, permanent injunctive relief, and declaratory relief to protect their fundamental expressive rights from ongoing harm.

136.   Absent injunctive and declaratory relief enjoining Defendants from excluding Plaintiffs from campus forums based on the content and viewpoints of their protected expression, the public university will continue to violate the constitutional rights of West Texas A&M's students, including Spectrum WT and its members.

137.   Plaintiffs are likely to succeed on the merits of their claims. Moreover, there is substantial public interest in ensuring Defendants cease engaging in content-based restrictions and censorship of speech on Texas' college campuses. *Healy*, 408 U.S. at 181; Tex. Educ. Code § 51.9315(g).

138.   Because a justiciable controversy exists over Plaintiffs' inability to use campus public forums for First Amendment expressive activity, Plaintiffs also seek declaratory relief against Defendants. A declaratory judgment will further resolve and clarify the parties' legal relationship.

## THIRD CAUSE OF ACTION
**First Amendment Violation (Damages)**
**Direct and Retaliatory Infringements of Freedom of Speech**
**(42 U.S.C. § 1983)**
**(All Plaintiffs against President Wendler in his individual capacity)**

139.   Plaintiffs re-allege and re-incorporate paragraphs 1–138 as though fully set forth herein.

140.   As alleged in the First Cause of Action, the law is clearly established that the First Amendment protects Plaintiffs against President Wendler's actions.

141.   By barring Plaintiffs from organizing and putting on a charity drag show on campus based on his personal disagreement with Plaintiffs' viewpoints and message, President Wendler directly deprived Plaintiffs of their First Amendment rights.

142.   President Wendler also retaliated against Plaintiffs because of their protected expression.

143.   Plaintiffs engaged in expression protected by the First and Fourteenth Amendments, including promoting, publishing, and organizing messaging about drag shows.

144.   Plaintiffs also intended to engage in expression protected by the First and Fourteenth Amendments—known to President Wendler—including organizing and putting on a charity drag show.

145.   Plaintiffs' message was the motivating factor in President Wendler's decision to take retaliatory action against Plaintiffs.

146.   President Wendler's retaliatory actions in response to Plaintiffs' message include:

a)   Abruptly canceling Plaintiffs' March 31 charity drag show event;

b)   Imposing a reactive, viewpoint- and content-based restriction on the expression of all students at West Texas A&M;

c)   Prohibiting future student expressive activity, including events organized by Plaintiffs and their right to use campus forums for First Amendment activity; and

d)   Declaring that Plaintiffs' expression, protected by the First Amendment, violates university policy on harassment.

147.   President Wendler's actions in response to Plaintiffs' message are sufficient to deter a person of ordinary firmness from continuing to engage in expressive activity.

148.   President Wendler's actions have dissuaded Spectrum WT from continuing to plan future events due to concern that the organization's good standing may be jeopardized when West Texas A&M, in conformity with President Wendler's

assertion that "drag" expression violates university policy, enforces against Spectrum WT or its members the harassment policies maintained by West Texas A&M or the Texas A&M System.

149.   President Wendler's actions have chilled the expression of individual members of Spectrum WT as they relate to drag, sexual orientation, and gender identity.

150.   It is clearly established that the First Amendment prohibits an individual acting under color of state law from retaliating against speakers based on their viewpoint or their exercise of First Amendment rights, including the rights of campus speakers to be free of viewpoint discrimination and unconstitutional limits on the use of campus forums for First Amendment activity.

151.   No reasonable public university administrator would have suppressed student expression like President Wendler did and continues to do.

152.   A reasonable public university administrator would have understood it is an obvious First Amendment violation for a university administrator to censor student expression because of the viewpoint expressed.

153.   A reasonable public university administrator would have understood it is an obvious First Amendment violation for a university administrator to retaliate against student speakers because of their message's content or viewpoint they expressed.

154.   Plaintiffs are entitled to compensatory and nominal damages against President Wendler in his individual capacity for violating Plaintiffs' clearly established First Amendment rights.

155.   Plaintiffs are also entitled to punitive damages against President Wendler in his individual capacity.

156.   President Wendler knew that the First Amendment, as the "law of the land," prohibits him from censoring student expression, including censorship based on any personal disagreement he has with a speaker's message or viewpoint.

157.   Due to his personal opposition to Plaintiffs' messages, President Wendler has deliberately violated Plaintiffs' First Amendment rights and his duty as a public official to avoid violating the First Amendment.

158.   President Wendler's deliberate defiance of the Constitution was and remains malicious, oppressive, and in reckless and callous disregard of Plaintiffs' well-established rights.

159.   Accordingly, punitive damages against President Wendler are appropriate and necessary to punish President Wendler for violating Plaintiffs' First Amendment rights and to deter similar violations in the future.

### JURY DEMAND

Under Fed. R. Civ. P. 38, Plaintiffs demand a jury trial on all issues triable to a jury.

### PRAYER FOR RELIEF

Plaintiffs request that the Court enter judgment against all Defendants and award the following relief:

1.    Temporary, preliminary, and permanent injunctive relief enjoining Defendants and their employees, agents, servants, officers, and persons in concert with Defendants, from preventing Plaintiffs' March 31 event from moving forward;

2.    Temporary, preliminary, and permanent injunctive relief enjoining Defendants and their employees, agents, servants, officers, and persons in concert with Defendants, from prohibiting Plaintiffs from holding future events similar to the March 31 event in campus facilities generally available for student group use;

3.    A declaratory judgement that President Wendler's cancellation of the March 31 charity drag show, and his pledge to prevent similar expressive activity at West Texas A&M, violate the First Amendment to the United States Constitution;

4.    Compensatory and nominal damages against President Wendler in his individual capacity in such amount as may be found, or as otherwise permitted by law;

5.    Punitive damages against President Wendler in his individual capacity in such amount as may be found, or as otherwise permitted by law, for his retaliatory and oppressive intent toward Plaintiffs in reckless and callous disregard for their clearly-established constitutional rights;

6.    Plaintiffs' attorneys' fees under 42 U.S.C. § 1988;

7.    Plaintiffs' costs; and

8.    Any other and further relief as the Court may deem just and proper.

Dated: March 24, 2023

Respectfully submitted,

/s/ JT Morris

JT MORRIS
TX Bar No. 24094444
FOUNDATION FOR INDIVIDUAL RIGHTS
   AND EXPRESSION
700 Pennsylvania Ave., SE; Ste. 340
Washington, DC 20003
Tel: (215) 717-3473
Fax: (267) 573-3073
jt.morris@thefire.org

CONOR T. FITZPATRICK*
MI Bar No. P78981
ADAM B. STEINBAUGH*
CA Bar No. 304829
JEFFREY D. ZEMAN*
MI Bar No. P76610
FOUNDATION FOR INDIVIDUAL RIGHTS
   AND EXPRESSION
510 Walnut St.; Ste. 1250
Philadelphia, PA 19106
Tel: (215) 717-3473
Fax: (267) 573-3073
conor.fitzpatrick@thefire.org
adam@thefire.org
jeff.zeman@thefire.org
* *Pro Hac Vice* Motions Forthcoming

*Counsel for Plaintiffs*

## VERIFICATION OF BARRETT BRIGHT

Pursuant to 28 U.S.C. § 1746, I, BARRETT BRIGHT, declare as follows:

1.     I am a Plaintiff in the present case and a citizen of the United States of America.

2.     I am the President of Spectrum WT, a plaintiff in the present case.

3.     I have read the foregoing Verified Complaint for Civil Rights Violations.

4.     I have personal knowledge of the factual allegations in paragraphs 8–12, 25–33, 35–43, 48, 50–56, 58–61, 63–65, 67–78, 81, 84–86, 91, 93–95, 97–99, 101 and 149 of the Verified Complaint and know them to be true.

5.     I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Executed on 03/23/23


_____
Barrett Bright

## VERIFICATION OF LAUREN STOVALL

Pursuant to 28 U.S.C. § 1746, I, LAUREN STOVALL, declare as follows:

1.      I am a Plaintiff in the present case and a citizen of the United States of America.

2.      I am the Vice President of Spectrum WT, a plaintiff in the present case.

3.      I have read the foregoing Verified Complaint for Civil Rights Violations.

4.      I have personal knowledge of the factual allegations in paragraphs 8–11, 13, 25–33, 35–40, 43, 48, 50–56, 58, 67–70, 73–74, 77–78, 81, 84–86, 91, 93–95, 97–99, 101 and 149 of the Verified Complaint and know them to be true.

5.      I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Executed on 03/23/23

_____
Lauren Stovall