# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

SPECTRUM WT, BARRETT BRIGHT, and LAUREN STOVALL,

        Plaintiffs,

    v.

WALTER WENDLER, in his individual capacity and his official capacity as the President of West Texas A&M University,

CHRISTOPHER THOMAS, in his official capacity as Vice President for Student Affairs at West Texas A&M University,

JOHN SHARP, in his official capacity as Chancellor of the Texas A&M University System,

ROBERT L. ALBRITTON, JAMES R. BROOKS, JAY GRAHAM, MICHAEL A. HERNANDEZ III, TIM LEACH, BILL MAHOMES, ELAINE MENDOZA, MICHAEL J. PLANK, CLIFF THOMAS, and DEMETRIUS L. HARRELL JR., in their official capacities as members of the Board of Regents of the Texas A&M University System,

        Defendants.

Case No.: 2:23-cv-00048-Z

Hon. Matthew J. Kacsmaryk

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**ORAL ARGUMENT REQUESTED**

---

JT MORRIS
TX Bar No. 24094444
FOUNDATION FOR INDIVIDUAL RIGHTS
  AND EXPRESSION
700 Pennsylvania Ave., SE; Ste. 340
Washington, DC 20003
Tel: (215) 717-3473
Fax: (267) 573-3073
jt.morris@thefire.org

CONOR T. FITZPATRICK*
MI Bar No. P78981
ADAM B. STEINBAUGH*
CA Bar No. 304829
JEFFREY D. ZEMAN*
MI Bar No. P76610
FOUNDATION FOR INDIVIDUAL RIGHTS
  AND EXPRESSION
510 Walnut St.; Ste. 1250
Philadelphia, PA 19106
Tel: (215) 717-3473
Fax: (267) 573-3073
conor.fitzpatrick@thefire.org
adam@thefire.org
jeff.zeman@thefire.org
* *Pro Hac Vice* Motions Forthcoming

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

Page(s):

TABLE OF AUTHORITIES ........................................................... iii

INTRODUCTION ......................................................................1

STATEMENT OF FACTS .............................................................3

    Spectrum WT, like many recognized student groups, has a message to
    share.....................................................................................3

    West Texas A&M Opens Facilities to Students and the Public for
    Expressive Activities. .............................................................3

    President Wendler decides to impose his personal views instead of
    following the Constitution..........................................................6

    Plaintiffs are suffering irreparable injury. ....................................8

ARGUMENT ...........................................................................9

    I.    Plaintiffs Are Substantially Likely to Succeed on the
        Merits Against the University's Brazen Censorship of
        Protected Expression.....................................................9

        A.    President Wendler's Censorship of a Drag Show
            Based on Personal Disagreements with the
            Expression's Message Is Textbook Viewpoint
            Discrimination. .................................................11

        B.    Excluding Plaintiffs' Drag Show from Campus
            Public Forums Violates the First Amendment. ...........14

    II.    Plaintiffs Will Suffer Irreparable Harm Absent
        Immediate Relief. ......................................................18

    III.    The Balance of Harms and the Public Interest Favor
        Plaintiffs' First Amendment Rights. .................................20

    IV.    The Court Should Waive the Bond Requirement Because
        Plaintiffs Seek Only to Protect Their First Amendment
        Rights. .................................................................21

CONCLUSION.........................................................................22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases:**

*Am. Booksellers Ass'n v. Hudnut,*
    771 F.2d 323 (7th Cir. 1985) .............................................................................17

*Ass'n of Club Execs. of Dallas, Inc. v. City of Dallas, Tex.,*
    604 F. Supp. 3d 414 (N.D. Tex. 2022) ............................................................20

*Bd. of Educ. of the Westside Cmty. Schs. v. Mergens By & Through Mergens,*
    496 U.S. 226 (1990) .........................................................................................21

*Berger v. Battaglia,*
    779 F.2d 992 (4th Cir. 1985) ...........................................................................11

*Bible Believers v. Wayne Cnty., Mich.,*
    805 F.3d 228 (6th Cir. 2015) ...........................................................................11

*Christian Legal Soc'y Chapter of the Univ. of Cali, Hastings Coll. of Law v.*
    *Martinez,* 561 U.S. 661 (2010) ......................................................................12

*Christian Legal Soc'y v. Walker,*
    453 F.3d 853 (7th Cir. 2006) ...........................................................................21

*City of Atlanta v. Metro. Atlanta Rapid Transit Auth.,*
    636 F.2d 1084 (5th Cir. 1981) ...................................................................21, 22

*Cohen v. California,*
    403 U.S. 15 (1971) ....................................................................................11, 16

*Dodds v. Childers,*
    933 F.2d 271 (5th Cir. 1991) ...........................................................................10

*Elrod v. Burns,*
    427 U.S. 347 (1976) ....................................................................................2, 18

*Gay Student Servs. v. Tex. A & M Univ.,*
    737 F.2d 1317 (5th Cir. 1984) .........................................................................14

*Gbalazeh v. City of Dallas, Tex.,*
    No.: 18-cv-0076, 2019 WL 2616668 (N.D. Tex. June 25, 2019).......................22

*Gordon v. City of Houston,*
    79 F. Supp. 3d 676 (S.D. Tex. 2015) ...............................................................22

*Healy v. James*,
    408 U.S. 169 (1972) ...................................................................................11

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*,
    515 U.S. 557 (1995) ...................................................................................10

*Iancu v. Brunetti*,
    139 S. Ct. 2294 (2019) ...............................................................................12

*Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.*,
    993 F.2d 386 (4th Cir. 1993) ...........................................................10, 13, 14

*Kaepa, Inc. v. Achilles Corp.*,
    76 F.3d 624 (5th Cir.1996) .........................................................................21

*Matal v. Tam*,
    582 U.S. 218 (2017) ...................................................................................12

*Ne. Women's Ctr., Inc. v. McMonagle*,
    939 F.2d 57 (3d Cir. 1991) .........................................................................15

*Norma Kristie, Inc. v. City of Okla. City*,
    572 F. Supp. 88 (W.D. Okla. 1983)..........................................................9, 10

*Opulent Life Church v. City of Holly Springs, Miss.*,
    697 F.3d 279 (5th Cir. 2012) ......................................................................21

*Papish v. Bd. of Curators of the Univ. of Mo.*,
    410 U.S. 667 (1973) ...............................................................................2, 10

*Pro-Life Cougars v. Univ. of Houston*,
    259 F. Supp. 2d 575 (S.D. Tex. 2003) ........................................................14

*Reed v. Town of Gilbert, Ariz.*,
    576 U.S. 155 (2015) ...............................................................................15, 17

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995) ...............................................................10, 11, 12, 17

*Se. Promotions, Ltd. v. Conrad*,
    420 U.S. 546 (1975) ............................................................................1, 2, 12

*Smith v. Tarrant Cnty. Coll. Dist.*,
    670 F. Supp. 2d 534 (N.D. Tex. 2009) .........................................................9

*Texans for Free Enter. v. Tex. Ethics Comm'n*,
    732 F.3d 535 (5th Cir. 2013).................................................................18, 21

*Texas v. Johnson*,
  491 U.S. 397 (1989) ...........................................................................10

*United States v. Playboy Ent. Grp., Inc.*,
  529 U.S. 803 (2000) .....................................................................15, 17

*Widmar v. Vincent*,
  454 U.S. 263 (1981) ...........................................................10, 14, 15, 17

**Statutes:**

Tex. Educ. Code § 51.9315(g) .................................................................4, 21

**Rules:**

Fed. R. Civ. P. 65 ...................................................................................21

**Other Authorities:**

Alex Morey, *Iowa State Stands Up for First Amendment After FIRE Letter, Turns
  Down Demands to Violate Law*, FIRE (Nov. 18, 2020) ...................................18

Emily Hoenig, *Why Can't We All Just Cher?: Drag Celebrity Impersonators Versus
  an Ever-Expanding Right of Publicity*, 38 Cardozo Arts & Ent. L.J. 537
  (2020) ..................................................................................................5

Letter from Sabrina Conza, Program Officer, FIRE, to Walter Wendler, President,
  W. Tex. A&M Univ. (Mar. 21, 2023),.....................................................8

Press Release, FIRE, *Victory: Pro-Life Student Group Finally Recognized at
  University of Arizona* (Apr. 21, 2010)......................................................18

Will Creeley, *Twin Victories At Central Washington, Montclair State as First
  Amendment Trumps Student Government Censorship*, FIRE
  (Mar. 11, 2008) .....................................................................................17

## INTRODUCTION

West Texas A&M University's President, Defendant Walter Wendler, has declared that he will not obey "the law of the land." Instead, he insists on banning a recognized student group's event from campus simply because he dislikes the event's entirely lawful message. By moving for a temporary restraining order and preliminary injunction, Plaintiffs ask this Court to put a swift end to Wendler's disdain for the First Amendment and prevent further irreparable harm to Plaintiffs' constitutional freedoms.

On March 20, 2023, President Wendler announced to the campus community that he is forbidding Plaintiff Spectrum WT from holding its scheduled PG-13 charity drag show because he disagrees with the show's viewpoint. Making matters worse, President Wendler has all but confessed that he is knowingly violating the Constitution: "A harmless drag show? Not possible. I will not appear to condone the diminishment of any group at the expense of impertinent gestures toward another group for any reason, *even when the law of the land appears to require it*." (Dkt. 1, Verified Compl., Ex. A.) That is textbook viewpoint discrimination. And it violates the First Amendment.

The Supreme Court has concluded that even controversial live theater is protected First Amendment expression. *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 557–58 (1975). If officials in Tennessee could not exclude a group from presenting the provocative play *Hair* in a public theatre because they disagreed with *Hair's* message, then surely President Wendler and the other Defendants cannot exclude students wanting to put on a PG-13 charity drag show in a campus space open to student

groups for expressive activities, simply because the show does not match Wendler's worldview. *Id.*

Indeed, the Constitution's bar against viewpoint discrimination is vital to preserving freedom of speech at public colleges and universities. "[N]o matter how offensive to good taste" some may find it, expression "on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Papish v. Bd. of Curators of the Univ. of Mo.*, 410 U.S. 667, 670 (1973). So, whether students gather on campus to support a political candidate, talk about the Bible, or put on a drag show, public college administrators cannot censor student expression just because they find it disagreeable or offensive.

Yet that is exactly what President Wendler is doing by refusing to let the show go on. The result is ongoing irreparable harm to Spectrum WT and its student officers, Plaintiffs Barrett Bright and Lauren Stovall. Above all, the eleventh-hour cancelation of their March 31 charity drag show—and President Wendler's moratorium on campus drag shows altogether—are depriving Spectrum WT's members of their First Amendment rights, which is always an irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). What's more, Spectrum WT carefully followed West Texas A&M's process for getting event approval—with the full backing of campus staff—only for Wendler to pull the rug out at the last minute. If Spectrum WT cannot hold its March 31 event on campus, or similar events it plans to hold in the future, it will suffer significant injury to its mission of advocating for the LGBTQ+ community at West Texas A&M.

This Court should grant Plaintiffs' motion for a temporary restraining order and preliminary injunction to preserve the supremacy of the Constitution and First Amendment at West Texas A&M and protect Plaintiffs against President Wendler's ongoing defiance of the First Amendment.

### STATEMENT OF FACTS[1]

**Spectrum WT, like many recognized student groups, has a message to share.**

Plaintiff Spectrum WT, formed in 2009, is a recognized student organization at West Texas A&M. (Dkt. 1, Verif. Compl. ¶ 8.) As West Texas A&M's website explains, "Spectrum is a student organization for West Texas A&M's LGBTQIA+ students and allies." (Verif. Compl. ¶ 10.) Spectrum WT's goals are to provide a space for "LGBT+ students and allies to come together," to "raise awareness of the LGBT+ community," and to "promote diversity, support, and acceptance on campus and in the surrounding community." (Verif. Compl. ¶ 9.) To help spread its message, Spectrum WT hosts various events, like Lavender Prom, and "regularly volunteers in the community." (Verif. Compl. ¶¶ 10–11.) Plaintiffs Barrett "Bear" Bright and Lauren "Laur" Stovall are undergraduate students at West Texas A&M and the executive officers for Spectrum WT. (Verif. Compl. ¶¶ 12–13.)

**West Texas A&M Opens Facilities to Students and the Public for Expressive Activities.**

As Texas law requires, West Texas A&M policy forbids administrators from "deny[ing] [a student] organization any benefit generally available to other student

---

[1] All facts stated are from Plaintiffs' Verified Complaint. Plaintiffs incorporate by reference all the verified factual allegations from their Verified Complaint.

organizations at the university," because of "political, religious, philosophical, ideological, or academic viewpoint expressed by the organization or any expressive activities of the organization." (West Texas A&M Policy No. 08.99.99.W1 ("Expressive Activity on Campus"), Rule 1.3; Tex. Educ. Code § 51.9315(g); Verif. Compl. ¶ 34.) And student organizations at West Texas A&M enjoy some benefits—including the right to use university facilities for group functions and events. (Verif. Compl. ¶¶ 26–35.)

These facilities include "Legacy Hall," a performance venue in the Jack B. Kelley Student Center. (Verif. Compl. ¶¶ 31–32.) The university holds out Legacy Hall as suitable for expressive activities like concerts and press conferences, and even weddings and parties. (Verif. Compl. ¶ 29.) West Texas A&M policy guarantees students can use Legacy Hall for "any special event," including "social gatherings or functions." (Verif. Compl. ¶ 33 & Ex. B, University Policy No. 24.01.01.W0.01.)

**Spectrum WT plans and organizes a PG-13 charity drag show at Legacy Hall.**

In November 2022, Spectrum WT began planning a drag show called "A Fool's Drag Race," scheduled for March 31, 2023. (Verif. Compl. ¶¶ 11, 37.) Putting on the drag show is important to convey Spectrum WT's collective message and to support the LGBTQ+ community. (Verif. Compl. ¶¶ 9, 11, 48.) The proceeds from the drag show are earmarked for donation to an LGBTQ+ suicide prevention group. (Verif. Compl. ¶ 48.)

With origins in Shakespearean-era theater, when only men could perform onstage, "drag" has since been a recurring genre of theatrical performance. (Verif.

Compl. ¶ 44.) During the "1920s and 1930s . . . drag matured into its present incarnation as a multivalent form of performance art and a commentary on social identity." Emily Hoenig, *Why Can't We All Just Cher?: Drag Celebrity Impersonators Versus an Ever-Expanding Right of Publicity*, 38 Cardozo Arts & Ent. L.J. 537, 551 (2020). In any case, modern "drag" performances encompass a range of expressive conduct taking different forms. (Verif. Compl. ¶¶ 44–47, 49.)

Spectrum WT planned a "PG-13" charity drag show to raise money for suicide prevention. Spectrum WT has instructed would-be performers not to engage in any "lewd" conduct. (Verif. Compl. ¶ 53.) It is forbidding anyone under 18 from attending the event without a parent or guardian. (Verif. Compl. ¶ 54.) And it is making the event alcohol-free. (*Id.*) Spectrum WT has even instructed performers not to use music which contains any profanity. (*Id.*)

Following the university's Facility Use Request Procedure, Spectrum WT reserved Legacy Hall for the event. (Verif. Compl. ¶¶ 57–66.) From the outset, West Texas A&M knew Spectrum WT intended to host a drag show—and that it would be PG-13. (Verif. Compl. ¶¶ 51–52, 58, 67.) West Texas A&M's administration supported Spectrum WT's planning of the drag show throughout the facility request process, helping Spectrum WT navigate the necessary steps to move forward. (Verif. Compl. ¶¶ 59–61, 64, 67, 71.)

Bright, Spectrum WT's President, took the lead role for Spectrum WT in organizing the drag show. (Verif. Compl. ¶¶ 12, 60–61.) Dr. Shawn Fouts, a Senior Staff Director at the Jack B. Kelley Student Center, praised Bright's efforts in an

email, writing: "I appreciate your attention to the event as you navigate everything else a college student has going on. We want to help ensure you have a great event." (Verif. Compl. ¶ 60.) Bright, Stovall, and the rest of Spectrum WT continued their efforts to plan and promote the event, including inviting attendees. (Verif. Compl. ¶¶ 63–69.)

Spectrum WT received "Tentative Confirmation" for its event on February 27, 2023. (Verif. Compl. ¶¶ 64, 71.) Bright kept doing everything to meet the university's requirements for holding an event. (Verif. Compl. ¶¶ 71–73.) But less than two weeks before the scheduled event, President Wendler thwarted Spectrum WT's efforts by spurning the facility-use procedure and banning drag shows at West Texas A&M. (Verif. Compl. ¶ 74.)

**President Wendler decides to impose his personal views instead of following the Constitution.**

Around lunchtime on March 20—just 11 days before the drag show—Bright received an email from Dr. Chris Thomas, West Texas A&M's Vice President for Student Affairs, asking to "meet with you and discuss your upcoming event." (Verif. Compl. ¶ 75.) When Bright met with Vice President Thomas, he learned that West Texas A&M was canceling the charity drag show. (Verif. Compl. ¶ 76.) When Bright asked why, Vice President Thomas said President Wendler did not like the idea of the drag show, believing it discriminated against women. (*Id.*)

Soon after, President Wendler sent a long email to West Texas A&M's students, faculty, and staff announcing that West Texas A&M "will not host a drag show on campus." (Verif. Compl. ¶ 77 & Ex. A.) President Wendler proclaimed his

6

opposition to his perceived messaging of Plaintiffs' show. (*Id.*) For instance, he stated that drag shows stray from the "basis of Natural Law," which "declared the Creator's origin as the foundational fiber in the fabric of our nation." (Verif. Compl. ¶ 79 & Ex. A.) And he claimed that drag shows are "a slapstick sideshow" that "becomes harassment" because, in his view, it is "sexism." (Verif. Compl. ¶ 80 & Ex. A.)

Finally, Wendler told the campus he was openly defying the Constitution: "A harmless drag show? Not possible. I will not appear to condone the diminishment of any group at the expense of impertinent gestures toward another group for any reason, ***even when the law of the land appears to require it.***" (Verif. Compl. ¶ 83 & Ex. A.) (emphasis added).

When President Wendler cancelled Spectrum WT's charity drag show, it had completed, or was in the process of completing, all requirements necessary for the event to move forward as planned. (Verif. Compl. ¶ 84.) And at no time did President Wendler—or any other Defendant or West Texas A&M staff member—give any reason other than Wendler's personal views as the reason for cancelling Spectrum WT's show and banning all drag shows on campus. (Verif. Compl. ¶ 85.) Nor have Defendants Sharp and the Board of Regents members stopped Wendler's actions, despite having the power and duty to do so. (Verif. Compl. ¶ 86.)

On March 21, the Foundation for Individual Rights and Expression (FIRE), which now represents Plaintiffs, wrote President Wendler, explained that his conduct violates the First Amendment, and called on West Texas A&M to confirm that it

would restore the event.[2] While President Wendler acknowledged the letter, copying the general counsel for the Texas A&M University System, he offered no substantive response to FIRE's concerns.

**Plaintiffs are suffering irreparable injury.**

Spectrum WT remains prepared for the event to move forward as scheduled on March 31. (Verif. Compl. ¶¶ 84, 95.) But President Wendler's refusal to permit the event to move forward defied West Texas A&M campus policy, injuring Plaintiffs and depriving them of the benefits the policy confers on all student groups. (Verif. Compl. ¶ 96.)

Indeed, Plaintiffs are West Texas A&M students. They pay tuition and student fees to West Texas A&M, which—as does the State of Texas—promises Plaintiffs the ability to use venues on campus for expressive activities. (Verif. Compl. ¶ 91.) Thus, Defendants' drag show ban is injuring Plaintiffs because they cannot use a campus venue for First Amendment expressive activity, despite those promises. (Verif. Compl. ¶ 92.) Likewise, Plaintiffs are enduring harm because they can no longer exercise their First Amendment right to engage in protected expression at the drag show event or conduct similar events in the future. (Verif. Compl. ¶ 97.)

Plaintiffs' injuries go further. They invested significant time and organizational resources into planning and promoting the drag show and obtaining approval for the event from West Texas A&M staff, following the university's

---

[2] Letter from Sabrina Conza, Program Officer, FIRE, to Walter Wendler, President, W. Tex. A&M Univ. (Mar. 21, 2023), available at https://www.thefire.org/research-learn/fire-letter-west-texas-am-university-march-21-2023 [perma.cc/SD82-92ZP].

approval procedures. (Verif. Compl. ¶ 93.) And not only are Plaintiffs thus injured financially, but they are suffering harm to their charitable goal in organizing the drag show and carrying out their overall mission. (Verif. Compl. ¶ 94.)

Indeed, even if Plaintiffs could find an alternative venue in days' time, exiling Plaintiffs' expressive activities to an off-campus venue both burdens their ability to reach their intended audience and sends the message that their expressive activity is unwelcome at West Texas A&M, a public university. (Verif. Compl. ¶ 98.). And of course, a new venue would cost money and require Plaintiffs to obtain both audio-visual equipment and security out-of-pocket. (*Id.*)

## ARGUMENT

Plaintiffs are entitled to a temporary restraining order and preliminary injunction because Plaintiffs satisfy their burden to demonstrate "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury to [Plaintiffs] outweighs any harm to [Defendants] that may result from the injunction; and (4) that the injunction will not undermine the public interest." *Smith v. Tarrant Cnty. Coll. Dist.*, 670 F. Supp. 2d 534, 537 (N.D. Tex. 2009) (granting in part temporary restraining order against university for violating the First Amendment).

## I. Plaintiffs Are Substantially Likely to Succeed on the Merits Against the University's Brazen Censorship of Protected Expression.

"The First Amendment is not an art critic," and drag shows, like other forms of theatrical performance, are expressive conduct that the First Amendment prohibits President Wendler from censoring. *Norma Kristie, Inc. v. City of Okla. City*, 572 F.

9

Supp. 88, 91 (W.D. Okla. 1983) (holding drag shows are protected First Amendment expression).

The freedom of expression enshrined in the First Amendment "does not end at the spoken or written word." *Texas v. Johnson*, 491 U.S. 397, 404 (1989). Whatever the mode of expression, the First Amendment protects conduct "inten[ded] to convey a particularized message," (*id.* at 404, 406), and it prohibits public university officials from suppressing student expression simply because they disagree with its viewpoint or find the message offensive. *Papish*, 410 U.S. at 670. If anything, whether speech is protected by the First Amendment is a legal, not moral, analysis. *Dodds v. Childers*, 933 F.2d 271, 273 (5th Cir. 1991). President Wendler imposing his morals at the expense of free expression violates the First Amendment.

The First Amendment also bars public university officials from denying student groups access to campus public forums because of the content or viewpoint of a group's message. *Widmar v. Vincent*, 454 U.S. 263, 267–70 (1981); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828–29 (1995). And messaging within a broader genre—such as art, theater, and dancing—is also protected even if it does not convey a "narrow, succinctly articulable message." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 569 (1995). Indeed, "[e]ven crude street skits come within the First Amendment's reach." *Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386, 390 (4th Cir. 1993) (fraternity "ugly woman contest" is protected expression). *See also Berger v. Battaglia*, 779 F.2d 992, 999 (4th

Cir. 1985) (holding a blackface performance is protected First Amendment expression, even when it is "sheer entertainment" without a political message).

Under core First Amendment principles, Defendants' ongoing suppression of a peaceful charity drag show constitutes unlawful viewpoint and content discrimination. The Court should stop the ongoing injury to Plaintiffs' First Amendment freedoms and restore constitutional order on West Texas A&M's campus by issuing a temporary restraining order and preliminary injunction.

### A. President Wendler's Censorship of a Drag Show Based on Personal Disagreements with the Expression's Message Is Textbook Viewpoint Discrimination.

President Wendler's abuse of his powers to quash a PG-13 charity drag show because he disagrees with the show's message—real or perceived—violates the First Amendment. It is "axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger*, 515 U.S. at 828. "Viewpoint discrimination is censorship in its purest form," and government action "that discriminates among viewpoints threatens the continued vitality of free speech." *Bible Believers v. Wayne Cnty., Mich.*, 805 F.3d 228, 248 (6th Cir. 2015) (en banc) (cleaned up). Indeed, government officials like college administrators are "inherently" incapable of making "principled distinctions" between offensive and inoffensive speech, and the state has "no right to cleanse" public expression such that it is "palatable to the most squeamish among us." *Cohen v. California*, 403 U.S. 15, 25 (1971).

To that end, "state colleges and universities are not enclaves immune from the sweep of the First Amendment." *Healy v. James*, 408 U.S. 169, 180 (1972). And that

includes the First Amendment prohibition on viewpoint discrimination. *Rosenberger*, 515 U.S. at 835–36 (invalidating college's denial of funding to Christian student newspaper). True, courts often employ "forum analysis" to determine when public university administrators "in regulating property in [their] charge, may place limitations on speech." *Christian Legal Soc'y Chapter of the Univ. of Cali, Hastings Coll. of Law v. Martinez*, 561 U.S. 661, 679 (2010). But regardless of the forum's classification, "any access barrier . . . must be viewpoint neutral." *Id.* (citing *Rosenberger*, 515 U.S. at 829).

By picking and choosing which performances fit his moral tastes, President Wendler is engaging in viewpoint discrimination. Indeed, "the essence of viewpoint discrimination" is "the Government's disapproval of . . . messages it finds offensive." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019) (quoting *Matal v. Tam*, 582 U.S. 218, 248–49 (2017) (Kennedy, J., concurring)). And as President Wendler proclaims, he personally finds that "drag shows are derisive, divisive and demoralizing misogyny, no matter the stated intent." (Verif. Compl., Ex. A.)

President Wendler's stance mirrors that of the censorial officials in *Southeastern Promotions*. 420 U.S. 546. There, a group petitioned to use a city-operated municipal auditorium to present the rock musical "*Hair*." *Id.* at 547. The auditorium directors denied the application, reasoning that allowing the play "was not in the best interest of the community" and the board would only "allow those productions which are clean and healthful and culturally uplifting, or words to that effect." *Id.* at 549. The Supreme Court struck down the directors' censorship as an

12

unconstitutional prior restraint. To the same end, this Court should put a stop to Defendants' ongoing viewpoint-based censorship of Plaintiffs' PG-13 charity drag show.

The Fourth Circuit's decision in *Iota Xi* also shows why the Court should enjoin Defendants' censorship. 993 F.2d 386. There, George Mason University imposed sanctions on a fraternity for hosting an "ugly woman contest" riddled with "racist and sexist" overtones, including contestants "dressed as caricatures of different types of women[]" (*i.e.*, in drag). *Id.* at 387–88. George Mason's administrators cited many of the same concerns President Wendler relies on—that the event was degrading, amounted to harassment, and conflicted with the institution's mission. *Id.* at 388; Verif. Compl., Ex. A.

The Fourth Circuit had no trouble brushing aside the administrators' excuses. As the court explained, "First Amendment principles governing live entertainment are relatively clear: short of obscenity, it is generally protected." *Iota Xi*, 993 F.2d at 389 (collecting cases). The court likewise held the fraternity's drag skit was constitutionally protected, since it intended to convey a message, both through the mode of dress and use of a theatrical medium. *Id.* at 392. The court held GMU engaged in unconstitutional viewpoint discrimination by sanctioning the fraternity as the sanction arose from the fact that "the 'ugly woman contest' . . . ran counter to the views the University sought to communicate to its students and the community." *Id.* at 393.

Even if President Wendler's opinion were shared by all but the students here, he cannot justify stifling Plaintiffs' expression on moral grounds. That argument lost in *Southeastern Promotions*. It lost in *Iota Xi*. And it must lose here. *See also Gay Student Servs. v. Tex. A & M Univ.*, 737 F.2d 1317, 1322–27 (5th Cir. 1984) (holding Texas A&M violated the First Amendment by refusing to recognize a gay student organization when the official responsible for the denial justified the decision "based on his perception that the organization would attempt to convey ideas" he found morally repugnant).

This Court should refuse Wendler's viewpoint-driven reasons for violating the First Amendment, grant Plaintiffs' motion, and put a stop to Wendler and the other Defendants' ongoing censorship of Plaintiffs' protected expression.

### B. Excluding Plaintiffs' Drag Show from Campus Public Forums Violates the First Amendment.

President Wendler's denial of use of a campus public forum to Plaintiffs also violates the First Amendment, to their ongoing injury. Legacy Hall is a designated public forum for First Amendment purposes. West Texas A&M opens its facilities, like Legacy Hall, to West Texas A&M students and student organizations for exactly these expressive purposes: theatrical performances before a willing audience, music, dancing, and banter. (Verif. Compl. ¶¶ 31–32, 41–42.) Thus, because "the University has created a forum generally open for use by student groups," "the University must therefore satisfy the standard of review appropriate to content-based exclusions." *Widmar*, 454 U.S. at 270. *See also Pro-Life Cougars v. Univ. of Houston*, 259 F. Supp. 2d 575, 582 (S.D. Tex. 2003) ("When as here a University by policy and practice opens

up an area for indiscriminate use . . . by some segment of the public, such as student organizations, such area may be deemed to be a designated public forum").

Under the First Amendment, "a government . . . has no power to restrict expression because of its message, its ideas, its subject matter, or its content" unless it satisfies strict scrutiny. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (cleaned up). To meet that high bar here, Defendants "must show that [their] regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Widmar*, 454 U.S. at 270.[3] They cannot meet that burden. *See United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions").

For starters, a ban on drag shows is content-based (if not outright viewpoint-based, as shown above). It singles out a particular type of expression—drag—for differential treatment. That is textbook content discrimination. *Reed*, 576 U.S. at 169 (content discrimination exists when the government "singles out a specific subject matter for differential treatment").

Defendants' content-based ban of campus drag shows—including canceling Plaintiffs' March 31 show—fails strict scrutiny. And *Widmar* shows why. In *Widmar*,

---

[3] Universities may also impose content-neutral "reasonable time, place, and manner regulations." *Widmar*, 454 U.S. at 276. Since West Texas A&M has prohibited the drag show outright, and is discriminating based on content to boot, the time, place, or manner test is inapplicable. *See Ne. Women's Ctr., Inc. v. McMonagle*, 939 F.2d 57, 63 (3d Cir. 1991) (explaining that a time, place, and manner restriction "regulates when, where, and how [a citizen] may speak, but not what he may say").

the University of Missouri at Kansas City denied an evangelical Christian student group the use of university facilities otherwise "generally available for . . . registered student groups." *Id.* at 264–65. The Supreme Court explained that such restrictions, which single out a particular subject for differential treatment, are subject to "the most exacting scrutiny." *Id.* at 276. The Court held that the university unlawfully "discriminated against student groups and speakers based on their desire to use a generally open forum to engage in" protected expression and that the university's stated goal, "achieving greater separation of church and State," was not sufficiently "'compelling' to justify content-based discrimination against respondents' religious speech." *Id.* at 269, 278.

Here, advancing President Wendler's belief that drag shows promote "misogyny" is not a compelling state interest. (Verif. Compl. Ex. A.) As a threshold matter, banning drag shows does not prevent tangible harm to women. Any women (or men) who might take offense from a drag show can simply opt to not attend. Likewise, those who agree with President Wendler's estimation of the value of the students' expression can exercise a time-honored means of "effectively avoid[ing] further bombardment of their sensibilities simply by averting their eyes." *Cohen*, 403 U.S. at 21.

Rather, President Wendler, like the administrators in *Iota Xi*, seeks to suppress Plaintiffs' speech "because it r[uns] counter to the views the University s[eeks] to communicate to its students and the community." 993 F.2d at 393. That is not redressing a harm. It is big-brother government insisting it "knows what's best"

16

for women and that it can silence dissenting expression. But "[t]he state may not ordain preferred viewpoints [about women and femininity] in this way. The Constitution forbids the state to declare one perspective right and silence opponents." *Am. Booksellers Ass'n v. Hudnut*, 771 F.2d 323, 325 (7th Cir. 1985).

Nor is Defendants' ban on drag shows narrowly tailored or the least restrictive means of furthering their goals. *See Playboy Ent. Grp.*, 529 U.S. at 813 (content regulation permissible only if the government "chooses the least restrictive means to further the articulated interest") (cleaned up). Neither President Wendler nor the other Defendants have banned any other type of expression from campus which might tend to disparage or demean women. And a content-based law is not narrowly tailored if it leaves untouched a significant amount of expression causing the same problem. *Reed*, 576 U.S. at 172. Plus, the government's objection to a speaker's message is not even a legitimate government interest, let alone a compelling one.

America's college campuses are no stranger to censorship, which is often visited upon students and faculty who find themselves among the minority viewpoint—including, in many cases, conservative and religious groups. *See, e.g.*, *Widmar*, 454 U.S. at 265; *Rosenberger*, 515 U.S. at 830. From Central Washington University threatening to defund the College Republicans for protected speech,[4] to Iowa State University threatening to punish the College Republicans for protected

---

[4] Will Creeley, *Twin Victories At Central Washington, Montclair State as First Amendment Trumps Student Government Censorship*, FIRE (Mar. 11, 2008), https://www.thefire.org/news/twin-victories-central-washington-montclair-state-first-amendment-trumps-student-government [perma.cc/2UQ3-ESPN].

speech,[5] to pro-life groups having to fight for recognition at the University of Arizona,[6] censorship of expression on public campuses continues to fester. But students' expressive rights should not, and do not, turn on the whims of college administrators. The First Amendment does not play favorites.

President Wendler's censorship singles out one type of artistic expression out of many—drag shows—for differential treatment and censorship simply because he dislikes the message he perceives. It is unconstitutional viewpoint discrimination for the reasons explained. And putting aside President Wendler's confessed motives, the ban is unlawful content discrimination. A temporary restraining order and preliminary injunction are necessary to secure Plaintiffs' First Amendment rights.

## II.     Plaintiffs Will Suffer Irreparable Harm Absent Immediate Relief.

Above all, the ban on Plaintiffs' March 31 show—as well as any similar shows—are causing them irreparable harm. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373. *See also Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) ("We have repeatedly held . . . that the loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury justifying the grant of a preliminary injunction.") (cleaned up).

---

[5] Alex Morey, *Iowa State Stands Up for First Amendment After FIRE Letter, Turns Down Demands to Violate Law*, FIRE (Nov. 18, 2020), https://www.thefire.org/news/iowa-state-stands-first-amendment-after-fire-letter-turns-down-demands-violate-law [perma.cc/TG5G-7B5F].

[6] Press Release, FIRE, *Victory: Pro-Life Student Group Finally Recognized at University of Arizona* (Apr. 21, 2010), https://www.thefire.org/news/victory-pro-life-student-group-finally-recognized-university-arizona [perma.cc/B689-YSQ3].

Plaintiffs' ongoing injuries go further. While the effects of President Wendler's unilateral cancelation of Plaintiffs' event will reach their peak on March 31, his announcement is causing *current* harm to Plaintiffs' First Amendment rights, which only this Court's swift intervention will cure.

Plaintiffs made great efforts to plan the March 31 event and follow the university's steps for securing a campus space, and toward staffing, promotion, and other logistics. (Verif. Compl. ¶¶ 37–40, 50–56, 58, 60–64, 67–69, 71–72.) And they have made efforts to inform would-be audience members of the event's date, time, and location. (Verif. Compl. ¶¶ 67–69.) President Wendler's cancelation of the event has jeopardized those efforts and Plaintiffs' ability to hold the show, causing ongoing and irreparable injury to Plaintiffs.

Because of President Wendler's order, Spectrum WT—staffed by busy students like Plaintiffs Bright and Stovall—must now seek alternative, off-campus venues to host the event, multiplying the cost and effort to put on the show. If the Court does not enjoin Wendler's efforts to exile the event, Plaintiffs will be forced to reach into their barren college-student pockets for a new venue and security, or instead self-censor. (Verif. Compl. ¶ 98.)

The ongoing ban on campus drag shows is also injuring Plaintiffs' ability to reach their intended audience. Spectrum WT's mission is to bring its message to *campus*—a mission frustrated if they are required to hold their event in exile. (Verif. Compl. ¶ 98.) Their intended audience and Spectrum WT's members may be less inclined to attend an event held off campus. Without a swift injunction, Spectrum

19

WT's ability to raise charitable funds for suicide prevention in support of its mission will suffer. (Verif. Compl. ¶ 94.)

President Wendler's edict is also chilling Spectrum WT's plans to hold similar events. For example, while Spectrum WT intends to hold an annual drag show, the ongoing ban forbids it. (Verif. Compl. ¶¶ 99, 101.) Without an injunction, that chill will go on indefinitely.

Plaintiffs are ready, prepared, and willing to go forward with their event on March 31, 2023. (Verif. Compl. ¶ 95.) It is only Defendants' censorship—and President Wendler's refusal to obey the Constitution instead of his personal beliefs—standing in the way. (*Id.*) Only immediate action by this Court can remedy Defendants' First Amendment violations in a way which will prevent irreparable harm.

## III.   The Balance of Harms and the Public Interest Favor Plaintiffs' First Amendment Rights.

The balance of harms favors Plaintiffs. The harm to Americans in losing their First Amendment rights "is presumptively great" because a violation of First Amendment rights "constitutes irreparable injury." *Ass'n of Club Execs. of Dallas, Inc. v. City of Dallas, Tex.*, 604 F. Supp. 3d 414, 439 (N.D. Tex. 2022). By contrast, President Wendler identifies no potential harm to the university (or himself) from the drag show proceeding other than his personal laments. That's not enough. Indeed, the Supreme Court stated that the notion that universities "do not endorse everything they fail to censor is not complicated." *Bd. of Educ. of the Westside Cmty. Schs. v. Mergens By & Through Mergens*, 496 U.S. 226, 250 (1990) (plurality opinion).

In addition, the Fifth Circuit has been clear that "injunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter.*, 732 F.3d at 539 (quoting *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006)). *See also Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 298 (5th Cir. 2012) (same). Even the State of Texas would seemingly agree that an injunction here would benefit the public interest, having passed a 2019 campus free speech law forbidding universities from "tak[ing] action against a student organization or deny[ing] the organization any benefit generally available to other student organizations at the institution on the basis of a political, religious, philosophical, ideological, or academic viewpoint expressed by the organization or of any expressive activities of the organization." Tex. Educ. Code § 51.9315(g). In sum, a temporary restraining order and preliminary injunction will serve the public interest. That is one more reason to grant Plaintiffs' motion.

## IV.    The Court Should Waive the Bond Requirement Because Plaintiffs Seek Only to Protect Their First Amendment Rights.

The amount of security for a bond under Fed. R. Civ. P. 65 is within the Court's discretion, meaning a Court may waive the bond requirement. *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir.1996). When, as here, plaintiffs seek to vindicate their constitutional rights and the potential monetary harm to the defendants is negligible, courts have rightly waived the bond requirement. Indeed, the Fifth Circuit explained that "public-interest litigation" is "an area in which the courts have recognized an exception to the Rule 65 security requirement." *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. 1981). Because Plaintiffs

21

are engaging in public-interest litigation to vindicate First Amendment rights, the Court should waive the bond requirement. *See, e.g., Gbalazeh v. City of Dallas, Tex.*, No.: 18-cv-0076, 2019 WL 2616668, at \*2 (N.D. Tex. June 25, 2019) (citing *City of Atlanta* and waiving bond requirement when granting preliminary injunction on First Amendment grounds against charitable solicitation ordinance); *Gordon v. City of Houston, Tex.*, 79 F. Supp. 3d 676,  695 (S.D. Tex. 2015) (waiving bond requirement when granting preliminary injunction on First Amendment grounds against political contribution limits).

## CONCLUSION

For all these reasons, Plaintiffs asks that the Court grant its motion for a temporary restraining order and a preliminary injunction.

Respectfully submitted,

/s/ JT Morris
JT MORRIS
TX Bar No. 24094444
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION
700 Pennsylvania Ave., SE
Ste. 340
Washington, DC 20003
Tel: (215) 717-3473
Fax: (267) 573-3073
jt.morris@thefire.org

CONOR T. FITZPATRICK*
MI Bar No. P78981
ADAM B. STEINBAUGH*
PA Bar No. 326475
JEFFREY D. ZEMAN
Pa. Bar No. 328570*
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION
510 Walnut St.; Ste. 1250

22

Philadelphia, PA 19106
Tel: (215) 717-3473
Fax: (267) 573-3073
conor.fitzpatrick@thefire.org
adam@thefire.org
jeff.zeman@thefire.org

\* *Pro Hac Vice* Motions
Forthcoming

*Attorneys for Plaintiffs
Spectrum WT, Barrett Bright,
and Lauren Stovall*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 24, 2023, a true and correct copy of the foregoing document was transmitted via using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record, and further, and a true and correct copy of the foregoing document was sent by electronic mail to Ray Bonilla, West Texas A&M University's General Counsel.

<u>/s/ JT Morris</u>
JT Morris
FOUNDATION FOR INDIVIDUAL
    RIGHTS AND EXPRESSION