## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | |
|---|---|
| SPECTRUM WT, BARRETT BRIGHT, and LAUREN STOVALL, <br><br>                 Plaintiffs, <br><br>     v. <br><br> WALTER WENDLER, in his individual capacity and his official capacity as the President of West Texas A&M University, <br><br> CHRISTOPHER THOMAS, in his official capacity as Vice President for Student Affairs at West Texas A&M University, <br><br> JOHN SHARP, in his official capacity as Chancellor of the Texas A&M University System, <br><br> ROBERT L. ALBRITTON, JAMES R. BROOKS, JAY GRAHAM, MICHAEL A. HERNANDEZ III, TIM LEACH, BILL MAHOMES, ELAINE MENDOZA, MICHAEL J. PLANK, CLIFF THOMAS, and DEMETRIUS L. HARRELL, JR., in their official capacities as members of the Board of Regents of the Texas A&M University System, <br><br>                 Defendants. | Case No.: 2:23-cv-00048 <br><br><br> **FIRST AMENDED VERIFIED COMPLAINT FOR CIVIL RIGHTS VIOLATIONS** <br><br><br><br><br> **JURY TRIAL DEMANDED** |

## INTRODUCTION

1. Walter Wendler, President of West Texas A&M University, is openly defying the Constitution. In a published edict, President Wendler barred a recognized student group, Spectrum WT, from exercising its clear First Amendment right to put on a PG-13 charity drag show at a campus event hall with the aim of raising funds for LGBTQ+ suicide prevention. In his edict, President Wendler confessed he is censoring Spectrum WT based on his personal views, and unabashedly admitted that doing so violates the Constitution: "A harmless drag show? Not possible. I will not

appear to condone the diminishment of any group at the expense of impertinent gestures toward another group for any reason, ***even when the law of the land appears to require it***."[1]

2.      That "law of the land" is the First Amendment to the United States Constitution. And our Constitution prohibits public officials, including public university presidents, from silencing Americans because a public official dislikes certain points of view. Whether students gather on campus to study the Bible, host a political talk, or put on a drag show for charity, the First Amendment prohibits public university officials from suppressing the students' expression simply because the administrator (or anyone else) finds the message offensive. *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973).

3.      President Wendler's edict is textbook viewpoint discrimination and a prior restraint on student expression. Of course, as a private citizen, President Wendler enjoys the First Amendment right to criticize expression he finds offensive, distasteful, or immoral. But as a public official, he cannot bar Spectrum WT and its members from exercising their First Amendment rights merely because he believes his personal opinions override the Constitution. They don't. The notion that universities "do not endorse everything they fail to censor is not complicated." *Bd. of Educ. of Westside Cmty. Schs. v. Mergens ex rel. Mergens*, 496 U.S. 226, 250 (1990) (plurality opinion).

---

[1] A true and correct copy of President Wendler's edict emailed to the campus is attached to this First Amended Verified Complaint as **Exhibit A** (emphasis added).

4.      President Wendler's betrayal of the First Amendment has caused and continues to cause Spectrum WT and its members irreparable harm. Not only did President Wendler block Spectrum WT's charity drag show just eleven days before its March 31 scheduled date—after Spectrum WT carefully followed the University's requirements for campus events—but his edict also makes clear: "West Texas A&M University will not host a drag show on campus."

5.      Not only does the First Amendment prohibit President Wendler's censorship, so too does the State of Texas, which mandates that a university not "deny [a student] organization any benefit generally available to other student organizations at the institution," on the basis of the "political, religious, philosophical, ideological, or academic viewpoint expressed by the organization or of any expressive activities of the organization." Tex. Educ. Code § 51.9315(g).

6.      Without injunctive relief from the Court, Spectrum WT will continue to suffer irreparable harm to its First Amendment right to use campus facilities for expressive activity just like other student groups do. The group wishes to proceed with specific events it has planned to hold on campus—including finally holding a charity drag show on campus—that convey a political, ideological, or academic message.

7.      But because President Wendler has not rescinded his edict, Plaintiffs cannot organize and host a drag show in campus venues open to recognized student groups or engage in similar expression on campus that Wendler personally deems

3

offensive or inappropriate. In effect, President Wendler's edict has locked Plaintiffs out of a public forum.

8.     And President Wendler's superiors, including the Texas A&M University System Board of Regents and its Chancellor, John Sharp, have not stopped President Wendler from continuing to spurn the First Amendment.

9.     Section 1983 empowers federal courts to bring brazen constitutional violations like President Wendler's to a swift end. Plaintiffs file this lawsuit under Section 1983 to protect their expressive freedoms, enjoin Defendants from violating those freedoms, and remedy the constitutional harm Plaintiffs have endured and continue to endure.

## PARTIES

**The Plaintiffs**

10.     Plaintiff Spectrum WT is a recognized student organization in good standing at West Texas A&M University (West Texas A&M). Spectrum WT has around 20 members who are undergraduates and graduate students enrolled at West Texas A&M and has existed since around 2009.

11.     Spectrum WT's mission is to "provide a safe space for LGBT+ students and allies to come together," to "raise awareness of the LGBT+ community," and to "promote diversity, support, and acceptance on campus and in the surrounding community."

12.     As the West Texas A&M website notes, Spectrum WT is a recognized student organization:[2]



13.     In furtherance of its mission, Spectrum WT hosts periodic events, including Lavender Prom, Queer History Night, and Queer Movie Night. In November 2022, Spectrum WT began planning a drag show to raise funds for an LGBTQ+ charity, scheduled for March 31, 2023, which Defendants have now banned from the West Texas A&M campus.

14.     Plaintiff Barrett "Bear" Bright, an undergraduate student enrolled at West Texas A&M, is the President of Spectrum WT and thus is the principal student organizer of the charity drag show that West Texas A&M is censoring. Bear intends to participate in future Spectrum WT events, including charity drag shows and other

---

[2] W. Tex. A&M Univ., *Spectrum GSA*, https://www.wtamu.edu/student-support/buff-allies/spectrum-gsa.html [https://perma.cc/E3P9-792Q].

events where participants express messaging consistent with Spectrum WT's mission.

15.     Plaintiff Lauren "Laur" Stovall is an undergraduate student enrolled at West Texas A&M. Stovall is the Vice President of Spectrum WT and a primary organizer of the charity drag show that West Texas A&M is censoring. Stovall also intends to participate in future Spectrum WT events, including charity drag shows and other events in which participants express messaging consistent with Spectrum's mission.

**The Defendants**

16.     Defendant Walter Wendler is the President of West Texas A&M, a governmental entity under the laws of the State of Texas and governed by the Board of Regents of the Texas A&M University System. As President, Wendler is responsible for administering West Texas A&M and supervising all student programs and services.[3] Wendler has held this post since 2016. Plaintiffs sue President Wendler in his individual capacity only as to Plaintiffs' Fourth Cause of Action for damages. Plaintiffs sue President Wendler in his official capacity as President of West Texas A&M as to the rest of Plaintiffs' claims.

17.     Defendant Christopher Thomas is the Vice President of Student Affairs at West Texas A&M. As Vice President, Thomas is the principal authority for the administration of student conduct. In his capacity as Vice President of Student

---

[3] Tex. A&M Univ. Sys., Sys. Pol'y 02.05, *Presidents of Sys. Member Univs.* (Aug. 26, 2021), https://policies.tamus.edu/02-05.pdf [https://perma.cc/M73K-SDTL].

6

Affairs, Thomas implemented President Wendler's directive canceling Plaintiffs' event and on-campus drag shows generally. Plaintiffs sue Vice President Thomas in his official capacity as Vice President of Student Affairs at West Texas A&M.

18.     Defendant John Sharp is the Chancellor of the Texas A&M University System, a governmental entity under the laws of the State of Texas. As Chancellor, Sharp is the chief executive officer of the Texas A&M University System, endowed with the authority to "do all the things necessary" to ensure the "general management and success of the system," including delegating such duties to subordinate system members. In that role, he is President Wendler's superior and has the power and duty to stop President Wendler from continuing to violate Plaintiffs' constitutional rights, yet he has not done so. Plaintiffs sue Chancellor Sharp in his official capacity as Chancellor of the Texas A&M University System.

19.     The Board of Regents of the Texas A&M University System is empowered to make "bylaws, rules, and regulations it deems necessary and proper for the government of the university system and its institutions, agencies, and services." Tex. Educ. Code § 85.21(a).  In that role, the Board has the power and duty to stop President Wendler from continuing to violate Plaintiffs' constitutional rights, yet it has not done so.

20.     Defendant Tim Leach is Chairman, presiding officer, and a member of the Board of Regents of the Texas A&M University System. Plaintiffs sue Defendant Leach in his official capacity.

7

21.     Defendant Bill Mahomes is Vice Chairman and a member of the Board of Regents of the Texas A&M University System. Plaintiffs sue Defendant Mahomes in his official capacity.

22.     Defendants Robert L. Albritton, James R. Brooks, Jay Graham, Michael A. Hernandez III, Elaine Mendoza, Michael J. Plank, Cliff Thomas, and Demetrius L. Harrell, Jr., are the remaining members of the Board of Regents of the Texas A&M University System. Plaintiffs sue each of these members in their official capacities.

23.     At all times relevant to the actions in the Complaint, Defendants acted under color of state law.

## JURISDICTION AND VENUE

24.     This action arises under the First and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, and the Declaratory Judgments Act, 28 U.S.C. §§ 2201–2202. Thus, this Court has subject matter jurisdiction over these federal causes of action under 28 U.S.C. §§ 1331, 1343.

25.     This Court has personal jurisdiction over all defendants because they reside in the State of Texas.

26.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because the acts and injuries alleged occurred in and continue to occur in this judicial district, at least one defendant resides in this district, and all defendants are residents of the State of Texas.

## FACTUAL ALLEGATIONS

*West Texas A&M provides venues, funding, and resources to recognized student organizations.*

27.    West Texas A&M has established a system for the formal recognition of student organizations.

28.    Recognized student organizations are entitled to use university facilities, organizational funds, and administrative support.

29.    These facilities include the Jack B. Kelley Student Center ("JBK Student Center"), "the heart of campus life" at West Texas A&M and a "gathering place for students" and student events.[4]

30.    West Texas A&M represents that the "venue spaces" in the JBK Student Center are for "student-centered programs and services."[5]

31.    The university also holds out these spaces as "ideal for events, large and small," including "wedding ceremonies and receptions, rehearsal dinners, milestone celebrations, corporate receptions and conferences, holiday parties, board meetings, and much more."[6]

---

[4] W. Tex. A&M Univ., *Jack B. Kelley Student Ctr.*, https://www.wtamu.edu/ student-life/jbk-student-center/index.html [https://perma.cc/L9UR-H5MB].

[5] W. Tex. A&M Univ., *Mission Statement*, https://www.wtamu.edu/student-life/jbk-student-center/jbk-about-us.html [https://perma.cc/W8WJ-MRTS].

[6] W. Tex. A&M Univ., *Events at WTAMU*, https://www.wtamu.edu/student-life/jbk-student-center/jbk-events.html [https://perma.cc/GX9F-EKG9].

32.     To facilitate student and public events in these spaces, West Texas A&M provides resources like audio-visual support, including "light programming, concert sound and more" for "events like[ ] concerts, press conferences, proms and weddings."[7]

33.     Among the JBK Student Center venue spaces available for use by student organizations (or rental by members of the public) is Legacy Hall, a "multi-purpose room capable of seating" 700 people for theatrical performances.[8]

34.     West Texas A&M holds Legacy Hall out as "great for events with bands or live music" or to otherwise "entertain" others.[9]

35.     JBK Student Center venue spaces also include the Legends Club, which the university makes available for performances and other events and is "perfect for events open to the public and larger receptions."[10]

36.     In reserving space in the JBK Student Center, student organizations are presented with a list of the "type" of event to be held in this space.

37.     According to the list, the types of events that may be held in these spaces include banquets, camps, competitions, concerts, dances, demonstrations, parties,

---

[7] W. Tex. A&M Univ., *Production Servs.*, https://www.wtamu.edu/student-life/jbk-student-center/JBK%20Production%20Services.html [https://perma.cc/V897-DMLB].

[8] *Mission Statement*, *supra* note 5.

[9] W. Tex. A&M Univ., *Events at WTAMU*, https://www.wtamu.edu/student-life/jbk-student-center/jbk-events.html [https://perma.cc/RK7N-BU9M].

[10] W. Tex. A&M Univ., *Meeting and Conference Rooms*, https://www.wtamu.edu/student-life/jbk-student-center/meeting-rooms.html. [https://perma.cc/PW4U-K6G5].

performances, press conferences, programs, receptions, recitals, rehearsals, seminars, and socials.

38.    West Texas A&M Policy No. 24.01.01.W0.01 ("Facility Use Request Procedure") makes the JBK Student Center venue spaces available for "any special event," including "social gatherings or functions." A true and correct copy of the policy is attached to this First Amended Verified Complaint as **Exhibit B**.

39.    As suggested by the university's description, student organizations and members of the public use the JBK Student Center spaces, with West Texas A&M's approval, for a variety of events and expressive activity, including beauty pageants, weddings, church services, concerts, galas, and political events.

40.    For example:

    a)    Until the pandemic, "University Sing," a choreographed song-and-dance competition among student organizations, took place each spring semester in Legacy Hall;

    b)    Each January, the Randall County Junior Livestock show hosts a fundraising animal auction in Legacy Hall;

    c)    In January 2017, a West Texas A&M fraternity held its annual "Miss Black & Gold Scholarship Pageant," featuring "seven beautiful contestants" competing on stage in Legacy Hall;

    d)    In April 2019 and February 2020, a local high school, Ascension Academy, held a "Friendly Feud Gala" in Legacy Hall, featuring a cocktail reception, live auction, and gameshow-style competition;

    e)    In May 2019, four local churches held a communal "Community Night of Worship and Prayer," featuring a live band, in Legacy Hall;

    f)    In September 2019, "ONE Marriage & Family Ministries," a local (non-student) organization which promotes marriage as "a

Covenant between one man and one woman under God," used Legacy Hall for a ministry event;

g)   In September 2020, the student government at West Texas A&M hosted separate "Congressional Candidate Forum" events in Legacy Hall, featuring speaking engagements by now-Representative Ronny Jackson and Gus Trujillo;

h)   In August 2022, Legacy Hall featured a concert by "The Band Monarch," a local rock and country music group;

i)   In October 2022, a sorority held "Big Man on Campus," a "male beauty pageant" onstage in Legacy Hall;

j)   On November 8, 2022, a student organization held a "Yule Ball" banquet in Legacy Hall;

k)   On November 15, 2022, Ceta Canyon—a Christian camp and retreat center that promotes a traditional view of marriage—hosted a fundraiser dinner in Legacy Hall, as it does annually;

l)   On January 28, 2023, an opera singer performed in Legacy Hall as part of a gala fundraiser for the university's opera program;

m)   On February 25, 2023, Canyon High School hosted its spring dance, featuring a "Casino Night" theme, in Legacy Hall;

n)   On March 18, 2023, a nonprofit organization held a "Shine for Autism" fundraiser gala in Legacy Hall, featuring live entertainment, dinner, and speeches; and

o)   On March 23, 2023, a magician and illusionist performed "jaw-dropping magic and comedy" in Legacy Hall.

41.   JBK Student Center spaces have even been used with approval by West Texas A&M for charity drag shows. For example:

a)   In March 2012, a student organization held a charitable "cross-dressing fashion show," limited to male participants and entitled "Buff-A-Whoa Drag Show," in the JBK Student Center's commons area "to raise money for Relay for Life"; and

b)   In April 2019, an academic fraternity at West Texas A&M held a fundraising drag pageant in Legacy Hall, promoting it as the "3rd consecutive Mr. & Miss West Texas Drag Show" and

featuring a performance by drag performer Ivy Tran Kenney-Monroe.

42.    The JBK Student Center permits student organizations to co-sponsor events with off-campus organizations, recognizing that student organizations' missions may differ from that of the university administration.

43.    The JBK Student Center's "maintenance and operations" are funded "entirely" through a "University Center Fee" paid by West Texas A&M students.

44.    General revenue funding from the State of Texas does not fund the JBK Student Center or any of its operations.[11]

45.    As required by Texas state law, West Texas A&M policy prohibits the university from "deny[ing a student] organization any benefit generally available to other student organizations at the institution," including use of university facilities, based on the "political, religious, philosophical, ideological, or academic viewpoint expressed by the organization or any expressive activities of the organization." W. Tex. A&M Policy No. 08.99.99.W1 ("Expressive Activity on Campus Policy"), Rule 1.3; Tex. Educ. Code § 51.9315(g). A true and correct copy of this policy is attached to this First Amended Verified Complaint as **Exhibit C**.

46.    West Texas A&M's Expressive Activity on Campus policy, consistent with Texas state law, provides that any person may "engage in expressive activities" on "campus," including in "all land and buildings owned or leased by the university,"

---

[11] *Id.*; *see also* Tex. Educ. Code § 54.521(a) (authorizing "a regular, fixed student fee" for "operating" and "maintaining" a center for "activities . . . financed in whole or in part by the student center facility fee").

subject only to "reasonable time, place, and manner restrictions." Ex. C, W. Tex. A&M Policy No. 08.99.99.W1, Rule 1.1 and Definitions 2 & 5.

47.    West Texas A&M's Expressive Activity on Campus policy's protection of "expressive activities" encompasses "any speech or expressive conduct protected by the First Amendment." Ex. C, W. Tex. A&M Policy No. 08.99.99.W1, Definition 5; Tex. Educ. Code § 51.9315(a)(2).

48.    West Texas A&M makes the spaces in the JBK Student Center, including Legacy Hall, available for use by student organizations for free, and for use by members of the public for a fee.

49.    West Texas A&M's Expressive Activity on Campus policy prohibits the university from considering anything other than "content-neutral and viewpoint-neutral criteria" in "determining the amount of a fee to be charged for use of the university's facilities" for expressive activities. Exhibit C, W. Tex. A&M Policy No. 08.99.99.W1, Rule 1.2; Tex. Educ. Code § 51.9315(h).

50.    West Texas A&M's Expressive Activity on Campus policy specifically forbids the university from considering "any anticipated controversy" in determining the amount of the fee to be charged. Ex. C, W. Tex. A&M Policy No. 08.99.99.W1, Rule 1.2; Tex. Educ. Code § 51.9315(h)(2).

***Spectrum WT plans "A Fool's Drag Race" for March 31, 2023.***

51.    As a recognized student organization, Spectrum WT and its members are within the class of persons or groups for which West Texas A&M makes the event spaces in the JBK Student Center available.

14

52. In November 2022, Spectrum WT began to plan a charity drag show event, aiming to hold the show on April Fool's Day (April 1, 2023), calling it "A Fool's Drag Race."

53. But because the university was holding an event on April 1, Spectrum WT agreed to hold the charity drag show one day earlier.

54. Spectrum WT intended to use the facilities and resources available to all recognized student groups for expressive activities.

55. So, Spectrum WT reserved Legacy Hall for the evening of Friday, March 31, 2023.

56. Spectrum WT's intended use of Legacy Hall was consistent with Legacy Hall's past uses and the uses for which West Texas A&M makes the space available.

57. Spectrum WT's planned event, to be held on a Friday evening, would not have been disruptive to the operations or educational functions of West Texas A&M.

58. According to a statement issued by the West Texas A&M University Police Department, West Texas A&M did not receive any threats concerning Spectrum WT's planned event.

59. The West Texas A&M University Police Department lauded students who demonstrated against Wendler's actions, explaining in a public statement that the students "have exercised their First Amendment rights the proper way" and "have shown that you can exercise your rights with decorum."

60.     From the time in January 2023 that Spectrum WT applied to use Legacy Hall, West Texas A&M's administration and staff knew that Spectrum WT intended to host a drag show.

61.     To Plaintiffs' knowledge, West Texas A&M did not maintain any written policy purporting to limit the persons or groups who may utilize these event spaces (including Legacy Hall), or the subject matter for which they can use them.

***Spectrum WT's planned drag show follows a long history of drag as performance art.***

62.     Drag performances encompass a range of expressive conduct taking different forms depending on the relevant audience, venue, or performer.

63.     Individual drag performers make unique choices concerning their attire, makeup, choreography, music, and prefatory or concluding remarks, all of which convey artistic, theatric, and/or personal perspectives on gender, sex, and individuality.

64.     Drag is often performed as entertainment, through some combination of singing, dancing, lip-synching, comedy, or spoken-word.

65.     With origins at least as old as Shakespearean-era theater—when only men were permitted to perform onstage—drag has since been a recurring genre of theatrical performance.

66.     During the Vaudeville era, famed actor Julian Eltinge used drag not to comedic effect, but as illusion, seeking to convince his audience that he was in fact a woman.

67.     During the Second World War, military personnel staged drag shows as a form of entertainment. "This Is The Army," a 1943 film starring Ronald Reagan and raising money for the Army Emergency Relief fund, prominently featured military performers in drag.

68.     Drag has also been a feature of campus life. Indeed, West Texas A&M currently displays on the wall inside Legends Club a photograph of a "Powderpuff Football Game Cheerleaders," depicting male football players posing in cheerleader skirts.

69.     Today, drag has become a mainstream form of performance art and a commentary on identity. "RuPaul's Drag Race," a competitive television series on MTV, is now in its 15th season and has spawned spin-offs and international adaptations on at least three continents.

70.     Over the past half-century, the public has come to associate drag with advocacy in favor of LGBTQ+ rights.

71.     Drag performances carry an ideological message of support and acceptance for the LGBTQ+ community.

72.     Drag performances have, in the current political climate, taken on a renewed political tone, offering counter-messaging against efforts to ban or regulate expression relating to gender or sexual identity.

73.     These and related messages are part and parcel of Spectrum WT's other expressive activities, including (a) its planned Queer Movie Night, during which they will exhibit and perform alongside the cult-classic film "Rocky Horror Picture Show";

(b) its annual celebration of National Coming Out Day each October; and (c) Queer History Night, during which students discuss political, social, and historical issues concerning the LGTBQ+ community.

74. For Spectrum WT, putting on a charity drag show is important to convey messages advocating for and showing support for the LGBTQ+ community. The proceeds from the March 2023 drag show are earmarked for donation to an LGBTQ+ suicide-prevention group.

75. Some drag performances are intentionally risqué, some comedic, some outlandish, and some would not give a moment's pause to a Motion Picture Association reviewer.

76. Spectrum WT planned and intended its March 2023 charity drag show to be "PG-13."

77. Spectrum WT informed West Texas A&M's administration and staff that the planned March 2023 drag show would be "PG-13."

78. West Texas A&M's administration and staff understood that Spectrum WT planned and intended a "PG-13" drag show.

79. Consistent with its commitment to a "PG-13" show, Spectrum WT instructed performers not to engage in any "lewd" conduct.

80. Even so, Spectrum WT forbade anyone under 18 from attending the event unless accompanied by a parent or guardian (intended for family members of students who want to come with students' parents to show their support). And Spectrum WT remained committed to having an alcohol-free event.

81.     Spectrum WT went so far as to instruct performers not to use music containing profanity at the planned event.

82.     Indeed, on Friday, March 17, nearly two weeks before the planned show, Spectrum WT submitted a list of planned songs to West Texas A&M's administration.

83.     Spectrum intends to make the same requirements for any future drag events it holds on campus.

***Spectrum WT navigates the event approval process with help from West Texas A&M staff.***

84.     West Texas A&M's "Campus Organizations Handbook" informs student groups that the campus event approval process encompasses three stages: (1) the "Request," during which spaces are temporarily reserved; (2) the "Tentative Confirmation," during which the significant logistics requirements (such as time, date, location, and audio-visual requirements) are arranged; and (3) Confirmed, which reflects that all details have been confirmed for the event[.]"

85.     Plaintiffs submitted a formal request to reserve Legacy Hall on or about January 27, 2023, identifying the event as "A Fool's Drag Race."

86.     Throughout the planning of the event, West Texas A&M's administration expressed support for the planning of the charity drag show and helped Plaintiffs navigate the logistical hurdles needed for the event to receive approval.

87.     On February 21, Dr. Shawn M. Fouts, a senior staff director at the JBK Student Center, praised Bright's work in an email, writing, "I appreciate your

attention to the event as you navigate everything else a college student has going on. We want to help ensure you have a great event."

88.     The following day, Dr. Fouts shared again that the university was eager to "get this event through all the approval processes," thanking Bright for "leading the event process."

89.     Under West Texas A&M policy, an event receives a "Tentative Confirmation" only after the university has confirmed logistical details, including the time, date, and audio-visual needs, and the event has passed a risk assessment.

90.     To move the approval process along, Bright also agreed that student participants would be required to sign a waiver, provided by West Texas A&M, acknowledging that their participation was voluntary, that they could avoid any risks by simply not participating, and that their participation would in no way hinder their ability to obtain educational benefits from the Texas A&M University System.

91.     On February 27, staff from the JBK Student Center issued Spectrum WT a "Tentative Confirmation" that the event was ready to move forward.

92.     Only after an event's organizer receives a "Tentative Confirmation" can they begin advertising for the event.

93.     An event is moved into a final "Confirmed" status once all details have been confirmed for the event.

94.     During the first week of March, West Texas A&M staff helped Bright and other event organizers put together flyers to promote the event:



95.     Soon, Spectrum WT put up posters in the JBK Student Center and shared the poster on Instagram.

96.     Spectrum WT also set up an Eventbrite page where attendees could purchase tickets and tables for the charity drag show.

97.     Spectrum WT began selling tickets through Eventbrite.

98.     Eventbrite charges organizers like Spectrum WT a service fee for each ticket sold.

99.     On March 14, Dr. Fouts informed Bright the event was "scheduled and approved as 'Tentative' as we await your performance verification and music."

100.    On March 17, Bright emailed Dr. Fouts with a list of planned songs and drag performers' stage names. Dr. Fouts did not object to any song on the list, and instead, encouraged Bright to share the list of songs with the staff member in charge of helping groups present performances at Legacy Hall.

101.    On information and belief, the "performance verification" refers to a final list of anticipated performers. Spectrum WT was prepared to provide that list.

102.    But President Wendler prevented Spectrum WT from completing that final step needed to hold the charity drag show at Legacy Hall, when he issued his edict banning drag shows at West Texas A&M.

### President Wendler spurns the approval process, cancelling and condemning the charity drag show.

103.    Shortly after noon on March 20, Bright received an email from Vice President for Student Affairs Thomas, asking to "meet with you and discuss your upcoming event."

104.    Bright met with Dr. Thomas at approximately 4:15 p.m. Dr. Thomas told Bright that West Texas A&M was cancelling the charity drag show. When Bright asked why, Dr. Thomas said President Wendler believed that drag shows discriminated against women.

105.    Half an hour later, President Wendler sent an email to West Texas A&M's students, faculty, and staff announcing that West Texas A&M "will not host a drag show on campus." Wendler's email denounced drag as "divisive and demoralizing misogyny" for, in his view, "portraying women as objects," and

condemned any group that would "elevate itself or a cause by mocking another person or group." (Ex. A, Wendler Email).

106.    President Wendler also posted the announcement on his personal blog.

107.    President Wendler's statement is unambiguous that he cancelled the charity drag show because he personally opposes Plaintiffs' expression. For instance, Wendler opined that drag shows are contrary to the "basis of Natural Law," which "declared the Creator's origin as the foundational fiber in the fabric of our nation," because "every human being is created in the image of God and, therefore, a person of dignity." (*Id.*)

108.    President Wendler also claimed that drag shows are a form of humor (a "slapstick sideshow") that "becomes harassment" because, in his view, it is "sexism" and results in "[m]ocking or objectifying in any way members of any group." (*Id.*)

109.    Finally, President Wendler acknowledged that "the law of the land appears to require" him not to censor the charity drag show. (*Id.*)

110.    President Wendler's statement asserted that allowing the event would create the appearance that he personally "condone[s] the diminishment" of women. (*Id.*)

111.    Upon information and belief, West Texas A&M had not received any formal or informal complaints from students or staff that a drag show would constitute harassment of any individual or group.

112.    Indeed, between 2012 and 2019 at the latest, West Texas A&M students hosted drag shows in the JBK Student Center.

113.    When President Wendler sent the email canceling the event, Spectrum WT had completed, or was prepared to complete, all necessary steps for the event to move forward as planned.

114.    Other than the assertions made in President Wendler's March 20 statement, neither President Wendler, the other Defendants, nor any other staff member at West Texas A&M, offered an explanation or rationale for canceling the charity drag show.

115.    At no time did President Wendler—or any other West Texas A&M employee or Defendant—indicate Spectrum WT had failed to comply with university policy or any other condition necessary to proceed with the event.

116.    On March 21, the Foundation for Individual Rights and Expression (FIRE), which now represents Plaintiffs, sent a letter to President Wendler, explaining that his conduct violated the First Amendment and calling on West Texas A&M to confirm that it would reinstate the event.

117.    The same day, President Wendler acknowledged the letter, copying the general counsel for the Texas A&M University System.

118.    But neither President Wendler, West Texas A&M, nor the Texas A&M University System responded substantively to FIRE's letter.

119.    President Wendler has not rescinded his edict.

120.    No other Defendant has disavowed Wendler's edict.

121.    By issuing and maintaining his edict, President Wendler is claiming he can cancel events he deems "inappropriate" or personally offensive at will, imposing

a viewpoint- and content-based restriction on the university's events registration process for campus facilities available for expressive activity.

***After President Wendler exiled the first drag show from campus, Plaintiffs' planned future events are in jeopardy.***

122.   Because Plaintiffs were unable to plan for both the on-campus event and an alternative off-campus event, they had to commit to an alternative venue.

123.   In order to hold their event in an alternative venue, Plaintiffs were required to spend $2,130.13 from funds donated by members of the public in order to rent a stage in a public park and hire off-duty police officers to provide security.

124.   The $2,130.13 would otherwise have been contributed to the Trevor Project, an LGBTQ+ charity dedicated to suicide prevention, as part of Plaintiffs' fundraising efforts.

125.   Because of President Wendler's cancellation of the event, Plaintiffs were unable to sell tickets purchased through Eventbrite, as there was no way to create a ticketed event by restricting entrance to a public park.

126.   As a result of President Wendler's cancellation, Plaintiffs paid or owe Eventbrite $30.54 for fees for tickets that could not be used.

127.   Plaintiffs intend to organize and put on drag shows and similar events on campus in the near future.

128.   But even if university staff again determine that Plaintiffs' planned events meet the criteria for use of university facilities, Wendler claims an unfettered right to cancel those events at the last moment based on his personal views.

129.   The risk posed by President Wendler's edict is exacerbated by the JBK Student Center's procedures and guidelines, which purport to authorize staff to "cancel, interrupt, or terminate any event" if it might "be viewed as inappropriate."

130.   The planned events include:

a)   Queer Movie Night, held by Spectrum WT several times annually, during which members watch and discuss films with LGBTQ+ themes. Plaintiffs have submitted a reservation for use of Legends Club, a venue in the JBK Student Center. On Halloween 2023, Plaintiffs intend to exhibit "The Rocky Horror Picture Show," a cult-classic 1975 film, popular in the LGBTQ+ community, starring Tim Curry, who is adorned in corset and fishnets. Because viewings of the film traditionally involve audience participation, Plaintiffs expect that participants will dress as Curry's gender non-conforming character. Plaintiffs' intended use of the Legends Club is consistent with the uses for which West Texas A&M holds out this venue. However, Plaintiffs' event will violate President Wendler's ban on drag shows and will express viewpoints Wendler disapproves of in his edict.

b)   A second-annual drag show, entitled "Don't Be A Drag Drag Show." Plaintiffs have submitted a reservation for use of Legacy Hall on the evening of Friday, March 22, 2024. This event violates President Wendler's ban on campus drag shows.

c)   Queer History Night, a program Spectrum WT holds several times a year, during which its members and panelists from the campus and local community discuss LGBTQ+ history, political, and social issues. Plaintiffs' event will express viewpoints Wendler disapproves of in his edict.

## **INJURIES TO PLAINTIFFS**

131.   Plaintiffs are injured by President Wendler and West Texas A&M canceling the planned March 31, 2023, charity drag show—and all similar events—based on his personal disagreement with the messaging he believes drag shows convey. Viewpoint discrimination violates the First Amendment, and "loss of First

Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

132.    In addition, Plaintiffs Bright and Stovall are West Texas A&M students. They pay tuition and student fees to West Texas A&M, which promises—as does the State of Texas[12]—Plaintiffs the ability to use venues on campus for expressive activities. Indeed, the JBK Student Center—the venue where Plaintiffs had been tentatively approved to host "A Fool's Drag Race"—is funded by fees paid by Plaintiffs Bright, Stovall, the members of Spectrum WT, and other West Texas A&M students.

133.    Thus, Defendants' drag show ban has also injured Plaintiffs because they cannot use campus venues for First Amendment expressive activity, despite those promises.

134.    President Wendler's ongoing edict works two harms to Plaintiffs' future expressive activity. First, it expressly prohibits any "drag show" at West Texas A&M, including the show students are planning for March 22, 2024 at Legacy Hall. Second, it imposes a viewpoint- and content-based restraint over the university's event registration process, indicating that if staff do not refuse or cancel an event that meets President Wendler's criteria for "inappropriate" expression, then Wendler will cancel it himself.

135.    Left in place, President Wendler's edict will continue to infringe and chill Plaintiffs' right to engage in planned expressive activity in campus spaces they

---

[12] Tex. Educ. Code § 51.9315(g).

have a right to use, because their expression meets Wendler's criteria for "derisive," "demeaning," "inappropriate," or is otherwise incompatible with Wendler's edict.

136.   Plaintiffs, then, are injured in their ability to exercise their First Amendment rights by holding the scheduled October 2023 "Queer Movie Night," the scheduled March 2024 drag show, the planned "Queer History Nights," and similar events in the future.

137.   There is a concrete and imminent danger that university administrators and staff will deny Plaintiffs access to university facilities for those upcoming events on the belief that President Wendler will find the expressive content and messaging of Plaintiffs' events inappropriate.

138.   There is also a concrete and imminent danger that President Wendler will unilaterally deny Plaintiffs access to university facilities for those upcoming events because he will declare the expressive content and messaging of Plaintiffs' events inappropriate.

139.   Moreover, any student participant in Plaintiffs' future events— including, for example, its annual prom events—could dress in a manner President Wendler deems to be "drag," or otherwise engage in expression that President Wendler personally finds "inappropriate."

140.   Plaintiffs are also injured because they invested substantial time and organizational resources into planning and promoting the March 31 charity drag show and obtaining approval for the event from West Texas A&M staff, following the university's approval procedures.

28

141.   But for the ban against drag shows, Spectrum WT would have put on their March 31, 2023, charity drag show on West Texas A&M's campus. West Texas A&M staff provided Spectrum WT with "Tentative Confirmation" for the event, and just hours before President Wendler vetoed the event, Spectrum WT had submitted the final details that university staff confirmed were necessary for the event to be moved to the "Confirmed" stage.

142.   Thus, Plaintiffs have been injured because President Wendler's refusal to permit the event to move forward defied the First Amendment, Texas state law, and West Texas A&M campus policy, depriving Plaintiffs of the benefits the Constitution, state law, and university policy confer to all student groups.

143.   Plaintiffs, including Bright and Stovall, have been injured because they were not able to exercise their First Amendment right to engage in protected expression by performing at the charity drag show event at West Texas A&M—the focal point of Spectrum WT's advocacy.

144.   Although Plaintiffs were able to locate, on short notice, an alternative venue, President Wendler's abrupt veto of their event and edict banning drag shows on campus has injured—and will continue to injure—Plaintiffs. For example:

a)   Spectrum WT's mission is to help LGBTQ+ students feel welcome at West Texas A&M, as well as to promote diversity and acceptance on campus. Exiling Plaintiffs' expressive activities to off-campus locations both burdens the students' ability to reach their intended audience and sends the message—as President Wendler intends—that their message is unwelcome.

b)   The new venue cost $1,000, a significant amount of money for a local student organization largely composed of undergraduate students. The expenses incurred by diverting donations that would otherwise have gone to Plaintiffs' charitable purposes are costs that would not have been

incurred but for President Wendler's denial of access to the facilities made available at no cost to student organizations whose message he approves.

c) Because Wendler cancelled Plaintiffs' event in its final stages of preparation, Plaintiffs were required to make efforts to again locate a venue and other requirements to put on a show. As a result, the time, energy, and resources required of Plaintiffs were multiplied by President Wendler.

d) To organize a new event off-campus, where they would not have the security of West Texas A&M's on-campus police force, Plaintiffs were forced to retain private security at their own expense, spending $1130.13.

145.   Further, Plaintiff Bear has experienced anxiety, stress, and doubt about whether he or Spectrum WT should plan further events because of the likelihood that President Wendler will again censor those events and cause Spectrum WT to again spend time, energy, and organizational resources on events that will not happen.

## FIRST CAUSE OF ACTION
**First Amendment Violation (Injunctive and Declaratory Relief)**
**Freedom of Speech - Viewpoint Discrimination**
**(42 U.S.C. § 1983)**
**(All Plaintiffs against all Defendants in their official capacities)**

146.   Plaintiffs re-allege and re-incorporate paragraphs 1–145 as though fully set forth herein.

147.   The First Amendment protects expressive conduct, including performance theater (like drag shows), whether held in high regard by supporters or low esteem by detractors. *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 557–58 (1975) (stage performance); *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (burning the American flag); *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 633–34 (1943) (saluting or refusing to salute the American flag); *Iota Xi Chapter of Sigma Chi Fraternity v.*

30

*George Mason Univ.*, 993 F.2d 386, 387 (4th Cir. 1993) (university fraternity's "ugly woman" contest).

148.    Expression by students and student organizations at public universities is entitled to robust protection under the First Amendment, which applies with no "less force on college campuses than in the community at large." *Healy v. James*, 408 U.S. 169, 180 (1972).

149.    An official acting under the color of state law cannot censor or restrict speech based on "its message" or the viewpoint expressed. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828–30 (1995).

150.    It is "well settled that viewpoint discrimination is a clearly established violation of the First Amendment in any forum." *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 350 (5th Cir. 2001).

151.    University officials cannot suppress student expression at public universities because they or others find it derisive, "no matter how offensive" others might find that expression. *Papish*, 410 U.S. at 670.

152.    Plaintiffs sought and are seeking to exercise their First Amendment right to engage in on-campus expression but were prevented from doing so—and cannot do so now—because of President Wendler's personal objections to their message.

153.    President   Wendler   engaged   in   unconstitutional   viewpoint discrimination by prohibiting Plaintiffs from putting on a charity drag show because

Wendler disagrees with the expressive message of the show and believes it is offensive.

154.    President Wendler's subjective evaluation about what expression is offensive, inappropriate, or objectionable is not a viewpoint-neutral basis to restrict student expression.

155.    To the contrary, "censorship based on a state actor's subjective judgment that the content of protected speech is offensive or inappropriate is viewpoint discrimination." *Robinson v. Hunt Cnty.*, 921 F.3d 440, 447 (5th Cir. 2019) (citing *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017)).

156.    President Wendler's condemnation of drag shows makes clear that he understands drag shows convey a particularized message, as he identifies them as "artistic expression which denigrates others—in this case, women" and which amount to "ridicule." (Ex. A, Wendler Email.)

157.    Vice President Thomas engaged in unconstitutional viewpoint discrimination by enforcing President Wendler's viewpoint-driven directive.

158.    By not putting an end to President Wendler's actions, the Board of Regents and Chancellor Sharp evidence an intent to let Wendler's viewpoint discrimination against on-campus drag shows continue.

159.    In addition to the harm to Plaintiffs' expressive freedoms caused by President Wendler's cancellation of the March 31 charity drag show, the general harm of the policy remaining in place continues to have a chilling effect on Plaintiffs' expressive freedoms.

160.   President Wendler's promise to ignore "the law of the land" and his establishment of a policy that "West Texas A&M University will not host a drag show on campus" is chilling and will continue to chill Plaintiffs' ability to organize similar events—whether or not styled as a "drag show"—if they convey a political, ideological, or academic message that President Wendler believes to be demeaning.

161.   These include Plaintiffs' intended future drag shows, including one Plaintiffs are planning for March 24, 2024, and events Plaintiffs are planning for the fall semester, including an October 31, 2023 "Queer Movie Night" production of "The Rocky Horror Picture Show."

162.   Plaintiffs have no adequate legal, administrative, or other remedy by which to prevent or minimize the immediate, irreparable, and ongoing harm to their First Amendment rights from Defendants' unconstitutional viewpoint discrimination.

163.   Thus, Plaintiffs require preliminary injunctive relief, permanent injunctive relief, and declaratory relief to protect their fundamental expressive rights from ongoing harm.

164.   Absent injunctive and declaratory relief upholding Plaintiffs' First Amendment rights and returning President Wendler's focus to his constitutional obligations, President Wendler's pledge to continue to violate the constitutional rights of West Texas A&M's students will have ongoing chilling effects on Plaintiffs' protected expression.

165.    Plaintiffs are likely to succeed on the merits of their claims. Moreover, there is substantial public interest in ensuring Defendants cease engaging in viewpoint-based restriction and censorship of speech on Texas's college campuses, where "the vigilant protection of constitutional freedoms is nowhere more vital[.]" *Healy*, 408 U.S. at 180 (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)).

166.    Recognizing this vital public interest, the Texas Legislature has codified the First Amendment's prohibition on viewpoint discrimination, barring public universities from "tak[ing] action against a student organization or deny[ing] the organization any benefit generally available to other student organizations at the institution on the basis of a political, religious, philosophical, ideological, or academic viewpoint expressed by the organization or of any expressive activities of the organization." Tex. Educ. Code § 51.9315(g).

167.    Because a justiciable controversy exists over Defendants' viewpoint-based discrimination against Plaintiffs' protected expression, Plaintiffs also seek declaratory relief against Defendants. A declaratory judgment will further resolve and clarify the parties' legal relationship.

**SECOND CAUSE OF ACTION**
**First Amendment Violation (Injunctive and Declaratory Relief)**
**Freedom of Speech—Exclusion from a Public Forum**
**(42 U.S.C. § 1983)**
**(All Plaintiffs against all Defendants in their official capacities)**

168.    Plaintiffs re-allege and re-incorporate paragraphs 1–167 as though fully set forth herein.

169.    West Texas A&M routinely provides facilities, funding, and resources for expressive activities of registered student organizations like Spectrum WT.

170.    By recognizing student organizations and providing them facilities, funding, and resources, West Texas A&M has created a public forum. *Widmar v. Vincent*, 454 U.S. 263, 267–70 (1981).

171.    Legacy Hall and other JBK Student Center spaces are designated public fora.

172.    Legacy Hall and other JBK Student Center spaces are held out by West Texas A&M as designated public fora, made available to student organizations and the general public.

173.    Legacy Hall, Legends Hall, and other JBK Student Center spaces are established as designated public fora by Tex. Educ. Code § 51.9315.

174.    Legacy Hall and other JBK Student Center spaces are established as designated public fora by West Texas A&M Policy Nos. 24.01.01.W0.01 ("Facility Use Request Procedure") and 08.99.99.W1 ("Expressive Activity on Campus").

175.    The existence of alternative venues, even if those venues were adequate, is not a basis to deny Plaintiffs access to the designated public fora at West Texas A&M. "[One] is not to have the exercise of his liberty of expression in appropriate place abridged on the plea that it may be exercised in some other place." *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 556 (1975) (quoting *Schneider v. New Jersey*, 308 U.S. 147, 163 (1939)).

176.    President Wendler's prohibition on student organizations' "drag shows" in university facilities is a content-based and viewpoint-based restriction.

177.    Because West Texas A&M's content- and viewpoint-based restrictions on drag shows do not satisfy strict scrutiny—*i.e.*, "necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end"—they are unconstitutional restrictions on speech in public forums. *Widmar*, 454 U.S. at 270.

178.    President Wendler's prohibition on student drag shows in campus public forums does not serve a compelling state interest nor is it the least restrictive means of achieving such an interest.

179.    President Wendler's prohibition on student drag shows in campus public forums is not narrowly drawn to achieve a compelling state interest.

180.    President Wendler's claim that his drag show ban prevents the appearance that he, or the university he shepherds, endorses that expressive activity is not a legitimate state interest, let alone a compelling one. *Id.* at 274 (a public university's "open forum . . . does not confer any imprimatur of state approval" on expression occurring within that forum).

181.    President Wendler's claim that the drag show ban is necessary to prevent the creation of a hostile environment is not narrowly drawn because it is a prohibition on expressive activity voluntarily encountered in enclosed spaces and because President Wendler had no evidence suggesting Plaintiffs' charity drag show would create a "hostile environment."

182.    Nor is the prohibition on drag shows reasonably related to the purpose of campus forums like Legacy Hall, which West Texas A&M holds out as available for a wide range of events, like weddings, parties, concerts, press conferences, and entertainment.

183.    The content-based and viewpoint-based prohibition, reflected in President Wendler's edict, excludes Plaintiffs from engaging in protected First Amendment activity in on-campus public forums, violating their First Amendment rights.

184.    Vice President Thomas also violated Plaintiffs' First Amendment rights by enforcing President Wendler's content- and viewpoint-based prohibition on student groups that would hold drag shows in campus public forums.

185.    By not putting an end to President Wendler's actions, the Board of Regents and Chancellor Sharp evidence an intent to let the unconstitutional prohibition against student groups holding drag shows in campus forums continue.

186.    President Wendler's edict reflects an ongoing ban against present and future drag shows on campus as well as similar events if they convey a political, ideological, or academic content that President Wendler believes to be demeaning, offensive, or otherwise objectionable. These include Plaintiffs' planned events for the Fall 2023 semester and intended future drag shows, including one Plaintiffs are planning for spring 2024.

187.    Plaintiffs have no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to their First Amendment right to use campus forums for First Amendment activity.

188.    Thus, Plaintiffs require preliminary injunctive relief, permanent injunctive relief, and declaratory relief to protect their fundamental expressive rights from ongoing harm.

189.    Absent injunctive relief and declaratory relief enjoining Defendants from excluding Plaintiffs from campus forums based on the content and viewpoints of their protected expression, the public university will continue to violate the constitutional rights of West Texas A&M's students, including Spectrum WT and its members.

190.    Plaintiffs are likely to succeed on the merits of their claims. Moreover, there is substantial public interest in ensuring Defendants cease engaging in content-based restrictions and censorship of speech on Texas' college campuses. *Healy*, 408 U.S. at 181; Tex. Educ. Code § 51.9315(g).

191.    Because a justiciable controversy exists over Plaintiffs' inability to use campus public forums for First Amendment expressive activity, Plaintiffs also seek declaratory relief against Defendants. A declaratory judgment will further resolve and clarify the parties' legal relationship.

**THIRD CAUSE OF ACTION**
**First Amendment Violation (Injunctive and Declaratory Relief)**
**Prior Restraint on Freedom of Speech**
**(42 U.S.C. § 1983)**
**(All Plaintiffs against All Defendants in their Official Capacities)**

192.    Plaintiffs re-allege and re-incorporate paragraphs 1–191 as though fully set forth herein.

193.    Government actions making "speech contingent on the will of an official . . . are unconstitutional burdens on speech classified as prior restraints." *Chiu v. Plano Indep. Sch. Dist.*, 339 F.3d 273, 280 (5th Cir. 2003).

194.    With his edict banning drag shows and "inappropriate" student expression based on content and viewpoint, President Wendler has created an unconstitutional prior restraint on speech against Spectrum WT, and effectively against any other student group seeking the benefit of using campus facilities.

195.    In making campus spaces available for use by student organizations, West Texas A&M requires student organizations to pre-register the event with campus officials.

196.    In addition to providing logistical details, student organizations registering planned events must provide a "full description" of the event.

197.    Student organizations are also required to identify certain "risks," including "damage to [West Texas A&M's] reputation" or "negative publicity for" West Texas A&M.

198.    By establishing a system requiring prior registration of an event in order to engage in expressive activity in designated public fora, West Texas A&M has established a system of prior restraints.

199.    Prior restraints are presumptively unconstitutional. *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971).

200.    A university administrator may not restrict student expression before it occurs based on his prediction of its content and consequences. *Gay Student Servs. v. Tex. A&M Univ.*, 737 F.2d 1317, 1325 (5th Cir. 1984).

201.    President Wendler's edict does not provide "narrow, objective, and definite standards to guide" administrators in granting or denying access. *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 151 (1969).

202.    Instead, President Wendler's blanket ban on "drag shows" at West Texas A&M is a viewpoint- and content-based prior restraint on speech.

203.    President Wendler's edict also effectively requires event registration staff and administrators to consider if an event is "inappropriate" because it is "divisive," "harmful," "demeaning," "objectifying," "diminish[es]" others, "denigrate[s]" others, or "stereotype[s]" others.

204.    Examining a student organization event's anticipated content or message to determine whether to grant that organization access to public fora on campus is an unconstitutional prior restraint.

205.    These prior restraints infringe on and chill Plaintiffs' right to schedule, plan, and hold expressive events and activities on campus.

40

206. These viewpoint- and content-based prior restraints deny Plaintiffs access to a designated public forum.

207. Even if these spaces are "limited" or "nonpublic forums," a prior restraint that lacks "neutral criteria to [e]nsure that the licensing decision is not based on the content or viewpoint of the speech being considered" violates the First Amendment. *Freedom from Religion Found., Inc. v. Abbott*, 955 F.3d 417, 427–29 (5th Cir. 2020).

208. Even if these spaces were limited or nonpublic fora, President Wendler's edict amounts to viewpoint discrimination, which is prohibited in every forum.

209. West Texas A&M also provides no procedural safeguards, such as providing student organizations with an administrative avenue of appeal or some means by which student organizations may contest a decision to deny expressive activity based on its content or message.

210. Faced with this prior restraint, Plaintiffs face a no-win choice: Alter their expression to meet the pre-registration requirements and access the benefit of a campus public forum, or risk losing that benefit at Wendler's whim.

211. Plaintiffs have no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to their First Amendment right to use campus forums for First Amendment activity.

212. Prior restraints on speech "are the most serious and the least tolerable infringement on First Amendment rights," *Nebraska Press Ass'n v. Stuart*, 427 U.S.

539, 559 (1976). But Defendants have taken no steps to remove the ongoing prior restraint on Plaintiffs' expressive rights.

213.  Thus, Plaintiffs require preliminary injunctive relief, permanent injunctive relief, and declaratory relief to protect their fundamental expressive rights from ongoing harm.

214.  Absent injunctive relief and declaratory relief enjoining Defendants from imposing an impermissible prior restraint on speech, the public university will continue to violate the constitutional rights of West Texas A&M's students, including Spectrum WT and its members.

215.  Plaintiffs are likely to succeed on the merits of their claims. Moreover, there is substantial public interest in ensuring Defendants cease engaging in viewpoint- and content-based prior restraints on speech.

216.  Because a justiciable controversy exists over Defendants imposing a prior restraint on Plaintiffs' ability to use campus public forums for First Amendment expressive activity, Plaintiffs also seek declaratory relief against Defendants. A declaratory judgment will further resolve and clarify the parties' legal relationship.

**FOURTH CAUSE OF ACTION**
**First Amendment Violation (Damages)**
**Direct and Retaliatory Infringements of Freedom of Speech**
**(42 U.S.C. § 1983)**
**(All Plaintiffs against President Wendler in his individual capacity)**

217.  Plaintiffs re-allege and re-incorporate paragraphs 1–216 as though fully set forth herein.

218.   By barring Plaintiffs from organizing and putting on a charity drag show on campus based on his personal disagreement with Plaintiffs' viewpoints and message, President Wendler directly deprived Plaintiffs of their First Amendment rights.

219.   By continuing to ban Plaintiffs from organizing and putting on a charity drag show on campus based on his personal disagreement with Plaintiffs' viewpoints and message, President Wendler is directly depriving Plaintiffs of their First Amendment rights.

220.   President Wendler also retaliated and is continuing to retaliate against Plaintiffs because of their protected expression.

221.   Plaintiffs engaged in expression protected by the First and Fourteenth Amendments, including promoting, publishing, and organizing messaging about drag shows.

222.   At all relevant times, Plaintiffs have intended to engage in expression protected by the First and Fourteenth Amendments, including organizing and putting on charity drag shows and similar expressive events.

223.   President Wendler knew the Constitution protected Plaintiffs' expression and prohibited his actions.

224.   Plaintiffs' message was the motivating factor in President Wendler's decision to take retaliatory action against Plaintiffs.

225.    President Wendler's retaliatory actions in response to Plaintiffs' message include:

    a)    Abruptly canceling Plaintiffs' March 31 charity drag show event;

    b)    Imposing a reactive, viewpoint- and content-based restriction on the expression of all students at West Texas A&M;

    c)    Prohibiting future student expressive activity, including events organized by Plaintiffs and their right to use campus forums for First Amendment activity; and

    d)    Declaring that Plaintiffs' expression, protected by the First Amendment, violates university policy on harassment.

226.    President Wendler's actions in response to Plaintiffs' message are sufficient to deter a person of ordinary firmness from continuing to engage in expressive activity.

227.    President Wendler's actions have caused Spectrum WT fear that the organization's good standing will be jeopardized when West Texas A&M, in conformity with President Wendler's assertion that "drag" expression violates university policy, enforces against Spectrum WT or its members the harassment policies maintained by West Texas A&M or the Texas A&M System.

228.    President Wendler's actions have chilled the expression of individual members of Spectrum WT as they relate to drag, sexual orientation, and gender identity.

229.    At the time of the events in question, it was clearly established that the Constitution prohibited President Wendler's actions. *See supra* paragraphs 147–51, 155, 170, 175, 177, 193, 199–201, 207, and 212.

230. At the time of the events in question, it was clearly established that the First Amendment protects stage performances, including drag shows, and the viewpoints those performances convey.

231. At the time of the events in question, it was clearly established that the First Amendment prohibits university administrators from censoring student expression based on its viewpoint.

232. At the time of the events in question, it was clearly established the First Amendment prohibits university administrations from censoring viewpoints some might find offensive or demeaning, including viewpoints conveyed through performances and similar expressive conduct.

233. At the time of the events in question, it was clearly established that the First Amendment prohibits university administrators from censoring student expression in any public forum based on its viewpoint, even if the administrator perceives the viewpoint as offensive.

234. At the time of the events in question, it was clearly established that the First Amendment prohibits university administrators from denying a student group access to any public forum based on the group's viewpoint, even if the administrator perceives the viewpoint as offensive.

235. As the time of the events in question, it was clearly established that Texas law prohibits university administrators from denying student groups access to or use of university facilities generally available to other student organizations at the school, based on the political, religious, philosophical, ideological, or academic

viewpoint expressed by the organization or any expressive activities of the organization.

236.   At the time of the events in question, it was clearly established the First Amendment prohibits campus speakers from imposing prior restraints or other unconstitutional limits on the use of campus forums for First Amendment activity.

237.   At the time of the events in question, it was clearly established that viewpoint-based prior restraints presumptively violate the First Amendment.

238.   At the time of the events in question, it was clearly established that the First Amendment bars university administrators from restricting student expression before it occurs based on a prediction of its content and consequences.

239.   At the time of the events in question, it was clearly established that the First Amendment prohibits an individual acting under color of state law from retaliating against speakers based on the viewpoint expressed.

240.   A reasonable public university administrator would have had fair warning that the First Amendment prohibited banning Plaintiffs from hosting drag shows in a public forum on campus because of the viewpoints that a show conveyed or that the administrator perceived, even if the administrator believed the viewpoint to be offensive or demeaning to others.

241.   It would have been obvious to any reasonable public university administrator that President Wendler's viewpoint-driven edict banning Plaintiffs' March 31 drag show violated the First Amendment.

242.    It would be obvious to any reasonable public university administrator that President Wendler's ongoing and viewpoint-driven edict banning drag shows on campus violates the First Amendment.

243.    No reasonable public university administrator would have suppressed Plaintiffs' expression like President Wendler did and continues to do.

244.    Plaintiffs are entitled to compensatory and nominal damages against President Wendler in his individual capacity for violating Plaintiffs' clearly established First Amendment rights.

245.    Plaintiffs are also entitled to punitive damages against President Wendler in his individual capacity.

246.    President Wendler knew that the First Amendment, as the "law of the land," prohibits him from censoring student expression, including censorship based on any personal disagreement he has with a speaker's message or viewpoint.

247.    Due to his personal opposition to Plaintiffs' messages, President Wendler has deliberately violated Plaintiffs' First Amendment rights and his duty as a public official to avoid violating the First Amendment.

248.    President Wendler's deliberate defiance of the Constitution was and remains malicious, oppressive, and in reckless and callous disregard of Plaintiffs' well-established rights.

249.    Accordingly, punitive damages against President Wendler are appropriate and necessary to punish President Wendler for violating Plaintiffs' First Amendment rights and to deter similar violations in the future.

## JURY DEMAND

Under Fed. R. Civ. P. 38, Plaintiffs demand a jury trial on all issues triable to a jury.

## PRAYER FOR RELIEF

Plaintiffs request that the Court enter judgment against all Defendants and award the following relief:

1.      Preliminary and permanent injunctive relief enjoining Defendants and their employees, agents, servants, officers, and persons in concert with Defendants, from enforcing President Wendler's prohibition on "drag shows" in campus facilities generally available for student group use;

2.      Preliminary and permanent injunctive relief enjoining Defendants and their employees, agents, servants, officers, and persons in concert with Defendants, from enforcing the viewpoint- and content-discriminatory prohibitions on expressive activity contained in Wendler's March 20, 2023 edict, when making West Texas A&M University facilities or spaces available to Plaintiffs or other student organizations;

3.      A declaratory judgment that President Wendler's cancellation of the March 31 charity drag show, and his pledge to prevent similar expressive activity at West Texas A&M, violated the First Amendment to the United States Constitution;

4.      Compensatory and nominal damages against President Wendler in his individual capacity in such amount as may be found, or as otherwise permitted by law;

5.      Punitive damages against President Wendler in his individual capacity in such amount as may be found, or as otherwise permitted by law, for his retaliatory

and oppressive intent toward Plaintiffs in reckless and callous disregard for their clearly established constitutional rights;

6.     Plaintiffs' attorneys' fees under 42 U.S.C. § 1988;

7.     Plaintiffs' costs; and

8.     Any other and further relief as the Court may deem just and proper.

Dated: April 18, 2023

Respectfully submitted,
/s/ JT Morris
JT MORRIS
TX Bar No. 24094444
FOUNDATION FOR INDIVIDUAL RIGHTS
   AND EXPRESSION
700 Pennsylvania Ave., SE; Ste. 340
Washington, DC 20003
Tel: (215) 717-3473
Fax: (267) 573-3073
jt.morris@thefire.org

CONOR T. FITZPATRICK*
MI Bar No. P78981
ADAM B. STEINBAUGH*
CA Bar No. 304829
JEFFREY D. ZEMAN*
MI Bar No. P76610
FOUNDATION FOR INDIVIDUAL RIGHTS
   AND EXPRESSION
510 Walnut St.; Ste. 1250
Philadelphia, PA 19106
Tel: (215) 717-3473
Fax: (267) 573-3073
conor.fitzpatrick@thefire.org
adam@thefire.org
jeff.zeman@thefire.org

* Admitted *Pro Hac Vice*

*Counsel for Plaintiffs*

## VERIFICATION OF BARRETT BRIGHT

Pursuant to 28 U.S.C. § 1746, I, BARRETT BRIGHT, declare as follows:

1.      I am a Plaintiff in the present case and a citizen of the United States of America.

2.      I am the President of Spectrum WT, a plaintiff in the present case.

3.      I have read the foregoing First Amended Verified Complaint for Civil Rights Violations.

4.      I have personal knowledge of the factual allegations in paragraphs 10–14, 27–37, 48, 51–57, 60–61, 68, 73–74, 76–83, 85–88, 90–92, 94–106, 111, 113–115, 119, 122–127, 130, 130(a), 130(b), 130(c), 133, 136, 139–141, 143–144, 144(a), 144(b), 144(c), 144(d), 145, and 196–197 of the First Amended Verified Complaint and know them to be true.

5.      I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Executed on 04/17/ 2023

_____
Barrett Bright

## VERIFICATION OF LAUREN STOVALL

Pursuant to 28 U.S.C. § 1746, I, LAUREN STOVALL, declare as follows:

1.      I am a Plaintiff in the present case and a citizen of the United States of America.

2.      I am the Vice President of Spectrum WT, a plaintiff in the present case.

3.      I have read the foregoing First Amended Verified Complaint for Civil Rights Violations.

4.      I have personal knowledge of the factual allegations in paragraphs 10–13, 15, 27–37, 48, 51–55, 57, 60–61, 68, 73–74, 76–83, 85, 94–96, 105–106, 111, 113–115, 119, 122–125, 127, 130, 130(a), 130(b), 130(c), 133, 136, 139–140, 143–144, 144(a), 144(b), 144(c), 144(d), and 196–197 of the First Amended Verified Complaint and know them to be true.

5.      I also have personal knowledge of Exhibit A to the First Amended Verified Complaint. Exhibit A is a true and correct copy of an email I received on March 30, 2023 from President Wendler.

6.      I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on **4/18/23**

Lauren Stovall

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 18, 2023, a true and correct copy of the foregoing document was transmitted via using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

/s/ JT Morris
JT Morris
FOUNDATION FOR INDIVIDUAL
    RIGHTS AND EXPRESSION