## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | |
|---|---|
| SPECTRUM WT, BARRETT BRIGHT, and LAUREN STOVALL, | |
| Plaintiffs, | Case No.: 2:23-cv-00048-Z |
| v. | |
| WALTER WENDLER, in his individual capacity and his official capacity as the President of West Texas A&M University, | Hon. Matthew J. Kacsmaryk |
| CHRISTOPHER THOMAS, in his official capacity as Vice President for Student Affairs at West Texas A&M University, | **PLAINTIFFS' BRIEF IN SUPPORT OF AMENDED MOTION FOR PRELIMINARY INJUNCTION** |
| JOHN SHARP, in his official capacity as Chancellor of the Texas A&M University System, | **ORAL ARGUMENT REQUESTED** |
| ROBERT L. ALBRITTON, JAMES R. BROOKS, JAY GRAHAM, MICHAEL A. HERNANDEZ III, TIM LEACH, BILL MAHOMES, ELAINE MENDOZA, MICHAEL J. PLANK, CLIFF THOMAS, and DEMETRIUS L. HARRELL JR., in their official capacities as members of the Board of Regents of the Texas A&M University System, | |
| Defendants. | |

JT MORRIS
TX Bar No. 24094444
FOUNDATION FOR INDIVIDUAL RIGHTS
  AND EXPRESSION
700 Pennsylvania Ave., SE; Ste. 340
Washington, DC 20003
Tel: (215) 717-3473
Fax: (267) 573-3073
jt.morris@thefire.org

CONOR T. FITZPATRICK*
MI Bar No. P78981
ADAM B. STEINBAUGH*
CA Bar No. 304829
JEFFREY D. ZEMAN*
MI Bar No. P76610
FOUNDATION FOR INDIVIDUAL RIGHTS
  AND EXPRESSION
510 Walnut St.; Ste. 1250
Philadelphia, PA 19106
Tel: (215) 717-3473
Fax: (267) 573-3073
conor.fitzpatrick@thefire.org
adam@thefire.org
jeff.zeman@thefire.org
* Admitted *Pro Hac Vice*

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

Page:

TABLE OF AUTHORITIES ........................................................................ iii

INTRODUCTION ..................................................................................... 1

STATEMENT OF FACTS ......................................................................... 3

    Spectrum WT, like many recognized student groups, has a message to
share. ...................................................................................................... 3

    West Texas A&M opens facilities to students and the public for
expressive activities. ................................................................................ 4

    Instead of following the Constitution, President Wendler decides to
impose his personal views. ....................................................................... 7

    Plaintiffs are suffering irreparable injury. ............................................. 8

ARGUMENT .......................................................................................... 10

I.    Plaintiffs Are Substantially Likely to Succeed on the Merits
Against the University's Brazen Censorship of Protected
Expression. ............................................................................... 10

    A.    President Wendler's Censorship of a Drag Show Based on
Personal Disagreements with the Expression's Message Is
Textbook Viewpoint Discrimination. ............................................ 11

    B.    Excluding Plaintiffs' Drag Show from Campus Public
Forums Violates the First Amendment. ........................................ 14

    C.    President Wendler's Edict Imposes an Unconstitutional
Prior Restraint on Plaintiffs' Protected Expression. ................... 19

II.    Plaintiffs Will Suffer Irreparable Harm Absent Immediate Relief.
.................................................................................................. 21

III.    The Balance of Harms and the Public Interest Favor Plaintiffs'
First Amendment Rights. ......................................................... 23

IV.    The Court Should Waive the Bond Requirement Because
Plaintiffs Seek Only to Protect Their First Amendment Rights. ......... 24

CONCLUSION ....................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s):**

**Cases**:

*Am. Booksellers Ass'n v. Hudnut*,
    771 F.2d 323 (7th Cir. 1985) ...............................................................................17

*Ass'n of Club Execs. of Dall., Inc. v. City of Dall.*,
    604 F. Supp. 3d 414 (N.D. Tex. 2022) ................................................................23

*Bd. of Educ. of the Westside Cmty. Schs. v. Mergens By & Through Mergens*,
    496 U.S. 226 (1990) ............................................................................................23

*Berger v. Battaglia*,
    779 F.2d 992 (4th Cir. 1985) ...............................................................................11

*Byrum v. Landreth*,
    566 F.3d 442 (5th Cir. 2009) ...............................................................................10

*Chiu v. Plano Indep. Sch. Dist.*,
    260 F.3d 330 (5th Cir. 2001) ...............................................................................12

*Chiu v. Plano Indep. Sch. Dist.*,
    339 F.3d 273 (5th Cir. 2003) ...............................................................................11

*Christian Legal Soc'y v. Walker*,
    453 F.3d 853 (7th Cir. 2006) ...............................................................................24

*City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*,
    636 F.2d 1084 (5th Cir. 1981) .............................................................................24

*Cohen v. California*,
    403 U.S. 15 (1971) .......................................................................................12, 17

*Elrod v. Burns*,
    427 U.S. 347 (1976) .......................................................................................3, 21

*Freedman v. Maryland*,
    380 U.S. 51 (1965) ..............................................................................................20

*Gay Student Servs. v. Tex. A & M Univ.*,
    737 F.2d 1317 (5th Cir. 1984) .......................................................................14, 24

*Gbalazeh v. City of Dall.*,
    *18-cv-0076*, 2019 WL 2616668 (N.D. Tex. June 25, 2019) ...............................25

*Gordon v. City of Hous*,
    79 F. Supp. 3d 676 (S.D. Tex. 2015) .................................................................25

*Healy v. James*,
    408 U.S. 169 (1972) .........................................................................................12

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*,
    515 U.S. 557 (1995) .........................................................................................11

*Iancu v. Brunetti*,
    139 S. Ct. 2294 (2019) .....................................................................................12

*Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.*,
    993 F.2d 386 (4th Cir. 1993) ...........................................................11, 13, 14, 17

*Kaepa, Inc. v. Achilles Corp.*,
    76 F.3d 624 (5th Cir. 1996) ...............................................................................24

*Matal v. Tam*,
    137 S. Ct. 1744 (2017) ...............................................................................12, 13

*Ne. Women's Ctr., Inc. v. McMonagle*,
    939 F.2d 57 (3d Cir. 1991) ...............................................................................15

*Norma Kristie, Inc. v. City of Okla. City*,
    572 F. Supp. 88 (W.D. Okla. 1983) ...................................................................10

*Papish v. Bd. of Curators of the Univ. of Mo.*,
    410 U.S. 667 (1973) .........................................................................2, 10, 14, 17

*Pro-Life Cougars v. Univ. of Hous.*,
    259 F. Supp. 2d 575 (S.D. Tex. 2003) ...............................................................15

*Se. Promotions, Ltd. v. Conrad*,
    420 U.S. 546 (1975) ...................................................................................*Passim*

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) .............................................................................15, 16, 18

*Robinson v. Hunt County*,
    921 F.3d 440 (5th Cir. 2019) .............................................................................12

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
    515 U.S. 819 (1995) ...................................................................................12, 18

*Schneider v. New Jersey*,
    308 U.S. 147 (1939) .........................................................................................22

*Shuttlesworth v. City of Birmingham,*
    394 U.S. 147 (1969) ......................................................................20

*Texans for Free Enter. v. Tex. Ethics Comm'n,*
    732 F.3d 535 (5th Cir. 2013) ....................................................22, 24

*United States v. Playboy Ent. Grp., Inc.,*
    529 U.S. 803 (2000) .................................................................15, 17

*Univ. of S. Miss. Chapter, Miss. C.L. Union v. Univ. of S. Miss.,*
    452 F.2d 564 (5th Cir. 1971) .......................................................20

*Widmar v. Vincent,*
    454 U.S. 263 (1981) ...............................................................*Passim*

**Statutes:**

Tex. Educ. Code § 51.9315(g)..........................................................4, 9, 21, 24

**Rules:**

Fed. R. Civ. P. 65................................................................................24

**Other Authorities:**

Alex Morey, *Iowa State Stands Up for First Amendment After FIRE Letter, Turns Down Demands to Violate Law*, FIRE (Nov. 18, 2020) ...................................18

Emily Hoenig, *Why Can't We All Just Cher?: Drag Celebrity Impersonators Versus an Ever-Expanding Right of Publicity*, 38 Cardozo Arts & Ent. L.J. 537 (2020) ...........................................................................................5, 6

Press Release, FIRE, *Victory: Pro-Life Student Group Finally Recognized at University of Arizona* (Apr. 21, 2010)...............................................18

Will Creeley, *Twin Victories At Central Washington, Montclair State as First Amendment Trumps Student Government Censorship*, FIRE (Mar. 11, 2008) .................................................................................17

## INTRODUCTION

West Texas A&M University's President, Defendant Walter Wendler, has declared that he will not obey "the law of the land." Instead, he insists on banning protected expression—drag—from campus simply because he dislikes the expression's entirely lawful message. By moving for a preliminary injunction, Plaintiffs ask this Court to put a swift end to Wendler's disdain for the First Amendment and prevent ongoing irreparable harm to Plaintiffs' constitutional freedoms.

On March 20, 2023, President Wendler announced to the campus community that he was cancelling Plaintiff Spectrum WT's scheduled PG-13 charity drag show because he disagreed with the show's message, condemning it as "demeaning," "derisive," "mocking," "objectifying," and "inappropriate." Wendler did not stop there. Rather, he imposed a blanket ban: "West Texas A&M will not host a drag show on campus." (Dkt. 28, First Am. Verif. Compl. Ex. A.) That, he said, was because a "harmless drag show" was "[n]ot possible." (*Id.*)

Making matters worse, President Wendler has all but confessed that he is knowingly violating the Constitution: "I will not appear to condone the diminishment of any group at the expense of impertinent gestures toward another group for any reason, *even when the law of the land appears to require it*." (*Id.*) (emphasis added). In that confession, at least, President Wendler is right: The First Amendment forbids Wendler or any other university official from censoring student organizations because they don't like the organization's message.

1

At bottom, Wendler's ongoing contempt for the rule of law is textbook viewpoint discrimination. The Supreme Court concluded decades ago that a live performance, even if disagreeable to public officials, is protected First Amendment expression. *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 557–58 (1975). If officials in Tennessee could not block a group from presenting the provocative play *Hair* in a public theatre because those officials disagreed with *Hair*'s message, then surely President Wendler and the other Defendants cannot block students from putting on a drag show in a public forum on campus simply because the show does not satisfy Wendler's worldview. *Id.*

The Constitution's bar against viewpoint discrimination is vital to preserving freedom of speech at public colleges and universities. "[N]o matter how offensive to good taste" some may find it, expression "on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Papish v. Bd. of Curators of the Univ. of Mo.*, 410 U.S. 667, 670 (1973). Whether students gather on campus to support a political candidate, talk about the Bible, or put on a drag show for charity, public college administrators cannot censor student expression just because they find it disagreeable or offensive.

Yet that is exactly what President Wendler is doing by banning drag. The result is ongoing and irreparable harm to Spectrum WT and its student officers, Plaintiffs Barrett Bright and Lauren Stovall. But for Wendler's action, these students would hold and perform in drag shows and similar events in university spaces designated for student expression. And if Spectrum WT cannot hold events on campus

featuring drag or that otherwise challenge President Wendler's views, it will suffer significant injury to its right to express views vital to the group's mission of advocating for the LGBTQ+ community at West Texas A&M. Thus, Wendler's March 20 edict continues to deprive Spectrum WT's members of their First Amendment rights, which is always an irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

This Court should grant Plaintiffs' motion for a preliminary injunction to preserve the supremacy of the Constitution and First Amendment at West Texas A&M and protect Plaintiffs against President Wendler's ongoing defiance of the First Amendment.

## STATEMENT OF FACTS[1]

**Spectrum WT, like many recognized student groups, has a message to share.**

Plaintiff Spectrum WT, formed in 2009, is a recognized student organization at West Texas A&M. (First Am. Compl. Verif. ¶ 10.) As West Texas A&M's website explains, "Spectrum is a student organization for WTAMU's LGBTQIA+ students and allies." (*Id.* ¶ 12.) Spectrum WT's goals are to provide a space for "LGBT+ students and allies to come together," to "raise awareness of the LGBT+ community," and to "promote diversity, support, and acceptance on campus and in the surrounding community." (*Id.* ¶ 11.) To help spread its message, Spectrum WT hosts various events, like a prom, movie night, and discussions about LGBTQ+ history, and

---

[1] All facts stated are from Plaintiffs' First Amended Verified Complaint. Plaintiffs incorporate by reference all the verified factual allegations from their First Amended Verified Complaint.

"regularly volunteers in the community." (*Id.* ¶¶ 12–13.) Plaintiffs Barrett "Bear" Bright and Lauren "Laur" Stovall are undergraduate students at West Texas A&M and the executive officers for Spectrum WT. (*Id.* ¶¶ 14–15.)

**West Texas A&M opens facilities to students and the public for expressive activities.**

As Texas law requires, West Texas A&M policy forbids administrators from "deny[ing] [a student] organization any benefit generally available to other student organizations at the university" because of "political, religious, philosophical, ideological, or academic viewpoint expressed by the organization or any expressive activities of the organization." (West Texas A&M Policy No. 08.99.99.W1 ("Expressive Activity on Campus"), Rule 1.3; Tex. Educ. Code § 51.9315(g); App.15-17). And student organizations at West Texas A&M enjoy important benefits—including the right to use university facilities for group functions and events. (App.12-13.)

These facilities include "Legacy Hall," a performance venue in the Jack B. Kelley Student Center. (First Am. Verif. Compl. ¶¶ 33–34.) The university holds out Legacy Hall as suitable for expressive activities like concerts and press conferences, and even weddings and parties. (*Id.* ¶¶ 32–34.) West Texas A&M policy guarantees students can use Legacy Hall for "any special event," including "social gatherings or functions." (App.12.) Student organizations and the public have regularly used Jack B. Kelley Student Center venue spaces for expressive activity for events—including drag shows at least in 2012 and 2019. (App.27-36.) Other events included beauty pageants for both men and women, annual singing competitions, concerts and dances, and religious and political events. (App.19-26, 37-80.)

**Spectrum WT plans and organizes a PG-13 charity drag show at Legacy Hall.**

In November 2022, Spectrum WT began planning a drag show called "A Fool's Drag Race," scheduled for March 31, 2023. (First Am. Verif. Compl. ¶ 52.) The proceeds from the March 31 drag show were earmarked from the event's inception for donation to an LGBTQ+ suicide prevention group. (*Id.* ¶ 74.)

With origins in Shakespearean-era theater, when only men could perform onstage, "drag" has since been a recurring genre of theatrical performance. Emily Hoenig, *Why Can't We All Just Cher?: Drag Celebrity Impersonators Versus an Ever-Expanding Right of Publicity*, 38 Cardozo Arts & Ent. L.J. 537, 550 (2020). For example, World War II military personnel staged drag shows as a form of entertainment; "This Is The Army," a 1943 film starring Ronald Reagan, prominently featured military performers in drag and raised money for the Army Emergency Relief fund.[2] Drag is also no stranger to college campuses—in fact, visitors to Legends Hall at the Kelley Student Center will see a photograph of "Powderpuff Football Game Cheerleaders," depicting male football players posing in cheerleader skirts. (First Am. Verif. Compl. ¶ 68.)

Drag is inherently expressive. During the 20th century, "drag matured into its present incarnation as a multivalent form of performance art and a commentary on social identity." Hoenig, 38 Cardozo Arts & Ent. L.J. at 551. Thus, drag may convey

---

[2] The National WWII Museum, *GIs as Dolls: Uncovering the Hidden Histories of Drag Entertainment During Wartime* (June 15, 2021), https://www.nationalww2museum.org/war/articles/drag-entertainment-world-war-ii [perma.cc/PA2B-YYWB].

social commentary or an ideological message. *See id.* at 551–52. And to the students of Spectrum WT, putting on a charity drag show is important to convey both messages advocating for and supporting the LGBTQ+ community. (First Am. Verif. Compl. ¶ 74.)

In planning its drag show, Spectrum WT instructed would-be performers not to engage in any "lewd" conduct. (*Id.* ¶ 79.) It forbade anyone under 18 from attending the on-campus event without a parent or guardian. (*Id.* ¶ 80.) And it made the event alcohol-free. (*Id.*) Spectrum WT even instructed performers not to use music containing profanity. (*Id.* ¶ 81.)

Following the university's regular processes, Spectrum WT reserved Legacy Hall for the event. (*Id.* ¶¶ 85–88, 90–92.) From the outset, West Texas A&M knew Spectrum WT intended to host a drag show—and that it would be PG-13. (*Id.* ¶¶ 77–78, 85, 94.) West Texas A&M's administration supported Spectrum WT's planning of the drag show throughout the facility request process, helping it navigate the necessary steps to move forward. (*Id.* ¶¶ 86–88, 91, 94, 99–100.)

Barrett Bright, Spectrum WT's President, took the lead role for Spectrum WT in organizing the drag show. (*Id.* ¶¶ 14, 87–88.) Dr. Shawn Fouts, a Senior Staff Director at the Jack B. Kelley Student Center, praised Bright's efforts in an email, writing: "I appreciate your attention to the event as you navigate everything else a college student has going on. We want to help ensure you have a great event." (*Id.* ¶ 87.) Bright, Stovall, and the rest of Spectrum WT continued their efforts to plan and promote the event, including inviting attendees. (*Id.* ¶¶ 90–92, 94–96.)

Spectrum WT received "Tentative Confirmation" for its event on February 27, 2023. (*Id.* ¶¶ 91, 99.) Bright kept doing everything necessary to meet the university's requirements for holding an event. (*Id.* ¶¶ 99–101.) But less than two weeks before the scheduled event, President Wendler thwarted Spectrum WT's efforts by banning not only the March 31 show, but all drag shows at West Texas A&M. (*Id.* ¶ 102.)

**Instead of following the Constitution, President Wendler decides to impose his personal views.**

Around lunchtime on March 20—just 11 days before the drag show—Bright received an email from Dr. Chris Thomas, West Texas A&M's Vice President for Student Affairs, asking to "meet with you and discuss your upcoming event." (*Id.* ¶ 103.) When Bright met with Vice President Thomas, he learned that West Texas A&M was canceling the charity drag show. (*Id.* ¶ 104.) When Bright asked why, Vice President Thomas said President Wendler did not like the idea of the drag show, believing it discriminated against women. (*Id.*)

Soon after, President Wendler sent a long email to West Texas A&M's students, faculty, and staff announcing that West Texas A&M "will not host a drag show on campus." (*Id.* ¶ 105 & Ex. A.) President Wendler proclaimed his personal opposition to his perceived messaging of Plaintiffs' show. (First Am. Verif. Compl. Ex. A.) For instance, he stated that drag shows stray from the "basis of Natural Law," which "declared the Creator's origin as the foundational fiber in the fabric of our nation." (*Id.*) And he claimed that drag shows are "a slapstick sideshow" that "becomes harassment" because, in his view, it is "sexism." (*Id.*)

7

Finally, Wendler told the campus he was openly defying the Constitution: "A harmless drag show? Not possible. I will not appear to condone the diminishment of any group at the expense of impertinent gestures toward another group for any reason, *even when the law of the land appears to require it*." (*Id.*) (emphasis added).

When President Wendler cancelled Spectrum WT's charity drag show, Plaintiffs had completed, or were trying to complete, all requirements necessary for the event to move forward as planned. (First Am. Verif. Compl. ¶ 113.) At no time did President Wendler—or any other Defendant or West Texas A&M staff member—give any reason other than Wendler's personal views as the reason for cancelling Spectrum WT's show and banning all drag shows on campus. (*Id.* ¶ 114.) Nor have Defendants Sharp and the Board of Regents members stopped Wendler's actions, despite having the power and duty to do so. (*Id.* ¶ 115.)

President Wendler has not rescinded his edict. (*Id.* ¶ 119.) Nor have the other Defendants disavowed Wendler's edict, including his ban on drag shows and the viewpoint-driven reasons for it.

**Plaintiffs are suffering irreparable injury.**

President Wendler's edict forced Plaintiffs to rent an off-campus venue to hold their charity drag show on March 31, 2023. (*Id.* ¶ 122.) By refusing to allow the event to move forward on campus, Wendler defied West Texas A&M policy, and the continued ban on drag shows and similar events injures Plaintiffs and deprives them of the benefits the campus expression  policy confers on all student groups. (App.15-16.)

8

Indeed, Plaintiffs, as West Texas A&M students, pay tuition and student fees to West Texas A&M, which—as does the State of Texas—promises Plaintiffs the ability to use venues on campus for expressive activities. (App.12-13; Tex. Educ. Code § 51.9315(g).) Thus, Defendants' drag show ban is injuring Plaintiffs because they cannot use a campus venue set aside for First Amendment expressive activity— including expression vital to carrying out their organization's mission. (First Am. Verif. Compl. ¶¶ 133, 144.) Likewise, Plaintiffs are injured because they can no longer exercise their First Amendment right to engage in protected expression by holding a drag show on campus or conduct similar events in the future. (*Id.* ¶ 136.) Although Plaintiffs managed to secure an alternative venue for their March 31 event, exiling Plaintiffs' expressive activities off campus burdens their ability to reach their intended audience, while also forcing them and other students to guess whether their expression will offend President Wendler's views—a chilling injury by any measure. (*Id.* ¶ 144.)

Because of President Wendler's edict banning drag shows and stifling other events he subjectively deems "inappropriate" or "degrading" to women, there is a concrete threat that President Wendler, Vice President Thomas, and the other Defendants will censor future events Plaintiffs have planned for the upcoming school year. These events include a "Queer Movie Night," which Spectrum holds several times annually. (*Id.* ¶ 130.) The next Queer Movie Night is scheduled for this coming Halloween in the Legends Club of the Student Center, when Plaintiffs intend to exhibit "The Rocky Horror Picture Show." (*Id.*) The cult-favorite film is famous for its

audience participation in musical numbers, including men adorning corsets and fishnets. (*Id.*) Plaintiffs also intend to hold an annual drag show and have already applied to hold the "Don't Be A Drag Drag Show" in Legacy Hall on March 22, 2024. (*Id.*) Each event is in imminent peril due to President Wendler's edict.

## ARGUMENT

Plaintiffs are entitled to a preliminary injunction because they satisfy their burden to demonstrate "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury [to Plaintiffs] if the injunction is denied outweighs any harm [to Defendants] that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009) (reversing and remanding for entry of preliminary injunction to protect the plaintiffs' First Amendment rights).

## I.   Plaintiffs Are Substantially Likely to Succeed on the Merits Against the University's Brazen Censorship of Protected Expression.

"The First Amendment is not an art critic," and drag shows, like other forms of theatrical performance, are expressive conduct that the First Amendment protects against President Wendler's subjective censorship. *Norma Kristie, Inc. v. City of Okla. City*, 572 F. Supp. 88, 91 (W.D. Okla. 1983) (holding drag shows are protected First Amendment expression). Indeed, the First Amendment prohibits President Wendler and the other Defendants from suppressing Plaintiffs' expression simply because they disagree with its viewpoint or find the message offensive. *Papish*, 410 U.S. at 670. And messaging within a broader genre—such as art, theater, and dancing—is

protected even if it does not convey a "narrow, succinctly articulable message." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 569 (1995); *see also Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386, 390 (4th Cir. 1993) (fraternity "ugly woman contest" is protected expression); *Berger v. Battaglia*, 779 F.2d 992, 999 (4th Cir. 1985) (holding a blackface performance is protected First Amendment expression, even when it is "sheer entertainment" without a political message).

Likewise, the First Amendment bars Defendants from denying Plaintiffs and other student groups access to campus public forums like Legacy Hall because of their message's content or viewpoint. *Widmar v. Vincent*, 454 U.S. 263, 267–70 (1981). Finally, President Wendler imposing his views at the expense of free expression is an unconstitutional prior restraint because it makes "speech contingent on the will of an official." *Chiu v. Plano Indep. Sch. Dist.*, 339 F.3d 273, 280 (5th Cir. 2003).

For these reasons, the Court should stop the ongoing injury to Plaintiffs' First Amendment freedoms and restore constitutional order on West Texas A&M's campus by issuing a preliminary injunction.

### A. President Wendler's Censorship of a Drag Show Based on Personal Disagreements with the Expression's Message Is Textbook Viewpoint Discrimination.

President Wendler's abuse of his powers to censor a PG-13 charity drag show because he disagrees with the show's message—real or perceived—violates the First Amendment's bar against viewpoint discrimination. "Viewpoint discrimination is [ ] an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective

of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995). And "censorship based on a state actor's subjective judgment that the content of protected speech is offensive or inappropriate is viewpoint discrimination." *Robinson v. Hunt County*, 921 F.3d 440, 447 (5th Cir. 2019) (citing *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017)). Indeed, government officials like college administrators are "inherently" incapable of making "principled distinctions" between offensive and inoffensive speech, and the state has "no right to cleanse" public expression such that it is "palatable to the most squeamish among us." *Cohen v. California*, 403 U.S. 15, 25 (1971).

To that end, "state colleges and universities are not enclaves immune from the sweep of the First Amendment." *Healy v. James*, 408 U.S. 169, 180 (1972). And that includes the First Amendment's prohibition on viewpoint discrimination. *Rosenberger*, 515 U.S. at 835–36 (invalidating college's denial of funding to Christian student newspaper). No matter the on-campus venue, "it is well settled that viewpoint discrimination is a clearly established violation of the First Amendment in any forum." *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 350 (5th Cir. 2001).

By picking and choosing which performances fit his moral tastes, President Wendler is engaging in viewpoint discrimination. Indeed, "the essence of viewpoint discrimination" is "the Government's disapproval of . . . messages it finds offensive." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019) (quoting *Matal*, 582 U.S. at 248–49 (Kennedy, J., concurring)). And President Wendler's own words leave no doubt: He banned drag shows because he finds their message "derisive, divisive and

12

demoralizing misogyny, no matter the stated intent." (First Am. Verif. Compl., Ex. A.)

President Wendler's stance mirrors that of the censorial officials in *Southeastern Promotions v. Conrad*, 420 U.S. 546 (1975). There, a group asked to use a city-operated municipal auditorium to present the rock musical *Hair*. *Id.* at 547. The auditorium directors denied the application, reasoning that allowing the play "was not in the best interest of the community" and the board would only "allow those productions which are clean and healthful and culturally uplifting, or words to that effect." *Id.* at 549. The Supreme Court struck down the directors' censorship as an unconstitutional prior restraint. To the same end, this Court should end Defendants' ongoing viewpoint-based censorship of Plaintiffs' PG-13 charity drag show.

The Fourth Circuit's decision in *Iota Xi* also shows why the Court should enjoin Defendants' censorship. 993 F.2d 386. There, George Mason University imposed sanctions on a fraternity for hosting an "ugly woman contest" riddled with "racist and sexist" overtones, including contestants "dressed as caricatures of different types of women[]" (*i.e.*, in drag). *Id.* at 387–88. George Mason's administrators cited many of the same concerns President Wendler relies on—that the event was degrading, amounted to harassment, and conflicted with the institution's mission. *Id.* at 388; First Am. Verif. Compl. Ex. A.

The Fourth Circuit had no trouble brushing aside the administrators' excuses. As the court explained, "First Amendment principles governing live entertainment are relatively clear: short of obscenity, it is generally protected." *Iota Xi*, 993 F.2d at

389 (collecting cases). The court likewise held the fraternity's drag skit was constitutionally protected, since it intended to convey a message, both through the mode of dress and use of a theatrical medium. *Id.* at 392. The court held GMU engaged in unconstitutional viewpoint discrimination by sanctioning the fraternity as the sanction arose from the fact that "the 'ugly woman contest' . . . ran counter to the views the University sought to communicate to its students and the community." *Id.* at 393.

Even if President Wendler's opinion were shared by all but Spectrum WT's student membership, he cannot justify stifling Plaintiffs' expression on moral grounds. *Papish*, 410 U.S. at 670. That argument lost in *Southeastern Promotions*. It lost in *Iota Xi*. And it must lose here. *See also Gay Student Servs. v. Tex. A & M Univ.*, 737 F.2d 1317, 1322–27 (5th Cir. 1984) (holding Texas A&M violated the First Amendment by refusing to recognize a gay student organization when the official responsible for the denial justified the decision "based on his perception that the organization would attempt to convey ideas" he found morally repugnant).

This Court should refuse Wendler's viewpoint-driven reasons for violating the First Amendment, grant Plaintiffs' motion, and put a stop to Wendler and the other Defendants' ongoing censorship of Plaintiffs' protected expression.

### B. Excluding Plaintiffs' Drag Show from Campus Public Forums Violates the First Amendment.

President Wendler's denial of use of a campus public forum to Plaintiffs also violates the First Amendment, to their ongoing injury. Legacy Hall is a designated public forum for First Amendment purposes. West Texas A&M opens its facilities,

like Legacy Hall, to West Texas A&M students and student organizations for expression like theatrical performances, music, and dancing, all before a willing audience. (First Am. Verif. Compl. ¶¶ 33–37; App. 12-13, 15-17.) Thus, because "the University has created a forum generally open for use by student groups," "the University must therefore satisfy the standard of review appropriate to content-based exclusions." *Widmar*, 454 U.S. at 270; *see also Pro-Life Cougars v. Univ. of Hous.*, 259 F. Supp. 2d 575, 582 (S.D. Tex. 2003) ("When as here a University by policy and practice opens up an area for indiscriminate use . . . by some segment of the public, such as student organizations, such area may be deemed to be a designated public forum").

Under the First Amendment, "a government . . . has no power to restrict expression because of its message, its ideas, its subject matter, or its content" unless it satisfies strict scrutiny. *Reed v. Town of Gilbert,* 576 U.S. 155, 163 (2015) (cleaned up). To meet that high bar here, Defendants "must show that [their] regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Widmar*, 454 U.S. at 270.[3] They cannot meet that burden. *See United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000) ("When the Government restricts

---

[3] Universities may also impose content-neutral "reasonable time, place, and manner regulations." *Widmar*, 454 U.S. at 276. Since West Texas A&M is prohibiting drag shows outright, and is discriminating based on content to boot, the time, place, or manner test is inapplicable. *See Ne. Women's Ctr., Inc. v. McMonagle*, 939 F.2d 57, 63 (3d Cir. 1991) (explaining that a time, place, and manner restriction "regulates when, where, and how [a citizen] may speak, but not what he may say").

speech, the Government bears the burden of proving the constitutionality of its actions.")

For starters, a ban on drag shows is content-based (if not outright viewpoint-based, as shown above). It singles out a particular type of expression—drag—for differential treatment. That is textbook content discrimination. *Reed*, 576 U.S. at 169 (content discrimination exists when the government "singles out a specific subject matter for differential treatment").

Defendants' content-based ban of campus drag shows—including canceling Plaintiffs' March 31 show—fails strict scrutiny. And *Widmar* shows why. In *Widmar*, the University of Missouri at Kansas City denied an evangelical Christian student group the use of university facilities otherwise "generally available for . . . registered student groups." *Widmar*, 454 U.S. at 264–65. The Supreme Court explained that such restrictions, which single out a particular subject for differential treatment, are subject to "the most exacting scrutiny." *Id.* at 276. The Court held that the university unlawfully "discriminated against student groups and speakers based on their desire to use a generally open forum to engage in" protected expression and that the university's stated goal, "achieving greater separation of church and State," was not sufficiently "'compelling' to justify content-based discrimination against respondents' religious speech." *Id.* at 269, 278.

Here, advancing President Wendler's belief that drag shows promote "misogyny" is not a compelling state interest. (First Am. Verif. Compl. Ex. A.) First, banning drag shows does not prevent tangible harm to women. Any women (or men)

who might take offense from a drag show can simply not attend. Likewise, those who agree with President Wendler's distaste for the students' expression can "effectively avoid further bombardment of their sensibilities simply by averting their eyes." *Cohen*, 403 U.S. at 21.

Rather, President Wendler, like the administrators in *Iota Xi*, seeks to suppress Plaintiffs' speech "because it r[uns] counter to the views the University s[eeks] to communicate to its students and the community." 993 F.2d at 393. That is not redressing a harm. It is big-brother government insisting it "knows what's best" for women and that it can silence dissenting expression. But "[t]he state may not ordain preferred viewpoints [about women and femininity] in this way. The Constitution forbids the state to declare one perspective right and silence opponents." *Am. Booksellers Ass'n v. Hudnut*, 771 F.2d 323, 325 (7th Cir. 1985). And when it comes to student expression at public institutions, "the mere dissemination of ideas— no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Papish*, 410 U.S. at 670.

Nor is Defendants' ban on drag shows narrowly tailored or the least restrictive means of furthering their goals. *See Playboy Ent. Grp.*, 529 U.S. at 813 (content regulation permissible only if the government "chooses the least restrictive means to further the articulated interest") (cleaned up). Neither President Wendler nor the other Defendants have banned any other type of expression from campus which might tend to disparage or demean women. And a content-based law is not narrowly tailored if it leaves untouched a significant amount of expression causing the same problem.

17

*Reed*, 576 U.S. at 172. Plus, the government's objection to a speaker's message is not even a legitimate government interest, let alone a compelling one.

America's college campuses are no stranger to censorship, which is often visited upon students and faculty who find themselves among the minority viewpoint—including, in many cases, conservative and religious groups. *See, e.g.*, *Widmar,* 454 U.S. at 265; *Rosenberger*, 515 U.S. at 830. From Central Washington University threatening to defund the College Republicans for protected speech,[4] to Iowa State University threatening to punish the College Republicans for protected speech,[5] to pro-life groups having to fight for recognition at the University of Arizona,[6] censorship of expression on public campuses continues to fester. But students' expressive rights should not, and do not, turn on the whims of college administrators. The First Amendment does not play favorites.

President Wendler's censorship singles out one type of artistic expression from many—drag—for differential treatment and censorship simply because he dislikes the message he perceives. This is unconstitutional viewpoint discrimination. And

---

[4] Will Creeley, *Twin Victories At Central Washington, Montclair State as First Amendment Trumps Student Government Censorship*, FIRE (Mar. 11, 2008), https://www.thefire.org/news/twin-victories-central-washington-montclair-state-first-amendment-trumps-student-government [perma.cc/2UQ3-ESPN].

[5] Alex Morey, *Iowa State Stands Up for First Amendment After FIRE Letter, Turns Down Demands to Violate Law*, FIRE (Nov. 18, 2020), https://www.thefire.org/news/iowa-state-stands-first-amendment-after-fire-letter-turns-down-demands-violate-law [perma.cc/TG5G-7B5F].

[6] Press Release, FIRE, *Victory: Pro-Life Student Group Finally Recognized at University of Arizona* (Apr. 21, 2010), https://www.thefire.org/news/victory-pro-life-student-group-finally-recognized-university-arizona [perma.cc/B689-YSQ3].

putting aside President Wendler's confessed motives, the ban is unlawful content discrimination. A preliminary injunction is necessary to secure Plaintiffs' First Amendment rights.

### C. President Wendler's Edict Imposes an Unconstitutional Prior Restraint on Plaintiffs' Protected Expression.

As the Supreme Court held, when officials like President Wendler deny a speaker access to a public forum because the speaker's message does not fit a public official's moral criteria, they impose an unconstitutional prior restraint. In *Southeastern Promotions*, the Supreme Court concluded that city officials imposed an unconstitutional prior restraint by excluding *Hair* from a municipal theater because it did not meet the government's "clean and healthful and culturally uplifting" criteria. 420 U.S. at 549. In the same way, President Wendler's edict excludes Plaintiffs from campus fora because of his moral disagreement with the message of Plaintiffs' show. Just as the Supreme Court struck down the prior restraint in *Southeastern Promotions*, the Court should enjoin the university's prior restraint here.

The Fifth Circuit's decision in *Gay Student Services v. Texas A&M University* provides even more reason to hold that President Wendler's edict imposes a prior restraint. 737 F.2d 1317. There, the Fifth Circuit held that Texas A&M University violated the First Amendment when an administrator refused to recognize the Gay Student Services student group "clearly based on his perception that the organization would attempt to convey ideas about homosexuality," which he believed were harmful. *Id.* at 1323. Looking to a prior decision, the Fifth Circuit affirmed that when

a "restriction upon student expression takes the form of an attempt to predict in advance the content and consequences of that expression, it is tantamount to a prior restraint and carries a heavy presumption against its constitutionality." *Id.* at 1325 (quoting *Univ. of S. Miss. Chapter, Miss. C.L. Union v. Univ. of S. Miss.*, 452 F.2d 564, 566 (5th Cir. 1971)).

Here, just as in *Gay Student Services*, Wendler's edict rests on his subjective views about Plaintiffs' expression and his attempt to "predict in advance the content and consequences" of Plaintiffs' expression. *Id.* In fact, his edict leaves no doubt, accusing the messages that drag conveys of being "demeaning," "derisive," "mocking," "objectifying," and "inappropriate." (First Am. Verif. Compl. Ex. A.) The Supreme Court and Fifth Circuit both made clear that public officials cannot restrain expression based on criteria like Wendler's.

In fact, the only way public officials can justify a prior restraint on access to a public forum—if ever—is by pointing to "narrow, objective, and definite standards to guide" officials in granting or denying access. *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51 (1969). Wendler's skewed criteria are none of those things. And even if they were, the university lacks safeguards to "obviate[s] the dangers of a censorship system" based on viewpoint-based determinations, including: (1) the state bearing the burden of proving that the speech is unprotected; (2) an adversarial proceeding and judicial determination of whether the speech is protected; and (3) ensuring that "within a specified brief period," the school "either issue[s] a license or go[es] to court to restrain" the speech. *Freedman v. Maryland*, 380 U.S. 51, 58–59

20

(1965); *see also Se. Promotions*, 420 U.S. at 559–60 (finding the moral standards used to censor *Hair* did not satisfy the *Freedman* safeguards).

At its core, President Wendler's edict subjects student expression to university review to figure out whether it falls within his personal view of "inappropriate." West Texas A&M makes campus spaces like Legacy Hall available to all student events (as Texas law requires[7]), provided the students first apply to campus administrators to reserve the space and submit a "full description" of the event. (First Am. Verif. Compl. ¶ 196.) But now, President Wendler has effectively compelled West Texas A&M staff and administrators to deny student groups access to these public fora if an application describes a message that might meet President Wendler's subjective views of what is "inappropriate," "divisive," "harmful," "demeaning," "objectifying," "diminishing" others, "denigrating" others, or "stereotyping" others. (First Am. Verif. Compl. Ex. A.) And if they don't deny access, President Wendler has shown that he will. (*Id.*)

In sum, the First Amendment forbids Defendants from imposing an impermissible content- and viewpoint-discriminatory prior restraint on Plaintiffs' expression. Thus, a preliminary injunction is necessary to restore the First Amendment to West Texas A&M.

## II. Plaintiffs Will Suffer Irreparable Harm Absent Immediate Relief.

Without a preliminary injunction, Plaintiffs' protected First Amendment expression will remain banned from public fora at a state university. That is quintessential irreparable harm. *Elrod*, 427 U.S. at 373 ("The loss of First

---

[7] Tex. Educ. Code § 51.9315(g)

Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"); *see also Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) ("We have repeatedly held . . . that the loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury justifying the grant of a preliminary injunction.").

Plaintiffs want to hold drag shows and similar expressive events in campus facilities that West Texas A&M holds open to student groups for expression. (First Am. Verif. Compl. ¶¶ 127, 130.) Yet President Wendler's ongoing edict has exiled Plaintiffs off-campus, forcing them to seek alternative venues to host a drag show or other event that does not meet Wendler's personal views—or instead dilute their message. "[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Se. Promotions*, 420 U.S. at 556 (quoting *Schneider v. New Jersey*, 308 U.S. 147, 163 (1939)). But if Defendants continue to force Plaintiffs' expression off campus, it will injure Plaintiffs by multiplying the cost and effort for Plaintiffs to put on their events. (First Am. Verif. Compl. ¶ 144.)

The ongoing ban on campus drag shows and other events that Defendants deem "inappropriate" also injures Plaintiffs' ability to reach their intended audience. Because sharing its message on campus is vital to Spectrum WT's mission, the group's ability to express its viewpoint is harmed if it cannot hold its planned events at West Texas A&M. (*Id.*) Their intended audience and Spectrum WT's members may be less inclined to attend an event held off campus. Moreover, the ongoing drag ban

22

conveys that the university considers Plaintiffs' expression second-class (if that). And President Wendler's edict is causing Plaintiff Bright to second-guess his and Spectrum's protected expression. (*Id.* ¶ 145.) By any measure, forcing students to live in constant fear of administrative censorship harms their First Amendment rights.

Plaintiffs are already planning and have applied to hold events that would violate Wendler's edict. They intend to hold a showing of "The Rocky Horror Picture Show"—a cult-classic film renowned for audience participation, including dressing in gender non-conforming attire—on October 31. (*Id.* ¶ 130.) And Plaintiffs have worked to hold a second iteration of the same show Wendler has banned from West Texas A&M facilities. (*Id.*) Without an injunction, Spectrum WT's ability to engage in protected expression on campus and share its message with its intended audience will continue to suffer.

## III.   The Balance of Harms and the Public Interest Favor Plaintiffs' First Amendment Rights.

The balance of harms favors Plaintiffs. The harm to Americans in losing their First Amendment rights "is presumptively great" because a violation of First Amendment rights "constitutes irreparable injury." *Ass'n of Club Execs. of Dall., Inc. v. City of Dall.*, 604 F. Supp. 3d 414, 439 (N.D. Tex. 2022). By contrast, President Wendler identifies no potential harm to the university (or himself) from the drag show proceeding other than his personal offense. That's not enough. Indeed, the Supreme Court has explained the notion that public educational institutions "do not endorse

everything they fail to censor is not complicated." *Bd. of Educ. of the Westside Cmty. Schs. v. Mergens By & Through Mergens*, 496 U.S. 226, 250 (1990) (plurality opinion).

In addition, the Fifth Circuit has been clear that "injunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter.*, 732 F.3d at 539 (quoting *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006)). Even the State of Texas would seemingly agree that an injunction here would benefit the public interest, having passed a 2019 campus free speech law forbidding universities from "tak[ing] action against a student organization or deny[ing] the organization any benefit generally available to other student organizations at the institution on the basis of a political, religious, philosophical, ideological, or academic viewpoint expressed by the organization or of any expressive activities of the organization." Tex. Educ. Code § 51.9315(g). In sum, a preliminary injunction will serve the public interest. That is one more reason to grant Plaintiffs' motion.

## IV.   The Court Should Waive the Bond Requirement Because Plaintiffs Seek Only to Protect Their First Amendment Rights.

The amount of security for a bond under Fed. R. Civ. P. 65 is within the Court's discretion, meaning a Court may waive the bond requirement. *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996). When, as here, plaintiffs seek to vindicate their constitutional rights and the potential monetary harm to the defendants is negligible, courts have rightly waived the bond requirement. Indeed, the Fifth Circuit explained that "public-interest litigation" is "an area in which the courts have recognized an exception to the Rule 65 security requirement." *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. 1981). Because Plaintiffs

24

are engaging in public-interest litigation to vindicate First Amendment rights, the Court should waive the bond requirement. *See, e.g., Gbalazeh v. City of Dall.*, No.: 18-cv-0076, 2019 WL 2616668, at *2 (N.D. Tex. June 25, 2019) (citing *City of Atlanta* and waiving bond requirement when granting preliminary injunction on First Amendment grounds); *Gordon v. City of Hous.*, 79 F. Supp. 3d 676, 695 (S.D. Tex. 2015) (waiving bond requirement when granting preliminary injunction on First Amendment grounds).

## **CONCLUSION**

For all these reasons, Plaintiffs ask that the Court grant their motion for a preliminary injunction.

Respectfully submitted,

/s/ JT Morris
JT MORRIS
TX Bar No. 24094444
FOUNDATION FOR INDIVIDUAL
    RIGHTS AND EXPRESSION
700 Pennsylvania Ave., SE
Ste. 340
Washington, DC 20003
Tel: (215) 717-3473
Fax: (267) 573-3073
jt.morris@thefire.org

CONOR T. FITZPATRICK*
MI Bar No. P78981
ADAM B. STEINBAUGH*
PA Bar No. 326475
JEFFREY D. ZEMAN*
Pa. Bar No. 328570
FOUNDATION FOR INDIVIDUAL
    RIGHTS AND EXPRESSION
510 Walnut St.; Ste. 1250

Philadelphia, PA 19106
Tel: (215) 717-3473
Fax: (267) 573-3073
conor.fitzpatrick@thefire.org
adam@thefire.org
jeff.zeman@thefire.org

* Admitted *Pro Hac Vice*

*Attorneys for Plaintiffs*
    *Spectrum WT, Barrett Bright,*
    *and Lauren Stovall*

## CERTIFICATE OF SERVICE

I hereby certify that on April 20, 2023, a true and correct copy of the foregoing document was transmitted via using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

/s/ JT Morris
JT Morris
FOUNDATION FOR INDIVIDUAL
 RIGHTS AND EXPRESSION