UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| SPECTRUM WT, *et al.*, | § | |
|     *Plaintiffs*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:23-CV-048-Z |
| | § | |
| WALTER WENDLER, *et al.*, | § | |
|     *Defendants.* | § | |

---

## DEFENDANT WENDLER'S BRIEF IN SUPPORT OF HIS MOTION TO DISMISS UNDER RULE 12(b)(1) & 12(b)(6)

---

# TABLE OF CONTENTS

Table of Contents ......................................................................................................... 2

Table of Authorities ..................................................................................................... 3

Facts ............................................................................................................................. 5

Procedural Background ................................................................................................ 7

Standard ....................................................................................................................... 7

    I.    Standard of Dismissal under Rule 12(b)(6). ..................................................... 7

    II.   Standard for Dismissal under Rule 12(b)(1) ..................................................... 7

Motion to Dismiss ....................................................................................................... 8

    I.    Plaintiffs fail to state a claim against Defendant Wendler. The Court should dismiss Plaintiffs' claims against him under Rule 12(b)(6). ................................................. 8

        A.    Plaintiffs have no right to host a drag show on the WTAMU campus. .......................... 8

            1.    Drag shows are not inherently expressive. ................................................. 8

                a.    The law of expressive conduct. ..................................................... 8

                b.    Under *FAIR*, drag shows are not inherently expressive conduct. ...................... 10

            2.    Universities may prohibit lewd conduct and speech. ............................................. 13

                a.    Drag shows can be noncommunicative, lewd conduct. ..................................... 13

                b.    Lewd speech and conduct on campus are not protected by the First Amendment. 14

        B.    Defendant Wendler is entitled to qualified immunity to the claims against him in his individual capacity because Plaintiffs have no clearly-established right to host a drag show on the WTAMU campus. ......................................................................................... 15

    II.   The *Ex parte Young* exception to sovereign immunity does not apply to Plaintiffs' claims against President Wendler in his official capacity. .................................................. 21

Conclusion ................................................................................................................. 23

Certificate of Service ................................................................................................. 25

# TABLE OF AUTHORITIES

Cases

*Abbott v. Pastides,*
    900 F.3d 160 (4th Cir. 2018) .................................................................... 17

*Ashcroft v. al-Kidd,*
    563 U.S. 731 (2011) ............................................................................... 16

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ............................................................................... 16

*Berger v. Battaglia,*
    779 F.2d 992 (4th Cir. 1985) ............................................................... 20, 21

*Bethel School District No. 403 v. Fraser,*
    478 U.S. 675 (1986) ............................................................................... 15

*Canady v. Bossier Par. Sch. Bd.,*
    240 F.3d 437 (5th Cir. 2001) .................................................................. 13

*Clark v. Cmty. for Creative Non-Violence,*
    468 U.S. 288 (1984) ................................................................................. 9

*Corn v. Miss. Dep't of Pub. Safety,*
    954 F.3d 268 (5th Cir. 2020) .................................................................. 22

*Green Valley Planned Parenthood Gulf Coast, Incorporated v. Phillips,*
    5 F.4th 568 (5th Cir. 2021) .................................................................... 22

*Hazelwood Sch. Dist. v. Kuhlmeier,*
    484 U.S. 260 (1988) ............................................................................... 17

*Healey v. James,*
    408 U.S. 169, 192–93 (1972) ............................................................... 15, 21

*Hunt v. Board of Regents of the University of New Mexico,*
    792 Fed. Appx. 595 (10th Cir. 2019) ....................................................... 18

*Hunter v. Bryant,*
    502 U.S. 224 (1991) ............................................................................... 16

*Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.,*
    993 F.2d 386 (4th Cir. 1993) .................................................................. 20

*Martin v. Parrish,*
    805 F.2d 583 (5th Cir. 1986) .................................................................. 15

*Morgan v. Swanson,*
    755 F.3d 757, 761 (5th Cir. 2011) ........................................................ 17, 18

*Mullenix v. Luna,*
    577 U.S. 7 (2015) .................................................................................. 16

*Murphy v. Amarillo Nat'l Bank,*
    No. 2:20-CV-048-Z, 2021 WL 40779 (N.D. Tex. Jan. 5, 2021) ...................... 8

*Norma Christie v. City of Okla. City,*
    572 F. Supp. 88 (W.D. Okla. 1983) ......................................................... 19

*Papish v. Board of Curators of University of Missouri,*
    410 U.S. 667 (1973) ............................................................................... 20

*Partners & Friends Holding Corp. v. Cottonwood Minerals L.L.C.*,
   No. 3:22-CV-02502-Z-BR, 2023 WL 2291252 (N.D. Tex. Jan. 27, 2023) ................................ 7

*Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*,
   506 U.S. 139 (1993) .......................................................................................................... 22

*Radwan v. Manuel*,
   55 F.4th 101 (2d Cir. 2022) ........................................................................................... 17, 18

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,
   547 U.S. 47 (2006) ..................................................................................................... 9, 11, 12

*Sasser v. Board of Regents of Univ. System of Georgia*,
   2023 WL 2446720 (11th Cir. Mar. 10, 2023) ................................................................... 18

*United States v. O'Brien*,
   391 U.S. 367 (1968) ......................................................................................................... 10

*Widmar v. Vincent*,
   454 U.S. 263 (1981) ......................................................................................................... 21

*Wilkerson v. Univ. of N. Tex.*,
   878 F.3d 147 (5th Cir. 2017) ............................................................................................ 16

*Williams ex rel. J.E. v. Reeves*,
   954 F.3d 729 (5th Cir. 2020) ............................................................................................ 21

There is no authority, and no clearly-established authority, that the First Amendment gives students a right to host on-campus drag shows, so Defendant Wendler is entitled to qualified immunity in his individual capacity. The Court should dismiss Plaintiffs' claims against Defendant Wendler in his individual capacity under Rule 12(b)(6) for failure to state a claim.

There is no constitutional right to put on an on-campus drag show, so the *Ex parte Young* exception does not overcome Defendant Wendler's sovereign immunity in his official capacity. The Court should dismiss Plaintiffs' claims against Defendant Wendler in his official capacity under Rule 12(b)(1) for lack of subject-matter jurisdiction.

## FACTS

Plaintiffs requested permission to host a drag show on March 31, 2023 at Legacy Hall on the WTAMU campus. ECF 28 at 18. The stated purpose of the drag show was "to raise funds for an LGBTQ+ charity" with the proceeds "earmarked for donation to an LGBTQ+ suicide-prevention group." ECF 28 at 5, 18.

Plaintiffs allow that "some drag performances are intentionally risqué." ECF 28 at 18 ¶ 74. But they say that they "planned and intended its charity drag show to be 'PG-13,'" and "informed [WTAMU] administration and staff" that the show would be PG-13. ECF 28 at 18 ¶¶ 77, 78. "Consistent with its commitment to a 'PG-13' show, Spectrum WT instructed performers not to engage in any 'lewd' conduct." ECF 28 at 18 ¶ 79. In contrast to their allegation that they informed WTAMU administration and staff that the show was intended to be "PG-13," Plaintiffs do not allege that they informed WTAMU administration and staff that they instructed performers not to engage in any lewd conduct. Additionally, "Spectrum WT forbade anyone under 18 from attending the even unless accompanied by a parent or guardian." ECF 28 at 18 ¶ 80. Forbidding

minors to attend without a parent or guardian is more consistent with an R-rated movie than a PG-13-rated movie.

On March 20, Defendant Walter V. Wendler, the President of WTAMU, decided not to approve the show and announced the decision in an email to WTAMU students, faculty, and staff. Wendler expressed solidarity with the charitable aspect of the event: "The nonprofit organization focuses on suicide prevention—a noble cause—in the LGBTQ community. Any person considering self-harm for any reason is tragic." ECF no. 28-1. But he objected to the drag show content of the event, saying that it "sterotype[s] women," "discriminate[] against womanhood," and is "misogynistic behavior." *Id*. He opined that drags shows are "derisive, divisive and demoralizing misogyny." *Id*. He compared the drag show to "debas[ing] Latinas" and a "'blackface' performance." *Id*.

Spectrum WT sued, but then held the drag show on April 1 at a public park. ECF 28 at 25 ¶ 123.

Plaintiffs allege that Defendant Wendler's actions harmed them. They seek compensatory, nominal, and punitive damages against him in his individual capacity. They also seek declaratory relief against him. ECF 28 at 48–49.

Plaintiffs further seek injunctive relief against Defendant Wendler and the other Defendants enjoining them from "from enforcing President Wendler's prohibition on 'drag shows' in campus facilities generally available for student group use" and "from enforcing the viewpoint- and content-discriminatory prohibitions on expressive activity contained in Wendler's March 20, 2023 edict, when making West Texas A&M University facilities or spaces available to Plaintiffs or other student organizations." ECF 28 at 48.

## PROCEDURAL BACKGROUND

Plaintiffs filed this lawsuit on March 24, 2023, seeking a temporary restraining order that they be allowed to hold the drag show on campus on March 31, seeking injunctive and declaratory relief to the effect that they will be allowed to hold drag shows on campus in the future, compensatory, nominal, and punitive damages against President Wendler in his individual capacity, and attorney's fees and costs. ECF 1, 8. On March 29, they withdrew their request for a TRO allowing the March 31 show to proceed on campus. ECF 16. On April 18, after they held their event elsewhere, they filed an amended complaint seeking the same relief as before, except they no longer seek a TRO, and on April 20 they filed an amended motion for preliminary injunction, seeking to enjoin Defendants from prohibiting drag shows in the future.

## STANDARD

### I.  Standard of Dismissal under Rule 12(b)(6).

A complaint should be dismissed if it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The court evaluates the pleadings by accepting all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff. *Partners & Friends Holding Corp. v. Cottonwood Minerals L.L.C.*, No. 3:22-CV-02502-Z-BR, 2023 WL 2291252, at *2 (N.D. Tex. Jan. 27, 2023) (cleaned up). To survive a motion to dismiss, a complaint must allege enough facts to state a claim to relief that is plausible on its face. *Id*. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*.

### II.  Standard for Dismissal under Rule 12(b)(1)

A complaint should be dismissed if the court "lack[s] [] subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). Federal courts are courts of limited jurisdiction which possess only that power

7

authorized by Constitution and statute. *Murphy v. Amarillo Nat'l Bank*, No. 2:20-CV-048-Z, 2021 WL 40779, at *2–3 (N.D. Tex. Jan. 5, 2021). The requirement that jurisdiction be established as a threshold matter springs from the nature and limits of the judicial power of the United States and is inflexible and without exception. *Id*. When a motion to dismiss for lack of subject-matter jurisdiction is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits. *Id*. Further, where a claim could be dismissed under Rule 12(b)(1) or Rule 12(b)(6), the court should dismiss only on the jurisdictional ground without reaching the question of failure to state a claim. *Id*. By doing so, courts avoid issuing advisory opinions. *Id*. Additionally, this prevents courts without jurisdiction from prematurely dismissing a case with prejudice. *Id*.

A Rule 12(b)(1) motion can mount either a facial or factual challenge. *Id*. When a party makes a Rule 12(b)(1) motion without including evidence, the challenge to subject matter jurisdiction is facial. *Id*. The court assesses a facial challenge as it does a Rule 12(b)(6) motion in that it looks only at the sufficiency of the allegations in the pleading and assumes them to be true. If the allegations are sufficient to allege jurisdiction, the court must deny the motion. *Id*.

## MOTION TO DISMISS

**I. Plaintiffs fail to state a claim against Defendant Wendler. The Court should dismiss Plaintiffs' claims against him under Rule 12(b)(6).**

**A. Plaintiffs have no right to host a drag show on the WTAMU campus.**

**1. Drag shows are not inherently expressive.**

**a. The law of expressive conduct.**

Plaintiffs do not allege that drag shows contain speech. Instead, they allege that drag performances are "expressive conduct" protected by the First Amendment. Plaintiffs bear the

burden of establishing that their conduct contains an expressive element. *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984) ("it is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies. To hold otherwise would be to create a rule that all conduct is presumptively expressive.").

Sometimes, "the expressive nature of the conduct … brings that conduct within the First Amendment's protection." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 65 (2006) ("*FAIR*"). To determine "whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, [the Supreme Court] [has] asked whether an intent to convey a particularized message was present, and whether the likelihood was great that the message would be understood by those who viewed it." *Texas v. Johnson*, 491 U.S. 397, 404 (1989).

The Supreme Court elaborated on the meaning of "expressive conduct" in *FAIR*, There:

> When law schools began restricting the access of military recruiters to their students because of disagreement with the Government's policy on homosexuals in the military, Congress responded by enacting the Solomon Amendment [citation omitted]. That provision specifies that if any part of an institution of higher education denies military recruiters access equal to that provided other recruiters, the entire institution would lose certain federal funds. The law schools responded by suing, alleging that the Solomon Amendment infringed their First Amendment freedoms of speech and association.

547 U.S. at 51.

In determining whether restricting access of military recruiters law schools because of disagreement with the Government's policy on homosexuals in the military was expressive conduct protected by the First Amendment, the Supreme Court first reaffirmed its rejection of "the view that conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." 547 U.S. at 65–66 (cleaned up) (citing *United States v. O'Brien*,

391 U.S. 367 (1968) (holding that burning a draft card in protest of the Vietnam War was not expressive conduct, and that even if the act included expressive conduct, the government could regulate and criminalize the nonexpressive conduct of burning a draft card)). "Instead, [courts] have extended First Amendment protection only to conduct that is inherently expressive." *Id.* at 66.

The *FAIR* court held that restricting access of military recruiters was not protected by the First Amendment because it was not inherently expressive, explaining:

> Prior to the adoption of the Solomon Amendment's equal access requirement, law schools "expressed" their disagreement with the military by treating military recruiters differently from other recruiters. But these actions were expressive only because the law schools accompanied their conduct with speech explaining it. For example, the point of requiring military interviews to be conducted on the undergraduate campus is not "overwhelmingly apparent" [citing *Johnson*, 491 U.S. at 406]. An observer who sees military recruiters interviewing away from the law school has no way of knowing whether the law school is expressing its disapproval of the military, all the law school's interview rooms are full, or the military recruiters decided for reasons of their own that they would rather interview someplace else.
>
> The expressive component of a law school's actions is not created by the conduct itself but by the speech that accompanies it. The fact that such explanatory speech is necessary is strong evidence that the conduct at issue here is not so inherently expressive that it warrants protection under *O'Brien*. If combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into "speech" simply by talking about it. For instance, if an individual announces that he intends to express his disapproval of the Internal Revenue Service by refusing to pay his income taxes, we would have to apply *O'Brien* to determine whether the Tax Code violates the First Amendment. Neither *O'Brien* nor its progeny supports such a result.

*FAIR*, 547 U.S. at 66.

### b. Under *FAIR*, drag shows are not inherently expressive conduct.

Plaintiffs argue that drag shows are expressive conduct in the following ways:

- "Today, drag has become a mainstream form of performance art and a commentary on identity." ECF 28 at 17 ¶ 69.

- "Over the past half-century, the public has come to associate drag with advocacy in favor of LGBTQ+ rights." *Id* ¶ 70.

- "Drag performances carry an ideological message of support and acceptance for the LGBTQ+ community." *Id.* ¶ 71.

- "Drag performances have, in the current political climate, taken on a renewed political tone, offering counter-messaging against efforts to ban or regulate expression relating to gender or sexual identity." *Id.* ¶ 72.

There are exactly the kinds of explanations that, under *FAIR*, show that drag shows are ***not*** inherently expressive conduct. The proposed drag show is expressive only to the extent that Plaintiffs explain how it is supposedly expressive. It is simply untrue that—as a matter of law—all drag shows inherently express points of view, let alone the points of view expressed above. For instance, many drag shows are pure entertainment. An observer watching a drag show has no way of knowing whether the performers are expressing anything unless the performance is accompanied by an explanation of the alleged message. But that means that drag shows are not inherently expressive, and are not protected by the First Amendment. The supposed messages of drag shows cannot be understood without explanatory speech.

Plaintiffs' arguments would just as unavailing if they had proposed to put on any other performative activity. If, for instance, Plaintiffs proposed to have a soccer game "to raise funds for an LGBTQ+ charity" with the proceeds "earmarked for donation to an LGBTQ+ suicide-prevention group," the soccer game would not be inherently expressive activity. And even if the stated purpose of the soccer game were to be "a commentary on identity," or "advocacy in favor of LGBTQ+ rights," or "an ideological message of support and acceptance for the LGBTQ+

community," or "counter-messaging against efforts to ban or regulate expression relating to gender or sexual identity," *FAIR* says that would not transform the soccer game into inherently expressive activity protected by the First Amendment. Likewise for drag shows.

Plaintiffs suggest that drag shows—all of them, apparently—somehow have changed in recent times when they say, "*Today*, drag has become a mainstream form of performance art and a commentary on identity," "*Over the past half-century*, the public has come to associate drag with advocacy in favor of LGBTQ+ rights," and "Drag performances have, *in the current political climate*, taken on a renewed political tone, offering counter-messaging against efforts to ban or regulate expression relating to gender or sexual identity." ECF 28 at 17 ¶¶ 69, 70, 72 (emphases added). Plaintiffs would have the Court believe that drag shows today can only have these kinds of meaning, and can never simply be performative conduct that some enjoy seeing. An apparent corollary would be that identical drag shows presented at different time periods would be constitutionally protected or not, depending on the unexplained intentions of the performers and "the current political climate." This is nonsense. Plaintiffs themselves know this is not true because they say, "Some drag performances are intentionally risqué, some comedic, some outlandish, and some would not give a moment's pause to a Motion Picture Association reviewer." ECF 28 at 18 ¶ 75.

Plaintiffs cannot transform performances (drag shows, soccer games, etc.) into speech simply by talking about the unexpressed messages they claim they intend to convey. The First Amendment does not apply to the proposed drag show.

### 2.   Universities may prohibit lewd conduct and speech.

#### a.   Drag shows can be noncommunicative, lewd conduct.

Performances of theatric works involving scenes with men dressed as women have been around for a very long time. As Plaintiffs note, ECF 28 at 17 ¶ 67, a 1943 movie called "This is the Army" starring Ronald Reagan featured a drag show.[1] It shows several members of the military dressed as women, later joined by others dressed as "nerdy men," performing a song and dance for an audience at a theater. The lyrics compare the strange experience of being drafted out of normal life into the army to the strange experience of being drafted out of normal life into a female chorus, and also satirize some aspects of male-female heterosexual relationships.[2]

The only reason the audience knows the message of the show is because of the explanatory speech in the lyrics. The message is a scripted story about Army life, which happens to incorporate the show. Plaintiffs get things exactly backwards by suggesting that simply because there is a drag show, there is always some particularized message warranting First Amendment protection. But that suggestion fails because there is nothing inherently expressive about wearing clothing. *Canady v. Bossier Par. Sch. Bd.*, 240 F.3d 437, 441 n.3 (5th Cir. 2001) ("We do not conclude that every choice of clothing expresses a particularized message."). The same could be said for many performances of men dressed as women, such as the photographs of men dressed as women attached to Plaintiffs' Amended Complaint; for instance, "male football players posing in cheerleader skirts," ECF 28 at 17 ¶ 68.

Moreover, the theatrical screenplay Plaintiffs reference is neither sexual, lewd, nor "PG-13. More "risqué," sexual, and lewd drag shows, such as the one performed by Myss Myka in

---

[1] Available at https://www.youtube.com/watch?v=ZbBZRnWoPbY (last accessed May 5, 2023).
[2] Lyrics available at https://www.stlyrics.com/lyrics/thisisthearmy/ladiesofthechorus.htm.

February (Exhibit 3), have also been around for a very long time. Neither the Court nor Defendants are required to be blind to this fact.

Thus, there are at least two kinds of drag shows (at least three kinds, according to Plaintiffs): Non-sexual drag shows; lewd, sexual drag shows; and, according to Plaintiffs, drag shows which somehow inherently express various things about "LGBTQ+ rights," "gender or identity," and the like that audiences are likely to understand. But Plaintiffs' argument that all drags shows inherently express messages about "LGBTQ+ rights," "gender or identity," etc. leads to the absurd conclusion that "male football players posing in cheerleader skirts" is now *inherently* a political statement "in favor of LGBTQ+ rights" or "counter-messaging against efforts to ban or regulate expression relating to gender or sexual identity," and that "the likelihood [is] great that the message would be understood by those who viewed it." *Johnson*, 491 U.S. at 404. The fact remains that some instances of drag are merely performative conduct that some find entertaining, which disproves Plaintiffs' argument that all drag shows are inherently expressive in the ways that they say they are. See Part I.A.

> **b. Lewd speech and conduct on campus are not protected by the First Amendment.**

Even if a proposed drag show actually contained inherent expressive conduct, under Fifth Circuit precedent, colleges may prohibit lewd speech and conduct without violating the First Amendment. "The first amendment does not prevent schools from determining 'that the essential terms of civil, mature conduct cannot be conveyed in a school that tolerates lewd, indecent or offensive speech and conduct.' [Citing *Bethel School District No. 403 v. Fraser*, 478 U.S. 675 (1986).] *Bethel* admittedly involved a high school audience and it may be suggested that its justification for speech restraints rests largely on this fact. Nevertheless, we view the role

of higher education as no less pivotal to our national interest." *Martin v. Parrish*, 805 F.2d 583, 585 (5th Cir. 1986). The *Bethel* court also held that it is "perfectly appropriate" for a public school to "disassociate itself" from "vulgar speech and lewd conduct that is wholly inconsistent with the 'fundamental values' of public school education." *Bethel*, 478 U.S. at 685-86.

Restricting lewd conduct is a permissible restriction on the "time, place, and manner" in which Plaintiffs may express themselves. *See Healey v. James*, 408 U.S. 169 (1972) (holding that campus groups do not have a first-amendment right to flout campus rules or to fail to adhere to generally accepted standards of conduct, and that requiring campus groups to follow rules and maintain standards of conduct is a reasonable time-manner-place restriction).

President Wendler could reasonably assess that a purported drag show might be offensively lewd or indecent, and therefore disapprove the show without violating the First Amendment (even assuming that all drag shows have inherent expressive conduct, which they do not).

**B. Defendant Wendler is entitled to qualified immunity to the claims against him in his individual capacity because Plaintiffs have no clearly-established right to host a drag show on the WTAMU campus.**

Plaintiffs First Amendment claims additionally fail against President Wendler in his individual capacity because he has qualified immunity. Qualified immunity is not merely an affirmative defense, but also "a limited entitlement not to stand trial or face the other burdens of litigation," including discovery. *Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009) (quotations omitted). Qualified immunity guards officials from civil liability "so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Wilkerson v. Univ. of N. Tex.*, 878 F.3d 147, 155 (5th Cir. 2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)).

To overcome this immunity, a plaintiff must show both (1) that the official violated a statutory or constitutional right and (2) that the right was "clearly established" at the time of the challenged conduct. *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). A right is "clearly established" when it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right, and either controlling authority or a robust consensus of persuasive authority defines the contours of the right in question with a high degree of particularity. *See id.* This standard "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991). This accommodation for reasonable error exists because officials should not always err on the side of caution because they fear being sued. *Id.*

"[W]here the area of law is as 'abstruse' and 'complicated' as First Amendment jurisprudence, [a] right cannot be clearly established for the purposes of qualified analysis" in the absence of authority recognizing an asserted right. *Morgan v. Swanson*, 755 F.3d 757 (5th Cir. 2011). School officials in particular have broad discretion because of their "difficult" and "vitally important" jobs, and "educators are rarely denied immunity from liability arising out of First–Amendment disputes. The rare exceptions involve scenarios in which a factually analogous precedent clearly established the disputed conduct as unconstitutional." *Id.* at 760 (citation omitted). "Given the ambiguity in the Supreme Court's jurisprudence, we have generally noted that the law governing restrictions on student speech can be difficult and confusing, even for lawyers, law professors, and judges and the relevant Supreme Court cases can be hard to reconcile, and courts often struggle to determine which standard applies in any particular case." *Radwan v. Manuel*, 55 F.4th 101 (2d Cir. 2022); *see also Abbott v. Pastides*, 900 F.3d 160, 174–75

16

(4th Cir. 2018) ("As we and other courts have recognized, First Amendment parameters may be especially difficult to discern in the school context." (collecting cases)) …. As a result, courts have not hesitated to grant qualified immunity to university officials who attempt to regulate speech at the university level in the uncertain waters of Hazelwood, Fraser, and other Supreme Court precedent.").

The Supreme Court has also noted the lack of clearly established university-free-speech law. "A number of lower federal courts have similarly recognized that educators′ decisions with regard to the content of school-sponsored newspapers, dramatic productions, and other expressive activities are entitled to substantial deference. [Citations omitted.] We need not now decide whether the same degree of deference is appropriate with respect to school-sponsored expressive activities at the college and university level." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 n.7 (1988). As noted above, despite this lack of clarity from the Supreme Court, the Fifth Circuit has applied the Supreme Court's rule that schools may regulate "lewd and indecent speech" to universities.

In other circuits, it is unsettled whether the "lewd and indecent speech" exception from high school applies to universities. The Second Circuit recently held in a case about university officials who disciplined a university student's vulgar gesture, allegedly in violation of her First Amendment rights, "In light of the absence of a decision by the Supreme Court or this Court on the application of the First Amendment to vulgar speech (or expression) by a university student while representing the university at a school-sponsored event, as well as the lack of any consensus among other courts on this issue, we conclude that the defendants are entitled to qualified immunity." *Radwan*, 55 F.4th at 122. *See also Hunt v. Board of Regents of the University of New*

*Mexico*, 792 Fed. Appx. 595, 598, (10th Cir. 2019) (granting qualified immunity to university officials who disciplined a university student's off-campus vulgar speech); *Sasser v. Board of Regents of Univ. System of Georgia*, 2023 WL 2446720 (11th Cir. Mar. 10, 2023) (granting qualified immunity to university officials who disciplined a student's use of a racial slur towards another student). In short, university students do not have a clearly established right to engage in lewd and indecent conduct on campus.

Thus, President Wendler is entitled to qualified immunity because there is no "scenario[] in which a factually analogous precedent clearly established the disputed conduct as unconstitutional." *Morgan*, 755 F.3d at 760. University groups do not have a clearly established right to conduct drag shows on campus.

Plaintiffs cite many cases to try to show that President Wendler violated the law, but none of them clearly establish that he did. Plaintiffs cite one case, *Norma Christie v. City of Okla. City*, 572 F. Supp. 88 (W.D. Okla. 1983) for the proposition "holding drag shows are protected First Amendment expression." ECF 31 at 15. That case is inapposite because it involved city property, not a campus. *Id*. at 90. Moreover, the case did not concern a drag show, but rather a proposed "event that was to be a national contest for female impersonators entitled the 'Miss Gay America Pageant.'" *Id*. The case also turned on whether the show would be obscene, which is not an issue in the present case. An official declined to approve the event on city property because "he thought the event to be an open expression of homosexuality which he believed violated prevailing community standards." *Id*. The court disagreed:

> Defendants conceded at the hearing of this cause that they had no evidence that contestants would engage in lewd exposure of the body in violation of [Oklahoma law]. Defendants have no evidence that contestants will engage in depiction of sexual conduct in violation of [Oklahoma law]. Defendants merely argue that the exposure of a male in female attire is

immoral. There are no state laws prohibiting a man dressing as a woman. Defendants have not satisfied their burden of showing the production to be obscene. Inasmuch as Defendants have not produced evidence of obscenity, this Court declines to find Plaintiff's production legally obscene.

*Norma Kristie*, 572 F. Supp. at 92.

Finally, the court barely discussed whether the show contained inherently expressive conduct. "Defendants contend the "Miss Gay America Pageant" is not accorded Constitutional protection because it is a commercial enterprise and not a noteworthy artistic endeavor such as a play or musical. Defendants contend that a blatant showing of men parading in women's apparel is not artistic. Such a judgment is subjective. While this Court may agree that such a 'pageant' may not rise to the level of artistic endeavor that 'Hair' or 'La Cage aux Folles' represent, it is still expression." *Id.* at 91 (paragraph break omitted). This analysis is not valid after *FAIR*. The plaintiffs did not even try to articulate what message the show supposedly expressed. *Norma Kristie* does not support Plaintiffs' case.

Plaintiffs also cite *Papish v. Board of Curators of University of Missouri*, 410 U.S. 667 (1973), for the proposition, "the First Amendment prohibits President Wendler and the other Defendants from suppressing Plaintiffs' expression simply because they disagree with its viewpoint or find the message offensive." ECF 31 at 15. But *Papish* concerned the distribution of a campus newspaper, not expressive conduct. *Id.* at 667 (1973). It is inapplicable.

Plaintiffs next cite *Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386, 390 (4th Cir. 1993) for the proposition "fraternity 'ugly woman contest' is protected expression." ECF 31 at 16. The Court held that any "low-grade entertainment [] was inherently expressive and thus entitled to First Amendment protection." *Id.* at 391. That is contrary to *FAIR*, which requires that all conduct, entertainment or not, express some thought without additional

explanatory speech in order to qualify for First Amendment protection. The court ruled in the alternative that the university admitted that the "the message conveyed by the Fraternity's conduct [was that] that racial and sexual themes should be treated lightly." *Id.* at 392. But President Wendler does not concede that drag shows convey any message.

Plaintiffs also cite *Berger v. Battaglia*, 779 F.2d 992 (4th Cir. 1985) for the proposition that "holding a blackface performance is protected First Amendment expression, even when it is 'sheer entertainment' without a political message." ECF 31 at 16. In fact, this case concerned whether a police department could punish an officer for his off-duty Al Jolson impressions, and "whether [such] 'speech' was, within contemplation of the *Pickering* test [to determine when a public employer can punish an employee for the employee's speech], upon a matter of 'public concern,' hence subject to qualified first amendment protection as against any public employer disciplinary action." *Berger*, 779 F.2d at 998. The court held that "this type of off-duty public employee speech has to be accorded the same weight in absolute terms that would be accorded comparable artistic expression by citizens who do not work for the state. And that value, traditionally, has been accorded a great deal of weight, certainly not far below the value accorded political and social commentary and debate." *Id.* at 999. But this does not apply to campuses. *See Healey v. James*, *supra* (holding that campus groups do not have a first-amendment right to flout campus rules or to fail to adhere to generally accepted standards of conduct, and that requiring campus groups to follow rules and maintain standards of conduct is a reasonable time-manner-place restriction).

Plaintiffs also cite *Widmar v. Vincent*, 454 U.S. 263 (1981), for the proposition that the First Amendment bars Defendants from denying Plaintiffs and other student groups access to campus public forums like Legacy Hall because of their message's content or viewpoint. ECF 31 at 16.

*Widmar* concerned a regulation "that prohibit[ed] the use of University buildings or grounds 'for purposes of religious worship or religious teaching.'" *Id.* at 265. Thus, that case concerned discrimination against certain speech and all exercise of religion. But drag shows are neither speech nor religion, and alternatively fall under the lewd and indecent speech exception. *Widmar* does not apply to this case.

President Wendler is entitled to qualified immunity to Plaintiffs' claims against him in his individual capacity.

## II. The *Ex parte Young* exception to sovereign immunity does not apply to Plaintiffs' claims against President Wendler in his official capacity.

Under the *Ex parte Young* doctrine, a federal court has jurisdiction over a lawsuit against a "state official in his official capacity if the suit seeks prospective relief to redress an ongoing violation of federal law." *Williams ex rel. J.E. v. Reeves*, 954 F.3d 729, 736 (5th Cir. 2020). For *Ex parte Young* to apply, three criteria must be satisfied: (1) A plaintiff must name individual state officials as defendants in their official capacities; (2) the plaintiff must allege an ongoing violation of federal law; and (3) the relief sought must be properly characterized as prospective. *Green Valley Planned Parenthood Gulf Coast, Incorporated v. Phillips*, 5 F.4th 568, 577 (5th Cir. 2021).

The *Ex parte Young* doctrine does not permit declarations regarding past conduct. *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993) ("[T]he exception is narrow: It applies only to prospective relief, [and] does not permit judgments against state officers declaring that they violated federal law in the past."). Plaintiffs' requested declaration that President Wendler violated their rights on March 20, 2023 is invalid and unenforceable because it is fundamentally retrospective. *See Corn v. Miss. Dep't of Pub. Safety*, 954 F.3d 268, 276 (5th Cir. 2020) (holding that sovereign immunity barred plaintiffs' request for a declaratory judgment that

21

the defendants violated the plaintiffs' First Amendment rights when they were terminated because the declaration did not constitute prospective relief).

The *Ex parte Young* exception also does not apply to Plaintiffs' claims for injunctive and declaratory relief because Plaintiffs do not allege an ongoing violation of federal law. Plaintiffs have no right to host a drag show on campus, and no right to engage in lewd conduct on campus.

Moreover, Plaintiffs are not currently being harmed or otherwise affected by anything President Wendler is doing or not doing. Plaintiffs have not shown the existence of any policy of prohibition on any type of activity. President Wendler disapproved one show, but did not change university policy. University regulations are not enacted by email. The email does not ban any future events. Plaintiffs have no evidence that future requests for permission to use campus facilities will not be determined on particular facts. Perhaps a future proposed event will more plainly be a non-lewd event—more plainly, anyway, than an event advertised as "PG-13" to which unaccompanied minors are not allowed—and will be approved.

Plaintiffs next drag show is not scheduled until March 2024. ECF 28 at 26 ¶ 130(b). Plaintiffs have no evidence that the show will be disapproved or that the show will be non-lewd.

Nor do Plaintiffs have any evidence that they will not be allowed to exhibit "The Rocky Horror Picture Show" movie in October, or any evidence that they will not be able to host "Queer Movie Night" or "Queer History Night" in the future. Moreover, those events are not described as drag shows.

Accordingly, Plaintiffs' claims for injunctive and declaratory relief against President Wendler in his official capacity are barred by sovereign immunity, and the Court lacks jurisdiction over those claims. Those claims should be dismissed under Rule 12(b)(1).

22

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs'' claims against President Wendler in his individual capacity under Rule 12(b)(6) and their claims against President Wendler in his official capacity under Rule 12(b)(1).

Dated: May 5, 2023.          Respectfully submitted,

KEN PAXTON
Attorney General

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

AARON F. REITZ
Deputy Attorney General for Legal Strategy

LEIF A. OLSON
Chief, Special Litigation Division

 */s/ Charles K. Eldred*
CHARLES K. ELDRED
Special Counsel for Legal Strategy
State Bar No. 00793681

MUNERA AL-FUHAID
Special Counsel
Special Litigation Division

DAVID BRYANT
Special Counsel
Special Litigation Division

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 936-1706 • fax (512) 320-0167
charles.eldred@oag.texas.gov

*ATTORNEYS FOR DEFENDANT WENDLER*

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on May 5, 2023.

*/s/ Charles K. Eldred*
Charles K. Eldred