# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

| | | |
|---|---|---|
| **SPECTRUM WT**, *et al.*, | § | |
| *Plaintiffs*, | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 2:23-CV-048-Z** |
| | § | |
| **WALTER WENDLER**, *et al.*, | § | |
| *Defendants.* | § | |

---

## DEFENDANT WENDLER'S BRIEF IN SUPPORT OF HIS
## RESPONSE IN OPPOSITION TO PLAINTIFFS'
## AMENDED MOTION FOR A PRELIMINARY INJUNCTION

---

# TABLE OF CONTENTS

Table of Contents ........................................................................................................ 2

Table of Authorities ................................................................................................... 3

Introduction ................................................................................................................ 4

Facts ............................................................................................................................ 7

Procedural Background ............................................................................................. 9

Standard.................................................................................................................... 10

Response ................................................................................................................... 11

    I.   Plaintiffs are not substantially likely to succeed on the merits of the underlying case. ...... 11

        A.   Drag shows are not inherently expressive. ................................................. 11

           1.   The law of expressive conduct. ............................................... 11

           2.   Under *FAIR*, drag shows are not inherently expressive conduct. .......................... 13

        B.   Universities may prohibit lewd conduct and speech. .................................................. 15

           1.   Drag shows can be noncommunicative, lewd entertainment. ................................ 15

           2.   Lewd speech and conduct on campus are not protected by the First Amendment. 16

        C.   There is no controlling authority holding that drag shows are protected by the First Amendment............................................................................................ 17

        D.   President Wendler's email is not dispositive of any issue. ......................................... 21

    II.   Plaintiffs cannot show irreparable harm........................................................ 21

    III.  The threatened injury to the movant does not outweigh the threatened harm to the non-movant, and granting the injunction will disserve the public interest. ............................ 23

Conclusion ................................................................................................................ 24

Certificate of Service............................................................................................... 26

# TABLE OF AUTHORITIES

Cases

*Berger v. Battaglia*,
   779 F.2d 992 (4th Cir. 1985) .................................................................. 20
*Bethel School District No. 403 v. Fraser*,
   478 U.S. 675 (1986) ............................................................................. 17
*Canady v. Bossier Par. Sch. Bd.*,
   240 F.3d 437 (5th Cir. 2001) ................................................................ 15
*Chacon v. Granata*,
   515 F.2d 922 (5th Cir. 1975) ................................................................ 22
*Clark v. Cmty. for Creative Non-Violence*,
   468 U.S. 288 (1984) ............................................................................. 11
*Healey v. James*,
   408 U.S. 169 (1972) .........................................................................17, 20
*Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.*,
   993 F.2d 386 (4th Cir. 1993) ................................................................ 19
*Lakedreams v. Taylor*,
   932 F.2d 1103 (5th Cir. 1991) .............................................................. 22
*Martin v. Parrish*,
   805 F.2d 583 (5th Cir. 1986) ................................................................ 17
*Mayo Found. for Med. Educ. & Research v. BP Am. Prod. Co.*,
   447 F. Supp. 3d 522 (N.D. Tex. 2020) ............................... 10, 21, 22, 23
*Nken v. Holder*,
   556 U.S. 418 (2009) ............................................................................. 23
*Norma Christie v. City of Okla. City*,
   572 F. Supp. 88 (W.D. Okla. 1983) ..................................................... 18
*Papish v. Board of Curators of University of Missouri*,
   410 U.S. 667 (1973) ............................................................................. 19
*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,
   547 U.S. 47 (2006) ........................................................................ passim
*Texas v. Johnson*,
   491 U.S. 397 (1989) .........................................................................11, 16
*Texas v. United States*,
   809 F.3d 134 (5th Cir. 2016) ................................................................ 23
*Trump v. Hawaii*,
   138 S. Ct. 2392 (2018) ......................................................................... 21
*United States v. O'Brien*,
   391 U.S. 367 (1968) ............................................................................. 12
*Valley v. Rapides Parish Sch. Bd.*,
   118 F.3d 1047 (5th Cir. 1997) .............................................................. 23
*Widmar v. Vincent*,
   454 U.S. 263 (1981) .........................................................................20, 21

## INTRODUCTION

Plaintiffs are simply wrong in their assertion that there is an absolute First Amendment right to conduct a "drag show" in campus facilities of a public university, no matter how lewd and devoid of expressive content it may be. But their Motion for a Preliminary Injunction must be denied for more fundamental reasons as well. Plaintiffs have fallen far short of the required showing that they are imminently threatened with irreparable harm from possible future actions of Defendant Wendler or the other Defendants in this case. Nor have they shown that, at this time, the balance of equities or the public interest require such an injunction.

Defendants have asserted that they plan to sponsor a gathering on the West Texas A&M campus in October 2023—five months from now—to show the 48-year-old musical comedy film, "The Rocky Horror Picture Show." Though that film includes some male characters dressed in women's garb, it plainly is not a "drag show." Defendants have not granted or denied permission to Plaintiffs to show the film. Plaintiffs admit that Defendants have permitted Plaintiffs to show movies on campus in the past.

Defendants also have asserted that in March 2024, almost a year from now, they intend to host a "drag show" on campus. They have tentatively reserved a location for the proposed event, but they have not completed the standard application to hold such events on campus that is required of all student groups. They have not provided Defendants with information as to the content of the proposed drag show. Unsurprisingly, Defendants have not granted or denied permission to conduct the show on campus in the second semester of the next academic year. Indeed, such decisions are typically made within a month or so prior to proposed student group events.

Simply stated, Plaintiffs request for the extraordinary legal remedy of a preliminary injunction is premature and not ripe at this time. It is in the public interest for federal courts not to short-circuit the administrative processes of state universities or to micro-manage them through injunctions regarding potential future grants or denials of permission to use campus facilities for poorly defined possible theatrical performances five or ten months in the future.

Plaintiffs decided to hold their drag show in March 2023 off campus. That matter is now in the past, and their complaints about Defendant Wendler's March 20 email denying permission for that event are now moot as far as injunctive relief is concerned. Defendant Wendler's email expresses his opinions at that time, but the email is not a West Texas A&M University policy or regulation. Nor is it a grant or denial of permission to use campus facilities for any student group event other than the one then at issue. Thus, Plaintiffs' request for a preliminary injunction should be denied because they have not shown an imminent threat of irreparable harm and because, at this time, the balance of equities and public interest require such denial.

Although not necessary to the Court's denial of a preliminary injunction, it is also true that Plaintiffs are not likely to prevail on the merits at trial. There is no authority—either specific or from first principles—holding that drag shows are inherently expressive conduct. Drag performances defy easy categorization. Some are lewd. Some are no more than a dance, sometimes including lip-syncing. Campus drag shows are unlike gatherings of students to study the Bible or to host a political talk, ECF 28 at 1 ¶ 2, because those activities necessarily contain speech protected by the First Amendment. Drag shows, as a category, are not speech and are not inherently expressive conduct.

Moreover, universities may prohibit "lewd, indecent, or offensive speech or conduct" on campus. West Texas A&M University does in fact prohibit "[p]ublic behavior that is disruptive, lewd, or indecent." West Texas A&M University, Rules and Procedures for Students, Updated August 2020, Code of Student Life, at 15. Exhibit 1.

Plaintiffs asked to hold a drag show on campus in March 2023. The show was to be "emcee[d] [by] popular Amarillo drag queen Myss Myka." Exhibit 2. Plaintiffs alleged that they "instructed performers not to engage in any 'lewd' conduct." ECF 28 at 18 ¶ 79. That is because plaintiffs know—as everyone knows—that drag shows today are often lewd. In fact, "Myss Myka" put on an extraordinarily lewd drag performance in February in Lubbock, involving stimulated stripping (and accepting money from audience members as if he were a stripper), simulated masturbation, bouncing feminine breasts (possibly prosthetic, possibly not), and frequent presentation of his barely covered crotch. Exhibit 3.[1]

Plaintiffs do not have a constitutional right to put on a lewd drag show on campus. No authority says they do. Defendants were within their rights to assume that the requested drag show might be lewd. There is absolutely no authority—and Plaintiffs cite none—establishing the constitutional right to hold a drag show on a public university campus, lewd or otherwise.

Plaintiffs thus cannot show a substantial likelihood that they will prevail on the merits. Moreover, Plaintiffs do not currently face any injury, let alone an irreparable injury. There is no West Texas A&M policy prohibiting future drag shows, but future performance of any kind that are lewd may constitutionally be prohibited by Defendants in accordance with University policy.

---

[1] Available at https://www.youtube.com/watch?v=QR9BjFpPeK0 (last accessed May 5, 2023).

For these and other reasons, the Court should dismiss this case and deny Plaintiffs' request for a preliminary injunction.

## FACTS

West Texas A&M University prohibits "[p]ublic behavior that is disruptive, lewd, or indecent." West Texas A&M University, Rules and Procedures for Students, Updated August 2020, Code of Student Life, at 15. Exhibit 1.

Plaintiffs requested permission to host a drag show on March 31, 2023 at Legacy Hall on the WTAMU campus. ECF 28 at 18. The stated purpose of the drag show was "to raise funds for an LGBTQ+ charity" with the proceeds "earmarked for donation to an LGBTQ+ suicide-prevention group." ECF 28 at 5, 18.

Plaintiffs allow that "some drag performances are intentionally risqué." ECF 28 at 18 ¶ 74. But they say that they "planned and intended its charity drag show to be 'PG-13,'" and "informed [WTAMU] administration and staff" that the show would be PG-13. ECF 28 at 18 ¶¶ 77, 78. "Consistent with its commitment to a 'PG-13' show, Spectrum WT instructed performers not to engage in any 'lewd' conduct." ECF 28 at 18 ¶ 79. In contrast to their allegation that they informed WTAMU administration and staff that the show was intended to be "PG-13," Plaintiffs do not allege that they informed WTAMU administration and staff that they instructed performers not to engage in any lewd conduct. Additionally, "Spectrum WT forbade anyone under 18 from attending the event unless accompanied by a parent or guardian." ECF 28 at 18 ¶ 80. Forbidding minors to attend without a parent or guardian is more consistent with an R-rated movie than a PG-13-rated movie.

Spectrum WT also created an Eventbrite page for the event. ECF 28 at 21 ¶ 96; Exhibit 2.

That page described the event as follows:

**A Fool's Drag Race**

A Fools' Drag Race will pit WT student organizations' fiercest drag performers against each other to support The Trevor Project

**About this Event**

A Fools' Drag Race will feature drag performers from an array of student organizations stomping it out to see who's the fiercest of them all. Proceeds from ticket sales and tips will benefit The Trevor Project, which provides 24/7 crisis support services to LGBTQ young people.

The night's emcee is popular Amarillo drag queen Myss Myka, and the judges' panel will include Amarillo drag performers and other special guests. Doors open at 5:30, and the fun starts at 6 p.m.

VIP tickets (a table of 6) are $50 individual VIP tickets can be bought at the door ($10) while supplies last. General-admission tickets are $5 online or at the door.

Sponsors: Spectrum, Black Student Union, WT K-Pop, F1RSTGEN, Resident Hall Association, Buff Allies

Exhibit 2.

Nothing in the Eventbrite page suggested that it would not be "lewd" or "risqué." To the contrary, the participation of "Myss Myka" strongly suggested the opposite. A video of an extraordinarily lewd drag performance by "Myss Myka" in Lubbock on February 24, 2023 is attached as Exhibit 3. "Myss Myka" remains barely clothed during the performance, but the performance otherwise could not be lewder and more sexual.

On March 20, Defendant Walter V. Wendler, the President of WTAMU, decided not to approve the show and announced the decision in an email to WTAMU students, faculty, and staff. Wendler expressed solidarity with the charitable aspect of the event: "The nonprofit organization focuses on suicide prevention—a noble cause—in the LGBTQ community. Any person considering self-harm for any reason is tragic." ECF no. 28-1. But he objected to the drag show content of the event, saying that it "steroetype[s] women," "discriminate[] against womanhood,"

8

and is "misogynistic behavior." *Id*. He opined that drags shows are "derisive, divisive and demoralizing misogyny." *Id*. He compared the drag show to "debas[ing] Latinas" and a "'blackface' performance." *Id*.

Spectrum WT sued, but then held the drag show on April 1 at a public park. ECF 28 at 25 ¶ 123.

Plaintiffs allege that they "intend to organize and put on drag shows and similar events on campus in the near future." ECF 28 at 25 ¶ 127. The planned events include (1) "Queer Movie Night" on October 31, 2023 (where they intend to exhibit "The Rocky Horror Picture Show"— a movie containing a scene where the protagonist sexually assaults a woman and then her husband, played for laughs), (2) a "second-annual drag-show," for which they have already submitted a reservation, intended to be held in Legacy Hall on March 22, 2024, and (3) "Queer History Night, a program Spectrum WT holds several times a year," at some unexplained future time or times, which is not alleged to have anything to do with drag shows. ECF 28 at 26, 28. Plaintiffs admit that Spectrum WT has been allowed to have "Queer Movie Night" and "Queer History Night" in the past. ECF 28 at 5 ("In furtherance of its mission, Spectrum WT hosts periodic events, including Lavender Prom, Queer History Night, and Queer Movie Night.").

## PROCEDURAL BACKGROUND

Plaintiffs filed this lawsuit on March 24, 2023, seeking a temporary restraining order that they be allowed to hold the drag show on campus on March 31, seeking injunctive and declaratory relief to the effect that they will be allowed to hold drag shows on campus in the future, compensatory, nominal, and punitive damages against President Wendler in his individual capacity, and attorney's fees and costs. ECF 1, 8. On March 29, they withdrew their request for a TRO allowing

the March 31 show to proceed on campus. ECF 16. On April 18, after they held their event elsewhere, they filed an amended complaint seeking the same relief as before, except they no longer seek a TRO, and on April 20 they filed an amended motion for preliminary injunction, seeking to enjoin Defendants from prohibiting drag shows in the future.

## STANDARD

Even though the District Court has discretionary power to issue a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure, the Supreme Court of the United States admonishes the courts to invoke this power sparingly and only in extraordinary circumstances. *Mayo Found. for Med. Educ. & Research v. BP Am. Prod. Co.*, 447 F. Supp. 3d 522, 527 (N.D. Tex. 2020). Absent extenuating circumstances, no District Court should issue a preliminary injunction unless one is necessary to protect the plaintiff from irreparable injury or to preserve the court′s power to render a meaningful decision after a trial on the merits. *Id*. at 527–28.

Even within this limited locus of action, the District Court should grant preliminary injunctions only when the plaintiff establishes the following: (1) it is substantially likely to succeed on the merits of the underlying case; (2) it is substantially likely to suffer irreparable harm if the injunction is not granted; (3) the threatened injury outweighs any harm that the injunction may occasion for the defendant; and (4) the injunction will not undermine the public interest. *Id*. at 528. These four factors are conjunctive—i.e., the plaintiff must carry the burden as to all four factors before a preliminary injunction may be considered. *Id*. The "irreparable harm" factor is perhaps the most important of the four elements that the Court must consider when adjudging a motion for a preliminary injunction. *Id*. at 534.

## RESPONSE

**I.  Plaintiffs are not substantially likely to succeed on the merits of the underlying case.**

**A.  Drag shows are not inherently expressive.**

**1.  The law of expressive conduct.**

Plaintiffs do not allege that drag shows contain speech. Instead, they allege that drag performances are "expressive conduct" protected by the First Amendment. Plaintiffs bear the burden of establishing that their conduct contains an expressive element. *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984) ("it is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies. To hold otherwise would be to create a rule that all conduct is presumptively expressive.").

Sometimes, "the expressive nature of the conduct … brings that conduct within the First Amendment's protection." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 65 (2006) ("*FAIR*"). To determine "whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, [the Supreme Court] [has] asked whether an intent to convey a particularized message was present, and whether the likelihood was great that the message would be understood by those who viewed it." *Texas v. Johnson*, 491 U.S. 397, 404 (1989).

The Supreme Court elaborated on the meaning of "expressive conduct" in *FAIR*, There:

> When law schools began restricting the access of military recruiters to their students because of disagreement with the Government's policy on homosexuals in the military, Congress responded by enacting the Solomon Amendment [citation omitted]. That provision specifies that if any part of an institution of higher education denies military recruiters access equal to that provided other recruiters, the entire institution would lose certain federal funds. The law schools responded by suing, alleging that the Solomon Amendment infringed their First Amendment freedoms of speech and association.

547 U.S. at 51.

In determining whether restricting access of military recruiters law schools because of disagreement with the Government's policy on homosexuals in the military was expressive conduct protected by the First Amendment, the Supreme Court first reaffirmed its rejection of "the view that conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." 547 U.S. at 65–66 (cleaned up) (citing *United States v. O'Brien*, 391 U.S. 367 (1968) (holding that burning a draft card in protest of the Vietnam War was not expressive conduct, and that even if the act included expressive conduct, the government could regulate and criminalize the nonexpressive conduct of burning a draft card)). "Instead, [courts] have extended First Amendment protection only to conduct that is inherently expressive." *Id.* at 66.

The *FAIR* court held that restricting access of military recruiters was not protected by the First Amendment because it was not inherently expressive, explaining:

> Prior to the adoption of the Solomon Amendment's equal access requirement, law schools "expressed" their disagreement with the military by treating military recruiters differently from other recruiters. But these actions were expressive only because the law schools accompanied their conduct with speech explaining it. For example, the point of requiring military interviews to be conducted on the undergraduate campus is not "overwhelmingly apparent" [citing *Johnson*, 491 U.S. at 406]. An observer who sees military recruiters interviewing away from the law school has no way of knowing whether the law school is expressing its disapproval of the military, all the law school's interview rooms are full, or the military recruiters decided for reasons of their own that they would rather interview someplace else.

> The expressive component of a law school's actions is not created by the conduct itself but by the speech that accompanies it. The fact that such explanatory speech is necessary is strong evidence that the conduct at issue here is not so inherently expressive that it warrants protection under *O'Brien*. If combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into "speech" simply by talking about it. For instance, if an individual announces that he intends to express his disapproval of the Internal Revenue Service by refusing to pay his income taxes, we would have to apply *O'Brien* to determine whether the Tax Code violates the First Amendment. Neither *O'Brien* nor its progeny supports such a result.

12

*FAIR*, 547 U.S. at 66.

> **2. Under *FAIR*, drag shows are not inherently expressive conduct.**

Plaintiffs argue that drag shows are expressive conduct in the following ways:

- "Today, drag has become a mainstream form of performance art and a commentary on identity." ECF 28 at 17 ¶ 69.

- "Over the past half-century, the public has come to associate drag with advocacy in favor of LGBTQ+ rights." *Id* ¶ 70.

- "Drag performances carry an ideological message of support and acceptance for the LGBTQ+ community." *Id.* ¶ 71.

- "Drag performances have, in the current political climate, taken on a renewed political tone, offering counter-messaging against efforts to ban or regulate expression relating to gender or sexual identity." *Id.* ¶ 72.

There are exactly the kinds of explanations that, under *FAIR*, show that drag shows are ***not*** inherently expressive conduct. The proposed drag show is expressive only to the extent that Plaintiffs explain how it is supposedly expressive. It is simply untrue that—as a matter of law—all drag shows inherently express points of view, let alone the points of view expressed above. For instance, many drag shows are pure entertainment. An observer watching a drag show has no way of knowing whether the performers are expressing anything unless the performance is accompanied by an explanation of the alleged message. But that means that drag shows are not inherently expressive, and are not protected by the First Amendment. The supposed messages of drag shows cannot be understood without explanatory speech.

Plaintiffs' arguments would just as unavailing if they had proposed to put on any other performative activity. If, for instance, Plaintiffs proposed to have a soccer game "to raise funds for an LGBTQ+ charity" with the proceeds "earmarked for donation to an LGBTQ+ suicide-prevention group," the soccer game would not be inherently expressive activity. And even if the stated purpose of the soccer game were to be "a commentary on identity," or "advocacy in favor of LGBTQ+ rights," or "an ideological message of support and acceptance for the LGBTQ+ community," or "counter-messaging against efforts to ban or regulate expression relating to gender or sexual identity," *FAIR* says that would not transform the soccer game into inherently expressive activity protected by the First Amendment. Likewise for drag shows.

Plaintiffs suggest that drag shows—all of them, apparently—somehow have changed in recent times when they say, "*Today*, drag has become a mainstream form of performance art and a commentary on identity," "*Over the past half-century*, the public has come to associate drag with advocacy in favor of LGBTQ+ rights," and "Drag performances have, *in the current political climate*, taken on a renewed political tone, offering counter-messaging against efforts to ban or regulate expression relating to gender or sexual identity." ECF 28 at 17 ¶¶ 69, 70, 72 (emphases added). Plaintiffs would have the Court believe that drag shows today can only have these kinds of meaning, and can never simply be performative conduct that some enjoy seeing. An apparent corollary would be that identical drag shows presented at different time periods would be constitutionally protected or not, depending on the unexplained intentions of the performers and "the current political climate." This is nonsense. Plaintiffs themselves know this is not true because they say, "Some drag performances are intentionally risqué, some comedic, some

14

outlandish, and some would not give a moment's pause to a Motion Picture Association reviewer." ECF 28 at 18 ¶ 75.

Plaintiffs cannot transform performances of conduct (drag shows, soccer games, etc.) into speech simply by talking about the unexpressed messages they claim they intend to convey. The First Amendment does not apply to the proposed drag show.

**B. Universities may prohibit lewd conduct and speech.**

**1. Drag shows can be noncommunicative, lewd entertainment.**

Performances of theatric works involving scenes with men dressed as women have been around for a very long time. As Plaintiffs note, ECF 28 at 17 ¶ 67, a 1943 movie called "This is the Army" starring Ronald Reagan featured a drag show.[2] It shows several members of the military dressed as women, later joined by others dressed as "nerdy men," performing a song and dance for an audience at a theater. The lyrics compare the strange experience of being drafted out of normal life into the army to the strange experience of being drafted out of normal life into a female chorus, and also satirize some aspects of male-female heterosexual relationships.[3]

The only reason the audience knows the message of the show is because of the explanatory speech in the lyrics. The message is a scripted story about Army life, which happens to incorporate the show. Plaintiffs get things exactly backwards by suggesting that simply because there is a drag show, there is always some particularized message warranting First Amendment protection. But that suggestion fails because there is nothing inherently expressive about wearing clothing. *Canady v. Bossier Par. Sch. Bd.*, 240 F.3d 437, 441 n.3 (5th Cir. 2001) ("We do not conclude that every choice of clothing expresses a particularized message."). The same could be said for many

---

[2] Available at https://www.youtube.com/watch?v=ZbBZRnWoPbY (last accessed May 5, 2023).
[3] Lyrics available at https://www.stlyrics.com/lyrics/thisisthearmy/ladiesofthechorus.htm.

performances of men dressed as women, such as the photographs of men dressed as women attached to Plaintiffs' Amended Complaint; for instance, "male football players posing in cheerleader skirts," ECF 28 at 17 ¶ 68.

Moreover, the theatrical screenplay Plaintiffs reference is neither sexual, lewd, nor "PG-13. More "risqué," sexual, and lewd drag shows, such as the one performed by Myss Myka in February (Exhibit 3), have also been around for a very long time. Neither the Court nor Defendants are required to be blind to this fact.

Thus, there are at least two kinds of drag shows (at least three kinds, according to Plaintiffs): Non-sexual drag shows; lewd, sexual drag shows; and, according to Plaintiffs, drag shows which somehow inherently express various things about "LGBTQ+ rights," "gender or identity," and the like that audiences are likely to understand. But Plaintiffs' argument that all drags shows inherently express messages about "LGBTQ+ rights," "gender or identity," etc. leads to the absurd conclusion that "male football players posing in cheerleader skirts" is now *inherently* a political statement "in favor of LGBTQ+ rights" or "counter-messaging against efforts to ban or regulate expression relating to gender or sexual identity," and that "the likelihood [is] great that the message would be understood by those who viewed it." *Johnson*, 491 U.S. at 404. The fact remains that some instances of drag are merely performative conduct that some find entertaining, which disproves Plaintiffs' argument that all drag shows are inherently expressive in the ways that they say they are. See Part I.A.

**2. Lewd speech and conduct on campus are not protected by the First Amendment.**

Even if a proposed drag show actually contained inherent expressive conduct, under Fifth Circuit precedent, colleges may prohibit lewd speech and conduct without violating the First Amendment. "The first amendment does not prevent schools from determining 'that the essential

16

terms of civil, mature conduct cannot be conveyed in a school that tolerates lewd, indecent or offensive speech and conduct.' [Citing *Bethel School District No. 403 v. Fraser*, 478 U.S. 675 (1986).] *Bethel* admittedly involved a high school audience and it may be suggested that its justification for speech restraints rests largely on this fact. Nevertheless, we view the role of higher education as no less pivotal to our national interest." *Martin v. Parrish*, 805 F.2d 583, 585 (5th Cir. 1986). The *Bethel* court also held that it is "perfectly appropriate" for a public school to "disassociate itself" from "vulgar speech and lewd conduct that is wholly inconsistent with the 'fundamental values' of public school education." *Bethel*, 478 U.S. at 685-86.

Restricting lewd conduct is a permissible restriction on the "time, place, and manner" in which Plaintiffs may express themselves. *See Healey v. James*, 408 U.S. 169, 192–93 (1972) (holding that campus groups do not have a first-amendment right to flout campus rules or to fail to adhere to generally accepted standards of conduct, and that requiring campus groups to follow rules and maintain standards of conduct is a reasonable time-manner-place restriction).

WTAMU does in fact prohibit "[p]ublic behavior that is disruptive, lewd, or indecent." West Texas A&M University, Rules and Procedures for Students, Updated August 2020, Code of Student Life, at 15. Exhibit 1. President Wendler could reasonably assess that a purported drag show might be offensively lewd or indecent, and therefore disapprove the show without violating the First Amendment (even assuming that all drag shows have inherent expressive conduct, which they do not).

### C. There is no controlling authority holding that drag shows are protected by the First Amendment.

Plaintiffs cite many cases, but do not cite *FAIR* or *Martin v. Parrish*, do not address *FAIR*'s discussion of inherently expressive conduct, and do not address the "lewd and indecent speech"

17

exception for universities, rendering most of their discussion irrelevant. Their three main arguments—"President Wendler's Censorship of a Drag Show Based on Personal Disagreements with the Expression's Message Is Textbook Viewpoint Discrimination," "Excluding Plaintiffs' Drag Show from Campus Public Forums Violates the First Amendment," and "President Wendler's Edict Imposes an Unconstitutional Prior Restraint on Plaintiffs' Protected Expression"—erroneously assume that drags shows are inherently expressive conduct and that there is no campus exception for lewd conduct and speech.

Plaintiffs cite one case, *Norma Christie v. City of Okla. City*, 572 F. Supp. 88 (W.D. Okla. 1983) for the proposition "holding drag shows are protected First Amendment expression." ECF 31 at 15. That case is inapposite because it involved city property, not a campus. *Id.* at 90. Moreover, the case did not concern a drag show, but rather a proposed "event that was to be a national contest for female impersonators entitled the 'Miss Gay America Pageant.'" *Id.* An official declined to approve the event on city property because "he thought the event to be an open expression of homosexuality which he believed violated prevailing community standards." *Id.* The court disagreed:

> Defendants conceded at the hearing of this cause that they had no evidence that contestants would engage in lewd exposure of the body in violation of [Oklahoma law]. Defendants have no evidence that contestants will engage in depiction of sexual conduct in violation of [Oklahoma law]. Defendants merely argue that the exposure of a male in female attire is immoral. There are no state laws prohibiting a man dressing as a woman. Defendants have not satisfied their burden of showing the production to be obscene. Inasmuch as Defendants have not produced evidence of obscenity, this Court declines to find Plaintiff's production legally obscene.

*Norma Kristie*, 572 F. Supp. at 92.

Finally, the court barely discussed whether the show contained inherently expressive conduct. "Defendants contend the 'Miss Gay America Pageant' is not accorded Constitutional protection

because it is a commercial enterprise and not a noteworthy artistic endeavor such as a play or musical. Defendants contend that a blatant showing of men parading in women's apparel is not artistic.  Such a judgment is subjective. While this Court may agree that such a 'pageant' may not rise to the level of artistic endeavor that 'Hair' or 'La Cage aux Folles' represent, it is still expression." *Id.* at 91 (paragraph break omitted). This analysis is not valid after *FAIR*. The plaintiffs did not even try to articulate what message the show supposedly expressed. *Norma Kristie* does not support Plaintiffs' case here.

Plaintiffs also cite *Papish v. Board of Curators of University of Missouri*, 410 U.S. 667 (1973), for the proposition, "the First Amendment prohibits President Wendler and the other Defendants from suppressing Plaintiffs' expression simply because they disagree with its viewpoint or find the message offensive." ECF 31 at 15. But *Papish* concerned the distribution of a campus newspaper containing speech and press, not alleged expressive conduct. *Id.* at 667 (1973). It is inapplicable.

Plaintiffs next cite *Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386, 390 (4th Cir. 1993) for the proposition "fraternity 'ugly woman contest' is protected expression." ECF 31 at 16. The Court held that any "low-grade entertainment [] was inherently expressive and thus entitled to First Amendment protection." *Id.* at 391. That is contrary to *FAIR*, which requires that all conduct, entertainment or not, inherently express some thought without additional explanatory speech in order to qualify for First Amendment protection. The court ruled in the alternative that the university admitted that the "the message conveyed by the Fraternity's conduct [was that] that racial and sexual themes should be treated lightly." *Id.* at 392. But President Wendler does not concede that drag shows inherently convey any message.

19

Plaintiffs also cite *Berger v. Battaglia*, 779 F.2d 992 (4th Cir. 1985) for the proposition that "holding a blackface performance is protected First Amendment expression, even when it is 'sheer entertainment' without a political message." ECF 31 at 16. In fact, this case concerned whether a police department could punish an officer for his off-duty Al Jolson impressions, and "whether [such] 'speech' was, within contemplation of the *Pickering* test [to determine when a public employer can punish an employee for the employee's speech], upon a matter of 'public concern,' hence subject to qualified first amendment protection as against any public employer disciplinary action." *Berger*, 779 F.2d at 998. The court held that "this type of off-duty public employee speech has to be accorded the same weight in absolute terms that would be accorded comparable artistic expression by citizens who do not work for the state. And that value, traditionally, has been accorded a great deal of weight, certainly not far below the value accorded political and social commentary and debate." *Id*. at 999. But this does not apply to campuses. *See Healey v. James*, *supra* (holding that campus groups do not have a first-amendment right to flout campus rules or to fail to adhere to generally accepted standards of conduct, and that requiring campus groups to follow rules and maintain standards of conduct is a reasonable time-manner-place restriction).

Plaintiffs also cite *Widmar v. Vincent*, 454 U.S. 263 (1981), for the proposition that the First Amendment bars Defendants from denying Plaintiffs and other student groups access to campus public forums like Legacy Hall because of their message's content or viewpoint. ECF 31 at 16. *Widmar* concerned a regulation "that prohibit[ed] the use of University buildings or grounds 'for purposes of religious worship or religious teaching.'" *Id*. at 265. Thus, that case concerned discrimination against certain speech and all exercise of religion. But drag shows are neither speech

nor religion, and alternatively fall under the lewd and indecent speech exception. *Widmar* does not apply to this case.

### D. President Wendler's email is not dispositive of any issue.

Plaintiffs argue that President Wendler admitted in his campus-wide email that his rejection of the drag show was unconstitutional. ECF 31 at 1.[4]

Plaintiffs' argument is reminiscent of the argument against President Trump's executive order suspending for 90 days the entry of foreign nationals from certain countries. *Trump v. Hawaii,* 138 S. Ct. 2392, 2403 (2018). The challengers argued that "a series of statements by the President and his advisors" showed unconstitutional animus towards Islam and evidenced that the order was therefore unconstitutional. *Id.* at 2406, 2417. The Court dismissed those concerns, holding that "the issue before us is not whether to denounce the statements. It is instead the significance of those statements in reviewing a Presidential directive, neutral on its face, addressing a matter within the core of executive responsibility." 138 S. Ct. at 2418.

Similarly, the issue here is not whether to denounce President Wendler's email or whether he properly stated the law. The issue is whether proposed drag shows are protected by the First Amendment.

### II. Plaintiffs cannot show irreparable harm.

Of course, in addition to showing a substantial likelihood of prevailing on the merits, the movant must show a substantial threat that the moving party will suffer irreparable injury prior to trial if the requested preliminary injunction is not granted. *Mayo Foundation*, 447 F. Supp. 3d at 528. This "irreparable harm" requirement is perhaps the most important of the four elements that

---

[4] Nevertheless, of course, because his rejection of the drag show did not violate the constitution, it cannot become unconstitutional via an explanation of his choice.

the Court must consider in determining whether to issue a preliminary injunction. *Mayo Foundation*, 447 F. Supp. 3d at 534. Conclusory allegations are not sufficient to show entitlement to injunctive relief. *Lakedreams v. Taylor*, 932 F.2d 1103, 1107 (5th Cir. 1991). Moreover, the plaintiff must show the injury to be imminent, and not merely speculative. *Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975). Referring to a past injury is not proof of the type of ongoing or probable future injury that can justify a preliminary injunction. *Mayo Foundation*, 447 F. Supp. 3d at 534-35.

The only relief sought by Plaintiffs is to enjoin Defendants "from enforcing President Wendler's prohibition on 'drag shows' in campus facilities generally available for student group use," and, similarly (but conclusorily), "from enforcing the viewpoint- and content-discriminatory prohibitions on expressive activity contained in Wendler's March 20, 2023 edict, when making West Texas A&M University facilities or spaces available to Plaintiffs or other student organizations." ECF 28 at 48. But Plaintiffs have not shown the existence of any West Texas A&M policy or regulation prohibiting any type of activity. President Wendler disapproved one show, but did not change or purport to change university policy. University regulations are not enacted by email. The email does not ban any future events. Plaintiffs have no evidence that future requests for permission to use campus facilities will not be determined on their particular facts. Perhaps a future proposed event will more plainly be a non-lewd event—more plainly, anyway, than the proposed March 2023 event, which was advertised as "PG-13" to which unaccompanied minors are not allowed and featuring outside performers with a history of lewd performances—and will be approved. Or perhaps not; it will depend on yet unknown facts.

If Plaintiffs are denied permission to conduct a specific future event after making a sufficient showing that the event will not be lewd, and will constitute expression protected by the First Amendment, then they could seek judicial relief to prevent immediate and irreparable harm. But they have not done so on the record now before the Court. Their next drag show—with unspecified content—is not scheduled until March 2024. ECF 28 at 26 ¶ 130(b). Plaintiffs have presented no evidence that the show will be disapproved or that the show will not be lewd. Plaintiffs thus fail to satisfy their burden to allege and present proof that they are threatened with imminent irreparable harm prior to trial absent the preliminary injunction they now seek. That failure is fatal to their request. Nor do Plaintiffs have any evidence that they will not be allowed to exhibit "The Rocky Horror Picture Show" movie in October, or any evidence that they will not be able to host "Queer Movie Night" or "Queer History Night" in the future. Moreover, those events are not described as drag shows.

Because Plaintiffs fail to carry their burden to show irreparable harm—perhaps the most important of the four elements that the Court must consider when adjudging a motion for a preliminary injunction, *Mayo Found.*, 447 F. Supp. 3d at 534,--the Court should deny their motion.

### III. The threatened injury to the movant does not outweigh the threatened harm to the non-movant, and granting the injunction will disserve the public interest.

When the government is a party, the balance-of-equities and public-interest factors merge. See *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Texas v. United States*, 809 F.3d 134, 187 (5th Cir. 2016) (same). A court therefore must weigh whether "the threatened injury outweighs any harm that may result from the injunction to the non-movant" and whether "the injunction will not undermine the public interest." *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1051, 1056 (5th Cir. 1997).

There is no harm to Plaintiffs in denying their request for a preliminary injunction at this time. Plaintiffs have not established that they have an absolute right to conduct an on-campus drag show. Moreover, they allege that they have applied to have an on-campus drag show in March 2024, but that the request has not yet been granted or denied. Whether it will be granted or denied is speculative. They also speculate that WTAMU may not allow their planned "Queer Movie Night" and "Queer History Night" events in the future, even though they have not been prohibited in the past and there is no evidence that they will be banned in the future.

The balance of equities and public interest thus weigh heavily in favor of denying the preliminary injunction. This is an independent reason why the Court should not issue a preliminary injunction.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for a Preliminary Injunction.

Dated: May 5, 2023.                    Respectfully submitted,

                                       KEN PAXTON
                                       Attorney General

                                       BRENT WEBSTER
                                       First Assistant Attorney General

                                       GRANT DORFMAN
                                       Deputy First Assistant Attorney General

                                       AARON F. REITZ
                                       Deputy Attorney General for Legal Strategy

                                       LEIF A. OLSON
                                       Chief, Special Litigation Division

                                       */s/ Charles K. Eldred*
                                       CHARLES K. ELDRED
                                       Special Counsel for Legal Strategy
                                       State Bar No. 00793681

                                       MUNERA AL-FUHAID
                                       Special Counsel
                                       Special Litigation Division

                                       DAVID BRYANT
                                       Special Counsel
                                       Special Litigation Division

                                       OFFICE OF THE ATTORNEY GENERAL OF TEXAS
                                       P.O. Box 12548, Capitol Station
                                       Austin, Texas 78711-2548
                                       (512) 936-1706 • fax (512) 320-0167
                                       charles.eldred@oag.texas.gov

                                       *ATTORNEYS FOR DEFENDANT WENDLER*

25

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on May 5, 2023.

*/s/ Charles K. Eldred*
Charles K. Eldred