## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

SPECTRUM WT, BARRETT BRIGHT, and LAUREN STOVALL,

     Plaintiffs,

   v.

WALTER WENDLER, in his individual capacity and his official capacity as the President of West Texas A&M University,

CHRISTOPHER THOMAS, in his official capacity as Vice President for Student Affairs at West Texas A&M University,

JOHN SHARP, in his official capacity as Chancellor of the Texas A&M University System,

ROBERT L. ALBRITTON, JAMES R. BROOKS, JAY GRAHAM, MICHAEL A. HERNANDEZ III, TIM LEACH, BILL MAHOMES, ELAINE MENDOZA, MICHAEL J. PLANK, CLIFF THOMAS, and DEMETRIUS L. HARRELL JR., in their official capacities as members of the Board of Regents of the Texas A&M University System,

     Defendants.

Case No.: 2:23-cv-00048-Z

Hon. Matthew J. Kacsmaryk

**PLAINTIFFS' COMBINED BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND IN REPLY IN SUPPORT OF PLAINTIFFS' AMENDED MOTION FOR PRELIMINARY INJUNCTION**

**ORAL ARGUMENT REQUESTED**

JT MORRIS
TX Bar No. 24094444
FOUNDATION FOR INDIVIDUAL RIGHTS
 AND EXPRESSION
700 Pennsylvania Ave., SE; Ste. 340
Washington, DC 20003
Tel: (215) 717-3473
Fax: (267) 573-3073
jt.morris@thefire.org

CONOR T. FITZPATRICK*
MI Bar No. P78981
ADAM B. STEINBAUGH*
CA Bar No. 304829
JEFFREY D. ZEMAN*
MI Bar No. P76610
FOUNDATION FOR INDIVIDUAL RIGHTS
 AND EXPRESSION
510 Walnut St.; Ste. 1250
Philadelphia, PA 19106
Tel: (215) 717-3473
Fax: (267) 573-3073
conor.fitzpatrick@thefire.org
adam@thefire.org
jeff.zeman@thefire.org
* Admitted *Pro Hac Vice*

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

**Page:**

TABLE OF AUTHORITIES ................................................................v

INTRODUCTION ........................................................................1

STATEMENT OF FACTS ............................................................3

    Spectrum WT, like many recognized student groups, has a message to
share. ....................................................................................3

    West Texas A&M opens campus venues for expressive activities....................3

    Spectrum WT plans and organizes a PG-13 charity drag show at
Legacy Hall. ..........................................................................4

    President Wendler imposes his personal views over the Constitution.
And the A&M System Defendants condone it. ....................................5

ARGUMENT ..............................................................................6

I.    The First Amendment Protects Drag Shows, Including On-Campus. ...........7

    A.    Drag shows are expressive conduct—if not pure speech—that
receive robust First Amendment protection. .................................8

    B.    Drag shows maintain their First Amendment protection on
public university campuses....................................................11

    C.    *Rumsfeld v. FAIR* is neither controlling nor persuasive.....................13

II.   The Court Should Deny President Wendler's Rule 12(b)(6) Motion to
Dismiss. ............................................................................16

    A.    Plaintiffs' allegations show Wendler violated the First
Amendment. .......................................................................16

        1.    Wendler banned drag shows because he doesn't like the
message. ....................................................................16

        2.    President Wendler is imposing a prior restraint—and he
doesn't deny it. ............................................................18

    B.    Qualified immunity does not shield President Wendler, who
professed his contempt for the Constitution...............................19

1.   Wendler's own words defeat his claim to qualified immunity. ................................................................... 19

2.   Settled First Amendment principles establish the "fair warning" needed to deny qualified immunity. ............................ 20

3.   Decades of precedent gave Wendler fair warning that he would violate the Constitution. .............................................. 23

4.   The cases Wendler relies on suggest only narrow and irrelevant exceptions to clearly established First Amendment protections. ................................................. 25

III.   Because Plaintiffs Have Shown Standing and a Controversy Ripe for Prospective Relief, the Court Should Deny the Rule 12(b)(1) Motions. .......... 27

A.   Plaintiffs have standing. ............................................... 28

1.   Plaintiffs show both ongoing and threatened Article III injuries. .................................................. 29

a.   President Wendler's March 20 email—and his refusal to rescind it—show an ongoing injury-in-fact. ........................................... 29

b.   The prior restraint is also an injury-in-fact. ................... 31

c.   A concrete threat underscores an Article III injury ........ 32

2.   Plaintiffs have standing as to Vice President Thomas. .............. 34

3.   Plaintiffs have standing as to Chancellor Sharp. ....................... 35

4.   Plaintiffs have standing as to The Board of Regents. ................ 37

B.   Defendants do not enjoy sovereign immunity. ....................... 39

C.   Plaintiffs' lawsuit is neither unripe nor moot. ........................ 41

IV.   The Court Should Grant a Preliminary Injunction Against Wendler ............ 42

A.   Because drag shows are protected speech, Plaintiffs are likely to succeed on the merits. ............................................... 43

B.   Wendler's boast that he "wouldn't have done anything any differently" drives home an irreparable injury. ...................... 44

iii

V.    A Preliminary Injunction Against Vice President Thomas and the A&M System Defendants is Required for Complete Relief. ...........................45

CONCLUSION..............................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.,*
    851 F.3d 507 (5th Cir. 2017) .........................................................................39, 41

*Already, LLC v. Nike, Inc.,*
    133 S. Ct. 721 (2013) ...........................................................................................44

*Anderson v. Creighton,*
    483 U.S. 635 (1987) ........................................................................................21, 22

*Ashcroft v. al-Kidd,*
    563 U.S. 731 (2011) .............................................................................................20

*Austin v. Univ. of Fla. Bd. of Trustees,*
    580 F. Supp. 3d 1137 (N.D. Fla. 2022) ...............................................................32

*Berger v. Battaglia,*
    779 F.2d 992 (4th Cir. 1985) .................................................................................9

*Bethel Sch. Dist. No. 403 v. Fraser,*
    478 U.S. 675 (1986) .............................................................................................12

*Brockett v. Spokane Arcades, Inc.,*
    472 U.S. 491 (1985) .............................................................................................11

*Bus. Leaders In Christ v. Univ. of Iowa,*
    991 F.3d 969 (8th Cir. 2021) ..........................................................................22, 24

*Calvary Christian Ctr. v. City of Fredericksburg,*
    832 F. Supp. 2d 635 (E.D. Va. 2011) ...................................................................15

*CAMP Legal Def. Fund, Inc. v. City of Atlanta,*
    451 F.3d 1257 (11th Cir. 2006) ............................................................................32

*Catholic Leadership Coal. of Tex. v. Reisman,*
    764 F.3d 409 (5th Cir. 2014) ................................................................................45

*Chiu v. Plano Indep. Sch. Dist.,*
    339 F.3d 273 (5th Cir. 2003) ..........................................................................24, 25

*Chiu v. Plano Indep. Sch. Dist.*,
  260 F.3d 330 (5th Cir. 2001) .......................................................................23, 24

*Clark v. Cmty. for Creative Non-Violence*,
  468 U.S. 288 (1984) .................................................................................13

*Davidson v. City of Stafford*,
  848 F.3d 384 (5th Cir. 2017) .......................................................................20

*Ex Parte Young*,
  209 U.S. 123 (1908) ................................................................................39

*Fed. Election Comm'n v. Cruz*,
  142 S. Ct. 1638 (2022) ..........................................................................35, 37

*Freedom From Religion Found. v. Abbott*,
  955 F.3d 417 (5th Cir. 2020) ...........................................................28, 39, 40, 42

*Gay Student Servs. v. Tex. A&M Univ.*,
  737 F.2d 1317 (5th Cir. 1984) .....................................................................25, 44

*Gerlich v. Leath*,
  861 F.3d 697 (8th Cir. 2017) .......................................................................22

*Get Outdoors II, LLC v. City of San Diego*,
  506 F.3d 886 (9th Cir. 2007) .......................................................................31

*Giovani Carandola, Ltd. v. Bason*,
  303 F.3d 507 (4th Cir. 2002) .......................................................................9, 23

*Haverkamp v. Linthicum*,
  6 F.4th 662 (5th Cir. 2021) .......................................................................39

*Healy v. James*,
  408 U.S. 169 (1972) .........................................................................11, 12, 22, 24

*Hoggard v. Rhodes*,
  141 S. Ct. 2421, (2021) ...........................................................................22

*Hope v. Pelzer*,
  536 U.S. 730 (2002) .......................................................................20, 21, 23

*Hunt v. Board of Regents of Univ. of New Mexico*,
  792 Fed. App'x 595 (10th Cir. 2019) .............................................................27

*Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston,*
    515 U.S. 557 (1995) ......................................................................................*passim*

*Intervarsity Christian Fellowship/USA v. Univ. of Iowa,*
    5 F.4th 855 (8th Cir. 2021) ..................................................................22

*Int'l Soc'y for Krishna Consciousness of Atlanta v. Eaves,*
    601 F.2d 809 (5th Cir.1979) .................................................................30

*Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.,*
    993 F.2d 386 (4th Cir. 1993) ....................................................8, 15, 23

*Joseph Burstyn, Inc. v. Wilson,*
    343 U.S. 495 (1952) ...............................................................................9

*Justice For All v. Faulkner,*
    410 F.3d 760 (5th Cir. 2005) ...............................................................44

*Kennedy v. Bremerton Sch. Dist.,*
    142 S. Ct. 2407 (2022) .........................................................................23

*Kinney v. Weaver,*
    367 F.3d 337 (5th Cir. 2004) ...............................................................20

*Kleinman v. City of San Marcos,*
    597 F.3d 323 (5th Cir. 2010) ...............................................................15

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1991) .............................................................................29

*Malley v. Briggs,*
    475 U.S. 335 (1986) .......................................................................19, 20

*Martin v. Parrish,*
    805 F.2d 583 (5th Cir. 1986) ...............................................................11

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n,*
    138 S. Ct. 1719 (2018) .........................................................................15

*Matal v. Tam,*
    582 U.S. 218 (2017) .................................................................16, 17, 18

*McCullen v. Coakley,*
        573 U.S. 464 (2014) ..................................................................................13

*Ne. Women's Ctr., Inc. v. McMonagle,*
        939 F.2d 57 (3d Cir. 1991) .....................................................................12

*NiGen Biotech, LLC v. Paxton,*
        804 F.3d 389 (5th Cir. 2015)...................................................................39

*Norma Kristie, Inc. v. City of Okla. City.,*
        572 F. Supp. 88 (W.D. Okla. 1983)....................................................8, 11

*Oliver v. Arnold,*
        3 F.4th 152 (5th. Cir. 2021) ..............................................................20, 21

*Papish v. Bd. of Curators of the Univ. of Mo.,*
        410 U.S. 667 (1973) ........................................................................*passim*

*People for the Ethical Treatment of Animals, Inc. v. Banks,*
        2022 WL 4021938 (S.D. Tex. Sept. 2, 2022)......................................39, 40

*Se. Promotions, Ltd. v. Conrad,*
        420 U.S. 546 (1975) ........................................................................*passim*

*R.A.V. v. City of Saint Paul,*
        505 U.S. 377 (1992) ..................................................................................18

*Radwan v. Manuel,*
        55 F.4th 101 (2d Cir. 2023)......................................................................26

*Ramming v. United States,*
        281 F.3d 158 (5th Cir. 2001)...............................................................27, 33

*Roark & Hardee LP v. City of Austin,*
        522 F.3d 533 (5th Cir. 2008) ...................................................................41

*Robinson v. Hunt Cnty.,*
        921 F.3d 440 (5th Cir. 2019) ...................................................................16

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
        515 U.S. 819 (1995) ......................................................................1, 16, 17

*Rumsfeld v. FAIR,*
        547 U.S. 47 (2006) ...................................................................................14

*Russell v. Lundergan-Grimes,*
    784 F.3d 1037 (6th Cir. 2015) ........................................................................37

*Sasser v. Board of Regents,*
    2023 WL 2446720 (11th Cir. 2023) ..........................................................26, 27

*Sause v. Bauer,*
    138 S. Ct. 2561 (2018) ................................................................................21

*Schacht v. United States,*
    398 U.S. 58 (1970) .......................................................................................7

*Schad v. Borough of Mt. Ephraim,*
    452 U.S. 61 (1981) .................................................................................9, 14

*Sierra Club, Lone Star Chapter v. F.D.I.C.,*
    992 F.2d 545 (5th Cir. 1993) ....................................................................45

*Speech First, Inc. v. Fenves,*
    979 F.3d 319 (5th Cir. 2020) ..........................................................12, 32, 37

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) .........................................................................28, 29, 32, 41

*T.V. ex rel. B.V. v. Smith-Green Cmty. Sch. Corp.,*
    807 F. Supp. 2d 767 (N.D. Ind. 2011) ......................................................15

*Thompson v. Ragland,*
    23 F.4th 1252 (10th Cir. 2022) .................................................................22

*Three Expo Events, LLC v. City of Dallas,*
    907 F.3d 333 (5th Cir. 2018) ...............................................................28, 30

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
    393 U.S. 503 (1969) .............................................................................10, 23

*United States v. Lanier,*
    520 U.S. 259 (1997) ...................................................................................21

*United States v. O'Brien,*
    391 U.S. 367 (1968) ...................................................................................14

*United States v. Playboy Ent. Grp.,*
    529 U.S. 803 (2000) ...............................................................................13

*United States v. Stevens,*
    559 U.S. 460 (2010) ...............................................................................26

*W. Va. Bd. of Educ. v. Barnette,*
    319 U.S. 624 (1943) ...............................................................................21

*Warth v. Seldin,*
    422 U.S. 490 (1975) ...............................................................................29

*Widmar v. Vincent,*
    454 U.S. 263 (1981) .....................................................................1, 13, 17

*Winters v. New York,*
    333 U.S. 507 (1948) .................................................................................9

**Statutes:**

42 U.S.C. § 1983 ..............................................................................................38

Tex. Educ. Code § 51.9315(g) ...................................................................4, 24

Tex. Educ. Code § 85.11 ................................................................................38

Tex. Educ. Code § 85.21 ................................................................................38

Tex. Educ. Code § 102.111 ............................................................................38

**Rules:**

L.R. 7 .................................................................................................................1

**Other Authorities:**

Michael Hardy, "Country Revival," Texas Monthly (July 2017) ................36

Emily Hoenig, *Why Can't We All Just Cher?: Drag Celebrity Impersonators*
    *Versus an Ever-Expanding Right of Publicity*, 38 Cardozo Arts & Ent.
    L.J. 537 (2020) ...............................................................................10, 11

Shannan Najmabadi, "Texas House Calls on Texas A&M Chancellor to Halt
    White Nationalist Rally," The Texas Tribune (Aug. 14, 2017) ..............37

Tex. A&M Univ. Sys., Sys. Pol'y 02.02, Office of the Chancellor ..............................35

Tex. A&M Univ. Sys., Sys. Pol'y 02.05, Presidents of Sys. Member Univs. .............35

Under L.R. 7.1 and the Court's May 15, 2023 order (ECF 43), Plaintiffs submit this brief (a) opposing Defendants' motions to dismiss (ECF 34, 38) and (b) replying to Defendants' responses (ECF 36, 39) to Plaintiffs' amended motion for a preliminary injunction (ECF 30).

## INTRODUCTION

President Walter Wendler has declared that "West Texas A&M University will not host a drag show on campus." ECF 28-1. He has even confessed that though "the law of the land" "appears to require" him to allow drag shows, "I do not support any show, performance or artistic expression which denigrates others—in this case women—for any reason." *Id.* President Wendler's edict violates the First Amendment.

The Supreme Court could hardly have been more clear: The government may not censor stage performance because it disapproves of the morals of the underlying expressive message. *Se. Promotions, Ltd. v. Conrad,* 420 U.S. 546, 549, 557–58 (1975). And college administrators are no exception. They cannot "shut off" expression "in the name alone of 'conventions of decency.'" *Papish v. Bd. of Curators of the Univ. of Mo.*, 410 U.S. 667, 670 (1973) (per curiam). They cannot censor student speech because of its viewpoint. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828–30 (1995). Nor can they deny students access to a public forum because they dislike the students' message. *Widmar v. Vincent*, 454 U.S. 263, 267–70 (1981).

Yet President Wendler's motion to dismiss and response to Plaintiffs' preliminary injunction motion ignore both binding precedent and his own words. Rather, he now argues that drag shows are not expression at all, insisting "an observer watching a drag show has no way of knowing whether the performers are

expressing anything unless the performance is accompanied by an explanation of the alleged message." ECF 35 at 11; ECF 37 at 13. That argument ignores how human civilization has relied on art, gestures, and performance to speak. An evocative violin piece, a vivid ballet, and a post-touchdown kneel to pray do not need a helper with placards to explain that there is a message conveyed. Neither does drag performance.

That is why "the Constitution looks beyond written or spoken words as mediums of expression." *Hurley v. Irish-American Gay, Lesbian and Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995). The Supreme Court roundly rejected Wendler's cramped view of the First Amendment, which "would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll." *Id.* Even if some might not understand the intended message from expressive performance like drag, there is no "I don't get it" or "I don't like it" exception to the First Amendment.

Because Wendler is wrong about First Amendment protection for drag shows, his arguments for dismissal and against a preliminary injunction fall apart. Qualified immunity does not shield his knowing violation of First Amendment principles that the Supreme Court and the Fifth Circuit established years ago. Nor do sovereign immunity or Article III shield him from Plaintiffs' claims for prospective relief—he has not rescinded the ongoing ban on drag shows that is harming Plaintiffs.

The other Defendants' arguments for dismissal and against a preliminary injunction also fail. Each of their roles, set out by statute and Texas A&M system policy, establish Plaintiffs' standing. For instance, Vice President Thomas must carry

out President Wendler's directives, showing a link between Plaintiffs' injuries and Thomas that only prospective relief can redress. And Chancellor Sharp's failure to stop Wendler from trampling the First Amendment, despite having direct legal authority to do so, leaves the conclusion that he has accepted and authorized Wendler's drag show ban. The same goes for the Texas A&M System Board of Regents. For the same reasons, *Ex Parte Young* applies and no Defendant has sovereign immunity against Plaintiffs' requests for injunctive and declaratory relief against the ongoing censorship at West Texas A&M.

The Court should deny Defendants' motions to dismiss and grant Plaintiffs' requested preliminary injunction.

## STATEMENT OF FACTS[1]

**Spectrum WT, like many recognized student groups, has a message to share.**

Plaintiff Spectrum WT, formed in 2009, is a recognized student organization at West Texas A&M, with a mission of providing support and acceptance for the LGTBQ+ community on campus and beyond. ECF 28, FAC ¶¶ 10–12. To help spread its message, Spectrum WT hosts various events, like movie night and discussions about LGBTQ+ history, and "regularly volunteers in the community." *Id.* ¶¶ 12–13.

**West Texas A&M opens campus venues for expressive activities.**

As Texas law requires, West Texas A&M policy forbids administrators from

---

[1] All facts stated in this section are from Plaintiffs' First Amended Verified Complaint ("FAC"). ECF 28. Additional facts outside the complaint relating to Defendants' 12(b)(1) motions and Plaintiffs' preliminary injunction are included in Sections III-V.

"deny[ing] [a student] organization any benefit generally available to other student organizations at the institution" because of "political, religious, philosophical, ideological, or academic viewpoint expressed by the organization or of any expressive activities of the organization." FAC Ex. C; Tex. Educ. Code § 51.9315(g). At the university, these benefits include using campus venues, like Legacy Hall, for expressive activity. FAC ¶¶ 46–49. Legacy Hall is a performance venue in the Jack B. Kelley Student Center, which the university holds out for expressive activities like concerts and press conferences, and even weddings and parties. *Id.* ¶¶ 32–34. Student organizations and the public have regularly used the student center's spaces for expressive activity—including drag shows at least in 2012 and 2019. *Id.* ¶¶ 40–41.

**Spectrum WT plans and organizes a PG-13 charity drag show at Legacy Hall.**

From Shakespearean-era theater to "RuPaul's Drag Race," people have used drag to express themselves, convey political messages, and entertain. FAC ¶¶ 62–72. Drag is also no stranger to college campuses—even Legends Club on campus hangs a photograph of "Powderpuff Football Game Cheerleaders," depicting male football players posing in cheerleading skirts. FAC ¶ 68.

In November 2022, Spectrum WT began planning a drag show called "A Fool's Drag Race," scheduled for March 31, 2023. FAC ¶ 52. From the start, it earmarked the proceeds from the drag show for donation to an LGBTQ+ suicide prevention group. *Id.* ¶ 74. For Spectrum WT's members, a charity drag show is important to convey messages advocating for and supporting the LGBTQ+ community. *Id.*

In planning its drag show, Spectrum WT instructed would-be performers not to engage in "lewd" conduct. *Id.* ¶ 79. It forbade anyone under 18 from attending the

on-campus event without a parent or guardian. *Id.* ¶ 80. It made the event alcohol-free. *Id.* It even told performers to avoid music containing profanity. *Id.* ¶ 81.

Following the university's regular processes, Spectrum WT reserved Legacy Hall for the event. FAC ¶¶ 85–88, 90–92. From the outset, West Texas A&M knew Spectrum WT intended to host a drag show—and that it would be PG-13. *Id.* ¶¶ 77–78, 85, 94. West Texas A&M's administration supported Spectrum WT's planning of the drag show throughout the facility request process, helping it navigate the necessary steps to move forward. *Id.* ¶¶ 86–88, 91, 94, 99–100. Spectrum WT received "Tentative Confirmation" for its event on February 27, 2023. *Id.* ¶¶ 91, 99.

**President Wendler imposes his personal views over the Constitution. And the A&M System Defendants condone it.**

Just 11 days before the drag show, Plaintiff Barrett Bright, who is Spectrum WT's president, learned from Defendant Christopher Thomas, West Texas A&M's Vice President for Student Affairs, that West Texas A&M was canceling Spectrum WT's charity drag show. FAC ¶ 104. When Bright asked why, Vice President Thomas said President Wendler did not like the idea of the drag show, believing it discriminated against women. *Id.*

Soon after, on March 20, 2023, President Wendler emailed West Texas A&M's students, faculty, and staff announcing that West Texas A&M "will not host a drag show on campus." FAC ¶ 105 & Ex. A. Wendler proclaimed his personal opposition to his perception of the message of Plaintiffs' show. FAC Ex. A. For instance, he stated that drag shows stray from the "basis of Natural Law," which "declared the Creator's origin as the foundational fiber in the fabric of our nation." *Id.* He claimed that drag

5

shows are "a slapstick sideshow" that "become[] harassment" because, in his view, it is "sexism." *Id.* And he branded drag shows as "mocking" and "demeaning." *Id.*

Wendler also told the campus he was openly defying the Constitution: "A harmless drag show? Not possible. I will not appear to condone the diminishment of any group at the expense of impertinent gestures toward another group for any reason, *even when the law of the land appears to require it.*" *Id.* (emphasis added).

President Wendler cancelled Spectrum WT's charity drag show even though Plaintiffs had received tentative approval for the event and were wrapping up all the requirements needed to hold the event on campus. FAC ¶¶ 91, 99, 113. West Texas A&M received no complaints that the drag show would harass anybody. *Id.* ¶ 111.

President Wendler has not rescinded his March 20 edict. *Id.* ¶ 119. Nor has Defendant Chancellor John Sharp stopped President Wendler's ongoing drag show ban, despite having the duty and authority to do so. FAC ¶ 18. The Texas A&M System Board of Regents members also have refused to exercise their power to stop Wendler's actions. *Id.* ¶ 19. Sharp and the Board of Regents Defendants (collectively, "A&M System Defendants") have not disavowed Wendler's edict, including his ban on drag shows and the viewpoint-driven reasons for the ban. ¶¶ 120, 158.

## ARGUMENT

In claiming that drag shows on campus lack First Amendment protection, President Wendler flouts longstanding precedent establishing stage performance as protected expression. And he betrays his own words affirming that he has banned drag shows at West Texas A&M because he disagrees with what he perceives as drag shows' message, not because he considers them "lewd."

Because Wendler's chief argument for dismissal fails, so does his claim for qualified immunity. Above all, Wendler confessed he was knowingly defying "the law of the land," like the First Amendment's clearly established prohibitions against viewpoint discrimination and prior restraints on speaking in public forums. Qualified immunity does not shield Wendler from Plaintiffs' damages claim, and the Court should deny his Rule 12(b)(6) motion.

Defendants' arguments that the Court lacks subject matter jurisdiction over Plaintiffs' prospective relief claims also fail. Plaintiffs have shown an injury-in-fact that meets Article III's standing requirements. Indeed, Wendler's drag show ban and prior restraint—which Vice President Thomas must enforce and the A&M System Defendants have effectively ratified—is thwarting Plaintiffs' protected expression. For the same reasons, Plaintiffs have shown an ongoing violation of federal law for which sovereign immunity is unavailable. In short, there is a ripe controversy, and a preliminary injunction is needed to redress irreparable harm to Plaintiffs' expressive freedoms. The Court should deny Defendants' Rule 12(b)(1) motions to dismiss and grant Plaintiffs' amended motion for a preliminary injunction.

## I. The First Amendment Protects Drag Shows, Including On-Campus.

No matter what President Wendler now argues, the First Amendment protects drag shows. "Since time immemorial, . . . theatrical performances, often performed by amateurs, have played an important part in the entertainment and the education of the people of the world." *Schacht v. United States*, 398 U.S. 58, 61–62 (1970) (holding an "amateurish and perhaps unappealing . . . street skit" is protected First Amendment expression). It is simple: When people get on stage and perform, the First

Amendment protects it—on or off campus. *E.g.*, *Se. Promotions*, 420 U.S. at 556–57 (holding the musical "Hair" is protected First Amendment expression); *Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386, 387 (4th Cir. 1993) (university fraternity's "ugly woman" contest was protected expression). The First Amendment's embrace of theatrical performance does not hinge on whether it conveys a "narrow, succinctly articulable message." *Hurley*, 515 U.S. at 569.

## A.   Drag shows are expressive conduct—if not pure speech—that receive robust First Amendment protection.

As Judge Russell explained 40 years ago when holding the First Amendment protects drag shows, "[t]he First Amendment values free and open expression, even if distasteful to the majority, including personally distasteful to this Court. As Voltaire said, 'I disapprove of what you say, but I will defend to the death your right to say it.'" *Norma Kristie, Inc. v. City of Okla. City.* 572 F. Supp. 88, 92 (W.D. Okla. 1983). As Plaintiffs allege (and as the Court must accept at the 12(b)(6) stage), drag performance throughout history has conveyed many messages, from political and social views, artistic and theatrical messages, to pure entertainment. FAC ¶¶ 62–72.

To that end, the Court should refuse President Wendler's arguments that drag is unprotected conduct. First, Wendler contends that "drag shows are not inherently expressive conduct" because "many drag shows are pure entertainment." ECF 35 at 11. But Wendler's March 20 email belies his argument. His email fuses drag shows with "artistic expression," accusing drag shows of messaging he finds "mocking" and "divisive." FAC, Ex. A. Wendler's words then are more telling than what he says now.

Even if the Court considers Wendler's argument, the Supreme Court rejected it decades ago, explaining that the Constitution does not draw a line between "political" speech and "entertainment" because "what is one man's amusement, teaches another's doctrine." *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952) (cleaned up); *see also Berger v. Battaglia*, 779 F.2d 992, 999 (4th Cir. 1985) (holding a blackface performance is protected First Amendment expression, even when it is "sheer entertainment" without a political message). The "line between the informing and the entertaining is too elusive" to divine the protected from the unprotected. *Winters v. New York*, 333 U.S. 507, 510 (1948). Thus, "motion pictures, programs broadcast by radio and television, and live entertainment, such as musical and dramatic works fall within the First Amendment guarantee." *Schad v. Borough of Mt. Ephraim*, 452 U.S. 61, 65–66 (1981) (collecting cases); *see also Joseph Burstyn*, 343 U.S. at 501 (concluding that the First Amendment protects motion pictures).

President Wendler also argues that "an observer watching a drag show has no way of knowing whether the performers are expressing anything unless the performance is accompanied by an explanation of the alleged message." ECF 35 at 11. Suppose President Wendler had his way. Ballet, orchestra, paintings, sculptures, saluting, kneeling in prayer, kneeling in protest, photography, and even opera would lack First Amendment protection. That is not, of course, what the law demands. The musical "Hair" did not need a narrator explaining to the crowd the play's message to gain First Amendment protection. *See Se. Promotions*, 420 U.S. at 557. Neither does a parade. *Hurley*, 515 U.S. at 569–70. And neither does a drag show. *See Giovani*

*Carandola, Ltd. v. Bason*, 303 F.3d 507, 516 (4th Cir. 2002) (describing expressive dance as "in the heartland of the First Amendment's protection") (cleaned up).

In any event, drag shows are expressive beyond mere entertainment. Drag is a "multivalent form of performance art and a commentary on social identity." Emily Hoenig, *Why Can't We All Just Cher?: Drag Celebrity Impersonators Versus an Ever-Expanding Right of Publicity*, 38 Cardozo Arts & Ent. L.J. 537, 551 (2020). Spectrum WT's members perform in drag to express messages on social identity, convey support for the LGBTQ+ community, and entertain in the process. FAC ¶¶ 74, 94.

President Wendler suggests that "there is nothing inherently expressive about wearing clothing." ECF 35 at 13. True enough, there is nothing inherently expressive, all things being equal, with putting on pants in the morning. But when a speaker wears clothing to express a message, the First Amendment protects that expression. *See, e.g.*, *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) (First Amendment protected students wearing black armbands to protest Vietnam war). Here, the display of performers in gender non-conforming clothing *is* the expression of drag. Hoenig, 38 Cardozo Arts & Ent. L.J. at 551.

Finally, President Wendler's newfound focus on "lewdness" is misplaced—his ban on drag shows has nothing to do with "lewdness." Instead, we know President Wendler's purpose from his clear-cut edict: He has banned drag shows because he views them as "mocking" and a "slapstick sideshow that erodes the worth of women." FAC Ex. A. The word "lewd" does not appear in President Wendler's edict. *Id*. Nor

does the edict cite any university policy on lewdness. *Id.* And Wendler knew Plaintiffs were putting on a PG-13 show. *Id.* ¶¶ 77–78, 82.

For that reason, the Court should reject President Wendler's "lewdness" argument. Even if one considers his argument, it still fails: The First Amendment protects "lewdness" unless it rises to the level of obscenity. *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 498–99 (1985) (invalidating overbroad prohibition on "lewdness" which encompassed material beyond obscenity); *Norma Kristie*, 572 F. Supp. at 91–92 (holding drag shows retain First Amendment protection because they do not constitute obscenity). Wendler concedes obscenity "is not an issue in this case." ECF 35 at 18. Nor could he claim otherwise—Plaintiffs' drag shows are PG-13, devoid of even music containing profanity. FAC ¶¶ 76-83.

### B. Drag shows maintain their First Amendment protection on public university campuses.

The Supreme Court has made clear that "state colleges and universities are not enclaves immune from the sweep of the First Amendment." *Healy v. James*, 408 U.S. 169, 180 (1972). "[T]he precedents of this Court leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large." *Id.*

Contrary to *Healy*, President Wendler argues that students have watered down First Amendment rights at public universities. ECF 35 at 14–15. He is wrong. President Wendler latches onto dicta from the 1986 *Martin v. Parrish* decision, which quotes grade-school cases to suggest that a university need not tolerate "lewd, indecent, or offensive speech and conduct." ECF 35 at 14, citing 805 F.2d 583, 585

(5th Cir. 1986) (citing *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986)). But Wendler omits the key fact from *Martin*: It is an employment case about a professor disciplined for cursing at and harassing his students. *Id.* at 586. *Martin*'s application and holding start and end there. So far as Plaintiffs can find, no court has applied the case to uphold censorship of student speech. That is no surprise given *Healy*'s holding. In the same way, Wendler mistakenly relies on *Bethel*, a case about grade schoolers' speech. ECF 35 at 15 (citing *Bethel,* 478 U.S. at 685–86). As Supreme Court and Fifth Circuit decisions establish, college students have robust First Amendment protection for controversial speech that grade school students might not. *E.g., Papish*, 410 U.S. at 670 (upholding First Amendment right of university student to depict police officers raping the Statue of Liberty); *Speech First, Inc. v. Fenves*, 979 F.3d 319, 337–38 (5th Cir. 2020) (questioning the extent to which university officials can constitutionally regulate "verbal harassment").

Wendler also claims barring drag shows and other supposedly "lewd" expression is a permissible time, place, and manner restriction on Plaintiffs' expression. ECF 35 at 15. It is not. Prohibiting student events from starting after 10 p.m. is a "time, place, or manner" restriction. Banning campus speech on a certain subject matter or viewpoint is not. *See Ne. Women's Ctr., Inc. v. McMonagle*, 939 F.2d 57, 63 (3d Cir. 1991) (explaining a time, place, and manner restriction "regulates when, where, and how [a citizen] may speak, but not what he may say").

A time, place, or manner restriction must be "justified without reference to the content of the regulated speech," "narrowly tailored to serve a significant

governmental interest," and "leave open ample alternative channels" for expression. *McCullen v. Coakley*, 573 U.S. 464, 477 (2014) (cleaned up). President Wendler does not mention that standard, much less meet it. Above all, Wendler's drag show ban is defined *solely* by the content of the performers' speech. Plaintiffs' allegations show the ban singles out drag performances and does so because Wendler disagrees with the message conveyed. FAC ¶¶ 40, 107–110, Ex. A. President Wendler's edict banned no other expression he believed "mocked" or "demeaned" women. *Id.* at Ex. A. Nor did it call out any lewd conduct. *Id.* Try as he may, Wendler cannot remake a content-based ban into a content-neutral time, place, and manner restriction.

President Wendler also offers no reason for why the drag show ban is narrowly tailored, what alternative channels it leaves open, or how his edict is the "least restrictive means" of achieving any state interest. *See United States v. Playboy Ent. Grp.*, 529 U.S. 803, 813 (2000) (content regulation permissible only if it is "the least restrictive means to further the articulated interest") (cleaned up). On that basis, he cannot meet strict scrutiny's high bar to justify censoring expression in a public forum because of its content and viewpoint, "lewd" or otherwise. *Widmar*, 454 U.S. at 270.

## C.   *Rumsfeld v. FAIR* is neither controlling nor persuasive.

Drag shows are expression protected under the First Amendment because they are intended to be communicative and are reasonably understood by the viewer to be communicative. *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 (1984). Indeed, as Plaintiffs allege, drag shows convey a range of artistic, theatric, and political messages. FAC ¶¶ 62–72. Their PG-13 drag shows follow suit, conveying messages in support of the LGTBQ+ community. *Id.* ¶¶ 73–78.

13

President Wendler argues that *Rumsfeld v. FAIR*, 547 U.S. 47 (2006), imposed a new rule that expression which "cannot be understood without explanatory speech" is not "inherently expressive" and therefore not protected. ECF 35 at 11. But *FAIR* says nothing of the sort.

In fact, *FAIR* is a compelled-speech case—an issue not at play here. *FAIR* involved a First Amendment challenge against the Solomon Amendment, which denies federal funding to universities that prevent the military from recruiting on campus. 547 U.S. at 55. Law schools claimed that the government was compelling them to speak in favor of the military by allowing recruiters on campus. The Court rejected their argument, holding that "the schools are not speaking when they host interviews and recruiting receptions" (*id.* at 64) and that excluding military recruiters was "expressive only because the law schools accompanied their conduct with speech explaining it." *Id.* at 66. The Court reiterated that conduct is not "'speech' whenever the person engaging in the conduct intends thereby to express an idea." *Id.* at 65–66 (quoting *United States v. O'Brien*, 391 U.S. 367, 376 (1968)).

*FAIR* did not set a new bar for expressive conduct, much less upend decades of First Amendment law. Instead, FAIR merely reiterated a settled rule: the First Amendment protects conduct that "is inherently expressive." 547 U.S. at 66. As explained above, live entertainment, music, and theatre are inherently expressive—indeed, those mediums *are* expression. *Schad*, 452 U.S. at 65–66 (collecting cases). And as the Supreme Court confirmed in *Hurley*, the First Amendment protects expressive conduct even if some observers may not grasp the message conveyed. 515

14

U.S. at 569 ("[A] narrow, succinctly articulable message is not a condition of constitutional protection."); *see also Kleinman v. City of San Marcos*, 597 F.3d 323, 327 (5th Cir. 2010) (applying the passage post-*FAIR*); *Masterpiece Cakeshop, Ltd. v. Co. Civ. Rts. Com'n*, 138 S. Ct. 1719, 1741–42 (2018) (Thomas, J., concurring) ("[T]he Court has recognized a wide array of conduct that can qualify as expressive, including nude dancing" and a "particularized message is not required") (cleaned up).

Finally, President Wendler suggests that on-point decisions like *Iota Xi*, which held that university students' "ugly woman contest" enjoyed First Amendment protection, have been implicitly overruled by *FAIR*. ECF 35 at 19. Not so. Post-*FAIR*, courts explicitly cite and rely on *Iota Xi*'s characterization of First Amendment expression to determine whether a speaker's message is protected. *See, e.g., Calvary Christian Ctr. v. City of Fredericksburg*, 832 F. Supp. 2d 635, 642–43 (E.D. Va. 2011) (quoting *Iota Xi* to establish test for expressive conduct); *T.V. ex rel. B.V. v. Smith-Green Cmty. Sch. Corp.*, 807 F. Supp. 2d 767, 776 (N.D. Ind. 2011) (citing *Iota Xi* to hold high schoolers' provocative photos were protected First Amendment expression, explaining that the "fact that adult school officials may not appreciate the approach to sexual themes the girls displayed actually supports the determination that the conduct was inherently expressive").

*FAIR* has no role to play here. Rather, *Southeastern Promotions*, *Hurley*, and a wealth of other cases confirm that the First Amendment protects drag shows.

15

## II.    The Court Should Deny President Wendler's Rule 12(b)(6) Motion to Dismiss.

Because drag shows are protected expression, President Wendler's 12(b)(6) motion to dismiss falls apart. Plaintiffs' First Amended Complaint (ECF 28) and preliminary injunction brief (ECF 31) detail how President Wendler violated the First Amendment's clearly established prohibitions against viewpoint discrimination, content-based restrictions to campus public forums, and prior restraints.[2] Yet, as Plaintiffs explain below, Wendler fails to address these prohibitions. In fact, his brief does not mention "prior restraint." ECF 35. And as Plaintiffs also show, qualified immunity does not shield President Wendler after he announced he was violating the "law of the land." The Court should deny Wendler's 12(b)(6) motion to dismiss.

### A.    Plaintiffs' allegations show Wendler violated the First Amendment.

#### 1.    Wendler banned drag shows because he doesn't like the message.

President Wendler is banning drag shows because he disagrees with their expressive message, finding it "inappropriate." FAC ¶¶ 105–111, 121 Ex. A. That is textbook viewpoint discrimination, and the First Amendment forbids it. *Rosenberger*, 515 U.S. at 829. "[C]ensorship based on a state actor's subjective judgment that the content of protected speech is offensive or inappropriate is viewpoint discrimination." *Robinson v. Hunt Cnty.*, 921 F.3d 440, 447 (5th Cir. 2019) (citing *Matal v. Tam*, 582

---

[2] To avoid repeating arguments on the legal merits, Plaintiffs incorporate Section I of their Brief in Support of Amended Motion for Preliminary Injunction (ECF 31 at 10-21), which relies on citations to Plaintiffs' First Amended Complaint, except for one citation to the appendix on page 15, which the Court can ignore for purposes of evaluating Wendler's 12(b)(6) motion.

U.S. 218, 243–44 (2017)).

Ignoring Plaintiffs' claim of unconstitutional viewpoint discrimination (FAC ¶¶ 146–67), President Wendler's brief "does not concede that drag shows convey any message." ECF 35 at 20. But once again, President Wendler averts his eyes from his campus-wide email proclaiming his opposition to the message he believes drag shows send. ECF 28-1. No amount of Monday-morning rewriting in his briefing can change that. The Court should hold President Wendler to his viewpoint-driven words.

President Wendler believes that drag shows "stereotype" and are "a performance exaggerating aspects of womanhood (sexuality, femininity, gender)." *Id.* And he claims that drag shows are "mocking" and "demeaning." *Id.* As Wendler's edict confirms, something cannot stereotype, exaggerate, mock, or demean without conveying a message. Even if that message merely conveys offense, that is a viewpoint the First Amendment protects. *See Matal,* 582 U.S. at 243; *Papish,* 410 U.S. at 670.

To that end, President Wendler is also violating the First Amendment by denying Plaintiffs' access to campus forums for expressive activity based on the content and viewpoint of Plaintiffs' expression. *E.g.*, *Rosenberger*, 515 U.S. at 831–32; *Widmar v. Vincent*, 454 U.S. 263, 267–70 (1981) (holding the First Amendment prohibits universities from excluding religious groups from campus facilities). And because President Wendler is regulating expression based on content and viewpoint, his newfound focus on "lewdness" is irrelevant. *See Papish*, 410 U.S. at 670.

The Supreme Court held decades ago that even with respect to unprotected

expression, "the government may not regulate use based on hostility—or favoritism—towards the underlying message expressed." *R.A.V. v. City of Saint Paul*, 505 U.S. 377, 386 (1992). President Wendler has not banned "lewd" music or movies from campus. *See* ECF 28-1. Nor has he banned "lewd" dances by the West Texas A&M spirit squad. *Id.* Instead, even crediting his newfound reliance on "lewdness" as a basis to ban drag shows, he is singling out *one* type of content for censorship—precisely what the Constitution prohibits. *R.A.V.*, 505 U.S. at 384 (explaining the First Amendment prohibits, for example, a city council from enacting "an ordinance prohibiting only those legally obscene works that contain criticism of the city government, or, indeed, that do not include endorsement of the city government").

Leaving no doubt, President Wendler told the campus he was defying the "law of the land," like First Amendment guarantees of free speech. FAC Ex. A. Wendler knows he censored—and continues to censor—protected expression.

### 2.     President Wendler is imposing a prior restraint—and he doesn't deny it.

Plaintiffs' allegations detail an unconstitutional prior restraint over the campus event registration process that President Wendler levied through the subjective criteria laid out in his March 20 email. FAC ¶¶ 192–216. Plaintiffs also detail in their preliminary injunction brief why the Supreme Court's decision in *Southeastern Promotions* establishes an unconstitutional prior restraint here. ECF 31 at 19–21. In *Southeastern Promotions*, the Supreme Court rejected a city's use of subjective values—just like President Wendler is using—to bar a performance of the controversial musical "Hair" at a municipal auditorium. 420 U.S. at 557–58. As the

Supreme Court explained, "a free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand. It is always difficult to know in advance what an individual will say, and the line between legitimate and illegitimate speech is often so finely drawn that the risks of freewheeling censorship are formidable." *Id.* at 559. Yet throttle Plaintiffs' protective expression before they took the stage is exactly what President Wendler did and continues to do.

For all that, President Wendler's motion to dismiss and brief in support do not mention the phrase "prior restraint." ECF 34–35. Nor does he mention *Southeastern Promotions*. Wendler's silence is just one more reason his motion to dismiss fails.

### B. Qualified immunity does not shield President Wendler, who professed his contempt for the Constitution.

President Wendler is not entitled to qualified immunity for two reasons. First, Wendler admitted that he was knowingly defying the Constitution, and qualified immunity does not shield knowing violations. Second, even though Wendler claims Plaintiffs have not shown an identical case holding college presidents cannot ban drag shows, that is not the standard. Fair warning is. And President Wendler had fair warning that cancelling expression because of its message and imposing subjective criteria over access to public forums violates long-settled First Amendment principles. Thus, the Court should reject Wendler's qualified immunity defense.

### 1. Wendler's own words defeat his claim to qualified immunity.

Qualified immunity does not protect public officials "who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). That is why qualified immunity does

19

not protect President Wendler: He told the campus he was knowingly defying "the law of the land." FAC Ex. A. Simply put, he made a deliberate choice to violate the Constitution—and in an obvious way. That knowing violation alone defeats Wendler's qualified immunity defense. *See Malley,* 475 U.S. at 341.

### 2.   Settled First Amendment principles establish the "fair warning" needed to deny qualified immunity.

Wendler also is not entitled to qualified immunity because his actions violating the First Amendment were objectively unreasonable in light of clearly established law. *Davidson v. City of Stafford*, 848 F.3d 384, 391 (5th Cir. 2017). The "clearly established" question turns on whether "a reasonable official would understand that what he is doing violates [a constitutional] right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). But President Wendler is wrong to insist that Plaintiffs must show a "factually analogous precedent" to meet that standard. ECF 35 at 16. In fact, the Supreme Court confirmed that the "clearly established" question does "not require a case directly on point." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

Instead, the "central concept" of the "clearly established" standard is "fair warning," a benchmark the Supreme Court established 20 years ago. *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (en banc) (quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)). "Fair warning" means "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope*, 536 U.S. at 741. So "[a]lthough earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding." *Id.*

To this end, a plaintiff can defeat qualified immunity with allegations showing an obvious constitutional violation, even without factually identical precedent. *Hope*, 536 U.S. at 741; *Sause v. Bauer,* 138 S. Ct. 2561, 2562 (2018) (per curiam) (recognizing that "[t]here can be no doubt that the First Amendment protects the right to pray.") Or a plaintiff can defeat qualified immunity by pointing to a "general constitutional rule already identified in the decisional law [that applies] with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." *Hope*, 536 U.S. at 741 (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)) (cleaned up); *see also Anderson*, 483 U.S. at 640.

In the First Amendment context, settled principles often apply with "obvious clarity" to give "fair warning" of a constitutional violation. Still, President Wendler suggests that courts should rarely deny qualified immunity in campus speech cases. ECF 35 at 16. But he overstates the law. In fact, courts often deny qualified immunity to school officials who defy settled constitutional principles protecting student speech.

Take the Fifth Circuit's recent decision denying qualified immunity on summary judgment to a public high school teacher who forced a student to write the Pledge of Allegiance over her religious objections. *Oliver v. Arnold*, 3 F.4th 152, 162 (5th. Cir. 2021). Holding that the Supreme Court's decision in *West Virginia Board of Education v. Barnette* clearly established a First Amendment violation, the court stated it was "immaterial" that *Barnette* involved an oral pledge instead of a written one. *Id.* at 162–163 (citing *Barnette*, 319 U.S. 624 (1943)). What mattered, the court stressed, is that *Barnette* clearly established the principle that "school officials may

not require students to swear allegiance." *Id.* at 163.

Nor does qualified immunity shield public university officials who defy settled First Amendment principles. For instance, the Eighth Circuit has twice denied qualified immunity to university officials who barred religious student groups from public forums, relying on decisions like *Widmar*, *Rosenberger*, and *Healy* to conclude that students have a clearly established "right not to be subjected to viewpoint discrimination while speaking in [the] [U]niversity's limited public forum." *Bus. Leaders In Christ v. Univ. of Iowa*, 991 F.3d 969, 985 (8th Cir. 2021) (citing *Gerlich v. Leath*, 861 F.3d 697, 709); *Intervarsity Christian Fellowship/USA v. Univ. of Iowa*, 5 F.4th 855, 867 (8th Cir. 2021). And the Tenth Circuit recently denied qualified immunity to a college official who punished a student for emailing criticism about a professor, even though the court found no precedent with identical facts. *Thompson v. Ragland*, 23 F.4th 1252, 1255–56, 1259–60 (10th Cir. 2022).

In each of these cases, university officials made deliberate decisions that violated the First Amendment. When university administrators do not face exigent circumstances, unlike police facing life-and-death choices on the street, the case for qualified immunity weakens even more. *See Hoggard v. Rhodes*, 141 S. Ct. 2421, 2422, (2021) (statement of Thomas, J., respecting the denial of certiorari) ("[W]hy should university officers, who have time to make calculated choices about enacting or enforcing unconstitutional policies, receive the same protection as a police officer who makes a split-second decision to use force in a dangerous setting?").

22

### 3. Decades of precedent gave Wendler fair warning that he would violate the Constitution.

As Plaintiffs detail in Section I, *supra*, the First Amendment protects drag performances. And no reasonable official could have thought otherwise, especially having the time like Wendler did to consider the lawfulness of his edict. Indeed, *Southeastern Promotions* alone gave fair warning that stage performance like drag— even if offensive to some—is protected expression. 420 U.S. at 556-58. Even though *Southeastern Promotions* involved a musical, it still applied "with obvious clarity" to establish that banning drag shows would violate the First Amendment. *See Hope*, 536 U.S. at 741. Just as a musical is live expression on stage, so is a drag show. A reasonable official would not think he could censor rock music just because precedent clearly establishing First Amendment protection for music involved only bluegrass. And amplifying that fair warning is a consensus of precedent showing that the First Amendment protects expressive activity across the spectrum, from parades and dance to crude entertainment. *E.g., Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2415–16, 2422 (2022); (kneeling in quiet prayer); *Hurley*, 515 U.S. at 569 (groups marching in parades); *Tinker,* 393 U.S. 503, 505–06 (1969) (wearing an armband in protest); *Giovani Carandola*, 303 F.3d at 516 (expressive dance); *Iota Xi*, 993 F.2d 386 (on-campus "ugly woman contest" filled with "racist and sexist overtones").

Thus, having "fair warning" that the First Amendment protects Plaintiffs' PG-13 drag shows, no reasonable official would have banned those shows from public forums on campus—especially based on the shows' viewpoint. "[I]t is well settled that viewpoint discrimination is a clearly established violation of the First Amendment in

any forum." *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 350 (5th Cir. 2001). Like the Eighth Circuit found settled principles from *Widmar*, *Rosenberger*, and *Healy* clearly established the "right not to be subjected to viewpoint discrimination while speaking in [the] [U]niversity's limited public forum," the Court should find those same cases clearly established that Wendler's viewpoint-based drag show ban violates the Constitution. *Bus. Leaders In Christ*, 991 F.3d at 985. And if Wendler insists that Plaintiffs' drag show is offensive or demeaning (or even "lewd"), *Papish* clearly established that those viewpoint-driven criteria violate the First Amendment. 410 U.S. at 670. If anything, a reasonable official would understand that if the First Amendment protects a university student's depiction of police officers raping the Statue of Liberty, it protects Plaintiffs' PG-13 drag shows. *Id.* at 668; FAC ¶¶ 76–78.

Likewise, a reasonable official would understand the subjective criteria in President Wendler's edict do not justify the prior restraint on Plaintiffs' right to reserve campus venues for expression. For one thing, the Texas campus free speech law passed in 2019 made clear that public university officials cannot deny access to campus venues based on a student group's viewpoint. Tex. Educ. Code § 51.9315(g). That law harmonizes with the First Amendment. As the Fifth Circuit has explained, "regulating speech contingent on the will of an official—such as the requirement of a license or permit that may be withheld or granted in the discretion of an official—are unconstitutional burdens on speech classified as prior restraints." *Chiu v. Plano Indep. Sch. Dist.*, 339 F.3d 273, 280 (2003) (*Chiu II*). On that basis, the Fifth Circuit denied qualified immunity to school officials who insisted on approving flyers before

parents could share them at a middle school campus meeting. *Id.* at 284.

The prior restraint in *Chiu II* pales in comparison to the one President Wendler has deliberately imposed over West Texas A&M, conforming expressive activity in campus forums to his worldview. FAC ¶¶ 194–198, 201–203. As the Fifth Circuit confirmed decades ago, when "restriction upon student expression takes the form of an attempt to predict in advance the content and consequences of that expression, it is tantamount to a prior restraint and carries a heavy presumption against its constitutionality." *Gay Student Servs. v. Tex. A&M Univ.*, 737 F.2d 1317, 1325 (5th Cir. 1984) (quotation omitted). That conclusion echoes the Supreme Court's 1975 decision in *Southeastern Promotions*, which rejected anticipatory use of criteria like "clean and healthful and culturally uplifting" to filter performances for a municipal theater. 420 U.S. at 549, 555. Given those holdings and Texas law, a reasonable college official would not deny students access to a public forum for a stage performance based on speculation, let alone using subjective criteria like "mocking" "derisive," and "demoralizing." Yet that's what Wendler has done—one more reason qualified immunity does not shield him.

### 4. The cases Wendler relies on suggest only narrow and irrelevant exceptions to clearly established First Amendment protections.

President Wendler argues that "it is unsettled whether the 'lewd and indecent speech' exception from high school applies to universities." ECF 35 at 17. But he is wrong for two reasons. First, whether there is a "lewd and indecent speech" "exception" to First Amendment protection for student speech at a public university is irrelevant. President Wendler gave neither lewdness nor indecency as a reason for

cancelling Plaintiffs' March 2023 drag show. ECF 28-1. Instead, he stressed his own views as the reason for banning Plaintiffs' protected expression in advance. *Id.*

Second, reasonable officials would understand there are only a handful of narrow exceptions to First Amendment protection for free expression, and that "lewd and indecent" speech is not one of them. *See Papish*, 410 U.S. at 670; *United States v. Stevens*, 559 U.S. 460, 468 (2010). And none of the cases President Wendler cites show otherwise.

Consider the Second Circuit's *Radwan v. Manuel* decision that Wendler relies on. *Radwan* asked whether a clearly established right exists over a student's "ability to display a vulgar or offensive gesture as an athlete on the university's sports team, wearing the university's jersey, during a university sports event." 55 F.4th 101, 119 (2023). That is a far cry from students performing in drag for a charity drag show that the university does not sponsor. At bottom, *Radwan* is a narrow decision that casts no doubt on the clearly established principle from *Papish* that offense or "lewdness" alone does not justify censoring student speech. Nor does it cast doubt over the fact that reasonable college officials know they cannot bar students from campus forums because they dislike the students' message.

Other cases cited by President Wendler fare no better. For the same reasons *Radwan* does not save Wendler from accountability for trampling the First Amendment, neither does the Eleventh Circuit's unreported decision in *Sasser v. Board of Regents*, granting qualified immunity to university officials who disciplined a student "for using a racial slur on campus *during a school-sponsored event.*" No. 21-

26

14433, 2023 WL 2446720 at *4 (11th Cir. Mar. 10, 2023) (emphasis added). And although the Tenth Circuit extended qualified immunity to the university officials in the unreported decision *Hunt v. Board of Regents of Univ. of New Mexico*, their analysis turned on "[o]ff-campus, online speech by university students, particularly those in professional schools, involv[ing] an emerging area of constitutional law." 792 Fed. App'x 595, 601, 605 (2019). By contrast, the Supreme Court and Fifth Circuit precedent showing why qualified immunity does not shield President Wendler uphold long-settled constitutional principles.

In the end, President Wendler acted as no reasonable public university official would have: He has censored students' protected expression on campus because he doesn't agree with the message. Wendler is not entitled to qualified immunity on Plaintiffs' damages claim, and the Court should deny his Rule 12(b)(6) motion.

## III. Because Plaintiffs Have Shown Standing and a Controversy Ripe for Prospective Relief, the Court Should Deny the Rule 12(b)(1) Motions.

Defendants are holding a blanket ban on protected expression and a viewpoint-based prior restraint over Plaintiffs' heads. Both directly impede Plaintiffs' right to access and use campus forums for protected expression. That is more than enough to show subject matter jurisdiction on Plaintiffs' claims for prospective injunctive and declaratory relief and defeat Defendants' Rule 12(b)(1) motions to dismiss.

"Ultimately, a motion to dismiss for lack of subject matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). Here, President Wendler minced no words: "West

27

Texas A&M will not host a drag show on campus." FAC Ex. A. He has not rescinded that decree. FAC ¶ 119.  Nor have the A&M System Defendants directed Wendler to rescind it and obey the Constitution—even though they can and should. *Id.* ¶ 120.

Those facts highlight why the Court has "jurisdiction to entertain the suit, and the controversy is ongoing." *Freedom From Religion Found. v. Abbott*, 955 F.3d 417, 425 (5th Cir. 2020) (holding group had standing for First Amendment challenge after state officials failed to rescind a viewpoint-based ban on access to public forum). President Wendler, with the A&M System Defendants' effective authorization, has banned drag shows like the one Plaintiffs planned for March 31, showing a live controversy. At the same time, a live controversy also exists because the viewpoint-based prior restraint that Wendler's edict imposes threatens Plaintiffs' expression.

In short, Plaintiffs have injuries-in-fact, Defendants lack sovereign immunity, and this controversy calls for injunctive and declaratory relief. The Court should deny Defendants' Rule 12(b)(1) motions.

## A.    Plaintiffs have standing.

A plaintiff has standing if (1) he has suffered, or imminently will suffer, a concrete and particularized injury-in-fact; (2) the injury has a sufficient connection to the defendant's conduct; and (3) a favorable judgment is likely to redress the injury. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 (2014) (finding standing on First Amendment challenge). When a plaintiff sues for a First Amendment violation based on public officials denying the plaintiff use of a public forum, standing "is not a complicated case . . . but a very simple one." *Three Expo Events, LLC v. City of Dallas*, 907 F.3d 333, 341–42 (5th Cir. 2018) (reversing dismissal for lack of standing).

That is why standing is "very simple" here: Defendants are denying Plaintiffs access to public forums on campus because they dislike Plaintiffs' messaging. Plaintiffs' injury also flows from a prior restraint on protected expression, a key issue that Defendants ignore. Because Plaintiffs' injuries are fairly traceable to Defendants, a preliminary injunction and declaratory judgment against each of them is necessary to redress Plaintiffs' injuries.

### 1. Plaintiffs show both ongoing and threatened Article III injuries.

In essence, Article III's injury-in-fact requirement asks whether the plaintiff has a "personal stake in the outcome of the controversy." *Warth v. Seldin,* 422 U.S. 490, 498 (1975) (internal quotation omitted). An injury sufficient to satisfy Article III must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1991) (cleaned up). Both allegations of ongoing injury and allegations of threatened injury can show an injury-in-fact. *Driehaus*, 573 U.S. at 158.

Plaintiffs' allegations show both an ongoing injury, like being unable to hold a drag show on campus, and the substantial threat of an injury, like President Wendler's subjective criteria barring access to campus venues. Those injuries meet Article III's requirements, no matter Defendants' efforts to downplay President Wendler's email or the viewpoint-driven prior restraint stifling Plaintiffs' expression.

### a. President Wendler's March 20 email—and his refusal to rescind it—show an ongoing injury-in-fact.

President Wendler's March 20 email confirms two things. First, that West Texas A&M "will not host a drag show." ECF 28-1. And second, that his personal

criteria for what is "inappropriate" controls Plaintiffs' right to use campus venues for expressive activity. *Id.* Both on its face and by favorable inference, President Wendler's email reveals an ongoing ban on drag shows at West Texas A&M and a prior restraint over Plaintiffs' access to campus forums. FAC ¶¶ 134, 137–38, 203.

That viewpoint-based ban impedes Plaintiffs' planned March 2024 drag show. Plaintiffs have applied to and are making plans to perform the show in Legacy Hall, a campus venue open to expressive activity. FAC ¶¶ 32–41, 83, 130, 161. That is enough to show an ongoing injury-in-fact to their First Amendment right to perform a drag show on a public campus. *See Three Expo Events*, 907 F.3d at 341–42; *Int'l Soc'y for Krishna Consciousness of Atlanta v. Eaves,* 601 F.2d 809, 818 (5th Cir.1979) (whether a plaintiff "is seriously interested in disobeying, and the defendant seriously intent on enforcing, the challenged measure," informs the "case or controversy" requirement). The ban also threatens Plaintiffs financial harm, if they again must relocate the show off-campus. FAC ¶ 144(b)-(d).

Of course, President Wendler downplays the effect of his emailed edict. (ECF 35 at 22). But the Fifth Circuit's decision in *Freedom From Religion Foundation* shows why the Court should not. 955 F.3d at 424–25. There, the Texas Preservation Board approved the Freedom From Religion Foundation's application to display an exhibit in the Texas Capitol showing "Benjamin Franklin, Thomas Jefferson, George Washington, and the Statute of Liberty gathered around a manger containing the Bill of Rights." *Id.* at 421. A day before the display came down, Governor Abbott wrote to the board's then-executive director, John Sneed demanding that he "remove this

display from the Capitol immediately." *Id.* at 422. Echoing President Wendler's claim that drag shows are "mocking" to women, Governor Abbott wrote, "it is hard to imagine how the general public ever could have a direct interest in mocking others' religious beliefs." *Id.* at 422–23. And so when the Foundation applied to again display their exhibit in the Capitol, Sneed, relying on the Governor's letter, rejected the application and informed it that the board would reject future applications. *Id.* at 423.

The Foundation sued, claiming Governor Abbott and Sneed's successor, Rod Welsh, violated the First Amendment's bar against viewpoint discrimination in public forums. *Id.* In response, the defendants argued the court lacked subject matter jurisdiction because the Supreme Court's intervening decision in *Matal v. Tam* abated any ongoing violation of federal law. *Freedom From Religion Foundation*, 955 F.3d at 424–25. But the Fifth Circuit disagreed. Holding that jurisdiction existed, the court explained "arguments presented through counsel" were not enough because the defendants had "not retracted their previous statement to [the Foundation] that future applications for the relevant display will be denied." *Id.* at 425.

Just as the Fifth Circuit found Governor Abbott and Welsh's refusal to rescind their statements created an ongoing controversy over a First Amendment violation, so too should the Court find that President Wendler's refusal to rescind his edict confirms an ongoing controversy over a First Amendment violation.

### b.    *The prior restraint is also an injury-in-fact.*

For Article III standing, "[p]rior restraint claims are unique" because "the *threat* of the prior restraint itself constitutes the injury-in-fact." *Get Outdoors II, LLC v. City of San Diego*, 506 F.3d 886, 895 (9th Cir. 2007). So "when a plaintiff has applied

31

for a permit in the past and intends to apply for a permit in the future, whether an administrator has yet to exercise their unbridled discretion to deny the permit is 'immaterial because it is the existence, not the imposition, of standardless requirements that causes [the] injury.'" *Austin v. Univ. of Fla. Bd. of Trustees*, 580 F. Supp. 3d 1137, 1159 (N.D. Fla. 2022) (quoting *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1275 (11th Cir. 2006)).

That is why Defendants' failure to address Plaintiffs' prior restraint claim reveals another flaw in their Rule 12(b)(1) motion to dismiss. *See generally* ECF 37, 39. The prior restraint imposes the *threat* of standardless, viewpoint-based requirements that President Wendler, Vice President Thomas, and other university staff—with the A&M System Defendants' backing—can wield again to deny Plaintiffs access to public forums on campus to engage in protected expression, like drag shows or events where students dress in drag. *See Austin*, 580 F. Supp. 3d at 1159. As the Fifth Circuit has noted, "[p]ast enforcement of speech-related policies can assure standing . . . ." *Speech First*, 979 F.3d 319, 336 (5th Cir. 2020). And history shows there is a very real threat that the West Texas A&M administration will stifle Plaintiffs' planned movie night, 2024 drag show, and other protected expression on campus just days before its scheduled date. FAC ¶¶ 103–115.

### c.   *A concrete threat underscores an Article III injury.*

Even assuming President Wendler's email edict is not an official "university regulation" as he suggests (ECF 35 at 22), his acts and those of the other Defendants show a threatened injury that satisfies Article III. *Driehaus*, 573 U.S. at 159. For a threatened injury, Plaintiffs must show (1) "an intention to engage in a course of

conduct arguably affected with a constitutional interest"; (2) that the "intended future conduct is arguably proscribed by the statute"; and (3) that "the threat of future enforcement is substantial." *Id.* at 161–64 (cleaned up). They show all three.

First, Plaintiffs have started planning and intend to perform the same type of drag show on campus as the one Wendler blocked, once again reserving Legacy Hall. FAC ¶¶ 32–41, 83, 130, 161. That is First Amendment-protected expression in a public forum, as shown above. Second, President Wendler's viewpoint-based drag show ban proscribes Plaintiffs' "intended future conduct." *See* ECF 28-1. Third, Wendler has not rescinded his edict or otherwise indicated that he will not cancel Plaintiffs' next drag show, and the A&M System Defendants have effectively accepted and authorized Wendler's censorship. FAC ¶¶ 18–19, 119 120, 158, 185. Indeed, as Plaintiffs show below, President Wendler recently proclaimed that he "wouldn't have done anything any differently "as to the drag show ban.[3] *See* Section IV, *infra*. Thus, the threat that Defendants will cancel Plaintiffs' intended drag show is "substantial." So too is the threat that they will cancel Plaintiffs' other expressive activities, like dressing in drag as part of Spectrum WT's Rocky Horror Picture Show campus movie night planned for October. *Id.* ¶¶ 73, 130(a). No matter how Defendants obscure whether West Texas A&M will deny Plaintiffs' pending event applications (ECF 35 at 20; ECF 39 at 1, 10), they cannot deprive Plaintiffs of standing by playing "will we or won't we." The threat of censorship is substantial, and that satisfies Article III.

---

[3] On a Rule 12(b)(1) motion, the Court may consider "undisputed facts" and facts resolved by the Court. *Ramming v. U.S.*, 281 F.3d 158, 161 (5th. Cir. 2001).

2.      **Plaintiffs have standing as to Vice President Thomas.**

Although President Wendler doesn't contest traceability and redressability, his Vice President for Student Affairs, Christopher Thomas, does. ECF 39 at 5–7. But the Vice President's role belies his argument. Given the ongoing ban against campus drag shows, Vice President Thomas will carry out President Wendler's edict against Plaintiffs' planned drag show, just as he did in March 2023. *Id.* ¶ 17. As Vice President Thomas confirms in his declaration, he is (i) "responsible for oversight and management of all matters related to student issues and affairs [and] activities," and (ii) he must carry out President Wendler's directives. ECF 39-1 ¶¶ 2, 5; *see also* FAC ¶¶ 17, 103–04, 157. Those two facts prove that Vice President Thomas has the authority to cancel Plaintiffs' next campus drag show and to impose Wendler's viewpoint-driven criteria like "mocking," "derisive," and "demeaning" to stifle Plaintiffs' protected speech. And so a preliminary injunction against Thomas is apt.

Two things refute Vice President Thomas's claim that he is "not aware of any reason" Plaintiffs' next drag show or Rocky Horror movie night "will not be permitted to be held on-campus." ECF 39-1 ¶ 11. First, he overlooks that President Wendler has not rescinded his edict. Second, Thomas omits a key point: Until 11 days before Plaintiffs' March 31 drag show, all signs pointed to the show going forward at Legacy Hall. *See* FAC ¶¶ 99–102. In fact, Plaintiffs received tentative approval from Thomas's department for the show, only to have President Wendler pull the rug out after deciding his views eclipse the First Amendment. *Id.* Because Wendler is certain to do it again (*see* Section IV, *infra*), Thomas will enforce Wendler's wishes again.

For these reasons, Plaintiffs' ongoing and threatened injuries are fairly

traceable to Vice President Thomas, as they stem from Thomas's "application or threatened application of an unlawful enactment . . . ." *Fed. Election Comm'n v. Cruz*, 142 S. Ct. 1638, 1647 (2022). An injunction against Thomas from enforcing the drag show ban or the viewpoint-based prior restraint will redress Plaintiffs' injuries.

###    3.    Plaintiffs have standing as to Chancellor Sharp.

Like Vice President Thomas, Chancellor Sharp contends that as to him, Plaintiffs lack standing. And like Thomas, Sharp's role belies his argument. "The chancellor is responsible to the board for the general management and success of the system, and is hereby delegated authority to do all things necessary to fulfill such responsibility . . . ." Tex. A&M Univ. Sys., Sys. Pol'y 02.02, Office of the Chancellor, § 2.1 (https://policies.tamus.edu/02-02.pdf). That authority includes "responsibility for . . . the chief executive officer (CEO) of each academic member of the system," or in other words, the president of each system member. *Id.* § 1.12. Indeed, system policy states that presidents like Wendler "serve under the direction of the chancellor." Tex. A&M Univ. Sys., Sys. Pol'y 02.05, Presidents of Sys. Member Univs. (https://policies.tamus.edu/02-05.pdf).

Those policies prove Plaintiffs' point that Sharp "is President Wendler's superior and has the power and duty to stop President Wendler from continuing to violate Plaintiffs' constitutional rights . . . ." FAC ¶ 18. To that end, Plaintiffs' ongoing and threatened Article III injuries as to Chancellor Sharp are not "purely speculative." ECF 39 at 4. Rather, despite having full authority to halt President Wendler violating the First Amendment, Chancellor Sharp has not stopped Wendler, or even denounced Wendler's viewpoint-driven edict. FAC ¶¶ 8, 18, 120. Sharp's

decisions reveal an intent that the drag show ban continue. FAC ¶¶ 158, 185.

In fact, Sharp offers no declaration distancing himself from President Wendler's acts. Instead, he relies on the declaration of Billy Hamilton, the deputy chancellor and chief financial officer for the Texas A&M University system. ECF 39-2. Hamilton's declaration mostly parrots Texas law and university system policy setting the Chancellor's duties. *Id.* ¶¶3–8. While Hamilton describes how Chancellor Sharp and the Board of Regents lack immediate power over President Wendler's day-to-day decisions, his testimony misses the point. *Id.* ¶¶ 8–9. A drag show ban has persisted at West Texas A&M since March. And so has the viewpoint-based prior restraint on Plaintiffs' right to use campus public forums. Yet Sharp has refused to exercise his authority to stop these First Amendment violations and "do all things necessary" to ensure "success of the system." Tex. A&M Univ. Sys., Sys. Pol'y 02.02.

Chancellor Sharp's history of involving himself in university free speech matters contradicts the hands-off picture he paints. In December 2016, noted white supremacist Richard Spencer was scheduled to speak at Texas A&M University. But Chancellor Sharp did not censor Spencer's talk. Rather, he and then University president Michael Young supported "Aggies United," a counter-speech event at Kyle Field.[4] On the other hand, Chancellor Sharp has also shown a willingness to block expressive events on campus. When Spencer was scheduled to speak again at Texas

---

[4] Michael Hardy, "Country Revival," Texas Monthly (July 2017) https://features. texasmonthly.com/editorial/country-revival.[Permalink:https://perma.cc/DCK5-C56C]

A&M in 2017, Sharp was instrumental in cancelling the event.[5]

If anything, Chancellor Sharp's past involvement in campus speech shows his willingness to facilitate the enforcement of the ongoing drag show ban at West Texas A&M. That past involvement refutes his suggestion that he lacks a meaningful connection to the ongoing drag show ban at West Texas A&M. *See* ECF 39 10–11. And it is enough to meet Article III's case or controversy requirement. *See, e.g.*, *Russell v. Lundergan-Grimes,* 784 F.3d 1037, 1047–48 (6th Cir. 2015) (denying motion to dismiss a First Amendment challenge on Article III grounds, as secretary of state had authority for the challenged law and showed a willingness to enforce it).

Because Sharp has effectively authorized the "application or threatened application" of Wendler's unlawful edict against Plaintiffs' next drag show, the threatened injury to Plaintiffs is traceable to Sharp. *See Cruz*, 142 S. Ct. at 1647. Even assuming there are unsettled facts around the Chancellor's role in infringing Plaintiffs' First Amendment rights, "[a]t the preliminary injunction stage, the movant must clearly show only that each element of standing is likely to obtain in the case at hand." *Speech First*, 979 F.3d at 330 (citations omitted). Plaintiffs have done so.[6] An injunction against Sharp will redress the harm to Plaintiffs' expressive freedoms.

### 4.   **Plaintiffs have standing as to The Board of Regents.**

Because Plaintiffs' allegations show Chancellor Sharp has effectively

---

[5] Shannan Najmabadi, "Texas House Calls on Texas A&M Chancellor to Halt White Nationalist Rally," The Texas Tribune (Aug. 14, 2017), https://www.texastribune.org/2017/08/14/texas-house-calls-texas-m-chancellor-stop-white-nationalist-rally-occu [Permalink: https://perma.cc/4M5S-XEZC].

[6] In any case, the Court can permit jurisdictional discovery to settle fact questions.

authorized President Wendler to violate the First Amendment, they also show the Board of Regents has authorized those acts. After all, Texas law gives the Board of Regents ultimate authority over the Texas A&M system and its member institutions, including West Texas A&M. Tex. Educ. Code §§ 85.11, 85.21, 102.111. And the Board of Regents has not stopped Wendler's unconstitutional acts, or even denounced Wendler's edict. FAC ¶¶ 8, 19. So like Chancellor Sharp, the Board has revealed an intent that the drag show ban continue, effectively authorizing it. FAC ¶¶ 158, 185.

The Board of Regents Defendants also lean on Hamilton's declaration. ECF 39.2. As with Chancellor Sharp's failed arguments, Hamilton's claim about the day-to-day operations of West Texas A&M overlooks that the Board of Regents have let President Wendler's First Amendment violations go on since March. In fact, the Board of Regents met May 17–May 19. ECF 39-2 ¶ 10. Yet despite having a chance to "act through a majority vote in an open meeting" on the drag show ban (*id.* ¶ 9), it has not.[7]

For those reasons, the Board of Regents has effectively authorized the ongoing drag show ban, "cause[ing] [Plaintiffs] to be subjected" to "the deprivation" of their First Amendment rights. 42 U.S.C. § 1983. Thus, Plaintiffs' injuries fairly trace to the Board of Regents Defendants. An injunction against them will redress that harm.

---

[7] Neither the regular agenda nor the special agenda for the Board's recent meeting reflect specific discussion of President Wendler or the drag show ban. *See* "Agenda Items, Meeting of the Board of Regents" (May 18, 2023), https://www.tamus.edu/regents/wp-content/uploads/sites/28/2023/05/RegentBinder May2023.pdf; "Agenda, Special Workshop Meeting" (May 18, 2023), https://www.tamus.edu/regents/wp-content/uploads/sites/28/2023/05/AGENDA-May-18-2023-Special-BOR-Workshop-Meeting.pdf.

**B.** **Defendants do not enjoy sovereign immunity.**

Sovereign immunity does not bar claims against state officials sued in their official capacity for prospective relief over ongoing violations of federal law. *Ex Parte Young,* 209 U.S. 123, 159 (1908). Even though Plaintiffs' allegations make out an ongoing First Amendment violation that only prospective relief can remedy, Defendants insist that *Ex Parte Young* does not apply and instead that they have sovereign immunity. The Court should reject their arguments for the same reasons it should reject their arguments on standing. *See Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 513–14 (5th Cir. 2017). ("There is significant overlap between standing and *Ex parte Young's* applicability").

For *Ex Parte Young* to apply, "a suit must: (1) be brought against state officers who are acting in their official capacities; (2) seek prospective relief to redress ongoing conduct; and (3) allege a violation of federal, not state, law." *Freedom From Religion Found.*, 955 F.3d at 424 (citing *NiGen Biotech, LLC v. Paxton*, 804 F.3d 389, 394–95 (5th Cir. 2015)). Of course, a "state official sued must have some connection with the enforcement of the challenged act" or scheme to avoid the Eleventh Amendment's bar on suits against the state. *Haverkamp v. Linthicum*, 6 F.4th 662, 669 (5th Cir. 2021) (cleaned up). But at the pleadings stage, that showing requires only "enough facts that [the court] can plausibly infer an enforcement connection." *People for the Ethical Treatment of Animals, Inc. v. Banks*, No. 4:20-CV-02913, 2022 WL 4021938, at *4 (S.D. Tex. Sept. 2, 2022) (rejecting Texas A&M president's sovereign immunity argument on Rule 12(b)(1) motion) (citing *Haverkamp*, 6 F.4th at 671).

Applying these standards, no Defendant has sovereign immunity. Start with

President Wendler. Plaintiffs are suing him in his official capacity for an injunction against an ongoing ban of protected expression and a prior restraint on access to campus venues, as well as a declaration that his "pledge to prevent similar expressive activity at West Texas A&M" is unconstitutional.[8] ECF 28 at 48. That is enough to show an ongoing violation of federal law, invoke *Ex Parte Young*, and overcome sovereign immunity. *Freedom From Religion Found.* 955 F.3d at 424. Although Wendler claims Plaintiffs lack "evidence" that he or others might ban their planned drag show and other expressive events (ECF 35 at 22), he ignores his own clear-cut words prohibiting West Texas A&M from hosting drag shows. ECF 28-1; *see People for the Ethical Treatment of Animals,* No. 4:20-CV-02913, 2022 WL 4021938, at *10 (rejecting sovereign immunity for Texas A&M's president after he "made clear" that the university believed plaintiff's speech violated school policies).

Ex Parte Young* also applies to Plaintiffs' claims against Vice President Thomas. He is responsible for enforcing President Wendler's directives, like the ban on drag shows and the prior restraint. ECF 39-1 ¶¶ 2, 5; *see also* FAC ¶¶ 103–04, 157.

Finally, *Ex Parte Young* applies to Plaintiffs' claims for prospective relief against Chancellor Sharp and the Board of Regents Defendants. They argue only that "[f]or the same reasons Plaintiffs lack standing against the A&M System Defendants . . . their claims against the A&M System Defendants [ ] remain barred by sovereign

---

[8] Plaintiffs acknowledge that declaratory relief is unavailable for Wendler's past actions. At the same time, by seeking a declaration against Wendler's "pledge" to censor them, Plaintiffs are requesting prospective declaratory relief. (ECF 28 at 48). If that is unclear, Plaintiffs request leave to amend, as the Court should "freely give leave" to do, so they can clarify. *See* Fed. R. P. 15(a)(2).

immunity." ECF 39 at 9. But the converse is true: Plaintiffs have standing against those Defendants, so sovereign immunity is no bar here. *Air Evac EMS,* 851 F.3d at 513–14 (noting "significant overlap" between standing and *Ex parte Young*).

### C.     Plaintiffs' lawsuit is neither unripe nor moot.

Defendants insist Plaintiffs' lawsuit is both unripe and moot. ECF 35 at 21–22; ECF 39 at 9–10. But they are wrong. The Supreme Court has cast doubt on the ripeness doctrine, finding it "in some tension" with "the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Driehaus*, 573 U.S. at 167 (cleaned up). Thus, the Court need not consider ripeness, because Plaintiffs show an Article III injury. *See* Section III.A, *supra*.

In any case, Plaintiffs meet the "fitness" and "hardship" ripeness factors. *Driehaus*, 573 U.S. 149. Plaintiffs' claims for prospective relief rest largely on legal questions, showing "fitness" for adjudication. *See id.*; *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 546 (5th Cir. 2008) (finding claims ripe where the merits involved "purely legal inquiries"). And "denying prompt judicial review would impose a substantial hardship" on Plaintiffs, "forcing them to choose between refraining from [protected] speech on the one hand or engaging in that speech and risking" exile from campus, financial harm, and injury to their group mission. *Driehaus*, 573 U.S. at 167–68; *see also* FAC ¶¶ 131–144 (detailing injuries).

Plaintiffs' claims for injunctive and declaratory relief also are not moot, for the same reasons establishing an Article III injury and *Ex Parte Young*'s application. A lawsuit is moot and no longer satisfies the Constitution's "case or controversy" requirement only "when the issues presented are no longer 'live' or the parties lack a

41

legally cognizable interest in the outcome." *Freedom From Religion Found.*, 955 F.3d at 425 (quoting *Already, LLC v. Nike, Inc.,* 133 S. Ct. 721 (2013)). Because there is a live controversy—which Defendants' refusal to rescind or renounce Wendler's edict highlights—Plaintiffs' claims for prospective relief are not moot. *Id.*

Though Defendants might argue that Plaintiffs' prospective relief claims are moot because the controversy over the March 31, 2023 drag show has passed, they miss the point. *E.g.,* ECF 39 at 10. The controversy did not end on March 31. Rather, it has *continued* since then, as President Wendler's blanket ban on drag shows looms. FAC ¶¶ 4, 105, 134, 160. And even if one views the March 31 controversy in a vacuum, it reflects censorship "capable of repetition, yet evading review," providing an alternative reason for why Plaintiffs' prospective relief claims are not moot. *Catholic Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 422 (5th Cir. 2014). Even if Defendants are hinting that they *might* allow a "different" drag show in the future, that negates their mootness claim, as Defendants still insist that Plaintiffs alter their protected expression. More to the point, because of Defendants' refusal to renounce Wendler's edict, there is a least a "reasonable expectation" that Defendants or other school officials will censor Plaintiffs' protected expression. FAC ¶¶ 119–20.

All of this is enough to negate Defendants' mootness claim. *Cath Leadership Coal. of Tex.*, 764 F.3d at 422. Because a justiciable "case or controversy" exists over Plaintiffs' prospective relief claims, the Court should deny the Rule 12(b)(1) motions.

## IV.   The Court Should Grant a Preliminary Injunction Against Wendler.

Like his motion to dismiss, President Wendler's response to Plaintiffs' preliminary injunction motion stands on the failed argument that drag shows are

"not inherently expressive" and are "lewd." ECF 37 at 11–17. What's more, Wendler's recent revelation to a local news station that he "wouldn't have done anything any differently" confirms that Plaintiffs are likely to suffer irreparable harm without a preliminary injunction. The Court should grant Plaintiffs' motion and prevent Wendler from further harming Plaintiffs' expressive freedoms.

## A.  Because drag shows are protected speech, Plaintiffs are likely to succeed on the merits.

President Wendler again argues that a stage performance like drag lacks First Amendment protection, that drag is "lewd," and that *FAIR* upends decades of First Amendment law. ECF 37 at 11–17. Those arguments fail, just like they do on Wendler's motion to dismiss. *See* Section I, *supra*. And the scant evidence Wendler offers does not save him.

For instance, President Wendler trawled around YouTube and found a February 2023 video of "Miss Myka," a drag performer slated as the guest emcee for the planned March 2023 drag show, and attached it to his opposition to suggest Plaintiffs' drag shows are "lewd." ECF 37 at 6, 8, Ex. 3. His suggestion misses the mark. For starters, Wendler does not argue that the video shows anything outside constitutional protection. *Id.* Instead, he (at best) speculates that the performer might defy Plaintiffs' instructions and engage in a "lewd" act. *Id.* Under Wendler's view, a university could bar a celebrated actor from a theatre performance if they once appeared nude in a movie, or bar a painter from an art demonstration because they once painted something erotic. Yet that is the kind of speculation the Supreme Court rejected in *Southeastern Promotions*, 420 U.S. at 554–55, and the Fifth Circuit

rejected in *Gay Student Services*, 737 F.2d at 1325.

Wendler also argues he "could reasonably assess" that Plaintiffs' drag show violates university policy against "public behavior" that is "lewd." ECF 37 at 17.  But that again overlooks the First Amendment bar against college officials censoring speech based on speculation. More to the point, the policy focuses on behavior—not expression. ECF 37-1. In any event, the First Amendment controls the permissible reach of university policies, not the other way around. *See, e.g.*, *Justice For All v. Faulkner*, 410 F.3d 760, 772 (5th Cir. 2005) (sustaining anti-abortion leafleteers' First Amendment challenge to university literature distribution policy). Wendler cannot twist West Texas A&M policy to do what the Constitution prohibits.

Finally, President Wendler insists his March 20 email "is not dispositive of any issue." ECF 37 at 21. But he offers nothing to explain away his plain statement: "West Texas A&M University will not hold a drag show on campus." FAC Ex. A. The Court should take Wendler at his word.

## B.    Wendler's boast that he "wouldn't have done anything any differently" drives home an irreparable injury.

President Wendler's brief argues that Plaintiffs lack an irreparable injury because they "have no evidence" that they will face censorship against holding drag shows on campus. ECF 37 at 22. Wendler's words are evidence enough. And not only do those words include his March 20 email declaring West Texas A&M will not host drag shows, but they also include his words in a late April interview with Amarillo's KAMR-4. Talking about his actions cancelling Plaintiffs' drag show, Wendler did not

hesitate: "I wouldn't have done anything any differently."[9]  No more is needed to show Wendler will likely enforce his ban and harm Plaintiffs' expressive freedoms.[10] The Court should grant Plaintiffs' motion and enjoin President Wendler from censoring Plaintiffs' protected expression.

## V.   A Preliminary Injunction Against Vice President Thomas and the A&M System Defendants is Required for Complete Relief.

Neither Chancellor Sharp, the Board of Regents Defendants, nor Vice President Thomas challenge the First Amendment merits of Plaintiffs' preliminary injunction motion or Plaintiffs' irreparable injury. ECF 39. Instead, they stand on the same arguments over subject matter jurisdiction that doom their Rule 12(b)(1) motion. ECF 39 at 2–10. For the same reasons Plaintiffs show irreparable harm as to President Wendler, they show irreparable harm as to Vice President Thomas and the A&M System Defendants. Only a preliminary injunction against those Defendants can afford complete relief.

## CONCLUSION

For all these reasons, Plaintiffs ask that the Court grant their motion for a preliminary injunction and deny Defendants' motions to dismiss.

---

[9] Exhibit 1, "Walter Wendler Full Interview", Myhighplains.com (April 27, 2023). *See also* https://www.myhighplains.com/video/walter-wendler-full-interview/8598931

[10] "At the preliminary injunction stage, the procedures in the district court are less formal, and the district court may rely on otherwise inadmissible evidence, including hearsay evidence." *Sierra Club, Lone Star Chapter v. F.D.I.C.*, 992 F.2d 545, 551 (5th Cir. 1993).

Dated: May 26, 2023

Respectfully submitted,

/s/ JT Morris
JT MORRIS
TX Bar No. 24094444
FOUNDATION FOR INDIVIDUAL
    RIGHTS AND EXPRESSION
700 Pennsylvania Ave., SE
Ste. 340
Washington, DC 20003
Tel: (215) 717-3473
Fax: (267) 573-3073
jt.morris@thefire.org

CONOR T. FITZPATRICK*
MI Bar No. P78981
ADAM B. STEINBAUGH*
PA Bar No. 326475
JEFFREY D. ZEMAN*
Pa. Bar No. 328570
FOUNDATION FOR INDIVIDUAL
    RIGHTS AND EXPRESSION
510 Walnut St.; Ste. 1250
Philadelphia, PA 19106
Tel: (215) 717-3473
Fax: (267) 573-3073
conor.fitzpatrick@thefire.org
adam@thefire.org
jeff.zeman@thefire.org

* Admitted *Pro Hac Vice*

*Attorneys for Plaintiffs*
    *Spectrum WT, Barrett Bright,*
    *and Lauren Stovall*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 26, 2023, a true and correct copy of the foregoing document was transmitted via using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

/s/ JT Morris

JT Morris
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION
