UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| SPECTRUM WT, *et al.*, <br>     *Plaintiffs*, <br><br> v. <br><br> WALTER WENDLER, *et al.*, <br>     *Defendants*. | § § § § § § §      CIVIL ACTION NO. 2:23-CV-048-Z |

**DEFENDANT WENDLER'S REPLY IN SUPPORT OF HIS
MOTION TO DISMISS UNDER RULE 12(b)(1) & 12(b)(6)**

Defendant Wendler hereby replies to Plaintiffs' response to his motion to dismiss.

**I. Neither entertainment nor performance are categorically protected by the First Amendment.**

In their amended complaint, plaintiffs claim that all drag shows have particular expressive messages, which they listed. ECF 28 at 17 ¶¶ 69–72 (quoted in President Wendler's motion to dismiss, ECF 35 at 10–11). But in their response to President Wendler's motion to dismiss, they have added a new position—that, without qualification, all "stage performance [is] protected expression." ECF 45 at 17. "It is simple: When people get on stage and perform, the First Amendment protects it—on or off campus." *Id.* at 18–19. "[L]ive entertainment, music, and theatre are inherently expressive." ECF 45 at 25.

That is not the law. Plaintiffs err by misciting several Supreme Court opinions and ignoring the holding of *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47 (2006) ("*FAIR*").

1

### A. Plaintiffs miscite Supreme Court opinions.

Plaintiffs incorrectly cite several cases in an effort to show that all entertainment or performance is protected by the First Amendment. The mistake common to all of Plaintiffs' citations is misreading holdings that *certain* types of entertainment or performances are protected as holdings that *all* kinds of entertainment or performances are protected. Of course, most entertainment or performance contains speech, press, or inherently expressive conduct that is protected. But the First Amendment protects speech and press—not entertainment or performance.

Plaintiffs cite *Winters v. New York*, 333 U.S. 507, 510 (1948), for the proposition that "'the line between the informing and the entertaining is too elusive' to divine the protected from the unprotected." ECF 45 at 20. Plaintiffs seem to thereby suggest that "entertaining" is as unqualifiedly "protected" as "informing." But at issue in the case was speech and press— specifically, magazines containing "criminal news, police reports, and accounts of criminal deeds, and pictures and stories of deeds of bloodshed, lust and crime." *Id.* at 508 n.1. The case really stands for the proposition that speech and press is protected even if it does nothing but entertain, not that anything that entertains is protected.

Plaintiffs cite *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952) for the proposition that "the First Amendment protects motion pictures." ECF 45 at 20. But no such unqualified statement appears on page 501. On the next page, the Court clarifies that "*expression by means of motion pictures* is included within the free speech and free press guaranty of the First and Fourteenth Amendments." *Id.* at 502 (emphasis added). Thus, the case does not simply declare all motion pictures are protected by the First Amendment. But expression within motion pictures is protected.

Plaintiffs cite *Schacht v. United States*, 398 U.S. 58, 61–62 (1970) for the proposition that "an 'amateurish and perhaps unappealing … street skit' is protected First Amendment protection." ECF 45 at 18. Incorrect. In fact, *Schacht* concerned a street performance by a non-military member in uniform who was convicted of violating a statute which made it a crime for any person without authority to wear the uniform or a distinctive part thereof of any of the armed forces of the United States, but with an exception: "[A]n actor in a theatrical or motion-picture production may wear the uniform of that armed force if the portrayal does not tend to discredit that armed force." *Id*. at 59–60. The Court found the latter half of the exception unconstitutional because

> Congress has in effect made it a crime for an actor wearing a military uniform to ***say things*** during his performance critical of the conduct or policies of the Armed Forces. An actor, like everyone else in our country, enjoys a constitutional right to freedom of speech, including the right openly to ***criticize the Government*** during a dramatic performance. The last clause of [the statute] denies this constitutional right to an actor who is wearing a military uniform by making it a crime for him to ***say things*** that tend to bring the military into discredit and disrepute.

*Schacht*, 398 U.S. at 62–63 (emphasis added). The Court did not endorse an unqualified First Amendment right to perform skits, but rather affirmed the right to "say things" and to "criticize the Government."

Plaintiffs cite *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 556-57 (1975) for the proposition: "It is simple: When people get on stage and perform, the First Amendment protects it—on or off campus." ECF 45 at 19. But the Court did not say that. Rather, it observed: "By its nature, theater usually is the acting out—or singing out—of the ***written word***, and frequently ***mixes speech with live action or conduct***." *Id*. at 557–58 (emphasis added). The Court applied the First Amendment to theater containing the written word, and acknowledged that theater "usually" contains speech, but sometimes does not. The Court held that the play at issue in the case— *Hair*— was protected under the First Amendment not because it is a performance or

3

entertainment, but because it has words, and does not need a narrator to explain the message. ECF 45 at 20.

Plaintiffs cite *Schad v. Borough of Mount Ephram*, 452 U.S. 61, 65–66 (1981) for the proposition that "motion pictures, programs broadcast by radio and television, and live entertainment, such as musical and dramatic works fall within the First Amendment guarantee." ECF 45 at 20. In that case, a city ordinance prohibited all activities in a commercial zone that were not permitted. *Id*. at 63. State courts interpreted the ordinance to prohibit live entertainment. *Id*. at 65. The Court held, "By excluding live entertainment throughout the Borough, the Mount Ephraim ordinance prohibits a wide range of expression that has long been held to be within the protections of the First and Fourteenth Amendments. Entertainment, as well as political and ideological speech, is protected; motion pictures, programs broadcast by radio and television, and live entertainment, such as musical and dramatic works fall within the First Amendment guarantee." *Id*. at 65. But the Court did not hold that *all* entertainment was protected. It specifically held that nude dancing might not be. *Id*. at 66. *Schad* is best read as an overbreadth case. *Id*. ("Because overbroad laws, like vague ones, deter privileged activit[ies], our cases firmly establish appellant's standing to raise an overbreadth challenge." (citing *Grayned v. City of Rockford*, 408 U.S. 104, 114 (1972)). The Court enjoined the ordinance because it prohibited lots of entertainment that contained First Amendment activity—not because *all* entertainment (such as nude dancing) *is* First Amendment activity.

Plaintiffs cite *Hurley v. Irish-American Gay, Lesbian and Bisexual Grp. Of Boston*, 515 U.S. 557, 569–70 (1995) for the proposition that parades categorically have First Amendment protection, and do not need a narrator explaining the parade's message to gain that protection. ECF 45 at 20.

4

But the Court said the opposite. "Not many marches, then, are beyond the realm of expressive parades," *Hurley,* 515 U.S. at 569, so some are. Moreover, the case did not concern a generalized First Amendment right to participate in a parade. Rather, it concerned parade organizers who claimed a First Amendment right to exclude a group whose

> participation as a unit in the parade was equally expressive [as the parade organizers' decision on who could participate]. GLIB was formed for the very purpose of marching in it, as the trial court found, in order to celebrate its members' identity as openly gay, lesbian, and bisexual descendants of the Irish immigrants, to show that there are such individuals in the community, and to support the like men and women who sought to march in the New York parade. App. to Pet. for Cert. B3. The organization distributed a fact sheet describing the members' intentions, App. A51, and the record otherwise corroborates the expressive nature of GLIB's participation, see Record, Exh. 84 (video); App. A67 (photograph). In 1993, members of GLIB marched behind a shamrock-strewn banner with the simple inscription "Irish American Gay, Lesbian and Bisexual Group of Boston." GLIB understandably seeks to communicate its ideas as part of the existing parade, rather than staging one of its own.

*Hurley* at 515 U.S. at 570. The Court held that the parade organizers had a First Amendment right to exclude the group the same way that other selectors of speech may choose which speech to select. *Id*. The importance to the present case is that the Court did not hold that everyone who participates in a parade gets First Amendment protection. It held that some parade participants do engage in speech and expressive conduct, and that organizers may therefore exclude them.

In short, the Supreme Court has held that only inherently expressive entertainment and performance is protected by the First Amendment. It has never held that all entertainment and performance is protected.

### B. Plaintiffs ignore *FAIR*.

Plaintiffs assert that "*FAIR* did not set a new bar for expressive conduct, much less upend decades of First Amendment law." ECF 45 at 25. But *FAIR* did in fact announce a new test for whether conduct is inherently expressive conduct: When the expressive component of conduct is

5

not created by the conduct itself, but rather by the speech that accompanies the conduct, the conduct is not protected by the First Amendment. *FAIR*, 547 U.S. at 66. Conduct does not become speech for First Amendment purposes merely because the person engaging in the conduct intends to express an idea. *Id.* There was no such test before.

Plaintiffs cannot show that a drag performance by itself is expressive conduct and that "the likelihood is great that the message would be understood by those who viewed it." *Texas v. Johnson*, 491 U.S. 397, 404 (1989). *See Voting for America, Inc. v. Andrade*, 488 Fed. App'x 890. 899 (5th Cir. 2012) (voter registration activities not "inherently expressive" conduct protected by 1st Amendment, quoting *FAIR*). A drag show is no more inherently expressive than "a photograph of 'Powderpuff Football Game Cheerleaders,' depicting male football players posing in cheerleading skirts" that Plaintiffs allege hangs on campus. Plaintiffs claim that the photograph depicts "people [] us[ing] drag to express themselves," ECF 45 at 15, and, presumably, that it has the same "expressive conduct" as a drag show. The only apparent common thread between a drag show and football players dressed as cheerleaders is that both have men dressed as women. By itself, men dressed as women does not mean anything under *FAIR*, any more than men wearing red shirts or green pants does.

### C. Not approving the drag show was not a prior restraint.

Plaintiffs also complain that "President Wendler's motion to dismiss and brief in support do not mention the phrase 'prior restraint.'" ECF 45 at 30. But prohibiting conduct that is not inherently expressive is not a prior restraint.

## II. Under current law, universities can ban lewd conduct.

The Fifth Circuit has held that "[i]ndecent language and profanity may be regulated in the schools" and that "the first amendment does not prevent schools from determining 'that the

6

essential terms of civil, mature conduct cannot be conveyed in a school that tolerates lewd, indecent or offensive speech and conduct.'" *Martin v. Parrish*, 805 F.2d 583, 585 (5th Cir. 1986) (citing *Bethel School District No. 403 v. Fraser*, 478 U.S. 675, 684 (1986)). Plaintiffs assert that *Matin* does not apply to this case because that case concerned employee speech and because *Bethel School District* concerns "grade schoolers' speech." ECF 45 at 23. (In fact, *Bethel School District* concerned high schoolers' speech.) But the Fifth Circuit purposely adopted the *Bethel School District* rule for universities: "Bethel admittedly involved a high school audience and it may be suggested that its justification for speech restraints rests largely on this fact. Nevertheless, we view the role of higher education as no less pivotal to our national interest." *Martin*, 805 F.2d at 585. Thus, Plaintiffs have no constitutional right to engage in "lewd, indecent or offensive speech and conduct" on the campus of West Texas A&M University.

### III. President Wendler is entitled to qualified immunity.

Plaintiffs can cite no authority clearly stablishing a First Amendment right for students to put on drag shows on campus. "[W]here the area of law is as 'abstruse' and 'complicated' as First Amendment jurisprudence, [a] right cannot be clearly established for the purposes of qualified analysis" in the absence of authority recognizing an asserted right. *Morgan v. Swanson*, 755 F.3d 757 (5th Cir. 2011). School officials in particular have broad discretion because of their "difficult" and "vitally important" jobs, and "educators are rarely denied immunity from liability arising out of First-Amendment disputes. The rare exceptions involve scenarios in which a factually analogous precedent clearly established the disputed conduct as unconstitutional." *Id*. at 760 (citation omitted).

Plaintiffs argue that President Wendler is not entitled to qualified immunity because "Wendler confessed he was knowingly defying 'the law of the land'" and "admitted that he was

7

knowingly defying the Constitution." ECF 45 at 18, 30. That is not true for two reasons. First, he *cannot* confess or admit that he violated the law because did *not* violate the law, and did *not* violate clearly established law. There is no law establishing a First Amendment right to put on a drag show, on campus or anywhere. Second, he did not in fact admit or confess any violation of law. Rather, he expressed confusion typical of many American citizens about how the Constitution could possibly require a drag show on campus. ECF 28-1 at 4 (President Wendler's email to campus stating that he opposes the drag show "even when the law of the land *appears* to require it." (emphasis added)). That confusion will persist unless and until the courts definitely answer the question. They have not yet done so.

Nonetheless, Plaintiffs claim that President Wendler should be denied qualified immunity because "settled First Amendment principles establish the 'fair warning' needed to deny qualified immunity." ECF 45 at 31. This argument mirrors Plaintiffs' incorrect argument that the First Amendment protects entertainment and performance unqualifiedly, and is wrong for the same reason.

Plaintiffs cite only one case—*Norma Kristie, Inc. v. City of Okla. City*, 572 F. Supp. 88 (W.D. Okla. 1983)—that supposedly holds that drag shows are entitled to First Amendment protection. ECF 45 at 22. President Wendler already explained how that case does not stand for that proposition. ECF 35 at 18–19. Moreover, this one case cannot establish a "robust" "out-of-circuit consensus" that would put President Wendler on notice of clearly established law giving drag shows First Amendment protection. *Morrow v. Meachum*, 917 F.3d 870, 879 (5th Cir. 2019).

## IV. The *Ex parte Young* exception does not apply to President Wendler's sovereign immunity in his official capacity.

The *Ex parte Young* exception does not apply to Plaintiffs request for prospective relief against President Wendler in his official capacity because there is no ongoing violation of federal law. In their response, Plaintiffs argue that there is such an ongoing violation, but for the reasons stated in President Wendler's motion to dismiss and this reply, there is not.

## V. *Friends of Georges, Inc. v. Mulroy* does not apply to this case.

Plaintiffs filed a notice of supplemental authority to discuss *Friends of Georges, Inc. v. Mulroy*, No. 2:23-cv-02163, 2023 WL 3790583 (W.D. Tenn. June 2, 2023). ECF 50. That court enjoined enforcement of Tennessee's new law making it illegal "for a person to perform adult cabaret entertainment (A) On public property; or (B) In a location where the adult cabaret entertainment could be viewed by a person who is not an adult." *Id*. at *2. The plaintiffs put on lewd, sexual (yet supposedly 'PG-13') drag performances, six of which are described at *12–13 (one of which was called "Trixie Thunderpussy—Pussycat Song"), and complained that the statute might result in prosecution if they put on similar performances in the future. The parties conceded that the statute regulated constitutionally protected speech, but disagreed about the standard of review. *Id*. at *18. The Court found that the statute violated the First Amendment.

Plaintiffs assert that the court found that drag shows are an art form, that indecent speech is protected under the First Amendment, which Plaintiffs say "relates to Plaintiffs' argument that it is well-settled that concerns over 'lewdness' cannot justify restricting student expression on a public university campus," and that the Court's constitutional ruling "parallels, in part, for why Defendants have violated the First Amendment." ECF 50 at 2–3.

9

But there are obvious distinctions between that case and this one. First, the government in the Tennessee case conceded that the statute regulated constitutionally-protected activity, *id*. at *18, and tried to prevail on other grounds. Here, President Wendler does not concede that there is a categorical First Amendment right to put on drag shows because drag shows do not inherently express anything. Second, the Tennessee case does not involve universities. Despite Plaintiffs' insistence, in the Fifth Circuit, universities may prohibit lewd conduct on campus such as the six lewd performances described in the opinion, even if such conduct is covered by the First Amendment.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs'' claims against President Wendler in his individual capacity under Rule 12(b)(6) and their claims against President Wendler in his official capacity under Rule 12(b)(1).

Dated: June 9, 2023.          Respectfully submitted,

JOHN SCOTT
Provisional Attorney General

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

RALPH MOLINA
Deputy Attorney General for Legal Strategy

LEIF A. OLSON
Chief, Special Litigation Division

 /S/ *Charles K. Eldred*
CHARLES K. ELDRED
Special Counsel for Legal Strategy
State Bar No. 00793681

MUNERA AL-FUHAID
Special Counsel
Special Litigation Division

DAVID BRYANT
Special Counsel
Special Litigation Division

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 936-1706 • fax (512) 320-0167
charles.eldred@oag.texas.gov

*ATTORNEYS FOR DEFENDANT WENDLER*

11

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on June 9, 2023.

*/s/ Charles K. Eldred*
Charles K. Eldred