*Spectrum WT, et al., v. Wendler, et al.*

# Exhibit A

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| SOUTHERN UTAH DRAG STARS and MITSKI AVALŌX,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF ST. GEORGE;<br>CITY COUNCIL OF ST. GEORGE;<br>COUNCILMEMBER JIMMIE HUGHES,<br>   in his official capacity;<br>COUNCILMEMBER DANNIELLE LARKIN<br>   in her official capacity;<br>COUNCILMEMBER NATALIE LARSEN,<br>   in her official capacity;<br>COUNCILMEMBER GREGG MCARTHUR<br>   in his official capacity;<br>COUNCILMEMBER MICHELLE TANNER<br>   in her official capacity;<br>MAYOR MICHELE RANDALL'<br>   in her official capacity;<br>CITY MANAGER JOHN WILLIS,<br>   in his official capacity,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING PRELIMINARY INJUNCTION**<br><br>Case No. 4:23-cv-00044-DN-PK<br><br>District Judge David Nuffer |

## INTRODUCTION

Public spaces are public spaces. Public spaces are not private spaces. Public spaces are not majority spaces. The First Amendment of the United States Constitution ensures that all citizens, popular or not, majority or minority, conventional or unconventional, have access to public spaces for public expression.

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

While the First Amendment does not apply directly to the states, "the states are precluded from abridging the freedom of speech or of the press by force of the due process clause of the Fourteenth Amendment."[1]

Municipal governing bodies such as county commissions and city councils have a political role in which they can respond to public interest and requirements, but they also have a governing role in which they are responsible to protect the constitutional rights of all people who are in their jurisdiction. In that governing role they must be vigilant for all, not just those who support them. Those with whom they disagree with and those with whom they share little in common are also entitled to governmental rights and protection.

Public officials and the city governments in which they serve are *trustees* of constitutional rights for all citizens, who are the beneficiaries of the trust imposed in their leaders. The governing power is to be exercised *on behalf of* citizens; Public officials take an oath to "support, obey, and defend the Constitution of the United States and the Constitution of the State of Utah."[2] They do not merely serve the citizens who elect them, the majority of citizens in the community, or a vocal minority in the community. A trustee acts for all those who are beneficiaries of the trust. This is a difficult and challenging responsibility. It requires a thorough understanding of constitutional rights and a deep personal commitment on the part of the governing body and each of its members to protect the entire community.

---

[1] *Grosjean v. Am. Press Co.*, 297 U.S. 233, 243 (1936).

[2] Article IV, Section 10, Utah Constitution, le.utah.gov/xcode/ArticleIV/Article_IV,_Section_10.html (last visited June 14, 2023).

The governing body and its members must never use pretended or pretextual reasons to hide the real reasons for denying individuals their constitutional rights. This is not only a fundamental breach of their oath and trust but also less than honest.

The value of all the principles just expressed was understood best in the time of the American colonies when rights guaranteed to us now were not generally enjoyed and public officials did not protect rights of individuals. The formative experience of the United States led to the adoption of the Bill of Rights of the United States Constitution.

These constitutional rights and principles of responsibilities of governments and governing individuals have been tested severely through the history of our Republic. And as society changes, the testing goes on in new contexts.

It is entirely understandable how politically sensitive elected and appointed officials with strong personal beliefs and preferences, a sense of community expectations and values, knowledge of historical norms and practices, and a cautious approach to change and controversy would be challenged by Plaintiffs' application for a special event permit. The approach to the Plaintiffs' permit application is not unusual, and neither is this resulting lawsuit. Public officials, including judges, are not permitted to make some decisions based on personal preference or values, but must often subordinate personal interests to the obligations we have as public officials.

Challenging times give us an opportunity to re-examine fundamental principles of our government and, once again, determine to adhere by them. We recognize that just as we enjoy and prize our rights, we must value and respect the rights of others. This case presents an opportunity for our recommitment.

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. i

GENERAL BACKGROUND .............................................................................................. 1

DISPOSITION AND OVERVIEW ..................................................................................... 2

FACTUAL BACKGROUND .............................................................................................. 3

    1.    The City Forces City Manager Resignation for Permitting Drag Show Event ....... 3

    2.    Southern Utah Drag Stars Seeks Special Event Permit for Community Drag Show
        ................................................................................................................................ 4

    3.    The City Flags Drag Stars' Application for the Allies Drag Show Due to
        "Sensitive Nature" ................................................................................................ 5

    4.    The City Passes Moratorium Ordinance That Suspends New Special Event Permit
        Applications ........................................................................................................... 5

    5.    City Event Decision-Makers Raise No Substantial Concerns During Processing of
        Drag Stars Permit ................................................................................................. 6

    6.    Based on Anti-Drag Complaint, the City Decides to Begin Enforcing Never-
        Before-Enforced Advertising Prohibition ............................................................ 7

    7.    The City Prepares to Exempt the Majority of Identified Applicants Violating the
        Advertising Prohibition ...................................................................................... 10

    8.    Drag Stars Prepares for the April 28 Allies Drag Show ................................... 12

    9.    The City Abruptly Denies Drag Stars' Permit ..................................................... 12

    10.    Despite Significant Acknowledged Problems with Advertising Prohibition, the
        City Maintains Prohibition for New Special Events and Only Exempts City-
        Sponsored and Recurring Events ....................................................................... 13

    11.    Advertising Prohibition Amendment Retroactively Exempts Majority of
        Identified Ordinance Violators .......................................................................... 16

    12.    The City Denies Drag Stars Permit Appeal ........................................................ 17

    13.    Drag Stars Files Suit .......................................................................................... 18

PRELIMINARY LEGAL ISSUES ................................................................................... 19

    Plaintiffs Have Standing ............................................................................................. 19

    The Controversy is Not Moot ...................................................................................... 20

    Preliminary Injunction Legal Standards ..................................................................... 21

    Plaintiffs' Request a Mandatory Injunction ................................................................ 21

PLAINTIFFS ARE ENTITLED TO INJUNCTIVE RELIEF UNDER RULE 65 ...................... 23

    1.    Plaintiffs have Demonstrated a Likelihood of Success on Merits ....................... 23

    2.    Plaintiffs Will Continue to Suffer Irreparable Harms Without Injunctive Relief. 49

    3.    The Balance of Harms Tips Heavily in Plaintiffs' Favor .................................... 49

    4.    The Public's Interest in Protecting Constitutional Rights is Paramount ............... 49

    5.    No Bond is Required ............................................................................................ 49

    6.    Summary of Analysis of Entitlement to Preliminary Injunction ......................... 50

    7.    Fitting the Remedy .............................................................................................. 53

ORDER AND PRELIMINARY INJUNCTION ............................................................... 55

## GENERAL BACKGROUND

Plaintiffs Southern Utah Drag Stars, LLC ("Drag Stars") and Mitski Avalōx ("Avalōx") seek their opportunity to speak in the public square through a community drag show which they say conveys messages of diversity, inclusion, and support for individuals with non-traditional gender expression and identities.[3] Drag Stars applied for a special event permit (the "Permit") to hold "Our Allies & Community Drag Show" ("Allies Drag Show") at a public park in St. George, Utah (the "City"). The City denied the Permit based on never-previously-enforced ordinances that prohibit special event advertising until a final event permit is issued. The record shows the use of this prohibition was a pretext for discrimination. The City also enacted a moratorium barring all new special event permit applications for six months. At the same time the City's two-step blocked Drag Stars from holding the Allies Drag Show for at least six months, the City retroactively exempted the majority of other known violators of the advertising prohibition and exempted major swaths of events from the moratorium.

Plaintiffs filed suit May 23, 2023.[4] On May 30, 2023, Plaintiffs moved for a preliminary injunction seeking an order reversing the City's Permit denial and directing the City to allow the Allies Drag Show be held in June, 2023.[5] A telephonic status conference was held June 1, 2023.[6] A docket text order from the court requesting Defendants file supplemental answers and documents was entered June 7, 2023.[7] Defendants filed their Opposition June 9, 2023[8] and

---

[3] Docket no. 34-6, filed May 30, 2023 at 2-3 ¶5-6 (Declaration of Mitski Avalōx in Support of a Preliminary Injunction).

[4] Docket no. 3, filed May 23, 2023 (Complaint).

[5] Notice of Motion and Motion for Preliminary Injunction (Motion), docket no. 34, filed May 30, 2023 ().

[6] Docket no. 48, filed June 1, 2023.

[7] Docket no. 52, filed June 7, 2023.

[8] Memorandum in Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (Opposition), docket no. 54, filed June 9, 2023 (.

1

included their responses to the court's supplemental requests.[9] An additional order from the court for Supplemental Questions and Documents Requests was entered June 10, 2023.[10] Plaintiffs' reply in support of their Motion was filed June 13, 2023.[11] Defendants filed their response to the additional document request on June 14, 2023.[12] On June 15, 2023, a Third Supplemental Questions and Document Requests Order was entered by the court.[13] Defendants filed their response on June 15, 2023.[14]

## DISPOSITION AND OVERVIEW

As explained more fully below, the Plaintiffs' Motion is GRANTED. The City is ORDERED to reverse its decision denying the Permit and is ORDERED to issue a permit allowing the Allies Drag Show to be held June 30, 2023. The City is also prevented from enforcing the advertising prohibition generally and the moratorium as to Plaintiffs current application.

---

[9] Docket no. 54-14, filed June 9, 2023.

[10] Docket no. 56, filed June 10, 2023.

[11] [Plaintiffs'] Reply in Support of Motion for Preliminary Injunction (Reply), docket no. 59, filed June 13, 2023.

[12] Docket no. 60, filed June 14, 2023.

[13] Docket no. 61, filed June 15, 2023.

[14] Docket no, 62, filed June 15, 2023.

## FACTUAL BACKGROUND[15]

St George City, Utah (the "City") and its surrounding area have experienced rapid growth and change in the last 50 years but the area still has less than 200,000 inhabitants.[16] The county is politically strongly conservative.[17]

**1.    The City Forces City Manager Resignation for Permitting Drag Show Event**

In the early summer of 2022, HBO program *We're Here* sought and obtained a permit to hold and film a drag show in one of St. George's public parks. *We're Here* involves 3 popular drag queens traveling to small towns to speak with members of the local LGBTQ+ community and to perform in drag shows. On May 28, 2022, Lenhard indicated he would not follow the City Council's order because *We're Here* complied with the legal requirements for the permit. Lenhard warned Councilmember Tanner that revoking the *We're Here* permit would violate the constitution; Tanner disputed that denying the We're Here permit would violate constitutional protections.[18]

On June 3, 2022, HBO taped an episode of *We're Here* in St. George, which included a drag show at a public park. That same day, Tanner published an open letter to Lenhard criticizing his approval of the *We're Here* permit and mentioned specific ordinances that could have been used to deny the *We're Here* permit including that the *We're Here* application was not submitted

---

[15] The factual summary is derived from the excellent briefing and supplemental responses provided by both parties, which included substantial evidence. Not many material facts are in actual dispute. Some citations appear in this factual summary.

[16] St. George MSA vs. Utah | Population Trends over 1969-2021 (reaproject.org) https://utah.reaproject.org/analysis/comparative-trends-analysis/population/tools/93290000/490000/#:~:text=vastly%20in%20size.-,The%20St.,States%20increase%20of%2064.88%25 (last visited June 14, 2023).

[17] Politics & Voting in Zip 84770 (St. George, UT) (bestplaces.net)  https://www.bestplaces.net/voting/zip-code/utah/st._george/84770 (last visited June 14, 2023).

[18] Docket no. 34 at 6, filed May 30, 2023; June 3, 2022 Instagram Post of Councilmember Michelle Tanner (@michelletannerusa), https://www.instagram.com/p/CeWlnkaphwq/ (last accessed June 15, 2023).

45 days prior to the event and that the event advertised before the final permit was issued.[19] In texts among the City Council, Tanner argued there was no First Amendment issue with her position that drag should be performed only in private and only for adult audiences. Tanner has also applauded anti-drag legislation[20] and advocated for "implementing ordinances" to ban what she views as "lewd, vulgar, and adult content in our public spaces."

On July 14, 2022, the City Council informed Lenhard he would be fired because he refused to revoke or deny the *We're Here* permit. Lenhard resigned. Lenhard threatened a wrongful termination claim, which the City settled for $625,000.

### 2. Southern Utah Drag Stars Seeks Special Event Permit for Community Drag Show

In November 2022, Mitski Avalōx formed Southern Utah Drag Stars ("Drag Stars") to foster diversity and community inclusiveness through drag shows. Drag Stars regularly hosts family-friendly drag performances in Washington County. In late-November 2022, Drag Stars organized a Christmas drag photobooth hosted by Modern Farm and Artisan Co-Op. In January 2023, Tanner attempted to revoke City sponsorship for St. George's Downtown Farmers Market, which is owned by the owners of Modern Farm and Artisan Co-Op. Tanner stated the photobooth "violate[d] community standards," and that she opposes drag "when it involves children" or all-ages locations.

In February 2023, Drag Stars contacted the City to reserve a park for the Allies Drag Show, a family-friendly drag event intended for April 28, 2023. On February 22, 2023, the City's Special Events Coordinator Sarah Reber ("Reber") informed Drag Stars that it had an unofficial

---

[19] Docket no. 34 at 6, filed May 30, 2023; June 3, 2022 Instagram Post of Councilmember Michelle Tanner (@michelletannerusa), https://www.instagram.com/p/CeWlnkaphwq/ (last accessed June 15, 2023).

[20] *See generally* Docket no. 34-4, filed May 30, 2023 (Podcast recording featuring Tanner where she advocated for anti-drag legislation).

"hold" on Vernon Worthen Park. On March 3, 2023, Drag Stars filed an application for a special event permit (the "Permit"). Between March 9, 2023, and March 26, 2023, Avalōx corresponded with Reber to work through details of the Allies Drag Show, including discussions that led the event to be moved to another City-owned park, JC Snow Park.

**3.    The City Flags Drag Stars' Application for the Allies Drag Show Due to "Sensitive Nature"**

On March 8, 2023, Councilmember Natalie Larsen ("Larsen") requested copies of upcoming special event applications from Reber.[21] In response, Reber attached two applications - the Drag Stars Permit application and the application for "Pride 2023" and told Larsen the two events had not been discussed by the Special Event Review Committee ("SERC")[22] due to the "sensitive nature" of the events.[23]

**4.    The City Passes Moratorium Ordinance That Suspends New Special Event Permit Applications**

Roughly 2 weeks after Drag Stars submitted its application for the Allies Drag Show, the City adopted a moratorium ordinance to prohibit the processing of all new special event applications. On March 16, 2023, the City Council approved Ordinance No. 2023-03-003 ("Moratorium"), which suspended City Code § 3-10-1 through § 3-10-10 and barred processing of any new special event application for six-months.[24] Exempted from the Moratorium are all reoccurring events on a list created September 2, 2022, all City events, and all new special events with completed applications received prior by March 15, 2023.[25] The stated reasons include

---

[21] Docket no. 34-9 at 39, filed May 30, 2023.

[22] Docket no. 60 at 6, filed June 14, 2023.

[23] Docket no. 34-9 at 39, filed May 30, 2023.

[24] Docket no. 54-10 at 2-6, filed June 9, 2023.

[25] Docket no. 54-10 at 2-6, filed June 9, 2023.

(1) to prevent overuse of parks pending a study on the impact of special events on City facilities, and (2) to permit the Council to make changes to the City Code regarding special event permits.[26]

The Moratorium blocks all new special event permit applications regardless of the desired location of the event, the historical use at the desired location, the condition of the desired location, and regardless of the size, duration, and potential impact of the proposed special event. But the Moratorium does not block recurring events from taking place regardless of the location of the event, the historical use at the desired location, the condition of the desired location, and regardless of the size, duration, and impact of the recurring event.

5. **City Event Decision-Makers Raise No Substantial Concerns During Processing of Drag Stars Permit**

On March 16, 2023, Reber indicated the permit application was complete, that she would "finish things up and get back to" Drag Stars.[27] Also on March 16, 2023, Reber circulated the permit application to various City departments for feedback.[28] No substantial concerns were raised by the various departments. Captain Curtis Spragg of the St. George Administrative Services Division emailed Reber that he "approved of [Drag Stars] security plan of having multiple private security on scene . . . ."[29] Parks Manager Todd Steed emailed that everything looked good to him.[30] Jessica Steed, a Grants Program Manager, and Rachel Hurd from the Parks Department both said that things looked good to them.[31] Fire Marshall Brett Remund

---

[26] Docket no. 54-10 at 2-6, filed June 9, 2023.

[27] Declaration of Mitski Avalox ¶ 19 at 6, docket no. 34-6.

[28] Docket no. 34-10 at 24, filed May 30, 2023.

[29] Docket no. 34-10 at 24, filed May 30, 2023.

[30] Docket no. 34-10 at 17, filed May 30, 2023.

[31] Docket no. 34-10 at 18-19, filed May 30, 2023.

indicated the fire department was good with the Allies Drag Show.[32] Shallen Sterner from the

Southwest Utah Public Health Department and Dave Terry from the Streets department also

raised no concerns.[33]

### 6. Based on Anti-Drag Complaint, the City Decides to Begin Enforcing Never-Before-Enforced Advertising Prohibition

On March 17, 2023, Lisa Dorn, a local

adjunct professor and clinical therapist sent

Tanner a text message about the Allies Drag

Show:[34]



---

[32] Docket no. 34-10 at 18-19, filed May 30, 2023.

[33] Docket no. 34-10 at 16, filed May 30, 2023.

[34] Docket no. 62-1, at 2, filed June 15, 2023.

Roughly an hour later, Tanner sent the following email to City attorneys and the City

Manager:[35]

---

**Michelle Tanner** <michelle.tanner@sgcity.org>                    Fri, Mar 17, 2023 at 2:59 PM
To: Tani Downing <tani.downing@sgcity.org>, Ryan Dooley <ryan.dooley@sgcity.org>, Jami Brackin
<jami.brackin@sgcity.org>, John Willis <john.willis@sgcity.org>, Michele Randall
<michele.randall@sgcity.org>

Good afternoon legal team,

I have been receiving more complaints this week from residents regarding adult entertainment being
performed in front of children, as well as in areas not zoned for adult entertainment performances. I
have had an concerned local mental health therapist contact me regarding a drag performance in
Vernon Worthen Park in April (sounds like Southern Utah Drag Stars may have started advertising
before receiving a permit which I believe violates our ordinance). Southern Utah Drag Stars has also
performed adult entertainment at times advertised for all ages and at times advertised as 18+ at Cafe
Elevato. Is Cafe Elevato zoned for this type of entertainment and would they require permits to do so?

Thanks for the clarification.

Michelle Tanner

---

After City Attorney Tani Downing ("Downing") told Tanner the city attorneys would

look into the issue, Tanner again emailed the group on March 17, 2023, to explain that she "did

verify that Southern Utah Drag Stars has violated our ordinance by prematurely advertising. I

believe this is also grounds for not issuing their permit."[36] Tanner attached two screenshots Drag

Stars posted on a vendor organizing platform, including a description of the Allies Drag Show

that concluded with a solicitation of vendors to "review the fees attached to being a

vendor/sponsor for this event." Tanner also included a screen shot of City Code 3-10-4(c).[37]

City Code § 3-10-3 provides that "[n]o person . . . or other entity . .  shall promote,

advertise, or hold a special even without first obtaining a special event permit."[38] City Code § 3-

10-4(c) (together with § 3-10-3, "Advertising Prohibition") provides that "[n]o advertising of a

---

[35] Docket no. 62-2 at 2, filed June 15, 2023.

[36] Docket no. 62-2 at 2, filed June 15, 2023.

[37] Docket no. 62-2 at 2-3, filed June 15, 2023.

[38] Docket no. 54-1 at 4, filed June 9, 2023.

special event shall be permitted until city approval of the special event is granted and a special event permit is issued."[39] City Code § 3-10-8 provides that "an application may be denied by the city if . . . the proposed special even violates a law, ordinance, policy, procedure, or regulation . . . ."[40] The Advertising Prohibition has been codified since at least October 1, 2015, but the City had never enforced the Advertising Prohibition prior to March 31, 2023.[41]

On March 21, 2023, Willis met with Assistant City Manager Marc Mortensen, Reber and two City Attorneys to discuss special events and "the complaint" from Tanner that Drag Stars was "advertising prior to obtaining a special event permit."[42] Willis directed staff to research which pending special event applications were advertising in violation of the Advertising Prohibition.[43] Neither City Code nor the Advertising Prohibition define the promotion or advertisement activities which are prohibited or which activities or communications concerning an upcoming event are acceptable.

Later on March 21, 2023, a high-school intern was assigned to identify any pending special event applicants that were violating the advertising prohibition.[44] The intern reported later that day[45] that 12 of 16 events with applications pending were "advertising" ahead of their permit approval.[46] The intern's report identified Drag Stars as an applicant for a special event permit that was advertising in advance of a permit being issued. The intern's report included two

---

[39] Docket no. 54-1 at 4, filed June 9, 2023.

[40] Docket no. 54-1 at 6, filed June 9, 2023.

[41] Docket no. 54-14 at 4, filed June 9, 2023.

[42] Docket no. 60-3 at 3, filed June 14, 2023.

[43] Docket no. 60-3 at 3, filed June 14, 2023; docket no. 34-7 at 56, filed May 30, 2023.

[44] Docket no. 34-7 at 56, filed May 30, 2023.

[45] Affidavit of Ryan Dooley, ¶ 8, at 2, docket no. 34-7 at 56.

[46] Docket no. 54-14 at 4-5, docket no 34-7 at 56, 58-60, filed May 30, 2023.

images from Drag Stars' posts on a public-facing Drag Stars web platform to facilitate vendor communications, contacts, and payments and on social media.[47] Drag Stars' posted images did not seek attendees.

The images collected in the intern's report considered "advertising" do not all target the same audiences and do not all contain the same event information.[48] Not all of the "advertising" images include locations for the special events or even indicate the events will be held in St. George.[49] Some images were found on public websites, some were on social media, and Drag Stars' images were on a platform used to facilitate vendor communication.[50] Although advertising and promotion are not defined, in the analysis of the special events flagged for improper advertising in the interns' report, the City determined that an image captured in the intern's report for the Utah Government Finance Officer's Association was only "an agenda item for a conference" and therefore "not considered advertising."[51]

### 7. The City Prepares to Exempt the Majority of Identified Applicants Violating the Advertising Prohibition

After the intern's report identified twelve applicants for special event permits that were improperly advertising, Willis directed staff to identify which of the improper advertisers were "recurring events or City-sponsored."[52] The City has historically exempted both City-sponsored events and recurring events from "certain requirements of ordinances."[53] A reoccurring event is

---

[47] Docket 59 at 5, filed June 13, 2023, docket no 34-7 at 56, 60, filed May 30, 2023; Declaration of Mitski Avalox ¶ 21 at 7, docket no. 34-6.

[48] Docket no. 34-7 at 58-56, filed May 30, 2023.

[49] Docket no. 34-7 at 58-56, filed May 30, 2023.

[50] Docket no. 34-7 at 58-56, filed May 30, 2023, docket no. 59 at 5, filed June 13, 2023.

[51] Docket no. 54-14 at 4-5, filed June 9, 2023 and DSTARS000057 in Exhibit A to Affidavit of Ryan Dooley, page 58 of docket no. 34-7, filed May 30, 2023.

[52] Docket no. 60-3 ¶ 8 at 3, filed June 14, 2023.

[53] Docket no. 60-3 ¶ 9 at 3, filed June 14, 2023.

defined in the City Code as "an event that has occurred annually without missing a year."[54] That same day, March 21, 2023, the City created a updated list of all recurring events.[55]

What events qualify as "City-sponsored" is not defined in the City Code and there are no guidelines for determining which events may be City-Sponsored.[56] At a March 9, 2023 City Council meeting, Reber presented on City-sponsorships and explained that "sponsorships, umm, we've always kind of called fee-waivers sponsorships and these past sponsorships that's expending in-kind or cash contributions in the process of holding an event . . . ." [57]

Reber explained that historically there has been no process or guidance for determining City-sponsorships.[58] When an event sought City-sponsorship, "it was like a letter. Please state what you want and we'll pass it on to City Council and then it was up to [the City Council] to go, 'I don't know, umm, uhh, let us look this over and we'll just try,' but there wasn't really anything to go off of."[59] During that same March 9, 2023 meeting, examples of past City-sponsorship of events included events that were not charged for the use of a field, events where the City provided a stage for the event without cost, events that received waiver of a permit fee, events that were permitted free use of garbage cans, and events permitted to advertise on City

---

[54] Docket no. 54-1 at 3, filed June 9, 2023, City Code § 3-10-2.

[55] Docket no. 54-14 at 7-11, filed June 9, 2021.

[56] Docket no. 60 at 2, 4-5, filed June 14, 2023.

[57] March 9, 2023 City Council Work Meeting Audio Recording at 48:10-48:25, https://www.sgcity.org/minutes/file/?id=1xptmR3O2In7TVNWPTvgoNFBimakNjRG4&file=1&type=mp3&time=0 0:43:07#t=00:43:07 (last accessed June 15, 2023).

[58] March 9, 2023 City Council Work Meeting Audio Recording at 53:30-53:50, https://www.sgcity.org/minutes/file/?id=1xptmR3O2In7TVNWPTvgoNFBimakNjRG4&file=1&type=mp3&time=0 0:43:07#t=00:43:07 (last accessed June 14, 2023).

[59] March 9, 2023 City Council Work Meeting Audio Recording at 53:30-53:50, https://www.sgcity.org/minutes/file/?id=1xptmR3O2In7TVNWPTvgoNFBimakNjRG4&file=1&type=mp3&time=0 0:43:07#t=00:43:07 (last accessed June 14, 2023).

social media accounts; City-sponsorships have historically occurred for both for-profit and not-for-profit events.[60]

### 8.    Drag Stars Prepares for the April 28 Allies Drag Show

Around March 23, 2023, Avalōx spoke with Reber at City Hall and verbally requested permission to begin advertising the April 28th event, which Reber verbally granted.[61] On March 26, 2023, Drag Stars held a photoshoot to use in advertising for the April 28th event. On March 30, 2023, Drag Stars made a social media post soliciting attendees for the April 28th event.[62] On March 29, 2023, Drag Stars received an email from the City seeking payment for use of the park for the Allies Drag show.

### 9.    The City Abruptly Denies Drag Stars' Permit

On March 30 and 31, 2023, the City received email complaints from residents opposed to drag shows.[63] On March 31, Willis and City Attorney Tani Downing ("Downing") contacted each City Councilmember to discuss the results of the investigation into violations of the Advertising Prohibition .[64] A majority of the City Council directed Willis and Downing to strictly enforce the special events City Code, "except against recurring events and city sponsored events."[65] As of March 31, 2023, the Advertising Prohibition included no exceptions. Willis and

---

[60] March 9, 2023 City Council Work Meeting Audio Recording at 46:30-53:50,
https://www.sgcity.org/minutes/file/?id=1xptmR3O2In7TVNWPTvgoNFBimakNjRG4&file=1&type=mp3&time=0
0:43:07#t=00:43:07 (last accessed June 15, 2023).

[61] There are very few disagreements between the parties on the facts of this case. Whether Reber verbally granted permission to advertise the event is disputed.

[62] Docket no. 34-7 at 35, filed May 30, 2023; docket no. 59 at 5, filed June 13, 2023.

[63] Docket no. 34-8 at 2-6, filed May 30, 2023.

[64] Docket no. 60-3 at 4, filed June 14, 2023.

[65] Docket no. 60-3 at 4, filed June 14, 2023.

Downing were also directed to draft an Ordinance to exempt City-sponsored events and recurring events from the Advertising Prohibition for the City Council to approve in the future.[66]

On March 31, 2023, Avalōx spoke with Reber at City Hall. Up until this conversation, neither Reber nor the City had given any indication to Avalōx that there was anything about the Allies Drag Show or Permit application that might prevent the Permit from being issued. At City Hall, Reber verbally assured Avalōx that the Permit was still being processed. Despite this assurance, an hour after Avalōx spoke with Reber at City Hall, Avalōx received a permit denial letter signed by Reber. The stated basis for the denial was "advertising prior to receiving city approval and/or a special event permit is issued." The only advertisement the city based the denial on was the post on the vendor website prior to March 21, 2023, not the post on social media Drag Stars made March 30, 2023.[67] Prior to the Permit denial, the City had never previously enforced the Advertising Prohibition.[68] On April 5, 2023, Drag Stars timely appealed the Permit denial to the City Council.

10. **Despite Significant Acknowledged Problems with Advertising Prohibition, the City Maintains Prohibition for New Special Events and Only Exempts City-Sponsored and Recurring Events**

On April 6, 2023, the City Council voted to amend the Advertising Prohibition to exempt "[e]vents which are listed on the March 21, 2023, list of reoccurring events and events for which the city is a sponsor" and allow these events to "promote and advertise the event after submission of a preliminary application, confirmation by city staff of the availability of the location and dates for the event, and payment of the application fee, if any."[69]

---

[66] Docket no. 60-3 at 4, filed June 14, 2023.

[67] Docket no 34-7 at 23, 56, 58-60, filed May 30, 2023, docket no. 59 at 5, filed June 13, 2023.

[68] Docket no. 54-14 at 4, filed June 9, 2023.

[69] City Code §§ 3-10-3 and 3-10-4, docket 54-1 at 4, filed June 9, 2014.

During discussion about the amendment, multiple problems with the Advertising Prohibition were discussed. Larsen explained the problems with the lack of guidance or definitions: "some of it just comes down to definition. Organizing. Advertising. What is the difference? If you put it out to organize an event or advertise an event . . . I think that's one of the definitions we're going to have to come through."[70] Councilmember Danielle Larkin ("Larkin") raised concerns with the Advertising Prohibition's impact on business owners looking to start new events, explaining that "often the final permit doesn't come until maybe even a day or two before the event because of insurance because you have to have the final list of your vendors" and how preventing advertising until the last second was "making it really challenging and they're not even going to be able to try to make a special event."[71] Larkin offered as an alternative the outright prohibition of advertising that "maybe what we say is you can't advertise the location until you have final approval of the location."[72]

Special events that are not City-sponsored or recurring cannot be promoted or advertised until the final permit is issued. Often, final special event permits are not issued until very near the event taking place. The City filed a list of special event permits issued in 2022 and part of 2023.[73] Of the 131 events listed that have a "Final Approval Issue Date," 28 permits or 21.3% were issued 3 days or less prior to an event, another 34 permits or 26% were issued 1 week or less prior to the event, and another 54 permits or 41.2% were issued 2 weeks or less prior to the event.[74]

---

[70] Video of April 6, 2023 City Council Meeting at 37:07-37:39, docket 34-2, filed May 30, 2023.

[71] Video of April 6, 2023 City Council Meeting at 35:48-35:59, 36:42-36:49, docket 34-2, filed May 30, 2023.

[72] Video of April 6, 2023 City Council Meeting at 36:27-36:37, docket 34-2, filed May 30, 2023.

[73] Docket 60-7 at 18-23, filed June 14, 2023.

[74] Docket 60-7 at 18-23, filed June 14, 2023.

At the April 6, City Council Meeting, Councilmember Jimmie Hughes offered that the Advertising Prohibition may prevent problems such as legal issues where significant money is spent advertising an event and then a permit is denied.[75] The City has submitted no historical evidence of any such problems caused by pre-final-permit advertising.[76] The justification is also contradicted by prior City Manager Gary Esplin, who explained in January of 2015 leading up to the adoption of the Advertising Prohibition that "if an event is advertised prior to getting approval, the City is not at fault, the promotor is."[77]

After the City council adopted the exemptions, at least nine members of the public made comments about the dangers of exposing children to drag shows, characterized drag shows as strip shows, thanked the City Council for denying the Allies Drag Show Permit, or provided anti-transgender sentiments.[78] Nearly all of nine commenter wore stickers with the logo of the Protect Utah's Kids organization.[79] Councilmember Tanner also wore the organization's sticker logo while she participated in the City Council Meeting.[80] After the April 6 City Council meeting, Tanner publicly posed on social media in with the logo sticker for Protect Utah's Kids and praised the public comments made during the council meeting.[81] On her website that displays her role as a City Councilmember, Tanner explains her position that she "supports adults in their

---

[75] Video of April 6, 2023 City Council Meeting at 38:37-39:12, docket 34-2, filed May 30, 2023.

[76] *See* Docket no. 60 at 7, filed June 14, 2023.

[77] Docket 60-4 at 4, filed June 14, 2023.

[78] Video of April 6, 2023 City Council Meeting at 40:05-1:12:15, docket 34-2, filed May 30, 2023.

[79] Video of April 6, 2023 City Council Meeting at 40:05-1:12:15, docket 34-2, filed May 30, 2023.

[80] *See generally* Video of April 6, 2023 City Council Meeting, docket 34-2, filed May 30, 2023.

[81] April 6, 2023 Instagram Post of Councilmember Michelle Tanner (@michelletannerusa), https://www.instagram.com/p/CquC_gwtAFr/ (last accessed June 15, 2023).

freedom of expression in appropriate venues, and opposes attempts to normalize men scantily dressed as women, gyrating in front of children."[82]

### 11.   Advertising Prohibition Amendment Retroactively Exempts Majority of Identified Ordinance Violators

The majority of those violating the Advertising Prohibition faced no consequence or were exempted, despite the City's denial of Drag Stars' permit. Of the twelve events identified as violating the Advertising Prohibition on March 21, 2023, the City only considers eleven to be special events.[83] One event, Brooks Block Party, which Reber included in an emailed list of events sent on March 30, 2023, and which event the City Council discussed sponsoring at the March 16, 2023 City Council Meeting, is now described by the City as not actually being an event, and only requiring an encroachment permit.[84] Of the remaining eleven other events found to be pre-final-permit advertising, one of the eleven events, Witchy Market, was still issued a permit after the City investigated and was aware the event was violating the Advertising Prohibition because it was "City-sponsored." Witchy Market's permit was issued on the day of the event, March 25, 2023.[85] At the time the Witchy Market permit was issued, City-sponsorship was not an exception to the Advertising Prohibition.[86] Another event that posted an "agenda item for a conference" on a website was determined not to have been advertising the event[87] even

---

[82] LGBTQIA+ webpage of Website of "Michelle Tanner, St. George, Utah City Council," https://www.michelletannerutah.com/michelle-tanner-political-views/lgbtqia (last visited June 15, 2023).

[83] Docket no 54-14 at 4-5, filed June 9, 2023.

[84] Docket 54-14 at 5, filed June 9, 2023, docket 34-8 at 14, filed May 30, 2023, Audio of March 16, 2023 City Council Meeting at 29:07-32:08, docket 34-1, filed May 30, 2023.

[85] Docket 60-7 at 22, filed June 14, 2023, docket no. 34-7 at 58, filed May 30, 2023, docket no. 54-14 at 4, filed June 9, 2023. At the April 11, 2023, City Council Meeting, when questioned why Witchy Market was not denied a permit, Mayor Michelle Randall said, "that one was City-sponsored, for D-week, for the University." Video of April 11, 2023 City Council Meeting at 37:02-37:17, docket 34-3, filed May 30, 2023.

[86] Docket no. 54-11 at 4 (exception not approved until April 6, 2023).

[87] Docket no. 54-14 at 4-5, filed June 9, 2023, and DSTARS000057 in Exhibit A to Affidavit of Ryan Dooley, page 58 of docket no. 34-7, filed May 30, 2023.

though advertising under the City Code is undefined. Six of the eleven events, a majority of the identified violators of the Advertising Prohibition, were retroactively exempted from the prohibition for being City-sponsored or recurring events.[88] Only three events of the eleven events were denied permits.[89]

### 12.   The City Denies Drag Stars Permit Appeal

On April 11, 2023, the City Council heard Drag Stars' appeal of the City's Permit denial. During the meeting, Councilmember Dannielle Larkin raised concerns that the advertising prohibition was insufficiently clear. Larkin explained:

> "We've known for, uh, as part of our discussions, that we do have a problem when it comes to exactly what we have meant by advertising. We had this conversation in the last meeting. Do we mean that you can say you are planning an event and are seeking vendors? You know, what exactly do we mean by that? Do we mean you are stating the location? And can that be done in advance? Can it be done not until the day you get the permit which is often the day before your event because of insurance? . . . it would be so much easier if everything was just clean, if we'd always said 45 days, if we'd always said no advertising and we knew what that meant, but nobody has really been able to say exactly what that's meant because we just haven't had to define it before . . ."[90]

Councilmember Larsen acknowledged that there was "a lot of grey area" in the Advertising Prohibition.[91] Larsen also explained that she had been look into changes to the special event permit process for "a good nine months" and "there ha[d] to be a starting spot to look at this and make it happen and it just happened to be right now . . . ."[92] The City asserts discussions about the use of public parks special events started in July 2022 including as early as

---

[88] Docket 54-14 at 4, filed June 9, 2023.

[89] Docket 54-14 at 4, filed June 9, 2023.

[90] Video of April 11, 2023, City Council Meeting at 33:07-34:07, docket 34-3, filed May 30, 2023.

[91] Video of April 11, 2023, City Council Meeting at 37:20 -37:49, docket 34-3, filed May 30, 2023.

[92] Video of April 11, 2023, City Council Meeting at 37:20 -37:49, docket 34-3, filed May 30, 2023.

July 14, 2022; July 28, 2022; August 11, 2022; December 8, 2022; January 5, 2023, March 9,

2023; March 16, 2023; April 6, 2023, and April 8, 2023.[93] July 14, 2022, the first date the City

claims parks and special events discussions took place, is the same day the City Council told

Lenhard he was being removed as City Manager for refusing to revoke the *We're Here* event

permit.[94]

The City Council denied Drag Stars' appeal.[95] Drag Stars did not file an appeal in state

district court as authorized by City Code § 3-10-9.

### 13.  Drag Stars Files Suit

On May 23, 2023, Drag Stars filed their Complaint, [96] which includes the following

causes of action against the City; the City Council; Councilmembers Jimmie Hughes, Dannielle

Larkin, Natalie Larsen, Gregg McArthur, and Michelle Tanner, in their official capacities; Mayor

Michele Randall in her official capacity; and City Manager John Willis in his official capacity:

Violation of 1st Amendment Freedom of Speech for content- and viewpoint-based

discrimination, Violation of 1st Amendment Freedom of Speech for exclusion from public forum,

Violation of 1st Amendment Freedom of Speech for prior restraint, Violation of 1st Amendment

Freedom of Speech for overbreadth, Violation of 14th Amendment Due Process for vagueness,

Violation of 14 Amendment Equal Protection for sex and LGBTQ+ discrimination, Violation of

Art. I, § 24 of Utah Const Uniform Operation of Laws for sex and LGBTQ+ discrimination, and

Violation of Art. IV, § 1 of Utah Const Equal Protection for sex and LGBTQ+ discrimination.

---

[93] Docket no. 54 at 26, filed June 9, 2023.

[94] Docket no. 2 at ¶ 36, Bryan Schott & Mark Eddington, *St. George City manager resigned after pressure over drag show on public property. He is leaving with a six-figure settlement.*, Salt Lake Trib. (Oct. 25, 2022), https://www.sltrib.com/news/politics/2022/10/25/st-george-City-manager-resigned/.

[95] Video of April 11, 2023 City Council Meeting at 46:38-47:21, docket 34-3, filed May 30, 2023.

[96] Docket no. 3, filed May 23, 2023 (Complaint).

Plaintiffs seek an order reversing the Permit denial and ordering the City to issue a permit to allow the Allies Drag Show to be held June, 30, 2023.[97]

## PRELIMINARY LEGAL ISSUES

### Plaintiffs Have Standing

Standing exists where a party can demonstrate "1) [an] injury-in-fact; 2) causation; and 3) redressability."[98] Plaintiffs meet this burden. Defendants' denial of Plaintiffs' Permit injures Plaintiffs: Plaintiffs cannot hold their event and Plaintiffs' protected speech curtailed. Plaintiffs' injury was caused by the City. And a court order directing the City to reverse its Permit denial and to issue a permit for Plaintiffs to hold their event on a future date would provide Plaintiffs redress. Standing exists.

The Defendants' focus on the lack of a prior application for a June 30 event fails. First, before the City denied Plaintiffs' special event permit, it instituted a six-month moratorium prohibiting all new special event permit applications from being filed or processed—Plaintiffs could not have filed an additional application to hold an event on June 30. Second, a "district court has considerable discretion in fashioning suitable relief and defining the terms of an injunction . . . ."[99] Plaintiffs provide no authority prohibiting an order directing the City to allow the Allies Drag Show, originally proposed for April 28, 2023, to take place on an alternative future date. Additionally, while Plaintiffs were permitted by the City Code to appeal the City Council's denial of Plaintiffs' Permit application to the state district court,[100] there was no

---

[97] Docket no. 34, filed May 30, 2023 (Notice of Motion and Motion for Preliminary Injunction).

[98] *Utah Animal Rts. Coal. v. Salt Lake City Corp.*, 371 F.3d 1248, 1255 (10th Cir. 2004).

[99] *Galvez v. Jaddou*, 52 F.4th 821, 834 (9th Cir. 2022) (quotation and internal citation omitted).

[100] City Code § 3-10-9, docket no. 54-1 at 7, filed June 9, 2023.

requirement to do so before asserting rights guaranteed by the federal Constitution in federal court. This is not a case where the doctrine of exhaustion of remedies applies.

### The Controversy is Not Moot

A case is moot if "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."[101] "The crucial question is whether granting a present determination of the issues offered will have some effect in the real world."[102]

There is no question that there are live issues in this case and granting the requested relief would have a real effect in the real world. This order directs the City to reverse their denial of Drag Stars' special event permit and orders the City to issue a permit for Drag Stars event to be held on June 30, 2023. Drag Stars can now hold its event, an effect in the real world.

Additionally, the City does not explain why the date of the application cannot be adjusted. The messages between Reber and Avalōx demonstrate that the special event planning process is fluid and evolves during the process. While the Drag Stars' application was originally for Vernon Worthen Park, Reber discussed alternatively using the Sunbowl, Sandtown, and JC Snow parks to host the event. Ultimately, Drag Stars agreed to holding the Allies Drag Show at JC Snow park. The City moved the pending hold from Vernon Worthen Park to JC Snow Park without requiring a new application.[103] Avalōx also inquired about additional dates for the event in emails with Reber.[104] While Defendants are correct that a court cannot wind back the clock if a statutorily fixed event (like an election) has already taken place,[105] no legally binding deadline

---

[101] *Wyoming v. U.S. Dep't of Agr.*, 414 F.3d 1207, 1211 (10th Cir. 2005) (quoting *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287, (2000).

[102] *Id.* at 1212 (quoting *Citizens for Responsible Gov't State Political Action Comm. v. Davidson*, 236 F.3d 1174, 1182 (10th Cir.2000)).

[103] Docket no. 34-9 at 18, filed May 30, 2023.

[104] Docket no. 34-9 at 24, filed May 30, 2023.

[105] Docket no. 54 at 17-18, filed June 9, 2023.

was missed here. If Defendants' argument was accepted, Defendants could deny permits shortly before events and no party could ever seek redress once the original date of the proposed event had passed. This is not the law of mootness.

## Preliminary Injunction Legal Standards

This Order is Preliminary. The parties will develop the record further during the discovery and pre-trial motion processes. A preliminary "injunction is not a preliminary adjudication on the ultimate merits."[106] "[T]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits."[107] This order analyzing Plaintiffs' request for a preliminary injunction is based on the parties' briefing and submitted documentary evidence. Counsel and the parties are commended for their excellent and timely briefing as well as the full development of the record—these efforts have materially considerably hastened and aided the analysis herein.

To obtain a preliminary injunction under Federal Rule of Civil Procedure 65, Plaintiff must demonstrate: (1) a likelihood of success on the merits; (2) a likelihood that Plaintiff will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in Plaintiff's favor; and (4) that the injunction is in the public interest.[108]

## Plaintiffs' Request a Mandatory Injunction

The issuance of any "preliminary injunction is an extraordinary remedy" that must be based on a "clear and unequivocal" right to relief.[109] Even so, injunctions that "alter the status quo;" are "mandatory;" or afford the person seeking the injunction "all the relief that [they]

---

[106] *Sierra On–Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1423 (9th Cir. 1984).

[107] *U. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *see also Sierra On–Line*, 739 F.2d at 1423.

[108] *Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 797 (10th Cir. 2019); *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1209 (10th Cir. 2009).

[109] *Schrier v. Univ. Of Co.*, 427 F.3d 1253, 1258 (10th Cir. 2005) (internal quotation marks and citation omitted).

could recover at the conclusion of a full trial on the merits" are "specifically disfavored."[110] The status quo in a case is "the last uncontested status between the parties which preceded the controversy."[111] An injunction is "mandatory if the requested relief affirmatively requires the nonmovant to act in a particular way, and as a result places the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction."[112]

Here the status quo would be a return to the state where Plaintiffs' Permit was pending and prior to the City's unprecedented denial of Plaintiffs permit based on the Advertising Prohibition. If this order only directed the reversal of the Permit denial and enjoined the City from enforcing the advertising prohibition in reevaluating the Permit application, the injunction would not be a disfavored type. But, given the thin arguments the City has advanced including that drag shows are not protected speech;[113] that the record evidence demonstrates the City could bar this application based on "an interest in protecting children;" and because of the plentiful evidence of the animus of the Defendants towards Plaintiffs' speech, relief granted Plaintiffs cannot assume there will be a fair review the application. To provide Plaintiffs' effective relief, the City must be ordered to reverse the Permit denial and further be ordered to grant the Drag Stars' Permit and allow Plaintiffs to hold their event on June 30, 2023. This relief is a mandatory injunction because it forces the City to act a particular way and it is not difficult to foresee additional supervision being necessary to ensure the City complies.

---

[110] *Id.* at 1259.

[111] *Id.* at 1260.

[112] *Id.* at 1261 (cleaned up).

[113] Docket 54 at 22-24, filed June 9, 2023.

The relief is not all that the Plaintiffs request nor does it foreshadow a result on the many other causes of action in the Complaint.

Accordingly, Plaintiffs' requested relief must "be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary" and Plaintiffs must "make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms" without reliance on a "modified likelihood-of-success-on-the-merits standard."[114] Plaintiffs meet this higher burden.

## PLAINTIFFS ARE ENTITLED TO INJUNCTIVE RELIEF UNDER RULE 65

### 1.   Plaintiffs have Demonstrated a Likelihood of Success on Merits

### A.  The Advertising Prohibition and Moratorium are Unconstitutionally Overbroad

**Standard of Review:** A successful overbreadth challenge shows "that a law punishes a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep," and "invalidate[s] all enforcement of that law . . . ."[115] Overbreadth challenges provide an important "remedy out of concern that the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech."[116] Chilling speech is problematic because many people will abstain from speech instead of taking on the burden of vindicating their rights through litigation.[117] When that happens, "society as a whole" is "deprived of an uninhibited marketplace of ideas."[118]

---

[114] *Schrier,* 427 F.3d at 1261.

[115] *Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003).

[116] *Id.* at 119.

[117] *Id.*

[118] *Id.*

"When assessing an overbreadth challenge, the usual rules of statutory construction apply."[119]  Generally, courts "interpret a word or phrase in a statute" consistent with "its ordinary, everyday meaning."[120] Dictionary definitions can be used to demonstrate the ordinary meanings of words and phrases.[121]

(1)    The Advertising Prohibition is Undefined and Overbroad.

**The City's Interests in the Advertising Prohibition.** The Advertising Prohibition bars promotion and advertising of all new special events before a special event permit is issued.[122] The City offers no legitimate interest in the Advertising Prohibition that is supported by the record.[123] The complete lack of historical enforcement and City Council's exemption of the majority of identified violators when it began enforcement are substantial evidence that the City lacks any legitimate purpose for the Advertising Prohibition. The City argues vaguely about confusion and public order being enhanced because applicants would not want to advertise "an event that may not be approved."[124] One council member speculated that the prohibition may prevent legal issues arising if an event is advertised and a permit is not issued.[125] The City provides no evidence of experience with these interests. And they are wholly undercut by reality. When the City reviewed pending permit applications on March 21, 2023, 12 out of 16 were advertising without a permit[126]—applicants do not appear concerned about permit denial.

---

[119] *See United States v. Hernandez-Calvillo*, 39 F.4th 1297, 1302 (10th Cir. 2022).

[120] *United States v. Thomas*, 939 F.3d 1121, 1123 (10th Cir. 2019)

[121] *See Hernandez-Calvillo*, 39 F.4th at 1304.

[122] City Code §§ 3-10-3 and 3-10-4(c).

[123] *See* docket no. 54 at 27, 33-34, filed June 9, 2023, docket no. 60 at 7, filed June 14, 2023.

[124] Docket no. 54 at 27, filed June 9, 2023.

[125] Video of April 6, 2023 City Council Meeting at 38:37-39:12, docket 34-2, filed May 30, 2023.

[126] Docket no. 34-7 at 56, 58-60, filed May 30, 2023.

Additionally, the City rarely denies permits.[127] Out of the 231 events the City's submitted spreadsheet for events in 2022 and through June 2023, only 10 are listed as denied.[128] Of those 10 denied permits, two are related to the March 31 Advertising Prohibition based denials at issue here.[129] Another four denials are related to conflicts between the Downtown Farmer's Market and other events, leaving only 4 denials on the merits out of 231 events.[130] So the risk of loss from fruitless advertising is very small while the overwhelming number of applicants would benefit from more advertising time.

**Scope of the Advertising Prohibition.** In comparison, the speech that the Advertising Prohibition bars is very significant. Neither "advertise" nor "promote" are defined in the City Code, and the dictionary definitions of "advertise" and "promote" include making the public aware of something, announcing something publicly, contributing to the growth or prosperity of something, advancing something in station, rank, or honor, helping to bring something into being, or presenting merchandise through advertising.[131] These broad definitions result in an overly broad restriction to commercial and non-commercial speech. At the April 6, 2023, City Council Meeting, Larkin noted the chilling impact of the Advertising Prohibition that is "making it really challenging and [new special event applicants are] not even going to be able to try to make a special event."[132]

---

[127] Docket 60-7 at 3, 19-23, filed June 14, 2023.

[128] Docket 60-7 at 3, 19-23, filed June 14, 2023.

[129] Docket 60-7 at 3, 19-23, filed June 14, 2023.

[130] Docket 60-7 at 3, 19-23, filed June 14, 2023.

[131] *Advertise*, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/advertise (last visited June 15, 2023), *promote*, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/promote (last visited June 15, 2023).

[132] Video of April 6, 2023 City Council Meeting at 36:42-36:49, docket 34-2, filed May 30, 2023.

**Application of the Advertising Prohibition.** The Advertising Prohibition also creates an impossibly circular scheme: the City application form requires information about vendors and lists of vendors, structural requirements like the use of tents and stages, information about security, and scheduling information. But the natural reading of "advertise" or "promote" easily encompasses communications gathering such information and participation for an event. And with more than 20% of event permits being issued 3 days or less before an event and more than 40% issued two weeks or less prior to an event, the Advertising Prohibition and application requirements make it near impossible to hold a new special event in the City. Such overbreadth is even more substantial given the lack of any legitimate sweep of the Advertising Prohibition. The newly enacted exceptions to the Advertising Prohibition for recurring and City-sponsored events (for which the City Council has unfettered discretion to apply) also do not save the prohibition from being unconstitutionally overbroad.[133] The exemptions extinguish the plausibility of any offered City interest in the Advertising Prohibition. As modified by the broad exceptions, only new special event applicants are barred, but restriction of any person's speech – even that of new persons or people without ties to the city – is significant.

**Conclusion:** The Advertising Prohibition sweeps within its bounds, with no foundation for its restraints, and impractical effect, communication that may not be restricted under the First Amendment. Therefore, Plaintiffs have demonstrated a substantial likelihood of success on the merits that the advertising prohibition is unconstitutionally overbroad.

---

[133] On Equal Protection grounds, an ordinance drawing a "distinction between publicly and privately-sponsored exhibits, displays and structures" in a public square was found invalid in *Congregation Lubavitch v. City of Cincinnati*, 997 F.2d 1160, 1167 (6th Cir. 1993).

(2)     The Moratorium is Unconstitutionally Overbroad.

The Moratorium is also unconstitutionally overbroad. In *International Action Center v City of New York* ("*IAC*"), the second circuit addressed an analogous ordinance.[134] In *IAC*, Plaintiff filed an application to hold a march on Fifth Avenue in New York City.[135] New York City denied the permit to march on Fifth Avenue based on a rule prohibiting new parades on Fifth Avenue.[136] New York City's interest in preventing additional parades on Fifth Avenue was to address the oversaturation of parades in one of the most congested areas of New York City.[137] The Second Circuit found the City's interest in "keeping public spaces safe and free of congestion" was significant.[138] Additionally, the rule preventing new parades on Fifth Avenue did not prevent parades on any other [139]The *IAC* Plaintiff argued the ordinance was overbroad because the fifteen annually permitted parades did not use all of Fifth Avenue, but the Circuit Court found the city had justifications for the sections of Fifth Avenue that new parades could not get permits, including based on the location of hospitals and the number of parades that used different sections of the street. [140] The Second Circuit found the limitation on new parades on Fifth Avenue did not violate constitutional protections.

Contrasting the facts here with *IAC* is instructive. Where New York City prohibited new parades on one street, the City here barred all new special event permits for all "City owned

---

[134] *Int'l Action Ctr. v. City of New York*, 587 F.3d 521, 523 (2d Cir. 2009)

[135] *Id.*

[136] *Id.*

[137] *Id.*, at 524.

[138] *Id.*, at 527.

[139] *Id.*, at 528.

[140] *Id.*

property or within City Facilities"—a wholesale ban for new special events for six months.[141]
The City's own evidence demonstrates how overbroad this wholesale approach is. In the City's
list of recurring events, from 2022, different public facilities have extremely different use.[142]
Town Square for instance, lists 24 recurring events annually.[143] Vernon Worthen Park holds the
Downtown Farmers Market every Saturday from February through the first week of
December.[144]  In contrast, JC Snow Park—where the Allies Drag Show was scheduled to
occur—has 3 recurring events.[145] The Sunbowl has 4 recurring events.[146]

      The city's interests, including interests such as "the over usage of the parks, including
wear and tear on the property and grass," and "that the public facilities should be available to the
public and should not be over encumbered by scheduled special events" are significant and
legitimate interests.[147] But these interests are not well served by the Moratorium and its
exemption of recurring events.[148] The City did not craft the Moratorium to limit use of parks
known to be overused or to limit special events size, duration, location, or frequency. As an
example of the city's stated reason diverging with the Moratorium's exemptions, the Downtown
Farmer's Market is held every Saturday for nearly the entire calendar year at Vernon Worthen
Park.[149] Moreover, when Drag Stars sought to hold an event at Vernon Worthen Park on a
Friday, Reber told Drag Stars that "Due to the Farmer's Market we haven't allowed events in the

---

[141] Docket no. 54-11 at 2-5, filed June 9, 2023.

[142] Docket no. 54-2 at 2, filed June 9, 2023.

[143] Docket no. 54-2 at 2, filed June 9, 2023.

[144] Docket no. 54-2 at 5, filed June 9, 2023.

[145] Docket no. 54-2 at 2, filed June 9, 2023.

[146] Docket no. 54-2 at 2, filed June 9, 2023.

[147] Docket no. 54-12 at 3, filed June 9, 2023.

[148] Docket no. 54-11 at 2-5, filed June 9, 2023; docket no. 54-10 at 2-6, filed June 9, 2023.

[149] Docket no. 54-2 at 5, filed June, 9, 2023.

past the night before since they use that evening to mark and it cuts down on the overuse of the park."[150]

In operation, the Moratorium meant to prevent overuse of the public facilities and to balance use for special events with use by the community would bar a single new special event that might use an underutilized park (JC Snow) that had 3 recurring events in 2022, but allow a Farmer's Market that monopolizes a city park two days every week for many months. And the comparison of a nearly 3-month period of time in 2022 to that same period in the Moratorium shows that the Moratorium is ineffective—significantly more special events are occurring during the Moratorium this year than occurred in the same period in 2022.[151] The City's stated interests are wholly undermined by the Moratorium's exemptions.

The City also states that the Moratorium is necessary while new regulations are designed, vetted, and adopted.[152] To support the Moratorium, the City submitted an affidavit that seems to indicate the Moratorium— prohibiting all new special events on all city property—is necessary because the City is understaffed and Reber needs a break from processing new special event applications to research ordinances, "get surveys" and put "lawn signs out to the community."[153] Although the Moratorium applies to all public-owned property and public facilities, the City has conducted park surveys at only 3 parks.[154] The City's staffing concerns are significantly outweighed by the interests of the public at large to speak in public forums.

---

[150] Docket no. 34-9 at 22, filed May 30, 2023.

[151] Affidavit of Sarah Reber, docket no. 60-7 at ¶ 8, filed June 14, 2023.

[152] Docket no. 54-11 at 2-5, filed June 9, 2023; docket no. 54-10 at 2-6, filed June 9, 2023.

[153] Docket no. 60-7 at 2-

[154] Docket no. 54-13 at 2-4, filed June 9, 2023.

On one hand, the legitimate sweep of the Moratorium is severely undercut by the exemptions for recurring events. On the other hand, the outright prohibition of all new special event permits for all public facilities for a 6-month period results in an overly broad restriction that restricts substantial amounts of protected speech. The Moratorium sweeps within its prohibitions what may not be punished under the First Amendment by restricting all new speakers that would use special events to speak in traditional public forums. And the Moratorium restricts this speech for an unreasonable length of time. Such overbreadth substantially goes beyond the slight legitimate basis the Moratorium may have for some parks and some types of events. The stated exceptions to the Moratorium for certain events also do not save the Moratorium from being unconstitutionally overbroad on its face because the amount of prohibited speech is still very significant. The value of the prohibited speech is substantially greater than the City's stated interests -- that the Moratorium and its exemptions actually fail to advance.

Therefore, Plaintiffs have demonstrated a substantial likelihood of success on the merits that the Moratorium is unconstitutionally overbroad.

**B. The Advertising Prohibition is Unconstitutionally Vague**

A law affecting First Amendment rights is unconstitutionally vague on its face if it "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," or it "authorizes or even encourages arbitrary and discriminatory enforcement."[155] But even when a statute does not reach a "substantial" amount of protected speech, it may still "be impermissibly vague because it fails to establish standards for [government officials] and

---

[155] *Hill v. Colorado*, 530 U.S. 703, 732 (2000); *see also Friends of George's, Inc. v. Tennessee*, No. 23CV02163, 2023 WL 2755238, at *5-6 (W.D. Tenn. Mar. 31, 2023) (finding unconstitutionally overbroad and vague a statute criminalizing "adult cabaret entertainment" on public property or in a location where it could be viewed by a minor and granting a TRO enjoining the statute).

public that are sufficient to guard against the arbitrary deprivation of liberty interests."[156] Law must provide sufficient guidance to ward against "potential for arbitrarily suppressing First Amendment liberties."[157] "[W]here a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of those freedoms."[158] "Thus, in the First Amendment context, stricter standards of permissible statutory vagueness may be applied."[159]

The Advertising Prohibition is unconstitutionally vague. By not defining "advertise" or "promote" in the City Code, the Advertising Prohibition fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct is prohibited. The lack of clarity in the Advertising Prohibition is made clear from the comments of the City Council.

At the April 11 City Council meeting where Drag Stars appealed the Permit denial, Councilmember Larkin explained how little clarity is contained in the Advertising Prohibition:

> "We've known for, uh, as part of our discussions, that we do have a problem when it comes to exactly what we have meant by advertising. We had this conversation in the last meeting. Do we mean that you can say you are planning an event and are seeking vendors? You know, what exactly do we mean by that? Do we mean you are stating the location? And can that be done in advance? Can it be done not until the day you get the permit which is often the day before your event because of insurance? . . . it would be so much easier if everything was just clean, if we'd always said 45 days, if we'd always said no advertising and we knew what that meant, but nobody has really been able to say exactly what that's meant because we just haven't had to define it before . . ."[160]

---

[156] *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999).

[157] *Kolender v. Lawson*, 461 U.S. 352, 358 (1983).

[158] *Harmon*, 981 F.3d at 1151.

[159] *Doctor John's, Inc. v. City of Roy*, 465 F.3d 1150, 1157 (10th Cir. 2006) (cleaned up).

[160] Video of April 11, 2023 City Council Meeting at 33:07-34:07, docket 34-3, filed May 30, 2023.

Larsen echoed the vagueness in the Advertising Prohibition at the April 6, 2023, City Council meeting where she discussed the lack of clarity in the ordinance's definitions: "Some of it just comes down to definition. Organizing. Advertising. What is the difference? If you put it out to organize an event or advertise an event . . . I think that's one of the definitions we're going to have to come through."[161]

Additionally, the exceptions to the Advertising Prohibition lack clarity, which encourages arbitrary enforcement. City-sponsored events are exempted from the Advertising Prohibition's strict advertising bar.[162] City-sponsored is also undefined and there are no guidelines for what events are City-sponsored; the City Council can just arbitrarily decide whether they sponsor event.[163]

The Advertising Prohibition was arbitrarily enforced against Drag Stars when the Allies Drag Show Permit was denied. One of the events found to be advertising on Facebook before permit issuance during the March 21, 2023 intern investigation, Witchy Market, was still issued a permit because it was "City-sponsored."[164] Another event that posted an "agenda item for a conference" on a website was determined not to have been advertising the event.[165] Even still, Drag Stars' Permit was denied for a post on a vendor focused website.[166] Three events, three

---

[161] Video of April 6, 2023 City Council Meeting at 37:07-37:39, docket 34-2, filed May 30, 2023.

[162] City Code §§ 3-10-3 and 3-10-4(c), docket no. 54-1, filed June 9, 2023.

[163] March 9, 2023 City Council Work Meeting Audio Recording at 48:10-48:25, 53:30-53:50, https://www.sgcity.org/minutes/file/?id=1xptmR3O2In7TVNWPTvgoNFBimakNjRG4&file=1&type=mp3&time=00:43:07#t=00:43:07 (last accessed June 15, 2023)

[164] Docket 60-7 at 22, filed June 14, 2023, docket no. 34-7 at 58, filed May 30, 2023, docket no. 54-14 at 4, filed June 9, 2023. At the April 11, 2023 City Council Meeting, when questioned why Witchy Market was not denied a permit, Mayor Michelle Randall said "that one was City-sponsored, for D-week, for the University." Video of April 11, 2023 City Council Meeting at 37:02-37:17, docket 34-3, filed May 30, 2023.

[165] Docket no. 54-14 at 4-5, filed June 9, 2023 and DSTARS000057 in Exhibit A to Affidavit of Ryan Dooley, page 58 of docket no. 34-7, filed May 30, 2023.

[166] Docket no 34-7 at 23, 56, 58-60, filed May 30, 2023, docket no. 59 at 5, filed June 13, 2023.

different outcomes. Additionally, the City Council amended the Advertising Prohibition to exempt recurring and City-sponsored events to retroactively exempt another six events found to be violating the Advertising Prohibition.[167]

In sum, the Advertising Prohibition fails to establish standards for City officials and the public that are sufficient to guard against the arbitrary deprivation and suppression of protected speech. Plaintiffs have demonstrated a substantial likelihood of successfully showing that the advertising prohibition is unconstitutionally vague.

## C. The Advertising Prohibition and Moratorium are Unconstitutional Prior Restraints on Protected Speech

**Standard of Review.** Any prior restraint of expression "bear[s] a heavy presumption against its constitutional validity."[168] Laws that impose a permit requirement for engaging in communicative conduct must include clear guidelines for the government's permitting decision.[169] Permitting schemes must not give government officials unfettered discretion to grant or deny permission.[170] And a permit or license "for a First Amendment-protected [activities] must be issued within a reasonable period of time, because undue delay results in the unconstitutional suppression of protect speech."[171]

Laws that proscribe protected speech violate the First Amendment, unless the government demonstrates that: (1) "the [government]'s interests in proscribing [speech at issue] are substantial," (2) "the challenged regulation advances these interests in a direct and

---

[167] Docket no. 54-11, filed June 9, 2023.

[168] *Freedman v. State of Maryland*, 380 U.S. 51, 57 (1965).

[169] *Id.*; see also *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 133 (1992) (striking down parade permit ordinance requiring marchers to pay unspecified government-determined fees); *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 769–72 (1988) (striking down an ordinance giving the mayor authority to impose "terms and conditions deemed necessary and reasonable" in issuing permits for newspaper boxes).

[170] *ACORN v. City of Tulsa*, 835 F.2d 735, 740 (10th Cir. 1987).

[171] *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 228 (1990) (plurality opinion).

material way," and (3) "the extent of the restriction on protected speech is in reasonable proportion to the interests served."[172] To meet this burden, "a governmental body . . . must demonstrate that the [interests or] harms it recites are real and that its restriction will in fact [address or] alleviate them to a material degree."[173] A law "is unconstitutional 'if the governmental interest could be served as well by a more limited restriction on commercial speech.'"[174] "A content-neutral regulation [must be] narrowly tailored to serve a significant governmental interest and leave open ample alternative channels for communication."[175]

    *Advertising Prohibition:* The advertising prohibition is an unconstitutional prior restraint on protected commercial speech.[176] An event promoter is barred, absolutely, from promoting or advertising pending permit approval. It is not clear that the ban applies only after application – only that the ban ends upon permit issuance. Under the terms of the Advertising Prohibition, the City may deny event permits based on pre-application communications.

    By not defining "advertise," the City Code fails to give clear guidelines for the applicant and for the government's permitting decision. As discussed, the dictionary definition of "advertise" results in overly broad restriction to commercial speech, and that definition has not been uniformly applied to applicants (particularly given the newly enacted exception to the advertising prohibition which grants unfettered discretion to the City Council). This is

---

[172] *Aptive Env't, LLC v. Town of Castle Rock*, 959 F.3d 961, 987–88 (10th Cir. 2020) (quoting *Edenfield v. Fane*, 507 U.S. 761, 767 (1993)).

[173] *Edenfield*, 507 U.S. at 770–71; *accord Utah Licensed Beverage Ass'n v. Leavitt*, 256 F.3d 1061, 1071 (10th Cir. 2001).

[174] *Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1231-32 (10th Cir. 2005) (quoting *Cent. Hudson Gas & Elec. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 564 (1980)).

[175] *Bery v. City of New York*, 97 F.3d 689, 697 (2d Cir. 1996) (cleaned up).

[176] The City's Opposition focuses on the event permitting requirement as a whole, not on the Advertising Prohibition. Opposition at 27-28.

demonstrated in the City's admitted evidence that a meeting agenda posted on the internet (for a government-related group) was found not to be an advertisement.[177]

Time guidelines are also lacking. An applicant cannot know when a permit will issue. Some special event permits are issued a few days or a week or two before an event, so there is not a reasonable time to exercise protected commercial speech in advance of an event.[178]

Use of the Advertising Prohibition to deny permits is also subject to unfettered discretion by the ordinance language: "The special event application *may* be denied" for a violation of an ordinance or regulation.[179] The ordinance contains no guidance for application of the ultimate penalty of denial.

Additionally, the City's asserted interests in the Advertising Prohibition, (legal issues where significant money is spent advertising an event and then a permit is denied),[180] are not substantial. At the adoption of the Advertising Prohibition, the City Manager stated "if an event is advertised prior to getting approval, the City is not at fault, the promotor is."[181] There is no evidence of this speculative harm of loss to an event promoter ever occurring; no evidence that the City would have liability for the loss; and no evidence of the significance of any loss amount.

The advertising prohibition also does not advance the asserted interest in a direct and material way (particularly given the number of events that fall within the newly enacted exceptions). Any protection the city might gain from barring advertising for new events is

---

[177] Docket no. 54-14 at 4-5, filed June 9, 2023, and DSTARS000057 in Exhibit A to Affidavit of Ryan Dooley, page 58 of docket no. 34-7, filed May 30, 2023.

[178] *Supra,* at 14, *citing* docket 60-7 at 18-23, filed June 14, 2023.

[179] City Code 3-10-8 A. and A.1 (emphasis added).

[180] *Supra,* at 15, citing video of April 6, 2023 City Council Meeting at 38:37-39:12; docket 34-2, filed May 30, 2023.

[181] Docket 60-4 at 4, filed June 14, 2023.

overshadowed by the permission for recurring and city sponsored events to advertise. It would make sense that the promoter of a recurring event could have a larger ad budget – and loss – and claim than a one-time new event applicant if a permit were denied after years of approvals.

The extent of the advertising prohibition's restriction on protected commercial speech until issuance time is not in reasonable proportion to the interests served. An applicant is motivated to prepare early. But the ordinance imposes a ban on all communication (advertising) or organization (promoting) until issuance. The provision is unworkable in practice as shown by the expansive exceptions granted.

The lack of a substantial interest is well demonstrated by the eight years of non-use of the provision to deny permit issuance. This factual record is clear that the enforcement only arose as a means to block Plaintiffs' event.[182]

The City's asserted interests could be served as well by a more limited restriction on commercial speech, such as requiring advertisements to state a permit is pending,[183] having the exception apply to all applications so that advertising is permitted after preliminary approvals, or having applicants sign a release of liability applicable if a permit is denied after advertisements are posted. Councilmember Danielle Larkin explained another alternative could be advertising prior to final approval without a location.

Therefore, Plaintiffs have demonstrated a substantial likelihood of success on the merits that the Advertising Prohibition is an unconstitutional prior restraint.

*Moratorium:* The Moratorium is an unconstitutional prior restraint on protected speech as to Plaintiffs' event. The City's asserted interests in protecting city parks and having time to study

---

[182] *Supra*, pp. 7, citing docket no. 62-1, at 2, filed June 15, 2023; docket no. 62-2 at 2, filed June 15, 2023.

[183] Reply at 12; Motion at 20-21.

public facility use are substantial. But the Moratorium is a comprehensive ban, without regard to the actual use of any specific facility. The number of events that fall within the exceptions for recurring events and city-events and the fact that the parks were used more this spring than last spring shows that the City is not committed to the interests it asserts.[184] The Moratorium fails to distinguish or balance events involving expression and other events.

The City's asserted interests could be better served by a general restriction on all events, regardless of their sponsorship or recurring nature, or a restriction as to specific overused facilities. The City could limit the size and duration of events, conduct more studies of park use, or scale fees proportionate to the burden of specific uses. Acknowledgment of the need to accommodate events implicating First Amendment rights is also necessary. Expressive events need special consideration.

Plaintiffs have demonstrated a substantial likelihood of success on the merits that the Moratorium as applied to their June 30 event is an unconstitutional prior restraint. This order will not affect other events not implicating First Amendment rights.

### D. The City's Unprecedented Enforcement of the Advertising Prohibition and the Moratorium Barring was Unconstitutional Discrimination

### (1)   Drag Stars' Planned Allies Drag Show is Protected Speech.

The First Amendment prohibits the government from making a law "abridging the freedom of speech" except in very limited well-delineated ways.[185] "Speech" includes "expressive conduct"[186] and live entertainment, such as musical and dramatic works . . . ."[187] Avalōx and another Drag artist scheduled to be at the Allies Drag show explain that drag "is an

---

[184] Affidavit of Sarah Reber, docket no. 60-7 at ¶ 8, filed June 14, 2023.

[185] U.S. Const. amend. I, *R.A.V. v. St. Paul*, 505 U.S. 377, 382

[186] *Texas v. Johnson*, 491 U.S. 397 (1989).

[187] *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65 (1981).

art form, a source of entertainment, and a form of activism"[188] and conveys a "valuable political message to convey that individuals with gender presentation and identities outside the majoritarian norm are welcome in public places."[189] Given current political events and discussions, drag shows of a nature like the planned Allies Drag Show are indisputably protected speech and are a medium of expression, containing political and social messages regarding (among other messages) self-expression, gender stereotypes and roles, and LGBTQIA+ identity. Accordingly, Drag Stars' Allies Drag Show is protected speech under the First Amendment.[190] The City's arguments to the contrary do not merit discussion.[191]

The City's related argument that it has a compelling interest in protecting children from obscene material is wholly unsupported on the record as to Plaintiffs' permit. To be clear: there is no question that governments have a legitimate interest in protecting children from genuine obscenity.[192] But the City has not provided a shred of evidence that would implicate that legitimate interest. Moreover, that legitimate interest "does not include a free-floating power to restrict the ideas to which children may be exposed. Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them."[193] Moreover, "speech that is not obscene—which may even be harmful to minors—is a different category from obscenity. Simply put, no majority of the Supreme Court has held that sexually explicit—but not

---

[188] Declaration of Tara Lipsyncki, docket no. 34-5 at 2, filed May 30, 2023.

[189] Declaration of Mikski Avalox, docket no. 34-6 at 2-3, filed May 30, 2023.

[190] *Norma Kristie, Inc. v. City of Oklahoma City*, 572 F. Supp. 88, 92 (W.D. Okla. 1983), *Friends of Georges, Inc. v. Mulroy*, No. 223CV02163TLPTMP, 2023 WL 3790583, at *19 (W.D. Tenn. June 2, 2023).

[191] *See* docket no. 54 at 22-24, filed June 9, 2023.

[192] *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 793-95 (2011).

[193] *Brown*, 564 U.S. at 794–95.

obscene—speech receives less protection than political, artistic, or scientific speech."[194] Critically, the City has presented no evidence that the Allies Drag Show was anticipated to be anywhere close to satisfying even one prong of the *Miller* standard establishing whether a work is legally obscene.[195]

      (2)      <u>The City's Discriminatory Actions Fail to Satisfy Strict or Intermediate Scrutiny.</u>

When laws regulate speech in traditional public forums, such as public parks, the government's right "to limit expressive activity [is] sharply circumscribed."[196] In a traditional public forum, the government must prove either that (1) the regulation is content-neutral, narrowly tailored to serve a significant government interest and leaves open ample alternative channels of communication (*i.e.* intermediate scrutiny) or (2) if the regulation is content-based, that it is narrowly tailored to serve a compelling government interest (*i.e.* strict scrutiny).[197]

But even laws that are content- or viewpoint-neutral on their face can be enforced in a discriminatory manner,[198] in which case, strict scrutiny is required. Impermissible discrimination in enforcing a seemingly content-neutral law may be found based on: (1) "statements by government officials on the reasons for an action," (2) "where the government states that it rejects something because of a certain characteristic, but other things possessing the same

---

[194] *Friends of Georges, Inc. v. Mulroy*, No. 223CV02163TLPTMP, 2023 WL 3790583, at *19 (W.D. Tenn. June 2, 2023).

[195] *See Miller v. California*, 413 U.S. 15, 24 (1973).

[196] *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983).

[197] *Id.*

[198] *See Hoye v. City of Oakland*, 653 F.3d 835, 854 (9th Cir. 2011) (holding that facially valid ordinance could not constitutionally be enforced in content-discriminatory manner); *see also Thomas v. Chi. Park Dist.*, 534 U.S. 316, 325 (2002) (explaining that pattern of denying waivers to disfavored speakers under otherwise valid statute "would of course be unconstitutional"); *Harmon v. City of Norman*, 981 F.3d 1141, 1148 (10th Cir. 2020) (a neutrally written ordinance can be deemed content-based discrimination if "adopted . . . because the [government] disagreed with a message being conveyed.").

characteristic are accepted", or (3) "where the viewpoint-neutral ground is not actually served very well by the specific governmental action at issue; where, in other words, the fit between means and ends is loose or nonexistent."[199] Last-minute policy changes that break from past practice also may support a finding of pretext: where stated reasons for excluding protected speech are "of such recent vintage. . . and such a break with past traditions," they may be pretexts for content or viewpoint discrimination.[200] And "authority to grant an exemption [to a law] on a 'case-by-case' basis is precisely the sort of discretionary process that the Supreme Court has condemned"[201] as giving rise to discriminatory enforcement.

*Advertising prohibition:* The City's Advertising Prohibition does not withstand either strict or intermediate scrutiny. Assuming *arguendo* that the general prohibition preventing advertising is a content-neutral restriction, the exception which exempts out "events for which the city is a sponsor" turns the restriction content based. City-endorsed events, including expressive events, are presumed permissible while other events are not on an even playing field, subject to restraint. As the City's responses and submitted evidence show, there are no guidelines to determine what "City-sponsorship" means. It is an undefined term in the ordinance, and the city can arbitrarily decide to "sponsor events and activities in the city that support Our Mission, Vision, and Values."[202] The Advertising Prohibition is therefore, content-based because it facially restricts content that is not "City-sponsored." Strict scrutiny applies to the Advertising Prohibition.

---

[199] *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 87 (1st Cir. 2004).

[200] *Mesa v. White*, 197 F.3d 1041, 1048 (10th Cir. 1999).

[201] *Ass'n of Cmty. Orgs. for Reform Now (ACORN) v. Mun. of Golden*, 744 F.2d 739, 749 (10th Cir. 1984) (citing *Sec'y of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 964 n.12 (1984)).

[202] Docket 60 at 2, filed June 14, 2023, Docket 60-2 at 2, filed June 14, 2023, docket 54-1 at 2-7, filed June 9, 2023.

The City's asserted interests in the Advertising Prohibition are non-existent or, at best, completely illusory. The City argues vaguely about confusion and public order being enhanced because applicants would not want to advertise "an event that may not be approved.[203] One council member speculated that the prohibition may prevent legal issues arising if an event is advertised and a permit is not issued.[204] The City provides no evidence of experience with these interests. And they are wholly undercut by reality. When the City reviewed pending permit applications on March 21, 2023, 12 out of 16 were advertising without a permit[205] demonstrating that applicants do not appear concerned about the risk of advertising if a permit is denied. Additionally, the City rarely denies permits.[206] Out of the 231 events the City's spreadsheet for events in 2022 and through June 2023, only 10 are listed as denied.[207] Of those 10 denied permits, two are related to the March 31 Advertising Prohibition Denials at issue here.[208] Another four denials are related to conflicts between the Downtown Farmer's Market and other events, leaving only 4 denials on the merits out of 231 events.[209] So the risk of loss from fruitless advertising is very small while the overwhelming number of applicants would benefit from more advertising time. In sum, the City's interest are not even close to compelling interests.

Even if the City had compelling interests, the Advertising Prohibition is not narrowly tailored serve those interests. As explained above, the ordinance does not define "advertise" or "promote" and the ordinary meaning of these words is so broad they could restrict organizing

---

[203] Docket no. 54 at 27, filed June 9, 2023.

[204] Video of April 6, 2023 City Council Meeting at 38:37-39:12, docket 34-2, filed May 30, 2023.

[205] Docket no. 34-7 at 56, 58-60, filed May 30, 2023.

[206] Docket 60-7 at 3, 19-23, filed June 14, 2023.

[207] Docket 60-7 at 3, 19-23, filed June 14, 2023.

[208] Docket 60-7 at 3, 19-23, filed June 14, 2023.

[209] Docket 60-7 at 3, 19-23, filed June 14, 2023.

and gathering information to complete a special events permit.[210] More than one member of the City Council discussed how broad the prohibition could be.[211] And when over 40% of the special permits are issued 2 weeks or less before an event,[212] special event organizers are severely restricted from advertising and promoting their events.

Even if the advertising prohibition were considered content neutral, Plaintiffs have shown it is being discriminatorily enforced against Plaintiffs based on content and viewpoint, thus requiring strict scrutiny. The record evidence is replete with statements and conduct of the City Councilmembers since at least June 2022 which demonstrate severe animus towards Drag Stars' protected speech and viewpoint. These facts include:

- City officials, including a majority of the City Council led by Tanner, attempted to have the special event permit revoked for the *We're Here* drag show—the same viewpoint as Drag Stars.[213]

- Despite counsel to the contrary, a majority of the City Council ordered then City Manager Lenhard to revoke or deny the *We're Here* permit.

- In texts among the City Council, Tanner has argued there are no First Amendment issues with her position that drag should not be performed in public.

- Tanner has applauded anti-drag legislation.[214]

- The City Council forced former City Manager Lenhard to resign because he refused to revoke or deny the *We're Here* permit and then settled a threatened wrongful termination claim for $625,000.

- In January 2023, Tanner attempted to revoke City-sponsorship for St. George's Downtown Farmers Market, whose owner hosted a Drag Stars Christmas drag photobooth at another one of its businesses.

---

[210] *Supra* at 25.

[211] Video of April 11, 2023 City Council Meeting at 37:07-37:39, 33:07-34:07, docket 34-3, filed May 30, 2023.

[212] Docket 60-7 at 18-23, filed June 14, 2023.

[213] Docket no. 34 at 6, filed May 30, 2023; June 3, 2022 Instagram Post of Councilmember Michelle Tanner (@michelletannerusa), https://www.instagram.com/p/CeWlnkaphwq/ (last accessed June 15, 2023).

[214] *See generally* Docket no. 34-4, filed May 30, 2023 (Podcast recording featuring Tanner where she advocated for anti-drag legislation).

- Tanner stated the drag photobooth "violate[d] community standards," and that she opposes drag "when it involves children" or all-ages locations.

- On March 8, 2023, Reber flagged the Drag Stars Permit application and the application for "Pride 2023" due to the "sensitive nature" of the events.[215]

- The Allies Drag Permit was denied despite no substantial concerns raised by members of the SERC.[216]

- The impetus for investigation of the Allies Drag Show was a targeting text message sent to Tanner:[217]



[215] Docket no. 34-9 at 39, filed May 30, 2023.

[216] Docket no. 34-10 at 16-24, filed May 30, 2023.

[217] Docket no. 62-1, at 2, filed June 15, 2023.

- Tanner immediately looked for reasons to deny the Allies Drag Show Permit, finding the Advertising Prohibition, and inquired after a business that hosted Drag Stars:

> **Michelle Tanner** <michelle.tanner@sgcity.org>                    Fri, Mar 17, 2023 at 2:59 PM
> To: Tani Downing <tani.downing@sgcity.org>, Ryan Dooley <ryan.dooley@sgcity.org>, Jami Brackin
> <jami.brackin@sgcity.org>, John Willis <john.willis@sgcity.org>, Michele Randall
> <michele.randall@sgcity.org>
>
> Good afternoon legal team,
>
> I have been receiving more complaints this week from residents regarding adult entertainment being
> performed in front of children, as well as in areas not zoned for adult entertainment performances. I
> have had an concerned local mental health therapist contact me regarding a drag performance in
> Vernon Worthen Park in April (sounds like Southern Utah Drag Stars may have started advertising
> before receiving a permit which I believe violates our ordinance). Southern Utah Drag Stars has also
> performed adult entertainment at times advertised for all ages and at times advertised as 18+ at Cafe
> Elevato. Is Cafe Elevato zoned for this type of entertainment and would they require permits to do so?
>
> Thanks for the clarification.
>
> Michelle Tanner

- On March 21, 2023, City Officials met and decided to research a never-previously-enforced Advertising Prohibition.[218]

- Willis then directed staff to research which pending special event applications were advertising in violation of the Advertising Prohibition.[219]

- A high-school intern was tasked with determining which events were violating the Advertising Prohibition, despite "advertising" being undefined.

- 12 of 16 events with applications pending were found to be "advertising" in violation of the Advertising Prohibition, further undercutting any legitimate City interest.

- Despite claims the City needed to follow the ordinance, on March 31, 2023, a majority of the City Council directed Willis and Downing to strictly enforce a revised Advertising Prohibition—not as written at the time—that exempts out "City-sponsored" events (giving the City Council unfettered ability to exempt any event it agrees with) and recurring events (further delegitimizing any illusory interest the City might have in the Advertising Prohibition).[220]

---

[218218] Docket no. 60-3 ¶ 7 at 3, filed June 14, 2023.

[219] Docket no. 60-3 at 3, filed June 14, 2023; docket no. 34-7 at 56, filed May 30, 2023.

[220] Docket no. 60-3 at 4, filed June 14, 2023.

- The City never gave any indication to Plaintiffs that there were any issues with the Drag Stars Permit before abruptly denying the permit based on the Advertising Prohibition.[221]

- On April 6, 2023, the City Council voted to amend the Advertising Prohibition to exempt "City-sponsored" events and recurring events, giving the City Council the unfettered ability to bar the Council chooses not to sponsor from advertising and retroactively exempting the majority of events found to be violating the Advertising Prohibition during the March 21 investigation.[222]

- Tanner, while participating in a City Council meeting, wore the same sticker logo many public commenters wore during an April 6, 2023 City Council meeting at which at least 9 commenters expressed anti-trans sentiment, anti-drag comments, or specifically thanked the City Council for denying Drag Stars' Permit.[223] After the meeting, Tanner publicly posed on social media with the same logo sticker for Protect Utah's Kids she wore during the hearing and praised the public comments made during the council meeting.[224]

- On her website that displays her role as a City Councilmember, Tanner expresses that she "opposes attempts to normalize men scantily dressed as women, gyrating in front of children."[225]

- Witchy Market was still issued a permit even though it was violating the statute in force at the time of its event on March 25, 2023.

- Another event that posted an "agenda item for a conference" on a website was determined not to have been advertising. The City provided no evidence showing how Drag Stars was determined to be advertising and this other event was determined not to be advertising.

- A majority of the identified violators of the Advertising Prohibition were retroactively exempted from the prohibition for being City-sponsored or recurring events.

- Only three events of the eleven "violating" events were denied permits.

- A majority of the City Council voted to deny Drag Stars' appeal even though more than one member of the city council expressed that there was no clear definition of advertising

---

[221] Docket no. 54-14 at 4, filed June 9, 2023.

[222] City Code §§ 3-10-3 and 3-10-4, docket 54-1 at 4, filed June 9, 2014.

[223] *See generally* Video of April 6, 2023 City Council Meeting, docket 34-2, filed May 30, 2023.

[224] April 6, 2023 Instagram Post of Councilmember Michelle Tanner (@michelletannerusa), https://www.instagram.com/p/CquC_gwtAFr/ (last accessed June 15, 2023).

[225] LGBTQIA+ webpage of Website of "Michelle Tanner, St. George, Utah City Council," https://www.michelletannerutah.com/michelle-tanner-political-views/lgbtqia (last visited June 15, 2023).

and the Council knew that the Advertising Prohibition had not been previously enforced.[226]

- The timing of the City investigating the use of the special events process and park overuse began on the same day, July 14, 2022, that Lenhard was told he was being fired for refusing to deny the We're Here drag show event permit.[227]

- The Moratorium was enacted as the Drag Stars application was pending, preventing Drag Stars from filing a new application.

The record facts viewed together demonstrate quintessential pretextual discrimination seeking to prevent the Allies Drag Show from occurring. Strict Scrutiny applies, and as explained above, the Advertising Prohibition cannot withstand such scrutiny.

Even if intermediate scrutiny were applied, the advertising prohibition cannot stand. The outright prohibition of advertising before a permit's issuance substantially restricts speech more than necessary to further the City's nonexistent interests. Other less restrictive alternatives such as having the exception apply to all applications, or having applicants sign a release of liability if a permit is denied after advertisements are posted, would achieve the City's asserted interests. Larkin even suggested advertisements could be made without listing the location until after final approval as an alternative.[228] Under any level of scrutiny, the Advertising Prohibition fails.

Therefore, Plaintiffs have demonstrated a substantial likelihood of success on the merits regarding the unconstitutional denial of their special event permit application based on the advertising prohibition.

*Moratorium:* The Moratorium does not withstand intermediate scrutiny. The Moratorium is a content-neutral restriction that requires intermediate scrutiny. The outright prohibition of

---

[226] Video of April 11, 2023 City Council Meeting at 33:07-34:07, docket 34-3, filed May 30, 2023.

[227] Docket no. 54 at 26, filed June 9, 2023.

[228] Video of April 6, 2023 City Council Meeting at 36:27-36:37, docket 34-2, filed May 30, 2023

new special event permits for all public facilities for a 6-month period substantially restricts speech more than necessary to further the City's legitimate interests in the Moratorium, including "the over usage of the parks," "wear and tear on the property and grass," and concerns "that the public facilities should be available to the public and should not be over encumbered by scheduled special events."

The Moratorium bars all new special events from occurring on all "City owned property or within City facilities."[229] Other less restrictive alternatives would have achieved the City's asserted interests. The City could have instead crafted the Moratorium to limit use of parks known to be overused or to limit special events size, duration, location, or frequency. In the City's list of recurring events, from 2022, different public facilities have extremely different use.[230] Town Square for instance, lists 24 recurring events annually.[231] Vernon Worthen Park holds the Downtown Farmers Market every Saturday from February through the first week of December.[232] In contrast, JC Snow Park—where the Allies Drag Show was scheduled to occur— has 3 recurring events.[233] The Sunbowl has 4 recurring events.[234] The Moratorium could have accomplished the City's objectives with significantly less restriction on speech.

Additionally, the exemption swallows the Moratorium. The Moratorium does not apply to recurring events. The Downtown Farmer's Market is a recurring event and is held every Saturday for ten months of the year at Vernon Worthen Park.[235] And the City also prevents

---

[229] Docket no. 54-11 at 2, filed June 9, 2023.

[230] Docket no. 54-2 at 2, filed June 9, 2023.

[231] Docket no. 54-2 at 2, filed June 9, 2023.

[232] Docket no. 54-2 at 5, filed June 9, 2023.

[233] Docket no. 54-2 at 2, filed June 9, 2023.

[234] Docket no. 54-2 at 2, filed June 9, 2023.

[235] Docket no. 54-2 at 5, filed June, 9, 2023.

events at Vernon Worthen Park on Fridays prior to the Farmer's Market.[236] The Moratorium could have alternatively limited the frequency of serial events like the farmer's market or been crafted without the exemption for recurring events but limiting the duration, frequency, or size of events. But because the Moratorium exempts recurring events, the Farmer's Market can continue to monopolize a City park while a new event is automatically barred by the Moratorium, even if it would have been held at an underutilized facility or park.

A comparison of a nearly 3-month period of time in 2022 to that same period in the Moratorium shows that the Moratorium is ineffective—significantly more special events occurring during the Moratorium this year than occurred in the same period in 2022.[237] The Moratorium could have been alternatively crafted to limit particularly burdensome recurring events recurring events to being held every other year. The city could also have increased fees to offset increases in public forum maintenance. The Moratorium could have also limited larger recurring events to smaller size or required the most burdensome events to be held only at particular locations that would reduce wear, or require burdensome events to rotate locations each time they are held.

All of these alternative constructions of the Moratorium would achieve the City's asserted interests without the complete bar to speech that would occur for new special events. Accordingly, the Moratorium does not survive intermediate scrutiny.

Therefore, Plaintiffs have demonstrated a substantial likelihood of success on the merits regarding the Moratorium being an unconstitutional restriction on protected speech.

---

[236] Docket no. 34-9 at 22, filed May 30, 2023.

[237] Affidavit of Sarah Reber, docket no. 60-7 at ¶ 8, filed June 14, 2023.

### 2.   Plaintiffs Will Continue to Suffer Irreparable Harms Without Injunctive Relief

[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."[238] Indeed, "when an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."[239] The combination of the denial of Plaintiffs' permit application and the Moratorium prohibits Plaintiffs from expressing protected speech on traditional public forums several more months. This is an irreparable harm.

### 3.   The Balance of Harms Tips Heavily in Plaintiffs' Favor

The harm from restriction of Plaintiffs' rights to free speech and expression outweighs the Defendants' interests in avoiding non-traditional use of a public space or opposition of vocal citizens. The record has sparse evidence of actual harm to the interests of Defendants.

### 4.   The Public's Interest in Protecting Constitutional Rights is Paramount

When the government opposes a preliminary injunction, the final two factors—the balance of equities and the public interest—merge.[240] Protection of a party's constitutional rights against governmental action that violate those rights is always in the public interest.[241] And the public interest is served by the same protection of rights.

### 5.   No Bond is Required

Trial courts possess "wide discretion under Rule 65(c) in determining whether to require security."[242] The rule only requires bond "in an amount that the court considers proper."[243]

---

[238] *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1190 (10th Cir. 2003) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

[239] *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012).

[240] *See Aposhian v. Barr,* 958 F.3d 969, 978 (10th Cir. 2020) (citing Nken v. Holder, 556 U.S. 418, 435 (2009)).

[241] *Awad* at 1131.

[242] *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1215 (10th Cir. 2009).

[243] Fed. R. Civ. P. 65(c).

When a preliminary injunction "enforces fundamental constitutional rights against the government … [w]aiving the security requirement best accomplishes the purposes of Rule 65(c)."[244] No bond will be required.

### 6.   Summary of Analysis of Entitlement to Preliminary Injunction

Plaintiffs' entitlement to a preliminary injunction is quite clear.

**The Advertising Prohibition and Moratorium are overbroad.** They have blanket effects, though for limited periods of time, with very little protection of vaguely articulated and unproven City interests and are thus impermissible. The policies underlying the Advertising Prohibition and Moratorium are inconsistent with the many exceptions the City has granted, which belies the City's stated interests.

The scope of the Advertising prohibition is vast due to the lack of definition of "advertise" and "promote,"

The Advertising Prohibition is unworkable in practice because of the need for event planners to communicate and solicit support to prepare to apply for a permit and hold an event. The lack of any enforcement history for the Advertising Prohibition before March 2023 demonstrates the slight value of the City's claimed interest. There are many alternative means of protecting genuine interests.

The blanket effect of the Moratorium on all City property and facilities is not supported by empirical evidence related to specific facilities and the variety of their level of use and maintenance. The argument that the Moratorium is less impactful because it only suspends all activities for three more months, six months in all, reflects a failure to properly respect the value of expression.

---

[244] *United Utah Party v. Cox*, 268 F. Supp. 3d 1227, 1260 (D. Utah 2017) (cleaned up)

**The Advertising Prohibition employed to deny Plaintiffs' event application is unenforceably vague in many ways**. It does not define the prohibited activities in certain terms. "City-sponsored" is also an undefined term. The haphazard exceptions granted and the lack of guidelines for permit decisions and issuance demonstrate the unworkability of the Advertising Prohibition.

**The Advertising Prohibition and Moratorium are impermissible prior restraints on speech.** To bar all communication about an event until a permit is approved is not just overbroad but an impermissible prior restraint on the exchange of idea. Similarly, to bar all public location events for a six month period is an invalid prior restraint, even though not based on content. Government does not have the right to halt or suppress general speech.

By applying to all speech regarding public events, the Advertising Prohibition exceeds permissible limits. The Advertising Prohibition is remarkably free of guidelines for granting exceptions, timelines for granting permits, and denial for permits for its violation. It is grounded in slimly defined government interests based on speculation, not on experience. Those interests never required its enforcement until Plaintiffs' permit application. There are much more narrowly tailored options for formulation of an ordinance to protect even the speculative interests.

By imposing a blanket bar on all new public events until mid-September 2023, the Moratorium, as applied to expressive events, is also a prior restraint on speech. The City has legitimate interests at stake but the absolute bar for a six month period failed to distinguish between constitutionally protected events and others, to offer alternative venues, or to distinguish between overused and other facilities. There are alternative methods of protecting the City's interests.

**The City's Unprecedented Enforcement of the Advertising Prohibition and the Moratorium Barring was Unconstitutional Discrimination.** The Drag Stars planned show is protected speech, applicable to traditional public forums. The City has failed to show that the Advertising Prohibition, with its exception for City-sponsored events, facially passes strict or intermediate scrutiny. It is neither narrowly tailored to serve a compelling government interest nor narrowly tailored to serve a significant government interest and leaving open ample alternative channels of communication. The City's asserted interests in the Advertising Prohibition are speculative. The City has betrayed those interests by granting a wide swath of exceptions. The undefined meaning of "advertise" and "promote" is so inclusive to defy tracing to specific City interests or applicant activities.

And even more compelling, its application against Plaintiffs is demonstrated by the record to be discriminatory based on content and viewpoint. The event timeline could hardly demonstrate discrimination more clearly. Failing to understand the vital nature of the First Amendment right of expression, the City has effectuated the will of vocal objectors at the expense of an unpopular group, with unpopular content and viewpoint. The Advertising Prohibition emerged from years of neglect to become a weapon against Plaintiffs.

The application of the Moratorium to Plaintiffs' permit does not survive intermediate scrutiny. The outright prohibition of new special event permits for all public facilities for a 6-month period substantially restricts speech more than necessary to further the City's stated interests in the Moratorium. Other less restrictive means could meet the City's needs, and specifically and proportionately apply to the facilities needing protection. Because the exemptions and failures to take effective action to prevent overuse have resulted this year on a greater burden on City facilities than last year, the Moratorium is a demonstrated failure.

### 7.  Fitting the Remedy

In devising a remedy for wrongful denial of a permit application for a past event, it is necessary to fit current reality. April 28, 2023, is past, and Plaintiffs seek an event on June 30, 2023.[245]

Defendants have provided information about park availability, saying that there would be significant conflicts on June 30, 2023, for some City Parks.[246] However, Defendants state that "[t]he Sunbowl is currently unreserved and, upon information and belief, could accommodate a special event with 500 attendees on June 30, 2023."[247]

As to JC Snow Park, where the City had suggested the event be held in an email sent March 10, 2023,[248] there may be an inconsistency with the timeframes in the Plaintiffs' permit application and another scheduled event at JC Snow Park.

**Plaintiffs' application cover sheet is not inconsistent with the other JC Snow scheduled event**. Plaintiffs' application cover sheet shows the following time frames for their proposed event.

| 4. EVENT DETAILS: | | [enter Start & End times as HH:MM] | |
|---|---|---|---|
| Set-up | Date: 04/28/2023 | Start time: 12:00 P.M. NOON | End time: 5:00 PM |
| Event | Date: Friday, April 28th, 2023. | Start time: 5:00 PM | End time: 7:30 PM |
| Clean-up | Date: 04/28/2023 | Start time: 7:30 PM | End time: 10:00 PM |

These time frames would not conflict with the timeframes stated by Tawnee Graywolf, the St. George City Administrative Professional for Parks, for the other scheduled event. According to her affidavit, "JC Snow Park is reserved on June 30. 2023 for Artie Bus from 11:00 a.m. -

---

245 *Supra* at 22.

246 Affidavit of Tawnee Graywolf ¶ 5., docket no. 60-10, filed June 14, 2023.

247 Affidavit of Tawnee Graywolf ¶ 6., docket no. 60-10, filed June 14, 2023.

248 Email from Sarah Reber to Mitski Avalox, March 10, 2023 (DSTARS000131), page 22 of docket no.34-9, filed May 30, 2023.

noon."[249] This is an event involving 15-20 children and another 15-20 parents.[250] The timeframes on Plaintiffs' application cover sheet for their event and those stated by Ms. Graywolf for the other event are not inconsistent.

**Plaintiffs' application narrative and a second City employee's affidavit create inconsistency between Plaintiffs' event and the "Artie Bus" event.** The *narrative* on Plaintiffs' permit application shows different timeframes than the cover sheet.

> and two exits. Set-up will begin at 10 am and will go on until 3 p.m. where vendors begin to set up. At 5 p.m., the festival will begin and at 6:30, the stage will be used to start a show that will have local music artists sing and performance actors perform. The show will be done by 8 p.m. which will leave an hour for patrons to roam around until it ends at 9 p.m. Take down will commence and will finish at 10 p.m.

The inconsistency is in the narrative setup start time of 10 am which conflicts with the "Artie Bus" event. (The narrative also splits the set-up time between event setup and vendor setup and the show time.)

Another inconsistency between Plaintiffs' event and Artie Bus may arise. According to the Affidavit of Peyton Smith, "Artie the Arts Bus" events sometimes extend for a longer time, for setup and clean up.

> The parks are typically reserved from 11:00 am to 12:30 pm for the actual hands-on art and musical activities. However, employees involved in Artie the Arts Bus and Performers in the Park arrive prior to the reserved time to set up and stay after the reserved time to clean up.[251]

Smith also recites a 'typical' reservation time which is longer, but Ms. Greywolf is clear on this event timeframe. Smith also says there is setup before and clean up after the reserved time.

Neither the Graywolf affidavit nor the Smith affidavit actually enclose the Artie Bus (or Artie the Arts Bus) permit, and the Graywolf affidavit says only that the Artie Bus reservation

---

[249] Affidavit of Tawnee Graywolf ¶ 5.c., docket no. 60-10, filed June 14, 2023.

[250] Affidavit of Peyton Smith ¶ 6, docket no. 62-3, filed June 15, 2023.

[251] Affidavit of Peyton Smith ¶ 5, docket no. 62-3, filed June 15, 2023.

was "processed," not that it was issued. However, the existence and terms of the reservation are taken at face value.

**Election Required:** Because both parties require certainty, and the terms of the preliminary injunction must be specific, Plaintiffs must file an election, on or before June 21, 2023, at 4:00 p.m. to hold their event at:

a. the Sun Bowl on June 30, 2023, with the timeframes in their application narrative; or
b. JC Snow Park, starting setup at 12:30 pm and otherwise observing times in their application narrative.

## ORDER AND PRELIMINARY INJUNCTION

THEREFORE, IT IS HEREBY ORDERED that the Motion for Preliminary Injunction[252] is GRANTED and a Preliminary Injunction is ORDERED, as specified below.

IT IS FURTHER ORDERED, ADJUDGED and DECREED that Defendants and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them are ORDERED, ENJOINED AND RESTRAINED as follows:

a. The City is ORDERED to reverse its denial of Plaintiffs' Application for their April 28, 2023, Event and issue a permit, treating the application as if submitted for the June 30, 2023, date at either JC Snow Park or the Sun Bowl, consistent with the election made by Plaintiffs and timing specified in this order. Plaintiffs' event shall take scheduling precedence over any other event.

b. The City is ENJOINED from enforcing the advertising prohibitions in City Code § 3-10-3 and 3-10-4(c) as presently drafted. The City also may not enforce new advertising prohibitions against Plaintiffs' June 30, 2023, event.

---

[252] Docket no. 34, filed May 30, 2023.

     c.   The City is ENJOINED from enforcing the Moratorium ordinance, City Ordinance

         No. 2023-03-003 as to Plaintiffs' permit application.

IT IS FURTHER ORDERED that the parties shall meet, confer, and by July 31, 2023 file an

attorney's meeting planning report and submit a proposed scheduling order for resolution of the

issues presented in the case. See Civil Case Scheduling | District of Utah | United States District

Court (uscourts.gov).

     Signed June 16, 2023.

                     BY THE COURT

                     David Nuffer
                     United States District Judge

56