# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

| | |
|---|---|
| SPECTRUM WT, BARRETT BRIGHT, and LAUREN STOVALL, | |
| Plaintiffs, | Case No.: 2:23-cv-00048-Z |
| v. | |
| WALTER WENDLER, in his individual capacity and his official capacity as the President of West Texas A&M University, | Hon. Matthew J. Kacsmaryk |
| CHRISTOPHER THOMAS, in his official capacity as Vice President for Student Affairs at West Texas A&M University, | **PLAINTIFFS' BRIEF IN SUPPORT OF RULE 62(d) MOTION FOR INJUNCTION PENDING APPEAL** |
| JOHN SHARP, in his official capacity as Chancellor of the Texas A&M University System, | |
| ROBERT L. ALBRITTON, JAMES R. BROOKS, JAY GRAHAM, MICHAEL A. HERNANDEZ III, TIM LEACH, BILL MAHOMES, ELAINE MENDOZA, MICHAEL J. PLANK, CLIFF THOMAS, and DEMETRIUS L. HARRELL JR., in their official capacities as members of the Board of Regents of the Texas A&M University System, | |
| Defendants. | |

JT MORRIS
TX Bar No. 24094444
CONOR T. FITZPATRICK*
MI Bar No. P78981
FOUNDATION FOR INDIVIDUAL RIGHTS
    AND EXPRESSION
700 Pennsylvania Ave., SE; Ste. 340
Washington, DC 20003
Tel: (215) 717-3473
Fax: (267) 573-3073
jt.morris@thefire.org
conor.fitzpatrick@thefire.org

ADAM B. STEINBAUGH*
CA Bar No. 304829
JEFFREY D. ZEMAN*
MI Bar No. P76610
FOUNDATION FOR INDIVIDUAL RIGHTS
    AND EXPRESSION
510 Walnut St.; Ste. 900
Philadelphia, PA 19106
Tel: (215) 717-3473
Fax: (267) 573-3073
adam@thefire.org
jeff.zeman@thefire.org
* Admitted *Pro Hac Vice*

*Counsel for Plaintiffs*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... iv

INTRODUCTION ...................................................................................................... 1

STATEMENT OF FACTS .......................................................................................... 2

         Spectrum WT, like many recognized student groups, has a message to
         share .......................................................................................................... 2

         West Texas A&M opens Legacy Hall to students and the public for
         expressive activities. ................................................................................ 3

ARGUMENT .............................................................................................................. 5

  I.   The First Amendment Protects Stage Performance, Like Plaintiffs' Drag
     Shows .................................................................... **Error! Bookmark not defined.**

    A.  The First Amendment protects stage performance of all kinds. ................... 6

    B.  Because Plaintiffs' drag shows are inherently expressive, the First
       Amendment protects them. ..................................................................... 8

    C.  The context of Plaintiffs' PG-13 drag shows underscores why they are
       protected expression. ............................................................................ 11

    D.  Neither Rumsfeld v. FAIR nor history weakens First Amendment
       protection for drag shows. .................................................................... 13

    E.  First Amendment protection for drag performance is just as robust at
       public universities. ............................................................................... 15

  II.  Because the First Amendment Protects Drag, Plaintiffs Are Likely to Succeed
     on the Merits of Their Appeal. .................................................................. 16

    A.  Wendler's edict is an unconstitutional prior restraint. ................................ 17

    B.  President Wendler is engaging in viewpoint discrimination. ....................... 19

    C.  Excluding Plaintiffs' drag show from campus public forums violates the
       First Amendment. ................................................................................ 20

  III.  Plaintiffs Will Suffer Irreparable Harm Absent Immediate Relief ................ 24

IV.  The Balance of Harms and the Public Interest Favor Plaintiffs' First
Amendment Rights. ................................................................ 25

V.  The Court Should Not Require a Bond Because Plaintiffs Seek Only to
Protect Their First Amendment Rights. ................................................ 25

CONCLUSION ................................................................ 25

## TABLE OF AUTHORITIES

### Cases

*Barnes v. Glen Theatre, Inc.,*
  501 U.S. 560 (1991) ............................................................... 9

*Bethel Sch. Dist. No. 403 v. Fraser,*
  478 U.S. 675 (1986) ............................................................... 16

*Brown v. Ent. Merchs. Ass'n,*
  564 U.S. 786 (2010) ....................................................... 8, 11, 23

*Canady v. Bossier Par. Sch. Bd.,*
  240 F.3d 437 (5th Cir. 2001) ................................................ 11

*Christian Legal Soc'y v. Martinez,*
  561 U.S. 661 (2010) ............................................................... 23

*Christian Legal Soc'y v. Walker,*
  453 F.3d 853 (7th Cir. 2006) ................................................ 25

*Chiu v. Plano Indep. Sch. Dist.,*
  339 F.3d 273 (5th Cir. 2003) ................................................ 18

*City of Atlanta v. Metro. Atlanta Rapid Transit Auth.,*
  636 F.2d 1084 (5th Cir. 1981) .............................................. 25

*City of Erie v. Pap's A.M.,*
  529 U.S. 277 (2000) ............................................................... 12

*Clark v. Cmty. for Creative Non-Violence,*
  468 U.S. 288 (1984) ........................................................... 9, 11

*Cohen v. California,*
  403 U.S. 15 (1971) ........................................................... 11, 22

*Erzoznik v. City of Jacksonville,*
  422 U.S. 205 (1975) ............................................................... 23

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale,*
  901 F.3d 1235 (11th Cir. 2018) ........................................ 11, 14

*Freedman v. Maryland,* 380 U.S. 51 (1965) ............................................. 19

*Friends of Georges, Inc. v. Mulroy,*
  No. 2:23-cv-02163-TLP-TMP, WL 3790583 (W.D. Tenn. June 2, 2023) ................. 7

*Garland v. Blackhawk Mfg. Grp., Inc.*,
   144 S. Ct. 338 (Mem) (2023) ........................................................................ 6

*Gay Student Services v. Texas A&M Univ.*,
   737 F.2d 1317 ............................................................................................. 18

*Gbalazeh v. City of Dall.*,
   No.: 18-cv-0076, 2019 WL 2616668 (N.D. Tex. June 25, 2019) ............................ 25

*Healy v. James*,
   408 U.S. 169 (1972) .............................................................................. 10, 15

*HM Fla.-ORL, LLC v. Griffin*,
   No: 6:23-cv-950-GAP-LHP, 2023 WL 4157542 (M.D. Fla. June 23, 2023) ............. 7

*Holloman ex rel. Holloman v. Harland*,
   370 F.3d 1252 (11th Cir. 2004) ..................................................................... 10

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*,
   515 U.S. 557 (1995) ................................................................... 9, 10, 11, 14

*Imperial Sovereign Ct. of Mont. v. Knudsen*,
   No. CV 23-50-BU-BMM, 2023 WL 6794043 (D. Mont. Oct. 13, 2023) ............ 2, 7

*Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.*,
   993 F.2d 386 (4th Cir. 1993) .................................................................... 20, 22

*Joseph Burstyn, Inc. v. Wilson*,
   343 U.S. 495 (1952) ..................................................................................... 8

*Justice for All v. Faulkner*,
   410 F.3d 760 (5th Cir. 2005) ........................................................................ 20

*Kennedy v. Bremerton Sch. Dist.*,
   142 S. Ct. 2407 (2022) ............................................................................. 9, 11

*Mahanoy Area Sch. Dist. v. B. L.*,
   141 S. Ct. 2038 (2021) ................................................................................. 16

*Martin v. Parrish*,
   805 F.2d 583 (5th Cir. 1986) ........................................................................ 16

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*,
   138 S. Ct. 1719 (2018) .................................................................................. 7

*Matal v. Tam*,
   137 S. Ct. 1744 (2017) ................................................................................. 19

*McCauley v. Univ. of the V.I.,*
    618 F.3d 232 (3d Cir. 2010) .................................................................. 16

*McCoy v. La. State Bd. of Ed.,*
    332 F.2d 915 (5th Cir. 1964) .................................................................. 2

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen,*
    142 S. Ct. 2111 (2022) ..................................................................... 14, 15

*Neb. Press. Ass'n v. Stuart,*
    427 U.S. 539 (1976) .............................................................................. 17

*Norma Kristie, Inc. v. City of Oklahoma City,*
    572 F. Supp. 88 (W.D. Okla. 1983) ...................................................... 7

*Papish v. Bd. of Curators of the Univ. of Mo.,*
    410 U.S. 667 (1973) ................................................................... 15, 16, 24

*Reed v. Town of Gilbert, Ariz.,*
    576 U.S. 155, 163 (2015) ........................................................... 20, 21, 22

*Robinson v. Hunt County,*
    921 F.3d 440 (5th Cir. 2019) .............................................................. 19

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
    492 U.S. 14 (2020) ................................................................................ 6

*Rosenberger v. Rector & Visitors of the Univ. of Va.,*
    515 U.S. 819 (1995) ........................................................................ 19, 24

*Rumsfeld v. FAIR,*
    547 U.S. 47 (2006) ..................................................................... 8, 13, 14

*S. Utah Drag Stars v. City of St. George,*
    No. 4:23-cv-00044-DN-PK, WL 4053395 (D. Utah June 16, 2023) ......... 7

*Schad v. Borough of Mount Ephraim,*
    452 U.S. 61 (1981) ........................................................................... 8, 14

*Se. Promotions v. Conrad,*
    420 U.S. 546 (1975) .................................................................... 7, 17, 19

*Shuttlesworth v. City of Birmingham,*
    394 U.S. 147 (1969) ............................................................................. 19

vi

*Speech First, Inc. v. Fenves,*
    979 F.3d 319 (5th Cir. 2020) .............................................................. 15, 25

*Spence v. Washington,*
    418 U.S. 405 (1974) ................................................................................ 9

*Tagami v. City of Chicago,*
    875 F.3d 375 (7th Cir. 2017) ............................................................... 12

*Texans for Free Enter. v. Tex. Ethics Comm'n,*
    732 F.3d 535 (5th Cir. 2013) ......................................................... 24, 25

*Texas v. Johnson,*
    491 U.S. 397 (1989) ...................................................................... *passim*

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
    393 U.S. 503 (1969) .......................................................................... 9, 16

*Turner Broad. Sys., Inc. v. FCC,*
    512 U.S. 622 (1994) .............................................................................. 1

*Univ. of S. Miss. Chapter, Miss. C.L. Union v. Univ. of S. Miss.,* 452 F.2d 564
    (5th Cir. 1971)...................................................................................... 18

*U.S. v. Playboy Ent. Grp.*
    529 U.S. at 813 (2000) ......................................................................... 22

*VanDerStok v. BlackHawk Mfg. Grp. Inc.,*
    No. 4:22-cv-00691-O, 2023 WL 5978332 (N.D. Tex. Sept. 14, 2023) ...................... 6

*Widmar v. Vincent,*
    454 U.S. 263 (1981) ........................................................................ 20, 21

*Zalewska v. Cnty. of Sullivan,*
    316 F.3d 314 (2d Cir. 2003).................................................................. 12

## Other Authorities

*303 Creative v. Elenis,* No. 21-476, oral arg. trans. 65:1-9 (Dec. 5, 2022) ................ 13

Walter Wendler Full Interview, KAMR, Apr. 27, 2023 ................................................. 5

## INTRODUCTION

From the public square to public universities, the First Amendment demands that the government remain neutral not only in our "political system," but also our "cultural life." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994). That neutrality extends to public universities. Recent months have only confirmed why university presidents—from the campus quad to the floor of Congress—cannot be trusted to act as censors-in-chief. Yet the president of West Texas A&M University, Walter Wendler, believes he can unilaterally decide what expression belongs at West Texas A&M. But the First Amendment ensures he cannot.

Before Plaintiffs even took the campus stage for a PG-13 charity drag show in March 2023, President Wendler cancelled it. In a written edict explaining his decision, Wendler banned all drag shows from campus, decrying them as "artistic expression which denigrates [. . .] women," all while admitting "the law of the land" compelled him not to censor the students. He was right about the last part. The First Amendment protects stage performance, just as it prohibits university officials from imposing a viewpoint-driven prior restraint over that protected expression.

Wendler has all but confirmed his drag ban remains in full effect, refusing to revoke his edict and recently declaring his "rejection of future drag shows." (Brief for Appellee Wendler at 32, Spectrum WT v. Wendler, No. 23-10994 (5th Cir. Dec. 28, 2023) ("Wendler CA5 Br.")) And with Plaintiffs' appeal of this Court's denial of a preliminary injunction still pending in the Fifth Circuit, Wendler's ban is posed to strike once again, muzzling Plaintiffs' planned drag show for March 22, 2024, absent immediate relief.

1

In September 2023, the Court denied Plaintiffs a preliminary injunction, finding it was "doubtful that Plaintiffs will suffer irreparable harm in the coming months while this issue is litigated." (ECF 59 at 25.) But now, the irreparable harm is on Plaintiffs' doorstep. And since the Court's September 2023 ruling, two more courts have recognized that the First Amendment protects drag performances. *Woodlands Pride, Inc. v. Paxton,* No. H-23-2847, 2023 WL 6226113 (S.D. Tex. Sept. 26, 2023) (permanently enjoining Texas's statutory drag performance ban); *Imperial Sovereign Ct. of Mont. v. Knudsen*, No. CV 23-50-BU-BMM, WL 6794043 (D. Mont. Oct. 13, 2023) (enjoining Montana's statutory drag ban).

For these reasons, the Court should grant an injunction pending appeal. Given the imminent irreparable harm to Plaintiffs' First Amendment rights, Plaintiffs intend to seek an injunction pending appeal from the Court of Appeals by Friday, February 9, 2024. *See McCoy v. La. State Bd. of Ed.*, 332 F.2d 915, 917 (5th Cir. 1964) (granting relief because "unless an injunction pending appeal is granted, appellant will be denied her constitutional rights for another school term or longer.").

## **STATEMENT OF FACTS**

**Spectrum WT, like many recognized student groups, has a message to share.**

Plaintiff Spectrum WT is a recognized student organization at West Texas A&M. (ECF 28, First. Am. Verif. Compl. ("FAC") ¶ 10.) It provides a space for "LGBT+ students and allies to come together," to "raise awareness of the LGBT+ community," and to "promote diversity, support, and acceptance on campus and in the surrounding community." (*Id.* ¶ 11.) To help spread its message, Spectrum WT hosts various events, like a prom, movie night, and discussions about LGBTQ+ history. (*Id.* ¶ 13.)

2

Plaintiff Barrett "Bear" Bright is an undergraduate student at West Texas A&M and Spectrum WT's President. (*Id.* ¶ 14.)

**West Texas A&M opens Legacy Hall to students and the public for expressive activities.**

West Texas A&M policy, consistent with Texas law, forbids administrators from "deny[ing] [a student] organization any benefit generally available to other student organizations" because of "political, religious, philosophical, ideological, or academic viewpoint expressed by the organization or of any expressive activities of the organization." (ECF 28-3, West Texas A&M Policy No. 08.99.99.W1, Rule 1.3; Tex. Educ. Code § 51.9315(g).)

Student organizations at West Texas A&M—and any member of the public—may reserve university facilities for group functions and events. (FAC ¶¶ 28, 32–34.) These facilities include Legacy Hall, a performance venue in the Jack B. Kelley Student Center. (*Id.* ¶¶ 28, 33–34.) The university holds out Legacy Hall as suitable for expressive activities like concerts, weddings, and parties. (*Id.* ¶ 32.) University policy places no limits on the content of events in these venues, guaranteeing students use of Legacy Hall for "any special event," including "social gatherings or functions." (*Id.* ¶ 38, ECF 28-2.)

The University has historically opened Legacy Hall to both student organizations and the public have regularly used for expressive activity—including drag shows. (*Id.* ¶¶ 39–41.) Other events have included beauty pageants for both men and women, annual singing competitions, concerts, dances, and religious and political events. (*Id.* ¶ 40.)

**Spectrum WT's first drag show meets the university's criteria, but President Wendler cancels it and bans all drag shows on campus.**

In November 2022, Spectrum WT began planning its first annual drag show, with proceeds from ticket sales to benefit an LGBTQ+ suicide prevention charity. (FAC ¶¶ 52, 74.) Following the university's regular processes, Spectrum WT reserved Legacy Hall to host a drag show. (*Id.* ¶¶ 85–86, 91–93.) West Texas A&M's administration supported Spectrum WT's planning of the drag show throughout the facility request process, helping it navigate the necessary steps to move forward. (*Id.* ¶¶ 86–94, 99–100.) Spectrum WT received "Tentative Confirmation" for its event on February 27, 2023, and was prepared to complete the final logistical issues to hold the event. (*Id.* ¶¶ 91, 99–101.)

On March 20—just 11 days before the show—President Wendler abruptly canceled it. (*Id.* ¶ 105; ECF 28-1.) Wendler told administrators that he was doing so because he believed drag shows discriminate against women. (Decl. Christopher Thomas (ECF 39-1) ¶ 4.)

Publicly, Wendler announced a ban: "West Texas A&M will not host a drag show on campus." (ECF 28-1.) Like he told Defendant Thomas, VP of Student Affairs at West Texas A&M, Wendler told the public drag "performance . . . discriminate[s] against womanhood." *Id.* He denounced drag performance as a "demeaning" and "divisive" form of "slapstick sideshow" used to "stereotype," and "mock[]" "womanhood" for the "amusement of others." (*Id.*) Wendler declared that a "harmless drag show" was simply "[n]ot possible." (*Id.*) As a result of Wendler's ban, Plaintiffs

moved their drag show, at considerable expense, to an off-campus location. (FAC ¶¶ 122–126.)

**Wendler defends the drag ban in the media and the courts.**

President Wendler later revealed in a television interview that his resolve to bar drag shows from campus remained firm: "I wouldn't have done anything any differently." (ECF 45-1 at 25:11–27:50.)[1] Just weeks ago, Wendler defended his rationale and acknowledged his "rejection of future drag shows." (Wendler CA5 Br. at 32.) And Wendler claimed he and other "officials" (presumably including Defendants Vice President Thomas and Chancellor John Sharp) have final, unfettered authority to "assess" the content of students' planned events and deny Plaintiffs' "application" to host any future event. (*Id.* at 1–2, 23, 36, 39, 41.)

**Spectrum WT plans a second charity drag show at Legacy Hall.**

On April 11, 2023, Spectrum WT applied to hold a second annual drag show in Legacy Hall on March 22, 2024. App. 5, Decl. of Barrett Bright ("Bright Decl."), ¶17; App. 34. As with the 2023 performance, Spectrum WT is complying with the administrative requirements necessary to proceed with their performance. (App. 5–6 ¶¶ 17–28.)

Absent an injunction, Defendants will once again force Plaintiffs off the stage they have a First Amendment right to perform on.

## <u>ARGUMENT</u>

A district court may grant an injunction while an appeal is pending. Fed. R.

---

[1] *See also* Walter Wendler Full Interview, KAMR, Apr. 27, 2023, https://www.myhighplains.com/video/walter-wendler-full-interview/8598931, at 25:11–27:50.

Civ. Pro. 62(d). "The factors governing the Court's discretion on whether to grant an injunction pending appeal are virtually identical to those governing whether to grant a preliminary injunction." *VanDerStok v. BlackHawk Mfg. Grp. Inc.*, No. 4:22-cv-00691-O, 2023 WL 5978332, at *16 (N.D. Tex. Sept. 14, 2023) (granting emergency injunction pending appeal) *vacated on other grounds*, *Garland v. Blackhawk Mfg. Grp.*, *Inc.*, 144 S. Ct. 338 (Mem) (2023).

Plaintiffs are entitled to an injunction pending appeal because they satisfy their burden to demonstrate: (1) a likelihood of success on the merits; (2) they will suffer irreparable injury if an injunction is not granted; and (3) the injunction will serve the public interest of vindicating First Amendment rights. *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 16–20 (2020) (granting an injunction pending appeal, assessing each factor, and finding that "there can be no question that the challenged restrictions, if enforced, will cause irreparable harm" to First Amendment freedoms).

## I.    The First Amendment Protects Stage Performance, Like Plaintiffs' Drag Shows.

While the "First Amendment literally forbids the abridgment only of 'speech,' [] we have long recognized that its protection does not end at the spoken or written word." *Texas v. Johnson*, 491 U.S. 397, 404 (1989). As Justice Thomas explained, the First Amendment protects "a wide array of conduct that can qualify as expressive, including nude dancing, burning the American flag, flying an upside-down American flag with a taped-on peace sign, wearing a military uniform, wearing a black armband, conducting a silent sit-in, refusing to salute the American flag, and flying

6

a plain red flag." *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1741–42 (2018) (Thomas, J., concurring). In short, the First Amendment protects "expressive conduct." *Johnson*, 491 U.S. at 403. And that includes drag performances like Plaintiffs', especially because their context leaves no doubt that the performers are expressing something, even if the audience might not agree on what.

### A.      The First Amendment protects stage performance of all kinds.

So when Americans get on stage and express themselves, whether through pantomime, an evocative ballet, or an electric guitar wailing the national anthem, the First Amendment protects it, even if it is not a government official's cup of tea. *See Se. Promotions v. Conrad*, 420 U.S. 546, 549 (1975) (striking down prior restraint on stage performance based on officials' personal values). And that protection extends to drag performance. *E.g.*, *Norma Kristie, Inc. v. City of Oklahoma City*, 572 F. Supp. 88, 91–92 (W.D. Okla. 1983) ("Any inequality between [a drag show] and a musical or play is a distinction without a difference.")[2] Like any stage performance, "[d]rag shows express a litany of emotions and purposes, from humor and pure entertainment to social commentary on gender roles." *Woodlands Pride*, 2023 WL 6226113, at *14.

---

[2]      *See also Woodlands Pride,* 2023 WL 6226113 (enjoining Texas' statutory drag ban); *Friends of Georges, Inc. v. Mulroy*, No. 2:23-cv-02163-TLP-TMP, 2023 WL 3790583 (W.D. Tenn. June 2, 2023) (Parker, J.) (enjoining Tennessee's statutory drag ban); *Knudsen*, 2023 WL 6794043; (enjoining Montana's statutory drag ban); *HM Fla.-ORL, LLC v. Griffin*, No: 6:23-cv-950-GAP-LHP, 2023 WL 4157542 (M.D. Fla. June 23, 2023) (Presnell, J.) (enjoining Florida's statutory drag ban); *S. Utah Drag Stars v. City of St. George*, No. 4:23-cv-00044-DN-PK, 2023 WL 4053395 (D. Utah June 16, 2023) (Nuffer, J.) (ordering city to grant permit for drag show on public property). To date, *Woodlands Pride*, *Imperial Sovereign Ct. of Mont.*, *Friends of Georges*, and *HM Fla.-ORL* are on appeal.

No matter if one views drag performance as political commentary, high art, or slapstick entertainment, the First Amendment protects it. Just like a political pamphlet or Picasso's *Guernica*, entertainment "may affect public attitudes and behavior in a variety of ways, ranging from direct espousal of a political or social doctrine to the subtle shaping of thought which characterizes all artistic expression." *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952). Thus, the Supreme Court has "long recognized that it is difficult to distinguish politics from entertainment, and dangerous to try." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790 (2010). Likewise, when art meshes with "live entertainment, such as musical and dramatic works" it still "fall[s] within the First Amendment guarantee." *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65 (1981). That is why the First Amendment protects stage performance like drag, even if it presents its audience with a mishmash of the political, the artistic, and pure entertainment. In the end, the performance communicates something, and that is what matters for First Amendment protection.

### B. Because Plaintiffs' drag shows are inherently expressive, the First Amendment protects them.

The First Amendment protects Plaintiffs' planned charity drag shows. First Amendment protection for expressive conduct like drag performance does not turn on genre or the mode of expression but whether it is "inherently expressive." *Rumsfeld v. FAIR*, 547 U.S. 47, 66 (2006) (citing *Johnson*, 491 U.S. at 406). If "conduct . . . is intended to be communicative" and "in context, would reasonably be understood by the viewer to be communicative," the First Amendment protects it. *Clark v. Cmty. for*

*Creative Non-Violence*, 468 U.S. 288, 294 (1984) (citing, *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969)and *Spence v. Washington*, 418 U.S. 405 (1974)).

On appeal, Plaintiffs are likely to succeed on the merits because the Court's decision denying a preliminary injunction departed from that standard in three ways. First, the Court held that for the First Amendment to apply, expressive conduct must "obviously convey or communicate a discernable, protectable message," (ECF 59 at 6.) But the Supreme Court rejected that view nearly 30 years ago: "[A] narrow, succinctly articulable message is not a condition of constitutional protection." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 569 (1995). If the First Amendment were "confined to expressions conveying a particularized message, [it] would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schoenberg, or Jabberwocky verse of Lewis Carroll." *Id.* Thus, even if "an observer" of Plaintiffs' drag show "may not discern that the performers' conduct communicates 'advocacy in favor of LGBTQ+ rights,'" (ECF 59 at 13), the First Amendment still protects Plaintiffs' drag show, just as it protects a ballet or symphony even if some observers may not "discern" the performance's true message.

Second, this Court concluded First Amendment expression requires an "'overtly political' message[s]." *Id.* at 5. But that overlooks how the Free Speech Clause protects non-political expressive conduct from nude dancing at a strip club to kneeling in prayer. *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 566 (1991); *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421 (2022).

Third, the Court concluded that "'campus protest' cases" require expressive conduct to "convey [an] 'intentional and overwhelmingly apparent' message." ECF 59 at 5 (citing cases). But none of the cases this Court relied on concerned a public university, much less held that university students have watered down First Amendment rights. The Supreme Court explained its decisions "leave no room for the view that . . . First Amendment protections should apply with less force on college campuses than in the community at large," and its protection is "nowhere more vital" than on college campuses. *Healy v. James*, 408 U.S. 169, 180 (1972). And as the Supreme Court affirmed in *Johnson*, the First Amendment protects expressive conduct so long as there is an intent to convey a message and viewers would understand the conduct as expressive. 491 U.S. at 404; *compare* ECF 59 at 11, n. 14.

If an "intentional and overwhelmingly apparent message" were the standard, *Hurley* would not have affirmed, just six years after *Johnson*, that the First Amendment "unquestionably" protects the abstract expression of Pollock, Schoenberg, and Carroll. *Hurley*, 515 U.S. at 569. So it does not matter if observers "get" what an artist is trying to express. "In determining whether conduct is expressive, we ask whether the reasonable person would interpret it as *some* sort of message, not whether an observer would necessarily infer a *specific* message." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004) (raising fist during Pledge of Allegiance is expressive conduct).

In denying Plaintiffs a preliminary injunction, the Court held that "ballet, orchestra, paintings, sculptures," and other non-verbal expression would still be

10

protected without *Hurley* because they "either 'convey a particularized message' or are 'works of fine art.'" ECF 59 at 11 n.14. But there is no constitutional difference between dancing on a stage in drag versus a tutu. The Founders forever divested government officials like President Wendler from imposing their artistic preferences on the public. *Cohen v. California*, 403 U.S. 15, 25 (1971) (the Constitution "leaves matters of taste and style so largely to the individual" because government officials "cannot make principled distinctions" between what is "palatable" or "distasteful"); *Brown*, 564 U.S. at 796 n.4 ("cultural and intellectual differences are not *constitutional* ones.")

### C.   The context of Plaintiffs' PG-13 drag shows underscores why they are protected expression.

Drag shows, like those planned by Spectrum WT and its students, are expressive conduct because they are communicative—even if their motifs, themes, or intended messages vary between performers. That is clear when applying the correct test for expressive conduct: whether "in context, [drag shows] would reasonably be understood by the viewer to be communicative." *Clark*, 468 U.S. at 294. Indeed, the context of expressive activity is key. *Johnson*, 491 U.S. 405; *Canady v. Bossier Par. Sch. Bd.*, 240 F.3d 437, 440 (5th Cir. 2001) (citations omitted). It separates an expressive civil rights sit-in from sitting down. *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1241 (11th Cir. 2018) (citation omitted). Context is also why Americans understand that a coach kneeling at the 50-yard line is expressing himself. *See generally Bremerton Sch. Dist.*, 142 S. Ct. at 2426–27. And it separates an expressive stage performance from merely putting on clothes.

11

In denying Plaintiffs' a preliminary injunction, the Court isolated drag shows from their context, suggesting that "a person's choice of dress or appearance in an ordinary context does not possess the communicative elements necessary to be considered speech[.]" ECF 59 at 11 n.15 (quoting *Zalewska v. Cnty. of Sullivan*, 316 F.3d 314, 320 (2d Cir. 2003)). But context separates an organized, choreographed drag show on stage under bright spotlights from the day-to-day "choice of dress." (*Id.* at 9 n.11). Spectrum WT intends to communicate a message with performances wearing gender non-conforming clothes, on stage, in a venue intended for student expression, dancing to themed music. Its performance would take place in front of a willing, ticketed audience invited to an event advertised for supporting an LGBTQ+ charity. Viewers of Plaintiffs' shows would understand them as expressive. Plaintiffs' flyers for the event leave no doubt as to its context as a pro-LGBTQ+ event, by LGBTQ+ groups, in support of an LGBTQ+ charity. (FAC ¶ 94.)

In discounting the context of Plaintiffs' show, the Court relied on *Tagami v. City of Chicago*. ECF 59 at 13 (citing 875 F.3d 375, 378 (7th Cir. 2017)). But in *Tagami*, the Seventh Circuit held the First Amendment did not protect a woman publicly baring her breasts as a form of protest because there were no "facts from which it might reasonably be inferred that onlookers would have readily understood that this public display of nudity was actually a political protest against the City's public-indecency ordinance." *Id.* Contrast that with the Supreme Court holding that nude dancing *on a stage* is protected expressive conduct, because live entertainment conveying a message and mere public nudity are different. *See City of Erie v. Pap's*

*A.M.*, 529 U.S. 277, 289 (2000). Defendants have never contended Plaintiffs' planned drag show constitutes obscenity or otherwise falls into a category of unprotected speech. So while Plaintiffs' PG-13 show is worlds away from nude dancing, the constitutional principle applies the same: The First Amendment protects it.

### D.   Neither *Rumsfeld v. FAIR* nor history weakens First Amendment protection for drag shows.

Denying Plaintiffs' preliminary injunction motion, this Court held *Rumsfeld v. FAIR* means that without "accompanying political speech or dialogue," observers won't understand a drag show is "communicat[ing] . . . LGBTQ+ rights," rendering drag performance unprotected. ECF 59 at 12–13 & n.16. But *FAIR* is a compelled-speech case, not one limiting protection for expressive conduct. 547 U.S. at 62–65. Law schools wanting to bar military recruiters claimed the government was compelling them to speak in favor of the military by allowing recruiters on campus. Chief Justice Roberts, who authored *FAIR*, recently explained why the decision is narrow: it "involved the schools providing rooms for the military recruiter, and . . . what the Court said is empty rooms don't speak." *303 Creative v. Elenis*, No. 21-476, oral arg. trans. 65:1-9 (Dec. 5, 2022). A stage filled with costumed performers dancing to music under the lights is no empty room.

While the Supreme Court in *FAIR* noted that excluding military recruiters was "expressive only because the law school accompanied their conduct with speech explaining it," 547 U.S. at 66, nowhere did it hold that an accompanying explanation divests inherently expressive conduct of First Amendment protection. Nor could it—an explanation often augments the message inherently expressive conduct conveys,

like an inscription under a painting, or the liner notes of a music album. Indeed, the Grammys have given an award for Best Album Notes since 1964. Johnny Cash's liner notes from *At Folsom Prison* did not divest his album of First Amendment protection.

Imagine a painter revealing her latest work. If half the audience sheds tears because the painting evokes sadness, the painter does not lose First Amendment protection if she explains her work is meant to convey happy thoughts. The audience understood the painting communicated *something*—and that is what matters. *Hurley,* 515 U.S. at 569; *Fort Lauderdale Food Not Bombs*, 901 F.3d at 1241. In the same way, drag performers do not lose the First Amendment if their intended message differs from how another perceives it. So it matters not that President Wendler says he perceives the "artistic expression" of drag shows to be "mocking" and "cartoon-like . . . amusement." (ECF 28-1.)

*FAIR* reaffirmed *Johnson*'s recognition that the First Amendment protects "inherently expressive" conduct. 547 U.S. at 66. And because live entertainment, music, and theatre—all intrinsic to drag shows—are inherently expressive, the First Amendment protects them, with explanation or without. *Schad*, 452 U.S. at 65–66 (collecting cases). These mediums *are* expression. Getting on stage and performing *is* expression and has been since the Ancient Greeks took to the Athenian stage.

Nor does *New York State Rifle & Pistol Association* change the outcome here. ECF 59 at 3 (citing 142 S. Ct. 2111, 2161 (2022)). *Bruen* requires the *government* to justify regulation of Second Amendment rights by pointing to text, history, and tradition. *Bruen*, 142 S. Ct. at 2126, 2131–33. It does not require Americans to prove

14

a historic right against their government controlling ideas and expression. *See id.* at 2132. (observing that "the First Amendment protects *modern* forms of communications . . . .") (citation omitted) (emphasis added). The Constitution establishes that enduring freedom and the Supreme Court's long line of jurisprudence upholding the First Amendment's guarantees for unpopular expression controls.

### E.   First Amendment protection for drag performance is just as robust at public universities.

First Amendment protection for drag shows apply with no "less force on college campuses than in the community at large." *Healy*, 408 U.S. at 180. The need to preserve adult college students' ability to "generate, debate, and discuss both general and specific ideas, hopes, and experiences" is why "courts must be especially vigilant against" limits on campus expression. *Speech First, Inc. v. Fenves*, 979 F.3d 319, 339 (5th Cir. 2020) (vacating the denial of a preliminary injunction against university verbal harassment policy).

The Supreme Court's holding in *Papish* shows this principle in action. *Papish v. Bd. of Curators of the Univ. of Mo.*, 410 U.S. 667 (1973) (per curiam). There, campus officials sanctioned a student after she published a newspaper featuring on its cover a vulgar and "indecent" cartoon—"depicting policemen raping the Statue of Liberty and the Goddess of Justice" *Id.* at 667. Rejecting the dissent's admonishment about "lewd" speech, the Supreme Court announced that expression "on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Id.* at 670. If the First Amendment protected the cartoon in *Papish*, it protects campus drag

shows like Spectrum WT's, featuring clothed performers dancing to non-profane music. (FAC ¶¶ 76–83; App. 5, Bright Decl. ¶19)

This Court departed from *Papish* and turned instead to *Fraser*—a case regulating minors' speech in K–12 schools. ECF 59 at 15 (citing *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 685 (1986)). But the interests of universities and their adult students differ from elementary schools and their pupils. That's why the "teachings of *Tinker*, *Fraser*, *Hazelwood*, *Morse*, and other decisions involving speech in public elementary and high schools, cannot be taken as gospel in cases involving public universities."[3] *McCauley v. Univ. of the V.I.*, 618 F.3d 232, 247 (3d Cir. 2010); *see also Mahanoy Area Sch. Dist. v. B. L.*, 141 S. Ct. 2038, 2049 n. 2 (2021) (Alito, J., concurring) (explaining that "[f]or several reasons, including the age, independence, and living arrangements of such students, regulation of their speech may raise very different questions from those presented" in a K-12 speech case.)

## II.   Because the First Amendment Protects Drag, Plaintiffs Are Likely to Succeed on the Merits of Their Appeal.

West Texas A&M's ban on drag shows violates the First Amendment three times over. It imposes a prior restraint on stage performance. It discriminates based on viewpoint. And it is a content-based restriction in a designated public forum. Strict scrutiny applies to each violation, a burden Defendants cannot satisfy.

---

[3] The Fifth Circuit has once cited *Fraser* in the public college employment context, upholding discipline of a professor who cursed at and harassed his students. *Martin v. Parrish*, 805 F.2d 583, 585 (5th Cir. 1986) (citing *Fraser*, 478 U.S. 675 (1986)). A narrow decision holding a university may punish an employee for hurling profanities at their students has no bearing on the student expressive rights at issue here.

## A.    Wendler's edict is an unconstitutional prior restraint.

If there were ever a compelling basis for an injunction pending appeal, it is a prior restraint, "the most serious and least tolerable infringement of First Amendment rights." *Neb. Press. Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). President Wendler banned Plaintiffs' performance before they ever took the stage. That is a classic prior restraint, as Plaintiffs alleged and showed in moving for a preliminary injunction. FAC ¶¶ 193–216; ECF 31 at 19–21. This demonstrates Plaintiffs are likely to prevail on the merits of their appeal. Although the Court passed over the prior restraint before, it should now stop the prior restraint and remind university officials that they cannot muzzle speech based on personal views.

President Wendler's stance mirrors that of the censorial officials in *SE Promotions*, 420 U.S. 546. There, a group asked to use a city-operated municipal auditorium to present the rock musical *Hair*. *Id.* at 547. The auditorium directors denied the application, reasoning that allowing the play "was not in the best interest of the community" and the board would only "allow those productions which are clean and healthful and culturally uplifting, or words to that effect." *Id.* at 549. The Supreme Court struck down the directors' censorship as an unconstitutional prior restraint. Likewise, President Wendler imposed a prior restraint by barring Plaintiffs' drag shows from campus forums because the message does not meet Wendler's criteria about what "demean[s] women." (ECF 28-1.)

Actions "regulating speech contingent on the will of an official—such as the requirement of a license or permit that may be withheld or granted in the discretion of an official—are unconstitutional burdens on speech classified as prior restraints."

17

*Chiu v. Plano Indep. Sch. Dist.*, 339 F.3d 273, 280 (5th Cir. 2003). And here, Defendants are "regulating speech contingent on the will" of President Wendler, denying Plaintiffs their First Amendment rights.

The Fifth Circuit's decision in *Gay Student Services v. Texas A&M University* provides even more reason to hold that President Wendler's edict imposes a prior restraint. 737 F.2d 1317 (5th Cir. 1984). There, the court held Texas A&M University violated the First Amendment when an administrator refused to recognize the Gay Student Services student group "clearly based on his perception that the organization *would* attempt to convey ideas about homosexuality," which he believed were harmful. *Id.* at 1323. The court explained when a "restriction upon student expression takes the form of an attempt to predict in advance the content and consequences of that expression, it is tantamount to a prior restraint and carries a heavy presumption against its constitutionality." *Id.* at 1325 (quoting *Univ. of S. Miss. Chapter, Miss. C.L. Union v. Univ. of S. Miss.*, 452 F.2d 564, 566 (5th Cir. 1971)).

As in *Gay Student Services*, Wendler's edict rests on his subjective views about Plaintiffs' expression and his attempt to "predict in advance the content and consequences" of Plaintiffs' expression. *Id.* His edict leaves no doubt, accusing drag of having a "demeaning," "derisive," "mocking," "objectifying," and "inappropriate" message. (ECF 28-1.) The Supreme Court and Fifth Circuit made clear the government cannot restrain expression based on criteria like Wendler's.

In fact, the only way public officials can justify a prior restraint on access to a public forum—if ever—is by pointing to "narrow, objective, and definite standards to

guide" officials in granting or denying access. *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51 (1969). Wendler's skewed criteria are none of those things. And even if they were, the university lacks safeguards to "obviate the dangers of a censorship system" based on viewpoint-based determinations, including: (1) the state bearing the burden of proving that the speech is unprotected; (2) an adversarial proceeding and judicial determination of whether the speech is protected; and (3) ensuring that "within a specified brief period," the school "either issue[s] a license or go[es] to court to restrain" the speech. *Freedman v. Maryland*, 380 U.S. 51, 58–59 (1965); *see also Se. Promotions*, 420 U.S. at 559–60 (finding the moral standards used to censor *Hair* failed the *Freedman* safeguards). Wendler has never argued his ban satisfies *Shuttlesworth*'s demanding test, instead hoping his prior restraint continues to hide in plain sight. The Court should enjoin the prior restraint pending appeal.

## B.   President Wendler is engaging in viewpoint discrimination.

President Wendler's ban on campus drag shows because he disagrees with their message—real or perceived—violates the First Amendment's bar against viewpoint discrimination. "Viewpoint discrimination is . . . an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995). And "censorship based on a state actor's subjective judgment that the content of protected speech is offensive or inappropriate is viewpoint discrimination." *Robinson v. Hunt County*, 921 F.3d 440, 447 (5th Cir. 2019) (citing *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017)).

19

President Wendler's own words leave no doubt: He banned drag shows because he finds their message "derisive, divisive and demoralizing misogyny, no matter the stated intent." (ECF 28-1.) That is viewpoint discrimination. *See Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386, 392 (4th Cir. 1993) (rejecting as unconstitutional viewpoint discrimination university's attempt to punish fraternity members for hosting an "ugly women competition").

To the same end, this Court should enjoin Defendants' ongoing viewpoint-based censorship of Plaintiffs' PG-13 charity drag show pending appeal.

## C. Excluding Plaintiffs' drag show from campus public forums violates the First Amendment.

President Wendler's denial of Legacy Hall to Plaintiffs also violates the First Amendment, to their ongoing injury. When a public university opens a space to student expressive activity, it creates a designated public forum. *See Justice for All v. Faulkner*, 410 F.3d 760, 769 (5th Cir. 2005) (holding that when a university opens parts of its university for student expression, it creates a designated public forum). Because West Texas A&M opens facilities like Legacy Hall to students and student organizations for performances like theater, music, and dancing (FAC ¶¶ 33–37), "the University must therefore satisfy the standard of review appropriate to content-based exclusions." *Widmar v. Vincent*, 454 U.S. 263, 270 (1981).

Under the First Amendment, "a government . . . has no power to restrict expression because of its message, its ideas, its subject matter, or its content" unless it satisfies strict scrutiny. *Reed v. Town of Gilbert,* 576 U.S. 155, 163 (2015) (cleaned up). To meet that high bar here, Defendants "must show that [their] regulation is

necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Widmar*, 454 U.S. at 270.[4] They cannot meet that burden.

A ban on drag shows is content-based (if not outright viewpoint-based, as shown above). It singles out a particular type of expression—drag—for differential treatment, despite leaving like expression, such as ballet, beauty pageants, cheerleading, and competitive dance, untouched. That is textbook content discrimination. *Reed*, 576 U.S. at 169 (content discrimination exists when the government "singles out a specific subject matter for differential treatment").

No matter a prior restraint, viewpoint discrimination, or a content-based restriction on expression in a designated public forum, all roads lead to strict scrutiny. Defendants cannot meet that hefty burden, making a swift injunction pending appeal to protect Plaintiffs' expressive freedoms even more compelling.

**D.    Defendants cannot meet strict scrutiny.**

Defendants' content-based ban of campus drag shows—including canceling Plaintiffs' March 31, 2023 show—fails strict scrutiny. And *Widmar* shows why. In *Widmar*, the University of Missouri at Kansas City denied an evangelical Christian student group the use of university facilities otherwise "generally available for . . . registered student groups." *Widmar*, 454 U.S. at 264–65. The Supreme Court explained that such restrictions, which single out a particular subject for differential

---

[4] Universities may impose content-neutral "reasonable time, place, and manner regulations." *Widmar*, 454 U.S. at 276. As West Texas A&M is prohibiting drag shows outright, and is discriminating based on content to boot, the time, place, or manner test is inapplicable. It is content-based censorship, and thus presumptively unconstitutional. *Reed*, 576 U.S. at 163.

treatment, are subject to "the most exacting scrutiny." *Id.* at 276. The Court held that the university unlawfully "discriminated against student groups and speakers based on their desire to use a generally open forum to engage in" protected expression and that the university's stated goal, "achieving greater separation of church and State," was not sufficiently "'compelling' to justify content-based discrimination against respondents' religious speech." *Id.* at 269, 278.

Here, advancing President Wendler's belief that drag shows promote "misogyny" is not a compelling state interest. (ECF 28-1.) Banning drag shows does not prevent tangible harm to women. Any women (or men) who might take offense at drag can simply not attend. Likewise, those who agree with President Wendler's distaste for the students' expression can "effectively avoid further bombardment of their sensibilities simply by averting their eyes." *Cohen*, 403 U.S. at 21. In short: don't like drag shows? Don't go to one. The government cannot wield its strong arm to enforce personal taste.

Nor is Defendants' ban on drag shows narrowly tailored or the least restrictive means of furthering their goals. *See U.S. v. Playboy Ent. Grp.*, 529 U.S. 803, 813 (2000) (content regulation permissible only if the government "chooses the least restrictive means to further the articulated interest") (cleaned up). A content-based law is not narrowly tailored if it leaves untouched a significant amount of expression causing the same problem. *Reed*, 576 U.S. at 172. Yet Defendants have not banned any other type of expression from campus which might tend to disparage or demean women. *See Iota Xi*, 993 F.2d at 393 ("[A] public university has many constitutionally

22

permissible means to protect female and minority students" short of punishing expression). And a government's objection to a speaker's message is not even a legitimate government interest, let alone a compelling one.

Nor can Wendler's censorship rest on a supposed interest in protecting children. Plaintiffs' planned drag shows *prohibit* children from attending unless accompanied by a parent or guardian. (FAC ¶ 80; App. 5, Bright Decl. ¶19) There was and is no danger of children "in the audience" at Plaintiffs' drag shows, performed on a university campus after-hours, without a parent's or guardian's blessing. And Defendants have no compelling interest in dictating "what [they] think[] parents *ought* to want." *Brown*, 564 U.S. at 804. Rather, expression falling short of obscenity standards "cannot be suppressed solely to protect the young from ideas or images" that an official "thinks unsuitable for them." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213–14 (1975). A supposed interest in protecting minors from PG-13 drag shows also fails narrow tailoring, because Wendler does not prevent student organizations from holding events showing PG-13 or R-rated movies if minors are present.

While Defendants might argue that *Christian Legal Society v. Martinez* ("*CLS*") governs here, it does not. *See* Wendler CA5 Br. at 32 (citing 561 U.S. 661 (2010)). *CLS* analyzed a student group's exclusion from a narrow type of forum— recognition of student organizations—that neither side disputed was a limited public forum. *See* 561 U.S. at 679. By contrast, all signs point to Legacy Hall being a designated public forum open to *anyone,* not just students.

What's more, the student group in *CLS* sought "not parity with other

organizations, but a preferential exception from [University] policy" that required registered organizations "to open eligibility for membership and leadership to all students." 561 U.S. at 668–69. But Plaintiffs seek no preferential exception. They simply seek parity without viewpoint discrimination, that all other recognized student groups (and the public) enjoy under university policy and practice dedicating Legacy Hall to expressive activity. Wendler's edict "singles out" drag performers because he finds their message offensive, unlike the policy the Supreme Court found neutral in *CLS*. 561 U.S. at 685. That viewpoint discrimination echoes the unconstitutional actions in *Papish* and *Rosenberger*, not the policy in *CLS*. *Papish*, 410 U.S. at 667–70; *Rosenberger*, 515 U.S. at 829.

### III.   Plaintiffs Will Suffer Irreparable Harm Absent Immediate Relief.

Plaintiffs have a drag show scheduled in Legacy Hall for March 22, 2024. (App. 5–6, Bright Decl. ¶¶17–23). Without immediate relief, Wendler's ban will exclude Plaintiffs from the very stage they have a First Amendment right to perform on. The Fifth Circuit has "repeatedly held . . . that the loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury justifying the grant of a preliminary injunction." *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) (cleaned up).

President Wendler has signaled every intent to "reject future drag" shows on campus, which would include Plaintiff's performance planned at Legacy Hall for March 22, 2024. Wendler CA5 Br. at 32. He even boasted to the media that "he wouldn't have done anything differently" than he did when censoring Plaintiffs in March 2023. (ECF 45-1 at 25:11–27:50.) Absent an injunction to stop irreparable

24

harm to Plaintiffs' expressive freedoms, history will likely repeat itself.

## IV. The Balance of Harms and the Public Interest Favor Plaintiffs' First Amendment Rights.

"[I]njunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter.*, 732 F.3d at 539 (quoting *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006)). This is especially true on campus, where "courts must be especially vigilant against assaults on speech in the Constitution's care." *Speech First, Inc.*, 979 F.3d at 339. By contrast, President Wendler has not identified any potential harm to the university or himself from the drag show proceeding other than offense to women and to his own worldview. That is not enough to overcome upholding the First Amendment.

## V. The Court Should Not Require a Bond Because Plaintiffs Seek Only to Protect Their First Amendment Rights.

The Court should decline to require a bond for an injunction under Rule 62(d). This Court has full discretion regarding whether to require security for an injunction. *Id.* Because Plaintiffs are engaging in public-interest litigation to vindicate First Amendment rights, the Court should waive the bond requirement. *See, e.g.*, *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. 1981). *Gbalazeh v. City of Dall.*, No. 18-cv-0076, 2019 WL 2616668, at *2 (N.D. Tex. June 25, 2019) (citing *City of Atlanta* and waiving bond requirement when granting preliminary injunction on First Amendment grounds).

### <u>CONCLUSION</u>

The Court should grant an injunction pending appeal under Rule 62(d).

Respectfully submitted,

/s/ JT Morris
JT MORRIS
TX Bar No. 24094444
CONOR T. FITZPATRICK*
MI Bar No. P78981
FOUNDATION FOR INDIVIDUAL
    RIGHTS AND EXPRESSION
700 Pennsylvania Ave., SE
Ste. 340
Washington, DC 20003
Tel: (215) 717-3473
Fax: (267) 573-3073
jt.morris@thefire.org
conor.fitzpatrick@thefire.org

ADAM B. STEINBAUGH*
PA Bar No. 326475
JEFFREY D. ZEMAN*
Pa. Bar No. 328570
FOUNDATION FOR INDIVIDUAL
    RIGHTS AND EXPRESSION
510 Walnut St.; Ste. 900
Philadelphia, PA 19106
Tel: (215) 717-3473
Fax: (267) 573-3073
adam@thefire.org
jeff.zeman@thefire.org

* Admitted *Pro Hac Vice*

*Attorneys for Plaintiffs
    Spectrum WT, Barrett Bright,
    and Lauren Stovall*

26

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 31, 2024, a true and correct copy of the foregoing document was transmitted via using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

/s/ JT Morris
JT Morris
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION