UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

SPECTRUM WT, et al.,          )
          Plaintiffs,  )
                             )
vs.                          )Cause No. 2:23-CV-00048-Z
                             )
WALTER WENDLER, et al.,   )
          Defendants.  )

_____

TRANSCRIPT OF STATUS CONFERENCE
BEFORE THE HONORABLE MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE

SEPTEMBER 10, 2025
AMARILLO, TEXAS

_____

**A P P E A R A N C E S**

FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
700 PENNSYLVANIA AVENUE, SE
SUITE 340
WASHINGTON, DC 200003

     BY   MR. JT MORRIS
          MR. CONOR T. FITZPATRICK
          MR. ADAM STEINBAUGH

                    FOR THE PLAINTIFFS;

ATTORNEY GENERAL OF TEXAS
P.O. BOX 12548
AUSTIN, TX  78711

     BY:  MR. DAVID BRYANT
          MS. MUNERA AL-FUHAID
          MS. ALEXIA BAKER, law fellow.
                    FOR THE DEFENDANTS.

     FEDERAL OFFICIAL COURT REPORTER:
     CHRISTINE M. ORR, 205 SE 5TH AVENUE,
     AMARILLO, TEXAS, 79101, (806)468-3816

PROCEEDINGS RECORDED BY STENOGRAPHY; TRANSCRIPT
PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.

[CALL TO THE ORDER OF THE COURT:]

The Court calls case number 2:23-CV-00048-Z, *Spectrum WT versus Wendler*, for status conference.  Are the parties ready to proceed?

MR. BRYANT:  Yes, your Honor.  Defendants are ready to proceed.

MR. MORRIS:  Plaintiffs are ready to proceed, your Honor.

THE COURT:  And will defense counsel state your name for the record so that the court reporter can have a record of your presence today.

MR. BRYANT:  Your Honor, David Bryant from the Office of the Attorney General of Texas on behalf of defendants.  With me is Munera Al-Fuhaid and Ms. Alexia Baker who has not quite yet passed the Texas Bar but soon will.

THE COURT:  Okay. Understood.  And will counsel for plaintiff please identify yourselves and any attorneys who will be part of your team today.

MR. MORRIS:  JT Morris for plaintiffs.  Along beside me is my colleague, Conor Fitzpatrick.  And Adam Steinbaugh.

THE COURT:  Okay.  And you can also leave your business cards with the court reporter just to

make sure all record entries accurately record your presence today.

So the Court reviewed the briefing in this case and the divided Fifth Circuit opinion filed on August 18, 2025.  The following day, the Fifth Circuit withheld issuance of the mandate, and the mandate has not yet issued in the intervening 21 days.

The Court called this status conference to discuss the issues outlined in its order dated August 26, 2025.  And to remind the parties, almost like a questions presented document, the Court identified at least four issues that may require additional record development and evidence, if necessary.  First, WT and Texas A&M System rules, regulations, policies, customs and practices relevant to Legacy Hall's use of registered student organizations, invitees of registered student organizations and the general public.

Second, the application of WT and Texas A&M System rules, regulations, policies, customs and practices vis-a-vis approval or denial of facility use request specific to Legacy Hall.

Three, relevant to facility use generally and Legacy Hall specifically, WT and Texas A&M

System rules, regulations, policies, customs and practices specific to sexualized material or content.

And fourth, any intervening legislation or jurisprudence regarding defendant's authority to exclude minors from sexualized material or content, including accessing content that is obscene only to minors.

Here, the Court specifically referenced two cases decided since this matter was last before the Court; *Free Speech Coalition versus Paxton* and *United States versus Skrmetti,* both of which the Supreme Court decided earlier this year while this case was pending at the Fifth Circuit. And the Court also advised the parties to consider the potential relevance of any intervening legislation and cited as a potential example S.B. 12. Now, I have your submissions that were filed electronically, and I do want to sort of clarify in response to those submissions the purpose of this hearing. So before we delve into these four categories, the Court will summarily respond to two background matters raised in plaintiff's pre-conference submission yesterday. First, the Court agrees with plaintiffs, that district courts

do not have jurisdiction to do anything that alters the case's status while on appeal.  However, as stated in the Court's prior order, the District Court does maintain jurisdiction as to matters not involved in the appeal, such as the merits of an action when appeal from a preliminary injunction is taken.  I cited *Lopez Dominguez*, a Fifth Circuit case from 2010.  Counsel may find that at 607 F.3d, 1066.  And *Farmhand, Inc*., an earlier Fifth Circuit case from 1982; 693 F.2d 1140.  And more specifically, an appeal from a grant or denial of preliminary injunction does not inherently divest the district court of jurisdiction or otherwise restrain it from taking other steps in the litigation.  That is a direct quote from the *Satanic Temple* case, 79 F.4th 512, at 514, a case decided just two years ago at the Fifth Circuit.  And because the Fifth Circuit never stayed this Court's order on preliminary injunction and the Fifth Circuit panel addressed expressly, quote:  Only the denial of the preliminary injunction, this Court may proceed on the merits for the reasons stated in that order dated August 26th, 2025, in ECF Number 104.

Secondly, this is a status conference, not an evidentiary hearing.  I wanted to allay

plaintiff's concerns about that. Though the order in ECF Number 104 does anticipate categories of evidence that may require additional discovery. And that was the purpose of identifying those four issues. This is a status conference more akin to a Rule 16 conference and is designed to discern case status after two and a half years of litigation and appeals, to update the Court on any intervening jurisprudence or legislation affecting the case moving forward to the merits phase and then to identify potential categories of evidence requiring additional discovery and development. So that is the purpose of this hearing. I understand counsel at least for the plaintiffs wanted to clarify that they weren't prepared and weren't required to present evidence. And I would agree. We're simply doing a status conference and identifying categories of evidence that might require further development; and at all times, this Court is analogizing to Federal Rule of Civil Procedure 16(a)(3) and (4), explaining that a purpose -- the purpose of such a conference is to discourage wasteful pretrial activities and to improve the quality of the trial through more thorough preparation. So at all times, that's the context of this status conference and the

purpose of that conference.

Now, before turning to the substantive issues identified in that ECF Order Number 104 and the categories of evidence addressed in that order, the Court will invite brief supplemental oral argument on two threshold issues raised in Defendant's Priority Motion to Dismiss in ECF Number 106, Plaintiff's Brief in Opposition in ECF Number 110 and the pretrial -- I'm sorry, the Pre-Conference Submission in ECF Number 112.

Now, limiting your responses only to what was briefed in the four corners of those papers, each party will be given five minutes to add any additional supplemental argument relevant to two threshold issues; specifically, the counts remaining and standing.

So I would frame the questions as follows:

First, if the mandate issues and the divided Fifth Circuit opinion controls, do the parties that plaintiffs have standing to sue for injunctive relief against President Wendler and Dr. Thomas but not Chancellor Sharp or the Board defendants?  So this is just to clarify which defendants remain in the litigation based on the parties' reading of that divided Fifth Circuit

opinion.  The mandate hasn't issued, but assuming that that will be our guidepost for deciding which counts and defendants remain, is it your reading that plaintiffs have standing to sue for injunctive relief against President Wendler and Dr. Thomas but not Chancellor Sharp or the Board defendants?

Number 2, does plaintiffs' fourth cause of action seeking section 1983 damages against President Wendler survive this Court's Memorandum Opinion and Order in ECF Number 59 and the divided Fifth Circuit opinion filed on August 18, 2025, which does not seem to address that fourth cause of action.

So I have your submissions on the paper. You don't need to repeat anything on those papers, but I'll give you five minutes per side for any additional supplemental argument.  The Court needs to decide those two questions.  And just briefly categorize question one are the counts remaining. Question two is whether that fourth cause of action survives and would require trial to a jury?

So I'll begin with the plaintiffs and I'll instruct my courtroom deputy and clerks to start a five-minute clock.

MR. MORRIS:  Thank you, your Honor, and

also thank you for clarifying the scope of this hearing. That puts our concerns to rest. As to your first question, if mandate issues, obviously, we believe that plaintiffs have standing to seek not only injunctive relief but declaratory relief against both against President Wendler and Vice President Thomas for the reasons stated in the Fifth Circuit's opinion and the reasons stated in our opposition to the Motion to Dismiss for Lack of Subject Matter Jurisdiction.

As to Chancellor Sharp and the Board defendants, the Fifth Circuit has said there is no Article III standing as to them. We do not plan to contest that. So going forward, our case would be for prospective injunctive and declaratory relief against President Wendler and Vice President Thomas for which we have standing for the reasons we've explained.

As to your second question, your Honor, the plaintiffs' fourth count, the Court dismissed those, both as to Plaintiff Bright -- all plaintiffs -- in the Memorandum Opinion from September of 2023. If the Court recalls, we asked for a partial entry of final judgment as to those counts, as to Count IV. The Court denied that. So

our position is that until a final judgment issues, that's not appealable because it is a -- a claim for retroactive damages.  When a file judgment does issue, we will appeal the grant of qualified immunity.  But at this time, our position is because there's no final judgment, that's not a tribal issue of fact until their final judgment issues and we're -- we have -- the Fifth Circuit would have jurisdiction to hear the qualified immunity matter.

THE COURT:  Okay.  Understood.  And just briefly, so I understand what this Court said in a Memorandum Opinion and Order that is now two years old, you were pointing specifically to Page 25 of Document Number 59 where the Court states:  And because plaintiffs' irreparable harm argument is predicated on a clearly-established First Amendment violation, their argument for that factor must fail as well.  Are there any other references in that Memorandum Opinion that guide your conclusion that Count IV was dismissed?

MR. MORRIS:  So let me -- let me clarify. We do disagree that irreparable harm is tied to the Court's reasoning on granting the motion to dismiss on qualified immunity.

THE COURT:  Okay.

MR. MORRIS:  We have -- we obviously maintain that the plaintiffs are still being irreparably harmed by the drag show ban.  If you give me one second to pull up your opinion, your Honor, I can tell you what I think what we're talking about here.

THE COURT:  And I don't know that law school prepares you for telling the Court what the Court meant to say.  So I understand that this is a bit of a curve ball, but I want to make certain that I understand where in that order you discern that this Count IV has the status you've assigned to it.

MR. MORRIS:  Sure.  I'm looking through your opinion right now, your Honor.  Give me one second.  So I think it would be on the top of Page 20 of your order.  For the foregoing reasons, President Wendler did not violate plaintiff's clearly-established rights and is therefore entitled to qualified immunity.  Accordingly, Plaintiffs' damages claim against President Wendler in his individual capacity must be dismissed.

And to be clear for the record, we do not think that impacts plaintiffs' ability to show irreparable harm at all.  Again, we believe they are still being irreparably harmed, but it's that

sentence on the top of Page 20 that informs our opinion that until final judgment issues from this Court, the denial of qualified -- the grant of qualified immunity is not appealable.

THE COURT:  And this would also echo in Document Number 63 which was the Court's order expressly granting President Wendler's motion to dismiss that claim, ruling that President Wendler is entitled to qualified immunity.

MR. MORRIS:  That is correct.

THE COURT:  Okay.  So I have those two bases for your conclusion that Count IV is dismissed but not yet appealable.

MR. MORRIS:  Correct.

THE COURT:  Okay.  Understood.  I have your argument on paper and in oral form.  I'll now invite any supplemental argument on just that point and those two questions.  Mr. Bryant, you may approach.

MR. BRYANT:  Thank you, your Honor.  With respect to the first question, Defendants agree that if the mandate comes down from the Fifth Circuit, with respect to its preliminary injunction opinion, then that would be -- there essentially would be two defendants left in the case; Dr. Wendler and

Dr. Thomas.  And that Chancellor Sharp who is now retired also is out of the case because the Fifth Circuit has determined that there was no standing for the claims against him.  With respect to -- However, I would say the import of the Fifth Circuit's opinion on standing is that the plaintiffs had standing at the time of this Court's Memorandum Opinion in 2023.  Of course, on a Motion to Dismiss for Lack of Subject Matter Jurisdiction, we believe and have asserted that the plaintiffs no longer have standing to assert the claims and that, therefore, the case should be dismissed before we go farther. I think that if the Court would like to either hear any further argument on that or ask any questions about it, I would be happy to address them.  But right now, I'll just stick to that -- to our papers on it.

THE COURT:  Okay.

MR. BRYANT:  Because that's what the Court initially indicated.

Second, with respect to damages, I think I agree with counsel for Plaintiff that certainly the Fifth Circuit's preliminary injunction opinion does not disturb or rule in any way on this Court's prior determination that the damages claims could not go

forward because of President Wendler's qualified immunity.  They may or may not be appealed after a final judgment is entered in this case, but they're not live claims for us to litigate prior to a final judgment in this case.

THE COURT:  Okay.  Understood.  I have your argument.  And it's my understanding that both parties require a ruling on that priority motion to dismiss specific to standing to sue and any organizational or associational standing arguments that were raised by the plaintiffs.  You need this Court to rule on that before we proceed to anything resembling trial on the merits; is that correct?

MR. BRYANT:  Yes, your Honor, and I believe also that we need a ruling on it prior to proceeding with discovery as well under decisions of the Fifth Circuit.  So, in addition, I know that in response to our Motion to Dismiss for Lack of Subject Matter Jurisdiction, the plaintiffs have made an argument that they should be allowed to amend their complaint.  So that would be another preliminary matter.  I think as I read their papers, they do not dispute that Plaintiff Stovall, at the least, no longer has -- is no longer a student and no longer has standing in the case; and therefore, I

don't think it is contested at this point that at a minimum, Plaintiff Stovall should be dismissed from the case. Of course, the defendants believe that that's true also for Mr. Bright who is no longer a student in the -- at West Texas A&M as well. And, of course, the Court has our arguments with respect to Spectrum WT.

THE COURT: Okay. And I have your argument on that. And so my to-do list before proceeding to discovery and something resembling trial on the merits, ruling on the pending motion to dismiss relevant to standing to sue and whether the students identified and the club have standing to sue and then the request to amend the complaint by plaintiffs. Those are on my to-do list before we can proceed.

MR. BRYANT: Thank you very much, your Honor. Would the Court -- of course, we just got the brief from plaintiffs Monday night, I guess, at 7:40. I was in federal court in Del Rio yesterday and then had the pleasure of driving up from Del Rio. Is -- would the Defendants have any opportunity to respond briefly to Plaintiffs' response? Quick reply?

THE COURT: Yes. I'll allow due by 5:00

o'clock tomorrow, and this will be memorialized in a written order, a reply brief not to exceed five pages.

MR. BRYANT:  Thank you, your Honor.

THE COURT:  And just please remember, I did First Amendment litigation as a practitioner, so I'm -- I'm somewhat familiar with the arguments relevant to associational standing, organizational standing.  So I think I have the papers I need to decide that; but in pursuit of further fairness, I'll allow a brief five-page reply and I'll --

MR. BRYANT:  I appreciate it, and I think the point that -- I think we would want to reply on is with respect to Mr. Bright who is no longer a student, but they argue that he should still have standing as a potential performer.

THE COURT:  Understood.

MR. BRYANT:  Thank you very much, your Honor.

THE COURT:  I have your papers.  I have your arguments.  I'll issue a written order allowing defendants a five-page reply.  And then, of course, that needs to be consistent with our local and judge-specific rules on page limits.

Okay.  So let's turn -- and you may return

to counsel table.

MR. BRYANT:  Thank you.

THE COURT:  And from this point forward, we'll pivot to the more substantive issues identified in that order dated August 26th.  And from this point forward, counsel may speak from table.  There's no need to do the shuttle walk back and forth to the podium.  So remember that I spent most of my career doing appellate law, not in district court.  So we can dispense with a lot of formality and just treat this more like an oral argument.  So I'm even permissive as to which counsel takes a question.  Just be certain for record purposes to identify any attorney if it's not lead counsel.  So we'll treat this more like oral argument, and it is a status conference, so it's already on that more informal end of the spectrum.

So I've organized my questions around topics and categories of evidence that the trier of fact may require as this case moves through discovery and into something like a trial on the merits.  So in category one, expressive conduct.  So in certain settings, First Amendment jurisprudence protects speech-adjacent activities deemed expressive conduct.  This court previously denied

plaintiff's requested preliminary injunction in part because the Court ruled that the proposed drag show was not expressive conduct under relevant precedent. But then, the Fifth Circuit majority in the divided opinion reversed this Court's order and determined that the proposed drag show is likely expressive conduct.  And I'm quoting directly from that *Spectrum WT* case decided on August 18, 2025.  So all subsequent references to the Fifth Circuit divided opinion are to that opinion.

Now, just briefly -- and we'll just go plaintiffs first, defendants second as if they're the movement, you're the respondent.  Do the parties agree that the Fifth Circuit's divided opinion, if binding upon this Court after issuance of mandate, held that the proposed drag show is likely expressive conduct?

MR. MORRIS:  We agree with that, your Honor.

THE COURT:  Okay.  And does the Government agree that the Fifth Circuit so held?

MR. BRYANT:  Your Honor, Ms. Al-Fuhaid will address the issues related to the documents and really all of the issues that I think the Court's about to raise.

THE COURT:  Okay.  It's really simple based on -- having taught First Amendment law just as an adjunct, not as an expert.  But so much of First Amendment law turns on these overlapping taxonomies.  One of the first predicates to decide is whether the proposed performance is expressive conduct.  I think that Fifth Circuit opinion by Judge Southwick does hold that the proposed performance is likely expressive conduct.  Does the Government agree?

MS. AL-FUHAID:  Yes, your Honor.  We agree that is what the Fifth Circuit's opinion says.

THE COURT:  Okay.  Now, burdens on expressive conduct are subject to a type of intermediate scrutiny when expression is incidentally burdened.  The Court -- the Supreme Court first announced those standards in *United States versus O'Brien* and a fairly unbroken line of cases have continued that tier of scrutiny.  Counsel can find *O'Brien* at 391 U.S. 367.  But if expression is directly regulated, strict scrutiny rules apply for content-based regulations.  This is the famous *Texas versus Johnson* case, 491 U.S. 397.  Based on the briefing, neither party has argued whether West Texas A&M directly or incidentally regulated

expression in a way that would implicate this line of cases.  Do the parties agree that a factual issue remains as to whether expression was incidentally or directly regulated in the case?

MR. MORRIS:  I think we would disagree with that, your Honor, based on President Wendler's edict from March 2023 where it's I think it's the Fifth Circuit found -- places a content-based burden directly on protected expression.  And as we've argued in this court and the Fifth Circuit, it also places a viewpoint-based burden on Plaintiffs' protected expression.

THE COURT:  So there is disagreement based on the briefing to date on whether that content-based regulation is direct or merely incidental?

MR. MORRIS:  I can certainly say that Defendants have raised *O'Brien* at least at the Fifth Circuit, and I believe they raised it briefly in the briefing here.  But our position is very clear. It's a direct restriction on speech.  *O'Brien* just doesn't come into play here.

THE COURT:  Okay.  Understood.  I have your point, and that's what I discern from your briefs.  I did not listen to oral argument, so I may

need to do that to have the entirety of your case up to this point.  Does the Government -- I should say Defendants.  Does the Defendant make a different argument and suggest that the -- any content-based regulation of this performance was merely incidental?

MS. AL-FUHAID:  Yes, your Honor.  We do maintain that it was incidental.

THE COURT:  Okay.  So this will be something for the Court's resolution.  We are just trying to distill down with clarity what issues remain.  Some sound in law.  Some sound in facts.  But thank you for that clarification.

Okay.  So under either form of scrutiny, whether intermediate or strict, the strength of the state's interest and the regulations tailoring to that interest become relevant.  So my next question, kind of in this broad category of expressive conduct.  Do the parties agree that factual disputes remain as to the state's interest and regulating the proposed content are relevant and then also it is still relevant for the trier of fact to discern any tailoring of those regulations?  So do the parties agree that there are potential factual disputes requiring additional discovery and eventually

determination by the fact-finder on tailoring of any of those regulations specific to this performance?

MR. MORRIS:  I think the parties disagree on those two issues, your Honor.  Whether those are factual disputes, I'm not sure.  We've certainly put in our position that whatever the Government's interest is, this is not narrowly tailored under any tier of scrutiny.  But there is a disputed issue I think around tailoring, at least.

THE COURT:  Okay.  The Court discerned as much, but I do want to give Defendants an opportunity to respond.  I do anticipate that we will need discovery of facts relevant to tailoring and that the trier of fact must potentially decide some of those questions.

MS. AL-FUHAID:  Yes, your Honor.  That's our position.

THE COURT:  Okay.  So put on your seatbelts.  I'm going to say a word that triggers all sorts of First Amendment panic, but I assure you this is more in response to recent intervening jurisprudence, and I'll sort of make a record on the Court's understanding of this category of speech or expressive conduct and then -- and why I want to make certain of any issues that need to be developed

through further discovery or decided by the trier of fact. So that next category is obscenity. Specifically obscenity as it relates to the participation of minors. Though expressive conduct may be protected under the First Amendment, obscene material is not. Every first-year law student knows that. Since at least 1973, of course the Supreme Court has used *Miller versus California* to create a three-factor test that the trier of fact may use in discerning whether expression warrants free speech protection even if deemed obscene or merely indecent. The test is well-known to the attorneys in the room. Part one, whether the average person applying contemporary community standards would find that the work taken as a whole appeals to the prurient interest. Number two, whether the work depicts or describes in a patently offensive way sexual conduct specifically defined by applicable state law. And three, whether the work as a whole lacks serious literary, artistic, political or scientific value.

I'm confident that the attorneys could probably cite these prongs verbatim and probably in their sleep. And when a state seeks to punish speech as obscene, it must specifically define the

forbidden depictions. And we could cite an unbroken chain of cases applying *Miller*, inside and outside the Fifth Circuit and also at the Supreme Court. But the First Amendment also permits states to prohibit minors from accessing speech that is obscene to them. Accordingly, the First Amendment permits those states to employ the appropriate means of enforcing such prohibitions. And citing from *Sable Communications*. Certainly, quote: There is a compelling interest in protecting the physical and psychological well-being of minors. Accordingly, many states have enacted statutes that feature what is sometimes termed a Miller for Minors Test, sometimes referred to as a Harmful for Minors or Variable Obscenity Standard. This legislation adjusts the Miller Test specific to minors. For example, the patently offensive requirement by statute then becomes the Patently Offensive for Minors Requirement. Some examples from other states include Florida Statute Section 847.001(7), Alabama Code Section 13A-12-200.1, Paragraph 11, and Georgia Code Annotated Section 20-2-324.6(a). So with all of that authority, jurisprudential and legislative, in mind, I have two questions -- actually three questions that will help this Court decide the scope

of discovery and assist the trier of fact in developing any facts relevant to minors and their proposed participation as audience members or within view of the performance.

First, although the parties believe that the case does not concern obscenity -- and I think that was stated through the briefing to date. Obscenity as related to adults is different than obscenity specific to minors.  Does Texas law require anything like a Miller for Minors Standard or a Harmful for Minors addendum to the Miller Test? If so, what are those standards, and what are those statutes, policies or requirements?  And because the Supreme Court decided some cases involving minors in the intervening months, specifically *Skrmetti* and *Free Speech Coalition*, I want to make certain that this Court doesn't miss anything specific to something like a Miller for Minors Requirement as it relates to Miller's second prong.

So Mr. Morris, you may proceed.  That is the question specific to Miller.  And I just need to know whether we will be addressing that as we move towards the merits phase.

MR. MORRIS:  Mr. Fitzpatrick is going to address this issue on behalf of plaintiffs, your

Honor.

THE COURT:  Mr. Fitzpatrick, you may take as much time as you need, and you may do so -- you may speak from counsel table.

MR. FITZPATRICK:  Thank you very much, and good morning, your Honor.  On the issue of the obscene as to minors exception, as your Honor correctly pointed out, our friends on the other side have affirmatively conceded -- and this is on Page 18 of their motion to dismiss at Docket Number 35 -- that obscenity is not at issue in this case.  At no point have Defendants argued that either Miller's obscenity test applies or that Ginsberg's Obscene as to Minor's Test applies.  Both in the District Court and the Fifth Circuit, at no point have defendants lodged an argument that a PG-13 drag show of the sort that's at issue in this case could trigger either Miller or *Ginsberg's* lesser obscene as to minors requirement.  And here's why that's important, and I want to go directly to the case your Honor raised in his order in *Paxton*. And I would like to go to footnote seven of the *Paxton* decision, which explicitly says in footnote seven, that content like a PG-13 or an R-rated movie is simply not the kind of content we're talking

about when it comes to obscene as to minors.  So when the undisputed record here is that this student group wants to host a PG-13 drag show, Vice President Thomas admitted in his answer that that is what the students communicated to him that they wanted to hold.  The poster that the students displayed for this show said PG-13 on the front.  The undisputed record in our view shows that this is intended to be a PG-13 drag show, and we have the Supreme Court in *Paxton* saying that PG-13 and R-rated material is not -- is not the same kettle of fish as the *Ginsberg* obscene as to minors standard.  The obscenity doctrine by Defendants' own submission simply has no role to play in this case.  And that means we're back at First Amendment -- first principles.  That means we're back at viewpoint discrimination and content discrimination.

THE COURT:  Okay.  Thank you, Mr. Fitzpatrick.  I have your argument.  And thank you for being prepared with record citations.  So you are treating this like oral argument.  So well done.  Mr. Bryant, will you be taking this question or your colleague?

MR. BRYANT:  My colleague will take the question.

THE COURT: Okay. You may proceed with your response.

MS. AL-FUHAID: Your Honor, I would like to point out that I guess plaintiffs say this is a PG-13 -- this would have been a PG-13 drag show and that that is undisputed. It is undisputed that that is what the students who intended to put on the performance communicated, but that -- that's a factual issue and -- as to whether it actually is PG-13 and as to what PG-13 might mean in this context. If this case proceeds to discovery, the evidence will show that university officials had questions about this event as to PG-13, R, worse than R, or as to exactly how that would have been categorized. And so that could be a factual dispute.

And as far as intervening legislation, your Honor identified S.B. 12 from this session earlier this year. And where it may -- you know, where it restricts on instruction regarding sexual orientation and gender identity and, you know, this restriction is placed on school districts, open enrollment, charter schools or district or charter school employees.

THE COURT: Did I correctly identify the

statute that's relevant to this case?

MS. AL-FUHAID:  Yes, your Honor.  Yes.
And the way that it is relevant to this case is that
West Texas A&M enrolls hundreds of dually-enrolled
high school and college students.  So there are
minors who are on campus who are enrolled in college
and also enrolled in these district -- school
district and charter schools.  And so they would be
governed -- or the schools -- they're K through --
their high schools would be governed by this
intervening legislation.  And so this section
prohibits school districts from allowing outside
groups and third parties to provide activities or
programmings related to sexual orientation or gender
identity to students enrolled in prekindergarten
through 12th grade.  So some of those high school
students who are also enrolled in these school
districts are also dually enrolled at West Texas A&M
University.  And --

THE COURT:  So the University would have a
coterminous obligation to protect high school
students such that the typical campus case and the
anticipated audience there might be different in
this case or at least it would be factually
disputed?

MS. AL-FUHAID:  It would be a factual -- it would be a factual matter, yes, your Honor.  And it would also be a restriction on the school district's, you know, joint enrollment program by allowing the University or like the outside group, whether -- you know, whether Spectrum would be considered an outside group or West Texas A&M to -- whether this could be considered an activity regarding sexual orientation or gender identity, you know, to these students.  So there is a question, you know, because these high school -- these high school students were minors could be on campus at any given point in time, as to whether they might be exposed to that.

THE COURT:  Right.  And not to reference facts outside the four corners, but only to flag a potential issue that needs further development through discovery and needs to be flagged as a potential factual dispute between the parties, this Court is aware of dual credit programs at both of the universities within the larger Amarillo area, West Texas A&M and then also Amarillo College.  So thank you for flagging that as a potential matter for the trier of fact and something that might require further discovery.

MS. AL-FUHAID:  Thank you, your Honor.

THE COURT:  So I have your argument; and if I require further briefing, the Court will advise the parties.  Now, so in my order, I identified potential intervening legislation that might relate back to that second Miller factor, specifically whether the sexual conduct that is regulable is defined by applicable state law.  I think I have your arguments on that.

Now, let's pivot to the jurisprudence that arose, and Mr. Fitzpatrick has already previewed some of the potential disputes in reading *Free Speech Coalition* but then also the *Skrmetti* opinion that the Court highlighted.  Do the parties dispute and will the triers of fact -- will the trier of fact need to ascertain whether Defendants have authority to exclude minors from sexual -- sexualized material or content including, quote: Accessing content that is obscene only to minors.  A phrase used in *Free Speech Coalition* and now we've identified Texas S.B. 12 as a potential interplay.  Do the parties disagree on whether there are minor-specific or age-specific restrictions that bear on Defendants' ability to regulate or restrict the proposed performance?  I think they do continue

to disagree; is that correct, Mr. Fitzpatrick?

MR. FITZPATRICK:  I think that's correct, your Honor, and I know my earlier argument primarily touched on the *Paxton* decision, so if I can briefly touch on the *Skrmetti* decision which I know you asked --

THE COURT:  I identified it in my order, so you would not be doing your job if you weren't ready.  Please proceed.

MR. FITZPATRICK:  Thank you, your Honor. With respect to the *Skrmetti* decision, we read it closely.  I reread it again yesterday, and I think it's important to point out for the Court that in neither the majority opinion nor the dissent is the First Amendment even mentioned.  *Skrmetti* is not a First Amendment case.  It does not deal with expressive rights either of parents or of minors. We think that the proper framework for deciding this case is traditional First Amendment jurisprudence. Cases like *Rosenberger.*  Cases like *Brown versus Entertainment Merchant's Association* which dealt with the First Amendment's interplay when California wanted to regulate the sale of violent video games to minors.  And it walked through how if you want to have those kinds of restrictions, you need to build

up the traditional First Amendment tests.  So we think that this -- that this case is at home in core First Amendment principles; and because it's at home in First Amendment principles, it's not altered by any intervening legislation because we're dealing with federal constitutional authority here.

THE COURT:  Sure.  So not to confuse the floor with the ceiling.

MR. FITZPATRICK:  That's correct, your Honor.

THE COURT:  Understood.  Is *Rosenberger* sometimes referred to as the *Rector* opinion?  Am I thinking of the same case?

MR. FITZPATRICK:  Yes, your Honor.

THE COURT:  Okay.  I have your argument. I understand.  And then *Brown* is the violent video game case, as I recall.  So I thank you for that response.  I'll invite any different view from defendants, but is counsel for plaintiffs correct, that this remains a disputed question, sounding in law and fact, as to whether there are minor-based restrictions that may apply in light of *Free Speech Coalition* and *Skrmetti*, or is this decided under the framework that Mr. Fitzpatrick identified or potentially both?

MS. AL-FUHAID:  I think we would disagree with plaintiffs, your Honor, regarding, you know, the standard -- the standards that should apply.  So I think your Honor's correct that there's a dispute there.

THE COURT:  Okay.  So whether that's developed through additional discovery or straightforward just legal briefing, the parties probably need a ruling from the Court and to have that issue decided, so --

MS. AL-FUHAID:  Yes, your Honor.

THE COURT:  -- the Court will operate under that assumption from this point forward.  So let's turn in this broad, broad category of expressive conduct.  Let's turn to potential evidence that might need to be further developed through discovery and then any potential legal determinations that necessarily stem from that factual development.  So at pinpoint number seven, in the divided Fifth Circuit opinion, Judge Leslie Southwick states, quote:  The question is whether the Plaintiffs' intended drag show would have communicated a message.  We consider context dispositive.  With an eye towards further developing that context, what categories of evidence will

assist the trier of fact in ascertaining the following?  Number one, whether the message -- and as the briefing reflects, it relates to suicide prevention and the Trevor Project -- is sufficiently related to the communicative conduct, Myss Myka's proposed drag show, to warrant expressive conduct protection under the First Amendment?  So what categories of evidence will this Court or the ultimate trier of fact need to make those determinations?  So are we talking about flyers, posters, placards, e-mails, in trying to discern the context and whether that -- you know, with an eye towards Judge Southwick's statement that context is dispositive, what categories of evidence will the trier of fact turn to in determining whether the message is sufficiently related to the communicative conduct to categorize the proposed performance as expressive conduct?  I'll turn first to the plaintiffs and then defendants.  Can you identify for the Court some of the materials or policies, rules, regulations, posters, placards, playbills, what discovery will assist the trier of fact in making that determination?

            MR. MORRIS:  Sure, your Honor.  JT Morris again for plaintiffs.  I think your Honor hit on

some of those categories; flyers, playbills, advertisements.  Advertisements for tickets.  Those sorts of things.  Communications might be relevant to that.  I think also context depends on the nature of the forum.  So we would certainly want discovery about Legacy Hall and other spaces on campus in terms of their suitability over the past few years and at current status for hosting performances --

THE COURT:  The next big issue is forum analysis, so we will get to that.

MR. MORRIS:  Sure.  I do just want to make clear for the record that does play --

THE COURT:  Of course.

MR. MORRIS:  -- into the context here.  I also think depositions of both President Wendler and Vice President Thomas would be helpful for that, particularly if you look at some of their admissions in the answers and to get their sense about whether they understood this would be a performance.  It's going to communicate something.  As we said in our briefing, the Supreme Court doesn't necessarily say you have to communicate a specific message.  It's enough that the reasonable observer knows you're communicating something.  And if that test is met, that's all that's required under the First

Amendment.  The Court's made that clear in *Hurley* and rejected the view that a specific message must be understood in order for the First Amendment to protect expressive conduct like Spectrum's drag performance here.

THE COURT:  Okay.  You used a trigger phrase there.  Reasonable observer.  So historically, that phrase is most litigated under a coercion test, under the religion clause, specifically the establishment clause.  I don't recall if the reasonable observer is -- the phraseology that the Supremes have used to make that determination, I can invite supplemental argument for Mr. Fitzpatrick.  Is that correct?  In thinking of all the categories of evidence, should I be looking with an eye towards something like a reasonable observer test that is objective to ascertain whether that reasonable observer would make the connection between the performance and the message?  Is it something like a reasonable observer standard?  Is that the terminology?

MR. MORRIS:  I think there are two paths there, your Honor.  One is if it's -- if it's very clear from the evidence that Spectrum and its members are communicating the message, they're

intending to communicate this; there is a tie with that and their drag show, then it's an obvious exercise of First Amendment rights. But I do think -- and it might be the ordinary observer or an ordinary audience member, right? A ticket -- an audience member who buys a ticket and goes to the show, they're seeing people on stage performing under the lights. That's also I think part -- another path to finding First Amendment protection here.

THE COURT: Okay. So -- and again, I don't mean to put you on the point. This isn't yet oral argument. I'm just trying to figure out what categories of evidence, how long we might need to develop that and then what the guardrails are for the claims that remain. Will this Court find something like the ordinary audience member test or reasonable observer test in the Supreme Court jurisprudence and which cases would you flag?

MR. MORRIS: I believe in *Hurley*.

THE COURT: *Hurley*.

MR. MORRIS: I also think there's some reference -- I might not have --

THE COURT: That's the Irish -- St. Patrick's Day parade case?

MR. MORRIS:  Correct, where they wanted to exclude a certain group of people from their parade.  The group said it wasn't expressive.  The Supreme Court said no.  Anybody watching this parade would understand they're trying to communicate a message.

THE COURT:  Okay.  I have your argument.  Any other cases, Mr. Fitzpatrick?  I'm more familiar with the establishment clause test and coercion test and the reasonable observer as a metric in that category.  But specific to forums and campuses and places like that, who is the -- who is the decision -- decision-maker is the wrong term.  Like who is the operative audience?  Is it a reasonable observer?  Is it an ordinary audience member?  What's the standard by which this Court must decide if the audience would get the message?

MR. MORRIS:  And again, I think there's two standards.  There's one where you can say if -- if they're communicating a specific message, and we've -- you know, we've submitted they've done that here with their flyers, their advertisements.  You know, having a ticketed audience who's coming to see this performance.  That's enough.

THE COURT:  And this is why you identified tickets and any contractual language appearing on

those tickets, that reasonable observer would then be defined by the ticketed audience, invitee sort of standards might apply.  You know, obviously from the sexually-oriented business category of cases, something that's zoned in a red light district has a different ticketed audience than something that might be more like a limited forum.  I know forum analysis is always lurking over this, but we will probably have to hear some evidence and argument about something like a reasonable observer or an ordinary audience member and things like flyers, playbills, tickets and advertisements might help this Court or the trier of fact decide that.

MR. MORRIS:  I agree.  I think those are the same things that the Fifth Circuit looked at, and obviously that's a different standard.  That's likelihood of success.  At trial, we obviously carry preponderance of the evidence standard.  But those are the things we would want to introduce, both at summary judgment and at trial, to assist the trier of fact here find that this is protected expression.

THE COURT:  Okay.  Understood.  The Court has your argument, and I will consider that in charting a course for discovery and then merits resolution.  Anything from the defendant on this

ordinary audience member versus reasonable observer test in discerning context as the Fifth Circuit referenced in Judge Southwick's opinion?  Do you agree those are the categories of evidence that we should look to?  And would the defendant add any other categories in this pursuit of context and trying to ascertain whether a reasonable observer or something like an ordinary audience member would make the necessary connection between the communicative conduct and the desired message?  I have flyers, playbills, advertisements, tickets, conversations, maybe an e-mail.  Are there any other categories of evidence that would assist the trier of fact?

MS. AL-FUHAID:  I believe University policies would -- regarding events and expressive activities would assist the trier of fact.  The advertising.  Well, I guess you mentioned that.  Any advertising documents related to what Spectrum -- how Spectrum would advertise the event, their planning of the event.  The standards by which they define PG-13.  Methods of determining who could enter and view the show.  Any documents and depositions that would be needed to ascertain that information would be useful to the Court.

THE COURT:  Okay.  So University policies specific to expressive conduct, forums.  This would be in the Texas A&M University System.  Various manuals, handbooks, things of that sort.

MS. AL-FUHAID:  Yes, the Texas A&M University System manuals and policies and also the West Texas A&M procedures and rules.

And also, your Honor, I would also add we would want the Court to be able to consider information about the drag show that actually did take place off campus in 2023.  And that would also assist --

THE COURT:  Okay.  I think you anticipated my next question, but we'll get to that category next.  I do want to follow up on University policies, regulation manuals.  What is the exact hierarchy between the Texas A&M System versus West Texas A&M and how this Court must read those intersecting manuals?  So I know West Texas A&M University is in the system; but as we go through discovery, in trying to discern forum policy, expressive conduct policies, how should this Court read those manuals, thinking of the hierarchy of that system; Texas A&M, West Texas and then of course anything that would affect dual credit with

local high schools, charter schools and the rest? How can you guide this Court in understanding how each of those manuals decide how a university or a designated public official will respond to the request for use?

MS. AL-FUHAID: My understanding of the hierarchy, your Honor, is that the West -- the Texas A&M University System adopts resolutions and promulgates policies. And then the West Texas A&M University promulgates rules and procedures to comply with those policies and resolutions. So that is my understanding of the hierarchy, that policies are higher than procedures and rules.

THE COURT: And would it assist the trier of fact to know which officials within that hierarchy are the designated decision-makers for denying or accepting a request for use?

MS. AL-FUHAID: Yes, your Honor. I believe that would be helpful to the Court.

THE COURT: So specific discovery relevant to that interplay between Texas A&M, West Texas A&M and any dorm officials, anybody with campus services. I'll just instruct the parties to have an eye towards that as we craft rules for discovery. Now, at Page 3 of the divided Fifth Circuit opinion,

Judge Southwick states, quote:  The proposed event was to be emceed by Myss Myka -- and that is spelled M-y-s-s M-y-k-a -- who had performed a highly sexual drag show off campus in February.  In Footnote 2, the divided Fifth Circuit opinion states, quote: President Wendler asserts and the plaintiffs do not dispute that Myss Myka simulated masturbation before the audience and simulated frottage with an audience member at this show.

Now, what categories of evidence will assist the trier of fact in ascertaining, number one, the sexualized nature of the performer, specifically Myss Myka's past proposed and prospective performances, and whether they qualify as expressive conduct, nonetheless regulable under something like a Miller for Minors jurisprudence or legislation or any other legislation relevant to the protection of minors?

So what categories of evidence will assist the trier of fact in determining the nature of that performance?  The Fifth Circuit characterized it as highly sexual, and Footnote 2 seems to indicate that the plaintiffs do not dispute that Myss Myka routinely stimulated -- or simulated masturbation and engaged in what the Court called simulated

frottage with audience members.

What evidence should the Court or trier of fact look to in ascertaining the nature of that performance?  I'll start with the plaintiffs.

MR. FITZPATRICK:  Good morning, your Honor.  Conor Fitzpatrick again on behalf of the plaintiffs.  Our position is that this is not a relevant issue in terms of what the trier of fact will be required to decide either at summary judgment or at trial.  Our position is that what's relevant here and what discovery would be relevant into is the nature of the show that the student group intended to put on rather than this performer's prior performances.  And I would like to offer the Court an analogy.  This is a performance.  It's in the performance arts.  It's akin to acting.  So let's take a well-known actress like Anne Hathaway.  And Anne Hathaway has appeared topless and nude in prior movies, though I presume the West Texas A&M System would not object if Anne Hathaway wanted to perform in an upcoming theater production at the University.  It would be no answer to say well, in prior movies you appeared topless and you appeared naked, because the pertinent question would be what is this production going to be?  If it's a

production of *The Lion King*, one presumes those concerns aren't going to be there.  So the relevant topic here for the fact-finder is not what a performer might or might not have done in prior performances.  The pertinent question here is what is this performance going to be.

THE COURT:  I'm not familiar with the specific movie, but I'll accept that Anne Hathaway has performed topless in movies.  But what if it's the same movie?  So if Anne Hathaway, just for purposes of the argument and the hypothetical.  I'm not going to fight your hypothetical.  If Anne Hathaway performed *My Fair Lady* topless -- which sounds absurd, and I'm using an absurd example just to play out the hypothetical -- and the proposed event is *My Fair Lady*.  Would that not have any relevance to a decision-maker's determination on whether that event and its coterminous obligation to protect minors, high school students who may be on campus, would that not at least be relevant and something for the Court to decide as a matter of law but then also develop as a matter of fact?

MR. FITZPATRICK:  Your Honor --

THE COURT:  I give you another example.  The vegan carnivore.  So there is a performance

involving some carnivore-like behavior, but the carnivore promises they will be a vegan in this production.  There has to be some factual development on what animated the defendant's concern because the performance does tend to recur in a certain category that might trigger university policies on lewd and lascivious conduct.  I have not read the Texas A&M manuals yet, but I know universities typically have forum analysis baked into their code and also appoint decision-makers to ascertain whether this performance is right for that forum; designated, limited or otherwise.

So using your example, if the performance that proved problematic in the past is the theme proposed for the next performance, would evidence in that category not have some relevance to a trier of fact trying to discern whether a defendant university violated the First Amendment in making that judgment call?

MR. FITZPATRICK:  So a couple of thoughts there, your Honor, and thank you for the examples. The first thought there is I think it would be appropriate for a university -- for a university official to perhaps ask questions of the student group regarding what sort of performance they were

going to put on.  But sort of the core of your Honor's question, if I understand it correctly, is how might it assist the trier of fact.  And what I would like to tie that to here is how that interacts with our prior restraint claim.  Because as your Honor knows, you mentioned as a former actor and professor, the First Amendment abhors a prior restraint.  And we know from cases like *Southeastern Promotion versus Conrad* that the First Amendment prefers for a show to go forward.  And then if something illegal happens, the performers are going to have to deal with the consequences.  But the First Amendment abhors the idea that a court or a legislature is going to guess or prejudge what expression would be as a basis to silence it.  So I hope your Honor will pardon me for fighting with the hypothetical a little bit, but sort of that kind of hypothetical in conceding that it could be relevant to a trier of fact, we think that that has some serious difficulty when it comes to prior restraint doctrine.

THE COURT:  But you do have a dissenting opinion from Judge Ho explaining that there may be a thumb on the scale if *CLS versus Martinez* applies with equal force to the University decision-maker in

this case. So the Court will have to determine what level of discretion applies to University official and whether there should be any deference to that decision-making where there are recurring instances of a performance that might be outside the rules for that forum. And the Court will have to decide whether *CLS versus Martinez* requires any deference. I know every member of the Supreme Court has a different view on in loco parentis and what that standard means as you move from kindergarten to grade school to university and beyond. We're not predetermining or prejudging that. I'm just trying to flag items that do remain in dispute and might require factual development. And so I do understand your prior restraint argument. I think you've correctly cited the cases that might apply. I'm glad you didn't invoke any of the national security cases, because I don't think we're dealing with state secrets at any point in this. So we don't have to do "Pentagon Papers" or any of those type cases. There seems to always be a permanent national security exception to a lot of those rules. But I think you've correctly identified we're in a campus setting. The relevant cases are those involving prior restraint of artistic performances,

things like that.  So I have your argument, and thank you for narrowing that inquiry.

Anything from defendants on categories of evidence specific to the Fifth Circuit's statements regarding highly sexualized performances and that the parties do not dispute that those performance had featured simulated masturbation before the audience and simulated frottage with an audience member in a case where defendants invited children as audience participants?  What categories of evidence would assist the trier of fact?  I have University policies.  So those will need to be matched to the proposed event.  Any other evidence that might assist the trier of fact in deciding whether, you know, certain minors -- Miller for Minors standards apply here?

MS. AL-FUHAID:  Communications between Spectrum West Texas and the intended emcee, Myss Myka, could be useful to the trier of fact.  A deposition of Myss Myka and how he intended to perform.  And any other intended performers and what they -- how they intended to perform at this -- at this drag show.  How they did perform at the drag show that they ended up holding off campus.  Perhaps whether Myss Myka has performed at other events at

which minors were invited to attend.  Videos of -- and any videos of past performances that would indicate what University officials might -- could expect from the -- any proposed drag show on campus. Any such -- any such information related to expected behavior that might guide University officials in their decision-making could be useful to the trier of fact.

THE COURT:  Okay.  So I have your argument, I have your papers, and I think I have from both parties a list of potential categories of evidence that might assist the trier of fact as we proceed through discovery and then trial on the merits.

Okay.  What evidence would assist the trier of fact in ascertaining whether plaintiffs expressly invited children to participate as audience members or participants in any other capacity?  So first from the plaintiffs.

MR. FITZPATRICK:  I suppose, your Honor, that discovery is likely not discovery that would be sought from -- by us.  It would likely be discovery sought from us.  So I suppose we would anticipate receiving interrogatories or request for admission or perhaps a deposition question on that subject.

But at least standing here today, I don't think there's any discovery we would affirmatively seek on that subject.

THE COURT:  Okay.  So like in deciding, you know, this reasonable observer or ordinary audience member and in what that denominator might entail, are we talking about University officials, or are we talking about the general public?  Are we talking about invitees who were actually under the age of 13, even though there's a proposed PG-13 rating?  We would probably receive those discovery requests from defendants, correct?

MR. FITZPATRICK:  Possibly.  And we would respond to those in the ordinary course.

THE COURT:  Okay.  Invitees, whether children are among the invited audience, I think it's been assumed as part of the case that as long as parental supervision is present, that children were invited to this event; is that correct?

MS. AL-FUHAID:  That is our understanding, your Honor.

THE COURT:  Okay.  And what evidence would defendants point to in assisting the trier of fact in deciding whether that was, in fact, the case?  It seems to be assumed by the parties; but as we move

towards merits and try to further develop the record for the Fifth Circuit, which made a series of assumptions about context and invitees and participants, what categories of evidence would defendants need to show that children were invitees to the proposed audience?

MS. AL-FUHAID:  Any knowledge that perhaps student members or performers had that minors were attending.  Any knowledge they have of invitations they have extended to minors specifically.  University policies regarding attendance at campus events by minors would be helpful to the trier of fact.  And yes, to the extent that they extended invitations.

THE COURT:  Okay.

MS. AL-FUHAID:  And whether minors, in fact, attended the drag show that the plaintiffs held.

THE COURT:  Okay.  So would it assist the trier of fact to elicit evidence on Myss Myka's past, proposed and prospective performances and whether they expressly included children as audience members or even invited children to participate?

MS. AL-FUHAID:  Yes, your Honor.

THE COURT:  Okay.  And understanding that

I think the briefing reflects that as this event was discussed in correspondence, there was always a parental approval, parental guidance overlay to that, correct?

MS. AL-FUHAID:  That is my understanding.

THE COURT:  Okay.  Understood.  So I have your arguments on that.  I think it's time for forum analysis.  So in the next large bucket, this Court and the trier of fact will have to do forum analysis to decide the case on the merits.  And specifically, the right of a speaker to access a particular piece of government property does turn on forum analysis and whether Legacy Hall is either a designated public forum or limited public forum.  I don't recall and I did not see in the briefing that either party argued that Legacy Hall is a traditional public forum; is that correct?  From the plaintiffs.

MR. FITZPATRICK:  Your Honor, we've argued it's a designated public forum which in many of the University policies, they point out is treated as a traditional public forum.  But yes, our position remains that this is a -- Legacy Hall is a designated public forum.

THE COURT:  Okay.  And we don't need to spend any time on discovery or argument that this is

something like a classical, traditional public forum; is that correct?

MR. FITZPATRICK:  That's correct, your Honor.

THE COURT:  Okay.  So from the plaintiffs, you will be arguing and you will be requesting discovery specific to designated public forum?  That is the category that you would argue?

MR. FITZPATRICK:  That's correct, your Honor.

THE COURT:  Okay.

MR. FITZPATRICK:  We'll be seeking discovery into past uses of Legacy Hall, past events that have been held there and the like.  I'm happy to expand on that if your Honor would like.  But if -- the Court is nodding as though it knows where I'm going, so I don't want to belabor the point.

THE COURT:  Okay. Understood.  I do have your papers.  In reading both the majority opinion and the dissent, I think this is a contested issue. And it's my understanding plaintiffs are arguing that Legacy Hall is a designated public forum and I'll permit discovery relevant to that inquiry.

MR. FITZPATRICK:  Thank you, your Honor.

THE COURT:  Now, regarding limited public

forum, I believe from the Fifth Circuit's majority opinion and the dissenting opinion that defendants argue that it is instead a limited public forum; is that correct?

MS. AL-FUHAID:  Yes, your Honor.  That's what we have argued.

THE COURT:  And what categories of evidence would assist the trier of fact in deciding this question?  Plaintiffs argue designated public forum.  Defendants argue limited public forum.  I think you are going to have much of the material in the form of University policies.  And with an eye towards customs and practices, what other categories of evidence would help the trier of fact make that determination?

MS. AL-FUHAID:  Any proposed changes to policies would be useful to the trier of fact, your Honor.

THE COURT:  Okay.  And I have from you earlier this hierarchy between Texas A&M University, West Texas A&M, the campus and then any decision-makers who use those manuals to make those decisions.  Is that a category of evidence that would assist a trier of fact in knowing which policy determines which forum determines which

decision-maker?

MS. AL-FUHAID:  Yes, your Honor.

THE COURT:  Okay.  Is there anything else in the form of depositions or discovery that would assist the Court and the parties in determining who is the ultimate decision-maker, because often, with campus cases, you might have a dorm director or a rec director or somebody who isn't in that vertical hierarchy but does appear in e-mails.  They might think they have the authority to make a decision, but they don't.  How is this Court or the trier of fact to ascertain that?  What other categories of evidence would the Court turn to to make that determination?

MS. AL-FUHAID:  Well, your Honor, if this case proceeds to trial, we may offer testimony from those officials who apply these policies so that they can explain to the Court how they work in practice and how they -- they apply these policies to the situations they encounter in the day-to-day running of the University.

THE COURT:  As a First Amendment specialist, both Mr. Morris and Mr. Fitzpatrick know, in the K-12 setting, often times you will find disagreements as you move from the Board of

Education, to the superintendent, to the principal, to the teacher, to the facility use coordinator. I just want to make certain that we don't waste time pinging discovery back and forth and that defendants are forthright in identifying those hierarchies.

Any other categories that the Court should know about that could assist the trier of fact?

MR. MORRIS: And just to add on to the statement about depositions, I think we would agree with that, to your Honor's point, about who's the final decision-maker here. For example, we know through Shawn Fouts who I think at least at the time both shows were cancelled was the director of the JBK Student Center. He might have information about who was the final decision-maker here. Obviously, Dr. Thomas and President Wendler would as well, so depositions is going to be a key category of discovery for this issue, your Honor.

THE COURT: Okay. Understood. I've been through some of these campus cases before; and at times, both parties do this in trying to identify which decision-maker actually had the authority. This is obviously relevant to the qualified immunity inquiry to the extent that that lingers over the case. So I just want to make sure that we refine

discovery and be as efficient as possible in marshaling that evidence both for opposing counsel and the Court.

Now, so I have a running list of categories of evidence that might assist the trier of fact. I just want to run my list across what we've heard at the hearing and make sure I didn't miss anything. So Texas A&M manuals, handbooks and policies. West Texas A&M advertised venues which can include the website; wtamu.edu. Requests for applications of use, although I'm not privy to the exact terminology. What paperwork is involved in making the request and then what does the record reflect in request denied, request accepted, those that were processed or not processed. The Fifth Circuit at pinpoint nine in the divided opinion states: On the record so far, President Wendler's objections were not to the message but to the way it would be delivered. That hints that there might be further record development on that point. I'm not certain if that is e-mail communications, if that would have to be adduced through deposition, but the Fifth Circuit is hinting that maybe the record is undeveloped on that point. Any denials of applications for use at Legacy Hall and, of course,

any history of events hosted. And plaintiffs have already previewed a series of events that they assert instruct forum analysis because Halloween parties and other events there. So that's obviously relevant. And so the parties should move towards producing information on events that were previously held at Legacy Hall.

The only category that I see omitted is something like a corporate representative who can speak on behalf of the University system, the West Texas A&M campus or whatever ultimate decision-maker who might explain which events would be prospectively declined or denied. So it's a little bit of the evidence of absence isn't -- what is the phrase? Absence of evidence isn't evidence of absence problem. Will defendants present something like a corporate or trial representative who can speak forum by forum, event by event, that this event would be approved prospectively. Do you intend to make those designations, and does that need to be part of the Court's planned discovery for this case?

MS. AL-FUHAID: Yes, I would imagine we would appoint someone to discuss that and offer evidence to -- offer testimony to the Court should

the Court proceed with discovery and trial.

THE COURT:  Right.  Because as you move away from more Metropolitan areas, different campuses, different university officials simply haven't dealt with some of the events that are relevant to the forum inquiry.  It might assist the trier of fact to have a corporate representative who says we've never received an application for blackface minstrel acts, but we might decline that for X,Y,Z reasons.  I know the competing opinions in the divided Fifth Circuit opinion use blackface as a metaphor, but the record may just not reflect that they've ever received any such request.  I would be surprised in this region of the country if that had ever happened, but that doesn't mean it's irrelevant to the Court's inquiry.  If Legacy Hall is a designated public forum or a limited forum, would you accept blackface as a proposed performance? There are specific circuit-level opinions that wrestle with the limits of forum analysis when it is an offensive event like that.  And then, of course, we can work our way all the way down to the Halloween party and things less offensive, but it might be good and useful to the trier of fact to have something like a corporate representative or

trial representative, and I can make that part of a planned discovery process.  Any objection from the plaintiffs?

MR. MORRIS:  No, I think we would welcome that, your Honor.

THE COURT:  Okay.  And I can't remember the exact rule, but I know -- it might be Rule 26. The Rules of Civil Procedure contemplate such a designation for discovery.  So please flag that, both plaintiffs and defendants, as we move forward with the discovery plan.

Okay.  So on questions presented.  So my next bucket, my next category, are questions presented, what remains for us to decide once the mandate is lifted.  I think I have from the defendant and from plaintiff that discovery should include West Texas, Texas A&M System rules, regulations, policies, customs and practice. Because customs and practices may not be memorialized in written documents, we may require depositions to ascertain customs and practices.  I have from the parties that they do think discovery should cover a facility use request, either acceptance of certain performances or denial of certain performances.  I think I have from the

parties what sort of evidence might assist the trier of fact in determining Legacy Hall's forum status. I think defendants mentioned that this reference to a prior drag show that took place at Legacy Hall in 2019 is potentially relevant, but that's just in that catchall discovery category of past performances. And I do have from defendants that you are continuing to argue that this may be viewpoint discrimination, not just a content-based discrimination; is that correct?

MR. MORRIS: That's correct, your Honor. And so we would obviously want discovery into that as well.

THE COURT: Okay. Now, the Supreme Court has given us, you know, the guardrails for all this forum analysis, expressive conduct analysis. Obviously you need a ruling from this Court on pending motions regarding standing. I believe the parties are agreed that we need not impanel a jury to decide damages on Count IV because it has been dismissed; is that correct?

MR. MORRIS: That is correct, your Honor.

THE COURT: And is that correct, Mr. Bryant?

MR. BRYANT: Yes, your Honor.

THE COURT:  So based on my review of what remains to be done, I believe we can proceed on something like a bench trial.  I think -- I use the term trial on the merits as a term of art to catch like whatever hearing or proceeding sort of finalizes everything for final judgment that the Fifth Circuit needs to finally decide the case.  So I use the phrase trial on the merits, but I perceive that this is more like an evidentiary hearing before the Court to finally resolve permanent injunction and that we don't have damages claims that would require a jury; is that correct, Mr. Morris?

MR. MORRIS:  I think that's correct, your Honor.  I mean, certainly the Court could impanel an advisory jury.  We would welcome that, but it doesn't have to.  I would just also remind the Court we also have claims for declaratory relief which I assume would fall within that evidentiary hearing for a permanent injunction.

THE COURT:  Any objection to that framework?

MR. BRYANT:  No, your Honor.

THE COURT:  Okay.  So you'll need some rulings from the bench specific to standing and in some of those gateway entry issues, but I think what

we're looking forward to is something like a bench trial, although it really is an evidentiary hearing on permanent injunction, which then can give the Court the necessary facts and law to close the case, have the ROA ready and off for whatever Fifth Circuit appeals that follow.  Am I correct?

MR. MORRIS:  I think mostly, your Honor. I would just question the Court whether in issuing a scheduling order, it will build in a deadline for summary judgment or other dispositive motion of briefing because I do think that could be beneficial to tailoring issues or even entering final judgment before a bench trial.

THE COURT:  Okay.  So I don't discern that summary judgment would be terribly helpful if we are going to present all the evidence that we discussed here.  I mean, we can work together, counsel and Court, to identify all the categories that are subject to a discovery order.  This case has been very well briefed by both sides, plaintiffs and defendants.  I think even in this very hearing, we've sort of identified the necessary legal standards.  And if we present a trial brief at the eve of that trial on the merits, evidentiary hearing, whatever terminology we want, I think the

Court will be apprised of anything that might appear in an MSJ. Am I missing some intervening Supreme Court case that I didn't read, anything that's MSJ-worthy that couldn't be reduced to a trial brief and then paired with whatever evidence is presented at the trial on the merits?

MR. MORRIS: I think my understanding of the federal rules, your Honor, is as part of the scheduling order, the -- a court needs to issue -- or set a deadline for dispositive motion briefing. We would ask to have the opportunity. Obviously, the Court can control its docket the way it wants, but we would urge it to adhere to Rule 56 and the general guidelines. And just to make the record, I just want to state my objection here just in case the Court decides not to set a dispositive motion deadline.

THE COURT: Okay. With an eye towards Rule 56, which is MSJ, correct?

MR. MORRIS: That's correct, your Honor.

THE COURT: Okay. I have your argument. I will make certain that you have a ruling. I do find that it is -- your objection has been preserved for further appellate review. That's the great thing about this District Court. I spent more time

as an appellate attorney, and I'm going to let either side make whatever record protecting a finding they need, because I want you to get the best ROA up to the Fifth Circuit as possible. So do not hesitate to request those rulings and those findings, if necessary. So you -- you -- plaintiffs will require a ruling from the Court on whether the schedule will include something like dispositive motion briefing schedule; and specifically, if so, a Rule 56, MSJ, process.

Okay. Now, I would like to move expeditiously since this case has lingered on my docket for close to three years. I'll ask that the parties submit all the -- all the categories of evidence and discovery that should be made part of something like a joint scheduling order. My courtroom deputy and clerks can provide examples of scheduling orders on this Court's civil docket, but I want to make sure it includes expert designations, document production and exchange of materials and all those categories we've discussed. You know, the Texas A&M manuals, the flyers, the playbills, everything that was discussed today. Witness list. Proposed time limits. So I do put you on the clock. If you're going to rent this space, I'm going to

give you time limits.  I don't think we need to address -- I had the Fifth Circuit Pattern Jury Instruction, Section 10.3, at the ready and anticipated bifurcated process if we did have a jury for damages, but I've now heard from both parties that that's not necessary.  The Court finds defendant has waived any argument that jury trial is needed.  This will instead be something like a bench trial or, as the Court described, an evidentiary hearing and final -- reaching final ruling on permanent injunction.  I do require robust exchange of exhibits and even demonstratives prior to trials or hearings.

I'm trying to see if there's any other category you should flag.  When do you think the parties could have a proposed joint scheduling order for discovery for the Court's review?  If necessary, we could have a Zoom hearing to just tweak dates and deliverables, but when could a proposed joint scheduling order be submitted by plaintiffs and defendants?

MR. MORRIS:  I'd say within a week to two weeks.

THE COURT:  Okay.

MR. MORRIS:  I'm not sure what

Mr. Bryant's schedule is, but --

THE COURT:  Well, sometimes he's in Del Rio; sometimes he's in Amarillo; sometimes he's in Austin.  So it's like "Where's Waldo?"

MR. BRYANT:  Your Honor, I probably made it sound more travel-oriented than it really is.  It has been that way the past few days, but --

THE COURT:  How far is Del Rio from here?

MR. BRYANT:  It's eight hours plus driving is all I know for sure.  Actually, it's about 600 miles, so.

THE COURT:  I am a life-long resident of Dallas-Fort Worth; and when I accepted this job, I didn't properly account for the size of this state.  It now takes five hours, six hours, seven hours to get anywhere.  So I -- the Court so finds.

MR. BRYANT:  Thank you, your Honor.  I would suggest perhaps 20 days.  And my colleague suggests -- I think it's a good suggestion.  You may want to key it to a couple of weeks after the Court rules on the motion to dismiss, because if the Court rules -- the Court's ruling could have an effect on this.

THE COURT:  Okay.

MR. BRYANT:  Another circumstance that --

I'm not suggesting it should determine this at all. We're part of a team that has to try the case with respect to the new congressional redistricting.

THE COURT:  You have enough on your plate?

MR. BRYANT:  Legislation beginning October 1st in El Paso.  So that's another part of our thinking, at least.

THE COURT:  Okay.  So this is what -- and I'll instruct my law clerks to take notes on this. This is what you can expect.  A quick ruling on pending motions to dismiss affecting standing and what we discussed at the outset of the hearing to be followed by an order instructing the parties to generate a joint proposed scheduling order.  And again, this is just proposed.  And I will try to highlight all the categories of evidence that we discussed today so that we can get deadlines for document production, witness list, depositions, et cetera.  I'll try to look at my own calendar, make some determinations.  I do think for the most part the legal issues are well-developed.  It's mostly factual development that remains, but you'll have in that order my decision on dispositive motion briefing and whether Rule 56, MSJ, will be part of that anticipated schedule.  And then you'll have at

the very tail of that order my proposed trial date. And again, it sounds like the parties and the Court are in agreement that this is more like a final evidentiary hearing on permanent injunction, but I will refer to that as the trial date because it's the final dispositive event in this case. So I usually start with that last date, I work my way forward. And I will try to work in an expedited manner so that we are looking at something like a workable joint scheduling order two weeks from now. But I did not know defense counsel's working on redistricting. So my classmate and current colleague, Judge Hendrix, clerked for Judge Higginbotham on the Fifth Circuit, and that was a redistricting year, and that's all he did for about 12 months of clerkship. So I did not experience that, but I have at least one anecdote about the amount of time that that might take. So I will try to be reasonable. And of course, the Texas AG can staff the case with additional attorneys if Mr. Bryant's unavailable.

MR. BRYANT: Thank you, your Honor.

THE COURT: Okay.

MR. BRYANT: We tried the redistricting case in El Paso for 20 days in May and June, and we

thought we were through with it. And now we -- we have this new product of the legislature, and so everything is accelerated to try to develop the facts to present to the three-judge court in that matter that -- so it's even more aggressive than redistricting legislation -- litigation typically is.

THE COURT: Okay. And I will keep that in mind and also that attorneys for plaintiffs have offices in Washington, D.C. and Austin, not Amarillo. So logistics are always an issue when you're doing cases in this division. So I'll bear that in mind as well, that there are some constraints on counsel. So I'm flexible. When you get this list, don't freak out if it -- if it's like you're one day that you plan, you know, to take a trip to Sonora or whatever. The Court tends to be pretty flexible within reason on some of these dates and deliverables. But we will try to move with some speed to get this case finalized and to the Fifth Circuit. And at all times, I intend to make all necessary findings to help you preserve the record on appeal so that we can get final resolution at the Fifth Circuit.

So is there anything further from the

plaintiffs?  You have me here in court.  Is there anything else you need me to decide so that we can get this case moving?

MR. MORRIS:  Nothing from plaintiffs at this time, your Honor.

THE COURT:  Anything from defendants?  You have a captive audience.

MR. BRYANT:  Your Honor, this doesn't pertain to the content of the pretrial preparations in this case; but if I could, I wanted to be sure the Court was aware of another case that has some pertinence to this one, and that is a case entitled *Texas A&M Queer Empowerment Council versus Mahomes, et al.*

THE COURT:  Is this the one pending in the Southern District of Texas before Judge Rosenthal?

MR. BRYANT:  Exactly, your Honor, and I believe there's a preliminary injunction that is now on appeal to the Fifth Circuit in that case, and it pertains to a policy that Texas A&M System Boards of Regents adopted in I believe February 2025.  I'm not counsel in that case, but I believe plaintiff's counsel is plaintiff's counsel in that case.  So the issue I've been struggling with is that that policy that the A&M System Board of Regents adopted back

then prescribed what each A&M campus should do with respect to drag shows, is currently under a preliminary injunction, but I don't think anyone can know when the Fifth Circuit will determine or what the Fifth Circuit will determine with respect to that. It has something -- some effect obviously on whether Dr. Wendler has or will have any discretion with respect to future drag shows that plaintiffs might schedule. And as we point out in the Motion to Dismiss For Subject Matter Jurisdiction, there are none currently scheduled, so that's why we -- we think this is not right, but whenever it is scheduled, the status of that Texas A&M Board of Regents resolution at that time would be relevant to what should be done with respect to that drag show. Just wanted to make sure the Court was aware of it; and since the Court is, that's just what I wanted. Thank you.

THE COURT: I think that's a good category for supplemental briefing. So if it were the Fifth Circuit, something like a Rule 28(j) letter, probably longer than a letter; but as we move forward and present the case for trial on the merits, I will likely order some version of briefing on how this case at 772 Federal Supplement 3d, 792,

bears on any Texas A&M policies relevant to this case. I know the Supreme Court has given us some guidance on nationwide injunctions. I don't recall that this *Mahomes* case involves anything like a nationwide injunction but is restricted to the facts of the case, but it may have some bearing on your ability to argue certain policies which are binding, not binding, and I'll instruct my law clerks to flag *Mahomes* as a potential issue for supplemental briefing. So thank you for drawing the Court's attention. I was aware of that opinion. I did not know its status at the Fifth Circuit. So you can anticipate something from the Court instructing the parties to brief that.

I think that is it. I do want to give you a preview of the mechanics of that final hearing. I anticipate opening statements. After we've done all the exchange of exhibits, demonstratives, witness list, we're trial-ready at that point. I will request proposed findings of fact and proposed findings of law from both parties. I'll keep those under advisement until the trial is concluded, all evidence is heard. And because there is no jury, I don't anticipate a lot of evidentiary fights or rulings. But if necessary, we can set a pretrial

conference to pre-litigate some of that.  This is much more like a PI hearing.  We don't have 403 issues or things like that, so I'm hopeful that you can put up your evidence, put up your witnesses. I'll have a proposed finding of fact, conclusions of law list from the plaintiff; a proposed finding of fact, conclusions of law list from defendant; and at the close of the case, I'll use those to develop what is the final order of the Court.  And at that point, I will give you the final judgment that you need to make any appeals to the Fifth Circuit.  Any objection to that proposed format?  Just the mechanics of how that trial on the merits would proceed?

MR. MORRIS:  Just one question, your Honor.  At the conclusion of the hearing, will the parties have an opportunity to file any supplements to their proposed findings of fact, findings of law? I ask only because of my experience.  Sometimes trial brings things out that neither party anticipates.

THE COURT:  Sure.  I'll instruct my law clerks and CRD to amend our typical order to allow for supplements.  I will -- we'll maybe build that into the schedule for trial day, to allow for that.

I don't think without a jury that we'll have, you know -- we won't have to have any sort of charge conference or any language about patterns, things of that sort, so we can skip that step.

Do the parties have any idea on time limits, how long you think that that final hearing might take?

MR. MORRIS:  I can't say with certainty without having done discovery.

THE COURT:  Okay.

MR. MORRIS:  I don't think it would take more than a couple days.  I mean, I think most preliminary injunctions, you know, on constitutional issues like this, that's consistent with my past experience.

THE COURT:  My experience has been one to two days maximum.  If it's basically a preliminary injunction converting to a permanent injunction, you can get the witnesses up and down within a day or two, but I didn't want to truncate that if you thought more time was necessary.  So I'm anticipating allotting two days.  Any objection from defendants?

MR. BRYANT:  No, your Honor.  Again, as we get farther into discovery, may have a different

view, but that -- I agree that that is typical and is likely reasonable in this case.

THE COURT:  Okay.  Just housekeeping.  We have internet in Amarillo.  We have some IT technology, but I'll probably set a date for y'all to pretest and pre-drive all of your equipment because you're going to be remote from your headquarters, so anticipate maybe on that first day bringing any IT specialist with you so that you can make use of all that technology.  It's just one person viewing it, so we'll just operate from what you see in the courtroom now.  But we have had glitches.  Apple computers sometimes don't talk to our DOS-based systems and things like that.  So I would just make time to arrive early.  We'll build it into the schedule so that we can test all of your IT equipment.  I will require if there is any video evidence, that you meet and confer about excerpts. So as an example, Friday we have a suppression hearing.  I don't want to waste time refereeing start and stop times.  So if this case is going to involve anything like video graphic or audio evidence, my order will require that the parties meet and confer about start, stop times, and you exchange those so that we can hit play, we can

present it.  We don't have to fight about, you know, which relevant portion of the video.  As an AUSA, I worked on Foreign Intelligence Surveillance Act cases with lots of foreign languages and things of that sort.  I don't -- I don't want to referee start and stop times and which tape and which video, so I do require that the parties collaborate so that when we're trial-ready, we hit play, we hit stop, everybody agrees on those numbers and those videos and any audio.  So there will be a little bit of pre-work to get trial ready for that day.  So I didn't want you to be surprised by that.  I'll just ask my courtroom deputy if there's anything else trial-ready-specific that I need to advise you of.

One judge-specific requirement, only because it's happened with jury trials.  I do require exchange of demonstratives.  That's a little bit different.  I would consider it waiving it here since we don't have a jury and we don't have the problems -- I mean, I'll see the demonstrative either in redacted form or whatever, but sometimes, it's better for the speed of the trial if we can reach agreement that certain demonstratives are in or out.  Just let me know the parties' preference on that.  But in criminal trials, especially, I do have

a judge-specific requirement that any objections to demonstratives be pre-litigated before we have an evidentiary problem with a jury. So I don't think that that will be a problem here, since there's only one person sitting as trier of fact and law, but sometimes exchanging demonstratives and kind of pre-litigating those will speed the process so that we're not fighting about this video or this slide or things like that. So please collaborate on demonstratives as well. And you can always preview that for me, you know, before we hit start on the record if you need something from the Court.

So other than that, anything further from plaintiffs?

MR. MORRIS: No, your Honor.

THE COURT: Anything further from defendants?

MR. BRYANT: No, your Honor.

THE COURT: Okay. So I've instructed my clerks to take good notes. You'll have the rulings that you need and we're going to move with deliberate speed on this matter, and I'll just instruct the parties to continue to collaborate so that we can get this done in a timely manner.

And let the record reflect that I win the

bet with my law clerks that we are done by noon. I tend to be long-winded, and I thought that this would ruin lunch, but that didn't happen. We got this done at noon. So thank you to the parties for excellent briefing up to this point, excellent presentation. I know it takes effort to get to this Court, so I appreciate you working with such deliberate speed to get us through this hearing. I will reciprocate in kind with fast orders on what remains from the bench.

So with that, we are adjourned and the Court stands adjourned for the remainder of the day. Counsel are excused.

[PROCEEDINGS CONCLUDED AT 11:57 A.M.]

* * * * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Christine M. Orr, RPR,*          9/11/2025
Official Court Reporter          Date