# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

SPECTRUM WT,

      Plaintiff,

    v.

WALTER WENDLER, in his official capacity as the President of West Texas A&M University,

      Defendant.

Case No.: 2:23-cv-00048-Z

Hon. Matthew J. Kacsmaryk

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

JT MORRIS
TX Bar No. 24094444
CONOR T. FITZPATRICK*
MI Bar No. P78981
FOUNDATION FOR INDIVIDUAL RIGHTS
   AND EXPRESSION
700 Pennsylvania Ave., SE; Ste. 340
Washington, DC 20003
Tel: (215) 717-3473
Fax: (267) 573-3073
jt.morris@fire.org
conor.fitzpatrick@fire.org

ADAM B. STEINBAUGH*
CA Bar No. 304829
JEFFREY D. ZEMAN*
MI Bar No. P76610
FOUNDATION FOR INDIVIDUAL RIGHTS
   AND EXPRESSION
510 Walnut St.; Ste. 1250
Philadelphia, PA 19106
Tel: (215) 717-3473
Fax: (267) 573-3073
adam@fire.org
jeff.zeman@fire.org

* Admitted *Pro Hac Vice*

*Counsel for Plaintiff*

# TABLE OF CONTENTS

LIVE PLEADINGS ................................................................................................ 1

INTRODUCTION ................................................................................................. 2

STATEMENT OF UNDISPUTED MATERIAL FACTS ............................................. 5

    West Texas A&M opens its facilities to student expression, including
        stage performance. ................................................................................. 5

    Spectrum, like many recognized student groups, has a message
        to share. ................................................................................................ 6

    Spectrum plans and organizes a PG-13 charity drag show in Legacy
        Hall. ..................................................................................................... 7

    President Wendler cancels Spectrum's performance, describing drag
        shows as "expression which denigrates others." ..................................... 9

    Spectrum sues and seeks injunctive relief. ................................................ 11

    Spectrum again seeks to hold a drag performance in Legacy Hall, and
        Wendler again unilaterally cancels the reservation. ........................... 12

    Spectrum has applied for a third time to host its drag performance at
        Legacy Hall in April 2026. .................................................................. 14

STANDARD OF REVIEW ...................................................................................... 16

ARGUMENT ......................................................................................................... 17

    I.     Spectrum Succeeds on the Merits. ........................................................ 17

        A.    Stage Performance, Like Spectrum's Planned Drag Shows,
            Is Inherently Expressive and Thus Constitutionally
            Protected. .................................................................................. 17

            1.    Stage performance, including drag, is inherently
                expressive. ......................................................................... 17

            2.    Spectrum's drag performances are protected
                expression. ........................................................................ 20

            3.    The First Amendment's protection does not turn on
                the perceived "value" of speech. ........................................ 21

i

4.    First Amendment protection for drag performance is equally robust on public university campuses ................ 22

B.    President Wendler's Blanket Ban on Drag Performance Because He Disagrees with Its "Ideology" Is Viewpoint Discrimination and *Per Se* Unconstitutional in Any Forum. ...................................................................................... 24

1.    President Wendler's tolerance of other speech does not make his drag show ban any less viewpoint discriminatory. ................................................................. 25

2.    The First Amendment's prohibition against viewpoint discrimination protects expressive conduct as well as speech. ................................................ 28

C.    President Wendler's Drag Show Ban Is Also an Unconstitutional Prior Restraint. ................................................ 29

1.    Wendler's prohibition on Spectrum's performances is a classic prior restraint because it prohibits speech before it occurs. ................................................................. 30

2.    Wendler's claimed authority to cancel expression he deems "demeaning" is a prior restraint unbound by narrow, objective, and definite criteria. ........................... 31

D.    Wendler's Drag Show Ban Is a Content-Based Prohibition in a Designated Public Forum That Cannot Satisfy Strict Scrutiny. ...................................................................................... 35

1.    University policy and practice establish Legacy Hall is a designated public forum. ........................................... 36

2.    Wendler's ban is content based and thus presumptively unconstitutional. ....................................... 39

E.    President Wendler cannot satisfy strict scrutiny ...................... 40

1.    President Wendler's contemporaneous reasons for the ban do not constitute a compelling interest. ............. 41

2.    President Wendler's post hoc justifications for the ban do not provide a compelling interest either. ............. 42

ii

3.     Wendler's sweeping ban on a form of expressive conduct is not narrowly tailored to satisfy strict scrutiny...................................................................... 46

II.     Spectrum Is Suffering Irreparable Harm............................................... 47

III.     An Injunction Will Serve The Public Interest....................................... 48

IV.     Declaratory Relief Is Appropriate.......................................................... 48

CONCLUSION............................................................................................... 49

CERTIFICATE OF SERVICE ..................................................................... 50

# TABLE OF AUTHORITIES

## Cases

*303 Creative LLC v. Elenis,*
   600 U.S. 570 (2023) ................................................................................ 17

*Alexander v. United States,*
   509 U.S. 544 (1993) ................................................................................ 30

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ................................................................................ 16

*Ark. Educ. Television Comm'n. v. Forbes,*
   523 U.S. 666 (1998) .................................................................................. 4

*Bolger v. Youngs Drug Products Corp.,*
   463 U.S. 60 (1983) ................................................................................... 46

*Boos v. Barry,*
   485 U.S. 312 (1988) ................................................................................ 41

*Brown v. Ent. Merchs. Ass'n,*
   564 U.S. 786 (2011) ........................................................................... passim

*Calmes v. United States,*
   926 F. Supp. 582 (N.D. Tex. 1996) ........................................................ 16

*Cath. Leadership Coal. of Tex. v. Reisman,*
   764 F.3d 409 (5th Cir. 2014) ............................................................ 30, 31

*Chiu v. Plano Ind. Sch. Dist.,*
   339 F.3d 273 (5th Cir. 2003) ................................................................. 34

*Chiu v. Plano Indep. Sch. Dist.,*
   260 F.3d 330 (5th Cir. 2001) ............................................... 25, 38, 39, 41

*Christian Legal Society Chapter of the University of California, Hastings
   College of the Law v. Martinez (CLS),*
   561 U.S. 661 (2010) .......................................................................... 24, 40

*City of Ladue v. Gilleo,*
   512 U.S. 43 (1994) ............................................................................ 28, 46

*Clark v. Cmty. for Creative Non-Violence,*
   468 U.S. 288 (1984) ................................................................................ 21

*Cohen v. California,*
403 U.S. 15 (1971) ............................................................... 18, 22, 23, 46

*Concerned Women for Am. Inc. v. Lafayette Cnty.,*
883 F.2d 32 (5th Cir. 1989) ...................................................... 35, 38, 39

*Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n,*
447 U.S. 530 (1980) ........................................................................ 28

*Davis v. Monroe Cnty. Bd. of Educ.,*
526 U.S. 629 (1999) ........................................................................ 33

*Deville v. Marcantel,*
567 F.3d 156 (5th Cir. 2009) ........................................................... 16

*Erznoznik v. City of Jacksonville,*
422 U.S. 205 (1975) ............................................................... 23, 41, 45

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale,*
901 F.3d 1235 (11th Cir. 2018) ....................................................... 18, 21

*Free Speech Coalition, Inc. v. Paxton,*
606 U.S. 461 (2025) ........................................................................ 45

*Gay Student Servs. v. Texas A&M Univ.,*
737 F.2d 1317 (5th Cir. 1984) ........................................................ 30, 43

*Hays Cnty. Guardian v. Supple,*
969 F.2d 111 (5th Cir. 1992) .......................................................... 23, 39

*Healy v. James,*
408 U.S. 169 (1972) .................................................................. passim

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.,*
515 U.S. 557 (1995) ........................................................... 18, 20, 21

*Imperial Sovereign Ct. of Mont. v. Knudsen,*
699 F. Supp. 3d 1018 (D. Mont. 2023) .............................................. 40

*Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.,*
993 F.2d 386 (4th Cir. 1993) ......................................................... 24, 29

*Joseph Burstyn, Inc. v. Wilson,*
343 U.S. 495 (1952) ........................................................................ 17

*Just. for All v. Faulkner,*
410 F.3d 760 (5th Cir. 2005) ................................................... 4, 36, 37, 39

*Kennedy v. Bremerton Sch. Dist.*,
  597 U.S. 507 (2022) ...................................................................... 21, 42

*Knowles v. City of Waco*,
  462 F.3d 430 (5th Cir. 2006) .................................................. 27

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*,
  584 U.S. 617 (2018) .............................................................. 18

*Matal v. Tam*,
  582 U.S. 218 (2017) ....................................................... passim

*McCauley v. Univ. of the Virgin Islands*,
  618 F.3d 232 (3d Cir. 2010) ................................................ 46

*McCullen v. Coakley*,
  573 U.S. 464 (2014) .......................................................... 40, 41

*Miller v. California*,
  413 U.S. 15 (1973) ........................................................... 33, 44

*Neb. Press Ass'n v. Stuart*,
  427 U.S. 539 (1976) ...................................................... 3, 29, 31

*Nken v. Holder*,
  556 U.S. 418 (2009) ............................................................ 16

*Norma Kristie, Inc. v. City of Oklahoma City*,
  572 F. Supp. 88 (W.D. Okla. 1983) ....................................... 20

*Papish v. Board of Curators of University of Missouri*,
  410 U.S. 667 (1973) ....................................................... passim

*Pope v. Illinois*,
  481 U.S. 497 (1987) ............................................................ 44

*Pro-Life Cougars v. Univ. of Hou.*,
  259 F. Supp. 2d 575 (S.D. Tex. 2003)............................ 30, 32, 34

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015) ...................................................... 36, 40, 41

*Reeves v. McConn*,
  631 F.2d 377 (5th Cir. 1980) ............................................... 28

*Robinson v. Hunt County*,
  921 F.3d 440 (5th Cir. 2019) ........................................ 24, 26, 27

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995) ........................................................................... passim

*Rumsfeld v. FAIR*,
547 U.S. 47 (2006) ...................................................................................... 17

*S. Utah Drag Stars v. City of St. George*,
677 F. Supp. 3d 1252 (D. Utah 2023) .................................................... 20

*Sable Commc'ns of Ca., Inc. v. FCC*,
492 U.S. 115 (1989) .................................................................................. 46

*Saxe v. State Coll. Area Sch. Dist.*,
240 F.3d 200 (3d Cir. 2001) .................................................................... 33

*Schacht v. United States*,
398 U.S. 58 (1970) .................................................................................... 21

*Schad v. Borough of Mount Ephraim*,
452 U.S. 61 (1981) ............................................................................... 17, 18

*Se. Promotions, Ltd. v. City of West Palm Beach*,
457 F.2d 1016 (5th Cir. 1972) .................................................... 22, 31, 32

*Se. Promotions, Ltd. v. Conrad*,
420 U.S. 546 (1975) ........................................................................... passim

*Shuttlesworth v. City of Birmingham*,
394 U.S. 147 (1969) ........................................................................... 32, 33

*Snyder v. Phelps*,
562 U.S. 443 (2011) ...................................................................... 26, 27, 41

*Spectrum WT v. Wendler*,
151 F.4th 714 (5th Cir. 2025) .................................................... 13, 20, 42

*Spectrum WT v. Wendler*,
157 F.4th 673 (5th Cir. 2025) .................................................................. 13

*Speech First, Inc. v. Fenves*,
979 F.3d 319 (5th Cir. 2020) .................................................................. 48

*Spence v. Washington*,
418 U.S. 405 (1974) .................................................................................. 21

*Street v. New York*,
394 U.S. 576 (1969) .................................................................................. 29

*Tex. A&M Queer Empowerment Council v. Mahomes,*
  772 F. Supp. 3d 792 (S.D. Tex. 2025)...................................................... 20, 38, 39, 41

*Texans for Free Enter. v. Tex. Ethics Comm'n,*
  732 F.3d 535 (5th Cir. 2013) ............................................................................... 47, 48

*Texas v. Equal Emp. Opportunity Comm'n,*
  633 F. Supp. 3d 824 (N.D. Tex. 2022) ............................................................. 16, 48

*Texas v. Johnson,*
  491 U.S. 397 (1989) .............................................................................. 17, 25, 28, 41

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
  393 U.S. 503 (1969) ................................................................................................. 21

*United States v. O'Brien,*
  391 U.S. 367 (1968) ................................................................................................. 28

*United States v. Stevens,*
  559 U.S. 460 (2010) ................................................................................................. 18

*Valentine v. Collier,*
  993 F.3d 270 (5th Cir. 2021) ................................................................................. 16

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.,*
  576 U.S. 200 (2015) ........................................................................................... 36, 38

*Whitney v. California,*
  274 U.S. 357 (1927) ................................................................................................... 2

*Widmar v. Vincent,*
  454 U.S. 263 (1981) ...................................................................................... passim

*Winters v. New York,*
  333 U.S. 507 (1948) ................................................................................................. 22

*Woodlands Pride, Inc. v. Paxton,*
  157 F.4th 775 (5th Cir. 2025) ............................................................................... 45

## **Statutes**

Tex. Educ. Code § 51.9315(b)(1) ............................................................................... 4

Tex. Educ. Code § 51.9315(g) ................................................................................... 5

Tex. Health & Safety Code § 769.002 ........................................................... 44

Tex. Loc. Gov't Code § 243.0031 ................................................................. 44

Tex. Penal Code § 43.28 ............................................................................. 44


**Rules**

Fed. R. Civ. P. 56(a) .................................................................................. 16


**Other Authorities**

KAMR,
   Walter Wendler Full Interview, at 25:11–26:36 (Apr. 27, 2023, at 16:28 CT) ...... 15

Texas A&M University System Board of Regents,
   *Agenda Items Meeting of the Board of Regents* (Nov. 13, 2025) ........................... 36

William T. Mayton,
   *Toward A Theory of First Amendment Process: Injunctions of Speech,*
   *Subsequent Punishment, and the Costs of the Prior Restraint Doctrine*, 67
   Cornell L. Rev. 245, 248 (1982) .............................................................. 34

## **LIVE PLEADINGS**

Pursuant to the Court's Second Amended Civil Scheduling Order (ECF 126), Plaintiff Spectrum WT identifies the following live pleadings:

- Plaintiff's First Amended Verified Complaint (ECF No. 28), filed April 18, 2023.

- Defendant Wendler's Answer to Plaintiff's Amended Complaint (ECF No. 80), filed January 8, 2024.

The active parties are Plaintiff Spectrum WT and Defendant Walter Wendler in his official capacity.[1]

---

[1] The parties recently stipulated to dismiss Defendant Christopher Thomas. ECF No. 142.

## **INTRODUCTION**

When Americans get on stage and express themselves, the First Amendment protects their expression—even when government officials dislike the medium or disagree with the message. Yet for over two years, the President of West Texas A&M University, Walter Wendler, has banned drag shows from the public university campus because, in his words, he disagrees with the underlying "ideology" and believes the shows are demeaning and disrespectful to others. Though Wendler has raised vague concerns about harassment and discrimination, he lacks even a hint of evidence that Spectrum's drag performance would violate any university policy or law. In fact, Wendler testified under oath that he canceled Spectrum's shows without ever talking to the students to determine what their performance would involve.

The undisputed facts in the record thus allow but one conclusion: President Wendler is banning protected expression because he finds it offensive. That is unconstitutional viewpoint discrimination, *Matal v. Tam*, 582 U.S. 218, 243 (2017), the most "egregious form of content discrimination," which violates the First Amendment in any setting. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Even President Wendler concedes "the law of the land" stands in his way. Wendler Depo. Ex. 3 (App'x 94).

If President Wendler strongly disagrees with drag shows' underlying message, Wendler enjoys the right to respond with criticism, the "more speech" remedy that our Constitution requires in lieu of censorship. *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring). But the First Amendment bars university presidents like Wendler from limiting expression that he believes may offend some

2

segment of the community. *Healy v. James*, 408 U.S. 169, 187–88 (1972) (First Amendment barred college president from denying recognition to student group whose views he believed "abhorrent" and contrary to the college's mission and values). Preventing disparagement of *any* group—even if that approach could be applied "evenhandedly"—is still "viewpoint discrimination" the First Amendment forbids. *Matal*, 582 U.S. at 243.

The undisputed facts establish two additional reasons why President Wendler is violating the First Amendment. First, Wendler alone has decided to prohibit Plaintiff's performances based on his subjective view of what is "demeaning" and "disrespectful." Because that constitutes exercising unbridled authority over campus expression with no meaningful limitations, the ban is an unconstitutional prior restraint, "the most serious and the least tolerable infringement" of the First Amendment. *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).

Second, both West Texas A&M policies and its consistent practices of opening Legacy Hall to students and the public alike for expression—facts Defendant Wendler cannot meaningfully dispute—establish Legacy Hall as a designated public forum. By excluding drag performances, Wendler has imposed a content-based restriction subject to strict scrutiny, which Wendler's mere speculation cannot satisfy. Even if Legacy Hall were a limited public forum, the drag show ban still violates the First Amendment because it is a viewpoint-based prior restraint. Moreover, because the ban excludes drag performers "who fall[] within the class to which" Legacy Hall "is made generally available," it triggers strict scrutiny. *Just. for All v. Faulkner*, 410

F.3d 760, 766–67 (5th Cir. 2005) (quoting *Ark. Educ. Television Comm'n. v. Forbes*, 523 U.S. 666, 677 (1998)); *see also Widmar v. Vincent*, 454 U.S. 263, 269–270 (1981). In sum, all roads lead to strict scrutiny, and Wendler cannot meet that high burden.

These First Amendment protections are "nowhere more vital" than at public universities, and apply with no "less force" there "than in the community at large." *Healy*, 408 U.S. at 180; *see also* Tex. Educ. Code § 51.9315(b)(1). All Spectrum asks is for President Wendler to honor those vital constitutional protections for its expression and that of all public university students. Because he refuses to do so, Plaintiff respectfully asks this Court to grant its motion for summary judgment, restore First Amendment rights to the students of West Texas A&M University, and preserve these First Amendment protections that are essential to free expression at public universities.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

**West Texas A&M opens its facilities to student expression, including stage performance.**

West Texas A&M is a public university within the Texas A&M University System. It is not a secondary school, public school district, or charter school, and offers only postsecondary courses. Wendler Tr. 236:21–25, 245:13–14 (App'x 80, 83); Thomas Tr. 50:7–18 (App'x 545).

The University maintains campus spaces for students, recognized student organizations, and the general public to use for a broad range of expressive activities. Wendler Depo. Exs. 17 (App'x 103–108), 19 (App'x 139–150); Fouts Depo. Ex. 58 (App'x 451–453).[2] Texas law and University policy bar administrators from denying access to these spaces based on students' "political, religious, philosophical, ideological, or academic viewpoint" or on the content of their "expressive activities." Tex. Educ. Code § 51.9315(g); Wendler Depo. Ex. 17 (App'x 104).

One of these spaces is Legacy Hall, an enclosed venue in the University's student center. Fouts Tr. 26:20–27:2 (App'x 380–381). The University maintains Legacy Hall as an open forum for expressive activities. Fouts Tr. 88:17–91:10 (App'x

---

[2] Wendler Depo. Ex. 17 (App'x 103–108) reflects West Texas A&M's Expressive Activity on Campus policy through June 25, 2024. It is the version posted on the University's website. *See* W. Tex. A&M Univ. Pol'y No. 08.99.99.W1 Expressive Activity on Campus (rev. June 25, 2024), *available at* https://www.wtamu.edu/_files/docs/about/rules-procedures/08-99-99-W1-Expressive-Activity-on-Campus.pdf [perma.cc/LSG4-8QR9]. Wendler Depo. Ex. 19 (App'x 139–150) is the redline version of the University's proposed amended policy Defendant Wendler submitted to the Court at the September status conference. *See* Defs' Ex. List for Sept. 10, 2025 hearing at DX-4. The proposed revised policy does not alter the forum analysis below, as both the 2024 and 2025 versions demonstrate that Legacy Hall is a designated public forum. *Compare* Wendler Depo. Ex. 17 at §§ 1.1 & 1.3 and Definitions 2, 3, & 6 (App'x 103–104, 106) *with* Wendler Depo. Ex. 19 at §§ 1.1 & 1.3 and Definitions 2, 3, & 7 (App'x 140, 146–47).

400–403); Fouts Depo. Ex. 59 (App'x 454–457). Students and the public alike use Legacy Hall for an array of events, including beauty pageants, singing competitions, concerts, religious worship, banquets, wedding ceremonies, wedding receptions, holiday parties, movie screenings, dance-off competitions, fashion shows, talent shows, male beauty pageants, female beauty pageants, press conferences, political events—and, as recently as 2019, student drag shows. Fouts Tr. 88:17–91:10 (App'x 400–403); Wendler Tr. 92:7–93:21 (App'x 27–28); ECF No. 80 ("Wendler Ans.") ¶ 41 (admitting prior campus drag shows).

The University offers Legacy Hall reservations on a first-come, first-served basis. Fouts Tr. 25:20–23 (App'x 379). It offers Legacy Hall for rent as a community service, providing the broader community a venue when other area venues won't suffice. Fouts Tr. 36:2–13 (App'x 388), 48:15–20 (App'x 394), 53:18–54:9 (App'x 395–396).

**Spectrum, like many recognized student groups, has a message to share.**

Spectrum WT (Spectrum) is a recognized student organization in good standing at West Texas A&M. Wendler Tr. 114:4–12 (App'x 39); Thomas Tr. 12:6–16 (App'x 540); *Compare* FAC ¶¶ 10–11 *with* Wendler Ans. ¶¶ 10–11 & ECF No. 79 ("Thomas Ans.") ¶¶10–11. The group's mission is to "provide a safe space for LGBTQ+ students and allies to come together," to "raise awareness of the LGBTQ+ community," and to "promote diversity, support, and acceptance on campus and in the surrounding community." *Compare* FAC ¶¶ 10–11 *with* Wendler Ans. ¶¶ 10–11 & Thomas Ans. ¶¶ 10–11. Spectrum organizes campus events focusing on issues important to the LGBTQ+ campus community. Bright Tr. 25:22–26:1 (App'x 723–

6

724). These events include proms, queer movie nights, and discussions about history and politics. Bright Tr. 43:13–24 (App'x 728), 28:16–22 (App'x 725); Stovall Tr. 20:2–15 (App'x 662). The organization raises awareness of LGBTQ+ culture on campus. Bright Tr. 25:22–26:1 (App'x 723–724).

**Spectrum plans and organizes a PG-13 charity drag show in Legacy Hall.**

In 2022, Spectrum began planning a charity drag show scheduled for March 31, 2023, at Legacy Hall. Bright Tr. 49:5–7 (App'x 729). Spectrum intended the show to be a celebratory expression of support for the LGBTQ+ community. Bright Tr. 51:8–17 (App'x 730); *see also* Chandler Tr. 21:20–22:13 (App'x 322–323); Stovall Depo. Ex. 7 (App'x 680) (promoting event with hashtags "#pride #lgbt #gay #trans"); Wendler Depo. Ex. 12 (App'x 101).

The show was to include choreographed dance, lip syncing, character creation, stylized hair, make-up, costumes, and amplified music. Bright Tr. 71:12–18 (App'x 741), 98:5–8 (App'x 745), 126:18–20 (App'x 752), 146:1–9 (App'x 753); Stovall Tr. 76:4–16 (App'x 674); Fouts Tr. 128:6–11 (App'x 415). In addition to choreographed dances, performers planned to express themselves through their clothing design and makeup. Bright Tr. 72:9–13 (App'x 742). Depending on the performer's chosen character, performances would span from "elegant" to "comedic." Bright Tr. 72:16–73:4 (App'x 742–743), 159:17–160:1 (App'x 755–756). As a whole, performers would use drag as a medium to challenge gender stereotypes and express the performers' individuality and queer identity. *See* Stovall Tr. 72:5–7 (App'x 672); Bright Tr. 107:22–109:10 (App'x 749–751). Judges were to choose a winner based on "how well [performers] created the character they're performing as." Bright Tr. 72:9–13 (App'x 742). Proceeds

7

from the event would benefit The Trevor Project, an organization dedicated to suicide prevention among LGBTQ+ young people. Wendler Depo. Ex. 12 (App'x 101); Stovall Tr. 38:1–6 (App'x 664).



**Flyer for Spectrum's planned show.** Wendler Depo. Ex. 12 (App'x 101).

The students planned their event carefully. Chandler Tr. 34:11–15 (App'x 329). They instructed performers to avoid profane music or "lewd" conduct. Chandler Tr. 33:21–34:15 (App'x 328–329); Stovall Tr. 62:9–22 (App'x 668), 63:4–11 (App'x 669), 137:23–138:22 (App'x 678–679). And in an abundance of caution, given the broader cultural debate over drag shows, the students barred anyone under the age of 18 from attending unless accompanied by a parent or guardian so that performers' family members could attend. Bright Tr. 58:2–4 (App'x 736), 60:20–61:7 (App'x 737–738), 61:12–16 (App'x 738), 62:16–63:1 (App'x 739–740); Chandler Tr. 32:16–23 (App'x 327). University administrators, for their part, relied on trusted staff and faculty—

including WT Director of University Communications and Media Relations Chip Chandler and Professor Kristina Drumheller—to help guide the students. Fouts Tr. 117:17–118:7 (App'x 412–413), 134:15–21 (App'x 418), 137:20–138:3 (App'x 419–420), 162:19–163:15 (App'x 425–426).

Spectrum reserved Legacy Hall for the performance in accordance with the University's event approval process. Fouts Tr. 96:3–98:4 (App'x 405–407); Bright Tr. 54:10–56:17 (App'x 732–734). University administrators worked with students to consider any risks to participants or the audience and helped students compile promotional materials for the event. *See* Fouts Depo. Exs. 82 (App'x 516–521), 83 (App'x 522–529). Throughout the approval process, University staff praised the students' initiative and leadership. Fouts Tr. 121:2–8 (App'x 414).

On February 27, 2023, University staff issued a tentative approval of the event, and there were no remaining steps for final confirmation of the event. Fouts Tr. 97:5–16 (App'x 406). By March 20, Spectrum's members had completed the requirements necessary for the event to move forward as planned. Fouts Tr. 97:5–16 (App'x 406); *see also, e.g.*, Fouts Tr. 129:21–130:2 (App'x 416–417) (university officials concluded Spectrum had a First Amendment right to put on the show); 134:5–22 (App'x 418) (age restrictions); 141:17–19 (App'x 421) (marketing); 145:14–18 (App'x 422) (all risks substantially mitigated).

**President Wendler cancels Spectrum's performance, describing drag shows as "expression which denigrates others."**

Eleven days before the scheduled performance, when Spectrum had satisfied each step in the approval process, Vice President for Student Affairs Christopher

9

Thomas informed Spectrum that President Wendler was canceling the drag show. Bright Tr. 88:18–25 (App'x 744); ECF No. 39–1 (Decl. Thomas) ¶¶ 4–5. Thomas explained that Wendler believes drag shows discriminate against women. *Id.* ¶¶ 4–5.

Later that day, in a public edict posted online and emailed to the campus community, President Wendler declared that "West Texas A&M will not host a drag show on campus." Wendler Depo. Ex. 3 (App'x 92). President Wendler's 734-word edict, titled "A Harmless Drag Show? No Such Thing," focused on the "ideology" underlying drag shows. *Id.* (App'x 92–94). Drag, he claimed, is "a performance exaggerating aspects of womanhood (sexuality, femininity, gender)" that, through "slapstick," "stereotype[s] women in cartoon-like extremes for the amusement of others." *Id.* (App'x 92–93). "When humor becomes harassment, it has gone too far," Wendler stated. *Id.* (App'x 93). He opined that "[d]rag shows are derisive, divisive and demoralizing," promoting "ideology" by focusing on "group membership," not "individual" achievement. *Id.* (App'x 93). He described how his views on natural law, religion, and "human dignity" informed his opinion. *Id.* (App'x 92–93). Nowhere did President Wendler mention concerns about "lewdness" or that minors might be among the audience. *See id.* (App'x 92–94); Wendler Tr. 216:4–8 (App'x 68). And Wendler acknowledged that the Constitution stands in his way: "I will not appear to condone the diminishment of any group at the expense of impertinent gestures toward another group for any reason, *even when the law of the land appears to require it*." Wendler Depo. Ex. 3 (App'x 94) (emphasis added).

At least three members of the WT faculty, along with the University's Director

of University Communications and Media Relations and JBK staff, were aware of what Spectrum planned for the 2023 drag show. *See* Chandler Tr. 8:8–10 (App'x 320), 20:12–17 (App'x 321), 28:21–29:8 (App'x 324–325). Still, President Wendler never spoke with them before issuing his edict.

He also did not speak with any of Spectrum's officers or members about what the performance would involve. *See* Wendler Tr. 207:5–8 (App'x 67), 65:22–66:8 (App'x 20–21), 67:18–68:23 (App'x 22–23). In fact, Wendler "decided to cancel it before [he] ever saw the PG-13 rating." Wendler Tr. 99:22–100:3 (App'x 31–32). Nor had Wendler heard of the planned emcee. Wendler Tr. 217:25–218:12 (App'x 69–70).

**Spectrum sues and seeks injunctive relief.**

On March 24, 2023, Spectrum and two of its student officers filed suit against President Wendler and Thomas. (ECF No. 1). The same day, they moved for a temporary restraining order and preliminary injunction. (ECF Nos. 8–9). The students explained that, without immediate relief, they would have to seek an off-campus venue, as the banned campus event was scheduled for the following Friday. (ECF No. 9 at 19). With the show's date rapidly approaching, the students withdrew their TRO to avoid simultaneously planning two events—one on-campus if the Court granted the TRO, and another off-campus if the Court denied relief. (ECF No. 16). Exiled from campus, Spectrum scrambled to raise funds and organize a show at a public park far from West Texas A&M. Bright Depo. Ex. 12 (App'x 757); Stovall Tr. 116:3–117:19 (App'x 676–677).

Soon thereafter, Plaintiff amended the Complaint, alleging four causes of action: three claims for injunctive and declaratory relief (based on First Amendment

viewpoint discrimination, exclusion from a public forum, and prior restraint) and a damages claim against President Wendler. (ECF No. 28). Plaintiff also amended its motion for a preliminary injunction to address future performances. (ECF No. 30).

Defendants moved to dismiss under F.R.C.P. 12(b)(1) and 12(b)(6). (ECF Nos. 34, 38). On September 21, 2023, the Court granted the Rule 12(b)(6) motion to dismiss the damages claim and denied Plaintiff's motion for a preliminary injunction. (ECF No. 59). The Court denied the Rule 12(b)(1) motion as to Defendants Wendler and Christopher Thomas. (*Id.*) Plaintiff timely appealed the order denying the motion for a preliminary injunction.[3] (ECF No. 61).

**Spectrum again seeks to hold a drag performance in Legacy Hall, and Wendler again unilaterally cancels the reservation.**

Shortly after Wendler canceled their March 2023 show, Spectrum again requested use of Legacy Hall on March 22, 2024, to stage a PG-13 drag performance. (ECF No. 83-1 (Bright Decl.) ¶¶ 17–22, 29 & Exs. 2–3). Campus staff again issued a "tentative confirmation" for the show and Spectrum again completed the necessary steps to confirm the reservation. (*Id.* ¶ 23 & Ex. 3); *see also* Fouts Tr. 95:24–97:4 (App'x 404–406), 150:3–151:1 (App'x 423–424).

To preserve their First Amendment right to hold the March 2024 show, Plaintiff sought an injunction pending appeal against President Wendler enforcing his drag show ban. (ECF No. 82). On March 18, 2024, after the Supreme Court declined to enter an emergency injunction, President Wendler sent a second campus-

---

[3] Plaintiff also moved for entry of a partial final judgment on their damages claim under Rule 54(b). (ECF No. 60). The Court denied that motion. (ECF No. 63).

wide email, this one announcing his denial of Spectrum's application for the performance scheduled six days later. Wendler Depo. Ex. 4 (App'x 96). In his email, Wendler stated, "when the court makes a final decision, it will be implemented." *Id.*

On August 18, 2025, a Fifth Circuit panel reversed the denial of Plaintiff's preliminary injunction motion, holding that drag shows are inherently expressive, Legacy Hall is a designated public forum, and President Wendler's ongoing drag show ban likely violates the First Amendment. *Spectrum WT v. Wendler*, 151 F.4th 714, 724–729 (5th Cir. 2025).

Soon after the panel decision, Defendants Wendler and Thomas moved in this Court to dismiss Plaintiff's claims for lack of subject matter jurisdiction. (ECF No. 105). The Court dismissed Plaintiffs Stovall and Bright, who are no longer enrolled at West Texas A&M, but held that Spectrum maintains standing to pursue equitable relief because "absent the injunction Plaintiffs seek, President Wendler likely would cancel any similar drag show Plaintiff applies to hold in Legacy Hall." (ECF No. 116 at *11). This Court also rejected Defendants' ripeness and mootness arguments, recognizing "the injury here is still ongoing" because "any similar drag show Spectrum applies to host on campus is likely to be canceled as well." *Id.* at *12.[4] On October 27, 2025, the Fifth Circuit granted rehearing *en banc*, vacating the panel opinion. *Spectrum WT v. Wendler*, 157 F.4th 673 (5th Cir. 2025).

---

[4] Plaintiff invokes subject-matter jurisdiction and respectfully submits this Court's Order of September 23, 2025 resolves any questions of fact and law pertaining to subject-matter jurisdiction. ECF No. 116. And as Spectrum shows herein, it intends to hold a show at Legacy Hall in 2026, and all signs point to President Wendler cancelling that show for the same reasons he gave in 2023.

**Spectrum has applied for a third time to host its drag performance at Legacy Hall in April 2026.**

Spectrum intends to stage future drag shows at Legacy Hall and has applied to hold a performance in Legacy Hall on April 17, 2026. Fanelli Tr. 26:17–21 (App'x 690), 30:5–9 (App'x 691). The show's purpose is to communicate support for the LGBTQ+ community, facilitate self-expression, and promote students' artistic expression. Fanelli Tr. 156:6–15 (App'x 711), 34:23–35:17 (App'x 695–696); 81:7–11 (App'x 705). Just like the planned 2023 and 2024 shows, the 2026 stage performance will incorporate a range of theatrical features, including character creation, choreographed dance, and amplified music. Fanelli Tr. 45:22–46:4 (App'x 701–702); 154:19–155:11 (App'x 709–710). Spectrum expects the show to include at least five to ten performers and that all performers will be current university students. Fanelli Tr. 31:17–32:4 (App'x 692–693); 63:19–64:5 (App'x 703–704).

In planning the show, Spectrum will again be cautious in ensuring the performance is "not inappropriate in any way." Fanelli Tr. 37:12–15 (App'x 697). Spectrum expects the show to again "be somewhere between PG [and] PG-13" and will "not allow or expect it to exceed that." Fanelli Tr. 156:19–157:4 (App'x 711–712).

Spectrum's experience—Wendler repeatedly cancelling its reservations shortly before a scheduled performance—and Wendler's public statements have led the organization to credibly fear Wendler will again cancel its future performances. Fanelli Tr. 157:17–21 (App'x 712); Wendler Depo. Exs. 3 (App'x 92–94), 4 (App'x 96). Wendler has reconfirmed his interest in "respect" on campus "supersedes any other policy," and that he can cancel any performance he believes is disrespectful to any

14

group. Wendler Tr. 248:2–15 (App'x 85), 257:25–258:4 (App'x 90–91). He has reasserted that drag performances are "disrespectful to women," that their "nature" is demeaning, and that drag is "by definition … usually demeaning" to women. Wendler Tr. 256:22–25 (App'x 89), 228:24–229:11 (App'x 78–79), 218:23–219:5 (App'x 70–71). And as public attention grew after Spectrum sued, President Wendler expressed continued resolve to ban drag shows from campus in a television interview, stating he "wouldn't have done anything any differently."[5]

---

[5] SPECTRUM 0002019 (App'x 774); *see also* KAMR, Walter Wendler Full Interview, at 25:11–26:36 (Apr. 27, 2023, at 16:28 CT), https://www.myhighplains.com/video/walter-wendler-fullinterview/8598931.

## STANDARD OF REVIEW

Summary judgment is warranted where the record establishes "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court "must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A "court may grant a permanent injunction without a trial on the merits if there are no material issues of fact and the issues of law have been correctly resolved." *Calmes v. United States*, 926 F. Supp. 582, 591 (N.D. Tex. 1996). A plaintiff must show "(1) that it has succeeded on the merits; (2) that a failure to grant the injunction will result in irreparable injury; (3) that said injury outweighs any damage that the injunction will cause the opposing party; and (4) that the injunction will not disserve the public interest." *Valentine v. Collier*, 993 F.3d 270, 280 (5th Cir. 2021). When the government is a defendant, the last two elements merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

Declaratory judgment is appropriate when (a) an actual controversy exists, (b) there is no pending state action between the parties, and (c) there are no inequities or similar issues that counsel against a court granting declaratory relief. *See Texas v. Equal Emp. Opportunity Comm'n*, 633 F. Supp. 3d 824, 846 (N.D. Tex. 2022).

# ARGUMENT

## I.  Spectrum Succeeds on the Merits.

### A.  Stage Performance, Like Spectrum's Planned Drag Shows, Is Inherently Expressive and Thus Constitutionally Protected.

#### 1.  Stage performance, including drag, is inherently expressive.

Decades of Supreme Court decisions establish why the First Amendment protects drag performance. If conduct is "inherently expressive," the First Amendment protects it. *Rumsfeld v. FAIR*, 547 U.S. 47, 66 (2006) (citing *Texas v. Johnson*, 491 U.S. 397, 406 (1989)); *see also 303 Creative LLC v. Elenis*, 600 U.S. 570, 600 (2023) (The First Amendment protects "all persons engaged in expressive conduct."). And stage performance is inherently expressive conduct.

The Supreme Court affirmed that "live entertainment, such as musical and dramatic works, fall within the First Amendment guarantee." *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65 (1981); *see also Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790 (2011); *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 557–58 (1975) (citing *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 503 (1952)) (affirming First Amendment protection for stage performance). After all, when performers take the stage, they do so to express themselves to the audience. That has been true since the Ancient Greeks took the Athenian stage and Shakespeare's plays were performed (in drag) at the Globe Theatre in England. And it's true with Spectrum's performance, featuring choreographed performers dancing on stage in costume and accompanied by music. Stovall Tr. 76:4–18 (App'x 674); Fanelli Tr. 45:22–46:4 (App'x 701–702), 154:19–155:11 (App'x 709–710). *Cf. Se. Promotions*, 420 U.S. at 557–58 ("By its

17

nature, theater usually is the acting out—or singing out—of the written word, and frequently mixes speech with live action or conduct.").

It does not matter whether each performance—drag show or not—has a defined, "particularized message." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569 (1995). This simply "is not a condition of constitutional protection." *Id.* Were it otherwise, the First Amendment "would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll." *Id.* Instead, the First Amendment reaches "a wide array of conduct … including nude dancing, burning the American flag … wearing a black armband, conducting a silent sit-in, refusing to salute the American flag, and flying a plain red flag." *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617, 657 & n.1 (2018) (Thomas, J., concurring) (collecting cases).[6]

To that end, the First Amendment protects artistic performance open to interpretation. If context alerts the viewer that the performance is communicating *something*, the performance is protected—even if the audience disagrees on what message the performance sends. *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1240 (11th Cir. 2018) ("[I]n determining whether conduct is expressive, we ask whether the reasonable person would interpret it as *some* sort of message, not whether an observer would necessarily infer a *specific* message.")

---

[6] The First Amendment protects violent video games, footage of illicit dog fighting, profanity, and racial epithets. *Brown*, 564 U.S. at 790 (violent video games); *United States v. Stevens*, 559 U.S. 460, 468 (2010) (footage of dog fighting); *Cohen v. California*, 403 U.S. 15, 25 (1971) (profanity); *Matal*, 582 U.S. at 243 (racial epithets). And it protects dramatic performance, on-stage and off. *Schad*, 452 U.S. at 65.

(citations omitted) (cleaned up). An audience member watching a stage performance, including a drag show, does not need a narrator's explanation to know the performers are intending to convey *some* message. Sometimes that message is obvious. As with any artistic performance, observers will come away with differing interpretations of the intended message. We have art schools, movie critics, online discussion forums debating the meaning of song lyrics, and discussions *about* art because people disagree with its intended meaning.

Drag shows possess the elements necessary to alert viewers that *something* is being conveyed. Performers communicate through character creation, choreography, costume design, dance, and makeup. Bright Tr. 72:9–24 (App'x 742); Stovall Tr. 76:11–18 (App'x 674). And in the case of drag, performances celebrate the LGBTQ+ community, challenge traditional gender norms, and accentuate individuality through performances ranging from lighthearted and comedic to elegant. Bright Tr. 51:8–52:2 (App'x 730–731), 72:16–73:4 (App'x 742–743), 104:24–106:3 (App'x 746–748), 107:3–4 (App'x 749), 107:10–16 (App'x 749), 107:22–109:10 (App'x 749–751), 159:17–160:1 (App'x 755–756); Stovall Tr. 72:5–7 (App'x 672).

President Wendler understands that drag shows intend to convey a message. Wendler Tr. 108:3–20 (App'x 36). Even before seeing Spectrum's planned performance (or any other drag performance), he described drag as "artistic expression" and "performance" that promotes a certain "ideology." Wendler Depo. Ex. 3 (App'x 92–94); *see also* Wendler Tr. 243:4–244:2 (App'x 81–82) (drag conveys an ideology that is "disrespectful of women" because it "creates a monolithic view" of

19

women). Even more, Wendler believes the University's expressive activities policy applies to drag shows. Wendler Tr. 111:21–112:13 (App'x 37–38).

Courts agree with Wendler that drag shows are expressive. Drag performance is "indisputably protected speech" as "a medium of expression, containing political and social messages regarding (among other messages) self-expression, gender stereotypes and roles, and LGBTQI+ identity." *S. Utah Drag Stars v. City of St. George*, 677 F. Supp. 3d 1252 (D. Utah 2023); *see also, e.g.*, *Norma Kristie, Inc. v. City of Oklahoma City*, 572 F. Supp. 88 (W.D. Okla. 1983); *Tex. A&M Queer Empowerment Council v. Mahomes*, 772 F. Supp. 3d 792 (S.D. Tex. 2025) (enjoining campus drag show ban). The Fifth Circuit panel held drag shows are inherently expressive, and the dissent did not disagree. *Spectrum WT*, 151 F.4th at 726.

### 2. Spectrum's drag performances are protected expression.

The message behind Spectrum's particular drag show—communicating "support for the LGBTQ+ students on campus and to raise funds for The Trevor Project"—would have been apparent to its audience members who purchased a ticket to attend an event expressly promoted to fund an LGBTQ+ charity and in furtherance of Spectrum's mission. Bright Tr. 51:15–17 (App'x 730); *see Hurley*, 515 U.S. at 570 (Parade float would convey that "openly gay, lesbian, and bisexual descendants of … Irish immigrants" in fact exist "in the community."). Spectrum's very reason for existing is to provide space for "LGBT+ students and allies to come together" and "promote diversity, support, and acceptance on campus and in the surrounding community." *See* Wendler Ans. ¶¶ 10–11, *and* Thomas Ans. ¶¶ 10–11. In service of that message, Spectrum organized a drag show for a ticketed audience to "show

support for the LGBTQ+ community … bend gender norms … [and] raise money for the Trevor Project." Bright Tr. 51:21–52:2 (App'x 730–731).

And in any event, that context would have clued the audience that the drag performers intended to convey *something*. *Hurley*, 515 U.S. at 569. If "conduct … is intended to be communicative" and "in context, would reasonably be understood by the viewer to be communicative," the First Amendment protects it. *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 (1984) (first citing *Spence v. Washington*, 418 U.S. 405 (1974); and then citing *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969)). This makes sense. Context is what distinguishes a parade from walking down the street. *Hurley*, 515 U.S. at 569–70. Or a coach kneeling in prayer at the 50-yard line from one bending down to tie his shoe. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 533 (2022). Or a civil rights sit-in from sitting down to eat in a restaurant. *See Fort Lauderdale Food Not Bombs*, 901 F.3d at 1241. And context is what distinguishes Spectrum's choreographed drag show performed on stage, under bright spotlights, before a ticketed audience, from an individual's day-to-day choice of dress.

Given the inherently expressive nature of stage performance and the context surrounding Spectrum's drag show, the First Amendment protects it.

### 3. The First Amendment's protection does not turn on the perceived "value" of speech.

Theatrical performances receive the First Amendment's full protection, whether one views drag shows as "crude and amateurish" or sophisticated. *Schacht v. United States*, 398 U.S. 58, 61–63 (1970); *Se. Promotions, Ltd. v. City of West Palm*

*Beach*, 457 F.2d 1016, 1018 (5th Cir. 1972) ("It is settled law that theatrical productions" are protected by the First Amendment.). Indeed, the Supreme Court has "long recognized" that when it comes to First Amendment protection, "it is difficult to distinguish politics from entertainment, and dangerous to try." *Brown*, 564 U.S. at 790 (cleaned up). Likewise, we do not entrust public officials to make "principled distinctions" between the offensive and inoffensive. *Cohen*, 403 U.S. at 25. That is why "esthetic and moral judgments about art and literature are for the individual to make, not for the Government to decree." *Brown*, 564 U.S. at 790 (citation omitted); *see also Winters v. New York*, 333 U.S. 507, 510 (1948) ("The line between the informing and the entertaining is too elusive for the protection of that basic right. ... What is one man's amusement, teaches another's doctrine.").

As Justice Scalia instructed, "cultural and intellectual differences are not *constitutional* ones. Crudely violent video games, tawdry TV shows, and cheap novels and magazines are no less forms of speech than The Divine Comedy." *Brown*, 564 U.S. at 796 n.4. So even if a court believes a type of expression contains "nothing of any possible value to society"—it is "as much entitled to the protection of free speech as the best of literature." *Winters*, 333 U.S. at 510.

### 4. First Amendment protection for drag performance is equally robust on public university campuses.

These First Amendment principles apply just as strongly at public universities, where First Amendment protections are "nowhere more vital." *Healy*, 408 U.S. at 180; *see also id.* ("[T]he precedents of this Court leave no room for the view that ... First Amendment protections should apply with less force on college campuses than in the

22

community at large."). The "campus of a public university … possesses many characteristics of a public forum" by design, and the campus itself "function[s] as the site of a community" that is "more akin to a public street or park than a non-public forum," such as a high school. *Hays Cnty. Guardian v. Supple*, 969 F.2d 111, 116–17 (5th Cir. 1992). And the Supreme Court has repeatedly made clear that we do not childproof our public spaces. *See, e.g.*, *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 209 (1975); *Cohen*, 403 U.S. at 21; *see also Brown*, 564 U.S. at 794, 804–05 (striking down state's ban on violent video games and expressly rejecting that the Constitutional analysis differs for speech specifically targeting children).

This vigorous First Amendment protection is a feature of the university, not a bug. It is critical to preserving the ideal of university campuses as bastions of free expression, debate, and intellectual exploration. To that end, the First Amendment protection for Spectrum's performance stands just as strongly at a public university as it did on the municipal stage in *Southeastern Promotions*, where the Supreme Court held it was an unconstitutional prior restraint for local officials to ban the musical *Hair* from a city-leased theater after they alone deemed it "obscene" and "not in the best interest of the community." 420 U.S. at 557–58.

The Supreme Court's decision in *Papish v. Board of Curators of University of Missouri* is especially instructive. 410 U.S. 667 (1973). There, the Supreme Court held a public university's ban on a student's "indecent" political cartoons "depicting policemen raping the Statue of Liberty and the Goddess of Justice" violated the First Amendment. *Id.* at 667. Drawing on principles from *Healy*, the *Papish* Court rejected

the dissent's admonishment about "lewd" speech and declared that "the mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Id.* at 670. Likewise, the Fourth Circuit held a fraternity's "ugly woman contest" was protected expressive conduct even if one could find it "low quality" and "crude." *Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386, 390–93 (4th Cir. 1993).

If the First Amendment protects the *Papish* cartoon distributed across campus and the "ugly women contest" in *Iota Xi*, it protects ticketed campus drag shows like Spectrum's, featuring costumed performers dancing to non-profane music.

### B.    President Wendler's Blanket Ban on Drag Performance Because He Disagrees with Its "Ideology" Is Viewpoint Discrimination and *Per Se* Unconstitutional in Any Forum.

Wendler's undisputed words reveal his "subjective judgment that the content of protected speech is offensive or inappropriate," rendering his ban on campus drag shows unconstitutional "viewpoint discrimination." *Robinson v. Hunt County*, 921 F.3d 440, 447 (5th Cir. 2019) (citing *Matal*, 582 U.S. at 243).[7] In his lengthy edict

---

[7] That President Wendler's ban is viewpoint-driven is just one key reason why *Christian Legal Society Chapter of the University of California, Hastings College of the Law v. Martinez* (*CLS*), 561 U.S. 661 (2010) has no bearing on this case. Unlike here, *CLS* did not involve viewpoint discrimination. Rather, it centered on a policy requiring registered student organizations to "allow *any* student to become a member, or seek leadership positions in the organization, regardless of [her] status or beliefs"—one which the policy's challenger stipulated was viewpoint neutral. 561 U.S. at 675 (2010). But even while upholding the policy, the Court pointedly stressed its "series of decisions" in the university context have "emphasized that the First Amendment generally precludes public universities from denying student organizations access to school-sponsored forums because of the groups' viewpoints." *Id.* at 667–68 (citing *Rosenberger*, *Healy*, and *Widmar*). As the Court explained: "Although registered student groups must conform their conduct to the Law School's regulation by dropping access barriers, they may express any viewpoint they wish—including a discriminatory one. Today's decision thus continues this Court's tradition of protecting the freedom to express the thought that we hate." *Id.* at 696 n.26 (citation omitted).

announcing the campus-wide drag show ban, he explained his subjective judgment that drag shows' underlying "ideology" is "derisive," "divisive" and "misogyn[istic]." Wendler Depo. Ex. 3 (App'x 92–94). He claimed that drag "stereotype[s] women in cartoon-like extremes for the amusement of others and discriminate[s] against womanhood." *Id.* (App'x 92). And he explained his personal beliefs about natural law, religion, and "human dignity" informed his opinion. *Id.* (App'x 92–93).

By stifling expression on what he subjectively finds "offensive or disagreeable" Wendler is violating "a bedrock principle underlying the First Amendment," *Johnson*, 491 U.S. at 414, that viewpoint discrimination is the most "egregious form of content discrimination." *Rosenberger*, 515 U.S. at 829. And Wendler's viewpoint discrimination is *per se* unconstitutional "in *any* forum." *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 350 (5th Cir. 2001) (emphasis added). On that basis alone, Spectrum is entitled to summary judgment.

It is immaterial how personally abhorrent Wendler may find drag shows; those subjective determinations cannot justify official censorship. And that includes at public universities: "the mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Papish*, 410 U.S. at 670. A public university may not proscribe "speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829.

### 1. President Wendler's tolerance of other speech does not make his drag show ban any less viewpoint discriminatory.

Viewpoint discrimination includes all "[o]fficial censorship based on a state

actor's subjective judgment that the content of protected speech is offensive or inappropriate." *Robinson*, 921 F.3d at 447. President Wendler has countered that his prohibition on drag shows cannot be viewpoint discriminatory because he has not censored other forms of LGBTQ+ speech and praised the same charity Spectrum supported. *See, e.g.*, Br. for Def.-Appellee Walter Wendler at 15, *Spectrum WT*, 151 F.4th 714 (No. 23-10994), Dkt. 94 (Wendler "amplified" Spectrum's message by promoting the Trevor Project). But that misunderstands the law. The Supreme Court rejected a "bipolar" conception of viewpoint discrimination because "exclusion of several views on" an issue "is just as offensive to the First Amendment as exclusion of only one." *Rosenberger*, 515 U.S. at 831.

Start with how the Constitution protects unpopular speech and prohibits censorship based on subjective determinations about what is offensive—regardless of whether censoring officials take a position on the underlying message. *Snyder v. Phelps*, 562 U.S. 443, 458–59 (2011). As the Supreme Court has explained, "[g]iving offense is a viewpoint." *Matal*, 582 U.S. at 243.

In *Matal*, the Supreme Court invalidated the Trademark Act's "disparagement clause" that denied registration to any mark "that disparages any person, group, or institution." *Id.* at 246 (emphasis omitted). The government argued the clause was viewpoint neutral because it was "evenhanded[]" and applied to *all* disparagement. *Id.* at 243. The Supreme Court rejected that argument. *Id.* As the Court explained, even though the disparagement clause "applie[d] equally to marks that damn Democrats and Republicans, capitalists and socialists, and those arrayed on both

26

sides of every possible issue"—it still discriminated based on viewpoint by targeting speech based on what officials might have deemed offensive. *Id.*

So even if President Wendler's drag ban applies to all groups, it still violates the First Amendment. In fact, President Wendler's viewpoint discrimination is far more blatant because, unlike the government officials in *Matal*, he does take a position on drag shows' underlying message. While permitting other forms of PG-13 stage performance, he singles out drag shows based expressly on his subjective determination that they are demeaning to women. Wendler Depo. Ex. 3 (App'x 92–94); Wendler Tr. 23:4–6 (App'x 13), 256:22–25 (App'x 89), 228:24–229:11 (App'x 78–79), 218:23–219:5 (App'x 70–71). But just as the Trademark Office cannot refuse to register marks it believes others will find disparaging, Wendler cannot bar Spectrum's performance because he finds it offensive, or suspects others will, too. *See Matal*, 582 U.S. at 223; *see also Snyder*, 562 U.S. at 458–59; *Robinson*, 921 F.3d at 447 (reversing denial of preliminary injunction against county's policy prohibiting "inappropriate" comments on government Facebook page).

That President Wendler permits alternative avenues of expressing support for the LGBTQ+ community makes no constitutional difference. The availability of alternative means of communication is a factor when evaluating a *content-neutral* time, place, or manner restriction. *Knowles v. City of Waco*, 462 F.3d 430, 433–34 (5th Cir. 2006). But Wendler's actions are undisputably viewpoint and content based. And the Supreme Court "ha[s] consistently rejected the suggestion that a government may justify a content-based prohibition by showing that speakers have alternative means

27

of expression." *Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n*, 447 U.S. 530, 541 n.10 (1980) (collecting cases).

The "right to communicate inherently comprehends the right to communicate effectively," and the existence of an alternative the government considers less objectionable cannot "justify a restraint on some particular means that the speaker finds more effective." *Reeves v. McConn*, 631 F.2d 377, 382 (5th Cir. 1980). And here, as is often true of expressive conduct, the *medium is part of the message*—as it "carries a message quite distinct" from "other means." *City of Ladue v. Gilleo*, 512 U.S. 43, 56 (1994) (striking down ordinance prohibiting residential signs even though other avenues for expression existed). Drag performances are a "central part of queer culture." Fanelli Tr. 34:23–35:17 (App'x 695–696). The medium is an essential part of the message.

### 2. The First Amendment's prohibition against viewpoint discrimination protects expressive conduct as well as speech.

The Constitution does not give the government a stronger hand to silence a view just because it's delivered through expressive conduct rather than pure speech. The "enduring lesson, that the government may not prohibit expression simply because it disagrees with its message, is not dependent on the particular mode in which one chooses to express an idea." *Johnson*, 491 U.S. at 416. While campus officials may have leeway to regulate conduct in ways "unrelated to the suppression of free expression," *United States v. O'Brien*, 391 U.S. 367, 377 (1968), President Wendler's edict confirms he is censoring drag performance *precisely because of* what he believes they express.

Whether students communicate their message through words or conduct, the First Amendment bars officials from censoring it "merely because the ideas are themselves offensive to some of their hearers." *Street v. New York*, 394 U.S. 576, 592 (1969). That's true when campus officials target crude political cartoons. *Papish*, 410 U.S. at 670. It's true when students host an "ugly woman contest" riddled with "racist and sexist" overtones, including contestants "dressed as caricatures of different types of women." *Iota Xi*, 993 F.2d at 387–88. And it's true here, where Wendler has banned drag performance based on subjective views about the offensiveness of its message.

Wendler's statements confirm his ban turns entirely on his subjective judgment that Spectrum's drag show would be offensive. That is *per se* unconstitutional in any setting. Plaintiff is entitled to summary judgment on this ground alone.

## C.    President Wendler's Drag Show Ban Is Also an Unconstitutional Prior Restraint.

Wendler's prohibition on drag performances is a classic unconstitutional prior restraint, banning performances before they occur because he believes they are offensive and demeaning. Prior restraints are "the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n*, 427 U.S. at 559. And Wendler cannot overcome the "heavy presumption" against their constitutionality. *Se. Promotions*, 420 U.S. at 558. His claimed authority to stop speech in advance is not bound by narrow, objective, or definite standards but rests on his subjective evaluation of whether speech is appropriate to a voluntary audience.

### 1. Wendler's prohibition on Spectrum's performances is a classic prior restraint because it prohibits speech before it occurs.

For over two years, Wendler has enforced a campus-wide prohibition on drag shows—a prohibition enacted before Spectrum's students could ever take the stage and premised entirely on Wendler's views on the meaning of drag and its potential impact on viewers. His decision "forbidding certain communications" or expression—issued "in advance of the time that such communications are to occur"—is a "classic prior restraint." *Cath. Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 437 (5th Cir. 2014) (quoting *Alexander v. United States*, 509 U.S. 544, 550 (1993)).

Wendler has exercised his power to ban Spectrum's performance from the Legacy Hall stage, the content of which he had no way of knowing in advance, based entirely on his notions of what is offensive or indecent. In fact, he admits he made no effort to speak with Spectrum's members to better ascertain what the performance would involve. Wendler Tr. 207:5–8 (App'x 67), 65:22–66:8 (App'x 20–21), 67:18–68:23 (App'x 22–23). His actions violate the cornerstone rule that "a free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand," when "the risks of freewheeling censorship are formidable." *Se. Promotions*, 420 U.S. at 559; *see also Gay Student Servs. v. Texas A&M Univ.*, 737 F.2d 1317, 1325 (5th Cir. 1984) (holding refusal to recognize student group based on ideology was a prior restraint); *Pro-Life Cougars v. Univ. of Hou.*, 259 F. Supp. 2d 575, 583–84 (S.D. Tex. 2003) (granting preliminary injunction against prior restraint on campus public forum). Whatever speculative concerns Wendler has, they cannot justify imposing a blanket prohibition on a medium of artistic expression

30

before students could take the stage. *Se. Promotions*, 420 U.S. at 559.

President Wendler's deposition testimony highlights why prior restraints constitute the "most serious" infringement of First Amendment rights. *Neb. Press Ass'n*, 427 U.S. at 558–59. When asked whether he'd ban an offensive cartoon for violating the University's mission statement, Wendler testified he would "have to see it" first. Wendler Tr. 177:1–3 (App'x 64). In describing West Texas values—a core rationale for his ban—President Wendler emphasized "the interplay of freedom and responsibility, that you're free to do things, but if those things have consequences, then … you have to accept those and understand them." Wendler Tr. 141:24–142:10 (App'x 52–53). And when asked how he would handle a situation in which a student organization advertised a show as PG-13 but instead put on a sexually explicit performance, Wendler testified there could be consequences "after the fact." Wendler Tr. 157:12–159:2 (App'x 54–56).

By stopping Spectrum's drag performances before they could occur, Wendler has imposed an unconstitutional prior restraint, and this Court should grant Plaintiff's motion for summary judgment on this basis as well.

### 2. Wendler's claimed authority to cancel expression he deems "demeaning" is a prior restraint unbound by narrow, objective, and definite criteria.

While the "classic prior restraint" is one in which an official issues an order "forbidding certain communications" before they occur, officials also create prior restraints when they require "registration" and approval before speech occurs. *Cath. Leadership Coal. of Tex.*, 764 F.3d at 437; *Se. Promotions, Ltd.*, 457 F.2d at 1020. In *Southeastern Promotions v. City of West Palm Beach*, for example, the Fifth Circuit

found a prior restraint where a municipality allowed the public to seek "permission to rent" an auditorium and subjected reservations to an official's unfettered discretion about what performances to permit. 457 F.2d at 1017, 1021.

While an approval process like that West Texas A&M uses is "not *per se* unconstitutional," and may survive where "certain constitutional requirements are met," *Pro-Life Cougars*, 259 F. Supp. 2d at 583, Wendler cannot meet those constitutional requirements here. He fails to bear his heavy burden to show that Spectrum's performance is unprotected, or to identify narrow, objective, and definite criteria constraining his authority. Nor has he followed the procedural safeguards the First Amendment mandates.

The Supreme Court's decision in *Southeastern Promotions* is dispositive. The Court invalidated a prior restraint that excluded the musical *Hair* from a municipal theater because city officials believed the performance did not fit the city's "clean and healthful and culturally uplifting" criteria. 420 U.S. at 549. The Court held that public officials may not bar stage performances "in advance of actual expression" unless they meet one of two stringent requirements: The performance "must fit within one of the narrowly defined exceptions to the prohibition against prior restraints," like obscenity; or, the system for preemptively banning the performance must be "bounded" by the "narrow, objective, and definite standards" the First Amendment demands. *Id.* at 553, 559 (quoting, in part, *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51 (1969)). Wendler meets neither exception.

For one thing, Wendler has conceded to this Court that obscenity "is not an

issue in the present case." (ECF No. 35 at 18); *see also Miller v. California*, 413 U.S. 15, 24 (1973) (defining obscenity). Nor does any other narrow exception to First Amendment protection apply. For instance, even though Wendler raises the specter of harassment, "[t]here is no categorical 'harassment exception' to the First Amendment's free speech clause." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 204 (3d Cir. 2001). And for good reason. Permitting public university presidents to quash protected speech based on speculative concerns about harassment would endanger protected expression on campus from political speech to pure entertainment. In any event, a one-time ticketed performance in an enclosed space cannot meet federal requirements for harassment. *See Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999) (recognizing the "severe, pervasive, and objectively offensive" standard for Title IX student-on-student harassment in education).

Second, Wendler's sole and unfettered discretion to veto "offensive" or "demeaning" expression is fatal under the *Shuttlesworth* requirement that his authority be bounded by "narrow, objective, and definite standards." 394 U.S. at 151. He has appointed himself the final and sole decisionmaker as to whether speech is "disrespectful" to a "segment of the population." Wendler Tr. 165:16–166:9 (App'x 57–58), 186:4–12 (App'x 65), 256:22–258:4 (App'x 89–91). He has leaned on the "Law of Reciprocity" and the "Golden Rule" in deciding to ban drag performances, even though those unwritten rules do not appear in any university policy. Wender Depo. Ex. 3 (App'x 093); Wendler Tr. 73:2–24 (App'x 26). He also subjectively relies on "campus culture"—through "[f]aculty, students, staff, alumni"—to determine if speech is

33

offensive. Wendler Tr. 138:22–139:6 (App'x 50–51). Wendler's elusive standards are not written anywhere because he asserts that his view on what speech shows "respect" to others "supersedes any other policy of the university." Wendler Tr. 248:2–15 (App'x 85).

Such "uncontrolled discretion" is anathema to the First Amendment, regardless of the public forum type. *Staub v. City of Baxley*, 355 U.S. 313, 325 (1958); *see also Freedom From Religion Found. v. Abbott*, 955 F.3d 417, 429 (5th Cir. 2020) (holding prior restraints "in limited public forums must contain neutral criteria" to "prevent … viewpoint-based censorship"). The Founders abhorred the English Press Acts of the 17th century, which "did not adequately circumscribe the authority of … bureaucratic licensers" who "exercised their unfettered discretion with an insensitivity to political and literary values." William T. Mayton, *Toward A Theory of First Amendment Process: Injunctions of Speech, Subsequent Punishment, and the Costs of the Prior Restraint Doctrine*, 67 Cornell L. Rev. 245, 248 (1982). Thus, government restrictions making "speech contingent on the will of an official … are unconstitutional burdens on speech classified as prior restraints." *Chiu v. Plano Ind. Sch. Dist.*, 339 F.3d 273, 280 (5th Cir. 2003) (citation omitted).

Wendler also failed to provide the procedural safeguards the First Amendment requires for prior restraints. *Pro-Life Cougars*, 259 F. Supp. 2d at 583. That requires that the government to bear "the burden of instituting judicial proceedings, and of proving that the material is unprotected" through "prompt" judicial determination. *Se. Promotions,* 420 U.S. at 560. Here, there was *no* process available to Spectrum—

judicial or otherwise. Wendler never spoke to the students. Wendler Tr. 207:5–8 (App'x 67), 65:22–66:8 (App'x 20–21), 67:18–68:23 (App'x 22–23). He afforded them no investigation or hearing. Wendler Tr. 247:16–23 (App'x 84). And Spectrum had no means of appeal except to Vice President Thomas—who has no authority to countermand Wendler. Thomas Tr. 20:11–21:24 (App'x 541–542), 109:21–110:13 (App'x 549–550).

Given both Wendler's unfettered discretion and the lack of procedural safeguards, he cannot overcome the heavy presumption against their prior restraint on drag shows. This is yet another ground for granting Spectrum summary judgment.

### D. Wendler's Drag Show Ban Is a Content-Based Prohibition in a Designated Public Forum That Cannot Satisfy Strict Scrutiny.

The record establishes that West Texas A&M policy and consistent practice opens Legacy Hall to students and the public for an unfettered range of expressive activities, leaving no doubt that Legacy Hall is a designated public forum. Wendler's decision to single out expression from a designated public forum based on content renders his ban presumptively unconstitutional and subject to strict scrutiny. *Widmar*, 454 U.S. at 269–70. "It is an elementary rule that the government may not exclude speech on the basis of its content from either a traditional public forum or a forum created by government designation, unless the exclusion is necessary to serve a compelling state interest which cannot be served by a less restrictive action." *Concerned Women for Am. Inc. v. Lafayette Cnty.*, 883 F.2d 32, 34–35 (5th Cir. 1989). Summary judgment is warranted on this ground as well.

35

### 1. University policy and practice establish Legacy Hall is a designated public forum.

Legacy Hall is a designated public forum, where content-based restrictions on expression like President Wendler's drag show ban must satisfy strict scrutiny. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). A forum's classification turns on the government's "policy and practice" and the venue's "compatibility with expressive activity." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 215–16 (2015) (citation omitted); *see also Justice for All*, 410 F.3d at 766 & n.8, 768–69 (forum classification is particular to a given space, not for "an entire university campus"). Here, both university policy, which broadly designates indoor venues for expressive activities by student organizations and the general public, as well as the University's longstanding practices involving Legacy Hall, establish it as a designated public forum suitable for stage performances.

Start with West Texas A&M policy. It guarantees expressive freedom in Legacy Hall (Wendler Depo. Ex. 17) (App'x 139–150), with only "minimal" limits on speech, rendering it a designated public forum. *Justice for All*, 410 F.3d at 768. The policy allows any person, subject only to content- and viewpoint-neutral "time, place, and manner restrictions, to engage in expressive activities on campus." Wendler Depo. Ex. 17 (App'x 103). And it broadly defines "campus" to include both its "land and buildings," *id.* (App'x 106), the latter including Legacy Hall.[8] University policy also

---

[8] The Texas A&M Board of Regents recently met to approve a system-wide policy governing expressive activity on campus. That policy would largely maintain the relevant criteria from West Texas A&M's expressive activity policy. Texas A&M University System Board of Regents, *Agenda Items Meeting of the Board of Regents*, pp. 93–105 (Nov. 13, 2025), https://www.tamus.edu/regents/wp-content/uploads/sites/28/2025/11/Regular-Binder-November-13-2025-website.pdf.

permits student organizations to use facilities like Legacy Hall to plan "any special event," including "fundraising activity" or "social gatherings or functions." Fouts Depo. Ex. 56 (App'x 449–450).

That policy reveals the University's intent to create a designated public forum for student organizations: It adopted the same language the Fifth Circuit found in *Justice for All* to establish a designated public forum, 410 F.3d at 768, and the University applied that language to campus buildings like Legacy Hall. Wendler Depo. Ex. 17 at §1.3 (App'x 104).[9] And that language is clear in prohibiting administrators from making content- or viewpoint-based judgments when granting access to campus facilities. It bars administrators from "act[ing] against" or "deny[ing] … any benefit"—including the use of campus facilities like Legacy Hall— "based on a political, religious, philosophical, ideological, or academic viewpoint expressed by the organization or of any expressive activities of the organization." Wendler Depo. Ex. 17 (App'x 104, 106). These written policies establish Legacy Hall as a designated public forum dedicated broadly to expression, with no substantial limit on the groups that may use it or what they can express.

The University's consistent practice aligns with its policies. The University actively promotes the JBK Student Center, which includes Legacy Hall, for both student and public use, making it available for "events like[] concerts, press conferences, proms and weddings." Wendler Ans. ¶ 32. Students and the public

---

[9] The University's forthcoming expressive activities policy goes further, prohibiting the university from considering the "content or viewpoint of the expressive activity" in evaluating reservation requests for Legacy Hall. Fouts Depo. Ex. 54 § 3.2 (App'x 433), Fouts Tr. 30:21–31:8 (App'x 384–385).

routinely use Legacy Hall for a wide range of expressive performances, confirming the space's "compatibility with the speech at issue." *Chiu*, 260 F.3d at 346 (citation omitted); *see also, e.g.*, *Tex. A&M Queer Empowerment Council*, 772 F. Supp. 3d at 803–04 (availability and uses of Texas A&M's campus theatre demonstrated it was a designated public forum, notwithstanding reservation system).

Legacy Hall has been used, can be used, and is suitable for a range of events with no educational purpose, including: beauty pageants, singing competitions, concerts, religious worship, banquets, wedding ceremonies, wedding receptions, holiday parties, movie screenings, dance-off competitions, fashion shows, talent shows, male beauty pageants, female beauty pageants, press conferences, political events—and, as recently as 2019, student drag shows. Fouts Tr. 88:17–91:10 (App'x 400–403); Wendler Tr. 92:7–93:21 (App'x 27–28); ECF No. 80 ("Wendler Ans.") ¶ 41 (admitting prior campus drag shows). Legacy Hall serves a broad range of uses, benefitting the campus community *and* the broader community, providing a communal gathering space that may not be available in the City of Canyon, or which is more convenient to students on campus. Fouts Tr. 36:2–13 (App'x 388), 48:15–20 (App'x 394), 53:18–54:9 (App'x 395–396).

Because Legacy Hall is open for student and public use alike, and not limited to any one subject, it is not a limited public forum. *Concerned Women for Am. Inc.*, 883 F.2d at 34.  A *limited* public forum, in contrast, is a designated forum exclusively reserved to particular speakers or subjects. *Walker*, 576 U.S. at 215. It does not matter whether "a group must obtain permission" to "gain access to the [forum]."

*Concerned Women for Am. Inc.*, 883 F.2d at 33. Requiring prior approval does not convert a designated public forum into a limited one, any more than requiring permits to hold a parade on a public street converts the street into a limited public forum. *Id.*; *see also Tex. A&M Queer Empowerment Council*, 772 F. Supp. 3d at 803–04 (reservation system did not convert campus theatre to limited public forum).

Nor can President Wendler's ban on drag shows in Legacy Hall change the nature of the forum. A forum's classification turns on "*consistent* practice, not each exceptional regulation that departs from the consistent practice." *Hays Cnty. Guardian*, 969 F.2d at 118; *see also, e.g., Concerned Women for Am., Inc.*, 883 F.2d at 34 (opening library auditorium for use by groups having "little to do with the Library's educational and artistic mission" created a designated public forum).[10] Otherwise, officials could justify content-based prohibitions in designated public forums merely because the prohibition itself exists.

For these reasons, Legacy Hall is a designated public forum open to a wide range of expressive conduct, including dramatic performances and events like drag shows that use amplified music, lights, and other theatrical features.

### 2. Wendler's ban is content based and thus presumptively unconstitutional.

Where, as here, a government official "target[s] speech based on its

---

[10] Even if Legacy Hall were a limited public forum, the drag show ban is still unconstitutional for two reasons. First, it is viewpoint-based, which is "a clearly established violation of the First Amendment in any forum." *Chiu*, 260 F.3d at 350. Second, when the government opens a limited public forum, it still must "respect the lawful boundaries it has itself set." *Rosenberger*, 515 U.S. at 829. Because Wendler's ban excludes students "who fall[] within the class to which" Legacy Hall "is made generally available," it triggers strict scrutiny. *Justice for All*, 410 F.3d at 766–67 (citation omitted); *see also Widmar*, 454 U.S. at 269–270. He cannot meet that burden. *See infra*, Section I.E.

communicative content," he imposes a content-based restriction. *Reed*, 576 U.S. at 163–64. That's especially so where a public university disparately "single[s] out" a group or expression from a public forum. *CLS*, 561 U.S. at 685 (citing *Rosenberger*, *Healy*, and *Widmar*). That is what President Wendler's ban does: It singles out drag shows among all other forms of stage performance or expressive conduct for blanket censorship. *See Imperial Sovereign Ct. of Mont. v. Knudsen*, 699 F. Supp. 3d 1018, 1036–37 (D. Mont. 2023) (holding ban on drag shows "targets speech based upon content" and collecting cases in support). Wendler does not, for instance, restrict the dance team, cheerleaders, theatre productions, or any other student group from holding events in Legacy Hall involving performers dancing to music. *See* Fouts Tr. 88:17–91:10 (App'x 400–403), 65:13–25 (App'x 397); Thomas Tr. 108:9–16 (App'x 548). (showing varied performances at West Texas A&M). Nor has President Wendler barred student organizations from showing PG-13 or R-Rated movies.

For those reasons, Wendler is wrong that his ban is a "time, place, or manner" restriction. A time, place, or manner restriction must be "justified without reference to the content of the regulated speech." *McCullen v. Coakley*, 573 U.S. 464, 477 (2014) (citation omitted). But President Wendler's ban directly references the show's content—i.e., whether it involves drag. Because Wendler's drag ban is a content-based restriction in a designated public forum, it is presumptively unconstitutional and subject to strict scrutiny. *Reed*, 576 U.S. at 163; *Widmar*, 454 U.S. at 270.

### E.    President Wendler cannot satisfy strict scrutiny.

Both generally and within a designated public forum, when the government restricts expression based on its content, it must satisfy strict scrutiny. Neither

President Wendler's contemporaneous reasons for banning drag shows nor his post-hoc justifications offered during litigation satisfy strict scrutiny, as they are not narrowly tailored to serve a compelling government interest. *Reed*, 576 U.S. at 171.

### 1. President Wendler's contemporaneous reasons for the ban do not constitute a compelling interest.

President Wendler publicly described his rationale for banning campus drag shows at great length. Wendler Depo. Ex. 3 (App'x 92–94). He focused on the "ideology" underlying drag shows and condemned them as "derisive, divisive and demoralizing." *Id.* He argued that, according to his beliefs about natural law, religion, and "human dignity," drag shows are misogynistic and demeaning towards women and are thus never "harmless." *Id.*

The Supreme Court has consistently rejected the argument that the government has *any* interest—let alone a compelling one—in censoring speech it finds objectionable or potentially offensive. *See, e.g.*, *Healy*, 408 U.S. at 187; *Matal*, 582 U.S. at 243; *McCullen*, 573 U.S. at 476; *Snyder*, 562 U.S. at 451–52; *Johnson*, 491 U.S. at 414; *Boos v. Barry*, 485 U.S. 312, 322 (1988); *Erznoznik*, 422 U.S. at 209. Indeed, doing so is expressly *prohibited* "in any forum." *Chiu*, 260 F.3d at 350.

Though Wendler raised vague concerns about harassment and discrimination when announcing his ban, those concerns cannot meet strict scrutiny. "[P]ermitting a once-a-year drag show to occur at" a public university venue "cannot constitute severe or pervasive harassment," as it must for a public university to act against it. *Tex. A&M Queer Empowerment Council*, 772 F. Supp. 3d at 809. Even more so where campus members would have to voluntarily attend the show in the enclosed Legacy

41

Hall to see it. And as Wendler admitted, no student submitted a harassment complaint over Spectrum's planned drag performance. Wendler Tr. 123:23–124:7 (App'x 42–43).

Moreover, the Student Handbook confirms that university officials may take only "disciplinary or remedial action" against harassment, following the university's review and adjudication process. Thomas Depo. Ex. 98 (App'x 601). Affording Spectrum that process after the show might comply with that policy and the Constitution. But stopping protected expression in advance based on mere speculation over harassment does not.

### 2. President Wendler's post hoc justifications for the ban do not provide a compelling interest either.

After Spectrum sued, Wendler for the first time offered several additional justifications. Setting aside, for a moment, the Supreme Court's admonishments about crediting such post hoc rationalizations, *see, e.g.*, *Kennedy*, 597 U.S. at 543 n.8, none of these purported justifications constitute a compelling interest.[11]

To begin, Wendler first expressed concerns about drag shows' "lewdness" in his motion to dismiss. (ECF No. 35 at 13–15). But the Supreme Court in *Papish* expressly rejected the notion that prohibiting "lewdness" is a compelling government interest. *Papish*, 410 U.S. at 669–70 (striking down university disciplinary action over cartoon "depicting policemen raping the Statue of Liberty and the Goddess of Justice"). And in any case, Wendler has no evidence of "lewdness" beyond mere speculation (nor

---

[11] Neither the Fifth Circuit panel majority nor the dissent credited Wendler's post hoc rationales for banning protected expression. *See Spectrum WT*, 151 F.4th at 722–39.

could they, having prevented themselves from seeing Spectrum's show).

By contrast, the record shows that Spectrum carefully planned a PG-13 drag show, instructing performers and its guest emcee to avoid profane music and lewd conduct. Chandler Tr. 32:16–33:3 (App'x 327–328), 33:21–34:15 (App'x 328–329). Wendler can point to no evidence that performers planned to defy Spectrum's clear instruction. No university officials raised concerns that the planned performance would violate the PG-13 rating (Wendler Tr. 159:3–12) (App'x 56), or any provision of the University's student handbook or community standards (Thomas Tr. 25:15–26:8) (App'x 543–544). Nor were there any documented concerns that the show would be lewd. Chandler Tr. 33:21–34:15 (App'x 328–329). The only basis President Wendler could cite during his deposition for his opinion that the performance would be lewd were his concerns (premised on a Mary Cheney Facebook post) that drag performances are "catty, bitchy, and slutty." *See* Wendler Tr. 220:9–221:1 (App'x 72–73); Wendler Depo. Ex. 29 (App'x 274).

President Wendler's ban also went into effect before Spectrum's performers ever took the stage—and before President Wendler ever learned, for instance, that Myss Myka was scheduled to perform. Wendler Tr. 217:20–218:12 (App'x 69–70); *see also* Thomas Tr. 88:2–9 (App'x 547). And even had he or other university officials known, Myss Myka's participation did not change the fact that Spectrum had planned a strictly PG-13 performance. In no case can mere conjecture about expression satisfy a government official's "heavy burden" to justify a prior restraint. *Gay Student Servs.*, 737 F.2d at 1327–30; *see also Se. Promotions*, 420 U.S. at 554–55.

43

Second, President Wendler's attempt to invoke Texas's 2023 Senate Bill 12 as rationale for enacting a campus-wide ban on protected expression also fails strict scrutiny. S.B. 12 applies strictly to specific forms of "sexually oriented performances" that "(1) features a performer who "is nude" or "engages in sexual conduct," and (2) "appeals to the prurient interest in sex," occurring on public property and in the presence of minors. Tex. Health & Safety Code § 769.002; Tex. Loc. Gov't Code § 243.0031; Tex. Penal Code § 43.28. A "prurient interest in sex" mirrors one of the elements for unprotected obscenity the Supreme Court set forth in *Miller*, 413 U.S. at 24.[12] But President Wendler, whose edict is notably silent on obscenity, admitted at the outset of this lawsuit that obscenity "is not an issue in the present case." (ECF No. 35 at 18). That concession alone shows that Wendler's vague concerns about S.B. 12 cannot meet his strict scrutiny burden.

Even if Wendler has not made that concession, there is nothing in Spectrum's performance that meets S.B. 12's definition of "sexually oriented performance." In applying S.B. 12 to various drag performances, the Fifth Circuit recently concluded that drag shows involving performers "giving front-facing hugs" and twerking, and featuring vendors handing out condoms and lubricant, fell outside S.B. 12's scope.

---

[12] Expression only qualifies as obscene when: (a) "the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest"; (b) "the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law"; and (c) "the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." Under that test, obscenity is confined to speech depicting "patently offensive 'hard core' sexual conduct." *Miller*, 413 U.S. at 24. In determining whether material has serious artistic value, "[t]he proper inquiry" does not turn on "whether an ordinary member of [the Panhandle] community would find" serious value in the expression, but "whether a reasonable person would find such value." *Pope v. Illinois*, 481 U.S. 497, 500–01 (1987).

*Woodlands Pride, Inc. v. Paxton*, 157 F.4th 775, 783–84 (5th Cir. 2025). Wendler has no evidence that Spectrum's planned performance would involve anything approaching even those non-sexually oriented actions. On the contrary, Spectrum took deliberate steps to ensure their drag show was *not* sexualized in any way. Chandler Tr. 33:21–34:15 (App'x 328–329); Stovall Tr. 62:9–22 (App'x 668), 137:23–138:22 (App'x 678–679), 63:9–11 (App'x 669), 50:10–51:12 (App'x 665–666). So there is no dispute that Spectrum's planned performance would not appeal to the prurient interest, let alone feature nudity or "sexual conduct." Their PG-13 show is squarely within the First Amendment's protections. *Brown*, 564 U.S. at 804; *see also Free Speech Coalition, Inc. v. Paxton*, 606 U.S. 461, 481 n. 7 (2025) (holding PG-13 or R-rated content presents no basis for departing from the Court's enduring protection of speech under the First Amendment, even when targeting minors).

Nor is this a case involving "obscenity to minors." Again, Wendler conceded obscenity "is not an issue in the present case." (ECF No. 35 at 18). And Spectrum specifically prohibited anyone below the age of 18 from attending their drag show without a parent or guardian present. Chandler Tr. 32:16–23 (App'x 327); Stovall Tr. 65:12–14 (App'x 670); Bright Tr. 58:2–4 (App'x 736), 61:12–16 (App'x 738). Wendler has no compelling interest in dictating "what [they] think[] parents *ought* to want." *Brown*, 564 U.S. at 804. Rather, expression falling short of obscenity "cannot be suppressed solely to protect the young from ideas or images" that an official "thinks unsuitable for them." *Erznoznik*, 422 U.S. at 213–14. Besides, the government may not "reduce the adult population to only what is fit for children." *Sable Commc'ns of*

*Ca., Inc. v. FCC*, 492 U.S. 115, 128 (1989) (quoting *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 73 (1983)). There is no "captive audience" concern with a ticketed event. *Bolger*, 463 U.S. at 72. And university campuses enjoy robust First Amendment protections, regardless of whether minors may be present. *See, e.g.*, *Papish*, 410 U.S. at 674–76 (Rehnquist, J., dissenting) (describing the "many" minors present when student circulated crude cartoon).[13]

Those who find drag shows offensive can choose not to attend and "effectively avoid further bombardment of their sensibilities simply by averting their eyes." *Cohen*, 403 U.S. at 21. None of Wendler's post-hoc justifications—already inherently suspect—are a compelling government interest.

### 3. Wendler's sweeping ban on a form of expressive conduct is not narrowly tailored to satisfy strict scrutiny.

A blanket prohibition on an entire genre of artistic expression is precisely the sort of unrestrained censorship the First Amendment does not tolerate. The Supreme Court has repeatedly "voiced particular concern with laws that foreclose an entire medium of expression." *City of Ladue*, 512 U.S. at 55 (collecting cases); *accord Sable Commc'ns of Ca.*, 492 U.S. at 127 (describing the unique constitutional pitfalls inherent to a "total ban" on a medium of communication).

On top of being grossly overinclusive, President Wender's ban is also underinclusive. It does not censor film, music, or books, including those that may be offensive to women. Nor does President Wendler censor any other theatrical

---

[13] Because public universities do not sit *loco parentis*, "there is a difference between the extent that a school may regulate student speech in a public university setting as opposed to that of a public elementary or high school." *McCauley v. Univ. of the Virgin Islands*, 618 F.3d 232, 242 (3d Cir. 2010).

performances—even those the university has rated PG-13 or R—singling out drag shows alone. Chandler Tr. 36:24–38:14 (App'x 330–332), 47:9–14 (App'x 337); Chandler Depo. Ex. 44 (App'x. 355-361). This is nowhere near the narrow tailoring the Constitution requires for his ban to survive strict scrutiny. *E.g.*, *Brown*, 564 U.S. at 805 (explaining that banning minors from purchasing violent video games "is seriously underinclusive" because it "excludes portrayals other than video games").

At an absolute minimum, Wendler's campus drag show ban is a content-based restriction in a designated public forum that must satisfy strict scrutiny. The record indisputably shows Wendler cannot meet that burden.

## II. Spectrum Is Suffering Irreparable Harm.

Only injunctive relief can stop the ongoing harm to Spectrum's First Amendment rights. Courts have "repeatedly held … that the loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury justifying the grant of a preliminary injunction." *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) (cleaned up). And absent injunctive relief, Spectrum will remain cut off from effectively advocating for and sharing its mission with the campus community to which it belongs. Fanelli Tr. 42:24–43:11 (App'x 699–700), 152:20–154:16 (App'x 707–709).

Spectrum intends to put on future drag shows at Legacy Hall. *E.g.*, Fanelli Tr. 26:17–21 (App'x 690), 30:5–9 (App'x 691). But Wendler is certain to cancel any of those future shows. Fanelli Tr. 157:17–21 (App'x 712); Wendler Depo. Exs. 3 (App'x 92–94), 4 (App'x 96). Consistent with his past reasons for cancelling Spectrum's shows, Wendler has confirmed he can cancel any performance he believes is

disrespectful to any group. Wendler Tr. 257:25–258:4 (App'x 90–91). And as Wendler told the media after Spectrum sued, he "wouldn't have done anything any differently." SPECTRUM 0002019 at 25:11–26:36 (App'x 774); *supra* n.4.

## III.    An Injunction Will Serve The Public Interest.

No matter Wendler's speculative concerns about harassment and offense, his ban on drag performances threatens the public interest in maintaining strong First Amendment protections at public universities. "[I]njunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter.*, 732 F.3d at 539 (citation omitted). To this end, courts do not defer to campus officials' restrictions on expression, but "must be especially vigilant against assaults on speech in the Constitution's care" at public universities. *Speech First, Inc. v. Fenves*, 979 F.3d 319, 339 (5th Cir. 2020). Otherwise, universities will entrench ideologically motivated censorship, leaving no view safe—whether religious, political, artistic, or otherwise.

## IV.    Declaratory Relief Is Appropriate.

For the same reasons Spectrum succeeds on the merits, the Court should declare that President Wendler's actions have violated and are violating the First Amendment. Declaratory relief is proper here. There is no dispute an actual controversy exists; there is no pending state action between the parties; and there are no inequities, concerns over judicial economy, or forum issues that counsel against the Court exercising its authority to grant declaratory relief. *See Equal Emp. Opportunity Comm'n*, 633 F. Supp. 3d at 846.

## **CONCLUSION**

For all these reasons, Plaintiff asks that the Court grant its motion for summary judgment.

Dated: December 30, 2025

Respectfully submitted,

/s/ JT Morris
JT MORRIS
TX Bar No. 24094444
CONOR T. FITZPATRICK*
MI Bar No. P78981
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION
700 Pennsylvania Ave., SE
Ste. 340
Washington, DC 20003
Tel: (215) 717-3473
Fax: (267) 573-3073
jt.morris@fire.org
conor.fitzpatrick@fire.org

ADAM B. STEINBAUGH*
PA Bar No. 326475
JEFFREY D. ZEMAN*
Pa. Bar No. 328570
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION
510 Walnut St.; Ste. 1250
Philadelphia, PA 19106
Tel: (215) 717-3473
Fax: (267) 573-3073
adam@fire.org
jeff.zeman@fire.org

* Admitted *Pro Hac Vice*

*Attorneys for Plaintiff Spectrum WT*

49

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 30, 2025, a true and correct copy of the foregoing document was transmitted via using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

/s/ JT Morris
JT Morris
