# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# AMARILLO DIVISION

SPECTRUM WT,

        Plaintiff,

    v.

WALTER WENDLER,

        Defendant.

Case No.: 2:23-cv-00048-Z

Hon. Matthew J. Kacsmaryk

**PLAINTIFF'S APPENDIX
IN SUPPORT OF ITS MOTION FOR
SUMMARY JUDGMENT**

---

JT MORRIS
TX Bar No. 24094444
CONOR T. FITZPATRICK*
MI Bar No. P78981
FOUNDATION FOR INDIVIDUAL RIGHTS
   AND EXPRESSION
700 Pennsylvania Ave., SE; Ste. 340
Washington, DC 20003
Tel: (215) 717-3473
Fax: (267) 573-3073
jt.morris@fire.org
conor.fitzpatrick@fire.org

ADAM B. STEINBAUGH*
CA Bar No. 304829
JEFFREY D. ZEMAN*
MI Bar No. P76610
FOUNDATION FOR INDIVIDUAL RIGHTS
   AND EXPRESSION
510 Walnut St.; Ste. 1250
Philadelphia, PA 19106
Tel: (215) 717-3473
Fax: (267) 573-3073
adam@fire.org
jeff.zeman@fire.org

    * Admitted *Pro Hac Vice*

*Counsel for Plaintiff*

**INDEX**

| Ex. | Document | App. Page Nos. |
|---|---|---|
| 1 | **Excerpts of Deposition Transcript of Walter Wendler** | **006–091** |
| 2 | Wendler Depo. Ex. 3 – Email 3-20-23 from President Wendler to Students, Faculty, and Staff (W_000085 – 000087) | 092–095 |
| 3 | Wendler Depo. Ex. 4 – Email 3-18-24 from President Wendler to Students, Faculty, and Staff (W_000088) | 096 |
| 4 | Wendler Depo. Ex. 5 – Talking Points 4-26-23 Fox News Lubbock Radio 95.9 FM (DEF_028052 – 028054) | 097–100 |
| 5 | Wendler Depo. Ex. 12 – A Fool's Drag Race Advertisement (DEF_000098) | 101 |
| 6 | Wendler Depo. Ex. 16 – WTAMU Student Event Calendar for Friday the 13th film, 9-13-24 (SPECTRUM 0002865) | 102 |
| 7 | Wendler Depo. Ex. 17 – West Texas A&M University Expressive Activity on Campus Policy 08.99.99.W1 Revised 6-25-24 (DEF_000450 – 000455) | 103–108 |
| 8 | Wendler Depo. Ex. 18 – Texas A&M University System Civil Rights Compliance Policy 08.01.01 (DEF_000235 – 000263) | 109–138 |
| 9 | Wendler Depo. Ex. 19 – West Texas A&M University Expressive Activity on Campus Policy 08.99.99.W1 Revised 7-28-25 (redline) | 139–150 |
| 10 | Wendler Depo. Ex. 20 – Texas A&M University System Expressive Activity on Campus Policy 08.02.01 Approved 11-13-25 | 151–156 |
| 11 | Wendler Depo. Ex. 21 – Defendant Wendler's Second Amended Responses and Objections to Plaintiff's First Set of Interrogatories | 157–188 |
| 12 | Wendler Depo. Ex. 22 – The Heart and Soul of the Texas Panhandle Minority Points of View 11-17-14 | 189–194 |
| 13 | Wendler Depo. Ex. 23 – WT Spectrum Official Statement 3-21-23 | 195–226 |
| 14 | Wendler Depo. Ex. 25 – The Heart and Soul of the Texas Panhandle Ists, Isms, and Free Will 6-12-22 (W_000163 – 000167) | 227–232 |
| 15 | Wendler Depo. Ex. 26 – Jingle Mingle Instagram Post 11-9-23 (SPECTRUM 0002280) | 233–234 |
| 16 | Wendler Depo. Ex. 29 – Wendler's research on drag (W_000090 – 000162) | 235–308 |
| 17 | Wendler Depo. Ex. 31 – Presidential Actions Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government (SPECTRUM 0003012 – 0003015) | 309–314 |
| 18 | **Excerpts of Deposition Transcript of Chip Chandler** | **315–341** |
| 19 | Chandler Depo. Ex. 37 – Email Chain 9-14-22 with Barrett Bright, Chip Chandler, Echo Sibley (SPECTRUM 0000545 – 0000546) | 342–343 |
| 20 | Chandler Depo. Ex. 38 – A Fool's Drag Race Meeting January 26 (SPECTRUM 0000753 – 0000754) | 344–345 |
| 21 | Chandler Depo. Ex. 39 – Email Chain 2-16-23 with Chip Chandler and Colette Ransom (SPECTRUM 0000792 – 0000793) | 345–347 |

| 22 | Chandler Depo. Ex. 40 – Email 2-27-23 from Chip Chandler to Barrett Bright (SPECTRUM 0000822) | 348 |
|----|---|---|
| 23 | Chandler Depo. Ex. 42 – Email Chain 2-21-23 Through 3-9-23 praising drag show promotional materials: "Awesome job." | 349–354 |
| 24 | Chandler Depo. Ex. 44 – WT Newsroom Article Double-Cast, Self-Aware Musical to Close Season for WT Theater (SPECTRUM 0000368 – 0000370) | 355–357 |
| 25 | Chandler Depo. Ex. 45 – WT Newsroom Article WT Theater to Bring Classic, Modern Touches to Shakespeare's As You Like It (SPECTRUM 0000417 – 0000418) | 358–359 |
| 26 | Chandler Depo. Ex. 46 – WT Newsroom Article WT Theater Hopes for Big Laughs with "Forum" Musical (SPECTRUM 0003369 – 0003370) | 360–361 |
| 27 | Chandler Depo. Ex. 47 – WT Newsroom Article "Outside the Box" Bodies to be Focus of New WT Art Exhibition (SPECTRUM 0003858 – 0003859) | 362–363 |
| 28 | **Excerpts of Deposition Transcript of Shawn Fouts** | **364–426** |
| 29 | Fouts Depo. Ex. 52 – Texas A&M University System Expressive Activity on Campus Policy 08.02: Approved 11-13-25 | 427–428 |
| 30 | Fouts Depo. Ex. 54 – West Texas A&M University Expressive Activity on Campus Policy 08.99.99.W1 Revised 7-28-25 | 429–439 |
| 31 | Fouts Depo. Ex. 55 – Events Listing for Various Years | 440–448 |
| 32 | Fouts Depo. Ex. 56 – Facility Use Request Procedure Policy 24.01.01.WO.01 Revised 3-1-17 (DEF_000412 – 000413) | 449–450 |
| 33 | Fouts Depo. Ex. 58 – West Texas A&M Mission Statement (SPECTRUM 0003824 – 0003826) | 451–453 |
| 34 | Fouts Depo. Ex. 59 – West Texas A&M Venues at WTAMU (SPECTRUM 0003827 – 0003830) | 454–457 |
| 35 | Fouts Depo. Ex. 61 – 25 Live Screenshots (SPECTRUM 0003909 – 0003914) | 458–462 |
| 36 | Fouts Depo. Ex. 62 – Jack B. Kelly Student Center Procedures and Guidelines Revised 3-5-25 | 463–482 |
| 37 | Fouts Depo. Ex. 63 – WT Campus Organizations Handbook (DEF_000109 – 000130) | 483–504 |
| 38 | Fouts Depo. Ex. 72 – WT Get Involved Instagram Post for Gabriel Holmes "Get Hypnotized" Event (SPECTRUM 0002365) | 505 |
| 39 | Fouts Depo. Ex. 73 – WT Get Involved Instagram Post for "Battle of the Buffs" Talent Show (SPECTRUM 0002663) | 506 |
| 40 | Fouts Depo. Ex. 77 – A Fool's Drag Show Reservation Comments (SPECTRUM 0000762 – 0000770) | 507–513 |
| 41 | Fouts Depo. Ex. 78 – WTAMU Risk Management and Insurance Matrix Form for A Fool's Drag Race (SPECTRUM 0000776 – 0000777) | 514–515 |
| 42 | Fouts Depo. Ex. 82 – Email Chain 2-13-23 through 2-16-23 with Shawn Fouts and Kris Drumheller (SPECTRUM 0000786 – 0000791) | 516–521 |

| 43 | Fouts Depo. Ex. 83 – Briefing with Dr. Thomas and Chance Haugen 2-21-23 | 522–529 |
|----|---|---|
| 44 | Fouts Depo. Ex. 89 – WTAMU Risk Management and Insurance Matrix Form for Don't Be a Drag Drag Show (DEF_000049 – 000050) | 530–531 |
| 45 | Fouts Depo. Ex. 92 – Don't Be a Drag Drag Show Flier (DEF_000096) | 532 |
| 46 | Fouts Depo. Ex. 93 – Outlook Post 3-12-24 Confirm Final Details for Reservation Scheduled 3-22-24 (SPECTRUM 0002436 – 0002437) | 533–534 |
| **47** | **Excerpts of Deposition Transcript of Christopher Thomas** | **535–550** |
| 48 | Thomas Depo. Ex. 97 – Dear Colleague Letter 7-28-03 | 551–555 |
| 49 | Thomas Depo. Ex. 98 – WTAMU Student Handbook 2025-2026 (DEF_000328 – 000411) | 556–639 |
| 50 | Thomas Depo. Ex. 100 – Civil Rights Protections and Compliance Policy 08.01 Revised 11-13-25 (DEF_181891 – 181894) | 640–643 |
| 51 | Thomas Depo. Ex. 103 – WTAMU PUP Frequently Asked Questions | 644–646 |
| 52 | Thomas Depo. Ex. 104 – Pre-University Program Agreement for Independent School Districts on Dual/Concurrent Enrollment Courses (DEF_000858 – 000860) | 647–649 |
| 53 | Thomas Depo. Ex. 105 – Pre-University Program Student Approval Form (DEF_017571 – 017573) | 650–652 |
| 54 | Thomas Depo. Ex. 106 – PUP Enrollment Count by Semester (DEF_181906) | 653 |
| **55** | **Excerpts of Deposition Transcript of Marcus Stovall** | **654–679** |
| 56 | Stovall Depo. Ex. 7 – Wtamuspectrum Instagram Screenshot [SPECTRUM 834] | 680 |
| **57** | **Excerpts of Deposition Transcript of Johnathan-Jayce Fanelli** | **681–712** |
| **58** | **Excerpts of Deposition Transcript of Barrett Bright** | **713–756** |
| 59 | Bright Depo. Ex. 12 – WTAMU Spectrum Instagram screenshot: Help Fund Spectrum WT's Drag Show [SPECTRUM 0001443– 0001446] | 757–760 |
| 60 | 2026 Drag Show Application [DEF_182279–182281] | 761–763 |
| 61 | 2026 Risk Matrix Submission [DEF_182282–182283] | 764–765 |
| 62 | List of Events [Def_083069.xlsx] | 766–773 |
| 63 | KAMR, Walter Wendler Full Interview (Apr. 27, 2023, at 16:28 CT), [SPECTRUM0002019] [Flash drive] | 774 |

Dated: December 30, 2025

Respectfully submitted,

/s/ JT Morris
JT MORRIS
TX Bar No. 24094444
CONOR T. FITZPATRICK*
MI Bar No. P78981
FOUNDATION FOR INDIVIDUAL
    RIGHTS AND EXPRESSION
700 Pennsylvania Ave., SE

Ste. 340
Washington, DC 20003
Tel: (215) 717-3473
Fax: (267) 573-3073
jt.morris@fire.org
conor.fitzpatrick@fire.org

ADAM B. STEINBAUGH*
PA Bar No. 326475
JEFFREY D. ZEMAN*
Pa. Bar No. 328570
FOUNDATION FOR INDIVIDUAL
    RIGHTS AND EXPRESSION
510 Walnut St.; Ste. 1250
Philadelphia, PA 19106
Tel: (215) 717-3473
Fax: (267) 573-3073
adam@fire.org
jeff.zeman@fire.org

* Admitted *Pro Hac Vice*

*Attorneys for Plaintiff Spectrum WT*

5

1          UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF TEXAS
2                 AMARILLO DIVISION

3    SPECTRUM WT,              )
                               )
4         Plaintiff,           )
                               )
5    v.                        )    Case No. 2:23-cv-00048
                               )
6    WALTER WENDLER, in his    )
     official capacity as the  )
7    President of West Texas    )
     A&M University, et al.,    )
8                               )
          Defendants.          )
9

10

11

12

13   ------------------------------------------------------------
        ORAL AND VIDEOTAPED DEPOSITION OF WALTER WENDLER
14              DECEMBER 8, 2025 - CANYON, TEXAS
        ------------------------------------------------------------
15

16

17

18

19

20          ORAL AND VIDEOTAPED DEPOSITION OF WALTER WENDLER,
     produced as a witness at the instance of the PLAINTIFF
21   and duly sworn, was taken in the above styled and
     numbered cause on DECEMBER 8, 2025, from 9:06 a.m.
22   to 6:07 p.m., at the offices of WEST TEXAS A&M
     UNIVERSITY, Old Main Building, Room 317, Canyon, Texas,
23   before SHARON D. LIVINGSTON, CSR-RPR, in and for the
     State of Texas, reported by machine shorthand, and
24   pursuant to the Federal Rules of Civil Procedure.

25

Pl. App'x 006

```
 1                  A P P E A R A N C E S

 2   FOR THE PLAINTIFF:
           Mr. JT Morris
 3         FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
           700 Pennsylvania Avenue, SE, Suite 340
 4         Washington, DC 20003
           (215) 717-3473
 5         Jt.morris@thefire.org
     - and -
 6         Mr. Adam Steinbaugh
           FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
 7         510 Walnut Street, Suite 900
           Philadelphia, Pennsylvania 19106
 8         (215) 717-3473
           Adam@thefire.org
 9
     FOR THE DEFENDANTS:
10         Mr. David Bryant
           OFFICE OF THE TEXAS ATTORNEY GENERAL
11         300 West 15th Street
           Austin, Texas 78701
12         (512) 463-2100
           David.bryant@oag.texas.gov
13
     ALSO PRESENT:  Mr. Brad Snyder, Videographer
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                           INDEX
                                                          PAGE
 2    Appearances ----------------------------------------   2

 3    Index ----------------------------------------------   3

 4    Index of Exhibits ------------------------------- 3-5

 5    WALTER WENDLER
            Examination by Mr. Morris --------------------   6
 6          Examination by Mr. Bryant -------------------- 260
            Re-examination by Mr. Morris ----------------- 262
 7
      Changes and Signature --------------------------- 265
 8
      Reporter's Certification ------------------------ 267
 9

10                      INDEX OF EXHIBITS

11    NUMBER        DESCRIPTION                           PAGE

12      1    Notice of Rule 30(b)(6) Deposition ----------  10

13      2    Presidents of System Member Universities
             Policy 02.05 --------------------------------  19
14
        3    Email 3-20-23 from President Wendler to
15           Students, Faculty, and Staff ---------------  21

16      4    Email 3-18-24 from President Wendler to
             Faculty, Staff, and Students ---------------  28
17
        5    Talking Points 4-26-23 Fox News Lubbock
18           Radio 95.9 FM ------------------------------  36

19      6    Typed-Up Document (DEF 019165) -------------  47

20      7    Email 3-14-23 from Walter Wendler to Todd
             Rasberry -----------------------------------  51
21
        8    Todd Rasberry Markup of 3-20-23 Email -------  56
22
        9    Email 3-15-23 from Walter Wendler to Tracee
23           Post and Amberly Winningham ----------------  58

24     10    Email 3-20-23 from Walter Wendler to Todd
             Rasberry -----------------------------------  61
25
```

```
 1              INDEX OF EXHIBITS (CONTINUED)

 2    NUMBER         DESCRIPTION                       PAGE
```

```
 3      11    Email 3-18-23 to Walter Wendler ------------   62

 4      12    A Fool's Drag Race Advertisement -----------   67

 5      13    Email 3-20-23 from Walter Wendler to John
              Sharp --------------------------------------   77
 6
        14    Email 3-20-23 from Walter Wendler to David
 7            Rejino -------------------------------------   79

 8      15    Email 3-20-23 from Walter Wendler to Ray
              Bonilla ------------------------------------   82
 9
        16    WTAMU Student Event Calendar 9-13-24 -------   95
10
        17    Expressive Activity on Campus Policy
11            08.99.99.W1 Revised 6-25-24 ---------------  111

12      18    Civil Rights Compliance Policy 08.01.01 ----  125

13      19    Expressive Activity on Campus Policy
              08.99.99.W1 Revised 7-28-25 ---------------  127
14
        20    Expressive Activity on Campus Policy
15            08.02.01 Approved 11-13-25 ----------------  130

16      21    Defendant Wendler's Second Amended Responses
              and Objections to Plaintiff's First Set of
17            Interrogatories ---------------------------  132

18      22    The Heart and Soul of the Texas Panhandle
              Minority Points of View 11-17-14 ----------  149
19
        23    WT Spectrum Official Statement 3-21-23 -----  169
20
        24    Civil Rights Report Number 1353 -----------  178
21
        25    The Heart and Soul of the Texas Panhandle
22            Ists, Isms, and Free Will 6-12-22 ---------  181

23      26    Instagram Post 11-9-23 --------------------  186

24      27    First Amended Verified Complaint for Civil
              Rights Violations -------------------------  194
25
```

```
1                INDEX OF EXHIBITS (CONTINUED)

2    NUMBER         DESCRIPTION                      PAGE

3      28    Defendant's Answer to Plaintiffs' Amended
             Complaint --------------------------------- 194
4
       29    WWW.JUSTICE.GOV What is a Hate Crime? ------ 202
5
       30    SB No. 12 Year 2023 ----------------------- 231
6
       31    Presidential Actions Defending Women From
7            Gender Ideology Extremism and Restoring
             Biological Truth to the Federal Government - 242
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              THE VIDEOGRAPHER:  Today is December 8th,
 2   2025.  This is the videotaped deposition of Walter
 3   Wendler in the case of Spectrum WT versus Walter
 4   Wendler, et al.
 5              Would counsel please state their
 6   appearances for the record.
 7              MR. MORRIS:  JT Morris, on behalf of
 8   plaintiff Spectrum WT.
 9              MR. STEINBAUGH:  Adam Steinbaugh, on behalf
10   of plaintiff Spectrum WT.
11              MR. BRYANT:  David Bryant, on behalf of
12   Dr. Wendler and the defendants in this case.
13              THE VIDEOGRAPHER:  The time is 9:06.
14   We're now on the record.
15              Will the court reporter please swear the
16   witness.
17              THE REPORTER:  Please raise your right
18   hand.
19              (Witness sworn.)
20                   WALTER WENDLER,
21   having been first duly sworn, testified as follows:
22                     EXAMINATION
23   BY MR. MORRIS:
24      Q.  All right.  Good morning, Dr. Wendler.
25      A.  Morning.
```

1    here.

2        Q.   Okay.  Let me ask you a different -- slightly

3    different question.  Where in this policy do you believe

4    the system has given presidents authority to cancel a

5    registered student organization's event?

6        A.   Would you repeat that question, please?

7        Q.   Sure.  Where in this policy do you believe it

8    gives presidents the authority or the duty to cancel a

9    registered student organization's event?

10        A.   That is not mentioned in this policy.

11        Q.   Okay.  You can set that aside for now.

12                (Exhibit 3 marked.)

13                MR. MORRIS:  I'm going to hand the witness

14    what's to be marked as Exhibit 3.  Please hand that to

15    your counsel.

16                MR. BRYANT:  Thank you.

17        Q.   (BY MR. MORRIS)  Dr. Wendler, do you recognize

18    this document?

19        A.   Yes, I do.

20        Q.   Okay.  Can you explain what it is?

21        A.   It is a notice to the campus community

22    canceling the proposed drag show in question.

23        Q.   Okay.  And this is the Spectrum WT planned drag

24    show for Legacy Hall in March 2023, correct?

25        A.   Correct.

1          A.    I'd consider it when the request was made and

2    based, to the best of my ability, on understanding the

3    content of the -- of the proposed event.

4          Q.    It's a fair reading of this document that you

5    believe drag shows are demeaning to women?

6          A.    Demeaning, disrespectful, yes.

7          Q.    Okay.  So is there any drag show you can

8    foresee that would not be demeaning or disrespectful to

9    women, in your view?

10          A.    I can't answer that.  I've not been presented

11    with one that I think was not demeaning --

12          Q.    Okay.

13          A.    -- to women.

14          Q.    You canceled this drag show before it took

15    place, correct?

16          A.    Correct.

17          Q.    So how could you have known whether or not it

18    was demeaning to women?

19          A.    Well, I looked at the whole concept of drag,

20    and my concern was that it stereotyped women, as is said

21    in this document, and presented these performances, in

22    my interpretation, as objectifying women as -- in

23    sexually explicit ways that I think is disrespectful.

24                Our job is to create a workplace and a

25    learning environment that is respectful to all.

1    Q.   Sure.  So you mentioned in your answer the
2    "concept of drag."
3              Did I hear you correctly?
4    A.   Yes.
5    Q.   Okay.  So if the concept of drag, in your view,
6    is demeaning and disrespectful to women, is there any
7    circumstance in which you would not cancel a drag show
8    on campus?
9              MR. BRYANT:  Asked and answered.
10   Q.   (BY MR. MORRIS)  You can answer.
11   A.   I'm -- I'm going to say I'd have to look at the
12   specifics.
13   Q.   Do you believe that every drag show is
14   demeaning and disrespectful to women?
15   A.   I've not even seen a full drag show.
16   Q.   Right.  Because you canceled the students
17   before -- Spectrum's before it took the stage, correct?
18   A.   Well, I wouldn't have gone to this one anyway
19   because I understand the general principles from reading
20   and studying a little bit about what drag is about, and
21   I -- I -- I would have to look at the particulars of the
22   circumstance.
23   Q.   So if a student group wanted -- if a student
24   group wanted to put on a performance at Legacy Hall
25   where men would dress up as women and dance on stage,

1  handy.  We're going to be referring to that throughout

2  the deposition today.

3              (Exhibit 5 marked.)

4              MR. MORRIS:  I'm going to hand the witness

5  what I'm marking as Exhibit 5.  There is your copy,

6  Dr. Wendler, and please hand that to -- you keep that

7  one, and please hand that to your counsel, Mr. Bryant.

8              MR. BRYANT:  Thank you.

9      Q.  (BY MR. MORRIS)  All right.  Mr. Wendler, do

10  you recognize this document?

11      A.  Yes.

12      Q.  Okay.  Can you explain what this is?

13      A.  I do a monthly news show on Fox News Lubbock

14  95.5 FM, and we put together, prior to that interview,

15  things that may be important to discuss.  We send that

16  to the host of the show.

17      Q.  Okay.  And did you appear on this show that

18  you've developed these Talking Points for?

19      A.  If it says I did, I probably did.

20      Q.  Okay.  And this is Talking Points April 26th,

21  2023.  Is that correct?

22      A.  Yes, sir.

23      Q.  So this is about a month after you published

24  your email explaining your reasons for canceling the

25  2023 drag show, correct?

1        A.   I believe so.

2        Q.   Okay.  If you turn to the last page, and you

3   look at --

4              MR. BRYANT:  Is this -- is this Page 4 of 4

5   or 3 of 4?

6              MR. MORRIS:  4 of 4, with the Bates stamp

7   Defendants 028055.

8              Thank you for specifying that, Mr. Bryant.

9        Q.   (BY MR. MORRIS)  Dr. Wendler, if you look at

10  the second bullet point, you'll see in your second

11  sentence there, "Other than my decision to cancel a drag

12  show for reasons I clearly stated as demeaning to

13  women."

14             Do you see that?

15       A.   I do.

16       Q.   Okay.  Is that a -- is that what you would

17  have -- is that what you wrote yourself in these Talking

18  Points?

19       A.   I believe I did.

20       Q.   Okay.  Do you mention "lewdness" anywhere in

21  these Talking Points?

22       A.   No.

23       Q.   Okay.  Do you mention any concerns over

24  children being on campus during a drag performance in

25  these Talking Points?

1    Q.    Okay.

2    A.    -- Project.  I would not say it was front and

3    center to me in that poster.

4    Q.    Sure.  But that poster, to you, would that --

5    did that tell you that Spectrum was -- through a drag

6    performance, was trying to convey a message of support

7    for the LGBTQ-plus community?

8             MR. BRYANT:  Objection; calls for

9    speculation.

10    Q.    (BY MR. MORRIS)  And I'm not asking you to

11    speculate.  I'm asking for your understanding.

12    A.    I didn't think that was the primary purpose.

13    Q.    What do you think the primary purpose was?

14    A.    Not sure.

15    Q.    You -- but you start off your email talking

16    about the Trevor Project, correct?

17    A.    Correct.

18    Q.    So you know at least one purpose of their

19    performance, or you would understand one purpose of

20    their performance was to convey a message of support for

21    the LGBTQ-plus community.

22             Is that fair?

23    A.    I think it probably is.

24    Q.    Okay.  How do you reconcile saying you "want to

25    be clear that WT welcomes diversity" with your decision

1  to cancel a performance that was conveying a message for
2  a minority group on campus?
3      A.   Diverse perspectives are welcome until they
4  demean one group over another, as I've said in this
5  missive that we're talking about.  That's one of the
6  reasons I would not host Blackface on the campus.
7      Q.   And it's your opinion that drag performances
8  are equivalent to Blackface in terms of how they demean
9  and disrespect others?
10     A.   That is my opinion.  It says so in here.
11     Q.   Okay.  So just to be clear, is it fair to say
12 that that 2023 email is the best representation of the
13 reasons for canceling -- your reasons for canceling the
14 2023 performance?
15     A.   I've said that in the email.
16     Q.   Okay.  So that's a yes?
17     A.   Yes.
18     Q.   Okay.  You can set that exhibit aside.
19          So when you first found out that Spectrum
20 was planning a drag performance at Legacy Hall in 2023,
21 what did you do?
22     A.   I first tried to get a better understanding of
23 what drag was.
24     Q.   How did you do that?
25     A.   I read about it.  I watched clips from drag

1      A.   No.

2      Q.   And you say here that -- also, that you want to

3 be clear that "WT welcomes diversity."

4             Did you believe that then?

5      A.   I did.

6      Q.   Do you believe that now?

7      A.   I do.

8      Q.   Do you believe that Spectrum WT was trying to

9 present a diverse viewpoint by putting on a drag

10 performance on campus?

11             MR. BRYANT:  Objection; calls for

12 speculation.

13     A.   I don't think I can add to anything that's in

14 here.

15     Q.   (BY MR. MORRIS)  Okay.  So if it's --

16 everything that's in here is your words and explains,

17 you think fairly, the reasons you canceled the 2023 drag

18 show in addition to your email?

19     A.   Yeah, I'd say my email is a more complete

20 description.

21     Q.   Sure.

22     A.   These are, as it's noted in the title, "Talking

23 Points."

24     Q.   Just one more question, and I'll move on from

25 this.  You're aware that Spectrum, in their Complaint,

```
 1  else?
 2       A.   I don't believe so.
 3       Q.   Did you share --
 4       A.   Tracee Post.
 5       Q.   Ms. Post.  Okay.
 6       A.   And Tracee Post -- just for clarity, Tracee
 7  Post is my chief of staff.  Amberly Winningham works in
 8  the president's communications office.  She's a writer
 9  and was a newsperson here in Amarillo.  And they
10  proofread everything that I write, everything that I
11  write.
12       Q.   Did you share a draft of the email before you
13  published it on March 20th with anybody at the Texas A&M
14  University System?
15       A.   I don't believe I did.
16       Q.   Okay.  So you didn't send a draft to
17  Dr. Sharp -- I mean Chancellor Sharp?
18       A.   No.
19       Q.   You didn't send a draft to Mr. Bonilla?
20       A.   I don't believe I did.
21       Q.   Okay.  You can set Exhibit 11 aside.
22            Did you talk to Spectrum WT's officers
23  before you decided to cancel the show?
24       A.   I did not.
25       Q.   Did you talk to any of their members before you
```

1  decided to cancel the show?

2      A.   I did not.

3      Q.   Why?

4      A.   I felt like that was the work of Student

5  Affairs.

6      Q.   So you made a decision to cancel their show

7  without talking to them first?

8      A.   Yes.

9      Q.   Without talking to them about what the

10  performance would involve?

11          MR. BRYANT:  Objection; asked and answered.

12     A.   Their poster in its three iterations said it

13  all.

14     Q.   (BY MR. MORRIS)  Their poster said it all.

15  Did it --

16     A.   Well, I mean, it's -- it's -- you know, it's --

17     Q.   Did their poster have depictions of their

18  performance?

19     A.   Not to my knowledge.

20     Q.   It couldn't have because you didn't let them

21  perform, correct?

22          MR. BRYANT:  Objection; argumentative.

23     A.   Didn't have -- it didn't -- there had been no

24  performance, so it was all other performance (sic).

25  There was one picture of a man dressed as a woman.

```
 1        Q.   (BY MR. MORRIS)  So a picture or a graphic?

 2        A.   I believe it was a picture.

 3                  (Exhibit 12 marked.)

 4        Q.   (BY MR. MORRIS)  This is marked as Exhibit 12.

 5   Do you recognize this, Dr. Wendler?

 6        A.   Yes.

 7        Q.   Is this the poster you're talking about?

 8        A.   This is one of the posters --

 9        Q.   Okay.

10        A.   -- I was talking about.  The first poster I saw

11   did not say "PG-13" on it.

12        Q.   Okay.  Does this refresh your recollection as

13   to whether there was an actual picture of a performer on

14   the poster?

15        A.   Yes.

16        Q.   And there was not, correct?

17        A.   There was not.

18        Q.   Okay.  So I'll re -- I'll restate my question.

19   You didn't talk to the students before you made the

20   decision to cancel their show about what their

21   performances would entail, right?

22                  MR. BRYANT:  Objection; asked and answered.

23                  MR. MORRIS:  He didn't answer the question.

24        Q.   (BY MR. MORRIS)  Correct?

25        A.   Correct.
```

1      Q.   You didn't talk to the students before they

2  took the stage about what music they were going to play

3  during their performances, correct?

4      A.   Correct.

5      Q.   You didn't talk to the students before they

6  took the stage about what their MC would be doing during

7  their performance, correct?

8      A.   Correct.

9      Q.   You didn't talk to the students before they

10 took the stage about what costumes they were going to be

11 wearing, correct?

12     A.   Correct.

13     Q.   You didn't talk to the students before they

14 took the stage about what message they hoped to convey

15 through their performance, correct?

16     A.   Correct.

17     Q.   You didn't talk to the students before they

18 took the stage about the actual people who were going to

19 be performing at the planned show in Legacy Hall in

20 2003, correct?

21     A.   2023.

22     Q.   Excuse me.

23     A.   That's all right.  Correct.

24     Q.   Thank you for correcting that.  I appreciate

25 that.

1  correct?

2     A.   Correct.

3     Q.   So is your statement -- is your position -- I

4  want to understand this -- that you don't think they

5  deserved to be talked with before you canceled the show

6  because of the Law of Reciprocity?

7     A.   Please repeat the question one more time.

8     Q.   Let me just rephrase it for you.

9          Is it your position that the Golden Rule

10  permits a public-university-college president to cancel

11  artistic expression because the president believes it

12  demeans others?

13          MR. BRYANT:  Objection; assumes facts not

14  in evidence as to "artistic expression."

15     Q.   (BY MR. MORRIS)  You refer in your 2023 email

16  to drag shows as "artistic expression."

17          Is that correct?

18     A.   I'd have to look at it again.  Did I use those

19  words exactly?

20     Q.   Yeah.  If you look on --

21          MR. BRYANT:  You can't ask the questions.

22          THE WITNESS:  Oh, sorry.

23     Q.   (BY MR. MORRIS)  If you look on the second

24  page, halfway down the first full paragraph, you say, "I

25  do not support any show, performance, or artistic

1    expression."

2        A.    That's correct.

3        Q.    Okay.  So I'll -- I'll go back to my question.

4    Is it your position that the Golden Rule or the Law of

5    Reciprocity permits a college-university president to

6    cancel a student's artistic expression because he

7    believes it demeans or denigrates others?

8                    MR. BRYANT:  Same objection.

9        A.    I'd have to reflect on that.

10        Q.    (BY MR. MORRIS)  Sure.

11        A.    I don't mean in a minute.  I need to think

12    about that, and I have to try and understand what

13    "artistic expression" means even though I used the word.

14                    I'm not exactly sure what it means.  I

15    mean, I can understand written expression, spoken

16    expression, but I'm not sure --

17                    And I'm not allowed to ask questions.  I

18    get it.

19        Q.    Sure.  You testified earlier today that you

20    chose every word carefully in drafting this, right?

21        A.    Yes.

22        Q.    And you spent four -- at least four days

23    drafting it, right?  So fair to say you chose the words

24    "artistic expression" carefully as part of drafting this

25    email, right?

 1          A.    I think that's fair to say.

 2          Q.    Okay.  Is -- the Law of Reciprocity, was that

 3     one of the criteria you used in evaluating whether to

 4     cancel Spectrum's 2023 show?

 5          A.    Yes.

 6          Q.    Okay.  And would that be a criteria you would

 7     use going forward in deciding whether to cancel a drag

 8     show Spectrum or another group applies to hold on

 9     campus?

10          A.    Yes.

11          Q.    Does the Law of Reciprocity or the Golden Rule

12     appear anywhere in West Texas University policies?

13          A.    Not to my knowledge.

14          Q.    Okay.  So it was your personal criteria for

15     making this decision?  One of your personal criteria was

16     the Law of Reciprocity.

17               Is that what you're testifying?

18          A.    My personal and professional criteria in over

19     50 years -- well, at the time it wasn't 50, but close --

20     to working with students and trying to help create

21     positive educational environments.

22          Q.    Sure.  Do you think the Law of Reciprocity

23     trumps the Constitution?

24          A.    Don't know.

25          Q.    You don't know?

1    that situation because I have never, in over 30 years of

2    university leadership, been asked to rule on something

3    that occurred in a free-speech zone or anyplace that was

4    considered a public forum --

5        Q.    (BY MR. MORRIS)  Well, let's --

6        A.    -- at a university.

7        Q.    Let's -- let's explore that a little bit.

8    So Legacy Hall -- and you -- you've admitted this in

9    your answer -- has hosted all sorts of events, correct?

10       A.    Correct.

11       Q.    Sure.  And registered student organizations can

12   use it, correct?

13       A.    Correct.

14       Q.    And the public can either (sic) reserve Legacy

15   Hall for events, correct?

16       A.    Yes.

17       Q.    And those include things like concerts?

18       A.    Correct.

19       Q.    Performances?

20       A.    Correct.

21       Q.    Plays?

22       A.    Correct.

23       Q.    Christmas parties?  I think you just had one

24   this week, right?

25       A.    Correct.

1    Q.    There's been livestock auctions there, correct?

2    A.    I don't think in Legacy Hall.

3    Q.    Okay.  But they'd be at the JBK or --

4    A.    I don't know if they bring any animals in

5    there, but I'll say yes.

6    Q.    Sure.  Political candidates have come to speak

7    there?

8    A.    Oh, yes.

9    Q.    There's been worship or religious services in

10   Legacy Hall, correct?

11   A.    Yes, sir.

12   Q.    There have been fashion shows in Legacy Hall,

13   right?

14   A.    Yes.

15   Q.    And pageants in Legacy Hall?

16   A.    Yes.

17   Q.    Okay.  So is it fair to say that Legacy Hall

18   has hosted a wide range of expression, both from

19   registered student organizations and the public?

20   A.    I'm not sure, again, exactly what "expression"

21   means.  But have those shows been permitted?  Yes.

22          Have I ever once been asked to approve, or

23   was there ever any question that came to me regarding

24   those shows?  And I think the answer -- or other

25   pageants and weddings and all of the other things that

1    "General supervision of all student programs and

2    services.  Such -- such supervision includes, but is not

3    limited to, recruitment of students, admission,

4    registration and records, academic advising, counseling,

5    housing, scholarships and financial aid, student

6    activities and services."

7              And I would underline, in that Section 3.2

8    of Exhibit 2, "student activities."

9        Q.   So I asked you earlier what part of this you

10   believe would allow you to cancel a registered student

11   organization's planned event.

12             Do you recall that?

13       A.   I do recall it.

14       Q.   Okay.  So is -- does that sort of amend your

15   answer to that question here?  Did Section 3.2 give you,

16   in your mind, the authority to cancel Spectrum's planned

17   drag shows on campus?

18       A.   Yes.

19             (Exhibit 16 marked.)

20       Q.   (BY MR. MORRIS)  I'm going to hand you what's

21   been marked as Exhibit 16.  It's been Bates stamped

22   SPECTRUM 0002865.

23             Dr. Wendler, is this a -- a screenshot from

24   the Student Event Calendar at West Texas A&M University?

25       A.   It appears to be so.

1      Q.   Okay.  And you see this is a calendar for

2    "Movie Night:  Friday the 13th," correct?

3      A.   Correct.

4      Q.   Okay.  Have you ever seen "Friday the 13th"?

5      A.   No, sir.

6      Q.   If I told you it was rated R, what would be

7    your response?

8            MR. BRYANT:  Objection; vague.

9      A.   I would ask what an R rating consists of.

10     Q.   (BY MR. MORRIS)  Well, about ten minutes ago

11   you seemed pretty certain you knew what a PG-13 rating

12   consisted of, saying you wouldn't allow that in a -- in

13   a campus forum, right?

14           So if "Friday the 13th" was rated R, would

15   you step in -- would you have stepped in and canceled

16   this if you'd known about it?

17     A.   I don't think so.

18     Q.   Why not?

19     A.   Because I don't know what it's rated R for,

20   Number 1.  Number 2, if it's rated R, there's a product

21   that I could preview that was already finished.

22           I don't have that opportunity with a drag

23   show.

24     Q.   Right.  You didn't have that opportunity

25   because you never let the students take the stage,

1    drag shows.

2        Q.   So ten minutes ago, you just said, "If it was

3    PG-13, I definitely would have not allowed a -- that

4    show to go on in an open campus forum," correct?

5        A.   Not sure.

6        Q.   You didn't just testify to that?

7                MR. BRYANT:  The record will reflect what

8    he testified to.

9                MR. MORRIS:  Can you search for "PG-13" or

10   on the video?  That's fine.

11       Q.   (BY MR. MORRIS)  Go ahead.

12                MR. BRYANT:  Is there a question pending?

13   What question are you about to answer?  Just wait for a

14   question.

15                THE WITNESS:  No, no.  It's a good point.

16   It's a good point.  I --

17                MR. BRYANT:  What -- what is the --

18                MR. MORRIS:  Let -- let -- let --

19                MR. BRYANT:  Counsel, what's your question?

20                MR. MORRIS:  Let me just rephrase the

21   question.

22       Q.   (BY MR. MORRIS)  So was -- was the fact that

23   Spectrum's planned performance rated PG-13 a problem for

24   you?

25       A.   No.

100

```
 1      Q.    No?   Okay.
 2      A.    I decided to cancel it before I ever saw the
 3  PG-13 rating.
 4      Q.    Okay.  Because in your 2023 email, as you
 5  explained, you believe it's demeaning and disrespectful
 6  to women?
 7      A.    Yes.
 8      Q.    Okay.
 9      A.    And we're trying to create an employment
10  opportunity in a place of work and study that treats
11  everybody with dignity and respect.
12      Q.    Sure.
13            MR. MORRIS:  All right.  Let's take a
14  break.  We've been on the record awhile.
15            THE VIDEOGRAPHER:  Going off -- off the
16  record at 11:52.
17            (Recess 11:52 a.m. to 12:56 p.m.)
18            THE VIDEOGRAPHER:  Going back on the record
19  at 12:56.
20            MR. BRYANT:  I'll tell you what.  Could we
21  go off the record for just a second?
22            THE VIDEOGRAPHER:  Going off the record at
23  12:56.
24            (Recess from 12:56 to 1:03.)
25            THE VIDEOGRAPHER:  Going back on the record
```

```
 1        A.    That would be by guess.

 2        Q.    And those would be university policies?

 3        A.    Yes.

 4        Q.    And JBK-Center-specific policies?

 5        A.    Right.

 6        Q.    Okay.  And then, obviously, the Texas A&M

 7   University Systemwide policies?

 8        A.    Yes, sir.

 9        Q.    We talked a little bit before about all the

10   different events that take place at Legacy Hall;

11   performances and concerts and parties and religious

12   events and political events.

13              To your knowledge, is there any limit on

14   the type of content that students or the public can put

15   on when they host an event at Legacy Hall?

16        A.    I don't know of a specific -- I can't cite a

17   specific rule or regulation that might limit content,

18   but I think -- well, I'll just say I don't know of one

19   in particular or specifically.

20        Q.    Would there be a policy or rule you would look

21   to to figure that out?

22        A.    I think the -- the JB key -- JBK staff,

23   predominantly Student Affairs, has a very thorough

24   working knowledge of the rules and regulations, and if

25   there was something that was going to cause them
```

105

```
 1        Q.   Do you wish you would have?

 2        A.   It's hard for me for speculate, but no.

 3        Q.   Why would you talk to them now if you didn't do

 4   so in the past two instances where you canceled their

 5   show?

 6        A.   Because the context of the events have now -- a

 7   proposed event like this has now changed.

 8        Q.   How so?

 9        A.   What we're doing right here.

10        Q.   So because of the lawsuit, that's the only

11   reason you would talk to them?

12        A.   No.   Because questions about propriety have

13   changed, not just the lawsuit, but in the state of Texas

14   there's been legislation about these kinds of events on

15   university campuses, especially when minors are present,

16   that I don't think ever came up before, to my knowledge.

17        Q.   What would you hope to gather from the

18   students, talking to them now, that you didn't need to

19   gather to them -- from them back in 2023 or '24?

20        A.   I -- I couldn't speculate on that.   I don't

21   know.

22        Q.   Would the fact that -- based on your view,

23   generally, that drag performances are demeaning and

24   disrespectful to women, would that still play a large

25   part in your decision?
```

1    A.    That would play a part in the decision.

2    Q.    Did everyone -- did anyone ever tell you that

3    the off-campus Spectrum drag show in 2023 harmed them?

4    A.    I don't recall anybody ever saying that to me.

5    Q.    Did you have any female students complain to

6    you that Spectrum's planned show in 2023 on campus would

7    harm them?

8    A.    No.

9    Q.    Did you have anybody complain to you that the

10   protesters dressed in drag after you canceled the 2023

11   show harmed them?

12   A.    Those protesters in the open-public

13   forum, nobody said anything about it except

14   counter-demonstrations that were quiet and much

15   different in their nature.

16   Q.    So is that a "no" to my question?

17   A.    Yes.  Yes, it's a no.

18   Q.    Did anybody complain to you in 2024 that the

19   planned 2024 show in Legacy Hall would harm them?

20   A.    No.

21   Q.    All right.  Can you turn back to Exhibit 3?

22   That is your 2000 -- March 20th, 2023 email in which you

23   list the reasons for canceling Spectrum's show.

24        So if you go down to the third paragraph on

25   the first page --

1    support any show, performance, or expression, which

2    denigrates others.

3        Q.    And you were -- in your view, Spectrum's

4    planned event was a show, performance, or artistic

5    expression that would denigrate others?

6        A.    Quite frankly, I'm not sure exactly how those

7    three descriptions of events occurred.  I don't -- I

8    mean, I don't -- I couldn't give you a careful

9    definition of each.

10       Q.    Sure.

11       A.    My goal was to cover an array of activities

12    that were -- that denigrated others --

13       Q.    Okay.

14       A.    -- in this case, women.

15       Q.    And would it be fair to say that, in your view,

16    Spectrum's planned 2023 performance fell within that

17    range of activities?

18       A.    Yes.

19       Q.    Same with their 20 -- their planned 2024 show?

20       A.    Yes.

21       Q.    Turn to the last page --

22       A.    I will.

23       Q.    -- please.  And the -- the second paragraph,

24    you use the term "impertinent gestures."

25            What do you mean by that?

111

1          MR. MORRIS:  I'm going to hand the witness

2     what is marked as Exhibit 17.  Has the Bates stamps

3     Defendants 000450.

4          Q.   (BY MR. MORRIS)  Dr. Wendler, are you familiar

5     with this policy?

6          A.   I have reviewed it.

7          Q.   Okay.  It's called Expressive Activity on

8     Campus.  Is it fair to say this was the -- this policy

9     was in place when you issued your email canceling the --

10    Spectrum's 2023 drag show on campus?

11         A.   Yes, but it was revised after the fact.  But

12    when I -- the original one approved in May of 202 --

13         Q.   That wasn't my question.

14              My question was:  Was this policy in place

15    at the time you canceled the drag show in 2023?

16         A.   Yes.

17              MR. BRYANT:  The policy is Exhibit 17

18    specifically?

19              MR. MORRIS:  Yes.

20         A.   Yes.

21         Q.   (BY MR. MORRIS)  Was this policy also in place

22    when you canceled the drag show planned for spring 2024?

23         A.   Yes.

24         Q.   Okay.  When you made your decision to cancel

25    the drag show in 2023, did you consider this policy?

112

```
 1        A.    Yes.

 2        Q.    How so?

 3        A.    I looked at it, and I looked at the challenge

 4   it created to what I had intended to do.

 5        Q.    Can you explain?

 6        A.    I did not want to endorse or condone through

 7   approval a policy that denigrated women.

 8        Q.    Where in this policy does it say anything about

 9   denigrating women?

10        A.    The extension of expressive activities on

11   campus, in my mind, would include drag shows.

12        Q.    So this policy would cover drag shows?

13        A.    I think so.

14        Q.    Okay.  So if you go down to the second

15   paragraph under Rule Summary, it says, "It is a matter

16   of statewide concern that all public institutions of

17   higher education officially recognize freedom of speech

18   as a fundamental right.  Freedom of speech and assembly

19   is central to the mission of institutions of higher

20   education, and persons should be permitted to assemble

21   peaceably on the campuses of institutions of higher

22   education for expressive activities, including to listen

23   to or observe the expressive activities of others."

24              What I just read, is that fairly read as

25   part of this policy?
```

114

1 other student organizations at the university based on a

2 political, religious, philosophical, ideological, or

3 academic viewpoint."

4              You'd agree with me that Spectrum WT, in

5 2023, was an RSO in good standing, yeah?

6      A.   I believe so.

7      Q.   Same in 2024?

8      A.   I believe so.

9      Q.   And to your knowledge, they're still an RSO in

10 good standing today?

11      A.   I think so.  I haven't checked, but I'm going

12 to say I think so.

13      Q.   Sure.  If you go down to the next section, it

14 says, "The university may take disciplinary or remedial

15 action against individuals or groups that engage in

16 expressive activity not protected by this rule or the

17 First Amendment."

18              So conceivably, this would allow the

19 university to discipline Spectrum WT if their drag show

20 was performed at Legacy Hall and violated a university

21 policy, correct?  That's a remedial action?

22      A.   It would seem so.

23      Q.   Okay.  Does anything in this rule or this

24 policy allow the university to stop a registered student

25 group's expression before it's made?

118

```
1        Q.   Yes?

2        A.   Yeah.  What did I say?  Yes, I would understand

3   that.

4        Q.   Okay.  And would you agree with me that the

5   land and buildings owned by or leased by the university

6   includes Legacy Hall at the JBK Student Center?

7        A.   Yes.

8        Q.   Okay.  And then go down to Definition Number 8,

9   "'Illegal harassment' means expressive conduct that is

10  so severe and pervasive and objectively defensive (sic),

11  that it denies or limits a person's ability to

12  participate in or benefit from an educational program or

13  activity."

14       A.   You said "objectively defensive," and I think

15  you meant "offensive."

16       Q.   I think I said "offensive," but if I didn't --

17       A.   Oh, okay.

18       Q.   -- let me be clear, "objectively offensive."

19            And let me state that again for the record.

20  So Number 8 defines "illegal harassment" to mean

21  "expressive conduct that is so severe and pervasive and

22  objectively offensive, that it denies or limits a

23  person's ability to participate in or benefit from an

24  educational program or activity."

25            Okay.  So this was the -- the university's
```

1   definition of "illegal harassment" --

2       A.   Right.

3       Q.   -- in place in 2023 when you banned or canceled

4   the drag show, correct?

5       A.   I believe so, yes.

6       Q.   Did you consider this definition when you made

7   your decision to cancel the 2023 drag show?

8       A.   Not specifically.

9       Q.   Why not?

10      A.   I looked generally at the responsibility of the

11  university to provide an environment that was/is free

12  from activities that would discern -- disturb other

13  students and/or employees and staff.

14      Q.   Is the word "disturb" found anywhere in this

15  definition of "illegal harassment?"

16      A.   No.

17      Q.   Now, you used the word "harassment" in your

18  March 20th, 2023 email canceling the 2023 drag show,

19  correct?

20      A.   I did.

21      Q.   So despite the fact that you used the word

22  "harassment," you didn't consider this definition?

23      A.   I don't know that I considered it specifically.

24      Q.   Okay.  Even though you just conceded in your

25  testimony that this policy applied to the 2023 and 2024

123

```
 1          MR. BRYANT:  You're talking about the one
 2  that actually occurred or the proposal?
 3          MR. MORRIS:  Let's start with the proposed
 4  one.  I'll -- I'll restate my question.  Thank you for
 5  clarifying, Mr. Bryant.
 6      Q.  (BY MR. MORRIS)  Did you ever receive a Title
 7  IX complaint stating that Spectrum's planned 2023 drag
 8  show would involve discrimination based on sex or sexual
 9  harassment?
10      A.  Not a formal complaint.  I think if you look at
11  my email records -- emails that I received from people,
12  you will frequently find that concept generally
13  mentioned.  It might not be mentioned in the sort of
14  canon that we're used to in rules and regulations, and
15  so on --
16      Q.  Sure.
17      A.  -- but it's clear that people felt that -- so
18  after the fact, yes.
19      Q.  Title IX complaints --
20      A.  Oh, no, no.
21      Q.  -- or just emails?
22      A.  No Title IX complaint.
23      Q.  Let's -- so let's step back.  So you received
24  no Title IX complaints that Spectrum's planned 2023
25  on-campus drag show would discriminate based on sex or
```

 1    create a hostile work environment?

 2        A.    None.

 3        Q.    Okay.  You received no complaint -- Title IX

 4    complaints that Spectrum's planned 2024 drag show would

 5    discriminate based on sex or create a hostile work

 6    environment?

 7        A.    No.

 8        Q.    Okay.  But you received some mails after you

 9    decided to cancel the show in 2023 praising your

10    decision and agreeing with your view that drag shows are

11    demeaning to women?

12        A.    Yes, that's true.

13        Q.    Okay.  You also received plenty of emails

14    saying that you were wrong and that drag shows are not

15    demeaning to women and are not harassing, correct?

16        A.    Correct.

17        Q.    Okay.  So it's a pretty controversial issue,

18    right?  Would you agree?

19        A.    Yes.

20        Q.    Okay.  Why, after receiving those mixed views

21    of your decision -- maybe you did.  Let me -- let me

22    step back.

23              After you received both praise and

24    criticism for your decision to cancel the 2023 show, did

25    that cause you to reevaluate your decision or take more

1   into consideration when you decided to cancel the 2024

2   campus show as well?

3       A.   No.

4       Q.   Is there any reason -- let me ask you this.

5   We -- we -- we established that the -- strike that.

6                (Exhibit 18 marked.)

7                MR. MORRIS:  Let's mark this as Exhibit 18.

8   It's Bates stamped Defendants 000235.  All right.

9       Q.   (BY MR. MORRIS)  Dr. Wendler, I've handed you

10  what's titled "08.01.01 Civil Rights Compliance."

11               Do you see that?

12      A.   I do see it.

13      Q.   And this is the policy referred to in Exhibit

14  17 that we just looked at, correct?

15      A.   Correct.

16      Q.   And this is the policy you have stated gives

17  you authority to cancel student expression in advance of

18  it occurring.

19               Is that correct?

20      A.   Correct.

21      Q.   Can you point out in this policy where that

22  authority is granted to you?  And if you need to take

23  your time to read it, please do.

24               MR. BRYANT:  This is a 29-page document

25  that we're talking about here?

```
 1                    MR. MORRIS:  (Nods head.)

 2         A.   It's a lot to read.

 3                    MR. BRYANT:  Okay.

 4         A.   It's a lot to read now and absorb.

 5         Q.   (BY MR. MORRIS)  Well, can I ask you just one

 6    question, Dr. Wendler?

 7                    Did you look at this document to prepare

 8    for your deposition today?

 9         A.   Not in detail.

10         Q.   Okay.  You -- you realize -- we talked about

11    this earlier -- you were designated to talk about Title

12    IX complaints received related to the drag show,

13    correct?

14         A.   Right.

15         Q.   Okay.  So you didn't read this even though

16    you're relying on it as your authority to cancel drag

17    shows in advance of their performance?

18                    That's just a simple yes-or-no question.

19         A.   Please repeat that.

20         Q.   Yeah.  So to prepare for your deposition today,

21    you didn't read this even though you've testified that

22    this document gives you the authority to cancel student

23    expression in advance of it occurring?

24         A.   I reviewed the --

25                    MR. BRYANT:  Objection to using the term
```

1    "student expression."  I thought we were talking about

2    the drag show.

3                    MR. MORRIS:  Okay.  To cancel a drag

4    performance before it occurred.

5        Q.   (BY MR. MORRIS)  You didn't read this before

6    today?

7        A.   I reviewed the general parameters, but I

8    couldn't cite chapter and verse in this that permits me

9    to cancel the drag show.

10       Q.   Okay.  So to your knowledge, there's no

11   specific provision of this Civil Rights Compliance

12   Policy that gave you authority to cancel the drag show

13   in advance of its performance?

14       A.   In this document?

15       Q.   Yes.

16       A.   That's correct.  I'm not -- I'm not familiar

17   with a particular section.

18       Q.   Okay.  That -- that's all -- that's all I

19   needed to know.  You can set that aside.

20                    (Exhibit 19 marked.)

21                    MR. MORRIS:  Okay.  I'll hand the witness

22   what we'll mark as Exhibit 19.  This doesn't have a

23   Bates stamp on it.  I know defendants have produced it

24   to us, so we can draw that link when we need to down the

25   line, Mr. Bryant, after the deposition.

1     Q.   (BY MR. MORRIS)  All right.  R. Wendler, are

2     you familiar with this document?

3          A.   Generally familiar with it, yes.

4          Q.   Okay.  Is it fair to say this is a update to

5     the Expressive Activity on Campus Policy at West Texas

6     A&M University, or is this a proposed update?

7          A.   It is an update.

8          Q.   Okay.  So is this -- as we stand right now, is

9     this the university's policy as it relates to expressive

10    activity on campus?

11         A.   Since June 25th, 2024.

12         Q.   And you signed this, is that correct, on the

13    last page?

14         A.   Yes, I did.

15         Q.   Okay.  When you make a decision about whether

16    or not to allow Spectrum WT to hold a drag show at

17    Legacy Hall in 2026, would you consider this policy?

18         A.   Yes.

19         Q.   Okay.  If you go down to the -- I'm sorry,

20    there's no page numbers on here, but it will be Section

21    3.2.

22         A.   3.2?

23         Q.   Yes, sir.

24         A.   I'm there.

25         Q.   Okay.  And you see it says, "The decision to

 1  confirm a request for space will be based on proper and

 2  timely completion of the reservation process, compliance

 3  with applicable sound and signing requirements and

 4  availability of space."

 5          And it says, "The decision to confirm will

 6  be based on the foregoing criteria, and in no

 7  circumstance will any decision be based on the content

 8  or viewpoint of the expressive activity or upon the

 9  expected reaction of others?"

10          Would you agree with me that that is the

11  current policy of West Texas A&M University?

12      A.   Yes.

13      Q.   Okay.  And that would apply to a student group

14  asking to hold an event in Legacy Hall?

15      A.   Correct.

16      Q.   Okay.  And that would apply to Spectrum

17  applying to host a drag performance in Legacy Hall?

18      A.   Correct.

19      Q.   Okay.  Please go down -- I'm sorry -- again,

20  under Definitions, Number 9.

21      A.   "Illegal harassment?"

22      Q.   Yeah.  And other than the addition where it

23  says "see Texas A&M University System Regulation

24  08.01.01," which we just discussed, would you agree that

25  this definition of "illegal harassment" is substantially

130

1  the same as the one in the prior Expressive Activities

2  Policy?

3      A.  I would.

4      Q.  Okay.  You can set Exhibit 18 aside.

5              THE REPORTER:  It's 19.

6              MR. MORRIS:  19.  I need like a Sesame

7  Street hammer here or something.  I'm struggling today.

8              MR. MORRIS:  Let's mark this as Exhibit 20.

9  Thank you.  For the witness.  There might be two copies

10  there.  I'm not sure.

11              (Exhibit 20 marked.)

12              THE WITNESS:  No, there's not.

13              MR. MORRIS:  No?  Oh, that's okay.  You can

14  give that to Mr. Bryant.  You can have mine.

15              MR. BRYANT:  Thank you.

16      Q.  (BY MR. MORRIS)  All right.  Dr. Wendler, are

17  you familiar with this document at all?

18      A.  I -- I have reviewed it.

19      Q.  Okay.  And is it fair to say this is a

20  systemwide policy approved this past November governing

21  expressive activity on campus?

22      A.  It is.  Excuse me, sir.  I have -- there were

23  two copies --

24      Q.  Oh, okay.

25      A.  -- stuck together.

 1           THE VIDEOGRAPHER:  Going off the record at

 2   2:02.

 3               (Recess 2:02 p.m. to 2:17 p.m.)

 4           THE VIDEOGRAPHER:  Going back on the record

 5   at 2:17.

 6       Q.   (BY MR. MORRIS)  All right.  President Wendler,

 7   if you could please go back to Exhibit 3.  That is your

 8   2023 email.

 9       A.   Uh-huh.

10       Q.   Do you have that in front of you?

11       A.   I do.

12       Q.   Okay.

13       A.   You told me to pull it aside, and that's what

14   I've done.

15       Q.   Good.  We're going to spend a little bit of

16   time with it now.  So we've talked about this a lot

17   today.

18               In your estimation and -- and the gist of

19   this email, is drag -- in your view, are drag

20   performances offensive to women?

21       A.   Yes.

22       Q.   Okay.  On a college campus, in your view, who

23   decides what's offensive?

24       A.   Means groups, of which I'm one.

25       Q.   Okay.  What other groups?

1          A.   Faculty, students, staff, alumni, in the case

2    of West Texas A&M University.  The Texas A&M University

3    System, all participate in the process of setting a

4    campus culture, not quite who decides what's offensive,

5    which is what you asked me.

6               They set a campus culture.

7          Q.   Sure.  Did you talk to any students before you

8    published your March 20th, 2023 email --

9          A.   I did not.

10         Q.   Let me finish my question.  I want to make

11   sure -- we've got to make a clean record here.

12              MR. BRYANT:  And I might have an objection.

13              THE WITNESS:  Okay.

14              MR. MORRIS:  You've got to let your witness

15   speak -- or your attorney speak up there.

16         Q.   (BY MR. MORRIS)  Did you speak to any students,

17   staff, faculty, before you published your March 20th,

18   2023 email, about whether they considered drag offensive

19   to women?

20              MR. BRYANT:  Are you talking about in his

21   entire tenure?

22              MR. MORRIS:  Just before he decided to --

23   yes, before he decided to publish this email.

24         A.   Not directly, but I spoke with folks

25   consistently about West Texas values.

1    talking with students about their aspirations for when

2    they finished high school, among other things, and then

3    talking with teachers and administrators of those

4    schools.

5                    Frequently county judges would come,

6    interesting -- interested citizens.  I don't think but

7    about -- in 136 visits, I think in all but four or five

8    cases, that I was the only university president that

9    ever put a foot on the campus of the high school I

10   visited.

11                    Over and over again I heard, "We've never

12   had a university president here."  And I told them I

13   wasn't pitching WT directly.  I was pitching that

14   students develop a plan for their futures.  And in

15   talking with those people, I developed, in my view, a

16   sense of the values of the people of West Texas.

17        Q.   So what are those values specifically that led

18   you to determine that Spectrum's drag performance was

19   too offensive to women to allow on campus?

20        A.   Can't identify one specific value.  Cannot.

21        Q.   Can you identify more than one?

22        A.   Can identify a few.

23        Q.   Please do.

24        A.   People here seem to value free expression --

25   no, let me -- let me strike that -- value free exchange

142

1    of ideas.  They tend to admire that in people.

2              They hold very dearly the concept of

3    personal responsibility, that we have a locus of control

4    over our own actions, and the interplay between these

5    two things.  I'm not a cultural expert, but I know what

6    I see, and people here frequently talked about the

7    interplay of freedom and responsibility, that you're

8    free to do things, but if those things have

9    consequences, then you have to be -- you have to accept

10   those and understand them.

11             You know, they value hard work.  They

12   value serving something larger than yourself, serving

13   the communities.  Many of these high schools that I

14   visited, that was the last public institution in the

15   community.

16             So these things collectively influenced

17   my decision to cancel the drag show scheduled for March

18   31st, 2023 in Legacy Hall, a limited public forum on the

19   campus of West Texas A&M University.

20   Q.   So you talked about the interplay between the

21   Panhandle community valuing free expression and these

22   other values.

23             What -- how did you reconcile those two

24   in determining to ban Spectrum's performances from

25   Legacy Hall?

157

```
 1        A.    That's what the flier said.

 2        Q.    Okay.  Wasn't that enough to let people know

 3   that this might have some content you might feel is --

 4   would make you comfortable or might offend you?

 5        A.    It could, but the problem is I don't know what

 6   PG-13 means.  I know parental guidance and under 13, I

 7   understand that, but I don't know how it's assessed in a

 8   live performance that has not yet occurred.

 9        Q.    You never talked to the students, though,

10   right, to assess what PG-13 meant?

11        A.    No, I did not.

12        Q.    Okay.  Are you aware that West Texas A&M, often

13   in press releases or on the university calendar, will

14   assign ratings to theatrical performances, for example?

15        A.    Yes.

16        Q.    Okay.  And sometimes it labels those theatrical

17   performances PG-13?

18        A.    Yes.

19        Q.    Those are live performances, right?

20        A.    Carried out by students under the tutelage of

21   faculty members expert in their field.

22        Q.    Sure.  The -- are you aware that Spectrum was

23   being advised by a theater professor as related to the

24   drag performance?

25        A.    No, I was not.
```

1    Q.   Okay.  But stepping back, safe to say that if

2    the university puts those labels on theatrical

3    performances, it has some understanding of what PG-13 or

4    R means for a live performance, correct?

5    A.   There are people within the university that do.

6    Q.   Okay.

7    A.   And there are consequences for -- I would

8    assume for violation of those, whatever the standards

9    are.  And I've never seen the standards.

10   Q.   Sure.  So if a -- if a -- if a student group

11   puts on a play, and Spectrum rates it PG-13, and they

12   violate that understanding, and it ends up being NC-17,

13   there's consequences after the fact, correct?

14   A.   Don't know.  I've never seen it happen.

15   Q.   Okay.  But there would be --

16   A.   Possibly.

17          MR. BRYANT:  Objection; asked and answered.

18   Q.   (BY MR. MORRIS) -- possibly.  So if -- if they

19   violated a -- a policy against sexually-explicit conduct

20   that wouldn't be PG-13, the university could punish that

21   after the fact, correct?

22   A.   There could be some action after the fact.

23   Q.   But the university has never told one of the

24   those theatrical performances, "This is PG-13, or this

25   is rated R.  We're just not going to let you perform at

1   all," correct?

2        A.   Not to my knowledge.

3        Q.   Okay.  Did anybody, to your knowledge, raise

4   any concern before your decision to cancel the show

5   about Spectrum advertising its show as PG-13?

6        A.   Not to my knowledge, but it would depend which

7   poster they saw.

8        Q.   Okay.  But not -- to your knowledge, nobody

9   raised --

10       A.   Nobody raised -- I had no voice of concern

11  about any of the advertised drag shows, any of the three

12  of them.

13       Q.   Okay.  Turn back to Exhibit 3 and Page 2.

14  And you -- you talk about mocking or objectifying.

15  In your view, would Spectrum's planned shows in 2023 and

16  2024, would they have mocked or objectified women?

17       A.   I believe so, yes.

18       Q.   Okay.  And you chose those words carefully in

19  your 2023 email?

20       A.   Best of my ability, yes, sir.

21       Q.   Okay.  What was your basis for determining that

22  a show you had never seen would mock and objectify

23  women?

24       A.   The sexual orientation of the show, in

25  depicting women as the sexual objects, gave me

 1      A.   I'll try.

 2      Q.   Did you take into account that Spectrum's shows

 3 were open to those who would voluntarily attend them and

 4 not be forced to see them when you made your decision

 5 about whether or not to allow their show on campus or

 6 whether or not it was too offensive or mocking?

 7      A.   I did.

 8      Q.   Okay.  How did you account for that?

 9      A.   It was one of a number of factors that I

10 considered.  If they hosted it with no public relations

11 in a dark room -- I mean if that's where it was -- if

12 the show was going to be staged, that doesn't -- that

13 would not necessarily affect my decision.  You know,

14 just because it was done in secret wouldn't make it

15 correct.

16      Q.   Do you think -- do you think an adult student

17 on a university campus should be allowed to buy a ticket

18 and attend a show that might be offensive?

19      A.   The show would be on campus?

20      Q.   Uh-huh.

21      A.   Condoned through the use of student fees?

22      Q.   Uh-huh.

23      A.   It depends.

24      Q.   Why -- under what circumstances would it not

25 be?

 1       A.   Well, if -- if the show was offensive to a

 2   segment of the population that we're trying to serve and

 3   be respectful of -- whatever we may think of a given

 4   population, we understand the concept of respect -- I

 5   might say it shouldn't be -- it shouldn't be -- it

 6   shouldn't go on here.

 7       Q.   Even though the show is only going to be seen

 8   by those who want to see it, you would shut it down?

 9       A.   No.  I said I might.

10       Q.   Okay.

11       A.   I'd have to better understand.  These are all

12   hypotheticals.

13       Q.   I don't think it's a hypothetical here.  Here

14   you had a show where the only people who could see it

15   were those who bought a ticket, correct?

16       A.   I assume.  That's what it said.

17       Q.   Okay.  So it's not a hypothetical.

18       A.   And were --

19       Q.   Well, I'll -- I'll -- I'll --

20            MR. BRYANT:  I'd object that the -- nobody

21   was going to pay for a ticket, apparently, if they had a

22   Buff ID.

23            MR. MORRIS:  Are you testifying --

24            MR. BRYANT:  They would have to choose --

25            MR. MORRIS:  -- for the witness?

1    Q.   Okay.

2    A.   That is my testimony.

3    Q.   Thank you for clarifying that, Doctor.

4         (Exhibit 23 marked.)

5         MR. MORRIS:  I'm going to hand the witness

6    what's been marked as Exhibit 23.

7              There you go, Mr. Bryant.

8         MR. BRYANT:  Thank you.

9         MR. MORRIS:  I think this has been produced

10   at SPECTRUM 0001088, and I apologize for not having it

11   Bates stamped.

12   Q.   (BY MR. MORRIS)  Dr. Wendler, have you seen

13   this Instagram post before?

14   A.   No.  I'm not a subscriber to Instagram.

15   Q.   Okay.

16   A.   Even if I was, I may not have seen it.  But I'm

17   not, and I haven't seen this.

18   Q.   Did anybody show it to you?

19   A.   You just did.

20   Q.   I'm the first person to show it to you?

21   A.   You're the first person on the face of the

22   planet.

23   Q.   Okay.  Were you interested in Spectrum WT's

24   reaction to your decision to cancel their 2023 drag

25   show?

```
 1  drag is demeaning, offensive, and disrespectful to women
 2  would play a substantial role in any decision you made
 3  about whether to allow a future drag show on campus.
 4              Is that accurate?
 5      A.   That's accurate.
 6      Q.   Okay.  Would you also consider the many emails
 7  and texts you received -- the many emails you received
 8  after you canceled the 2023 show expressing to you
 9  similar sentiments, that drag is not offensive, it's a
10  celebration, it's not mockery?
11              Would you consider those as well?
12      A.   I would attend to them.
13      Q.   But it wouldn't change your opinion, correct?
14      A.   I would attend to them is my answer.
15      Q.   Okay.  Would it change your opinion that drag
16  is demeaning, offensive --
17      A.   I can't say, Counselor.
18      Q.   Let me finish the question.
19      A.   Oh.
20      Q.   Would anything change your opinion that drag is
21  demeaning, disrespectful, and offensive to women?
22              MR. BRYANT:  Objection; calls for
23  speculation.
24      A.   It's possible that something could.
25      Q.   (BY MR. MORRIS)  But nothing you've seen today
```

```
 1   or --
 2        A.   Not --
 3        Q.   -- heard today?
 4        A.   Not today.  Not anything we've talked about.
 5        Q.   Okay.  And nothing you've seen outside of the
 6   four walls of this deposition room, correct?
 7        A.   I think that's a fair statement.
 8        Q.   So go back to Exhibit 3.
 9        A.   Oh, Exhibit 3.
10        Q.   Exhibit 3, your -- your --
11        A.   This is -- I wish I'd seen this ahead of time.
12        Q.   -- your big old email there.
13             You talk about -- and we talked about this
14   today -- "demeaning" -- you use the word "demeaning" a
15   couple times in your email here, correct?
16        A.   Correct.
17        Q.   And you chose that word deliberately?
18        A.   I did.
19        Q.   Okay.  What is your basis for believing that
20   Spectrum's shows would be demeaning to women?  Same
21   thing we've discussed already today?
22        A.   Pretty much.  I would say anything that
23   portrays a woman as primarily a sexual object is
24   demeaning to women, in my perspective.
25        Q.   Okay.  Is there a difference to you between
```

1    demeaning and offensive?

2         A.    Yes, a little bit.

3         Q.    What's the difference?

4         A.    Offensive has more intention in it than

5    demeaning.  Demeaning -- you can demean someone without

6    realizing it, but I don't think you can -- well, you

7    could be offensive without realizing it, but typically,

8    it's -- there's more intentionality in it, in my mind.

9         Q.    What criteria do you use to determine whether

10   student expression on campus is demeaning?  Do you look

11   at a policy?  Do you talk to students?  What do you do?

12        A.    I ask myself this simple question:  Does this

13   activity demonstrate respect for others even when

14   different perspectives are held?

15        Q.    So your view of demeaning involves whether or

16   not something is showing respect?

17        A.    Exactly.

18        Q.    Okay.

19        A.    If there's a lack of respect.

20        Q.    Okay.  So what do you use -- what criteria do

21   you use to evaluate whether something is respectful or

22   not?

23        A.    A matrix of various criteria that looks at the

24   history of the group, the group's current status in

25   society, a series of cultural issues that define the

1  group, and if those aren't attended to, it could be that
2  the behavior would be disrespectful.

3      Q.    Do you think it's important that students
4  respect America?

5      A.    I'm not sure what you mean by "respect" in that
6  sense.

7      Q.    Let's say the registered student newspaper at
8  West Texas A&M published a cartoon portraying the Statue
9  of Liberty as a sexual object.

10            Would you find that demeaning?

11      A.    I'd find it demeaning to women, yeah.

12      Q.    Would you find it disrespectful?

13      A.    To both women and our nation?  I would say yes,
14  I would.

15      Q.    Do you think that would be a reason to prevent
16  them from publishing the cartoon?

17      A.    Not necessarily.

18      Q.    Why?

19      A.    A cartoon is a frozen-in-time statement.
20  There's nothing that comes before it except for the
21  artist thinking it through, and nothing comes after it
22  other than public opinion.  It's not an act of
23  performance -- it's -- not directly.  It's a thing.

24      Q.    Do you think it would violate West Texas A&M's
25  mission statement?

```
 1      A.   I'd have to see it to understand whether or not
 2  it would violate West Texas A&M University's mission
 3  statement.  I'd have to see the product, in this case,
 4  of a cartoon.
 5      Q.   So why didn't you wait to see the product here
 6  to determine whether or not the drag -- Spectrum's drag
 7  show would violate WT's mission statement as you have
 8  set out in your interrogatory responses and your email?
 9      A.   Because it would never twice be the same.
10      Q.   What does that even mean?
11              MR. BRYANT:  Objection; vague.
12              MR. MORRIS:  I'm asking him:  What does
13  that mean?
14              THE WITNESS:  "Objection; vague" me or him?
15              MR. BRYANT:  No.  The question is vague.
16              THE WITNESS:  Oh, I'm being vague, but --
17  but --
18              MR. BRYANT:  "What does that even mean?"
19  Objection.
20                 Go ahead.
21      A.   You can't step in the same stream twice.  Live
22  performances are live performances.  A static is
23  different.
24      Q.   (BY MR. MORRIS)  Sure.  So -- so a performer
25  giving a live performance at one point doesn't mean
```

186

1  more than me canceling the show ahead of time?"

2      A.   I -- I did not have that sort of discussion

3  with myself.

4      Q.   Are you -- do you consider yourself the -- the

5  final decisionmaker about what is and is not offensive

6  or demeaning to women at Texas A&M -- at West Texas A&M?

7      A.   I have a perspective of that.

8      Q.   Do you consider yourself the final

9  decisionmaker about what's offensive and demeaning to

10 women in terms of how it relates to student activities

11 and events?

12     A.   Yes.

13              (Exhibit 26 marked.)

14              MR. MORRIS:  I'm going to hand the witness

15 what I'm marking as Exhibit 26.  It's been Bates stamped

16 SPECTRUM 0002280.  For the witness, Mr. Bryant.

17              THE REPORTER:  It's 26.

18              MR. MORRIS:  I wrote it down right this

19 time.  Thanks.

20     Q.   (BY MR. MORRIS)  Dr. Wendler, are you familiar

21 with an event at Legacy Hall called Jingle Mingle?

22     A.   I am now.

23     Q.   Okay.  This is a screenshot -- I want to

24 represent to you this is a screenshot from Instagram,

25 and it says it's a screenshot of something at West Texas

```
 1        A.   Tentative confirmation, I admit -- I -- I will
 2   say --
 3             MR. BRYANT:  You're not asked a question
 4   yet.
 5             THE WITNESS:  Oh.
 6        Q.   (BY MR. MORRIS)  I'm just asking you.  So
 7   you've admitted that Paragraph 89 of the Complaint is
 8   true.
 9             Any reason you need to change that today?
10        A.   No.
11        Q.   Okay.
12        A.   Because it says "tentative."
13        Q.   Okay.  If you move down to 91 in Exhibit 27
14   where it says, "On February 27th, staff from the JBK
15   Student Center issued Spectrum WT a 'tentative
16   confirmation' that the event was ready to move forward."
17             Do you see that?
18        A.   I do.
19        Q.   And turn in your Answer to Paragraph 91.  It
20   says "admit."
21        A.   Okay.
22        Q.   Okay.  Does that refresh your recollection that
23   Spectrum received tentative confirmation from the JBK
24   staff to move forward with the 2023 drag show?
25        A.   Uh-huh.
```

1      A.   I did try to understand who Myss Myka was, who

2   was presented as a key figure in this process.

3      Q.   We'll get to that in a second, but answer my

4   question.

5           You didn't talk to students, staff,

6   faculty, about the context of the performance that

7   Spectrum had planned, correct?

8      A.   Correct.

9           MR. BRYANT:  Objection; asked and answered.

10     Q.   (BY MR. MORRIS)  Okay.  Is it fair to say that

11  your understanding -- you've said you're not an expert

12  in drag -- that your understanding of drag is mostly

13  contained in the four corners of this document?

14     A.   That's not -- that's not completely true, but

15  these are some examples that I came upon.  That's not

16  all there is.

17     Q.   So we look at that -- that previous statement

18  about "context," and he says -- the commentator here

19  says -- suggests that drag can be entertaining, it can

20  be intriguing, it can be insulting, or it can otherwise

21  be provocative.

22           Would you agree with that?

23     A.   To different audiences, yes.

24     Q.   Sure.

25     A.   To some, it could be perceived as entertainment

1          Q.    You don't cite any state or federal law.

2                  Is that correct?

3          A.    That's correct.

4          Q.    And we went over this morning you don't mention

5     lewdness or sexual -- sexually explicit criteria,

6     correct?

7          A.    Correct, but that's in -- that is encapsulated

8     in the concept of drag show, as I understand it.

9          Q.    So who is Myss Myka?  You -- you have mentioned

10    her a couple times today.

11         A.    That is a person that performs in drag.  I

12    believe they may be from Lubbock.  I'm not an expert on

13    Myss Myka, but I did see some outtakes and photographs,

14    and so on, from Instagram that were shared with me about

15    this person.

16         Q.    Who shared them with you?

17                MR. BRYANT:  Exclude any communications you

18    had with your attorneys in answering the question.

19         A.    I can't -- I can't say.

20         Q.    (BY MR. MORRIS)  So no non-attorney at West

21    Texas A&M shared photos or videos of Myss Myka with you?

22         A.    That's correct.  And I think you mean West

23    Texas A&M.

24         Q.    Yeah.

25         A.    You said "Texas A&M."

217

1      Q.   Sorry.

2      A.   I'm sorry to --

3      Q.   West Texas A&M.

4      A.   -- keep correcting you on this.

5      Q.   I do know there's a lot of Texas A&M --

6      A.   Stuff.

7      Q.   -- members.

8           MR. BRYANT:  It's late in the day.

9           THE WITNESS:  Yeah, it's late in the day.

10          MR. BRYANT:  It's tough to keep it all

11  straight.

12     Q.   (BY MR. BRYANT)  Did anybody in the Canyon or

13  Amarillo or Lubbock community share pictures of Myss

14  Myka or videos of Myss Myka with you?

15     A.   Just the local news station.  They didn't share

16  them with me.  They shared them with the general public.

17     Q.   Sure.  Was that before or after you made your

18  decision to cancel the 2023 show?

19     A.   I think that actually was after.

20     Q.   When did you first learn of Myss Myka, or when

21  did you first receive these pictures and videos?

22     A.   Not long ago, but I've -- I've heard the name

23  of Myss Myka associated with this event since probably

24  March 21st, 2023.

25     Q.   So you didn't hear "Myss Myka" until after you

1  published your letter?

2      A.  I believe that's correct.

3      Q.  And is it your understanding that Myss Myka was

4  only going to MC the planned performance?

5      A.  You know, I have to tell you I was not -- at

6  the time of the cancellation, I was not aware of what

7  her role would be.

8      Q.  Okay.  But at the time you canceled, you didn't

9  even know she had a role.

10         Is that fair to say?

11     A.  I think that's -- I think that's fair to

12  say.

13     Q.  Okay.

14     A.  I was --

15         MR. BRYANT:  You've answered the question.

16         THE WITNESS:  I know.  I know.

17     Q.  (BY MR. MORRIS)  So in the -- in your -- sorry

18  to "ask and answer" this.  I'm going to frame it

19  slightly differently so I don't do that, though.

20         So we've established that your email of

21  2023 doesn't mention the word "lewd," but some of your

22  court briefing makes arguments about lewdness.

23         What evidence do you have -- or did you

24  have at the time you canceled the show in 2023 that

25  plaintiff's show would be lewd, in your view?

1       A.   Well, from everything I've read and studied

2  about drag, not to go back to the Exhibit 29,

3  contemporary drag is, by definition, sexualized and

4  usually demeaning to many of the characteristics of

5  being a woman.

6       Q.   So you mean, for example, using prosthetic

7  breasts?

8       A.   Right.

9       Q.   Prosthetic buttocks?

10      A.   Right.

11      Q.   Okay.  You had no reason to believe that

12 Spectrum's show would involve nudity, for example, did

13 you?

14      A.   No, I didn't.  I did not.

15      Q.   And -- and again, you never talked to the

16 students to see if it would involve simulated sex or

17 anything like that, correct?

18      A.   Correct.

19      Q.   Okay.  So is it fair to say, at most, you were

20 guessing about whether it would be lewd based on your

21 research?

22      A.   Yes.  I was -- it wasn't just a guess.  It was

23 more than that.  I did do some research and tried to

24 understand different perspectives.  I listened to a

25 RuPaul interview, and so on and so forth.

220

1    Q.   Okay.  So based on that research document, you

2  found it appropriate to deem a show you had never seen

3  before lewd?

4    A.   Yes, but it was beyond just this research.  I

5  hate to repeat myself, but you're asking me to.  There

6  was more than this involved.  These were some things

7  that -- these were like notes to me, and they are not

8  all of the things I read or looked at.

9    Q.   What else did you look at that would have told

10  you that a show that was never performed would be lewd?

11    A.   I looked at drag shows generally and tried to

12  understand what the basis for them was, and they

13  presented women in a -- in a overtly sexual way.  And

14  I'm not going to quote what Mary Cheney said, but you --

15  you know, catty and, you know, these kinds of things.

16    Q.   Okay.  So -- so things like being catty,

17  bitchy, slutty, you -- you equate that with lewdness?

18    A.   Yes.

19    Q.   Okay.  And those are the things that you're

20  saying today formed the basis for your opinion that the

21  shows you canceled would be lewd?

22    A.   Correct.

23    Q.   Okay.  Any other evidence you can point to that

24  the 2023 or 2024 show you canceled would be lewd, in

25  your view?

1      A.   Not offhand.

2      Q.   Okay.

3           MR. MORRIS:  Okay.  Let's take a break.  I

4  think we can finish up in the next hour.

5           THE VIDEOGRAPHER:  Going off the record at

6  4:29.

7           (Recess 4:29 p.m. to 4:53 p.m.)

8           THE VIDEOGRAPHER:  Going back on the record

9  at 4:53.

10     Q.   (BY MR. MORRIS)  All right.  Welcome back,

11  Dr. Wendler.

12     A.   Yes, sir.

13     Q.   You mentioned this morning you had lost two

14  employees due to your decision to cancel Spectrum's drag

15  shows.

16          Who were those employees?

17     A.   They were a student worker and a staff support

18  person.

19     Q.   Okay.  How did you -- or what's your

20  understanding for your -- your testimony that they left

21  because of your decision to cancel the drag

22  performances?

23     A.   Well, it was not my decision that caused them

24  to leave.  It was the reaction to the kinds of phone

25  calls.  We had to put all the phones on -- on answering

223

1   office about the protesters dressed in drag?

2       A.   I did not.

3       Q.   Do you have an obligation to as a university

4   employee?

5       A.   I might have, but I would have had to seek them

6   out, which would have been difficult based on the sort

7   of milieu that was out there.

8       Q.   Okay.  Let's go ahead and -- you mentioned

9   earlier today the word "disruption."

10      A.   I did?

11      Q.   Do you believe if you had allowed Spectrum's

12  performance in 2023, it would have substantially

13  disrupted West Texas A&M's operations?

14      A.   I don't think that would be the case, but I'm

15  not sure it was -- I said it was disruptive.

16      Q.   What was -- how could it be disruptive if the

17  show never occurred?

18      A.   I did not -- I don't -- I didn't classify the

19  show as "disruptive."

20      Q.   Okay.  Then I'm sorry if I mischaracterized

21  your testimony.

22      A.   I -- I think you did, but --

23      Q.   Okay.

24      A.   -- apology accepted.

25      Q.   My apologies.  So -- so you didn't believe that

1    if the show had gone on, it would have substantially

2    disrupted the university's operations?

3        A.    I don't believe so.

4        Q.    Same answer for the 2024 show?

5        A.    Same answer.

6        Q.    Okay.  Do you think if you -- if a future drag

7    show on campus was permitted, ticketed, or with student

8    ID after hours -- after class hours, same answer?  It

9    would not substantially disrupt the university's

10   operations?

11            MR. BRYANT:  Objection; calls for

12   speculation.

13       A.    I don't know.

14       Q.    (BY MR. MORRIS)  Okay.  Do you have any reason

15   to believe it would substantially disrupt the

16   university's operation?

17       A.    No, because I've never had to make this kind of

18   decision before.

19       Q.    Okay.  Was there any Title IX investigation of

20   Spectrum WT?

21       A.    Not to my knowledge.

22       Q.    Okay.  If they did, in fact, engage in conduct

23   that was alleged to be discriminatory or harassing,

24   would the university have investigated it?

25       A.    We typically do, but I can't speculate as to

225

1  what we would have done in this circumstance.

2       Q.   But it didn't here, correct?

3       A.   Not to my knowledge.

4       Q.   Did you ever receive -- did the university ever

5  receive communication from the Federal Office of Civil

6  Rights about Spectrum shows possibly violating federal

7  civil rights laws?

8       A.   I don't believe we did.

9       Q.   Did the university receive any communications

10  from a state agency alleging that Spectrum's planned

11  drag shows would violate civil rights laws?

12      A.   I don't think so.

13      Q.   Go ahead and turn back to Exhibit 21.  That's

14  your Responses to Plaintiff's -- or your Second Amended

15  Responses to Plaintiff's Interrogatories.

16           And if you would, Dr. Wendler, turn to

17  Page 4.  And you see Interrogatory Number 4:  "Identify

18  every basis for canceling plaintiff's drag shows at

19  Legacy Hall?"

20      A.   I see that, yes, sir.

21      Q.   Okay.  And you give, oh, a number of reasons

22  here extending from Page 4 to page 8.

23           Is that correct?

24      A.   Yes.

25      Q.   Okay.

Pl. App'x 076

1      A.   Those are the reasons cited.

2      Q.   So you have, I mean over, would you say, 50

3 state laws, reasons, policies here that you're citing as

4 the basis for canceling Spectrum's drag shows at Legacy

5 Hall?

6      A.   What I cited was on overview of these policies,

7 not necessarily chapter and verse of a particular

8 policy.

9      Q.   Sure.  But this asks -- asks you to identify

10 every basis.

11      A.   Right.

12      Q.   So in responding to this interrogatory, which

13 you verified under oath --

14      A.   Correct.

15      Q.   -- you provided, I mean, over 50 bases as your

16 justification for canceling Spectrum's drag shows at

17 Legacy Hall.

18           Is that accurate?

19      A.   Yes.

20      Q.   Okay.  So we've covered a lot of these today.

21 I just want to run through some of the ones we haven't

22 had a chance to cover.

23              Go ahead and turn to Page 5.  And you

24 cite, under Federal and State Statutes and Policies,

25 Title IX.  We've gone over that today.

1    that treats people with decency and respect, and that

2    general principle is what guides me or guided me in

3    making the decision memorialized in that March 20th, '23

4    memorandum.

5        Q.  Well, SB 12 2023 wasn't passed at the time you

6    issued the March 20th, 2023 memorandum, correct?

7        A.  Correct.

8        Q.  Okay.  So you only cited it in respect to your

9    decision to cancel the 2024 show, right?

10       A.  Correct.

11       Q.  Okay.  Just want to make that clear.

12                   So that -- that would -- your answer

13   would apply to your 2024 decision?

14       A.  Yes.  Not the '23.

15       Q.  Okay.

16       A.  Yes.

17       Q.  So it says here you're "aware of proposed and

18   later enacted legislation, SB 12, which criminalizes

19   sexually-oriented performances on public property in the

20   presence of minors."

21                   Does SB 12 mention anything about public

22   universities, to your knowledge?

23       A.  Not to my knowledge.

24       Q.  Okay.  And without seeing Spectrum's

25   performances, what evidence did you have that they would

1  be sexually-oriented performances?

2      A.   On my understanding of the nature of drag

3  shows.

4      Q.   So simply the general nature of drag shows, you

5  -- informed your decision that SB 12 might apply to

6  Spectrum's 2024 performance?

7      A.   Right.  And the -- the "sexually-oriented

8  performances on public property in the presence of

9  minors," the quotation that's there, does not exclude

10  public universities, which, of course, are public

11  property, as we've discussed.

12      Q.   Does anything in SB 12 compel public-university

13  officials take action against sexually-oriented

14  performances in the presence of minors?

15      A.   I felt compelled.  I feel compelled to do that

16  as part of my responsibility for -- I don't -- I don't

17  know that it's in -- I don't know.

18      Q.   Okay.  Well, you said here "criminalizes,"

19  right?

20      A.   Yeah.

21      Q.   University presidents don't criminalize things,

22  correct?

23      A.   Well, I can only speak for myself.

24      Q.   Do you enforce criminal laws?

25      A.   Is that what "criminalizes" means?

1    that was communicated to you by attorneys.

2                THE WITNESS:  Okay.  Thank you.

3        A.   Not directly, to my recollection.

4        Q.   (BY MR. MORRIS)  Okay.  Does 2025 SB 12 mention

5    anything about public universities?

6        A.   I can't recollect if it does or it doesn't.

7        Q.   Okay.  So in your answer to your interrogatory,

8    you quote from 2025 SB 12.

9                "Prevents Texas public school districts and

10   open-enrollment charter schools from providing or

11   allowing a third party to provide instruction, guidance,

12   activities, or programming regarding sexual orientation

13   or gender identity to," in brackets, "K through 12," in

14   brackets, "students."

15               Did I read that accurately?

16       A.   Yes.

17       Q.   Is that your exclusive basis for stating that

18   2025 SB 12 is a basis you might invoke for canceling a

19   future drag show?

20       A.   It could have an impact on the decision, yes.

21       Q.   Okay.  Is West Texas A&M a public school

22   district?

23       A.   No.

24       Q.   Is it a public charter school?

25       A.   No.

243

1    Q.   Okay.  But you're citing this as a potential

2   basis for canceling a future show at Legacy Hall?

3    A.   I'd say yes.

4    Q.   Okay.  And you -- you quote here from the EO in

5   your interrogatory response about "federal funds shall

6   not be used to promote gender ideology."

7                   So based on that, is it your belief that

8   a potential campus drag show would promote gender

9   ideology?

10    A.   I think a campus drag show is disrespectful of

11   women, demeaning to women, denigrating womanhood,

12   creates a monolithic view of what a women -- a woman is

13   and her purpose.

14                   And if that's gender ideology, then

15   I'm -- I'd be very concerned about it.

16    Q.   Okay.  So if that is gender ideology, you would

17   say a direct performance on campus would promote that

18   ideology?

19    A.   Right.

20    Q.   So demeaning women, disrespecting women,

21   offending women, that's the way of promoting an

22   ideology?

23    A.   Yes, and looking at women monolithically

24   through a sexual lens.  It's the first time I've said

25   that this way, but that's what's in the memo that you've

244

1  referred to occasionally today as "the March 20th, 2023
2  memo."
3         Q.   Okay.  To your knowledge, was Spectrum's 2023
4  or 2024 performance going to deny the existence of two
5  sexes, as this Executive Order defines, as a man and a
6  woman?
7         A.   Can't speculate.  Do not know.
8         Q.   Okay.  And that's -- that's because the show
9  never took place, correct?
10         A.   I'll say -- I'll say the show did not take
11  place.
12         Q.   Okay.  So there was no way to tell, at least
13  for those shows, whether or not Spectrum was going to
14  deny the existence of only two sexes?
15         A.   Yeah.  I don't know.
16         Q.   Okay.  Moving on on your -- back to your
17  interrogatory responses, "Executive Order 14190, Ending
18  Radical Indoctrination in K Through 12 Schooling," you
19  cite that as a basis for potentially canceling a future
20  direct show.
21              Is that accurate?
22         A.   What page is that on, please?
23         Q.   We're still on Page 5, and that is Subsection
24  E.
25         A.   I'm reading it, yes.

245

```
 1        Q.   Okay.  So that's a "yes," that it's a potential
 2   basis you've cited here for canceling a future show?
 3        A.   Possibly, yes.
 4        Q.   Okay.  And again, the language you're quoting
 5   from this EO is about a secondary school.
 6                  Is West Texas A&M University a secondary
 7   school?
 8                  MR. BRYANT:  Asked and answered; objection.
 9        A.   We have secondary-school students on the campus
10   in our PUP programs, pre-university programs, taking
11   specific courses that are not offered at the high school
12   and the university environment.
13        Q.   Is it a secondary school?
14        A.   No.
15        Q.   Okay.  And has Spectrum ever been found to have
16   violated Title IX by a university?
17        A.   Not to my knowledge.
18        Q.   And you received no complaints about the
19   poten -- the planned drag shows potentially violating
20   Title IX.
21                  Is that correct?
22        A.   That is correct.  I've answered that earlier.
23        Q.   Okay.  Moving down to Paragraph F, you have a
24   "letter from Governor Abbott to University Systems dated
25   May 8th, 2024 ordering public universities in Texas not
```

1    well-defined process.

2        Q.    So how could you follow that process if you

3    simply ban a -- or cancel a performance based on the

4    fact that it might violate Title IX?

5        A.    Because of my understanding of what would occur

6    in the performance and because there are other venues.

7    I'm not saying people can't go to the drag shows.  They

8    can go.  There's plenty of places they can go, to halls

9    and other places that are not educational institutions,

10   where they can have those -- have a drag show.

11             But here, I'm concerned that it gets in the

12   way of the educational process.

13             I didn't answer your question.

14       Q.    No.  You did.  You did.  I'll -- I'll follow up

15   for you.

16             Did Spectrum receive that notice of

17   investigation and hearing process in 2023 after you

18   canceled their show?

19       A.    I don't believe so.

20       Q.    Did it -- would it have received that notice of

21   investigation and hearing process after you canceled

22   their show in 2024?

23       A.    I don't believe so.

24       Q.    But in both those instances, you believe their

25   show might have violated Title IX?

1        A.    That was my concern.

2        Q.    Do you think you violated university policy by

3   not affording them that notice of investigation and

4   hearing period -- or process?

5        A.    Creating an environment of mutual respect that

6   leads to educational opportunity for everyone supersedes

7   any other policy of the university.

8        Q.    Including the Expressive Activities Policy?

9        A.    I'd look very carefully at it and make that

10  determination.

11       Q.    Including Texas A&M University Civil Rights

12  Compliance Policy, including -- the 08.01.01 we looked

13  at earlier?

14       A.    I'd look very carefully before making the

15  decision.

16       Q.    Okay.  Moving down, number -- Letter G, you

17  have a "letter from Governor Abbott to state agencies

18  from January 30th, 2025," you quoted, "as requiring

19  state agencies to reject radical sexual orientation and

20  gender identity ideologies."

21             I assume your basis for -- for saying

22  that applies is the same one as saying the EO applies

23  because of the ideology that drag shows might advance?

24       A.    Yes.

25       Q.    Moving down to Letter H, "the Texas A&M

```
 1                MR. BRYANT:  -- this Answer --

 2                MR. MORRIS:  -- not respecting court

 3  decisions.

 4                MR. BRYANT:  These Answers --

 5                MR. MORRIS:  Let me rephrase.  Let rephrase

 6  it for you.

 7                MR. BRYANT:  These Answers were prepared by

 8  his lawyers for his review.  That doesn't mean he

 9  understands every legal statute and principle in detail.

10     Q.   (BY MR. MORRIS)   So President Wendler, are

11  your interrogatory responses your words or your lawyer's

12  words?

13     A.   They're -- they're -- they're my words and then

14  edited and added to and subtracted from by the counsel.

15     Q.   And you verified them, though, right?

16     A.   Oh, yeah.

17     Q.   So you -- you can attest that you understand

18  every response you gave in your interrogatory responses?

19     A.   To the best of my professional ability, yes.

20     Q.   So let me just ask you simply:  Do you believe

21  you are bound by the federal district court's order

22  enjoining the systemwide ban on drag shows?

23                MR. BRYANT:  Same objection; asking for a

24  legal conclusion --

25                MR. MORRIS:  That's not a --
```

254

 1              MR. BRYANT:  -- from a non-lawyer.

 2              MR. MORRIS:  -- legal conclusion.  It's an

 3   order from a federal district court that applied to lay

 4   people all the time.

 5              I'm going to repeat my question.

 6        Q.  (BY MR. MORRIS)  Do you believe you are bound

 7   by the federal district court order enjoining the

 8   systemwide ban against drag shows?

 9              MR. BRYANT:  Same objection.

10        A.  I don't know.

11        Q.  (BY MR. MORRIS)  Okay.  Let's move to Page 6 of

12   your interrogatory responses, and I promise you we're

13   almost done here.

14              We can take a break if you'd like, but I

15   think we can --

16        A.  No, no.

17        Q.  -- push through.

18        A.  I'm fine.  I'm fine.

19        Q.  Okay.  So we talked about some of these today,

20   I think most of them in -- in Subheader 2 or Header 2,

21   but I want to move to Header 3.

22              And we have "West Texas A&M University

23   Rules and Procedures," and there's a laundry list of

24   these that go on two and a half pages.

25              So you list, for example, in Paragraph

255

```
 1    R-13, "explosives, fireworks, and weapons."
 2                    What was your basis for believing that
 3    Spectrum's planned drag shows would violate that policy?
 4        A.   No specific basis, but the policies frame up
 5    acceptable behavior on the campus through very specific
 6    references, and all of those things contribute to my
 7    decisionmaking about a safe environment.
 8        Q.   By "explosives, fireworks, and weapons," you
 9    had some reason to believe that would be part of a
10    planned drag show?
11                    MR. BRYANT:  Objection; asked and answered.
12        A.   Could lead to an unsafe environment.
13        Q.   (BY MR. MORRIS)  Did you have any reason to
14    believe explosives, fireworks, and weapons would be part
15    of a planned -- one of Spectrum's planned drag shows?
16        A.   I don't know exactly.
17        Q.   So if -- if I went down this list with you
18    today, would you be able to point specifically to the
19    evidence that you believe or you were aware of about
20    Spectrum's shows that violated each of these policies
21    you cite, or would you simply say what you've said
22    earlier, that sort of as a general framework, you
23    considered these policies?
24        A.   I would say that in a general framework, I've
25    reviewed the policies.
```

 1          Q.   And would you say that going forward, you would
 2    apply these policies to specific evidence you knew about
 3    a future planned Spectrum drag show, or you would just
 4    consider the general framework of these policies in
 5    helping you make a decision?
 6          A.   It's hard for me to speculate about that, but I
 7    would consider the concept on the campus of safety and
 8    all campus events.
 9          Q.   Okay.  You've written in an op-ed and other
10    places about conservative values at West Texas A&M.
11                    Is that correct?
12          A.   Correct.
13          Q.   What do you mean by "conservative values?"
14          A.   I mean the values that are exhibited by the
15    people -- generally exhibited by the people in the Texas
16    Panhandle, from my experience.
17          Q.   Sure.  And are those the values we talked about
18    earlier today; respect for free expression, hard work,
19    responsibility?
20          A.   Correct.  Rugged individualism, correct.
21    There's a whole long list of --
22          Q.   Sure.  In your view, do -- does a drag
23    performance run counter to those conservative values?
24          A.   Respect is nearly always first on my list, and
25    I believe drag is disrespectful to women.

1     Q.   Do you believe, in your position as the

2   president of a public university, that if you believe

3   something is disrespectful enough to a certain group,

4   that you can stop it?

5     A.   I believe there are times that's the correct

6   answer -- correct action to take.

7     Q.   Do you believe, in your position as a president

8   of a public university, that if expression, mere words,

9   is disrespectful enough to a group of individuals, that

10  you can punish that expression?

11    A.   Yes.

12    Q.   And I would assume you would say "yes," but --

13  let me strike that.

14              Is it your belief that in your position as

15  a public university president, that you believe if

16  artistic expression is disrespectful enough to a group

17  of individuals, that you can stop that performance from

18  going forward?

19    A.   I'm not sure of --

20              MR. BRYANT:  Objection.  Are you asking

21  about a performance on the university campus or in

22  general off-campus?

23              MR. MORRIS:  Let me restate my objection

24  (sic) to alleviate your counsel's concerns.

25    Q.   (BY MR. MORRIS)  Is it your position that as a

1  public university president, that if a stage performance

2  is disrespectful enough to a group, that you can stop

3  that performance from going forward?

4      A.  Yes.

5            MR. MORRIS:  Let's go off the record for

6  about five to ten minutes, let me go through my notes,

7  consult with my colleague, and we'll wrap this up.

8            MR. BRYANT:  Okay.

9            THE VIDEOGRAPHER:  Going off the record at

10  5:48.

11            (Recess 5:48 p.m. to 5:59 p.m.)

12            THE VIDEOGRAPHER:  Going back on the record

13  at 5:59.

14            MR. MORRIS:  Okay.  Just a few more

15  questions for you, Dr. Wendler.

16            THE WITNESS:  Yes, sir.

17      Q.  (BY MR. MORRIS)  We talked about -- or you

18  testified about the educational mission --

19      A.  Yes.

20      Q.  -- of West Texas A&M University.

21            Students and the public, as we've discussed

22  today, they hold events at Legacy Hall and the JBK

23  Student Center all the time, correct?

24      A.  Correct.

25      Q.  Okay.  Does the noise from those events affect

**From:** President Walter V. Wendler
**Sent:** Monday, March 20, 2023 4:47 PM
**To:** CURRENT_STUDENT@LISTS.WTAMU.EDU
**Subject:** Message from President Wendler: A Harmless Drag Show? No Such Thing.



# Office of the President

*visio | veritas | valor*

**To:**      Students, Faculty and Staff

**From:**    Walter V. Wendler, President

**Date:**    March 20, 2023

**RE:**      A Harmless Drag Show? No Such Thing.

West Texas A&M University will not host a drag show on campus. It was advertised for March 31, 2023, as an effort to raise money for The Trevor Project. The nonprofit organization focuses on suicide prevention—a noble cause—in the LGBTQ community. Any person considering self-harm for any reason is tragic.

I believe every human being is created in the image of God and, therefore, a person of dignity. Being created in God's image is the basis of Natural Law. James Madison and Thomas Jefferson, prisoners of the culture of their time as are we, declared the Creator's origin as the foundational fiber in the fabric of our nation as they breathed life into it.

Does a drag show preserve a single thread of human dignity? I think not. As a performance exaggerating aspects of womanhood (sexuality, femininity, gender), drag shows stereotype women in cartoon-like extremes for the amusement of others and discriminate against womanhood. Any event which diminishes an individual or group through such representation is wrong. I registered a similar concern on campus when individuals debased Latinas

**EXHIBIT**
**3**

W_000085

Pl. App'x 092

regarding a quinceañera celebration. Should I let rest misogynistic behavior portraying women as objects? While I am not a woman, my best friend I have been married to for over a half-century is. I am also blessed to have daughters-in-law and granddaughters. Demeaning any demeans all. This is not an intellectual abstraction but a stark reality.

WT endeavors to treat all people equally. Drag shows are derisive, divisive and demoralizing misogyny, no matter the stated intent. Such conduct runs counter to the purpose of WT. A person or group should not attempt to elevate itself or a cause by mocking another person or group. As a university president, I would not support "blackface" performances on our campus, even if told the performance is a form of free speech or intended as humor. It is wrong. I do not support any show, performance or artistic expression which denigrates others—in this case, women—for any reason. WT intends to provide fair opportunities to all based on academic performance. Ideas, not ideology, are the coin of our realm. A university campus, charged by the state of Texas to treat each individual fairly, should elevate students based on achievement and capability, performance in a word, without regard to group membership—an implacable and exacting standard based on educational mission and service to all, sanctioned by the legislature, the governor and numerous elected and appointed officials.

The WT community should live by the Golden Rule. As a Christian, I personally learned this in the book of Matthew, *"So in everything, do to others what you would have them do to you, for this sums up the Law and the Prophets."* Buddhism expresses it this way: "Hurt not others with that which pains yourself." Judaism states, "What you yourself hate, do to no man." The law of reciprocity is at work in every known religion and society on the planet. Colloquially speaking, it is a manifestation of Newton's Third Law of Motion, "For every action, there is an equal and opposite reaction."

Mocking or objectifying in any way members of any group based on appearance, bias or predisposition is unacceptable. Forward-thinking women and men have worked together for nearly two centuries to eliminate sexism. Women have fought valiantly, seeking equality in the voting booth, marketplace and court of public opinion. No one should claim a right to contribute to women's suffering via a slapstick sideshow that erodes the worth of women.

When humor becomes harassment, it has gone too far. Any reading of the U.S. Equal Employment Opportunity Commission's purpose, coupled with common

Pl. App'x 093

sense, affirms that acts of prejudice in the workplace and our campus is a workplace, even when not criminal, are harmful and wholly inappropriate. No amount of fancy rhetorical footwork or legal wordsmithing eludes the fact that drag shows denigrate and demean women—noble goals notwithstanding.

A harmless drag show? Not possible. I will not appear to condone the diminishment of any group at the expense of impertinent gestures toward another group for any reason, even when the law of the land appears to require it. Supporting The Trevor Project is a good idea. My recommendation is to skip the show and send the dough.

Offering respect, not ridicule, is the order of the day for fair play and is the WT way. And equally important, it is the West Texas way.

**Walter V. Wendler**
**President**
806.651.2100
president@wtamu.edu

If you need email content or attachments in alternate formats for accessibility, please send your contact information and the details of your request to accessibility@wtamu.edu.

###################################################################

W_000087

Pl. App'x 094

**From:** President Walter V. Wendler <president@wtamu.edu>
**Sent:** Monday, March 18, 2024 3:33 PM
**To:** ALL <ALL@wtamu.edu>
**Subject:** WTAMU News: Spectrum WT Application for On-Campus Drag Show

 **Office of the President**

*visio | veritas | valor*

**To:**      Faculty, Staff, and Students

**From:**   Walter V. Wendler, President

**Date:**   March 18, 2024

**RE:**      Spectrum WT Application for On-Campus Drag Show

Spectrum WT asked three courts to prevent the denial of their pending application to conduct an on-campus drag show. I did not rule on the application out of respect for the judicial process. On March 15th, a unanimous United States Supreme Court rejected the attempt to prevent another denial.

And so, the Spectrum WT application to conduct an on-campus drag show is denied for the reasons given previously and for the reasons further explained in court filings and those provided by the courts themselves.

Moreover, it is denied because S.B. 12 went into effect as a Texas law in September 2023, as well as a number of other compelling considerations.

When the court makes a final decision, it will be implemented.

**Walter V. Wendler**
**President**



EXHIBIT

4

W_000088

<span style="color:red">Pl. App'x 096</span>

# Talking Points 04.26.23
# Fox News Lubbock Radio 95.9FM

**Student Debt Awareness**
- Published EBook
- Do not borrow for the first two-years—whether that's at a university or community college
- Take dual-credit courses in high school
- Work while attending school
- Be mindful of starting salary after graduation
- Be aware of what degree is needed after graduation
- Look for university plans to reduce costs
  - WT's Beat Any Offer
    - It has been stated the "Beat any Offer" campaign is "misleading" because it attempts to concretely show to prospective students that WT is affordable and a great value.  In the three months the campaign has been running, 42 freshman prospects have submitted offers they received from other universities. In 32 cases WT already is a better deal. In each of those 32 cases, the prospect was given a personal coaching session to help them understand the offer they had and how WT is a better value. Further, 10 freshman prospects who shared an offer they received from another school, WT sweetened the deal to make a better offer. I say our campaign is working.
  - WT's Housing Incentive Program
  - WT's Merit Scholarship Promise
  - WT's Family Scholarship Program
  - WT's Buff Promise
  - WT's Education Credit Union Buff$mart Financial Literacy Program
  - WT's President's Earn and Learn Internship
  - WT's Half Off Tuition and Fees for Employees
- Do not take out unnecessary loans (car, living expenses, etc.), borrow only for education
- If borrowing is necessary, only borrow for courses that count towards the degree plan
- Textbook-Free
  - I have been an outspoken advocate encouraging faculty to join me in finding ways to WT be more affordable and help students with costs. One



EXHIBIT

5

Def_028052

Pl. App'x 097

idea I have asked faculty to consider is working toward WT becoming a textbook free campus. What this would do is save costs of students purchasing textbooks, which are very expensive. It would require faculty to find alternatives, which might not be possible in every case, but I think is possible in the majority of cases given the state of current information technology.

**Community Involvement**
- "Your Community, Your University" Tours
  - 17,755 miles
  - 35,427 students
  - 199 schools
  - Published EBook
- Communication and Community Outreach Letters
  - Total Letters: 48,212
- Weekly op-eds
- High School Scholar Programs
  - WT Principal's Scholars Program: 835 recommendations
  - WT Athletic Director Scholars Program: 49 recommendations
  - WT Band Director Scholars Program: 19 recommendations
- WT Alumni Scholars Program
  - 137 recommendations
- "Plan for One"
  - I encouraged students to carefully consider a plan for their life which would allow them to become engaged and productive citizens. I shared noble pursuits through which such a life could be accomplished including running a family business, joining the military, learning a trade, as well as getting a college education.
  - For those considering post-secondary education, I cautioned them to be wise and do not go into excessive debt. I said, "**IF** you have to borrow money for the first two years of college, **THEN** consider community college, where you can work and pay for school at the same time. **THEN** transfer to WT and complete your degree."
  - I shared a formula they could use by taking the starting annual salary for the profession in which they hoped to work and not borrowing more than 60% of the annual starting salary to obtain a degree. I clarified my advice by saying that if a student had to borrow money the first two-years of college to obtain a degree from WT, they should attend community college before transferring to WT in order to save money.

04.26.23  Radio Show Talking Points                                    Page **2** of **4**

Def_028053
Pl. App'x 098

      o   More than a year ago I changed my messaging about attending community college when I learned that the national average for debt among community college transfers is about $10,000 (which is ½ the cost of obtaining a degree at WT). Community college students should not borrow because it defeats the purpose of low-cost community college courses. If they are going to borrow, I encourage them to begin at WT because it is a better value for their investment.

**Transfer Friendly University**
- Community Colleges: WT's Partners for the Future
  - Published EBook
- WT Community College Scholars Program
  - 121 endorsements

**Enrollment**
- Since my "Your Community, Your University" visits and messaging, WT has enrolled its 2nd (2019) and 3rd (2021) highest number of freshman ("first time in college") enrollment across the last 4 years. On these visits, I am talking to potential incoming freshman. I believe students and families are looking for a University who is honest, transparent, and advocating for them when it comes to costs.
- In addition, for this coming fall enrollment when compared to this same time last year, applications are up 12%, admitted students are up 7%, and transfer orientation registrations are up 26%. New Student Orientation registrations are up 3% and residential hall occupancy is up almost 10%.

***WT 125: From the Panhandle to the World***
- Set strategic planning goals for WT
  - The Pioneering Spirit: Pursuit of WT 125
- Set forth the OneWest Comprehensive Capital Campaign
- Committed to serving the Panhandle, first
- Committed to undergraduate academic excellence
  - Focus on importance of the core curriculum
- Committed to graduate academics regional research opportunities
- Committed to leadership development
- Efficiently utilize resources
- Provide access to intellectual resources
  - Textbook free campus
- Engage and empower excellence in human capital
- Foster locally responsive research

Def_028054

Pl. App'x 099

- Purposefully lead, govern and organize

**Personal**
- Critiques have accused me of "shaming and hurting" West Texas A&M University. They are certainly privy to their own opinion, but allow me to share some data. Since my arrive at WT as President:
  - o State support for WT has been at record funding levels for new and renovated buildings;
  - o System support as measured in dollars invested in partnerships like VERO, TVMDL, AgriLife and associated programs is unprecedented;
  - o Community support as reflected in the One West comprehensive fundraising campaign is historic not only for WT but is the largest campaign ever undertaken in the Panhandle
- I have always been transparent and open about who I am and what shapes my thinking and values. Unapologetically, I let people know that as a Christian, my religious beliefs are part of how I make decisions. I tell people this so they can know who I am and be aware and understand the many influences on my thinking and ideas. I have been transparent in my thinking and ideas through the more than one-million words I have written in op-eds published almost weekly for more than a decade. I do not anticipate everyone will agree with my ideas, nor should they. They are welcome to publish their own ideas in response to anything I write or say, which is how academic institutions should work—free exchange of ideas and thought.
- It has been said recently that WT is not a place the welcomes diversity. Other than my decision to cancel a drag show for reasons I clearly stated as demeaning to women, I want to be clear that WT welcomes diversity. I as President do not believe I have treated anyone unfairly or discriminated against anyone because they are different from me, not matter how they might be different. As a matter of fact, I expect every employee of WT and every office on campus to be a safe place for students regardless of the type of diversity they represent. In reality, we are all more different than alike.
- Likewise, I expect faculty to avoid discrimination against students who ideas are different from theirs. Intellectual integrity on a university campus should be able to tolerate diversity of all kinds, including diversity in thinking.

Def_028055

Pl. App'x 100



# A Fool's *Drag* Race

## Fundraiser for The Trevor Project!

Buff ID: Free
General Admission: $5
VIP Ticket: $10
Can pay at door or online!

Concessions will be sold!



6pm-8pm

March 31st!

Legacy Hall

PG-13

Sponsored by:

# F1RSTGEN
West Texas A&M University

West Texas K-Pop
Est. 2020

RHA
WT Residence Hall Association
WEST TEXAS A&M UNIVERSITY

Spectrum

wtamu.edu/buffallies

EXHIBIT
12

Def_000098
Pl. App. x 101







Pl. App'x 102
SPECTRUM 0002865



# 08.99.99.W1  Expressive Activity on Campus

Approved May 14, 2020
Revised June 25, 2024
Next Scheduled Review June 25, 2029

---

## Rule Summary

---

In 2019, the 86th Texas Legislature passed Senate Bill 18, addressing the protection of campus expressive activities.  This new law adds Texas Education Code Section 51.935, which requires that each public institution of higher education "adopt a policy detailing student's rights and responsibilities regarding expressive activities" on its campus.

As stated in the Preamble to the bill: Freedom of expression is of critical importance and requires each public institution of higher education to ensure free, robust, and uninhibited debate and deliberations by students enrolled at the institution, regardless of whether the students are on or off campus.  It is a matter of statewide concern that all public institutions of higher education officially recognize freedom of speech as a fundamental right.  Freedom of speech and assembly is central to the mission of institutions of higher education and persons should be permitted to assemble peaceably on the campuses of institutions of higher education for expressive activities, including to listen to or observe the expressive activities of others.

This rule has been amended to comply with Governor Abbott's Executive Order GA-44, dated March 27, 2024.

---

## Rule

---

1. EXPRESSIVE ACTIVITY RIGHTS
    1.1. Any person is allowed, subject to reasonable time, place and manner restrictions, to engage in expressive activities on campus, including by responding to the expressive activities of others.

    1.2. Student organizations and employees are allowed to invite speakers to speak on campus.  In determining the amount of a fee to be charged for use of the university's facilities for purposes of engaging in expressive activities, the university may consider only content-neutral and viewpoint-neutral criteria related to the requirements of the event, such as the proposed venue and the expected size of the audience, any anticipated need for campus security, any

Def_000450

EXHIBIT 17

necessary accommodations, and any relevant history of compliance or noncompliance by the requesting student organization or employee with this rule and other relevant rules. The university may not consider any anticipated controversy related to the event.

1.3. The university may not act against a student organization or deny the organization any benefit generally available to other student organizations at the university based on a political, religious, philosophical, ideological, or academic viewpoint expressed by the organization or of any expressive activities of the organization.

    1.1.1.   The university may take disciplinary or remedial action against individuals or groups that engage in expressive activity not protected by this rule or the First Amendment[1]. Sanctions which may be imposed include all those identified in the WTAMU Student Handbook.

    1.1.2.   Expressive activities which may result in sanctions and are not protected by this rule or the First Amendment include: physical abuse or assault; true threats; disruption of the academic environment or a university-sponsored extracurricular event; inciting or producing imminent lawless action; or illegal harassment.

    1.1.3.   Conduct described in 1.3.2 may be reviewed and adjudicated under A&M System Regulation 08.01.01 Civil Rights Compliance, including those related to actionable discrimination or harassment based on race, color, sex, religion, national origin, age, disability, genetic information, veteran status, sexual orientation, gender identity, or any other classification protected by federal, state, or local law[2]. Additionally, such conduct may also be reviewed and adjudicated by the WTAMU Office of Community Standards.

1.4. The common outdoor areas of the university's campus are deemed traditional public forums. Any person is permitted to engage in expressive activities in these areas freely, as long as the person's conduct: (a) is not unlawful; and (b) does not materially and substantially disrupt the functioning of the institution. Members of the university community are allowed to assemble or distribute written material in common outdoor areas without a permit or other permission from the institution.

---

[1] This rule must be applied in a manner consistent with the Dear Colleague Letter (July 28, 2003) issued by the Department of Education related to First Amendment and civil rights laws compliance.

[2] This includes unprotected activities motivated by antisemitism and other forms of shared ancestry discrimination as listed in the Dear Colleague Letter (Nov. 7, 2023) issued by the Department of Education in the wake of the tragic events of October 7, 2023.

Def_000451
Pl. App'x 104

1.5. Nothing in this rule should be interpreted as prohibiting faculty members from maintaining order in the classroom.

2. COMPLAINT PROCEDURE
   2.1. Any person who believes that their campus expressive activity rights, as recognized by this rule, have been unduly interfered with by a student, student organization, or employee has the right to file a complaint.

   2.2. Complaints should be filed on the university's online complaint form, found at www.wtamu.edu/complaint.

   2.3. A student, student organization, or employee who is found to have unduly interfered with another person's expressive activity rights, as recognized by this rule, is subject to disciplinary action in accordance with the university's applicable rules and procedures. All complaints will be administered by the university complaint process found on the complaint website: www.wtamu.edu/complaint. If a violation of this rule was found to occur the report will be referred to the appropriate office for further action. The referral office will be determined by the status of the offending individual. Complaints concerning (a) faculty will be referred to the Office of the Provost; (b) students will be referred to the Student Conduct Office; and (c) complaints concerning staff and third parties will be referred to Human Resources.

3. IMPLEMENTATION
   3.1. A copy of this rule will be included in any university published Code of Student Life.

   3.2. A copy of this rule will be distributed each semester when the Code of Student Life is normally distributed electronically.

   3.3. A copy of this rule will be posted to the university's website.

4. EXTERNAL CLIENT EVENTS
   4.1. Events organized by an external party and held on campus must be sponsored by a recognized student organization, university academic or administrative unit, or a Texas A&M University System member.

## Related Statutes, Policies, or Requirements

Texas Education Code § 51.9315
Texas Government Code §448.001
Executive Order GA-44 March 27, 2024
WTAMU Student Handbook
System Regulation 08.01.01 Civil Rights Compliance

U.S. DOE Dear Colleague Letter July 28, 2023
U.S. DOE Dear Colleague Letter November 7, 2023

## Definitions

1. **Antisemitism** means a certain perception of Jews that may be expressed as hatred toward Jews. The term includes rhetorical and physical acts of antisemitism directed toward Jewish or non-Jewish individuals or their property or toward Jewish community institutions and religious facilities[3] Antisemitic conduct comprised of behavior expressed in section 1.3.2 of this rule can be sanctioned by the university. Examples of antisemitism are included with the International Holocaust Remembrance Alliance's "Working Definition of Antisemitism" adopted on May 26, 2016.

2. **Benefit** means recognition by or registration with the university, the use of the university's facilities for meetings or speaking purposes, the use of channels of communication controlled by the university, and funding sources made generally available to student organizations at the university.

3. **Campus** means all land and buildings owned or leased by the university.

4. **Common outdoor areas** mean places located outside a building or facility that are accessible to the public, such as streets, sidewalks, plazas, lawns, and parks, unless closed by the university for a special event. This term does not include areas immediately adjacent to a private residence.

5. **Employee** means an individual employed by the university.

6. **Expressive Activity** means any speech or expressive conduct protected by the First Amendment to the United States Constitution or by Section 8, Article I, Texas Constitution, and includes assemblies, protests, speeches, the distribution of written material, the carrying of signs, and the circulation of petitions. The term does not include commercial speech.

7. **Faculty** means any full or part-time employee of the university holding an academic appointment.

8. **Illegal Harassment** means expressive conduct that is so severe and pervasive and objectively offensive that it denies or limits a person's ability to participate in or benefit from an educational program or activity.

---

[3] Texas Government Code, Section 448.001.

Page 4 of 6
Def_000453

Pl. App'x 106

9. **Inciting or producing imminent lawless action** means speech or behavior that prevents a clear, present, and imminent threat of physical harm or property damage.

10. **Materially and substantially disrupt** means interrupting a program or activity in a significant and consequential manner.

11. **Person** means students, faculty, staff, student organizations, and third parties.

12. **Reasonable time, place, and manner restrictions** means limitations that:
    12.1.    are narrowly tailored to serve a significant institutional interest;
    12.2.    employ clear, published, content-neutral, and viewpoint-neutral criteria;
    12.3.    provide ample alternative means of expression.

13. **Staff** means an employee of the university that is not a faculty member.

14. **Student** means an individual currently enrolled at the university, full or part-time, pursuing undergraduate, graduate, or professional studies, including students who were enrolled the previous semester and registered for a future semester.

15. **Student Organization** means any organization that is composed mostly of students enrolled at an institution of higher education and that receives a benefit from the institution.

16. **Third-party (external client)** means an individual or entity that is not a student, student organization, or employee of the university.

17. **Traditional public forum** means a place, widely recognized in law, which has been intended for the use of the public, and has been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions when the principal function of the location would not be disrupted by expressive activity. Examples of traditional public forums include public streets, sidewalks, plazas, lawns, and parks.

18. **True Threats** means communication of a serious expression of an intent to harm a specific person or group of people.

## Appendix

None

## Revision History

Revised June 25, 2024

## Contact Office

Student Affairs
(806) 651-2025

## Approval Office

Office of the President
(806) 651-2100

## Approval Signature

06.25.2024

_____        _____
President/CEO                      Date

**System Approvals***

**Approved for Legal Sufficiency:**

_____        $\dfrac{6/25/24}{\text{Date}}$
Ray Bonilla
General Counsel

**Approved:**

_____        $\dfrac{6/25/24}{\text{Date}}$
John Sharp
Chancellor

*System approvals are contingent upon incorporation of any and all System-required changes in the rule's final posting.

Def_000455

Pl. App'x 108

# 08.01.01    Civil Rights Compliance



Revised August 15, 2022
Next Scheduled Review:  August 15, 2027
Click to view Revision History.

## Regulation Summary

The Texas A&M University System (system) will provide equal opportunity to all employees, students, applicants for employment and admission, and the public.  This regulation provides guidance to each member in complying with local, state and federal civil rights laws and regulations (laws) and related system policy.

All complaints, appeals, or reports of discrimination received by the system will be appropriately reviewed and addressed in accordance with this regulation.

This regulation establishes systemwide standards for each member's receipt and processing of reports, complaints, formal complaints, investigations, adjudication, appeals, and use of informal resolution in cases involving allegations of discrimination, harassment and/or related retaliation based on a protected class (discrimination), including complaints made by employees, students and/or third parties.

A member also has a duty to respond to inappropriate employee or student conduct that does not constitute discrimination under this regulation.  See System Policy *32.02, Discipline and Dismissal of Employees*; System Regulation *32.02.02, Discipline and Dismissal of Nonfaculty Employees*; and System Policy *12.01, Academic Freedom, Responsibility and Tenure*.  For student misconduct, see the member's student code of conduct.

## Definitions

Advisor – an individual selected by each complainant and respondent to provide guidance during the investigation and resolution process and to conduct cross-examination when a complaint is referred to a formal hearing.  An advisor may be an attorney.  A member may appoint an advisor of the member's choice for a complainant or respondent for a hearing if either party does not have an advisor present.  Advisors may not otherwise represent or speak for the party they are advising.  Each party is allowed one advisor, although members may establish circumstances under which a second advisor would be permitted (e.g., accommodating a party with a disability).  See Section 4.2.5.

Appellate authority – an individual or panel responsible for rendering appeal decisions as specified in member rules. The role of the appellate authority is to review the process by which an original decision was reached and render an appellate decision, consistent with the grounds for appeal. Title IX Coordinators may not serve as an appellate authority in any case involving an allegation of discrimination or harassment based on sex.

08.01.01 Civil Rights Compliance

Def_000235



Pl. App'x 1000

Coercion – the act, process, or power of compelling a person to take an action, make a choice, or allow an act to happen that they would otherwise not choose or give consent to.

Complainant – the individual(s) who is alleged to have been subjected to discrimination.

Complaint - an oral or written report of an alleged violation of this regulation. A complaint may be filed by a complainant, any system member employee or student, or a third party. The complaint does not have to meet the definition of a "formal complaint" (see below).

Confidential – communication that cannot legally be disclosed to another person without the consent of the individual who originally provided the information, except under very limited circumstances such as allegations of elderly, disabled or child abuse; an imminent threat of injury or to the life of any person; or as required by law.

Confidential reporter – an employee designated or permitted by a member to receive complaints of discrimination and maintain confidentiality. Confidential Reporters are required to provide general nonidentifying information as required to comply with the Clery Act, and must report to the Title IX Coordinator any type of sex-based incident made known to them, but may not include any information that would violate that person's expectation of privacy. Exceptions to confidentiality/privacy include reports of child abuse, abuse or neglect of disabled or elderly persons, and when a party poses an imminent danger to themselves or others.

Consent – clear, voluntary and ongoing agreement to engage in a specific sexual act. Persons need not verbalize their consent to engage in a sexual act for there to be permission. Permission to engage in a sexual act may be indicated through physical actions rather than words. A person who is asleep or mentally or physically incapacitated, either through the effect of drugs or alcohol or for any other reason, or whose agreement was made by threat, coercion, or force, cannot give consent. Consent may be revoked by any party at any time.

Dating violence – violence committed by a person who is or has been in a social relationship of a romantic or intimate nature with the victim.

(a) The existence of such a relationship will be determined based on the reporting party's statement and with consideration of the length of the relationship, the type of relationship, and the frequency of interaction between the persons involved in the relationship.

(b) For the purposes of this definition:

(1) Dating violence includes, but is not limited to, sexual or physical abuse or the threat of such abuse.

(2) Dating violence does not include acts covered under the definition of domestic violence. [34 U.S.C. 12291(a)(10)]

Dating violence is explicitly prohibited under this regulation. Aiding another in the commission of dating violence is also prohibited under this regulation. Dating violence is a form of sexual harassment or sex-based misconduct.

Designated administrator – the decision-making entity specified in member rules. This may be an administrator or a hearing officer/panel but may not include a person with a clear conflict of interest (e.g., supervisor, subordinate, and/or family member of either party) or personal bias. The role of the designated administrator is to determine whether or not allegations of misconduct rise

Def_000236
Pl. App'x 110

to the level of a violation of this regulation based on the evidence provided and utilizing the preponderance of the evidence standard. The designated administrator cannot have served as an investigator nor may they later serve as an appellate authority in the same case. Title IX Coordinators may not serve as a designated administrator in any case involving an allegation of discrimination or harassment based on sex. Designated administrators may consist of a single decision-maker (hearing officer for formal hearings) or a group of decision makers (hearing panel for formal hearings). When a hearing panel is utilized by a member, it must be chaired by a voting member and consist of an odd number of total voting members.

Discrimination - a materially adverse action or actions that intentionally or unintentionally excludes one from full participation in, denies the benefits of, or affects the terms and conditions of employment or access to educational or institutional programs because of an individual's race, color, sex, religion, national origin, age, disability, genetic information, veteran status, sexual orientation, gender identity, or any other classification protected by federal, state, or local law. Discrimination includes harassment (based on both hostile environment and quid pro quo) and retaliation based on a legally protected category.

Domestic violence – a felony or misdemeanor crime of violence committed by:

  (a) a current or former spouse or intimate partner of the victim;

  (b) a person with whom the victim shares a child in common;

  (c) a person who is cohabitating with, or has cohabitated with, the victim as a spouse or intimate partner;

  (d) a person similarly situated to a spouse of the victim under the domestic or family violence laws of the jurisdiction in which the crime of violence occurred; or

  (e) any other person against an adult or youth victim who is protected from that person's acts under the domestic or family violence laws of the jurisdiction in which the crime of violence occurred. [34 U.S.C. 12291(a)(8)]

Domestic violence is explicitly prohibited under this regulation. Aiding another in the commission of domestic violence is also prohibited under this regulation. Domestic violence is a form of sexual harassment or sex-based misconduct.

Educational program or activity – an "educational program or activity" is interpreted broadly to include all of the member's operations, including locations, events, or circumstances over which the member exercised substantial control over both the respondent and the context in which the alleged discriminatory behavior occurred, including any building owned or controlled by a student organization that is officially recognized by the system member.

Employee – all personnel employed by the member including faculty, staff and students who receive compensation in either a full- or part-time capacity. Employees who are also students would have their status in the civil rights process determined by the context of the allegations; these individuals are subject to civil rights processes, as well as student conduct and employment standards set by the member.

Exculpatory evidence – evidence that would tend to support a finding that a respondent did not commit the alleged misconduct.

08.01.01 Civil Rights Compliance

Def_000237

Pl. App'x 111

Formal complaint – a document or electronic submission (such as by electronic mail or through an on-line portal provided for this purpose) filed by a complainant, or signed by the Title IX Coordinator, alleging sex-based discrimination against a respondent and requesting that the member investigate the allegation(s). The formal complaint must contain the complainant's physical or digital signature, or otherwise indicate that the complainant is the person filing the complaint. Alternatively, a Title IX Coordinator may sign a formal complaint but is not a complainant or otherwise a party to the complaint.

Hostile environment – a situation in which there is unwelcome harassing conduct based on a legally protected class that is severe, persistent, or pervasive enough to create a work, educational, or campus living environment that a reasonable person would consider objectively offensive. The determination of whether an environment is "hostile" must be based on all of the circumstances, which may include the frequency of the conduct, the nature and severity of the conduct, whether the conduct was physically threatening or humiliating, and/or the mental or emotional effect of the conduct on the individual(s) subjected to the alleged discrimination.

Incapacitated – a state in which a person, due to a disability, the use of alcohol or drugs, being asleep, or for any other reason, is not capable of making rational decisions about consent to sexual activity and recognizing the consequences of their decision.

Inculpatory evidence – evidence that would tend to support a finding that a respondent is responsible for alleged misconduct.

Informal resolution – resolution of a civil rights complaint without the use of a formal hearing. Informal resolutions may or may not involve the establishment of findings of fact and the application of sanctions.

Investigative authority – one or more trained individuals appointed to conduct a formal investigation to discover and examine the facts of an allegation and conclude if, based on the preponderance of the evidence, the allegation is substantiated, unsubstantiated, or if there is insufficient information. In complaints involving allegations of sex-based behaviors, the investigative authority will be limited to only reporting the evidence collected during the investigation, as well as issuing appropriate determinations surrounding credibility of witnesses and evidence.

Member – any or all members of The Texas A&M University System, including universities, agencies and System Offices.

Misconduct – an action or actions that violate published behavioral standards.

Objectively offensive – behavior determined by a reasonable person to be offensive.

Offensive – actions that cause unreasonable harm or distress to another individual or group of people.

Persistent – conduct occurring frequently over an unspecified period of time.

Pervasive – conduct existing in or spreading over a large area of an activity or program over a period of time.

Def_000238

Pl. App'x 112

Predation – an intent to engage in acts of misconduct prior to their occurrence demonstrating premeditation, planning or forethought, and is reflected in communicated intent (physical, verbal, visual, or written), threats directed at a party, attempts to incapacitate a party, attempts to isolate a party, utilizing physical force or violence, or other actions that a reasonable person would construe as a pre-meditation to engage in actions that are unwanted by/against the recipient. Committing any of these actions with an individual under the age of consent is also considered predatory.

Preponderance of the evidence – what is more likely than not to be true, based on the totality of the available evidence. The preponderance of the evidence is the standard of evidence used for all determinations made under this regulation.

Private – that which affects, characterizes, or belongs to an individual person, as opposed to the general public. With respect to this regulation, private means restricting information to those with a reasonable need to know.

Private body parts – a person's breast, posterior (butt), groin, and/or genitals.

Quid pro quo sexual harassment – "this" for "that"; i.e., unwelcome sexual advances, requests for sexual favors or other verbal, nonverbal or physical conduct of a sexual nature, the submission to or rejection of which may result in an adverse educational or employment action. Quid pro quo sexual harassment is explicitly prohibited under this regulation. Aiding another in the commission of quid pro quo sexual harassment is also prohibited under this regulation.

Reasonable person – a comparative standard on one person's assessment of an action, actions, or situation compared with how most persons might act or react based on similar circumstances. This standard considers the identities of an individual as well as the context of the actions being evaluated.

Remedies – actions taken to restore or preserve equal access to the member's education program or activity. Remedies may be disciplinary in nature and may burden the respondent.

Reporter – an individual who observed or was made aware of an alleged violation and who provides an initial oral or written account of an alleged violation of this regulation.

Respondent – an individual who has been alleged to have engaged in discriminatory conduct as defined in system policy and this regulation.

Retaliation — intimidation, threats, coercion, or discrimination against any individual for the purpose of interfering with any right or privilege secured under civil rights laws and regulations, or because the individual has opposed a discriminatory practice, files a report or complaint, testified, assisted, or participated or refused to participate in any manner in an investigation, proceeding, or hearing. The exercise of rights protected under the First Amendment does not constitute prohibited retaliation, nor does the filing of a mandatory report as required by Section 2.1 of this regulation. In addition, a university official who files a mandatory report or charges an individual with making a materially false statement in the course of an investigation has not engaged in prohibited retaliation. Retaliation is explicitly prohibited under this regulation. Aiding another in the commission of retaliation is also prohibited under this regulation.

Severe – of sufficient seriousness to interfere with the rights, privileges, and legal activities of an individual, as well as actions that would be deemed by a reasonable person to be extreme or life-threatening.

<u>Sexual assault</u> – an offense that meets the definition of rape, fondling, incest or statutory rape as used in the FBI's Uniform Crime Reporting system. A sex offense is any sexual act directed against another person, without the consent of the victim, including instances in which the victim is incapable of giving consent. These offenses are defined as:

Rape: The penetration, no matter how slight, of the vagina or anus with any body part or object, or oral penetration by a sex organ of another person, without the consent of the victim.

Fondling: The touching of the private body parts of another person for the purpose of sexual gratification, without the consent of the victim, including instances where the victim is incapable of giving consent because of his/her age or because of his/her temporary or permanent mental incapacity.

Incest: Sexual intercourse between persons who are related to each other within the degrees wherein marriage is prohibited by law.

Statutory Rape: Sexual intercourse with a person who is under the statutory age of consent.

Sexual assault is explicitly prohibited under this regulation. Aiding another in the commission of sexual assault is also prohibited under this regulation. Sexual assault is a form of sexual harassment or sex-based misconduct.

<u>Sex-based misconduct</u> – unwelcome conduct on the basis of sex that is severe, persistent, or pervasive enough to create a work, educational, or campus living environment that a reasonable person would consider intimidating, abusive, or offensive. Sex-based misconduct is explicitly prohibited under this regulation. Aiding another in the commission of sex-based misconduct is also prohibited under this regulation. Sex-based includes, but is not limited to, sexual assault, sexual exploitation, dating violence, domestic violence, and stalking based on sex.

<u>Sexual exploitation</u> – a situation in which an individual(s) takes non-consensual or abusive sexual advantage of another for his or her own advantage or benefit, or to benefit or advantage anyone other than the one being exploited. For example, sexual exploitation could include such actions as secretly videotaping sexual activity, voyeurism, sexually-based stalking, invasion of sexual privacy, exposing one's genitals or causing another to expose one's genitals, and knowingly exposing another person to a sexually transmitted infection or disease. Sexual exploitation is a form of sex-based misconduct.

<u>Sexual harassment</u> – a form of sex discrimination. Unwelcome conduct on the basis of sex (of a sexual nature or otherwise): (1) by an employee of the member who conditions the provision of an aid, benefit, or service of the member on an individual's participation in that unwelcome sexual conduct; (2) determined by a reasonable person to be so severe and pervasive and objectively offensive that it effectively denies a person equal access to the member's education program or activity; or (3) sexual assault or dating violence, domestic violence, or stalking based on sex.

<u>Stalking</u> – engaging in a course of conduct directed at a specific person that would cause a reasonable person to:

(a) fear for the person's safety or the safety of others; or

(b) suffer substantial emotional distress.

For the purposes of this definition:

(a) *Course of conduct* means two or more acts, including, but not limited to, acts in which the stalker directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about a person, or interferes with a person's property.

(b) *Reasonable person* means a reasonable person under similar circumstances and with similar identities to the victim.

(c) *Substantial emotional distress* means significant mental suffering or anguish that may, but does not necessarily, require medical or other professional treatment or counseling. [34 CFR 668.46(a)]

Stalking is explicitly prohibited under this regulation. Aiding another in the commission of stalking is also prohibited under this regulation. Stalking based on sex is a form of sexual harassment or sex-based misconduct.

Student – individual enrolled in member universities or someone who has accepted an offer of admission or, if not currently enrolled, otherwise has a continuing relationship with the university; for example, someone enrolled in a future semester. Students who are also employees would have their status in the civil rights process determined by the context of the allegations; these individuals are subject to civil rights processes as well as student conduct and employment standards set by the member.

Supportive measures – non-disciplinary, non-punitive individualized services offered as appropriate, as reasonably available, and without fee or charge to the complainant or the respondent before or after the filing of a formal complaint or where no formal complaint has been filed. Such measures are designed to restore or preserve equal access to the member's education program or activity without unreasonably burdening the other party, including measures designed to protect the safety of all parties or the member's educational or work environment, or deter sexual harassment. Supportive measures may include counseling, extensions of deadlines or other course-related adjustments, modifications of work or class schedules, campus escort services, mutual restrictions on contact between the parties, changes in work or housing locations, leaves of absence, increased security and monitoring of certain areas of the campus or workplace, and other similar measures.

Title IX Coordinator – an employee designated and authorized to coordinate the member's efforts to comply with its responsibilities under the Title IX of the Education Amendments of 1972 Act.

# Regulation

## 1. RESPONSIBILITIES OF MEMBERS

Each member chief executive officer (CEO) has the primary responsibility for ensuring compliance with civil rights laws and related system policy.

1.1    The CEO must designate a contact person(s) responsible for overseeing its civil rights protections program. This person(s) will ensure that all complaints of discrimination are

Def_000241

Pl. App'x 115

promptly, thoroughly, and equitably investigated and resolved in accordance with this regulation. The designee(s) will periodically follow up on situations in which discrimination is found to ensure that the situation does not reoccur.

1.2   Members must designate at least one Title IX Coordinator, who may or may not be the same employee designated in 1.1 above. Members must notify applicants for admission and employment, students, parents or legal guardians of elementary and secondary school students, and employees of the name or title, office address, electronic mail address, and telephone number of the employee(s) designated as the Title IX Coordinator(s). The notification should also state that the member does not discriminate on the basis of sex in its education programs and activities, including admission and employment, in accordance with Title IX of the Educational Amendments of 1972 and its implementing regulations. The contact information for the Title IX Coordinator(s) must be prominently displayed on the member's website and in each handbook or catalog that it makes available to persons entitled to notification as listed above.

1.3   Members receiving an inquiry or a charge of discrimination from a local, state or federal agency must immediately inform the System Ethics and Compliance Office (SECO) which will, in coordination with the System Office of General Counsel (OGC), serve as the liaison between the member and the agency.

1.4   Each member must adopt and publicly display a rule for the receipt, investigation and prompt and equitable resolution of discrimination complaints, in accordance with this regulation. Rules must be published in student and personnel handbooks or the institution's equivalents, if any, and published on a dedicated website. Individuals entitled to notifications as specified in Section 1.2 must be provided notice of the member's grievance process, including how to report or file a complaint of discrimination, how to report or file a formal complaint of sexual harassment, and how the member will respond.

1.5   To ensure consistency, thoroughness and impartiality, each member will designate one office (designated office) to receive and investigate all complaints involving a student respondent(s) and one office (designated office) to receive and investigate all complaints involving an employee or third party respondent(s). All complaints can be handled by the same office.

1.6   Member universities must provide orientation training to all entering freshman and undergraduate transfer students on sexual harassment, sexual assault, dating violence, and stalking during the student's first semester. Students are required to complete this training. The training may be conducted in person or online at the discretion of the member university.

1.7   Member universities must develop and implement comprehensive prevention and outreach programs on sexual harassment, sexual assault, dating violence, and stalking. These programs must address prevention strategies and reporting protocols. Reporting protocols must also be emailed to each student at the beginning of each fall and spring semester.

1.8   To facilitate effective communication and coordination regarding allegations of sexual harassment, sexual assault, dating violence, and stalking at the institution, member

Def_000242

Pl. App'x 116

universities must enter into one or more memoranda of understanding with an entity from one or more of the following categories, as agreeable to these entities:

(a) local law enforcement agencies;

(b) sexual harassment, sexual assault, dating violence, or stalking advocacy groups; and

(c) hospitals or other medical resource providers.

1.9 Members must ensure that all of those involved in the administration of civil rights complaints (including but not limited to: reporting, administering, investigating, adjudicating, advising, and informal resolution) complete annual training specific to their roles in accordance with requirements established by SECO. A document entitled *Minimum Training Requirements for Civil Rights Investigations, Advisement, Adjudication, Appeals, and Informal Resolution in The Texas A&M University System*, is an appendix to this regulation. Training requirements adopted by members must be consistent with the *Minimum Training Requirements* included in the appendix to this regulation. All campus law enforcement officers reviewing complaints based on sexual harassment, sexual assault, dating violence, and stalking must receive training in trauma-informed investigations. All training materials must be published on the member's website.

1.10 Members must provide a quarterly report to SECO on all alleged violations of System Policy *08.01, Civil Rights Protections and Compliance*. The format, timeline and specific reporting requirements will be developed and communicated by SECO.

2. RESPONSIBILITIES OF ALL EMPLOYEES AND STUDENTS

2.1 All employees are responsible for ensuring their work and educational environments are free from discrimination. When alleged or suspected discrimination is experienced by, observed by or made known to an employee in the course and scope of their employment, the employee is responsible for promptly reporting that information as outlined in Section 4.1, except as provided by Section 2.3. An employee's failure to report alleged or suspected discrimination may result in disciplinary action, including dismissal. A member must dismiss an employee if, in accordance with its applicable disciplinary processes, the member determines that the employee knowingly failed to make a required report, or that the employee, with the intent to harm or deceive, knowingly made a report that is false.

2.2 Notwithstanding Section 2.1, an employee is not required to report an incident in which that employee was a victim of sexual harassment, sexual assault, dating violence, or stalking, or an incident about which the employee received information due to a disclosure made at a sexual harassment, sexual assault, dating violence, or stalking public awareness event sponsored by the member, or by a student organization affiliated with the member, or under circumstances in which the person has either learned of the incident during the course of their employer's review or process, or has confirmed with the designated office overseeing the review or process, that the incident has been previously reported.

2.3 Only certain employees may keep complaints of discrimination confidential, such as licensed health care personnel and sexual assault advocates who have completed a

Def_000243

Pl. App'x 117

training program approved by the Attorney General of Texas, when acting in this capacity as part of their official employment. Researchers are deemed confidential only when the research project is federally funded and the identity of research subjects on the specific project are deemed confidential by law. These employees must provide information required under the Clery Act and other applicable state and federal laws and regulation. Confidential reporters must report to the Title IX Coordinator only the type of incident made known to them and may not include any information that would violate that person's expectation of privacy. All other employees informed of possible discrimination should advise the reporter that they cannot keep the information confidential and are required to report it. Employees should inform the reporter where confidential guidance can be obtained, such as the student counseling center or employee assistance program. To the extent possible, the member will protect the privacy of all parties to the report. (See definitions for "confidential" and "private.")

2.4    Each member university must designate one or more persons to serve as a person with whom students may speak confidentially concerning incidents involving sexual harassment, sexual assault, dating violence, or stalking, and who have reporting responsibilities consistent with expectations established in Section 2.3. All students must be informed of the existence and identities of these confidential reporters.

2.5    Requests from complainants to withhold any name, or a request not to investigate or seek action against the respondent, will be considered by the member in the context of the member's duty to provide a safe and nondiscriminatory work, educational, and campus living environment. This may require that the member take actions when the complainant requests no action, such as when violence is involved, when the threat of violence exists, or when required by law, as in the case of elderly, disabled, or child abuse. A request to withhold information or not to investigate the alleged misconduct may limit the member's ability to respond.

2.6    In cases in which a complainant has requested that a member not investigate a complaint, the member may initiate an investigation based on the seriousness of the allegation, whether or not there are multiple allegations, and/or whether or not a respondent poses a risk of harm to others. The member must inform the complainant of its intentions to investigate or to comply with the request not to investigate.

2.7    Reporters and complainants may, but cannot be required to, submit a complaint or report with any law enforcement authority. Employees receiving a complaint under this regulation may not disclose the identity of the complainant to any law enforcement authority unless expressly authorized by the complainant, when an imminent threat to health or safety may exist, or when required by law.

2.8    Complainants and respondents may, at any time, file a complaint with any local, state or federal civil rights office, including, but not limited to, the Equal Employment Opportunity Commission, the Texas Workforce Commission's Civil Rights Division, the U.S. Department of Education's Office of Civil Rights, and the U.S. Department of Justice.

2.9    Reports of suspected discrimination should contain as much specific information as possible to allow for proper assessment of the nature, extent, and urgency of preliminary investigative procedures and supportive measures.

Pl. App'x 118

2.10 All employees must, and students should, cooperate fully with those performing an investigation pursuant to this regulation. Employees failing to cooperate with those performing an investigation may be disciplined, up to and including dismissal.

2.11 Employees and students must not retaliate against a person for filing a complaint or participating in an investigation under this regulation. Employees and students found to have retaliated, or intentionally provided false or materially misleading information regarding alleged discrimination under this regulation, may be disciplined, up to and including dismissal or expulsion. Employees and student must not retaliate against administrative personnel (e.g., Title IX Coordinator, Investigative Authority, Decision Maker, Hearing Panel members) for processing civil rights investigations under this regulation.

Prohibited conduct includes, but is not limited to:

(a) attempting to coerce, compel, or prevent an individual from reporting alleged discrimination or providing testimony or relevant information;

(b) removing, destroying, or altering documentation or other evidence (e.g., text messages) relevant to the investigation;

(c) providing false or misleading information to member officials who are involved in the investigation and resolution of a complaint, or encouraging others to do so; and

(d) using intimidation, threats, coercion, or discrimination against any individual for the purpose of interfering with any right or privilege secured under civil rights laws and regulations, or because the individual participated in any manner in the administration, investigation, proceedings, or hearings related to this regulation.

2.12 All employees are responsible for complying with state law requiring system training on equal opportunity and nondiscrimination within 30 days of hire and every two (2) years thereafter.

3. RESPONSIBILITIES OF THE SYSTEM ETHICS AND COMPLIANCE OFFICE (SECO)

3.1 SECO, in coordination with OGC, will serve as the liaison between the members and any local, state or federal agency investigating a complaint of discrimination or conducting a civil rights audit or review.

3.2 In coordination with OGC, SECO will provide general guidance on the implementation of applicable laws, policies, regulations, rules, and appropriate training.

3.3 SECO is also responsible for the coordination of all reporting requirements related to equal opportunity and affirmative action for the system and its members.

4. CIVIL RIGHTS COMPLAINT PROCESSING

4.1 <u>Complaints</u>

4.1.1 Except as specified in Section 2.3 and 2.4, an employee who experiences, observes, or becomes aware of alleged discrimination must promptly report the

incident(s) to a member official, administrator or other designee identified in the member's applicable rule. If an employee reasonably believes that an incident constitutes sexual harassment, sexual assault, or domestic violence, dating violence, or stalking based on sex and that the incident is alleged to have been committed by or against a person who was a student enrolled at or an employee of the institution at the time of the incident, the employee must promptly report the incident to the member's Title IX Coordinator or Deputy Title IX Coordinator, or designee. Students and third parties (including, but not limited to, anyone receiving services from the member, vendors and private business associates) are strongly encouraged to report the incident(s) promptly to the member's office designated to receive such complaints. When applicable, an alleged victim of sexual harassment, sexual assault, or domestic violence, dating violence, or stalking based on sex should be encouraged to go to a hospital for treatment and/or preservation of evidence as practicable following an incident.

Any person may report sex discrimination, including sexual harassment (whether or not the person reporting is the person alleged to be the victim of conduct that could constitute sex discrimination) in person, by mail, by telephone, or by electronic mail, using the contact information listed for the Title IX Coordinator, or by any other means that results in the Title IX Coordinator receiving the person's verbal or written report. Such a report may be made at any time (including during non-business hours).

4.1.2   An employee or student is not required to report discrimination to a direct supervisor or to the alleged offender. The alleged offense may instead be reported to another member official, administrator, supervisor or other designee identified in the member's applicable rule. Each member must provide an anonymous electronic reporting option for students and employees as provided by state law.

4.1.3   Except as specified in Sections 2.2 and 2.4, the report must include all information concerning the incident known to the reporting person including whether a complainant has expressed a desire for confidentiality in reporting the incident.

4.1.4   An employee's or student's complaint alleging discrimination should be reported as soon as possible after the action that caused the complaint.

4.1.5   SECO is designated to receive, review, investigate, and adjudicate complaints against the chancellor, a member Chief Executive Officer (CEO), an employee who reports directly to a CEO or the chancellor, or a Title IX Coordinator. The chancellor or designee will serve as the designated administrator in complaints against a member CEO or an employee who reports directly to a CEO. The chair of the Board of Regents or designee will serve as the designated administrator in complaints against the chancellor or an employee who reports directly to the chancellor.

4.1.6   All complaints of discrimination should be reported immediately and immediate and appropriate supportive measures should be implemented by all levels of supervision. Reports should be made to SECO and OGC in writing (through the centralized reporting process) within two (2) business days by the designated member office.

Def_000246

Pl. App'x 120

Notification to SECO and OGC must include the:

(a) date(s) of the complaint and alleged incident(s);

(b) nature and description of the alleged conduct;

(c) name(s), category (employee, student, and/or third party) and title(s), if applicable, of the individual who was subjected to the alleged discriminatory conduct;

(d) name(s), category (employee, student, and/or third party) and title(s), if applicable, of the respondent(s), if known; and

(e) documentation of the immediate supportive measures taken.

4.1.7   Not less than once every three months, the member Title IX Coordinator must submit to the CEO a written report on all complaints of sexual harassment, sexual assault, and dating violence, domestic violence, and stalking based on sex, as well as acts of sex-based misconduct alleged to have been committed by or against a person who was a student enrolled at or an employee of the institution at the time of the incident (without personally identifying information), including information regarding:

(a) the investigation of those reports;

(b) the disposition, if any, of any disciplinary processes arising from those reports; and;

(c) the reports for which the institution determined not to initiate a disciplinary process, if any.

4.1.8   In addition, the member Title IX Coordinator will immediately report to the CEO an incident covered under Section 4.1.6 if the coordinator has cause to believe that the safety of any person is in imminent danger as a result of the incident.

4.1.9   At least once during each fall or spring semester, the CEO will submit to the Board of Regents and post on the member's website a report of complaints covered under Section 4.1.6. However, the report:

(a) may not identify any person; and

(b) must include:

(1) the number of reports received;

(2) the number of investigations conducted as a result of those reports;

(3) the disposition, if any, of any disciplinary processes arising from those reports;

(4) the number of those reports for which the institution determined not to initiate a disciplinary process, if any; and

(5) any disciplinary actions taken.

4.1.10 Each CEO will annually certify in writing to the Texas Higher Education Coordinating Board that the university is in substantial compliance with Chapter 51 Education Code, Subchapter E-2.

4.1.11 The filing of a discrimination complaint will not stop, delay or affect pending personnel or disciplinary actions. This includes, but is not limited to, performance evaluations or disciplinary actions related to an employee or student who is not performing at acceptable levels or standards or who has violated system policies or regulations or member rules.

4.2   Investigations and Adjudications

4.2.1   The designated office(s) to receive complaints of discrimination will review each one to determine if there is sufficient information to proceed with an investigation or if additional information is needed.

(a)   If the information is insufficient, the designated office, in consultation with OGC, may conduct an initial assessment into the circumstances of the complaint and (1) dismiss it as baseless; (2) close it for insufficient information to investigate or lack of jurisdiction (see 4.2.9); (3) refer it to another office which has responsibility for such complaints; or (4) with the consent of the parties, as well as with the approval of SECO, refer the complaint to informal resolution. Cases involving allegations based on sex require the submission of a formal complaint before they may be referred to informal resolution. The designated office will notify the complainant of such action in writing.

(b)   If the information is sufficient, the designated office will forward the complaint to an appointed investigative authority within five (5) business days of the determination to proceed with the investigation.

(c)   The designated office will provide written notification to the complainant(s) and the respondent(s) of: (1) receipt of the complaint stating the allegation of a violation of this regulation; (2) the appointed investigative authority; (3) the appointed designated administrator; (4) interim supportive measures, if any; (5) admonishments regarding cooperation and prohibiting retaliation, and (6) any informal resolution process that may be available.

(d)   An unredacted version of the complaint will be given to an employee respondent(s) and their advisor, if applicable, with admonishments regarding privacy.

4.2.2   At any point in the process, a respondent may be subject to removal from the member's education program or activity on an emergency basis, provided that an individualized safety and risk analysis (conducted by or in conjunction with a member's behavioral assessment team) has determined that an immediate threat to the physical health or safety of any student or other individual arising from the allegations justifies removal and provides the respondent with notice and opportunity to challenge the decision immediately following the removal. Upon being removed, any student respondent must be granted the opportunity for a hearing within five (5) business days to review whether or not the removal is

Def_000248

Pl. App'x 122

warranted. The outcome of this hearing is not subject to appeal and is not a disciplinary action. Members shall designate the assignment of a hearing authority for this purpose.

4.2.3    Section 4.2.2 above does not preclude a member from suspending with pay, reassigning, and/or placing an employee in another type of temporary status pending completion of the investigation and final resolution of the allegations. This is not a disciplinary action.

4.2.4    The member should offer the complainant(s), the respondent(s) and other affected individuals supportive measures (see Definitions). In all sex-based complaints, the Title IX Coordinator or designee must promptly contact the parties to discuss the availability of supportive measures, consider the parties' wishes with respect to supportive measures, inform the complainant of the availability of supportive measures with or without the filing of a formal complaint, and explain to the complainant the process for filing a formal complaint. Members must maintain the privacy of any supportive measures provided to the complainant or respondent to the extent that maintaining such privacy would not impair the ability of the member to provide supportive measures. The Title IX Coordinator or designee is responsible for coordinating the effective implementation of supportive measures. Failure to comply with the terms of supportive measures such as mutual no contact restrictions may be considered a separate violation of system policies and regulations and member rules and procedures. In cases in which a student complainant and student respondent are enrolled in the same course, either student may elect to drop the course without any academic penalty.

4.2.5    Both the complainant(s) and the respondent(s) must receive equitable treatment in all facets of the complaint investigation and resolution process including, but not limited to, the right to an advisor (if any), the right to present evidence and witnesses, and the right to be informed of the outcome of the investigation. Prior to any formal hearing, the role of any advisor will be limited to being present and communicating only with their advisee; advisors may not represent the party or otherwise actively participate in the process.

4.2.6    The investigative authority will review each complaint, interview witnesses (if applicable), review relevant documentation, and provide an initial draft report of their investigation to OGC for review within 30 business days. OGC will coordinate with SECO and provide its review to the investigative authority within ten (10) business days. The investigative authority will have five (5) business days to create a final draft report and share that document electronically with both the complainant and the respondent. The complainant and respondent will have ten (10) business days to review the report and submit written commentary to the investigative authority. The investigative authority will then have five (5) additional business days to prepare a final report for review by OGC and SECO, who will have five (5) business days to provide feedback. The latter review provided by OGC and SECO may be waived by mutual agreement between the member and OGC/SECO if no substantive changes were made following the initial review. The final report shall be submitted directly to the designated administrator.

Def_000249

4.2.7   Time frames for the receipt, investigation, and adjudication of complaints may be extended for good cause with written notice to the complainant and respondent of the delay and/or extension and the reasons therefor.  Good cause is to be determined by the member in consultation with OGC and SECO and reasonable extensions may be granted at the discretion of the member.  The investigative authority should send an extension request, if needed, to the office or individual who appointed them.

4.2.8   If in the course of an investigation a member decides to investigate allegations about the complainant or respondent that were not included in the original notice, the member must provide notice of the additional allegations to the parties.

4.2.9   Complaints (or formal complaints in Title IX cases) will be investigated and adjudicated under one of the following processes:

1. Title IX (see 4.2.10)
2. Sex-Based Misconduct (see 4.2.11)
3. All other civil rights complaints (see 4.2.12)

(a) When a complaint involves allegations of misconduct that involve both sex-based allegations (1 and/or 2 above) and allegations of other civil rights violations (3 above), the process shall be conducted under the requirements established for sex-based offenses (1 or 2 above).  Sex-based complaints include those complaints based on sex, sexual orientation, and/ or gender identity.

(b) In addition to reviewing complaints against students for civil rights violations, members are expected to review allegations for possible violations of codes of student conduct and professional expectations of employees.

(c) When unprofessional behavior by an employee that does not rise to the level of a violation of this regulation is discovered during the civil rights investigation and adjudication process, the information will be forwarded to the employee's supervisor.

(d) When possible violations of the code of student conduct by a student that do not rise to the level of a civil rights violation are discovered during the civil rights investigation process, and where there are no civil rights charges brought forward as a result of the investigation, the information will be forwarded for review to the student conduct process.

(e) When possible violations of the code of student conduct by a student that do not rise to the level of a civil rights violation are discovered during the civil rights investigation process, and where there is also going to be an adjudication of the civil rights violation (through a formal hearing, or through informal resolution methods that result in a finding and sanction), the case will be consolidated into one adjudication conducted under the processes described in 4.2.9(a).

(f) Any complaints involving allegations of pay disparities and/or program inequities (excluding hostile environment) will be addressed under Section 4.2.12.

Def_000250

PI. App'x 124

4.2.10  Title IX - The following applies to complaints of sexual harassment, sexual assault or domestic violence, dating violence, or stalking based on sex at member institutions of higher education only:

(a) Complaints will be processed under Title IX if all of the following apply:

  i.   The member has actual knowledge of a notice of sexual harassment or a complaint involving allegations of sexual harassment, sexual assault, and/or dating violence, domestic violence, and stalking based on sex to the member's Title IX Coordinator or any member official who has authority to institute corrective measures on behalf of the member. Imputation of knowledge based solely on vicarious liability or constructive notice is insufficient to constitute actual knowledge. Each member must designate in its rule which employees have the authority to institute corrective measures;

  ii.  A formal complaint is filed by the complainant or signed by the Title IX Coordinator (see Definitions);

  iii. The alleged behavior/conduct must have occurred against a person while in the United States;

  iv.  At the time the formal complaint was filed, the complainant was participating or attempting to participate in the member's education program or activity. This includes an enrolled student, an employee, and applicants for admission or employment at the system member, and;

  v.   The alleged conduct meets the definition of sexual harassment as set forth in this regulation (see Definitions).

(b) The burden of proof and the burden of gathering evidence sufficient to reach a determination regarding responsibility rests on the member and not on the parties, provided that the member cannot access, consider, disclose, or otherwise use a party's records that are made or maintained by a physician, psychiatrist, psychologist, or other recognized professional or paraprofessional acting in the professional's or paraprofessional's capacity, or assisting in that capacity, and which are made and maintained in connection with the provision of treatment to the party, unless the member obtains that party's voluntary, written consent to do so for the grievance process.

(c) In all investigations and in any hearing, a presumption will exist that a respondent is not responsible for the allegations until a determination is made at the conclusion of an adjudicatory process.

(d) Mandatory dismissals - If the conduct alleged in the formal complaint would not constitute sexual harassment as defined even if proved, did not occur in the member's education program or activity, or did not occur against a person in the United States, then the member must dismiss the formal complaint with regard to that conduct for purposes of sexual harassment under Title IX; such dismissal does not preclude action under another provision of the member's conduct standards, nor does it preclude the member proceeding with a civil

Def_000251

Pl. App'x 125

rights process under this Regulation as Sex-based Misconduct provided that the investigatory, adjudicatory, and informal resolution processes are administered as outlined in Section 4.2.9.

(e) Discretionary dismissals - Members may also dismiss a formal complaint if the complainant notifies the Title IX Coordinator in writing that the complainant wishes to withdraw it, if the respondent is no longer enrolled or employed by the member, or if specific circumstances prevent the member from collecting evidence sufficient to reach a determination (for example, when the complainant has ceased participating in the process; in certain fact-specific cases when the passage of time precludes the collection of sufficient evidence; when complainant's identity is not known; and when the exact same allegations have already been investigated and adjudicated); such dismissal does not preclude action under another provision of the member's conduct standards, nor does it preclude the member proceeding with a civil rights process under this Regulation as Sex-based Misconduct provided that the investigatory, adjudicatory, and informal resolution processes are administered as outlined in Section 4.2.9.

(f) Upon a dismissal required or permitted pursuant to (d) and (e) above, the member must promptly send written notice of the dismissal and the reason(s) therefore simultaneously to the parties. The parties must be given the opportunity to appeal a dismissal to the member designated appellate authority. Appeals processes will be established by each member in consultation with OGC and SECO.

(g) Members may consolidate formal complaints as to allegations of sex-based violations against more than one respondent, or by more than one complainant against one or more respondents, or by one party against the other party, when the allegations of sexual harassment arise out of the same facts or circumstances.

(h) Members must provide a notice of allegations in cases involving sex-based violations which include sufficient details known at the time and with sufficient time to prepare a response before any initial interview. Sufficient details include the identities of the parties involved in the incident, if known, the conduct allegedly constituting sexual harassment, and the date and location of the alleged incident, if known. The written notice must include a statement that the respondent is presumed not responsible for the alleged conduct and that a determination regarding responsibility is made at the conclusion of the grievance process. The written notice must inform the parties that they may have an advisor of their choice who may be, but is not required to be, an attorney, and that they may inspect and review evidence. The written notice must also inform the parties that they are prohibited from knowingly making false statements or knowingly submitting false information during the grievance process. If, in the course of an investigation, the member decides to investigate allegations about the complainant or respondent that were not included in the original notice, the member must provide notice of the additional allegations to the parties whose identities are known.

(i) Members must provide to each party whose participation in the investigation

is invited or expected written notice of the date, time, location, participants, and purpose of all hearings, investigative interviews, and other meetings, with sufficient time for the party to prepare to participate.

(j) Members must provide an equal opportunity for the parties to present witnesses, including fact and expert witnesses, and other inculpatory and exculpatory evidence; not restrict the ability of either party to discuss the allegations under investigation or gather and present relevant evidence; provide the parties with the same opportunities to have others with them during the grievance proceeding, including the opportunity to be accompanied to any related meeting or proceeding by the advisor of their choice; and not limit the choice or presence of the advisor in any meeting or grievance proceeding. However, the member may establish restrictions regarding the extent to which the advisor may participate in the proceedings, as long as the restrictions apply equally to both parties. Advisors who fail to adhere to established rules may be dismissed from the process at the discretion of the member.

(k) After the final draft investigation report is prepared, members must provide parties an equal opportunity to inspect and review any evidence obtained as part of the investigation that is directly related to the allegations raised in the formal complaint, including the evidence upon which the member does not intend to rely in reaching a determination regarding responsibility, and inculpatory or exculpatory evidence whether obtained from a party or other source, so that each party can meaningfully respond to the evidence prior to the conclusion of the investigation. This includes sending to each party and the party's advisor, if any, the final draft investigation report (with exhibits) subject to inspection and review in an electronic format or a hard copy, and the parties must have at least ten (10) days to submit a written response, which the investigative authority will consider prior to final completion of the investigative report. Both the report and the collected evidence will be unredacted to the extent allowed by law. Investigation reports should include a statement of the allegation(s), a listing of individuals interviewed including the dates of the interviews, all inculpatory and exculpatory evidence collected in the investigation, credibility assessments (which may not be based an individual's status as a complainant, respondent, or witness), and a listing of relevant documents attached to the report as exhibits. Reports should not contain speculation, opinions, findings, decisions, or recommendations for sanctions.

(l) After the investigative authority has reviewed responses from the parties (if any), a final investigation report will be developed and sent to SECO and OGC for review, along with the responses from the parties. SECO and OGC have five (5) business days to provide feedback to the investigative authority, at which point the investigative authority will then have five (5) business days to finalize the investigation report. The final investigation report will be issued to the designated administrator. The review by OGC and SECO may be waived by mutual agreement between the member and OGC/SECO if no substantive changes were made to the draft report previously reviewed by OGC/SECO.

(m) The designated administrator or designee will provide the final investigative

Def_000253

Pl. App'x 127

report and exhibits to the parties. The parties will be provided a pre-hearing conference to review the hearing process as well as to explore any available options for informal resolution. The parties will be provided at least ten (10) business days to review the final investigative report and to respond in writing to the designated administrator (if desired) prior to the hearing.

(n) At any time prior to the adjudication of a formal complaint, the parties may seek informal resolution to resolve the complaint. Informal resolution is described in 4.6.

(o) Administrative conferences - If the complainant, respondent, and member all agree on both the findings associated with the allegations and the sanctions to be imposed, a designated administrator may reach a written resolution of the complaint without a hearing, provided any sanctions imposed are in compliance with the sanctioning requirements noted in 4.5.5. The pre-hearing conference may serve as the administrative conference. Administrative conferences are considered a form of informal resolution (see 4.6).

(p) If a formal complaint cannot be resolved through an informal process or if either the complainant or the respondent requests a hearing, a formal live hearing will be conducted by the designated administrator (a hearing officer or hearing panel). Under this option, the following rules apply:

    i. Unless waived by the parties, following the pre-hearing conference the parties will be given a minimum of five (5) business days notice of any formal hearing. The notice must include the date, time, and location of the hearing, as well as instructions for those participating in hearings through online means.

    ii. Hearings will be closed to the public. Members must create an audio or audiovisual recording, or transcript, of any live hearing and make it available to the parties for inspection and review. Physical access to the recording or transcript must be provided upon request for the purpose of preparing an appeal following the hearing.

    iii. A complainant and a respondent at a hearing must have an advisor with them. In cases in which a party does not have an advisor, the university will provide a trained advisor to assist them in the hearing process. Training requirements for university advisors are outlined in the Training Requirements (see 1.9).

    iv. Cross-examination of the complainant, respondent, and any witnesses may not be conducted by the opposing party but must be conducted by their advisor. Questions are to be directed to the hearing officer or hearing panel chair, who will determine whether or not each question will be admitted into the hearing. If a question is deemed repetitious or not relevant, the decision-maker(s) must explain the decision to exclude it. When parties are being subject to cross-examination, the advisor may not answer on behalf of the party.

    v. Questions and evidence about the complainant's sexual predisposition or prior sexual behavior are not relevant, unless such questions and evidence about the complainant's prior sexual behavior are offered to prove that

Def_000254
Pl. App'x 128

someone other than the respondent committed the alleged conduct, or if the questions and evidence concern specific incidents of the complainant's prior sexual behavior with respect to the respondent and are offered to prove consent. The hearing panel chair or hearing officer makes final determinations on the relevance of questions and evidence.

vi. Attendance at a hearing may be in person or may be conducted through remote means, provided that all parties and the hearing officer or hearing panel can see and hear one another in real time during the course of the hearing.

vii. Hearing officers/hearing panels cannot draw an inference regarding responsibility based solely on a party's or witness's absence from the live hearing or refusal to answer cross-examination or other questions.

viii. No hearing officer or hearing panel member can also serve as an investigative authority or appellate authority in the same complaint. Students (who are otherwise not full-time employees) may not serve in the role of investigative authority, hearing officer, hearing panel member, or appellate authority.

ix. When a hearing panel is being utilized to resolve a complaint, either a voting chairperson or non-voting administrative advisor who does not serve on the panel shall oversee the live hearing and deliberations, and assist in the development of a finding of fact, decision rationale, and, when appropriate, a sanction rationale in consultation with the panel members.

x. Following the hearing, the hearing officer or hearing panel will develop a draft decision and submit the draft to SECO within two (2) business days. SECO will have a maximum of three (3) business days to provide feedback to the hearing officer/hearing panel. Thereafter, the designated administrator will have a maximum of three (3) additional business days to issue a decision letter. The decision letter must be sent simultaneously to both/all parties.

xi. Decision letters must include:

1. The identification of the allegations;

2. A description of the procedural steps taken from the receipt of a formal complaint through determination, including any notifications to the parties, interviews with parties and witnesses, site visits, methods used to gather other evidence, and hearings held if any;

3. Findings of fact supporting the determination;

4. Conclusion regarding the application of the member's conduct standards to the facts;

5. A statement of, and rationale for, the result as to each allegation, including a determination regarding responsibility, any disciplinary sanctions the member imposes on the respondent, and whether remedies designed to restore or preserve equal access to the

member's education program or activity will be provided by the member to the complainant, and;

6. The member's procedures and permissible bases for the complainant and respondent to appeal.

xii. If for any reason there is reasonable cause for a member to delay the issuance of the decision letter, this will be communicated to the parties by the designated administrator or designee.

xiii. If a student respondent withdraws or graduates from a member university pending the resolution of a complaint, the process will continue and, the member university will not issue a transcript on behalf of the student until the conclusion of the process.

xiv. Member universities, upon request by another postsecondary educational institution, must provide to the requesting institution any determination that a student violated the member university's code of conduct by committing sexual harassment, sexual assault, sex-based misconduct, and/or dating violence, domestic violence, and/or stalking based on sex.

4.2.11 Sex-based Misconduct - The following applies to complaints of sex-based misconduct at all member universities and agencies:

(a) Cases involving allegations of sexual harassment, sexual assault, and dating violence, domestic violence, and/or stalking based on sex that are subject to mandatory or discretionary dismissal from the Title IX process may be subject to investigation and adjudication as sex-based misconduct at the discretion of the Title IX Coordinator, in consultation with OGC and SECO.

(b) All cases involving sex-based allegations are to be investigated and adjudicated under the procedures outlined in 4.2.10, noting that the process is to determine whether or not the allegations are substantiated and, if substantiated, created a hostile environment.

4.2.12 All Other Civil Rights Complaints (Non sex-based) - The following applies to all civil rights complaints based on race, color, religion, national origin, age, disability, genetic information, and/or veteran status:

(a) After SECO's and OGC's review of the initial draft report, the investigative authority will have five (5) business days to create a final draft report and share that document electronically with both the complainant and the respondent. The complainant and respondent will have ten (10) business days to review the report and submit responses and/or written, relevant questions that the party wants asked of any other party or witness. The investigative authority will, provide each party with the other party's questions and answers, and allow for additional, limited follow-up questions from each, provide each party with the questions and answers, and allow for additional, limited follow-up questions from each party. The investigative authority will have ten (10) business days to complete this process. The investigative authority must explain to the party proposing the questions any decision to exclude a question as repetitious or not relevant.

Def_000256
Pl. App'x 130

(b) The investigative authority will then have five (5) additional business days to prepare a final report for review by OGC and SECO. Once approved by OGC and SECO, the final report shall be submitted directly to the designated administrator. Circumstances may warrant extensions to the time frames in this section. The investigative authority should send an extension request, if needed, to the office or individual who appointed them. Both the complainant(s) and the respondent(s) should be notified of any extensions in writing.

(c) Investigation reports should include a statement of the allegation(s), a listing of individuals interviewed including the dates of the interviews, all inculpatory and exculpatory evidence collected in the investigation, credibility assessments (which may not be based an individual's status as a complainant, respondent, or witness), and a listing of relevant documents attached to the report as exhibits. Investigators must conclude, based on the preponderance of the evidence, whether or not the alleged behavior/conduct occurred, did not occur, or there was insufficient evidence to establish that the behavior occurred or not, but will not determine whether or not the behavior establishes a violation of system or member regulations or rules. Reports should not contain speculation, opinions, findings, decisions, or recommendations for sanctions.

(d) At any time prior to the adjudication of a formal complaint, the parties may seek informal resolution to resolve the complaint. Informal resolution is described in 4.6.

4.3   Decisions (non sex-based cases)

4.3.1   For a complaint against an employee or third party, the designated administrator will review the investigation report and provide a draft decision to OGC for review within five (5) business days after receiving the investigative authority's report. OGC will coordinate with SECO and provide its review of the draft decision within five (5) business days. The designated administrator will have five (5) business days to finalize the decision and provide it to the complainant(s), the respondent(s), and the investigative authority. In cases in which the allegations are substantiated, the final decision will be provided to the respondent's supervisor. Circumstances may warrant extensions to the time frames in this section. The designated administrator should send an extension request, if needed, to the office or individuals who appointed them. Both the complainant(s) and the respondent(s) should be notified of any extensions in writing.

4.3.2   For student respondent cases, the investigation report will be used as directed in the university's student conduct rules.

4.3.3   For a complaint against a student, it is impractical for OGC to review the intended decision prior to issuance by the hearing officer or hearing panel. Universities are therefore exempt from obtaining OGC review of the decision prior to issuance but may request assistance from OGC and SECO when needed.

4.3.4   When the respondent(s) is an employee, both the complainant(s) and the

respondent(s) may review a copy of the investigation report and exhibits, with admonishments regarding privacy, after the decision is rendered. The report will be redacted in accordance with state and/or federal law.

4.4 <u>Sanctions</u>

4.4.1 Disciplinary sanctions or other actions that are not supportive measures may not be imposed on respondents prior to a determination of responsibility except in cases meeting the requirements for removal on an emergency basis.

Remedies, which may be disciplinary or punitive in nature and may burden the respondent, must be designed to restore or preserve the complainant's equal access to the member's education program or activity. Members must describe or list the range of possible disciplinary sanctions and remedies that the member may implement following any determination of responsibility for any discrimination finding in their member rule.

4.4.2 The designated administrator may decide sanctions, if any, or may delegate the sanctioning decision to another authority within the member. Sanctioning decisions involving employees must be determined in consultation with OGC. The sanctioning authority may review an unredacted copy of the investigation report and exhibits.

4.4.3 Sanctions may have educational, restorative and rehabilitative components for employees and/or students. In addition, employee sanctions may have punitive components. Examples of sanctions may include, but are not limited to, written warning or reprimand, required training and/or counseling, "no contact" order, probation, suspension, and employment dismissal and/or student expulsion from an educational institution. For students, expulsion is a disciplinary action taken to teach them that their actions and conduct have consequences, which includes ineligibility to continue as a member of the educational community.

4.4.4 Students found responsible for committing dating or domestic violence and/or non-consensual sexual penetration of another person will be subject to a minimum sanction of a one-year suspension, in the absence of significant mitigating factors. Students found responsible for these acts who have demonstrated predation for the purpose of carrying out these acts will be subject to permanent expulsion.

4.4.5 Member universities must establish guidelines for sanctions and remedies for sexual harassment or sexual misconduct student violations. These guidelines must be disseminated widely to the university community and utilized in the training of adjudicators and appellate officers. A model guidelines document, *Model Sanctioning Matrix for Sexual Violence and Sexual Harassment Violations by Students in The Texas A&M University System*, is an appendix to this regulation. Guidelines adopted by members must be consistent with the *Model Sanctioning Matrix* included in the appendix to this regulation.

4.4.6 Students found responsible for committing acts of sexual harassment, sexual assault, and dating violence, domestic violence, stalking based on sex, and/or any

Def_000258

Pl. App'x 132

other sex-based misconduct who are allowed to return to a member university after a suspension of one year or more will be ineligible to hold an office in any student organization, ineligible to represent the university in any way (including intercollegiate athletics or other competitions, both on and off campus), and ineligible to receive an institutional scholarship, in the absence of significant mitigating factors.

4.4.7   For other sex-based student conduct rule violations, member universities must establish a process to determine the student's eligibility to represent the university in extracurricular activities, both on and off campus. The initial determination of eligibility must exclude any administrator who has an inherent conflict of interest in the student's participation in a particular activity (e.g., the coach of a student-athlete, the advisor to a student club or organization).

4.4.8   When an employee is found to have sexually harassed or engaged in sex-based misconduct (as defined by this regulation) another member of the university or agency community, the sanction will be termination of employment.

4.4.9   Universities may not take any disciplinary action against an enrolled student or employee who in good faith reports to the university being the victim of, or a witness to, an incident of sexual harassment, sexual assault, dating violence, or stalking for a violation by the student or employee of the university's code of conduct occurring at or near the time of the incident and reasonably related to the incident, for which suspension, expulsion, or dismissal from the university is not a possible punishment, regardless of the location at which the incident occurred or the outcome of the university's disciplinary process regarding the incident, if any. This does not apply to a student or employee who reports their own commission or assistance in the commission of sexual harassment, sexual assault, dating violence, or stalking.

4.4.10  For sex discrimination complaints, both the complainant(s) and the respondent(s) will be informed in writing of any and all sanctions, except when to do so would violate state or federal law (e.g., Family Educational Rights and Privacy Act).

4.5   Appeals

4.5.1   Appeal of Decision and/or Sanctions – Allegations of Sex Discrimination. With respect to allegations of sex discrimination, including sexual harassment and sex-based misconduct, the designated administrator's decision and the sanction(s) imposed by the sanctioning authority can be appealed by the complainant(s) and/or the respondent(s), but only on the following bases, as applicable:

(a) a procedural irregularity that affected the outcome;

(b) new evidence, not reasonably available at the time the determination regarding responsibility or dismissal was made, that could affect the outcome. The new evidence must be provided at the time of appeal with the appropriate member appeals form;

Def_000259

Pl. App'x 133

(c) the Title IX Coordinator, investigator(s), or decision-maker(s) had a conflict of interest or bias for or against complainants or respondents generally or the individual complainant or respondent that affected the outcome;

(d) the appropriateness or severity of the sanctions.

4.5.1.1  In order to avoid the appearance of a conflict of interest, appeals on any of these bases must be directed to an authority who had no previous involvement and/or participation in the investigation and/or decision. The appellate authority must be specified in the member's rule, whose decision with regard to the appeal will be final.

4.5.1.2  The appeal will be confined to a review of the written documentation and record of the investigation and/or hearing, and pertinent documentation regarding the grounds for appeal. The appeal does not create an entitlement to a new investigation or a full re-hearing of the complaint. The appeal process for both the complainant(s) and the respondent(s) must be equitable, but not necessarily identical. The appeal must be filed within five (5) business days of notification of the decision. The appeals process carries a presumption that the original decision was correct unless a preponderance of the evidence demonstrates that one or more of the conditions of the appeal are met, and that either or both parties was deprived of a fair process.

4.5.1.3  Members must notify the other party in writing when an appeal is filed and implement appeal procedures equitably for both parties. Parties will be given three (3) business days to review the appeal and submit any written response in support of, or challenging, the outcome to the appellate authority.

4.5.1.4  If the respondent is an employee or third party, the appellate authority will provide a draft decision to OGC for review within five (5) business days after receiving the appeal(s). OGC will coordinate with SECO and provide its review of the draft decision within five (5) business days. The appellate authority will then have five (5) additional business days to finalize the decision and provide it to the complainant(s), the respondent(s), and the investigative authority simultaneously to the extent possible. If the complaint on appeal is substantiated, the respondent's supervisor will also be informed. Circumstances may warrant extensions to the timeframes in this section. The appellate authority should send extension requests, if needed, to the office or individual(s) who appointed them. Both the complainant(s) and the respondent(s) must be notified of any extensions in writing.

4.5.1.5  For student cases, the appellate authority has ten (10) business days to reach the decision and provide it to the complainant(s), the respondent(s), and the investigative authority simultaneously to the extent possible. Appellate authorities are exempt from obtaining OGC review of the decision prior to issuance but may request assistance from OGC and SECO when needed.

Def_000260

Pl. App'x 134

4.5.1.6  The appellate authority may reach one of the following outcomes:

    (a)  affirm the original finding and sanction;

    (b)  affirm the finding and modify the sanction; or

    (c)  remand the case to a new hearing or review.

4.5.2  <u>Appeals – Allegations of Discrimination Not Based on Sex</u>.  Any employee disciplined pursuant to this regulation may appeal that action in accordance with System Policy *12.01, Academic Freedom, Responsibility and Tenure*; System Policy *32.01, Employee Complaint and Appeal Procedures*; System Regulation *32.01.01, Complaint and Appeal Procedures for Faculty Members*; System Regulation *32.01.02, Complaint and Appeal Process for Nonfaculty Employees*; and/or other system policies or regulations as appropriate.

Any student receiving a sanction of separation (expulsion or suspension) pursuant to this regulation may appeal the sanction in accordance with the member rule and/or code of conduct for student grievances.

4.5.3  Employees appealing sanctions issued pursuant to this regulation will receive an unredacted copy of the investigation report and exhibits, upon request, with admonishments regarding privacy.

## 4.6  <u>Informal Resolution</u>

4.6.1  At any time prior to the determination of a final decision, the parties may seek informal resolution to resolve the complaint.  The following conditions apply to informal resolution:

    (a)  Informal resolution is a voluntary process.  No party may be compelled to participate in informal resolution.  The system member, in consultation with SECO, must agree to allow an informal resolution to move forward and must obtain the parties' voluntary, written consent to the informal resolution process.

    (b)  Prior to an informal resolution, the parties will be provided with: (a) written notice of the allegations; (b) the requirements of the informal resolution process, including the circumstances under which it precludes the parties from resuming a formal complaint arising from the same allegations; and (c) the consequences of withdrawing from the informal process and resuming the formal process, and including the records that will be maintained or could be shared.

    (c)  Once a party agrees to participate in informal resolution, they may withdraw from the process at any time prior to a final agreement and resume the formal grievance process. Information shared in the informal resolution process may not be introduced into the formal process without independent evidence.

    (d)  Once a final agreement is established through informal resolution, the complaint may not return to the formal complaint process unless one or both parties fails to abide by any conditions established in the agreement.

Pl. App'x 135

(e) Informal resolution options include mediation, restorative conferences, shuttle facilitation, and other forms of facilitated dialogue. Each member must work in consultation with SECO in developing informal resolution programs and the conditions for their use.

(f) Mediation may not be used to resolve complaints of rape, statutory rape, dating violence, domestic violence, or any case in which imminent threats of harm may exist.

(g) Members may not offer an informal resolution process in sex-based complaints unless a formal complaint is filed and may not offer or facilitate an informal resolution process to resolve allegations that an employee sexually harassed a student.

## Related Statutes, Policies or Requirements

Family Educational Rights and Privacy Act (FERPA)

The Equal Pay Act of 1963

Title VII of the Civil Rights Act of 1964, as amended

The Age Discrimination in Employment Act of 1967

The Age Discrimination Act of 1975

Title IX of the Education Amendments of 1972

The Rehabilitation Act of 1973, as amended

Americans with Disabilities Act of 1990, as amended

The Genetic Information Nondiscrimination Act of 2008

Executive Order 11246, as amended

Executive Order 13672

Texas Commission on Human Rights Act

Texas Fair Housing Act

Tex. Educ. Code 51 Subchapter E-2, Reporting Incidents of Sexual Harassment, Sexual Assault, Dating Violence, and Stalking

Tex. Educ. Code § 51.282, Sexual Harassment, Sexual Assault, Dating Violence, and Stalking

Tex. Lab. Code, Ch. 21, Employment Discrimination

08.01.01 Civil Rights Compliance

Def_000262

Pl. App'x 136

*System Policy 08.01, Civil Rights Protections and Compliance*

*System Policy 12.01, Academic Freedom, Responsibility and Tenure*

*System Policy 32.01, Employee Complaint and Appeal Procedures*

*System Regulation 32.01.01, Complaint and Appeal Process for Faculty Members*

*System Regulation 32.01.02, Complaint and Appeal Process for Nonfaculty Employees*

This regulation supersedes:

> System Regulation *33.02.01, EEO and Affirmative Action Programs*
>
> System Regulation *33.02.02, Compliance with Employment Provisions of the Americans with Disabilities Act*
>
> System Regulation *34.01.01, Sexual Harassment*

## Appendix

*Model Sanctioning Matrix for Sexual Violence, Sexual Harassment, and Sex-based Misconduct by Students in The Texas A&M University System*

*Minimum Training Requirements for Civil Rights Investigations, Advisement, Adjudication, Appeals, and Informal Resolution in The Texas A&M University System*

## Member Rule Requirements

A rule is required to supplement this regulation. See Section 1.4.

## Contact Office

System Ethics and Compliance Office
(979) 458-6203



## 08.99.99.W1   **Expressive Activity on Campus**

Approved May 14, 2020
Revised July 28, 2025~~June 25, 2024~~
Next Scheduled Review June 25, 2029

---

## Rule Summary

---

West Texas A&M University is committed to providing an educational climate that is conducive to the personal and professional development of each individual. In fulfilling its missions as an institution of higher education, it encourages the free exchange of ideas. The university will protect the freedom of speech, expression, petition, and peaceful assembly as set forth in the U.S. Constitution and Texas state law. West Texas A&M University maintains its right to regulate reasonable time, place, and manner restrictions concerning acts of expression and dissent.

In 2019, the 86th Texas Legislature passed Senate Bill 18, addressing the protection of campus expressive activities. This new law ~~adds~~ added Texas Education Code Section 51.93<u>1</u>5, which requires that each public institution of higher education "adopt a policy detailing student's rights and responsibilities regarding expressive activities" on its campus. In 2025, the 89th Texas Legislature passed Senate Bill 2972, which made significant changes to 51.9315. The changes made by SB 2972 are effective September 1, 2025.

As stated in the Preamble to ~~the bill:~~SB 18: Freedom of expression is of critical importance and requires each public institution of higher education to ensure free, robust, and uninhibited debate and deliberations by students enrolled at the institution, regardless of whether the students are on or off campus. It is a matter of statewide concern that all public institutions of higher education officially recognize freedom of speech as a fundamental right. Freedom of speech and assembly is central to the mission of institutions of higher education and persons should be permitted to assemble peaceably on the campuses of institutions of higher education for expressive activities, including to listen to or observe the expressive activities of others.

This rule has been amended to comply with Governor Abbott's Executive Order GA-44, dated March 27, 2024.

**EXHIBIT**
**19**

---

## Rule

---

1. EXPRESSIVE ACTIVITY RIGHTS

1.1. Any person is allowed, subject to limitations in this rule, and reasonable time, place and manner restrictions, to engage in expressive activities on campus, including by responding to the expressive activities of others. Students enrolled at and employees of the university must present proof of identity and status at the university on request by a university official on campus engaging in an official duty.

1.2. Student organizations and employees are allowed to invite speakers to speak on campus subject to the restrictions outlined in this rule. In determining the amount of a fee to be charged for use of the university's facilities for purposes of engaging in expressive activities, the university may consider only content-neutral and viewpoint-neutral criteria related to the requirements of the event, such as the proposed venue and the expected size of the audience, any anticipated need for campus security, any necessary accommodations, and any relevant history of compliance or noncompliance by the requesting student organization or employee with this rule and other relevant rules. The university may not consider any anticipated controversy related to the event.

1.3. The university may not act against a student organization or deny the organization any benefit generally available to other student organizations at the university based on a political, religious, philosophical, ideological, or academic viewpoint expressed by the organization or of any expressive activities of the organization.

    1.3.1. The university may take disciplinary or remedial action against individuals or groups that engage in expressive activity not protected by this rule or the First Amendment[1]. Sanctions which may be imposed include all those identified in the WTAMU Student Handbook.

    1.3.2. Expressive activities which may result in sanctions and are not protected by this rule or the First Amendment include: defamation, obscenity, physical abuse or assault,; true threats,; disruption of the academic environment or a university-—sponsored extracurricular event,; inciting or producing imminent unlawfullawless action,; or illegal unlawful harassment.

    1.3.3. Conduct described in 1.3.2 may be reviewed and adjudicated under A&M System Regulation 08.01.01 Civil Rights Compliance, including those related to actionable discrimination or harassment based on race, color, sex, religion, national origin, age, disability, genetic information, veteran status, sexual orientation, gender identity, or any other classification protected by federal, state, or local law[2]. Additionally, such conduct may also be reviewed and adjudicated by the WTAMU Office of Community Standards using the Student Conduct process when the conduct does not rise to the level of a civil rights violation.

1.4. The common outdoor areas of the university's campus are deemed traditional public forums. Any person is permitted to engage in expressive activities in these areas freely, as long as the person's conduct: (a) is not unlawful; and (b) does not materially and substantially disrupt the functioning of the institution. ~~Members of the university community are~~Any person is allowed to assemble or distribute written material in common outdoor areas without a permit or other permission from the institution, subject to the restrictions outlined in this rule.

> 1.4.1.  As outlined in Section 2, West Texas A&M University may require advance reservation of events in certain circumstances to ensure safety and to promote an environment conducive to study.

> 1.4.2.  There are areas such as residences and the Cornette Library that have distance requirements, crowd placement restrictions, and security concerns that may vary depending on security needs, terror alerts, and other factors. Additionally, security needs, terror alerts, local and national events may affect the availability of spaces that would otherwise be routinely available. Information about existing requirements, restrictions, or security concerns will be discussed at the time a reservation request is processed.

> 1.4.3.  The University reserves the right to have policies that are reasonable time, place, and manner restrictions in common outdoor areas if the restrictions: (a) are narrowly tailored to serve a significant university interest; (b) employ clear, published, content-neutral, and view-point neutral criteria; (c) provide for ample alternative means of expression; and (d) allow all persons to assemble or distribute written material without a permit or other permission from the university.

> ~~1.5.~~1.4.4.  The Texas A&M University Board of Regents, by review and approval of this rule, have sole authority to designate the areas on member campuses that are public forums (including both traditional public forums and designated public forums.), in a manner consistent with the First Amendment to the U.S. Constitution and Section 8, Article I of the Texas Constitution.

---

[1] This rule must be applied in a manner consistent with the Dear Colleague Letter (July 28, 2003) issued by the Department of Education related to First Amendment and civil rights laws compliance.

[2] This includes unprotected activities motivated by antisemitism and other forms of shared ancestry discrimination as listed in the Dear Colleague Letter (Nov. 7, 2023) issued by the Department of Education in the wake of the tragic events of October 7, 2023.

1.5. Nothing in this rule should be interpreted or construed as:

    1.5.1. -prohibiting faculty members from maintaining order in the classroom.

    1.5.2. limiting or infringing on a person's right to freedom of speech or expression protected by the First Amendment to the U.S. Constitution or by section 8, Article I, Texas Constitution.

    1.5.3. prohibiting the university from having rules differentiating between the rights of students and employees to engage in expressive activities on campus and the rights of those individuals who are not students or employees.

1.6. This rule categorically prohibits the following expressive activity on campus:

    1.6.1. Using a device to amplify sound that, as determined by the university, (a) intimidates others; (b) interferes with campus operations; (c) interferes with a university employee's or a peace officer's lawful performance of a duty.

    1.6.2. During the last two weeks of a semester, engaging in the following expressive activities in a manner that materially and substantially disrupts the functioning of the university: (a) having events in the common outdoor areas; (b) inviting speakers to speak on campus; (c) using a device to amplify sound; or (d) using drums or other percussive instruments.

    1.6.3. At any time, camping or erecting tents or other living accommodations on campus.

    1.6.4. Wearing a disguise or other means of concealing a person's identity while engaging in expressive activities on campus with the intent to: (a) obstruct the enforcement of the university's rules or the law by avoiding identification; (b) intimidate others; or (c) interfere with a university employee's or a peace officer's lawful performance of a duty.

    1.6.5. Lowering the university's U.S. flag, Texas flag, or university flag, with the intent to raise the flag of another nation, state, or a flag representing an organization or group of people.

    1.6.6. Engaging in expressive activity between the hours of 10:00 p.m. and 8:00 a.m. in a manner that materially and substantially disrupts the functioning of the university.

2. Advance Reservation Requirements

    2.1. In an effort to ensure safety and to promote an environment conducive to study, advanced reservation for expressive activity is required (in the form of an approved Reservation Request for Space) for events or activities that are promoted in advance, and/or sponsored by student organizations, and/or expected to draw a

crowd of more than 25 people. Advance reservation is also required for activities near intersections, and/or in close proximity to academic buildings anytime classes, and/or study activities, and/or research are taking place.

3.  Reservation Procedures

3.1. Individuals or groups who are either required to make advance reservation (see Section 2) or those individuals or groups who otherwise wish to make advance reservations on campus must request use of the space through the university's reservation process, which can be found here: https://reservations.wtamu.edu/. If advance reservation is required (see Section 2), requests must be made at least five business days in advance of the event. Additional collaboration and coordination may be required from a building/space proctor. Usually, use of the space will be assigned to the person or organization that requests the area first. University sponsored events have first priority on the use of campus facilities. The university reserves the right to locate any assembly so as to ensure that the activity does not interfere with the normal operation of the university or interfere with the rights of others.

3.2. The decision to confirm a request for space will be based on proper and timely completion of the reservation process (found here: https://reservations.wtamu.edu/), compliance with applicable sound and sign requirements, and availability of space. The decision to confirm will be based on the foregoing criteria, and in no circumstance will any decision be based on the content or viewpoint of the expressive activity or upon the expected reaction of others. If a request is denied, the rationale for the decision will be provided in writing. The denial of a reservation request can be appealed to the Vice President for Student Affairs or a designee. At the time of the request, the following information will be required:

3.2.1.  Name information of the person or organization sponsoring the event. Contact information for one individual who will be present during the course of the event.

3.2.2.  Location, date, and time requested for the event.

3.2.3.  General purpose of the event.

3.2.4.  List of planned activities (i.e., speech or rally, march with signs, distribution of literature, sit-in).

3.2.5.  Special equipment requested.

3.3. For recognized student organizations, an officer of the sponsoring organization must be present at the event, and during the entire course of the event.

3.4. Guidelines for Expression

3.4.1.  Disruptive Activity – Obstruction, disruption or interference with classes, research, administrative functions or other university activities is not permitted. Likewise, infringement on the rights of others is

prohibited.

3.4.2.  Reasonable Access – It is important to provide reasonable access to, and exit from, any office, classroom, laboratory, or building. Likewise, vehicular and pedestrian traffic should not be obstructed.

3.4.3.  Picketing – Picketing in an orderly manner outside of university buildings may be permitted. Such activities should not become disruptive, nor should they impede access. Picketing is not permitted inside campus buildings.

3.4.4.  Literature – Literature may be distributed in traditional designated public forums. Such activities should not become disruptive, nor should they impede access.

3.4.5.  Symbolic Protest – Displaying a sign, gesturing, wearing symbolic clothing or otherwise protesting silently is permissible unless it is a disruptive activity or impedes access. In addition, such acts should not block the audience's view or prevent the audience from being able to pay attention.

3.4.6.  Noise – Making sustained or repeated noise in a manner that substantially interferes with speakers' ability to communicate their message is not permitted. Noise levels should not interfere with classes, meetings or activities in progress or the privacy of residence hall students.

3.4.7.  Force or Violence – Any attempt to prevent a university activity or lawful assembly by the threat or use of force or violence is not permissible.

3.4.8.  Presenting Identification – In accordance with Texas Education Code 51.209, it is unlawful for any persons on any property either owned or controlled by the university to refuse to identify themselves to a university official in response to a request. For the purpose of this rule people identify themselves by presenting student or faculty/staff ID card or government issued ID card.

3.4.9.  Damage to Property – Any damage to university or personal property in the course of, or as a result of, an expressive activity is prohibited. Care should be taken to ensure that university and personal property is not damaged or destroyed. This includes the campus lawns, shrubs, and trees.

3.4.10. Aesthetics – Exterior-facing messages, including but not limited to signs, posters, flags, or banners, on the windows of any West Texas A&M University building, other than a student's room in the residence halls, are prohibited.

3.4.11. Other University Rules – All applicable University Rules and Student

Rules should be followed whenever engaging in activities on campus. Consult the WTAMU Student Handbook for further information.

~~1.6.~~3.5. All individuals participating in expressive activity are expected to comply with state and federal law, municipal ordinances, and the above guidelines. Failure to do so may result in immediate removal from the campus and any other appropriate action by university officials and/or University Police.

~~2.~~4.    COMPLAINT PROCEDURE

~~2.1.~~4.1. Any person who believes that their campus expressive activity rights, as recognized by this rule, have been unduly interfered with by a student, student organization, or employee has the right to file a complaint.

~~2.2.~~4.2. Complaints should be filed on the university's online complaint form, found at: https://apps.wtamu.edu/complaint/. ~~www.wtamu.edu/complaint.~~

~~2.3.~~4.3. Any acts that are disruptive to the normal operations of the university, including classes and university business, or that invade the rights of others will not be tolerated. A student, student organization, or employee who is found to have unduly interfered with another person's expressive activity rights, as recognized by this rule, is subject to disciplinary action in accordance with the university's applicable rules and procedures. Any participant in a disruptive activity may also face criminal charges. ~~—~~

~~2.4.~~4.4. All complaints will be administered by the university complaint process found on the complaint website: www.wtamu.edu/complaint. If a violation of this rule was found to occur the report will be referred to the appropriate office for further action. The referral office will be determined by the status of the offending individual. Complaints concerning (a) faculty will be referred to the Office of the Provost; (b) students will be referred to the Student Conduct Office; and (c) complaints concerning staff and third parties will be referred to Human Resources.

~~3.~~5.    IMPLEMENTATION

5.1. A copy of this rule must be provided to students during New Student Orientation.
5.2. This rule must be posted on the university's website.
5.3. A link to this rule must be included in both student and employee handbooks.
~~3.1. will be included in any university published Code of Student Life.~~
~~3.2. A copy of this rule will be distributed each semester when the Code of Student Life is normally distributed electronically.~~

~~3.3.        A copy of this rule will be posted to the university's website.~~

~~4.~~6.      EXTERNAL CLIENT EVENTS

~~4.1.~~6.1. Events organized by an external party and held on campus must be sponsored by a recognized student organization, university academic or administrative unit, or a Texas A&M University System member (see University Standard Administrative Procedure 24.99.99.M0.02, External Client Events for applicable

procedures).

---

## Related Statutes, Policies, or Requirements

Texas Education Code § 51.9315
Texas Government Code §448.001
Executive Order GA-44 March 27, 2024
WTAMU Student Handbook
System Regulation 08.01.01 Civil Rights Compliance

U.S. DOE Dear Colleague Letter July 28, 2023
U.S. DOE Dear Colleague Letter November 7, 2023

---

## Definitions

1. **Antisemitism** means a certain perception of Jews that may be expressed as hatred toward Jews. The term includes rhetorical and physical acts of antisemitism directed toward Jewish or non-Jewish individuals or their property or toward Jewish community institutions and religious facilities[3] Antisemitic conduct comprised of behavior expressed in section 1.3.2 of this rule can be sanctioned by the university. Examples of antisemitism are included with the International Holocaust Remembrance Alliance's "Working Definition of Antisemitism" adopted on May 26, 2016.

2. **Benefit** ~~means~~ includes, but is not limited to recognition by or registration with the university, the use of the university's facilities for meetings or speaking purposes, the use of channels of communication controlled by the university, and funding sources made generally available to student organizations at the university.

3. **Campus** means all land and buildings owned or leased by the university, including remote locations.~~.~~

4. **Common outdoor areas** mean places located outside a building or facility that are accessible to the public, such as streets, sidewalks, plazas, lawns, and parks, unless closed by the university for a special event. This term does not include areas immediately adjacent to a private residence.

5. **Designated public forums** include other parts of campus that may be temporarily available for expressive activity as designated by the university. These temporary locations, while in existence, will be treated similar to public streets, sidewalks, and parks in terms of access and availability for expressive activity. (Obstructing or impeding the flow of vehicular or pedestrian traffic is prohibited.)

4. **Disruptive Activity** is the obstruction, disruption or interference with classes, research, administrative functions, or other university activities, and is not permitted. Likewise, infringement on the rights of others is prohibited.

5.6.        **Employee** means an individual employed by the university.

6.7.        **Expressive Activity** means any speech or expressive conduct protected by the First Amendment to the United States Constitution or by Section 8, Article I, Texas Constitution, and includes assemblies, protests, speeches, the distribution of written material, the carrying of signs, and the circulation of petitions. The term does not include commercial speech, defamation, unlawful harassment, incitement to imminent unlawful activity, obscenity, or threats to engage in unlawful activity.

7.8.        **Faculty** means any full or part-time employee of the university holding an academic appointment.

8.9.        **Illegal Harassment** means expressive conduct that is so severe and pervasive and objectively offensive that it denies or limits a person's ability to participate in or benefit from an educational program or activity. See TAMU System Regulation 08.01.01.

9.10.        **Inciting or producing imminent lawless action** means speech or behavior that ~~prevents~~ presents a clear, present, and imminent threat of physical harm or property damage.

11. **Materially and substantially disrupt(s)** means interrupting a program or activity in a significant and consequential manner.

10.12.        **Non-public forums** are areas that are not traditional public forums or designated public forums. These include areas that are not by tradition or designation forums for public communication. These forums will be restricted to use for their intended purpose and are not available for public expressive activity. Examples include, but are not limited to, classrooms, residence hall rooms, faculty and staff offices, academic buildings, administration buildings, medical treatment facilities, libraries, research and computer laboratories, and research facilities.

11.13.        **Person** means students, faculty, staff, student organizations, and third parties.

12.14.        **Reasonable time, place, and manner restrictions** means limitations that:
        12.1.14.1.  are narrowly tailored to serve a significant institutional interest;
        12.2.14.2.  employ clear, published, content-neutral, and viewpoint-neutral criteria;
        12.3.14.3.  provide ample alternative means of expression.

---

[3] Texas Government Code, Section 448.001.

13.15.      **Staff** means an employee of the university that is not a faculty member.

14.16.      **Student** means an individual currently enrolled at the university, full or part-time, pursuing undergraduate, graduate, or professional studies, including students who were enrolled the previous semester and registered for a future semester.

15.17.      **Student Organization** means any organization that is composed mostly of students enrolled at an institution of higher education and that receives a benefit from the institution.

16.18.      **Third-party (external client)** means an individual or entity that is not a student, student organization, or employee of the university.

17.19.      **Traditional public forum** means a place, widely recognized in law, which has been intended for the use of the public, and has been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions when the principal function of the location would not be disrupted by expressive activity. Examples of traditional public forums include public streets, sidewalks, plazas, lawns, and parks. These areas are generally available for expressive activity, planned or spontaneous, for the individual or small groups (generally where a crowd of 25 or less will be present, and/or where an event is not promoted in advance, and/or when an event is not sponsored by a student organization) at any time without the need for reservation, or prior approval. (Obstructing or impeding the flow of vehicular or pedestrian traffic is prohibited.)

18.20.      **True Threats** means communication of a serious expression of an intent to harm a specific person or group of people.

## Appendix

None

## Revision History

Revised June 25, 2024

## Contact Office

Student Affairs
(806) 651-2025

## Approval Office

Office of the President
(806) 651-2100

## Approval Signature

_____                    06.25.2024
President/CEO                               Date

**System Approvals***

Approved for Legal Sufficiency:

_____                    6/25/24
Ray Bonilla                                Date
General Counsel

Approved:

_____                    6/25/24
John Sharp                                 Date
Chancellor

*System approvals are contingent upon incorporation of any and all System-required changes in the rule's final posting.

Pl. App'x 150

# 08.02.01 Expressive Activity on Campus

Approved: November 13, 2025
Next Scheduled Review: November 13, 2030



---

## Regulation Summary

In accordance with System Policy *08.02, Expressive Activity on Campus*, this regulation outlines the rights and responsibilities regarding expressive activities at member campuses.

---

## Definitions

1. **Antisemitism** means a certain perception of Jews that may be expressed as hatred toward Jews. The term includes rhetorical and physical acts of antisemitism directed toward Jewish or non-Jewish individuals or their property or toward Jewish community institutions and religious facilities.[1] Antisemitic conduct comprised of behavior expressed in section 1.4.1 of this regulation will not be tolerated by the system or its members.

2. **Benefit** includes, but is not limited to, recognition by or registration with the member, the use of the member's facilities for meetings or speaking purposes, the use of channels of communication controlled by the member, and funding sources made generally available to student organizations at the member.

3. **Campus** means all land and buildings owned or leased by the member, including those at branch campuses and remote locations.

4. **Common outdoor areas** mean places located outside a building or facility that are accessible to the public, such as streets, sidewalks, plazas, lawns, and parks, unless closed by the member for a special event. This term does not include areas immediately adjacent to a private residence or secure facility.

5. **Designated public forums** include other parts of campus that may become temporarily available for expressive activity as designated by the member. These temporary locations, while in existence, will be treated similar to public streets, sidewalks, and parks in terms of access and availability for expressive activity. (Obstructing or impeding the flow of vehicular or pedestrian traffic is prohibited.)

6. **Disruptive Activity** is the obstruction, disruption or interference with classes, research, administrative functions, or other member activities, and is not permitted. Likewise, infringement on the rights of others is prohibited.

7. **Employee** means an individual employed by the member.

8. **Expressive activity** means any speech or expressive conduct protected by the First Amendment to the United States Constitution or by Section 8, Article   Texas Constitution,

---

[1] Tex. Gov't Code § 448.001.
08.02.01, Expressive Activity on Campus

**EXHIBIT 20**

Page 1 of 6

and includes but is not limited to assemblies, protests, speeches, the distribution of written material, the carrying of signs, and the circulation of petitions. The term does not include defamation, unlawful harassment, incitement to imminent unlawful activity, obscenity, or threats to engage in unlawful activity.

9. **Faculty** means any full or part-time employee of the member holding an academic appointment.

10. **Inciting or producing imminent lawless action** means speech or behavior that is directed to inciting or producing imminent unlawful action and is likely to incite or produce such action.

11. **Limited public forums** have limited open access for public expression, or they may be limited to particular groups or particular topics.

12. **Materially and substantially disrupt(s)** means interrupting a program or activity in a significant and consequential manner.

13. **Member** means a system academic institution or the System Offices (for purposes of the RELLIS Academic Alliance at the RELLIS Campus).

14. **Non-public forums** are areas that are not traditional public forums or designated public forums. These include areas that are not by tradition or designation forums for public communication. These forums will be restricted to use for their intended purpose and are not available for public expressive activity. Examples include, but are not limited to, classrooms, residence hall rooms, faculty and staff offices, academic buildings, administration buildings, medical treatment facilities, libraries, research and computer laboratories, and research facilities.

15. **Person** means students, faculty, staff, student organizations, and third parties.

16. **Reasonable time, place, and manner restrictions** means limitations that: (1) are narrowly tailored to serve a significant institutional interest; (2) employ clear, published, content-neutral, and viewpoint-neutral criteria; (3) provide for ample alternative means of expression.

17. **Staff** means an employee of the member that is not a faculty member.

18. **Student** means an individual currently enrolled at the member, full or part-time, pursuing undergraduate, graduate, or professional studies, including students who were enrolled the previous semester and registered for a future semester.

19. **Student Organization** means any organization that is composed mostly of students enrolled at an institution of higher education and that receives a benefit from the institution.

20. **Third party** means a person that is not a member student, student organization, or employee.

21. **Traditional public forum** means a place, widely recognized in law, which has been intended for the use of the public, and has been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions when the principal function of the location would not be disrupted by expressive activity. Examples of traditional public forums include public streets, sidewalks, plazas, lawns, and parks. These areas are generally available for expressive activity, planned or spontaneous, for the individual or small groups of individuals at any time without the need for reservation or prior approval. (Obstructing or impeding the flow of vehicular or pedestrian traffic is prohibited.)

22. **True Threats** means communication of a serious expression of intent to harm a specific person or group of people or commit unlawful violence.

Pl. App'x 152

23. **Unlawful Harassment** means conduct that is so severe and pervasive and objectively offensive that it denies or limits a person's ability to participate in or benefit from an educational program or activity. See System Regulation 08.01.01.

# Regulation

1.  EXPRESSIVE ACTIVITY RIGHTS & RESPONSIBILITIES

    1.1.    Any person is allowed, subject to the limitations in this regulation and a member's reasonable time, place, and manner restrictions, to engage in expressive activities on campus, including by responding to the expressive activities of others.

    1.2.    Students and employees must present proof of identity and status at the member on request by a member official on campus engaging in an official duty.

    1.3.    Student organizations and employees are allowed to invite speakers to speak on campus, subject to the restrictions outlined in this regulation. In determining the amount of a fee to be charged for use of the member's facilities for purposes of engaging in expressive activities, the member may consider only content-neutral and viewpoint-neutral criteria related to the requirements of the event, such as the proposed venue and the expected size of the audience, any anticipated need for campus security, any necessary accommodations, and any relevant history of compliance or noncompliance by the requesting student organization or employee with this regulation and other relevant member rules. The member may not consider any anticipated controversy related to the event.

    1.4.    The member may not take action against a student organization or deny the organization any benefit generally available to other student organizations at the member on the basis of a political, religious, philosophical, ideological, or academic viewpoint expressed by the organization or of any expressive activities of the organization.

        1.4.1.  The member may take action against persons who engage in expressive activity that is not protected by this regulation or the First Amendment.

        1.4.2.  Expressive activities that may result in sanctions and are not protected by this regulation or the First Amendment include the following: defamation, obscenity, physical abuse or assault, true threats, disruption of the academic environment or member-sponsored extracurricular event; inciting or producing imminent unlawful activity; or unlawful harassment.

        1.4.3.  Conduct described in 1.4.2 may be reviewed and adjudicated under System Regulation *08.01.01, Civil Rights Compliance*, including those related to actionable discrimination or harassment based on race, color, sex, religion, national origin, age, disability, genetic information, veteran status, or any other classification protected by federal, state, or local law.[2] Additionally, said conduct may also be reviewed and adjudicated under the member's student conduct code when the conduct does not rise to the level of a civil rights violation.

---

[2] This includes unprotected activities motivated by antisemitism and other forms of shared ancestry discrimination as listed in the Dear Colleague Letter (Nov. 7, 2023).

Pl. App'x 153

1.5.    The common outdoor areas of the member's campus, unless otherwise identified by the member in its approved expressive activity rule, are deemed traditional public forums. Any person is permitted to engage in expressive activities in these areas freely, as long as the person's conduct: (a) is not unlawful; and (b) does not materially and substantially disrupt the functioning of the institution. Any person is allowed to assemble or distribute written material in common outdoor areas without a permit or other permission from the institution, subject to the restrictions outlined in this regulation.

    1.5.1.    As outlined in Section 2, members may require advance reservation of events in certain circumstances to ensure safety and to promote an environment conducive to study.

    1.5.2.    There are areas such as residences, secure facilities, utility buildings, etc., that have distance requirements, crowd placement restrictions, and security concerns that may vary depending on security needs, terror alerts, and other factors. Additionally, security needs, terror alerts, and local and national events may affect the availability of spaces that would otherwise be routinely available. Information about existing requirements, restrictions, or security concerns will be discussed at the time a reservation request is processed.

    1.5.3.    The members retain the right to adopt reasonable time, place, and manner restrictions in common outdoor areas if the restrictions: (a) are narrowly tailored to serve a significant member interest; (b) employ clear, published, content-neutral, and view-point neutral criteria; (c) provide for ample alternative means of expression; and (d) allow all persons to assemble or distribute written material without a permit or other permission from the member.

1.6.    Nothing in this regulation should be interpreted or construed as:

    1.6.1.    prohibiting faculty members from maintaining order in the classroom.

    1.6.2.    limiting or infringing on a person's right to freedom of speech or expression protected by the First Amendment to the U.S. Constitution or by section 8, Art. I, Texas Constitution.

    1.6.3.    prohibiting the member from maintaining rules differentiating between the rights of students and employees and the rights of those persons who are not students or employees.

1.7.    This regulation categorically ***prohibits*** the following expressive activity on campus:

    1.7.1.    Using a device to amplify sound that, as determined by the member, (a) intimidates others in a manner that rise to the level of a true threat or another exception to First Amendment protection; (b) interferes with campus operations in a matter that materially and substantially disrupts the functioning of the member; or (c) interferes with a member employee's or a peace officer's lawful performance of a duty.

    1.7.2.    During the last two weeks of a semester, engaging in the following expressive activities in a manner that materially and substantially disrupts the functioning of the member: (a) having events in the common outdoor areas; (b) inviting speakers to speak on campus; (c) using a device to amplify sound; or (d) using drums or other percussive instruments.

1.7.3. At any time, camping or erecting tents or other living accommodations on campus.

1.7.4. Wearing a disguise or other means of concealing a person's identity while engaging in expressive activities on campus *with the intent to*: (a) obstruct the enforcement of the member's rules or the law by avoiding identification; (b) intimidate others in a manner that rises to the level of a true threat or another exception to First Amendment protection; or (c) interfere with a member employee's or a peace officer's lawful performance of a duty.

1.7.5. Lowering a member-owned or controlled flag, including the U.S. flag, Texas flag, or member's official flag, *with the intent to* raise the flag of another nation, state, or a flag representing an organization or group of people. Member-owned flag poles are not to be used for private expression.

1.7.6. Engaging in expressive activity between the hours of 10:00 p.m. and 8:00 a.m. in a manner that materially and substantially disrupts the functioning of the member.

2. ADVANCE RESERVATION REQUIREMENTS

Notwithstanding section 1.5.3, to ensure safety and to promote an environment conducive to study, research, and scholastic activity, an advanced reservation for expressive activity is required for events or activities that are near intersections, and/or in close proximity to academic or research buildings anytime classes, study activities, and/or research or scholarly activity are taking place.

3. ADDITIONAL RESPONSIBILITIES

3.1. <u>Other Member Rules</u>

All applicable system regulations and member rules must be followed whenever engaging in activities on campus.

3.2 <u>Compliance with Law</u>

All persons participating in expressive activity are expected to comply with state and federal law, and applicable municipal ordinances. Failure to do so may result in immediate removal from the campus and any other appropriate action by member officials and/or University Police.

4. GRIEVANCE PROCEDURE

4.1. Any person who believes that their campus expressive activity rights, as recognized by this regulation, have been unduly interfered with by a student, student organization, or employee has the right to file a grievance.

4.2. Member rules will designate the appropriate office for grievances filed by staff, faculty, students, and third parties.

4.3. Those who choose to observe and/or listen to expressive activities bear the responsibility of recognizing and honoring the right of free speech. Any acts that are disruptive to the normal operations of the member, including classes and member business, or that invade the rights of others will not be tolerated. A student, student organization, or employee who is found to have unduly interfered with another person's expressive activity rights, as recognized by this regulation, is subject to

Pl. App'x 155

disciplinary action in accordance with the member's applicable rules and procedures. Any participant in a disruptive activity may also face criminal charges.

5. IMPLEMENTATION

5.1. A copy of this regulation and the member's expressive activity rule must be provided to students during new student orientation programs.

5.2. This regulation and the member's expressivity activity rule must be posted on the member's website.

5.3 A link to this regulation and the member's expressive activity rule must be included in student and employee handbooks, if maintained by the member.

## Related Statutes, Policies, or Requirements

Texas Education Code § 51.9315, *Protected Expression on Campus*.
Texas Government Code § 448.001
Executive Order GA-44 (March 27, 2024)

## Appendix

Member Rule Template

## Contact Office

General Counsel
(979) 458-6120

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

SPECTRUM WT, *et al.*,

        Plaintiffs,

v.

WALTER WENDLER, *et al.*,

        Defendants.

No. 2:23-cv-00048

## DEFENDANT WALTER WENDLER'S SECOND AMENDED RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Pursuant to Federal Rules of Civil Procedure 33 and 34, Defendant, Walter Wendler, in his official capacity, hereby submit his objections and responses to Plaintiff's First Set of Interrogatories to Defendant Wendler.

## GENERAL STATEMENT

Defendant Wendler's responses and objections are based on the information known to Defendant Wendler at this time and are made without prejudice to the assertion of additional responses and objections should Defendant identify additional grounds thereof. Defendant reserves the right to supplement, clarify, revise, or correct any or all their responses to Plaintiff's Interrogatories and Requests for Production. By answering any requests, Defendant does not concede the materiality of the subject to which it refers. Defendant's responses are made expressly subject to, and without waiving or intending to waive, any questions, or objections as to the competency, relevancy, materiality, privilege, or admissibility as evidence or for any other purpose, of any of the documents or information provided, or of the subject matter thereof, in any proceeding including the trial of this action or any subsequent proceeding.

## GENERAL OBJECTIONS

1. Defendant objects to Plaintiff's 11-prong definition of "identify" as overbroad and unduly burdensome to the extent that it demands information irrelevant to the ongoing litigation.

2. Defendant objects to each interrogatory directing it to "identify every person" it has communicated with concerning Plaintiff's drag shows to the extent that such requests seek

1



Pl. App'x 157

information collected in preparation for this litigation and communications protected by attorney-client privilege.

3. Defendant objects to each interrogatory directing it to "[s]tate all facts," "[i]dentify each reason," "[s]tate all bases," or something similar. Defendant is not obligated to furnish all its evidence at this stage of litigation. *See* Fed. R. Civ. P. 33; *see also Faykus-Orr v. Liberty Life Assur. Co. of Boston*, No. 3:06-cv-0750, 2006 WL 3734213, at *4 (N.D. Tex. Dec. 18, 2006) ("Defendant is not required to marshal plaintiff's evidence for her.").

4. Defendant objects to each interrogatory to the extent that it seeks publicly available information or information that is equally available to Plaintiff.

5. Defendant objects to each interrogatory to the extent that it is overbroad or unduly burdensome, requesting information neither proportional to the needs of this case nor within the scope of discovery.

6. Defendant objects to each interrogatory to the extent that it requests information about non-parties to the litigation who are beyond the scope of Defendant's control.

## RESPONSES AND OBJECTIONS TO INTERROGATORIES

### Interrogatory No. 1

Identify every person Wendler communicated with concerning Plaintiff, drag shows, A Fool's Drag Race, the Sam Houston drag show, the Don't Be A Drag Drag Show, the "Draggieland" performance(s) at Texas A&M University, the February 28, 2025 resolution of the Texas A&M University System entitled "Resolution Regarding Certain Public Events on the Campuses of Universities in the Texas A&M University System," or the Litigation since January 1, 2022.

**Response:**

Defendant objects to this interrogatory because it is multifarious, vague, overbroad, not within the scope of discovery, as it is not "proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *See* Fed. R. Civ. P. 26(b)(1). The Sam Houston drag show was an off-campus event planned and facilitated entirely by Plaintiff. President Wendler was not apprised of details concerning that event before or at the time of its occurrence. Moreover, no "Draggieland" performances have occurred at

2

WTAMU or are at issue in this litigation.

Defendant further objects to the phrase "every person Wendler communicated with" to the extent it is vague, impermissibly overbroad, and potentially seeks information that is not only irrelevant to any party's claim or defense but also which concerns non-parties whose deliberations and activities are not within President Wendler's custody or control.

Subject to and without waiving the foregoing objections, President Wendler communicated with the following Texas A&M University ("TAMU") System and West Texas A&M University ("WTAMU," or "University") officials and employees regarding Plaintiff's proposed drag shows in 2023 or 2024:  WTAMU Vice Presidents Chris Thomas and Todd Rasberry; WTAMU Executive Vice President Neil Terry; WTAMU Chief of Staff Tracee Post; (former) WTAMU Communication and Community Outreach Specialist Amberly Winningham; WTAMU donor Alex Fairly; (former) TAMU System Chancellor John Sharp; and TAMU Assistant Vice Chancellor for Governmental Relations David Rejino.

On March 20, 2023, and March 18, 2024, President Wendler emailed memoranda discussing his decision not to permit Plaintiff's drag show in Legacy Hall to substantially all students, faculty, and staff on the University's listserv. The memoranda were likely forwarded to many others unknown to Defendant.

President Wendler's communication with Alex Fairly and David Rejino was limited to an "FYI" email putting them on notice of his 2023 memorandum after its publication.  President Wendler's communications with Todd Rasberry, Amberly Winningham and Tracee Post were for editing purposes.  Tracee Post and Amberly Winningham provided grammatical and stylistic editorial suggestions for President Wendler's 2023 memorandum before its publication. Todd Rasberry also reviewed the 2023 document and made non-substantive editorial suggestions.

**Interrogatory No. 2**

Identify every person who provided input (or was provided a draft version of) President Wendler's March 20, 2023 statement on or before March 20, 2023.

**Response:**

Defendant objects to the phrase "every person who provided input" to the extent it is vague, ambiguous, and potentially seeks information that is not relevant to any party's claim or defense. Moreover, the request for "every person who provided input" concerning President Wendler's March 20, 2023, statement imposes upon Defendant a burden to identify all people who may have set eyes on the statement on or before March 20, 2023, without regard to those individuals' degree of "input" or relationship to WTAMU.

Subject to and without waiving foregoing objections, Defendant responds as follows:

3

Tracee Post (Chief of Staff) and Amberly Winningham (former WTAMU Communication and Community Outreach Specialist) provided grammatical and stylistic editorial suggestions for President Wendler's 2023 memorandum before its publication. Todd Rasberry (WTAMU Vice President for Philanthropy and External Relations) also reviewed the 2023 document and made non-substantive editorial suggestions.

**Interrogatory No. 3**

Identify every person who participated in any decision to cancel any of Plaintiff Spectrum WT's proposed events.

**Response:**

Defendant objects to the phrase "every person who participated" as vague and ambiguous.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

It was President Wendler's decision alone to not permit Plaintiff's proposed drag shows at Legacy Hall, as reflected in his two memoranda to the University community dated March 20, 2023, and March 18, 2024. To President Wendler's knowledge, all other events sponsored by Plaintiff on the West Texas A&M University campus during his time at WTAMU were not cancelled but proceeded.

**Interrogatory No. 4**

Identify every basis for canceling Plaintiff's drag shows at Legacy Hall.

**Response:**

Defendant objects to this interrogatory because it is unreasonably cumulative or duplicative of prior statements which have been produced in this lawsuit. Defendant objects to this request because the discovery requested can be obtained from some other source that is more convenient, less burdensome, or less extensive. *See* FED. R. CIV. P. 26(b)(2)(C)(i).

Subject to and without waiving the foregoing objections, Defendant responds as follows:

In deciding not to permit Plaintiff's drag shows at Legacy Hall in March 2023 and March 2024, President Wendler was guided by his obligation to ensure that West Texas A&M University remains a discrimination-free workplace and learning environment where all students, faculty, and staff are treated with dignity and respect. Respect is a core value of WTAMU. President Wendler believes all members of the campus community not only enjoy certain rights and privileges but also bear certain responsibilities. Among those responsibilities is the commonsense imperative to refrain from conduct that disrespects, demeans, or dehumanizes others. Legacy Hall is a limited public forum

4

that should not be used for events that are inappropriate or inconsistent with WTAMU's core values and educational mission or that risk violations of law or exposure of minors to lewd conduct that may be obscene according to standards applicable to such minors. President Wendler's decisions were generally consistent with the following non-exhaustive list of statutes, policies, procedures, rules, and regulations (some of which have been enacted or placed in effect during the pendency of this action but after March 2024:

### I. Federal and State Statutes and Policies

    a. Title IX of the Educational Amendments Act of 1972 ("Title IX")

    b. Texas Senate Bill 12 ("S.B. 12"), enacted during the Legislature's 88th Regular Session.

When he did not permit Plaintiff's 2024 drag show at Legacy Hall, President Wendler was aware of proposed and later enacted legislation, S.B. 12, which criminalizes "'sexually oriented performances' on public property in the presence of minors." *The Woodlands Pride, Inc. v. Paxton*, No. 23-20480, 2025 U.S. App. LEXIS 29217, at *6 (5th Cir. Nov. 6, 2025) (citing TEX. HEALTH & SAFETY CODE ANN. § 769.002; TEX. LOC. GOV'T CODE ANN. § 243.0031; and TEX. PENAL CODE ANN. § 43.28).

    c. Texas Senate Bill 12 ("S.B. 12"), enacted during the Legislature's 89th Regular Session.

While this litigation has been pending, the Texas Legislature enacted "S.B. 12," which, in relevant part, prevents Texas public "school district[s][and] open-enrollment charter schools" from "provid[ing] or allow[ing] a third party to provide instruction, guidance, activities, or programming regarding sexual orientation or gender identity to [K-12] students . . . ." *See* TEX. EDUC. CODE §28.0043.

    d. Exec. Order No. 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, 90 Fed. Reg. 8615 (Jan. 20, 2025) (acknowledging the "biological reality of sex" and warning "[f]ederal funds shall not be used to promote gender ideology")

    e. Exec. Order No. 14190, Ending Radical Indoctrination in K-12 Schooling, 90 Fed. Reg. 8853 (Feb. 3, 2025) (empowering federal agencies to, among other things, "prevent or rescind [f]ederal funds . . . from being used by a[] . . . secondary school to directly or indirectly support or subsidize . . . a violation of . . . Title IX")

    f. Letter from Governor Abbott to University Systems (May 8, 2024) (ordering public universities in Texas "not to comply with President Biden's . . revision of Title IX")

    g. Letter from Governor Abbott to State Agencies (Jan. 30, 2025) (requiring state agencies to "reject[] radical sexual orientation and gender identity ideologies").

    h. "Resolution Regarding Certain Public Events on the Campus of Universities in the Texas A&M University System," dated February 28, 2025 (declaring on-campus drag shows "likely to create or contribute to a hostile environment for women contrary to

System anti-discrimination policy and Title IX") and directive from Chancellor Sharp thereafter.

## II. TAMUS Policies and Regulations

   i.  TAMUS Regulation 08.01, entitled "Civil Rights Protections and Compliance"
   j.  TAMUS Regulation 08.01.01, entitled "Civil Rights Compliance"
   k.  TAMUS Policy 08.02, entitled "Expressive Activity on Campus"TAMUTAMU Regulation 08.02.01, entitled "Expressive Activity on Campus"
   l.  TAMUS Policy 13.02, entitled "Student Rights and Obligations"

## III. WTAMU Rules and Procedures

   m.  WTAMU Rule 07.03.01.W1, entitled "Political Campaign Events"
   n.  WTAMU Rule 08.01.01.W1, entitled "Civil Rights Compliance"
   o.  WTAMU Rule 08.99.99.W1, entitled "Expressive Activity on Campus"
   p.  WTAMU Rule 08.99.99.W1, entitled "Expressive Activity on Campus" (revised July 28, 2025)
   q.  WTAMU Procedure 24.01.01.W0.01, entitled "Facility Use Request Procedure"
   r.  WTAMU's Code of Student Life: Rules and Procedures for Students (Updated August 2020)
- Relevant sections include, but are not limited to:
  1. General Purpose
  2. WTAMU Mission Statement
  3. WTAMU Core Values
  4. Student Centered Philosophy
  5. Affirmative Action/Equal Opportunity
  6. Procedures and Rules for Students
  7. Student Bill of Rights
  8. Students' Responsibilities
  9. Free Speech and Advocacy on Campus
  10. Section A: Student Conduct Mission and Policies
  11. Student Rules on (a) disorderly conduct; (b) disruptive activity; (c) harmful, threatening or endangering conduct; (d) harassment; and (e) sexual misconduct.
  12. Hazing
  13. Explosives, Fireworks, and Weapons
  14. Violation of Published University Rules or Regulations
  15. Violation of Federal, State, Local Law and/or University Procedures
  16. Civil Rights & Title IX Complaints
  17. Definition of "Gender-based Harassment," located in Appendix A

   s.  WTAMU Student Handbook 2022-2023
- Relevant sections include, but are not limited to:
  1. Student Life Rules

2. Student Bill of Rights
3. Community Standards
4. Failure to Comply and Disorderly Conduct
5. Food & Beverages
6. Misuse of Skateboards, Rollerblades, Scooters, Bicycles, Self-Balancing Boards, or Similar Modes of Transportation
7. Hazing
8. Violation of Federal, State, Local Law and/or University Rules and Procedures
9. Propose Revisions

t. WTAMU Student Handbook 2023-2024
- Relevant sections include, but are not limited to:
  1. Welcome Statement
  2. Foreword
  3. Student Life Rules
  4. Student Bill of Rights and Responsibilities
  5. Community Standards
  6. Explosives, Fireworks, and Weapons
  7. Failure to Comply and Disorderly Conduct
  8. Harassment
  9. Sexual Misconduct
  10. Food & Beverages
  11. Misuse of Transportation
  12. Hazing
  13. Violation of Federal, State, Local Law and/or University Rules and Procedures
  14. Propose Revisions

u. WTAMU Student Handbook 2025-2026
- Relevant sections include, but are not limited to:
  1. Welcome Statement
  2. Foreword
  3. Students' Rights and Responsibilities
  4. Community Standards
  5. Expressive Activity
  6. Failure to Comply and Disorderly Conduct
  7. Firearms, Ammunition, and Weapons
  8. Food and Beverages
  9. Harassment
  10. Hazing
  11. Misuse of Transportation
  12. Sexual Misconduct
  13. Soliciting on Campus
  14. Violation of Federal, State, Local and/or University Procedures
  15. Civil Rights and Title XI

7

Pl. App'x 163

16. Propose Revisions
- v. WTAMU Jack B. Kelley Student ("JBK") Center Procedures & Guidelines (2023 and 2025 editions)
  - Relevant sections in the 2023 edition include, but are not limited to:
    1. Mission Statements
    2. General Policies
    3. Decorations
  - Relevant sections in the 2025 edition include, but are not limited to:
    1. Mission Statements
    2. General Policies
    3. Buffaloes Traditions Program
    4. Institutional Priority Events
    5. Marketing/Advertising
- w. WTAMU Statement on Equal Opportunity/Nondiscrimination (available at: https://www.wtamu.edu/about/information/equal-opportunity-nondiscriminatio n.html)
- x. Campus Organizations Handbook
- y. WTAMU Pre-University Program ("PUP") Frequently Asked Questions (available at: https://www.wtamu.edu/admissions/pre-university-program/pup-faq.html)
- z. WTAMU PUP Program Agreement Forms (for Independent School Districts)
- aa. WTAMU PUP Program Agreement Form (for Homeschool Students)

Hard copies of several materials in this list are already in Plaintiff's possession. Defendant included items d, e, f, h, i, j, t, v, w, x, y, bb, cc, and ee in the Exhibits Binder that it presented to Plaintiff during the parties' status conference on September 10, 2025.

Aside from the above-mentioned statutes, policies, procedures, and rules, please see President Wendler's memoranda to the campus community entitled "A Harmless Drag Show? No Such Thing," dated March 20, 2023, and "Spectrum WT Application for On-Campus Drag Show," dated March 18, 2024. Defendant has produced a non-exhaustive list of the many publications and materials he considered contemporaneously with his 2023 response. *See, e.g.,* Def_000749–Def_000821.

President Wendler also took into account both the custom of according respect to individuals of all races and genders in the University community, and the custom of not publicly disrespecting, denigrating, demeaning, or negatively caricaturing individuals of other races and genders. In his view, maintaining those customs is important to achieving the educational mission of WTAMU; to living up to WTAMU's core value of Respect; to attracting and retaining quality students, faculty, and employees at WTAMU; and to garnering and retaining critical public and private financial and community support for WTAMU.

**Interrogatory No. 5**

8

State all facts known to Wendler individually that he relied on in deciding to cancel A Fool's Drag Race.

**Response:**

Defendant objects to the phrase "all facts known to Wendler individually" to the extent it is vague, ambiguous, and potentially seeks information that is not relevant to any party's claim or defense. Moreover, Plaintiff does not define the term "facts." Defendant objects to this interrogatory because it is unreasonably cumulative or duplicative of prior statements which have been produced in this lawsuit. Defendant further objects to this request because the discovery requested can be obtained from some other source that is more convenient, less burdensome, or less extensive. *See* FED. R. CIV. P. 26(b)(2)(C)(i).

Subject to and without waiving the foregoing objections, Defendant hereby incorporates Response to Interrogatory No. 4 above and further responds as follows. President Wendler was aware of the following facts:

- Plaintiff planned to host its drag performance in Legacy Hall, located in the JBK Student Center on the WTAMU campus.
- As President and CEO of WTAMU, President Wendler is obligated to create a discrimination-free learning and work environment for WTAMU students, faculty, and staff.
- WTAMU endeavors to ensure all individuals are treated with dignity and respect; indeed, respect is a core value of WTAMU, and it is the obligation of university leaders to safeguard and further that value.
- Executive university administrators must make difficult and important decisions with which some inevitably will disagree.
- WTAMU students have rights, privileges, and responsibilities as members of the University community, including the responsibility to treat each other with basic respect.
- WTAMU seeks to meet or exceed the expectations of its internal and external stakeholders, including the Panhandle community, the WTAMU community, and those who provide the public and private resources essential to WTAMU.
- WTAMU reserves the right to cancel on-campus events or programming that is inappropriate or inconsistent with the University's mission or policies.
- Drag performances commonly involve biological men dressing up as and impersonating women in an attempt to parody gender norms.
- Drag performances often may exaggerate aspects of femininity and womanhood in a manner that may reasonably be perceived as disrespectful to women.
- Drag performances often may include conduct reasonably deemed to be lewd or sexually risqué by community standards in the Texas Panhandle, especially those standards applicable to minors.
- Plaintiff planned to host a drag performance hosted by a non-student billed as Myss Myka, also known as Mr. Michael Arredondo, in WTAMU's Legacy Hall.
- Plaintiff did not initially advertise A Fool's Drag Race as a "PG-13" event.

- Plaintiff did not specify what criteria it used in rating A Fool's Drag Race as "PG-13."
- Plaintiff stated that it would permit minors to attend A Fool's Drag Race if they were accompanied by a parent or guardian.
- Plaintiff stated that proceeds from Plaintiff's 2023 drag show would be donated to the Trevor Project, a non-profit organization focused on suicide prevention in the LGBTQ+ community.
- Off campus venues were expected to be available to Plaintiff for drag shows so that a restriction on the use of Legacy Hall would not prevent Plaintiff from exercising any claimed First Amendment rights to conduct drag shows.
- Plaintiff claimed that its drag shows express a message of LGBTQ+ acceptance, but Plaintiff has expressed that message through other events that do not disrespect others. Plaintiff remains free to do so on the WTAMU campus.

## Interrogatory No. 6

Identify every statute, policy, rule, regulation, or custom Wendler individually relied upon in deciding to cancel A Fool's Drag Race.

## Response:

Defendant objects to this request to the extent the terms "policy," "rule," "regulation," or "custom" are vague or ambiguous. Defendant further objects to this request because it is unreasonably cumulative or duplicative of the A&M System policies and regulations, and WTAMU rules and procedures themselves. *See* Fed. R. Civ. P. 26(b)(2)(C)(i). The requesting party's ability to obtain the information is similar to that of the responding party. *See* Fed. R. Civ. P. 26(b)(1).

Subject to and without waiving the foregoing objections, Defendant hereby incorporates Responses to Interrogatories 4 and 5 and further responds as follows:

In deciding not to permit A Fool's Drag Race at Legacy Hall, President Wendler was guided by his obligation to ensure that West Texas A&M University remains a discrimination-free workplace and learning environment where all students, faculty, and staff are treated with dignity and respect. As the President and CEO of WTAMU, President Wendler must make difficult and important decisions which balance students' needs with the needs of the larger campus community. These decisions inevitably are unpopular with some. He believes all members of the campus community not only enjoy certain rights and privileges but also bear responsibilities to refrain from conduct that disrespects, demeans or dehumanizes others. President Wendler's decisions were generally consistent with the following non-exhaustive list of statutes, policies, procedures, rules, and regulations:

### I. Federal and State Statutes and Policies
    a. Title IX of the Educational Amendments Act of 1972 ("Title IX")
    b. Texas Senate Bill 12 ("S.B. 12"), enacted during the Legislature's 88th Regular Session.

Pl. App'x 166

    c. Texas Senate Bill 12 ("S.B. 12"), enacted during the Legislature's 89th Regular Session.

    d. Exec. Order No. 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, 90 Fed. Reg. 8615 (Jan. 20, 2025) (acknowledging the "biological reality of sex" and warning "[f]ederal funds shall not be used to promote gender ideology")

    e. Exec. Order No. 14190, Ending Radical Indoctrination in K-12 Schooling, 90 Fed. Reg. 8853 (Feb. 3, 2025) (empowering federal agencies to, among other things, "prevent or rescind [f]ederal funds . . . from being used by a[] . . . secondary school to directly or indirectly support or subsidize . . . a violation of . . . Title IX")

    f. Letter from Governor Abbott to University Systems (May 8, 2024) (ordering public universities in Texas "not to comply with President Biden's . . . revision of Title IX")

    g. Letter from Governor Abbott to State Agencies (Jan. 30, 2025) (requiring state agencies to "reject[] radical sexual orientation and gender identity ideologies").

    h. "Resolution Regarding Certain Public Events on the Campus of Universities in the Texas A&M University System," dated February 28, 2025 (declaring on-campus drag shows "likely to create or contribute to a hostile environment for women contrary to System anti-discrimination policy and Title IX")

## II. TAMU Policies and Regulations

    i. TAMUS Regulation 08.01, entitled "Civil Rights Protections and Compliance"

    j. TAMU Regulation 08.01.01, entitled "Civil Rights Compliance"

    k. TAMUS Policy 08.02, entitled "Expressive Activity on Campus"

    l. TAMUS Regulation 08.02.01, entitled "Expressive Activity on Campus"

    m. TAMUS Policy 13.02, entitled "Student Rights and Obligations"

## III. WTAMU Rules and Procedures

    n. WTAMU Rule 07.03.01.W1, entitled "Political Campaign Events"

    o. WTAMU Rule 08.01.01.W1, entitled "Civil Rights Compliance"

    p. WTAMU Rule 08.99.99.W1, entitled "Expressive Activity on Campus"

    q. WTAMU Rule 08.99.99.W1, entitled "Expressive Activity on Campus" (revised July 28, 2025)

    r. WTAMU Procedure 24.01.01.W0.01, entitled "Facility Use Request Procedure"

    s. WTAMU's Code of Student Life: Rules and Procedures for Students (Updated August 2020)

        • Relevant sections include, but are not limited to:

            1. General Purpose

            2. WTAMU Mission Statement

            3. WTAMU Core Values

            4. Student Centered Philosophy

            5. Affirmative Action/Equal Opportunity

            6. Procedures and Rules for Students

            7. Student Bill of Rights

            8. Students' Responsibilities

      9. Free Speech and Advocacy on Campus
    10. Section A: Student Conduct Mission and Policies
    11. Student Rules on (a) disorderly conduct; (b) disruptive activity; (c) harmful, threatening or endangering conduct; (d) harassment; and (e) sexual misconduct.
    12. Hazing
    13. Explosives, Fireworks, and Weapons
    14. Violation of Published University Rules or Regulations
    15. Violation of Federal, State, Local Law and/or University Procedures
    16. Civil Rights & Title IX Complaints
    17. Definition of "Gender-based Harassment," located in Appendix A

t. WTAMU Student Handbook 2022-2023
- Relevant sections include, but are not limited to:
  1. Student Life Rules
  2. Student Bill of Rights
  3. Community Standards
  4. Failure to Comply and Disorderly Conduct
  5. Food & Beverages
  6. Misuse of Skateboards, Rollerblades, Scooters, Bicycles, Self-Balancing Boards, or Similar Modes of Transportation
  7. Hazing
  8. Violation of Federal, State, Local Law and/or University Rules and Procedures
  9. Propose Revisions

u. WTAMU Student Handbook 2023-2024
- Relevant sections include, but are not limited to:
  1. Welcome Statement
  2. Foreword
  3. Student Life Rules
  4. Student Bill of Rights and Responsibilities
  5. Community Standards
  6. Explosives, Fireworks, and Weapons
  7. Failure to Comply and Disorderly Conduct
  8. Harassment
  9. Sexual Misconduct
  10. Food & Beverages
  11. Misuse of Transportation
  12. Hazing
  13. Violation of Federal, State, Local Law and/or University Rules and Procedures
  14. Propose Revisions

v. WTAMU Student Handbook 2025-2026
- Relevant sections include, but are not limited to:
  1. Welcome Statement

12

2. Foreword
3. Students' Rights and Responsibilities
4. Community Standards
5. Expressive Activity
6. Failure to Comply and Disorderly Conduct
7. Firearms, Ammunition, and Weapons
8. Food and Beverages
9. Harassment
10. Hazing
11. Misuse of Transportation
12. Sexual Misconduct
13. Soliciting on Campus
14. Violation of Federal, State, Local and/or University Procedures
15. Civil Rights and Title XI
16. Propose Revisions

w. WTAMU JBK Student Center Procedures & Guidelines (2023 and 2025 editions)
- Relevant sections in the 2023 edition include, but are not limited to:
  1. Mission Statements
  2. General Policies
  3. Decorations
- Relevant sections in the 2025 edition include, but are not limited to:
  6. Mission Statements
  7. General Policies
  8. Buffaloes Traditions Program
  9. Institutional Priority Events
  10. Marketing/Advertising

x. WTAMU Statement on Equal Opportunity/Nondiscrimination (available at: https://www.wtamu.edu/about/information/equal-opportunity-nondiscriminatio n.html)
y. Campus Organizations Handbook
z. WTAMU Pre-University Program ("PUP") Frequently Asked Questions (available at: https://www.wtamu.edu/admissions/pre-university-program/pup-faq.html)
aa. WTAMU PUP Program Agreement Forms (for Independent School Districts)
bb. WTAMU PUP Program Agreement Form (for Homeschool Students)

Hard copies of several materials in this list are already in Plaintiff's possession. Defendant included items d, e, f, h, i, j, t, v, w, x, y, bb, cc, and ee in the Exhibits Binder that it presented to Plaintiff during the parties' status conference on September 10, 2025.

Aside from the above-mentioned statutes, policies, procedures, and rules, please see President Wendler's memoranda to the campus community entitled "A Harmless Drag Show? No Such Thing," dated March 20, 2023, and "Spectrum WT Application for On-Campus Drag

13

Show," dated March 18, 2024. President Wendler has produced to Plaintiff a non-exhaustive list of the many publications and materials he considered contemporaneously with his 2023 response. *See, e.g.*, Def_000749–Def_000821.

President Wendler also generally took into account both the custom of according respect to individuals of all races and genders in the university community, and the custom of not publicly disrespecting, denigrating, demeaning, or negatively caricaturing individuals of other races or genders. In his view, maintaining those customs is important to achieving the educational mission of WTAMU; to attracting and retaining quality students, faculty, and employees at WTAMU; and to garnering critical public and private financial and community support for WTAMU.

Finally, President Wendler's decision was informed by his role, responsibilities, and experiences as the top administrative official of a university in the Panhandle community of Texas with thousands of students, some of whom are minors. He took into account his years of conversations and dealings with current and prospective WTAMU students, faculty, staff, parents, and community members in reaching his decision not to permit Plaintiff's on-campus drag performances at Legacy Hall.

**Interrogatory No. 7**

State all facts known to Wendler individually that he relied on in deciding to cancel Don't Be A Drag Drag Show.

**Response:**

Defendant objects to the phrase "all facts known to Wendler individually" to the extent it is vague, ambiguous, and potentially seeks information that is not relevant to any party's claim or defense. Defendant objects to this interrogatory because it is unreasonably cumulative or duplicative of prior statements which have been produced in this lawsuit. Defendant objects to this request because the discovery requested can be obtained from some other source that is more convenient, less burdensome, or less extensive. *See* FED. R. CIV. P. 26(b)(2)(C)(i).

Subject to and without waiving the foregoing objections, Defendant incorporates Responses to Interrogatories 4 through 6 and states as follows:

President Wendler was aware of the following facts:

- Plaintiff planned to host the Don't Be a Drag Drag Show at WTAMU's Legacy Hall, located in the JBK Student Center.
- As President and CEO of WTAMU, President Wendler is obligated to create a discrimination-free learning and work environment for WTAMU students, staff, faculty.
- Executive university administrators must make difficult and important decisions with which some inevitably will disagree.
- Because of WTAMU's PUP Program and otherwise, minors are enrolled in the University, credentialed as other students, and take courses on campus.
- WTAMU endeavors to ensure all individuals are treated with dignity and respect.

14

- WTAMU seeks to meet or exceed the expectations of its internal and external stakeholders, including the WTAMU community, the Panhandle community, and those who provide public or private support to WTAMU.
- WTAMU students have rights, privileges, and responsibilities as members of the University community, including the responsibility not to disrespect or demean others.
- WTAMU reserves the right to not permit on-campus events or programming that are inappropriate or inconsistent with the University's mission or policies.
- At the time of deciding not to permit Plaintiff's 2024 drag performance, Don't Be a Drag Drag Show, at Legacy Hall, President Wendler was aware of proposed and later enacted legislation, S.B. 12, which criminalizes "'sexually oriented performances' on public property in the presence of minors." *The Woodlands Pride, Inc. v. Paxton*, No. 23-20480, 2025 U.S. App. LEXIS 29217, at *6 (5th Cir. Nov. 6, 2025) (citing TEX. HEALTH & SAFETY CODE ANN. § 769.002; TEX. LOC. GOV'T CODE ANN. § 243.0031; and TEX. PENAL CODE ANN. § 43.28).
- Drag performances commonly involve biological men dressing up as and impersonating women in attempt to parody gender norms.
- Drag performances often may exaggerate aspects of femininity and womanhood.
- Drag performances often may feature conduct reasonably deemed to be lewd, sexually oriented, or obscene by community standards in the Texas Panhandle, especially those applicable to minors.
- Plaintiff advertised Don't Be a Drag Drag Show as a "PG-13" event.
- Plaintiff did not specify what criteria it used in rating Don't Be a Drag Drag Show as "PG-13."
- Plaintiff stated it would permit minors to attend Don't Be a Drag Drag Show if they were accompanied by a parent or guardian.
- Plaintiff stated that proceeds from Plaintiff's 2023 drag show would be donated to the Trevor Project, a non-profit organization focused on suicide prevention in the LGBTQ+ community.
- Off campus venues were expected to be available to Plaintiff for drag shows so that a restriction on the use of Legacy Hall would not prevent Plaintiff from exercising any claimed First Amendment rights to conduct drag shows.
- Plaintiff claimed that its drag shows express a message of LGBTQ+ acceptance, but Plaintiff has expressed that message through other events that do not disrespect others. Plaintiff remains free to do so on the WTAMU campus.

**Interrogatory No. 8**

Identify every statute, policy, rule, regulation, or custom Wendler individually relied on in deciding to cancel Don't Be A Drag Drag Show.

**Response:**

Defendant objects to this request to the extent the terms "policy," "rule," "regulation," or

Pl. App'x 171

"custom" are vague or ambiguous. Defendant further objects to this request because it is "unreasonably cumulative or duplicative" of the A&M System policies and regulations, and WTAMU rules and procedures themselves. *See* Fed. R. Civ. P. 26(b)(2)(C)(i). The requesting party's ability to obtain the information is similar to that of the responding party. *See* Fed. R. Civ. P. 26(b)(1).

Subject to and without waiving the foregoing objections, Defendant incorporates Responses to Interrogatories 4 through 7, and for further response states as follows:

In deciding not to permit use of Legacy Hall for Plaintiff's Don't Be A Drag Drag Show, President Wendler was guided by his obligation to ensure that West Texas A&M University remains a discrimination-free workplace and learning environment where all students, faculty, and staff are treated with dignity and respect. As the President and CEO of WTAMU, President Wendler must make difficult and important decisions which balance students' needs with the needs of the larger campus community. He believes all members of the campus community not only enjoy certain rights and privileges but also bear certain responsibilities—among those responsibilities is the commonsense imperative to refrain from conduct that disrespects, demeans and dehumanizes others. President Wendler's decision is consistent with the following non-exhaustive list of statutes, policies, procedures, rules, and regulations:

## I. Federal and State Statutes and Policies

    a. Title IX of the Educational Amendments Act of 1972 ("Title IX")
    b. Texas Senate Bill 12 ("S.B. 12"), enacted during the Legislature's 88th Regular Session.

When he cancelled Plaintiff's 2024 drag show, President Wendler was aware of proposed and later enacted legislation, S.B. 12, which criminalizes "'sexually oriented performances' on public property in the presence of minors." *The Woodlands Pride, Inc. v. Paxton*, No. 23-20480, 2025 U.S. App. LEXIS 29217, at *6 (5th Cir. Nov. 6, 2025) (citing TEX. HEALTH & SAFETY CODE ANN. § 769.002; TEX. LOC. GOV'T CODE ANN. § 243.0031; and TEX. PENAL CODE ANN. § 43.28).

    c. Texas Senate Bill 12 ("S.B. 12"), enacted during the Legislature's 89th Regular Session.

While this litigation has been pending, the Texas Legislature enacted "S.B. 12," which, in relevant part, prevents Texas public "school district[s][and] open-enrollment charter schools" from "provid[ing] or allow[ing] a third party to provide instruction, guidance, activities, or programming regarding sexual orientation or gender identity to [K-12] students . . . ." *See* TEX. EDUC. CODE §28.0043.

    d. Exec. Order No. 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, 90 Fed. Reg. 8615 (Jan. 20, 2025) (acknowledging the "biological reality of sex" and warning "[f]ederal funds shall not be used to promote gender ideology")

16

e. Exec. Order No. 14190, Ending Radical Indoctrination in K-12 Schooling, 90 Fed. Reg. 8853 (Feb. 3, 2025) (empowering federal agencies to, among other things, "prevent or rescind [f]ederal funds . . . from being used by a[] . . . secondary school to directly or indirectly support or subsidize . . . a violation of . . . Title IX")

f. Letter from Governor Abbott to University Systems (May 8, 2024) (ordering public universities in Texas "not to comply with President Biden's . . . revision of Title IX")

g. Letter from Governor Abbott to State Agencies (Jan. 30, 2025) (requiring state agencies to "reject[] radical sexual orientation and gender identity ideologies").

h. "Resolution Regarding Certain Public Events on the Campus of Universities in the Texas A&M University System," dated February 28, 2025 (declaring on-campus drag shows "likely to create or contribute to a hostile environment for women contrary to System anti-discrimination policy and Title IX")

## II. TAMUS Policies and Regulations

    a. TAMUS Regulation 08.01, entitled "Civil Rights Protections and Compliance"
    b. TAMUS Regulation 08.01.01, entitled "Civil Rights Compliance"
    c. TAMUS Policy 08.02, entitled "Expressive Activity on Campus"
    d. TAMUS Regulation 08.02.01, entitled "Expressive Activity on Campus"
    e. TAMUS Policy 13.02, entitled "Student Rights and Obligations"

## III. WTAMU Rules and Procedures

    f. WTAMU Rule 07.03.01.W1, entitled "Political Campaign Events"
    g. WTAMU Rule 08.01.01.W1, entitled "Civil Rights Compliance"
    h. WTAMU Rule 08.99.99.W1, entitled "Expressive Activity on Campus"
    i. WTAMU Rule 08.99.99.W1, entitled "Expressive Activity on Campus" (revised July 28, 2025)
    j. WTAMU Procedure 24.01.01.W0.01, entitled "Facility Use Request Procedure"
    k. WTAMU's Code of Student Life: Rules and Procedures for Students (Updated August 2020)
- Relevant sections include, but are not limited to:
  1. General Purpose
  2. WTAMU Mission Statement
  3. WTAMU Core Values
  4. Student Centered Philosophy
  5. Affirmative Action/Equal Opportunity
  6. Procedures and Rules for Students
  7. Student Bill of Rights
  8. Students' Responsibilities
  9. Free Speech and Advocacy on Campus
  10. Section A: Student Conduct Mission and Policies

11. Student Rules on (a) disorderly conduct; (b) disruptive activity; (c) harmful, threatening or endangering conduct; (d) harassment; and (e) sexual misconduct.
12. Hazing
13. Explosives, Fireworks, and Weapons
14. Violation of Published University Rules or Regulations
15. Violation of Federal, State, Local Law and/or University Procedures
16. Civil Rights & Title IX Complaints
17. Definition of "Gender-based Harassment," located in Appendix A

l. WTAMU Student Handbook 2022-2023
- Relevant sections include, but are not limited to:
  1. Student Life Rules
  2. Student Bill of Rights
  3. Community Standards
  4. Failure to Comply and Disorderly Conduct
  5. Food & Beverages
  6. Misuse of Skateboards, Rollerblades, Scooters, Bicycles, Self-Balancing Boards, or Similar Modes of Transportation
  7. Hazing
  8. Violation of Federal, State, Local Law and/or University Rules and Procedures
  9. Propose Revisions

m. WTAMU Student Handbook 2023-2024
- Relevant sections include, but are not limited to:
  1. Welcome Statement
  2. Foreword
  3. Student Life Rules
  4. Student Bill of Rights and Responsibilities
  5. Community Standards
  6. Explosives, Fireworks, and Weapons
  7. Failure to Comply and Disorderly Conduct
  8. Harassment
  9. Sexual Misconduct
  10. Food & Beverages
  11. Misuse of Transportation
  12. Hazing
  13. Violation of Federal, State, Local Law and/or University Rules and Procedures
  14. Propose Revisions

n. WTAMU Student Handbook 2025-2026
- Relevant sections include, but are not limited to:
  1. Welcome Statement
  2. Foreword
  3. Students' Rights and Responsibilities

18

    4. Community Standards
    5. Expressive Activity
    6. Failure to Comply and Disorderly Conduct
    7. Firearms, Ammunition, and Weapons
    8. Food and Beverages
    9. Harassment
    10. Hazing
    11. Misuse of Transportation
    12. Sexual Misconduct
    13. Soliciting on Campus
    14. Violation of Federal, State, Local and/or University Procedures
    15. Civil Rights and Title XI
    16. Propose Revisions

o. WTAMU JBK Student Center Procedures & Guidelines (2023 and 2025 editions)
- Relevant sections in the 2023 edition include, but are not limited to:
  1. Mission Statements
  2. General Policies
  3. Decorations
- Relevant sections in the 2025 edition include, but are not limited to:
  1. Mission Statements
  2. General Policies
  3. Buffaloes Traditions Program
  4. Institutional Priority Events
  5. Marketing/Advertising

p. WTAMU Statement on Equal Opportunity/Nondiscrimination (available at: https://www.wtamu.edu/about/information/equal-opportunity-nondiscriminatio n.html)

q. Campus Organizations Handbook

r. WTAMU Pre-University Program ("PUP") Frequently Asked Questions (available at: https://www.wtamu.edu/admissions/pre-university-program/pup-faq.html)

s. WTAMU PUP Program Agreement Forms (for Independent School Districts)

t. WTAMU PUP Program Agreement Form (for Homeschool Students)

    Hard copies of several materials in this list are already in Plaintiff's possession. Defendant included items d, e, f, h, i, j, t, v, w, x, y, bb, cc, and ee in the Exhibits Binder that it presented to Plaintiff during the parties' status conference on September 10, 2025.

    Aside from the above-mentioned statutes, policies, procedures, and rules, please see President Wendler's memoranda to the campus community entitled "A Harmless Drag Show? No Such Thing," dated March 20, 2023, and "Spectrum WT Application for On-Campus Drag Show," dated March 18, 2024. President Wendler has produced a non-exhaustive list of the many publications and materials he considered contemporaneously with his 2023 response. *See, e.g.,*

Def_000749–Def_000821.

President Wendler also considered both the custom of according respect to individuals of all races and genders in the university community, and the custom of not publicly denigrating, demeaning, or negatively caricaturing individuals of other races or genders. In his view, maintaining those customs is important to achieving the educational mission of WTAMU; to attracting and retaining quality students, faculty, and employees at WTAMU; and to garnering critical public and private financial and community support for WTAMU.

Finally, President Wendler considered his role, responsibilities, and experiences as the top administrative official of a university in the Panhandle community of Texas with thousands of students, some of whom are minors. He took his years of conversations and dealings with current and prospective students, faculty, staff, parents, and community members into account in reaching his decision to cancel Plaintiff's on-campus drag performances.

**Interrogatory No. 9**

Identify each reason you contend that Plaintiff's intended uses of Legacy Hall for drag performances are inconsistent with the uses for which West Texas A&M makes the space available.

**Response:**

Defendant objects to this request to the extent it is unreasonably cumulative or duplicative of other requests.

Subject to and without waiving the foregoing objections, please see President Wendler's memoranda to the campus community entitled "A Harmless Drag Show? No Such Thing," dated March 20, 2023, and "Spectrum WT Application for On-Campus Drag Show," dated March 18, 2024. In addition, please see President Wendler's weekly op-ed article entitled "Ists, Isms and Free Will," dated June 12, 2022 (available at: https://walterwendler.com/2022/06/ists-isms-and-free-will/).

As a preliminary matter, President Wendler was generally aware of A&M System policies and regulations, as well as WTAMU rules and procedures, including those prohibiting discrimination or harassment on WTAMU's campus. Please see the TAMUS policies, WTAMU rules and SAPs, which are publicly available online at the URL: https://www.tamus.edu/legal/policy/. Defendant has produced a copy of the WT Student Handbook, Campus Organizations Handbook, JBK Student Center Policies Manual, JBK Student Center Procedures and Guidelines, and other documents.

Additionally, President Wendler reviewed and considered various publications, articles, scholarly works, and other materials on the matter prior to making his decision not to permit Plaintiff's drag shows in Legacy Hall. Defendant has produced a non-exhaustive list of the many publications and materials he considered contemporaneously with his 2023 response. *See, e.g.*, Def_000749–Def_000821.

Finally, President Wendler regarded his role, responsibilities, and experiences as the top administrative official of a university in the Panhandle community of Texas with thousands of students, some of whom are minors. He also took his dealings with current and prospective WTAMU students, faculty, staff, parents, and community members into account.

President Wendler's view that Legacy Hall should not be used for Plaintiff's March 2023 and March 2024 drag performances was informed by both the custom of according respect to individuals of all races and genders in the university community, and the custom of not publicly disrespecting, demeaning, or negatively caricaturing individuals of other races and genders.

President Wendler believes maintaining these customs is important to achieving the educational mission of WTAMU and living up to its core value of respect; to attracting and retaining quality students, faculty, and employees at WTAMU; and to garnering critical public and private financial and community support for WTAMU.

**Interrogatory No. 10**

Identify every campus event Wendler individually refused to permit, reserve space for, or cancelled because it included sexual material or content.

**Response:**

Defendant objects to this request to the extent the phrase "every campus event" to the extent it is vague or ambiguous. Defendant further objects that the request is not reasonably specific or limited in scope or time.

Subject to the foregoing objections, Defendant incorporates Responses to Interrogatories 4 through 9, and further states as follows: aside from the March 2023 and March 2024 proposed drags shows, President Wendler in May of 2024 did not permit the signing of a contract for the requested use of WTAMU on-campus facilities for a proposed concert by what was described as a "rap" or "hip-hop" group. The group's concerts, performances and/or recordings were reasonably deemed inappropriate, disrespectful, offensive, and advocate or describe gun violence.

**Interrogatory No. 11**

Identify every campus event since 2020 that West Texas A&M University has refused to permit or cancelled because it included content that was offensive, divisive, demeaning, misogynistic, or mocking.

**Response:**

Defendant objects to this request to the extent the term "every campus event" is overly broad, vague or ambiguous.

21

Subject to the foregoing objections, Defendant incorporates Responses to Interrogatories 4 through 10 and further states as follows:

Defendant understands this request to inquire about any campus event, since 2020, for which WTAMU has disallowed use of campus facilities, aside from the drag shows referred to above.

In May of 2024, President Wendler did not permit the signing of a contract for the requested use of one of WTAMU's campus facilities for a rap or hip-hop concert based on concern that the featured performer's music/lyrics were reasonably deemed inappropriate, disrespectful, offensive or advocated or described gun violence.

**Interrogatory No. 12**

Identify each reason you contend that Plaintiff's performances will be or would have been disruptive to the operations or educational functions of West Texas A&M University.

**Response:**

Defendant objects to this interrogatory because it is unreasonably cumulative or duplicative of prior statements which have been produced in this lawsuit. Defendant objects to this request because the discovery requested can be obtained from some other source that is more convenient, less burdensome, or less extensive. *See* FED. R. CIV. P. 26(b)(2)(C)(i). Defendant further objects because it is not possible to know at this time what will be the content or parameters of any future performance by Plaintiff.

Subject to and without waiving the foregoing objections, Defendant incorporates Responses to Interrogatories 4 through 11, and further states as follows:

Please see President Wendler's memoranda to the campus community entitled "A Harmless Drag Show? No Such Thing," dated March 20, 2023, and "Spectrum WT Application for On-Campus Drag Show," dated March 18, 2024. In addition, please see President Wendler's weekly op-ed article entitled "Ists, Isms and Free Will," dated June 12, 2022 (available at: https://walterwendler.com/2022/06/ists-isms-and-free-will/).

As a preliminary matter, President Wendler was generally aware of A&M System policies and regulations, as well as WTAMU rules and procedures, including those prohibiting discrimination or harassment on WTAMU's campus. Please see the TAMUS policies, WTAMU rules and SAPs, which are publicly available online at the URL: https://www.tamus.edu/legal/policy/. Defendant has provided to Plaintiff a copy of the WT Student Handbook, Campus Organizations Handbook, JBK Student Center Policies Manual, JBK Student Center Procedures and Guidelines, and other documents.

22

President Wendler also reviewed and considered various publications, articles, scholarly works, and other materials on the matter prior to making his decisions not to permit use of Legacy Hall for Plaintiff's drag shows. Defendant has produced to Plaintiff a non-exhaustive list of the many publications and materials he considered contemporaneously with his 2023 response. *See, e.g.*, Def_000749–Def_000821.

President Wendler also regarded his role, responsibilities, and experiences as the top administrative official of a university in the Panhandle community of Texas with thousands of students, some of whom are minors. He also took into account his dealings with current and prospective students, faculty, staff, parents, and community members.

**Interrogatory No. 13**

Identify each reason you contend that Plaintiff's performances will amount to "harassment" as referenced in your March 2023 email announcing the cancellation of Plaintiff's first drag show.

**Response:**

Defendant objects to this interrogatory because it is unreasonably cumulative or duplicative of prior statements which have been produced in this lawsuit. Defendant objects to this request because the discovery requested can be obtained from some other source that is more convenient, less burdensome, or less extensive. *See* FED. R. CIV. P. 26(b)(2)(C)(i). Defendant further objects because it is not possible to know at this time what will be the content or parameters of any future performance by Plaintiff.

Subject to and without waiving the foregoing objections, Defendant incorporates Responses to Interrogatories 4 through 12, and further states as follows: please see President Wendler's memoranda to the campus community entitled "A Harmless Drag Show? No Such Thing," dated March 20, 2023, and "Spectrum WT Application for On-Campus Drag Show," dated March 18, 2024. In addition, please see President Wendler's weekly op-ed article entitled "Ists, Isms and Free Will," dated June 12, 2022 (available at: https://walterwendler.com/2022/06/ists-isms-and-free-will/).

As a preliminary matter, President Wendler was aware of A&M System policies and regulations, as well as WTAMU rules and procedures, including those prohibiting discrimination or harassment on WTAMU's campus. Please see the TAMU policies, WTAMU rules and SAPs, which are publicly available online at the URL: https://www.tamus.edu/legal/policy/. Defendant is providing a copy of the WT Student Handbook, Campus Organizations Handbook, JBK Student Center Policies Manual, JBK Student Center Procedures and Guidelines, and other documents.

Additionally, President Wendler reviewed and considered various publications, articles, scholarly works, and other materials on the matter prior to making his decision not to permit Plaintiff's drag shows in Legacy Hall. Defendant is producing a non-exhaustive list of publications and materials considered by President Wendler contemporaneously with this response.

23

Finally, President Wendler regarded his role, responsibilities, and experiences as the top administrative official of a university in the Panhandle community of Texas with thousands of students, some of whom are minors. He also took his dealings with current and prospective students, faculty, staff, parents, and community members into account.

**Interrogatory No. 14**

State all bases for your statement in your March 20, 2023, email that "West Texas A&M University will not host a drag show on campus."

**Response:**

Defendant objects to this interrogatory because it is unreasonably cumulative or duplicative of prior statements which have been produced in this lawsuit. Defendant objects to this request because the discovery requested can be obtained from some other source that is more convenient, less burdensome, or less extensive. *See* FED. R. CIV. P. 26(b)(2)(C)(i).

Subject to and without waiving the foregoing objections Defendant incorporates Responses to Interrogatories 4 through 13 and further states as follows:

President Wendler's statement that "West Texas A&M University will not host a drag show on campus" was based on the facts then presented to him in March 2023 as to the drag show proposed by Plaintiff and was not an "edict", "ban", or change in applicable WTAMU policies or rules. He was guided in making that statement by his obligation to ensure that West Texas A&M University remains a discrimination-free workplace and learning environment where all students, faculty, and staff are treated with dignity and respect. As the President and CEO of WTAMU, President Wendler must make difficult and sometimes unpopular decisions which balance students' needs with the needs of the larger campus community. He believes all members of the campus community not only enjoy certain rights and privileges but also bear certain responsibilities—among those responsibilities is the commonsense imperative to refrain from conduct that disrespects, demeans or dehumanizes others. President Wendler's decision is consistent with the following non-exhaustive list of statutes, policies, procedures, rules, and regulations:

**I. Federal and State Statutes and Policies**

a. Title IX of the Educational Amendments Act of 1972 ("Title IX")
b. Texas Senate Bill 12 ("S.B. 12"), enacted during the Legislature's 88th Regular Session.
c. Texas Senate Bill 12 ("S.B. 12"), enacted during the Legislature's 89th Regular Session.
d. Exec. Order No. 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, 90 Fed. Reg. 8615 (Jan. 20, 2025) (acknowledging the "biological reality of sex" and warning "[f]ederal funds shall not be used to promote gender ideology")

24

e.  Exec. Order No. 14190, Ending Radical Indoctrination in K-12 Schooling, 90 Fed. Reg. 8853 (Feb. 3, 2025) (empowering federal agencies to, among other things, "prevent or rescind [f]ederal funds . . . from being used by a[] . . . secondary school to directly or indirectly support or subsidize . . . a violation of . . . Title IX")

f.  Letter from Governor Abbott to University Systems (May 8, 2024) (ordering public universities in Texas "not to comply with President Biden's . . . revision of Title IX")

g.  Letter from Governor Abbott to State Agencies (Jan. 30, 2025) (requiring state agencies to "reject[] radical sexual orientation and gender identity ideologies").

h.  "Resolution Regarding Certain Public Events on the Campus of Universities in the Texas A&M University System," dated February 28, 2025 (declaring on-campus drag shows "likely to create or contribute to a hostile environment for women contrary to System anti-discrimination policy and Title IX")

## II. TAMUS Policies and Regulations

i.  TAMUS Regulation 08.01, entitled "Civil Rights Protections and Compliance"

j.  TAMUS Regulation 08.01.01, entitled "Civil Rights Compliance"

k.  TAMUS Policy 08.02, entitled "Expressive Activity on Campus"TAMUS Regulation 08.02.01, entitled "Expressive Activity on Campus"

l.  TAMUS Policy 13.02, entitled "Student Rights and Obligations"

## III. WTAMU Rules and Procedures

m.  WTAMU Rule 07.03.01.W1, entitled "Political Campaign Events"

n.  WTAMU Rule 08.01.01.W1, entitled "Civil Rights Compliance"

o.  WTAMU Rule 08.99.99.W1, entitled "Expressive Activity on Campus"

p.  WTAMU Rule 08.99.99.W1, entitled "Expressive Activity on Campus" (revised July 28, 2025)

q.  WTAMU Procedure 24.01.01.W0.01, entitled "Facility Use Request Procedure"

r.  WTAMU's Code of Student Life: Rules and Procedures for Students (Updated August 2020)
- Relevant sections include, but are not limited to:
    1.  General Purpose
    2.  WTAMU Mission Statement
    3.  WTAMU Core Values
    4.  Student Centered Philosophy
    5.  Affirmative Action/Equal Opportunity
    6.  Procedures and Rules for Students
    7.  Student Bill of Rights
    8.  Students' Responsibilities
    9.  Free Speech and Advocacy on Campus
    10. Section A: Student Conduct Mission and Policies

    11. Student Rules on (a) disorderly conduct; (b) disruptive activity; (c) harmful, threatening or endangering conduct; (d) harassment; and (e) sexual misconduct.
    12. Hazing
    13. Explosives, Fireworks, and Weapons
    14. Violation of Published University Rules or Regulations
    15. Violation of Federal, State, Local Law and/or University Procedures
    16. Civil Rights & Title IX Complaints
    17. Definition of "Gender-based Harassment," located in Appendix A

s. WTAMU Student Handbook 2022-2023
- Relevant sections include, but are not limited to:
    1. Student Life Rules
    2. Student Bill of Rights
    3. Community Standards
    4. Failure to Comply and Disorderly Conduct
    5. Food & Beverages
    6. Misuse of Skateboards, Rollerblades, Scooters, Bicycles, Self-Balancing Boards, or Similar Modes of Transportation
    7. Hazing
    8. Violation of Federal, State, Local Law and/or University Rules and Procedures
    9. Propose Revisions

t. WTAMU Student Handbook 2023-2024
- Relevant sections include, but are not limited to:
    1. Welcome Statement
    2. Foreword
    3. Student Life Rules
    4. Student Bill of Rights and Responsibilities
    5. Community Standards
    6. Explosives, Fireworks, and Weapons
    7. Failure to Comply and Disorderly Conduct
    8. Harassment
    9. Sexual Misconduct
    10. Food & Beverages
    11. Misuse of Transportation
    12. Hazing
    13. Violation of Federal, State, Local Law and/or University Rules and Procedures
    14. Propose Revisions

u. WTAMU Student Handbook 2025-2026
- Relevant sections include, but are not limited to:
    1. Welcome Statement
    2. Foreword
    3. Students' Rights and Responsibilities

26

    4. Community Standards
    5. Expressive Activity
    6. Failure to Comply and Disorderly Conduct
    7. Firearms, Ammunition, and Weapons
    8. Food and Beverages
    9. Harassment
    10. Hazing
    11. Misuse of Transportation
    12. Sexual Misconduct
    13. Soliciting on Campus
    14. Violation of Federal, State, Local and/or University Procedures
    15. Civil Rights and Title XI
    16. Propose Revisions

v. WTAMU JBK Student Center Procedures & Guidelines (2023 and 2025 editions)
- Relevant sections in the 2023 edition include, but are not limited to:

    1. General Policies
    2. Decorations
- Relevant sections in the 2025 edition include, but are not limited to:

    1. Mission Statements
    2. General Policies
    3. Buffaloes Traditions Program
    4. Institutional Priority Events
    5. Marketing/Advertising

w. WTAMU Statement on Equal Opportunity/Nondiscrimination (available at: https://www.wtamu.edu/about/information/equal-opportunity-nondiscriminatio n.html)

x. Campus Organizations Handbook

y. WTAMU Pre-University Program ("PUP") Frequently Asked Questions (available at: https://www.wtamu.edu/admissions/pre-university-program/pup-faq.html)

z. WTAMU PUP Program Agreement Forms (for Independent School Districts)

aa. WTAMU PUP Program Agreement Form (for Homeschool Students)

Hard copies of several materials in this list are already in Plaintiff's possession. Defendant included items d, e, f, h, i, j, t, v, w, x, y, bb, cc, and ee in the Exhibits Binder that it presented to Plaintiff during the parties' status conference on September 10, 2025.

Aside from the above-mentioned statutes, policies, procedures, and rules, please see President Wendler's memoranda to the campus community entitled "A Harmless Drag Show? No Such Thing," dated March 20, 2023, and "Spectrum WT Application for On-Campus Drag Show," dated March 18, 2024. Defendant has produced a non-exhaustive list of the many publications and materials he considered contemporaneously with his 2023 response. *See, e.g.,*

Def_000749–Def_000821.

President Wendler's decision was also informed by both the custom of according respect to individuals of all races and genders in the university community, and the custom of not publicly disrespecting, demeaning, or negatively caricaturing individuals of other races or genders. In his view, maintaining those customs is important to achieving the educational mission of WTAMU; to attracting and retaining quality students, faculty, and employees at WTAMU; and to garnering critical public and private financial and community support for WTAMU.

Finally, President Wendler considered his role, responsibilities, and experiences as the top administrative official of a university in the Panhandle community of Texas with thousands of students, some of whom are minors. He took his years of conversations and dealings with current and prospective WTAMU students, faculty, staff, parents, and community members into account in reaching his decision to cancel Plaintiff's on-campus drag performances.

Date: December 1, 2025

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

RYAN D. WALTERS
Deputy Attorney General for Legal Strategy

RYAN G. KERCHER
Chief, Special Litigation Division

Respectfully submitted.

*/s/ David Bryant*
DAVID BRYANT
Senior Special Counsel
Tex. State Bar No. 03281500

MUNERA AL-FUHAID
Special Counsel
Tex. State Bar No. 24094501

ZACHARY BERG
Special Counsel
Tex. State Bar No. 24107706

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 463-2120
Fax: (512) 320-0667
david.bryant@oag.texas.gov
munera.al-fuhaid@oag.texas.gov
zachary.berg@oag.texas.gov

Attorneys for Defendants

Pl. App'x 184

## CERTIFICATE OF SERVICE

I hereby certify that on November 7, 2025, I electronically served the foregoing responses on all counsel of record.

/s/ David Bryant
DAVID BRYANT

29

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

SPECTRUM WT, *et al.*,

               Plaintiffs,

v.

WALTER WENDLER, *et al.*,

               Defendants.

No. 2:23-cv-00048

**VERIFICATION**

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | |
| | § | |
| COUNTY OF RANDALL | | § |

I, Walter Wendler, have read the foregoing amended answers to Plaintiff's October 8, 2025 Interrogatories and certify that the information contained therein is within my personal knowledge or was derived from a review of documents, and is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 1, 2025.

Walter Wendler

EXHIBIT
22
tabbies®

# THE HEART AND SOUL OF THE TEXAS PANHANDLE

## Minority Points of View

WENDLER / NOVEMBER 17, 2014

*Seventh and final in the IMTE series*

A reflection on October 6, *"I'm Mad, too, Eddie,"* (IMTE) **claimed that** minority points of view are swept under the rug and labeled as intolerant. Mayor Michael Bloomberg, speaking at Harvard's commencement, was correct when he said U.S. higher education is becoming dangerously narrow-minded. Contravening perspective relative to the status quo is frowned upon. This reflection is not about "political correctness," an overused, misunderstood, and meaningless phrase that is bantered about to demean any view with which an individual or group disagrees.

Jonathan Last writes thoughtfully in *The Weekly Standard* on the changing nature of virtues in our nation and the impact these changes have on how we see the world, or at least how we say we see the world. Last makes a compelling example regarding smoking and sex. While it is acceptable — according to "modern" virtue — to treat smokers as lepers, the idea of suggesting that indiscriminate sex likewise has a negative impact on human physical and emotional health is relegated to citizens of the Cretaceous epoch. On the one hand the individual who detests smoking is current, proper, and virtuous. On the other hand, if that same person rejects casual one night sexual "hookups," fueled by instantaneous gratification, and too frequently alcohol and/or recreational drugs, or sexual relations outside the bond of marriage, they would be branded as stupid, uncaring, and Neanderthal. On a good day.

Universities, to the diminishment of their effectiveness as reflective social forces, have become institutions prone to eye-rolling responses to diverse points of view. Harvey C. Mansfield of the Heritage Foundation provides thoughtful discussion on the issue and encourages caution of quick-draw, shoot-from-the-hip responses to complex issues. And apart from proclamations from the Ivory Tower, the butchers, bakers and candlestick makers know that no educational opportunity is *"value-free."* Some within the ivy covered walls believe freedom from values is the benchmark of university life. They are wrong.

Some points of view are just not welcome. And these unwelcome perspectives come from different locations on the spectrums of insight, knowledge, culture and morality. But, because virtuousness is determined by committees, standards are in flux. Committees take votes and the view that rises to acceptability is the one that causes the least grief. This falls short and transforms public morality into thresholds of acceptability. Different targets I fear.

The newest approaches to dealing with sensitive issues are *"trigger warnings"* to presage potential offenses to unwary audiences, like MPAA ratings for movies. While dean at a major college of architecture I issued a *"trigger warning"* regarding a gallery exhibit over 20 years ago. The show exhibited pencil drawings of acts of homosexual acts that many people found frightening for the content, but beyond that for the darkness and intensity of the presentations. A custodial worker asked me if she could be freed from cleaning the gallery as the images were so intense and disconcerting (she said "disgusting") she did not want to see them. Said she, "I am having nightmares." I told custodial service not to ask anyone offended by the exhibit to clean the gallery. They could find no one willing to do it.

I wanted to remove the exhibit. It was offensive to many beyond the janitorial staff. The Office of General Counsel said I could close the exhibit, but I would likely have to reopen it after a protracted public discussion. The attorneys suggested I post a *"trigger warning"* (they did not call it that) outside the exhibit hall. I acquiesced, fueled by fear of standing up for a value system that would be wantonly

misconstrued by many. Even the faculty whose protégés produced the exhibited work were concerned and believed fair warning was appropriate.

It is possible to walk on the knife's edge of personally held values and free public expression, but it is, nonetheless, a knife's edge. What made the knife's edge navigable was not a bureaucracy or a set of rules but thoughtful people trying to understand how to solve a difficult problem in a complex and changing world. In the end, I expressed my thoughts, representing many others, and the artists expressed their views through the work. A set of rules or a committee would not have achieved a desirable outcome. The commentary about *"trigger warnings"* suggests every work of fiction ever written would need a caveat, most especially so if the work had any value: Any idea worth its salt is offensive to some. Pick the offender: Auclert, Tolstoy, King, Dickens, Laozi, Shakespeare, and Christ are a few examples.

Jonathan Last points out seven "modern" cardinal virtues: freedom, convenience, progress, equality, authenticity, health, and the grandparent of them all, nonjudgmentalism. By comparison, and in contrast, Christianity's traditional virtues: chastity, temperance, charity, diligence, patience, kindness, and humility seem antiquated. The primary difference between the two sets is simply summed up in Hindu philosophy: Virtue cannot be imposed or external, but is attained and lived up to by each individual, as an internal commitment. Interestingly, this is the foundation of Christian practice.

Universities are masters of their own fate and would do well to espouse and act on the fact that people are too. No two are the same. Hide-and-seek with committees, rules, and processes obfuscate moral responsibility and diminish rather than define it.

# Related Posts



**In Loco Parentis**

October 24, 2025



**Presidential Leadership in Higher Education**

October 31, 2025



**Did Galileo Need Tenure?**

November 8, 2025



**Civics Working on Campus: Learning for Liberty**

November 15, 2025

## Leave a Reply

Your email address will not be published. Required fields are marked *

Name *

Email *

Website

Add Comment *



☐ Notify me of follow-up comments by email.

Post Comment

This site uses Akismet to reduce spam. Learn how your comment data is processed.

**Popular Opinion Pieces** ↗

**Our Universities: Open Letter to High School Graduates**

**Our Universities: Bread and Circuses**

**Our Universities: I'm Ashamed**

**Our University: Fiscal Integrity**

TAGS



alumni athletics borrowing budgeting Campus capabilites challenge community

Community Colleges consequences corruption curiosity Demographics engagement excellence

expectations expenses Faculty incentives integrity leadership learning mission

passion practicality preparedness Public public/private quality relevance scholarship

shared governance society standards student loans student work study abroad teaching thinking

tradition traditions transfer students tuition value work ethic

Pl. App'x 194



# WT SPECTRUM Official Statement

21 March, 2023

To whom it may concern,

WT Spectrum would like to address our official stance concerning President Walter Wendler's cancellation of the charity drag show.

*Instagram*

- Home
- Search
- Explore
- Reels
- Messages
- Notifications
- Create
- Profile
- More
- Also from

**wtamuspectrum** · Follow
West Texas A&M University

···

**wtamuspectrum** Our official statement in regards to President Walter V. Wendler's e-mail canceling A Fool's Drag Race. WT Spectrum fully supports organizers working to overturn this decision made by an ignorant man who has no respect for activism and the rights of the student body at WTAMU.

#lgbt #gayrights #humanrights #buffsfordrag #wtamu #wtspectrum #gay #trans #activism

138w

**pillaykelvin** The 1st amendment does not give you freedom to anything & everything you want. Above all the laws that exist on earth stands the laws of the Creator!. Remember well that you did not create your body for you to do as you like. God has given us laws regarding life & what is right & wrong & that is ultimately what we are to live by!.

135w  Reply

**bastroptxconservative_patriots** West Texas is no place for liberals

137w  Reply

View replies (2)

**886 likes**
March 21, 2023

Add a comment...

Post

EXHIBIT 23 sticky's



First, we would like to state that drag is not designed to be offensive. Drag is not a mockery- it is a celebration. Drag is a celebration of many things; queerness, gender, acceptance, love, and especially femininity. To call it mockery or misogynistic is to miss the entire point of what drag is, and what drag means. We also find the use of religion by a university official disturbing and unprofessional, and believe that the separation of church and state is essential to our country (U.S. Const. amend. I, U.S. Const. amend. XIV, § 2)

wtamuspectrum • Follow
West Texas A&M University

wtamuspectrum Our official statement in regards to President Walter V. Wendler's e-mail cancelling A Fool's Drag Race. WT Spectrum fully supports organizers working to overturn this decision made by an ignorant man who has no respect for activism and the rights of the student body at WTAMU.

#lgbt #gayrights #humanrights #buffsfordrag #wtamu #wtspectrum #gay #trans #activism
139w

pillaykelvin The 1st amendment does not give you freedom to anything & everything you want. Above all the laws that exist on earth stands the laws of the Creator!. Remember well that you did not create your body for you to do as you like. God has given us laws regarding life & what is right & wrong & that is ultimately what we are to live by!.
135w  Reply

bastroptxconservative_patriots West Texas is no place for liberals
137w  Reply

886 likes
March 21, 2023

Add a comment...





# WT SPECTRUM Official Statement

21 March, 2023

To whom it may concern,

WT Spectrum would like to address our official stance concerning President Walter Wendler's cancellation of the charity drag show.

wtamuspectrum · Follow
West Texas A&M University

bastroptxconservative_patriots West Texas is no place for liberals

138w  Reply  ···

Hide replies

b0ntlee @bastroptxconservative_patriots and according to your ideology your moms bed is no place for me but I still end up in it every night 😏

137w  2 likes  Reply

bastroptxconservative_patriots @b0ntlee 😂 BAH HAHA . Are you in college or middle school 😂 these jokes are what a child would tell

137w  Reply

bastroptxconservative_patriots 🚫📵🚫

138w  Reply

bastroptxconservative_patriots 🚫📵🚫

138w  Reply

886 likes
March 21, 2023

Add a comment...



# WT SPECTRUM Official Statement

21 March, 2023

To whom it may concern,

WT Spectrum would like to address our official stance concerning President Walter Wendler's cancellation of the charity drag show.

Pl. App'x 199



szcemzhol-www-instagram-com-2025-11-15-12-49-10
https://www.instagram.com/p/CqDvOqzuO7z/?img_index=1
15.11.2025

*Instagram*

- Home
- Search
- Explore
- Reels
- Messages
- Notification
- + Create
- Profile
- More
- Also from M

**WT SPECTRUM Official Statement**

21 March, 2023

To whom it may concern,

WT Spectrum would like to address our official stance concerning President Walter Wendler's cancellation of the charity drag show.

wtamuspectrum • Follow
West Texas A&M University

b0ntlee @bastroptxconservative_patriots is that why someone liked my comment and ignored yours
137w  2 likes  Reply

b0ntlee @bastroptxconservative_patriots and I don't really give a shit who agrees with me and who doesn't. Your mom didn't seem to mind when I was in her bed
137w  1 like  Reply

b0ntlee @mothersdreamartworks you do realize there was an uproar during the Christmas drag show right? People had guns and were protesting outside of it. Just saying, a campus with security is much safer than a public venue where anyone is free game for protesters. And you do realize you're talking to a "biological woman", right? As if I don't understand the constant uphill battle it is to be a woman. And what about women no assigned female at birth? You're discriminating against them, fellow women. Isn't that what you're preaching about, not belittling women when that's exactly what you're doing now.
138w  1 like  Reply

886 likes
March 21, 2023

Add a comment...

Post



# WT SPECTRUM Official Statement

21 March, 2023

To whom it may concern,

WT Spectrum would like to address our official stance concerning President Walter Wendler's cancellation of the charity drag show.



# WT SPECTRUM Official Statement

21 March, 2023

To whom it may concern,

WT Spectrum would like to address our official stance concerning President Walter Wendler's cancellation of the charity drag show.

Pl. App'x 202



# WT SPECTRUM Official Statement

21 March, 2023

To whom it may concern,

WT Spectrum would like to address our official stance concerning President Walter Wendler's cancellation of the charity drag show.

**wtamuspectrum** · Follow
West Texas A&M University

**mothersdreamartworks** @bbntlee how are drag shows flattering to women?
138w  Reply  ⋯

**mothersdreamartworks** @shueytexas why is it weird? Real women of character don't dress or act that way.
138w  Reply

**shueytexas** @mothersdreamartworks You identify as a follower of Jesus, am I right
138w  1 like  Reply

**shueytexas** @mothersdreamartworks Ohhhhh LDS. Even better. Ok. Well this isn't gonna go anywhere
138w  2 likes  Reply

**bbntlee** @mothersdreamartworks having the shows funds go directly to the source rather than having to consistently press people to donate is more convenient and efficient, don't you think? I'm not saying people don't care enough to donate on their own, but this would have helped so much more and had an outcome with a much bigger donation. Don't act ignorant, I know that you know how damaging

886 likes
March 21, 2023

Add a comment...



# WT SPECTRUM Official Statement

21 March, 2023

To whom it may concern,

WT Spectrum would like to address our official stance concerning President Walter Wendler's cancellation of the charity drag show.

---

**wtamuspectrum** · Follow
West Texas A&M University

**b0ntlee** @mothersdreamartworks having the shows funds go directly to the source rather than having to consistently press people to donate is more convenient and efficient, don't you think? I'm not saying people don't care enough to donate on their own, but this would have helped so much more and had an outcome with a much bigger donation. Don't act ignorant, I know that you know how damaging this will be.

13w   2 likes   Reply

**b0ntlee** @mothersdreamartworks It is quite literally a celebration of femininity. Yes, it is also used for comedy purposes, however it is in no way to tease or insult women. It is simply to make things more entertaining. The whole "drag shows are misogynistic" thing is entirely false, what women do you see on the regular that look, dress, or act like drag queens? And do you have any proof that they are using it as a means to belittle women? No, you don't.

13w   3 likes   Reply

**mothersdreamartworks** @b0ntlee they mock womanhood and femininity by the way they dress,

886 likes
March 21, 2023

Add a comment…

Pl. App'x 204



# WT SPECTRUM Official Statement

21 March, 2023

To whom it may concern,

WT Spectrum would like to address our official stance concerning President Walter Wendler's cancellation of the charity drag show.

wtamuspectrum · Follow
West Texas A&M University

mothersdreamartworks @b0ntlee they mock womanhood and femininity by the way they dress, wear makeup and dance. Regardless, we have more important things to worry about then whether a drag show goes on or not if you're not prepared financially and otherwise, none of this stuff is going to matter over the next few months.

138w Reply

mothersdreamartworks @b0ntlee how much have you donated to the Trevor Project?

138w Reply

mothersdreamartworks @shueytexas I do identify as a disciple of Jesus Christ. We're not talking about religion right now we're talking about a group of people who are harassing a school president over standing up for what's right. There are other ways of raising money for the Trevor project. I'm sure y'all are smart enough to figure that out.

138w Reply

shueytexas @mothersdreamartworks I love how the most visible fruit of the spirit among today's believers seems to be arrogant condescension. It

888 likes
March 21, 2023

Add a comment...



# WT SPECTRUM Official Statement

21 March, 2023

To whom it may concern,

WT Spectrum would like to address our official stance concerning President Walter Wendler's cancellation of the charity drag show.

---

**wtamuspectrum · Follow**
West Texas A&M University

**shueytexas** @mothersdreamartworks I love how the most visible fruit of the spirit among today's believers seems to be arrogant condescension. It was Jesus's favorite one!
138w  1 like  Reply

**bOntlee** @mothersdreamartworks it doesn't matter to YOU. Cancelling drag shows is just the start of discrimination and unjust treatment the lgbtq+ community faces every single day. But you don't care about that, you'd rather choose to blow it off and ignore the consequences this will have on my community. This is send the signal that it's ok to treat members of my community unjustly, especially at WT now. It's not just about drag shows or donations (though those are very important). It's about setting an example of how you can treat people in a community and think it's okay
138w  2 likes  Reply

**bOntlee** @mothersdreamartworks I'm actually the president of the AC Pride club, and we've donated and helped raise money for several organizations, some local and some not. So try again, I think I'd know about this kind of stuff.

886 likes
March 21, 2023

Add a comment…



**WT SPECTRUM Official Statement**

21 March, 2023

To whom it may concern,

WT Spectrum would like to address our official stance concerning President Walter Wendler's cancellation of the charity drag show.

wtamuspectrum · Follow
West Texas A&M University

b0ntiee @mothersdreamartworks I'm actually the president of the AC Pride club, and we've donated and helped raise money for several organizations, some local and some not. So try again, I think I'd know about this kind of stuff.

138w   2 likes   Reply

b0ntiee @mothersdreamartworks the show's profit was being directly donated though. By canceling it, do you think it's going to show the same support as having it happen? He actually has a history of saying/implying bigoted statements, so saying he has put in good efforts to help the community is just false. Drag shows are not attacks, as a "biological woman" myself I see no issue. It's actually flattering. If they're not directly imitating or making fun of you, why are you getting so upset about it?

138w   9 likes   Reply

shueytexas @mothersdreamartworks this is the weirdest line of thinking. Just so strange. But ok, JK

138w   2 likes   Reply

mothersdreamartworks @b0ntiee if the people that would go to these shows truly cared about the

886 likes
March 21, 2023

Add a comment...



# WT SPECTRUM Official Statement

21 March, 2023

To whom it may concern,

WT Spectrum would like to address our official stance concerning President Walter Wendler's cancellation of the charity drag show.

---

**wtamuspectrum** · Follow
West Texas A&M University

**mothersdreamartworks** @bOntIee if the people that would go to these shows truly cared about the Trevor Project, they would donate, regardless of whether there is a show or not, don't you think?
13w   Reply

**mothersdreamartworks** @bOntIee how are drag shows flattering to women?
13w   Reply

**mothersdreamartworks** @shueytexas why is it weird? Real women of character don't dress or act that way.
13w   Reply

**shueytexas** @mothersdreamartworks You identify as a follower of Jesus, am I right
13w   1 like   Reply

**shueytexas** @mothersdreamartworks Ohhhhh LDS. Even better. Ok. Well this isn't gonna go anywhere
13w   2 likes   Reply

**bOntIee** @mothersdreamartworks having the shows funds on directly to the source rather than having to

886 likes
March 21, 2023

Add a comment...



# WT SPECTRUM Official Statement

21 March, 2023

To whom it may concern,

WT Spectrum would like to address our official stance concerning President Walter Wendler's cancellation of the charity drag show.

**wtamuspectrum · Follow**
West Texas A&M University

**b0ntlee** @mothersdreamartworks having the shows funds go directly to the source rather than having to consistently press people to donate is more convenient and efficient, don't you think? I'm not saying people don't care enough to donate on their own, but this would have helped so much more and had an outcome with a much bigger donation. Don't act ignorant, I know that you know how damaging this will be.

138w  2 likes  Reply

**b0ntlee** @mothersdreamartworks it is quite literally a celebration of femininity. Yes, it is also used for comedy purposes, however it is in no way to tease or insult women. It is simply to make things more entertaining. The whole "drag shows are misogynistic" thing is entirely false, what women do you see on the regular that look, dress, or act like drag queens? And do you have any proof that they are using it as a means to belittle women? No, you don't.

138w  3 likes  Reply

**mothersdreamartworks** @b0ntlee they mock womanhood and femininity by the way they dress,

886 likes
March 21, 2023

Add a comment...

Pl. App'x 209





# WT SPECTRUM Official Statement

21 March, 2023

To whom it may concern,

WT Spectrum would like to address our official stance concerning President Walter Wendler's cancellation of the charity drag show.

**wtamuspectrum · Follow**
West Texas A&M University

**shueytexas** @mothersdreamartworks I love how the most visible fruit of the spirit among today's believers seems to be arrogant condescension. It was Jesus's favorite one!

13w  1 like  Reply

**b0ntlee** @mothersdreamartworks It doesn't matter to YOU. Cancelling drag shows is just the start of discrimination and unjust treatment the lgbtq+ community faces every single day. But you don't care about that, you'd rather choose to blow it off and ignore the consequences this will have on my community. This is send the signal that it's ok to treat members of my community unjustly, especially at WT now. It's not just about drag shows or donations (though those are very important). It's about setting an example of how you can treat people in a community and think it's okay.

13w  2 likes  Reply

**b0ntlee** @mothersdreamartworks I'm actually the president of the AC Pride club, and we've donated and helped raise money for several organizations, some local and some not. So try again, I think I'd know about this kind of stuff.

886 likes

March 21, 2023

Add a comment...



# WT SPECTRUM Official Statement

21 March, 2023

To whom it may concern,

WT Spectrum would like to address our official stance concerning President Walter Wendler's cancellation of the charity drag show.

---

wtamuspectrum · Follow
West Texas A&M University

b0ntiee @mothersdreamartworks I'm actually the president of the AC Pride club, and we've donated and helped raise money for several organizations, some local and some not. So try again, I think I'd know about this kind of stuff.

138w  2 likes  Reply

mothersdreamartworks There was nothing hateful about what he said. As a woman I don't appreciate being treated like a sex object in any way shape or form. Drag shows don't represent true femininity or womanhood. It's degrading and makes a mockery of biological womanhood.

138w  Reply

—— Hide replies

llamanoo @mothersdreamartworks Have you seen a drag show????? You literally just hit at the whole problem. They absolutely do not represent true "Feminity" or "Womanhood" because guess what... ITS A JOKE. Its supposed to be blown out of proportion. People literally are playing CHARACTERS. What sex object? What are you talking about? People wear dresses and dance to

886 likes
March 21, 2023

Add a comment...

screenshot-www-instagram-com-2025-11-15-17-52-10
https://www.instagram.com/p/CqrDxCqzu57s/?img_index=l
15.11.2025



# WT SPECTRUM Official Statement

21 March, 2023

To whom it may concern,

WT Spectrum would like to address our official stance concerning President Walter Wendler's cancellation of the charity drag show.

wtamuspectrum • Follow
West Texas A&M University

llamanoo @mothersdreamartworks Have you seen a drag show????? You literally just hit at the whole problem. They absolutely do not represent true "Feminity" or "Womanhood" because guess what... ITS A JOKE. Its supposed to be blown out of proportion. People literally are playing CHARACTERS. What sex object? What are you talking about? People wear dresses and dance to Adele songs. Smh

13&w  6 likes  Reply

mothersdreamartworks @llamanoo Did you read their statement? They claim it's a celebration not a joke. They supposedly celebrate femininity. Read their statement. They are lying about the school president and his reasoning, and lying about why they drag.

13&w  Reply

mothersdreamartworks @llamanoo Drag Queens objectify women in dress, makeup and sexually illicit dance.

13&w  Reply

mothersdreamartworks @llamanoo tarvin Well it's

886 likes
March 21, 2023

Add a comment...



Pl. App'x 214



# WT SPECTRUM Official Statement

21 March, 2023

To whom it may concern,

WT Spectrum would like to address our official stance concerning President Walter Wendler's cancellation of the charity drag show.

**wtamuspectrum** · Follow
West Texas A&M University

women are exploited daily. March the Capital, or protest in Washington but God forbid you accuse drag shows exploiting women. I believe our society as a whole as that covered. And are you threatened by drag bc you mention biological womanhood.
Drag isn't about biological womanhood and frankly, DNA is DNA but how one identifies is not for you to judge. It's absolutely 100% NOT degrading or a mockery ...It's a performing art and if you don't approve you don't have to go or support it. And he most certainly did use religion just like Mayor Ginger Nelson and in reality, this is why people remove themselves from religion, churches, and the association of those who believe it is their right to cast the first stone and judge those they disagree with. Fortunately, the LOVE & ACCEPTANCE & FORGIVENESS of Jesus saved Mary Magdalene as people like you, the mayor, WT's president and the likes begin to throw stones. May I remind you that everyone who encircled her walked away as Jesus stated, "Ye without sin cast the first stone." It saddens me to the depth of my soul that you cannot find it within yourself to love first and allow a safe space for people to gather and foster relationships.

13w  5 likes  Reply

886 likes
March 21, 2023

Add a comment...

Pl. App'x 215



# WT SPECTRUM Official Statement

21 March, 2023

To whom it may concern,

WT Spectrum would like to address our official stance concerning President Walter Wendler's cancellation of the charity drag show.

wtamuspectrum • Follow
West Texas A&M University

find it within yourself to love first and allow a safe space for people to gather and foster relationships.

138w   5 likes   Reply

mothersdreamartworks @kcsigler drag originally started with men dressing up as a woman wearing exaggerated, make up among other things on their bodies. I'm sure I've been around a lot longer than you and I've been around a lot more people than you have, including working for a man and his friends that were drag queens. Unlike you and your friends here they respected me for the things I stood for. We had a mutual respect for each other even if we didn't always agree on everything. Find a better way to raise money for the Trevor Project.

138w   Reply

mothersdreamartworks @kcsigler where did he use religion in his statement? Aren't you being judge mental yourself? This isn't about religion, even though you keep trying to make it about that. Just for clarification on Mary Magdalene Jesus also told her to go and sin no more of course he loved her, just as he loves all of us, including those who want to perform drag it doesn't mean he condones every

886 likes
March 21, 2023

Add a comment...

GAME NIGHT



# WT SPECTRUM Official Statement

21 March, 2023

To whom it may concern,

WT Spectrum would like to address our official stance concerning President Walter Wendler's cancellation of the charity drag show.

---

**wtamuspectrum** · Follow
West Texas A&M University

**mothersdreamartworks** @kcsigler where did he use religion in his statement? Aren't you being judge mental yourself? This isn't about religion, even though you keep trying to make it about that. Just for clarification on Mary Magdalene Jesus also told her to go and sin no more of course he loved her, just as he loves all of us, including those who want to perform drag it doesn't mean he condones every behavior and nor should we as a society. It's OK to hate the sin while loving the sinner if you want to bring religion into this.
138w  Reply

**Occultcowboy** @mothersdreamartworks you cannot desperate your womanhood from Dresses and Hair, so you seek to oppress people of the "wrong sex" who wear those things ... ur a freak lowkey
138w  Reply

— Hide replies

**alenworm** good, people dont want this shoved in the face
138w  Reply

886 likes
March 21, 2023

Add a comment...

Pl. App'x 217

# WT SPECTRUM Official Statement

21 March, 2023

To whom it may concern,

WT Spectrum would like to address our official stance concerning President Walter Wendler's cancellation of the charity drag show.

---

**wtamuspectrum** • **Follow**
West Texas A&M University

**alenworn** good, people dont want this shoved in the face
138w  Reply  ...

— Hide replies

**b0ntlee** @alenworn idk who pissed in your cereal this morning but you do realize you can just not go. It's not being forced on anyone to go, and I don't see how something being discriminatory getting called out is it being "shoved in your face". Just don't show up to the show, problem solved 👍
138w  5 likes  Reply

**kiyapapaya18** Any way alumni can help support this?
138w  Reply

**shueytexas** What kind of a name is Walter Wendler anyway, what is the old or something
138w  3 likes  Reply

— Hide replies

886 likes
March 21, 2023

Add a comment...

Pl. App'x 218



## WT SPECTRUM Official Statement

21 March, 2023

To whom it may concern,

WT Spectrum would like to address our official stance concerning President Walter Wendler's cancellation of the charity drag show.

**wtamuspectrum** • Follow
West Texas A&M University

**shueytexas** What kind of a name is Walter Wendler anyway, what is he old or something
138w   3 likes   Reply   •••

—— Hide replies

**creenia** @shueytexas back in my day, we had J. Patrick O'Brien. We were spoiled. He was perfect.
138w   Reply

**wtenviro_eng** @shueytexas ad hominem - appealing to feelings or prejudices rather than intellect
137w   Reply

**shueytexas** @wtenviro_eng Uh huh I've heard the term also you're replying from a WT account
137w   Reply

**jazlyn.dingfelder** ❤️
138w   1 like   Reply

886 likes
March 21, 2023

Add a comment...

Pl. App'x 219



# WT SPECTRUM Official Statement

21 March, 2023

To whom it may concern,

WT Spectrum would like to address our official stance concerning President Walter Wendler's cancellation of the charity drag show.

wtamuspectrum • Follow
West Texas A&M University

jazlyn.dingfelder 💀
138w  1 like  Reply  ···

ohmyghosh.monica WT deserves better than a bigoted leadership. Self-expression is a first amendment right!
138w  6 likes  Reply

— Hide replies

bastroptxconservative_patriots
@ohmyghosh.monica West Texas is the most conservative region in The US. You should have done your research before going to WTA&M
137w  Reply

ohmyghosh.monica @bastroptxconservative_patriots I literally grew up in Canyon TX, I think I know what I'm working with lol. Maybe you should do your own research before making claims towards people you've never met on IG 👍
137w  1 like  Reply

886 likes
March 21, 2023

Add a comment...                                    Post

Pl. App'x 220



# WT SPECTRUM Official Statement

21 March, 2023

To whom it may concern,

WT Spectrum would like to address our official stance concerning President Walter Wendler's cancellation of the charity drag show.

**wtamuspectrum** · Follow
West Texas A&M University

**ohmyghosh.monica**
@bastroptxconservative_patriots I literally grew up in Canyon TX, I think I know what I'm working with lol. Maybe you should do your own research before making claims towards people you've never met on IG 😂

137w   1 like   Reply

**bastroptxconservative_patriots**
@ohmyghosh.monica you definitely don't belong in Texas

137w   Reply

**ohmyghosh.monica**
@bastroptxconservative_patriots not to mention - so, conservatives suddenly don't defend the first amendment right?? Only when THEY get uncomfy, right? So what I'm understanding is, y'all are ONLY scared of men dressing up with wigs and costumes when it's for self-expression, but the founding fathers wearing powdered wigs, heals, and make-up is okay though, right?? I'm sorry - what *is* your argument here? You do realize you're coming off as a lg troll more than a contributing piece to any real argument?

886 likes
March 21, 2023

Add a comment...



# WT SPECTRUM Official Statement

## 21 March, 2023

## To whom it may concern,

WT Spectrum would like to address our official stance concerning President Walter Wendler's cancellation of the charity drag show.

**wtamuspectrum** · Follow
West Texas A&M University

**ohmyghosh.monica**
@bastroptxconservative_patriots not to mention – so, conservatives suddenly don't defend the first amendment right??? Only when THEY get uncomfy, right? So what I'm understanding is, y'all are ONLY scared of men dressing up with wigs and costumes when it's for self-expression, but the founding fathers wearing powdered wigs, heals, and make-up is okay though, right?? I'm sorry - what *is* your argument here? You do realize you're coming off as a ig troll more than a contributing piece to any real argument?

137w  1 like  Reply

**bastroptxconservative_patriots**
@ohmyghosh.monica the first amendment does not apply to sexual events

137w  Reply

**ohmyghosh.monica**
@bastroptxconservative_patriots that's funny – it never states that it doesn't...??? But, of course y'all make that kind of sh*t up all the time just to justify bigotry

886 likes
March 21, 2023

Add a comment...



**WT SPECTRUM Official Statement**

21 March, 2023

To whom it may concern,

WT Spectrum would like to address our official stance concerning President Walter Wendler's cancellation of the charity drag show.

---

**wtamuspectrum · Follow**
West Texas A&M University

**ohmyghosh.monica**
@bastroptxconservative_patriots that's funny - it never states that it doesn't...??? But, of course y'all make that kind of sh*t up all the time just to justify bigotry
137w  1 like  Reply

**bastroptxconservative_patriots**
@ohmyghosh.monica first amendment does not apply to thirds that are lewd and indecent , such as nudity and sexual activity
137w  Reply

**anavianey_13** is there any type of petition we can sign tl help?
138w  2 likes  Reply

—— Hide replies

**bellakbarnett** @anavianey_13 there's a change.org petition. I have it linked in my story.
138w  1 like  Reply

**david mccarthvr14f57** @anavianev 13

886 likes
March 21, 2023

Add a comment...

screenshot.www.instagram.com-2025-11-15 (2:56:16)
https://www.instagram.com/p/Cp[tjvCzJU7zv?img_index=1
15 11 2025



# WT SPECTRUM Official Statement

21 March, 2023

To whom it may concern,

WT Spectrum would like to address our official stance concerning President Walter Wendler's cancellation of the charity drag show.

**wtamuspectrum · Follow**
West Texas A&M University

**bellakbarnett** @anavianey_13 there's a change.org petition. I have it linked in my story.
138w  1 like  Reply

**david.mccarthy1457** @anavianey_13 https://www.papajohns.com/order/menu
138w  Reply

**kraftwitch** ⊘ 🦋
138w  4 likes  Reply

**biancacg8** Texas A&M University had this issue last year and the diversity clubs were able to work together to raise the funds and host a drag show anyway!!!!
138w  17 likes  Reply

**iamadangowea** It is truly awful to see something like this be stopped and hated by administrators. Change is needed
138w  11 likes  Reply

— Hide replies

886 likes
March 21, 2023

Add a comment...

Post



# WT SPECTRUM Official Statement

21 March, 2023

To whom it may concern,

WT Spectrum would like to address our official stance concerning President Walter Wendler's cancellation of the charity drag show.

---

**wtamuspectrum · Follow**
West Texas A&M University

**iamadangovea** It is truly awful to see something like this be stopped and hated by administrators. Change is needed

138w   11 likes   Reply   ···

— Hide replies

**vampiremechanic** @dougster_1178 he might but ik i be wit ur mom

138w   Reply

**nolimitkidd** DO THE SHOW ANYWAY!!!!

138w   23 likes   Reply

— Hide replies

**dougster_1178** @nolimittkidd hell nah we don't want that shit at WT

138w   2 likes   Reply

**b0ntlee** @dougster_1178 then simply don't go. It's not mandatory.

138w   5 likes   Reply

886 likes
March 21, 2023

Add a comment...



# WT SPECTRUM Official Statement

21 March, 2023

To whom it may concern,

WT Spectrum would like to address our official stance concerning President Walter Wendler's cancellation of the charity drag show.

🔍    THE HEART AND SOUL OF THE TEXAS PANHANDLE    ☰

CATEGORIES ▾

# Ists, Isms and Free Will

👤 WENDLER  /  JUNE 12, 2022



*In the following reflection, historical quotes use the word "man." I understand the utilization of "man" as indicative of all human beings.*

Racism is a sin against God. It's abhorrent.

On April 6, West Texas A&M University held its annual "Buffs Around the World" event for faculty, staff and students to share diverse cultural characteristics and experiences. Among other experiences, a group of Hispanic students reenacted a traditional quinceañera, which celebrates a young woman's 15th birthday and marks her transition into womanhood. Similar <u>celebrations</u> are common around the world in nearly every culture.

EXHIBIT

25

tabbies®

Pl. App'x 227

Pejorative, racist comments followed from one or more individuals on a social media platform that allows anonymous postings. This platform provides a means to express vile and inappropriate, irresponsible, racist comments, which WT condemned in a <u>letter to the community</u>.

Any classification of individuals into groups based on outward manifestations of any kind rather than the condition of the heart is dehumanizing and wrong. The significant challenge of derogatory –ists and –isms is that education will not guarantee the eradication of the problem. These are typically not problems of the mind that education could fix. Instead, they are problems of the heart, a more profound and penetrating condition that cannot be addressed without some form of repentance and self-reflection.

I am a Christian, and among those who follow this faith, necessary repentance happens when a person is reborn with the knowledge of God empowered by the love of Jesus Christ. As I understand it, Christianity does not support –ists or –isms of any kind. Elevating self over "others" denies a fundamental Christian truth: <u>We are all sinners</u>. None are worthy but by the grace of God. Christ's parable of the Good Samaritan graphically demonstrates both –ist and –ism when "one" turns away from the "other." A personal decision was made by the first two of the three individuals in the story not to lend aid—to be a neighbor—regardless of group membership. They turned away. The Samaritan turned towards. Both turns are acts of free will.

With a blunt and natural-law-denying, quasi-intellectual scalpel, Marxism divides the world into two groups: oppressors and oppressed. (Oversimplified, to be sure, but accurate). Generalizations fail to capture the most important aspects of the human condition: character, capability and charity, guided by liberty, equality and responsibility. Racists, and the practitioners of various -isms, look towards simple outward manifestations creating castes of individuals held to be inferior or superior by one or more measures.

Human beings are created in the image of God, individually, <u>fearfully and wonderfully</u> made, according to <u>Holy Writ</u>. Noted author C.S. Lewis wrote in "<u>The Weight of Glory</u>," "There are no ordinary people. You have never met a mere mortal." In Robert Barker's "<u>Review of Metaphysics," he quotes </u>James Madison, the "Father of the Constitution," regarding the duty to God: "This duty is precedent, both in order of time and in degree of obligation, to the claims of Civil Society. Before any man can be considered as a member of Civil Society, he must be considered as a subject of the Governor of the Universe." This full expression of natural law disallows -ist, -ism or similar manifestation of inappropriate bias towards an human being.

For ages, people have been branded by visible and outward characteristics and assumed to represent one thing or another by such superficial preconceptions rather than a deeper knowing. Such knowing always requires effort, extension and exposure of self.

Systemic inequality is against the law. Looking for social adjustments and intervention from the state to create equity falls short. Laws have not solved the problem. The <u>Emancipation Proclamation</u>, elimination of <u>Jim Crow</u>, <u>Brown versus the Board of Education</u>, the <u>Civil Rights Act of 1964</u>, the <u>Voting Rights Act of 1965</u>, <u>Equal Opportunity legislation</u>, the <u>2009 Matthew Shepard and James Byrd Junior Hate Crimes Prevention Act</u> and other legislative efforts, too numerous to cite, fall short. All of these rightfully, and with the full force of government behind each, attempt to eliminate -ists and -isms in our society. When reading the newspaper and watching television news, I am reminded of the regrettable shortcomings of the law. Through God-given free will, a person can affect the redeeming change of heart and balance on the razor-sharp, but simultaneously, the rusty knife-edge of righteous personal belief and legislated behavior. Eve and Adam exercised free will against God's Law. Each, equal before God, made their own choice.

Equity is the quality of being fair and impartial and cannot be legislated, though we may try. Individuals give and receive equity, almost as a traded commodity. (The capitalism of the Golden Rule). Equality is the state of being equal in status, rights, and opportunities. Equality is Creator ordained, constitutionally guaranteed and often defined by metaphysical assumptions regarding people and their relationship to each other and the world around them.

As an educator, I support and promote the power of individual responsibility and accountability based on personal, family and community values reinforced in the <u>American Experiment</u>. Deeply held precepts regarding personal responsibility and its exercise affect every academic, professional and vocational discipline studied and taught at West Texas A&M University. Joseph A. Hill, who led the Panhandle's University from 1918 to 1948, acknowledged the power of personal responsibility in a free society speaking at The A&M College of Texas on July 29, 1935:

*A fact of first importance in the democratic theory is the capacity, the right, and the responsibility of the individual, The Declaration of Independence proclaims, among other things, that <u>every human being</u> has measureless capacity for the abundant life; that he has an inalienable right to the opportunity to attain it; and that he is under heavy obligation to th society that makes this attainment possible. No one of these three elements of the Americ system can be omitted without serious danger to our whole governmental and social structu*

Pl. App'x 229

Our past is imperfect, as will be our future. Timeless truths light a path forward.

*Walter V. Wendler is President of West Texas A&M University. His weekly columns are available at* https://walterwendler.com/.

## Related Posts



### Presidential Leadership in Higher Education

October 31, 2025



### In Loco Parentis

October 24, 2025



### Universities have lost sight of their mission

October 19, 2025



### Elitism in Higher Education

October 12, 2025

## Leave a Reply

Your email address will not be published. Required fields are marked *

Name *

Email *

Website

Add Comment *

W_000166

Pl. App'x 230

☐ Notify me of follow-up comments by email.

Post Comment

This site uses Akismet to reduce spam. Learn how your comment data is processed.

**Popular Posts** ↗

**Our Universities: Open Letter to High School Graduates**

**Our Universities: Bread and Circuses**

**Our Universities: I'm Ashamed**

**Our University: Fiscal Integrity**

# TAGS

alumni athletics borrowing budgeting Campus capabilites challenge community Community Colleges consequences corruption curiosity Demographics engagement excellence expectations expenses Faculty incentives integrity leadership learning mission passion practicality preparedness Public public/private quality relevance scholarship shared governance society standards student loans student work study abroad teaching thinking tradition traditions transfer students tuition value work ethic

W_000167

SPECTRUM 0002280

EXHIBIT 26

Screenshot: https://www.instagram.com/p/C1roaVKGCnv/?img_index=6, 09.04.2025, 11:11:38PM

lcspino14 · Follow
West Texas A&M Legacy Hall

lcspino14  95w
🎄 Jingle Mingle 🎄

soleil_gucklan 95w
Love u sugar!
Reply

21 likes
November 9, 2023

Add a comment...



More posts from lcspino14

Instagram
Home
Search
Explore
Reels
Messages
Notifications
Create
Profile
More
Also from Meta

Messages

# https://www.justice.gov/hatecrimes/learn-about-hate-crimes

*Experts estimate an average of 250,000 hate crimes were committed each year between 2004 and 2015 in the United States. The majority of these were not reported to law enforcement. Read more here.*

## What is a hate crime?

In the simplest terms, a hate crime must include both "hate" and a "crime."

### Hate

The term "hate" can be misleading. When used in a hate crime law, the word "hate" does not mean rage, anger, or general dislike. In this context "hate" means bias against people or groups with specific characteristics that are defined by the law.

At the federal level, hate crime laws include crimes committed on the basis of the victim's perceived or actual race, color, religion, national origin, sexual orientation, gender, gender identity, or disability.

Most state hate crime laws include crimes committed on the basis of race, color, and religion; many also include crimes committed on the basis of sexual orientation, gender, gender identity, and disability.

### Crime

The "crime" in hate crime is often a violent crime, such as assault, murder, arson, vandalism, or threats to commit such crimes. It may also cover conspiring or asking another person to commit such crimes, even if the crime was never carried out.

Under the First Amendment of the U. Constitution, people cannot be prosec simply for their beliefs. People may b offended or upset about beliefs that a or based upon false stereotypes, but it crime to express offensive beliefs, or with others who share such views. H the First Amendment does not protect committing a crime, just because the is rooted in philosophical beliefs.

## Why have hate crime laws?



EXHIBIT
29

W_000090

Hate crimes have a broader effect than most other kinds of crime. Hate crime victims include not only the crime's immediate target but also others like them. Hate crimes affect families, communities, and at times, the entire nation.

---

## Why report hate crimes?

The Hate Crimes Reporting Gap is the significant disparity between hate crimes that actually occur and those reported to law enforcement. It is critical to report hate crimes not only to show support and get help for victims, but also to send a clear message that the community will not tolerate these kinds of crimes. Reporting hate crimes allows communities and law enforcement to fully understand the scope of the problem in a community and put resources toward preventing and addressing attacks based on bias and hate.

---

## Terminology

**Hate Crime**: At the federal level, a crime motivated by bias against race, color, religion, national origin, sexual orientation, gender, gender identity, or disability.

**Bias or Hate Incident**: Acts of prejudice that are not crimes and do not involve violence, threats, or property damage.

**Scenario - Color**
Six black men assaulted and seriously injured a white man and his Asian male friend as they were walking through a residential neighborhood. Witnesses stated the victims were attacked because they were trespassing in a "black" neighborhood.

**Scenario - Disability**
A group home for persons with psychiatric disabilities who were in transition back into the community was the site of a reported arson. Investigation revealed that neighbors had expressed many concerns about the group home in town meetings and were angry that the house was located in their community. Shortly before the fire was reported, a witness heard a man state, "I'll get rid of those 'crazies,' I'll burn them out." Twelve persons, including patients and staff, suffered second and third degree burns.

**Scenario - Ethnicity**
Two Palestinian university students speaking in Arabic were attending a department reception when another student, a white male, deliberately bumped into one of them. When one Palestinian student said, "Hey, watch where you're going," the white student responded by saying, "I'll go wherever I want. This is my country, you Arab!" The aggressor proceeded to punch the Palestinian student in the face.

**Scenario - Gender**
A man entered a community college and shot and killed a female in a corridor. He then entered a classroom with 10 women and 48 men, fired a shot into the ceiling and said, "I want the women! I hate feminists!" He sent all of the men from the room, lined the women up against the wall and opened fire, killing 6 of the women and wounding the others.

**Scenario - Gender Identity**
A transgender woman was walking down the street near her home when three men walking toward her said, "Hey, what's your problem? Huh?" She kept walking, trying to ignore them. However, as they

Pl. App'x 236

close, one yelled "We don't want no queers in this neighborhood!" and a second one knocked her to the ground.

**Scenario - Race**
In a parking lot next to a bar, a 29-year-old Japanese American male was attacked by a 51-year-old white male wielding a tire iron. The victim suffered severe lacerations and a broken arm. Investigation revealed that the offender and victim had previously exchanged racial insults in the bar. The offender initiated the exchange by calling the victim by a well-known and recognized epithet used against the Japanese and complained that the Japanese were taking away jobs from Americans.

**Scenario - Religion**
Overnight, unknown persons broke into a synagogue and destroyed several priceless religious objects. The perpetrators drew a large swastika on the door and wrote "Death to Jews" on a wall. Although other valuable items were present, none were stolen.

**Scenario - Sexual Orientation**
Five gay, male friends, some of whom were wearing makeup and jewelry, were exiting a well-known gay bar when they were approached by a group of men who were unknown to them. The men began to ridicule the gay men's feminine appearance and shouted "Sissy!" "Girlie-men!" and other slurs at them then escalated to physically attacking the victims, rendering them unconscious.

Click on any of the bias categories to view a scenario of a hate crime or bias incident involving that category.



https://www.austintexas.gov/page/understanding-hate-crimes

# Understanding Hate Crimes

The City of Austin is a diverse and multicultural city. As such, we believe that diversity must be protected in every way, including preventing and responding to hate crimes and hate incidents.

- **What is a hate crime?**
- **What is a hate incident?**
- **How do I report a hate crime or incident?**
- **What happens when I make a report?**
- **What happens after a report is generated?**
- **Who is part of the APD Hate Crimes Review Committee?**
- **Where does the report go after review by the APD Hate Crimes Committee?**
- **Where can I get support?**

**What is a hate crime?**

A hate crime is a criminal act committed against a person or person's property that is motivated by bias against a person's or group's race, color, disability, religion, national origin or ancestry, age, gender, sexual preference, gender identity and expression, or status as a peace officer or judge.

It is important to note that Texas does not have a separate hate crime offense. Instead, the Texas Hate Crimes Act allows for the enhancement of the punishment for certain crimes. Examples of crimes eligible for punishment enhancement under the Texas Hate Crimes Act include murder, assault, sexual assault, terroristic threat, arson, criminal mischief, and graffiti. *See* **Tex. Code of Crim. Proc. Art. 42.014**

**What is a hate incident?**

A hate incident is similar to a hate crime in that the act is motivated by bias. The difference between a hate incident and a hate crime is that a hate incident may not rise to the level of a criminal act.

Many offensive and provocative actions are not criminal and may be protected by the First Amendment. For example, if someone handed out fliers with offensive language directed at a group of people due to that group's race or religion, that act is considered a hate incident (rather than a crime) because there is no criminal activity involved.

**How do I report a hate crime or incident?**

If you are in immediate danger, call 9-1-1.

If you are not in immediate danger, you may utilize the following non-emergency options:

- Create and submit your report directly to the Police Department using **iReport**.
- Call 3-1-1 to make a police report.

It is always important to file a police report with the Police Department and provide as much information as possible as this will assist in finding and arresting a suspect in a crime, adding serial numbers to statewide databases to recover stolen property, tracking criminal activity in various areas to prevent future crimes, among others.

If you are unsure if you should file a report, have questions, comments, concerns, or are looking for an update on a case, you can email **APDHateCrimes@austintexas.gov**.

**What happens when I make a report?**

- If you call 9-1-1, an officer will be sent to the location provided. The officer will gather details and generate a police report.
- If you choose to utilize **iReport** online, you will fill out the details on your own. A report will be generated and sent directly to the Police Department.

- If utilizing 3-1-1 non-emergency, you will be provided a customer service report number.  Your report will be entered into a queue and the next available APD call taker will call you back to gather information and generate a police report.  The wait time varies based on call load, but can take several weeks.

**What happens after a report is generated?**

After the initial reporting process has been completed, the report is flagged as a possible hate crime and routed to the appropriate investigative unit.  APD has a Hate Crimes Review Committee that meets monthly to review all cases where the victim may have been targeted due to hate or bias.  The Hate Crimes Review Committee reviews each case to first determine that a criminal offense occurred and then to review the details of hate or bias motivation.

If you send an email to **APDHateCrimes@austintexas.gov**, your email will be reviewed and, depending on the information provided, you will receive a response with guidance on next steps. Emails are reviewed Monday thru Friday during normal business hours.

**Who is part of the APD Hate Crimes Review Committee?**

The Hate Crimes Review Committee consists of Law Enforcement, Victim Services, and representatives from APD Central Records.

**Where does the report go after review by the APD Hate Crimes Committee?**

If the APD Hate Crimes Review Committee determines that a crime was committed and it was due to hate, the assigned investigator will staff the case with the appropriate prosecuting agency.

The prosecuting agency then decides whether to pursue a hate crime enhancement to the offense. For most offenses, this elevates the potential punishment by one degree. For example, if the defendant committed a Class B misdemeanor level graffiti offense, and a court finds that it was a hate crime, then the defendant will be punished for a Class A level misdemeanor graffiti offense. *See* **Tex. Pen. Code § 12.47**.

**Where can I get support?**

The Austin Police Department Victim Services Division can provide an array of support and resources.

Contact 512-974-5037 or email **Victim.Services@austintexas.gov**

You can also visit the **Austin/Travis County Hate Crimes Task Force Resource page** for more resources.

**https://www.sfu.ca/ipinch/outputs/blog/aotm-drag-queens-and-femininity/**

W_000094

Pl. App'x 239

# Appropriation (?) of the Month: Drag Queens and Femininity

April 10, 2015

By Sarah Lison

Last month Logo TV premiered the seventh season of *RuPaul's Drag Race*, a flashy competition reality show that is part *America's Next Top Model*, part *Project Runway*, and showcases fourteen drag queens in their bid to be crowned "America's Next Drag Superstar."

Along with host and supermodel RuPaul Charles himself, it is perhaps the most mainstream example of drag performance and culture today. Most drag queens are gay men (though there are performers of all genders and orientations) who adopt a female persona for the purpose of performance, rather than identifying as a woman all the time. However, the history of drag as a haven for marginalized gay men, often of lower economic class and ethnic minorities, has led to a distinct and fully formed culture of performers with their own developed lexicon and unique traditions.

Drag as a performance of gender brings up complex questions around the distinctions between appreciation, appropriation, and subversion. The premise of drag itself as a performance of gender could be interpreted as an appropriation of the culture of women, as many queens aspire to look as "fishy" (realistically feminine) as possible, and compete in drag queen pageants. Female icons such as Cher, Lucille Ball, and Judy Garland are regularly paid tribute to, and celebrity impersonations are a popular category of performance. Given the shared experience of disempowerment that many women and gay men have experienced, it can be viewed as homage to imitate and perform as female celebrities who have forged their own success. On the other hand, many drag queens construct more androgynous or genderless looks, such as the Club Kids of the 1980s and 1990s, the provocative Tranimal movement, or Eurovision winner Conchita Wurst. Whether intended by each individual performer or not, drag highlights the constructed nature of gender (Butler 2006), but whether it is at the expense of women is a matter up for debate.

Feminist writings attacking drag as anti-women have likened it to gender blackface (Murphy 2014), taking and exaggerating feminine traits for the purpose of entertainment. Queens are able to don and remove their female personas at will, while women must deal with the realities of their gender constantly. Cultural appropriation often involves cherry-picking sometimes superficial aspects with no regard for the full context of living within that culture. However, most instances of cultural appropriation occur through a power imbalance, with the more dominant demographic sampling from less empowered. Drag in its infancy worked in reverse.

The individuals that made up the New York scene of the 1970s and 1980s were largely black or Latino, lower class, and often teen runaways. Drag offered a way to slip on the identity of someone else with much more social power and privilege. As performer Dorian Corey noted in the documentary *Paris is Burning* (1990), "Black people have a hard time getting anywhere and those that do are usually straight. In a ballroom you can be anything you want…you're showing the straight world that I can be an executive if I had the opportunity because I can look like one, and that is like a fulfillment." In its formative years, drag was not an appropriation of a marginalized class, but an act of class aspiration. Both the stage and the persona represent a safe haven where performers are not subject to the slurs and abusive of daily life as gay men (Berkowitz and Belgrave 2010:169). However, with the increasing recognition of equal rights to LGBT people, and the more mainstream appreciation of drag culture, does this dynamic still hold true? Or with a less extreme power imbalance, do these performances lose their aspirational quality and become more complex?

To further complicate matters, drag culture itself has become subject to appreciation/appropriation. Madonna famously showcased the art of voguing, a dance style that came about the in drag ballroom scene of the 1980s, in her "Vogue" music video. Its mainstream success helped the dance form gain popularity among a much wider audience, and Madonna established herself as an icon to many drag queens. Yet such critics as bell hooks (1995:31) have accused her of tokenism and insincerity in featuring racial and sexual minorities for her own branding purpose. As a Caucasian woman, she has taken an aspect of a niche subculture, which itself draws inspiration from feminine appearance and behavior, and capitalized on

WW000095                                                          Pl. App'x 240

it. In this case, is this appropriation? And if so, who is appropriating from whom? And does drag benefit from its migration to a more mainstream practice, or do its nuances get reduced to its basic premise and a few catchphrases?

Drag by its nature causes provocation by mirroring aspects of mainstream society, and exaggerates it in a manner that blurs the line between reverence and parody. Whether or not it is a form of appropriation raises larger questions about society. Is there a *female culture*? Does the act of a man performing as a woman demean women? Does it mock our perception of what it means to be a woman, and is that a negative? Does appropriation exist when acted out by a disempowered demographic, or is drag's status as an act of appreciation or subversion contingent on its performers remaining marginalized?

It is the history of drag and its part in providing a community for gay men otherwise rejected from society that differentiates it from a man simply wearing a dress for comedy, as in *Mrs. Doubtfire* or *Tootsie*. However, this history is all too easily left by the wayside as drag becomes increasingly accessible. Context matters and whether you are entertained, intrigued, insulted, or otherwise provoked by drag, it is important to appreciate drag's history to help dissect the discourse surrounding it today.

Photo: RuPaul by David Shankbone (David Shankbone) [CC BY 3.0], via Wikimedia Commons.

## References Cited

Berkowitz, Dana, and Linda Liska Belgrave. 2010. "She Works Hard for the Money": Drag Queens and the Management of Their Contradictory Status of Celebrity and Marginality. *Journal of Contemporary Ethnography* 39(2): 159–186.

Butler, Judith. 2006. *Gender Trouble: Feminism and the Subversion of Identity*. Routledge, New York.

hooks, bell. 1995. Madonna: Plantation Mistress or Soul Sister? In *Gender, Race, and Class in Media: A Text-Reader*, edited by Gail Dines and Jean McMahon Humez, pp. 28–32. Sage, Thousand Oaks.

Livingston, Jennie (dir.). 1990. *Paris Is Burning* [Motion Picture]. Miramax, USA.

Murphy, Meghan. 2014. Why Has Drag Escaped Critique from Feminists and the LGBTQ Community? Feminist Current, accessed March 15, 2015.

## Additional Reading

Baker, Roger, Peter Burton, and Richard Smith. 1994. *Drag: A History of Female Impersonation in the Performing Arts*. Cassell, London.

Jacob, John, and Catherine Cerny. 2004. Radical Drag Appearances and Identity: The Embodiment of Male Femininity and Social Critique. *Clothing and Textiles Research Journal* 22(3): 122–134.

Jenkins, Sarah. 2013. Hegemonic "Realness"? An Intersectional Feminist Analysis of *RuPaul's Drag Race*. Unpublished MA thesis, The Dorothy F. Schmidt College of Arts and Letters, Florida Atlantic University, Boca Raton.

Moore, F. Michael. 1994. *Drag!: Male and Female Impersonators on Stage, Screen and Television: An Illustrated World History*. McFarland, Jefferson.

Moore, Ramey. 2013. Everything Else Is Drag: Linguistic Drag and Gender Parody on RuPaul's Drag Race. *Journal of Research in Gender Studies* 3: 15.

Newton, Esther. 1979. *Mother Camp: Female Impersonators in America*. University Of Chicago Press, Chicago.

Strings, Sabrina, and Long T. Bui. 2014. "She Is Not Acting, She Is." *Feminist Media Studies* 14(5): 822–836.

Taylor, Verta, and Leila J. Rupp. 2006. Learning from Drag Queens. *Contexts* 5(3): 12–17.

Underwood, Lisa. 2004. *The Drag Queen Anthology: The Absolutely Fabulous but Flawlessly Customary World of Female Impersonators.* Routledge, New York.

## https://eliesheva.medium.com/what-drag-queen-culture-does-to-women-via-rupauls-drag-race-5814c544d0ae

**From Drags to Bitches: The implications of mainstreamed drag culture on women**

S7:E1 of RuPaul's Drag Race may not have been the best one with which to begin a Netflix binge

**Introduction: Down a rabbit hole, I am Alice in Wonderland**

This investigation began because I watched an episode of RuPaul's Drag Race and it was like being immersed in a warm rainbow.

Reddit: Throwback to the amazing season 9 rainbow shoot

And then something happened, and it didn't feel good anymore.

The eyelashes, the glitter, the body language, the movement — I couldn't take my eyes off any of it. It is genuinely fun and enjoyable to take in. To wonder what it would be like gluing massive eyelashes to your lids, to having incredible cheek-bone drawing skills. To be able to sashay.

And yet. Something felt wrong.

I started asking myself — is it possible (and necessary) to separate appreciation for the performance art of drag from the *mainstreamed reality show competition drag spectacle* created by RuPaul's Drag Race? And how did we get to this fantastical land of RuPaul? And what would it mean if it had never come to be?

A bit of background: RuPaul's Drag Race is streaming all ten seasons on Netflix (as of December 2018) and was only transitioned to the more mainstream VH1 from LOGOtv in 2017 (both are Viacom properties). Plenty of articles and commentaries have been written — especially in the last year — as the show has become a cultural phenomenon over the last decade. The show is a mix of reality TV and competitive pageantry.

The premise is intriguing: What is drag's place in the context of a competitive reality show? I'm not sure RuPaul saw it coming when he started, but the premise now may as well be: What is the mainstreaming of drag doing for the drag community, and beyond? What is this show teaching viewers — LGBT and straight — outside of that community?

After watching a handful of episodes, a few things became clear:

1. Drag is a fascinating performance art.

2. There is something visually pleasing in watching this.

3. There is also a bit of a 'can't take eyes off a train wreck' quality.

4. There is something, which at first I could not put my finger on, that felt insulting.

W_000097

As a television viewer, it is entertaining. As a Netflix binge-watcher, it is fulfilling. As a woman — it was something else entirely. A mockery? An illusion strengthening stereotypes? At what point does drag go too far? Can it? How can it not?

Why, historically, have men found a fascination in dressing as women — or caricatures of women — for personal fulfillment, entertainment? Was it out of need, or was there truly an internal yearning to mask oneself in the yang to their yin? Do all humans have a dual male-female nature, and is this a manifestation of it?

This all seems more than plausible — it seems true.

But here's where it starts to get messy: when the historically dominant sex, men, are empowered and emboldened to strut, 'sashay' and develop their female alter egos to a point that seems to cross a line into an extreme, hyperactive *caricaturization* of overblown female stereotypes. When is drag queen imagery insulting and belittling? If there is truly a movement to make traditionally feminine beauty genderless, what comes first? The mainstreaming or the extreme?

The way I see it, as a woman, the characterization of a reality TV drag queen series is not 'gay men are this at the extreme' or even 'men can be this at the extreme' but 'this is a cartoonish portrayal of overblown women stereotypes now being owned and developed by men for entertainment/a personal fulfillment.'

Maybe I feel this way because I haven't been all that exposed to real-life drag queens or drag shows. Maybe it's the time I'm living in. Maybe I'm right, and there is something here to poke at — a misunderstood wound.

This is all, of course, conjecture on my part.

I began to investigate.

**Religious Rites to Boogie Nights: A too-short history of drag**

For the sake of this paper, the following is a very short history to put the drag culture into context.

First, some interesting — and ancient — artifacts of drag history, which is rooted in drama, and actually directly connected to, of all things, religious rites (Sashay Through the History of Drag Queen Culture — PopSugar, August 16, 2018):

- Earliest forms of cross-dressing — simply the act of wearing clothes that are designated as belonging to the opposite sex — are actually rooted in religious rites — like ancient ceremonies of Native American, indigenous South American, and Ancient Egyptian societies, as well as Japanese theater.

- In England, "formal drama came, literally, from the church. In an effort to help the illiterate and, well, less intelligent members of the congregation better understand church worship, parts of the mass were dramatized in very simple ways."

- Women were omitted from the craft entirely, as it was originally a function of the church and they played no active part in services, offices, or — in this case — acting within the church. This was all done by men.


Julian Eltinge, female impersonator in the 1910s (Wikipedia)

Drama became a secular sport. Stories evolved from their religious roots, ownership left the church and entered local guilds, and motivations for storytelling changed.

The idea that 'drag' was the word to describe wearing clothing normalized by the opposite sex appeared in print as early as 1870 (Wikipedia: Drag clothing). Drag queens are mainly thought of as men who dress in women's clothing, and "often act with exaggerated femininity and in feminine gender roles with a purpose

Pl. App'x 243

entertaining purpose. They often exaggerate make-up such as eyelashes for dramatic, comedic or satirical effect." (Wikipedia: Drag Queen).

Why is this… a thing?

*"The activity… has many motivations, from individual self-expression to mainstream performance. Drag queen activities among stage and street performers may include lip-syncing, live singing, dancing, participating in events such as gay pride parades, drag pageants, or at venues such as cabarets and discotheques." (Wikipedia)*

Perhaps what is less well known or assumed by younger generations watching reality TV, is that:

*"…this sort of public awe — sometimes, it borders on worship — of drag queens has really only cropped up in the past decade or two. Before that, drag was submerged deep in underground clubs and back-alley bars. And before that, it was an exaggerated and integral part of the theater culture. The fact is, drag has been a part of our culture for centuries. And every era and every new iteration of the art form has been crucial to the shape and success of drag today." (PopSugar)*

Like so much related or associated with LGBTQ culture and society, this being out, exposed to the mainstream, is all fairly new.

*"Drag was a powerful movement in NYC during the late 1980s and 1990s, due in large part to the explosively experimental East Village performance scene." (PopSugar)*

It's that effect of seeing a reflection of yourself on screen and stage — not as a caricature, but as a character in the story. Or a fantasy version of yourself un-mocked or fetishized — but rather, celebrated. Respected. Parts of the 1990s included breakthroughs on otherwise generally homophobic TV; Gen Xers and elder millennials will surely remember.

*"As true drag queens came out of the shadows, mainstream media continued to paint more portraits of female interpretation. But there was a notable shift. The drag queen wasn't quite as much of a punchline, or a garish creature to shine a spotlight on. New films, like* The Adventures of Priscilla, Queen of the Desert *(1995), depicted drag queens in more flattering light." (PopSugar)*

It is no wonder the millennial generations drive so much change by just *existing* after the childhoods they experienced during that period.

Then there is the very concept of being a 'straight ally'.

*"A straight ally or heterosexual ally is a heterosexual person who supports equal civil rights, gender equality, LGBT social movements, and challenges homophobia, biphobia and transphobia." (Wikipedia: Straight Ally)*

Acceptance and support — in the mainstream, with vocabulary to describe it. Drag certainly finds its place among these newer generations exposed to concepts and vocabularies built for wider acceptance.

Then again, in a 2018 interview with Joe E. Jeffreys, a drag historian and teacher at the Tisch School of Arts at NYU, Jeffreys claims it's actually always been mainstream — and is actually a lot simpler a concept than laid out previously:

*"…drag is a theatrical form. Drag is anytime that someone is putting on clothing that is considered to be not appropriate to them, and then wearing it with some type of ironic distance. In its purest form, drag is when a person goes into a dressing room, they put this thing on, they go out on stage and they perform, and [after the show] they take it off." (RuPaul's Drag Race* and What People Get Wrong About the History of Drag — TIME, March 9th, 2018)

And on the topic of correlation with gay culture? Jeffreys says:

*"Drag, I say, is the indigenous queer performance form, meaning it is of the people, by the people and for the people. I also maintain that drag has always been mainstream — it is just that with the different*

*platforms that drag is now able to work through, perhaps there is a wider, quicker audience that has access to it."*

Explaining further, Jeffreys maintains that you must go back to the point where homosexuality and drag became an assumption. In the 1930s, the study of sexual practices among people in cultures, was actually working to create concrete ideas of labels, categories of people, and motivations. Maybe a predecessor of the 'identity culture' we are familiar with today. It was the beginning of mistaking or assuming cross-dressing was a direct causation or association with what we call homosexuality today.

**Gay and Drag: Deleting the 'mask' in masculine**

As anyone born and raised in the last handful of decades knows, drag is "closely associated with gay men and gay culture." (Wikipedia).

Here's Jeffreys again — answering the question of where drag is in its purest form. His answer: gay bars.

*"This is where the drag queen serves this kind of shaman role, this kind of court-fool role [in which] they are allowed to say and do things that the culture perhaps needs to look at. Even one of the performers on* RuPaul's Drag Race*, Bianca Del Rio, will say, "I'm a clown." She recognizes this comedic role, like we see in Shakespeare with the fools. Drag performers will say that once they are in this costume, they're allowed to say and do things that they could never do in their everyday persona."*

But that's not to say there are no sophisticated relationships -

**Drag mother** *(n.): Also* drag daughter, drag family. *An experienced drag performer who acts as a mentor and guide to someone who wants to learn the art of drag. Often, the new drag queen, who is referred to as the drag mother's drag daughter, takes the last name of her drag mother to pay homage to her. A drag family is made up of a drag mother and all of her drag daughters. (Glossary of Drag Terms — Enterthequeendom)*

It's no surprise that this particular scene can serve as the safe space many young gay men thrive in, especially after trauma. On season 10, episode 6 of *Drag Race*, contestant Blair St. Clair went deep into personal trauma — sexual assault and rape — and it was a moment of all the episodes that I cherished, in all the realness served (RuPaul's Drag Race star Blair St Clair opens up about surviving rape- Pink News, May 31st, 2018).

Not that I watched every single episode of every season, but this struck me as a brave moment as any rape trauma telling, and here on TV, in a vulnerable position, within a vulnerable community building beauty out of that. Judging by the reactions of the episode's judges, and RuPaul himself, this was clearly a one-of-a-kind incident on the shot.

It was certainly a cry-it-out moment, and the show responded with the F word:

Meanwhile, in *Dancing Queen*, an original show produced by Netflix (2018 release), Justin Dwayne Lee Johnson — a dance teacher for kids who is also known as Alyssa Edwards when performing — says, very simply, "the power of drag is giving someone the courage." (Season 1, Episode 1, Dancing Queen).

How is that any different than the formerly shy, stuttering kid who finds solace in acting? Or the writer who can't function as well in the 'real world' as they can on the page? Where *aren't* people using masks and makeup — literal or figurative — to uncover and make public their true selves in this world?

As RuPaul says — many times:

*"You're born naked, and the rest is drag."*

# https://thecritic.co.uk/how-drag-degrades-women/

*Picture Credit: antanddec / Instagram*

# How drag degrades women

*Sexism in a dress is still sexism*

**ARTILLERY ROW**

25 February, 2022

By

- **Dr Em**

**O**n 19 February 2022 the Conservative MP Darren Henry was filmed receiving a lap-dance and simulated oral sex from a drag queen at a charity fundraiser for homeless youth.

Speaking of the evening's unexpected turn, Mr Henry said: "I was very pleased to attend the charity drag night on Saturday at the invitation of Broxtowe's Mayor. The event raised a lot of money for Broxtowe Youth Homelessness … I had no idea I would be asked on to the stage", despite being the MP for the constituency.

Mr Henry claimed to be "slightly alarmed by what it entailed, but", in case you had any misgivings, has "been assured by my lovely wife that it is part of the parcel of a drag show".

A man dressing up as a woman and performing a lap-dance and simulated sex acts at a fundraiser for homeless youth is particularly distasteful as homeless women are recognised as incredibly vulnerable to sexual exploitation and being recruited into the sex trade. In 2017 Crisis, the homelessness charity, released research that indicated that nearly 1 in 4 female rough sleepers had been sexually assaulted in the past year.

Porchlight's report "Seeing the Unseen" found that "91 per cent of women who experienced violence or sexual abuse while sleeping rough did not report it to the police, primarily because they did not feel they would be believed or were too afraid". Women in "hidden homelessness", those sleeping on sofas or in spare rooms fare no better.

Drag at its core is misogynistic

Addressing the House of Lords in January 2022 Baroness Kennedy of Cradley highlighted how this was a long-standing and widespread issue. She cited how "back in 2016, Shelter found that 8 per cent of women had been offered a sexual arrangement. Two years later, its polling estimated that 250,000 women had been asked for sexual favours in exchange for free or discounted rent, and its more recent research showed that 30,000 women in the UK were propositioned with such an arrangement between the start of the pandemic in March 2020 and January 2021". Thus, I hope you will excuse me if I do not find men simulating sex acts for other men's entertainment at a homelessness fundraiser funny.

It is only this year that "Sex for rent" in the UK will finally be recognised as a specific offence. Previously, the victim had to identify herself as a prostitute in court to bring a case. Lord Ponsonby of Shulbrede, who brought amendment 104E outlawing the practice, recognised how this discouraged victims from pressing charges.

W_000101

Pl. App'x 246

He argued that: "The law itself has made it extremely difficult for sex-for-rent victims to seek justice. According to the law, victims must be legally defined as prostitutes, which is a huge deterrent in their access to justice". Indeed, although offering accommodation in return for sexual services has been illegal for over a decade, only one person has ever been charged with an offence.

This context reinforces how a drag night to raise funds for homeless youth was incredibly inappropriate. Drag at its core is misogynistic; it is men portraying women as sexually objectified caricatures. Drag performers frequently reduce women to hyper sexualised, big breasted, big haired bimbos.

Celebrated men in drag have names that objectify, sexualise or make light of women's issues. The SNP MP Mhairi Black "accompanied Nathan Mullen, a drag queen who performs under the name 'FlowJob', to Glencoats primary school" to read to children. "Anna Bortion" was listed as one of the funniest drag queen names by *Pride* alongside "Malestia Child". Ginger Minj finished as a runner up on Ru Paul's Drag Race.

Or maybe you wish to hire "Felicity Suxwell" who we are informed "is a 23 year old Drag queen, she looks 12 and has the energy of a 3 year old … ready to steal your man, grandad, dad and all the D's in your life". For £250 you can enjoy the company of "miss Annie Rexie".

The language of drag is often no better as it is a highly sexualised genre of entertainment in which women are often the butt of the joke. The British Library promoted an event with children's drag entertainer Alyssa Van Delle, calling Van Delle a "hot" performer who will "have you on the edge of your seat and gagging for more". "Charisma, uniqueness, nerve and talent" is a phrase repeated by RuPaul, simply because the words spell out C.U.N.T. Or how about the drag term "fish", which is used to describe a very feminine drag queen or man that "passes". It is a reference to the supposed smell of women's genitals.

In what other circumstance is it acceptable to woop and clap when a member of the privileged group uses ridicule against an oppressed group? To rub salt in the wounds, these men build their careers off of the tools of female oppression — gender stereotypes and sexual objectification — and re-entrench them in performances where they are portrayed as just a laugh and a lark.

Lap dancing, a form of sexual exploitation of women, is a case in point: "Academic research has linked lap-dancing to trafficking, prostitution and an increase in male sexual violence against both the women who work in the clubs and those who live and work in their vicinity". Speaking of her time working in a strip club, Elena described how "I was seen as an object, not a person".

Making a joke out women forced by poverty to sexually service men and objectify themselves is cruel and anything but challenging the status quo. Aren't we supposed to have agreed as a society that sexist banter wasn't going to be getting a pass and that male sexual exploitation of women wasn't funny? So why is male chauvinism ok just because it's wearing drag?

## [https://www.heraldscotland.com/news/18124382.mark-smith-feminists-got-problem-drag-queens-back-off-dear/](https://www.heraldscotland.com/news/18124382.mark-smith-feminists-got-problem-drag-queens-back-off-dear/)

**Mark Smith: Feminists have got a problem with drag queens. Back off, dear**

26th December 2019

By Mark SmithFeature writer

Panti Bliss

WOULD you believe it – someone has said something stupid on Twitter. The culprit was the former athlete Sharron Davies, who said this: "Am I the only person fed up of drag shows? A parody of what a real woman is, like black face. Women are juggling kids, rushing out a wholesome dinner, doing the laundry and cleaning, holding down a job all with period pains and leaky boobs if breast feeding. Enough of the stereotypes."

Yup, she really said "enough of the stereotypes" at the end of a sentence full of stereotypes about women. "Juggling kids" – what about women who don't have kids? "Rushing out a wholesome dinner" – what about women who don't cook? "Holding down a job" – what about women who don't work? As for "doing the laundry and cleaning" – yikes.

Recommended by

———

**Check out the new 2023 Volvo XC40 that's stylish and won't break the bank.**Best Volvo Deals | Search Ads | Sponsored

Davies's comparison between drag performances and black face is also problematic. Some of the greatest drag performers are black, and drag has often been a way for them to escape prejudice. But comparing drag and blackface also misunderstands what drag is. Blackface is about white people putting on make-up to mock a minority. Drag is about a minority (usually gay men) putting on make-up to express and explore their identity. They are not copying women, they are revealing an aspect of themselves.

Pl. App'x 248

The best people to explain what I mean are the drag queens themselves. Most of them say the feminist critique is nothing new – feminists have been accusing drag of being oppressive since the 1970s. More recently, trans women and activists have also taken offence, and even some gay men worry that drag perpetuates a certain camp and prissy stereotype of gay life. Drag queens, it seems, are apparently capable of offending almost everybody (which is the way they like it, to be honest).

RuPaul, the most famous of all drag queens, puts it this way: the fact that someone might be offended by drag is not enough to restrict the right of performers to do it. But more important is why the performer does it in the first place. The Irish drag queen Rory O'Neill, aka Panti Bliss, once told me that when he puts on his heels and his hair, he isn't impersonating a woman, he's using tools traditionally seen as feminine to express himself. His point is that we are still hung up on stereotypes about what women wear, and – by the looks of Sharron Davies's tweet – lots of other stereotypes about women too.

Drag is, among other things, about refusing to accept those stereotypes on clothes and the way men and women are apparently supposed to look. In the words of Panti Bliss: our culture insists men should be grey and dull-looking and that frocks and make-up should be restricted to women and it's all bulls***. "If I want to cover myself in glitter or have big hair and make myself bigger," says Panti, "then why shouldn't I?" We say: do it – glitter, hair, whatever you like.

For gay men, there are other, more obviously political elements to drag. In the 1960s, drag artists were at the heart of the Stonewall Riots, the event that's considered to be the start of the modern struggle for gay rights. Drag queens can also help bring about a society in which a gay man can express his flamboyant side without facing prejudice and homophobia.

Take this story from Rory O'Neill for example. Rory is from Ballinrobe in County Mayo and in 2015 the town confounded the image of Ireland as a conservative, intolerant place when Rory took his show there. Not only that, he walked through the streets in drag with his mother and father by his side; his father also held an umbrella to prevent his son's big blonde wig getting wet, which is the least any drag-father can do. What would feminists be achieving, I wonder, if they managed to put a stop to that?

I'm not saying drag is perfect and I accept that just because gay people have experienced prejudice does not mean they can never inflict it on others. There are also some drag queens who do make misogynistic jokes and I'm uncomfortable with some of the vocabulary some of them use, particularly words like bitch and slut.

But, in the end, drag itself is a solution, not a problem, and is about challenging the kind of prejudice that Sharron Davies is accusing it of. I've watched drag queens put on their make-up. I've watched them layer foundation on their face and use highlighter to soften their jaw. They're not putting on blackface when they do it, or anything like it. They're not mocking women. They are putting on the wigs and the make-up not to hide themselves but to reveal it.

Share

Hide comments

**COMMENTS & MODERATION**

Readers' comments: You are personally liable for the content of any comments you upload to this website, so please act responsibly. We do not pre-moderate or monitor readers' comments appearing on our websites, but we do post-moderate in response to complaints we receive or otherwise when a potential problem comes to our attention. You can make a complaint by using the 'report this post' link . We may then apply our discretion under the user terms to amend or delete comments.

Post moderation is undertaken full-time 9am-6pm on weekdays, and on a part-time basis outwith those hours.

Read the rules here

Sort by

Peter Dale Smith27th December 2019 2:34 am

User ID: 1076148

I should not maybe comment, however having been brutalised by feminists over the years, most likely well deserved, I can confidently recommend a drag queen if you wish to share a flat. For those who disagree with me, I can recommend that you experience this situation before you make a decision. Personally I never experienced it either, but the feminist flack I got in real life, tended to encourage me to assess my attitudes. Drag Queens, Irish, Dogs, Jehovah's Witnesses and Mormons, OK. Feminists banned.

Last Updated: 6th January 2022 5:27 pm

Report

1

Hugh Oxford27th December 2019 10:19 am

User ID: 642931

It's a fair point. But then we have people like Jo Swinson who deny that women even exist, and the Scottish Government are proposing to legally abolish women entirely.

Last Updated: 8th December 2022 11:54 pm

Report

22

↪ in reply to Hugh Oxford

Paul Brownsey27th December 2019 10:50 am

User ID: 1013795

**W_000105**

Pl. App'x 250

Drag is different from trans.

Last Updated: 7th March 9:31 pm

Report

3

Carolyn Cowan27th December 2019 1:13 pm

User ID: 1011575

Sorry to disappoint you Mark dear -but I have no problem with drag queens. However it was good of you to mansplain how I should be feeling

Last Updated: 4th March 1:54 am

Report

37

↪ in reply to Carolyn Cowan

Paul Brownsey27th December 2019 1:44 pm

User ID: 1013795

There is nothing wrong with a man telling a woman there is something amiss with her sentiments on a given matter. Likewise, there is nothing wrong with a woman telling a man there is something wrong with his sentiments on a given matter. Of course, one hopes that reasons will be given in both cases. And in both cases the person who has the stronger position may be the one not of the sex addressed. Do get out of this silly men-vs-women mentality.

Last Updated: 18th February 6:47 am

Report

2

↪ in reply to Paul Brownsey

Carolyn Cowan27th December 2019 3:21 pm

User ID: 1011575

Sorry Paul -you missed the point completely .Mark is assuming that women have a problem with drag queens just because of a remark made by one single person on Twitter and has spun out a whole article on it-not unusual in the Herald. I don't need Mark to tell me what to think about drag queens and I don't need him to make assumptions about what I think either. People can do as

please. This isn't 'man' against 'women' -I usually largely agree with Mark's articles. Also, who gives any person the power to decide what is 'right' and what is 'wrong' on a particular matter-why do you assume that there is a right or wrong aspect to sentiments which are often just a matter of opinion-there may not be a 'stronger position' held by any party.

Last Updated: 4th March 1:55 am

Report

15

↳ in reply to Carolyn Cowan

Paul Brownsey27th December 2019 3:36 pm

User ID: 1013795

"I don't need Mark to tell me what to think about drag queens" Is he really doing that? He's offering a view as to how it's sensible to view drag queens. He isn't purporting to tell you to do anything. "Also, who gives any person the power to decide what is 'right' and what is 'wrong' on a particular matter" We each have our reason to bring to bear on the matter in hand. Someone else's exercise of reason can be illuminating. "why do you assume that there is a right or wrong aspect to sentiments which are often just a matter of opinion-there may not be a 'stronger position' held by any party" Whether or not there is a right answer on these matters is itself open to discussion, but leaving that aside, one can come to judge one set of reasons to be stronger than another, and one's judgement can be informed by the reasons others give for their positions.

Last Updated: 15th December 2022 11:29 pm

Report

4

Lindsay Schluter27th December 2019 6:18 am

User ID: 1676566

It's always so uplifting when a man tells a woman what to think and where she's got it wrong about women. Oh, and the mockery bit: ever tried oversized boobs for real? Together with the back breaking pain they induce? And the stereo-type bit: if only more men were enlightened and helped in very practical ways to debunk the stereo-type of the 'plate spinning' woman, that would go a much longer way than conflating those who are gay with drag queens and telling women how wrong they've got it all.

Last Updated: 7th March 8:36 am

Report

75

**W_000107**
Pl. App'x 252

↳ in reply to Lindsay Schluter

Paul Brownsey27th December 2019 7:45 am

User ID: 1013795

"It's always so uplifting when a man tells a woman what to think and where she's got it wrong about women." Oh dear. Intelligence isn't sexed. Neither is it party-line stuff: all women vs all men. Sometimes a man may know better than a woman even on something about women. Sometimes a woman may know better than a man even on something about men.

Last Updated: 17th February 2:33 pm

Report

2

↳ in reply to Paul Brownsey

Lindsay Schluter27th December 2019 11:54 am

User ID: 1676566

Absolutely take your point. Unfortunately this partcular author has some form in hectoring women.

Last Updated: 28th February 9:14 am

Report

21

Michael murray27th December 2019 3:53 am

User ID: 1038482

Its always strange how prejudice is always one way. No potential that drag queens are ever derisory about women. But lets get real - its all a bit dull . There are only so many times you can see a second rate comedian wearing a dress and lip synching. For the majority of the world more of us cook and look after children - drag queens are about as relevant as accusations that super models induce anorexia. Topical but frankly acutely boring hearing the same story.

Last Updated: 7th March 9:31 pm

Report

12

↳ in reply to Michael murray

Gavin Harrison 27th December 2019 3:59 am

User ID: 1086681

Thank you. Third and fourth sentences are absolutely bang on.

Last Updated: 15th August 2022 10:42 am

Report

3

John Collins 28th December 2019 2:38 pm

User ID: 1809594

Would you believe it - someone has written something stupid in print. The culprit Herald journalist Mark Smith. What a patronising article by a self entitled man. Well said Sharon, drag queens - suitable role models - I don't think so - cashing in on the current fad more like.

Last Updated: 7th March 9:33 pm

Report

46

Joyce Molloy 27th December 2019 3:41 am

User ID: 1059784

So drag queens are gay men exploring their identity? Please explain.

Last Updated: 8th March 9:48 am

Report

18

↪ in reply to Joyce Molloy

Paul Brownsey 27th December 2019 3:58 am

User ID: 1013795

I'm gay and it's nothing to do with my 'identity' or my husband's.

Last Updated: 7th March 9:30 pm

# Chicago-Kent Law Review

Volume 75                                                                          Article 4

Issue 3 *Symposium on Unfinished Feminist Business*

June 2000

# Drag = Blackface

Kelly Kleiman

Follow this and additional works at: https://scholarship.kentlaw.iit.edu/cklawreview

 Part of the Law Commons

## Recommended Citation

Kelly Kleiman, *Drag = Blackface*, 75 Chi.-Kent L. Rev. 669 (2000).

Available at: https://scholarship.kentlaw.iit.edu/cklawreview/vol75/iss3/4

This Article is brought to you for free and open access by Scholarly Commons @ IIT Chicago-Kent College of Law.
It has been accepted for inclusion in Chicago-Kent Law Review by an authorized editor of Scholarly Commons @ IIT

Chicago-Kent College of Law. For more information, please contact jwenger@kentlaw.iit.edu, ebarney@kentlaw.iit.edu.

# DRAG = BLACKFACE

**KELLY KLEIMAN***

To most educated Americans, performance in blackface is an artifact of long ago, an embarrassing reminder of a distant past in which overt racism was tolerated, as obsolete a form of cultural expression as lawn jockeys or the Uncle Tom in the turn-of-the- century Cream of Wheat ads. In fact, though, the consensus that blackface performance is intolerably racist is of relatively recent vintage. Before that, analyses of blackface minstrelsy-even those that conceded its racism-concentrated on the meaning of the performance to the performers and the audience, ignoring or discounting its meaning to, and impact on, the people being portrayed.

That is the current state of scholarship about performance in drag. Why hasn't our understanding that blackface is insulting extended itself to drag? In this Essay, I hope to begin that extension, suggesting that the same arguments that forged the cultural consensus against blackface should forge a consensus against drag. We retain a salutary sense of shock when the BBC replaces James Earl Jones as Othello with a white actor in blackface.[1] What will it take to develop that sense of shock when a man plays Lady Bracknell?

In this Essay, "drag" means men dressing as women in public, especially in performance. I argue that a whole range of activities, from vaudeville "illusionists" to the pantomime dame, from *Mrs. Doubtfire* to *La Cage aux Folles,* from cross-dresser balls in Harlem to Hasty Pudding theatricals at Harvard, represent institutionalized male hostility to women on a spectrum running from prescription of desired behavior to simple ridicule. These performances may be glamorous or comic, and presented by gay men or straight men. Nonetheless, all of them represent a continuing insult to women, as is apparent from the parallels between these performances and those of white performers of blackface minstrelsy.

* The author would like to thank Professor Anita Bernstein of Emory University School of Law for her helpful comments and indispensable advice and support in the shaping of this Essay.

1. *See* WILLIAM TORBERT LEONARD, MASQUERADE IN BLACK 123-25 (1986).

669

W_000112

Pl. App'x 257

My definition of drag excludes private transvestism precisely on the grounds of its privacy, though I invoke the arguments made for public acceptance of transvestism as examples of bad reasoning in support of drag. The definition also excludes women dressing up as men, for reasons that will become clear.

Drag and blackface in American culture are similar in a number of respects. First, each is a masquerade in which powerful or privileged people dress up as less powerful or less privileged people. Examples are legion though, pointedly, examples of drag are more current than those of blackface. Major contemporary Hollywood movies such as *Tootsie* and *The Birdcage* have drag as a central plot device, while the last use of blackface in American film is in movies of the 1950s that are almost never seen. Similarly, drag is pervasive on television, from *Flip Wilson* to *Monty Python's Flying Circus* to *Bosom Buddies* (in which Tom Hanks got his big break in a dress), while blackface is unknown: even the repulsive *Amos 'n' Andy,* originally written by and for two white comedians, was televised featuring African-American actors.

Second, drag and blackface originated when the impersonated people were excluded from the stage; however, each outlasted that original excuse for its practice.[2] That is, audiences were curious to see Africans and African-Americans on the stage long before they were permitted to appear, and plots required the inclusion of women long before women were permitted on the English-speaking stage. But even after African-Americans gained access to the minstrel stage, white performers continued to impersonate them. Similarly, long after women were permitted on the stage-to this day, in fact-men continue to appear as women.

These practices led to expectations of what the impersonated person ought to look like. For instance, the convention of white performers impersonating African-Americans was so powerful that black performers were required to wear blackface.[3] It seems ludicrous now that black performers had to "black up" to play themselves- that is, black people. But this is no different from women having their breasts enlarged so they will be sufficiently feminine. African-Americans had to be a particular kind of black, to

2. For a history of blackface minstrelsy, see ROBERT C. TOLL, BLACKING UP: THE MINSTREL SHOW IN NINETEENTH-CENTURY AMERICA (1974). For a history of performance in drag, see ROGER BAKER, DRAG: A HISTORY OF FEMALE IMPERSONATION IN THE PERFORMING ARTS (1994).

3. *See* TOLL, *supra* note 2, at 200-01.

W_000113
Pl. App'x 258

be black enough to satisfy white people; women have to be a particular kind of feminine to be woman enough to satisfy men.

Third, drag and blackface show the person(s) being impersonated in a restricted range of behaviors, characterized by exaggeration that is at least interpretable as insult. African- Americans were shown singing, dancing, being foolish, or longing for the old plantation; women are shown primping, nagging, or longing for male protection. With respect to blackface, at least, the scholarly consensus is clear: such "stereotyping was a primary example of the majority culture's desire to maintain political, social, and economic control by transferring false theories of racial inferiority into a form of comic theater designed to demean African-Americans."[4] As Marlon Riggs notes in his documentary *Ethnic Notions,* blackface made "the distinctive physical features of blacks not only laughable but grotesque."[5] The big lips assigned to African-Americans by blackface performers have a virtually exact parallel in the big breasts that are mandatory for drag performers.

Blackface presents its exaggerations through two standard "types," Zip Coon (an urban dandy out of his depth) and Sambo (a shuffling rural fool). The first makes fun of black people for being free while the second ridicules them for being slaves. Drag has a pair of "types" of its own, the glamour girl and the pantomime dame (an elderly harridan). The first makes fun of women because of their sexuality and the second for their lack of it.[6] This commonality-in which the aspirations of African-Americans and the sexuality of women are either exaggerated or ignored-suggests the parallel nature of the practices.

Both pairs of tropes are deeply reactionary, and both assert that the people imitated need controlling. Zip Coon is out of control, a menace loose in the city; Sambo is simply incapable of caring for himself. The glamour girl is either predatory or helpless; the pantomime dame is either an idiot or a harpy. One and all, they are people who cannot-or cannot be permitted to-care for themselves. And people who do not care for themselves do not get to represent themselves. If people are incompetent to represent themselves, in the political as well as artistic sense, they have to be represented-which

---

4.  William J. Mahar, *Ethiopian Skits and Sketches, in* INSIDE THE MINSTREL MASK 179, 182 (Annemarie Bean et al. eds., 1996).
5.  ETHNIC NOTIONS: BLACK PEOPLE IN WHITE MINDS (California Newsreel 1987).
6.  *See generally* BAKER, *supra* note 2.

Pl. App'x 259

is to say governed-by others.

I am hardly the first person to notice the larger consequences of performance images.  Toll summarizes the problem with minstrel images of black people: "[W]hen white Americans later came in contact with Afro-Americans, whites who were disposed to confirm the caricatures could do it by focusing on the familiar elements, like superstition, love of music and dance, and the 'childish' belief in 'silly' animal fables and by ignoring everything else about blacks."[7]  Likewise, even those who defend drag as a valuable or privileged public expression are easily able to articulate the central objection to it.  Journalist Holly Brubach, author of a sympathetic portrait of drag queens (men both gay and straight "who dress as women in public, on social occasions"),[8] prefaces her book by saying, "What impressed me about drag ...  was that it articulates men's idea of women      [T]he men I found who dress in drag most often became babes if not  outright bimbos, bearing little resemblance to the ideal most women have set for themselves."[9]  Similarly, Sambo bore little resemblance either to the antebellum slave or the postbellum  freed black man of the south.

More insidiously, to the extent that there was a resemblance between  Sambo-who resists work, tells lies, and fails to  take seriously matters of great concern to the master-and any actual African-Americans in a condition of captivity or dependence, that resemblance was attributable not to black people but to slavery.  Thus, Sambo was a presentation of the way white people prefer their black  people, that is, enslaved.  Moreover, the repetition of the Sambo stereotype conditioned white audiences to recognize only Sambo-like behaviors in the actual African-Americans they met.  Small wonder  that eradication of the stereotype  was a priority for civil rights leaders.

Likewise, to the extent that there is a resemblance between male "pantomime dames" or "glamour girls" and actual women, that resemblance is an indictment of the conditions in which real women struggle rather than a justification of the practice of performance.  In this light, the current  popularity of drag seems ominous.  It means that men become more insistent on displaying the traditional roles of women  as  many women challenge them: "No, no, you don't get it,

---

7. TOLL, *supra* note 2, at 51.
8. HOLLY BRUBACH, GIRLFRIEND: MEN, WOMEN, AND DRAG xviii (1999).
9. *Id.* at xviii-xix.

Pl. App'x 260

being a woman looks like *this."*

Fourth, the forms of drag and blackface perform the same function: to ease the minds of an audience threatened by change (whether this pertains to the coming of abolition or the advent of sexual equality) by presenting the agents of that change as ridiculous rather than frightening. Precisely because the performances are about change, what they "mean" is not a fixed thing but changes over time. T. D. "Daddy" Rice, the man whose minstrel tum as "Jim Crow" lends its name to every aspect of American racism, intendeq and imagined himself as a respectful interpreter of the exotic culture of African-Americans. Even that original intention could not and should not have saved blackface from its critics. At a certain point white audiences had to acknowledge that it was unfair for black people to bear the burden of being misrepresented for the purpose, mostly, of other people's comfort. It is about time to acknowledge the same thing about women.

Clearly, the forms are not identical, and the parallels between oppression based on race and oppression based on gender are inexact. Because gender cross-dressing is also associated with anxiety about sexuality (as blackface is not, at least in any obvious way), drag carries multiple meanings in a way that blackface does not. These multiple meanings contribute to the most striking way in which blackface and drag are not alike: the continued, unapologetic practice of drag.

An account of the process by which blackface became anathema-a confluence of events including the rise of the twentieth century civil rights movement and the rise of realism in the arts, especially the movies-is beyond the scope of this Essay.[10] Instead, I will consider the ideas around which that process coalesced. There are two of them: (1) that the portrait of African-Americans contained in blackface minstrelsy was an insult and (2) that the fact of portraiture itself was unacceptable. The first idea is based on *what* is portrayed and revulsion at such a portrayal. The second idea is based on *who* is portraying. It rests on the understanding that any cross- racial performance constitutes an appropriation-a theft-of blackness by whites.

The second half of the consensus is weak enough that people occasionally defend (the very few) contemporary uses of blackface by

10. *See* DONALD BOGLE, TOMS, COONS, MULATTOES. MAMMIES, AND BUCKS (3d. ed. 1994).

W_000116

Pl. App'x 261

adverting to the intentions of the performer. When Ted Danson blacked up for a public performance in 1993, he and his long-time lover Whoopi Goldberg imagined that his nonracist credentials ("lover of a black woman") would protect him from objections.[11] They were wrong. If the insult is simply to believe that the culture and experience of black people is trivial enough to be put on like a costume, the intentions of the performer are not relevant. The content of the performance may be respectful, but the very fact of the performance is disrespectful.[12]

Most people understand this point well enough to be appalled on re-reading Norman Mailer's essay *The White Negro,* in which he posits African-Americans as the repository of authenticity from whom white people must learn. "Only by cultivating his 'dark, romantic, and yet undeniably dynamic view of existence' can the white man reconnect with the primitive, vital 'Negro' within himself, and thereby recapture his own vaunted 'individuality.'"[13]

This is an embarrassment to read today-get in touch with your inner Negro?-but how is it any different from announcements by male cross-dressers of every stripe (from straight transvestites to gay drag queens to Dustin Hoffman in the movie *Tootsie)* that wearing women's clothing enables them to get in touch with their authentic inner woman, their feminine side?[14] Taking this claim at face value, one sees the whole problem: drag enables men to decide, and then to claim, what is "feminine"; and it permits men to ascribe certain characteristics to women and certain others to men, and then regard the remaining characteristics as problematic if they happen to show up in a member of the wrong gender.

---

11.  *See* Thomas Huang, *When the Laughter Stops,* DALLAS MORNING NEWS, Apr. 13, 1995, at IC (noting that Danson and Goldberg had explained the act as "a parody of the racism they had run into during their relationship").

12.  As bell hooks explains,

It is a sign of white privilege to be able to "see" blackness and black culture from a standpoint where only the rich culture of opposition black people have created in resistance marks and defines us. Such a perspective enables one to ignore white supremacist domination and the hurt it inflicts *via* oppression, exploitation, and everyday wounds and pains.

bell hooks, *Madonna: Plantation Mistress or Soul Sister, in* BLACK ON WHITE 307,308 (David R.

Roediger ed., 1998).

13.  James S. Miller, Racial Imitations: White Subjects, Black Others and the Legitimation of American Culture, 1920-1950, at 3 (1998) (unpublished Ph.D. dissertation, University of Wisconsin-Madison) (on file with author).

14.  *See, e.g.,* REBECCA BELL-METEREAU, HOLLYWOOD ANDROGYNY 200-04 (1993); Virginia Prince, *Seventy Years in the Trenches of the Gender Wars, in* GENDER BLENDING 469,

475 (Bonnie Bullough et al. eds., 1997); Elaine Showalter, *Critical Cross-Dressing: Male Feminists and the Woman of the Year,* RARITAN, Fall 1983, at 130, 136-37.

W_000117

*DRAG = BLACKFACE*

The culture and experience of women is not a costume. Everything I do is feminine, by definition, because I am female, while any decree about what is feminine restricts my range of options. When RuPaul says, "we're born naked and the rest is drag,"[15] he is wrong. *He* is in drag because he is a man, and he can stop being a woman whenever it becomes inconvenient. When being a woman is inconvenient for me, I need to remove the inconvenience. Male ideas of "femininity" are a major inconvenience to those of us who are actually women and have to live our lives in that state.

Is drag the most important aspect of male discrimination against women? No, probably not; nor was the eradication of the big-lipped Gold Dust Twins the most important victory of the civil rights struggle. But images do matter; we learn to see and understand people according to what we have been told about them. The more white people portray black people, the less room there is for black people to speak for themselves. The more men portray women, the harder it is for women to be understood for themselves.

The parallels between drag and blackface are so obvious that it seems bizarre that the intellectual consensus against blackface has not formed against drag. Instead, defenses of the practice continue to appear. All four of the principal defenses are, in my opinion, false. Drag is not a liberating challenge to gender stereotypes, nor is it a timeless statement of gay pride, nor is it legitimated by female cross-dressing, a practice separate and unequal. Nor is it funny.

A number of scholars argue that drag contributes to women's liberation by subverting gender stereotypes, revealing the constructed nature of most gender-linked behavior.[16] At its most extreme, this argument disputes the reality of gender itself:

> [T]he arguments of modern theorists such as Garber, Butler, and Joan Riviere [are] that all gender is performative or, in Riviere's famous phrase, a "masquerade".... While [an earlier] account posits an interior self to be shaped and corrected by performance, modern accounts argue that this interiority is an effect produced by the masquerade, and that status as "woman" or "man" is achieved not by being born with a particular anatomy but by performing gendered behaviors successfully in accordance with prevailing social norms.17

---

15.  BAKER, *supra* note 2, at 258 (quoting RuPaul).

16.  *See, e.g.*, JUDITH BUTLER, BODIES THAT MATTER: ON THE DISCURSIVE LIMITS OF "SEX" 124-138 (1993) [hereinafter BUTLER, BODIES THAT MATTER]; JUDITH BUTLER, GENDER TROUBLE: FEMINISM AND THE SUBVERSION OF IDENTITY 137 (1990) [hereinafter BUTLER, GENDER TROUBLE]; MARJORIE GARBER, VESTED INTERESTS (1992).

17.  Ellen Bayuk Rosenman, *"Just Man Enough to Play the Boy": Theatrical Cross-Dressing*

Thus: "Genders can be neither true nor false, neither real nor apparent, neither original nor derived."[18]

The argument that all gender is performative begins soundly enough with the observation that lots of things women "can't" do are actually merely things that women are not permitted to do, and that therefore it is wise to be skeptical of many essentialist claims. But it is quite a leap from there to saying that there is no such thing as a "woman," and therefore one may claim "womanhood" on any basis, including the possession of an evening gown. This latter argument means that cross-dressing eradicates women entirely. If anyone who puts on women's clothing is a woman, and many of those people do not have a problem with unequal pay or a lack of reproductive rights, then there must not be a problem.

The argument that the very recognition of the category "woman" validates male supremacy is, in this context, false and dangerous. This is clear from the analogy with race. There may be no such thing as "race" insofar as most of the attributes given to people based on their perceived skin color have little or nothing to do with skin color, but "race" certainly does exist if we are trying to understand the experience of people whose skin color puts them at a constant disadvantage in competing for opportunities in a larger society. That experience of "race" is actual and distinct, a fact we readily acknowledge in noting the difference between a white man "blacking up" and a black man. The experience of gender is similarly actual and distinct-if there is no such thing as a "woman," who is being paid seventy-three cents on the dollar?

The fact that women are already oppressed-instructed by men how to look and behave for male convenience-does not mean that the most extreme version of this is therefore inoffensive. Quite the contrary: we need to challenge the most public ways in which men specify women's conduct so we can overcome even their more subtle dictates. The acceptance of drag is one of those "most public ways," such an obvious imposition of male preference on female decision that it is practically invisible. Just as African-Americans were taught by blacked-up white minstrels that they ought to shuffle-and, more important, white people were taught to expect African-Americans to shuffle-women are taught by dolled-up male glamour girls and pantomime dames to be hyper-sexual, and shown that failure to do so

*in Mid-Victorian England, in* GENDER BLENDING, *supra* note 14, at 303, 306.

   18.  BUTLER, GENDER TROUBLE, *supra* note 16, at 141.

renders them repulsive and superfluous. Again more important, men are taught the same lesson.

Erika Munk dismissed the claims for drag's subversive status in a few pungent paragraphs in the *Village Voice:*

> At the moment, most men in drag are no more subversive than whites in blackface were when minstrel shows were America's most popular form of entertainment....The more women fight for autonomy, the less helpful become restatements of stereotype which have lost their critical edge and turned into means of putting women down and aside. Drag may be liberating when it's part of a wave of iconoclastic revolt, but when the culture is rigid and conformist, taking on feminine personae while edging women from the stage is rigid and conformist too. It doesn't have to be so-the radical possibilities remain-but it is.[19]

Many people understand "drag" to mean private cross-dressing for sexual satisfaction. For the purposes of this Essay, I am indifferent to private cross-dressing (overwhelmingly an activity of straight men), just as I would be indifferent if burnt cork or black greasepaint suddenly gained currency as an aphrodisiac. Private conduct is none of our business. But the set of arguments marshaled by private cross-dressers in support of their call for public acceptance is a matter of public concern, and these arguments are as unpersuasive as those of the feminist scholars whose work (as well as bras) they are appropriating.

Straight men who cross-dress generally describe doing so as a compulsion. If it is, then its victims should receive sympathy, not public approbation. Some people who have Tourette's syndrome feel compelled to curse; that is not an argument for generalized public acceptance of profanity.

In *The Man in the Red Velvet Dress*, J. J. Allen, a private cross- dresser, makes an argument that he shares with those who affect or defend performance drag. He argues that women have a privilege- to wear satin evening gowns-from which men are unfairly barred.

> If men and women are to achieve true equality, everything should be up for grabs: miniskirts, boxer shorts, the office of the president of the United States, congressional seats, wearing cosmetics ....

> While the women's liberation movement of the sixties was not merely about wearing pants, smoking, or working as a riveter, it nevertheless had its roots in appropriating those artifacts that had once been exclusively associated with masculinity. And while

---

19. Erika Munk, *Drag: I. Men*, VILLAGE VOICE, Feb. 5, 1985, at 89.

Pl. App'x 265

femininity is about more than simply wearing skirts and cosmetics, men, if they are to be truly equal with women, should be free to appropriate the artifacts of femininity.[20]

This is total sophistry. First, the women's movement "had its roots" in a demand for justice; the "artifacts ... of masculinity" were secondary. Second, men are not "equal" with women, they are privileged over them. Men who want to wear women's clothing simply cannot do it in the street without being stared at. This seems like a very small price to pay, hardly comparable to being unable to join the professions.

Allen continues, "[W]omen do not 'own' femininity any more than men 'own' masculinity. So in the same way that feminism wants to destroy the barriers to male privilege that men have erected, [cross-dressers] want to destroy the barriers to female privilege that women have erected."[21] Wrong again: "femininity" is not a female privilege-it is a construct designed to keep women in their place. And feminists are not trying to appropriate masculinity, that is, the state of being male or taken for male; we are trying to achieve equal rights. To argue that women's clothing is a mark of privilege, when so much else about being a woman is obviously a mark of disadvantage, is to willfully miss the point, as Allen makes clear when he falsely equates a woman's right to admission to the Citadel with his "right" to wear women's underpants.[22] This assumes that an identifying badge of status is the same thing as a privilege, which is only true if you assume what is obviously false, namely, that all statuses are equal. Allen likewise claims that there is no difference between women's cross-dressing (e.g., to be able to serve as a soldier) and men's cross-dressing.[23] He also asserts that there is no difference between the class of things men are expected not to do (e.g., wear evening gowns) and those women are expected not to do (e.g., get paid for their work).[24] When Allen refers to disapproval of cross-dressing as "another gender wrong that need[s] to be righted,"[25] he is trivializing all of feminism.

Allen borrows from academic theorists of gender-bending to argue that recognizing some clothes as "women's" and other clothes

---

20. J. J. ALLEN, THE MAN IN THE RED VELVET DRESS 124-25 (1996).

21. *Id.* at 125.

22 *Id.* at 126.

23. *Id.* at 137.

24. *Id.* at 121-22, 138-39.

25. *Id.* at 126.

W_000121

*DRAG = BLACKFACE*

as "men's" reinforces the oppressiveness of traditional categories.[26] In fact, though, those categories are precisely the point to a cross- dresser. If these were not specifically women's garments, he would not be interested in them. If there were no performed sex roles connected with a costume, then the entire activity of transvestism-

sexual excitement while spending time temporarily as "the other"- would be beside the point.[27]

Another group of scholars argues that dressing up in women's clothing is a privileged activity of gay men. For the most part, in fact, dressing up in women's clothing is an activity of straight men-and whether it is privileged when done in public is exactly what is in contention.

"Professional drag queens are ... professional homosexuals; they represent the stigma of the gay world," announces Esther Newton in her seminal study of drag, *Mother Camp.'*[28] "Not all gay people want to wear drag, but drag symbolizes gayness. The drag queen symbolizes an open declaration, even celebration, of homosexual- ity."[29] She continues: "[D]rag questions the 'naturalness' of the sex- role system *in toto;* if sex-role behavior can be achieved by the 'wrong' sex, it logically follows that it is in reality also achieved, not 'inherited,' by the 'right' sex."[30]

This is received wisdom, to the extent anything can be in the contentious world of gender studies; but it is, at best, a half-truth. The only way to argue that drag is gay is to exclude from its definition a whole range of activities in which men dress as women, including not only private cross-dressing but the lion's share of comic drag performance.

Even Judith Butler, who valorizes glamour drag as gay performance art, acknowledges this comic, and ostensibly heterosexual, side of drag, which she calls "high het entertainment."[31] This includes most people's exposure to drag before the mid-1980s:

---

26. *Id.* at 136.
27. As Annie Woodhouse notes in her feminist study of straight men's private cross- dressing, dismissing the claim that the condu ct is revolutionary: "Undoubtedly transvestism replicates gender divisions; it relies on images of women which have been used to objectify and oppress them. The transvestite uses this as fantasy for his own pleasure, always retaining the facility to return to the primary status of masculinity." ANNIE WOODHOUSE, FANTASTIC WOMEN: SEX, GENDER AND TRANSVESTISM 145 (1989).
28. ESTHER NEWTON, MOTHER CAMP 3 (1972).
29. *Id.* at 64.
30. *Id.* at 103.
31. BUTLER, BODIES THAT MATIER, *supra* note 16, at 126.

W_000122

Pl. App'x 267

the Hope-Crosby *Road* movies, Flip Wilson as Geraldine in the *Flip Wilson Show,* Jonathan Winters as a washerwoman on the *Carol Burnett Show,* and Jack Lemmon and Tony Curtis in *Some Like It Hot.* Several of these performers are notorious for the fuss they made about their heterosexuality; and, though perhaps they protested too much, there seems little doubt that most comic drag performers (like most people) are straight. To argue that drag is a "queer practice[]" whose "radical specificity" protects it from objection, as Butler does,[32] is both ahistorical and unprincipled, resembling the argument that clitoridectomy is acceptable because it is practiced by Africans oppressed by colonialism-or that blackface was acceptable because it was practiced on stage largely by Jews.

In any case, as historian Marybeth Hamilton makes clear, the universal association of glamour drag with gay men dates in this country from 1928, specifically from the production of Mae West's play *Pleasure Man,* which purported to provide a realistic backstage look at female impersonators ("realistic" being a euphemism for "gay").[33] As Hamilton notes, through *Pleasure Man,* West almost single-handedly transformed female impersonation from a mainstream vaudeville specialty into an outre pleasure. "[T]hough we take female impersonation's inherent 'queerness' for granted, in fact that assumption is relatively recent. ... [F]or the fifty years prior to *Pleasure Man's* premiere, female impersonation had been viewed as wholesome amusement, particularly suitable for women and children."[34]

Vaudeville female impersonation owed its popularity to the notion that the differences between men and women were so enormous that a man who could pass for a woman was essentially a magician. Thus, it was about putting people-specifically women-in their deeply conventional places. "While vaudeville hailed imper- sonators as virile men transforming themselves through magical skills of performance, Mae West suggested a far more sensational reading: that female impersonation was a vehicle of homosexual self-expression, a means for gay men to flaunt their true sexual selves."[35]

Mae West didn't invent this notion; she derived it from an

32  *Id.* at 128.

33. Marybeth Hamilton, *"I'm the Queen of the Bitches," Female Impersonation and Mae West's Pleasure Man, in* CROSSING THE STAGE: CONTROVERSIES ON CROSS-DRESSING 107, 107-19 (Lesley Ferris ed., 1993).

34.  *Id.* at 107.
35.  *Id.* at 112.

underground tradition of female impersonation parallel to conventional vaudeville.

> The underworld impersonator    made no pretense of showcasing
> a skill of performance, of attempting to impress observers with impeccable recreations of feminine detail. The whole thrill of his stage appearances lay, on the contrary, in the fact that he was not, technically, performing at all. He was displaying his real, offstage, self-as (in turn-of-the-century terms) a "fairy," a "third sexer," a being who straddled the gender divide.[36]

However disingenuously, Mae West denied that she had done anything radical with her play, adverting to the existence of mainstream impersonation, which validated sexual stereotypes, to protect her presentation of "deviant" impersonation, which challenged them. But instead of saving her play, she succeeded only in tagging all glamour female impersonation as gay and thus eliminating it from the vaudeville stage.

Once dressing in drag was "recognized" as gay (and then banned), it is not surprising that the gay community would claim appearing in drag as one of the privileges of being liberated, especially when drag queens featured so prominently as fighters in the pivotal Stonewall riot.[37] Like use of the word "nigger" in the African-American community, dressing in drag can be seen as an effort to transform a stigma into a badge of pride. But clearly being gay and being effeminate are not the same, and neither of them requires dressing in drag. The connection between drag and gay men is at best vestigial, like the appendix, and thus can be removed. Moreover, once we acknowledge the fluidity of drag's meaning-that it suggests different things to different audiences at different times- we must also acknowledge the claim of women to decide what it means today. No prior claim of meaning can possibly take priority over that of the subject/object of the practice. Some commentators imagine that the complaint of misogyny is directed at drag's gay practitioners rather than at the practice itself.

> The problem with the analysis of drag as only misogyny is, of course, that it figures male-to-female transsexuality, cross-dressing, and drag as male homosexual activities-which they are not always-and it further diagnoses male homosexuality as rooted in misogyny. The feminist analysis thus makes male homosexuality *about* women [38]

36. *Id.* at 115-16.
37. *See* SUSAN FALUDI, STIFFED: THE BETRAY AL OF THE AMERICAN MAN 500-02 (1999).
38. BUTLER, BODIES THATMATtER, *supra* note 16, at 127.

W_000124

Pl. App'x 269

In fact, it is just the reverse: this analysis makes male impersonation of women *about* homosexuals. Drag is misogynistic, no matter who performs it. The relevant fact about gay men dressing as women is that they are *men* dressing as women. As Kate Millett wrote:

> [T]he storm of outrage an insouciant queen in drag may call down is due to the fact that she is both masculine and feminine at once-or male, but feminine. [And thus] [s]he has ... challenged more than the taboo on homosexuality, she has uncovered what the source of this contempt implies-the fact that sex role is sex rank.[39]

Drag is not about gay men and their sexuality- not, that is, about the intentions of the performers. (As with blackface, the intentions of the performers are beside the point.) Drag is not about sexuality at all, but about gender, its images and stereotypes-and those always mean things that privilege men and injure women.

Much of the literature about this seems to miss the point, suggesting that the drag performer is the person oppressed. For instance, Rebecca Bell-Metereau is concerned about the stereotyping of drag performers:

> Just as film images of blacks, with rare exceptions, have tended to offer only two basic stereotypes-the evil, no-good Negro and the good-hearted Uncle Tom or nanny-movie depictions of female impersonation during the Code era fall into similarly constrained categories. Men are seldom allowed to take on feminine clothing or roles without being punished for betraying their sex.[40]

This focus on the performer rather than on the woman being portrayed is peculiar, the equivalent of a discussion about what blackface meant to its white working-class performers: possibly an interesting sidelight, but hardly the point. Bell-Metereau continues, "A film that defies society's codes of dress and sex roles implies that we can be liberated from superficial restrictions and sexual limitations, for in truly exploring androgyny the work taps the most profound psychological and mythic sources of art-the genderless human psyche."[41]

This is the conventional defense of drag: that it enables us to transcend restrictions imposed by gender, which is, after all, just a social invention. But I do not have a "genderless human psyche"-I have a woman's psyche, formed by my experience of being morphologically, biologically, sexually, and socially a woman. As Pat

---

39.   KATE MILLETT, SEXUAL POLmcs 343 (1970).
40.   BELL-METEREAU, *supra* note 14, at 65.
41.   *Id.*

Schroeder said when asked if she were running for President "as a woman," "'Do I have an option?'"[42] To impersonate gender is not to eradicate it but to reinforce it, to reify it and, more important, the power relations attached to it.

Imitation may be the sincerest form of flattery, but do not tell that to anyone whose work has been plagiarized. Drag performers- gay or straight-plagiarize the appearance and behavior of women, just as minstrels plagiarized the appearance and behavior (or some facsimile) of African-Americans. The historical moment for wearing blackface was over as soon as the larger society was prepared to acknowledge the authenticity of black people. The historical moment for wearing drag should be over now if society is prepared to acknowledge the authenticity-that is, the independent validity-of women.

Some scholars suggest that dressing across gender lines is an equal-opportunity sport because there is a tradition of women dressing as men (as there is not of black people masquerading as white people). Unless you ignore the power differential between men and women in society, this is nonsense. Annie Woodhouse makes clear that all gender-bending is not created equal.

> The gender divide is not one of equal balance; the scales of power and control tip decisively to the side of masculinity, which is accordingly attributed primary status. Thus, to deviate from this status is to take a step down; to adopt the trappings of the second sex is akin to slumming it, or selling out.[43]

Thus, women who dress as men are dressing *up*, seeking power, privilege, or even just protective camouflage from male violence; while men dressing as women are dressing down. As Janice Raymond says in her critique of all things "trans,"

> [A] woman putting on a man's clothes is, in a sense, putting on male power status, whereas a man putting on women's clothes is putting on parody. That drag queens and cross-dressers draw hoots and howls in audiences of mostly men says more about how women were and are perceived than it does about the supposed boundary- breaking behaviour of gender-bending men who wear women's clothes.[44]

In other words: masters making fun of slaves, or at most making fun of themselves, do not equal slaves poking fun at masters. Humor

---

42.  LINDA WITT ET AL., RUNNING AS A WOMAN ix (1995).

43.  WOODHOUSE, *supra* note 27, at 6-7.

44.  Janice Raymond, *The Politics of Transgenderism, in* BLENDING GENDERS 215. 217 (Richard Ekins & Dave King eds., 1996).

W_000126

Pl. App'x 271

684

is what masters get in addition to power and what slaves get instead of it. Raymond adds,

> Gender bending is gender identity condensed to the point of little or no feminist or lesbian politics ..................................................................The new gender outlaw is

> the old gender conformist, only this time we have men conforming to femininity and women conforming to masculinity.................................................................................What good

> is a gender outlaw who is still abiding by the law of gender?[45]

But of course it is not the arguments of feminist or gay scholars that make drag acceptable to the wider public. Scholars in general, and feminist and gay scholars in particular, are held in low regard in American society. To the extent that their arguments have currency, it is because they serve the interests of those who are more powerful. The people keeping drag alive are the people who benefit somehow from the argument that being a woman is something you can just put on and take off. Their claim is very simple: drag is funny.

What exactly is funny about it? Perhaps it is the simple incongruity: you can always knock 'em dead with chest hair pouring out of the cleavage of an evening gown. Perhaps the contrast between the (male) performer and the (female) performance is, in and of itself, uproarious. But this seems like a pretty thin joke on which to hang years of amusement. Unless you think that men are from Mars and women are from Venus-that is, that differences in gender behavior are huge and immutable-the contrast does not hold much interest. Certainly, the contrast between white performers and black characters was not, in and of itself, enough to make blackface funny. There had to be something else-and there was.

There was ridicule of black people. No one rationalized blackface by suggesting that the very contrast between the (white) performer and the (black) performed was funny or interesting in and of itself. No, what was funny or interesting was the glimpse blackface purported to offer into the world of African-Americans. "Aren't they stupid?" "Don't they have weird physical features?" "But they sing good songs and dance funny dances, and doesn't that prove they're happy in the confinement in which we've placed them?"

Men who dress up as women and adopt stereotyped feminine behaviors are comical because of their stereotyped behavior, and the inference they encourage the audience to draw is not that stereotypes are comical but that women are; not that social restrictions are foolish but that the people restricted are. It would be hard to imagine as

---

45. *Id.* at 222-23.

clear an example of blaming the victim-if blackface had not already provided us with one.

This entire society reifies the concept that the behavior of women should be dictated by men because men know best. Men know that marriage is best for women; men know that child rearing is best for women; men know that getting paid and recognized less is best for women. I do not really think that men also need to be able to say that they know-and will demonstrate-how perfectly lean and curveless women should look in their evening gowns.

Glamour drag, which depends on downplaying the incongruity, minimizing the contrast between performer and performed, and concealing the "masculine" within the "feminine," makes clear the prescriptive nature of all drag. The point of glamour drag is not to tell jokes but to perform the feminine. The only reason to hire a man for this purpose-when there are plenty of women available, by definition more experienced and better qualified-is to give men the continued right and privilege to determine the content of the feminine. Just as white people in blackface announced and established the limits of African-Americans' behavior, men in dresses announce, establish, and enforce the limits of what will be expected of, and tolerated from, women.

Minstrel performances of cake-walking took the dance out of its compulsory context to present African-Americans as feckless and jolly in servitude. Similarly, glamour drag takes glamour out of its context, which is the need women have to use sexual attractiveness to secure male protection in a society that punishes women who are without it. And if even those sober-faced performances are funny, it must be because women themselves are a joke. "Look at how vain and foolish they are!" "Look how self-absorbed!" "Look how trivial!" "Aren't women funny when they want sex?" "And aren't they hilarious when they don't?"

Thus, drag's humor depends entirely on the audience's willingness to believe that women are rightfully the butt of every joke. Does it seem humorless to refuse to participate? Well, it was precisely the fact that blackface impersonation *was* a joke-played by white people, for white people, through the medium of and on black people- that led ultimately to its condemnation. In fact, Ralph Ellison's 1958 essay-perhaps the single most important scholarly contribution to the eradication of blackface-is called *Change the*

W_000128

Pl. App'x 273

686

*Joke and Slip the Yoke.*[46]  Ellison points out first that what have been taken by white audiences to be the archetypes of the black experience are, in fact, its stereotypes.[47]  He then addresses the defense of high spirits and boyish fun, saying,

> Down at the deep dark bottom of the melting pot, where the private is public and the public private, where black is white and white black, where the immoral becomes moral and the moral is anything that makes one feel good (or that one has the power to sustain), the white man's relish is apt to be the black man's gall.

> It is not at all odd that this black-faced figure of white fun is for Negroes a symbol of everything they rejected in the white man's thinking about race, in themselves and in their own group.[48]

Likewise, the drag queen is a symbol of everything women reject in men's thinking about gender, and the relish of drag performance- by performer and audience alike-is every woman's gall.

## https://www.kpcc.org/show/airtalk/2015-02-19/drag-queen-asks-is-drag-degrading-to-women

**A debate about the significance of drag has been brewing on the internet since the beginning of the year and raising the question: is drag degrading to women?**

A debate about the significance of drag has been brewing on the internet since the beginning of the year and raising the question: is drag degrading to women?

It started when Mary Cheney, the openly lesbian and actively Republican daughter of former Vice President Dick Cheney, opined on her Facebook page, "Why is it socially acceptable—as a form of entertainment—for men to put on dresses, makeup and high heels and act out every offensive stereotype of women (bitchy, catty, dumb, slutty, etc.)—but it is not socially acceptable—as a form of entertainment—for a white person to put on blackface and act out offensive stereotypes of African Americans?"

The comparison roiled supporters of drag who see it as a subversive commentary that's both a means of self expression and empowerment. But as the drag queen Miz Cracker recently penned in a piece on Slate, the discussion has raised "a question all queens and conscientious drag fans must contend with at one point or another: Is drag degrading to women?"

Has drag lost some of its shock value with shows like RuPaul's Drag Race and is now a moment to ask whether drag performances truly celebrate femininity or mock it? Has the social significance of drag performance changed?

**Guests:**

686

W _ 000129

**Miz Cracker**, writer and drag queen living and working in Harlem, New York; author of this recent piece in Slate's Outward section.

**Meredith Heller, Ph.D.**, Faculty member in Women's and Gender Studies specializing in drag and performance at Northern Arizona University; Her blog is called The Saucy Scholar.

**Drag Isn't Like Blackface. But That Doesn't Mean It's Always Kind to Women.**

BY MIZ CRACKER

FEB 17, 201510:45 AM

 

What's the difference?

Left: Al Jolson in blackface. Credit: Wikimedia/Warner Bros. Right: RuPaul in drag. Credit: Logo TV.

TWEETSHARECOMMENT

On Jan. 29, Mary Cheney, the openly lesbian and actively Republican daughter of former Vice President Dick Cheney, outraged the drag and drag-allied community by comparing drag to blackface in a post on her private Facebook page. Here's what she wrote about "men who entertain in drag" after seeing a TV commercial for the upcoming season of Logo's *RuPaul's Drag Race*:

Why is it socially acceptable—as a form of entertainment—for men to put on dresses, make up and high heels and act out every offensive stereotype of women (bitchy, catty, dumb, slutty, etc.)—but it is not socially acceptable—as a form of entertainment—for a white person to put on blackface and act out offensive stereotypes of African Americans? Shouldn't both be OK or neither? Why does society treat these activities differently?

ADVERTISEMENT

Since the post sashayed off of Cheney's newsfeed and out into the wider Internet, commentators ranging from college professors to RuPaul herself have been condemning the comparison, mainly defending drag as a means of self-expression and empowerment. As a queen, my initial inclination was to join the backlash. Comparing drag to blackface seemed recklessly hateful, a blunder on par with Republican Rep. Randy Weber's recent tweet comparing Obama and Hitler. But in the following days, as Cheney's words ran through my mind, I began to wonder if they held a grain of truth. Beneath

W_000130

Pl. App'x 275

her ham-fisted language, Cheney was asking a question all queens and conscientious drag fans must contend with at one point or another: Is drag degrading to women?

For some, the answer to that question is unambiguous. Three years ago, a male co-worker informed me that he would no longer attend my drag shows because his girlfriend thought that drag was "an insult to femininity." I started to tell him that his girlfriend's New Balance sneakers were a much graver offense to femininity than my drag could ever be, but the indictment gave me pause—I had no ready defense for the suggestion that my nightlife career was harmful to women. At my shows, women have occasionally made barbed remarks about how sinewy queens create unfair expectations for biologically female bodies. I've been told that drag makes a farce of womanhood and that if I really want to understand the experience, I should wear heels all day at the office instead of for a few hours at the club. And last year, when I ran into a madamenoir.com article about the notion that drag queens degrade black femininity, the accusations contained therein were not unfamiliar.

Of course, one could dismiss all of this as the complaining of those who mistake drag's queer commentary on "femininity" for an exercise in literal gender mimicry or parody—and that is part of the story. But the critics are right to sense a thinly veiled disdain for women among some of my fellow queens. At certain shows, women in the audience are given a particularly bad time. Backstage I have heard complaints that there's too much "tuna" in the crowd. Making a living by playing with society's notion of womanhood can even lead to a troubling sort of competitiveness: Watching a female artist perform, I sometimes secretly wonder if a man in a dress could do her job better. Sure, women can be—to recall Mary Cheney's words—bitchy, catty, dumb, and slutty; but that doesn't mean they do it well enough to impress me.

ADVERTISEMENT

That said, just because some drag queens partake in misogyny individually does not make the entire art form inherently misogynistic—and this is where the blackface comparison breaks down. For some perspective on this controversy, I spoke with W. Fitzhugh Brundage, chair of the Department of History at UNC-Chapel Hill, and editor of a fascinating book on black representation in American pop culture, *Beyond Blackface*.

"My immediate response," Brundage said, "is that Cheney's comments show very little understanding of blackface as a historical phenomenon." One major problem with Cheney's comparison, he explained, was the yawning gap between the immense cultural influence of blackface at its height and the comparatively low visibility of drag, even in its present RuPaul-sponsored golden age. "In the 1840s, anyone in even a moderate-sized American city had access to minstrelsy, and the rest had access to it through sheet music," Brundage said. "It was an incredibly pervasive cultural phenomenon. Drag has never enjoyed that cultural weight." Even if drag were harmful, its impact on American perceptions of women has been so negligible relative to that of blackface that any comparison is foolish. More important, there's a profound difference in the power dynamics of the two forms of entertainment. "Minstrelsy was being performed by whites in positions of cultural and local power, whereas drag is performed by a marginalized group who are subject to fear and repression," Brundage said. "To be a drag queen is not an act of privilege. It's just not comparable."

W_000131

While history does not support Cheney's comparison on the level of fact, the feelings behind her words are not necessarily illegitimate: As a woman, she finds contemporary drag offensive to her sex. In launching our countercritique, the drag community and its allies have ignored these feelings to our detriment.

In the *Huffington Post*, for example, theater professor and drag queen Domenick Scudera attempts to legitimize drag by pointing to the long history of cross-dressing in theater and other performative traditions. "Men dressing in female garb have been integral to the performing arts for thousands of years in a myriad of cultures," he writes. "Juliet, Lady Macbeth, Rosalind, Beatrice and so on—all were created by male actors." I'm not sure if these mainstream theatrical traditions can really be tied to drag, or why their existence should make Cheney or those who hold similar reservations feel more comfortable with drag as it manifests today. In the same publication, Walt Hawkins discounts Cheney's feelings altogether, insinuating that she's just confused because she's having a hard time in her political career: "To be fair, it must be tough to be Mary Cheney," he writes. "She desperately wants to be a conservative icon and has spent countless hours and dollars pandering to the same political party that wants absolutely nothing to do with her." The sharpest and most incisive response to Cheney comes from the *Advocate*'s Matt Baume, who addresses Cheney's questions in part by pointing to the many women who love drag, even take part in it. He's certainly right, but that doesn't change the fact that many do not feel part of the fun.

So what's to be done? Here's my proposal: In the same way that many queens listened to the transgender community's concerns last year over use of controversial terms like *tranny* within drag culture, we can listen to women this year. Without chilling drag's wonderful tradition of free expression, we can take this moment to ask if our drag personae and performances truly celebrate feminine gender expressions, or if they lazily mock them. I know that this kind of sensitivity is possible, because some queens are already excelling at it. Just last week, I saw Brooklyn queen Lady Bearica Andrews perform a number in which she literally threw off the marionette strings of domesticity to become an independent woman. It's rare and risky for a queen to create work that so directly addresses women's issues, but the audience was on its feet, screaming. Judging from that experience, I don't think that listening to women's concerns will hurt us. In fact, I think it may make our drag even richer.

# https://4w.pub/is-drag-misogynistic/

**Is Drag Misogynistic?**

M. K. Fain

Oct 7, 2019 9 min

It's time to stop letting sexist gay men off the hook.

Iam hardly the first one to pose this question, and I won't be the last. The truth is, gay men have been getting away with misogyny since the start of the gay liberation movement. As Nico Lang wrote in 2017, "Gay men, first and foremost, are men."

Women have long looked for allyship from gay men. In some ways, we find it. Being gay is, inherently, gender non-conforming and disrupts the patriarchal narrative of male/female, dominance/submission (despite the fact that this pattern may be replicated in same-sex partnerships). Many of us have gay male friends who have served as great allies to us on a personal level — myself included.

To criticize aspects of gay male culture is not to attack gay men as a whole. Many gay men are interested in being better allies to women and willing to engage in this discussion and learn from it. In fact, it was through conversations (and debate) with my good friend, Lucas, that I came to fully shape my opinion on drag.

**The History of Drag**

Men portraying women in entertainment goes back as far as ancient Greece, and Japanese Kabuki theater. Originally, this had nothing to do with subverting gender roles but rather enforcing them — women weren't allowed on stage.

In more modern history, drag has been an integral part of the gay male community since the mid-twentieth century. Sheila Jeffreys, lesbian feminist historian, wrote in her 1990 book, *Anticlimax*:

*"Drag is a phenomenon deeply rooted in gay male consciousness, so deeply rooted indeed that one might be persuaded to see it as the foundation of gay male culture."*

Within this culture, she explains, drag arose from a desire to be "gender-free." Some men adopted a behavior they called "radical drag," which involved wearing dresses, heels, and makeup and participating in gay community meetings by "knitting and chatting through some person's big ego-trip speech." (*Anticlimax*, pg. 169) They claimed this was their way of resisting the macho-masculine behavior of other gay men and struggling against male privilege in the community.

This behavior was, of course, highly offensive to the lesbians in the room — women who largely were working to shirk the expectations of oppressive femininity themselves. Women's interests in the gay community, as with all of society, were largely ignored.

Recently, drag has broken through mainstream consciousness in an unprecedented way. *Ru Paul's Drag Race* has become a cultural icon. Children are starting to do drag, like the 12-year-old Desmond Napoles who has been catapulted into recent fame and sparked controversy over the sexualization of children. Drag Queen story hours at local libraries are finding similar controversy across the country, facing backlash from conservatives and feminists alike.

**Drag and Role-Playing Womanhood**

In all other areas, it's generally accepted by progressives that members of a dominant/oppressor class should not dress up as and mock the members of a more marginalized class — especially when that costume involves harmful stereotypes.

Consider, for example, the recent backlash Canadian Prime Minister, Justin Trudeau, faced when it was revealed he had dressed in black and brown-face makeup. Critics, rightfully, pointed out that black-face

W_000133

is rooted in a deep history of violence and oppression, including slavery, against black and brown people.

*The Indian Express* wrote in regards to Trudeau:

*"Despite its continuing existence in popular culture, blackface is a mocking, deeply offensive, racist portrayal of black people, whose dehumanising tropes strongly suggest the inherent superiority of white people, and reduce blackness itself to a joke."*

Similarly, Warren Kinsella of the *Toronto Sun* wrote, "blackface is literally about white people caricaturing black people."

Blackface isn't offensive simply because a person of one race is dressing up as another. The power dynamics and history of white supremacy are what make the act particularly harmful. The costume dehumanizes, mocks, and stereotypes a marginalized group at the hands of their oppressors — sound familiar?

When men dress up "like women" in overly feminine costumes, change their bodies to look more like women's (fake breasts, etc), and act in stereotypically female ways ("bitchy, catty, dumb, and slutty") they are perpetuating patriarchial and offensive expectations of women.

In 2015, the conversation around blackface and drag rose to public awareness when Mary Cheney, lesbian daughter of Dick Cheney, compared the two.

The backlash she faced was immediate. It was "foolish," people said, to compare blackface and drag. The difference, one gay man explained to her, is that "A blackface performer had no respect for the people he was caricaturing... Drag queens do not hate women. Drag queens view women as sisters and friends, as inspiration."

Another drag queen interviewed W. Fitzhugh Brundage, male author of *Beyond Blackface*, to come to his defense:

*"Minstrelsy was being performed by whites in positions of cultural and local power, whereas drag is performed by a marginalized group who are subject to fear and repression," Brundage said. "To be a drag queen is not an act of privilege."*

Suspiciously missing from the public conversation were the voices of any *actual* women — just men talking to other men about how totally not sexist they are.

These criticisms missed two main points: drag queens *do* display disdain for the women they mock (more on this later), and drag queens are men playing women — an inherently privileged position.

A drag queen irons clothes, like a woman, at The Glory in London. (source)

To deny that men hold privilege over women in a debate that is deeply related to gender is to deny the existence of patriarchy entirely.

Black lesbians, of course, have had their voices consistently ignored in this debate (where is their HuffPo feature column?).

W_000134
Pl. App'x 279

While the black radical feminist community seems torn on whether or not blackface and drag are comparable given their different histories, one thing is clear: black feminists overwhelmingly find drag offensive to women.

Multiple black women shared their personal experiences in a feminist forum on Reddit. The top comment, by u/AnyEmphasis, reads:

*"I am a black woman from the DC area where drag shows are common forms of entertainment and while I do NOT feel as degraded by drag shows as I am by blackface, I do see drag as an absurd interpretation on femininity, just like blackface is an absurd (yet markedly violent and offensive) interpretation on blackness."*

This feeling is repeated throughout the thread by hundreds of black women.

Charles Knipp as Shirley W. Liquor with fans, sfbayview.com

Of course, drag and blackface can more directly intersect. Black lesbian Jasmyne A. Cannick wrote in 2008 about Charles Knipp, better known as the "Mammy Welfare Queen," Shirley Q. Liquor.

Played by gay white man, Shirley is said to be, "a heavy-set, shoplifting, promiscuous, inarticulate, malt liquor drinking single parent Black woman that doesn't know who the fathers of her 19 children are. If that wasn't enough, many of the children are named after sexually transmitted infections, like Chlamydia."

When discussing Knipp, critics seem to be able to easily point out how his caricature is both racist and sexist.

Femininity is not an inherent aspect of womanhood. Femininity is a socially-constructed set of behaviors, attitudes, and aesthetics which women are expected under patriarchy to adhere to in order to keep us in the subservient position. Femininity, to any significant degree, is not a choice that many women have. It is a sign of our oppression.

Dressing in traditionally feminine outfits (dresses, heels, makeup, etc) is a choice that only men can actually freely make. Men do not face oppression for refusing to adhere to femininity, women do. Women are still persecuted at work and home for not presenting feminine enough. One survey found that more than half of employers would be less likely to hire a woman who didn't wear makeup, and admitted it would also have a detrimental effect on her promotion prospects.

Donning the shackles of another's oppression for fun is the very height of privilege.

Similarly, women are oppressed for our female bodies — bodies that drag performers simultaneously attempt to emulate and mock.

**Drag Culture, Itself, is Full of Misogyny**

In his article defending drag for *Slate*, drag performer Miz Cracker admits that drag culture is often misogynistic:

*"But the critics are right to sense a thinly veiled disdain for women among some of my fellow queens. At certain shows, women in the audience are given a particularly bad time. Backstage I have heard complaints that there's too much 'tuna' in the crowd."*

Cabaret performer, Miz Ima Starr, reports the same experience:

*"When I started doing drag 25 years ago, there wasn't anyone I knew doing drag that wasn't misogynistic, and it's something we continue to see today."*

In a 2014 article for *The Spectator*, feminist journalist Julie Bindel writes about iconic drag queen Divine:

*"Divine was born into a conservative, middle-class family and played on nasty stereotypes of trailer trash women to get a laugh. In his films Divine called his female co-stars 'sluts'."*

Likely, misogyny in the drag community is just an exaggeration of misogyny in the wider gay community. Despite the fact that gay men suffer under patriarchy (through their alignment with the "woman's position," a violation of gender norms), where men go, misogyny will follow. In some ways, since gay men do not need women for sex the same way straight men do, the sexism is more pointed — often related to our bodies (which straight men need to at least pretend to like).

The perpetuation of the "fish" narrative in gay male communities is the most prominent example of this. While gay men certainly have the right to not like vaginas (it should be noted, lesbians are rarely granted the same courtesy), the sheer disgust associated with female bodies in gay communities is often astonishing.

Despite claiming to be disgusted by our bodies, many in the gay male and drag cultures display a massive amount of entitlement to them. Sexual assault in the gay community is rampant and constantly brushed under the rug because "gay men can't assault a woman!" As someone who was personally sexually assaulted by a drag queen in college— I promise you, they can.

**Drag isn't inherently misogynistic**

Despite the overwhelming evidence to the contrary, I don't actually believe all drag is inherently misogynistic. It is still possible for drag to deliver on its initial promise of a "gender-free" space by bending what is culturally expected of both men and women. Men should be allowed to be feminine, bold, and divas if they so desire. So should women.

So what separates misogynistic drag from good gender-bending fun?

**1. A true appreciation for the female artists**

My friend, Lucas, recently exposed me to Alexia Twister, a Brazilian drag performer who makes nearly-perfect replications of Lady Gaga performances.

Twister's work stands out to me because it demonstrates a deep appreciation and respect for the woman he is emulating. There is no question in my mind that Twister respects Lady Gaga — he's not playing her for laughs. He's using his own body to share her work with the world, unlike the Liza Minelli drag impersonators that turn up every year at Pride.

**2. Comedy that isn't at the expense of women**

Although now there are many genres of drag ranging from serious to horror, drag, historically, has been a comedy act. Despite being a feminist kill-joy, I still appreciate a good joke. But when comedy performed by men comes at the expense of women, it crosses the line. If men in drag are supposed to

W_000136

Pl. App'x 281

694

be acting in solidarity with women to take down the patriarchy, how about making men the butt of the joke?

**3. Female bodies aren't used as props**

By wearing fake breasts or otherwise artificially sculpting their bodies to look more "feminine," drag performers perpetuate the idea that female body parts are commodities and that womanhood is a costume that can be taken on or off — real women, though, don't have that privilege. Drag performers can gender-bend in dresses, wigs, heels, and makeup all without pretending to actually have a female body.

**4. Actual women are welcome**

Are *actual* women welcome at the drag venue, or will they be insulted and called names? What about as performers? More and more women are discovering that dressing up like a man and gyrating on stage can be fun — but these women ("drag kings") are still excluded from the more elite levels of drag performance. Some women even have an interest in participating as drag queens. Yet, Ru Paul states that "Drag loses its sense of danger and its sense of irony once it's not men doing it." If drag is truly about creating a gender-free world, women should be not only welcome but leading it.

Despite the fact that feminists have been making these same arguments for decades, it's hard to find drag that's not perpetuating the gender roles it claims to contradict. The shameful reality is that men have little motivation to listen to women they aren't trying to fuck. Our complaints largely go ignored.

If we want to see more good drag that truly allies with women, gay men need to hold their communities accountable for the sexism they perpetuate. Drag is just the start.

---

*The generous support of our readers allows 4W to pay our all-female staff and over 50 writers across the globe for original articles and reporting you can't find anywhere else. Like our work? Become a monthly donor!*

**W_000137**

Pl. App'x 282

| Natural Law | Man's law |
|---|---|
| Based Upon Principles & Truth (Inherent To Creation) | Based Upon Dogmatic Beliefs (Constructs Of Mind) |
| Harmonized with, due to Knowledge & Understanding | Complied with, due to Fear of Punishment |
| Universal; exists and applies anywhere in the Universe regardless of location | Differs with location based upon the whim of legislators (Moral Relativism) |
| Eternal and Immutable; exists and applies for as long as the Universe exists, and cannot be changed | Changes with time based upon the whim of legislators (Moral Relativism) |

# Natural law

⌐ 61 languages

- Article
- Talk
  - Read
  - Edit
  - View history

From Wikipedia, the free encyclopedia

*Not to be confused with Natural justice.*

*For other uses, see Natural law (disambiguation).*

**Natural law**[1] (Latin: *ius naturale*, *lex naturalis*) is a system of law based on a close observation of human nature, and based on values intrinsic to human nature that can be deduced and applied independently of positive law (the express enacted laws of a state or society).[2] According to the theory of law called jusnaturalism, all people have inherent rights, conferred not by act of legislation but by "God, nature,

W_000138

Pl. App'x 283

or reason."[3] Natural law theory can also refer to "theories of ethics, theories of politics, theories of civil law, and theories of religious morality."[4]

In the Western tradition, it was anticipated by the pre-Socratics, for example in their search for principles that governed the cosmos and human beings. The concept of natural law was documented in ancient Greek philosophy, including Aristotle,[5] and was referred to in ancient Roman philosophy by Cicero. References to it are also to be found in the Old and New Testaments of the Bible, and were later expounded upon in the Middle Ages by Christian philosophers such as Albert the Great and Thomas Aquinas. The School of Salamanca made notable contributions during the Renaissance.

Although the central ideas of natural law had been part of Christian thought since the Roman Empire, the foundation for natural law as a consistent system was laid by Aquinas, as he synthesised ideas from his predecessors and condensed them into his "Lex Naturalis" (lit. 'Natural law').[6] Aquinas argues that because human beings have reason, and because reason is a spark of the divine (see: image of God), all human lives are sacred and of infinite value compared to any other created object, meaning all humans are fundamentally equal and bestowed with an intrinsic basic set of rights that no human can remove.

Modern natural law theories took shape in the Age of Enlightenment, combining inspiration from Roman law, Christian scholastic philosophy, and contemporary concepts such as social contract theory. It was used in challenging the theory of the divine right of kings, and became an alternative justification for the establishment of a social contract, positive law, and government—and thus legal rights—in the form of classical republicanism. In the early decades of the 21st century, the concept of natural law is closely related to the concept of natural rights. Indeed, many philosophers, jurists and scholars use natural law synonymously with natural rights (Latin: *ius naturale*), or natural justice,[7] though others distinguish between natural law and natural right.[8]

Because of the intersection between natural law and natural rights, natural law has been claimed or attributed as a key component in the Act of Abjuration (1581) of the Netherlands, the Declaration of Independence (1776) of the United States, the Declaration of the Rights of Man and of the Citizen (1789) of France, the Universal Declaration of Human Rights (1948) of the United Nations, as well as the European Convention on Human Rights (1953) of the Council of Europe.

# https://www.thepublicdiscourse.com/2021/08/77439/

**Natural Law and the Declaration of Independence**

AUGUST 24, 2021 BY JAMES STONER

To those who wrote and signed the Declaration of Independence, political liberty and natural law went together: Nature summons man, individually and collectively, to self-government and guides him in the exercise of his power of choice.

W_000139

*This essay is part of a week-long series drawn from the Witherspoon Institute's project on Natural Law, Natural Rights, and American Constitutionalism. Click here to read PD Editor-in-Chief R.J. Snell's introduction to the series.*

No public document gives more prominence to the idea of natural law, nor relies more crucially upon natural law as a premise, than the Declaration of Independence.  To understand why this is so and what it means for American constitutionalism requires reading the text of the Declaration in its political, historical, and philosophical context.

As a political statement, the Declaration was the culmination of a series issued by the several Continental Congresses, the voluntary associations of representatives of thirteen British colonies in North America that spoke for the colonists as a whole.  These documents catalogued grievances against British colonial policy, appealing for the most part to liberties and privileges claimed under the English constitution and the common law.  Declarations and petitions of this sort were themselves part of the English constitutional tradition, from Magna Carta in 1215 through the 1689 Bill of Rights.  The middle section of the Declaration of Independence follows this pattern, detailing complaints against the king and Parliament alleging constitutional violations, unconstitutional statutes, and acts of oppression and war.

Because the Congress in July 1776 had resolved upon independence from Great Britain, however, they thought it inadequate to appeal only to the British constitution.  Instead, they addressed the "opinions of mankind" and made their appeal on the basis of "the laws of nature and of nature's God."   Seen as justification for recognition of the political independence of the new United States, natural law appears to ground the law of nations; in the absence of an imperial suzerain or an international league, nature itself must be the standard and world opinion its court.  Little is said at the beginning of the Declaration about this aspect of natural law, other than that it supports the equality of separate states.  But the powers belonging "of right" to "free and independent states" detailed in the Declaration's conclusion – "to levy war, conclude peace, contract alliances, establish commerce" and unspecified others – should probably be understood as natural in the minds of the Declaration's signers.  The notion that "international law" arises chiefly from treaties among nations, even the term "international" itself, is a development subsequent to the Declaration; indeed, one commentator has traced the origin of modern thinking about international law to the question among European powers of what constituted formal recognition of American independence.[1]  That the Americans needed legal separation from Britain in order to find allies in the fight against her was clearly recognized at the time and by scholars since.

If the first and final role of natural law in the Declaration is to explain the independence of the United States from the perspective of the law of nations, its second and central function is to ground the theory of God-given rights and man-made government that comprises its most memorable passage, justifying not only independence but revolution:

We hold these truths to be self-evident: That all men are created equal; that they are endowed by their Creator with certain unalienable rights; that among these are life, liberty, and the pursuit of happiness; that, to secure these rights, governments are instituted among men, deriving their just powers from the consent of the governed; that whenever any form of government becomes destructive of these ends, it is the right of the people to alter or to abolish it, and to institute new government, laying its foundation

W_000140

Pl. App'x 285

on such principles, and organizing its powers in such form, as to them shall seem most likely to effect their safety and happiness.

While the "unalienable rights" said to be self-evidently true are not explicitly called natural rights, the inference is unavoidable: the passage follows immediately after the sentence that explicitly mentions the laws of nature; Jefferson's earlier draft called the rights "inherent"; and "self-evident truth" is not a bad definition of natural law itself.  Moreover, several of the Declaration's antecedents did refer more explicitly to natural rights.  George Mason's Bill of Rights for the Virginia Constitution, published in the Philadelphia papers in mid-June 1776 and almost certainly in Jefferson's possession when he drafted the Declaration, began, "all men are by nature equally free and independent, and have certain inherent rights."  The Declaration and Resolves of the First Continental Congress in 1774 had introduced its catalogue of rights as follows: "That the inhabitants of the English colonies in North-America, by the immutable laws of nature, the principles of the English constitution, and the several charters or compacts, have the following RIGHTS" – and rights to life, liberty, and property began the list.  As this last passage makes plain, the Americans generally did not see a practical distinction between natural law and the common law, nor between natural rights and British liberties.  Violations of the English constitution proved the king a tyrant; natural rights indicated what could be justly done by a people thus oppressed.

Much comment has been devoted to precisely what Jefferson had in mind when he defined the first principles of government as he did.  The reference to equality suggested the fundamentally democratic orientation of the founders; while the equality referred to is theoretically pre-political, allowing and maybe even requiring men to consent to inequalities in government, natural equality is established as a basic standard against which government institutions must be measured.  Writing of life, liberty, and "the pursuit of happiness" rather than the familiar "life, liberty, and property" is more precise when grounding rights in human nature, since property was traditionally held to be a conventional rather than a natural right, but it surely puts oligarchs on the defensive.   Many have seen in the famous passage the theory of the state of nature propounded by modern political philosophers such as Thomas Hobbes and especially John Locke, according to which natural rights precipitate a state of war of every man against every man, settled only by a compact creating a government: radically individualistic persons create a radically positive (and thereby suspect) state.[2]  Nor was the revolutionary effect of the Declaration's second paragraph confined to theory or to the moment of rejecting the king.  As Abraham Lincoln recognized, its significance could be seen in its promise of  future reform: the statement of equality provided "a standard maxim for free society, which should be familiar to all, and revered by all; constantly looked to, constantly labored for, and even though never perfectly attained, constantly approximated, and thereby constantly spreading and deepening its influence, and augmenting the happiness and value of life to all people of all colors everywhere."[3]  Lincoln appealed to the equality principle to place the Declaration on the side of the abolition of slavery.  Others have argued from the Declaration against sexual inequality and inequality in other forms, not only in America but also among peoples seeking liberation from imperial exploitation.[4]

Still, there is a conservative as well as liberal moment in the natural law doctrine of the Declaration.  Though the phrase "nature's God" might indicate the deist's first cause, other invocations of the deity are more orthodox: inalienable rights are said to be an endowment of the Creator, while the signers promise a "firm reliance" on "Divine Providence" and submission to the verdict of the "Supreme Judge."  Whereas men are acknowledged to have the right to dissolve bad government, they have the

duty to establish a better one, and besides, they now claim only to alter, not abolish, their current regime.  Though the phrase "pursuit of happiness" might suggest a government limited to protecting the conditions of what is privately pursued, the Declaration says that principles and forms of government established in the wake of revolution have as their object a people's "safety and happiness," a more comprehensive formulation.  Prudence, the classical virtue of statesmanship, is invoked, and the catalogue of grievances suggests that constitutional order has been upset by tyrannical actions, not that new order is desired only for the sake of change.  Though he always remembered the revolutionary intention of the Declaration, speaking of its call to burst the chains of "monkish ignorance and superstition," Jefferson denied its novelty: The Declaration aimed to capture "the harmonizing sentiments of the day, whether expressed in conversation, in letters, printed essays, or in the elementary books of public right, as Aristotle, Cicero, Locke, Sidney, etc."[5]  To be sure, Jefferson did not connect "harmonizing sentiments" to natural law, but one finds that usage in the writings of his contemporary, Edmund Burke.[6]

The various meanings of natural law in the Declaration – in relation to world politics or to first principles, as proto-liberal or as conservative – come together if the Declaration is seen as an assertion of political liberty, and if political liberty is seen as a good endorsed by natural law or promised by natural right.  To an age like our own where law is often seen in opposition to politics, and nature seen in opposition to liberty, this suggestion might seem paradoxical.  Political liberty is the right of men to rule themselves or at least to participate in the management of their common life, and today we either take this for granted or see it as allowing arbitrary choice in the rational administration of an interdependent whole.  To those who wrote and signed the Declaration of Independence, however, political liberty and natural law went together: Nature summons man, individually and collectively, to self-government and guides him in the exercise of his power of choice.  The exercise of political liberty leads men to make their own laws and so in that respect can obscure its natural law foundation.  The meaning of the appeal to natural law in the Declaration is that political freedom – as independent statehood on the one hand, and as republicanism on the other – rests on transcendent, rational ground.

# https://www.thepublicdiscourse.com/2022/11/85536/

**America's Way Forward on Marriage**

NOVEMBER 6, 2022BY WITHERSPOON INSTITUTE

Families, religious communities, community organizations, and public policymakers must work together toward a great goal: strengthening marriage so that each year more children are raised by their own mother and father in loving, lasting marital unions.

*This is a lightly edited excerpt from the Witherspoon Institute's recently published book, Marriage and the Public Good: Ten Principles (Second Edition).*

When it comes to family life, the great paradox of our time is this: every society that we think of as generally best for human flourishing—stable, democratic, developed, and free—is experiencing a radical crisis around human generativity. Family fragmentation and fatherlessness are increasing enormously,

W_000142

Pl. App'x 287

usually coupled with the collapse of fertility to levels that, if continued, spell demographic and social decline. Suddenly, developed nations are finding themselves unable to accomplish the great, simple task of every human society: bringing young men and women together to marry and raise the next generation together.

With legalized same-sex marriage and historically low marriage and fertility rates, the United States has accelerated its own descent into this state of affairs. For the first time in our nation's history, older people are projected to outnumber children by the year 2030. In the face of decline, however, we are witnessing a "marriage movement" and pockets of reasoned resistance. The great task for America in our generation is to energize a return to and renewal of traditional marriage. We need to transmit a stronger, healthier, and more supportive marriage culture to the next generation, so that each year more children are raised by their own mother and father united by a loving marriage, so that they can grow up to have thriving marriages themselves.

Our task is a daunting one. Creating such a marriage culture is not a job for the government. Families, religious communities, and civic institutions must point the way. But law and public policy are also teachers; they will either reinforce and support these goals or undermine them. We call upon our nation's leaders and our fellow citizens to support public policies that strengthen traditional marriage as a social institution. This nation must reestablish the normative understanding of marriage as the union—intended for life—of a man and a woman, who welcome and raise together any children who are the fruit of their self-giving love, extending the family tree into a flourishing grove where other citizens can rest in its shade.

In particular, we advocate the following eight actions toward undergirding and strengthening marriage:

**1. Maintain the legal distinction between married and cohabiting couples.**

Powerful intellectual institutions in family law, including the American Law Institute, have proposed that America follow the path of many European nations and Canada in erasing the legal distinction between marriage and cohabitation. But since such a shift in law would create further harm by sending a false message to the next generation that marriage itself is irrelevant or secondary, we encourage our legislators to refuse to extend legal marital status to cohabiting couples. We believe it is unjust as well as unwise to either impose marital obligations on people who have not consented to them or extend marital benefits to couples who have not promised marital responsibilities.

**2. Investigate divorce-law reforms.**

Under America's current divorce system, courts today provide less protection for the marriage contract than they do for an ordinary business contract. We believe that the current system is a failure in both practical and moral terms, and deeply in need of reform. We call for renewed efforts to discover ways in which laws can strengthen marriage and reduce unnecessarily high rates of divorce. We affirm that protecting Americans from domestic violence and abuse is a critically important goal. But because both children and adults in nonmarital unions are at vastly increased risk for both, encouraging high rates of family fragmentation is not a good strategy for protecting them. Proposals we consider worthy of more consideration include the following:

W_000143

Pl. App'x 288

*Extend waiting periods for unilateral no-fault divorce.* Require couples in nonviolent marriages to attend (religious, secular, or public) counseling designed to resolve their differences and renew their marital vows.

*Permit the creation of prenuptial covenants that restrict divorce* for couples who seek more extensive marriage commitments than current laws allow. (The enforcement by secular courts of Orthodox Jewish marriage contracts may provide a useful model, as well as Louisiana's "Covenant Marriage" option.)

*Expand court-connected divorce-education programs to include divorce interventions* (such as PAIRS or Retrouvaille) that help facilitate reconciliations as well as reduce acrimony and litigation.

*Apply standards of fault to the distribution of property, where consistent with the best interests of children.* Spouses who are abusive or unfaithful should not share marital property equally with innocent spouses. The laments of spouses whose mate has left them against their will—especially in order to form a new union—ought to be heard and considered.

*Create pilot programs on marriage education and divorce interventions in high-risk communities,* using both faith-based and secular programs. Track program effectiveness to establish "best practices" that could be replicated elsewhere.

### 3. End marriage penalties for low-income Americans.

To address the growing racial and class divisions in marriage, federal and state governments ought to act quickly to eliminate the marriage penalties embedded in means-tested welfare and tax policies—such as the Earned Income Tax Credit (EITC) and Medicaid—that affect couples with low and moderate incomes. A recent study found that where there was an anticipated loss of income-tax credit due to a marriage penalty, lower-income women were less likely to marry and more likely to cohabit; thus, financial disincentives are potentially affecting the marriage decisions of millions of low-income women. It is unconscionable that government levies substantial financial penalties on low-income parents who marry. Other approaches to strengthening marriage for couples and communities at risk include public information campaigns, marriage education programs, and jobs programs for low-income couples who wish to get and stay married. Experimenting with such new initiatives allows scholars to determine which measures are best suited to the task at hand.

### 4. Protect and expand pro-child and pro-family provisions in our tax code.

The tax code ought to privilege institutions that stabilize society and help those making sacrifices to ensure the next generation.

### 5. Protect the interests of children against a powerful fertility industry.

Treating the making of babies as a business like any other is fundamentally inconsistent with the dignity of human persons and the human rights of children. At the very least, we urge our legislators to consider restricting reproductive technologies to married couples. In addition, we believe the following proposals are worthy of further investigation:

*Ban the use of anonymous sperm and egg donation for all adults.* Children have a right to know their biological origins. Adults have no right to strip children of this knowledge to satisfy their own desires for

W_000144

Pl. App'x 289

a family. Countries such as the Netherlands, Norway, Sweden, Switzerland, Finland, New Zealand, and the UK all have banned this practice to protect the identity rights of donor-conceived children.

*Ban all surrogacy.* Some countries, such as Thailand and India, have banned commercial surrogacy; others, such as Nepal and Sweden, have banned all surrogacy. The European Parliament has condemned surrogacy as "reproductive exploitation" that "undermines the human dignity" of women, particularly "vulnerable women in developing countries." Surrogacy also commodifies the children being carried, subjects them to increased health risks, and disregards their rights by prioritizing adult desire over a child's best interests.

*Refuse to create legally fatherless children.* Require men who are sperm donors (or the clinics that trade in gametes) to retain legal and financial responsibility for any children they create who lack a legal father. The most important forces underwriting the current United States fertility industry are not technological; they are social and legal. Both law and culture have stressed the interests of adults to the exclusion of the needs of children. Parents seeking children deserve our sympathy and support. But we ought not, in offering this, deliberately create an entire class of children deprived of their natural human right to know their own origins and to experience the unique love of both a mother and a father.

**6. Protect the freedom to live out and express belief in the uniqueness of traditional marriage without fear of government coercion and institutional hostility.**

Instances of intolerance for individuals who hold a traditional view of marriage grow more numerous by the day and are increasingly accompanied by legal efforts to compel either violations of individual conscience or religious beliefs. For instance, faith-based adoption and foster-care providers have been forced to compromise their belief that placing children in homes with a mother and a father is in the best interest of the child—or to cease offering services entirely, leaving vulnerable children in need. In a similar way, sexual orientation and gender identity nondiscrimination laws are often used by their backers as a sword "to punish the wicked," as multimillionaire activist Tim Gill refers to his goals for such laws. We can only interpret this kind of language to indicate an intention to silence and stamp out dissent, violating legitimate individual and religious liberty.

**7. Protect the freedom to conduct scholarly inquiry and promote dissemination of accurate research findings on marriage and related topics.**

In tandem with the widespread misrepresentation of research findings both in academia and public media on the subject of marriage, a disturbing trend toward actual suppression of research based on ideological rather than scientific grounds appears to be emerging and altering the playing field in the study of sexuality and gender. For example, in August 2018, Brown University professor Lisa Littman published a study that explored the recent statistical upsurge of adolescent and young-adult gender-dysphoric girls and the possibility of social media and peer influence as a contributing factor. Despite being peer reviewed and found acceptable, the study was immediately denounced online by gender ideology activists, since it suggested that some of the girls could have been influenced by forces outside of themselves. In response to the attacks, Brown University removed the article from its news distribution on the basis that it "could be used to discredit efforts to support transgender youth," while the journal editors posted a comment of concern and conducted an additional review that ultimately resulted in the publication of a revised version, even though the article's results were unchanged. A former dean of Harvard Medical School spoke out against the journal's and Brown's actions.

W_000145

**8. Restore the public understanding of marriage as uniquely the union of one man with one woman as husband and wife.**

In 2015, the Supreme Court redefined marriage and imposed a new legal standard of what marriage means, with some justices erroneously declaring that our historic understanding of marriage as the union of one man and one woman is rooted in animus or ignorance. While these legal mandates won't be easily reversed, we *can* seek to restore the public's understanding of the unique goods of traditional marriage for society. Our best hope in the years ahead is to foster a nonpartisan cultural renewal so that a new generation of legislators and justices will arise to legally reestablish the institution of marriage for the good of all Americans. Families, religious communities, community organizations, and public policymakers must work together toward a great goal: strengthening marriage so that each year more children are raised by their own mother and father in loving, lasting marital unions. The survival of the American experiment depends upon it. And our children deserve nothing less.

# https://www.prb.org/resources/family-more-complicated/

**Projects** Report. Summary of PRB Methods to Produce Estimates of Women and Girls Potentially at Risk of FGM/C in the United States

SHARESHARE

- Facebook
- Twitter
- LinkedIn
- email

**Family Life Is More Complicated Than Ever**

**DATE**

**May 4, 2020**

**AUTHOR**

**Paola Scommegna**

Senior Writer

**FOCUS AREAS**

COVID-19

The coronavirus pandemic—coupled with ongoing demographic trends—is making family life even more complicated for Americans. Millions of families are at increased risk of falling into poverty due to pandemic-related job losses, and social distancing protocols are separating some children from their parents who live in a different household.

W_000146

Pl. App'x 291

American parents and children are more likely than ever before to live in separate households: More than one in three U.S. children under age 18 (36%) does not live with both biological parents, according to research supported by the *Eunice Kennedy Shriver* National Institute of Child Health and Human Development (NICHD).[1]

During coronavirus stay-at-home orders, some noncustodial parents have found seeing their children complicated, risky, or even impossible. Not living under the same roof also makes it harder for parents to invest time and money in their offspring, putting more children at risk of growing up poor, says Alicia VanOrman, senior research associate at Population Reference Bureau (PRB).

Economically disadvantaged Americans are more likely to have complex family ties spanning multiple households; they are also bearing the brunt of the coronavirus health effects and economic hardships, she says.

"Working-poor parents are most at risk of losing their jobs, are more vulnerable to contracting the disease at work or on their commutes, are less likely to have health insurance, and often have limited savings to cushion the economic toll," says Mark Mather, PRB associate vice president of U.S. Programs.

NICHD-supported family scholars recently took a close look at the ways family life has become more complex, unstable, and unequal over the past decade, as reported in the *Journal of Marriage and Family*. They identified seven interrelated trends.

**1. Americans Are Retreating From Marriage**

"More of the population of the United States is currently unmarried than ever before," report Benjamin Karney and Thomas Bradbury of the University of California, Los Angeles.[2] In 2019, about 53% of all U.S. adults ages 18 and older were currently married, compared with 70% in 1970.[3]

Driving this decline is more young adults delaying marriage to older ages, more couples cohabiting before or instead of marrying, couples still divorcing at relatively high rates, and fewer adults remarrying following a divorce or the death of a spouse, the researchers report.

Pamela Smock of the University of Michigan-Ann Arbor and Christine Schwartz of the University of Wisconsin-Madison point to a "marriage divide" by education level and race and ethnicity.[4] In 2019, 41% of women without a high school diploma were currently married compared with 47% of those with high school diplomas or some college and 62% of those with a bachelor's degree or more.[5] In the early 1970s among women in their early 40s, over 90% of both non-Hispanic black and white women had ever married; by 2019, fewer than two-thirds of black women had ever married compared with 87% of white women.[6]

**2. Debt, Low Wages, Uncertain Employment Have Become Barriers to Marriage**

Surveys show that Americans now "appear to tie marriage 'readiness' to having comfortable income, little or no debt, and a secure job," Smock and Schwartz report. "Marriage has come to be seen as a luxury good, a step to be taken after one has achieved a comfortable level of economic stability."

"Those markers of economic stability have become less available to those without college degrees as the number of well-paid, skilled manufacturing jobs has declined."

W_000147

Another barrier to marriage is high incarceration levels, which affects the availability of male partners and the income-earning prospects of those released, they suggest.

**3. Cohabitation, Now Common, Is Less Likely to Be a Pathway to Marriage for Lower-Income Americans**

Living together instead of marrying has become the norm: Among women ages 25 to 29, nearly half (49%) had ever cohabited in 1995, "rising to a striking 73% in 2011 to 2013," report Smock and Schwartz.[7]

Cohabiting relationships tend to be short: Most marry or dissolve their partnership within two or three years, with evidence of higher levels of break ups in recent years, they say. Numerous studies suggest that cohabitation has become less of a stepping stone to marriage, particularly for economically disadvantaged women, who are less likely to transition to marriage than college-educated women, according to Smock and Schwartz.[8] Instead "serial cohabitation—cohabiting more than once—has been rising and is more widespread among the less educated."[9]

**4. More Children Are Being Born to Unmarried Parents, Particularly Cohabiting Couples**

The share of children born to unmarried parents has doubled since the 1980s, rising from 21% in 1980-1984 to 43% in 2009-2013.[10]

Smock and Schwartz point to a "decoupling of marriage and childbearing": Births to cohabiting couples (whose relationships tend to be less stable than those of married couples) represented 26% of all U.S. births in 2010-2014 and accounted for nearly all the recent increase in nonmarital births.[11]

Nonmarital births are more prevalent among mothers with lower education levels: In 2009-2013, 68% of births to mothers with less than a high school diploma were to unmarried mothers, compared with 11% for mothers with a college degree, they report.[12]

They also noted differences by race and ethnicity: In 2016, the share of nonmarital births among black women was 70%, compared with 53% for Latinas and 29% among white women.[13]

**5. Divorce Rates Remain High, Despite Declines**

Recent estimates suggest that divorce continues to be "financially devastating" for mothers and children, report R. Kelly Raley of the University of Texas at Austin and Megan Sweeney of the University of California, Los Angeles.[14]
U.S. divorce rates are among the world's highest, although they have declined from their peak in 1980, according to the researchers. Divorce rates have dropped since the 1990s for couples in their 20s and 30s, which suggests that only the most committed couples marry. Divorce rates "increased dramatically" among those ages 50 and older, possibly a sign of the instability of second marriages.

Smock and Schwartz identify stark differences in marital stability by education level and by race and ethnicity.[15] Women with at least a bachelor's degree have a much higher probability of their marriage lasting 20 years than women with a high school diploma (78% versus 41%). Men with bachelor's degrees are more likely than men with high school diplomas to reach the 20-year mark (65% versus 47%).[16]

W_000148

Pl. App'x 293

Black women have the highest risk of divorcing or separating within 20 years of marriage (63%), followed by Latinas, non-Hispanic white women, and Asian American women (47%, 46%, and 31% respectively). These differences likely reflect variations in education and income levels, they say.

**6. More Parents Have Children With Multiple Partners**

Having children with more than one partner—called multi-partner fertility by family researchers—is related to the rise of unmarried childbearing and unstable relationships. These parents tend to be the most disadvantaged U.S. adults; typically, they had their first child at a young age, usually outside of marriage. While many parents create complex households that include children who are "hers, his, and/or ours," others never reside with the other biological parent of their children.

Smock and Schwartz point to a "marked increase" in multi-partner fertility with estimated levels ranging from 14% to 25% of all parents, depending on the data used and the age range studied. Among cohabiting U.S. couples with children, a 2019 study estimates that 44% of households had at least one adult who had a child with another partner.[17]

The greater prevalence of multi-partner fertility among people with lower levels of education and income may reinforce and magnify the instability already found among unmarried couples with children.[18] Parents' time and money are spread across households, potentially increasing inequality and exacerbating poverty.

**7. A Large Share of Children Experience Complex Living Arrangements**

As more parents split up and form relationships with new partners, a growing share of children experience unstable living arrangements. They may move from families with two biological parents (either married or cohabiting) to families with a single parent, a cohabiting parent, or a step-parent (either married or cohabiting).

Smock and Schwartz report that only three in five children under age 18 (60%) live with both biological parents in a married family household (see table).[19] In 2019, about 4% of children lived in a cohabiting family with both their biological parents, 9% in a step-parent family (either married or cohabiting), 22% in a single-parent family (mainly headed by their mothers), and the remainder in other arrangements, such as with grandparents.

**TABLE. Many Children Under Age 18 DO NOT LIVE WITH BOTH BIOLOGICAL PARENTS**

| LIVING ARRANGEMENTS FOR CHILDREN UNDER AGE 18 | PERCENT DISTRIBUTION |
|---|---|
| Both biological parents, married | 60 |
| Both biological parents, cohabiting | 4 |
| Step-parent (married or cohabiting) | 9 |
| Single-parent family | 22 |

W_000149

Pl. App'x 294

| LIVING ARRANGEMENTS FOR CHILDREN UNDER AGE 18 | PERCENT DISTRIBUTION |
|---|---|
| Other (such as grandparents) | 4 |

**Note:** Numbers do not add to 100 because of rounding.

**Source:** Krista K. Payne, *Children's Family Structure, 2019* (Bowling Green, OH: National Center for Family and Marriage Research, Bowling Green State University, 2019), https://doi.org/10.25035/ncfmr/fp-19-25.

About half of children with noncollege-educated parents are in complex families (a single-parent family, a cohabiting or married step-parent family, or a family with half-siblings or step-siblings) compared with one in five children with a college-educated parent.[20]

"Economics and family structure play out in a way that disadvantages children with less-privileged backgrounds and under-represented minorities," argue Smock and Schwartz. They point to children living with both of their biological parents: Among those in married families, 53% had at least one parent with a bachelor's degree compared with 15% of children in cohabiting families.[21]

### Trends Lead to Concerns About Effects on Health, Child Poverty, and Child Development

Marriage and divorce in the United States are "stratified and stratifying institutions" that widen existing social inequalities, assert Raley and Sweeney. After surveying family patterns over the past decade, they conclude that family complexity "is here to stay." Family scholars raise several concerns related to these trends:

- **Health and well-being:** On average, research links marriage to many benefits for children and adults, including higher income, better health, and longer life expectancy. Some—but not all—of these differences are explained by who marries: Studies show that healthier and wealthier people are more likely to marry and remain married, and also that married people are more likely to enjoy health-promoting resources such as shared income and greater social support, report Debra Umberson of the University of Texas at Austin and Mieke Beth Thomeer of the University of Alabama at Birmingham.[22]

- **Child development:** Extensive research "makes clear that the more family structure transitions children face, the lower their level of well-being," reflected in increased depression, anxiety, aggression, rule breaking, and temper outbursts, report Raley and Sweeney.[23]

- **Child poverty:** Research shows that children raised outside of stable, two-biological-parent families face greater odds of being poor and of receiving lower-quality parenting—which can hinder their healthy development and future life chances, report Marianne Cooper of Stanford University and Allison J. Pugh of the University of Virginia.[24] "Family structure not only reflects societal inequities but exacerbates them," they suggest.

W_000150

Pl. App'x 295

The family scholars report their findings in a recent issue of the *Journal of Marriage and the Family*, documenting what Sara McLanahan of Princeton University has called the "diverging destinies" that U.S. children face.

That is, children with highly educated mothers are more likely to grow up in stable households with married parents and economic resources, while children with less-educated mothers tend to spend more of their childhoods in unstable settings with unmarried parents and limited economic resources.

Read more from family scholars about the policy implications of complex families, trends in same-sex marriages, immigrant families, and more.

---

This article was produced under a grant from the *Eunice Kennedy Shriver* National Institute of Child Health and Human Development (NICHD). The researchers at the following NICHD-funded Population Dynamics Research Centers were highlighted in this article: Benjamin Karney, Thomas Bradbury, and Megan Sweeney of the University of California, Los Angeles; Sarah McLanahan of Princeton University; Krista Payne of Bowling Green State University; Pamela Smock of the University of Michigan-Ann Arbor; Christine Schwartz of the University of Wisconsin-Madison; R. Kelly Raley and Debra Umberson of the University of Texas at Austin. Kristi Williams of Ohio State University edited the February 2020 issue of the *Journal of Marriage and the Family*.

---

## References

1. Pamela J. Smock and Christine R. Schwartz, "The Demography of Families: A Review of Patterns and Change," *Journal of Marriage and the Family* 82, no. 1 (2020): 9-34; and Krista K. Payne, *Children's Family Structure, 2019* (Bowling Green, OH: National Center for Family and Marriage Research, Bowling Green State University, 2019), https://doi.org/10.25035/ncfmr/fp-19-25.

2. Benjamin R. Karney and Thomas N. Bradbury, "Research on Marital Satisfaction and Stability in the 2010s: Challenging Conventional Wisdom," *Journal of Marriage and the Family* 82, no. 1 (2020): 100-16.

3. PRB analysis of Integrated Public Use Microdata Series, Current Population Survey (IPUMS-CPS) data.

4. Smock and Schwartz, "The Demography of Families."

5. PRB analysis of IPUMS-CPS data.

6. PRB analysis of IPUMS-CPS data.

7. Smock and Schwartz, "The Demography of Families," citing Esther Lamidi and Wendy D. Manning, *Marriage and Cohabitation Experiences Among Young Adults* (Bowling Green, OH: National Center for Family and Marriage Research, Bowling Green State University, 2016), https://scholarworks.bgsu.edu/ncfmr_family_profiles/60.

8. Smock and Schwartz, "The Demography of Families," citing multiple sources.

W_000151

Pl. App'x 296

9. Smock and Schwartz, "The Demography of Families," citing multiple sources.

10. Wendy D. Manning, Susan L. Brown, and J. Bart Stykes, *Trends in Births to Single and Cohabiting Mothers, 1980-2013* (Bowling Green, OH: National Center for Family and Marriage Research, Bowling Green State University, 2015), www.bgsu.edu/content/dam/BGSU/college-of-arts-and-sciences/NCFMR/documents/FP/FP-15-03-birth-trends-single-cohabiting-moms.pdf.

11. Smock and Schwartz, "The Demography of Families," citing multiple sources.

12. Smock and Schwartz, "The Demography of Families," citing Manning, Brown, and Stykes, *Trends in Births to Single and Cohabiting Mothers, 1980-2013*.

13. Child Trends, *Births to Unmarried Women* (Bethesda, MD: Child Trends, 2018), www.childtrends.org/indicators/births-to-unmarried-women.

14. R. Kelly Raley and Megan M. Sweeney, "Divorce, Repartnering, and Stepfamilies: A Decade in Review," *Journal of Marriage and the Family* 82, no. 1 (2020): 81-99.

15. Smock and Schwartz, "The Demography of Families," citing multiple sources.

16. Casey Copen et al., "First Marriages in the United States: Data From the 2006-2010 National Survey of Family Growth," *National Health Statistics Report* 49 (2012).

17. Lindsay M. Monte, "Multiple-Partner Fertility in the United States: A Demographic Portrait," *Demography* 56 no. 1 (2019): 103-27.

18. Smock and Schwartz, "The Demography of Families," citing multiple sources.

19. Smock and Schwartz, "The Demography of Families," and Payne, *Children's Family Structure, 2019*.

20. Wendy Manning, Susan L. Brown, and J. Bart Stykes, "Family Complexity Among Children in the United States," *The Annals of the American Academy of Political and Social Science* 654, no. 1 (2014): 48-65.

21. [1] Smock and Schwartz, "The Demography of Families," citing Eickmeyer, *American's Children's Family Structure: Two Biological Parent Families*.

22. Debra Umberson and Mieke Beth Thomeer, "Family Matters: Research on Family Ties and Health, 2010 to 2020," *Journal of Marriage and the Family* 82, no. 1 (2020): 404-19, citing multiple sources.

23. R. Kelly Raley and Megan M. Sweeney, "Divorce, Repartnering, and Stepfamilies: A Decade in Review," *Journal of Marriage and the Family* 82, no. 1 (2020): 81-99, citing multiple sources.

24. Marianne Cooper and Allison J. Pugh, "Families Across the Income Spectrum: A Decade in Review," *Journal of Marriage and the Family* 82, no. 1 (2020): 272-99.

W_000152

Pl. App'x 297

# https://ifstudies.org/blog/children-first-why-family-structure-and-stability-matter-for-children

FEBRUARY 28, 2022

Children First: Why Family Structure and Stability Matter for Children

by AEI-Brookings Working Group on Childhood in the United States

- Having married parents typically means that children live in families with more resources, including more time with their parents, and with greater stability. TWEET THIS

- There are roles for both policy and civil society in promoting and supporting marriage. TWEET THIS

- Study after study shows a strong correlation between marriage and a wide array of positive outcomes, and also shows that the benefits of marriage are larger than would be predicted by economic factors alone. TWEET THIS

-

Category: MARRIAGE, PUBLIC POLICY

**Editor's Note:** *What follows is a chapter from* Rebalancing: Children First, *a new report* *from the AEI-Brookings Working Group on Childhood in the United States.*

Our working group agrees that the research evidence indicates that, on average, children who have (a) two parents who are committed to one another, (b) a stable home life, (c) more economic resources, and (d) the advantage of being intended or welcomed by their parents are more likely to flourish. In general, we believe that evidence suggests that marriage is the best path to the favorable outcomes highlighted above. Marriage is of course not the only path that allows children to succeed; many children raised by single parents and cohabiting parents thrive in life. Even so, in the United States marriage continues to be the institution most likely to combine the four benefits outlined above for the sake of children.

Marriage matters to children. Having married parents typically means that children live in families with more resources, including more time with their parents, and with greater stability. While these factors in themselves point to a range of improved outcomes for children, the benefits of growing up in a family with married parents is more than a sum of these parts. Yet a long, steady decline in marriage rates over the past five decades means that more children are growing up in single-parent families. Today about one in four children ages 0–12 does not have married parents. While the decline in marriage has occurred across all demographics, more than one in three children whose mother has an education level of less than a college degree does not have married parents.[1]

Of course, marriage does not guarantee an environment in which children get what they most need—a secure and stable environment with engaged and nurturing caregivers. But, in our review of the

W_000153

Pl. App'x 298

evidence, the working group concludes that marriage offers the most reliable way to promote these ends. We underline that the differences in outcomes we have been discussing are primarily the rates at which children experience adversities; most children from single, step, and cohabiting families do well or average on most outcomes (D'Onofrio and Emery 2019; Eggebeen and Licher 1991; Hetherington and Kelly 2002). In other words, many children from nonintact families thrive.

There are roles for both policy and civil society in promoting and supporting marriage, including targeted reductions of marriage tax penalties, improved economic opportunities that will in turn promote marriage, and communication of clear public messages about the importance of marriage for children.

**Family Structure and Stability in the U.S. Context**

Over the past half century, marriage has become less likely to anchor the lives of American families, leaving more and more children to experience family instability and single parenthood. As shown in figure 2.1, the percentage of children (ages 12 and under) living in households with married parents (with spouse present) declined from 83 percent in the mid-1970s to 71 percent in 2019. This decline in children living with two parents was accompanied by a steady increase in the percentage of children living with only their mother. This trend was entirely driven by a rise in the share of children living with never-married mothers, which increased from 3 percent in 1976 to 18 percent in 2019. The share of children living with divorced mothers held relatively steady over this period at 6 percent (Cherlin 2009; Cohen 2019).

Changes in family life have not affected all children equally. Children with less-educated parents and Black and Hispanic children have been disproportionately affected. Over the past 40 years nonmarital childbearing rose the most for families in these two groups (Cherlin 2009; Wilcox and Marquardt 2010). As shown in figure 2.1, two-thirds of children ages 12 and younger with mothers with less than a college degree had married parents in 2019, down from more than 80 percent in 1976. The decline in marriage has been much less steep for college-educated mothers, dropping from 93 percent in 1976 to about 90 percent in 2019. Among mothers with a college degree, 14 percent of the decline in marriage rates is explained by an increase in divorce, 75 percent is explained by an increase in never-married mothers, and the remainder is explained by an increase in the small share of mothers that are separated or widowed.

W_000154

Pl. App'x 299



**FIGURE 2.1**

## Percent of Children 12 and Under in Households with Married Parents, by Mother's Education Level

Source: Bureau of Labor Statistics Current Population Survey (n.d.)

Today, when it comes to both socioeconomic status and race, American family life is deeply unequal (figure 2.2). Much of the difference across racial and ethnic groups likely reflects group differences in economic conditions, including differences in wages and employment opportunities (Sawhill 2013), differences in wealth including home ownership rates (Schneider 2011), as well as differences in educational attainment (figure 2.1). An increasing share of children across all groups lived with a never-married mother in 2018. In 2018 more Black children lived with never-married mothers than with married parents. Fewer than two in five Black children lived with married parents in 2018, compared with two in three Hispanic children and 82 percent of white children. After rising for most groups between 1976 and 2000, the proportion of children living with separated, divorced, or widowed parents in 2019 is about the same as it was in 1976: 6 percent of Hispanic children and 6 percent of white children, and 8 percent of Black children ages 12 and under.

W_000155

Pl. App'x 300

raised in a stable, two-parent home. Compared to cohabitation, for instance, marriage in the United States is markedly more likely to bundle commitment, nonviolence, and stability (Kenney and McLanahan 2006; Musick and Michelmore 2018; Nock 1998; Wilcox and DeRose 2017). Figure 2.3, which displays the likelihood that children will see their parents break up before age 12 by parental education and marital status, shows a big gap between cohabiting and married parents (Wilcox and DeRose 2017). Other research indicates that children born to cohabiting couples who never marry are almost twice as likely to see their parents break up, compared to children whose parents are married, even after controlling for a range of confounding factors, such as parental education, race, and income (Musick and Michelmore 2018).

**FIGURE 2.3**

## Probability of Family Dissolution before Age 12, by Parents' Marital Status and Education (2006–2010)



Source: Wilcox and Rose (2017).

AEI BROOKINGS

There are many reasons why children raised by married parents are more likely to flourish compared to children raised in single-parent families. For example, children in married-parent families have access to higher levels of income and assets, more involvement by fathers, better physical and mental health among both parents, more family stability, and many other factors (Ribar 2015). Most of these individual factors have been shown to have a positive impact on children's well-being. David Ribar's recent study of the impacts of marriage on children investigated the effects of these specific mechanisms. Even after accounting for these factors that are correlated with marriage, he finds that children with married parents have better outcomes. This means that, even given equal levels of

W_000157

Pl. App'x 301

**FIGURE 2.2**

## Percent of Children 12 and Under, by Marital Status and Race/Ethnicity



Source: Bureau of Labor Statistics Current Population Survey (n.d.).



Since the Great Recession, declines in marriage rates have halted—at least from the perspective of children. Divorce has fallen by more than 20 percent since the onset of the Great Recession, nearly returning to 1970 levels (Payne 2018). The share of children living with married parents has edged up by a percentage point since 2011, driven by a decline in the share living with divorced parents; in addition, nonmarital childbearing declined by a percentage point since 2009 (Centers for Disease Control and Prevention [CDC] 2019). Especially striking about this modest reversal is that it has been largest for Black and Hispanic children. In other words, in recent years the share of children in married-parent families is rising faster for Black and Hispanic children than it is for white children, though the gaps in levels remain large. So even though stark inequalities still exist, American families have become somewhat less unequal in the past decade.

**Evidence That Family Structure and Stability Matter for Children**

The family divide in America has many roots, but it has been largely driven by changes in our economy and in our culture that have made marriage less attainable and less required for poor and working-class Americans (Cherlin 2009; Ellwood and Jencks 2004; Wilcox, Wolfinger, and Stokes 2015; Wilson 1987). Nevertheless, this divide matters because children are, on average, more likely to thrive when they are

Pl. App'x 302

parental attention, income, family stability, and other factors, children in married-parent families tend to end up better off than those living in other types of family arrangements. The advantages of being raised in a married-parent family appear to be more than the sum of the inputs. As Ribar concludes, "The advantages of marriage for children's wellbeing are likely to be hard to replicate through policy interventions other than those that bolster marriage itself" (Ribar 2015, 11).

We will not attempt to summarize the voluminous literature on family structure and child well-being, but outcomes related to education, economic security, and health suggest links between stable families and children's well-being. For example, children raised in stable, married-parent families are more likely to excel in school, and generally earn higher grade point averages (Harker 2007). The effects of family structure are even stronger for social and behavioral outcomes related to schooling, such as school suspensions, whether a school contacts parents about a child's behavior, and whether a child drops out of high school (Autor et al. 2016; Kearney and Levine 2017; McLanahan and Sandefur 1994). Children who live in homes with married parents are more likely to attend and graduate from college (Kearney and Levine 2017; Lerman and Wilcox 2014). Research from Melissa Kearney and Phillip Levine indicates that the effects of marriage on high school and college completion are larger for children from less-educated homes than for children from homes with college-educated parents (Kearney and Levine 2017). In other words, children are more likely to acquire the human capital they need to later flourish in adulthood when they are raised in stable, married-parent families. We note that the effects of family structure vary by outcome, race, and financial status. Some of the effects of family structure are modest, such as on academic test scores; other effects of family structure seem larger, such as high school graduation rates (McLanahan, Tach, and Schneider 2013).

Because families that have two parents are more likely to have two earners, children in stable, married-parent families enjoy markedly higher income and lower risks of poverty and material deprivation (Lerman, Price, and Wilcox 2017). Figure 2.4 shows that children under age 12 living in single-parent homes are much more likely to be in poverty than children in married-parent families. Child poverty would be markedly reduced if the marriage rate was the same as it was in 1970 (Lerman 1996; Thomas and Sawhill 2005).

W_000158
Pl. App'x 303



**FIGURE 2.4**
## Percent of Individuals in Poverty, by Marital Status (2018)

Source: Bureau of Labor Statistics Current Population Survey (n.d.). 

Obviously, much of the association between family structure and family income is about selection: married parents tend to be better educated and to be employed in better-paying jobs, even before they marry (Cherlin 2018). But part of the employment effect seems to be causal, as well. That is, marriage increases the odds that families have access to two earners, reduces the odds that households go through costly family transitions such as a divorce, engenders more support from kin, and fosters habits of financial prudence, including more savings (Eggebeen 2005; Lerman 2002).

The links between family structure and children's economic well-being also extend over the life course. A recent study by Richard Reeves and Chris Pulliam found that upward economic mobility is much higher for the children of married parents. Among those who were in the bottom income quintile as children, four out of five who were raised by married parents throughout their childhood rose out of the bottom quintile when they reached adulthood. In contrast, those raised by a single parent throughout childhood

W_000159
Pl. App'x 304

had a 50 percent chance of remaining in the bottom income quintile (Reeves and Pulliam 2020). Another study, this one by Raj Chetty and coauthors, found sharp differences in upward mobility across geographic areas (Chetty et al. 2014); the strongest single predictor of rates of upward mobility in a particular area was the share of single-parent families. This factor was much more predictive than other measures tied to economic well-being, such as parents' education levels, income, or race. To be sure, these studies report correlations and do not necessarily reflect the causal impact of marriage. But study after study shows a strong correlation between marriage and a wide array of positive outcomes, and also shows that the benefits of marriage are larger than would be predicted by economic factors alone.

Furthermore, regarding race, family structure can have a larger effect on some outcomes for white children than for Black children (Dunifon and Kowaleski-Jones 2002; Manning and Brown 2006). This differential impact across races and ethnicities may reflect greater support from kin or community organizations, such as churches, for Black and Hispanic children when they experience adversity related to family instability (Brown 2010; Putnam 2015). On the other hand, Black children are more likely to face other challenges, such as poverty, that compound disadvantages and increase the relative impact of family instability for them (Iceland 2019).

We also acknowledge that the quality of family life is crucial for the well-being of children, and not just the structure and stability of their family lives. Children do better when they receive high levels of affection, attention, and consistent discipline from their parents (Baumrind 2012). By contrast, children exposed to authoritarian and abusive parenting, or to high levels of conflict between their parents, are more likely to suffer, regardless of their family structure (Morrison and Coiro 1999). Indeed, the evidence suggests that parental separation is better for children in cases where high levels of conflict characterize a marriage (Amato and Booth 2000; Jekielek 1998). On the other hand, divorces involving children when there are low levels of conflict—perhaps one parent is depressed, the parents have grown apart, or one of the parents has had an affair—are more likely to make children worse off (Amato and Booth 2000).

### Policy Priorities

After decades of decline, the share of children today being raised by married parents has stabilized and recently increased slightly. That's the good news. The bad news is that a large share of children do not have married parents—especially those from lower-income backgrounds and Black and Hispanic children. To bridge this divide and to strengthen family environments for all children, we propose the following public policy and civic measures to strengthen and stabilize marriage and family life in the United States.

### Reduce Marriage Penalties in Means-Tested Programs

Currently, means-tested programs such as Medicaid, the Earned Income Tax Credit (EITC), and the Supplemental Nutrition Assistance Program (SNAP) penalize low-income couples who choose to marry (Carasso and Steuerle 2005) including working-class Americans, with one study showing that more than 70 percent of American families with young children and incomes in the second and third income quintiles face marriage penalties related to Medicaid, cash welfare, or SNAP receipt (Wilcox, Gersten, and Regier 2020; Wilcox, Price, and Rachidi 2016). These penalties can reduce the odds that lower-income couples will marry; one survey found that almost one-third of Americans ages 18 to 60 report

W_000160

Pl. App'x 305

they personally know someone who has not married for fear of losing means-tested benefits (Wilcox, Gersten, and Regier 2020; Wilcox, Price, and Rachidi 2016).

We recommend that Congress consider minimizing marriage penalties by (a) increasing thresholds for means-tested programs for married-parent families, especially those with young children; (b) experimenting with waivers that would allow state and local governments to try innovative approaches to reducing marriage penalties; or (c) passing a secondary earner deduction for low- to moderate-income families that would ease the financial impact of such penalties for two-earner families (Kearney and Turner 2013).

**Strengthen Career and Technical Education and Apprenticeships**

One reason marriage is fragile in many poor and working-class communities is that job stability and income are inadequate, especially for workers without a college degree. We acknowledge that better jobs and greater income are not a silver bullet. New research finds, for example, that better-paying jobs associated with fracking did not boost the share of children being raised in married-parent families (Kearney and Wilson 2018). But insofar as stable, decent-paying jobs remain a key ingredient for young adults considering marriage, steps should be taken to scale up vocational education and apprenticeship programs (Cass 2018; Lerman 2014; Sawhill 2018). We endorse recent initiatives to increase apprenticeships and shorter training programs. Congress should do more to expand access to apprenticeships and career and technical education and to support students in the completion of their degrees.

**Encourage Young Adults to be Prepared before Having Children**

Social marketing and relationship education on behalf of marriage could also prove helpful. Campaigns against smoking and teenage pregnancy have taught us that sustained efforts to change behavior can work. We would like to see a civic campaign organized around what Brookings Institution scholars Ron Haskins and Isabel Sawhill have called the success sequence, in which young adults are encouraged to pursue education, work, marriage, and parenthood, in that order (Haskins and Sawhill 2009; see also Wilcox and Wang 2017). Today, 97 percent of young adults who follow this sequence are not poor in midlife (Wilcox and Wang 2017). While the sequence has not been proven to exercise a casual role in adults' economic lives, an extensive body of research indicates that each step—that is, education, work, and marriage—is associated with better economic outcomes for families with children (Lerman and Wilcox 2014; Wang and Wilcox 2020).

A campaign organized around this sequence—with hopefully widespread support from educational, civic, media, pop cultural, and religious institutions—might meet with the same level of success as the recent campaign to prevent teen pregnancy, a campaign that helped drive down the teen pregnancy rate by more than 65 percent since the 1990s (CDC 2015, 2016, 2017; Kearney and Levine 2014). All aspects of society should encourage young adults to plan and be mentally, financially, and relationally prepared for parenthood before starting a family.

---

1. It is convention to refer to the characteristics of the mother when describing the attributes of parents. These analyses would not meaningfully differ if we were to refer to fathers.

W_000161
Pl. App'x 306

## BOX 2.1
## Children in Foster Care

One consequence of growing family instability, as well as a consequence of the ongoing opioid crisis, has been the removal of more children from their biological or adoptive parents and their home. After declining steadily from 1999 through 2012, the foster care caseload began to increase, rising from 5.4 foster children per 1,000 children ages 17 and under to a rate of 6.0 per 1,000, with a total of 443,000 children in foster care (Child Trends n.d.). In addition, the share of foster children staying in the home of a relative (i.e., kinship care) has increased steadily over the past decade.

Decades of research on the well-being of children in foster care shows that these children are more likely to fail in school and drop out, are more likely to become involved in the juvenile justice system, are more likely to experience homelessness, and are more likely to encounter low wages and high unemployment as adults. In recent years, there has been a growing consensus in the field of child welfare that removing children from their families often does more harm than good. As a result, reforms of federal and state child welfare programs have aimed to help families avoid child neglect or abuse. The Family First Prevention Services Act of 2018 attempts to help at-risk families raise their children without removing them from their homes and placing them in foster care or institutions. The state child welfare programs are being carefully evaluated, so we will soon know whether focusing on helping to keep struggling families together can improve their child raising and, as a result, whether it can improve the outcomes for their child. Some experts are skeptical that these programs can work and think that child welfare agencies should move more quickly to remove children from troubled families, terminate parental rights, and place children for adoption, especially in light of the opioid crisis (Riley 2018). Evaluations of these new programs will be instrumental in determining which approach is best for children.

W_000162

Pl. App'x 308

PRESIDENTIAL ACTIONS

DEFENDING WOMEN FROM GENDER IDEOLOGY EXTREMISM AND RESTORING BIOLOGICAL TRUTH TO THE FEDERAL GOVERNMENT

The White House

January 20, 2025

By the authority vested in me as President by the Constitution and the laws of the United States of America, including section 7301 of title 5, United States Code, it is hereby ordered:

Section 1. Purpose. Across the country, ideologues who deny the biological reality of sex have increasingly used legal and other socially coercive means to permit men to self-identify as women and gain access to intimate single-sex spaces and activities designed for women, from women's domestic abuse shelters to women's workplace showers. This is wrong. Efforts to eradicate the biological reality of sex fundamentally attack women by depriving them of their dignity, safety, and well-being. The erasure of sex in language and policy has a corrosive impact not just on women but on the validity of the entire American system. Basing Federal policy on truth is critical to scientific inquiry, public safety, morale, and trust in government itself.

This unhealthy road is paved by an ongoing and purposeful attack against the ordinary and longstanding use and understanding of biological and scientific terms, replacing the immutable biological reality of sex with an internal, fluid, and subjective sense of self unmoored from biological facts. Invalidating the true and biological category of "woman" improperly transforms laws and policies designed to protect sex-based opportunities into laws and policies that undermine them, replacing longstanding, cherished legal rights and values with an identity-based, inchoate social concept.

Accordingly, my Administration will defend women's rights and protect freedom of conscience by using clear and accurate language and policies that recognize women are biologically female, and men are biologically male.

Sec. 2. Policy and Definitions. It is the policy of the United States to recognize two sexes, male and female. These sexes are not changeable and are grounded in fundamental and incontrovertible reality. Under my direction, the Executive Branch will enforce all sex-protective laws to promote this reality, and the following definitions shall govern all Executive interpretation of and application of Federal law and administration policy:

(a) "Sex" shall refer to an individual's immutable biological classification as either male or female. "Sex" is not a synonym for and does not include the concept of "gender identity."

(b) "Women" or "woman" and "girls" or "girl" shall mean adult and juvenile human females, respectively.

(c) "Men" or "man" and "boys" or "boy" shall mean adult and juvenile human males, respectively.

(d) "Female" means a person belonging, at conception, to the sex that produces the large reproductive cell.

(e) "Male" means a person belonging, at conception, to the sex that produces the small reproductive cell.

(f) "Gender ideology" replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus





become women and vice versa, and requiring all institutions of society to regard this false claim as true.  Gender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex.  Gender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body.

(g)  "Gender identity" reflects a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex.

Sec. 3.  Recognizing Women Are Biologically Distinct From Men.  (a)  Within 30 days of the date of this order, the Secretary of Health and Human Services shall provide to the U.S. Government, external partners, and the public clear guidance expanding on the sex-based definitions set forth in this order.

(b)  Each agency and all Federal employees shall enforce laws governing sex-based rights, protections, opportunities, and accommodations to protect men and women as biologically distinct sexes.  Each agency should therefore give the terms "sex", "male", "female", "men", "women", "boys" and "girls" the meanings set forth in section 2 of this order when interpreting or applying statutes, regulations, or guidance and in all other official agency business, documents, and communications.

(c)  When administering or enforcing sex-based distinctions, every agency and all Federal employees acting in an official capacity on behalf of their agency shall use the term "sex" and not "gender" in all applicable Federal policies and documents.

(d)  The Secretaries of State and Homeland Security, and the Director of the Office of Personnel Management, shall implement changes to require that government-issued identification documents, including passports, visas, and Global Entry cards, accurately reflect the holder's sex, as defined under section 2 of this order; and the Director of the Office of Personnel Management shall ensure that applicable personnel records accurately report Federal employees' sex, as defined by section 2 of this order.

(e)  Agencies shall remove all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology, and shall cease issuing such statements, policies, regulations, forms, communications or other messages.  Agency forms that require an individual's sex shall list male or female, and shall not request gender identity.  Agencies shall take all necessary steps, as permitted by law, to end the Federal funding of gender ideology.

(f)  The prior Administration argued that the Supreme Court's decision in *Bostock v. Clayton County* (2020), which addressed Title VII of the Civil Rights Act of 1964, requires gender identity-based access to single-sex spaces under, for example, Title IX of the Educational Amendments Act.  This position is legally untenable and has harmed women.  The Attorney General shall therefore immediately issue guidance to agencies to correct the misapplication of the Supreme Court's decision in *Bostock v. Clayton County* (2020) to sex-based distinctions in agency activities.  In addition, the Attorney General shall issue guidance and assist agencies in protecting sex-based distinctions, which are explicitly permitted under Constitutional and statutory precedent.

(g)  Federal funds shall not be used to promote gender ideology.  Each agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology.

Sec. 4.  Privacy in Intimate Spaces.  (a)  The Attorney General and Secretary of Homeland Security shall ensure that males are not detained in women's prisons or housed in women's detention centers, including through amendment, as necessary, of Part 115.41 of title 28, Code of Federal Regulations and interpretation guidance regarding the Americans with Disabilities Act.

(b)  The Secretary of Housing and Urban Development shall prepare and submit for notice and comment rulemaking a policy to rescind the final rule entitled "Equal Access in

Accordance with an Individual's Gender Identity in Community Planning and Development Programs" of September 21, 2016, 81 FR 64763, and shall submit for public comment a policy protecting women seeking single-sex rape shelters.

(c) The Attorney General shall ensure that the Bureau of Prisons revises its policies concerning medical care to be consistent with this order, and shall ensure that no Federal funds are expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex.

(d) Agencies shall effectuate this policy by taking appropriate action to ensure that intimate spaces designated for women, girls, or females (or for men, boys, or males) are designated by sex and not identity.

Sec. 5. Protecting Rights. The Attorney General shall issue guidance to ensure the freedom to express the binary nature of sex and the right to single-sex spaces in workplaces and federally funded entities covered by the Civil Rights Act of 1964. In accordance with that guidance, the Attorney General, the Secretary of Labor, the General Counsel and Chair of the Equal Employment Opportunity Commission, and each other agency head with enforcement responsibilities under the Civil Rights Act shall prioritize investigations and litigation to enforce the rights and freedoms identified.

Sec. 6. Bill Text. Within 30 days of the date of this order, the Assistant to the President for Legislative Affairs shall present to the President proposed bill text to codify the definitions in this order.

Sec. 7. Agency Implementation and Reporting. (a) Within 120 days of the date of this order, each agency head shall submit an update on implementation of this order to the President, through the Director of the Office of Management and Budget. That update shall address:

(i)  changes to agency documents, including regulations, guidance, forms, and communications, made to comply with this order; and

(ii) agency-imposed requirements on federally funded entities, including contractors, to achieve the policy of this order.

(b) The requirements of this order supersede conflicting provisions in any previous Executive Orders or Presidential Memoranda, including but not limited to Executive Orders 13988 of January 20, 2021, 14004 of January 25, 2021, 14020 and 14021 of March 8, 2021, and 14075 of June 15, 2022. These Executive Orders are hereby rescinded, and the White House Gender Policy Council established by Executive Order 14020 is dissolved.

(c) Each agency head shall promptly rescind all guidance documents inconsistent with the requirements of this order or the Attorney General's guidance issued pursuant to this order, or rescind such parts of such documents that are inconsistent in such manner. Such documents include, but are not limited to:

(i)  "The White House Toolkit on Transgender Equality";

(ii) the Department of Education's guidance documents including:

(A) "2024 Title IX Regulations: Pointers for Implementation" (July 2024);

(B) "U.S. Department of Education Toolkit: Creating Inclusive and Nondiscriminatory School Environments for LGBTQI+ Students";

(C) "U.S. Department of Education Supporting LGBTQI+ Youth and Families in School" (June 21, 2023);

(D) "Departamento de Educación de EE.UU. Apoyar a los jóvenes y familias LGBTQI+ en la escuela" (June 21, 2023);

(E) "Supporting Intersex Students: A Resource for Students, Families, and Educators" (October 2021);

(F) "Supporting Transgender Youth in School" (June 2021);

(G) "Letter to Educators on Title IX's 49th Anniversary" (June 23, 2021);

(H) "Confronting Anti-LGBTQI+ Harassment in Schools: A Resource for Students and Families" (June 2021);

(I) "Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of Bostock v. Clayton County" (June 22, 2021);

(J) "Education in a Pandemic: The Disparate Impacts of COVID-19 on America's Students" (June 9, 2021); and

(K) "Back-to-School Message for Transgender Students from the U.S. Depts of Justice, Education, and HHS" (Aug. 17, 2021);

(iii) the Attorney General's Memorandum of March 26, 2021 entitled "Application of *Bostock v. Clayton County* to Title IX of the Education Amendments of 1972"; and

(iv) the Equal Employment Opportunity Commission's "Enforcement Guidance on Harassment in the Workplace" (April 29, 2024).

Sec. 8. General Provisions. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(d) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its provisions to any other persons or circumstances shall not be affected thereby.

THE WHITE HOUSE,

    January 20, 2025.





**GET THE FACTS →**

NEWS

WIRE

ISSUES

CONTACT

VISIT

EOP

ADMINISTRATION

Pl. App'x 312

SPECTRUM 0003014

GALLERY

VIDEO LIBRARY

AMERICA 250

FOUNDING FATHERS

THE SIGNERS

Subscribe to The White House newsletter

Your email                                                                                          SIGN UP

Text POTUS to 45470 to receive updates

THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

Copyright

Privacy

Pl. App'x 313
SPECTRUM 0003015

```
 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF TEXAS
 2                  AMARILLO DIVISION

 3   SPECTRUM WT,              )
                               )
 4        Plaintiff,           )
                               )
 5   v.                        )   Case No. 2:23-cv-00048
                               )
 6   WALTER WENDLER, in his    )
     official capacity as the  )
 7   President of West Texas    )
     A&M University, et al.,   )
 8                             )
          Defendants.          )
 9

10

11

12

13   ---------------------------------------------------------
                  ORAL DEPOSITION OF CHIP CHANDLER
14              DECEMBER 9, 2025 - CANYON, TEXAS
     ---------------------------------------------------------
15

16

17

18

19

20        ORAL DEPOSITION OF CHIP CHANDLER, produced as a
     witness at the instance of the PLAINTIFF and duly sworn,
21   was taken in the above styled and numbered cause on
     DECEMBER 9, 2025, from 1:00 p.m. to 2:59 p.m., at the
22   offices of WEST TEXAS A&M UNIVERSITY, Old Main Building,
     Room 317, Canyon, Texas, before SHARON D. LIVINGSTON,
23   CSR-RPR, in and for the State of Texas, reported by
     machine shorthand, and pursuant to the Federal Rules of
24   Civil Procedure.

25
```

```
 1                    A P P E A R A N C E S

 2  FOR THE PLAINTIFF:
         Mr. JT Morris
 3       FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
         700 Pennsylvania Avenue, SE, Suite 340
 4       Washington, DC 20003
         (215) 717-3473
 5       Jt.morris@thefire.org
    - and -
 6       Mr. Adam Steinbaugh
         FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
 7       510 Walnut Street, Suite 900
         Philadelphia, Pennsylvania 19106
 8       (215) 717-3473
         Adam@thefire.org
 9
    FOR THE DEFENDANTS:
10       Mr. David Bryant
         Ms. Munera Al-Fuhaid
11       OFFICE OF THE TEXAS ATTORNEY GENERAL
         300 West 15th Street
12       Austin, Texas 78701
         (512) 463-2100
13       David.bryant@oag.texas.gov
         Munera.al-fuhaid@oag.texas.gov
14
    FOR THE WITNESS:
15       Ms. Hannah L. Rivera
         LOVELL HOFFMAN LAW, PLLC
16       1008 South Madison Street
         Amarillo, Texas 79101
17       (806) 376-8903
         Hannah@makerightlaw.com
18

19

20

21

22

23

24

25
```

```
 1                          INDEX
                                               PAGE
 2   Appearances ------------------------------------   2

 3   Index ------------------------------------------   3

 4   Index of Exhibits ------------------------------ 3-4

 5   CHIP CHANDLER
         Examination by Mr. Morris ---------------   5
 6       Examination by Mr. Bryant ---------------  62
         Re-examination by Mr. Morris ------------  67
 7
     Changes and Signature --------------------------  70
 8
     Reporter's Certification -----------------------  72
 9

10                    INDEX OF EXHIBITS

11   NUMBER       DESCRIPTION                        PAGE

12     37     Email Chain 9-14-22 with Barrett Bright,
              Chip Chandler, Echo Sibley -----------  12
13
       38     A Fool's Drag Race Meeting January 26 ------  15
14
       39     Email Chain 2-16-23 with Chip Chandler and
15            Colette Ransom ---------------------  18

16     40     Email 2-27-23 from Chip Chandler to Barrett
              Bright -----------------------------  22
17
       41     Email 2-28-23 from Chip Chandler to JBK,
18            Barrett Bright ---------------------  25

19     42     Email Chain 2-21-23 Through 3-9-23 ---------  27

20
       43     Email 3-14-23 from WTAMU Risk Assessments to
21            Barrett Bright, Chip Chandler -------------  30

22     44     WT Newsroom Article Double-Cast, Self-Aware
              Musical to Close Season for WT Theater -----  36
23
       45     WT Newsroom Article WT Theater to Bring
24            Classic, Modern Touches to Shakespeare's
              As You Like It ----------------------  39
25
```

1                    INDEX OF EXHIBITS (CONTINUED)

2    NUMBER          DESCRIPTION                              PAGE

3    46    WT Newsroom Article WT Theater Hopes for Big
           Laughs with "Forum" Musical ----------------    42
4
     47    WT Newsroom Article "Outside the Box" Bodies
5          to be Focus of New WT Art Exhibition -------     44

6    48    Email Chain 3-22-23 from Sibley Echo -------     50

7    49    WT Staff Council Memo from Amanda Rogers
           and Steven Knadle -------------------------     51
8
     50    Text Message Chain 3-21-23 with Chip Chandler
9          and Dr. Hunt ------------------------------     53

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. MORRIS:  Does Mr. Chandler's attorney

2     want to make an appearance?

3          MS. RIVERA:  Yeah.  Hannah Rivera, on

4     behalf of the witness, Chip Chandler.

5                    CHIP CHANDLER,

6     having been first duly sworn, testified as follows:

7                     EXAMINATION

8     BY MR. MORRIS:

9          Q.   Good afternoon, Mr. Chandler.  How are you?

10         A.   Doing well.  How are you?

11         Q.   Good.

12              You understand we're here today to discuss

13    certain issues surrounding President Wendler's decision

14    to cancel a couple drag shows that Spectrum WT had

15    planned in Legacy Hall.

16              Is that right?

17         A.   Yes.

18         Q.   Okay.  Have you ever been deposed before?

19         A.   Yes.

20         Q.   When?

21         A.   Approximately 1997.

22         Q.   Okay.  What was the case about?

23         A.   I was a reporter and was sued for libel.

24         Q.   Okay.  Is that the only time you've been

25    deposed?

1   about a five-year break.

2        Q.   What made you want to come work at WT?

3        A.   I wanted a new job.

4        Q.   Fair enough.

5             And what was your role when you started at

6   West Texas A&M?

7        A.   Senior communications specialist.

8        Q.   And what's your role now?

9        A.   Director of University Communications and Media

10  Relations.

11       Q.   Generally what are your duties in that role?

12       A.   Generally, if the press reaches out for an

13  interview, I'm their primary point of contact for

14  anything not athletics-related.  They have their own

15  staff.  I write the bulk of the news releases for the

16  university, or rewrite or edit.  I do internal email

17  communications, campus fliers, things like that.

18       Q.   Okay.  This is sometimes an unfair question

19  because none of us have typical days, but what does your

20  most typical day look like here?

21       A.   I put out a news release before 9:00 a.m., send

22  it to my media list, hopefully field some interview

23  requests based off of that, get those set up, spend some

24  time writing more news releases for the next day or the

25  next several days ahead, send out a couple of campus

1      Q.    More than 20?

2      A.    Yes.

3      Q.    Did you discuss the planning for Fool's Drag

4   Race with other members of Buff Allies?

5      A.    With Echo Sibley, the co-leader.

6      Q.    Anybody else?

7      A.    And with Kris Drumheller, who was the faculty

8   advisor for Spectrum.

9      Q.    Anybody else?

10     A.    Anne Medlock, who had previously been a leader

11  of Buff Allies.

12     Q.    Okay.  So fair to say there were a number of

13  employees and faculty who were aware of what was being

14  planned for Fool's Drag Race?

15     A.    At least three.

16     Q.    If not four?

17     A.    Four with me, yeah.

18     Q.    If you go down to the second email in this

19  chain, it's an email from you to Ransom Colette and Bear

20  Bright?

21     A.    Yes.

22     Q.    You talk about some of your concerns here and

23  ways to address those.  You say, "We definitely need to

24  include that this is a fundraiser for the Trevor

25  Project," and you're suggesting to Bear and Ransom that

 1  they should put that on the flier or poster?

 2      A.  That's how I read this, yes.

 3      Q.  To your recollection, did that appear on the

 4  final poster that was advertised?

 5      A.  I can't remember what the final poster looked

 6  like.

 7      Q.  Okay.  In here, you're also suggesting to

 8  Ransom and Bear that the flier should reflect that they

 9  had planned the show to be PG-13.

10          Is that right?

11      A.  That's what it says here, yes.

12      Q.  Okay.  And again, at this point, it was clear

13  that the students had planned the show to be PG-13,

14  correct?

15      A.  I'm asking them if that's what was decided.

16      Q.  To your recollection, did that ever change

17  between the time you started planning the show and the

18  time the show was canceled?

19      A.  Not to my recollection.

20      Q.  You say here in the last line of this email,

21  "And I think it needs to have a little description of

22  what's going on:  Student orgs compete to see who's the

23  fiercest of them all maybe?"

24          Why did you suggest that, the best you

25  recall?

 1          A.   The best I can recall, it was just so that
 2     people looking at the poster would know what it is.
 3          Q.   Okay.  Why did you choose the word "fiercest?"
 4     Does that have a special connotation for this kind of
 5     event?
 6          A.   Yes.
 7          Q.   Okay.  What is that connotation?
 8          A.   It's just common slang or a commonly used turn
 9     of phrase in the LGBTQ-plus community.
10          Q.   Okay.  Can you explain to me sort of what its
11     common understanding is?  I'm sorry to put you on the
12     spot.  I'm just trying to understand myself here.
13          A.   To be fierce is to be the best essentially.
14          Q.   Okay.  You can set that aside.
15               (Exhibit 40 marked.)
16               MR. MORRIS:  I'm going to mark now as
17     Exhibit 40 what's Bates stamped SPECTRUM 0000822.
18               Mr. Bryant?
19               MR. BRYANT:  Thank you.
20          Q.   (BY MR. MORRIS)  Mr. Chandler, let me know
21     when you've had a chance to look at this.
22          A.   Yes.
23          Q.   This is an email from you to Mr. Bright?
24          A.   Yes.
25          Q.   And is it your understanding at that time that

```
 1  Exhibit 42.  I apologize it doesn't have a Bates stamp
 2  on it, and I'm not sure what our production number is.
 3  We can look it up and provide one after the deposition.
 4  It's obviously something we produced.
 5              MR. BRYANT:  Thank you.
 6       Q.   (BY MR. MORRIS)  Let me know when you've had a
 7  chance to look at this, Mr. Chandler.
 8       A.   Okay.
 9       Q.   It looks like an email chain between several
10  folks at West Texas A&M University.
11              Is that correct?
12       A.   Yes.
13       Q.   Do you remember this email chain at all?
14       A.   Vaguely.
15       Q.   Is it fair to say this is a discussion among
16  Mr. Bright, yourself, JBK Center staff, and Ransom
17  Colette, about the flier for the 2023 Fool's Drag Race?
18       A.   Yes.
19       Q.   And on Page 2 of 6, you see an email down there
20  from Shawn Fouts.
21              Who is Shawn Fouts?
22       A.   Shawn Fouts, at the time, was the senior
23  director of Campus Community.
24       Q.   Was he in charge of or had a role in overseeing
25  what events took place at JBK?
```

1          A.    To my knowledge, yes.

2          Q.    And here, he says in regards to the flier, "I'm

3    not the expert, but I think it looks great, Colette."

4                And then he asks, "Chip and Evelyn?"

5                Fair to say that Dr. Fouts is asking for

6    your view about how the flier looks?

7          A.    I would speculate that yeah, that's what he's

8    asking.

9          Q.    Do you know who Evelyn Montoya is?

10         A.    Yes.

11         Q.    Who is she?

12         A.    Evelyn works in Student Affairs and does

13   marketing materials for them.

14         Q.    Okay.  In response to Dr. Fouts, you say,

15   "Agreed," yes?

16         A.    Yes.

17         Q.    That was a truthful statement you made?

18         A.    Yes.

19                MR. MORRIS:  Is there a problem with my

20   question, Mr. Bryant?

21                MR. BRYANT:  I didn't object.

22                MR. MORRIS:  Okay.

23         Q.    (BY MR. MORRIS)  Fair to say, based on this

24   email chain, that there were multiple staff of West

25   Texas A&M University involved in reviewing and approving

 1  the flier for the Fool's Drag Race event?

 2      A.   Based on this email chain, there were several

 3  eyes on that flier.

 4      Q.   And based on your recollection, is that what

 5  happened, that there were several eyes on the Fool's

 6  Drag Race flier?

 7      A.   Based on my recollection and this email chain,

 8  there were these eyes on it.

 9      Q.   Does this email refresh your recollection about

10  what happened in terms of the flier being approved?

11      A.   Somewhat.

12      Q.   Okay.  You can set that aside for now.

13           (Exhibit 43 marked.)

14           MR. MORRIS:  I'm going to mark this as

15  Exhibit 43.  It's Bates stamped SPECTRUM 0000860.

16           Mr. Bryant.

17           MR. BRYANT:  Thank you.

18      Q.   (BY MR. MORRIS)  Mr. Chandler, do you know

19  what this document is?

20      A.   It's an email from Dr. Fouts to Bear and myself

21  about the Fool's Drag Race.

22      Q.   Okay.  And this email confirms the Fool's Drag

23  Race received tentative approval as of March 14th, 2023?

24      A.   Yes.

25      Q.   Why would Dr. Fouts have sent this to you as

```
1       Q.   So we talked and established earlier in this
2   deposition that Spectrum made clear that the Fool's Drag
3   Race would be a PG-13 show, right?
4           MR. BRYANT:  Objection; leading.
5       A.   Yes.
6       Q.   (BY MR. MORRIS)  In your personal perspective,
7   what did PG-13 mean to you?
8       A.   Personally, it's borrowing from the MPAA rating
9   system for movies.
10      Q.   Okay.  Does the university use that rating
11  system in other student events or university events that
12  it puts on?
13      A.   I can't remember off the top of my head if the
14  theater department uses that kind of rating system or
15  something similar.
16      Q.   So to your knowledge, Spectrum WT made clear
17  that no minors would be allowed at Fool's Drag Race
18  unless they had a parent or guardian with them.
19           Is that right?
20      A.   To my knowledge, yes.
21      Q.   Any reason to believe they would have deviated
22  from that?
23      A.   No.
24      Q.   To your recollection, the students made clear
25  that the performers were not allowed to use profane
```

1    music during their performance.

2              Is that right?

3        A.    To my knowledge, yes.

4        Q.    Okay.  I want to step back because I don't want

5    to mischaracterize your role here.

6              If I say "during your time helping

7    Spectrum" or "guiding Spectrum in putting on Fool's Drag

8    Race," is that fair to say?

9        A.    Yes.  But can I clarify something?

10       Q.    Please do.

11       A.    Okay.

12       Q.    I don't want to mischaracterize your role.

13       A.    I was the co-leader of Buff Allies, which is

14   the support organization for all LGBTQI-plus students.

15   Spectrum had a faculty advisor, and I was not that

16   faculty advisor, but I did help out when asked.

17       Q.    Okay.  If I say "your role supporting Spectrum

18   WT as it planned its Fool's Drag Race show," would that

19   be more fair?

20       A.    Yes.

21       Q.    During your time supporting Spectrum WT's

22   efforts to host Fool's Drag Race at Legacy Hall -- and

23   again, just asking for your knowledge and experience --

24   did anyone on staff at West Texas A&M University raise

25   concerns that the show would be lewd?

1      A.   Not to my recollection, no.

2      Q.   Did anyone on staff at West Texas A&M

3 University, during your time supporting students'

4 efforts to host the drag show, raise concerns about it

5 being sexualized or anything more than PG-13?

6      A.   Not to my recollection, no.

7      Q.   Did anyone at that time raise concerns about

8 minors being prohibited from attending without having

9 parental consent and supervision?

10      A.   Not to my recollection.

11      Q.   Based on your experience supporting Spectrum's

12 efforts to host a drag show at Legacy Hall in 2023,

13 would you say the students were cautious in planning the

14 show?

15      A.   Yes.

16           MR. MORRIS:  This is a good spot to take a

17 short break.

18           MR. BRYANT:  Sure.

19           (Recess 1:47 p.m. to 1:57 p.m.)

20      Q.   (BY MR. MORRIS)  Mr. Chandler, before the

21 break, we were speaking about your efforts to support

22 Spectrum as they intended to put on Fool's Drag Race in

23 Legacy Hall in 2023.

24           You supported them through your capacity as

25 a co-chair of Buff Allies, correct?

1   about Fool's Drag Race?

2       A.   No.

3       Q.   Did Dr. Fouts ever raise concerns with you

4   about Fool's Drag Race?

5       A.   Just questions in those emails.  Beyond that,

6   none, to my recollection.

7       Q.   So to your recollection, just questions about

8   complying with the reservation requirements for Legacy

9   Hall?

10      A.   Not to my recollection, no.

11      Q.   What were the questions he raised?

12      A.   Primarily, it was about the poster marketing.

13      Q.   Just the marketing of the poster?

14      A.   To my recollection.

15           (Exhibit 44 marked.)

16           MR. MORRIS:  I'm going to hand the witness

17   what I'm marking as Exhibit 44.  This is SPECTRUM

18   0000368.

19           Mr. Bryant.

20           MR. BRYANT:  Thank you.

21      Q.   (BY MR. MORRIS)  Mr. Chandler, have you had a

22   chance to look at this document?

23      A.   Yes.

24      Q.   What is this?

25      A.   This is a news release that I wrote about the

1    upcoming performance of a musical called "Title of Show"

2    from WT Theater.

3         Q.   Okay.  These news releases that you write and

4    publish, are these official news releases from WT?

5         A.   Yes.

6         Q.   This is a news release dated March 31st, 2021,

7    correct?

8         A.   Yes.

9         Q.   On the second page, about halfway down, it

10   says, "The show is considered to be rated R for strong

11   language."

12              Do you see that?

13        A.   I do.

14        Q.   Is it commonly the university's practice to put

15   R ratings on theatrical productions that have strong

16   language?

17        A.   The university?

18        Q.   Well, who decides how to rate or what rating to

19   give a theatrical production?

20        A.   The theater department.

21        Q.   So that would be theater faculty?

22        A.   Yes.

23        Q.   You see here that even though it's considered

24   to be rated R, the press release advertises "tickets for

25   families."

1              Is that accurate?

2        A.    Yes, that's what it says.

3        Q.    Any reason you would have included that if the

4   university wasn't selling tickets for families?

5        A.    As I recall, this show was staged -- yes, it

6   says in the second paragraph that this show was staged

7   in video-on-demand performances, so this wasn't a live

8   performance.

9        Q.    Okay.

10       A.    As I recall, they were selling a package, which

11  might have had something to do with rights issues.

12       Q.    Okay.  But they were still selling tickets to

13  families, correct?

14       A.    That's what it says here.

15       Q.    This is dated 2021.  At the bottom of the page,

16  you write, "A commitment to the arts is a key component

17  of the university's long-term plan."

18              Do you see that?

19       A.    Yes.

20       Q.    Was that accurate in 2021?

21       A.    Yes.

22       Q.    To the best of your knowledge, is that accurate

23  today?

24       A.    That's what's in the plan, yes.

25       Q.    So it was accurate also in 2023?

```
 1        A.   Yes.

 2        Q.   And 2024?

 3        A.   Yes.

 4        Q.   You can set that aside for now.

 5                  (Exhibit 45 marked.)

 6                  MR. MORRIS:  I'm going to hand the

 7   witness what I'm marking as Exhibit 45.  It's Bates

 8   stamped SPECTRUM 0000417.

 9        Q.   (BY MR. MORRIS)  Mr. Chandler, do you recognize

10   this document?

11        A.   Yes.

12        Q.   What is it?

13        A.   It is a news release about the WT Theater

14   production of "As You Like It."

15        Q.   So this is an official press release from the

16   university?

17        A.   Yes.

18        Q.   And it's dated February 1st, 2022?

19        A.   Yes.

20        Q.   And you see below here in the fourth to last

21   paragraph of the first page, it says that this is a

22   production of "one of Shakespeare's more popular

23   romantic comedies, 'Rosalind.'"

24                  Do you see that?

25        A.   It says, "In the play, one of Shakespeare's
```

```
 1              (Exhibit 46 marked.)
 2              MR. MORRIS:  I'm going to hand the witness
 3   what I'm marking as Exhibit 46.  It's Bates stamped
 4   SPECTRUM 0003369.
 5              MR. BRYANT:  Thank you.
 6      Q.  (BY MR. MORRIS)  Mr. Chandler, do you
 7   recognize what's been handed to you as Exhibit 46?
 8      A.   Yes.
 9      Q.   Can you explain what it is?
10      A.   It's a press release for WT Theater's
11   production of "A Funny Thing Happened on the Way to the
12   Forum."
13      Q.   And it's dated April 16th, 2025?
14      A.   Yes.
15      Q.   So just this year, right?
16      A.   Yes.
17      Q.   Did you attend this show, if you remember?
18      A.   I did.
19      Q.   In this press release, Echo Sibley says that
20   "WT Theater considers the musical to be rated PG-13
21   because of suggestive humor?"
22      A.   That's what it says, yes.
23      Q.   When you went and saw the show, did it appear
24   to be PG-13 to you?
25              Let me rephrase.  Did you have any reason
```

1    any concern that PG-13 was too low of a rating for this

2    production, again, based on your experience seeing the

3    show?

4        A.   No.

5        Q.   Okay.  You can set that aside.

6             To your knowledge, did the university

7    receive any complaints about "A Funny Thing Happened on

8    the Way to the Forum"?

9        A.   Not to my knowledge.

10       Q.   If someone were to complain about a theatrical

11   production, do you think you would know about it?

12       A.   Maybe.

13       Q.   Just kind of through the grapevine or through

14   your duties as communications director?

15       A.   It could be both.

16            (Exhibit 47 marked.)

17            MR. MORRIS:  I'll mark as Exhibit 47 what's

18   been Bates stamped SPECTRUM 0003858.

19            MR. BRYANT:  Thanks.

20       Q.   (BY MR. MORRIS)  Mr. Chandler, let me know when

21   you've had a chance to look at this.

22       A.   Yes.

23       Q.   Can you tell me what this is?

24       A.   It's a press release about an art exhibition in

25   October.  Well, actually, I guess it opened in November.

1     Q.   November of this year?

2     A.   Yes.

3     Q.   All right.  And is this an official press

4  release from West Texas A&M University?

5     A.   Yes.

6     Q.   And is this a press release promoting an art

7  exhibit depicting nude bodies in large pieces?

8     A.   Yes.

9     Q.   There's no rating conveyed here, PG-13 or R, I

10  assume because art exhibitions like this typically don't

11  get ratings from the university or art department?

12          MR. BRYANT:  Objection; leading.

13     A.   There's no rating for it, and I don't usually

14  have a rating in an art exhibition.  It's not provided

15  to me is what I should say.

16     Q.   (BY MR. MORRIS)  There's nothing on here

17  limiting attendance at this art exhibition to 18-plus or

18  anything like that, correct?

19     A.   Nothing in this release.

20     Q.   Okay.  And based on your experience supporting

21  Spectrum WT in planning their drag show, they didn't

22  plan on having nudity or their performance being nude at

23  their show, correct?

24     A.   Not that I recall, no.

25     Q.   Do you have any reason to believe that they

1  disagreed with it, the university let this exhibition of

2  artistic nude bodies go forward, right?

3      A.   Yes.

4      Q.   To your knowledge, did anybody complain about

5  this exhibition being displayed at West Texas A&M

6  University?

7      A.   I was not told of any, no.

8      Q.   All right.  You can set that aside.

9           Given the documents we just went through

10  and the fact that West Texas A&M is using terms like

11  "PG-13" and "R-rated" in its press releases, in your

12  experience, is it fair to say that the university has a

13  general understanding about what those ratings mean?

14      A.   Yes.

15      Q.   So how did you learn that President Wendler was

16  canceling "Fool's Drag Race"?

17      A.   My boss, Dr. Todd Rasberry, called me and asked

18  me to come to his office, and he showed me the memo.

19      Q.   Do you know why Dr. Rasberry would have called

20  you to his office specifically?

21      A.   It would be speculation, but he didn't --

22           MR. BRYANT:  Don't speculate.

23      Q.   (BY MR. MORRIS)  You can answer the question.

24           MR. BRYANT:  I object as speculation.

25      A.   Because there was potential for media

1    A.    I believe so, yes.

2    Q.    Any reason to believe that the performance at

3  Legacy Hall would have deviated materially from the

4  performance put on at Sam Houston Park?

5    A.    I don't remember if community drag queens were

6  going to perform at the Legacy Hall event.  I believe,

7  because it was on campus, there might have been a few

8  more student organizations who took part.

9    Q.    With sponsoring and that sort of thing?

10    A.    Yeah.

11    Q.    So let me phrase this slightly different.

12            In terms of the content of the

13  performance at Sam Houston Park, did that materially

14  differ from what you would have expected the content of

15  the performance at Legacy Hall to be?

16    A.    Not that I recall.

17    Q.    Would you describe what you saw at Sam Houston

18  Park as an artistic performance?

19    A.    Yes.

20    Q.    Were there lights?

21    A.    I don't recall if there were lights or not.

22    Q.    Was there choreographed dancing?

23    A.    There was dancing.

24    Q.    And was there choreographed music?

25    A.    Yes.

1    Q.    And was there choreographed dancing to music

2    and costumes that the performers chose themselves?

3    A.    Yes.

4    Q.    And was it on a stage?

5    A.    Yes.

6    Q.    Police were present at the performance at Sam

7    Houston Park.

8         Do you recall that?

9    A.    Yes.

10    Q.    Did they try to stop any of the performers?

11    A.    Not that I recall, no.

12    Q.    To your knowledge, did they try to shut the

13    show down?

14    A.    No.

15    Q.    To your knowledge, did they issue any citations

16    to any of the performers?

17    A.    No.

18    Q.    Did you see any nudity during the performance

19    at Sam Houston Park?

20    A.    No.

21    Q.    Did you see anything lewd?

22    A.    No.

23    Q.    Did you see any simulated sex?

24    A.    No.

25    Q.    Did you see anything that was sexual conduct?

1    A.    No.

2    Q.    We talked earlier today about how you've seen,

3  in five years, at least over 50 events at the JBK

4  Student Center, right?

5    A.    Yeah.

6    Q.    And the show that you saw at Sam Houston Park,

7  would that have been out of place at Legacy Hall, given

8  your experience seeing other events on campus?

9              MR. BRYANT:  Objection; vague.

10    A.    I've seen a wide variety of events in JBK.

11    Q.    (BY MR. MORRIS)  Based on your experience, was

12  the performance at Sam Houston Park the type of

13  performance or event that would fit in with all those

14  other events you've seen at JBK?

15              MR. BRYANT:  Objection; vague.

16    A.    I've never seen a drag show in there before, so

17  it would be different just in that respect.

18    Q.    (BY MR. MORRIS)  Any reason to believe the show

19  you saw at Sam Houston Park would have been

20  inappropriate for Legacy Hall?

21    A.    In my personal belief, no.

22    Q.    And in your experience, seeing over 50 events

23  at JBK?

24    A.    Many of those events were lectures, so it's

25  apples and oranges.

1      Q.    Okay.  How about the theatrical performances

2  that we talked about earlier?  Anything that you saw at

3  the show at Sam Houston Park that would have been

4  materially inconsistent or inappropriate for that

5  theater venue?

6      A.    No.

7      Q.    Was Myss Myka at the Sam Houston Park

8  performance?

9      A.    I believe so, yes.

10     Q.    Did she emcee?

11     A.    I believe so, yes.

12     Q.    Did she announce the performers?

13     A.    As the MC, yes.

14     Q.    Did she simulate sex?

15     A.    Not that I recall, no.

16     Q.    Did she simulate masturbation?

17     A.    Not that I recall, no.

18     Q.    Was she fully clothed?

19     A.    Yes, as far as I recall.

20     Q.    Are you aware that in 2023, Spectrum submitted

21  an application to host a 2024 drag show at Legacy Hall?

22     A.    Yes.

23     Q.    And it was called the "Buffalo Drag Show," I

24  think?

25     A.    I do not recall that.

 Outlook

---

**RE: Leigh Anne- Judge!**

---

**From** Barrett Bright <babright1@buffs.wtamu.edu>

**Date** Wed 9/14/2022 6:21 PM

**To** Chandler, Chip <cchandler@wtamu.edu>; esibley@wtamu.edu <esibley@wtamu.edu>

Sorry for responding so late, my computer is completely broken. I am unable to access anything on it. Back on topic, for the judging I was thinking we have 3 categories, performance i.e how they walk and personify their character, their make up, and their costume design. As for the M.C. they introduce the contestants via their stage name, with a catchphrase that the contestant gives them before the event. I.e. "with all that frass and sass it's Sarsaparilla"

Sent via the Samsung Galaxy S21+ 5G, an AT&T 5G smartphone

-------- Original message --------
From: "Chandler, Chip" <cchandler@wtamu.edu>
Date: 9/14/22 11:25 AM (GMT-06:00)
To: esibley@wtamu.edu, Barrett Bright <babright1@buffs.wtamu.edu>
Subject: Re: Leigh Anne- Judge!

Great!

Bear, can you tell me more about what you have in mind for the event and what you'll want a judge and an emcee to do? I realized that I'm a little shaky on the details still.

**CHIP CHANDLER**
SENIOR COMMUNICATIONS SPECIALIST

Office of Communication and Marketing
O: 806.651.2124 | C: 806.654.7145
cchandler@wtamu.edu | Old Main 235

West Texas A&M University
Box 60766 | Canyon, Texas 79016

 **OneWest** | **WT**
ONE VISION. ONE SPIRIT. ONE TEXAS.

EXHIBIT
37

**From:** Sibley, Echo S. <esibley@wtamu.edu>
**Date:** Wednesday, September 14, 2022 at 11:24 AM
**To:** Barrett Bright <babright1@buffs.wtamu.edu>, Chandler, Chip <cchandler@wtamu.edu>
**Subject:** Leigh Anne- Judge!

HI,

Leigh Anne Crandall, costumer extraordinaire, has enthusiastically agreed to be a judge for the drag Race April 1st.

**Echo Sunyata Sibley, M.F.A., M.M.**
Assistant Professor of Theatre, (She, Her, Hers)
O: FAC 119 | P: 806-651-2813 | C: 806-476-8797
E: esibley@wtamu.edu
wtamu.edu/atd | @wtamuarttheatredance



Theatre Program
WEST TEXAS A&M UNIVERSITY    signature_1310385721

A Fool's Drag Race meeting January 26

| Name | Org | Phone # or email |
|------|-----|------------------|
| Barrett Bright (President) | Spectrum | 806 886 3940 |
| Ransom Colette | RHA | rcolette@wtamu.edu; 432-213-7068 |
| Yadhira Avalos (yaya) (VP) | F1RSTGEN | 8063168852 |
| Jolaine Machado (president) | F1RSTGEN | Jrmacahdo1@buffs.wtamu.edu |
| Alexa Perez (public relations) | F1RSTGEN | Aperez5@buffs.wtamu.edu |
| Lauren Stovall (VP) | Spectrum | Lestovall1@buffs.wtamu.edu |
| William Blackmon (Historian) | F1RSTGEN | Wrblackmon1@buffs.wtamu.edu |
| Chip Chandler | Buff Allies | cchandler@wtamu.edu |
| Ilse pAREDES | WTK | Imparedes1@buffs.wtamu.edu |
| Rogue Navejar | WTK | Roguen95@gmail.com |
| Mackenzy Ragland | WTK | Meragland1@buffs.wtamu.edu |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

Angela – for drag workshop as apart of the we are one talks

Talk to osel

Date- May 31st

Place – Legacy Hall

Set up- + talk to Julie Eatley say chip sent me

Time – 7hrs show time from 6 to 8

Security – Assistant chief Kyle Hawbaker

Performance Recruiting – F1RSTGEN

Advertising – RHA

Music design/set up-( ask theatre and JBK))

Drag queen outreach for mc and judge – Buff Allies

Tickets ect. – Vip tickets for tables, general admin tickets, get in free with gold card

Ticket prices – gen admin $10, VIP $15  tables



EXHIBIT
38

Pl. App'x 344
SPECTRUM 0000753

Receiving payments – Facebook , cash at door, Paypal maybe

Bouncer - checklist

Drag workshop – outreach

Help Drag performers setup day of and practice –

Check up meeting –

Changing rooms –

Tips – for Trevor Project

Financing – Spectrum

Drinks – water, soda, mocktails

Speak to micheal Ives

 have 12 performances.

Mc will have notes for orgs and acts

Mc will have an act maybe be first

have program

break in the middle

!!!PG13!!!

Rent for tech.

Age limit of 18 or admission with legal guardian

Pl. App'x 345
SPECTRUM 0000754

 Outlook

## Re: Fool's Drag Race Posters

**From** Colette, Ransom A. <rcolette@wtamu.edu>

**Date** Thu 2/16/2023 5:22 PM

**To** Chandler, Chip <cchandler@wtamu.edu>; Barrett Bright <babright1@buffs.wtamu.edu>

I will pass all that along to my designer. I will ask them if they are able to remove the backgrounds on those logos, and I will let you know if they need help. Thank you for all the pointers.

Ransom Colette

---

**From:** Chandler, Chip <cchandler@wtamu.edu>
**Sent:** Thursday, February 16, 2023 5:04:27 PM
**To:** Colette, Ransom A. <rcolette@wtamu.edu>; Bear Bright <babright1@buffs.wtamu.edu>
**Subject:** Re: Fool's Drag Race Posters

I think the JBK liaison passed along some of the same concerns that I have, but we definitely need to include that this is a fundraiser for The Trevor Project, as well as the ticket prices and how to buy them. It should also indicate that this is a PG-13 show (that's what was decided, right?).

I'd love to see if F1RSTGEN and K-Pop have logos with transparent backgrounds so that they're not in white boxes. Let me know if our designers need to help with that. You should add "Sponsored by" above the logos, too.

And I think it needs to have a little description of what's going on:
"Student orgs compete to see who's the fiercest of them all!" maybe?

**CHIP CHANDLER**
SENIOR COMMUNICATIONS SPECIALIST

Office of Communication and Marketing
O: 806.651.2124 | C: 806.654.7145
cchandler@wtamu.edu | Old Main 235

West Texas A&M University
Box 60766 | Canyon, Texas 79016


ONE VISION. ONE SPIRIT. ONE TEXAS.

---

**From:** Colette, Ransom A. <rcolette@wtamu.edu>
**Date:** Thursday, February 16, 2023 at 10:21 AM
**To:** Chandler, Chip <cchandler@wtamu.edu>
**Subject:** Fool's Drag Race Posters

Hey Chip,



EXHIBIT
39

I have attached the poster we are using for the Org Rally (the one with the logos) and the one we were planning to use after the org rally. We did not use this one for the org rally as it was hard to see the title and we did not have time to change it. Bear told me of some of the changes and things to add for the next draft of the poster, but I would very much like our input on what to add or subtract from the poster.

Thank you,
Ransom Colette

Pl. App'x 347
SPECTRUM 0000793

 Outlook

---

## Descriptions

**From** Chandler, Chip <cchandler@wtamu.edu>
**Date** Mon 2/27/2023 1:44 PM
**To**      Barrett Bright <babright1@buffs.wtamu.edu>

Short:
A Fools' Drag Race will pit WT student organizations' fiercest drag performers against each other in a friendly contest raising funds to support The Trevor Project.

Long:
A Fools' Drag Race will feature drag performers from an array of student organizations stomping it out to see who's the fiercest of them all. Proceeds from ticket sales and tips will benefit The Trevor Project, which provides 24/7 crisis support services to LGBTQ young people.

The night's emcee is popular Amarillo drag queen Myss Myka, and the judges' panel will include Amarillo drag performers and other special guests. Doors open at 5:30, and the fun starts at 6 p.m.

VIP tickets are $10 and general-admission tickets are $5 online or at the door.

Sponsors: Spectrum, Black Student Union, WT K-Pop, F1RSTGEN, Resident Hall Association, Buff Allies

**CHIP CHANDLER**
SENIOR COMMUNICATIONS SPECIALIST

Office of Communication and Marketing
O: 806.651.2124 | C: 806.654.7145
cchandler@wtamu.edu | Old Main 235

West Texas A&M University
Box 60766 | Canyon, Texas 79016


ONE VISION. ONE SPIRIT. ONE TEXAS.



EXHIBIT
40



Redacted - ACP

**From:** Montoya, Evelyn
**Sent:** Thursday, March 9, 2023 3:09 PM
**To:** Chandler, Chip; Colette, Ransom A.; Barrett Bright; Fouts, Shawn M.
**Cc:** JBK
**Subject:** Re: Fool's Day Drag Race Marketing

Awesome job. Thank you!



**EVELYN MONTOYA** MARKETING COORDINATOR
Division of Student Affairs
806.651.2051 I emontoya@wtamu.edu I wtamu.edu

Submit a Student Affairs Marketing Creative Request here.
**From:** Chandler, Chip <cchandler@wtamu.edu>
**Sent:** Thursday, March 9, 2023 3:05 PM
**To:** Colette, Ransom A. <rcolette@wtamu.edu>; Barrett Bright <babright1@buffs.wtamu.edu>; Fouts, Shawn M. <sfouts@wtamu.edu>
**Cc:** JBK <jbk@wtamu.edu>; Montoya, Evelyn <emontoya@wtamu.edu>
**Subject:** Re: Fool's Day Drag Race Marketing

Thanks, Ransom. Looks great!

**CHIP CHANDLER**
SENIOR COMMUNICATIONS SPECIALIST

Office of Communication and Marketing
O: 806.651.2124 | C: 806.654.7145
cchandler@wtamu.edu | Old Main 235

West Texas A&M University
Box 60766 | Canyon, Texas 79016


ONE VISION. ONE SPIRIT. ONE TEXAS.

**From:** Colette, Ransom A. <rcolette@wtamu.edu>
**Date:** Thursday, March 9, 2023 at 2:57 PM
**To:** Barrett Bright <babright1@buffs.wtamu.edu>, Chandler, Chip <cchandler@wtamu.edu>, Fouts, Shawn M. <sfouts@wtamu.edu>
**Cc:** JBK <jbk@wtamu.edu>, Montoya, Evelyn <emontoya@wtamu.edu>
**Subject:** Re: Fool's Day Drag Race Marketing

Here is the poster with the QR code included.


EXHIBIT
42

Pl. App'x 349

**From:** Barrett Bright <babright1@buffs.wtamu.edu>
**Sent:** Wednesday, March 8, 2023 2:03:43 PM
**To:** Chandler, Chip <cchandler@wtamu.edu>; Fouts, Shawn M. <sfouts@wtamu.edu>; Colette, Ransom A. <rcolette@wtamu.edu>
**Cc:** JBK <jbk@wtamu.edu>; Montoya, Evelyn <emontoya@wtamu.edu>
**Subject:** RE: Fool's Day Drag Race Marketing

QR code is made, and it is currently being put on the poster.

Sent from Mail for Windows

**From:** Chandler, Chip
**Sent:** Tuesday, March 7, 2023 9:47 AM
**To:** Fouts, Shawn M.; Colette, Ransom A.; Barrett Bright
**Cc:** JBK; Montoya, Evelyn
**Subject:** Re: Fool's Day Drag Race Marketing

Agreed. Ransom, let me know if you need help getting the QR code made.

## CHIP CHANDLER
**SENIOR COMMUNICATIONS SPECIALIST**

Office of Communication and Marketing
O: 806.651.2124 | C: 806.654.7145
cchandler@wtamu.edu | Old Main 235

West Texas A&M University
Box 60766 | Canyon, Texas 79016


ONE VISION. ONE SPIRIT. ONE TEXAS.

**From:** Fouts, Shawn M. <sfouts@wtamu.edu>
**Date:** Tuesday, March 7, 2023 at 9:34 AM
**To:** Colette, Ransom A. <rcolette@wtamu.edu>, Chandler, Chip <cchandler@wtamu.edu>, Barrett Bright <babright1@buffs.wtamu.edu>
**Cc:** JBK <jbk@wtamu.edu>, Montoya, Evelyn <emontoya@wtamu.edu>
**Subject:** Re: Fool's Day Drag Race Marketing

I'm not the expert, but I think it looks great Colette. Chip and Evelyn?

Thanks,
Shawn


**DR. SHAWN M. FOUTS** Jack B. Kelley Student Center
SENIOR DIRECTOR OF CAMPUS COMMUNITY
806.651.2329 | sfouts@wtamu.edu | wtamu.edu

**WIN the Day!** *What's Important Now*

**From:** Colette, Ransom A. <rcolette@wtamu.edu>
**Date:** Tuesday, March 7, 2023 at 9:30 AM
**To:** Fouts, Shawn M. <sfouts@wtamu.edu>, Chandler, Chip <cchandler@wtamu.edu>, Barrett Bright <babright1@buffs.wtamu.edu>

Pl. App'x 350

**Cc:** JBK <jbk@wtamu.edu>
**Subject:** Re: Fool's Day Drag Race Marketing

I have made those revisions. We have also put room for the QR code in the middle of the poster for when I receive that.


**From:** Fouts, Shawn M. <sfouts@wtamu.edu>
**Sent:** Monday, March 6, 2023 4:19:08 PM
**To:** Chandler, Chip <cchandler@wtamu.edu>; Colette, Ransom A. <rcolette@wtamu.edu>; Barrett Bright <babright1@buffs.wtamu.edu>
**Cc:** JBK <jbk@wtamu.edu>
**Subject:** Re: Fool's Day Drag Race Marketing

Thank Chip for your input.



**DR. SHAWN M. FOUTS** Jack B. Kelley Student Center
SENIOR DIRECTOR OF CAMPUS COMMUNITY
806.651.2329 I sfouts@wtamu.edu I wtamu.edu

**WIN the Day!** *What's Important Now*

**From:** Chandler, Chip <cchandler@wtamu.edu>
**Date:** Monday, March 6, 2023 at 4:03 PM
**To:** Colette, Ransom A. <rcolette@wtamu.edu>, Fouts, Shawn M. <sfouts@wtamu.edu>, Barrett Bright <babright1@buffs.wtamu.edu>
**Cc:** JBK <jbk@wtamu.edu>
**Subject:** Re: Fool's Day Drag Race Marketing

VIP should be in all caps
"The" should be capitalized in "The Trevor Project"
I'd love to see Spectrum's name below its logo
Can you put the bubbles in this order: Time, Date, Location, Rating? That's just a more logical progression.

Looks good!

**CHIP CHANDLER**
**SENIOR COMMUNICATIONS SPECIALIST**

Office of Communication and Marketing
O: 806.651.2124 | C: 806.654.7145
cchandler@wtamu.edu | Old Main 235

West Texas A&M University
Box 60766 | Canyon, Texas 79016


ONE VISION. ONE SPIRIT. ONE TEXAS.

**From:** Colette, Ransom A. <rcolette@wtamu.edu>
**Date:** Monday, March 6, 2023 at 1:15 AM
**To:** Fouts, Shawn M. <sfouts@wtamu.edu>, Barrett Bright <babright1@buffs.wtamu.edu>
**Cc:** JBK <jbk@wtamu.edu>, Chandler, Chip <cchandler@wtamu.edu>
**Subject:** Re: Fool's Day Drag Race Marketing

Pl. App'x 351

Here is the new draft for the drag race flyer. Please let me know if anything is missing or you think something should be changed.

**From:** Fouts, Shawn M. <sfouts@wtamu.edu>
**Sent:** Monday, February 27, 2023 4:44 PM
**To:** Colette, Ransom A. <rcolette@wtamu.edu>; Barrett Bright <babright1@buffs.wtamu.edu>
**Cc:** JBK <jbk@wtamu.edu>; Chandler, Chip <cchandler@wtamu.edu>
**Subject:** Re: Fool's Day Drag Race Marketing

Thank you. Can they purchase tickets in advance? If so, how? I would put 'General' and 'Admission' on same line (General Admission $5) as it is a little confusing. You do probably want to mention that concessions will be sold will proceeds benefitting the Trevor Project (if they are?). I can tell you've put a lot of work into this piece.



**DR. SHAWN M. FOUTS** Jack B. Kelley Student Center
SENIOR DIRECTOR OF CAMPUS COMMUNITY
806.651.2329 l sfouts@wtamu.edu l wtamu.edu

**WIN the Day!** *What's Important Now*

**From:** Colette, Ransom A. <rcolette@wtamu.edu>
**Date:** Monday, February 27, 2023 at 4:31 PM
**To:** Fouts, Shawn M. <sfouts@wtamu.edu>, Barrett Bright <babright1@buffs.wtamu.edu>
**Cc:** JBK <jbk@wtamu.edu>
**Subject:** Re: Fool's Day Drag Race Marketing

Here is the current draft of the flyer for the drag race. We are putting the Buff Allies logo and the method of payment on it for the next draft, and I can put that concessions will be available as well. Is there anything else I need to change or add to it?

Thank you,
Ransom Colette

**From:** Fouts, Shawn M. <sfouts@wtamu.edu>
**Sent:** Monday, February 27, 2023 9:46 AM
**To:** Barrett Bright <babright1@buffs.wtamu.edu>
**Cc:** Colette, Ransom A. <rcolette@wtamu.edu>; JBK <jbk@wtamu.edu>
**Subject:** Re: Fool's Day Drag Race Marketing

Thank you



**DR. SHAWN M. FOUTS** Jack B. Kelley Student Center
SENIOR DIRECTOR OF CAMPUS COMMUNITY
806.651.2329 l sfouts@wtamu.edu l wtamu.edu

**WIN the Day!** *What's Important Now*

**From:** Barrett Bright <babright1@buffs.wtamu.edu>
**Date:** Monday, February 27, 2023 at 9:40 AM
**To:** Fouts, Shawn M. <sfouts@wtamu.edu>
**Cc:** Colette, Ransom A. <rcolette@wtamu.edu>
**Subject:** RE: Fool's Day Drag Race Marketing

Pl. App'x 352

Yes, let me get you in contact with our marketing team. They should be able to give you better information than I would be able to. They are Cc in this email.

Sent from Mail for Windows

**From:** Fouts, Shawn M.
**Sent:** Monday, February 27, 2023 9:33 AM
**To:** Barrett Bright
**Cc:** Chandler, Chip; Drumheller, Kristina; JBK
**Subject:** Re: Fool's Day Drag Race Marketing

Good morning all, I trust you were safe over the weekend, especially in the wind storms yesterday. I know I sound like a broken record, but we need to have this event approved by March 17th (2 weeks prior to an event). This is due to scheduling of JBK staff, Police Officers (UPD is assigning 2 officers to the event), set up plans, and other items that may need our attention, not to mention the Student Org's continued efforts. Let us know how we can help in any way.

Thanks,



**DR. SHAWN M. FOUTS** Jack B. Kelley Student Center
SENIOR DIRECTOR OF CAMPUS COMMUNITY
806.651.2329 I sfouts@wtamu.edu I wtamu.edu

**WIN the Day!** *What's Important Now*

**From:** Fouts, Shawn M. <sfouts@wtamu.edu>
**Date:** Wednesday, February 22, 2023 at 8:55 AM
**To:** Barrett Bright <babright1@buffs.wtamu.edu>
**Cc:** Chandler, Chip <cchandler@wtamu.edu>, Drumheller, Kristina <kdrumheller@wtamu.edu>
**Subject:** Re: Fool's Day Drag Race Marketing

Thank you, we just want to get this event through all the approval processes. I appreciate your attention to this and leading the event process.



**DR. SHAWN M. FOUTS** Jack B. Kelley Student Center
SENIOR DIRECTOR OF CAMPUS COMMUNITY
806.651.2329 I sfouts@wtamu.edu I wtamu.edu

**WIN the Day!** *What's Important Now*

**From:** Barrett Bright <babright1@buffs.wtamu.edu>
**Date:** Wednesday, February 22, 2023 at 8:53 AM
**To:** Fouts, Shawn M. <sfouts@wtamu.edu>
**Cc:** Chandler, Chip <cchandler@wtamu.edu>, Drumheller, Kristina <kdrumheller@wtamu.edu>
**Subject:** RE: Fool's Day Drag Race Marketing

Good morning,
Yes we have informed our designer for the promotional content about what everyone suggested and they are currently making said content. Thank you for your advice.

Pl. App'x 353

Sent via the Samsung Galaxy S21+ 5G, an AT&T 5G smartphone

-------- Original message --------
From: "Fouts, Shawn M." <sfouts@wtamu.edu>
Date: 2/21/23 8:20 AM (GMT-06:00)
To: Barrett Bright <babright1@buffs.wtamu.edu>
Cc: "Chandler, Chip" <cchandler@wtamu.edu>, "Drumheller, Kristina" <kdrumheller@wtamu.edu>
Subject: Fool's Day Drag Race Marketing

Good morning Barrett, I just wanted to follow up on your marketing material. Make sure that you:
   1. List all your sponsors
   2. Indicate that the event is a fund raiser and for what organization the funds are being raised for
   3. That the event may not be appropriate for minors under the age of 13 (as you stated the event is pg13)
   4. Concessions will be available
   5. The cost of admission

I appreciate your attention to the event as you navigate everything else a college student has going on. We want to help ensure you have a great event.

Thanks,
Shawn



**DR. SHAWN M. FOUTS** Jack B. Kelley Student Center
SENIOR DIRECTOR OF CAMPUS COMMUNITY
806.651.2329 | sfouts@wtamu.edu | wtamu.edu

**WIN the Day!** *What's Important Now*



**WT** WEST TEXAS A&M
U N I V E R S I T Y ™

Info For   About   Admissions   Academics   Student Life   Athletics   Research   Giving

HOME > WT NEWSROOM

## Double-Cast, Self-Aware Musical to Close Season for WT Theatre

**CHIP CHANDLER**
MAR 31, 2021 | ARTS, FEATURED

## Double-Cast, Self-Aware Musical to Close Season for WT Theatre

**Photo:** Members of the Festival cast of WT Theatre's "[title of show]" are, from left, Socorra Carrillo, Mitch Grosso, Aidan Tsichlis and Hayley Hurst.

Copy by Chip Chandler, 806-651-2124, cchandler@wtamu.edu

CANYON, Texas — Eight student actors will play the creators of a musical, characters based on the creators of that musical and, in a very real sense, themselves in the next theatrical production from West Texas A&M University.

WT Theatre will close its season with the musical "[title of show]," featuring two casts in video-on-demand performances April 8 to 11.

Written by creators Jeff Bowen and Hunter Bell in 2004 for the New York Musical Theatre Festival, the original musical is a postmodern, metatextual show about the creation of a show — about its own creation, essentially.

"It's a musical about two guys writing a musical about two guys writing a musical. This is a surprisingly complex show, but it's also so simple in regards to the premise," said director Stephen Crandall, the Royal R. Brantley Endowed Professor of Theatre Studies and head of WT's Department of Art, Theatre and Dance. "And it's a lot of fun, too."

"This show is very aware of itself," said musical director Bradley Behrmann, assistant professor of musical theater. "The music is aware of the forms and functions of itself — this is now our duet song, for instance. This is our buddy song. We love meta-musicals here, and this is one that is very clever and witty and is very aware of what it's doing whenever it's doing it."

The Festival cast, which will be featured April 8 and 9, will include Aidan Tsichlis, junior musical theatre major from Plano, as Jeff; Mitch Grosso, senior musical theatre major from Waxahachie, as Hunter; Hayley Hurst, junior musical theatre major from Melissa, as Heidi; and Socorra Carrillo, senior musical theatre major from Amarillo, as Susan.

The Medley cast, which will be featured April 10 and 11, will include Nolan Quintanilla, sophomore musical theatre major from Canyon, as Jeff; Zane Wells, junior acting major

**EXHIBIT 44**

from Amarillo, as Hunter; Anna Holmes, senior musical theatre major from Lubbock, as Heidi; and Erin Gayan, senior musical theatre major from Garland, as Susan.



**Photo:** Members of the Medley cast of "[title of show]" are, from left, Erin Gayan, Zane Wells, Nolan Quintanilla and Anna Holmes.

The WT actors play characters based on Bowen and Bell, as well as their friends and collaborators Susan Blackwell and Heidi Blickenstaff.

"When the show was originally staged, they were playing themselves. Now, we're playing them playing themselves," Holmes said. "Stephen has encouraged us to find ourselves within what they've written, so we can really be ourselves and use how we would react in those situations."

Double-casting the show gives more students the chance to perform, and it also lets them get firsthand experience in seeing how different actors can approach the same character.

"We're watching each other do the exact same thing. I've stolen stuff from Zane, and maybe he's stolen from me," Grosso said. "It's really cool to work alongside someone with the exact same role."

The show is considered to be rated R for strong language.

Tickets are $15 for individuals and $30 for families, or free for WT students, faculty and staff. A 25 percent discount is available for those purchasing tickets to both casts; for a coupon, email **artsboxoffice@wtamu.edu**.

The performances can be watched at any time within the two-day run of each cast.

A commitment to the arts is a key component of the University's long-term plan, _**WT 125: From the Panhandle to the World**_.

### About West Texas A&M University

WT is located in Canyon, Texas, on a 342-acre residential campus. Established in 1910, the University has been part of The Texas A&M University System since 1990. With enrollment of more than 10,000, WT offers 60 undergraduate degree programs, 40 master's degrees and two doctoral degrees. The University is also home to the Panhandle-Plains Historical Museum, the largest history museum in the state and the home of one of the Southwest's finest art collections. The Buffaloes are a member of the NCAA Division II Lone Star Conference and offers 15 men's and women's athletics programs.

—WTAMU—

| Accessibility | Emergency Information | Form Policy | Open Records/ Public Information Act | Texas CREWS |
| Accreditation | Energy Management Report (PDF) | GDPR | Risk, Fraud and Misconduct Hotline | Texas Homeland Security |
| Consumer Information | Equal Opportunity & | House Bill 2504 | | Texas Veterans Portal |

Pl. App'x 356

SPECTRUM 0000369



Contact WT

Counseling & Mental Health Services
(HB2895)

Nondiscrimination

Family Educational Rights and
Privacy Act

Legislative Appropriation Request

Link Policy and Privacy Statement

Online Institutional Resumes

SB18 Report

State of Texas

Statewide Search

University Directory

University Organizational Chart (PDF)

Title IX

WEST TEXAS A&M
U N I V E R S I T Y ™

© West Texas A&M University | All Rights Reserved
Canyon, TX 79016 | 806-651-0000



screenshot-www-wtamu-edu-2025-11-21-20-11-51
https://www.wtamu.edu/news/2022/02/wt-theatre-to-bring-classic-modern-touches-to-shakespeares-as-you-like-it.html
21.11.2025

**WT** WEST TEXAS A&M UNIVERSITY

Info For    About    Admissions    Academics    Student Life    Athletics    Research    Giving

HOME > WT NEWSROOM

# WT Theatre to Bring Classic, Modern Touches to Shakespeare's 'As You Like It'

A⁊ Español

**CHIP CHANDLER**

FEB 01, 2022 | ARTS, FEATURED, COMMUNITY

# WT Theatre to Bring Classic, Modern Touches to Shakespeare's 'As You Like It'

Copy by Chip Chandler, 806-651-2124, cchandler@wtamu.edu

CANYON, Texas — A William Shakespeare comedy will get twists both classical and of-the-moment in a new production at West Texas A&M University.

WT Theatre will stage the Bard's comedy "As You Like It" at 7:30 p.m. Feb. 9 to 12 and 2:30 p.m. Feb. 12 and 13 in the Happy State Bank Studio Theatre inside the Sybil B. Harrington Fine Arts Complex.

The play will simultaneously incorporate a style of theater that's hundreds of years old while considering more modern ideas of gender presentation.

Commedia dell'arte is one of the earliest forms of professional theater, using masked character types — masters and servants, for example — and a mix of improvisation and scripted performance.

"Shakespeare was highly influenced by commedia dell'arte, and in some ways, he turned commedia on its Head. Usually, it's the servants who are helping the masters, but in this, Rosalind, a master, is the one helping all of these shepherds get together," said Echo Sunyata Sibley, a WT assistant professor of theatre.

"We've broken down every character in the show with these basic commedia archetypes, though that's giving the actors a place to explore from, not something to be confined to," continued Sibley, who began teaching at WT in the fall after teaching theater in Italy for the past decade and working in her own feminist clown troupe, Women from Mars.

"Putting on the masks is a completely different acting experience," said Taylor Pritchett, a senior acting major from Amarillo, who plays Jacques. "You're not yourself. It's almost an out-of-body experience. It's so much fun seeing how much you can discover with a mask covering your face."

In the play, one of Shakespeare's more popular romantic comedies, Rosalind (played by Carley Venter, a junior musical theatre major from Midland) is banished from the court of her uncle and finds refuge in the Forest of Arden, where she disguises herself as a man, Ganymede. In the forest, she meets Orlando (played by Jovani Trevino, a senior theater major from Andrews), and becomes involved in an escalating series of mistaken identities and misplaced romantic affections.

The play is "ahead of its time," Venter said, in its exploration of gender fluidity.

"Androgyny is very human, so when we play with gender in this play, it's very natural," Venter said.

Sibley said she wants the production to reflect a modern world tinged with the magical, where there's "a full embrace of what love can be."



EXHIBIT

45

Pl. App'x 358
SPECTRUM 0000417

"Orlando sees Rosalind for who she truly is, even when she's disguised as Ganymede," Trevino said. "He realizes that he falls in love with her for who she is, not because she's a woman."

Other cast members include Mackenzie Privett, senior musical theatre major from Portales, N.M., as Celia; Sawyer Landry, a junior acting major from Canadian, as Oliver; Wyatt Brownell, senior musical theatre major from Lubbock, as Adam; Christian Howard, junior theatre education major from Loomis, as Corin; Ethan Chase, senior acting major from Amarillo, as Silvius; Nolan Quintanilla, junior musical theatre major from Amarillo, as Phoebe; Socorra Carrillo, senior musical theatre major from Amarillo, as Audrey; R.J. Flud, junior musical theatre major from Midland, as Touchstone; and Taylor Pritchett, senior acting major from Amarillo, as Jacques.

The cast also includes Peyton Hastings, sophomore musical theatre major from Sundown, as Charles and second lord to Duke Senior; Connor Unwin, junior musical theatre major from Amarillo, as Le Beau and Jacques de Boys; Byron Baez, senior acting major from Snyder, as Duke Senior; Evan Hample, sophomore musical theatre major from Wasilla, Alaska, as Duke Frederick; Omar Nevarez, senior theatre performance major from Amarillo, as first lord to Duke Senior; Sam Fry, sophomore theatre education major from Canadian, as William and first lord to Duke Frederick; Aidan Tsichlis, junior musical theatre major from Plano, as second lord to Duke Frederick; Leah Ingram, junior acting major from Cisco, as page to Duke Senior; Kenzie Dennis, junior acting major from Dalhart, as page to Duke Senior; Bella Walker, senior performance major from Melissa, as Zanni, Sir Oliver Martext and Dennis; and Hayley Hurst, senior musical theatre major from Melissa, as Hymen and Isperia. Greek trio members are Abigail Martin, sophomore musical theatre major from Amarillo; Caleb Martinez, junior musical theatre major from Seagraves; and Natalie Davis, senior performance major from Canyon. Dance captain is Jewel Schonhoff, sophomore musical theatre major from Little Elm.

Tickets are $12 for adults, $8 for seniors and students and free for WT students, faculty and staff with a Buff Gold Card. For reservations, call 806-651-2810 or email artsboxoffice@wtamu.edu.

Fostering an appreciation of the arts is a key tenet of the University's long-range plan, *WT 125: From the Panhandle to the World*.

That plan is fueled by the historic, $125 million **One West** comprehensive fundraising campaign. To date, the five-year campaign — which publicly launched Sept. 23 — has raised more than $85 million.

**About West Texas A&M University**

WT is located in Canyon, Texas, on a 342-acre residential campus. Established in 1910, the University has been part of The Texas A&M University System since 1990. WT, a Hispanic Serving Institution since 2016, boasts an enrollment of about 10,000 and offers 59 undergraduate degree programs, 39 master's degrees and two doctoral degrees. The University is also home to the Panhandle-Plains Historical Museum, the largest history museum in the state and the home of one of the Southwest's finest art collections. The Buffaloes are a member of the NCAA Division II Lone Star Conference and offers 14 men's and women's athletics programs.

—WT—

| | | | | |
|---|---|---|---|---|
| Accessibility | Emergency Information | Form Policy | Open Records/ Public Information Act | Texas CREWS |
| Accreditation | Energy Management Report (PDF) | GDPR | Risk, Fraud and Misconduct Hotline | Texas Homeland Security |
| Consumer Information | Equal Opportunity & Nondiscrimination | House Bill 2504 | SB18 Report | Texas Veterans Portal |
| Contact WT | Family Educational Rights and Privacy Act | Legislative Appropriation Request | State of Texas | University Directory |
| Counseling & Mental Health Services (HB2895) | | Link Policy and Privacy Statement | Statewide Search | University Organizational Chart (PDF) |
| | | Online Institutional Resumes | | Title IX |

 **WEST TEXAS A&M UNIVERSITY**™

© West Texas A&M University | All Rights Reserved
Canyon, TX 79016 | 806-651-0000

  

SPECTRUM 0000418



screenshot-www-wtamu-edu-2025-11-21-20-47-40
https://www.wtamu.edu/news/2025/04/wt-theatre-hopes-for-big-laughs-with-forum-musical.html
21.11.2025

WT WEST TEXAS A&M
UNIVERSITY™

Apply

Info For    About    Admissions    Academics    Student Life    Athletics    Research    Giving

HOME › WT NEWSROOM
## WT Theatre Hopes for Big Laughs with 'Forum' Musical

**CHIP CHANDLER**

APR 16, 2025 | FEATURED, COMMUNITY, ARTS

# WT Theatre Hopes for Big Laughs with 'Forum' Musical

Copy by Chip Chandler, 806-651-2124, cchandler@wtamu.edu

CANYON, Texas — There's "never a dull moment" in West Texas A&M University Theatre's season-ending production of "A Funny Thing Happened on the Way to the Forum."

The classic musical will be staged at 7:30 pm. April 24 to 26 and May 1 to 3, plus 2:30 p.m. May 4, in the Branding Iron Theatre in the Sybil B. Harrington Fine Arts Complex on WT's Canyon campus.

The musical—featuring music and lyrics by Stephen Sondheim and a book by Burt Shrevelove and Larry Gelbart—takes inspiration from both ancient Roman farces and American vaudeville comedy. In the show, Pseudolus (played by Ray Barber, a senior musical theatre major from Conroe) desperately tries scheme after scheme to win his freedom.

"There's never a dull moment, not only in the show, but also for Pseudolus," Barber said. "Every line he says is a chance to crack a joke or do some big physical gesture to get a laugh.

"For someone like me who loves comedy and loves making an audience laugh, it's a very fun role to get to play," Barber said.

Director Echo Sunyata Sibley said she's encouraging her cast to "lean into the farce and ridiculousness."

"We're approaching this from the lens of commedia dell'arte (an early form of Italian professional theatre)," Sibley said. "This show is all about class systems—masters and slaves trying to one-up each other. And that's what commedia dell'arte is all about—archetypes, social commentary big physical comedy."

And not just physical comedy.

"We're going for an over-the-top, cartoony feel," Sibley said. "The colors of the set are really vivid. The costumes are really fun. ... And the best part of it is trying new bits with the actors but also letting them try their own things."

Sibley said WT Theatre considers the musical to be rated PG-13 because of suggestive humor.

Tickets are $16 for adults, $12 for seniors and students, and free for WT students, faculty and staff with a Buff Gold Card.

**EXHIBIT**

46

Pl. App'x 360
SPECTRUM 0003369

For tickets, visit the WT Box Office, call 806-651-2810 email artsboxoffice@wtamu.edu, or visit cure.com/175forproject131215.

Cast members also include Bella Bailey, a junior musical theatre major from Little Elm, as Hysterium; Jonah Gonzales, a senior theatre major from Plains, as Senex; Rylee Bass, a senior theatre major from Brownsboro, as Domina; Logan Lawhon, a sophomore musical theatre major from Midland, as Hero; Jackie Arellano, a junior musical theatre major from El Paso, as Phila; Mario Banos, a senior theatre major from Perryton, as Miles; Devin Lindley, a junior musical theatre major from Pampa, as Marcus Lycus; Lee Roberson, a junior musical theatre major from La Porte, as Erronius; Angelica Pantoja, a senior theatre major from Lubbock, as Gymnasia; Savannah Bohl, a senior theatre major from Muenster, and P.J. Jewett, a senior musical theatre major from Monahans, as the Geminae; Avery Fedele, a freshman musical theatre major from Andrews, as Panacea; Morgan Baily, a junior musical theatre major from El Paso, as Vibrata; Tori Ybarra, a sophomore musical theatre major from Austin, as Tintinabula; and Daniel Baggerman, a freshman theatre major from Corpus Christi, as the eunuch.

Ensemble members include Peyton Hastings, a senior musical theatre major from Sundown; Kyndal Knapp, a senior theatre major from Pampa; Ciara Moos, a senior musical theatre major from Plano; and Victoria Reyes, a senior musical theatre major from Inez.

Fostering an appreciation of the arts is key mission of the University's long-range plan, *WT 125: From the Panhandle to the World*.

That plan is fueled by the historic **One West** comprehensive fundraising campaign, which reached its initial $125 million goal 18 months after publicly launching in September 2021. The campaign's new goal is to reach $175 million by 2025; currently, it has raised more than $160 million.

#### About West Texas A&M University

WT, a Regional Research University, is redefining excellence in Canyon, Texas, on a 342-acre residential campus, as well as the Harrington Academic Hall WTAMU Amarillo Center in downtown Amarillo. Established in 1910, the University has been part of The Texas A&M University System since 1990. WT, a Hispanic Serving Institution since 2016, boasts an enrollment of more than 9,000 and offers 66 undergraduate degree programs, including eight associate degrees; and 44 graduate degrees, including an integrated bachelor's and master's degree, a specialist degree and two doctoral degrees. The University is also home to the Panhandle-Plains Historical Museum, the largest history museum in the state and the home of one of the Southwest's finest art collections. The Buffaloes are a member of the NCAA Division II Lone Star Conference and offers 14' men's and women's athletics programs.

**Photo:** Hysterium (Bella Bailey, left) and Pseudolus (Ray Barber) will lead audiences through West Texas A&M University Theatre's production of "A Funny Thing Happened on the Way to the Forum," on stage April 24 to May 4 in the Branding Iron Theatre.

—WT—

| | | | | |
|---|---|---|---|---|
| Accessibility | Emergency Information | Form Policy | Open Records/ Public Information Act | Texas CREWS |
| Accreditation | Energy Management Report (PDF) | GDPR | Risk, Fraud and Misconduct Hotline | Texas Homeland Security |
| Consumer Information | Equal Opportunity & Nondiscrimination | House Bill 2504 | SB18 Report | Texas Veterans Portal |
| Contact WT | Family Educational Rights and Privacy Act | Legislative Appropriation Request | State of Texas | University Directory |
| Counseling & Mental Health Services (HB2895) | | Link Policy and Privacy Statement | Statewide Search | University Organizational Chart (PDF) |
| | | Online Institutional Resumes | | Title IX |

 WEST TEXAS A&M UNIVERSITY™

© West Texas A&M University | All Rights Reserved
Canyon, TX 79016 | 806-651-0000



SPECTRUM 0003370

screenshot-www-wtamu-edu-2025-11-21-20-48-47
https://www.wtamu.edu/news/2025/10/outside-the-box-bodies-to-be-focus-of-new-wt-art-exhibition.html
21.11.2025

**WT** WEST TEXAS A&M UNIVERSITY

Apply

Info For | About | Admissions | Academics | Student Life | Athletics | Research | Giving

HOME > WT NEWSROOM

# 'Outside the Box' Bodies to Be Focus of New WT Art Exhibition



A Español

**CHIP CHANDLER**

OCT 30, 2025 | FEATURED, ARTS, COMMUNITY

## 'Outside the Box' Bodies to Be Focus of New WT Art Exhibition

Copy by Chip Chandler, 806-651-2124, cchandler@wtamu.edu

CANYON, Texas — A new art exhibition celebrating unconventional beauty and examining impossibly high body standards will open Nov. 6 at West Texas A&M University.

"Outside the Box" will feature the work of Amber Miller, a graduate student in art from El Paso.

"This exhibition is the result of over two years of research and art making," said Jon Revett, head of WT's **Department of Art, Theatre and Dance** in the **Sybil B. Harrington College of Fine Arts and Humanities**. "Amber focuses on the human body as a symbol of either domination or liberation, delineating the two by presenting them differently in her work."

"Outside the Box" will be on view through Nov. 29 in the Dord Fitz Formal Art Gallery in Mary Moody Northen Hall on WT's Canyon campus. An opening reception will be held at 5 p.m. Nov. 6 in the gallery.

Miller said her "Dominated" paintings are in black and white, referencing her upbringing as a mixed-race woman. Sculptures in the same series reference the physical ideals in ancient Greek sculpture.

In her "Liberated" series, Miller depicts nude bodies in large pieces painted with bold, complementary colors instead of human skin tones.

"Growing up, I didn't see anyone in magazines or in art who looked like me or my family members," Miller said. "My idea behind doing these nudes is to show off unconventional bodies and show that they can still be beautiful forms."

Viewers are so used to the bodies presented in art from ancient times to the latest superhero film that "they take them literally, as in, this is what people are supposed to look like," said Miller, whose exhibition is on view as part of her pursuit of a Master of Fine Arts degree.

"When I was little, I didn't have that feeling of yes, I am worthy of being in this art space even if I don't have this ideal body," she said. "And even bad bodies were not what everyone looked like."

Fitz Gallery hours are 9 a.m. to 5 p.m. Mondays through Thursdays and by appointment Fridays and Saturdays. Email **rweingart@wtamu.edu**.

Fostering an appreciation of the arts is a key component of the University's long-range plan, **WT 125: From the Panhandle to the World**.

EXHIBIT

47

Pl. App'x 362
SPECTRUM 0003858

That plan is fueled by the historic **One West** comprehensive fundraising campaign, which reached its initial $125 million goal 18 months after publicly launching in September 2021. The campaign has raised more than $175 million and will continue through 2025.

### About West Texas A&M University

A Regional Research University, West Texas A&M University is redefining excellence in Canyon, Texas, on a 342-acre residential campus, as well as the Harrington Academic Hall WTAMU Amarillo Center in downtown Amarillo. Established in 1910, the University has been part of The Texas A&M University System since 1990. A Hispanic Serving Institution since 2016, WT boasts an enrollment of more than 9,000 and offers 66 undergraduate degree programs, including eight associate degrees; and 44 graduate degrees, including an integrated bachelor's and master's degree, a specialist degree and two doctoral degrees. WT recently earned a Carnegie Foundation classification as a Research College and University. The University also is home to the Panhandle-Plains Historical Museum, the largest history museum in the state and the home of one of the Southwest's finest art collections. The Buffaloes are a member of the NCAA Division II Lone Star Conference and offers 16 men's and women's athletics programs.

**Photo:** "Venus" is one of the sculptures and paintings made by Amber Miller for her Master of Fine Arts exhibition "Outside the Box," opening Nov. 6 in West Texas A&M University's Dord Fitz Formal Art Gallery.

—WT—

| | | | | |
|---|---|---|---|---|
| Accessibility | Emergency Information | Form Policy | Open Records/ Public Information Act | Texas CREWS |
| Accreditation | Energy Management Report (PDF) | GDPR | Risk, Fraud and Misconduct Hotline | Texas Homeland Security |
| Consumer Information | Equal Opportunity & Nondiscrimination | House Bill 2504 | SB18 Report | Texas Veterans Portal |
| Contact WT | Family Educational Rights and Privacy Act | Legislative Appropriation Request | State of Texas | University Directory |
| Counseling & Mental Health Services (HB2895) | | Link Policy and Privacy Statement | Statewide Search | University Organizational Chart (PDF) |
| | | Online Institutional Resumes | | Title IX |

 **WEST TEXAS A&M UNIVERSITY**

© West Texas A&M University | All Rights Reserved
Canyon, TX 79016 | 806-651-0000

  

```
 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF TEXAS
 2                  AMARILLO DIVISION

 3   SPECTRUM WT,              )
                               )
 4        Plaintiff,           )
                               )
 5   v.                        )   Case No. 2:23-cv-00048
                               )
 6   WALTER WENDLER, in his    )
     official capacity as the  )
 7   President of West Texas    )
     A&M University, et al.,   )
 8                             )
          Defendants.          )
 9

10

11

12

13

14   -------------------------------------------------------
                ORAL DEPOSITION OF SHAWN FOUTS
15           DECEMBER 10, 2025 - CANYON, TEXAS
     -------------------------------------------------------
16

17

18

19

20        ORAL DEPOSITION OF SHAWN FOUTS, produced as a
     witness at the instance of the PLAINTIFF and duly sworn,
21   was taken in the above styled and numbered cause on
     DECEMBER 10, 2025, from 9:04 a.m. to 2:41 p.m., at the
22   offices of WEST TEXAS A&M UNIVERSITY, Old Main Building,
     Room 317, Canyon, Texas, before SHARON D. LIVINGSTON,
23   CSR-RPR, in and for the State of Texas, reported by
     machine shorthand, and pursuant to the Federal Rules of
24   Civil Procedure.

25
```

```
1                    A P P E A R A N C E S
2   FOR THE PLAINTIFF:
        Mr. JT Morris
3       FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
        700 Pennsylvania Avenue, SE, Suite 340
4       Washington, DC 20003
        (215) 717-3473
5       Jt.morris@thefire.org
    - and -
6       Mr. Adam Steinbaugh
        FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
7       510 Walnut Street, Suite 900
        Philadelphia, Pennsylvania 19106
8       (215) 717-3473
        Adam@thefire.org
9
    FOR THE DEFENDANTS:
10      Mr. David Bryant
        Ms. Munera Al-Fuhaid
11      OFFICE OF THE TEXAS ATTORNEY GENERAL
        300 West 15th Street
12      Austin, Texas 78701
        (512) 463-2100
13      David.bryant@oag.texas.gov
        Munera.al-fuhaid@oag.texas.gov
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                          INDEX
                                                  PAGE
 2   Appearances ------------------------------------   2

 3   Index ------------------------------------------   3

 4   Index of Exhibits ---------------------------- 3-5

 5   SHAWN FOUTS
           Examination by Mr. Steinbaugh ----------------   6
 6         Examination by Mr. Bryant -------------------- 152
           Re-examination by Mr. Steinbaugh ------------- 162
 7         Re-examination by Mr. Bryant ----------------- 166

 8   Changes and Signature -------------------------- 169

 9   Reporter's Certification ----------------------- 171

10                     INDEX OF EXHIBITS

11   NUMBER      DESCRIPTION                         PAGE

12    51     Amended Notice of Rule 30(b)(6) Deposition -   7

13    52     Expressive Activity on Campus Policy 08.02
             Approved 11-13-25 -------------------------  18
14
      53     Expressive Activity on Campus Policy
15           08.02.01 Approved 11-13-25 ----------------  19

16    54     Expressive Activity on Campus Policy
             08.99.99.W1 Revised 7-28-25 ---------------  20
17
      55     Events Listing for Various Years ----------  28
18
      56     Facility Use Request Procedure Policy
19           24.01.01.WO.01 Revised 3-1-17 -------------  31

20    57     Political Campaign Events in Facilities
             Under the Control of West Texas A&M Policy
21           07.03.01.W1 Revised 3-22-18 ---------------  32

22    58     West Texas A&M Mission Statement ----------  33

23    59     West Texas A&M Venues at WTAMU ------------  36

24    60     Theknot.com Website West Texas A&M University
             Wedding Venues ----------------------------  38
25
```

```
 1              INDEX OF EXHIBITS (CONTINUED)

 2   NUMBER        DESCRIPTION                        PAGE
```

```
 3    61   25 Live Screenshots ----------------------   39

 4    62   Jack B. Kelly Student Center Procedures and
           Guidelines Revised 3-5-25 ------------------  41
 5
      63   WT Campus Organizations Handbook -----------  55
 6
      64   Video of University Sing -------------------  66
 7
      65   First Amended Verified Complaint for Civil
 8         Rights Violations -------------------------  66

 9    66   Defendant's Answer to Plaintiffs' Amended
           Complaint ---------------------------------  67
10
      67   Spreadsheet Listing Reservations Made and
11         Status ------------------------------------  72

12    68   The Prairie Article Herdsmen Hearts Hosts
           Buff-A-Whoa Drag Show ---------------------  76
13
      69   Screenshots from Flickr Website -----------  77
14
      70   Presidential Actions Defending Women From
15         Gender Ideology Extremism and Restoring
           Biological Truth to the Federal Government -  79
16
      71   Video of Jingle Mingle --------------------  81
17
      72   WT Get Involved Instagram Post for Gabriel
18         Holmes Event ------------------------------  81

19    73   WT Get Involved Instagram Post for Events
           Schedule ----------------------------------  82
20
      74   WTAMU Student Event Calendar 9-13-24 ------- 84
21
      75   Email Chain 3-21-24 through 3-27-24 With
22         Chari Hill, Shawn Fouts, and Chris Thomas --  91

23    76   Series of Chats 4-23-25 with Chari Hill
           and Shawn Fouts ---------------------------  93
24
      77   A Fool's Drag Show Reservation Comments ----  99
25
```

```
 1              INDEX OF EXHIBITS (CONTINUED)

 2   NUMBER         DESCRIPTION                        PAGE

 3    78    WTAMU Risk Management and Insurance Matrix
            Form for A Fool's Drag Race --------------- 102
 4
      79    Email Chain 2-14-23 with Shawn Fouts and
 5          Chance Haugen ---------------------------- 104

 6    80    Marketing Material for A Fool's Drag Race -- 106

 7    81    1-2-1 Meeting Notes with Chance Haugen ----- 111

 8    82    Email Chain 2-13-23 through 2-16-23 with
            Shawn Fouts and Kris Drumheller ----------- 116
 9
      83    Briefing with Dr. Thomas and Chance Haugen
10          2-21-23 ----------------------------------- 120

11    84    Kimberly 1-on-1 6-6-22 -------------------- 138

12    85    JBK and OSEL 3-6-23 ----------------------- 139

13    86    Email Chain 2-21-23 through 3-9-23 with
            Evelyn Montoya, Chip Chandler, Ransom
14          Colette, Barrett Bright, Shawn Fouts ------ 139

15    87    Email 3-14-23 from WTAMU Risk Assessments
            to Barrett Bright and Chip Chandler -------- 141
16
      88    Email Chain 3-17-23 through 3-20-23 with
17          Shawn Fouts, Barrett Bright, Andrew Mangum - 142

18    89    WTAMU Risk Management and Insurance Matrix
            Form for Don't Be a Drag Drag Show --------- 145
19
      90    Outlook Post 1-8-24 Don't Be a Drag Drag
20          Show on March 22nd ------------------------ 146

21    91    Outlook Post 3-8-24 Re:  Please Proof Drag
            Show -------------------------------------- 147
22
      92    Don't Be a Drag Drag Show Flier ----------- 147
23
      93    Outlook Post 3-12-24 Confirm Final Details
24          for Reservation Scheduled 3-22-24 --------- 148

25
```

```
 1                         SHAWN FOUTS,
 2   having been first duly sworn, testified as follows:
 3                         EXAMINATION
 4   BY MR. STEINBAUGH:
 5        Q.   Good morning, Dr. Fouts.  It's Dr. Fouts,
 6   correct?
 7        A.   Yes.
 8        Q.   You understand that you are here for your
 9   deposition in a lawsuit involving the cancellations of
10   student drag shows?
11        A.   Uh-huh.
12        Q.   Have you ever been deposed before?
13        A.   No.
14        Q.   Well, I have three kind of broad rules for us
15   today.  Please listen and answer the question that was
16   asked.  If you don't understand the question, please let
17   me know.  I will probably ask some questions that don't
18   make sense, and I want to make sure there's a clean
19   record, so if it doesn't make sense to you, then the
20   answer is not going to make sense to other people.
21             Please don't talk over me, and I won't talk
22   over you.  We want to make sure that she creates a clean
23   written record.
24             Please give verbal answers because it's hard
25   to tell from a transcript when someone nods or says
```

1   "huh-uh."

2        A.   Yes.

3        Q.   Do you understand that you're under oath and

4   what that means?

5        A.   Yes.

6        Q.   Is there any reason you can't give truthful

7   testimony today?

8        A.   No.

9        Q.   What did you do to prepare for today?  And I

10  don't want you to tell me anything you discussed with

11  your lawyers, but what did you do in general?

12       A.   I reviewed, the best that I could find, the

13  original reservation, I reviewed any email

14  correspondence between myself and the client, and then

15  for events prior to my working at WT, I consulted with

16  Chance Haugen.  I replaced him as the director of the

17  JBK, so he was the only one I thought may have

18  information of events prior to my employment.

19       Q.   You understand that you are also here to

20  testify, not only on your own behalf, but on behalf of

21  the university with respect to certain topics?

22       A.   Yes.

23                 (Exhibit 51 marked.)

24                 MR. STEINBAUGH:  I'm going to mark this as

25  Exhibit 51, and I'll ask the court reporter to hand it

1    to the witness.

2        Q.    (BY MR. STEINBAUGH)    This is the Amended Rule

3    30(b)(6) Deposition Notice.    Have you seen this before?

4        A.    Yes.

5        Q.    I want to talk through some of the topics that

6    you're designated to testify about today just to make

7    sure that you are aware of what the topics are and that

8    you're prepared to testify about them.

9        A.    Yes.

10        Q.    And you understand that the lawyers have talked

11    about this and negotiated this so that the topics are a

12    little bit more limited than what's in this document, a

13    little bit more narrower?

14        A.    Okay.

15        Q.    Do you understand that?

16        A.    I do.

17        Q.    And I'm going to read my understanding of what

18    the topics are based on the negotiations with the

19    lawyers, so let me know if there's anything about that

20    that isn't correct.

21        A.    Okay.

22        Q.    Topic Number 1 on the third page is:    "The

23    proposed and actual uses of Legacy Hall, including drag

24    performances, between January 1st, 2022 and the

25    present," involving a list of specific events that

1  should be listed there, and the lawyers have also

2  added -- or at least I have added the Chicago

3  performance in the Branding Iron Theater in 2017, the

4  Peter and the Starcatcher performance in the Fine Arts

5  Complex in 2018, the Representative Ronny Jackson

6  Candidate Forum, the title of Show Performance, the One

7  Marriage and Family Ministries event, and the Community

8  Night of Worship and Prayer.

9            Is that correct.

10     A.   I'm not familiar with those events.

11     Q.   Okay.  So you're not prepared to discuss those

12  particular events?

13     A.   I do not have any knowledge of those particular

14  events.

15     Q.   Okay.  What did you do to prepare for this

16  topic?

17     A.   I reviewed the ones prior to 2022.  And just

18  for clarification, Topic 1 says "January 2012," but you

19  said "2022?"

20     Q.   Correct.  So it should be narrower, so you

21  don't have to go that far back.

22     A.   Okay.  I reviewed specifically the reservation

23  for the Fool's Drag Race and Don't Be a Drag Drag Show.

24  The other ones don't -- we've narrowed it, so those were

25  pre-2022.

1    Q.   Okay.  Topic Number 2 on Page 4 is:  "The

2  proposed and actual uses of Legacy Hall, including drag

3  performances, and the Fine Arts Complex, between January

4  1st, 2022 and the present for a list of particular

5  events:  A Fool's Drag Race, Don't Be a Drag Drag Show,

6  Queer Movie Night, the March 2012 Buff-A-Whoa Drag Show,

7  and each Mr. And Miss West Texas Drag Show since January

8  2015," and then we limited the particular events with

9  the words "drag show," "drag," "pageant," "dance," or

10  "talent" in the title or description, or the words

11  "Miss," "Ms.," "Mister," or "Mr." In the title.

12              Does that make sense?

13    A.   Yes, sir.

14    Q.   And what did you do to prepare for this

15  topic?

16    A.   Since they were before my tenure, I spoke with

17  Chance Haugen, as I assumed he would have the most

18  knowledge of any event prior to 2022.

19    Q.   And how long has Chance Haugen been at the

20  university, to your knowledge?

21    A.   Since 2007 or '8.  I'm not sure when he assumed

22  the role of director of the JBK.

23    Q.   Okay.  Does the university maintain a database

24  or an event-planning system to keep track of these types

25  of events?

1        A.    I cannot tell you the date that the Electronic

2    Management System was put into place.  That was

3    discontinued within the last 12 months, and we no longer

4    have access to that system, as we've switched to a new

5    management system.

6        Q.    And you say you no longer have access to that.

7              Who does?  What happened to that system?

8        A.    We made the transition from -- the previous

9    system was called EMS, Electronic Management System.

10   That particular company was no longer servicing that

11   product, and we were forced to switch to what is 25

12   Live, which is now the reservation process.  I could not

13   answer who may have access to EMS at this point.

14       Q.    Okay.  For Topic 4 on Page 4, you're going to

15   talk about the proposal, registration, and university

16   response to a list of events that are listed.  If you

17   want to take a moment to review those, let me know when

18   you have.

19       A.    Has anything been added to this list?

20       Q.    No.

21       A.    I'm fine, sir.

22       Q.    Are you prepared to discuss this topic?

23       A.    Yes.

24       Q.    Are there any limitations on your ability to

25   testify about this topic?

1    A.    They would be limited to prior to my tenure.

2    Q.    So information you gathered from Chance?

3    A.    Yes.

4    Q.    Topic 5 on Page 6 is:  "The policies,

5    procedures, practices, and customs concerning the

6    reservation or use of Legacy Hall."

7              Are you prepared to testify about that?

8    A.    Yes, sir.

9    Q.    Topic 7 on Page 6 is:  The university's efforts

10   between January 1st, 2020 and the present to promote" --

11   meaning advertise or draw publicity -- "the availability

12   of Legacy Hall for the use, reservation, or rental by

13   students, student organizations, faculty, or the

14   public."

15             Are you prepared to testify about that?

16   A.    My knowledge would be limited to 2022 and

17   forward, but yes.

18   Q.    Topic Number 9 on Page 6 is:  "The university's

19   policies, rules, and practices for student expression,

20   registered student organizations, the student use of

21   campus facilities, and the reservation process for

22   reserving those facilities."

23             Are you prepared to testify about that?

24   A.    Yes.

25   Q.    And Topic Number 10 is:  "The university's

```
 1   processing" -- meaning the decision-making, who made the
 2   decision about the application, when those decisions
 3   were made, and the basis for those decisions up to and
 4   including Wendler's decision to cancel the 2023 and 2024
 5   shows -- "of any application by plaintiff to host an
 6   event on campus since January 1st, 2023."
 7              Are you prepared to testify about that?
 8        A.   Yes.
 9        Q.   All right.  How long have you been at West
10   Texas University (sic)?
11        A.   I began in October of 2022.
12        Q.   What were you doing before that?
13        A.   I was in private practice as a business coach
14   and sports consulting coach.
15        Q.   Tell me about your educational background.
16        A.   My undergraduate degree is in religion, and my
17   doctorate is in higher education administration.
18        Q.   Okay.  You said that you were doing consulting.
19   What were you doing before that?
20        A.   Pastoring a church.
21        Q.   Where at?
22        A.   Here in Amarillo and various place in Texas,
23   but my last senior pastorate was in Amarillo.
24        Q.   Were you at West Texas University before then,
25   or were you in higher --
```

1  need audiovisual technicians, but they have not

2  specified the reason as to why, they'll follow up and

3  ask, "How many audiovisual technicians do you think you

4  need?"  "Are you just showing a movie?"  That could be

5  one audiovisual technician.  For instance, if it's a new

6  student orientation, they may need four microphones.

7       Q.   So essentially, it is helping students identify

8  boxes that have not been checked, checking those boxes,

9  identifying issues the university might have with an

10  event, and working through ways to overcome those

11  obstacles?

12       A.   It's usually facilitating to make sure that

13  everything is in place for the day of the event, and

14  there's no last-minute things that have not been

15  completed prior to the event taking place.

16       Q.   And your answer to that question is "yes?"

17  You nodded, but I'm just making sure.

18       A.   Okay.  Thank you.  Yes.

19            (Exhibit 52 marked.)

20            MR. STEINBAUGH:  I want to mark and hand

21  the witness Exhibit 52.

22            THE WITNESS:  Is this yours?

23            MR. BRYANT:  Thank you.

24       Q.   (BY MR. STEINBAUGH)  Are you familiar with this

25  policy?

```
 1        A.   I am familiar with the policy.  The current
 2   version of this policy I would be less familiar with,
 3   but yes.
 4        Q.   This is a policy dated November 13th, 2025, but
 5   this is the current policy?
 6        A.   As far as I know.
 7        Q.   Are you aware of any plans to amend or change
 8   this policy?
 9        A.   No.
10             (Exhibit 53 marked.)
11             MR. STEINBAUGH:  I want to mark and hand
12   the witness Exhibit 53.
13        Q.   (BY MR. STEINBAUGH)  Are you familiar with this
14   policy?
15        A.   No.
16        Q.   Can you identify what this policy is?
17        A.   The Expressive Activity Policy.
18        Q.   This is the Expressive Activity Policy of the
19   Texas A&M System?
20        A.   As I can tell from the logo, I would say yes.
21             MR. BRYANT:  Dr. Fouts, I'd instruct you
22   that when counsel asks you to identify a document, you
23   should tell him what it is if you know what it is, but
24   if it's a document you've never seen before, you should
25   so advise him.
```

1      Q.    Does that reservation process apply to spaces

2  in public, like sidewalks or the area around the

3  fountain?

4      A.    Public space that is open, it's not required to

5  make a reservation.

6      Q.    Does the Advance Reservation Requirement of

7  this policy apply to Legacy Hall?

8      A.    Yes.

9      Q.    And if you'll turn to the next page, you'll see

10  Section 3, Reservation Procedures.  If you want to read

11  through 3.1 and 3.2, let me know when you're done.

12      A.    Yes, sir.

13      Q.    Is this the procedure that governs the

14  requirement to request the use of Legacy Hall?

15      A.    Yes.

16      Q.    And that's the Live 25 system?

17      A.    Yes.

18      Q.    Or 25 Live?

19      A.    25 Live.

20      Q.    I'm going to make that mistake all day long.

21  And is that generally a first-come-first- serve basis

22  for reserving spaces in Legacy Hall?

23      A.    Yes, sir.

24      Q.    What's a university priority event?

25      A.    It's an institutional event that is reoccurring

```
 1   every year.  The easiest example is graduation or such
 2   an institutional event that has been recognized as a
 3   reoccurring institutional event.  It receives priority
 4   over other events.
 5       Q.   And in general, how early are those planned?
 6   How far do you see those coming?
 7       A.   Six to 12 months.
 8       Q.   You'll see in Section 3.1 at the very tail end
 9   there, it says, "The university reserves the right to
10   locate any assembly so as to ensure that the activity
11   does not interfere with the normal operation of the
12   university or interfere with the rights of others."
13                Is Legacy Hall and the JBK situated away
14   from classrooms or academic buildings on campus?
15       A.   It is adjacent to the classroom center.
16       Q.   How far away?
17       A.   The buildings are connected, and they're
18   divided by a courtyard between the west wing, Legacy
19   Hall, and the west entrance to the classroom center.
20       Q.   Is Legacy Hall an enclosed space?
21       A.   Yes, sir.
22       Q.   Are the walls fairly soundproof?
23       A.   Yes.
24       Q.   The doors can be closed?
25       A.   Yes, sir.
```

1    Q.   Are there windows on the doors?

2    A.   No.

3    Q.   The location of Legacy Hall, is it fair to

4  assume that the university put it in a place where

5  events can be held so they do not disrupt classes?

6    A.   I could not answer why it was built where it

7  was built.

8    Q.   Do events in Legacy Hall frequently disrupt

9  classes?

10   A.   No.

11   Q.   Does the university take steps to ensure that

12  events in Legacy Hall do not disrupt academic classes?

13   A.   Yes.

14   Q.   What kind of steps do you take?

15   A.   Considering class schedule, considering Legacy

16  has reservable rooms underneath of it that classes will

17  sometimes reserve for exams, so just ensuring that on

18  the calendar there is no academic program within the

19  building that the event at Legacy may interfere with.

20   Q.   And you're familiar with the 2023 and 2024 drag

21  show applications by Spectrum?

22   A.   Yes.

23   Q.   Were either of those events taking place during

24  exams or classes that it might have interfered with?

25   A.   I do not believe so.

1      Q.    If they were, the university would have raised

2    that concern or accommodated the event or moved it so

3    that it could happen without interfering with classes,

4    correct?

5      A.    Yes.

6      Q.    You can set that aside for now, but we'll come

7    back to this document.

8      A.    Okay.

9              (Exhibit 55 marked.)

10              MR. STEINBAUGH:    I want to mark as Exhibit

11    55 a spreadsheet.    This is derived from a document that

12    was identified as Defendants 088565, which was an Excel

13    spreadsheet.

14      Q.    (BY MR. STEINBAUGH)    Have you seen this before?

15      A.    Yes.

16      Q.    What is this?

17      A.    This is a recap of events that have been held

18    in each of the facilities in those particular years.

19      Q.    If you look at the first box that says "Legacy

20    Hall 151," what is that?

21      A.    Legacy Hall 151 is the room number of Legacy

22    Hall, and then this is a breakdown, from 2017 to 2024,

23    of the number of events that occurred in Legacy Hall by

24    designation.

25      Q.    And those designations are student

 1  organizations, departments, students, and

 2  non-university?

 3      A.   Yes, sir.

 4      Q.   "Student organization" refers to recognized

 5  student organizations?

 6      A.   Yes, sir.

 7      Q.   "Departments," I assume, refers to

 8  administrative departments or faculty departments of the

 9  university?

10      A.   Yes, sir.

11      Q.   "Students" refers to individual students?

12      A.   Yes, sir.

13      Q.   And "non-university," what does that mean?

14      A.   An example would be the city of Canyon may use

15  that space.

16      Q.   So groups with no formal connection to the

17  university?

18      A.   Yes, sir.

19      Q.   And under the column 2024, it says there were

20  34 student organization events in Legacy Hall in 2024.

21            Is that accurate?

22      A.   As far as I know.

23      Q.   And 137 department uses of Legacy Hall?

24      A.   Yes, sir.

25      Q.   And 14 non-university uses?

1      A.   Yes, sir.

2      Q.   If you turn to the fourth page, it says "25

3   Live Data 2024" at the top there?

4      A.   Yes, sir.

5      Q.   Are these events that were in addition to the

6   events in the first box?

7      A.   Yes, sir.

8      Q.   So it had 18 additional student organization

9   events in addition to the 34 from the first box?

10      A.   Yes, sir.

11      Q.   And same with non-university?  There were three

12   more in addition to the 14 uses?

13      A.   Yes, sir.

14      Q.   And this is because of the transition to 25

15   Live?

16      A.   Yes.

17      Q.   Are these fairly typical uses of Legacy Hall

18   year over year, just as a ballpark, setting aside the

19   COVID era?

20      A.   Yes, sir.

21      Q.   I want to go back to the Expressive Activities

22   Policy that we were looking at.

23           MR. BRYANT:  Which exhibit is that?

24   There are several of them.

25           MR. STEINBAUGH:  That would have been

 1    Exhibit 54.

 2                  THE WITNESS:  Okay.

 3        Q.   (BY MR. STEINBAUGH)  Can you look at Section

 4    3.2?

 5        A.   Yes, sir.

 6        Q.   3.2 governs the process to reserve spaces in

 7    Legacy Hall?

 8        A.   Yes, sir.

 9                  (Exhibit 56 marked.)

10                  MR. STEINBAUGH:  I want to mark and hand

11    the witness Exhibit 56.  This should be Bates stamped

12    Defendants 000412.

13                  MR. BRYANT:  Thank you.

14        Q.   (BY MR. STEINBAUGH)  Have you seen this

15    document before?

16        A.   I'm not sure how to answer.  I've seen the

17    content of the document.

18        Q.   Okay.  Can you describe this document?

19        A.   Yes.  It is the basic facility use and the

20    responsibilities of those who would use a given facility

21    on campus.

22        Q.   And the paragraph under "Responsibilities"

23    where it references the "request-for-space reservation

24    website," that is again the 25 Live website?

25        A.   Yes, sir.

1    Exhibit 58.  Are you familiar with this document?

2        A.   Yes, sir.

3        Q.   What is this?

4        A.   This is a copy of the website of the Jack B.

5    Kelley.

6        Q.   And is this the Mission Statement website?

7        A.   Yes, sir.  It includes a brief history, who

8    makes up the JBK, the goals.

9        Q.   It describes the JBK as the "living room for

10   campus?"

11       A.   Yes, sir.

12       Q.   What does that mean?

13       A.   The JBK has been the place where students

14   gather.  It has restaurants that students or the public

15   can utilize.  It's the place where students outside of

16   the classroom or their residence hall, provides a place

17   for them to socialize.

18       Q.   Okay.  So the JBK and the facilities there are

19   about educational growth, social engagement, and

20   intellectual development?

21       A.   Yes, sir.

22       Q.   So it's broader than just academic or

23   educational purposes?  It's also a social function?

24       A.   Yes, sir.

25       Q.   Do student events have to have an express

1  educational purpose?

2      A.   No, sir.

3      Q.   Is it fair to say that allowing students the

4  opportunity to have diverse events -- and I mean that in

5  a sense of having a range of social, academic, political

6  types of events -- contributes to a vibrant community on

7  campus?

8              MR. BRYANT:  Objection; vague.

9      Q.   (BY MR. STEINBAUGH)  You can answer.

10     A.   Could you repeat the question?

11     Q.   Is it fair to say that allowing students or

12 facilitating students' ability to organize a range of

13 events on campus contributes to a vibrant culture on

14 campus?

15             MR. BRYANT:  Same objection.

16     A.   Yes, sir.

17     Q.   (BY MR. STEINBAUGH)  You'll see on this

18 document that it mentions that Legacy Hall is a

19 "multi-purpose room."

20             Can you describe some of its purposes?

21     A.   Which document are you referring to?

22     Q.   The Mission Statement document.

23     A.   Okay.

24     Q.   And the "Legacy Hall multi-purpose room" part

25 is in the second paragraph here, kind of in the middle.

```
 1        A.    Yes.   Could you repeat the question?
 2        Q.    What are some of the purposes of that room when
 3   it refers to "multi-purpose room?"
 4        A.    Could you clarify "purpose?"
 5        Q.    I mean when it's saying to the public it's a
 6   "multi-purpose room," what is the purpose of making that
 7   representation to the public?
 8        A.    Legacy Hall has served as a place for weddings,
 9   concerts.  The public may use it for their events when
10   there's not a space large enough as an event center,
11   let's say.  There are meetings of large groups that need
12   that size meeting space that are not available to them
13   in their own facilities.
14              (Exhibit 59 marked.)
15        Q.    (BY MR. STEINBAUGH)  I want to mark this as
16   Exhibit 59.  Are you familiar with this document?
17        A.    Yes, sir.
18        Q.    What is this?
19        A.    It's a continuation of the Jack B. Kelley
20   website.
21        Q.    And you'll see at the top under "Event Venues
22   at WTAMU," it says that it's "home to several venue
23   spaces that are ideal for events, large and small
24   wedding ceremonies and receptions, rehearsal dinners,
25   milestone celebrations, corporate receptions and
```

 1  conferences, holiday parties, board meetings, and much

 2  more."

 3              Are those all events that can be held in

 4  Legacy Hall?

 5      A.   Yes, sir.

 6      Q.   And on Page 2, in the middle there under "Jack

 7  B. Kelley Student Center Legacy Hall," it says it's "a

 8  large modern hall that is equipped with some of the best

 9  technology in the Texas Panhandle."

10              Is that accurate?

11      A.   Yes, sir.

12      Q.   What kind of technology is that?

13      A.   Sound equipment, lighting equipment, acoustics.

14      Q.   Is there a stage that can be put in there?

15      A.   There is a permanent stage with two large

16  drop-down screens, and there are temporary stages that

17  can be brought in as well.

18      Q.   Is there a back-stage area, like a changing

19  room or a green room?

20      A.   No, not in Legacy Hall.

21      Q.   Are there places adjacent to it that can be

22  used for a changing room?

23      A.   There is a green room across the hall.

24      Q.   So you could put anything from a low-tech kind

25  of press conference or lecture to a full rock musical in

```
 1   Legacy Hall?
 2        A.   Yes, sir.
 3        Q.   Page 2 also says, "It's great for events with
 4   bands or live music."
 5                  Is that accurate?
 6        A.   Yes, sir.
 7        Q.   Is it fair to say that the university, through
 8   this document, is holding out the space as suitable for
 9   a stage performance involving music?
10        A.   Yes, sir.
11        Q.   It also says, "It's completely customizable, as
12   you can see from the photos."  The photo here is of a
13   wedding.
14                  Is that accurate?
15        A.   Which photo are you referring to?
16        Q.   The one adjacent to "Student Center Legacy
17   Hall."
18        A.   Could you repeat the question?
19        Q.   Is that a wedding in that photo?
20        A.   Yes, sir.
21        Q.   And that is a wedding that was staged at Legacy
22   Hall?
23        A.   Yes, sir.
24                  (Exhibit 60 marked.)
25        Q.   (BY MR. STEINBAUGH)  I'm going to mark this as
```

1    Exhibit 60.  Are you familiar with this?

2        A.    Yes, sir.

3        Q.    What is this?

4        A.    Speaking of the picture?

5        Q.    Not the picture.  The website itself or the

6    document.

7        A.    Oh, no, sir.

8        Q.    Are you familiar with theknot.com website?

9        A.    No, sir.

10       Q.    Do you know whether or not the university

11   promotes the availability of Legacy Hall on websites for

12   advertising wedding locations?

13       A.    No, sir.

14       Q.    Okay.  That photo, is that Legacy Hall?

15       A.    No, sir.

16       Q.    Is that another space at West Texas A&M?

17       A.    Yes, sir.  It's the chapel.

18       Q.    Okay.

19             (Exhibit 61 marked.)

20       Q.    (BY MR. STEINBAUGH)  I'll mark this as Exhibit

21   61.  Take a look at this, and let me know if you're

22   familiar with it.

23       A.    I'm familiar with the screenshots, yes, sir.

24       Q.    And what is this?

25       A.    This is information that a client would fill

1    out in 25 Live.

2        Q.    So this is the registration process to register

3    for Legacy Hall?

4        A.    Yes, sir.

5        Q.    On Pages 4, 5 and 6, there's a drop-down menu

6    showing all of the options on it.

7                  Is that accurate?

8        A.    Yes, sir.

9        Q.    And from this list, I want to go through some

10   of these and get a "yes" or "no" response as to whether

11   or not these are the types of events a student

12   organization or members of the public could hold in

13   Legacy Hall.

14                  So a ceremony?

15       A.    Yes, sir.

16       Q.    A meeting?

17       A.    Yes, sir.

18       Q.    A social/reception?

19       A.    Yes, sir.

20       Q.    Advertising?

21       A.    Yes, sir.

22       Q.    A banquet?

23       A.    Yes, sir.

24       Q.    An exhibit or fair?

25       A.    Yes, sir.

1      Q.    A performance?

2      A.    Yes, sir.

3      Q.    A presentation?

4      A.    Yes, sir.

5      Q.    A seminar or conference?

6      A.    Yes, sir.

7      Q.    That's the end of the list.  You can set that

8  one aside.

9              (Exhibit 62 marked.)

10     Q.    (BY MR. STEINBAUGH)  I'll mark as Exhibit 62 a

11  document entitled "Jack B. Kelley Student Center West

12  Texas A&M University Procedures and Guidelines, Revised

13  March 5th, 2025."

14              Are you familiar with this?

15     A.    Yes, sir.

16     Q.    We are going to return to this document a

17  couple of times, so we'll keep hold of that one.

18              What is this document?

19     A.    This is the procedures and guidelines for use

20  of the Jack B. Kelley.  It serves as a tool for the Jack

21  B. Kelley workers as a resource.

22     Q.    Is this the current version of this policy?

23     A.    As far as I know.

24     Q.    Do you know whether this is the version on the

25  university's website?

1      Q.  I want to go down towards the bottom.

2            It says, "In the JBK, classes may be

3 scheduled on a one-time basis during each semester.

4 Classes will not be allowed to use the JBK on a regular

5 basis."

6            Is that accurate?

7      A.  Yes, sir.

8      Q.  Why?

9      A.  The space is designated primarily for student

10 use, and then department classroom is secondary.

11      Q.  Going back to the top, are you aware of any

12 plans to change or alter the availability of Legacy Hall

13 as a space students can reserve?

14      A.  No, sir.

15      Q.  Okay.  So we have the JBK, which is set up to

16 allow or to facilitate social and entertainment events

17 for students and for the campus community and the

18 broader community.

19            Is that accurate?

20      A.  Yes, sir.

21      Q.  Is it fair to say that the use of Legacy Hall

22 for expressive events is the normal operation of the

23 university?

24            MR. BRYANT:  Objection; vague.

25      Q.  (BY MR. STEINBAUGH)  You can answer.

```
 1  not be held to that.  They would pay a rental fee.  I
 2  cannot tell you what those fees are.
 3       Q.   Do you have a ballpark?
 4       A.   No, sir.
 5       Q.   And you mentioned that students would not be
 6  charged a fee.  Is that referring to student
 7  organizations?
 8       A.   Yes, sir, registered student organizations.
 9       Q.   But an individual student who wanted to rent
10  that space, or an individual faculty member or staff
11  member, they would have to pay that fee?
12       A.   Yes, sir.
13       Q.   Would you say that you have substantial
14  experience renting event spaces, including Legacy Hall,
15  to members of the greater community, so outside of the
16  university?
17       A.   Explain what you mean by "substantial."
18       Q.   What I mean is the university is renting out
19  space to the broader community.
20            Is that correct?
21       A.   Yes, sir.
22       Q.   Do you know whether or not the rates the
23  university is charging are competitive compared to other
24  venues in the area?
25       A.   Yes, sir.
```

1        Q.    They are?

2        A.    Yes, sir.

3        Q.    I think you mentioned earlier -- correct me if

4    I'm mischaracterizing you at all -- that Legacy Hall is

5    a community resource because there are not that many

6    resources or venues that other people could use, so they

7    come to Legacy Hall from outside the community to be

8    able to use that space?

9        A.    Yes, sir.

10       Q.    Do you know whether or not there are spaces

11   comparable to Legacy Hall in Canyon?

12       A.    There are now.

13       Q.    When you say "now," what does that mean?

14       A.    Many event venue spaces have developed in the

15   last couple of years.

16       Q.    Can you name some of those?

17       A.    The new facility right next to the campus, the

18   Lumberyard.

19       Q.    What is the Lumberyard?

20       A.    It's a multi-purpose facility that holds

21   outdoor concerts, and they have a large space that

22   groups and other event venues could use that seem to

23   have become popular in the last couple of years.

24       Q.    Do you know what they charge for use of that

25   space?

1      A.   Yes, sir.

2      Q.   And those primarily serve students at the

3   university?

4      A.   Yes, sir.

5      Q.   There are a number of events at Legacy Hall and

6   other JBK facilities that are worship events.

7              Is that accurate?

8      A.   There are some.

9      Q.   Do you know whether or not the worship center

10  or the facility adjacent to the university is called

11  "the Wesley?"

12     A.   "The Wesley," yes, sir.

13     Q.   Okay.  Are you familiar with an event called

14  "University Sing?"

15     A.   Yes, sir.

16     Q.   What is University Sing?

17     A.   University Sing has been a competition among

18  fraternities and sororities, most recently involving

19  student orgs.  A theme is generally chosen.

20              In 2024, the theme was Disney musicals.

21  Student orgs can register, and they will choose a scene

22  usually involving a skit, maybe a song that they will

23  lip-sync, and they will compete in front of an audience

24  and judges.  I don't believe there's a prize, but it's

25  just a competition.

```
 1        Q.   Have you attended those before?

 2        A.   Not since 2006.

 3        Q.   Okay.  Do you remember what the theme was for

 4   that one?

 5        A.   I have no idea.  Legacy wasn't even in

 6   existence then.

 7        Q.   When was Legacy built?

 8        A.   It opened December of 2012, I believe.

 9             MR. STEINBAUGH:  I want to show you a

10   video.  This was produced at SPECTRUM 0003004, and I

11   will mark this video as Exhibit 64.  It's a short video.

12             (Exhibit 64 marked.)

13        Q.   (BY MR. STEINBAUGH)  Are you able to see that?

14        A.   Yes, sir.

15             (Video plays.)

16        Q.   (BY MR. STEINBAUGH)  Do you know if the JBK

17   produced that video?

18        A.   I do not know.

19        Q.   Is that video an accurate representation of

20   what University Sing is?

21        A.   Yes.

22        Q.   Do you know how long this event has been held,

23   just as a ballpark?

24        A.   It was postponed during COVID, and I'm not sure

25   how long of a break, but I know it was brought back in
```

1  2024.

2     Q.   Okay.  But if the university has held this

3  repeatedly, is it safe to assume that Legacy Hall is

4  compatible with this type of use?

5     A.   Yes, sir.

6              (Exhibit 65 marked.)

7     Q.   (BY MR. STEINBAUGH)  I'm going to mark as

8  Exhibit 65 the First Amended Complaint.

9              Have you ever been sued before?

10    A.   No, sir.

11    Q.   Are you familiar with what a Complaint and

12 Answer are?  Totally fine if you're not.

13    A.   No, sir.

14    Q.   So as a general overview, what happens in a

15 lawsuit is the plaintiff, the person suing, will file

16 the First Amended Complaint, and then the person who is

17 the defendant will sometimes have to file what's called

18 an Answer.

19              In the Answer, they will say, "Yes, I admit

20 this," or "No, I deny this, and you need to prove this

21 particular allegation?"

22              Exhibit 66 marked.)

23    Q.   (BY MR. STEINBAUGH)  I also want to mark as

24 Exhibit 66 the Answer of Walter Wendler.  As part of

25 this process, when we filed the lawsuit against

```
 1        A.   I can't speak to the reason for its
 2   cancellation.
 3        Q.   Do you know if Christopher Thomas was involved
 4   in that cancellation?
 5        A.   That, I do not know.
 6        Q.   Do you know who made the decision to cancel it?
 7        A.   No, sir.
 8        Q.   Do you know whether or not the university
 9   issued a statement about the cancellation?
10        A.   I don't recall.
11        Q.   I want to go back through some of the events
12   that have previously occurred or could occur in Legacy
13   Hall.  I just want to get a yes or no answer about
14   whether or not this event could be held in Legacy Hall.
15             MR. BRYANT:  Whether it could be held?
16             MR. STEINBAUGH:  Yeah.  I'll rephrase it.
17        Q.   (BY MR. STEINBAUGH)  So I want to get a yes or
18   no about whether or not it would be acceptable under JBK
19   policies and whether or not Legacy Hall is suitable for
20   this type of event.
21             Does that make sense?
22        A.   Yes, sir.
23        Q.   Wedding ceremonies?
24        A.   Yes, sir.
25        Q.   Wedding receptions?
```

```
 1        A.   Yes, sir.

 2        Q.   Meetings?

 3        A.   Yes, sir.

 4        Q.   Socials?

 5        A.   Describe.

 6        Q.   That was one of the types of events that was

 7   listed on the 25 Live.

 8        A.   Yes, sir.

 9        Q.   So yes?

10        A.   Yes, sir.

11        Q.   Banquets?

12        A.   Yes, sir.

13        Q.   Performances?

14        A.   Yes, sir.

15        Q.   Presentations?

16        A.   Yes, sir.

17        Q.   Seminars?

18        A.   Yes, sir.

19        Q.   Conferences?

20        A.   Yes, sir.

21        Q.   Holiday parties?

22        A.   Yes, sir.

23        Q.   Movie screenings?

24        A.   Yes, sir.

25        Q.   Dances?
```

```
 1        A.   Yes, sir.

 2        Q.   Dance-off competitions?

 3        A.   Yes, sir.

 4        Q.   Fashion shows?

 5        A.   Yes, sir.

 6        Q.   Talent shows?

 7        A.   Yes, sir.

 8        Q.   Male beauty pageants?

 9        A.   Yes, sir.

10        Q.   Female beauty pageants?

11        A.   Yes, sir.

12        Q.   Press conferences?

13        A.   Yes, sir.

14        Q.   Worship services?

15        A.   Yes, sir.

16        Q.   Concerts?

17        A.   Yes, sir.

18        Q.   Rock concerts?

19        A.   Yes, sir.

20        Q.   Christian music concerts?

21        A.   Yes, sir.

22        Q.   Opera music concerts?

23        A.   Yes, sir.

24        Q.   Rap music concerts?

25        A.   Yes, sir.
```

```
 1        Q.   Country music concerts?

 2        A.   Yes, sir.

 3        Q.   Magicians?

 4        A.   Yes, sir.

 5        Q.   Hypnotists?

 6        A.   Yes, sir.

 7        Q.   Fundraisers?

 8        A.   Yes, sir.

 9        Q.   Political candidates?

10        A.   Yes, sir.

11             (Exhibit 75 marked.)

12        Q.   (BY MR. STEINBAUGH)  I'll mark this as Exhibit

13   75.  It's a long email chain, so take your time to look

14   through it, and once you're done reading it, let me

15   know.

16        A.   Yes, sir.

17        Q.   Does this refresh your recollection about

18   whether or not Christopher Thomas was involved in

19   discussions about canceling this concert?

20        A.   Yes, sir.

21        Q.   Does this refresh your recollection about

22   whether or not the university issued -- if you'll look

23   at the first page -- a statement along the lines of "the

24   vice president denied this event due to the risk

25   associated with it?"
```

1    had the most knowledge.

2        Q.   (BY MR. STEINBAUGH)  Look at the last page of

3    the exhibit.

4        A.   Yes, sir.

5        Q.   In the very middle is a chat from you on April

6    23rd at 8:16 p.m.

7                 Is that right?

8        A.   Yes.

9        Q.   You say, "Frustrating at times."

10                What did you mean by that?

11       A.   Chari had never been involved in anything like

12   this before, and she was feeling stressed.

13                MR. STEINBAUGH:  Do we want to take a break

14   for lunch?

15                MR. BRYANT:  Let's go off the record.

16                (Recess 11:41 a.m. to 12:29 p.m.)

17       Q.   (BY MR. STEINBAUGH)  All right.  We are getting

18   there.  Not too much longer.  I appreciate your patience

19   in being here with us today.

20                I want to talk about the drag show that

21   Spectrum WT proposed to be held in March of 2023.

22                Do you recall that?

23       A.   Yes, sir.

24       Q.   And before we get to that, I want to talk

25   about, in general, the steps that are required for a

 1  student organization to register and hold an event in

 2  Legacy Hall.

 3              As I understand it, there are five broad

 4  steps to doing so.  Number 1 is submitting an online

 5  reservation request through the 25 Live website.

 6              Is that correct?

 7      A.   Yes, sir.

 8      Q.   Number 2 is completing and submitting a risk

 9  assessment?

10      A.   Yes, sir.

11      Q.   Number 3 is reviewing the marketing to ensure

12  it aligns with the marketing requirements for student

13  organizations?

14      A.   Yes, sir.

15      Q.   Number 4 is completing and submitting the

16  catering exemption form if you're serving food?

17      A.   Yes, sir.

18      Q.   And Number 5 is receiving event confirmation

19  from the JBK Event Services Team?

20      A.   Yes, sir.

21      Q.   Are there any other significant or major steps

22  that I'm missing there that a student organization would

23  have to go through?

24      A.   They would be subsidiary steps, such as if you

25  need liability insurance, or sometimes there may be a

1    request of -- for example, if a student org is having a

2    Pie In the Face Fundraiser, you need to ensure that

3    participant waivers are signed, and everyone wears a

4    goggle, but they're all part of those particular areas.

5        Q.    With respect to the 2023 proposed drag show,

6    did Spectrum WT satisfy all of those steps?

7        A.    Yes, sir.

8        Q.    So they had received confirmation for holding

9    the event?

10       A.    I do not recall if it was moved from tentative

11   to confirmed.  I don't know where in the timeline the

12   cancellation of the event occurred in relationship to

13   moving it from tentative to confirmed.

14       Q.    Were there any steps that they would have had

15   to take in order to move it from tentative to confirmed?

16       A.    No, sir.

17       Q.    So essentially, moving it from tentative to

18   confirmed was purely ministerial in that it was someone

19   on the JBK Team that would have to click a button or

20   something?

21       A.    Yes, sir.  To the best of my knowledge, the

22   last thing remaining was proof of liability insurance.

23   That can actually happen up until the day of the event.

24   That insurance is a three to five-minute process to

25   secure, so sometimes that is the last thing that will

1   happen.

2        Q.   Okay.  And there's no question that the

3   students would have been able to get that?

4        A.   No, sir.

5        Q.   When did you first hear about the proposed drag

6   show in 2023?

7        A.   When the reservation itself was made, best of

8   my recollection, late December, early January.

9        Q.   That reminds me.  During the break, your

10  counsel asked me to give you an opportunity to address a

11  mistake in one of the dates, I guess, about employment

12  or something like that?

13       A.   Not employment.  I was reassigned to

14  Residential Living October of 2023, and I believe I said

15  "October of 2024."

16       Q.   Okay.  I appreciate that.  Thank you.

17            When did you first hear about the proposed

18  drag show?

19       A.   When the original reservation came in.

20       Q.   And that's how you first heard about it?

21       A.   Yes, sir.

22       Q.   Would that have been the risk assessment

23  itself, or did it come later?

24       A.   The risk assessment came after the reservation.

25       Q.   Okay.  When you received the reservation, what

1    did you do with it?

2        A.    It was being processed by the JBK Event

3    Services Team as any other reservation.

4        Q.    But you read that reservation request?

5        A.    I don't remember if I actually read the

6    reservation.

7        Q.    Do you recall whether that reservation request

8    referenced it being a drag show?

9        A.    Yes.

10       Q.    So at the moment the reservation request was

11   made, the university understood that this was a drag

12   show that was being proposed?

13       A.    Yes.

14                  (Exhibit 77 marked.)

15       Q.    (BY MR. STEINBAUGH)  I'll mark as Exhibit 77 a

16   redacted document stamped SPECTRUM 0000762.

17                  Let me know when you've had a chance to

18   read through this.

19       A.    Yes, sir.

20       Q.    Are you familiar with this document?

21       A.    Yes, sir.

22       Q.    I want to start towards the end where it's

23   stamped 768 at the bottom.

24       A.    Yes, sir.

25       Q.    Do you see where it says "Response Summary" and

1  the text that follows over the next two pages?

2      A.   Yes, sir.

3      Q.   What is that?

4      A.   Are you referring to the description of the

5  event or the entire paragraph?

6      Q.   What kind of document or email is it?  Is this

7  something you get for a lot of events?

8      A.   Every risk assessment is identical.

9      Q.   So this is the risk assessment that the

10 students submitted?

11     A.   Yes, sir.

12     Q.   And starting at the bottom of 768, part of the

13 Description of Event says, "A student drag show with

14 dancing on stage and performances by students.  The

15 performers will perform a song while in drag."

16          Is that correct?

17     A.   Yes, sir.

18     Q.   Is that your understanding of what the show was

19 going to be?

20     A.   Yes, sir.

21     Q.   And is that the type of activity that Legacy

22 Hall is capable of facilitating?

23     A.   Yes, sir.

24     Q.   You see it says here twice that "it will be a

25 student drag show with performances by students."

```
 1              Was there an indication at this time that
 2  anyone other than a student would be involved in this
 3  event?
 4       A.   As a participant?
 5       Q.   Yes.
 6       A.   No.
 7       Q.   Any indication that anyone other than a student
 8  would be on stage for this event?
 9       A.   No.
10       Q.   I want to look at the first four pages in the
11  exhibit that are redacted.  Do you have any recollection
12  of who this communication might have been with?
13              And I know I'm asking you to look beyond
14  redacted text.
15       A.   Yes, sir.
16       Q.   Do you know who it might have been?
17       A.   It's the same people every time.
18       Q.   Okay.
19       A.   I may have the blocks out of order, but I know
20  the first block is Richard Smith.  There's a space for
21  Fire and Life Safety.  There's a space for myself.
22  There's a space for, at this time, Kimberly Cornelsen,
23  who was over Office of Student Engagement and
24  Leadership.  Her role was to verify they were a
25  registered org.
```

1    Q.   So this would have been those folks' risk
2    assessment of this event?
3    A.   No.  It's their comments on the event.
4    Q.   Their comments?
5    A.   Yes, sir.
6    Q.   So this was sort of their initial comments and
7    reactions to this proposed event?
8    A.   Yes.
9    Q.   Are you aware that as part of the discovery
10   process, the parties in the lawsuit exchanged documents,
11   which is how I have these kinds of things?
12   A.   Yes, sir.
13   Q.   Were you asked by anyone other than a lawyer to
14   search for records relating to this lawsuit?
15   A.   No, sir.
16   Q.   Were you asked to search for text messages
17   relating to this lawsuit or the events in this lawsuit,
18   like the drag shows?
19   A.   Outside of the attorneys?
20   Q.   Outside of the attorneys.
21   A.   No, sir.
22   Q.   If you were to look through your emails today,
23   would you be able to locate this email?  Do you have
24   those going that far back?
25   A.   Yes, sir.

1        Q.   Going to the next page, is that Bates stamped
2   787 on the bottom?
3        A.   Yes, sir.
4        Q.   That email in the center there, is that an
5   email you sent?
6        A.   Yes, sir.
7        Q.   Do you know if that would have been with
8   Barrett Bright?
9        A.   To the best of my recollection.
10       Q.   Starting at Page 789 and continuing through the
11  end, is that the same risk assessment the students had
12  submitted?
13       A.   Yes.
14       Q.   On Pages 788 to 789, is that an email that you
15  sent to Bear and to Kristina Drumheller?
16       A.   Yes, sir.
17       Q.   Who is Kristina Drumheller?
18       A.   She is the faculty advisor for Spectrum.
19       Q.   You asked a number of different questions of
20  Bear here, and I want to make sure I'm characterizing
21  them correctly.
22            Number 1 says, "Will a club advisor be at
23  event?"
24            You're referring to Kristina Drumheller?
25       A.   Yes.  Chip Chandler is also -- I'm not sure if

1  he's an advisor, but he was actively involved with the

2  group, but it was primarily Kristina.

3      Q.  Do you know Kristina well?

4      A.  No.

5      Q.  Do you have any reason to doubt her ability to

6  work with the students to facilitate an event?

7      A.  No.

8      Q.  Number 2, you ask, "Will the event contain

9  material that may need 'warning labels' for minors that

10 may attend (song lyrics, for instance)?  We've had this

11 happen before.  As an example, sometimes with a

12 comedian, signage will be posted that states that not

13 all material may be appropriate for minors?"

14          Do you recall asking that?

15     A.  Yes.

16     Q.  Does this refresh your recollection as to

17 whether or not the university uses signage to warn

18 potential visitors about content of events?

19     A.  I believe that's placed on the person making

20 the reservation.

21     Q.  Is it your understanding that the university

22 has asked other events to post that kind of signage?

23     A.  Yes, sir.

24     Q.  The third question is:  "Are the participants

25 required to get prior approval for their dress and

1        A.    I believe so.

2        Q.    (BY MR. STEINBAUGH)   And you thanked Bear for

3   his responsiveness, correct?

4        A.    Yes.

5        Q.    Did you perceive Bear as being responsive to

6   inquiries?

7        A.    For a full-time student that also worked on

8   campus, yes.

9        Q.    Do you have any recollection of who you would

10  have forwarded this to other than a lawyer?

11       A.    No.

12              (Exhibit 83 marked.)

13       Q.    (BY MR. STEINBAUGH)   I'll mark this as Exhibit

14  83.  Take a couple minutes to look at this.

15       A.    Yes, sir.

16       Q.    Do you recognize this document?

17       A.    Yes, sir.

18       Q.    What is this?

19       A.    This was a meeting between myself, Dr. Thomas,

20  and Chance Haugen.

21       Q.    Would anyone else have been present for this

22  meeting?

23       A.    No.

24       Q.    What was this meeting about?

25       A.    It was in response to a comment made in the

1  the list of music?

2      A.   Yes.

3      Q.   And the university had approved that list of

4  music?

5      A.   The risk assessment review does not approve or

6  disapprove, it just reviews the process.  But in

7  requesting who was reviewing the music, Barrett said he

8  and another person were.  And I do not remember who that

9  other person was, but he had sent our AV technician the

10 music so they could pre-program it for the event so that

11 the program would flow, and there would not be any

12 disconnect.

13     Q.   I see.  And I understand elsewhere, that JBK

14 has a list of songs that cannot be played.

15                Is that accurate?

16     A.   It's not accurate that it's a list of songs.

17 It would just be key words or themes within the music.

18     Q.   Who makes that determination?

19     A.   That, I can't answer.

20     Q.   And within the JBK, is there somebody who

21 researches songs and prints out lyrics or something like

22 that?

23     A.   Not that I know of.  The general practice would

24 be to put it back on the person making the reservation.

25 In this case, Barrett was very cooperative and seemed to

1   be in complete agreement with that statement.

2       Q.   Is there like a published list or set of

3   requirements about what music will or will not be

4   approved?

5       A.   Not that I know of.

6       Q.   How do they make that determination?

7            MR. BRYANT:  I believe he's already

8   answered that question.

9       Q.   (BY MR. STEINBAUGH)  By listening to the music

10  and reading the lyrics?

11      A.   I would say so.

12      Q.   So the individual staffer who is listening to

13  the music or reading the lyrics would make a

14  determination about their content?

15      A.   Again, it's generally put back on the student

16  making the reservation to make that call.

17      Q.   The music that Barrett submitted had been

18  reviewed by the university?

19      A.    It had been submitted.  That's as far, I

20  believe, as it got in the process.

21      Q.   I want to jump down to the next bullet point.

22  "The students have a First Amendment right to have this

23  event."

24            That was the consensus of the risk

25  assessment?

1     A.   Yes.  This portion contains comments that may

2 have been brought up in the meeting with Dr. Thomas.

3     Q.   Okay.  There's a line here that says, "If WT

4 does not have a written Expressive Activity Policy, now

5 is the time to develop one."

6             What does that reflect?

7     A.   Dr. Thomas was new, and he wasn't familiar

8 with all the policies.

9     Q.   I see.  Did you know that there was an

10 Expressive Activity Policy at the time?

11     A.   Yes.

12     Q.   And you told him that there was an Expressive

13 Activity Policy?

14     A.   Yes.

15     Q.   It says, "Why hasn't the VPSA been brought in

16 sooner?"

17             Was that Chris Thomas?

18     A.   Yes.

19     Q.   What was the concern there?

20     A.   I don't recall.

21     Q.   It says, "This event should have gone through

22 WT's Office of DEI."

23             What does that reference?

24     A.   At the time, we had an Office of Diversity,

25 Equity, and Inclusion.  Part of the risk review was:

1    A.   Yes.

2    Q.   And was it sufficient to satisfy any concerns

3    about their marketing?

4    A.   Yes.

5    Q.   And another step to mitigate risk was signage

6    stating "may not be appropriate for minors under the age

7    of 13."

8           Was that sufficient to satisfy the

9    university's assessment of the risk of minors seeing

10   this?

11   A.   That, along with who would verify that a minor

12   was with their guardian or parent.

13   Q.   And who would do that?

14   A.   Spectrum was going to take that responsibility.

15   Q.   And the university trusted them to be able to

16   undertake that responsibility?

17   A.   Yes.

18   Q.   And is that because Kristina Drumheller and

19   Chip Chandler were participating in the organization of

20   the event?

21   A.   Yes.  And we would not have a reason not to

22   trust a registered student org.

23   Q.   "JBK will have two event managers present."

24         Is that typical?

25   A.   It's not untypical for 100 people.

137

```
 1        A.   Not in person that I recall.
 2        Q.   The next line says, "Kyle Hawbaker, two
 3   officers assigned."
 4             Did this reflect a further conversation
 5   with the chief?
 6        A.   No.  Kyle is the assistant chief of police, and
 7   he is on the Risk Review Team.  He made a comment that
 8   he would assign two officers.
 9        Q.   So this is you updating Chance about that?
10        A.   Yes.
11        Q.   I see.  Line C says "03-17-2023 - deadline for
12   approval."
13             What does that reference?
14        A.   We generally need an event to be completely
15   finalized two weeks in advance so that the JBK Team can
16   make sure they have student workers that they schedule a
17   week at a time.  So just to make sure they can schedule
18   sufficient staff, we generally always ask for an event
19   to be finalized two weeks in advance.
20        Q.   Line D says, "Chip Chandler becoming more
21   involved and helping steer Barrett and Colette Ransom."
22             Did you ask Chip Chandler to take a more
23   active role?
24        A.   I did not.  He works in marketing.  I believe
25   it was Kristina.
```

138

1     Q.   Is this a reflection that you trusted Chip

2  Chandler to help advise the students about this event?

3     A.   Yes.

4     Q.   Line E says "03-14 LGBTQ-plus training

5  mandatory."  What does that refer to?

6     A.   That was in response to the risk review, that

7  we make sure all students and staff are aware of any

8  particular needs that would arise.  We ask the same

9  training of an event we've never held before, and our

10 students are not familiar, so maybe we need training on

11 a particular event.

12    Q.   When you talk about students and the training

13 here, is this referring to student employees?

14    A.   I don't recall.

15    Q.   Was the university asking for training of all

16 students at the university about this?

17    A.   I don't recall.

18    Q.   Do you know whether or not you took this

19 particular training?

20    A.   I really don't recall.

21    Q.   I can't remember most of the trainings I've

22 taken.

23    A.   Yeah.

24         (Exhibit 84 marked.)

25    Q.   (BY MR. STEINBAUGH)  I want to mark this as

```
 1                    Do you see that?
 2       A.   Yes, sir.
 3       Q.   You had received what appears to be the final
 4  versions of the marketing material for the drag show.
 5                    Is that correct?
 6       A.   I can't confirm that it was the final version,
 7  but yes, it was revisions to the marketing.
 8       Q.   But you are informing them that "it looks
 9  great?"
10                    MR. BRYANT:  Objection; the document speaks
11  for itself.
12       Q.   (BY MR. STEINBAUGH)  Is it fair to say that
13  this is your confirmation that this material is
14  approved?
15       A.   I never said "approved," but in my reviewing it
16  as a non-expert in marketing, it looked good.
17       Q.   But the university ultimately did approve the
18  marketing material here?
19       A.   Yes.
20       Q.   Okay.  You can set that aside.
21                    (Exhibit 87 marked.)
22       Q.   (BY MR. STEINBAUGH)  I'll mark this as Exhibit
23  87.  Let me know when you've had a chance to look at
24  that.
25       A.   Yes, sir.
```

1      A.    Not that I recall.

2      Q.    What was your reaction to it?

3      A.    We process thousands of events.  It was just

4  another event that didn't make it.

5      Q.    When you say "another event that didn't make

6  it," are you familiar with others other than the rap

7  show that Dr. Wendler has canceled?

8      A.    No.  They could be canceled for any number of

9  reasons; student lack of interest; the organization

10  couldn't make it happen like they thought they could.

11      Q.    If Dr. Wendler had not canceled it, the event

12  would have moved forward?

13      A.    As far as I know.

14      Q.    And just to confirm, despite the risks that

15  were identified in the risk assessment process, those

16  risks were accounted for and substantially mitigated

17  sufficient for JBK to issue a confirmation of the event?

18      A.    Yes.

19      Q.    I want to move to the 2024 show.  When was the

20  first time you heard about the planning of the 2024 drag

21  show?

22      A.    When the reservation came through at the end of

23  December, early January.

24      Q.    Did you ask Barrett and Marcus Stovall, also

25  known as Lauren Stovall, to submit a risk assessment for

1  food, and he approved their catering, that they could

2  buy their own stuff.

3      Q.   So this 2024 event had cleared the risk

4  assessment process?

5      A.   Yes.

6      Q.   Is it accurate that the students had submitted

7  a risk assessment form for the 2024 show?

8      A.   Yes.

9      Q.   And they had cleared the risk assessment

10 process for the 2024 show?

11     A.   Yes.

12     Q.   They had obtained marketing material from the

13 university or gotten it approved by the university?

14     A.   Yes.

15     Q.   They had completed and submitted the catering

16 exemption form?

17     A.   Yes.

18     Q.   When did you first learn that Dr. Wendler was

19 canceling the 2024 show?

20     A.   I don't recall.

21     Q.   Did you ever talk to Dr. Wendler about the drag

22 shows at all?

23     A.   No.

24     Q.   Is it your understanding that it was his

25 decision alone to cancel the 2023 and 2024 drag shows?

1      A.    Yes.

2      Q.    I know that you are no longer the director of

3   the JBK, but have you talked to Chance Haugen about a

4   potential 2026 drag show?

5      A.    No.

6      Q.    Have you ever talked to him about the potential

7   for future drag shows?

8      A.    No.

9      Q.    Given your experience as director of JBK, if

10  Spectrum submits or has submitted an application to use

11  Legacy Hall for a drag show, let's say it submits a risk

12  assessment form consistent with the prior two shows,

13  let's say it completes the risk assessment process

14  consistent with the prior two shows, let's say it gets

15  approval of marketing materials just like it has done

16  the previous times, and let's say they also get the

17  catering exemption form.

18          Are you aware of any other reason why JBK

19  would not give them final approval?

20          MR. BRYANT:  Objection; calls for

21  speculation, improper hypothetical.

22      A.    Referring back to the policies and guidelines

23  of the February 2025 Texas A&M University board of

24  regents' decision not to allow drag shows, that may be

25  the only reason.

Pl. App'x 424

1   at which Dr. Wendler canceled it, no one employed by the

2   university, no university officials, actually had any

3   knowledge of what the performance or dress for the

4   proposed '23 drag show would be except what Mr. Bright

5   told them?

6        A.   That's correct.

7             MR. BRYANT:   That's all the questions I've

8   got.  Thank you very much.

9             THE WITNESS:   Yes, sir.

10             MR. STEINBAUGH:   Just a couple more

11   questions, Dr. Fouts.

12                     RE-EXAMINATION

13   BY MR. STEINBAUGH:

14        Q.   With respect to that last question by my friend

15   from the other side, he said that "no one employed by

16   the university, no university officials, had any

17   knowledge about what the performance would entail in

18   terms of clothing or performance."

19             You had testified earlier that you and the

20   university were relying on Chip Chandler and Kristina

21   Drumheller to interact with the students in assessing

22   that performance.

23             Is that correct?

24        A.   Yes.

25        Q.   Is Chip Chandler a university employee?

1     A.    Yes.

2     Q.    Is his role in the university to further the

3    university's image and communications?

4     A.    I can speak to the communications.  Yes.

5     Q.    Do you know what his title is?

6     A.    I don't know his formal title.

7     Q.    That's fine.

8               Kristina Drumheller, you were also relying

9    on her to assess the performance and the clothing and

10    the interaction with the students about the propriety of

11    that performance?

12    A.    I was relying on Barrett, and if Kristina and

13    Chip had been involved, then --

14    Q.    But to your knowledge, they were involved?

15    A.    I believe so, yes.

16    Q.    With respect to the question about whether or

17    not Spectrum WT had satisfied the university's

18    requirements in order to perform the 2023 show, do you

19    have any knowledge that Dr. Wendler was informed of any

20    requirements that were left unfulfilled?

21    A.    No.

22    Q.    With respect to the question about the 2024

23    Buff-A-Whoa Drag Show, there was a little bit of

24    discussion about the name of the event on the

25    confirmation page.

# 08.02    Expressive Activity on Campus



Approved November 13, 2025
Next Scheduled Review: November 13, 2030

## Policy Summary

The Texas A&M University System (system) will protect the rights of freedom of speech, expression, petition, and peaceful assembly as set forth in the U.S. Constitution and state law. System members retain their right to implement and enforce reasonable time, place, and manner restrictions concerning acts of expression in a manner that conforms with this policy and state and federal law.

## Policy

1. It is the policy of the system to protect all rights outlined by the First Amendment of the United States Constitution and Section 8, Article I, Texas Constitution, and to enforce Tex. Educ. Code Sec. 51.9315.

2. The system will adopt System Regulation *08.02.01, Expressive Activity on Campus*, that outlines the rights and responsibilities regarding expressive activities at member academic institutions and the RELLIS Academic Alliance areas on the RELLIS Campus.

3. Each member academic institution and the System Offices (for the RELLIS Academic Alliance areas on the RELLIS Campus) must establish a rule designating the public forums on their campus and outlining the grievance procedures for addressing complaints of violations of the regulation in accordance with System Regulation *08.02.01*.

4. The board designates as public forums the areas on each member campus identified as such in System Regulation *08.02.01* and in the member rules required by this policy.

## Related Statutes, Policies, or Requirements

System Regulation *08.02.01, Expressive Activity on Campus*
Texas Education Code § 51.9315

## Member Rule Requirements

A rule is required to supplement this policy. See section 3.



## Contact Office

General Counsel
(979) 458-6120

Pl. App'x 428



## 08.99.99.W1    Expressive Activity on Campus

Approved May 14, 2020
Revised July 28, 2025
Next Scheduled Review June 25, 2029

## Rule Summary

West Texas A&M University is committed to providing an educational climate that is conducive to the personal and professional development of each individual. In fulfilling its missions as an institution of higher education, it encourages the free exchange of ideas. The university will protect the freedom of speech, expression, petition, and peaceful assembly as set forth in the U.S. Constitution and Texas state law. West Texas A&M University maintains its right to regulate reasonable time, place, and manner restrictions concerning acts of expression and dissent.

In 2019, the 86th Texas Legislature passed Senate Bill 18, addressing the protection of campus expressive activities. This new law added Texas Education Code Section 51.9315, which requires that each public institution of higher education "adopt a policy detailing student's rights and responsibilities regarding expressive activities" on its campus. In 2025, the 89th Texas Legislature passed Senate Bill 2972, which made significant changes to 51.9315. The changes made by SB 2972 are effective September 1, 2025.

As stated in the Preamble to SB 18: Freedom of expression is of critical importance and requires each public institution of higher education to ensure free, robust, and uninhibited debate and deliberations by students enrolled at the institution, regardless of whether the students are on or off campus. It is a matter of statewide concern that all public institutions of higher education officially recognize freedom of speech as a fundamental right. Freedom of speech and assembly is central to the mission of institutions of higher education and persons should be permitted to assemble peaceably on the campuses of institutions of higher education for expressive activities, including to listen to or observe the expressive activities of others.

This rule has been amended to comply with Governor Abbott's Executive Order GA-44, dated March 27, 2024.

## Rule

1. EXPRESSIVE ACTIVITY RIGHTS





Defendants'
Exhibit

4    Pl. App'x 429

1.1. Any person is allowed, subject to limitations in this rule, and reasonable time, place and manner restrictions, to engage in expressive activities on campus, including by responding to the expressive activities of others. Students enrolled at and employees of the university must present proof of identity and status at the university on request by a university official on campus engaging in an official duty.

1.2. Student organizations and employees are allowed to invite speakers to speak on campus subject to the restrictions outlined in this rule. In determining the amount of a fee to be charged for use of the university's facilities for purposes of engaging in expressive activities, the university may consider only content-neutral and viewpoint-neutral criteria related to the requirements of the event, such as the proposed venue and the expected size of the audience, any anticipated need for campus security, any necessary accommodations, and any relevant history of compliance or noncompliance by the requesting student organization or employee with this rule and other relevant rules. The university may not consider any anticipated controversy related to the event.

1.3. The university may not act against a student organization or deny the organization any benefit generally available to other student organizations at the university based on a political, religious, philosophical, ideological, or academic viewpoint expressed by the organization or of any expressive activities of the organization.

   1.3.1. The university may take disciplinary or remedial action against individuals or groups that engage in expressive activity not protected by this rule or the First Amendment[1]. Sanctions which may be imposed include all those identified in the WTAMU Student Handbook.

   1.3.2. Expressive activities which may result in sanctions and are not protected by this rule or the First Amendment include: defamation, obscenity, physical abuse or assault. true threats, disruption of the academic environment or a university-sponsored extracurricular event, inciting or producing imminent unlawful action, or unlawful harassment.

   1.3.3. Conduct described in 1.3.2 may be reviewed and adjudicated under A&M System Regulation 08.01.01 Civil Rights Compliance, including those related to actionable discrimination or harassment based on race, color, sex, religion, national origin, age, disability, genetic information, veteran status, sexual orientation, gender identity, or any other classification protected by federal, state, or local law[2]. Additionally, such conduct may also be reviewed and adjudicated by the WTAMU Office of Community Standards using the Student Conduct process when the conduct does not rise to the level of a civil rights violation.

1.4. The common outdoor areas of the university's campus are deemed traditional public forums. Any person is permitted to engage in expressive activities in these areas freely, as long as the person's conduct: (a) is not unlawful; and (b) does not materially and substantially disrupt the functioning of the institution. Any person is allowed to assemble or distribute written material in common outdoor areas without a permit or other permission from the institution, subject to the restrictions outlined in this rule.

    1.4.1. As outlined in Section 2, West Texas A&M University may require advance reservation of events in certain circumstances to ensure safety and to promote an environment conducive to study.

    1.4.2. There are areas such as residences and the Cornette Library that have distance requirements, crowd placement restrictions, and security concerns that may vary depending on security needs, terror alerts, and other factors. Additionally, security needs, terror alerts, local and national events may affect the availability of spaces that would otherwise be routinely available. Information about existing requirements, restrictions, or security concerns will be discussed at the time a reservation request is processed.

    1.4.3. The University reserves the right to have policies that are reasonable time, place, and manner restrictions in common outdoor areas if the restrictions: (a) are narrowly tailored to serve a significant university interest; (b) employ clear, published, content-neutral, and view-point neutral criteria; (c) provide for ample alternative means of expression; and (d) allow all persons to assemble or distribute written material without a permit or other permission from the university.

    1.4.4. The Texas A&M University Board of Regents, by review and approval of this rule, have sole authority to designate the areas on member campuses that are public forums (including both traditional public forums and designated public forums.), in a manner consistent with the First Amendment to the U.S. Constitution and Section 8, Article I of the Texas Constitution.

---

[1] This rule must be applied in a manner consistent with the Dear Colleague Letter (July 28, 2003) issued by the Department of Education related to First Amendment and civil rights laws compliance.

[2] This includes unprotected activities motivated by antisemitism and other forms of shared ancestry discrimination as listed in the Dear Colleague Letter (Nov. 7, 2023) issued by the Department of Education in the wake of the tragic events of October 7, 2023.

1.5. Nothing in this rule should be interpreted or construed as:

    1.5.1.  prohibiting faculty members from maintaining order in the classroom.

    1.5.2.  limiting or infringing on a person's right to freedom of speech or expression protected by the First Amendment to the U.S. Constitution or by section 8, Article I, Texas Constitution.

    1.5.3.  prohibiting the university from having rules differentiating between the rights of students and employees to engage in expressive activities on campus and the rights of those individuals who are not students or employees.

1.6.  This rule categorically prohibits the following expressive activity on campus:

    1.6.1.  Using a device to amplify sound that, as determined by the university, (a) intimidates others; (b) interferes with campus operations; (c) interferes with a university employee's or a peace officer's lawful performance of a duty.

    1.6.2.  During the last two weeks of a semester, engaging in the following expressive activities in a manner that materially and substantially disrupts the functioning of the university: (a) having events in the common outdoor areas; (b) inviting speakers to speak on campus; (c) using a device to amplify sound; or (d) using drums or other percussive instruments.

    1.6.3.  At any time, camping or erecting tents or other living accommodations on campus.

    1.6.4.  Wearing a disguise or other means of concealing a person's identity while engaging in expressive activities on campus with the intent to: (a) obstruct the enforcement of the university's rules or the law by avoiding identification; (b) intimidate others; or (c) interfere with a university employee's or a peace officer's lawful performance of a duty.

    1.6.5.  Lowering the university's U.S. flag, Texas flag, or university flag, with the intent to raise the flag of another nation, state, or a flag representing an organization or group of people.

    1.6.6.  Engaging in expressive activity between the hours of 10:00 p.m. and 8:00 a.m. in a manner that materially and substantially disrupts the functioning of the university.

2.  Advance Reservation Requirements

2.1. In an effort to ensure safety and to promote an environment conducive to study, advanced reservation for expressive activity is required (in the form of an approved Reservation Request for Space) for events or activities that are promoted in advance, and/or sponsored by student organizations, and/or expected to draw a crowd of more than 25 people. Advance reservation is also required for activities

near intersections, and/or in close proximity to academic buildings anytime classes, and/or study activities, and/or research are taking place.

3. Reservation Procedures

3.1. Individuals or groups who are either required to make advance reservation (see Section 2) or those individuals or groups who otherwise wish to make advance reservations on campus must request use of the space through the university's reservation process, which can be found here: https://reservations.wtamu.edu/. If advance reservation is required (see Section 2), requests must be made at least five business days in advance of the event. Additional collaboration and coordination may be required from a building/space proctor. Usually, use of the space will be assigned to the person or organization that requests the area first. University sponsored events have first priority on the use of campus facilities. The university reserves the right to locate any assembly so as to ensure that the activity does not interfere with the normal operation of the university or interfere with the rights of others.

3.2. The decision to confirm a request for space will be based on proper and timely completion of the reservation process (found here: https://reservations.wtamu.edu/), compliance with applicable sound and sign requirements, and availability of space. The decision to confirm will be based on the foregoing criteria, and in no circumstance will any decision be based on the content or viewpoint of the expressive activity or upon the expected reaction of others. If a request is denied, the rationale for the decision will be provided in writing. The denial of a reservation request can be appealed to the Vice President for Student Affairs or a designee. At the time of the request, the following information will be required:

3.2.1. Name information of the person or organization sponsoring the event. Contact information for one individual who will be present during the course of the event.

3.2.2. Location, date, and time requested for the event.

3.2.3. General purpose of the event.

3.2.4. List of planned activities (i.e., speech or rally, march with signs, distribution of literature, sit-in).

3.2.5. Special equipment requested.

3.3. For recognized student organizations, an officer of the sponsoring organization must be present at the event, and during the entire course of the event.

3.4. Guidelines for Expression

3.4.1. Disruptive Activity – Obstruction, disruption or interference with classes, research, administrative functions or other university activities is not permitted. Likewise, infringement on the rights of others is prohibited.

3.4.2. Reasonable Access – It is important to provide reasonable access to, and exit from, any office, classroom, laboratory, or building. Likewise, vehicular and pedestrian traffic should not be obstructed.

3.4.3. Picketing – Picketing in an orderly manner outside of university buildings may be permitted. Such activities should not become disruptive, nor should they impede access. Picketing is not permitted inside campus buildings.

3.4.4. Literature – Literature may be distributed in traditional designated public forums. Such activities should not become disruptive, nor should they impede access.

3.4.5. Symbolic Protest – Displaying a sign, gesturing, wearing symbolic clothing or otherwise protesting silently is permissible unless it is a disruptive activity or impedes access. In addition, such acts should not block the audience's view or prevent the audience from being able to pay attention.

3.4.6. Noise – Making sustained or repeated noise in a manner that substantially interferes with speakers' ability to communicate their message is not permitted. Noise levels should not interfere with classes, meetings or activities in progress or the privacy of residence hall students.

3.4.7. Force or Violence – Any attempt to prevent a university activity or lawful assembly by the threat or use of force or violence is not permissible.

3.4.8. Presenting Identification – In accordance with Texas Education Code 51.209, it is unlawful for any persons on any property either owned or controlled by the university to refuse to identify themselves to a university official in response to a request. For the purpose of this rule people identify themselves by presenting student or faculty/staff ID card or government issued ID card.

3.4.9. Damage to Property – Any damage to university or personal property in the course of, or as a result of, an expressive activity is prohibited. Care should be taken to ensure that university and personal property is not damaged or destroyed. This includes the campus lawns, shrubs, and trees.

3.4.10. Aesthetics – Exterior-facing messages, including but not limited to signs, posters, flags, or banners, on the windows of any West Texas A&M University building, other than a student's room in the residence halls, are prohibited.

3.4.11. Other University Rules – All applicable University Rules and Student Rules should be followed whenever engaging in activities on campus. Consult the WTAMU Student Handbook for further information.

3.5. All individuals participating in expressive activity are expected to comply with state and federal law, municipal ordinances, and the above guidelines. Failure to do so may result in immediate removal from the campus and any other appropriate action by university officials and/or University Police.

4. COMPLAINT PROCEDURE

4.1. Any person who believes that their campus expressive activity rights, as recognized by this rule, have been unduly interfered with by a student, student organization, or employee has the right to file a complaint.

4.2. Complaints should be filed on the university's online complaint form, found at: https://apps.wtamu.edu/complaint/.

4.3. Any acts that are disruptive to the normal operations of the university, including classes and university business, or that invade the rights of others will not be tolerated. A student, student organization, or employee who is found to have unduly interfered with another person's expressive activity rights, as recognized by this rule, is subject to disciplinary action in accordance with the university's applicable rules and procedures. Any participant in a disruptive activity may also face criminal charges.

4.4. All complaints will be administered by the university complaint process found on the complaint website: www.wtamu.edu/complaint. If a violation of this rule was found to occur the report will be referred to the appropriate office for further action. The referral office will be determined by the status of the offending individual. Complaints concerning (a) faculty will be referred to the Office of the Provost; (b) students will be referred to the Student Conduct Office; and (c) complaints concerning staff and third parties will be referred to Human Resources.

5. IMPLEMENTATION
5.1. A copy of this rule must be provided to students during New Student Orientation.
5.2. This rule must be posted on the university's website.
5.3. A link to this rule must be included in both student and employee handbooks.

6. EXTERNAL CLIENT EVENTS
6.1. Events organized by an external party and held on campus must be sponsored by a recognized student organization, university academic or administrative unit, or a Texas A&M University System member (see University Standard Administrative Procedure 24.99.99.M0.02, External Client Events for applicable procedures).

## Related Statutes, Policies, or Requirements

Texas Education Code § 51.9315
Texas Government Code §448.001
Executive Order GA-44 March 27, 2024

WTAMU Student Handbook
System Regulation 08.01.01 Civil Rights Compliance

U.S. DOE Dear Colleague Letter July 28, 2023
U.S. DOE Dear Colleague Letter November 7, 2023

## Definitions

1. **Antisemitism** means a certain perception of Jews that may be expressed as hatred toward Jews.  The term includes rhetorical and physical acts of antisemitism directed toward Jewish or non-Jewish individuals or their property or toward Jewish community institutions and religious facilities[3] Antisemitic conduct comprised of behavior expressed in section 1.3.2 of this rule can be sanctioned by the university. Examples of antisemitism are included with the International Holocaust Remembrance Alliance's "Working Definition of Antisemitism" adopted on May 26, 2016.

2. **Benefit** includes, but is not limited to recognition by or registration with the university, the use of the university's facilities for meetings or speaking purposes, the use of channels of communication controlled by the university, and funding sources made generally available to student organizations at the university.

3. **Campus** means all land and buildings owned or leased by the university, including remote locations.

4. **Common outdoor areas** mean places located outside a building or facility that are accessible to the public, such as streets, sidewalks, plazas, lawns, and parks, unless closed by the university for a special event.  This term does not include areas immediately adjacent to a private residence.

5. **Designated public forums** include other parts of campus that may be temporarily available for expressive activity as designated by the university. These temporary locations, while in existence, will be treated similar to public streets, sidewalks, and parks in terms of access and availability for expressive activity. (Obstructing or impeding the flow of vehicular or pedestrian traffic is prohibited.)

6. **Disruptive Activity** is the obstruction, disruption or interference with classes, research, administrative functions, or other university activities, and is not permitted. Likewise, infringement on the rights of others is prohibited. **Employee** means an individual employed by the university.

7. **Expressive Activity** means any speech or expressive conduct protected by the First Amendment to the United States Constitution or by Section 8, Article I, Texas Constitution, and includes assemblies, protests, speeches, the distribution of written material, the carrying of signs, and the circulation of petitions. The term does not include commercial speech, defamation, unlawful harassment, incitement to imminent unlawful activity, obscenity, or threats to engage in unlawful activity.

8. **Faculty** means any full or part-time employee of the university holding an academic appointment.

9. **Illegal Harassment** means expressive conduct that is so severe and pervasive and objectively offensive that it denies or limits a person's ability to participate in or benefit from an educational program or activity. See TAMU System Regulation 08.01.01.

10. **Inciting or producing imminent lawless action** means speech or behavior that presents a clear, present, and imminent threat of physical harm or property damage.

11. **Materially and substantially disrupt(s)** means interrupting a program or activity in a significant and consequential manner.

12. **Non-public forums** are areas that are not traditional public forums or designated public forums. These include areas that are not by tradition or designation forums for public communication. These forums will be restricted to use for their intended purpose and are not available for public expressive activity. Examples include, but are not limited to, classrooms, residence hall rooms, faculty and staff offices, academic buildings, administration buildings, medical treatment facilities, libraries, research and computer laboratories, and research facilities.

13. **Person** means students, faculty, staff, student organizations, and third parties.

14. **Reasonable time, place, and manner restrictions** means limitations that:
    14.1.     are narrowly tailored to serve a significant institutional interest;
    14.2.     employ clear, published, content-neutral, and viewpoint-neutral criteria;
    14.3.     provide ample alternative means of expression.

---

[3] Texas Government Code, Section 448.001.

15. **Staff** means an employee of the university that is not a faculty member.

16. **Student** means an individual currently enrolled at the university, full or part-time, pursuing undergraduate, graduate, or professional studies, including students who were enrolled the previous semester and registered for a future semester.

17. **Student Organization** means any organization that is composed mostly of students enrolled at an institution of higher education and that receives a benefit from the institution.

18. **Third-party (external client)** means an individual or entity that is not a student, student organization, or employee of the university.

19. **Traditional public forum** means a place, widely recognized in law, which has been intended for the use of the public, and has been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions when the principal function of the location would not be disrupted by expressive activity. Examples of traditional public forums include public streets, sidewalks, plazas, lawns, and parks. These areas are generally available for expressive activity, planned or spontaneous, for the individual or small groups (generally where a crowd of 25 or less will be present, and/or where an event is not promoted in advance, and/or when an event is not sponsored by a student organization) at any time without the need for reservation, or prior approval. (Obstructing or impeding the flow of vehicular or pedestrian traffic is prohibited.)

20. **True Threats** means communication of a serious expression of an intent to harm a specific person or group of people.

## Appendix

None

## Revision History

Revised June 25, 2024

## Contact Office

Student Affairs
(806) 651-2025

## Approval Office

Office of the President
(806) 651-2100

## Approval Signature

06.25.2024

President/CEO                                    Date

## System Approvals*

Approved for Legal Sufficiency:

Ray Bonilla                                      6/25/24
General Counsel                                  Date

Approved:

John Sharp                                       6/25/24
Chancellor                                       Date

*System approvals are contingent upon incorporation of any and all System-required changes in the rule's final posting.



**Legacy Hall 151**

| Type | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|
| Student Organizations | 56 | 40 | 62 | 15 | 52 | 44 | 23 | 34 |
| Departments | 161 | 162 | 133 | 63 | 139 | 156 | 183 | 137 |
| Students | 3 | 7 | 2 | 0 | 0 | 1 | 0 | 0 |
| Non-University | 23 | 21 | 23 | 5 | 3 | 10 | 17 | 14 |

**ABH Dr. Hazel Kelley Wilson Banquet Hall**

| Type | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|
| Student Organizations | 37 | 27 | 21 | 4 | 20 | 46 | 50 | 34 |
| Departments | 85 | 90 | 95 | 84 | 136 | 84 | 76 | 65 |
| Students | 2 | 0 | 3 | 1 | 2 | 2 | 1 | 0 |
| Non-University | 22 | 21 | 31 | 3 | 2 | 9 | 8 | 1 |

**WT Ag Development Association Public Hall RM 101**

| Type | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|
| Student Organizations | 0 | 1 | 0 | 0 | 0 | 9 | 5 | 2 |
| Departments | 0 | 19 | 62 | 42 | 55 | 77 | 100 | 87 |
| Students | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Non-University | 0 | 0 | 5 | 0 | 0 | 0 | 0 | 0 |

**Fairly Group Club**

| Type | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|
| Student Organizations | 0 | 0 | 0 | 0 | 2 | 13 | 16 | 23 |
| Departments | 0 | 0 | 2 | 130 | 88 | 125 | 129 | 81 |
| Students | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Non-University | 0 | 0 | 0 | 2 | 2 | 1 | 1 | 3 |



ABH



Legacy Hall





Pl. App'x 442

| 25Live Data (2024) | JBK Legacy | ABF Hall | Chapel | ADAP Hall | Stadium FG( | Chapel |
|---|---|---|---|---|---|---|
| Student Organizations | 18 | 6 | 32 | 2 | 5 | 32 |
| Departments | 34 | 13 | 1 | 38 | 25 | 1 |
| Non-University | 3 | 1 | 0 | 0 | 0 | 0 |

Chapel

| Type | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|
| Student Organizations | 36 | 44 | 77 | 63 | 89 | 78 | 45 | 41 |
| Departments | 0 | 1 | 15 | 0 | 46 | 11 | 0 | 8 |
| Students | 23 | 9 | 10 | 6 | 3 | 7 | 1 | 0 |
| Non-University | 18 | 44 | 19 | 3 | 5 | 17 | 3 | 9 |

Venue Totals over the years

800

Pl. App'x 443





| Venue | Birds Eye | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
| Legacy Hall 151 | 243 | 230 | 220 | 83 | 194 | 211 | 223 | 185 |
| ABH Dr. Hazel Kelley Wilson Banquet Hall | 146 | 138 | 150 | 92 | 160 | 141 | 135 | 100 |
| WT Ag Development Association Public Hall RM 101 | 0 | 20 | 67 | 44 | 55 | 88 | 105 | 89 |
| Fairly Group Club | 0 | 0 | 2 | 132 | 92 | 139 | 146 | 107 |
| Chapel | 77 | 98 | 121 | 72 | 143 | 113 | 49 | 58 |

Pl. App'x 446





**24.01.01.W0.01**
**Facility Use Request Procedure**

Revised: March 1, 2017
Approved: December 1, 2013
Supplements WTAMU Rule #24.02.02.W1, Visitor Safety Access Control

## Procedure Statement

The purpose of this procedure is to outline the process to reserve and use West Texas A&M University (WTAMU) campus spaces, rooms, buildings and facilities. This procedure is for any special event (i.e. fundraising activity, social gatherings or functions, or advisory groups), including third party requests. WTAMU reserves the right to cancel an event and immediately remove access to campus if an event violates the policies and regulations of the Texas A&M University System, the rules and procedures of WTAMU, or if an event is deemed to be unsafe.

## Responsibilities

The request for facility use must be initiated by the department and/or event requestor, with a charge account number required if necessary, using the previously approved request-for-space reservation request site found at: https://reservations.wtamu.edu/

The request form must be routed to the specific departments responsible for event activities, including but not limited to:

a. The designated reservation coordinator for final reservation confirmation. Room and key access will be determined in coordination with the Lock Shop and the building coordinators. The following facilities have a designated reservation coordinator:

   Academic Classroom Spaces, Activities Center, Ag Education, Amarillo Center, Athletics, Electronic Learning Center, Fine Arts, Jack B. Kelley Student Center, and Library.

b. University Police Department (UPD) for event security charges. Event requestor(s) and campus departments are responsible for all charges associated with required security.

c. Event Services staff for all concealed carry signage requirements (please refer to Rule #34.06.02.W1, Carrying Concealed Handguns on Campus).

EXHIBIT
56

Event requestor(s) and campus departments are responsible for all charges associated with required concealed carry signage, including start and end times designated on the request for timely signage removal.

d. The Physical Plant Director for accessible utilities (i.e. heating and air) and custodial services for clean-up.

e. The Food Services Director for approval, if the event includes food not provided by the approved campus caterer.

f. The Risk Management Office for required insurances, programs-for-minors requirements, and event risk reviews.

Alcohol is only allowed in previously approved and designated locations on campus. If alcohol is to be served, the requestor must route the request to the University President's Office to be approved before the event. The President's Office will then return the form to the event requestor. The approval form can be found at: http://www.wtamu.edu/home/faculty-staff.aspx

Campus visitors are not allowed in the designated academic classroom lab areas unless pre-approved by Environmental Health and Safety Office: http://www.wtamu.edu/environmental_safety/academic-research-environmental-safety.aspx

**PARKING**

For events involving large buses, including commercial and school buses, the buses can only access parking lots interior to campus for drop-off purposes only. Parked or standing buses are only allowed at the Event Center parking lot, the Sports Complex north parking lot, or other pre-approved event site, until they are ready for passenger pickup.

---

**Contact Office**

Director of the JBK Student Center
(806) 651-2394

---

**Approval**

*Walter V. Wendler*

President/CEO

05.17.17
Date

2

Def_000413  Pl. App'x 450



Apply    Visit    Quick Links    Buff Connect    Search...

Info For    About    Admissions    Academics    Student Life    Athletics    Research    Giving

HOME › STUDENT LIFE › JACK B. KELLEY STUDENT CENTER

## About Us

- Jack B. Kelley Student Center
- About Us
- Event Services
- Production Services
- Venues at WTAMU
- Food Court
- ⟨A⟩⟨F⟩ Español
- Mail drop boxes

## MISSION STATEMENT

The Jack B. Kelley Student Center is the gathering place for the entire West Texas A&M University community. We are dedicated to providing a premiere facility that inspires educational growth, social engagement and intellectual development through student-centered programs and services.

## HISTORY OF THE JBK



Originally built in 1967, the JBK was first known as the Administration Building. Then in 1989, it underwent a major facelift in both appearance and personality. The building became the Jack B. Kelley Student Center after a generous endowment contribution in memory of former Amarillo businessman Jack B. Kelley. The JBK is the center of student activity at West Texas A&M University and is known as "The Living Room" for our Buff Family.

Construction for the expansion of the JBK began in 2011 and was completed in December 2012. The addition to the JBK includes additional meeting spaces, Legacy Hall (a multi-purpose room capable of seating 500-banquet style and 700 theatre style), a catering kitchen, a First-Year Experience office suite, a Buff Tech store, and restrooms on both floors.



The JBK Student Center underwent another significant change in 2016. After a massive hail storm damaged the roof, the Student Center was thrust into another renovation project. During the renovation, the Food Court was converted to open concept, new terrazzo and carpet flooring was installed, and new furnishings were installed throughout.

During the summer of 2018, a huge video wall was added to the commons.

In early 2020, the EBuff Tech Store was moved into the Bookstore to make way for the new Nathaniel and Helen Neal Multicultural Suite. Though it most obviously serves as a space for students to work, it also serves as a historic marker of the Neal family legacy at WT that began over 60 years ago.

## OUR TEAM



EXHIBIT
58

Pl. App'x 451

SPECTRUM 0003824

Shawn Fouts, Ed.D., Senior Director of Campus Community
Position Vacant, Assistant Director of the JBK
Andrew Mangum, Production Services Manager
Position Vacant, Event Services Manager
Position Vacant, JBK Operations Coordinator

We couldn't run the department without our fantastic Student Building Managers, Operation Crew, Audio Visual Technicians, Event Services Assistants, Event Managers and Student Accountant.

We work hard to be a resource for our students and the entire WTAMU community; whether through event planning or just a place to relax. We at the JBK take great pride in knowing we are the heart of the University and strive for greatness in every endeavor. Our team is always looking for new ways to improve, so if you have any comments or concerns please fill out our facility questionnaire linked below.

Help Us Improve 

## OUR GOALS

- To instill in student staff the philosophy of workplace professionalism.

- To maintain facilities that are clean and in an excellent state of repair in order to provide an area in which quality programs and services for students can be accommodated.

- To build and cultivate campus community through programs and services.

- Develop students into capable and competent professionals that are prepared for their chosen career.

- Develop premier venues that are versatile to clients' needs in a manner that is sustainable.

- Build an inventory of versatile and efficient equipment to meet the audio-visual needs of the campus community in a sustainable way.

- Develop an efficient and transparent reservation process for the campus community and for non-university guests.

Helps Us Accomplish Our Goals

Accessibility
Accreditation
Consumer Information
Contact WT
Counseling & Mental Health Services (HB2895)

Emergency Information
Energy Management Report (PDF)
Equal Opportunity & Nondiscrimination
Family Educational Rights and Privacy Act

Form Policy
GDPR
House Bill 2504
Legislative Appropriation Request
Link Policy and Privacy Statement
Online Institutional Resumes

Open Records/ Public Information Act
Risk, Fraud and Misconduct Hotline
SB18 Report
State of Texas
Statewide Search

Texas CREWS
Texas Homeland Security
Texas Veterans Portal
University Directory
University Organizational Chart (PDF)
Title IX

 WEST TEXAS A&M UNIVERSITY™

© West Texas A&M University | All Rights Reserved
Canyon, TX 79016 | 806-651-0000



Pl. App'x 452
SPECTRUM 0003825

Pl. App'x 453
SPECTRUM 0003826



HOME > STUDENT LIFE > JACK B. KELLEY STUDENT CENTER
## Venues at WTAMU



- Jack B. Kelley Student Center
- About Us
- Event Services
- Production Services
- Venues at WTAMU
- Food Court
- A文 Español
- Mail drop boxes

## EVENT VENUES AT WTAMU

West Texas A&M University is home to several venue spaces that are ideal for events, large and small – wedding ceremonies and receptions, rehearsal dinners, milestone celebrations, corporate receptions and conferences, holiday parties, board meetings, and much more.

Our friendly and helpful staff will work with you to make your event a success. Onsite Catering through Top of Texas Catering is an additional service offered here at WTAMU.

For more information about Events at West Texas A&M University please call 806-651-2337 or email:jbk@wtamu.edu.

## EVENT SERVICES

This team is tempararily coordinated by Chari Hill and Student Assistants. This team assists with reservations in the JBK, Classrooms for non-academic events, Outdoor Spaces, non-athletic events in the FUBC and the Stadium and the Alumni Banquet Hall.

If you are non-university, please give us a call at 806-651-2337, the Event Services Team would be happy to help you!

( University - Reserve a space now! ⊙ )



## ALUMNI BANQUET FACILITY

The Alumni Banquet Facility houses the Dr. Hazel Kelley Wilson Banquet Hall (ABH), the Buffalo Room and Isley Terrace.

The ABH is a traditional banquet space for the cozy and classic events. Events here can seat anywhere from 100 to 350 people and can be set to suit a variety of styles and themes. There are many options and services that can be added to this hall, so let our staff help you create the perfect event.

**EXHIBIT**
**59**

Pl. App'x 454
SPECTRUM 0003827



## BUFFALO ROOM

The Buffalo Room is perfect for receptions 100 or less. Its a beautiful little space and is accompanied by Isely Terrace. This room is quaint and intimate and brings a sense of closeness to any gathering.

## ISLEY TERRACE

This beautiful private garden is attached to the Buffalo room, is perfect for a quaint outdoor wedding, reception, or corporate gathering. This Terrace is bright and vibrant year round.



## JACK B. KELLEY STUDENT CENTER- LEGACY HALL

Legacy Hall is a large, modern hall that is equipped with some of the best technology in the Texas Panhandle. The hall can accommodate anywhere from 200 to 750 people, contingent on setup. This hall is great for events with bands or live music and is a favorite location for those folks who love to entertain. Legacy Hall is completely customizable as you can see from the photos and can be tailored to match your liking.



UNDER REMODEL UNTIL SUMMER OF 2024

## JOSEPH A. HILL CHAPEL

Built in 1949, JA Hill Chapel is a gem on the WTAMU campus and is the oldest operating University Chapel in the State of Texas. With seating for 125, a bride's room and a groom's room, it is the ideal location for an intimate wedding and one of a kind in the Panhandle. The Chapel is also a beautiful backdrop for an outdoor wedding. Come visit The Chapel—we promise you will fall in love with it.

SPECTRUM 0003828

## PEDESTRIAN MALL

This space is beautiful! Perfect for the couple wanting an outdoor wedding and reception. Use Old Main or the Clock Tower as your backdrop, and dance the night away around Spirit Rock. The gardens of WT are unmatched in the Texas Panhandle and will make for a beautiful backdrop to your perfect day. No matter if you're an Alumni, Community Member, Faculty or Staff, this space is perfect for you.



## BUFFALO STADIUM

Are you and your groom total Buff Fans? Or maybe you just love some Football? Get married on the concourse with the field as your back drop! Then move up to the Fairly Club Group Level and have the perfect reception, with a fantasic night view.

Corporate events work well in the stadium as well! If you have a large staff, we can facilitate a great event here!

## FAIRLY GROUP CLUB LEVEL

The Fairly Club is a beautiful modern space perfect for sizes 150 or less. You will love the view of both the soccer pitch and J Ferg Field of Buffalo Stadium. Perfect space for sports lovers, modern couples and Buff Alumni.





## FIRST UNITED BANK CENTER ARENA

The First United Bank Center has the ability to do a Wedding and Reception for up to 600 people. This space is perfect for large families, basketball fanactics and Buff Alumni.

## Contacts

..............
Phone: 806-651-2394

email: jtbk@wtamu.edu



| | | | | |
|---|---|---|---|---|
| Accessibility | Emergency Information | Form Policy | Open Records/ Public Information Act | Texas CREWS |
| Accreditation | Energy Management Report (PDF) | GDPR | Risk, Fraud and Misconduct Hotline | Texas Homeland Security |
| Consumer Information | Equal Opportunity & Nondiscrimination | House Bill 2504 | SB18 Report | Texas Veterans Portal |
| Contact WT | Family Educational Rights and Privacy Act | Legislative Appropriation Request | State of Texas | University Directory |
| Counseling & Mental Health Services (HB2895) | | Link Policy and Privacy Statement | Statewide Search | University Organizational Chart (PDF) |
| | | Online Institutional Resumes | | Title IX |

**WEST TEXAS A&M UNIVERSITY**

© West Texas A&M University | All Rights Reserved
Canyon, TX 79016 | 806-651-0000

  

Pl. App'x 457

SPECTRUM 0003830

screenshot-25live-collegenet-com-2025-11-21-18-41-50
https://25live.collegenet.com/pro/wtamu/embedded/rose?allowEventCreation=T&compsubject=event&embeddedConfigToken=35C648D1-8687-49C6-BF5B-CF1F2C2E4E4F#!/home/dash#labelingEventFormItem-2
21.11.2025

Expected Attendance
Event Description
Date and Time
Locations
Resources
Attached Files
Further Event Information
Confirmation Notes
Scheduling Policy
Acknowledgement

this information.   * All requests are subject to approval *

### Event Name - *Required* ⓘ

**Instructions**

Please enter a name that clearly describes the event.  40 Character limit.

### Event Type - *Required* ⓘ

**Instructions**

Select the Event Type that best describes the event.

Select from Types ⌄

### Expected Attendance - *Required* ⓘ

**Instructions**

### Event Description - *Required* ⓘ

**Instructions**

Please provide a full description of your event.  What is the event about?  Who is the event for?  What activities are happening?

[ Cancel ] [ Preview ] [ Save ]

File  Insert  Table  View  Format  Tools

↶ ↷ | **B** *I* U | A ⌄ ✎ ⌄ | ≔ ≔ | System Font ⌄ | 12pt ⌄ | 🔗

Event Type
Expected Attendance
Event Description
Date and Time
Locations
Resources
Attached Files
Further Event Information
Confirmation Notes
Scheduling Policy
Acknowledgement

### Date and Time - *Required* ⓘ

**Instructions**

Select the Start Date, Start Time, End Date, and End Time for the event.  Please use the ACTUAL start and end times for events.

If additional time is needed for mingling before or after the event, use the Additional Time editors below (as available) and add the appropriate number of minutes or hours desired.

Mon Nov 24 2025

4:00 pm

To:

5:00 pm

Duration:
**1 Hour**

Event Type
Expected Attendance
Event Description
Date and Time
Locations
Resources
Attached Files
Further Event Information
Confirmation Notes
Scheduling Policy
Acknowledgement

🔖 **Additional time** ⌄

### Locations - *Required* ⓘ

**Instructions**

Select the Location(s) for your event from your list of starred locations or search by location name or location search.  Multiple Locations may be requested.

**Note:** If the search does not return the expected result, try limiting the search term to a key word in the location name such as the building name.

**Locations Search** ⌃

Auto-Load Starred:  No 🔵 Yes

☐ Hide Conflicts    ☐ Hide Request Conflicts    ☐ Enforce Headcount

Your Starred Locations ⌄    Your Starred Locations ✕



Reset  **Search**



**Request**  Stadium FGC    Bain-Schaeffer  200    1/1    None    Bain-Schaeffer
Buffalo                          Buffalo
Stadium -                        Stadium
Fairly Group
Club

Return to Top

## Resources ⓘ

**Instructions**

Resources are the various equipment or services that are available in a specific location.

Choose the Recommended Resources filter to see the list of resources available in your selected facility. You can still search for and request other items which are not listed under Recommended Resources, **but please note that items not on the Recommended list may not be able to be provided.** Multiple resources may be requested.

**Note:** If the search does not return the expected result, try limiting the search term to a key word in the resource name.

**Recommended Resources**  ∧

Search Filters ∨

Search Resources    ✕          Reset  **Search**

No Results

## Attached Files ⓘ

**Instructions**

Please use this field to attach any relevant documents to the event request (e.g., custom layout diagrams or other attachments to assist approvers or service providers with your event).

Drag and drop file here or click below to upload.

Upload a file

## Further Event Information - *Required* ⓘ

**Instructions**

Please use this field to provide YOUR contact info (Name, Phone, Email), and any other details you feel are important for your event.

## Confirmation Notes ⓘ

**Note**

This information is entered by Approvers and will appear at the top of generated confirmation reports.

## Scheduling Policy Acknowledgement - *Required*

By checking this box, I confirm that I have read, understand and agree to abide by the terms outlined in the College/University Scheduling Policy.

Event Type
Expected Attendance
Event Description
Date and Time
Locations
Resources
Attached Files
Further Event Information
Confirmation Notes
Scheduling Policy Acknowledgement

SPECTRUM 0003910

Expected Attendance

Event Description

Date and Time

Locations

Resources

Attached Files

Further Event Information

Confirmation Notes

Scheduling Policy

Acknowledgement

**Event Type** - *Required* ⓘ

**Instructions**

Select the Event Type that best describes the event.

Select from Types ⌄

🔍 | Select from Types

Ceremony ⭐

Meeting ⭐

Social / Reception ⭐

Advertising

Banquet

Camp

event. What is the event about? Who is the event for? What activities are happening?

rmat   Tools

↶ ↷   **B** *I* U̲   A ⌄   🖉 ⌄   ☰ ☰   System Font ⌄   12pt ⌄   🔗

Cancel   Preview   **Save**

Pl. App'x 460

SPECTRUM 0003912

screenshot-25live-collegenet-com-2025-11-21-18-43-15
https://25live.collegenet.com/pro/elern/embedded/css?showEventCreation=T&compis.ib/activevent&embeddedConfigToken=35C648D1-6687-49C6-BF5B-
CF1F2C2E454F#!/home/dash/#abeingEventFromItem/3
21:11:2025

**Event Type** - *Required*  ⓘ

**Instructions**

Select the Event Type that best describes the event.

| Select from Types ⌄ |
|---|

🔍 Select from Types

| Camp | ⌄ | uired ⓘ |
|---|---|---|
| Competition | ⌄ | |
| Exhibit / Fair | ⌄ | ⓘ |
| Game / Meet / Match | ⌄ | |
| Orientation | ⌄ | event. What is the event about? Who is the event for? What activities are happening? |
| Performance | ⌄ | rmat   Tools |

↶  ↷   **B**  *I*  U  **A** ⌄  🖊 ⌄  ≔  ⋮≡   System Font  ⌄   12pt  ⌄   🔗

Cancel | Preview | **Save**

Pl. App'x 461
SPECTRUM 0003913





**WT** Jack B. Kelley Student Center
WEST TEXAS A&M UNIVERSITY.

# Procedures and Guidelines

© 2023

**Revised March 5, 2025**



EXHIBIT

62

Pl. App. x 463

# Contents

**MISSION STATEMENTS** ................................................................................................................ **3**

**GENERAL POLICIES** .................................................................................................................... **4**

Reservations .......................................................................................................................... 4

Sponsored/Hosted Events ..................................................................................................... 6

Building Hours/After Hours .................................................................................................. 6

Decorations ........................................................................................................................... 6

Cleanliness ............................................................................................................................ 7

Lost & Found ......................................................................................................................... 8

Parking .................................................................................................................................. 8

Political Activity .................................................................................................................... 8

Prohibited Events .................................................................................................................. 8

Smoking/Tobacco .................................................................................................................. 8

Illegal Weapons/Illegal Substances ...................................................................................... 8

**Buffaloes Traditions Program** ................................................................................................ **9**

**Institutional Priority Events** ................................................................................................... **9**

**Production Services** ................................................................................................................. **10**

Off-Campus University Events .............................................................................................. 11

**Event Liability Insurance** ...................................................................................................... **11**

**Alcohol** .................................................................................................................................... **11**

Reservable Indoor Spaces ..................................................................................................... 12

Reservable Outdoor Spaces .................................................................................................. 13

**Rates and Billing** ................................................................................................................... **14**

**Emergency Safety (buff alert, tornadoes, fire, etc.)** ............................................................. **15**

Bicycles/Non-Motorized Vehicles ........................................................................................ 15

**Food/Catering** ........................................................................................................................ **15**

Catering Kitchen at Legacy Hall ........................................................................................... 16

**Marketing/Advertising** .......................................................................................................... **17**

Bulletin Boards ..................................................................................................................... 17

Posters and Sandwich Boards .............................................................................................. 18

Outside Banners ................................................................................................................... 18

Table Tents ........................................................................................................................... 19

Electronic Signs .................................................................................................................... 19

Floor Stickers ....................................................................................................................... 19

Exhibitor Tables ................................................................................................................... 19

Sales ..................................................................................................................................... 20

Donation Boxes/Drives ........................................................................................................ 20

Pl. App'x 464

## MISSION STATEMENTS

*Mission Statement*

- The mission of West Texas A&M University is to provide intellectually challenging, critically reflective, regionally-responsive, and inclusive *academic* programs that discover, interpret, apply, and disseminate knowledge for preparing the next generation of global citizens.

*Vision Statement*

Guided by its pioneering spirit, West Texas A&M University is recognized for its excellence in teaching and learning, and a strong focus on engaging students in experiences that aid in the development of skills, capabilities, and insights. Our vision is to become a Regional Research University responsive to the forces that shape who we are. Our distinctive focus on the people and places of the Panhandle region will be acknowledged throughout Texas, across the country, and around the world.

*Division of Student Affairs Mission Statement*

The Division of Student Affairs promotes an educational environment that enhances your involvement and development as a student by offering rich and varied programs, services and facilities that support lifelong learning. You are empowered to become an informed, responsible, creative and articulate decision maker who exercises good citizenship, and is professionally competitive.

*Jack B. Kelley Student Center Mission Statement*

The Jack B. Kelley Student Center is the gathering place for the entire West Texas A&M University community. We are dedicated to providing a premiere facility that inspires educational growth, social engagement and intellectual development through student-centered programs and services.

*Funding*

The Jack B. Kelley Student Center is committed to remaining fiscally responsible and makes every effort to remain open and transparent. The JBK Student Center funds its maintenance and operations entirely through the University Center Fee. General revenue funding (money from The State of Texas) is used for academic purposes and does not fund the JBK Student Center or any of the operations.

Pl. App'x 465

## GENERAL POLICIES

Reservations

The use of the JBK facility, J.A. Hill Chapel, Alumni Banquet Hall, Buffalo Room/Isley Terrace, First United Bank Center, Bain-Schaeffer Buffalo Stadium, classrooms across campus or outside lawn areas (not including Buffalo Sports Park) will be scheduled through **www.reservations.wtamu.edu**

Reservations can be made up to 1 reservation year in advance. The reservation year is defined as: The Friday before the Fall Semester starts through the Thursday before the next Fall semester starts. (i.e., August 23, 2024 – August 21, 2025)

- **Buffaloes Traditions** can make reservations for the next reservation year starting the first Monday in January.
- **Institutional Priority** can make reservations for the next reservation year starting the first Monday in February. Event Organizers must apply to have their event included in this category. Requirements can be found below.
- **Student Organizations** can make reservations for the next reservation year starting on April 1st*.
- **Departments** can make reservations for the next reservation year starting on May 1st*.
- **Non-University Clients** can make reservations for August – December and the following Summer starting on May 1st* and January – May on November 1st*.

*If the start date falls on a weekend or holiday, the book will open on the next business day.

Scheduling an event at least 2 weeks in advance is recommended. Meeting rooms and exhibitor tables must be reserved by 5pm the day before the event. Setups cannot be guaranteed in meeting rooms with less than 18 hours notice. 30 days' notice is required for Legacy Hall, Alumni Banquet Hall, First United Bank Center, and Bain-Schaeffer Buffalo Stadium. Reservations outside of this timeframe must be approved by JBK Event Services Staff.

The JBK Student Center staff reserves the right to deny space usage for any group/event that is programmatically or operationally impractical to accommodate or that conflicts with the University's mission or policies.

The JBK Student Center reserves the right to cancel or interrupt any event in the interest of public safety, noncompliance with university policies, or if the event can be viewed as inappropriate or not consistent with the mission of West Texas A&M University.

Pl. App'x 466

All educational programs provided by an outside organization and open to the community at large will be required to pay an exhibitor fee.

Groups should not advertise their events until the tentative confirmation email has been received. If advertising is sent out prior to approval, it may result in denial of the request to use the space.

The University is not liable for problems that might occur prior to or during the rental period (i.e., power failure, air conditioning problems, sprinkler systems, etc.)

The University will not be responsible for acquiring any special equipment for any group unless agreed upon when the reservation is made.

Large-scale events scheduled outside the fall and spring semester, can reserve an extra setup day. During the fall and spring semesters, no setup days will be permitted without JBK Event Services Staff approval. A large-scale event is any event that will have more than two hundred (200) people in attendance.

Reservation space is critical space, and it is important to remain efficient. "No shows" will not be tolerated and may jeopardize future opportunities to reserve space in the JBK. Failure to cancel reservations for events involving special set-ups at least two business days in advance of the event date may result in a fee. Showing up more than 1 hour late for your event will also result in a fee.
- o   1st time – verbal and written warning
- o   2nd time – $25 fee
- o   3rd time – $100 fee
- o   4th time or more – lose scheduling privileges within the facilities under the JBK Event Services area of responsibility for duration of the academic year.

If the date of an event needs to be changed, it must be done so through reservations.wtamu.edu or by contacting JBK Event Services. There is no guarantee that the new date will be available until the change is confirmed.

Pl. App'x 467

**Sponsored/Hosted Events**

University departments and student organizations may sponsor events with off-campus organizations, as long as the mission of the off-campus organization relates to the mission of the on-campus sponsor and/or the mission of WTAMU. Additionally, university sponsors must be present at the event to ensure that WTAMU policies and procedures are followed at all times. University departments and student organizations may not serve as fronts for off-campus organizations. If "fronting" is discovered, Non-University rental rates will apply.

**Building Hours/After Hours**

All events must end 15 minutes prior to regularly scheduled closing time if no prior arrangements have been made for extended hours. Any requests for extended hours must be made in advance and approved by the Student Center Staff.

Building and food court hours will be posted throughout the JBK.

**Decorations**

All decorations must be removed immediately following the activity. Nothing may be left or stored in the JBK. Any items left in the facility may be charged a storage fee.

The loading dock must be cleared of all debris after the event is concluded.

A florist/wedding consultant may be used to provide non-food items only. JBK Event Services must approve the set-up and decorations of the rented facility if the decorations are out of the norm. Centerpieces, tablecloths, and chair covers do not need prior approval.

Items such as confetti, glitter, birdseed, rice and fireworks (i.e., sparklers) may not be utilized on WTAMU campus.

Biodegradable confetti is allowed outside, but not inside any WTAMU facility.

Bubbles are allowed outside, but not inside any WTAMU facility.

Candles, incense, or any other flame effect devices may not be used in any University facility.

No decorations may be hung from any wall, drapes, acoustic panel, ceiling, door or other surface of University facilities. All decorations must have advance approval of the JBK Event Services Staff.

Double-sided tape of any kind shall not be used. Any damage and costs associated with repairing the damage will be billed to the group responsible for the event.

Pl. App'x 468

Items weighing more than 3,000 pounds will not be allowed inside the JBK Facility.  Dimensions of items must allow for easy access into facility.

All items must be clean and will be visually inspected and approved prior to entering the facility.

Helium balloons are not allowed inside J. A. Hill Chapel, First United Bank Center, Fairly Group Club, Alumni Banquet Hall, and Legacy Hall or adjoining hallways.

Helium tanks are not permitted inside WTAMU facilities.

Fog/smoke machines may not be used in WTAMU facilities without prior permission. If a fog/smoke machine is approved, a Fire Marshal may be required at the hourly expense of the client.

If a lift is needed for decorations, the first two hours of its use will be provided free of charge. Any additional time will be charged at an hourly rate. The lift must be operated by a WTAMU Staff Member, Non-University persons are not allowed to use a WTAMU owned lift, hourly fees for staffing will be charged.

Within the JBK facility: Signs designating the food court areas, Buffalo Gold Card office, offices in the building, or any permanent sign will be of a design and style first approved by JBK Staff. No other permanent-type signage is allowed.

### Cleanliness

Organizations or individuals using the JBK facilities or equipment will be held financially responsible for damage and/or cleaning.

The group hosting an event is responsible for cleanup, repair of damages and replacement of damaged equipment.  If an excessive amount of trash has been left in the room, a charge will be billed to the customer for housekeeping.

The student center director or a student center staff member must approve all requests to move furniture in any part of the JBK.  If individuals and groups move furniture themselves, they will be held financially responsible for damages to furniture and facilities.

Pl. App'x 469

Lost & Found

A lost and found will be operated at the JBK Information Desk for items found at the University.

Each Friday, all items will be brought to the University Police Department.

All items found left behind at events in Events Services spaces will be brought back to the JBK after the event.

Parking

Parking is not allowed on 26th street without special permission. All loading/unloading must occur at the available parking behind the Alumni Banquet Facility.

JBK Student Center visitor parking is for university visitors only. No faculty, staff, or students are permitted to park in visitor parking.

30 minute parking may be used by faculty, staff or students for unloading and loading only.

Parking Services will provide specific parking instructions for all events on campus with non-university guests through EMS. This will be communicated with clients on their confirmations.

Political Activity

Table space for candidates of political or student government elections is not allowed unless sponsored by a registered student organization.

Prohibited Events

In accordance with the Texas A&M University System's Board of Regents resolution regarding Certain Public Events on the Campuses of Universities in the Texas A&M University System, dated February 28, 2025, Drag Show Events are prohibited at Special Event Venues on the campus of West Texas A&M University.

Smoking/Tobacco

Smoking and use of any tobacco products (cigars, cigarettes, chewing tobacco, etc.) as well as e-cigarettes, vapes, etc are prohibited on the University campus.

Illegal Weapons/Illegal Substances

Illegal substances, and/or illegal weapons (according to Texas law and the West Texas A&M Code of Student Life) are not permitted on university property.

Pl. App'x 470

## Buffaloes Traditions Program

Buffaloes Traditions Program recognizes that some traditional events and programs should have precedence on the calendar. Buffaloes Traditions Program reservations are deemed to have priority status. Submission for this status shall be received no later than January 1 of the previous year. Buffaloes Traditions Program Event Organizers will be allowed to make these reservations starting the first Monday in January

This procedure permits selection of a few programs that must happen annually on campus at a prescribed time. The programs should remain constant from year to year and if the event fails to remain constant, the space will be lost. Dates for the event may change as dictated by the University calendar. Once these have been selected, any new submissions will be submitted to the JBK Student Center Advisory Board for review.

Submission Criteria
1. Sponsorship by organization or University department
2. Annual program at a specified time of year
3. Open to the entire campus community

Selection Criteria
1. Significant student involvement in planning
2. Resources required are unique to JBK Student Center
3. Program will aid in student recruitment and retention efforts.

## Institutional Priority Events

Institutional Priority Events are mission critical events that take priority over regular university and non-university events and must be approved by the JBK Student Center Advisory Board. When Institutional Priority Events are initially scheduled, it will only be for the actual day of the event, unless significant setup is required. Event Organizers will be allowed to make these reservations starting the first Monday in February.

Events must meet three (3) of the following criteria to be considered for Institutional Priority status:
1. Attendance must exceed 200 or more
2. Annual event which has occurred at least 3 years in a row
3. Open to the entire campus community
4. Requires a contract of 12 or more months in advance
5. Will aid in recruitment and retention efforts
6. Requires significant space utilization in the JBK Student Center
7. Donor funded program at $500,000 or above

© March 2025 | Jack B. Kelley Student Center & Event Services | West Texas A&M University    **PAGE | 9**

Any previously approved Institutional Priority event that fails to meet the criteria for two consecutive years will be removed from the list pending the JBK Student Center Advisory Board approval. Any group that has been removed from the list, must wait one scheduling cycle before applying for reinstatement onto the list.

## Production Services

The JBK Student Center reserves the right to require Production Service staff, including hours of call and crew sizes for meetings and events. All groups will be charged an hourly fee for an A/V technician(s) for large-scale events, multi-media presentations, and events using the A/V booth in Legacy Hall. The technician is there to assist but may not be able to accommodate last minute requests.

All A/V support equipment needs to be scheduled through the JBK Information Desk, and at least two weeks in advance. Further notice is preferable and helps ensure availability.
No other A/V service provider is allowed to provide services in the JBK Student Center without prior approval.

Size, type, and cost of audio and visual systems will be determined by Production Services after the venue and event details are presented by the requestor. It will not be presumed Production Services will provide any services until JBK staff is given the opportunity to study the tech rider information and it has been determined that the Production Services can satisfy event requirements. Production Services is not responsible for satisfying entertainment contract requirements.

Production Services staff will operate all lighting, sound, and video systems when necessary. No client setup, movement, or operation is allowed.

Smaller sound systems are available for use. JBK Production Services has a limited amount of equipment, so it is encouraged to plan ahead. Sound levels of events in the JBK may not disrupt regular business operations and must remain at a level appropriate for the facility. The use and volume of p.a. systems, sound systems, stereo systems, or other musical/sound devices must have prior approval of the student center director.

Weather that may damage equipment will result in cancellation of services during the event and/or during setup/teardown time.

Clients that do not cancel prior to event loading will be charged the entire amount of the A/V order.

Pl. App'x 472

## Off-Campus University Events

Production Services can provide support for university events outside of the student center.   All university organizations will be charged hourly fees for A/V services along with other mandatory fees. Production Services A/V Technicians will always deliver, setup, and operate equipment during off-site events.

## Event Liability Insurance

All outside organizations and parties renting the facility, which are not directly administered by WTAMU, may be required (as determined by the Risk Assessment process) to provide proof of event liability insurance valued at one-million dollars specifically listing WTAMU as additionally insured.  Copies of the policy must be provided at the same time the balance is paid in full.

Student organizations and/or departments that are hosting an event may be required (as determined by the Risk Assessment process) to verify that all participants have a signed TAMUS liability waiver on file before participating in the event.

## Alcohol

Alcohol is allowed only in the following JBK Event Services Spaces:

- 26th Street
- Alumni Banquet Hall
- Bain-Schaeffer Buffalo Stadium
- Buffalo Room/Isley Terrace
- First United Bank Center
- Hazel Kelley Wilson Room
- Legacy Hall
- Legacy Foyer
- Legends Club
- Pedestrian Mall
- Terrill Lawn

Prior approval must come from the President's Office, through the Alcohol request form, before alcohol will be permitted.

If alcohol is served, UPD will determine if an officer will be required to attend the event.  The fees associated with having an officer present will be billed to the client.

If alcohol is part of an official University function, the event must start after 5 p.m.

Any Student Organization that wants to host an event with alcohol must show that alcohol is not the primary focus of the event and must get prior approval from the Office of Student Engagement and Leadership and the Vice President for Student Affairs.

JBK can staff bartenders at any event on campus for an hourly fee for beer/wine/pre-mixed drink service.

Self-services of alcohol is not allowed on campus. Cash bars and/or distribution of hard liquor at an event will require coordination with an approved licensed liquor provider. If beer and/or wine are supplied for open distribution, it will be the responsibility of the event host to provide or hire TABC certified bartenders for each bar. If the client would like to allow guests to bring their own alcohol, all alcohol must be turned in to and served by the bartender.

Pl. App'x 473

Reservable Indoor Spaces

The following spaces are available in the Jack B. Kelley Student Center (JBK):

- Legacy Hall
- Legacy Foyer
- The Legends Club
- Entire Commons area
- East Commons
- Hazel Kelley Wilson*
- Eternal Flame*
- Senate Chamber*
- West Texas*
- Thunder*
- Maroon*
- White

*Can be reserved for recurring meetings.

The following spaces are available in the Alumni Banquet Facility* (ABF):

- Alumni Banquet Hall
- Buffalo Room/Isley Terrace

*ABF spaces may NOT be reserved for regularly scheduled meetings
without approval from the director of the JBK.

The following spaces are available in the First United Bank Center (FUBC):

- Arena
- Buffalo Room

The following spaces are available in Bain-Schaeffer Buffalo Stadium:

- Fairly Group Club
- Concourse
- First United Bank Field

Classrooms across campus are also available for reservations for non-academic events, however, academic classes take priority and may bump the reservation from the room. If this happens, please reach out to JBK Event Services for help finding a new space.

In the JBK, classes may be scheduled on a one-time basis during each semester. Classes will not be allowed to use the JBK on a regular basis.

The entire Commons area may only be reserved by university departments and student organizations if planned during JBK regular business hours. Non-University groups may reserve the entire Commons area, but the event must occur outside the JBK's regular business hours.

Events held in the entire Commons area may not be scheduled prior to 5:00 p.m. on weekdays.

Reservations for private use of Legends Club may be made before 10am or after 3pm Mon – Thurs. Reservations may only be made between 10am and 3pm on Fri or with special approval.

Pl. App'x 474

## Reservable Outdoor Spaces

- Library East
- Museum East
- Museum South
- Education South
- Old Main North
- Old Main South
- Old Main East
- Old Main West

- Terrill Lawn
- Sand Volleyball Court
- Isley Terrace
- 26th Street
- Thunder Island
- Vaughan Pedestrian Mall
- Classroom Center North

Due to the risk of damage to sprinkler systems and lawns, stakes cannot be used without approval of Physical Plant personnel. No signs/stakes will be allowed to be placed anywhere within the Pedestrian Mall.

Any equipment ordered from Central Supply must be set up, torn down and cleaned after the event by the group reserving the outdoor space unless arrangements are made to hire JBK staff to set up, teardown and clean.

No unauthorized vehicles or trailers are allowed to drive and/or park on the Vaughan Pedestrian Mall.

For reservations on 26th Street, it is the responsibility of the group to contact UPD to open the gates when they are ready for them to be opened.

Portable BBQ grills may be permitted through the risk assessment process. Location and drought conditions will be taken into consideration.

No loud music or bands will be allowed to play on the Pedestrian Mall or areas adjacent to classroom buildings during class times. Permitted times are during the week that the University has scheduled as a designated open period as well as Saturdays and Sundays.

Non-University groups must pay the hourly fee for rental of the outdoor space as well as the hourly fee for a staff member to be present during the entire event.

Pl. App'x 475

## Rates and Billing

The different groups for billing purposes are:

- Student Organizations
- University Departments
- Faculty, Staff, Student individuals
- Non-University clients

Student orgs and university departments will be charged facility rental fees for events accepting monetary donations or charging an admission and/or registration fees. The rental costs will be determined by 10% of the gross revenue collected or by the WTAMU student rate – whichever is less. Fees may be waived if the event is a fundraiser, or it has been approved by the student center director. Direct charges may be assessed for complex events.

All student organizations and university departments will be charged an hourly staffing fee for each JBK staff member required before or after the normal JBK operating hours in all facilities managed by JBK Event Services.

University departments will be charged an hourly staffing fee for each JBK staff member required at events in the Alumni Banquet Facility, Bain-Schaefer Buffalo Stadium, First United Bank Center, and J. A. Hill Chapel.

Student orgs can have up to 4 hours of free setup/teardown time for their events. This can be split from the event time or continuous. i.e., event from 5pm - 7pm; setup from 9am - 12pm, teardown from 7-8 pm. Hourly staffing charges will be applied if staffing is required and more time is needed.

Non-University groups will be charged hourly staffing fees for each staff member required during the entire reservation period.

Setup fees are addressed based on the size of the event, the number of staff required, and how long it will take to set the event. Non-University events will have a required setup fee for the event as determined by the JBK Staff. Student orgs and Departments may be required to pay setup fees depending on the complexity of their event.

To provide sufficient staffing, any University group that schedules an event in Legacy Hall, Alumni Banquet Facility, Bain-Schaeffer Buffalo Stadium or First United Bank Center with less than 7 days' notice will incur all setup charges along with all other staffing charges required to properly manage the event.

Pl. App'x 476

The payment schedule for non-university reservations is as follows:

- ½ the full rental fee is due at time of booking. The remainder is due by 30 days before the event.
- The full amount is refundable if cancelled up to 30 days before the event.
- If an event or any portion of the event is cancelled less than 30 days before the event, 50% will be refundable.
- Within 15 days there is no refund.

The payment schedule for university departments and student org. reservations is as follows:

- Reservations will be invoiced the month after the event takes place.
- Payment is due within 30 days of the invoice date.
- If payment is not received within 30 days, a reminder will be sent.
- If payment is not received within an additional 30 days, future reservations could be cancelled at the discretion of the JBK Director.

Refunds will be processed through our credit card system as soon as possible after the event is completed or cancelled. If payment was made by check, refund checks will be mailed out approximately three weeks after an event is completed or cancelled.

## Emergency Safety (buff alert, tornadoes, fire, etc.)

In the event of an emergency during an event, the JBK Event Services staff will follow the proper procedures outlined in the JBK Student Center emergency manual. All building occupants are expected to follow all instructions given to them by a JBK staff member.

In case of University emergency, any event may be cancelled up to 24 hours in advance.

## Bicycles/Non-Motorized Vehicles

No running, roller-skating, rollerblading, skateboarding, bike riding or scooters inside any WTAMU facility.

No battery-powered vehicles (i.e., Scooters, Golf Carts, etc.) will be permitted in WTAMU facilities.

## Food/Catering

*In accordance with existing contracts and University rules, catering will be allowed within the following guidelines:*

All food must be contracted with the on-campus caterer – Aramark. No outside caterers are allowed in the Jack B. Kelley Student Center, Alumni Banquet Facility, First United Bank Center, or Bain-Shaeffer Buffalo Stadium without prior approval from the food service director via the online Catering Exemption Form. (Food court is run by Aramark, no exemption is necessary.)

Pl. App'x 477

The use of heating appliances (open-flame devices, toaster ovens, heating plates, sterno cans, fry cookers, etc.,) to prepare food or to warm food is not allowed in the JBK, the outer covered patio of the JBK, Alumni Banquet Facility, Isley Terrace, First United Bank Center, or Bain-Shaeffer Buffalo Stadium. Upon approval by the student center director, exceptions may be granted for certain events contracted through University food services and insured catering companies.

Any baked goods prepared for distribution in the JBK must be approved by Aramark, pre-portioned, and individually wrapped prior to the event.

No food will be allowed inside J.A. Hill Chapel without prior approval from the student center director.

Any person or group serving food on WTAMU Campus shall hold harmless WTAMU, its agent, employees, and representatives from any liability or action arising from personal injury or property damage caused by the negligent act of omission or commission of the group.

Food Safety: The group hosting an event is liable for all food safety preparation and service. Individuals within the group are expected to follow standard food safety and hygiene practices for food served or sold. Groups are expected to comply with all city, county, and state regulations related to food preparation, handling, and permits. WTAMU retains the right to require insurance, permits, or inspections as needed.

## Catering Kitchen at Legacy Hall

The kitchen is available for groups bringing in and/or preparing food for special events only (non-reoccurring event).

The kitchen is equipped with electrical outlets, refrigerators, freezer, warming cabinets, microwave, ice machines, coffee/tea makers and counter space. Equipment is not to be moved from its original location.

All items must be removed from the kitchen at the end of the event including food.

The kitchen must be left clean after the event is completed. To clean the kitchen, you must use the approved cleaning chemicals provided by the JBK Student Center. An additional cleaning fee may be charged if the kitchen requires cleaning beyond normal end of the day custodial service.

Pl. App'x 478

## Marketing/Advertising

Marketing space is available to campus organizations, academic and auxiliary departments. Reservations are only for those groups advertising events and services that are open to the entire campus community and respect the mission of the University and its endeavors.

Marketing reservations will follow same date availability as space reservations.
Providing space for an event or marketing of an event does not necessarily imply university endorsement or sponsorship of a product, issue, or idea.  Therefore, users may not state or imply University sponsorship or endorsement of their activities without the University's consent.  Promotional material and advertising for Non-University sponsored activities must include the following disclaimer: "This is not a West Texas A&M University program."

All posters, flyers, banners, or table tents must include the name of the registered student organization or University department and the name, date and time of the event. University Graphic standards must be followed.  Materials that do not include this information will be removed from the JBK.

Any written material placed within the JBK may not contain obscene words, promote alcohol or other drug usage or any unlawful activity; or violate University rules, Texas A&M University System policies or local, state or federal laws.

Posters, flyers or banners may not be attached to or placed on any unauthorized part of the JBK.  This includes doors, windows, ceilings, walls, tables or other surfaces.  Tacks must be used to post information on bulletin boards. No glue, tape, etc. will be allowed.

Information written on posters, flyers, banners and table tents must be written in English or have the English translation included.   If acronyms or abbreviations are used, the full translation must be printed.  The only exceptions are when acronyms or abbreviations are used for the name of the University, registered student organizations, or campus buildings.

Persons or organizations that post materials are responsible for the removal of these materials when the date of posting has expired.  An expiration date will be considered as one day following the date of the posted event. Any materials that are removed by the JBK will be thrown away unless prior arrangements have been made.

## Bulletin Boards

A maximum of one (1) flyer per event may be posted on each bulletin board. All bulletin boards will be cleared at the first of each month.

All student election campaign materials must have Student Government approval visible on the poster.

Pl. App'x 479

## Sandwich Boards

One outdoor sandwich board (two sides) is available for use in designated areas of the Pedestrian Mall. It may be reserved online and picked up from and returned to the JBK Information Desk. Posters/signs must be weather resistant, i.e., vinyl, laminated. Posters/signs must be attached with Velcro or bungee cords, and tape. No tacks, nails, etc. will be allowed.

One indoor sandwich board sign is available for the Commons area. An organization may use the sandwich board for publicizing its events the day before the event and the day of the event, pending availability. It may be reserved online and picked up at the JBK Information Desk. No other sandwich board or standing signs will be allowed in the Commons area or in the hallways of the JBK without student center staff approval.

## Outside Banners

There is space available for Four Banners (Banner A. B, C, & D) to be hung outside the northeast exit of the JBK.

Banners must be reserved online at reservations.wtamu.edu.

Banners must be weather resistant, i.e., vinyl.

Banners must be brought to the JBK Info Desk the week before they are to be hung.

Banners will be taken down after the date of the event.

If the group wants the banner returned, this must be arranged when the reservation is made.

Pl. App'x 480

## Table Tents

The table tents are available in the JBK Student Center Food Court. Space is available on a weekly basis (Monday - Sunday) only.

All artwork will be submitted electronically via email.

All ads must be received no later than the Monday prior to the week the ad is to run.

The required artwork dimensions are 6.5" wide x 3.75" tall with a .5 white space at the bottom making the finished dimensions 6.5" wide x 4.25" tall with the artwork at the top portion of the card.

All artwork submitted must be either .jpeg, .pdf, .psd, or .tif. No other formats will be accepted. Microsoft Publisher or Word documents are unacceptable. All ads must be proofed and approved by you before sending to us.

## Electronic Signs

Electronic signage will not be allowed for political promotion.
The electronic signage content manager must approve all content of a questionable nature. Content manager reserves the right to reject ads containing content that is in direct competition with JBK vendors or services.

## Floor Stickers

Floor stickers must be approved by JBK staff before putting them out. They can be put down the day before the event and must be picked up directly after the event is over. If the event is several days long, the stickers may remain overnight until the last day of the event.

## Exhibitor Tables

Registered student organizations and University departments may reserve exhibitor table space in the JBK at no cost and must be reserved by 5:00 pm the day before.

Individuals and non-university groups may rent a table space for a daily fee. Non-University Vendors are required to have a sales tax permit and abide by applicable state policies.

If an outside organization is sponsored by a student organization, but the student organization does not benefit, the exhibitor fee will remain. However, if an outside organization is sponsored by a student organization and the student organization benefits in some way, then the fee will be waived.

Exhibitor Table space in the JBK is limited to seven (7) six-foot tables in the Commons. A

Pl. App'x 481

maximum of two (2) chairs per table is allowed.

Exhibitor Table space is limited to one (1) table per day per group. Exhibitor tables can be reserved for a maximum of two (2) five consecutive day periods per semester. Additional requests should be submitted for approval one week in advance and are contingent upon available space.

Table space is not available on Dead Day and finals week. Exceptions must be pursued through the VP for Student Affairs.

To keep the flow of traffic thru the commons area, literature may only be handed to persons who express an interest and are in an area immediately adjacent to the assigned table. Any signs or banners used at a table may only be hung from the front of the table or hung from the metal poster strips above the table.

All groups must check in at the JBK Info desk the day of their reservation to obtain their Exhibitor Table permit. The permit must remain prominently displayed on the table during the entire time the exhibitor table space is occupied.

## Sales

Registered student organizations, University departments, and outside vendors may be permitted to sell items in the JBK if they have an approved Exhibitor Table reservation. No items may be sold that conflict with the sales of an auxiliary service (i.e., University Bookstore or Aramark without the auxiliary service director's approval. (See also *Exhibitor Table Reservations*)

Tickets to events sponsored by off campus groups or individuals may be sold upon approval of the Vice President for Student Affairs if a discount is offered to WTAMU students.

## Donation Boxes/Drives

All requests to provide donation boxes and/or drives in the JBK must be placed through the JBK Information Desk.

All donation boxes must be checked regularly and have the following information on the box: contact person with phone number, University organization name, and date(s) of the event.

Pl. App'x 482

**WT** Office of Student
Engagement and Leadership
WEST TEXAS A&M UNIVERSITY.







# Campus
# Organizations
## Handbook

## Office of Student Engagement
## and Leadership
### JACK B. KELLEY STUDENT CENTER,
### SUITE 103

806.651.2313
WTOSEL@WTAMU.EDU
WWW.WTAMU.CAMPUSLABS.COM



EXHIBIT 63

Student Organization Handbook Revised - August 2026    Page 1

Def_000109

Pl. App'x 483



**Office of Student Engagement and Leadership**
**WEST TEXAS A&M UNIVERSITY**

# Table of Contents

This Handbook offers an overview of information relevant to student organizations. Please keep in mind:

- It doesn't cover all University rules, procedures, or regulations.
- The University can update any procedure, policy, or program in this Handbook without notice.
- Individual divisions or departments may have their own rules that also apply to student organizations.

Introduction & Purpose ........................................................................................................3

Rights and Responsibilities ..................................................................................................3

Privileges ................................................................................................................................3

Responsibilities.....................................................................................................................3

Advisor Selection and Responsibilities ..........................................................................4

Student Organization Management ...................................................................................5

Annual Re-Registration for Existing Student Organizations (REQUIRED) ................5

Registration of New Student Organizations...................................................................6

Herd Huddle – Student Organization Orientation/Training .......................................7

Grade Point Release Form .................................................................................................7

Student Organization Finances & Fundraising................................................................8

Recommended Guidelines for the Management of Funds...........................................8

Campus Organization Funding .........................................................................................9

Raffles ................................................................................................................................ 10

Solicitations of Private Donations ................................................................................ 11

Campus Services ................................................................................................................ 11

Office of Student Engagement and Leadership Services ......................................... 11

Events & Activities On-Campus ...................................................................................... 13

Reserving University Facilities ....................................................................................... 13

Food Services/Catering ................................................................................................... 13

Promotion & Publicity of Events .................................................................................... 14

Posting Marketing Guidelines - Any University Facility .......................................... 14

University Graphics Standards ....................................................................................... 15

Risk Management ............................................................................................................... 15

Organizational Risk Management................................................................................... 15

**Def_000110**

Pl. App'x 484

**WT** Office of Student
**Engagement and Leadership**
**WEST TEXAS A&M UNIVERSITY.**

Alcohol and Illegal Substances........................................................................................ 17

Equipment Safety ............................................................................................................. 18

Hazing/Harassment ......................................................................................................... 18

Insurance............................................................................................................................ 20

Student Activity Release Form......................................................................................... 20

Houses/Lodges, Fire Safety and Equipment ................................................................. 21

Student Travel Procedures............................................................................................... 21

# Introduction & Purpose

This handbook serves as a comprehensive guide for student organizations at West Texas A&M University (WTAMU). It outlines the requirements, privileges, and resources available to support student-led groups in creating meaningful experiences, promoting leadership development, and engaging the campus community.

# Rights and Responsibilities

## Privileges

- Access to campus facilities
- Access to Campus Organization Funding
- Support from the Office of Student Engagement and Leadership (OSEL)
- Listing in the Buff Link Directory
- Use of West Texas A&M University name to signify campus affiliation
- Involvement opportunities such as; NSO Involvement Fairs, Buff Branding events, Join the Herd, the WT Block Party Tailgating experience, etc.
- Check-out equipment such as; yard games, popcorn machine, 360 rotating photo booth, karaoke machine, etc.
- Program planning, marketing, graphic design, and printing services

## Responsibilities

- Abide by procedures and regulations pertaining to campus organizations found in the current *Student Handbook* and *Campus Organizations Handbook* and to state and federal laws
  - Update your executives and advisor's contact information.
  - Complete the Risk Management process for all new advisors and presidents.
- Re-register **ANNUALLY** (starting in January) in Buff Link by February 27.

---

**Def_000111**

Pl. App'x 485

**WT** Office of Student
Engagement and Leadership
WEST TEXAS A&M UNIVERSITY.

# Advisor Selection and Responsibilities

University regulations require each campus organization to have a primary advisor, a full-time WTAMU faculty or staff member. It is in the organization's best interest to have a secondary advisor if your primary advisor is frequently unavailable. We hope the following will help you select an advisor and understand his/her function in your organization.

## The Role of the Advisor

An advisor adds to the continuity of your organization by making sure that successive officers of the organization understand the responsibility they share with the officers, as well as explaining to the officers the policies established for campus organizations.

## Duties of an Advisor

- To be aware of and understand those rules pertaining to organizations at WTAMU and rules and procedures governing WTAMU students.
- To be aware of liability issues (i.e. hazing, alcohol, etc.) and advise the organization to make reasonable and prudent decisions regarding these issues in planning activities.
- To attend meetings of the organization whenever possible.
- To be available to the officers and members of the organization on a regular basis for advice and consultation.
- Take all necessary trainings that are required by the state of Texas.

## Hints for Recruiting an Advisor

- Before making a selection, keep in mind the following:
  - o Find someone who believes in the organization's mission and values.
  - o Find someone who will have the time to devote to your organization.
  - o Find someone who will take the role willingly and seriously.
- When approaching your potential advisor for the first time, make sure that he/she understands your organization's mission and values as well as what will be required of them in their role, duties and time commitment.
- Allow the person a reasonable length of time to consider his/her decision.
- If possible, choose someone who shares some of the same interests of your organization, and someone with which members are in contact.
- When starting a departmental club or organization, it can be helpful to find someone in that department as the advisor.

Def_000112
Pl. App'x 486

**WT** Office of Student
Engagement and Leadership
WEST TEXAS A&M UNIVERSITY.

## How to Work with Your Advisor

- It is best to meet with your advisor prior to your meetings to review the agenda and topics to be discussed.
- Be open to suggestions and criticisms from your advisor. Their knowledge and experience will help in solutions and organizational procedures.
- If an advisor cannot attend all your meetings, be sure to meet with them after the meeting to provide an update on what happened.

# Student Organization Management

## Annual Re-Registration for Existing Student Organizations (REQUIRED)

Becoming a registered campus organization is a required process at West Texas A&M University. It provides a terrific opportunity to serve the campus community, develop skills within a large group and have a good time in the process. A WTAMU registration involves privileges and responsibilities as listed below.

Existing organizations **MUST** re-register once per year (February Deadline).
- Access your organization in BuffLink (Buff Connect > BuffLink > Sign In > click on your org icon circle on the left-hand side of the page > Manage Home > click the blue Re-Registration button)
    o If the above steps don't work, it is possible that you don't have access to your organization because you are not listed on the current roster. Email us at WTOSEL@wtamu.edu and we will get you set up.
    o Make sure to check your email. You will receive approval if all requirements are met, or you will be contacted by one of our Student Life Coordinators with the corrections needed for approval.
- You will have an opportunity to update the org profile, roster (must include all members), and the organization profile.

The president and any new advisors (depending on the semester) **MUST** also complete the Risk Management process. It's Texas Law!
- Risk Management Online training

**Constitution and By-Laws.** Every campus organization must have an up-to-date constitution or by-laws (cannot be older than 3 years) uploaded in BuffLink.

Def_000113
Pl. App'x 487

**WT** Office of Student
Engagement and Leadership
WEST TEXAS A&M UNIVERSITY.

- There is a template available on the Office of Student Engagement and Leadership's BuffLink profile.

# Registration of New Student Organizations

If there is not already an organization on campus that meets your needs, the Office of Student Engagement and Leadership can help you through the process required to create a new one.

These are the items you will need to collect and prepare prior to registering:
- Constitution and By-Laws. Every campus organization must have an up-to-date constitution and/or by-laws. This will help in the development of a new organization and in the stability of an existing one. Important things to remember about the constitution are (1) it must be voted on and approved by the general membership, and (2) it must be uploaded into Buff Link at the time of registration and anytime it is changed. You can find a sample constitution <u>here.</u>
- Secure an advisor for the organization. The University requires each campus organization to have at least one advisor. The advisor must be a full-time faculty or staff member at WTAMU.
- Secure four (4) WT students to be added to the organization roster. (You will need each members' WT email address and Student ID). Always, include all members on the roster.
- Of the above members you will need to elect three (3) officers: president, vice president, and treasurer.
- Become familiar with WTAMU policies concerning campus organizations.

When the above items are available you can register your new organization in Buff Link. (Buff Connect > Buff Link icon > Sign In > Organization icon (symbol of two people) > Register an Organization > Scroll down to the bottom of this page and you will see the blue Register a New Organization button)
- Make sure to check your email. You will receive approval if all requirements are met, or you will be contacted by one of our Student Life Coordinators with the corrections needed for approval.
- As soon as the organization is registered, it can begin operating and meeting.

The president and any new advisors (depending on the semester) **MUST** also complete the Risk Management process. It's Texas Law!
- <u>Risk Management Online training</u>

Def_000114
Pl. App'x 488

**WT** Office of Student
**Engagement and Leadership**
WEST TEXAS A&M UNIVERSITY.

# Herd Huddle – Student Organization Orientation/Training

## Mission

The mission of the Herd Huddle is to enhance campus life and provide support to student organizations. We encourage the executive member whose role best relates to the session content to attend each Herd Huddle—for example, the treasurer attending the financial session. Monthly Herd Huddle sessions will be held to review the goals and objectives, listed below.

## Goals and Objectives

- To provide a network for organizations to support and promote themselves and other organizations.
- To market major campus events and promote joint programming efforts among organizations.
- To provide leadership training.
- To promote community awareness.
- To increase communication flow to organizations.
- To guide and direct through the *Campus Organizations Handbook*

## Grade Point Release Form

(Required **only** for groups that have GPA requirements in their constitution.)

The release of student grades to other students is prohibited unless written permission is obtained from each student, as indicated on the Grade Point Release Form.  This form is available **here**.

Grade reports are compiled by the Office of Student Engagement and Leadership at the end of each semester.  Groups submitting the Grade Point Release Form must do so by the established deadlines **(Fall: December 1; Spring: May 1)**.

Grades will not be disclosed unless the release section of the form is signed.  Grades will only be released to the organization president, advisor and national office, as needed, to complete national reports, provide academic assistance, and recognize academic excellence.  Grade reports released to organization president, advisor and national office may not be released to any other students.

**Def_000115**
Pl. App'x 489

**WT** Office of Student
Engagement and Leadership
WEST TEXAS A&M UNIVERSITY.

# Student Organization Finances & Fundraising
## Recommended Guidelines for the Management of Funds

Most registered campus organizations at WTAMU are self-funded and do not receive direct financial support from the University. These organizations typically raise money through dues, donations, and fundraising activities.

All registered campus organizations are required to maintain an on-campus account for managing their funds. Exceptions apply for Greek and religious organizations that already have an established account with their state or national organization.

The Office of Student Engagement and Leadership (OSEL) can assist you in opening an on-campus account. Please reach out when you are ready to start.

Acceptable Financial Practices
- Debit cards are not available for student organization accounts. Instead, Procurement (Pro) Cards are available through the organization's advisor to assist with purchasing needs and to maintain a proper paper trail.
- Venmo and other cash apps are not permitted for collecting money. OSEL provides an online dues form (linked **here**) that will deposit funds directly into your organization's account.
- All financial obligations should be paid promptly.
- Deposits should be brought to OSEL to be made into your account. Cash will not be accepted. Cashier's checks, money orders, and checks made out to WTAMU are acceptable.
- Receipts should be issued for any money collected by the organization.
- Balance your account monthly.
- Always have a budget for each semester and stick to it. Establish a budget committee to set guidelines for dues and fines and to develop the semester budget. A budget template is available **here,** on the OSEL BuffLink page to help your organization plan effectively.
- The treasurer is strongly encouraged to submit monthly reports to the appropriate executive officer and/or the advisor.

Def_000116
Pl. App'x 490

**WT** Office of Student
Engagement and Leadership
WEST TEXAS A&M UNIVERSITY.

## Third-Party Fundraising Vendors

Student organizations wishing to partner with any outside or third-party fundraising vendor must first receive approval from the **Office of Philanthropy and External relations.**

> IMPORTANT: Gifts collected through unapproved third-party vendors are not considered gifts to West Texas A&M University or the WT Foundation, are not charitable contributions for tax purposes, and do not provide donor credit to WT. In addition, most third-party vendors retain a percentage of each donation (some as high as 30%)

All third-party vendor agreements must go through the University contract process before any fundraising begins. Organizations that do not obtain proper approval may be required to notify donors that their gifts were not made to WT and offer refunds, including vendor fees.

The Office of Philanthropy and External Relations is available to assist student organizations in planning successful fundraising efforts using approved methods.

## Campus Organization Funding

Campus Organization Funding is available to support certain activities sponsored by recognized student organizations. To be eligible, an organization must:

- Be officially recognized by the University and in good standing with the Office of Student Engagement and Leadership.
- Not have received other forms of campus funding for the same activity.
- Demonstrate the benefit of the allocation to the University community.

How to Apply
- Requests must be submitted to OSEL at least two weeks prior to the event.
- The Student Judicial Board (SJB) reviews proposals for approval during its weekly meetings.
- Applications and funding guidelines are available on Buff Link under the Office of Student Engagement and Leadership page.

Funding Schedule
- Fall Activities: Requests accepted from the first day of class through the last day of finals in December.
- Spring Activities: Requests accepted from the first day of class through the last day of finals in May.

**Def_000117**

Pl. App'x 491

**WT** Office of Student
Engagement and Leadership
WEST TEXAS A&M UNIVERSITY.

Funding Priorities
Funding is awarded on a first-come, first-served basis. Higher consideration will be given to activities that:

1. Are widely publicized on the University Student Events Calendar and other campus-wide media (copies of flyers/advertisements should be submitted with the application).
2. Are predominately funded by the sponsoring organization.
3. Are held on campus.
4. Encourage academic enrichment.
5. Have no admission charge for WTAMU students.

Restrictions
Campus Organization Funds may not be used to purchase items intended for resale or fundraising events.

Allocation Process
Funds for all tiers are allocated based on demonstrated need as shown on the application and during your presentation to the Student Judicial Board.

- Presentations should address:
  o A description of the organization and its purpose.
  o The reason for funding and amount requested.
  o The organization's retention rate.
  o Other contributions the organization will make to the event.
  o How the event will benefit the University and/or students.

Disbursement & Accountability
Once approved, funds will be deposited into the organization's on-campus account. Receipts for all expenditures must be submitted after the event; failure to do so will result in a hold on the organization's account.

# Raffles

Per the definition below, student organizations are NOT allowed to have raffles, "opportunity to win", etc. The ONLY way to have a raffle is by collecting participants information to win a prize but no money can be collected. For example, giving away a pair of earbuds for all guests at an event would be allowed. However, the organization cannot collect money as an entry to qualify for the drawing.

Def_000118

Pl. App'x 492



**WT** Office of Student
Engagement and Leadership
WEST TEXAS A&M UNIVERSITY.

## Raffles What is a raffle?

The Charitable Raffle Enabling Act defines a raffle as "the award of one or more prizes by chance at a single occasion among a single pool or group of persons who have paid or promised a thing of value for a ticket that represents a chance to win a prize."

- More information available **here.**

## Solicitations of Private Donations

To protect WT's donor relationships, all new fundraising efforts should be coordinated with the Assistant Vice President for Leadership Gifts & Development, Lesly Bosch Annen, at (806) 651-3252. This coordination ensures private support to WTAMU is not jeopardized.

# Campus Services

## Office of Student Engagement and Leadership Services

Programs offered through OSEL provide WTAMU students opportunities to engage on campus, build lasting relationships, develop support networks, and participate in educational and entertainment activities. The primary purpose of OSEL is to foster leadership development, cultural awareness, and community service.

## Hours of Operation

Jack B. Kelley Student Center, Suite 103
Monday-Friday: 8:00 am to 5:00 pm

## Copy Services

Each registered organization is eligible to have copies made by the OSEL (JBK 103) to copy minutes, agenda, flyers and other materials. The OSEL will provide the first 100 copies each long semester at no charge. If an organization wants colored paper, the organization must provide the colored paper. The cost for copies over the 100 limit is .10 per copy.

## Program Planning Assistance

If you need help planning an event or activity, your student life coordinator can offer you experienced advice. The staff can help find efficient means of publicity, budgeting, advice, less expensive means to obtain services, food services advice, and any other aspect of successful programming planning.

**Def_000119**

Pl. App'x 493

**WT** Office of Student
Engagement and Leadership
WEST TEXAS A&M UNIVERSITY.

## Campus Organizations Directory

Each semester every organization is required to re-register on BuffLink. When the re-registration is complete then your organization is added back to the BuffLink directory. The purpose of this directory is to have an updated listing of all campus organizations, their presidents and advisors. This is available to all potential and current students. It may be viewed by going to www.wtamu.edu > click on Student Life > Student Orgs

## Standards of Excellence Checklist & Recognition Program

The Standards of Excellence (SOE) Checklist is a recognition framework designed to support student organizations in developing meaningful engagement, leadership growth, and organizational excellence.

Participation is not mandatory, but strongly encouraged for all registered student organizations. Groups that complete a majority of the checklist items will be recognized at the annual Honors Banquet and may qualify for Gold, Silver, or Bronze standings.

The checklist focuses on:

- Practical Skills
- Financial Responsibility
- Personal Well-Being
- Healthy Relationships & Community
- Community Engagement
- Reflection & Recognition

What You Need to Know:

- Orgs track their progress throughout the year using the checklist and optional templates provided by the Office of Student Engagement and Leadership.
- Documentation should be saved in the org's BuffLink folder for easy access.
- Final submission is made through the SOE Submission Form on BuffLink each spring.
- Groups falling below 50% completion may enter a support-based recovery process called *Path to Progress*.

Benefits of Participating:

- Recognition at Honors Banquet
- Stronger advisor engagement
- Improved event planning, member retention, and leadership development
- Early access to select leadership trainings and resources
- Access to campus organization funding

**Def_000120**

Pl. App'x 494

**WT** Office of Student
Engagement and Leadership
WEST TEXAS A&M UNIVERSITY.

Helpful Links & Resources:
- Toolkit: https://wtamu.campuslabs.com/engage/submitter/form/start/690101
- Submission Form:
  [https://wtamu.campuslabs.com/engage/submitter/form/start/690101

## Check-out Items

Registered organizations can check out miscellaneous items from the OSEL free of charge unless the items are not returned or they are returned damaged. Here is a short list of items that we have but if you don't see what you need contact the OSEL at 806-651-2313 to inquire if we have what you need.

- Tablecloths
- Bose speaker
- Various board and card games
- Yard games
- Popcorn machine
- 360-degree rotating photo booth
- Canopy tent
- Chalk boards
- Large dry-erase board
- Miscellaneous decorations

# Events & Activities On-Campus

## Reserving University Facilities

Student organizations have priority access to reserve University facilities. The reservation book opens each year on **April 1** for the upcoming academic year, allowing organizations to secure preferred spaces early.

Reservations can be made at reservations.wtamu.edu. Directions for submitting a request are available on the BuffLink homepage once you are logged in (your name should appear in the top right corner).

For questions about the reservation process, contact the Jack B. Kelley Student Center at **JBK@wtamu.edu** or **(806) 651-2394**

## Food Services/Catering

By contract, ARAMARK Food Services shall provide, or provide and serve, all food items on the WTAMU campus. Student groups are not allowed to sell or distribute any food item on the campus unless written permission has been granted by the Director of Food Services (whose office is located in the Dining Hall). The On Campus Catering Exemption Form can be found **here**.

**Def_000121**

Pl. App'x 495



Office of Student
**Engagement and Leadership**
**WEST TEXAS A&M UNIVERSITY**

Arrangements for food and beverage requirements are to be made with the Catering Manager, Ollie Sims, in the Dining Hall, at 651-2707 or osims@wtamu.edu. The complete catering guide for student organizations, including menus and rates, is available from the Catering Manager.

# Promotion & Publicity of Events
## Posting Marketing Guidelines - **Any University Facility**

West Texas A&M University's visual identity reflects our shared beliefs, values, and commitment to academic excellence. Consistent, professional use of university marks, such as the seal and logo are essential for reinforcing that image.

- All materials displaying University marks must adhere to published graphic standards and obtain approval from the Office of Communication and Marketing.
- Official, ready-to-use artwork for the University seal and logo is available at wtamu.edu/graphicstandards.
- Recognized student organizations may use University marks, names, and logos as part of their materials.
- However, such organizations may not formally represent West Texas A&M University or speak on behalf of the institution.
- Student organizations are not authorized to enter into contracts on the University's behalf and are solely responsible for all financial and legal obligations tied to any agreements they sign.
- All contracts involving University entities must be reviewed and executed in coordination with the Contract Administration Office to ensure proper delegation and compliance.
- Student organizations must comply with the Student Handbook and related rules governing operations, recognition, and accountability.

To clarify the scope of authority and prevent misinterpretation, include the following clause in all contracts:
"(Organization Name) is a recognized student organization of West Texas A&M University and does not represent, nor has the authority to contractually obligate, the University. As (Position Title) of (Organization Name), I enter into this agreement solely on behalf of the organization."

Def_000122



**Office of Student Engagement and Leadership**
**WEST TEXAS A&M UNIVERSITY.**

# University Graphics Standards

West Texas A&M University's image reflects the collective beliefs, values, and impressions of our community. Consistent and professional use of University marks—such as the seal, logo, and wordmark—helps reinforce WTAMU's commitment to academic excellence, research, and community engagement.

To maintain this unified image, all materials using University marks must comply with the published graphic standards and receive approval from the Office of Communication and Marketing.

Official, ready-to-use artwork for the University seal and logo is available at wtamu.edu/graphicstandards

For questions, guidance, or assistance in promoting and marketing your event, contact: **Evelyn Montoya, Marketing Coordinator for Student Success and Engagement**
Jack B. Kelley Student Center, Suite 103
WTAMU Box 60775
Canyon, Texas 79016-0001
Phone: 806-651-2051
Fax: 806-651-2926
Email: emontoya@wtamu.edu

# Risk Management

## Organizational Risk Management

Effective risk management helps protect your members, guests, and organization. Leaders and advisors are responsible for minimizing risks during planning and programming, but proactive preparation is key.
West Texas A&M University encouráges student organizations to follow the **PREFF model** when planning events:

- **Physical** – Prevent injuries and ensure food, alcohol, and venue safety.
- **Reputational** – Avoid actions that may harm the image of your organization or the university.
- **Emotional** – Consider how events may affect the mental well-being of attendees.
- **Financial** – Plan realistic budgets and maintain accountability.
- **Facilities** – Use spaces appropriately and in line with university policies.

Def_000123

Pl. App'x 497

**WT** Office of Student
Engagement and Leadership
WEST TEXAS A&M UNIVERSITY.

There is no substitute for good planning. Thinking through your event from start to finish allows you to anticipate challenges and create a safer experience for everyone. For a detailed overview of risk categories, insurance requirements, and event safety practices, refer to the **Risk Management and Insurance Matrix** (pictured below) and the full **WTAMU Social Events Practices** guide linked here.

### West Texas A&M University Risk Management and Insurance Matrix

Exposure To Be Reviewed: _____

Instructions: Step 1 - List all event activities and be as inclusive as possible. Step 2 - Honestly identify risks associated with each activity. Step 3 - Use the matrix below to assess your activities. Tally the severity and probability scores for evaluation. Step 4 - Brainstorm methods to manage risks. See if you can reduce the probability or severity of something going wrong. Step 5 - Submit the Risk Management and Insurance Matrix Form with your Risk Assessment Form for further review. If you have questions, please contact Richard Smith via email at rcsmith@wtamu.edu.

| List of Activities to Occur | Associated Risks* | Severity | Probability | Method to Manage Risks** |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

*Possible risks include:medical emergencies, food poisoning/allergens, damage to WTAMU reputation, accidents, injuries, and/or death

**Methods to manage risks include: insuring risk, arranging for security, use of administrative procedures, and/or use of PPE or safety devices

| Severity | Risk Matrix | | | | Probability |
|---|---|---|---|---|---|
| **I: May result in death** | | Probability | | | **A: Likely to occur immediately or in a short period of time (6<months); expected to occur frequently** |
| **II: May cause severe injury, major property damage, significant financial loss, and/or result in negative publicity for WTAMU** | Severity | A | B | C | D | |
| | I | High Risk | High Risk | High Risk | Medium Risk | **B: Likely to occur in the near future (6 months – 1 year); expected to occur periodically over a relatively short timeframe; expected to occur over the life of an event or project** |
| **III: May cause a moderate illness, injury, property damage, financial loss, and/or result in negative publicity for WTAMU** | II | High Risk | High Risk | Medium Risk | Medium Risk | |
| | III | Medium Risk | Medium Risk | Medium Risk | Low Risk | **C: May occur if given enough time; probability of occurrence is equal to it not occurring** |
| **IV: Presents a minimal threat to safety, property, operations, or reputation** | IV | Medium Risk | Medium Risk | Low Risk | Low Risk | |
| | High risk areas may be sent to System Risk Management for additional review. Although insurance procurement may not be the answer, discussions should occur regarding self-retention so all parties are aware of the risks associated with the activity. | | | | **D: Unlikely to occur at any point** |

*Form Updated 07/22/22*

Def_000124

Pl. App'x 498

**WT** Office of Student
Engagement and Leadership
WEST TEXAS A&M UNIVERSITY.

| List of Activities to Occur | Associated Risks* | Seriousness | Probability | Method to Manage Risks** |
|---|---|---|---|---|
| BBQ for Private Event | Undercooked food | IV | D | Make sure all food is thoroughly cooked and kept at temperature |
| | Equipment catches on fire | III | D | Have fire extinguisher on site |
| BBQ for Open to Public Event | Undercooked food | IV | D | Have temporary food permit |
| | | | | Keep all food at proper temperature |
| Inflatables | Injury to participants | III | C | Choose course items that are individually wrapped |
| Dunk Tank | Injury to person in tank | III | C | Waivers will be signed by all participants |
| | | | | Waivers will be signed by person in tank |
| | | | | Tank will be positioned on solid ground |
| | Injury to people behind tank | IV | D | Will be positioned to prevent others walking behind |
| Dodge Ball Tournament | Injury to participants | III | C | Waivers signed by all participants |
| Cash money will be present | Cash is stolen | IV | D | Safety cash boxes will be used |
| Minors will be present | Minors with no parents/guardians on site | III | C | At staff members will have background checks on file |
| Minors will be present | Minors and parents/guardians on site | III | D | Parents/guardians must continually be in supervision |
| 5K Race | Risk of injury to participants | III | C | Waivers signed by all participants |
| | | | | UPD coordinated route with client |
| | | | | Event Liability Insurance required |
| Alcohol Service | Alcohol consumption | | | Fill out the Alcohol Request Form |
| Non-University Event with Risk | Any risk event above or not detailed | | | Event Liability Insurance is required |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

*Form Updated 07/22/22*

# Alcohol and Illegal Substances

West Texas A&M University is committed to fostering a safe and responsible event environment. Alcohol and illegal substances are among the most common contributors to organizational risk and disciplinary issues. Student organizations are strongly encouraged to plan substance-free events whenever possible.

If your organization hosts events where alcohol is present, you must follow all federal, state, and local laws, as well as University and Social Events Practices policies. This includes:
- No person under the legal drinking age may possess, consume, or be provided alcohol.
- Alcoholic beverages must be provided by a licensed and insured third-party vendor or through a BYOB (bring your own beverage) system within the approved alcohol content limits.
- Alcohol cannot be purchased with organizational funds or pooled member contributions.
- Common sources (kegs, bulk containers, communal pour stations) are prohibited.

Illegal drugs or controlled substances are strictly prohibited at all student organization events, including their possession, use, sale, delivery, or distribution.

Def_000125

Pl. App'x 499

**WT** Office of Student
Engagement and Leadership
WEST TEXAS A&M UNIVERSITY.

Violations of these policies may result in disciplinary action through the Office of Community Standards and/or the appropriate governing council.
*More information and guidance on how to host an event with alcohol is available in the WTAMU Social Events Practices Guide.*

## Equipment Safety

Equipment is another area where good risk management must be practiced. A careful check that equipment is in order is very important, as well as making sure participating students know how to use the equipment. All equipment, sport or non-sport, should be checked and it should be documented that participants were instructed in how to use each piece.

One way to document is by having everyone that attends a certain workshop or demonstration sign a list and make sure that list is kept in the organization's file for the remainder of the year. There may be other types of equipment that have no connection with a sport. Please remember any type of equipment your organization uses needs to be considered.

Another area where groups need to manage their risks is that which relates to products your group may sell. Baskets, which contain a variety of products, architectural or medical equipment, food or any kind of sports equipment may be a problem if someone is harmed. Your group could be held liable for selling or giving away a faulty product. Make sure your supplier is reliable and use common sense when deciding what products with which you may want to involve your group.

## Hazing/Harassment

Preventing hazing and sexual or racial harassment are not usually considered in the context of risk management, but your organization can suffer great consequences if hazing and harassment occur. This is something this University simply will not tolerate. Please read this section carefully.

The Student Handbook states this about hazing:
- In accordance with the Campus Hazing Act (H.R. 5646), any intentional, knowing, or reckless act committed by a person (whether individually or in concert with other persons) against another person or persons, regardless of the willingness to participate, that is committed in the course of an initiation into, an affiliation with, or the maintenance of membership in, a registered student organization or student group (e.g., a club, athletic team, fraternity, or sorority) and causes or

Student Organization Handbook Revised - August 2026                                    Page 18

**Def_000126**

Pl. App'x 500

**WT** **Office of Student
Engagement and Leadership**
WEST TEXAS A&M UNIVERSITY.

creates a risk above the reasonable risk encountered in the course of participation
in the IHE or the organization, of physical or psychological injury. Examples of
physical and psychological injury can include, but are not limited to:

- o Misuse of authority by virtue of one's class rank or leadership position, such
  as assigning acts of servitude.
- o Whipping, beating, striking, electronic shocking, placing of a harmful
  substance on someone's body, or similar activity.
- o Causing, coercing, or otherwise inducing sleep deprivation, exposure to
  the elements, confinement in a small space, extreme calisthenics, or other
  similar activity.
- o Causing, coercing, or otherwise inducing another person to consume food,
  liquid, alcohol, drugs, or other substances.
- o Causing, coercing, or otherwise inducing another person to perform sexual
  acts.
- o Any activity that places another person in reasonable fear of bodily harm
  through the use of threatening words or conduct.
- o Any activity that requires a violation of the WTAMU Student handbook.
- o Any activity that induces, causes, or requires another person to perform a
  duty or task that involves a criminal violation of local, State, Tribal, or
  Federal law.

- For purposes of this definition, a 'student group' means an organization at an
  institution of higher education in which two or more of the members are students
  enrolled at the institution of higher education, whether or not the organization is
  established or recognized by the institution. This is in alignment with the Campus
  Hazing Act (H.R. 5646).
- In alignment with WT's Amnesty policies, students who are recipients and/or
  victims of hazing (and who have not perpetrated hazing behavior on others
  involved in the fact pattern for which they are reporting) and who report the
  activities to the VP for Student Affairs, or designee responsible for oversight of the
  student conduct processes and/or the University Police Department, will not be
  charged with a violation of the hazing rule.
- Having firsthand knowledge of the planning or occurrence of a hazing incident
  and failing to report it to appropriate university officials (e.g., the Vice President
  for Student Affairs, at JBK Suite 102, 806-651-2389, Human Resource Office, 806-
  651-2114, or the University Police Department, 806-651-2300) is a violation.
- The hazing rule is not intended to prohibit the following conduct:
  - o Customary public athletic events, contests, or competitions that are
    sponsored by the University or the organized and supervised practices
    associated with such events; or

---

Student Organization Handbook Revised – August 2026                    Page 19

Pl. App'x 501



**WT** Office of Student
Engagement and Leadership
WEST TEXAS A&M UNIVERSITY.

- Activity or conduct that furthers the goals of a legitimate educational curriculum, a legitimate extracurricular program, or a legitimate military training program as defined and approved by the University.
- Hazing is a violation of Federal law (H.R. 5646), Texas state law under Texas Education Code Sections 37.151 and 51.936, and TAMU System Policy 07.01 - Ethics.

## Insurance

In many cases, your organization should require participants to have medical, accident, or injury insurance. Most students are covered under a family plan, but it is a good practice to request proof of insurance (such as a copy of their insurance card) or to secure event-specific insurance when needed.

The University does not provide insurance coverage for students and cannot be responsible for medical bills or related expenses.

For assistance with purchasing event insurance, contact Richard Smith, Assistant Vice President of Research, Risk & Compliance, at rcsmith@wtamu.edu or 806-651-2740.

## Student Activity Release Form

West Texas A&M University, in conjunction with The Texas A&M University System Office of Risk Management and Safety, is committed to the minimization of risk and protecting against unpredictable loss by promoting safety awareness on the part of all campus departments. This form is a legal document and should be stated as such. It is a good idea to have everyone sign it at the time they join or pay dues. It is important that participants are warned of any dangers inherent in an activity and that they sign a document stating that they understand this danger and will assume responsibility for themselves. It is also a good idea to have your members sign a more specific form before each event that carries some risk. This may seem like a lot of paperwork, but very important.

- <u>Waiver, Indemnification, and Medical Treatment Authorization</u>

Only students of WTAMU should participate in your activities. If outsiders want to participate, be sure they sign all risk forms, too. If you allow children to participate, it is a good idea for minors to have a release from their parents and require parents to be present at the event.

**Def_000128**

Pl. App'x 502

**WT** Office of Student
**Engagement and Leadership**
WEST TEXAS A&M UNIVERSITY.

If your organization has questions regarding risk management or liability, please don't hesitate to contact the Office of Student Engagement and Leadership.

## Houses/Lodges, Fire Safety and Equipment

Houses/Lodges, fire safety, and equipment are other areas where good risk management must be practiced. A careful check of each is very important to the overall safety of guests and users of a group's facilities and equipment. Guests and users should be made aware of any potential hazard, taught how to use certain equipment, and informed of proper fire evacuation plans. These measures are necessary to safeguard groups from potential legal action stemming from the use of their facilities or equipment. It is good practice to contact Fire Marshall's office to have annual inspections of your facilities.

## Student Travel Procedures

West Texas A&M University (WTAMU) supports student activities both on and off campus while prioritizing student safety. The requirements outlined in this rule apply to student travel more than 25 miles from campus, or to Palo Duro Canyon, for any activity organized, registered, funded, or sponsored by WTAMU. Students traveling on behalf of the University must receive prior approval from the appropriate vice president or department head.

Before taking any trips in regard to your organization, please make sure to review our Social Event Procedure document the Student Travel website.

**If you have any questions about student travel and the process, please contact the OSEL at 651-2313 or WTOSEL@wtamu.edu.**

**Def_000129**

Pl. App'x 503

**WT** Office of Student
Engagement and Leadership
WEST TEXAS A&M UNIVERSITY.

# Campus Resources



### Office of Student Engagement and Leadership
Office location: JBK 103
Phone Number: (806) 651-2313
Email: wtosel@wtamu.edu
Website: https://www.wtamu.edu/osel



### Student Affairs
Office Location: JBK 102
Phone Number: (806) 651-2050
Website: https://www.wtamu.edu/studentaffairs

### Jack B. Kelly Student Center
Phone Number: (806) 651-2394
Email: jbk@wtamu.edu
Website: https://www.wtamu.edu/jbk



### West Texas A&M Catering
Phone Number: (806) 651-2709
Email: catering@wtamu.edu
Website: https://wt.catertrax.com/index.asp?
&intOrderID=&intCustomerID=

### Residential Living
Phone Number: (806) 651-3000
Email: housing@wtamu.edu
Website: https://www.wtamu.edu/housing



### Career and Professional Development
Office Location: Classroom Center, Suite 113
Phone Number: (806) 651-2345
Email: wtcareer@wtamu.edu
Website: https://www.wtamu.edu/career



Def_000130

Pl. App'x 504





EXHIBIT
72

Pl. App'x 505
SPECTRUM 0002365





EXHIBIT

73

tabbies

WEST TEXAS A&M UNIVERSITY



EXHIBIT
77

RECORD FOR RELEASE
ADAM STEINBAUGH
H000731
Pl. App'x 507
SPECTRUM 0000762

WEST TEXAS A&M UNIVERSITY



RECORD FOR RELEASE
ADAM STEINBAUGH
H000731

Pl. App'x 508

SPECTRUM 0000763

WEST TEXAS A&M UNIVERSITY



RECORD FOR RELEASE
ADAM STEINBAUGH
H000731

Pl. App'x 509

SPECTRUM 0000764

WEST TEXAS A&M UNIVERSITY



| Other: | | | |
|--------|--|--|--|
| Other: | | | |

RECORD FOR RELEASE
ADAM STEINBAUGH
H000730 Pl. App'x 510

SPECTRUM 0000765

**WEST TEXAS A&M UNIVERSITY**

**Recipient Data:**
**Time Finished:** 2023-02-13 19:34:37 CST
**IP:** 173.219.125.11
**ResponseID:** R_3UWtFnRJo33S4fL
**Link to View Results:** ████████
**URL to View Results:**

████████████████████████████████

**Response Summary:**

Please provide event information below:* designates required field
   Date of Request:  2/13/2023
   Person Requesting Approval*  ████████
   Title*  A Fool's Drag Race
   Sponsoring Organization / Department: *(if applicable)*  Spectrum
   Phone (xxx-xxx-xxxx)*  ████████
   Email*  ████████
   Organization's Advisor*(if applicable)*  Dr. Drumheller
   Advisor's Phone (xxx-xxx-xxxx)  8066261039

Does your Advisor know about the event and the risk(s) involved?
   Yes

Please provide the event information below: * designates required field
   Date of Event*  March 31st
   Event Start Time*  6pm
   Event Name* *No acronyms or abbreviations please*  A Fool's Drag Show
   Estimated Attendance*  Expected up to 100 may exceed number of people.
   Description of Event* *Describe in detail the planned activities that will take place during the event (e.g. sports, running games, dancing, live music, jump houses, fire pits, etc.)*  A student drag show with dancing on stage and performances by students. The performers will

RECORD FOR RELEASE
ADAM STEINBAUGH
H000734

Pl. App'x 511

SPECTRUM 0000768

WEST TEXAS A&M UNIVERSITY

perform a song while in drag.
  Event End Time*  8pm
  Age Range of Participates*  All ages (18 and under with a guardian)
  Event Location(s)*  Legacy Hall
  # of Non-WTAMU Participates  20

Will food be served at your event/activity?
  Yes

What type of food will be served?
  Bottled water, soda cans, and a mocktail

Will alcohol be served at your event/activity?
  No

Will money be present at your event/activity?
  Yes

How will the money be secured?
  A lockbox

Does this event/activity require a contract to be signed by the organization?
  No

Does this event/activity, as currently planned, present a risk of damage to property?
  No

Does the event/activity, as currently planned, present more than an everyday risk of physical inj...
  No

Are minors (individuals less than 18 years of age) specifically invited to attend the event/activ...
  Yes

Please explain who will be onsite throughout the event/activity that will be directly responsible...
  Only minors with a legal guardian will be allowed to enter.

Does the event include any inherently dangerous activity?  Examples might be:  Fire, pyrotechnics...
  No

Does this event/activity pose a risk of embarrassment, humiliation, coercion, physical assault, o...
  Yes

Please explain the risk to participants AND what steps are being taken to mitigate those risks.
  Risks include dressing up in drag, which can lead to embarrassment and harassment from other students after the event. To mitigate this, when introducing the student in the

RECORD FOR RELEASE
ADAM STEINBAUGH
H00073
Pl. App'x 512

SPECTRUM 0000769

WEST TEXAS A&M UNIVERSITY

performance, we will not state their legal name, just their stage name they gave us.

This event will be insured by which of the following:
  None

Please attach the completed Hazard Matrix.  This needs to be provided with each risk assessment s...
  https://proxy.qualtrics.com/proxy/?
url=https%3A%2F%2Fwtamuuw.az1.qualtrics.com%2FWRQualtricsControlPanel%2FFile.ph
p%3FF%3DF_1GE2prHFukYUdnT&token=ZTp31EADjNZ4BfzEqvfKWjqMpUpjuHreypJjr
Qgvgjs%3D

Are any of the activities the event contemplates specifically excluded from coverage by the terms...
  No

Is this event/activity co-sponsored?
  Yes

With whom is it co-sponsored?
  F1RSTGEN, RHA, WTK, BSU, Buff Allies

Does this event/activity require waivers to be signed by participants?
  Yes

It is the responsibility of the group/organization to ensure that the use of University facilitie...
  https://proxy.qualtrics.com/proxy/?
url=https%3A%2F%2Fwtamuuw.az1.qualtrics.com%2FWRQualtricsControlPanel%2FFile.ph
p%3FF%3DF_2ceC1oEmUK52d23&token=%2B3dBDUAQHO3L6wFyNcsLwm4qb7zAk5K
RwAmJ9j6kEMU%3D

RECORD FOR RELEASE
ADAM STEINBAUGH
H000737

EXHIBIT
78

# West Texas A&M University Risk Management and Insurance Matrix

Exposure To Be Reviewed: A Fool's Drag Race

**Instructions: Step 1** - List all event activities and be as inclusive as possible. **Step 2** - Honestly identify risks associated with each activity. **Step 3** - Use the matrix below to assess your activities. Tally the severity and probability scores for evaluation. **Step 4** - Brainstorm methods to manage risks. See if you can reduce the probability or severity of something going wrong. **Step 5** - Submit the Risk Management and Insurance Matrix Form with your Risk Assessment Form for further review. If you have questions, please contact Richard Smith via email at rcsmith@wtamu.edu.

| List of Activities to Occur | Associated Risks* | Severity | Probability | Method to Manage Risks** |
|---|---|---|---|---|
| Practice Race | walking in heels (sprained ankle) | IV | D | have performers practice in heels before event |
| Drag Race | performing in drag (possible bad press) | III | C | not allowing minors entry without a legal guardian |
| " " | possible protesters | IV | C | |
| | | | | |
| | | | | |

*Possible risks include: medical emergencies, food poisoning/allergens, damage to WTAMU reputation, accidents, injuries, and/or death

**Methods to manage risks include: insuring risk, arranging for security, use of administrative procedures, and/or use of PPE or safety devices

## Severity

**I: May result in death**

**II: May cause severe injury, major property damage, significant financial loss, and/or result in negative publicity for WTAMU**

**III: May cause a moderate illness, injury, property damage, financial loss, and/or result in negative publicity for WTAMU**

**IV: Presents a minimal threat to safety, property, operations, or reputation**

## Risk Matrix

| | | Probability | | |
|---|---|---|---|---|
| **Severity** | **A** | **B** | **C** | **D** |
| **I** | High Risk | High Risk | High Risk | Medium Risk |
| **II** | High Risk | High Risk | Medium Risk | Medium Risk |
| **III** | Medium Risk | Medium Risk | Medium Risk | Low Risk |
| **IV** | Medium Risk | Medium Risk | Low Risk | Low Risk |

High risk areas may be sent to System Risk Management for additional review. Although insurance procurement may not be the answer, discussions should occur regarding self-retention so all parties are aware of the risks associated with the activity.

## Probability

**A: Likely to occur immediately or in a short period of time (6-months); expected to occur frequently**

**B: Likely to occur in the near future (6 months – 1 year); expected to occur periodically over a relatively short timeframe; expected to occur over the life of an event or project**

**C: May occur if given enough time; probability of occurrence is equal to it not occurring**

**D: Unlikely to occur at any point**

_Form Updated 07/22/22_

SPECTRUM 0000776

| List of Activities to Occur | Associated Risks* | Seriousness | Probability | Method to Manage Risks** |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Form Updated 07/22/22

SPECTRUM 0000777

WEST TEXAS A&M UNIVERSITY





**DR. SHAWN M. FOUTS** Jack B. Kelley Student Center
SENIOR DIRECTOR OF CAMPUS COMMUNITY
806.651.2329 | sfouts@wtamu.edu | wtamu.edu



RECORD FOR RELEASE
ADAM STEINBAUGH
H000731

EXHIBIT 82

WEST TEXAS A&M UNIVERSITY



**From:** WTAMU Risk Assessments <risk@wtamu.edu>
**Sent:** Thursday, February 16, 2023 9:45 AM
**To:** ███████████████████████ JBK <jbk@wtamu.edu>; WTAMU Risk
Assessments <risk@wtamu.edu>
**Subject:** Re: [EXTERNAL] Risk Assessment for : A Fool's Drag Show on March 31st

Thank you █████, make sure on your marketing material that you mention that this is fund raiser and the cost of admission. Please indicate on the marketing material that "may not be appropriate for persons under the age of 13," or something similar. Angela Allen and the Office of Diversity, Equity, and Inclusion may be a great resource as well. I appreciate your responsiveness.

Let us know how we can continue to offer assistance,
Shawn



**SHAWN M. FOUTS** Jack B. Kelley Student Center
SENIOR DIRECTOR OF CAMPUS COMMUNITY
806.651.2329 | sfouts@wtamu.edu | wtamu.edu

***WIN the Day*** *– What's Important Now*

**From:** ███████████████████
**Date:** Thursday, February 16, 2023 at 9:35 AM
**To:** WTAMU Risk Assessments <risk@wtamu.edu>
**Subject:** RE: [EXTERNAL] Risk Assessment for : A Fool's Drag Show on March 31st

Good morning,

1.) Yes our advisor will be present as well multiple Buff Allies.

RECORD FOR RELEASE
ADAM STEINBAUGH
H00073
Pl. App'x 517
SPECTRUM 0000787

WEST TEXAS A&M UNIVERSITY

2.) The show is planned to be pg13, so yes there will need to be content warnings up to that age.

3.) Yes all performers will have to get their song and dress pre-approved.

4.) The advisor for Spectrum and the Treasurer will account for the funds received, payed out, and donated

5.) Yes 100 chairs should be enough and thank you for having more in reserve just in case.

6 and 7.) We will get on that.

Sent via the Samsung Galaxy S21+ 5G, an AT&T 5G smartphone

-------- Original message --------
From: WTAMU Risk Assessments <risk@wtamu.edu>
Date: 2/14/23 2:49 PM (GMT-06:00)
To: ████████████████████████████ "Drumheller, Kristina"
<kdrumheller@wtamu.edu>
Subject: Re: [EXTERNAL] Risk Assessment for : A Fool's Drag Show on March 31st

Good afternoon, we're trying to insure you have a great event without any unforeseen issues:

1. Will a Club Advisor be at the event? We always highly recommend it for all events.

2. Will the event contain material that may need "warning labels" for minors that may attend (song lyrics, for instance? We've had this happen before)? As an example, sometimes with a comedian signage will be posted that states that not all material may be appropriate for minors.

3. Are the participants required to get prior approval for their dress and performance prior to the event? Reference above.

4. For money received, will a transaction record be kept of money received and its use following the event (deposited, gifted, etc)? We want to ensure that the event organizers mitigate any perceived misuse of funds or funds not being accounted for.

5. Are 100 chairs enough? We will be prepared to add more if needed and may set up extra.

6. On your poster, please list BSU as a sponsoring club. Also, please show this as a fund raiser.

7. The Risk Assessment committee would ask you to consider changing one of your graphics on

RECORD FOR RELEASE
ADAM STEINBAUGH
H000731

WEST TEXAS A&M UNIVERSITY

your marketing, specifically the one on the right with the individual doing the splits.

We really do want you to have a successful event and generate a great donation for The Trevor Project. This event is a first of this nature so it generated questions in order to provide you with a great event experience.

Thank you for your responsiveness. I'm glad to help any way I can.

Shawn

**Error! Filename not specified.**

***WIN the Day*** *– What's Important Now*

---

**Recipient Data:**
**Time Finished:** 2023-02-13 19:34:37 CST
**IP:** 173.219.125.11
**ResponseID:** R_3UWtFnRJo33S4fL
**Link to View Results:** ▮▮▮▮
**URL to View Results:** ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮

---

**Response Summary:**

Please provide event information below:* designates required field
  Date of Request:  2/13/2023
  Person Requesting Approval* ▮▮▮▮▮
  Title*  A Fool's Drag Race

RECORD FOR RELEASE
ADAM STEINBAUGH
H00073

Pl. App'x 519

SPECTRUM 0000789

WEST TEXAS A&M UNIVERSITY

Sponsoring Organization / Department: *(if applicable)*  Spectrum
Phone (xxx-xxx-xxxx)*  ████████
Email*  ████████████████
Organization's Advisor*(if applicable)*  Dr. Drumheller
Advisor's Phone (xxx-xxx-xxxx)  8066261039

Does your Advisor know about the event and the risk(s) involved?
   Yes

Please provide the event information below: * designates required field
   Date of Event*  March 31st
   Event Start Time*  6pm
   Event Name* *No acronyms or abbreviations please*  A Fool's Drag Show
   Estimated Attendance*  Expected up to 100 may exceed number of people.
   Description of Event* *Describe in detail the planned activities that will take place during the event (e.g. sports, running games, dancing, live music, jump houses, fire pits, etc.)*  A student drag show with dancing on stage and performances by students. The performers will perform a song while in drag.
   Event End Time*  8pm
   Age Range of Participates*  All ages (18 and under with a guardian)
   Event Location(s)*  Legacy Hall
   # of Non-WTAMU Participates  20

Will food be served at your event/activity?
   Yes

What type of food will be served?
   Bottled water, soda cans, and a mocktail

Will alcohol be served at your event/activity?
   No

Will money be present at your event/activity?
   Yes

How will the money be secured?
   A lockbox

Does this event/activity require a contract to be signed by the organization?
   No

Does this event/activity, as currently planned, present a risk of damage to property?
   No

Does the event/activity, as currently planned, present more than an everyday risk of physical inj...

RECORD FOR RELEASE
ADAM STEINBAUGH
H000731

Pl. App'x 520

SPECTRUM 0000790

WEST TEXAS A&M UNIVERSITY

No

Are minors (individuals less than 18 years of age) specifically invited to attend the event/activ...
  Yes

Please explain who will be onsite throughout the event/activity that will be directly responsible...
  Only minors with a legal guardian will be allowed to enter.

Does the event include any inherently dangerous activity?  Examples might be:  Fire, pyrotechnics...
  No

Does this event/activity pose a risk of embarrassment, humiliation, coercion, physical assault, o...
  Yes

Please explain the risk to participants AND what steps are being taken to mitigate those risks.
  Risks include dressing up in drag, which can lead to embarrassment and harassment from other students after the event. To mitigate this, when introducing the student in the performance, we will not state their legal name, just their stage name they gave us.

This event will be insured by which of the following:
  None

Please attach the completed Hazard Matrix.  This needs to be provided with each risk assessment s...
  https://proxy.qualtrics.com/proxy/?url=https%3A%2F%2Fwtamuuw.az1.qualtrics.com%2FWRQualtricsControlPanel%2FFile.php%3FF%3FDF_1GE2prHFukYUdnT&token=ZTp31EADjNZ4BfzEqvfKWjqMpUpjuHreypJjrQgvgjs%3D

Are any of the activities the event contemplates specifically excluded from coverage by the terms...
  No

Is this event/activity co-sponsored?
  Yes

With whom is it co-sponsored?
  F1RSTGEN, RHA, WTK, BSU, Buff Allies

Does this event/activity require waivers to be signed by participants?
  Yes

It is the responsibility of the group/organization to ensure that the use of University facilitie...
  https://proxy.qualtrics.com/proxy/?url=https%3A%2F%2Fwtamuuw.az1.qualtrics.com%2FWRQualtricsControlPanel%2FFile.php%3FF%3FDF_2ceC1oEmUK52d23&token=%2B3dBDUAQHO3L6wFyNcsLwm4qb7zAk5KRwAmJ9j6kEMU%3D

RECORD FOR RELEASE
ADAM STEINBAUGH
H00073Pl. App'x 521

SPECTRUM 0000791

**02.21.2023**
**Briefing w/Dr. Thomas and Chance Haugen**
**Spectrum Fool's Day Drag Race**

Consults
Jennifer Ford TAMU Assoc Senior Dir of Student Affairs
Dora Zavala TAMU OGC/Director of DEI
Dr. Kristen Harrell TAMU AVP Student Affairs/Dean of Students
Kris Drumheller WT Spectrum Org Adviser
Barrett Bright Spectrum Student Leader

Email Correspondence

Thank you **Barrett**, make sure on your marketing material that you mention that this is fund raiser and the cost of admission. Please indicate on the marketing material that "may not be appropriate for persons under the age of 13," or something similar. Angela Allen and the Office of Diversity, Equity, and Inclusion may be a great resource as well. I appreciate your responsiveness.

Let us know how we can continue to offer assistance,
Shawn

*WIN the Day – What's Important Now*

**From:** Barrett Bright <babright1@buffs.wtamu.edu>
**Date:** Thursday, February 16, 2023 at 9:35 AM
**To:** WTAMU Risk Assessments <risk@wtamu.edu>
**Subject:** RE: [EXTERNAL] Risk Assessment for : A Fool's Drag Show on March 31st

Good morning,

1.) Yes our advisor will be present as well multiple Buff Allies.

2.) The show is planned to be pg13, so yes there will need to be content warnings up to that age.

3.) Yes all performers will have to get their song and dress pre-approved.

4.) The advisor for Spectrum and the Treasurer will account for the funds received, payed out, and donated

5.) Yes 100 chairs should be enough and thank you for having more in reserve just in case.

6 and 7.) We will get on that.



EXHIBIT 83

Sent via the Samsung Galaxy S21+ 5G, an AT&T 5G smartphone

-------- Original message --------
From: WTAMU Risk Assessments <risk@wtamu.edu>
Date: 2/14/23 2:49 PM (GMT-06:00)
To: Barrett Bright <babright1@buffs.wtamu.edu>, "Drumheller, Kristina" <kdrumheller@wtamu.edu>
Subject: Re: [EXTERNAL] Risk Assessment for : A Fool's Drag Show on March 31st

Good afternoon, we're trying to insure you have a great event without any unforeseen issues:

1. Will a Club Advisor be at the event? We always highly recommend it for all events.

2. Will the event contain material that may need "warning labels" for minors that may attend (song lyrics, for instance? We've had this happen before)? As an example, sometimes with a comedian signage will be posted that states that not all material may be appropriate for minors.

3. Are the participants required to get prior approval for their dress and performance prior to the event? Reference above.

4. For money received, will a transaction record be kept of money received and its use following the event (deposited, gifted, etc)? We want to ensure that the event organizers mitigate any perceived misuse of funds or funds not being accounted for.

5. Are 100 chairs enough? We will be prepared to add more if needed and may set up extra.

6. On your poster, please list BSU as a sponsoring club. Also, please show this as a fund raiser.

7. The Risk Assessment committee would ask you to consider changing one of your graphics on your marketing, specifically the one on the right with the individual doing the splits.

We really do want you to have a successful event and generate a great donation for The Trevor Project. This event is a first of this nature so it generated questions in order to provide you with a great event experience.

Thank you for your responsiveness. I'm glad to help any way I can.

Shawn

*Error! Filename not specified.*

***WIN the Day*** *– What's Important Now*

---

**Recipient Data:**
**Time Finished:** 2023-02-13 19:34:37 CST
**IP:** 173.219.125.11
**ResponseID:** R_3UWtFnRJo33S4fL
**Link to View Results:** Click Here
**URL to View**
**Results:** https://proxy.qualtrics.com/proxy/?url=https%3A%2F%2Fwtamuuw.sjc1.qualtrics.com%2Fapps%2Fsingle-response-reports%2Freports%2FfgaPhQgAD0XsHTrJcLsYRQchbij5daXSZkvD2IStt%252EZz8IkZQfjE5reL90WG4EfAA5lthV-O6orZvH11QpXNLP4bcoM2sf3Ko4i5EWWYZWUjUvhrLQeDcZrbSImPbONCTiVRgGatnHlxEUVj2yur8D10B1KTjC79PGYNCxVxsToe8ITQ3lAY0ZKyllIEjy5WIXQm%252EHa2MjK0qq5xBwvMuNFrMi9q5DVUWfYMbBwH7rd0ewdKUi10gsXpqUaPrs994gQ6VSKlSqv1Ek3eajAB0emkA-lF3Ue8a25K4Xn53V4&token=5U4IXlo0IGXUKhzupfFkXOTPutraGAI84zwZ2JlHoGg%3D

---

**Response Summary:**

Please provide event information below:* designates required field
   Date of Request:  2/13/2023
   Person Requesting Approval*   Barrett Bright
   Title*   A Fool's Drag Race
   Sponsoring Organization / Department: *(if applicable)*  Spectrum
   Phone (xxx-xxx-xxxx)*   8068863940
   Email*  Babright1@buffs.wtamu.edu
   Organization's Advisor*(if applicable)*  Dr. Drumheller
   Advisor's Phone (xxx-xxx-xxxx)   8066261039

Does your Advisor know about the event and the risk(s) involved?
   Yes

Please provide the event information below: * designates required field
   Date of Event*   March 31st
   Event Start Time*   6pm
   Event Name* *No acronyms or abbreviations please*   A Fool's Drag Show
   Estimated Attendance*   Expected up to 100 may exceed number of people.

Description of Event* *Describe in detail the planned activities that will take place during the event (e.g. sports, running games, dancing, live music, jump houses, fire pits, etc.)*  A student drag show with dancing on stage and performances by students. The performers will perform a song while in drag.

Event End Time*  8pm

Age Range of Participates*  All ages (18 and under with a guardian)

Event Location(s)*  Legacy Hall

# of Non-WTAMU Participates  20


Will food be served at your event/activity?
  Yes

What type of food will be served?
  Bottled water, soda cans, and a mocktail

Will alcohol be served at your event/activity?
  No

Will money be present at your event/activity?
  Yes

How will the money be secured?
  A lockbox

Does this event/activity require a contract to be signed by the organization?
  No

Does this event/activity, as currently planned, present a risk of damage to property?
  No

Does the event/activity, as currently planned, present more than an everyday risk of physical inj...
  No

Are minors (individuals less than 18 years of age) specifically invited to attend the event/activ...
  Yes

Please explain who will be onsite throughout the event/activity that will be directly responsible...
  Only minors with a legal guardian will be allowed to enter.

Does the event include any inherently dangerous activity?  Examples might be:  Fire, pyrotechnics...
  No

Does this event/activity pose a risk of embarrassment, humiliation, coercion, physical assault, o...
  Yes

Please explain the risk to participants AND what steps are being taken to mitigate those risks.
  Risks include dressing up in drag, which can lead to embarrassment and harassment from other students after the event. To mitigate this, when introducing the student in the performance, we will not state their legal name, just their stage name they gave us.

This event will be insured by which of the following:
  None

Please attach the completed Hazard Matrix.  This needs to be provided with each risk assessment s...
  https://proxy.qualtrics.com/proxy/?url=https%3A%2F%2Fwtamuuw.az1.qualtrics.com%2FWRQualtrics
ControlPanel%2FFile.php%3FF%3DF_1GE2prHFukYUdnT&token=ZTp31EADjNZ4BfzEqvfKWjqMpUpjuHre
vpJirOgvgjs%3D

Are any of the activities the event contemplates specifically excluded from coverage by the terms...
  No

Is this event/activity co-sponsored?
  Yes

With whom is it co-sponsored?
  F1RSTGEN, RHA, WTK, BSU, Buff Allies

Does this event/activity require waivers to be signed by participants?
  Yes

It is the responsibility of the group/organization to ensure that the use of University facilitie...
  https://proxy.qualtrics.com/proxy/?url=https%3A%2F%2Fwtamuuw.az1.qualtrics.com%2FWRQualtrics
ControlPanel%2FFile.php%3FF%3DF_2ceC1oEmUK52d23&token=%2B3dBDUAQHO3L6wFyNcsLwm4qb7
zAk5KRwAmJ9j6kEMU%3D


Good morning. We have had a drag show on campus a couple of times, but it was organized by another
department and then later was organized by an independent student organization so our department
has not been directly involved. Here is one resource that may be helpful to you in navigating expressive
activity on campus https://provost.tamu.edu/Provost/media/Assets/pdfs-essentials/Access-Expressive-
Activity-0618.pdf

I also think speaking with Dr. Kristen Harrell, Assistant Vice President for Student Affairs, would be
helpful as she has Texas A&M University System Student Affairs support as part of her job. You can find
more information including contact information here.

I hope that helps and let me know if you still want to touch base or if I can do anything else.

Jennifer Ford
Jennifer-ford@tamu.edu


**From:** Drumheller, Kristina <kdrumheller@wtamu.edu>
**Date:** Thursday, February 16, 2023 at 9:05 AM

Pl. App'x 526

**To:** Fouts, Shawn M. <sfouts@wtamu.edu>
**Subject:** Re: Spectrum Event 03.31.2023

Hi Shawn,

I have communicated with Barrett and asked to see the marketing materials after the previous email. He tends to work with Chip quite a bit so I will also loop him in to make sure the materials have everything they need on them. I appreciate the attention to details since I was mostly brought in for the risk assessment portion and wasn't much in the planning stages.

Kris

Kristina Drumheller, PhD
Associate Dean, Communication & ATD
Professor, Communication
WTAMU Box 60754
Canyon, Texas 79016
806.651.2816
she/her/hers

Dr. Fouts,

Good afternoon. As we discussed over the phone, your first contact should be the Office of the VP of Student Affairs (Dr. Mike Knox). There should be support and guidance for events such as this one in terms of a business plan, marketing plan, security plan, etc. Another good resource would be the TAMU Division of Student Affairs. I have not reached out to them myself, but as a System Member, I am certain that they have someone in their office who would be able to advise you. Their contact information is below:

Student Life
(979) 845-3111
studentlife@tamu.edu
https://studentlife.tamu.edu/directorsoffice/staff/

I hope this information helps. Have a great evening!

**Dora Lisa Zavala | Director, Equal Opportunity & Diversity**
Office of General Counsel
dzavala@tamus.edu

1230 TAMU | College Station, TX 77840-7896
Tel. 979.458.6203 | Fax: 979.458.6150  | www.tamus.edu

Moore/Connally Building
301 Tarrow, 4th Floor
College Station, TX 77840-7896

THE TEXAS A&M UNIVERSITY SYSTEM

<u>General Consensus/Thoughts to Keep in Mind (in no particular order)</u>
- Red Flags
  - Marketing very non-descript
    - Who/where is marketing directed/being placed?
    - Why so vague?
    - Did not even list this was a fund raiser, nor for who
    - Does not include all event sponsors
    - Why is RHA sponsoring this event? Student Org's – yes
    - WT Dept's? Would RHA sponsor other events?
  - If a fund raiser, why reserve for only 100 people?
    - After expenses not much left to send to non-profit
    - Is this first year merely a pilot program?
    - If not, what is the motivation for the event?
  - Who's monitoring/approving performances (if anyone; if needed)?
    - JBK has an approved list of music
    - Barrett said they would submit music for approval in advance
  - Why did they seem to by-pass so many WT Offices?
    - Office of DEI
    - OSEL
    - Does WT need to review its processes?
- The students have a 1st Amendment right to have this event. However, that does not mean they have carte blanche to do whatever they want
  - As long as the standards they are required to follow are no different from what other groups would be held to
  - If WT does not have a written <u>Expressive Activity</u> policy now is the time to develop one
  - Does this need to land with Risk Assessment as the final approval?
    - Seems outside the scope of approvals?
    - Why hasn't the VPSA been brought in sooner (OGC)?
      - My response was that I was working with the student org to ensure a successful event and doing due diligence to mitigate risk
- This event should have gone through WT's Office of DEI (Office of General Counsel/Dir. Of DEI – Dora Zavala)
  - Kristen Harrell (TAMU AVP) agreed that in an ideal world this should happen
  - However, it would have fallen to Student Affairs at TAMU too
- The Org Adviser should be more actively involved, beyond just Risk
- Marketing material needs to include that it is a fund raiser and list the non-profit funds are supporting; that it may not be appropriate for minors under the age of 13; that there is an admission charge (and how much); and that concessions will be available for purchase
- The first time event on campus always carries with it the greatest potential for fallout

- o Be prepared
- o Make sure VPSA is fully informed so he is not taken by surprise and can keep the University President informed if something happens
- o Do everything to cover the University and Pro-Staff in case of fallout
- All student events need to go through an approval process outside of just Risk
- Refer student org events to proper areas for guidance, in this case Office of DEI; OSEL; other as appropriate
- Make sure you have an <u>Expressive Activities</u> policy and procedure (TAMU sent us theirs)
- TAMU developed a separate committee that is lead by their VPSA, it is a Student Event Resource and Response Team
  - o It is not necessarily an approval committee
  - o It is designed to be a resource committee (can really help org advisers)
- Possible Fallout from Event:
  - o Unwanted publicity from inside and outside the University
    - ▪ Community responses
  - o Student protests
  - o Civil unrest (although generally unlikely)
- This event can be an opportunity for student diversity development
- What we've done to mitigate risk:
  - o UPD has assigned 2 officers (one is a supervisor)
  - o We have asked Spectrum to adjust their marketing
  - o Signage needed that states "May not be appropriate for minors under the age of 13)
  - o JBK will have 2 event managers present
  - o We are setting up for more than the 100 seats requested and will be ready with Ops Crew to add more chairs if needed
  - o Asked for performance music ahead of time as we have an approved playlist in the JBK
  - o Consulted with other System Schools for input

# West Texas A&M University Risk Management and Insurance Matrix

Exposure To Be Reviewed: __Don't be a Drag, Drag Show__

**Instructions: Step 1** - List all event activities and be as inclusive as possible. **Step 2** - Honestly identify risks associated with each activity. **Step 3** - Use the matrix below to assess your activities. Tally the severity and probability scores for evaluation. **Step 4** - Brainstorm methods to manage risks. See if you can reduce the probability or severity of something going wrong. **Step 5** - Submit the Risk Management and Insurance Matrix Form with your Risk Assessment Form for further review. If you have questions, please contact Richard Smith via email at rcsmith@wtamu.edu.

| List of Activities to Occur | Associated Risks* | Severity | Probability | Method to Manage Risks** |
|---|---|---|---|---|
| dancing | accident/injury | III | C | practice |
| mocktails | food poisoning/allergens | IV | D | ingredients list posted and practicing proper food handling |
| Drag show | reputational damage | III | B | police at event, minors not allowed |
| Drag show | risk of protests | IV | C | inform UPD, inform participants not to engage |

*Possible risks include: medical emergencies, food poisoning/allergens, damage to WTAMU reputation, accidents, injuries, and/or death

**Methods to manage risks include: insuring risk, arranging for security, use of administrative procedures, and/or use of PPE or safety devices

## Severity

**I: May result in death**

**II: May cause severe injury, major property damage, significant financial loss, and/or result in negative publicity for WTAMU**

**III: May cause a moderate illness, injury, property damage, financial loss, and/or result in negative publicity for WTAMU**

**IV: Presents a minimal threat to safety, property, operations, or reputation**

## Risk Matrix

| Severity | Probability | | | |
|---|---|---|---|---|
| | A | B | C | D |
| I | High Risk | High Risk | High Risk | Medium Risk |
| II | High Risk | High Risk | Medium Risk | Medium Risk |
| III | Medium Risk | Medium Risk | Medium Risk | Low Risk |
| IV | Medium Risk | Medium Risk | Low Risk | Low Risk |

High risk areas may be sent to System Risk Management for additional review. Although insurance procurement may not be the answer, discussions should occur regarding self-retention so all parties are aware of the risks associated with the activity.

## Probability

**A: Likely to occur immediately or in a short period of time (6<months); expected to occur frequently**

**B: Likely to occur in the near future (6 months – 1 year); expected to occur periodically over a relatively short timeframe; expected to occur over the life of an event or project**

**C: May occur if given enough time; probability of occurrence is equal to it not occurring**

**D: Unlikely to occur at any point**

*Form Updated 07/22/22*
Def_000049

EXHIBIT 89

Pl. App'x 530

| List of Activities to Occur | Associated Risks* | Seriousness | Probability | Method to Manage Risks** |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Form Updated 07/22/22
Def_000050



# The Don't be a Drag
# DRAG SHOW
*Don't be a drag, just be a queen!*

**GET YOUR TICKETS HERE:**



*Minors can be admitted with an adult parent or guardian.

# 18+

## March 22 | 6pm

### West Texas A&M University
### JBK Legacy Hall

**UNIVERSITY STUDENTS GET IN _FREE_ WITH ID CARD.**


EXHIBIT 92

  

Fundraiser for
## The Trevor Project

Def_000096

Def. App'x 532

 Outlook

---

## Confirm final details for Reservation #137159 scheduled on 3/22/2024 Fri

---

**From** JBK@wtamu.edu <JBK@wtamu.edu>

**Date** Tue 3/12/2024 8:30 AM

**To** Barrett Bright <babright1@buffs.wtamu.edu>; Marcus Stovall <lestovall1@buffs.wtamu.edu>

Good morning!

With your event coming up soon, we wanted to reach out and make sure your event details have been finalized, if there are any changes please reach out and let us know.

If you have any questions, we are available at (806) 651-2337 or email at JBK@wtamu.edu.

Thank you and have a great day!

<div align="center">

### Jack B. Kelley Student Center
WTAMU Box 60266
Canyon, TX 79016
(806) 651-2337

## Confirmation

</div>

| Student Org/Department/Individual | Reservation: 137159 |
|---|---|
| Barrett Bright | Event Name: Buff-a-Woah Drag Show |
| Spectrum WT | Status: Confirmed |
| Canyon, TX 79016 | Phone: 806-886-3940 |

| Bookings / Details | Quantity | Price | Amount |
|---|---|---|---|

Parking Instructions

*Will the event run the seven hours that it shows?*

Event Description?

The event is drag show a fundraiser for the Trevor Project, again. Activities include WT students performing in the art form of drag,

which includes makeup, attire, and music in that fashion.

Event Attendees?

University & Non-University

Event Attendees - Non-Uni.2

15

Event Attendees - Minors2

No

Setup - Time setup/teardown?

No

Food - Will Food be Served?

Yes

Food - Will Aramark be Used?

No

Food - Non-Aramark served

bottled water, sodas, Hurricane Mocktail



EXHIBIT

93

tabbies®

Auction?
  No
Risk Assessment?
  Moderate potential
Risk - Property - Moderate
  no
Risk - Participants - Moderate
  yes, dancing
Risk - Activity - Moderate
  no
Advertising?
  on WT campus through posters, TVs, and social media.

## Friday, March 22, 2024

### 2:00 PM - 8:00 PM Buff-a-Woah Drag Show (Confirmed) Legacy Hall 151

Reserved: 12:00 PM - 9:00 PM
Banquet Style for 100

| | | | |
|---|---|---|---|
| Room Charge: (9 hours @ $170.00/hr) | 1 | $1,530.00 | $1,530.00 |
| Less 100% Discount | | | -$1,530.00 |

A/V Setup:
  Lighting - Lighting cue per performer
  Audio - Spotify, MP4's; 500HP Sub; 1 wireless mic
  Tech - Yes

JBK Equipment:

| | |
|---|---|
| 60" Round Table | 8 |
| 6ft Rectangle Table | 4 |
| Banquet Chair | 336 |
| Pipe & Drape | 2 |

  *Inventory:*
  *13 bases, 13 uprights, 12 top crossbars, 36 drapes (Drape was purchased Feb. 2016)*

Production Services Equipment:

| | |
|---|---|
| Microphone (Legacy Hall - Handheld or Headset) | 1 |

Production Services Staffing:
1:00 PM - 8:00 PM Staffing

| | | | |
|---|---|---|---|
| Production Services Technician 1(7 hours @ $15.00/hr) | 2 | $105.00 | $210.00 |

Setup Details:
  Front 1/2 of room:

  Banquet for 48
  8 - 60" Rounds (6 Chairs/Table)
  Theatre for 72
  Curtains 3/4 Closed

  4 - 6' Tables in center of room for bar
  Theatre style in back 1/2 of room

  Pipe & Drape Hallway to Green Room

| | |
|---|---|
| JBK Equipment | $0.00 |
| Production Services Equipment | $0.00 |
| Production Services Staffing | $210.00 |
| Room Charge | $0.00 |
| Subtotal | $210.00 |
| Grand Total | $210.00 |

Pl. App'x 534

SPECTRUM 0002437

1          UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF TEXAS
2                 AMARILLO DIVISION

3   SPECTRUM WT,              )
                              )
4        Plaintiff,           )
                              )
5   v.                        )   Case No. 2:23-cv-00048
                              )
6   WALTER WENDLER, in his    )
    official capacity as the  )
7   President of West Texas   )
    A&M University, et al.,    )
8                             )
         Defendants.          )
9

10

11

12

13  ----------------------------------------------------------
                ORAL DEPOSITION OF CHRIS THOMAS
14             DECEMBER 11, 2025 - CANYON, TEXAS
    ----------------------------------------------------------
15

16

17

18

19

20       ORAL DEPOSITION OF CHRIS THOMAS, produced as a
    witness at the instance of the PLAINTIFF and duly sworn,
21  was taken in the above styled and numbered cause on
    DECEMBER 11, 2025, from 9:01 a.m. to 12:31 p.m., at the
22  offices of WEST TEXAS A&M UNIVERSITY, Old Main Building,
    Room 317, Canyon, Texas, before SHARON D. LIVINGSTON,
23  CSR-RPR, in and for the State of Texas, reported by
    machine shorthand, and pursuant to the Federal Rules of
24  Civil Procedure.

25

```
 1                    A P P E A R A N C E S

 2   FOR THE PLAINTIFF:
          Mr. Adam Steinbaugh
 3        FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
          510 Walnut Street, Suite 900
 4        Philadelphia, Pennsylvania 19106
          (215) 717-3473
 5        Adam@thefire.org

 6   FOR THE DEFENDANTS:
          Ms. Munera Al-Fuhaid
 7        OFFICE OF THE TEXAS ATTORNEY GENERAL
          300 West 15th Street
 8        Austin, Texas 78701
          (512) 463-2100
 9        Munera.al-fuhaid@oag.texas.gov

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          INDEX
                                                PAGE
 2   Appearances ------------------------------------   2

 3   Index ------------------------------------------   3

 4   Index of Exhibits ---------------------------- 3-4

 5   CHRIS THOMAS
          Examination by Mr. Steinbaugh ----------------   5
 6        Examination by Ms. Al-Fuhaid ----------------- 113
          Re-examination by Mr. Steinbaugh ------------- 114
 7
     Changes and Signature ---------------------------- 118
 8
     Reporter's Certification ------------------------- 120
 9
                       INDEX OF EXHIBITS
10   NUMBER        DESCRIPTION                       PAGE

11    94     Expressive Activity on Campus Policy 08.02
             Approved 11-13-25 -------------------------   13
12
      95     Expressive Activity on Campus Policy
13           08.02.01 Approved 11-13-25 ----------------   13

14    96     Expressive Activity on Campus Policy
             08.99.99.W1 Revised 7-28-25 ---------------   15
15
      97     First Amendment:  Dear Colleague 7-28-03 ---   18
16
      98     WTAMU Student Handbook 2025-2026 ----------   22
17
      99     WT Campus Organizations Handbook ----------   27
18
     100     Civil Rights Protections and Compliance
19           Policy 08.01 Revised 11-13-25 -------------   36

20   101     Civil Rights Compliance Policy 08.01.01
             Revised 8-15-22 ---------------------------   38
21
     102     WTAMU Equal Opportunity/Nondiscrimination --   39
22
     103     WTAMU PUP Frequently Asked Questions -------   45
23
     104     Pre-University Program Agreement for
24           Independent School Districts on Dual/
             Concurrent Enrollment Courses --------------   47
25
```

```
 1                    INDEX OF EXHIBITS (CONTINUED)
       NUMBER         DESCRIPTION                            PAGE
 2
```

```
 3     105    Pre-University Program Student Approval
              Form ------------------------------------    51

 4     106    PUP Enrollment Count by Semester -----------   53

 5     107    Handwritten Notes -------------------------    76

 6     108    The Heart and Soul of the Texas Panhandle
              Ists, Isms, and Free Will 6-12-22 ----------   80
 7
       109    Briefing with Dr. Thomas and Chance Haugen
 8            2-21-23 ------------------------------------   91

 9     110    Kimberly 1-on-1 6-6-22 --------------------    93

10     111    JBK and OSEL 3-6-23 -----------------------    97

11     112    Email Chain 3-24-25 with TAMUS Senior Student
              Affairs Officers, Chris Thomas, Chance Haugen
12            and Amber Black ---------------------------    98

13     113    Jack B. Kelly Student Center Procedures and
              Guidelines Revised 3-5-25 ------------------ 100
14
       114    Email Chain 3-24-25 with TAMUS Senior Student
15            Affairs Officers, Chris Thomas, and
              Walter Wendler ---------------------------- 103
16
       115    Calendar Appointment Reminder 3-24-25 ------ 104
17
```

```
18

19

20

21

22

23

24

25
```

1                          CHRIS THOMAS,

2    having been first duly sworn, testified as follows:

3                          EXAMINATION

4    BY MR. STEINBAUGH:

5         Q.   Good morning, Dr. Thomas.  It's Dr. Thomas,

6    correct?

7         A.   Yes.

8         Q.   Do you understand that you are here today for a

9    deposition over the university's cancellation of two

10   student drag shows?

11        A.   Yes.

12        Q.   Have you ever been deposed before?

13        A.   No, sir.

14        Q.   Okay.  I have three broad rules for us.  Please

15   listen to and answer the question that I'm asking.  If

16   you don't understand the question, let me know;

17   otherwise, I will assume that you know what I am asking.

18             Lawyers are prone to being mealy-mouthed. I

19   will probably ask some questions that are confusing, and

20   I'd rather get clean answers and something that everyone

21   reading this will understand.

22             I'm going to do my best not to talk over

23   you.  Please don't talk over me.  We want to give the

24   court reporter the ability to create a clean record.

25             Please give verbal answers, no nods, no

1  happening, my day would be working through emails,

2  continuing projects that are larger and take time, have

3  meetings with people, schedule meetings with staff, and

4  deal with any campus emergency or issue that comes up

5  that may change those other things.

6      Q.   Would you know whether a student organization

7  is in good standing with the university?

8      A.   I could look.

9      Q.   Do you know whether or not Spectrum is in good

10  standing with the university?

11     A.   As of today?

12     Q.   Correct.

13     A.   The last time I looked, I believe they were.

14     Q.   Do you have any reason to believe they would

15  not be?

16     A.   No.

17     Q.   To your knowledge, does Spectrum discriminate

18  against students on the basis of a protected class in

19  their membership or activities?

20     A.   Not to my knowledge.

21     Q.   Have you had any complaints that they do?

22     A.   No, sir.

23     Q.   Have you had any complaints alleging that

24  Spectrum has violated any university policy?

25     A.   No, sir.

 1            MS. AL-FUHAID:  Objection; calls for a

 2    legal conclusion.

 3        A.    Being offended wouldn't inherently mean that

 4    someone had been harassed.

 5        Q.    (BY MR. STEINBAUGH)  But I assume, in your

 6    role, you have attorneys who would be able to advise you

 7    on that?

 8        A.    I would ask for legal advice, yes, sir.

 9        Q.    And they would look to -- well, you probably

10    don't know what they would look to.

11            If we can go back to the university's

12    Expressive Activities Policy that we were looking at.

13        A.    Yes, sir.

14            MS. AL-FUHAID:  Is that 96?

15            MR. STEINBAUGH:  That is 08.02.01 for West

16    Texas A&M.

17            MS. AL-FUHAID:  Oh, that's 95.

18            MR. STEINBAUGH:  Oh, I'm sorry.

19    08.99.99.W1.

20            MS. AL-FUHAID:  Okay.  That's 96.

21        A.    Exhibit 96.  Yes, sir.

22        Q.    (BY MR. STEINBAUGH)  Can you go to Section 3.2?

23        A.    3.2, yes, sir.

24        Q.    Can you read through 3.2 to yourself and let me

25    know when you've had a chance to review that?

1     A.    Yes, sir.

2     Q.    This is referring to decisions by the

3 university to deny student organizations' requests for

4 use of particular spaces.

5               Is that right?

6     A.    Yes, sir.

7     Q.    And you see where it says, "If a request is

8 denied, the rationale for the decision will be provided

9 in writing.    The denial of a reservation request can be

10 appealed to the vice president for Student Affairs or a

11 designee."

12               Do you see that?

13     A.    Yes, sir.

14     Q.    And that's referring to you as the person who

15 would receive that appeal?

16     A.    Yes, sir.

17     Q.    If President Wendler decided to refuse or to

18 deny a request for space, would a student be able to

19 appeal to you?

20     A.    According to this policy, yes.

21     Q.    Would you have any authority to overturn

22 President Wendler?

23     A.    I would not have authority to overturn

24 President Wendler's decision.

25     Q.    If we could turn now to Section 6.

1  event.

2      A.   Yes, sir.

3      Q.   Were there any allegations that the 2023

4  on-campus proposed drag show was going to violate a

5  particular provision of the code of conduct or the

6  community standards?

7           MS. AL-FUHAID:  Objection; calls for a

8  legal conclusion.

9      A.   Please say that again.  I want to understand

10 that.

11     Q.   (BY MR. STEINBAUGH)  I appreciate, if my

12 questions are confusing, you letting me know, and I'll

13 make sure we get a clean answer.

14     A.   Yes, sir.

15     Q.   Was there a concern that a particular provision

16 of the code of conduct or community standards would be

17 violated by the planned drag show in 2023?

18     A.   That was not communicated to me.

19     Q.   Did you communicate any concern about that to

20 anyone else?

21     A.   No.

22     Q.   With respect to the 2024 planned performance,

23 do you know what I'm speaking about?

24     A.   Yes, sir.

25     Q.   Was there any concern or allegation that that

```
 1  performance would violate any particular provision of
 2  the Student Handbook or community standards?
 3       A.   Expressed to me?
 4       Q.   Correct.
 5       A.   No.
 6       Q.   And you didn't express a concern to anyone
 7  else?
 8       A.   I did not.
 9       Q.   Is there any particular concern that students
10  would violate some provision of the code of conduct or
11  community standards with respect to any future drag
12  performances?
13            MS. AL-FUHAID:  Objection; calls for
14  speculation.
15       A.   Please ask that again.
16       Q.   (BY MR. STEINBAUGH)  Let me back up.
17       A.   Yes, sir.
18       Q.   Are you aware that Spectrum has filed an
19  application to hold a drag show in 2026 at West Texas
20  A&M?
21       A.   I'm not aware.
22       Q.   Okay.  You can set that one aside.
23       A.   Okay.  I want to make sure I answer that
24  question.
25       Q.   Sure.
```

1    in that section says, "The PUP courses are regular

2    university courses with no variance in syllabi, course

3    outlines, grading procedures, and other academic

4    policies."

5               Is that accurate?

6         A.   Yes.

7         Q.   Does that mean that PUP students are taking

8    university courses, not secondary school courses?

9         A.   Yes.

10        Q.   Does the university offer any secondary school

11   courses?

12        A.   What do you mean by "secondary?"

13        Q.   Is West Texas A&M a secondary school?

14        A.   No.

15        Q.   So these are the same courses an undergraduate

16   student takes?  It's not watered down to accommodate

17   younger students?

18        A.   Correct.

19        Q.   And then under the section "Fees" at the

20   bottom, do you see where it says, "Students will pay

21   $150 per course?"

22        A.   Yes.

23        Q.   Are you aware of whether or not that depends on

24   the number of hours per course, or is it just a flat fee

25   of $150 whether or not the course is one credit or three

```
 1        A.   No, sir.  I had forgotten about that meeting.

 2        Q.   So you don't recall?

 3        A.   No, sir.

 4        Q.   Do you recall the meeting that you had with

 5   Barrett Bright about the cancellation?

 6        A.   I do.

 7        Q.   What was the nature of that discussion?

 8        A.   To inform him that the president had canceled

 9   his drag show.

10        Q.   And what did you tell him?

11        A.   I said, "I'm sorry.  The president has canceled

12   your drag show."

13        Q.   Anything else?

14        A.   I told him that if he was out money for

15   security cost or equipment rental, that I would cover

16   it.

17        Q.   Do you recall whether or not the university did

18   cover any of those costs?

19        A.   I don't believe they had any costs.

20        Q.   How did Barrett react?

21        A.   He was disappointed.

22        Q.   Did he say anything?

23        A.   Not that I recall.

24        Q.   When you say "he was disappointed," why did you

25   think he was disappointed, or what made you think that?
```

1        A.    No.

2        Q.    Have you heard the name "Myss Myka" before?

3        A.    I have now.

4        Q.    When was the first time you heard that name?

5        A.    After the drag show, and then with this

6    lawsuit.

7        Q.    So it would have been after President Wendler

8    canceled the show?

9        A.    Oh, yeah.

10        Q.    Would it have been in 2024?

11        A.    No.

12        Q.    Did you recently learn name of "Myss Myka"?

13        A.    No.

14        Q.    Do you have a ballpark estimate of when you

15    learned the name?

16        A.    I believe after the off-campus show, of which I

17    believe they were a performer.

18        Q.    How did you learn about the name "Myss Myka"?

19        A.    Either from the media or the lawsuit.

20        Q.    Do you know who Alex Fairly is?

21        A.    I do.

22        Q.    Who is that?

23        A.    He owns an insurance company in Amarillo.

24        Q.    Are you aware of his relationship with the

25    university?

1   concert.  Primarily, it was about that only the business

2   office has the authority to sign the contract.

3        Q.   Are you aware of the involvement of the campus

4   or the university police department in discussions about

5   that event?

6        A.   No, sir.

7        Q.   This is an exhibit we have previously marked as

8   Exhibit 64.  It's a video.

9             Are you familiar with the event University

10  Sing?

11       A.   Here at WT?

12       Q.   Yes.

13       A.   Yes, sir.

14       Q.   Can you describe what that is?

15       A.   The student organizations team up, and they do

16  songs and skits.

17       Q.   I'll play this short video.

18            Are you able to see that?

19       A.   Yes, sir.

20            (Video plays.)

21       Q.   (BY MR. STEINBAUGH)  Did you see at the very

22  end it showed "Office of Student Engagement and

23  Leadership?"

24       A.   Yes, sir.

25       Q.   That's your office?

```
 1        A.    That's OSEL, yes.
 2        Q.    Do you know whether or not your office produced
 3   this video?
 4        A.    I don't.
 5        Q.    Okay.  Have you been in Legacy Hall?
 6        A.    I have.
 7        Q.    Have you seen one of these University Sing
 8   events?
 9        A.    I have.
10        Q.    Does that appear to be an accurate
11   representation?
12        A.    Yeah.
13        Q.    Would it surprise you if your office had
14   produced a video like that?
15        A.    No, sir.
16        Q.    It produces videos like that pretty routinely?
17        A.    Yes, sir.  They work with other offices too.
18        Q.    So is this material that the university
19   produced?
20        A.    Yes.
21        Q.    Jumping back to the 2023 show, when you had the
22   conversation with Bear, was there any way for him to
23   appeal that, anyone he could have gone to to say "No,
24   this is wrong?"
25        A.    Not really.  I mean there's always a level of
```

 1  appeal.

 2       Q.   What do you mean?

 3       A.   Well, I mean that's the cornerstone of due

 4  process in American higher education.

 5       Q.   Sure, but who would he appeal to?

 6       A.   That's a fair question.

 7       Q.   Are you aware of an opportunity he would have

 8  had beforehand to contest President Wendler's decision

 9  to cancel it?

10       A.   No, sir.

11       Q.   Your meeting with him was just informing him

12  about the decision, correct?

13       A.   Yes, sir.

14       Q.   Was there ever, to your knowledge, a Title IX

15  investigation or guidance concerning the proposed show

16  before it was canceled?

17       A.   Title IX I don't know about.

18       Q.   During your meeting with President Wendler when

19  he informed the vice presidents he was canceling the

20  show, do you recall whether or not he said that he

21  believed drag shows were demeaning to women?

22       A.   I remember that phrase specifically in the

23  Harmless Drag Show memo.  I don't know if he mentioned

24  it at that particular meeting.

25       Q.   When you met with Bear, do you recall conveying

🇺🇸 An official website of the United States government  Here's how you know

U.S. Department of Education

# First Amendment: Dear Colleague

# [OCR-00028]

UNITED STATES DEPARTMENT OF EDUCATION
OFFICE FOR CIVIL RIGHTS
400 MARYLAND AVE., S.W.
WASHINGTON, D.C. 20202-1100

## THE ASSISTANT SECRETARY

July 28, 2003

Dear Colleague:

I am writing to confirm the position of the Office for Civil Rights (OCR) of the U.S. Department of Education regarding a subject which is of central importance to our government, our heritage of freedom, and our way of life: the First Amendment of the U.S. Constitution.

OCR has received inquiries regarding whether OCR's regulations are intended to restrict speech activities that are protected under the First Amendment. I want to assure you in the clearest possible terms that OCR's regulations are not intended to restrict the exercise of any expressive activities protected under the U.S. Constitution. OCR has consistently maintained that the statutes that it enforces are intended to protect students from invidious discrimination, not to regulate the content of speech. Harassment of students, which can include verbal or physical conduct, can be a form of

Help improve ED.gov

PI. App'x 551

discrimination prohibited by the statutes enforced by OCR. Thus, for example, in addressing harassment allegations, OCR has recognized that the offensiveness of a particular expression, standing alone, is not a legally sufficient basis to establish a hostile environment under the statutes enforced by OCR. In order to establish a hostile environment, harassment must be sufficiently serious (i.e., severe, persistent or pervasive) as to limit or deny a student's ability to participate in or benefit from an educational program. OCR has consistently maintained that schools in regulating the conduct of students and faculty to prevent or redress discrimination must formulate, interpret, and apply their rules in a manner that respects the legal rights of students and faculty, including those court precedents interpreting the concept of free speech. OCR's regulations and policies do not require or prescribe speech, conduct or harassment codes that impair the exercise of rights protected under the First Amendment.

As you know, OCR enforces several statutes that prohibit discrimination on the basis of sex, race or other prohibited classifications in federally funded educational programs and activities. These prohibitions include racial, disability and sexual harassment of students. Let me emphasize that OCR is committed to the full, fair and effective enforcement of these statutes consistent with the requirements of the First Amendment. Only by eliminating these forms of discrimination can we fully ensure that every student receives an equal opportunity to achieve academic excellence.

Some colleges and universities have interpreted OCR's prohibition of "harassment" as encompassing all offensive speech regarding sex, disability, race or other classifications. Harassment, however, to be prohibited by the statutes within OCR's jurisdiction, must include something beyond the mere expression of views, words, symbols or thoughts that some person finds offensive. Under OCR's standard, the conduct must also be considered sufficiently serious to deny or limit a student's ability to participate in or benefit from the educational program. Thus, OCR's standards require that the conduct be evaluated from the perspective of a reasonable person in the alleged victim's position, considering all the circumstances, including the alleged victim's age.

There has been some confusion arising from the fact that OCR's regulations are enforced against private institutions that receive federal-funds. Because the First

Amendment normally does not bind private institutions, some have erroneously assumed that OCR's regulations apply to private federal-funds recipients without the constitutional limitations imposed on public institutions. OCR's regulations should not be interpreted in ways that would lead to the suppression of protected speech on public or private campuses. Any private post-secondary institution that chooses to limit free speech in ways that are more restrictive than at public educational institutions does so on its own accord and not based on requirements imposed by OCR.

In summary, OCR interprets its regulations consistent with the requirements of the First Amendment, and all actions taken by OCR must comport with First Amendment principles. No OCR regulation should be interpreted to impinge upon rights protected under the First Amendment to the U.S. Constitution or to require recipients to enact or enforce codes that punish the exercise of such rights. There is no conflict between the civil rights laws that this Office enforces and the civil liberties guaranteed by the First Amendment. With these principles in mind, we can, consistent with the requirements of the First Amendment, ensure a safe and nondiscriminatory environment for students that is conducive to learning and protects both the constitutional and civil rights of all students.

Sincerely,


Gerald A. Reynolds
Assistant Secretary
Office for Civil Rights
Department of Education




**Office for Civil Rights (OCR)**

Page Last Reviewed: September 30, 2024

## Pay for College

Fill out the FAFSA

529 Plans

Repay Your Loans

1098 Tax Forms

## Educational Resources

504 Plans

FERPA

IEPs (Individualized Education Program)

## Teaching Resources

Professional Resources

School Safety and Security

Teaching Abroad

## File a Report

Report Fraud, Waste, or Abuse

Report a Civil Rights Violation

Student Privacy Complaint Forms

## About Us

Contact Us

ED Offices

Overview of ED

Frequently Asked Questions (FAQs)

Jobs at ED

## News

Press Releases

Homeroom Blog

Subscriptions

## Research

Data

Education Research

What Works Clearinghouse

## Site Notices and Privacy Policies

## ED Archive

# U.S. Department of Education



 www.ed.gov
**An official website of the Department of Education**

About Dept of Education          Accessibility Support          No FEAR Act data

Office of the Inspector General          Performance reports          FOIA          Privacy Policy

ED Archive

Looking for U.S. government information and services? **Visit USA.gov**

**WT** Community Standards
WEST TEXAS A&M UNIVERSITY

**WTAMU Student Handbook 2025-2026**



# WTAMU Student Handbook 2025-2026

*Published on 8/1/2025 by the Office of Community Standards at West Texas A&M University*



EXHIBIT
98

Office of Community Standards | JBK Suite 102 | 806-651-2389                    1 | P a g e

Def_000328    Pl. App'x 556

**WT** Community Standards
WEST TEXAS A&M UNIVERSITY™        WTAMU Student Handbook 2025-2026

## Table of Contents

Welcome and Forward.................................................................................................................5
**Part 1 | Academic Integrity Code**.........................................................................................6
1.1 | Academic Dishonesty......................................................................................................6
1.2 | Reporting Violations of the Academic Integrity Code.....................................................9
1.3 | Initial Finding of Fact and Review of Case.......................................................................9
1.4 | Hearings Before a College Integrity Committee (CIC)....................................................10
1.5 | Findings of a CIC............................................................................................................11
1.6 | Registration and Enrollment .........................................................................................12
1.7 | English Proficiency.........................................................................................................14
1.8 | Student Drop Procedure.................................................................................................14
1.9 | Withdrawal Procedure...................................................................................................14
1.10    | Attendance...............................................................................................................15
1.11    | Notification of Absences...........................................................................................16
1.12    | Grading System.........................................................................................................18
1.13    | Academic Standing....................................................................................................21
1.14    | Classification.............................................................................................................22
1.15    | Degree Requirements...............................................................................................23
1.16    | University Honors Program.......................................................................................23
1.17    | Tuition Laws..............................................................................................................23
1.18    | Payment of Fees and Charges...................................................................................23
1.19    | Tuition Refunds.........................................................................................................24
1.20    | Classroom Behavior..................................................................................................24
1.21    | Computing Services: Rules for Responsible Computing............................................25
**Part 2 | Student Life Rules**....................................................................................................27
2.1 | Students' Rights and Responsibilities............................................................................27
2.2 | Reporting Violations of the WTAMU Student Handbook...............................................27
2.3 | Community Standards.....................................................................................................27
2.4 | Standard of Evidence.....................................................................................................30
2.5 | Amnesty..........................................................................................................................31
2.6 | Student Conduct Proceedings........................................................................................31
2.7 | Interim Measures and Sanctions....................................................................................37
2.8 | Student Conduct Files and Retention.............................................................................40
2.9 | Departure from Campus Following Suspension or Dismissal..........................................40
2.10    | Parental Notification.................................................................................................41
2.11    | Abuse of the Student Conduct System......................................................................41
2.12    | Alcohol Beverages....................................................................................................41
2.13    | Animals on Campus...................................................................................................41
2.14    | Behavioral Intervention Team (BIT)..........................................................................44
2.15    | Campus Security Report............................................................................................45
2.16    | Damage to Property..................................................................................................45
2.17    | Dishonesty................................................................................................................45

Def_000329    App'x 557

2.18    | Expressive Activity........................................................................................45
2.19    | Failure to Comply and Disorderly Conduct.........................................................49
2.20    | Firearms, Ammunition, and Weapons..............................................................50
2.21    | Fire Safety.................................................................................................51
2.22    | Food & Beverages........................................................................................52
2.23    | Hammocks..................................................................................................52
2.24    | Harassment.................................................................................................52
2.25    | Hazing.......................................................................................................52
2.26    | Illegal Substances.........................................................................................53
2.27    | Lost, Found, or Abandoned Property.................................................................54
2.28    | Misuse of Transportation...............................................................................54
2.29    | Photography and Recording of Students and Employees.........................................55
2.30    | Sexual Misconduct.......................................................................................56
2.31    | Soliciting on Campus.....................................................................................57
2.32    | Student Organizations...................................................................................57
2.33    | Unauthorized Areas......................................................................................58
2.34    | Violation of Federal, State, Local Law and/or University Procedures..........................58
2.35    | Violation of Published University Rules or TAMU System Regulations .......................58
**Part 3 | Civil Rights and Title IX**...................................................................................59
3.1 | Title IX, Sex-Based Misconduct and Civil Rights Adjudication Process...........................60
3.2 | All Other Civil Rights Complaints (Non Sex-Based)..................................................61
3.3 | Decisions (Non Sex-Based Cases) Involving Employees as Respondents..........................61
3.4 | Appeal of Decision and/or Sanctions of Allegations of Sex Discrimination........................62
3.5 | Appeals — Allegations of Discrimination Not Based on Sex .......................................63
**Part 4 | Residential Living Handbook**...........................................................................63
4.1 | Residence Hall Rights and Responsibilities..........................................................63
4.2 | Alcohol Containers.........................................................................................63
4.3 | Animals......................................................................................................63
4.4 | Balconies....................................................................................................64
4.5 | Business Operations........................................................................................64
4.6 | Candles and Incense.......................................................................................64
4.7 | Car Washing................................................................................................64
4.8 | Card Access System........................................................................................64
4.9 | Chalking.....................................................................................................64
4.10    | Community Living........................................................................................64
4.11    | Cooperation with University Officials................................................................65
4.12    | Cleaning...................................................................................................65
4.13    | Damages or Theft of Property.........................................................................65
4.14    | Decorations...............................................................................................66
4.15    | Early Arrivals ............................................................................................66
4.16    | Emergency and Safety Equipment ..................................................................67
4.17    | Exterior Door Locking ..................................................................................67
4.18    | Furniture ..................................................................................................68

**Def_000330** App'x 558

4.19   | Guests.... ......................................................................................................68
4.20   | Hall Sports.....................................................................................................69
4.21   | Health and Safety Checks...........................  ..............................................69
4.22   | Identification.................................................................................................70
4.23   | Laundry, Ice, or Vending Machines.............................................................70
4.24   | Lost or Found Property..................................................................................70
4.25   | Lounge Use......................................................................................................70
4.26   | Maintenance and Repair Request.................................................................70
4.27   | Minor Supervision and Endangerment.........................................................70
4.28   | Noise................................................................................................................71
4.29   | Offensive Odor...............................................................................................71
4.30   | Posting Notices...............................................................................................71
4.31   | Prohibited Items.............................................................................................72
4.32   | Room Entry......................................................................................................72
4.33   | Solicitation......................................................................................................73
4.34   | Storage.............................................................................................................73
4.35   | Trash.................................................................................................................73
4.36   | Unauthorized Areas.......................................................................................73
4.37   | Vandalism........................................................................................................73
4.38   | Window/Window Screens..............................................................................73
**Part 5 | Student Complaints and Appeals**...........................................................75
5.1 | Complaints.........................................................................................................75
5.2 | Appeals..............................................................................................................75
5.3 | Grievance Process.............................................................................................76
5.4 | Rule and Policy Resources................................................................................77
**Part 6 | Propose Revisions**......................................................................................78
6.1 | The Student Handbook Rule Revision Process...............................................78
6.2 | Rule Additions, Changes, and Deletions.........................................................78
**Definitions Section**...................................................................................................79

Def_000331 App'x 559

# WT Community Standards
## WEST TEXAS A&M UNIVERSITY.

**WTAMU Student Handbook 2025-2026**

# WTAMU Student Handbook

## Welcome

Welcome to the West Texas A&M University community! It is our hope that you find an environment that supports your success as a student, and to that end, this document outlines the community standards that, when upheld by all, will support that environment.

While this document outlines some general prohibitions of conduct contrary to the building of a positive learning environment, it also lays your rights as a student, and we hope you will pay close attention to those.

We seek a community of learners where mutual respect, between and among students, faculty, staff, and administration, allows for meaningful and productive dialogue, and this document represents our intent to balance those rights, responsibilities, and various levels of authority.

We encourage you to familiarize yourself with the processes and guidelines found within. If you have any questions along the way, please contact us in the Office of the Vice President for Student Affairs, located in Suite 102 of the Jack B. Kelley Student Center.


Good luck and Go Buffs!

**Dr. Chris Thomas**

Vice President for Student Affairs




## Foreword

West Texas A&M University is a community dedicated to personal and academic excellence. Choosing to join the community binds each member to a code of civilized behavior. The purpose of this handbook is to present the rules that govern the student conduct and student activities at West Texas A&M University and describe faculty and staff obligations in their work with students. These rules result from years of experience, and are the products of students, staff, and faculty thought. Each individual student and employee are expected to read this handbook carefully and observe its requirements.

No rule, no matter how carefully worded, can cover all eventualities completely. Beyond specific rules, we should all aspire to conduct ourselves with respect towards others, the highest ethical standards, and personal integrity. That is what Buff Spirit is all about.

Def_000332    App'x 560

**WT** | **Community Standards**
WEST TEXAS A&M UNIVERSITY.                    **WTAMU Student Handbook 2025-2026**

# Part 1 | Academic Integrity Code

## 1.1 | Academic Dishonesty

1.1.A | Academic dishonesty includes the commission of any of the following acts. This listing is not exclusive to any other acts that may reasonably be called academic dishonesty. Clarification is provided for each definition by listing some prohibited behaviors.

i. <u>Cheating</u>: Intentionally using or attempting to use unauthorized materials, information, notes, study aids, or other devices or materials in any academic exercise. Unauthorized materials may include anything or anyone that gives a student assistance and has not been specifically approved in advance by the instructor. Examples include:
   a. During an examination, looking at another student's examination or using external aids (for example, books, notes, calculators, conversation with others, or electronic devices) unless specifically allowed in advance by the instructor.
   b. Having others conduct research, or prepare work, without advance authorization from the instructor.
   c. Acquiring answers for any assigned work or examination from any unauthorized source. This includes, but is not limited to, using the services of commercial term paper companies, purchasing answer sets for homework from tutoring companies, and obtaining information from students who have previously taken the examination.
   d. Collaborating with other students in completing assigned work, unless authorized by the instructor teaching the course. It is safe to assume that all assignments are to be completed individually unless the instructor indicates otherwise; however, students who are unsure should seek clarification from their instructors.
   e. Other similar acts.

ii. <u>Fabrication</u>: Making up data or results and recording or reporting them; submitting fabricated documents. Examples include:
   a. The intentional invention and unauthorized alteration of any information or citation in any academic exercise.
   b. Using "invented" information in any laboratory experiment, report of results or academic exercise. It would be improper, for example, to analyze one sample in an experiment and then "invent" data based on that single experiment for several more required analyses.
   c. Failing to acknowledge the source from which cited information was obtained. For example, a student shall not take a quotation from a book review and then indicate that the quotation was obtained from the book itself.
   d. Changing information on tests, quizzes, examinations, reports, or any other material that has been graded and resubmitting it as original for the purpose of improving the grade on that material.
   e. Providing a fabricated document to any university employee to obtain an excused absence or satisfy a course requirement: altering an official document such as a transcript.
   f. Other similar acts.

iii. <u>Falsification</u>: Manipulating research materials, equipment, or processes, or changing or omitting data or results, such that the research is not accurately represented in the research record. Examples include:

Def_000333 App'x 561

# WT Community Standards
## WEST TEXAS A&M UNIVERSITY™

**WTAMU Student Handbook 2025-2026**

    a. Changing the measurements in an experiment in a laboratory exercise to obtain results more closely conforming to theoretically expected values.

    b. Other similar acts.

iv. <u>Multiple Submissions:</u> Submitting substantial portions of the same work (including oral reports) for credit more than once without authorization from the instructor of the class for which the student submits the work. Examples include:

    a. Submitting the same work for credit in more than one course without the instructor's permission.

    b. Making revisions in a paper or report (including oral presentations) that have been submitted in one class and submitting it for credit in another class without the instructor's permission.

    c. Representing group work done in one class as one's own work for another.

    d. Other similar acts.

v. <u>Plagiarism:</u> The appropriation of another person's ideas, processes, results, or working without giving appropriate credit. Examples include:

    a. Intentionally, knowingly, or carelessly presenting the work of another as one's own (i.e., without crediting the author or creator).

    b. Failing to credit sources used in a work product in an attempt to pass off the work as one's own.

    c. Attempting to receive credit for work performed by another, including papers obtained in whole or in part from individuals or other sources. Students are permitted to use the services of a tutor (paid or unpaid), a professional editor, or the University Writing Center to assist them in completing assigned work, unless the instructor explicitly prohibits such assistance. If the student uses such services, the resulting product must be the original work of the student. Purchasing research reports, essays, lab reports, practice sets, or answers to assignments from any person or business is strictly prohibited. The sale of such materials is a violation of both these rules and Texas State law (Penál Code 32.50).

    d. Failing to cite the World Wide Web, databases, or other electronic resources if they are used as resource material in an academic exercise.

    e. Other similar acts.

    f. General Information pertaining to Plagiarism:

        i. *Style Guides:* Instructors are responsible for identifying any specific style/format requirements for the course. Examples include but are not limited to: American Psychological Association (APA) style and Modern Language Association (MLA) style.

        ii. *Direct Quotation:* Every direct quotation must be identified by quotation marks or appropriate indentation and must be properly acknowledged in text by citation or in a footnote or endnote.

        iii. *Paraphrase:* Prompt acknowledgement is required when material from another source is paraphrased or summarized, in whole or in part, in one's own words. To acknowledge a paraphrase properly, one might state: "To paraphrase Locke's comment..." and then conclude with a footnote or endnote identifying the exact reference.

        iv. *Borrowed Facts:* Information gained from reading or research, which is not common knowledge, must be acknowledged.

        v. *Common Knowledge:* Common knowledge includes generally known facts such as the names of leaders in prominent nations, basic scientific laws, or basic historical

Def_000334 App'x 562

# WT Community Standards
## WEST TEXAS A&M UNIVERSITY™          WTAMU Student Handbook 2025-2026

information (e.g., George Washington was the first President of the United States). Common knowledge does not require citations.

vi. _Works Consulted:_ Materials that add only to a general understanding of a subject may be acknowledged in the bibliography and need not be footnoted or end noted. Writers should be certain that they have not used specific information from a general source in preparing their work unless it has been appropriately cited. Writers should not include books, papers, or any other type of source in a bibliography, "works cited" list, or a "works consulted" list, unless those materials were used in the research. The practice of citing unused works is sometimes referred to as "padding."

vii. _Footnotes, Endnotes, and In-text Citations:_ One footnote, endnote, or in-text citation is usually enough to acknowledge indebtedness when several connected sentences are drawn from one source. When direct quotations are used, however, quotation marks must be inserted, and acknowledgement must be made. Similarly, when a passage is paraphrased, acknowledgement is required.

viii. _Graphics, Design Products, and Visual Aids:_ All graphics, design products, and visual aids from another creator used in academic assignments must reference the source of the material.

vi. Generative AI: Generative artificial intelligence (Generative AI) is computer-based technology that produces a variety of data, such as pictures, videos, music, or words, which may look or sound like a person made them. Generative AI tools appear to be created by humans because they are derived from deep machine learning routines and large language models based on algorithmic comprehension of materials created by humans. West Texas A&M University recognizes that generative AI presents challenges and simultaneously offers stimulating opportunities in higher education. West Texas A&M University offers faculty members the following choices of three distinct approaches to this complex challenge:

a. _No Use of Generative AI Permitted:_ Because writing and critical thinking skills are part of the learning outcomes of this course, it is a violation of academic integrity to employ generative AI at any point in this course.

b. _Use of Generative AI Permitted Under Some Circumstances with Permission:_ There are specific situations within the course where you will use generative AI to explore how technology can serve as a complimentary learning tool. The course faculty members will inform students when, where, and how students may employ these tools, along with guidance for attribution. Any use outside of faculty defined parameters constitutes a violation of academic integrity.

c. _Generative AI Permitted with Attribution:_ The use of generative AI is permitted in this course to help prepare assignments and projects. When submitting work, students must clearly identify any generative AI content in contrast to student contributions (e.g., student citation of prompts, the generative AI platform used, the date the prompts were issued, and related). Using an AI tool without proper attribution qualifies as a violation of academic integrity.

vii. Complicity: Intentionally or knowingly helping, or attempting to help, another commits an act of academic dishonesty. Examples include:

a. Knowingly allowing another to copy from one's paper during an examination or test.

b. Distributing test questions or substantive information about the test without the instructor's permission.

Def_000335 App'x 563

**WT** **Community Standards**
WEST TEXAS A&M UNIVERSITY™          **WTAMU Student Handbook 2025-2026**

   c.  Collaborating on academic work knowing that the collaboration will not be reported.
   d.  Taking an examination or test for another student.
   e.  Signing another's name on an academic exercise or attendance sheet.
   f.  Conspiring or agreeing with one or more people to commit, or attempting to commit, any act of academic dishonesty.
   g.  Other similar acts.

## 1.2 | Reporting Violations of WTAMU Academic Integrity Code

1.2.A | As all members of the WTAMU community are responsible for maintaining the academic integrity of the University's mission, any member of the community may report and is responsible for reporting known violations of the academic integrity code to a faculty member, direct supervisor, academic dean, or Executive Vice President and Provost (EVPP). Violations shall be construed as any prohibited action outlined in the Student Handbook or the violation of any other university code or regulation that impacts the University's ability to meet the academic expectations that it has set forth in its mission.

1.2.B | Any student with knowledge of a violation who fails to report it shall be in violation of academic integrity. A student who believes their work has been stolen, copied, or inappropriately acquired by another student should report that information to the instructor. Also, any community member who reports themselves in violation of the Student Handbook before it is likely that another might consider this possibility will be understood as repentant and acting in good faith toward the community. Though the confession will not excuse the student from the violation, the act will be considered with great weight by all hearing/sanctioning bodies and the violation should not result in suspension or expulsion except in the most extreme cases.

1.2.C | Before reporting a suspected violation, the accusing party should make a reasonable attempt to collect evidence (eyewitnesses, material facts, etc.) to present the case at a hearing. Teaching faculty who suspects a violation should confer with the suspected violators(s) and attempt to resolve the case at that point. If the faculty member and student can mutually consent to a solution, the faculty member should complete an Academic Integrity Code Violation Review Form regarding the WT Academic Integrity Code. This form is to be signed by the student, faculty member, direct supervisor, and dean, then forwarded to the EVPP office for signature where it will be placed in the student's file.

1.2.D | A faculty member can choose to report to their direct supervisor. Additionally, if the faculty member and accused students cannot agree upon a resolution, or if the faculty member believes that suspension or expulsion is the only fair sanction, the case should immediately be reported, by the faculty member and in writing to the appropriate direct supervisor.

## 1.3 | Initial Finding of Fact and Review of Case

1.3.A | In a case where a non-teaching member of the WTAMU community reports a suspected integrity violation, the case will be referred to the appropriate faculty member, direct supervisor, or dean for initial review. The referral will come from the WTAMU community member to whom the suspected act was first reported.

1.3.B | In a case where a resolution between the student and faculty member has been reached, an Academic Integrity Code Violation Review Form will be completed by the faculty member, signed by all parties, direct supervisor, and dean, and forwarded to the EVPP office to be placed in the student's file.

Def_000336   App'x 564

**WT** **Community Standards**
WEST TEXAS A&M UNIVERSITY.    **WTAMU Student Handbook 2025-2026**

1.3.C | In a case where a resolution between the student and the faculty member cannot be reached, all materials will be presented to the direct supervisor who will then review the case (including evidence, students and professor testimony, any documents, etc.), determine if a violation occurred, and, in the case of a finding of violation, impose through their dean's office, then forward to the EVPP for the appropriate sanction. The direct supervisor will then notify the students and faculty of their decision and the student of their right to appeal to the College Integrity Committee (CIC).

1.3.D | Each college will create a CIC as needed. It will be comprised of the college dean (who will chair the committee and vote only in case of a tie), three students (appointed by Student Senate) and three faculty members from the college (one appointed by the dean for a two-year term, one chosen by the student, and one chosen by the dean). Should the dean feel that chairing the committee would present a potential conflict of interest, they may recuse themselves through the VPAA's office and have another dean appointed to chair the hearing.

1.3.E | In the case of the finding of guilt, the direct supervisor will forward this finding to the VPAA's office to be placed in the student's file. Upon any subsequent violation by the student (if another AICVRF, direct supervisor sanction or any combination is already present in the student's file), the EVPP office will notify the dean and have them examine the file to determine if a trend of violation needs to be addressed.

1.3.F | For undergraduate students, "dean" in this document refers to the dean of the college in which the most recent violation occurred. For graduate students, "dean" refers to the dean of the Graduate School. If the dean determines the presence of multiple violations, they will impose or request that the EVPP impose the appropriate sanction. The dean will then notify the student of their decision and their right to appeal to the CIC.

1.3.G | Should the student desire to appeal either to a direct supervisor's, or dean's decision, the student will notify the dean that they request an appeal hearing before a CIC. The notification must be in writing and delivered to the dean within ten (10) days of the student's initial notification of the direct supervisor's or dean's findings. Such an appeal must specify if the student is appealing for the finding of violation or the fairness of the sanction.

## 1.4 | Hearings Before a College Integrity Committee (CIC)

1.4.A | The CIC functions only as an appeal committee. This committee will hear the facts of the case to determine the appropriateness of the original finding and/or sanction.

    i.    Once an appeal hearing has been requested, the dean's office will, at least seven (7) business days before the scheduled hearing, make a reasonable attempt to notify:
        a.    The appealing party and any accusing parties (as well as the accusing party's witnesses);
        b.    Any faculty member(s) involved; and
        c.    The selected members of the committee.
    ii.    These time frames are contingent upon the academic calendar and the necessity of bringing closure to a situation and, at the dean's discretion, may be adjusted as deemed necessary.
    iii.    If the student is appealing the finding of violation itself, the accuser has the burden of proving their case by the preponderance of the evidence (proof that leads a reasonable person to conclude that the facts in issue are more likely to have occurred than not).

Def_000337 App'x 565

iv.   If the student is appealing the sanctions, only facts presented to the committee or that are in the student's file may be considered in judging the fairness of the original sanction. The appealing student is responsible for offering evidence that supports a different sanction.

v.    The appealing party may have one person accompany them to the hearing. This person cannot act as a witness.  The appealing party may obtain advice from a legal advisor at their own expense.

vi.   An opportunity will be provided for the appealing party to present their version of the facts and to present other evidence, including witnesses, in support of their appeal. Witnesses not having information directly pertaining to the appeal may not be allowed. The appealing student should notify their witnesses of their request that they present information at the hearing. The appealing student is responsible for making sure their witnesses attend the hearing and/or for providing any notarized written information or official university reports (the student may request these through the presiding dean's office) that they would like considered at the appeal. The appealing party, through the dean, will also have the right to hear and question evidence. The dean may impose reasonable limitations upon the presentation of evidence and the questioning of witnesses.

vii.  If the student chooses not to testify at the appeal, the process will continue in their absence with the information available. Evidence that the student was notified of the hearing should be entered into the record. If the student is late for the hearing, the CIC should make a good faith effort to inform the student of what occurred prior to their arrival.

viii. Disorderly or disruptive behavior by any individual in the appeal process may, at the dean's discretion, result in the removal of that individual from the hearing, and the hearing may continue in their absence. The University will record these proceedings and retain a copy in its records. All educational content will be stored and destroyed based on the University's Records Retention schedule.  Suspension/expulsion sanctions result in records being maintained permanently in the Office of Academic Affairs. The appealing party may, at their expense, make a personal recording of the hearing. Appeal hearings will be confidential except those directly hearing, or involved, in the case.

## 1.5 | Findings of a CIC

1.5.A | The CIC is not bound by state or federal rules of evidence. The CIC will consider only the facts presented during the hearing and the facts already contained in the appealing student's academic file.

1.5.B | At the conclusion of the hearing, the CIC will meet to adjudicate in a closed session.  The faculty and student members will first vote as to whether the original finding of violation -by faculty member, direct supervisor, or dean- has merit.

1.5.C | In the case that the CIC finds no violation, the student's file will be cleared of all documents that relate solely to this case. If the appropriateness of the sanction is under appeal, the CIC will vote on the original sanction fairness. If the CIC finds that the original sanction is not appropriate, the members will discuss alternative sanctions that may include more severe than those originally imposed.

1.5.D | The CIC may impose any of the sanctions described in the Student Handbook up to and including suspension or expulsion. The CIC can recommend to the dean of the college that suspension or expulsion is the appropriate sanction. In the case of such a recommendation, the case will immediately be referred to the dean and forwarded to the EVPP office, and all further action will be taken by the EVPP.

1.5.E | The CIC will convene privately to discuss, vote and determine applicable sanctions.

Def_000338    App'x 566

# WT Community Standards
WEST TEXAS A&M UNIVERSITY.    **WTAMU Student Handbook 2025-2026**

1.5.F | The CIC will, at the conclusion of the appeal, present its findings to the appealing party. Additionally, the dean's office will forward a written statement of the findings and the formal action to be taken by the University to the student within five (5) working days, as defined by the University.

## 1.6 | Registration and Enrollment

1.6.A | Student Identification Cards: Upon initial registration, each student is issued a student identification card (more commonly called a Buffalo Gold Card or Buff ID). This card, designed to be a career identification card, is the property of West Texas A&M University and is validated each semester upon payment of fees.

   i.   Possession, alteration, use or attempted use of an ID card for the purpose of identification or to receive services, by anyone other than the person whose name, ID number and photo appear on the card, is considered unauthorized use. The offender will be subject to penalties and confiscation of the ID card by University Officials.
   ii.  A student must produce their identification card upon the request of a University Official.
   iii. It is a student's responsibility to report a lost or stolen identification card immediately by calling (806)-651-4653, Monday through Friday between 8am and 5pm. Students will be assessed a fee to replace the lost or stolen card.
   iv.  The name as submitted at the time of the application to West Texas A&M University establishes the official record for the student at the University. This record is considered an official record for the State of Texas. Any change of name request must be accompanied by legal federal or state documentation. A social security card or driver's license cannot be used as documentation to request a change of name; a birth certificate, passport, court issued name change document, marriage license, or common-law certificate are acceptable.

1.6.B | Current Address: To avoid missing important communications from the University, it is the student's responsibility to keep the registrar informed of current, local, and permanent addresses. Communications mailed to either address of record, or to a student's official WT email account, will be deemed adequate notice.

   i.   Every student must register upon admission to the University and each subsequent semester, as announced by the registrar.
   ii.  Students who were previously enrolled at West Texas A&M but did not attend class through the official census date of the previous long semester must apply for readmission.
   iii. Registration is not complete until the student has paid their fees by the prescribed deadline.

1.6.C | Registration Holds: A student may be held from registering for future semesters by the following offices, for the following reasons. This is not inclusive of all offices that can hold students, or all types of holds. A student who wishes to resolve the problem that resulted in the hold, or wishes to appeal the placing of the hold, should go to the department that placed the hold on their record.

   i.   Office of Graduate Studies, Academic Departments or Colleges – For scholastic deficiency or for disciplinary reasons related to scholastic dishonesty.
   ii.  Transportation Services – For an accumulation of overdue, unpaid parking violation citations.
   iii. Student Business Services – For an outstanding bill owed to the University.
   iv.  Office of Admissions and Records, Office of Graduate Studies, Academic Departments and Colleges – For students admitted provisionally or on probation, or for information lacking to complete the admission

Def_000339    App'x 567

**WT** **Community Standards**
WEST TEXAS A&M UNIVERSITY.    **WTAMU Student Handbook 2025-2026**

process and for enrolled students who have submitted questionable records (such as transcripts or residency documents) to the registrar's office.

- v. Office of Title IX, Office of Community Standards, and Department of Residential Living – For disciplinary reasons.
- vi. Athletic Academic Affairs Office – To ensure compliance with NCAA regulations.
- vii. International Student Services – To ensure compliance with university procedures and I.N.S regulations.
- viii. Academic Success Center – To ensure compliance with Texas Success Initiative mandate.

1.6.D | Maximum Schedule: An undergraduate student with an overall grade point ratio of 3.0, or better, may register for a course load in excess of 19 hours in the fall or spring semester, or six (6) hours (seven [7] if part is laboratory) in a summer term with the approval of their advisor. An undergraduate student with an overall grade point ratio of less than 3.0 must obtain approval from their dean or designee before registering for a course load in excess of 19 hours in a fall or spring semester, or six (6) (seven [7] if part is laboratory) in a summer term.

1.6.E | Maximum Schedule for Graduate Students: Graduate students may enroll for a maximum of 15 hours during a regular semester, six (6) hours for a 5-week summer session and 12 hours for a 10-week summer session with approval of their college dean or designee. A graduate student may enroll in more than 18 hours (regular semester), nine (9) hours (5-week summer session), or 15 hours (10-week summer session) with approval of the Office of Graduate and Professional Studies.

1.6.F | Prerequisites: It is the responsibility of the student to be sure that course prerequisites are met. All prerequisites must be listed in the appropriate catalog or schedule of classes. A student may register for a course for which they have not met the prerequisites only with the consent of the head of the department in which the course is offered. Failure to meet course prerequisites could result in a student being dropped from the class.

1.6.G | Class Schedules: All classes will meet according to schedules prepared by the registrar. Modification in these schedules, including common night exams, may be made only when authorized by the registrar and approved by the dean or designee of the college in which the course is offered.

1.6.H | Scheduling of Courses: In case a section is dropped, because of insufficient enrollment, a student may substitute other courses approved by their advisor.

1.6.I | Priority Registration Eligibility: Outlined under the WT Catalog, students that meet the following eligibility requirements may be allowed to register during priority registration.

- i. *Veterans:* Students must notify Military and Veteran Services of eligibility.
- ii. *Student Athletes*: Students who participate in an approved University sport may be eligible.
- iii. *Honors Program:* Students who participate in the University's Honors Program may be eligible.
- iv. *Parenting Student*: Per Texas Senate Bill 459, students that identify as a "parenting student", which is a student enrolled at an institution of higher education who is the parent or legal guardian of a child under 18 years of age, are provided early registration for courses. Prior to the semester registration date; students that meet these requirements will need to contact the Registrar's Office at 806-651-4911 and notify them of their eligibility status.

Def_000340    Ph. App'x 568

**WT** **Community Standards**
WEST TEXAS A&M UNIVERSITY.          **WTAMU Student Handbook 2025-2026**

**1.7 | English Proficiency**

1.7.A | Any college may require an English Proficiency Examination of its students. Any student who fails the examination may be required to do remedial work in English, as recommended by the head of the student's department and approved by the dean, or designee, of the student's college.

**1.8 | Student Drop Procedure**

1.8.A | Refer to the University calendar on Buff Connect for the last day to add or drop courses. Classes dropped on or before the 12th class day in regular semesters (fourth class day in summer sessions) will not be reflected on the student's transcript. Classes dropped prior to the last day to drop or withdraw will reflect a grade of "X" (drop passing). Restrictions will prevent dropping classes on Buff Advisor. For more information review the WTAMU Student Catalog for the current academic year.

1.8.B | If a faculty member charges a student in one of their classes with a violation of the Academic Integrity Code (AIC) and the student drops the class before the issue has been resolved, the faculty member may submit a grade change at the end of the semester to the Registrar's Office changing the students grade from "X" to "XF", and indicating that the change is due to a violation of the Academic Integrity Code. This may only occur when the faculty member determines that the appropriate penalty for the AIC violation is a failing grade in the class.

**1.9 | Withdrawal Procedure**

1.9.A | Before Withdrawing, if there is anything that WTAMU can do to assist you in remaining enrolled, please contact The Office of the Registrar via email at registrar@wtamu.edu. This office is available to advocate for your needs and to assist with any questions or concerns you may have.

1.9.B | Withdrawing from WT: Withdrawing is dropping all classes in a semester (with the option of returning). Withdrawing, or dropping your last class, cannot be accomplished through Buff Advisor. Deadlines to drop or withdraw are available in the University calendar (https://www.wtamu.edu/about/calendar/index.html). Withdrawing by the deadline can be done by:

i.    Completing and submitting the electronic withdrawal form (https://www.wtamu.edu/student-support/registrar/registrar-drop-withdrawal.html), or visiting the Office of the Registrar, located in Old Main Room 103.

1.9.C | Involuntary Leave: In the event that a student cannot safely remain at the University or meet academic standards, even with reasonable accommodations and other supports, the University may require the student to take a leave of absence.

i.    Decisions whether to impose an Involuntary Leave will be made by the University's Behavioral Intervention Team (BIT), a committee that includes members from the Office of the Vice President for Student Affairs, Counseling Services, Office for Academic Affairs, Office of Student Accessibility, Department of Residential Living, and the University Police Department.
ii.   The committee may impose an Involuntary Leave if it finds, after an individualized assessment, that the student's conduct:
      a.   Poses a significant risk to the health or safety of others.
      b.   Substantially interferes with the educational experience of others.
      c.   Causes a chronic and inordinate use of university resources.

Def_000341 App'x 569



**WT Community Standards**
WEST TEXAS A&M UNIVERSITY.    **WTAMU Student Handbook 2025-2026**

iii.   Before making a decision, the committee will:
  a.  Notify the student that the committee is considering imposing Involuntary Leave and the basis for the committee's belief that the student may need to be placed on Involuntary Leave; and
  b.  Provide the student with an opportunity to appear personally before the committee and provide relevant information.

iv.   The BIT may inquire into a student's current condition, including requesting recent medical health information and records, but must confine its inquiry to information and records necessary to make a determination. The committee may not insist on unlimited access to confidential information or records.

v.   If the committee imposes Involuntary Leave, the committee may restrict the student's interactions with the campus community during the period of the leave as deemed necessary or appropriate. Such restrictions may include limits on the student's communications with faculty, staff, or other students and on the student's access to the campus.

vi.   *Request for Review:* A student placed on Involuntary Leave may request, within three (3) business days of being notified of the decision, a review by the Vice President for Student Affairs. The request should delineate the reason(s) why the student believes the decision is inappropriate and should include supporting materials. The Vice President for Student Affairs will have five (5) business days to review the petition and uphold, reverse, or alter the decision. The VP for Student Affairs will notify the student in writing and shall be considered final.

vii.   *Complaints:* Any student who believes they have been discriminated against on the basis of a disability should complete a Complaint Form, available at the University's website: https://apps.wtamu.edu/complaint/.

viii.   *Refunds:* The same arrangements for refunds of tuition or other costs will be available to a student who takes a leave of absence for mental health reasons, whether voluntary or involuntary, as are available for a student who takes a leave of absence for physical health reasons.

ix.   *Returning from Leave:* A student who wishes to return from Involuntary Leave must submit a written request to the Behavioral Intervention Team. The written request should contain relevant documentation from health professionals showcasing that the student is fit to return. The Behavioral Intervention Team will conduct an individualized, fact-specific assessment to determine whether the student no longer meets the standard set forth for imposing an involuntary leave. A student's request to return may be denied if the committee finds that the student will not be able, upon return, to meet academic standards or safely remain at the University, even with reasonable accommodations or other supports. A student who desires to return to the University after taking a leave of absence for mental health reasons will not be subject to more rigorous standards or procedures than a student who desires to return to the University after taking a leave for physical health reasons.

## 1.10 | Attendance

1.10.A | Class attendance and participation is an individual student responsibility. Students taking traditional face-to-face courses are expected to attend class and to complete all assignments by stated due dates. Violation of this attendance policy is subject to disciplinary action through the Student Conduct process.

1.10.B | Individual instructors have the right to set reasonable and clearly explained attendance standards for their classes. If an attendance requirement is adopted because regular active participation is essential to satisfactory mastery of the course content, the requirement should be reasonable and clearly explained in the course syllabus. If a student wishes to contest the fairness of an instructor's attendance policy, a complaint

Def_000342    Pl. App'x 570

# WT Community Standards
## WEST TEXAS A&M UNIVERSITY

**WTAMU Student Handbook 2025-2026**

should be filed in accordance with the Student Grievance procedures. When an instructor believes that excessive absences have put a student's grade in jeopardy, the instructors should report this information to Advising Services who will contact the student and will attempt to resolve the problem.

## 1.11 | Notification of Absences

1.11.A | Unless otherwise stated in this rule, to be considered for an excused absence the student must notify the instructor in writing (e-mail is acceptable) prior to the day of the absence. In cases where advanced notification is not possible, the student must provide notification by the end of the second business day after the last date of the absence. This notification must include an explanation of why notice could not be sent.

1.11.B | <u>Excused Absences Defined by State and Federal Regulations:</u>

   i.   In accordance with Texas Education Code Section 51.911 Religious Holy Days, West Texas A&M University shall excuse a student from attending classes or other required activities, including examinations, for the observance of a religious holy day, including travel for that purpose. A student whose absence and shall be allowed to take an examination or complete an assignment from which the student is excused within a reasonable time after the absence. An instructor may appropriately respond if the student fails to satisfactorily complete the assignment or examination within a reasonable time after the absence.

   ii.  In accordance with Texas Education Code Section 51.9111 Excused Absence for Active Military Service, WT shall excuse a student from attending classes or engaging in other required activities, including examinations, in order for the student to participate in active military service to which the student is called, including travel associated with the service. A student whose absence is excused under this subsection may not be penalized for that absence and shall be allowed to complete an assignment or take an examination from which the student is excused within a reasonable time after the absence. An instructor may appropriately respond if the student fails to satisfactorily complete the assignment or examination within a reasonable time after the absence.

   iii. In accordance with Title IX of the Education Amendments of 1972, WT shall treat pregnancy (childbirth, false pregnancy, termination of pregnancy and recovery there from) and related conditions as a justification for an excused absence for so long a period of time as is deemed medically necessary by the student's medical provider. Requests for excused absence related to pregnancy should be directed to the instructor. Questions about Title IX should be directed to the University Title IX Coordinator.

1.11.C | Excused Absences for a student that is a non-birthing parent, adoptive parent, or guardian of a child: Absences related to the birth of a child, adoption of a child or foster care placement of a child under three years of age will be excused as directed below.

1.11.D | In accordance with the Americans with Disabilities Act, West Texas A&M University shall provide equal access for students with disabilities. Some students with disabilities may qualify for an attendance policy modification and should provide the instructor with proper notification from the Office of Student Accessibility concerning this accommodation prior to a disability-related absence. Questions about a disability-related absence should be directed to the Office of Student Accessibility.

Def_000343    Def App'x 571

# WT Community Standards
WEST TEXAS A&M UNIVERSITY.

**WTAMU Student Handbook 2025-2026**

**1.11.E | Student Absence Notification Request:**

i. Students who miss more than three (3) consecutive days of course content due to extenuating circumstances should contact the Division of Student Affairs for assistance. Circumstances such as:

    a. Personal injury or illness that is too severe or contagious for the student to attend class. An absence for a non-acute medical service does not constitute an excused absence.

    b. Death or major illness in a student's immediate family. Immediate family may include parents, siblings, grandparents, spouse, child, spouse's parents, spouse's grandparents, stepparents, stepsiblings, and others as deemed appropriate by faculty member or student's academic dean or designee.

    c. Illness of a dependent family member. An absence for a non-acute medical service does not constitute an excused absence.

    d. Participation in legal or governmental proceedings that require a student's presence and that cannot be rescheduled.

    e. Graduate or professional school interviews which are mandatory, and fixed date by university/school policy, which cannot be rescheduled.

    f. Mandatory interviews for permanent, full-time employment or full-time internships (including those that are part of cooperative education program) that have a duration of at least 10 weeks, provided that such interviews are related to the student's academic program and provided that the interviews are fixed date by employer policy and cannot be rescheduled. A student may not request excused absences for employment or internship interviews for more than one scheduled class meeting in one academic term.

    g. Presentation of research or scholarship at a professional conference related to the student's academic program, provided that the student is a presenter.

    h. Mandatory participation as a student athlete in NCAA-sanctioned competition.

    i. Required pre-donation and donation activities for a student selected as a donor of a transplant such as bone marrow, stem cells (Peripheral Blood Stem Cell Donation), and organs, provided that it cannot be rescheduled. An absence for single visit donations such as blood donation, plasma donation, and platelet donation does not constitute an excused absence.

    j. For compelling reasons not included in this section, the dean or dean's designee of the student's college with the support of the dean or dean's designee of the college offering the course may provide a statement (email is acceptable) that the dean or designee has verified the absence as excused.

ii. The student is responsible for providing verifiable documentation substantiating the reason for the absence. Absence documentation may include, but is not limited to:

    a. A medical confirmation note from the student's medical provider. The medical provider can provide a medical confirmation note only if medical professionals are involved in the medical care of the student. The medical confirmation note must contain the date and time of the medical assessment and the date at which the student may return to classes. Students cannot be required to provide detailed medical information.

    b. A medical confirmation note from the medical provider involved in the care of the student's immediate family member or dependent. The medical provider can provide a medical confirmation note only if medical professionals are involved in the medical care of the

Def_000344    PL App'x 572

**WT** | **Community Standards**
WEST TEXAS A&M UNIVERSITY.    **WTAMU Student Handbook 2025-2026**

immediate family member or dependent. Students cannot be required to provide detailed medical information.

c.  Death notice, obituary, or death certificate for a student's immediate family member.
d.  Documentation regarding the scheduling of legal or governmental proceedings that require a student's presence and that cannot be rescheduled.
e.  Documentation regarding the scheduling of mandatory admission interviews for professional or graduate schools. Documentation must be provided five (5) business days in advance.
f.  Documentation regarding the scheduling of mandatory interviews. Documentation from the employer must be provided five (5) business days in advance.
g.  Documentation regarding the scheduling of presentations of research or scholarship. ·Documentation for professional conference presentations must include confirmation of the student's role as a presenter. Documentation must be provided five (5) business days in advance.

iii.  Upon receipt of the documentation detailing the illness or emergency, Student Affairs will contact each instructor indicated by the student's submission, in writing, explaining the nature of the absence and requesting consideration making up missed work without penalty. Students can complete this request at https://cm.maxient.com/reportingform.php?WestTexasAMUniv&layout_id=8. Documents may be sent to the Office of Student Affairs via www.wtamu.edu/absence, studentaffairs@wtamu.edu, fax to 806-651-2926, call 806-651-2050, or dropped off in the JBK Suite 102. For additional information surrounding the Student Absence Notification request, visit https://www.wtamu.edu/student-support/more-support/absence-notification-request.html#standards.

**1.11.F | Absence Due to University Business:** Under the WT Catalog, students who miss classes for reasons of official University business will be given the opportunity to make up for the missed work without penalty, provided the student and/or the sponsor (for example, coach) of the official University activity informed  ⸍ individual professors prior to the absence.

**1.11.G | Active-Duty Students:** Students called to active duty should tell instructors and must withdraw from the University by notifying the Office of the Registrar of that intent in person, by email, by mail, or fax.

**1.11.H | Pregnant Students:** Any pregnant student(s), or student(s) planning to become pregnant, should consult their health care provider to determine what, if any, additional precautions and/or accommodations may be needed. It is the responsibility of the student to communicate their needs to the Division of Student Affairs as soon as possible for risk reduction to begin when it can be most effective, and to determine if additional modifications are needed. While the University cannot mandate that the student notify that they are pregnant or are planning to become pregnant, the University strongly recommends that students provide notification so appropriate steps can be taken to ensure the health of both parent and child. To communicate health circumstances or to request additional information contact the Division of Student Affairs.

## 1.12 | Grading System

**1.12.A |** The accompanying grade chart indicates grade symbols and their numerical equivalents for evaluating course work outlined in the WTAMU Catalog:

i.  A | 4 – Excellent
ii.  B | 3 – Good

Def_000345App'x 573

# WT Community Standards
**WEST TEXAS A&M UNIVERSITY**   **WTAMU Student Handbook 2025-2026**

   iii.    C | 2 – Average
   iv.    D | 1 – Passing
   v.    F | 0 – Failing
   vi.    XF | 0 – Drop/Withdraw failing after midterm (calculated in GPA)
   vii.    X | Drop/Withdraw after the official reporting date (12th class day fall/spring, and 4th class day summer - not calculated in GPA)
   viii.    P | Pass grade for developmental courses prior to 2002 fall semester
   ix.    U | Fail grade for developmental courses prior to 2002 fall semester
   x.    I | Incomplete
   xi.    S | Pass in CLEP, SAT, ACT and other specially approved courses
   xii.    IP | Thesis/Dissertation progress

**1.12.B | Incomplete Grade ("I"):** A grade of Incomplete (I) indicates a portion of required course work has not been completed and evaluated in the prescribed time period due to unforeseen, but fully justified (for example, hospitalization, personal injury), reasons and that there is still a possibility of earning credit. See WT Catalog for the current academic term for additional information.

**1.12.C | Grade Changes:** Changes in grades after the final grade has been assigned are initiated by the faculty member via the Grade Change Form, found on the Office of the Registrar website. These changes, except for grades "I" or "N," require review and approval of the appropriate direct supervisor. Grade changes must be made by the instructor of record, or in the absence of the instructor, by the direct supervisor. Requests for grade changes made more than 6 months after the grade is assigned require College Dean and Provost approval. Grade changes will not be made without sufficient justification.

**1.12.D | Grade Challenges Procedure for Students Who Challenge Semester Grades:**

   i.    _Academic Appeals Committee (Provost/EVPAA)_: The Academic Appeals Committee hears appeals involving disputes over final course grades. Membership consists of:
        a.    Chair – Faculty member (appointed by the Provost/EVPAA from among the elected members)
        b.    Six faculty (one from each college, elected by the colleges)
        c.    Six students (appointed by Student Government)
   ii.    When the appeal is ready to be heard by the Academic Appeals Committee, the chair chooses a panel of two additional faculty members from the remaining five faculty members, and two students from among the six student members.

**1.12.E | Challenge Procedure:**

   i.    Before a grade-challenge hearing can be scheduled with the committee, the student must make the initial appeal to the faculty member of that particular course; or if the faculty member is no longer with the University, the student must appeal to the head of the department that offered the course. If no resolution is reached at the department head level, the student may appeal to the dean of the college in which the course was offered. If at this point the problem has not been resolved to the satisfaction of the student, the student may file a formal appeal with the Academic Appeals Committee.
   ii.    A student desiring a hearing before the Academic Appeals Committee must file a written request for an appeal hearing with the dean of the college in which the course was offered. The dean will forward the appeal to the EVPP.

Def_000346    App'x 574

# WT Community Standards
## WEST TEXAS A&M UNIVERSITY™

**WTAMU Student Handbook 2025-2026**

- a. Deadline to file a formal grade challenge:
    - i. If the grade being challenged was given during the spring semester, spring intersession or a summer session – October 1.
    - ii. If the grade being challenged was given during the fall semester or winter intersession – March 1.
- b. The student must understand that the act of filing the written request is construed as authorizing all committee members to have access to all records, including academic, civil, and medical records where relevant and appropriate, that may have a bearing on deliberations.

iii. The written request for an appeal hearing must be accompanied by a statement from the student outlining the basis for the appeal, copies of any evidence and supporting documents that will be introduced at the hearing, and the names of any witnesses who will be present. The faculty member also has the right to provide evidence or bring witnesses to the committee.

iv. Upon receipt of the appeal, the EVPP shall notify the chair of the Academic Appeals Committee, who will, within three (3) business days, appoint the panel to hear the appeal. The chair will set a date for a hearing within ten (10) business days and inform the student, faculty member, the faculty member's department head, and the appropriate dean of the time and place for the hearing. All parties will be given notice five (5) business days before the hearing and the opportunity to confirm their attendance.

v. Failure of the student to appear without justifiable cause terminates the right to appeal. The faculty member may waive the right to appear at the hearing, and a faculty member who has not waived the right to appear, but fails to appear without notice, will be deemed to have waived the right to appear. No hearing may take place in the absence of the faculty member unless the faculty member has specifically waived the right to appear or has failed to appear without notice.

vi. The burden of proof shall be upon the student to prove their case by a preponderance of evidence. The student and the faculty member shall have the right to have counsel present, to present such witnesses. Legal counsel, if present, may offer counsel and advice, but may not participate in the hearing.

vii. All parties shall be afforded the opportunity for reasonable oral argument.

viii. Upon request, sufficiently in advance by either party, the chair shall cause testimony presented at the hearing to be recorded. A copy of the recording may be obtained from the chair at the expense of the requesting party.

ix. Immediately after the appeal hearing, the panel will go into closed session to deliberate and render a decision that is approved by at least three members of the panel.

x. The student and faculty member will be all interested parties, with a copy of the EVPP, will confirm the panel's decision.

xi. If the panel finds that due to an arbitrary, capricious, or prejudiced action, a student received an unearned grade, the panel will recommend to the faculty member that the grade be changed. If the faculty member is no longer at the University, the department head or dean of the college will facilitate changing the grade.

xii. Either party has the right to appeal the decision of the panel to the EVPP. Written notice of the appeal by either party will be given to the committee chair, who will notify the other party and the EVPP within three (3) working days. All documents and any recordings of testimony at the hearing will be forwarded to the EVPP who will review them and render a decision within five (5) working days.

xiii. There will be no further appeal from the decision of the EVPP.

Def_000347    Def App'x 575

**WT** Community Standards
WEST TEXAS A&M UNIVERSITY.        **WTAMU Student Handbook 2025-2026**

xiv.    In the event that the faculty member loses the appeal at either level, they will be given the opportunity to change the student's grade. If the faculty member refuses to change the grade, the EVPP will direct the Office of the Registrar to change the grade, without prejudice to the faculty member.

**1.13 | Academic Standing**

1.13.A | Scholastic Deficiency/Probation: Continued enrollment in an undergraduate program at WTAMU is dependent upon a student maintaining satisfactory academic progress toward attaining a degree.

i.    To assist students in maintaining satisfactory progress, WTAMU has adopted academic standards designed to provide early identification through academic advising and academic support programs.

ii.    *Under 13.10.99-W1 Academic Probation and Suspension for Undergraduate Students, WT has outlined the delineation of levels of academic standing:*

    a.    ***Academic Warning:*** Is the least severe of the levels in Academic Probation and Suspension, and does not appear on a student's official academic record. Academic Warning serves as an opportunity to address any academic difficulties with the goal of preventing a student from being placed on Academic Probation.

        i.    Students must meet with an advisor prior to each semester following inadequate performance to develop a plan and determine any necessary referrals to campus resources. Students must repeat this process every semester they are on Academic Warning.

        ii.    Students who have earned less than 30 hours must meet with an Advising Services advisor.

        iii.    Students who have earned 31 or more hours must meet with their departmental academic advisor. If the academic advisor is not available, the student should meet with the appropriate department head. If both the faculty advisor and department head are not available, the student should meet with the appropriate Associate Dean of the college.

        iv.    At the end of the semester in which a student is on Academic Warning, the student will either:

            1.    Be removed from warning status by earning at least a 2.0 semester GPA and completing at least 75% of the courses in which they are officially enrolled; or

            2.    Continue on academic warning (WRN2) by earning less than a 2.0 semester GPA or completing less than 75% of the semester credit hours in which they are officially enrolled, but maintaining a cumulative GPA of at least 2.0; or

            3.    Be placed on Academic Probation by earning less than a 2.0 semester GPA and their cumulative GPA falls below 2.0; and

            4.    A student remaining on Academic Warning must follow the procedures outlined in the University Catalog outlined in 2.3.1.1.

        v.    Students who have received three consecutive semesters of Academic Warning (WRN3) must consult with the Associate dean of their college.

    b.    ***Academic Probation:*** Is an indication of serious academic difficulty that may ultimately lead to suspension from the University. Probation appears on the student's academic record.

        i.    Students will be placed on Academic Probation at the end of any semester when their cumulative GPA falls below 2.0.

*l*

**Def_000348** App'x 576

**WT** **Community Standards**
WEST TEXAS A&M UNIVERSITY™                WTAMU Student Handbook 2025-2026

  ii. Students placed on Academic Probation are required to be re-advised (greenlighted) and complete a *Probation Conditions and Plan for Academic Improvement* form. Failure to comply may result in the deletion of future semester registrations.
    1. Students must complete the *Probation Conditions and Plan for Academic Improvement* form online. The online document should be submitted at least five (5) working days prior to the start of the semester.
    2. After the *Probation Conditions and Plan for Academic Improvement* form has been received, students will be contacted by Advising Services to complete the process.
  iii. At the end of the semester on which the student is on Academic Probation, the student will either:
    1. Be removed from Academic Probation by earning a cumulative GPA of 2.0 or above, or
    2. Continue on Academic Probation by earning at least a 2.0 semester GPA but the cumulative GPA remains below 2.0, or
    3. Be subject to Academic Suspension by failing to earn a semester GPA of 2.0 or higher.
 c. ***Academic Suspension:*** Is an indicator of severe academic difficulty and appears on the student's official academic record. Academic Suspension allows the student time to reassess academic and career goals and/or resolve other causes for continued academic failure.
  i. Students on Academic Suspension may not take courses nor participate in any extracurricular/co-curricular activities.
    1. Students suspended for the first time may not enroll for two consecutive semesters.
    2. Students suspended for a second time may not enroll for three consecutive semesters (one calendar year).
    3. Students returning from a first or second suspension may not enroll in an intersession or summer session without approval from the Associate Dean of their college.
 d. ***Academic Dismissal***: Following a second reinstatement after a second suspension, a student failing to fulfill the terms of their reinstatement contract will be dismissed.
  i. Students dismissed by the University may only be reinstated by filing an appeal with the Academic Review Committee and receiving approval for reinstatement from said committee. See this year's publication of the University Catalog for information about Reinstatement.

## 1.14 | Classification

1.14.A | As defined in the University Catalog, student's class standing is measured by the number of college-level hours completed.

 i. 0 – 29 hours | Freshman
 ii. 30 – 59 hours | Sophomore
 iii. 60 – 89 hours | Junior
 iv. 90 plus hours | Senior

Def_000349 App'x 577

**WT** **Community Standards**
**WEST TEXAS A&M UNIVERSITY™**                    **WTAMU Student Handbook 2025-2026**

**1.15 | Degree Requirements**

1.15.A | Please see the degree checklist for the year of your first semester of college. A degree must be completed within six years, or a new catalog will be assigned.

**1.16 | University Honors Program**

1.16.A | Mission: The William H. And Joyce Attebury Honors Program is to provide intense individualized support and enriched academic experiences for the most promising and motivated students at West Texas A&M University. Unique opportunities, in and out of the classroom, create an exciting honors undergraduate experience focused on leadership, scholarship, and excellence. Honors students engage in honors courses, seminars, programs, and campus activities designed to further develop the high achieving student's intellectual, professional and personal p2otential. For more information contact Attebury Honors Program, Kilgore Research Center, Room 107, WTAMU Box 60247, Canyon, Texas, 79016, 806-651-2736, honors.program@wtamu.edu or visit wtamu.edu/honors.

**1.17 | Tuition Laws**

1.17.A | <u>Statutory Tuition:</u> Statutory tuition rates are set by the Texas Legislature. The rate for Texas residents is $50 per semester credit hour. The Non-Resident, Out of State rate is $80 per semester credit hour after the TEC 54.0601 waiver is applied. Non-Resident, Out of State graduate students that fall below a 3.0 GPA are billed at a rate of $465 per semester credit hour. Non-Resident, International students are billed at a rate of $465 per semester credit hour.

1.17.B | <u>Texas Education Code 56.014:</u> Requires a portion of a Texas Resident student's designated and differential tuition be set aside as scholarship funds to provide financial assistance for students enrolled with the University. Texas residents are notified by Buff email of the specific amount of their bill designated and differential tuition that has been set aside each semester they are enrolled. This notification is not a bill for amounts due, nor is it a promise of scholarship funds to be awarded to that student. Each student must apply for, and meet eligibility requirements, for any scholarships they desire in order to be awarded.

**1.18 | Payment of Fees and Charges**

1.18.A | Students are required to pay tuition, fees, and charges to the University when they are due. Failure to do so may result in:

i.    The student's being administratively withdrawn and removed from the rolls of the University with loss of credit for academic work performed that semester.
ii.   Assessment of a reinstatement fee.
iii.  Denial of future registration in the University until all past due balances, including late charges, and reinstatement fees, are paid.
iv.   Denial of an official WTAMU transcript until all past due balances, including late charges, and reinstatement fees, are paid.
v.    Removal from on-campus housing.
vi.   Disclosure of the delinquent debt to any credit bureau, collection agency, or attorney.
vii.  Assessment of amounts actually incurred by the University as court costs, attorney's fees, and reasonable cost for collection.

Def_000350 App'x 578

**WT** **Community Standards**
WEST TEXAS A&M UNIVERSITY.

**WTAMU Student Handbook 2025-2026**

viii. If a check accepted by the University is returned by the bank on which it is drawn, the person presenting it will be required to pay a returned check service charge. If the check is for tuition or fees, the student's registration for that semester or term may be cancelled.

ix. A student whose registration is cancelled for failure to redeem an unpaid check, or checks within a specified grace period, will be assessed a $50 reinstatement fee prior to being reinstated.

1.18.B | Students whose fees are billed to a sponsor, including, but not limited to, a government agency, will be held responsible for those fees should the sponsor fail to pay.

**1.19 | Tuition Refunds**

1.19.A | Students that choose not to complete a class for the semester but intend to remain enrolled in other courses for the remainder of the semester should follow the Drop Procedure. Dropping a course is not appropriate for students enrolled in only one course for the semester. If the student is enrolled in one course and does not wish to complete it, the student should follow the Withdrawal Process.

1.19.B | Tuition and Fee Refund Procedure is covered under the WTAMU University Catalog under the current academic year. The refund is calculated on the total cost of tuition and mandatory fees charged for the courses in which the student was enrolled. If a student drops a class on or before the census date of the semester (12th class day for fall and spring semesters, 4th class day for summer terms) and remains enrolled in at least one course for that term, the tuition and mandatory fees for the dropped class will be refunded to the student.

1.19.C | Petition for Waiver of University Regulations: Students who have experienced extenuating circumstances and were unable to withdraw or drop a course within the allotted timeframe may complete a Petition for Waiver of University Regulations. You can complete a Petition at the following link: https://cm.maxient.com/reportingform.php?WestTexasAMUniv&layout_id=9. The general rules surrounding the Petition process are:

i. Petitions must be submitted by the last class day of the following semester – for example: if you wish to Petition Fall 2023, your submission must be received before the last class day of Spring 2024.

ii. Documentation of the extenuating circumstances must be provided for your Petition to be reviewed.

iii. A full cancellation/refund of your bill is not guaranteed by the approval of a Petition.

iv. The committee will convene to review Petitions as they are received. Therefore, a response may take up to 2-3 weeks to be reviewed.

v. Decisions made by the committee are final.

**1.20 | Classroom Behavior**

1.20.A | West Texas A&M University supports the principle of freedom of expression for both instructors and students. The University respects the rights of instructors to teach and students to learn. Maintenance of these rights requires classroom conditions that do not impede their exercise. Classroom behavior that seriously interferes with either (1) the instructor's ability to conduct the class, or (2) the ability of other students to profit from the instructional program will not be tolerated. An individual engaging in disruptive classroom behavior may be subject to disciplinary action through the Student Conduct process.

1.20.B | When a student's action is not so serious as to require immediate removal from the class, these steps are to be followed:

Def_000351 App'x 579

i.    The instructor responsible for the class or activity where the alleged disruptive behavior occurred will inform the student what specific behavior has been inappropriate. The instructor will describe to the student specific needed changes in the student's behavior. The student will be provided an opportunity to modify specific behavior in accordance with the changes identified. The instructor will provide the student with an emailed summary of this discussion with the student, and the instructor will retain a file copy of this summary.

ii.   If a student believes the instructor's expectations are unreasonable, the student may confer with the instructor's department head or designee about this matter. The department head or designee may choose to support the guidelines developed by the instructor or may work with the instructor to develop a modified set of expectations. If there are changes in the instructor's original set of expectations, an emailed copy will be provided by the department head or designee to both the student and the instructor.

iii.  Should a student's behavior continue to be outside of established expectations, the instructor will apprise their department head or designee of what has occurred and will share with the department head or designee the written summary of the discussion with the student. The department head or designee may wish to initiate additional discussion with the instructor and/or the student. If the department head concurs with the instructor's view that the problem has not been resolved, the situation may be referred to the Office of Community Standards. A summary or incident report describing the student's behavior, as well as a copy of all relevant communications should be forwarded to the Office of Community Standards for consideration.

1.20.C | When a student's behavior in a class is so seriously disruptive as to compel immediate action, the instructor has the authority to remove a student from the class on an interim basis. A student who has been removed from a class on an interim basis is entitled to a meeting with the course faculty within five working days of the removal. The instructor may either:

i.    Approve an agreement of expectations between the student and the instructor and reinstate the student to the class, or,

ii.   Extend the removal of the student from the class and refer the case to the Student Conduct Office for adjudication. A copy of all material sent to Student Conduct should be provided to the instructor's academic dean or designee and to the academic Dean or designee of the student's major.

1.20.D | In a laboratory course covered by a laboratory safety acknowledgement form, students are required to electronically acknowledge their agreement to follow safety rules. Any student who has not completed this acknowledgement by the second lab period will be asked to leave the laboratory until the acknowledgement is completed. The student will be readmitted to the laboratory session immediately upon completion of the acknowledgement. Students in violation of safety rules will be prohibited from participating in lab activities.

1.20.E | Members of the faculty and staff may outline responsible dress and grooming standards in their syllabus within their respective classrooms, laboratories, and offices, to ensure safety for specific activities.

### 1.21 | Computing Services: Rules for Responsible Computing

1.21.A | Misuse of Computing Resources: Failure to comply with University rules and procedures, license agreements, and contracts governing network, software and hardware use; abuse of communal resources; use of computing resources for unauthorized commercial purposes or personal gain; failure to protect your

**Def_000352** App'x 580

# **WT** Community Standards
**WEST TEXAS A&M UNIVERSITY.**    **WTAMU Student Handbook 2025-2026**

password or use of your account; breach of computer security resources including, but not limited to: Use of another individual's identification and/or password.

    i.    Use of computing facilities and resources to send obscene or threatening messages.

    ii.   Use of computing facilities and resources in violation of copyright laws.

1.21.B | Use of university computing resources and facilities is a privilege and requires that individual users act in compliance with university rules. The University provides users with an account that permits use of computing resources and facilities within guidelines established by WTAMU. Users must respect the integrity of computing resources and facilities, respect the rights of other users, and comply with all relevant laws (local, state, federal, and international), University rules and contractual agreements. The University reserves the right to limit, restrict or deny computing privileges and access to its information resources for those who violate University rules and/or laws. As an institution of higher learning, WTAMU encourages, supports, and protects freedom of expression and an open environment to pursue scholarly inquiry and to share information. Access to networked computer information in general and to the Internet, in particular, supports the academic community by providing a link to electronic information in a variety of formats and covering all academic disciplines. As with any resource, it is possible to misuse computing resources and facilities and abuse access to the internet. The following statements address, in general terms, WTAMU's philosophy about computing use.

    i.    *Freedom of Expression:* Censorship is not compatible with the goals of WTAMU. The University should not limit access to any information due to its content when it meets the standards of legality.

    ii.   *Privacy:* The general right to privacy is extended to the electronic environment to the extent possible. Privacy is subject to the Texas Public Information Act, administrative review, and computer system administration. Contents of electronic files will be examined or disclosed only when authorized by their owners, approved by an appropriate university official or required by law.

   iii.   *Intellectual Property:* All members of the University community should be aware that property laws apply to the electronic environment. Users should assume that works communicated through a network are subject to copyright unless specifically stated otherwise. Unless permission of the author is obtained, utilization of any electronically transmitted information must comply with the "fair use" principle.

   iv.   *Criminal and Illegal Acts:* Computing resources of the University, which include the hardware, software, and network environment, shall not be used for illegal activities. Any such use of these resources will be dealt with by appropriate university authorities and/or other legal and law enforcement agencies. Criminal and illegal use may involve unauthorized access, intentional corruption, or misuse of computing resources, theft, obscenity, child pornography, and racial, ethnic, religious, or sexual harassment.

    v.   *Authorized Use:* Computing resources are provided by the University to accomplish tasks related to the University's mission. Some computers may be dedicated to specific research or teaching missions that limit their use. Computing resources may not be used for unauthorized commercial activities or any illegal activities.

Def_000353    App'x 581

**WT** **Community Standards**
WEST TEXAS A&M UNIVERSITY™                    WTAMU Student Handbook 2025-2026

# Part 2 | Student Life Rules

## 2.1 | Students' Rights and Responsibilities

### 2.1.A | <u>Students' Rights:</u>

i.    A student shall have the right to participate in a free exchange of ideas, and there shall be no University rule or administrative rule that in any way abridges the rights of freedom of speech, expression, petition, and peaceful assembly as set forth in the U.S. Constitution.

ii.   Each student shall have the right to participate in all areas and activities of the University, free from any form of discrimination, including harassment, on the basis of race, color, national or ethnic origin, religion, sex, disability, age, sexual orientation, or veteran status in accordance with applicable federal and state laws.

iii.  A student has the right to personal privacy except as otherwise provided by law, and this will be observed by students and University authorities alike.

iv.   Each student subject to disciplinary action arising from violations of the WTAMU Student Handbook shall be assured a fundamentally fair process.

### 2.1.B | <u>Students' Responsibilities:</u>

i.    A student has the responsibility to respect the rights and property of others, including other students, the faculty, and University officials.

ii.   A student has the responsibility to be fully acquainted with the published WTAMU Student Handbook and to comply with federal, state, and local laws.

iii.  A student has the responsibility to recognize that student actions reflect the individual involved and the entire University community.

iv.   A student has the responsibility to maintain a level of behavior which is consistent in supporting the learning environment of the institution and to recognize the University's obligation to provide an environment for learning.

## 2.2 | Reporting Violations of the WTAMU Student Handbook

2.2.A | To file allegation(s) of violation(s) against student(s) or student organization(s), individuals should complete an Online Incident Report form, which can be found at: https://cm.maxient.com/reportingform.php?WestTexasAMUniv&layout_id=0. The written allegation should describe the action or behavior in question, include a list of involved parties, and, when possible, contain documentation such as photos or official paperwork that supports the reporter's allegations. Individuals may also file a report in person at the Office of Community Standards in the Jack B. Kelley Student Center, Suite 102.

## 2.3 | Community Standards

2.3.A | The Office of Community Standards enforces behavioral standards developed by the University community for students, student organizations, and the related procedures for addressing misconduct. Students should be aware that the Student Conduct process is not a criminal or civil court proceeding.

2.3.B | The attendance of a student at a university is a voluntary entrance into the academic community. By such entrance, the student voluntarily assumes obligations of performance and behavior reasonably imposed by the University. These obligations are generally much higher than those imposed on all citizens by civil and

Def_000354 App'x 582

**WT Community Standards**
WEST TEXAS A&M UNIVERSITY.    **WTAMU Student Handbook 2025-2026**

criminal law. A university may discipline students to secure compliance with these higher obligations as a teaching method or to remove the student from the academic community.

2.3.C | Students and student organizations are responsible for actions that constitute misconduct, and violate rules outlined within the Student Handbook. Any student or student organization found responsible for misconduct may be subject to Student Conduct sanctions. The University provides a fair and equitable Student Conduct process, utilizing a thorough, neutral, and impartial investigation, from which a prompt resolution is generated.

2.3.D | The Office of Community Standards, and related offices, seek to educate students about their rights and responsibilities while prompting holistic development, self-worth, and mutual respect for all members of the University community. Freedom of discussion, inquiry, and expression is also fostered by an environment in which the privileges of citizenship are protected, and the obligations of citizens are understood.

2.3.E | The Office of Community Standards is committed to an educational and developmental process that balances the interests of individual students with the interests of the University community. No student will be found in violation by university policy, procedure, or rule without sufficient information, and evidence showing that it is more likely than not that a violation occurred. Any sanctions will be proportionate to the violation's severity and to the student's cumulative conduct history.

2.3.F | The Office of Community Standards exists to protect the interests of the community and to challenge those whose behavior is not in accordance with our rules. Sanctions are intended to challenge students' moral and ethical decision-making, and to help bring their behavior into accord with our community expectations and values. When a student is unable to conform their behavior to community expectations, the Student Conduct process may determine that the student should no longer share the privilege of participating in this community.

2.3.G | Disciplinary Authority: The authority to enact A&M System policy is vested in the Board of Regents. The responsibility for implementing and enforcing System policy and regulations and imposing penalties is delegated to the President of the University and any university officials and President designates. The VP for the Division of Student Affairs is the principal agent for the administration of Student Conduct. The VP for Student Affairs, or designee, shall implement the student discipline procedures. The VP of Student Affairs, and Assistant VP of Student Affairs, or designee, will assume responsibility for the investigation of an allegation of misconduct to determine if the complaint has merit.

2.3.H | Jurisdiction: The Student Handbook shall apply to conduct that occurs on university premises, at university-sponsored activities, or at any other activity which adversely affects the University community and/or the pursuit of its objectives and mission. This action may be taken for either affiliated or non-affiliated activities.

   i.   Using their sole discretion, the VP of Student Affairs, or designee, shall decide whether the Student Handbook shall be applied to conduct occurring outside of university premises.

   ii.   The University may act in situations occurring off university premises involving:

       a.   Student misconduct demonstrates flagrant disregard for any person.

       b.   When a student's or student organization's behavior is judged to threaten the health, safety, and/or property of any individual or group.

Def_000355 App'x 583

**WT Community Standards**
WEST TEXAS A&M UNIVERSITY.                    **WTAMU Student Handbook 2025-2026**

**2.3.I | Timeline:** It is recommended that reports of alleged violations of the Student Handbook should be received by the Office of Community Standards within ten (10) university working days of the alleged incident to initiate Student Conduct procedures.

    i.    There is no time limit on reporting violations; however, the longer someone waits to report an offense, the more difficult it becomes to obtain information and evidence regarding the incident(s).

    ii.   Incident(s) should be resolved within sixty (60) days of notice regarding the incident, not including appeal. This timeline may vary depending on the availability of students to participate in the process, availability of evidence, delays for concurrent criminal investigations, breaks between academic semesters, and other delays.

**2.3.J | Notice:** Notice is deemed to have been properly provided when written notification is sent to the student's official assigned WTAMU email address, placed in First Class U.S. Mail, campus mail, or personally delivered to the student no less than five (5) university working days prior to the scheduled appearance. The failure of a student to receive notice which is properly delivered does not prevent the Student Conduct proceedings from being carried out. After proper notice has been given to the student, the Student Conduct officer or designee may proceed with the review process and may issue a Failure to Comply violation against the student. Note: Students are required to keep their most current email address, local address, permanent address, and cell phone number updated in the student records system at:
https://www.wtamu.edu/webres/File/Reg%20Change%20of%20Stu%20Info%20Form%202_6_2019.pdf

**2.3.K | Family Educational Rights and Privacy Act (FERPA):** In compliance with TAMU System Rule 16.01.02.M1 FERPA Compliance, and WT Rule 16.01.02.W1 Privacy, West Texas A&M University annually informs students of the Family Educational Rights and Privacy Act of 1974 (FERPA), as amended. This act, with which the institution intends to comply fully, was designated to protect the privacy of education records, to establish the right of students to inspect and review their education records, to provide guidelines for the correction of inaccurate or misleading data through informal and formal hearings, and to submit an explanatory statement for inclusion in the education record if the outcome of the hearing is unsatisfactory.

    i.    Students have the right to file complaints with the Family Educational Rights and Privacy Act Office of the Department of Education in Washington, D.C., concerning alleged failures by the University to comply with the act. Written complaints should be directed to:

        a.    Family Policy Compliance Office U.S. Department of Education 400 Maryland Avenue, SW Washington, D.C. 20202-5920.

    ii.   Local rules/procedures explain in detail the procedures to be used by the institution for compliance with provisions of the act. Copies of the policy may be obtained at the Office of the Registrar, located in Old Main, Room 103 on the WTAMU Campus. Students have the right to consent to disclosures of personally identifiable information contained in the student's education records, except to the extent that FERPA authorizes disclosure without consent. One exception that permits disclosure without consent is disclosure to school officials with legitimate educational interests.

    iii.  A school official is:

        a.    A person employed by the University in an administrative, supervisory, academic, research or support staff position (including law enforcement unit personnel and health staff).

        b.    A person or company with whom the University has contracted (such an attorney, auditor, or collection agent).

Def_000356 App'x 584

**WT** **Community Standards**
WEST TEXAS A&M UNIVERSITY.          **WTAMU Student Handbook 2025-2026**

       c.   A person serving on the Board of Regents.
       d.   A student serving on an official committee, such as a disciplinary or grievance committee, or assisting another school official in performing their tasks.

  iv.     A school official has a legitimate education interest if the official needs to review an education record in order to fulfill their professional responsibility. Upon request, the University discloses education records without the consent of officials of another school in which a student seeks or intends to enroll.

  v.     According to FERPA, the University may release information without the students' written consent to the following:

       a.   School officials, as identified by the University, are determined by the University to have a legitimate education interest.
       b.   Officials of the other institutions in which the students seek to enroll.
       c.   People or organizations providing to the student financial aid or determining financial aid decisions.
       d.   Parents of the student who have established that student's status as a dependent according to IRS code of 1986, Section 152.
       e.   Persons in compliance with judicial order or a lawfully issued subpoena.
       f.   People in an emergency, if the knowledge of information, in fact, is necessary to protect the health or safety of the student and/or others.
       g.   Directory information may be disclosed unless the students or parents' request, in writing, that specific information not be divulged. Requests must be filed with the Office of the Registrar by the twelfth (12th) class day of each semester. For more information go to: https://www2.ed.gov/policy/gen/guid/ferpa/index.html. Directory information includes a student's name, gender, local, and permanent address, telephone number, date, and the place of birth, marital status, major field of study, classification, enrollment status (full-time, part-time, undergraduate, graduate), participation in recognized activities and sports, height and weight (if a member of an athletic team), date of attendance, degrees, awards, and honors received, the most recent educational institution attended, and other information which would make the student's identify easily traceable.

**2.3.L | Reporter:** While WT maintains the individual confidentiality of reporters, the Office of Community Standards can disclose the source who reported the alleged misconduct. Reporters are broken down into one of the following sources:

  i.     Student
  ii.     Staff/Faculty/University Police Department
  iii.   Alumni
  iv.     Community Member

## 2.4 | Standard of Evidence

**2.4.A |** The standard of proof used in WTAMU Student Conduct proceedings is the preponderance of evidence, or "it is more likely than not that it occurred." All Conduct Officers will make decisions regarding their cases based on this standard.

Def_000357 App'x 585

**2.5 | Amnesty**

**2.5.A | Amnesty relating to sexual harassment, sexual assault, dating violence, and stalking.** West Texas A&M University will "not take any disciplinary action against a student enrolled at the institution who in good faith reports to the institution being the victim of, or a witness to, an incident of sexual harassment, sexual assault, dating violence, or stalking, for a violation of the student of the institution's rules of conduct occurring at, or near, the time of the incident, regardless of the location at which the incident occurred or the outcome of the institution's disciplinary process regarding the incident, if any." This amnesty does not apply in situations where:

  i.   A student "reports the student's own commission or assistance in the commission of sexual harassment, sexual assault, dating violence, or stalking"; or

  ii.  A student's behavior occurring near or at the time of the incident could result in a suspension or expulsion from the University. For the purposes of this rule, suspension or expulsion may be possible outcomes when the student's behavior:

      a.  Threatens or endangers the physical or mental health or safety of other individuals.

      b.  Causes significant property damage or loss.

      c.  Causes significant burden on the University and/or community members to repair the harm caused by the behavior.

      d.  Would cause a reasonable person similarly situated to fear for their safety or suffer substantial emotional distress.

      e.  Causes significant disruption that limits others' ability to access the academic, co-curricular, or work environment.

      f.  Has demonstrated a pattern of failure to comply with university behavioral expectations.

  iii. Staff in the Office of Community Standards "may investigate to determine whether a student report of an incident of sexual harassment, sexual assault, dating violence, or stalking was made in good faith" (Texas Education Code Sec. 51.284(b)). A determination by the VP for Student Affairs or designee responsible for oversight of the student conduct processes that a student is entitled to amnesty is final and may not be revoked. All questions of implementation of this amnesty rule are subject to the decision of the Vice President for Student Affairs or designee responsible for oversight of the Student Conduct processes.

**2.5.B | Amnesty Pertaining to Alcohol and Other Drugs:** A student who calls 9-1-1 or takes an individual to receive emergency treatment for possible alcohol and/or drug overdose will not be charged under this code for possession or use of alcohol or other drugs. This amnesty only applies if:

  i.   This student stays with the individual needing treatment until emergency services arrive.

  ii.  The student takes reasonable measures to assist the individual needing treatment.

  iii. The student is cooperative with emergency services and university processes.

**2.6 | Student Conduct Proceedings**

**2.6.A |** Student Conduct proceedings will address behavioral misconduct outlined in the Student Handbook. This process does not apply to Title IX or sex based/civil rights cases.

**2.6.B |** Upon notice of an alleged violation of the Student Handbook, the Office of Community Standards will review allegations of misconduct and assign a Conduct Officer to the case. The Conduct Officer will inquire, gather, and review information about the reported student misconduct and will investigate the for factual

Def_000358    App'x 586

sufficiency. Incidents will not be forwarded for an Initial Conference unless there is reasonable cause to believe a rule or procedure has been violated.

2.6.C | If an initial report of misconduct is filed but does not identify the victim, or the victim is not available, the Conduct Officer will fully investigate the reported incident with the information provided. Unsupported allegation(s) with no credible information will not be forwarded for an Initial Conference.

2.6.D | A student will be given notice via their WT email of their involvement in an alleged violation of the Student Handbook. When preliminary information indicates that a student is associated with the reported incident, the student will be asked to meet with a Conduct Officer.

2.6.E | In order to train Conduct officials in their role, the Office of Community Standards may assign staff to shadow or observe an Initial Conference, Formal Hearing, Evidence Review or other component of the Conduct proceeding.

2.6.F | Student Responsibilities:

i. Failure of an alleged party to comply with, or respond to, a notice issued as part of the Student Conduct proceedings and/or failure to appear, may result in a hold placed on the student's account, additional alleged violations and a charge of Failure to Comply.

   a. *Case Resolution Form Completion:* In the Informal Process, following the Initial Conference, the Conduct Officer assigned to that case will make a determination of Responsible or Not Responsible for each alleged violation. A Case Resolution Form will be sent to the student. The student has three (3) business days to either Accept or Reject this Initial Finding.

   b. Without good cause shown, if the student is late to their designated hearing, the Conduct Officer or Hearing Body may make a determination in their absence, and is not responsible for beginning the hearing over, recalling witnesses, or re-entering any evidence into record.

   c. Disorderly or disruptive behavior by any individual during the Conduct Process may result in the removal of the individual from the Conduct Process, at the discretion of the Student Conduct Officer.

   d. When information on more than one student is contained in a single education record, each student may inspect the information specifically related to themselves. If a student requests their case documents sections may be redacted to protect confidentiality. If a student requests a recording, and the recording pertains to only the requesting student, arrangements may be made to review the recording.

   e. Conduct proceedings will be open only to those parties and witnesses involved in the Case. Hearings will not be open to the public, or any form of media or live feeds.

   f. At the University's discretion, notices and Student Conduct correspondence will be issued to the student via email to their university email account, to their local and/or permanent address or record, delivered by staff, and shall constitute full and adequate notice. It is the student's responsibility to keep the address of record current or provide a forwarding address. The refusal to accept/receive a letter (sent either by first class mail or certified mail or by staff delivery), or failure to check university email shall not constitute good cause for failure to comply with the content of the official university correspondence. Disciplinary action may be taken against a student for failure to appear after proper notice.

Def_000359 App'x 587

**WT** **Community Standards**
WEST TEXAS A&M UNIVERSITY.                    **WTAMU Student Handbook 2025-2026**

**2.6.G | Student Conduct Proceedings:** All Student Conduct proceedings will adhere to the following procedures. Student Conduct cases that involved allegations of misconduct begin with the Informal Process. If a student receives a determination through the Informal Process and they reject that decision, their case will move onto the Formal Process. Cases that involve allegations of weapons violations and repeat offenders will go straight to the Formal Process. Student Conduct cases that contain complaints or incidents of misconduct involving a registered Student Organization of WT will result in the Office of Community Standards initiating the Student Organization Accountability Process (SOAP).

i.   Informal Process: The student will be informed in writing of the allegations made and the date, time, and place of the Initial Conference with their assigned Conduct Officer. This information will be sent to the accused student's WTAMU email address. For university-related correspondence, it is the student's responsibility to check their university email account, check it regularly, and provide an accurate local mailing address.

   a.   *Evidence Review:* (optional) Prior to the Initial Conference, a student may request to schedule an Evidence Review meeting with the Conduct Officer, or designee. This provides an opportunity for the student to review the evidence, excluding official University Police Department reports on cases pending action in the district attorney's office or while the case is still under investigation. An appointment must be set up with the Office of Community Standards, or designee, located at the Jack B. Kelley Center 102 and available by phone at (806)-651-2389. The following rules apply to Evidence Reviews:

      i.   Protected information may be redacted from the documents provided. This could include reporter(s) identity, victim information, and/or other information made confidential under state and federal law.

      ii.  During the Evidence Review case materials will be provided to the student. The student is allowed to take notes but may not take photographs or record images of the materials, and all materials will be collected by staff prior to the end of the meeting.

   b.   *Initial Conference:* The Initial Conference will be conducted by the Conduct Officer assigned to the case. The Conduct Officer is responsible for collecting information from all involved parties, including their perspective and any evidence to support their narrative. The Conduct Officer will explain the Student Conduct process and answer any remaining questions from the involved parties.

      i.   ***Election of an Advisor:*** Students may elect to bring an advisor of their choice to the Initial Conference. An advisor, in this context, is an individual selected by the student involved to provide support. An advisor can be a family member, friend, teacher, or attorney. Students are responsible for contacting their assigned Conduct Officer not later than two (2) business days prior to their scheduled Initial Conference to elect an advisor to be present. An advisor may advise the student but may not actively participate in the Initial Conference. Advisors who impede or disrupt the Student Conduct process may be removed.

   c.   *Informal Resolution:* After the assigned Conduct Officer has met with all involved parties the Officer will have three (3) business days to issue a determination for each party on whether a student is Responsible or Not Responsible for each alleged violation. When circumstances warrant, the three business-day deadline may be extended. If a student is found Responsible for

Def_000360    App'x 588



one or more violations they will be issued a Sanction, and if applicable, Condition(s) and/or Restriction(s). The Conduct Officer will issue notifications to each party via their WT email.

    d. *Case Resolution Form:* A student will receive a Case Resolution Form via their WT email. The Case Resolution Form will contain the Conduct Officer's determination of Responsible or Not Responsible for each alleged violation, along with any applicable rationale for their decision. Upon receipt of the Case Resolution Form the student will have three (3) business days to select one of the following:

        i. I accept the decision made as a result of my Initial Conference and agree to adhere to all sanctions, conditions, and/or restrictions assigned as a result of a Responsible finding.

        ii. I reject all or part of the decision made as a result of my Initial Conference and request a Formal Hearing as outlined in the Student Handbook.

            1. If a student rejects all or part of the decision made in their Informal Resolution, their case will be assigned to a new Conduct Officer by the Office of Community Standards and referred through the Formal Process.

    e. *In-Absentia:* If the student chooses not to appear at the Initial Conference, no inference may be drawn from this decision. The Initial Conference will proceed, and a decision will be made based on the facts presented. If a Conduct Officer completes an In-Absentia Initial Conference they will issue the student notification of their determination via a Case Resolution Form within the specified three (3) business day period.

  ii. Formal Process: The student will be informed in writing that their case has been forwarded to the Formal Process. The assigned Conduct Officer will send notification to the students' WT email no less than five (5) business days prior to the date and time of the Formal Hearing.

    a. *Election of Advisor:* For the Formal Hearing process, the student may elect to be accompanied by an advisor. An advisor can be a family member, friend, teacher, or attorney at their own expense. The advisor may advise the student privately but may not present or participate in the case. The advisor cannot be a witness to the proceeding. Students must notify their assigned Conduct Officer no later than two (2) business days prior to the Hearing of their election to have an advisor. Advisors who impede or disrupt the Student Conduct process may be removed.

    b. *Formal Hearing:* The Formal Hearing will be conducted by the assigned Conduct Officer and recorded. The recording will remain the property of the institution. Deliberations will not be recorded. The University will present evidence supporting the allegations first and has the burden of proving its case by the preponderance of evidence. A determination of the facts will be based only on the evidence as presented. Rules of evidence applicable to civil and criminal cases do not apply. An opportunity will be provided for the student to present their own version of the facts and to present other evidence in support of the current case, including witnesses. Witnesses will also have the right to hear evidence and question the Student Conduct Officer. The Conduct Officer may impose reasonable limitations upon the presentation of evidence and questioning of witnesses. A student may not be compelled to testify. If the student chooses not to testify during the Hearing, no inference may be drawn from this action. The Hearing will proceed, and a decision will be made based on the facts presented. Suspension/Expulsion sanction records will be maintained in the VP of Student Affairs.

    c. *Formal Resolution:* Upon conclusion of the Hearing, the assigned Conduct Officer will provide a written statement of the findings, the formal action to be taken by the University, and a

**Community Standards**
WEST TEXAS A&M UNIVERSITY.    **WTAMU Student Handbook 2025-2026**

description of the Appeal process. This will be sent to the students' WT email within five (5) business days of the date of the Formal Hearing.

d. *Appeal Procedure:* A student may appeal the decision, or the sanction(s), condition(s) and/or restriction(s) imposed by the Office of Community Standards by submitting a written petition to the VP of Student Affairs within five (5) business days of receiving the Formal Hearing decision. The Appeal form can be completed at:
https://cm.maxient.com/reportingform.php?WestTexasAMUniv&layout_id=4.

   i. The petition must clearly set forth the grounds for the appeal, together with the evidence upon which the appeal is based. A disagreement with the decision alone shall not constitute grounds for appeal. The Office of Community Standards has ten (10) business days to make a decision on the appeal. The only proper grounds for appeal are as follows:

      1. A procedural (or substantive error) occurred that significantly impacted the outcome of the hearing (e.g., substantiated bias, material deviation from established procedures, etc.).
      2. The discovery of new evidence, unavailable during the original hearing or review of the case, which could substantially impact the original finding or sanction. A summary of this new evidence and its potential impact must be included.
      3. The sanctions imposed substantially vary from the range of sanctions normally imposed for similar infractions.

iii. Student Organization Accountability Process (SOAP Case): All complaints and reported incidents of misconduct will be investigated by the Office of Community Standards. All evidence and case materials will be provided to the Student Organization Accountability Board (SOAB) who will issue a determination of Responsible or Not Responsible, and any Sanctions or Conditions included in the finding.

   a. *Hearing Body:* The SOAB will be comprised of:
      i. Chair – a current organization advisor.
      ii. Two faculty/staff member seats.
      iii. Three trained student board member seats.

   b. *Notification:* The president or chief student leader of the organization and the organization advisor will be notified via WT email of the report and applicable process. This notification will be issued via email to their university account, the student's local and/or permanent address on record, or delivered by staff, and shall constitute full and adequate notice. It is the student's responsibility to keep the address of record current. The refusal to accept/receive a letter (sent either by first class mail, certified mail, email, or by staff delivery) shall not constitute good cause for failure to comply with the content of the official university correspondence.

   c. *Investigations:* The Office of Community Standards will conduct a preliminary investigation and may meet with selected members or associated individuals to gather information pertaining to the incident(s) and allegation(s). The Office of Community Standards will create a Summary Report, which will include all the evidence collected and case materials available. If the report contains information that supports alleged violations to the Student Handbook, the case will be sent onto the SOAB for a Hearing date, time and location to be scheduled.

   d. *Interim Measures:*

Def_000362 App'x 590

**WT** **Community Standards**
WEST TEXAS A&M UNIVERSITY™          **WTAMU Student Handbook 2025-2026**

i. ***Interim Suspension of Recognition:*** Based upon a student organization's alleged behavior, the VP for Student Affairs, or the Office of Community Standards may impose an interim disciplinary action prior to the initiation of investigation. Interim Suspension of a Student Organization can include, but is not limited to:

1. Barring or limiting some, or all of the organization's activities and/or privileges, including but not limited to: social activities, intramural competitions, organizational competitions, eligibility to receive any leadership or responsibility in any university student organization, governing body, publication, or activity, and the ability to represent the University in an official capacity or position.

e. *SOAB Hearing:* Following the receipt of the investigation report, the SOAB will notify the student organization president of the Hearing time, date, and location at minimum five (5) business days prior to the date of the Hearing. The organization president can elect to have an Advisor present (see WTAMU Student Handbook section 2.6.G.b.i Election of an Advisor for more information). The University will present evidence supporting the allegations first and has the burden of proving its case by the preponderance of evidence. A determination of the facts will be based only on the evidence as presented. Rules of evidence applicable to civil and criminal cases do not apply. An opportunity will be provided for the organization to present their own version of the facts and to present other evidence in support of the current case, including witnesses. The SOAB may impose reasonable limitations upon the presentation of evidence and questioning of witnesses. A student may not be compelled to testify. If the student chooses not to testify during the Hearing, no inference may be drawn from this action. The hearing will proceed, and the decision will be made based on the facts presented.

f. *Determinations:* Following the SOAB Hearing, the SOAB will have three (3) business days to issue a determination. Determinations will be based upon a preponderance of the evidence and must include:

i. A finding of either Responsible or Not Responsible for each alleged violation.
ii. Sanction(s), condition(s), and/or restriction(s) for each allegation determined to be a violation.

g. *SOAB Appeal:* Organization presidents may appeal a finding of responsibility, or the sanction(s), condition(s) and/or restriction(s) imposed by SOAB by submitting a written petition to the VP of Student Affairs within five (5) business days of receiving the determination. The Appeal form can be completed at: https://cm.maxient.com/reportingform.php?WestTexasAMUniv&layout_id=4.

i. The petition must clearly set forth the grounds for the appeal, together with any evidence upon which the appeal is based. A disagreement with the decision alone shall not constitute grounds for appeal. The VP of Student Affairs has ten (10) business days to make a decision on the appeal. The only proper grounds for appeal are as follows:

1. A procedural (or substantive error) occurred that significantly impacted the outcome of the hearing (e.g., substantiated bias, material deviation from established procedures, etc.).
2. The discovery of new evidence, unavailable during the original hearing or review of the case, which could substantially impact the original finding or sanction. A summary of this new evidence and its potential impact must be included.

Def_000363 App'x 591

**WT** Community Standards
WEST TEXAS A&M UNIVERSITY™          **WTAMU Student Handbook 2025-2026**

    3. The sanctions imposed substantially vary from the range of sanctions normally imposed for similar infractions.

**2.7 | Interim Measures and Sanctions**

**2.7.A | Interim Measures:** The University may take immediate action to prevent misconduct, its recurrence, and address any effects on members of the community. This includes immediate steps to protect parties before the final outcomes of the investigations. These steps will attempt to minimize the burden on a reporter, witness, or alleged, while respecting the due process rights of all. The implementation of interim measures does not replace the conduct process, which shall proceed on the normal schedule. Interim measures can include, but are not limited to:

    i.    A hold placed on a student's account, limiting their ability to register for courses, pull transcripts, etc.
    ii.    Revocation of access to on campus buildings/areas/halls.
    iii.    No Contact Order placed between two parties, which prohibits individuals from contacting one another through any means.
    iv.    *Interim Suspension of a Student:* At any point in the process, an alleged may be subject to removal from WT or the program/activity on an emergency basis, provided that an individualized safety and risk analysis (conducted by, or in conjunction with a WTAMU's Behavioral Intervention Team member) has determined that an immediate threat to the physical health or safety of any student or other individual arising from the allegations justifies immediate removal. The interim suspension does not replace the conduct process, which shall proceed on the normal schedule. The student should be notified in writing of this action and the reasons for the interim suspension.
        a.    Conduct, on or off campus, which may result in interim suspension:
            i.    A significant and articulable threat to the health or safety of a student or other member(s) of the University community.
            ii.    Sexual assault, other forms of sexual misconduct, stalking, and relationship violence that create a hostile environment for the victim, and the remedy for the harassment requires a temporary separation. All sex based and civil rights-based cases will be adjudicated through the Title IX and Civil Rights process according to TAMUS Regulation and WTAMU Rules, which can be found here:
                1.    TAMUS Regulation 08.01.01: https://policies.tamus.edu/08-01-01.pdf
                2.    WT Rule 08.01.01.W1: https://www.wtamu.edu/_files/docs/about/rules-procedures/08-01-01-W1-Civil-Rights-Compliance.pdf
            iii.    Criminal felony charges related to weapons, drugs, aggravated assault, and/or terroristic threats.
            iv.    Severe disruption in the academic community related to erratic behavior, threats, property damage, and/or verbal aggression with another student, where the offending student is uncooperative with staff requests.
            v.    Violation of a No Contact determination.
            vi.    Retaliatory harm, discrimination, or harassment.

**2.7.B | Resources and Referrals:** Referrals and/or resources may be offered to students involved in the Conduct Process. These can include, but are not limited to:

    i.    Counseling Services appointment

Def_000364    App'x 592

ii.    Victim's advocate assistance
iii.   Modifications to on-campus housing
iv.    Modifications to academic schedule

**2.7.C | Interim Suspensions of a Student Organization:** If it is determined that a student organization's actions or activities are detrimental to the educational purposes of the University, and/or not in accordance with the Student Handbook, the student organization will lose its officially registration with the Office of Student Engagement and Leadership. The registration of a student organization may be temporarily suspended while an investigation is pending involving an alleged violation of registered student organization's rules and regulations, as outlined in the Student Handbook. The Student Organization will be afforded all due process guidelines as described in the Student Handbook. Conduct, on or off campus, of members of a Student Organization that may result in interim suspension can include, but are not limited to:

i.     Violent or harassment-type behavior.
ii.    Organization events and activities resulting in allegations against individual students that may result in individual student interim suspension.
iii.   Cease and desist directives from regional or national entities.
iv.    Alcohol/drug rule/procedure violations during recruitment or social events.

**2.7.D | Not in Good Standing:** A student who is not in good standing is subject to the following restrictions:

i.     Ineligible to hold an office in any student organization recognized by the University or to hold any elected or appointed office of the University.
ii.    Ineligibility to represent the University in any way, including representing the University at any official function, intercollegiate athletics or any forms of intercollegiate competition or representation. This includes events taking place both on and off of the University campus.
iii.   Eligibility to receive a university administered scholarship may be affected when the length of the period of not in good standing is greater than one semester. Some scholarships adhere to more strict guidelines, and, therefore, ineligibility may result from a lesser length of not in good standing.
iv.    Additional restrictions or conditions also may be imposed, depending on the nature and seriousness of the misconduct.

**2.7.E | Student Conduct Findings:** A student conduct officer may impose sanctions, conditions, and/or restrictions as a result of an Informal Resolution or Formal Resolution where a student is found Responsible.

i.     *Sanctions*: Sanctions are defined as the primary outcome of the alleged violation.
    a.    ***Disciplinary Reprimand***: An official warning that the student's, or student organization's, conduct is in violation of the WTAMU Student Handbook.
    b.    ***Social Probation*** (for organizations): A period of time during which a student group or organization will not be allowed to have, host, or attend social gatherings as an entity of their organization.
    c.    ***Conduct Review:*** An official warning that the student's, or student organization's, conduct is in violation of the WTAMU Student Handbook, but is not sufficiently serious to warrant expulsion, suspension, or disciplinary probation. A student on conduct review shall have their conduct under review for a specified period of time. This sanction may require regular meetings with an appropriate official to ascertain and evaluate the nature and seriousness of the misconduct.

**Def_000365** App'x 593

**WT** **Community Standards**
WEST TEXAS A&M UNIVERSITY.                    **WTAMU Student Handbook 2025-2026**

Students and student organizations placed on this sanction remain in good standing with the University. If there is a finding of responsibility for subsequent violations of the WTAMU Student Handbook during this period of time, more severe sanctions may be administered.

   d. ***Disciplinary Probation:*** An official warning that the student's conduct is in violation of the WTAMU Student Handbook but is not sufficiently serious to warrant expulsion or suspension. A student on disciplinary probation is deemed "not in good standing" with the university. If there is a finding of Responsibility for subsequent violations of the WTAMU Student Handbook during this period of time, more severe sanctions may be administered.

   e. ***Suspension:*** A period of separation of the student from the University. The student is not guaranteed readmission at the end of the suspension but is guaranteed a review of the case and a decision regarding eligibility for readmission. Suspension takes effect upon exhaustion of the disciplinary process. Suspensions may be implemented in one of two ways: immediate implementation of suspension or deferred implementation of suspension. A student who has been issued a suspension sanction is deemed "not in good standing" with the University. At the end of the suspension period, the student is eligible for re-enrollment. Actual admission to the University will be determined by the academic rules in place at the time of application for re-enrollment.

      i. *Immediate Suspension:* Separation of the student or student organization from the University for a definite period of time.

      ii. *Deferred Suspension:* The sanction of suspension may be placed in deferred status. If the student or student organization is found in violation of any University rule during the time of deferred suspension, the suspension takes effect immediately without further review. Additional sanctions appropriate to the new violation also may be applied.

   f. ***Expulsion***: Separation of the student from the University whereby the student is not eligible for readmission to West Texas A&M University.

ii. <u>*Conditions*</u>: Conditions are additional components of a disciplinary sanction. A condition is usually an educational element that is to occur in conjunction with the assigned sanction. Some examples of conditions include, but are not limited to:

   a. Personal and/or academic counseling intake session. This condition is attached to the outcome of the intake requiring a certain number of follow-up sessions to be determined by the intake administrator.

   b. Educational programming, interventions, restorative practice, or workshops determined to help develop the student or organization. For example, Anger Management course, Substance Abuse module, Hazing Education workshop, etc.

   c. Residence hall relocation and/or contract review/cancellation of Residence Hall contact and/or use of dining facilities.

   d. Restitution or compensation for loss, damage, or injury, which may take the form of appropriate service and/or monetary or material replacement.

   e. Structural sanctions applied to student organizations, which are changes related to the structure, membership, or governance of the organization.

   f. <u>No Contact Order:</u> This is an official directive from WT that two parties do not have any contact with one another. This mutual No Contact Order asks both students to refrain from

Def_000366 App'x 594

**WT Community Standards**
WEST TEXAS A&M UNIVERSITY.    **WTAMU Student Handbook 2025-2026**

communicating in person, through electronic communications, or contacting one another via a third party.

iii. *Restrictions*: The withdrawal of specified privileges for a defined period of time, but without the additional stipulations contained in the imposition of a sanction which results in a student being not in good standing. The restrictions involved will be clearly defined. Some examples of restrictions include, but are not limited to:

   a. Revocation of parking privileges.
   b. Denial of eligibility for holding office in registered student organizations.
   c. Denial of participation in extracurricular activities.
   d. Prohibited access to university facilities and/or prohibited direct or indirect contact with members of the University community.
   e. Loss of privileges on a temporary or permanent basis.

## 2.8 | Student Conduct Files and Retention

2.8.A | Record Retention: Student records, disciplinary records, and other reporting records will be retained and removed per the current and approved TAMU System SAP 13.02.99.M0.01, Records Retention Schedule, which can be found at: http://www.tamus.edu/legal/records-management. Disciplinary records resulting in suspension or expulsion are maintained permanently in the Office of Community Standards.

2.8.B | Personal Records Request: A student may examine their own Student Conduct records by making an appointment with the Office of Community Standards and detailing their request in writing. Any records that contain other students' protected information as outlined under the Family Educational Rights and Privacy Act (FERPA) will be redacted. The student will have an opportunity to review the contents of the record and submit a request for amendments or additions. The student may not retain copies or take photos of the records.

2.8.C | Public Records Request: Texas Government Code Chapter 552 gives individuals the right to access government records. All government information is presumed to be available to the public. Certain exceptions may apply to the disclosure of the information. Individuals can make an Open Records Request in the WT Portal, found here: https://wt-texasam.mycusthelp.com/WEBAPP/_rs/supporthome.aspx.

## 2.9 | Departure from Campus Following Suspension or Dismissal and Request for Reinstatement

2.9.A | Students who have been required to withdraw from the University by Involuntary Withdrawal or Student Conduct determinations shall leave the premises within three (3) days after being notified, or sooner, if directed by the Office of Community Standards, or the VP for Student Affairs.

2.9.B | Students who have been required to withdraw from the University for Student Conduct reasons, and who desire to be reinstated, shall present their requests in writing to the Office of Community Standards.

   i. If a student was removed with a Criminal Trespass Warning (CTW), the student must first contact UPD in order to be escorted to the Office of Community Standards.

2.9.C | Students who have been required to withdraw from the University by Involuntary Withdrawal, and who desire to be reinstated shall follow reenrollment procedures obtained from the Office of the Registrar.

2.9.D | After obtaining clearance, students must comply with all deadlines and/or requirements of the current university catalog for readmission.

Def_000367 App'x 595

**WT** **Community Standards**
WEST TEXAS A&M UNIVERSITY.          **WTAMU Student Handbook 2025-2026**

### 2.10 | Parental Notification

2.10.A | Violations of alcohol beverages, narcotics, or drugs standard may result in notification to the parents/guardians of dependent students under the age of 21. Typically, parental notification will only take place after a second violation, however, the VP of Student Affairs and their delegate in the Office of Community Standards reserves the right to notify parents based on the severity of an offense, or when there is a concern for the safety or wellbeing of a student, or the campus community.

### 2.11 | Abuse of the Student Conduct System

2.11.A | Abuse of the Student Conduct, disciplinary, or legal processes including, but not limited to, investigations, conferences and appeals. Prohibited behavior includes, but is not limited to:

i.   Failure of a student to respond to a notification to appear before a student Conduct Officer during any stage of the conduct process.
ii.  Falsification, distortion, or misrepresentation of information in Conduct Proceedings.
iii. Filing an allegation known to be without merit or cause.
iv.  Disruption or interference with the orderly conduct of an investigation, conference, or an appeal process.
v.   Discouraging, or attempting to discourage, an individual's proper participation in, or use of, the Conduct Process, disciplinary proceedings, etc.
vi.  Intentionally initiating, or causing to be initiated, any false report.
vii. Influencing, or attempting to influence, the impartiality of a member of a disciplinary body prior to and/or during the disciplinary proceedings.
viii. Influencing, or attempting to influence, another person commits an abuse of the discipline system.
ix.  Failure to comply with the sanction(s), condition(s), and/or restriction(s) imposed by a Student Conduct Officer under the Student Handbook.

### 2.12 | Alcohol Beverages

2.12.A | In accordance with TAMU Rule 34.03, alcohol use, possession, sale, delivery, manufacture, and/or distribution of alcoholic beverages (except as expressly authorized by university rules), is prohibited. In addition, use, possession, or distribution of alcohol beverages while driving or riding in or on a vehicle on university premises is prohibited. Alcoholic beverages may not, in any circumstances, be used by, possessed by, or distributed to any person under twenty-one (21) years of age.

2.12.B | Individuals may not be in a state of public intoxication or drunkenness. Individuals may not operate motor vehicles or another form of transportation while intoxicated or while under the influence of alcohol.

### 2.13 | Animals on Campus

2.13.A | Animal Cruelty: Intentionally, knowingly, or recklessly torturing or in a cruel manner killing or causing serious bodily injury to an animal, failing to provide necessary food, water or care for an animal in the person's custody, abandoning unreasonably an animal in the person's custody, transporting or confining an animal in a cruel manner, causing bodily injury to any animal without the owner's consent, causing one animal to fight with another animal, or seriously overworking an animal. Intentionally, knowingly, or recklessly attacking, injuring or killing an assistance animal or inciting another to attack, injure, or kill an assistance animal.

**Def_000368** App'x 596

**WT** **Community Standards**
WEST TEXAS A&M UNIVERSITY™                    **WTAMU Student Handbook 2025-2026**

i.   This policy is not intended to prohibit:
   a.   Killing or injuring an animal within the scope of a person's employment or furthering the goals of legitimate educational curriculum as designed and approved by the University.
   b.   Killing or injuring an animal when the actor had a reasonable fear of bodily injury to self or another person by that animal.

**2.13.B | Emotional Support Animals (ESAs):** In accordance with federal and state law (Fair Housing Act), emotional support animals are permitted within university controlled on-campus housing and those areas immediately surrounding the residential facilities for approved students with disabilities on a case-by-case basis. Emotional support animals are not permitted in other university buildings, without prior approval as a reasonable accommodation through the Office of Student Accessibility. Emotional support animals are not considered service animals and improperly representing an emotional support animal as a service animal is in violation of the State of Texas Human Resources Code Section 121.006(a), and a violation Dishonesty.

i.   *ESAs in University Housing:* Students seeking approval for the use of an emotional support animal within university controlled on-campus housing will be required to submit a written request to the Office of Student Accessibility and be approved for an ESA prior to the animal coming to campus. Applications can be found here: https://cm.maxient.com/reportingform.php?WestTexasAMUniv&layout_id=7.
   a.   ***ESA Approval Status:*** After receiving final confirmation from the Office of Student Accessibility approving your ESA to be housed in your assigned Residence Hall room, you can bring your animal to campus. ESA approval status is contingent upon maintenance of owner responsibilities and animal behavior (see section 2.14.E of this Handbook). Any animal, regardless of purpose, service or emotional support, may not cause a disruption to the campus community.
      i.   *Disruption:* ESAs that cause significant disruption to the community, damage to university property, or pose a safety risk will be subject to documentation through Student Conduct. Students found Responsible for one or more violations as a result of the actions of their ESA may be subject to revocation of their approval status by the Office of Student Accessibility.

**2.13.C | Service Animals:** A service animal is permitted on campus grounds and within the administrative buildings with limited exceptions and restrictions. This practice follows the Americans with Disabilities Act (ADA), as amended. The service animal must have been trained as a service animal in the specific work or tasks directly related to the person's disability. Students requiring the use of a service animal within university controlled on-campus housing should go through the Office of Student Accessibility (OSA) to complete an application for this accommodation. Under TAMU SAP 08.01.02.M0.02, employees are permitted to ask two (2) questions of the owner:

i.   Is this a service animal required because of a disability?
ii.   What work or task has the service animal been trained to perform?

**2.13.D | Approved Animals on Campus:** Students who apply through the Office of Student Accessibility for a Service Animal or ESA to reside with them in the residence halls, must obtain approval from the Director of OSA prior to the animal coming to campus. The approval status of a student to have an ESA or Service Animal is reliant upon both animal and handler behavior, see Handler's Responsibilities for more information.

**WT** | Community Standards
WEST TEXAS A&M UNIVERSITY™    **WTAMU Student Handbook 2025-2026**

**2.13.E | Owner Responsibilities and Animal Behavior:** Under TAMU SAP 08.01.02.M0.02, an approved ESA or Service Animal has one owner, the student who applied for the accommodation. That is the person responsible for the animal's behavior and the only person authorized to handle the animal. If a Service Animal or ESA is found to be disruptive or violating any of the rules surrounding approval status, the student will be documented through Student Conduct, which may result in the approval status being revoked.  The owner is required to:

i.      Follow any departmental/unit rules and/or restrictions.
ii.     Maintain control of the animal at all times (e.g., voice control, signals, or other effective means). The animal shall have a harness, leash or other tether. Exemptions:
   a.   When the owner is unable to use the harness, leash, or other tether because of a disability; or
   b.   The use of a harness, leash or other tether would interfere with the animal's safety and/or effective performance of work or tasks for the disabled owner.
iii.    Ensure the animal is licensed, registered, and immunized as applicable and in accordance with the laws, regulations, and ordinances of the State of Texas and county and city authorities.
iv.     Ensure the animal is in good health and care. This includes, but is not limited to feeding, grooming, and veterinary care. The care and supervision of the animal is solely the responsibility of the owner. Animals that are ill must not be taken into public areas. An owner with an ill animal may be asked to remove the animal from the premises.
v.      To clean up after the animal relieves itself. An owner with a disability who physically cannot clean up after their animal shall make all necessary arrangements for assistance.
vi.     Maintain care and supervision of the animal, as well as for loss of services or any damage or injury caused by the animal while on university property. The owner may be billed for the expense of any damage to buildings, furnishings, and/or grounds caused by the animal.

**2.13.F | Animal Removal:** West Texas A&M University may require an individual to remove their animal from the premises under the following circumstances:

i.      The animal's owner cannot or does not take effective action to control it. Examples of uncontrolled behavior from an animal includes, but is not limited to, continuously barking, approaching or jumping on people, or trying to get away from the handler.
ii.     The animal is not housebroken.
iii.    The animal poses a direct threat to the safety of others.

**2.13.G | Unattended Animals:** An animal left unattended in a vehicle or other area and is perceived to be in distress is to be reported to the University Police Department at 806-651-2300 or 911 in case of emergency. Any animal found unattended in, or on any campus facility may be impounded. Owners of the impounded animal will be held responsible for payment of any impoundment and/or license fees required to secure the release of their animal.

**2.13.H | Wild, Feral, or Stray Animals:** Wild animals will be left alone if no immediate threat to human safety or property is evident. Violations include, but are not limited to attempting to capture, harm, or engaging with undomesticated animals on university property will be subject to disciplinary action. If an animal is exhibiting dangerous or destructive behavior or posing an immediate threat, UPD must be notified immediately. If the animal is deemed a threat and immediate intervention is required, UPD may elect to remove the threat. Individuals are discouraged from feeding wild, feral, and stray animals. This includes domesticated or feral cats, raccoons, opossums, skunks, squirrels, and any/all of the fauna which occur either naturally or unnaturally on

Def_000370 App'x 598

**WT** **Community Standards**
WEST TEXAS A&M UNIVERSITY.    **WTAMU Student Handbook 2025-2026**

WT campus. This shall not apply to food left out as bait for purposes of capturing or attracting animals for animal control or for educational purposes as approved and monitored for research purposes. Any person who vandalizes, removes, or deactivates an animal trap that has been set by Animal Control will be in violation of this procedure and will be responsible for replacement costs and/or subject to disciplinary action.

2.13.I | Exclusions: This rule does not apply to the following animals:

    i.   Animals involved in authorized research.
    ii.   K-9 animals (police dogs).
    iii.  Official university mascots.
    iv.  Animals utilized under approved academic programs and research projects.

**2.14 | Behavior Intervention Team (BIT)**

2.14.A | The Behavior Intervention Team (BIT) exists to help promote the development of a healthy campus community at WT. The BIT will be comprised of university staff and faculty appointed by the VP of Student Affairs. BIT's mission is to provide early intervention and support to students who display behavior that causes reason for concern for the welfare of the individual, or the University community. BIT will meet on a regular basis throughout the regular academic year. During these meetings, cases will be reviewed, and determinations will be made on student referrals and intervention plans, as appropriate. In cases where the safety of a student or others is at risk, or when there is significant disruption, or potential disruption, to the learning environment at the University, the BIT has the authority to require a student to complete an intervention plan. To report an incident to the BIT team, use the Incident Reporting Form: https://cm.maxient.com/reportingform.php?WestTexasAMUniv. Types of actions made on behalf of the Behavioral Intervention Team can include:

    i.   Referral to University and/or Community Counseling, or Other Resources: The BIT may refer the student to Counseling Services for intervention and connection with appropriate university and community resources.
    ii.   Referral to Student Conduct: The BIT will refer cases to Student Conduct that involve behavior that is in violation of the WTAMU Student Handbook.
    iii.  Involuntary Leave: The BIT may impose an Involuntary Leave for safety reasons, if it finds, after an individualized assessment, that there is significant risk that a student will harm themselves or another, substantially interfere with the educational experience of others, or causes a chronic and inordinate use of university resources.
    iv.  Threat Assessment: WT is licensed to use the WAVR-21 to assess a student's level of threat to the campus community. Students found to be at high risk for danger to self or others will be required to participate in a Behavioral Intervention Plan.
    v.   Behavioral Intervention Plans (BIPs): BIT may work directly with the student to create an Improvement Plan. These will be developed individually and created with the purpose of educational development and student support.

Def_000371    App'x 599

**WT Community Standards**
WEST TEXAS A&M UNIVERSITY™                WTAMU Student Handbook 2025-2026

**2.15 | Campus Security Report**

2.15.A | In accordance with the Higher Education Act of 1998 and The Clery Act, West Texas A&M University publishes an annual Campus Security and Fire Safety Report. The Campus Security and Fire Safety Report is published every year by October 1st and contains three years of selected campus crime statistics and certain campus security policy statements in accordance with the Clery Act. This document is available in the Division of Student Affairs, University Police Department, or online at: http://www.wtamu.edu/reports.

**2.16 | Damage to Property**

2.16.A | Behavior that damages, destroys, tampers with, vandalizes or litters any property of this, or another educational institution, or of another person or entity on university premises, or at university-sponsored activities.

**2.17 | Dishonesty**

2.17.A | Acts of dishonesty are prohibited, including but not limited to the following:

i.   Withholding material information from the University, misrepresenting the truth during a university investigation or Student Conduct conference, and/or making false statements to any University official or law enforcement officer, in the course of their duties.
ii.  Furnishing false information to and/or withholding information from any university official, faculty member, office, or law enforcement officers in the course of their duties.
iii. Forgery, alteration, possession, or misuse of any university document, record, or instrument of identification.
iv.  The submission of false information.

**2.18 | Expressive Activity**

2.18.A | In accordance with WT Rule 08.99.99.W1 and TAMU Rule 08.99.99.M1, any person is allowed, subject to limitations described in this rule and reasonable time, place, and manner restrictions, to engage in expressive activities on campus, including by responding to the expressive activities of others. Students enrolled at, and employees of, the university must present proof of identity and status at the university on request by a university official on campus engaging in an official duty.

2.18.B | Student organizations and employees are allowed to invite speakers to speak on campus subject to the restrictions outlined in this rule. In determining the amount of a fee to be charged for use of the University's facilities for purposes of engaging in expressive activities, the University may consider only content-neutral and viewpoint-neutral criteria related to the requirements of the event, such as the proposed venue and the expected size of the audience, any anticipated need for campus security, any necessary accommodations, and any relevant history of compliance or noncompliance by the requesting student organization or employee with this rule and other relevant rules. The University may not consider any anticipated controversy related to the event.

2.18.C | The University may not act against a student organization or deny the organization any benefit generally available to other student organizations at the University on the basis of a political, religious, philosophical, ideological, or academic viewpoint expressed by the organization or of any expressive activities of the organization.

Def_000372    App'x 600

**WT** **Community Standards**
WEST TEXAS A&M UNIVERSITY.

WTAMU Student Handbook 2025-2026

**2.18.D |** The University may take disciplinary or remedial action against individuals or groups that engage in expressive activity not protected by WT Rule 08.99.99.W1, Expressive Activity, or the First Amendment. Sanctions which may be imposed include all those identified in section 2.8 of this Student Handbook. Expressive activities which may result in sanctions and are not protected by this rule or the First Amendment include:

i.   Defamation.
ii.  Obscenity.
iii. Physical abuse or assault.
iv.  True threats.
v.   Disruption of the academic environment or a university sponsored extracurricular event.
vi.  Inciting or producing imminent lawless action.
vii. Unlawful harassment.

**2.18.E |** Conduct described in 2.18.D may be reviewed and adjudicated under TAMU System Regulation 08.01.01 Civil Rights Compliance, including those related to actional discrimination or harassment based on race, color, sex, religion, national origin, age, disability, genetic information, veteran status, sexual orientation, gender identity, or any other classification protected by federal, state, or local law. Additionally, such conduct may also be reviewed and adjudicated by the Office of Community Standards using the Student Conduct Process when the conduct does not rise to the level of a civil rights violation.

**2.18.F |** The common outdoor areas of the University's campus are deemed traditional public forums. Any person is permitted to engage in expressive activities in these areas freely, as long as the person's conduct:

i.   Is not unlawful; and
ii.  Does not materially and substantially disrupt the functioning of the institution.

**2.18.G |** Any person is allowed to assemble or distribute written material in common outdoor areas without a permit or other permission from the institution, subject to the restrictions outlined in this rule.

**2.18.H |** West Texas A&M University may require advance reservation of events in certain circumstances to ensure safety and to promote an environment conducive to study. There are areas such as residences and the Cornette Library that have distance requirements, crowd placement restrictions, and security concerns that may vary depending on security needs, terror alerts, and other factors. Additionally, security needs, terror alerts, local and national events may affect the availability of spaces that would otherwise be routinely available. Information about existing requirements, restrictions, or security concerns will be discussed at the time a reservation request is processed.

**2.18.I |** The university reserves the right to have policies that are reasonable time, place, and manner restrictions in common outdoor areas if the restrictions:

i.   Are narrowly tailored to serve a significant university interest;
ii.  Employ clear, published, content-neutral, and view-point neutral criteria;
iii. Provide ample alternative means of expression; and
iv.  Allow all persons to assemble or distribute written material without a permit or other permission from the university.

Def_000373  App'x 601

# WT Community Standards
WEST TEXAS A&M UNIVERSITY.    **WTAMU Student Handbook 2025-2026**

2.18.J | The Texas A&M University Board of Regents, by review and approval of this rule, have sole authority to designate the areas on member campuses that are public forums (including both traditional public forums and designated public forums.), in a manner consistent with the First Amendment to the U.S. Constitution and Section 8 Article I of the Texas Constitution.

2.18.K | Nothing in this rule should be interpreted or construed as:

  i. Prohibiting faculty members from maintaining order in the classroom.
  ii. Limiting or infringing on a person's right to freedom of speech or expression protected by the First Amendment to the U.S. Constitution or by Section 8, Article I, Texas Constitution.
  iii. Prohibiting the university from having rules differentiating between the rights of students and employees to engage in expressive activities on campus and the rights of those individuals who are not students or employees.

2.18.L | This rule categorically prohibits the following expressive activity on campus:

  i. Using a device to amplify sound that, as determined by the university:
      a. Intimidates others;
      b. Interferes with campus operations; or
      c. Interferes with a university employee's or a peace officer's lawful performance of a duty.
  ii. During the last two weeks of a semester, engaging in the following expressive activities in a manner that materially and substantially disrupts the functioning of the university:
      a. Having events in the common outdoor areas;
      b. Inviting speakers to speak on campus;
      c. Using a device to amplify sounds; or
      d. Using drums or other percussive instruments.
  iii. At any time, camping or erecting tents or other living accommodations on campus.
  iv. Wearing a disguise or other means of concealing a person's identity while engaging in expressive activities on campus with the intent to:
      a. Obstruct the enforcement of the university's rules or the law by avoiding identification;
      b. Intimidate others; or
      c. Interfere with a university employee's or peace officer's lawful performance of a duty.
  v. Lowering the university's U.S. flag, Texas flag, or university flag, with the intent to raise a flag of another nation, state, or a flag representing an organization or group of people.
  vi. Engaging in expressive activity between the hours of 10:00 p.m. and 8:00 a.m. in a manner that materially or substantially disrupts the functioning of the university.

2.18.M | Advance Registration Requirements: In an effort to ensure safety and to promote an environment conducive to study, advanced reservation for expressive activity is required (in the form of an approved Reservation Request for Space) for events or activities that are promoted in advance, or sponsored by student organizations, or expected to draw a crowd of more than 25 people. Advance reservation is also required for activities near intersections, in close proximity to academic buildings anytime classes or study activities, and research is taking place.

2.18.N | Reservations Procedures: Individuals or groups who are either required to make advance reservation or those individuals or groups who otherwise wish to make advance reservations on campus must request use of

Def_000374 App'x 602

# WT Community Standards
## WEST TEXAS A&M UNIVERSITY™

**WTAMU Student Handbook 2025-2026**

the space through the university's reservation process, which can be found here: https://reservations.wtamu.edu/. If advance reservation is required, requests must be mate at least five business days in advance of the event. Additional collaboration and coordination may be required from a building/space proctor. Usually, the use of the space will be assigned to the person or organization that requests the area first. University sponsored events have first priority on the use of campus facilities. The university reserves the right to locate any assembly so as to ensure that the activity does not interfere with the normal operation of the university or the rights of others. The decision to confirm a request for space will be based on proper and timely completion of the reservation process, compliance with applicable sound and sign requirements, and availability of space. The decision to confirm will be based on the foregoing criteria, and in no circumstance will any decision be based on the content or viewpoint of the expressive activity or upon the expected reaction of others. If a request is denied, the rationale for the decision will be provided in writing. The denial of a reservation request can be appealed to the Vice President for Student Affairs or a designee. At the time of the request, the following information will be required:

i. Name information of the person or organization sponsoring the event. Contact information for one individual who will be present during the course of the event.
ii. Location, date, and time requested for the event.
iii. General purpose of the event.
iv. List of planned activities (i.e., speech or rally, march with signs, distribution of literature, sit-in).
v. Special equipment requested.

**2.18.O |** For recognized student organizations, an officer of the sponsoring organization must be present at the event, and during the entire course of the event.

**2.18.P | Guidelines for Expression:**

i. _Disruptive Activity_: Obstruction, disruption, or interference with classes, research, administrative functions or other university activities is not permitted. Likewise, infringement on the rights of others is prohibited.
ii. _Reasonable Access_: It is important to provide reasonable access to, and exit from, any office, classroom, laboratory, or building. Likewise, vehicular and pedestrian traffic should not be obstructed.
iii. _Picketing_: Picketing in an orderly manner outside of university buildings may be permitted. Such activities should not become disruptive, nor should they impede access. Picketing is not permitted inside campus buildings.
iv. _Literature_: Literature may be distributed in traditional designated public forums. Such activities should not be become disruptive, nor should they impede access.
v. _Symbolic Protest_: Displaying a sign, gesturing, wearing symbolic clothing or otherwise protesting silently is permissible unless it is a disruptive activity or impedes access. In addition, such acts should not block the audience's view or prevent the audience from being able to pay attention.
vi. _Noise_: Making sustained or repeated noise in a manner that substantially interferes with speakers' ability to communicate their message is not permitted. Noise levels should not interfere with classes, meetings, or activities in progress or the privacy of residence hall students.
vii. _Force or Violence_: Any attempt to prevent a university activity or lawful assembly by the threat or use of force or violence is not permissible.

Def_000375 App'x 603

# WT Community Standards
## WEST TEXAS A&M UNIVERSITY.

**WTAMU Student Handbook 2025-2026**

viii. _Presenting Identification_: In accordance with Texas Education Code 51.209, it is unlawful for any persons on any property either owned or controlled by the university to refuse to identify themselves to a university official in response to a request. For the purpose of this rule people identify themselves by presenting student or faculty/staff ID card or government issued ID card.

ix. _Damage to Property_: Any damage to university or personal property in the course of, or as a result of, an expressive activity is prohibited. Care should be taken to ensure that university and personal property is not damaged or destroyed. This includes the campus lawns, shrubs, and trees.

x. _Aesthetics_: Exterior-facing messages, including but not limited to signs, posters, flags, or banners, on the windows of any West Texas A&M University building, other than a student's room in the residence halls, are prohibited.

xi. _Other University Rules:_ All applicable University Rules and Student Rules should be followed whenever engaging in activities on campus. Consult the WTAMU Student Handbook for further information.

2.18.Q | All individuals participating in expressive activity are expected to comply with state and federal law, municipal ordinances, and the above guidelines. Failure to do so may result in immediate removal from the campus and any other appropriate action by university officials or University Police.

2.18.R | Complaint Procedure: Any person who believes that their campus expressive activity rights have been unduly interfered with by a student, student organization, or employee has the right to file a complaint. Complaints should be filed on the university's online complaint form, found at: www.wtamu.edu/complaint. Any acts that are disruptive to the normal operations of the university, including classes and university business, or that invade the rights of others will not be tolerated. A student, student organization, or employees who is found to have unduly interfered with another person's expressive activity rights, as recognized by this rule, is subject to disciplinary action in accordance with the university's applicable rules and procedures. Any participant in a disruptive activity may also face criminal charges. All complaints will be administered by the university complaint process found on the complaint website: www.wtamu.edu/complaint. If a violation of this rule is found to occur the report will be referred to the appropriate office for further action. The referral office will be determined by the status of the offending individual, for example, complaints concerning:

i. A faculty will be referred to the Office of the Provost.
ii. Students will be referred to the Office of Community Standards.
iii. Staff and third parties will be referred to Human Resources.

## 2.19 | Failure to Comply and Disorderly Conduct

2.19.A | Disruptive Activity: Activity that interferes with teaching, research, administration, disciplinary proceedings, residential communities, academic mission or pursuits, free flow of pedestrian or vehicular traffic on university premises, or other university missions, processes, or functions, including public service functions or other university activities.

2.19.B | Disorderly Conduct: Public behavior that is disruptive, lewd, or indecent; breach of peace; or aiding or procuring another person to breach the peace on university premises or at functions sponsored by the University or participated in by members of the University community.

2.19.C | Harmful, Threatening, or Endangering Conduct: Intentional or reckless behavior that harms, threatens, or endangers the physical or emotional health or safety of self or others, including but not limited to:

Def_000376 App'x 604

**WT** **Community Standards**
WEST TEXAS A&M UNIVERSITY™          **WTAMU Student Handbook 2025-2026**

i. *Physical Assault:* Assault is threatening someone with imminent bodily injury, intentionally causing bodily injury, or intentionally causing physical contact when the person knows such contact will be considered offensive.

ii. *Threats*: Communication of a serious expression of an intent to harm a specific person or group of people. Action that causes a reasonable expectation of injury to the health or safety of any person or damage to any property.

**2.19.D | Failure to Comply:** Failure to comply with a reasonable directive and/or request, or to present student identification, or identify oneself, to any University official acting in the performance of their position. Fleeing a university official or law enforcement officer when the person knows, or reasonably should have known, the University official or law enforcement officer is attempting to confront, arrest, or detain.

## 2.20 | Firearms, Ammunition, and Weapons

**2.20.A | Firearms and Ammunition:** The use, or threatened use, of firearms or ammunition on university property or at university function is prohibited. The possession of these items outside of a locked, privately owned, or leased, motor vehicle, unless the person is authorized to carry by the State of Texas, is prohibited. Concealed handguns must be carried in accordance with University Rule 34.06.02.W1. These items, or those similar in nature, may not be used for display or decoration in university buildings.

i. Students living in the Residence Halls:
   a. In accordance with Texas SB 11 (Texas Government Code 411.2031), the "Campus Carry" law and WTAMU Rule 34.06.02.W1, only residents who have a license to carry a concealed handgun will be permitted to have their handgun and ammunition in their Residence Hall room. The aforementioned law allows WTAMU to establish rules, regulations, or other provisions concerning the storage of handguns in the Residence Halls. Any student who has a license to carry a concealed handgun and will store the weapon in the Residence Halls must rent a university owned safe. The use of personal safes for this reason is not permitted.
   b. For more information, visit Carrying Concealed Handguns on Campus 34.06.02.W1: https://www.wtamu.edu/about/campus-concealed-carry.html

**2.20.B | Explosives and Fireworks:** Illegal or unauthorized use, possession, or storage of fireworks or explosives, or dangerous chemicals on university premises or at any university sponsored activity is prohibited. In addition, use of any such item, even if legally possessed, in a manner that harms, threatens or causes fear for others is prohibited.

**2.20.C | Weapons:** The term weapon is defined as any object or substance designed or used to inflict a wound, to cause or threaten injury, or to incapacitate. Weapons may include, but are not limited to, all firearms, pellet guns, tasers, stun guns, slingshots, martial arts devices, switchblade knives, clubs, paint ball guns, Orbeez guns, blow guns, air-powered guns, nun chucks, brass knuckles, projectiles, bow and arrows, axes, and swords. These items, or those similar in nature, may not be used for display or decoration in university buildings. The possession of key chain pepper sprays, or kubatons, is allowed; however, misuse of such items may result in disciplinary action, as these are considered deadly weapons.

Def_000377    App'x 605

**WT** **Community Standards**
**WEST TEXAS A&M UNIVERSITY**

WTAMU Student Handbook 2025-2026

**2.21 | Fire Safety**

**2.21.A |** Persons who jeopardize the security or safety of any resident will be subject to severe disciplinary action. Tampering with fire equipment, or acts of arson, can result in civil prosecution, disciplinary measures, and/or possible fines.

**2.21.B |** When a fire alarm sounds, all individuals in the area are expected to proceed to the nearest exit, stand at least 100 feet from the building and should never impede emergency responders' ability to reach the building. Failing to evacuate a building, or to take the first opportunity to evacuate a building, anytime a fire alarm is sounded will result in a disciplinary sanction. Additionally, causing the fire alarm to sound due to negligence, by tampering with equipment, or unsafe practices (i.e., overloading circuits, use of unauthorized cooking appliances, negligence, use of inappropriate extension cords, power taps, etc.) may result in disciplinary action including, but not limited to, renumeration of fees assessed by local authorities.

**2.21.C |** Fire Drills: The University will hold fire drills to acquaint the people with fire evacuation procedures. All people are required to follow directions during the drills. Failure to evacuate the building may result in disciplinary action, a monetary fine, and/or a possible suspension.

**2.21.D |** Fire Equipment: It is imperative that fire and safety equipment function properly when it is needed, the following acts are prohibited:

   i. Tampering or playing with fire extinguishers, smoke detectors, exit lights, emergency lights, door and door frame fire-rating labels.
   ii. Tampering with or pulling a fire alarm under false pretense.
   iii. Removing smoke detector batteries or otherwise rendering a smoke detector inoperable.
   iv. Propping open or impeding fire doors.
   v. Obstructing halls and stairwells with furniture, debris, and other materials.
   vi. Hanging objects from smoke detectors and sprinklers.
   vii. Presence on fire escapes in non-emergency situations.

**2.21.E |** Smoke Detectors: All rooms and offices are equipped with smoke detectors. People that see a problem with their smoke detector should contact the maintenance staff or building staff immediately. Disciplinary action will result if the smoke detector is removed or otherwise renders the detector inoperable. Disciplinary action could also result for people who cause potential fire hazards through unsafe practices (i.e., overloading circuits, use of inappropriate extension cords, power taps, use of unauthorized cooking appliances, etc.).

**2.21.F |** Sprinkler Systems: The University is not responsible for damage caused by the sprinkler system. Residents who cause the system to activate will be held accountable for any damage caused to their personal property, other residents' property, and to university property. Residents tampering with the system will be fined based on state regulations and will face disciplinary and possible legal action. Sprinkler systems are very sensitive. Please be aware of the following:

   i. Never cover a sprinkler head.
   ii. Do not hang items from the sprinkler head or pipe.
   iii. Sprinkler heads may never be obstructed or altered.
   iv. Nothing may be stored within 18 inches of the sprinkler's head.
   v. Any items that hit the sprinkler head may cause it to activate.

Def_000378    App'x 606



**Community Standards**
WEST TEXAS A&M UNIVERSITY™

**WTAMU Student Handbook 2025-2026**

    vi.    The sprinkler system is activated by contact or heat, not smoke.

2.21.G | <u>Open Flames:</u> Under TAMU SAP 24.01.01.M7.02, candles, incense burners, oil lamps or other personal items that have open flames or that smolder, are prohibited in work areas (individual or group), conference rooms, restrooms, and in all campus buildings. This restriction applies to such items regardless of whether the item has been lit. Such items may be confiscated immediately by staff. Exceptions apply to candles, flame effects or pyrotechnics used for banquets, ceremonies, science demonstrations, theatrical production, indoor fireworks or other entertainment.

2.21.H | <u>Micro-mobility Devices:</u> Any electronic transportation device that houses a lithium battery poses a fire hazard and is not permitted inside university buildings. This includes, but is not limited to, hover boards and electric scooters.

## 2.22 | Food and Beverages

2.22.A | The sale of food and beverages is prohibited without the appropriate, and prior, approval from necessary university officials is prohibited. The consumption of food and beverages in academic buildings and libraries shall be confined to the concession's area and designed common areas.

## 2.23 | Hammocks

2.23.A | Attaching rope, wire, or other material, or device, to any tree, shrub, bush, or plant is prohibited on university property. Designated hammock areas exist in multiple locations on campus. Hammocks must not be attached to anything other than the established posts in these designated areas.

## 2.24 | Harassment

2.24.A | Behavior that is severe, pervasive, or persistent, to a degree that a reasonable person similarly situated would be prevented from accessing an educational opportunity of benefit. This behavior includes, but is not limited to, verbal or written abuse, threats, intimidation, coercion, or violence and other forms of harassment against any member of the university community.  In addition, harassment may be conducted by a variety of mediums, including but not limited to, physical verbal, graphic, written, or electronic.

## 2.25 | Hazing

2.25.A | In accordance with the Campus Hazing Act (H.R. 5646), any intentional, knowing, or reckless act committed by a person (whether individually or in concert with other persons) against another person or persons, regardless of the willingness to participate, that is committed in the course of an initiation into, an affiliation with, or the maintenance of membership in, a registered student organization or student group (e.g., a club, athletic team, fraternity, or sorority) and causes or creates a risk above the reasonable risk encountered in the course of participation in the IHE or the organization, of physical or psychological injury. Examples of physical and psychological injury can include, but are not limited to:

    i.    Misuse of authority by virtue of one's class rank or leadership position, such as assigning acts of servitude.

    ii.    Whipping, beating, striking, electronic shocking, placing of a harmful substance on someone's body, or similar activity.

Def_000379
Def App'x 607

**WT** **Community Standards**
WEST TEXAS A&M UNIVERSITY™        **WTAMU Student Handbook 2025-2026**

iii.    Causing, coercing, or otherwise inducing sleep deprivation, exposure to the elements, confinement in a small space, extreme calisthenics, or other similar activity.
iv.    Causing, coercing, or otherwise inducing another person to consume food, liquid, alcohol, drugs, or other substances.
v.    Causing, coercing, or otherwise inducing another person to perform sexual acts.
vi.    Any activity that places another person in reasonable fear of bodily harm through the use of threatening words or conduct.
vii.    Any activity that requires a violation of the WTAMU Student Handbook.
viii.    Any activity that induces, causes, or requires another person to perform a duty or task that involves a criminal violation of local, State, Tribal, or Federal law.

2.25.B | For purposes of this definition, a 'student group' means an organization at an institution of higher education in which two or more of the members are students enrolled at the institution of higher education, whether or not the organization is established or recognized by the institution. This is in alignment with the Campus Hazing Act (H.R. 5646).

2.25.C | In alignment with WT's Amnesty policies, students who are recipients and/or victims of hazing (and who have not perpetrated hazing behavior on others involved in the fact pattern for which they are reporting) and who report the activities to the VP for Student Affairs or designee responsible for oversight of the student conduct processes and/or the University Police Department, will not be charged with a violation of the hazing rule.

2.25.D | Having firsthand knowledge of the planning or occurrence of a hazing incident and failing to report it to appropriate university officials (e.g., the Vice President for Student Affairs, at JBK Suite 102, 806-651-2389, Human Resource Office, 806-651-2114, or the University Police Department, 806-651-2300) is a violation.

2.25.E | The hazing rule is not intended to prohibit the following conduct:

i.    Customary public athletic events, contests, or competitions that are sponsored by the University or the organized and supervised practices associated with such events; or
ii.    Activity or conduct that furthers the goals of a legitimate educational curriculum, a legitimate extracurricular program or a legitimate military training program as defined and approved by the University.

2.25.F | Hazing is a violation of Federal law (H.R. 5646), Texas state law under Texas Education Code Sections 37.151 and 51.936, and TAMU System Policy 07.01 – Ethics.

**2.26 | Illegal Substances**

2.26.A | In alignment with TAMU Rule 34.02.01.M1, the act of using, possessing, being under the influence of, manufacturing, or distributing, Illegal drugs or illegally obtained/possessed controlled substances is prohibited.

2.26.B | Abusing legally obtained drugs by failing to take the drug as directed. Except as expressly permitted by law, use, possession, manufacturing, or distributing or being party thereto of tetrahydrocannabinol (THC), heroin, narcotics, or other controlled and/or prescribed substances and/or drug paraphernalia and/or dangerous drug is also prohibited. Individuals may not operate a motor vehicle or another form of transportation while under the influence of drugs or while intoxicated.

Def_000380    Pl. App'x 608

**WT** **Community Standards**
WEST TEXAS A&M UNIVERSITY™            **WTAMU Student Handbook 2025-2026**

2.26.C | Possession of drug-related paraphernalia, except in accordance with federal, state, or local law, is prohibited.

2.26.D | <u>Smoking and Use of Tobacco and Vape Products:</u> No tobacco products, including smokeless tobacco (e.g., vapes, nicotine pouches, chew, and hookahs), legal and illegal smoking products will not be allowed inside university buildings or on university property. This includes the use of these products in personal vehicles while on campus. Possession, purchase, or consumption of tobacco products under the age of 21 is illegal, under Texas Health and Safety Code 161.252.

## 2.27 | Lost, Found, or Abandoned Property

2.27.A | The WTAMU Police Department is the central depository for all lost and found property on campus. This is established in WTAMU Rule No. 21.99.04.W1 in 1998.

2.27.B | Lost and Found collects, accepts, stores, releases, and disposes of abandoned and found property. Diligent attempts are made to reunite the property with the proper owner. Lost and Found maintains custody of all abandoned/found property until properly disposed of in accordance with TAMUs Regulations and University rules. Found items are held for a minimum of 90 days, at which time they are disposed of in accordance with TAMUs Policy 21.99.04 and WTAMU Rule No. 21.99.04.W1. People claiming property must present valid government-issued identification, or their Buff Gold Card.

2.27.C | The Lost and Found is located in Room 104 across the hall from the University Police Department and Parking Services in the Old Sub Building at 301 23rd Street, Canyon, Tx 79016. The hours of operation are 7:30am to 5:00pm, Monday through Friday. Closed weekends and holidays.

## 2.28 | Misuse of Transportation

2.28.A | <u>Reckless Driving:</u> Driving in a manner that recklessly endangers the health and/or safety of oneself or others.

2.28.B | In accordance with WT Rule 24.01.01.W0.03, use of skateboards, rollerblades, scooters, bicycles, or other similar modes of transportation in university buildings is prohibited. In addition, use of such transportation on university premises in such a manner as to constitute a safety hazard or cause damage to university, or personal property, is prohibited. Exceptions to this include motorized vehicles that are approved ADA accommodations. Contact the Office of Student Accessibility for more information.

2.28.C | The use, possession, charging, or storage of self-balancing boards, or similar personal devices, within university buildings, including the Residence Halls, is prohibited.

2.28.D | Bicycles and scooters need to be secured to university provided bike racks, or designated university scooter/charging stations. Any property in violation of these rules will be impounded by the University Police Department. These items are not permitted in any university buildings.

2.28.E |<u>Micro-mobility Devices:</u> Electric scooters are available for campus visitors, students, staff, and faculty in outdoor sections of the WT campus. Those who utilize electric scooters must operate them according to campus rules. The following rules apply to the use of electric scooters on campus:

    i.     Scooters are not allowed inside any university-owned buildings.

Def_000381 App'x 609

**WT** **Community Standards**
**WEST TEXAS A&M UNIVERSITY**

WTAMU Student Handbook 2025-2026

ii.    Users are responsible for following all traffic laws. This includes, but is not limited to, stopping at stop signs and stoplights, yielding, and not surpassing the speed limit.

iii.   Scooters should be operated in areas where bicycle traffic is allowed.

iv.   Scooters must be operated in a safe manner and may be subject to Student Conduct sanctions if operated in a manner that is determined to be reckless.

v.    Scooters are meant for single riders only.

vi.   Scooters should be parked in preferred designated scooter parking spaces/areas when possible.

vii.  Be mindful not to impede pedestrian and ADA access. Do not park on sidewalks, ADA ramps, curb cuts, or staircases.

viii. Access to electric scooters may be limited by the University or the City of Canyon, at any time.

2.28.F | WTAMU has the right to revoke scooter privileges on campus for anyone found in violation of the WTAMU Student Handbook.

2.28.G | If you see a battery-powered scooter/bike/hover board inside a building, please ask the individual to take it outside. The lithium batteries could pose a fire hazard inside the buildings.

2.28.H | Reckless riders should be reported to the Office of Community Standards at studentconduct@wtamu.edu.

2.28.I | <u>Drones</u>: All drone flights on the WTAMU campus must be approved by the University Police Department (UPD), which works in conjunction with the Environmental Health and Safety and Risk Management offices; unless the flight has an approved flight plan in a designated location prior to the flight taking place. FAA guidelines for all drone flights can be found at www.knowbeforeyoufly.org. The TAMU system is also finalizing a drone policy which can be found at www.tamus.edu/legal/policy.

2.28.J | <u>Parking Barricades</u>: The University Police Department and Physical Plant often have to block off spaces for special events, construction projects, and routine maintenance. Students caught tampering with cones, barricades, or signs could be subject to disciplinary action.

### 2.29 | Photography and Recording of Students and Employees

2.29.A | West Texas A&M University reserves the right to photograph and record (through the use of still, video, audio, or other medium) students and employees on campus and at university-sponsored functions and events. The university reserves the right to use, broadcast, distribute, and/or publish any part of such images, likenesses, voices, appearances, and/or performances for promotional, advertising, educational or other honorable purposes.

2.29.B | <u>Unauthorized recording</u>: Any unauthorized use of electronic or other devices to make an audio, video, still frame or photographic record of any persons without their prior knowledge, or without their effective consent when the person or persons being recorded have a reasonable expectation of privacy and/or such recording is likely to cause injury or distress. If a recording is made that captures a violation of the WTAMU Student Handbook or law, the Student Conduct administrator may elect not to enforce this section of the rules against the student making the recording. Unauthorized recordings include, but are not limited to:

i.    Surreptitiously taking pictures of another person in the gym, locker room, or restroom.

ii.   Recording administrative meetings with university officials.

Def_000382    Pl. App'x 610

**WT Community Standards**
WEST TEXAS A&M UNIVERSITY.

**WTAMU Student Handbook 2025-2026**

## 2.30 | Sexual Misconduct

2.30.A | For the definition of sexual misconduct see Texas A&M University System Regulation 08.01.01 *Civil Rights Compliance*, and University Rule 08.01.01.W1 *Civil Rights Compliance* which governs Title IX, sex-based misconduct, and all other civil rights cases

2.30.B | Sexual Contact: Attempting or making sexual contact, including but not limited to, inappropriate touching without the person's consent (see "consent" definitions), or in circumstances where the person is physically, mentally or legally unable to give consent when the behavior is not so severe, pervasive, or persistent to create a work, educational, or campus living environment that a reasonable person would consider intimidating, abusive, or offensive or sexual exploitation as defined in Texas A&M University System Regulation 08.01.01.

2.30.C | Sexual Harassment:  A form of sex discrimination. Unwelcome conduct on the basis of sex (of a sexual nature or otherwise):

   i.   By an employee of the member who conditions the provision of aid, benefit, or service of the member on an individual's participation in that unwelcome sexual conduct.
   ii.  Determined by a reasonable person to be so severe and pervasive and objectively offensive that it effectively denies a person equal access to the member's education program or activity.
   iii. Sexual assault or dating violence, domestic violence, or stalking based on sex.

2.30.D | Sexual Exploitation: Taking non-consensual or abusive sexual advantage of another for the benefit of oneself or a third party. Prohibited behavior includes, but is not limited to:

   i.   Photography or video recording of another person in a sexual, intimate, or private act, without that person's full knowledge and consent.
   ii.  Purposeful distribution or dissemination of sexual or intimate images or recordings of another person, without that person's full knowledge and consent.
   iii. Sexual voyeurism.
   iv.  Inducing another to expose one's genitals, or private areas.
   v.   Prostituting another student.
   vi.  Engaging in sexual activity while knowingly infected with an STD.

2.30.E | Public Indecency: Engaging in private or sexual acts in a publicly viewable location, such that it is offensive to accepted standards of decency. Including, but not limited to, exposing one's genitals or private area(s), public urination, defecation, and/or public sex acts.

2.30.F | Nonconsensual Sexual Contact: Intentional sexual touching, however slight, and with any object or part of one's body, of another's private areas without consent. Private area includes buttocks, breasts, mouth, genitals, groin areas, or other bodily orifice.

## 2.31 | Soliciting on Campus

2.31.A | Any solicitation on campus must have the approval of the University through the JBK Information Desk, whether such solicitation is by an officially recognized student organization, university organization, governmental agency or other.

**WT Community Standards**
WEST TEXAS A&M UNIVERSITY™          **WTAMU Student Handbook 2025-2026**

## 2.32 | Student Organizations

**2.32.A |** Student organization leaders must meet minimum requirements, as outlined herein, in order to maintain the recognition of their student organizations. Should they fail to meet these requirements, a student leader will be ineligible to hold an office in the student organization.

**2.32.B |** The Office of Student Engagement and Leadership (OSEL) acknowledges that self-governing student organizations contribute significantly to the educational, social, and personal development of students, as well as the vibrant culture of the institution. The University further recognizes that students may freely establish and participate in these organizations within the context of local, state, and federal law, as well as University rules outlined in the WTAMU Student Handbook. In order to receive and retain official recognition, student organizations must be granted approval by OSEL and must meet annual requirements. Privileges associated with the status of being officially recognized by the University include the use of university names, logos, and trademarks. To be recognized and/or maintain their recognized status, student organizations must:

    i.      Have an approved faculty or staff advisor, employed at a level consistent with the categorization of the organization and committed to upholding the expectations of an advisor as defined in the Student Organization Handbook.

    ii.      Annually renew their recognition with OSEL. An organization's annual recognition cycle should begin in the month that the organization elects or selects leadership, as defined by the organization's constitution. Each organization must provide contact information from all advisors and officers of the group; an up-to-date profile of the student organization; and a current constitution and by-laws that comply with the provisions outlined in the Student Organization Handbook. Student leader and advisor training must also be completed during the renewal period. West Texas A&M may identify the required expectations for organizations with a specialized/higher degree of risk or affiliation with the University.

    iii.      A student organization must maintain a name and mission that distinguishes it from other existing organizations. Organizations may not be formed for the purpose of participating in illegal activities.

**2.32.C |** Students selected, elected, or appointed as officers in officially recognized student organizations shall:

    i.      Be in good standing with the University and enrolled:

        a.    At least half time (six or more credits), if an undergraduate or first professional student (unless fewer credits are required to graduate in the spring and fall semesters) during the term of office.

        b.    At least half time (five or more credits), if a graduate level student (unless fewer credits are required in the final stages of their degree) during their term of office.

    ii.      Student organizations and their advisors are responsible for compliance with the WTAMU Student Handbook and local, state, and federal laws, as well as expectations and additional guidelines outlined in the Student Organization Handbook.

    iii.      More information and guidelines concerning recognized student organizations are available in the Student Organization Handbook.

    iv.      Actions of recognized student organizations are subject to review. Failure to abide by the WTAMU Student Handbook may result in organizational disciplinary hearings by the Student Organization Accountability Board. Sanctions may range from a warning to revocation of recognition privileges. Disciplinary procedures are outlined in the Student Conduct section of the WTAMU Student Handbook.

    v.      Individuals who are not a student of West Texas A&M University are ineligible for membership and may not participate in regular activities of the recognized student organization.

Def_000384          App'x 612



**Community Standards**
WEST TEXAS A&M UNIVERSITY.    **WTAMU Student Handbook 2025-2026**

2.32.D | All organizations will be held to the Student Handbook as well as guidelines given by the OSEL.

**2.33 | Unauthorized Areas**

2.33.A | Unauthorized access to university facilities, entry into or use of university premises without permission, unauthorized entry into another person's residence, vehicle or business, and unauthorized entry into maintenance rooms is prohibited. Building roofs and exterior walls are considered restricted university property and are off limits to students. If something is lost on a roof, contact an area office to have it recovered.

**2.34 | Violation of Federal, State, Local Law and/or University Procedures**

2.34.A | Misconduct which may constitute a violation of federal, state, local laws, and/or WTAMU rule/procedure will be considered a violation of this rule/procedure and will be investigated and adjudicated through the University conduct system. A lack of conviction in any criminal proceeding will not, in and of itself, serve as evidence in a university conduct proceeding.

2.34.B | <u>University Housing Requirement:</u> Full-time students enrolled in 12 or more semester hours who are under the age of 20 by the first-class day are required to live in university housing during the first two (2) years following their high school graduation. In order to reside on campus in the residence halls during the fall or spring semesters, an undergraduate student must be enrolled for a minimum of nine hours.

**2.35 | Violation of Published University Rules or TAMU System Regulations**

2.35.A | Violation of any published university policy, rule or system regulations that govern the student body or student organizations behavior. Information pertaining to each department or office can be found on their university website pages:

  i.   Parking Services Regulations: <u>http://wtamu.edu/university_police/upd-parking-services.aspx</u>.
  ii.  Residential Living Handbook: <u>http://wtamu.edu/student-life/residential-living.aspx</u>.
  iii. Virgil Henson Activities Center Policies: <u>https://www.wtamu.edu/student-life/recreational-sports/vhac-policies.html</u>.
  iv.  West Texas A&M Operating Rules and Procedures: <u>https://www.wtamu.edu/about/rules-and-procedures.aspx</u>.
  v.   System Operating Policies: <u>http://www.tamu.edu/legal/policy</u>.
  vi.  Acceptable Use Policy: <u>https://www.wtamu.edu/it/_files/PDFs/acceptable-use-standard.pdf</u>.
  vii. NCAA Regulations: <u>https://gobuffsgo.com/sports/2010/5/13/COMPLIANCE_MAIN.aspx</u>.
 viii. WT Catalog: Search the applicable academic term here: <u>https://catalog.wtamu.edu/index.php?catoid=34</u>.

Def_000385    Pl. App'x 613



**Community Standards**
WEST TEXAS A&M UNIVERSITY.

**WTAMU Student Handbook 2025-2026**

## PART 3 | Civil Rights and Title IX

### 3.1 | Title IX, Sex-Based Misconduct and Civil Rights Adjudication Process

3.1.A | West Texas A&M University prohibits physical abuse, threats of violence, physical assault, and any form of sexual harassment, sexual violence, or other sex-based misconduct, including, but not limited to, sexual assault, domestic violence, dating violence, and/or stalking based on sex. In addition, such acts of sexual violence are considered forms of sexual harassment covered under Title IX of the Education Amendments of 1972 and related regulations. For more information regarding the process for Title IX, sex-based misconduct, and civil rights complaints, see University Rule 08.01.01.W1 Civil Rights Compliance and Texas A&M System Regulation 08.01.01 Civil Rights Compliance.

3.1.B | Upon receipt of a complaint, and if deemed to be a Title IX discrimination complaint, the Office of Civil Rights & Title IX will assign the complaint for investigation. Upon conclusion of the investigation, the investigative report and exhibits will be submitted to the Executive Director of Civil Rights & Title IX (EDCRTIX) for adjudication and sanctioning considerations. The EDCRTIX will then assign the case to a hearing body consisting of one to three (1-3) members, also referred to as Hearing Panel Officers. A Hearing Panel is a decision-making entity who determines whether allegations of misconduct rise to the level of a violation based on the evidence provided.

3.1.C | The EDCRTIX will provide the final investigative report and exhibits, which may be redacted, to the parties. The EDCRTIX will also provide written notice to the complainant(s) and respondent(s), which will include an acknowledgement of receipt of the complaint along with a description of the adjudication process.

3.1.D | The case will then be submitted to the selected hearing body for adjudication and resolution. Hearings will be conducted in accordance with the Formal Hearing Procedures set forth in this document, and in accordance with the TAMUS Regulation 08.01.01 and University Rule 08.01.01.W1.

3.1.E | The complainant(s) and respondent(s) will be informed in writing of the date, time, and location of the hearing. This information will be sent to the student's WT email address. For university-related correspondence, it is the student's responsibility to check their university email account, check it regularly, and to provide an accurate local mailing address.

3.1.F | A complainant and a respondent must have an advisor with them at a hearing. In cases in which a party does not have an advisor, the University will provide a trained advisor to assist them in the hearing process.

3.1.G | The burden of proof for the formal hearing will be based on a preponderance of the evidence, which means proof that leads a reasonable person to find that the facts in issue are more likely to have occurred than not. A determination of the facts will be based only on the evidence as presented. The technical rules of evidence applicable to civil and criminal cases shall not apply.

3.1.H | Cross-examination of the complainant, respondent, and any witnesses may not be conducted by the opposing party but must be conducted by their advisor. Questions are to be directed to the hearing panel chair, who will determine whether each question will be admitted into the hearing. If a question is deemed repetitious, or non-relevant, the decision-maker(s) must explain the decision to exclude it. When parties are subject to cross-examination, the advisor may not answer on behalf of the party.

Def_000386 BK App'x 614

**WT** **Community Standards**
WEST TEXAS A&M UNIVERSITY™    **WTAMU Student Handbook 2025-2026**

3.1.I | If a complainant or respondent is late to the hearing, the hearing body reserves the right to make the determination on participation in the hearing, and the hearing body is not responsible for beginning the hearing over, recalling witnesses or re-entering any evidence into the record. If no parties participate in the hearing, a decision will be reached based on evidence gathered prior to the hearing.

3.1.J | Disorderly or disruptive behavior by any individual during the hearing process may result in the removal of that individual from the hearing process, at the discretion of the hearing body and the hearing process may continue.

3.1.K | Attendance at a hearing may be in person or may be conducted through remote means, provided that all parties and the hearing panel can see and hear one another in real time during the course of the hearing.

3.1.L | The hearing body will record the hearing and that recording remains the property of the institution. Deliberations will not be recorded. FERPA provides that when information on more than one student is contained in a single education record, each student may inspect only the information specifically related to that individual. If the recording pertains to only the requesting student, arrangements may be made to review the recording. An appointment will be required to review the recording, if applicable.

3.1.M | Upon conclusion of the hearing, a written statement of the findings, the formal action to be taken by the University, the rationale for those actions, and a description of the appeals process will be provided to both the complainant(s) and respondent(s) within ten (10) business days.

3.1.N | Formal hearings will be closed except for those directly involved in the hearing. Proceedings will not be open to the media, social media, or any form of live streaming (outside of the online hearing platform).

3.1.O | All cases involving sex-based misconduct that do not fall under Title IX parameters are to be investigated and adjudicated under the Title IX procedures previously stated, noting that; the process is to determine whether the allegations are substantiated and, if substantiated, created a hostile environment.

**3.2 | All Other Civil Rights Complaints (Non-Sex Based)**

3.2.A | The following applies to all civil rights complaints based on race, color, sex, religion, national origin, age, disability, genetic information, veteran status, sexual orientation, and/or gender identity:

    i.    The investigative authority will review each complaint, interview witnesses (if applicable), review relevant documentation, and provide an initial draft report of their investigation to OGC for review within 30 business days.

    ii.    The investigative authority will have five (5) business days to create a final draft report and share that document electronically with both the complainant and the respondent.

    iii.    The complainant and respondent will have ten (10) business days to review the report and submit responses and/or written relevant questions that the party wants to ask of any other party or witness.

    iv.    The investigative authority will provide each party with the other party's questions and answers, and allow for the additional, limited follow-up questions from each, provide each party with the questions and answers and allow for additional, limited follow-up questions from each party.

    v.    The investigative authority will have ten (10) business days to complete this process.

3.2.B | The investigative authority must explain to the party proposing the questions any decisions to exclude a question as repetitious or not relevant. The investigative authority will then have five (5) additional business

**WT** Community Standards
**WEST TEXAS A&M UNIVERSITY**    WTAMU Student Handbook 2025-2026

days to prepare a final report for review by OGC and SECO. Once approved by OGC and SECO, the final report shall be submitted directly to the Designated Administrator by the EDCRTIX.

### 3.3 | Decisions (Non-Sex Based Cases) Involving Employees as Respondents

3.3.A | For a complaint against an employee, or third party, the Designated Administrator will review the investigation report and provide a draft decision to OGC for review within five (5) business days after receiving the investigative authority's report. OGC will coordinate with SECO and provide its review of the draft decision within five (5) business days to finalize the decision and provide it to the complainant(s), and respondent(s), and the investigative authority. In cases in which the allegations are substantiated, the final decision will be provided to the respondent's supervisor.

3.3.B | When the respondent(s) is an employee, both the complainant(s) and the respondent(s) may review a copy of the investigation report and exhibits, with admonishments regarding privacy, after the decision is rendered. The report will be redacted in accordance with state and/or federal law.

### 3.4 | Appeal of Decisions or Sanctions of Allegations of Sex Discrimination

3.4.A | With respect to allegations of sex discrimination, including sexual harassment and sex-based misconduct, the Hearing Panel's decision and the sanction(s) imposed by the Hearing Panel can be appealed by the complainant(s) and/or the respondent(s), but only on the following bases, as applicable:

    i.    A procedural irregularity that affected the outcome.
    ii.    New evidence, not reasonably available at the time the determination regarding responsibility or dismissal was made, that could affect the outcome. The new evidence must be provided at the time of the appeal with the appropriate member appeals form.
    iii.    The Executive Director of Civil Rights & Title IX, investigator(s), or decision-maker(s) had a conflict of interest, or bias for or against complainant(s) or respondent(s) generally or the individual complainant or respondent that affected the outcome.
    iv.    The appropriateness or severity of the sanctions.

3.4.B | The appeal will be confined to a review of the written documentation and record of the investigation and/or hearing, and pertinent documentation regarding the grounds for appeal. The appeal does not create an entitlement to a new investigation or a full re-hearing. A request for an appeal must be submitted in writing, within five (5) business days to the EDCRTIX after the final decision and sanction have been issued.

3.4.C | Members must notify the other party in writing when an appeal is filed and implement appeal procedures equitably for both parties. Parties will be given three (3) business days to review the appeal and submit any written response in support of, or challenging, the outcome to the appellate authority.

3.4.D | If the respondent is an employee or third party, the appellate authority will provide a draft decision to OGC for review within five (5) business days after receiving the appeal(s). OGC will coordinate with SECO and provide its review of the draft decision within five (5) business days. The appellate authority will have five (5) additional business days to finalize the decision and provide it to the complainant(s), the respondent(s), and the investigative authority simultaneously, to the extent possible. If the complaint on appeal is substantiated, the respondent's supervisor will also be informed. Circumstances may warrant extensions to the timeframes in this

Def_000388 App'x 616



**Community Standards**
WEST TEXAS A&M UNIVERSITY™    **WTAMU Student Handbook 2025-2026**

section. The appellant authority should send extension requests, if needed, to the office, or individual(s) who appointed them. Both the complainant(s) and the respondent(s) must be notified of any extensions in writing.

3.4.E | For student cases, the appellant authority has ten (10) business days to reach the decision and provide it to the complainant(s), the respondent(s), and the investigative authority simultaneously to the extent possible. Appellant authorities are exempt from obtaining OGC review of the decision prior to issuance but may request assistance from OGC and SECO when needed.

3.4.F | The appellate authority may reach one of the following outcomes:

    i.   Affirm the original finding and sanction.
    ii.  Affirm the finding and modify the sanction.
    iii. Remand the case to a new officer for review.

**3.5 | Appeals – Allegations of Discrimination Not Based on Sex**

3.5.A | Any employee disciplined pursuant to this regulation may appeal that action in accordance with System Policy 12.01, Academic Freedom, Responsibility and Tenure; System Policy 32.01, Employee Complaint and Appeals Procedures; System Regulation 32.01.02, Complaint and Appeal Process for Non-faculty Employees; and/or other system policies or regulations as appropriate.

3.5.B | Any student receiving a sanction of separation (expulsion or suspension) pursuant to this regulation may appeal the sanction in accordance with the member rule and/or code of conduct for student complaints.

3.5.C | Employees appealing sanctions issued pursuant to this regulation will receive an unredacted copy of the investigation report and exhibits, upon request, with admonishments regarding privacy.

3.5.D | During business hours, you are strongly urged to contact the Executive Director of Civil Rights & Title IX in Old Sub Building Room 108, or by phone (806) 651-3199.

3.5.E | In order to report an alleged violation of the Title IX Sexual Misconduct Policy, you may report directly to the EDCRTIX at (806) 651-3199, University Police Department at (806) 651-2300, or you may complete the online complaint form at: https://apps.wtamu.edu/forms/complaint.php.

**Def_000389** App'x 617

# WT Community Standards
## WEST TEXAS A&M UNIVERSITY™

**WTAMU Student Handbook 2025-2026**

## Part 4 | Residential Living Handbook

### 4.1 | Residence Hall Rights and Responsibilities

4.1.A | The University has some basic expectations that govern the special nature of interpersonal relationships in residence halls. These are reasonable expectations that students should have for one another while sharing space in the Residence Halls. The rights and responsibilities of students in the Residence Halls are as follows:

   i.   Rights associated with living in the Residence Halls are:
      a.  To sleep in one's room free of noise and distractions during quiet hours.
      b.  Access to one's room and facilities during the duration of the academic term.
      c.  To feel secure against physical or emotional harm.
      d.  To host guests, when they will not disturb your roommate's right to sleep or study, and in adherence to all guest related procedures.
      e.  The right to privacy.
      f.  The right to redress complaints.
   ii.   Responsibilities associated with living in the Residence Halls are:
      a.  To keep assigned room clean and free of prohibited items.
      b.  To keep common areas free of trash and personal items.
      c.  To avoid damaging assigned room and university issued furniture, and obligation to compensate the University for any damages incurred during stay.
      d.  To report work orders to hall staff immediately.
      e.  To know, understand, and follow all published community expectations and rules within each Residence Hall.
      f.  To report any concerning or prohibited behavior to hall staff immediately.

### 4.2 | Alcohol Containers

4.2.A | The possession of any alcohol containers within the Residence Halls is prohibited. Alcohol containers are defined as any container with alcohol in them at the time of purchase. This includes any alcohol containers used for decorative purposes.

### 4.3 | Animals

4.3.A | With the exception of fish (limited to a 20-gallon aquarium), those approved by the University and trained for work, or emotional support animals, residents are not allowed to keep animals or pets in the Residence Halls. Such authorization must be obtained in writing from the Office of Student Accessibility.

4.3.B | <u>Fish</u>: Aquariums must be unplugged, and all animals must vacate the Residence Halls anytime their owner leaves for longer than 3 days.

4.3.C | <u>Approved Service Animals or Emotional Support Animals:</u> Students who have obtained official approval from the Office of Student Accessibility to have a Service Animal or Emotional Support Animal in their Residence Hall are required to abide by the rules surrounding their ownership (see section 2.13.E of this Handbook). Owners are also expected to:

   i.   Crate their animal when the owner is not present in the room.
   ii.  Remove their animal from campus if the owner is gone for longer than 24 hours.

Def_000390    Pl. App'x 618

**WT** **Community Standards**
WEST TEXAS A&M UNIVERSITY.

**WTAMU Student Handbook 2025-2026**

4.3.D | The use of university bathroom facilities to wash an animal is strictly prohibited.

### 4.4 | Balconies

4.4.A | No item should be thrown, pushed, dropped, or allowed to fall from any balcony. Residents should not spit, pour, or drop any materials, including liquids, from a balcony. Residents are not permitted to climb in, or out of, balconies. Residents must use doors to gain access to the balconies. No personal items can be stored on balconies (bicycles, chairs, grills, laundry, etc.).

### 4.5 | Business Operations

4.5.A | Babysitting, Hair Care/Salon, or running any other type of business is not allowed in the Residence Halls.

### 4.6 | Candles and Incense

4.6.A | In accordance with TAMU SAP 24.01.01.M7.02, candles, candle warmers, incense, oil lamps, and other devices which use an open flame (including potpourri pots) are prohibited in residence halls. This restriction applies to such items regardless of whether the item has been lit. Such items may be confiscated immediately by staff. Confiscated items will be disposed of at the end of each semester if they go unclaimed.

4.6.B | "Scentsy" or similar type products are permitted if it is Underwriters Laboratories (UL) or FM Global (FM) approved, and utilizes a light bulb. Anything that burns, or smolders, is not permitted Confiscated items will be disposed of at the end of each semester if they go unclaimed.

### 4.7 | Car Washing

4.7.A | Residents may not wash vehicles in the campus parking lots.

### 4.8 | Card Access System

4.8.A | Residents are required to use their university issued identification card, or Buffalo Gold Card, to enter all residence halls. Non-residents will not be given access to residence halls. Convenience phones are located at the main entrance of each hall for guest use.

### 4.9 | Chalking

4.9.A | The use of chalk on any buildings is prohibited. Students are able to use chalk on campus, under the following conditions:

   i.    The use of powdered, temporary chalk.
   ii.   Chalking is only on the sidewalk or ground.

4.9.B | Any use of liquid chalk, non-removable materials, or use of profanity will be considered damage to university property and be adjudicated through Student Conduct.

### 4.10 | Community Living

4.10.A | For a community atmosphere to develop, each resident must show respect and courtesy towards each other. Residents must comply with noise reduction or other reasonable requests in a prompt and considerate manner. Disregarding the rights of others or creating circumstances that could jeopardize life, limb or property may be cause for contract termination and/or university disciplinary action. Examples include maintaining

Def_000391    App'x 619

# WT Community Standards
## WEST TEXAS A&M UNIVERSITY.

**WTAMU Student Handbook 2025-2026**

cleanliness in common areas by removing all trash and personal items upon your leave, ensuring furniture does not create a tripping hazard or block routes of egress, and reporting damaged property or repairs needed to building staff immediately.

## 4.11 | Cooperation with University Officials

4.11.A | Your residence hall staff are University officials. Residents must immediately comply with any lawful directions from any University official. Verbal and/or physical abuse directed toward any University staff member will not be tolerated and violations may result in disciplinary action being taken.

## 4.12 | Cleaning

4.12.A | Residents are expected to keep their assigned room reasonable neat and clean at all times. The staff reserves the right to ask residents to clean their room for safety, health, or roommate concerns. Custodial services are not provided after a resident has moved into their room. Residents should report common area cleaning concerns to a staff member. Buff Hall residents are responsible for maintaining a reasonably neat and clean bathroom. Residents of Centennial Hall and Founders Hall are responsible for keeping their sinks reasonable clean. Food and trash attract insects, students who discover insect problems should report the problem to residence hall staff so that their rooms may be treated by a professional.

## 4.13 | Damages or Theft of Property

4.13.A | <u>Theft</u>: Unauthorized removal or stealing and/or attempted removal or stealing of property of a member of the University community or other personal or public property is prohibited. This also includes theft of services and/or misuse of another's property including, but not limited to, unauthorized use of another's property, unauthorized selling of subsidized tickets, and use of a forged parking permit. Please assist in protecting the community by reporting suspicious behavior and securing exterior and room doors.

4.13.B | <u>Damage</u>: Behavior that destroys, damages, or litters any property of the University of a University community member, or another institution, or of another person, on or off campus is prohibited under this rule. Residents are responsible for keeping the premises (room/hall) and their contents in good order, free from damage, both by themselves and their guests. Residents will be held accountable for any damage they cause in common areas, university property, and resident rooms.

4.13.C | Damage to, or littering on, University property is not permitted. Damage will be billed to individual or groups of residents as necessary and may also result in university discipline and/or criminal charges being pursued. Your assistance in properly utilizing the grounds outside the Department of Residential Living facilities is expected. This is best accomplished by avoiding large scale activities on the grounds during wet or rainy periods when the turf is likely to be damaged.

4.13.D | In situations where no individual can be held accountable for damages, the Office of Residential Living reserves the right to "group bill" all residents that may have been associated with damages. Each resident understands and agrees that they are responsible for the replacement cost for any insurance for loss or theft of personal items.

Def_000392 App'x 620

**WT Community Standards**
**WEST TEXAS A&M UNIVERSITY™**                     **WTAMU Student Handbook 2025-2026**

**4.14 | Decorations**

**4.14.A |** Pictures, posters, and other items used to decorate a student's room, are encouraged, as long as they do not create a health, fire hazard, or cause damage to the room. Residents may not make alterations to their room. Alterations could include but are not limited to nail or screw holes in walls, window frames and door frames, or installation of tile/carpet squares, adhesive carpet and painting, or plumbing devices. The alterations will be corrected by maintenance staff and the resident charged to return the room to its original condition.

**4.14.B |** No decorations may hinder use of or restrict access to hallways, breezeways, doorways, stairs, corridors, or fire safety equipment. No one should attach anything to or tamper with light fixtures, sprinklers or exit signs. Staff may remove decorations, and resident(s) may be billed for cleaning or damage.

**4.14.C |** To maintain compliance with Fire Safety rules, decorations may not take up more than 20% of the wall on which they are attached and must not cover or block access to emergency equipment such as fire alarm pull stations or notification appliances. Decorations may not be hung from the ceiling.

**4.14.D | Appropriate adhesives:** Residents may not nail or drill into the walls. Use of command strips is allowed; however, students are responsible for correct application and removal. If removal causes damage to the wall, cost will be assessed and charged to the student upon check-out.

**4.14.E | Public View:** All decorations visible through the window or on the door should be appropriate. Pictures and other materials that may be considered objectionable should not be displayed in areas that may be visible outside the student's room.

**4.14.F | Painting:** Residents are not permitted to paint any section of their Residence Hall room. Students will be charged for altering any portion of their room, and/or the cost of repainting.

**4.14.G | Lights:** Miniature holiday string lights, or rope lights, may be used year-round if: they are appropriately hung/attached to the wall, are Underwriters Laboratories (UL) or FM Global (FM) approved, and are plugged directly into the wall outlet, or approved surge protector.

**4.14.H | Holiday Decorations:** If students decorate their rooms for the holidays these guidelines must be followed:

   i.   Trees and other greenery must be artificial and must have proof of flame resistance.
   ii.  Fire alarm pull stations, fire extinguisher cabinets, smoke detectors, sprinkler heads, and exit signs must not be covered, and exits must not be impeded.

**4.14.I | Street/Road Signs:** Street/Road signs are considered the property of the respective government agencies where the sign is located and any inappropriate removal or possession by authorized individuals may result in judicial or legal action. Individuals possessing street/road signs may be requested to provide proof of ownership.

**4.14.J | Wallpaper and Border:** The use of wallpaper and/or border is not permitted within the Residence Halls.

**4.15 | Early Arrivals**

**4.15.A |** An Early Arrival is defined as a student who would like to move into on-campus housing earlier than the official opening/move-in date in their lease agreement/contract. Approval must be obtained prior to arrival and

Def_000393    App'x 621

**WT Community Standards**
**WEST TEXAS A&M UNIVERSITY.**                    **WTAMU Student Handbook 2025-2026**

move-in, and there is a fee assessed for each day they are living on campus before the official opening/move-in date.

4.15.B | Residence halls have an official date every semester when they open for occupancy. If a resident needs to arrive to move in before the official opening date, approval must be obtained. Once the resident has their assignment, they may apply to be an Early Arrival online by logging into myHousing Portal and clicking on Early Arrival Request.

4.15.C | All Early Arrivals must complete a mandatory Early Arrival Agreement prior to moving into their room and agree to abide by rules applicable to Early Arrivals.

**4.16 | Emergency and Safety Equipment**

4.16.A | Tampering, damaging, or inhibiting the use of emergency/safety equipment, including exterior Residence Hall doors is prohibited. Residents may not use emergency equipment for any purpose other than emergency use. This regulation includes, but is not limited to, fire extinguishers, heat and smoke detectors, exit signs, fire alarm pull stations, automatic door closures, and locked exterior doors. It is a violation to cover, hang items from, throw things at or tamper with sprinkler heads. Residents involved in such activities will be subject to disciplinary action and may be removed from University Housing.

4.16.B | Each student room has an evacuation map fixed to the backside of the door. This map is an essential safety measure and should not be removed for any reason. Removal of this material may result in restitution assessed to the student.

**4.17 | Exterior Door Locking**

4.17.A |The exterior doors with card access are always locked. Residents are expected to carry their keys and university identification card to gain access to locked halls. Propping of exterior doors and/or tampering with locks are considered serious security violations. Residents are expected to aid in maintaining the security of their hall. ID cards are never to be given to another person to gain entry into the hall. Residents involved in such activities may be removed from university housing.

4.17.B | "Tailgating" is defined as allowing another student, or individual, to enter the building ahead of, or behind you, without swiping their university identification card. Tailgating is prohibited. The card access system is in place for the a of residents of each building; allowing individuals to enter without swiping their ID puts the safety of the community at risk. Additionally, residents providing their ID card to a guest will be subject to disciplinary action.

4.17.C | Room keys and outside door keys will be issued to each resident at check-in. Outside door keys will not be issued to residents in halls with card access systems. If a key is lost or broken students are expected to report that information to a Residence Hall staff member as soon as possible. Students will be charged a minimum of $200 per lost key ($300 for Buff Hall, which requires a lock change of the main suite door and private room door). The room key charge will cover the cost of lock replacement and printing the new set of keys. Residents failing to return their keys at the time of check-out or during vacation periods will be charged the replacement fee. Excessive lockouts may result in disciplinary action, or fines. Duplication of university keys is prohibited. Possession of university keys other than those assigned is not permitted.

Def_000394    App'x 622

4.17.D | Tampering with a room lock to gain or prevent entry into a resident's room is strictly prohibited and may result in a facility-damage related assessment of lock and/or door handle assembly which can result in a resident being billed for damages. Room obstruction and/or lock tampering is a direct violation of the WTAMU Student Handbook and will result in disciplinary action.

## 4.18 | Furniture

4.18.A | Furniture must remain in its designated space. Students may not leave any type of furnishings or property outside of their room or in the hallway. No university property may be moved or taken from the hall without written authorization from the Hall Coordinator.

4.18.B | Room furnishings are to remain in the rooms at all times. Any damages incurred during an official occupant's stay in their assigned Residence Hall room may result in damage fees being charged at the time of check-out.

4.18.C | No university furniture should be moved to an outside or balcony location, as outdoor elements can damage the furniture.

4.18.D | University furniture is not to be altered or lofted. Students may be responsible for repair or replacement costs for damaged furniture.

4.18.E | When rearranging furniture, students should not block access to windows, air vents, air conditioning or heating units.

4.18.F | Lounge furnishings must remain in their designated areas. If lounge furniture is missing and attempts to locate it fail, the Department of Residential Living reserves the option to do a Residence Hall room search. Any such searches will be publicized at least 24 hours in advance. Students who are found in possession of public area furniture will be subject to university disciplinary action. Any lounge furniture not accounted for will be assess as a group billing. Do not move lounge furniture.

## 4.19 | Guests

4.19.A | A guest is defined as a person who is not assigned to the room and/or hall they are visiting. Students living on campus are allowed to host guests in their rooms according to the rules outlined below. However, violating a roommate's right of entry into the room, or hindering a roommate's ability to study and/or sleep within their room is considered a violation of guest's privileges. Roommates have the right to deny guests. Guests are not to enter, or be present in a room, suite, or lobby area without their host being present.

4.19.B | <u>Host Responsibilities:</u> Hosts are responsible for the behavior of their guest(s) at all times and are obligated to inform the guest(s) of all university and Residence Hall rules. Any violation of rules or regulations by a guest may result in disciplinary action being taken against both the host and guest.

4.19.C | <u>Overnight Guests:</u> Overnight guests are visitors who will be staying past quiet hours. Overnight guests must be officially registered through Roompact (see instructions below). Overnight guests are allowed to spend the night in a student's Residence Hall room, if they have permission from all official occupants within that space. Guests may stay not longer than three (3) consecutive nights and no more than six (6) nights within a semester. Official occupants are students assigned to that room by the Department of Residential Living.

Def_000395    Ds App'x 623

**WT** **Community Standards**
WEST TEXAS A&M UNIVERSITY.                    **WTAMU Student Handbook 2025-2026**

i.    *Guest Registration:* On-campus residents are required to officially register their overnight guests in Roompact. Contact Residence Hall staff for the link, the form will collect the following information: guest's full name, gender, permanent address, email, phone number, vehicle information (make, model, license plate number), date of arrival and date of departure.

4.19.D | Escorting Guests: Guests must be escorted by their host at all times within the Residence Halls. Guests are required to wait for their escort before proceeding to their host's room. Guests should be escorted completely out of their host's Residence Hall. Escorting must also take place in enclosed courtyards. Never escort anyone who is not your guest. Violating this policy will result in disciplinary action.

4.19.E | Visitation Hours: 24-hour visitation is permitted in the Residence Halls; however, this does not supersede the overnight guest policy or necessity of permission from all official occupants of the Residence Hall room.

**4.20 | Hall Sports**

4.20.A | Hall sports are prohibited within the Residence Halls. Hall sports are defined as activities involving projectiles, sticks, rackets, rope, and/or miscellaneous sports equipment inside the Residence Halls.

4.20.B | Darts/Dartboards: Due to the potential danger to both persons and property, darts and dartboards are prohibited in the Residence Halls, without permission from the Senior Director of Residential Living, or designee.

4.20.C | Projectiles: For reasons of health and safety, propelling devices such as rockets, paint guns, water balloons/launchers, catapults, slingshots, or any homemade device for the purpose of launching an object, are prohibited. Objects may not be thrown into or out of windows or off of balconies.

4.20.D | Rappelling: Rappelling off of any university building is prohibited.

4.20.E | Running/Roughhousing: Residents must refrain from running, rollerblading, skateboarding, skating, roughhousing, scuffling, use of water guns, use of scooters, use of motorized vehicles/cycles, throwing, bouncing, or kicking of objects in halls, stairwells, and other common areas.

4.20.F | Hover Boards: Hover boards are not allowed to be used, stored, or charged in any campus buildings including Residence Halls due to the significant fire hazard posed by these devices.

4.20.G | Water Fights: Water fights, water balloons, or any activities historically associated with water fights (throwing mud, rocks, or use of scalding water) are not allowed in or near the Residence Halls. Water shall not be thrown inside the hallways, onto or from balconies, stoops, or windows. Additionally, instigation or participation in such activities could result in disciplinary action and/or billing of damages.

**4.21 | Health and Safety Checks**

4.21.A | Health and safety checks occur a minimum of two times each semester and notification will be posted at least 48 hours in advance of the week the health and safety checks will take place. The purpose of these checks is to ensure student rooms are clean, free of prohibited items or damage, and all work orders have been reported to maintenance personnel. Residential Living staff are permitted to confiscate prohibited items found during these checks, and students may retrieve them upon notification from staff.

**WT** **Community Standards**
**WEST TEXAS A&M UNIVERSITY**

WTAMU Student Handbook 2025-2026

**4.22 | Identification**

4.22.A | All West Texas A&M University students are required to have their University ID (Buffalo Gold Card) in their possession at all times. Failure to identify yourself to a University staff member upon request is a violation of the WTAMU Student Handbook and Texas Education Code 51.209, and could result in disciplinary action.

**4.23 | Laundry, Ice, or Vending Machines**

4.23.A | Abuse of laundry, ice, or vending machines only aggravates whatever problem the machine may have and is prohibited.

4.23.B | Only residents of the hall are permitted to use laundry machines. Laundry machines are for residents' personal use only. Residents using machines for non-personal use may face disciplinary sanctions and have their laundry privileges removed.

**4.24 | Lost or Found Property**

4.24.A | The Office of Residential Living and its staff are not responsible for any student property left in residence hall rooms or public areas of residence halls. In the event that student property is left in residence halls after the housing contract period is over, the property will be removed at the owner's expense. Abandoned property will be stored for 30 days and then will be disposed of, donated, or turned over to UPD. Residential Living is not responsible for mailing/shipping personal property to residents.

**4.25 | Lounge Use**

4.25.A | Lounges are community spaces and are considered public areas. Lounges have been provided so that residents may study, work on class assignments, watch TV, hold community events, and visit with friends.

4.25.B | Lounges are not intended for such uses as sleeping, weekly club meetings, gaming or other such activities that dominate the lounge for long periods of time and prevent use by the greater community, unless they are Department of Residential Living sponsored. Please properly dispose of trash in these lounges.

**4.26 | Maintenance and Repair Request**

4.26.A | Maintenance requests or other room concerns should be reported to your Residence Hall Director or Area Coordinator in a timely manner through the Work Order form located in your myHousing Portal. For emergency repairs, contact a staff member immediately. If repairs are not completed to your satisfaction (within one week for regular repairs or within a day for emergencies), notify your Residence Hall Director immediately. It is helpful if you report maintenance problems early and with as much detail as possible. Maintenance personnel work between 8am and 5pm on weekdays and may not always be able to arrive at hours most convenient for students.

**4.27 | Minor Supervision and Endangerment**

4.27.A | Residents who host guests that are minors (under the age of 18) are responsible for proper supervision of their guest at all times. If minors are found without proper adult supervision, staff will make reasonable attempts to contact the parent or caregiver. The parent or caregiver should be prepared to show identification. If the parent or caregiver cannot be located, the University Police Department will be contacted.

Def_000397    Def's App'x 625

**WT Community Standards**
WEST TEXAS A&M UNIVERSITY™    **WTAMU Student Handbook 2025-2026**

4.27.B ] Minors who are disruptive, display inappropriate behaviors or require excessive staff attention may be asked to leave.

4.27.C | All staff members are required to abide by the Texas reporting laws for abusive and neglectful supervision.

4.27.D | The Texas Family Code defines neglectful supervision as placing a minor in or failing to remove a minor from a situation that requires judgment or actions beyond the minor's level of maturity, physical condition or mental abilities.

### 4.28 | Noise

4.28.A | Sound carries easily. Voices, stereos, televisions and large indoor gatherings can often be heard next door, above and below you. Remember that while you have a right to listen to music of your choice, other residents have a right to sleep, study or listen to music of their choice without disturbance. You may be asked by other residents or staff to adjust the sound/noise level to reduce the disturbance to others around you. Please be considerate and flexible.

4.28.B | The playing of musical instruments is permitted within your room as long as it does not disturb others.

4.28.C | Quiet hours are maintained to help provide an atmosphere that is conducive to academic success and to promote an environment where individuals can learn from the experience of group living. The enforcement of quiet hours is the responsibility of each resident, with the assistance of the hall staff as needed. Each living area must observe quiet hours from:

   i.   Sunday to Thursday: 10pm to 8am.
   ii.  Friday and Saturday: midnight to 8am.

4.28.D | Each living area may vote to extend these hours. The Office of Residential Living reserves the right of final approval for such hours.

4.28.E | Quiet Hours During Finals: To help promote an intense study period, there will be 24-hour quiet hours in effect during final exams in all Residence Halls. Students remaining in the halls after their last final exam and alleged to be responsible for causing a disturbance may be required to leave the Residence Halls immediately.

### 4.29 | Offensive Odor

4.29.A | An offensive odor is any odor, or aroma, of such intensity that it becomes apparent and is offensive or disruptive to others. Any odor can become offensive when it is too strong. Some examples are perfume, air freshening spray, or large amounts of dirty laundry. Hall staff will address offensive odors when complaints are received. Residents identified as being responsible for the offensive odor will be asked to eliminate the cause of the odor.

### 4.30 | Posting Notices

4.30.A | There are bulletin boards located in or around all residence life facilities that are for use by the Department of Residence Life staff and other groups as approved by the department. If you would like to disseminate information through the use of these boards, please visit Residential Living located on the southwest corner of Centennial Hall, Monday through Friday between the hours of 8am and 5pm.

Def_000398 App'x 626



**Community Standards**
WEST TEXAS A&M UNIVERSITY.    **WTAMU Student Handbook 2025-2026**

## 4.31 | Prohibited Items

**4.31.A | Air Conditioners:** For safety, and electrical concerns, no student may install an air conditioner or water cooler in their room. This includes portable air conditioning systems. Fans are permitted.

**4.31.B | Appliances:** Electrical appliances must be plugged directly into a wall outlet and are not permitted to be plugged into a power strip. Electrical appliances that are not allowed include, but are not limited to: heat lamps, camping stoves, ceiling fans, electric skillets or woks, griddles, "Insta-pot" or similar multi-cooker, pressure cooker, deep fryers, convection cooker, "George Foreman" type grills, any halogen torchiere lamp or lamps that use halogen bulbs, potpourri pots, hot oil popcorn poppers, hot plates, oven broilers, power tools, any appliance with an open coil, space heater, toaster ovens, or chest freezers. Allowed appliances include coffee pots, rice cookers, blenders, and crock pots.

**4.31.C |** Only university issued refrigerators and microwaves are permitted. The hall staff will confiscate unauthorized or misused appliances, and the individual(s) responsible will be subject to Student Conduct proceedings. If additional refrigerators or microwaves are medically needed, students can apply through the Office of Student Accessibility for special approval to have these items. It is the resident's responsibility to seek approval for any appliance in question prior to bringing it on campus.

**4.31.D | Electrical Power Strips:** Multiple plug adapters and extension cords are not permitted under Fire Safety rules. When additional electrical outlets are needed, residents must use United Laboratories (UL) approved electrical power strips with built-in circuit breakers.

**4.31.E | Extension Cords:** Extension Cords of any type are not permitted in the halls. Only Underwriters Laboratories (UL), Electrical Testing Laboratories (ETL) or FM Global (FM) rated surge protectors are permitted. The UL/ETL/FM sticker on the surge protector must note "surge protected device." They must be plugged directly into the wall. Those listen as "relocatable power taps" or otherwise are not permitted. Daisy chaining (connecting multiple surge protectors together) is a fire safety hazard and prohibited.

**4.31.F | Electronic Transportation:** Hover boards, electric scooters and other electronic transportation devices that contain lithium batteries may not enter the Residence Halls or any university buildings.

**4.31.G | Heat Producing Devices:** For safety and electrical concerns, no portable heating units, heat lamps, or light fixtures with halogen lamps are allowed within the Residence Halls.

**4.31.H | Electric Power Tools:** Electric power tools are not allowed in the Residence Halls, with the exception of those being stored for use of university property. Gas power tools are not allowed in the Residence Halls, even if they are not in use.

**4.31.I | Waterbeds:** Waterbeds are not permitted in any student room, due to safety and maintenance concerns.

## 4.32 | Room Entry

**4.32.A |** The University recognizes residents' desire for privacy, particularly in the context of their group living situation, and will do all it can to protect and guarantee their privacy. However, the university, through the Department of Residential Living staff members, reserves the right to enter a resident's room at any time for the following purposes:

i.    To determine compliance with all relevant health and safety regulations.
   a.   Health and Safety checks will be conducted routinely each semester.
ii.    To provide cleaning, maintenance work and/or pest control.
iii.    To conduct an inventory of university property.
iv.    To silence unattended loud alarms or music.
v.    If there is an indication of imminent danger to life, health and/or property.
vi.    If there is a reasonable cause to believe that a violation of university or housing rules is occurring.
vii.    To search for missing university property.

4.32.B | A room search by a designated Department of Residential Living staff member is possible but rare. For a search to take place, the conditions for room entry must exist. Permission for a room search is determined at the Associate Director of Residential Living level and above.

4.32.C | Items that violate university or housing rules will be confiscated. A room search by law enforcement officials must be accomplished through the use of a valid search warrant or with the explicit consent of the resident.

### 4.33 | Solicitation

4.32.A | Solicitation of commercial products or services within Residence Halls is prohibited. This includes but is not limited to solicitation/sales within student rooms, common areas, and entry areas (inside or outside) of the Residence Halls. If sales personnel approach you, do not allow them to enter your room and inform UPD, or your hall staff immediately.

### 4.34 | Storage

4.34.A | Residents cannot store personally owned property outside of their designated Residence Hall room, except for bicycles, which should be stored in designated areas.

### 4.35 | Trash

4.35.A | Trash toters are provided either inside or outside of each building for residents' trash disposal. Personal trash left in halls or in restrooms will be considered improper trash disposal and subject to disciplinary action. Please deposit personal trash in the toters.

### 4.36 | Unauthorized Areas

4.36.A | Student's paying the double room rate have access to one set of furniture (bed, desk, dresser, chair). Any student paying the double room rate who utilizes both sets of furniture or monopolizes the majority of the room's space may be found in violation of this rule and charged the private room rate by Residential Living.

4.36.B | Unauthorized areas include, but are not limited to, mechanical rooms, rooftops, opposite sex community restroom, another student's room without permission, tunnels/crawl spaces, etc. Students found in, or having been in, unauthorized areas, are subject to disciplinary action.

Def_000400    App'x 628

**WT** **Community Standards**
WEST TEXAS A&M UNIVERSITY.

**WTAMU Student Handbook 2025-2026**

**4.37 | Vandalism**

4.37.A | Residents who remove, destroy, or deface any property or area related to the University or Residential Living (including vandalism of the elevators, ceilings, and grounds surrounding the buildings) are subject to disciplinary action and will be required to pay any damages, and any criminal charges as outlined by Texas law.

**4.38 | Windows and Window Screens**

4.38.A | Windows are not to be used as a room exit unless residents do so for emergency purposes. Window screens should not be removed. Residents will be charged for damage to screens and for the reinstallation of any removed screens. Throwing, hanging, or spitting objects from windows or balconies is prohibited. Excessive window coverings are not allowed (including paper or foil).

Def_000401    App'x 629

**WT** **Community Standards**
WEST TEXAS A&M UNIVERSITY.    **WTAMU Student Handbook 2025-2026**

## Part 5 | Student Complaints & Appeals

### 5.1 | Complaints

5.1.A | Types of complaints may include, but are not limited to:

i.   General Complaints:
    a.   This form is administered by the Office of Human Resources/Payroll, which provides an entry point for any type of complaint. Complaints initiated through this general form are monitored by the Office of Human Resources/Payroll and then forwarded to the appropriate Vice President for process and resolution.

ii.   Discrimination:
    a.   West Texas A&M University students, employees, faculty, vendors, visitors, or others with an online method to file a formal complaint or report specific information related to an alleged incident(s) of discrimination, harassment, or retaliation can complete a Complaint Form located here: https://apps.wtamu.edu/complaint/.

iii.   Accessibility Accommodation:
    a.   Students with accessibility-related complaints may utilize this process. Students must demonstrate that they have made a good-faith effort to resolve the complaint with the parties involved. If the complaint is not resolved satisfactorily, the student may visit with the Assistant Vice President for Student Affairs. The Assistant Vice President may take up to five working days to determine an appropriate resolution. During this process, informal discussions will take place with all parties involved in an attempt to resolve the complaint. If no informal resolution is determined within five working days, the student may request the complaint be referred to the Accessibility Accommodations Appeals Committee. Recommendations of the Accommodations Appeals Committee will be forwarded to the University President for final approval and implementation. More information about this process can be found here: https://www.wtamu.edu/student-support/student-accessibility/index.html.

iv.   Civil Rights and Title IX:
    a.   In compliance with TAMU System Regulation 08.01.01, Civil Rights Compliance and WTAMU Rule 08.01.01.W1, Civil Rights Compliance, students can submit a complaint or report an incident through the online reporting form, found here: https://cm.maxient.com/reportingform.php?WestTexasAMUniv&layout_id=0. Upon receipt of a complaint that falls within the scope of Civil Rights or Title IX, the Civil Rights and Title IX Compliance Director (CRTIXCD) will assign the complaint for investigation. The complainant will be contacted by CRTIXCD to ensure safety, support, and be informed of the administrative process.

### 5.2 | Appeals

5.2.A | Certain departments require an appeal to resolve specific issues. The following offices have standard procedures for formal resolution of issues within their scope.

i.   Discrimination/Civil Rights and Title IX Appeals:
    a.   Students who have been found Responsible through the Title IX process may appeal the decision only on the basis of a procedural irregularity that affected the outcome, new evidence not

Def_000402    App'x 630

**WT Community Standards**
WEST TEXAS A&M UNIVERSITY.    **WTAMU Student Handbook 2025-2026**

> reasonably available at the time of the determination regarding responsibility or dismissal that could affect the outcome, the Title IX Coordinator, investigator, or decision maker can a conflict of interest or bias that affected the outcome, or to challenge the appropriateness or severity of the sanctions. This criteria is outlined in the Texas A&M University System Policy 08.01.01. The Appeal form can be found here:
> https://cm.maxient.com/reportingform.php?WestTexasAMUniv&layout_id=4.

ii.   Grade Challenges:
   a.   Students wishing to challenge a semester grade can do so by following the established procedures outlined in section 1.12 of this Handbook.

iii.   Academic Suspensions and Holds:
   a.   WTAMU Rule 13.01.99.W1 outlines the University's procedure in regard to Academic Probation and Suspension for Undergraduate students. A student may appeal an Academic Suspension in accordance with the deadlines established by the Registrar and should complete the following form:
   https://www.wtamu.edu/_files/docs/registrar/Request%20for%20Reinstatement%20After%20Serving%202nd%20Suspension%20Form%20May%2022%202020.pdf.

iv.   Student Conduct Appeals:
   a.   Student(s) and/or student organizations who are found Responsible after a Formal Hearing in the Student Conduct process can appeal the determination using the steps outlined in 2.7.E.d Appeal Procedure. The Appeal Form can be found online at:
   https://cm.maxient.com/reportingform.php?WestTexasAMUniv&layout_id=4.

v.   Parking Citation Appeals:
   a.   Students may appeal a parking citation within 20 days of their issued citation date and can do so through the University Police Department, Parking Services website. The appeal will be assigned to the next appeal hearing and will be reviewed by the Student Appeals Committee, which is comprised of judicial members from Student Government. More information can be found in the WT Parking Rules document, which can be found on the Parking Services webpage here: https://www.wtamu.edu/university-police/parking-services/index.html.

## 5.3 | Grievance Process

5.3.A | In the event a compliance or appeal is not resolved at the department level, it can be elevated to a formal grievance. The formal grievance process provides final authority to resolve any complaint or appeal. All parties must make a good-faith effort to resolve the complaint prior to the formal grievance procedure.

5.3.B | A formal grievance is defined as a complaint that has not been resolved at a department level through an informal process. The grievance process can be initiated directly with an appropriate academic or non-academic office. Grievances reported through the online Compliance Form are routed to the appropriate department to initiate the formal and applicable process.

5.3.C | The grievance process is resolved by the Student Grievance Committee. This committee is comprised of two tenured faculty drawn from a pool of members appointed by Faculty Senate, two students appointed by Student Government, and two staff members appointed by Staff Council. The chair will be a faculty or staff member from the committee, elected by the membership. Upon receipt of a grievance, the Executive Vice

Def_000403 App'x 631

**WT** **Community Standards**
WEST TEXAS A&M UNIVERSITY.                    **WTAMU Student Handbook 2025-2026**

President and Provost (EVPP) and the Vice President for Student Affairs (VPSA) will consult and appoint an appropriate committee from this pool.

### 5.4 | Rule and Policy Resources

5.4.A | Resources:

i.   Human Resources | HR Information – https://www.wtamu.edu/business-finance/human-resources/index.html
ii.  Residential Living: https://www.wtamu.edu/student-life/residential-living/rl-handbook/index.html
iii. Texas A&M University System Policy Manual: https://www.tamus.edu/legal/policy/policy-and-regulation-library/
iv.  Office of Community Standards: https://www.wtamu.edu/student-support/student-judicial-affairs/index.html
v.   Parking: https://www.wtamu.edu/university-police/parking-services.html
vi.  WT Catalog: Search the applicable academic year here: https://catalog.wtamu.edu/index.php?catoid=34.

Def_000404 App'x 632

**WT** **Community Standards**
WEST TEXAS A&M UNIVERSITY.

WTAMU Student Handbook 2025-2026

## Part 6 | Propose Revisions

### 6.1 | The Student Handbook Rule Revision Process

**6.1.A |** The Student Handbook Committee is charged with reviewing proposals for revisions to the West Texas A&M University Student Handbook. Only current faculty, staff, or students may submit a rule change to the WTAMU Student Handbook.

**6.1.B |** Federal, state, and local education law updates, that directly impact the Student Handbook, will be posted to the Rule Additions, Changes, and Deletions page. If you would like to propose a revision to any WTAMU Student Handbook, please follow the steps below:

    i. Use the following link to access the Proposed Revision Form:
        https://baseline.campuslabs.com/wtau/handbookrevision2526.
    ii. Complete the form and submit.
    iii. The Student Handbook Committee will confirm receipt of the submission.
    iv. The committee will follow up with the individual once a decision on the revision has been made.

### 6.2 | Rule Additions, Changes, and Deletions

**6.2.A |** Additions, deletion, and changes may occur over the course of the academic year. Significant revisions will be communicated through WT's Community Standards website.

Def_000405    App'x 633



**Community Standards**
WEST TEXAS A&M UNIVERSITY.                    **WTAMU Student Handbook 2025-2026**

## Definitions Section

**Alleged:** This role defines an individual who is believed to have broken a policy or rule.

**Arbitrary:** No reasonably factual basis for reaching the conclusion or taking the action.

**Assertion:** A contention or theory about the existence of some state of being. An assertion is established or disproved by information.

**Breach of Security:** Unauthorized access to information resources or information resources technologies and/or release of password or other confidential information related to computer security.

**Capricious:** Unpredictable and subject to whim.

**Chairperson:** An Office of Community Standards administrator who is authorized by the Vice President for Student Affairs or designee to take the lead role in conducting conferences when there is more than one person serving as a Panel and/or more than one Student Conduct Administrator present.

**Charge:** An allegation of a potential violation of the WTAMU Student Handbook. Charges are issued after a Student Conduct Officer has determined sufficient information exists to hold a conference to determine whether any student(s) has violated any rule(s).

**Classification:** A student's classification refers to the number of years they have been enrolled in higher education. This is measured by the number of college-level hours completed.

**College Integrity Committee:** The Appeal committee for Academic Dishonesty cases.

**Complainant:** This role defines an individual who submits a formal complaint against another party.

**Conduct Officer:** A University official authorized by the VP for Student Affairs or designee to collect information, initiate notification letters, articulate charges in conferences, present information to support charges, conduct meetings, and impose sanctions upon any student(s) found to have violated the Student Handbook.

**Conference/Hearing:** A process that provides an opportunity for an alleged student to respond to a specific charge or charges. The purpose of a conference or hearing is to determine responsibility and appropriate sanctions. Only information presented during the designated conference or hearing can be used to determine if there is a finding of responsibility.

**Consent:** Solely for the purposes of sexual misconduct, means clear, voluntary, and positive verbal or non-verbal communication that all participants have agreed to the activity. Consent must occur prior to or at the same time as the activity. Consent must remain clear, voluntary, and positive throughout the activity. Consent must be given for the current activity. The existence of a prior relationship or prior activity does not automatically ensure consent for current or future activity. Consent must be given by each participant involved. A person must be 17 years of age or older to be able to consent to a sexual activity if the other participant(s) involved are more than three (3) years of age older than that person. A person who is clearly or visibly incapacitated is not able to give consent to sexual activity.

Def_000406 App'x 634

# WT Community Standards
## WEST TEXAS A&M UNIVERSITY.

**WTAMU Student Handbook 2025-2026**

**Controlled Substances:** Those drugs and substances whose possession, sale, or delivery results in criminal sanctions under the Texas Controlled Substances Act (Texas Civil Statutes, Article 4479-15), as well as substances that possess a chemical structure similar to that of a controlled substance (e.g., "designer drugs").

**Credible:** Believable by a reasonable person.

**Day:** Means Monday through Friday during regular University business hours (8am to 5pm).

**Direct threat:** A significant risk of causing substantial harm to the health or safety of a student or other members of the University community that cannot be eliminated or reduced to an acceptable level through the provision of reasonable accommodations.

**Directory of Information:** Information contained in an education record of a student that would not generally be considered harmful or an invasion of privacy if disclosed. The University has designated the following items as directory information, thus they may be made public unless the student submits a request to withhold any or all of this information: the student's name, UIN (Universal Identification Number), local address, permanent address, email address, local telephone number, permanent telephone number, dates of attendance, program of study, classification, previous institution(s) attended, degrees, honors, and awards received, participation in officially recognized activities and sports, and medical residence specialization (Health Science Center students).

**Education Records:** Any records (in handwriting, print, tapes, film or other medium) maintained by the University, an employee of the University or agent of the University that are directly related to a student.

**Emotional Support Animal:** Under TAMU System SAP 08.01.02.M0.02, an Emotional Support Animal is defined as any animal that works, provides assistance, or performs tasks for the benefit of a person with a disability, or provides emotional support that alleviates one or more identified symptoms of effects of a person's disability, as defined by the ADA.

**Expressive Activity:** Under WT Rule 08.99.99.W1, expressive activity means any speech or expressive conduct protected by the First Amendment to the United States Constitution or by Section 8, Article I, Texas Constitution, and includes assemblies, protests, speeches, the distribution of written material, the carrying of signs, and the circulation of petitions. The term does not include commercial speech.

**Faculty:** An individual holding a position in which the primary title includes the word "professor," "lecturer," or "librarian" regardless of other rank of appointment qualifiers associated with the title. Appointments with the word "dean" or "provost" with or without a specified faculty rank higher than assistant professor are normally tenured faculty appointments.

**Feral Animal:** Under TAMU SAP 08.01.02.M0.02, a feral animal is defined as a non-domesticated animal that is in or has reverted to an untamed state.

**Final Grade:** A grade assigned by the instructor at the end of the academic term. This does not include other grade designations of I, X, Q, W and NG.

**Fraud:** Any intentional act or omission designated to deceive others and resulting in the victim suffering a loss and/or the perpetrator achieving a gain (i.e., willful or deliberate act or failure to act with the intention of obtaining an unauthorized benefit, such as money or property, by deception or other unethical means). Fraud and fraudulent activities include, but are not limited to: theft of any university asset including money, tangible

Def_000407    App'x 635



**WT** **Community Standards**
WEST TEXAS A&M UNIVERSITY.      **WTAMU Student Handbook 2025-2026**

property, time, trade secrets, and intellectual property; embezzlement; bribery/rebate/kick-back; misappropriation, misapplication, destruction, removal or concealment of university property; forgery, alteration, or falsification of documents and/or conflicts of interest.

**Full-Time Graduate Student:** One who is registered for nine (9) semester hours during a Fall or Spring semester, or eight (8) in a summer semester.

**Full-Time Undergraduate Student:** One who is enrolled in at least 12 semester hours during a Fall or Spring semester, or eight (8) in a summer semester.

**Hazing:** Any intentional, knowing, or reckless act committed by a person (whether individually or in concert with other persons) against another person or persons, regardless of the willingness to participate, that is committed in the course of an initiation into, an affiliation with, or the maintenance of membership in, a registered student organization or student group (e.g., a club, athletic team, fraternity, or sorority) and causes or creates a risk above the reasonable risk encountered in the course of participation in the IHE or the organization, of physical or psychological injury.

**Hold:** A hold can be applied to a student's account, this would limit the person's ability to register for upcoming courses or receive a transcript from the University.

**Incapacitation:** The physical and/or mental inability to make informed, rational judgements. States of incapacitation include, but are not limited to sleep, unconsciousness, and brownouts or blackouts (where an individual is awake but is not forming memories). Where alcohol or other drugs are involved, incapacitation is defined with respect to how the substance consumed impacts a person's decision-making capacity, awareness of consequences, and ability to make fully informed judgements.

**Information Resources:** The procedures, computer equipment, computing facilities, software and data which are purchased, designed, built, operated and maintained to collect records, process, store, retrieve, display, report, and transmit information.

**Intoxication:** Is either 1) not having the normal use of mental or physical faculties due to the introduction of alcohol or other drugs into the body; or 2) having an alcohol concentration of 0.08 or more. Penal Code, 49.01.

**Investigation:** The follow-through on a report to ascertain details and circumstances associated with the report. Investigations may result in charges, a form of alternative dispute resolution, or closure of the report. This determination is made at the sole discretion of the Office of Community Standards, responsible for the oversight of the Student Conduct process.

**Letter:** In the context of Student Conduct proceedings, a Letter is defined as the official notification sent to the student via the Office of Community Standards. This Letter will go to the students' WT email account and will require the student to sign in with their university credentials.

**Member of the University Community:** Any person who is a student, faculty member, staff, University official, or any other person employed by the University or by a company contracted to provide services for the University.

**Minor:** Is defined as a person who is under the age of 18 and does not possess the legal rights and responsibilities of adults.

Def_000408    App'x 636

**WT** **Community Standards**
WEST TEXAS A&M UNIVERSITY.            **WTAMU Student Handbook 2025-2026**

**Non-Student:** An individual who has not been admitted into West Texas A&M University, or a former student that does not have a current or upcoming course schedule.

**Stray Animal:** Under TAMU System SAP 08.01.02.M0.02, a stray animal is defined as any domestic animal on campus that is not under physical restraint, i.e., leashed or caged, whether accompanied by a person or not.

**Student Organization:** Any number of people who meet any single or combination of the following criteria:

- Belong to a group whose members are primarily West Texas A&M University students including but not limited to academic, athletic, recreational, religious, performance, political, and social or similar groups.
- Have complied with the formal requirements for university recognition.
- Are advised by a university official whose position description designates them as an advisor.
- Are advised by a university official who has volunteered as an advisor; and/or
- Are otherwise considered by the University to be an organization.

**Pledge:** Any person who has been accepted by is considering an offer of membership from, or is in the process of qualifying for membership in an organization.

**Prejudicial:** Irrational attitude of hostility directed against an individual. This does not include hostility on the basis of any legally protected status that is addressed through Civil Rights violations.

**Preponderance of Evidence:** The greater weight of credible evidence submitted to the University. For a fact to be established by a preponderance of the evidence the judicial officer must find the fact is more likely true than not true.

**Respondent:** This role defines an individual who was named in a Formal Complaint submitted in reference to alleged misconduct.

**Retaliation:** Any adverse action taken against a person for making a good faith report of a violation of the WTAMU Student Handbook, and/or the law, or for participating in any proceeding related to the investigation or resolution of such report. Retaliation includes threatening, intimidating, harassing, coercing or any other conduct that would discourage a reasonable person from engaging in activity protected under this policy. Retaliation may be present even where there is a decision of "Not Responsible" on the allegations. Retaliation does not include good faith actions lawfully pursued in response to a report. Violation of an interim, remedial, or protective measure will be considered retaliation.

**Sanction:** Responses or requirements given by the University to a student during adjudication in response to a violation of a rule. University sanctions include all items listed in Section 27 of this Student Conduct Code.

**Service Animal:** Under TAMU System SAP 08.01.02.M0.02, a Service Animal is defined as a dog that is individually trained to do work or perform tasks for a person with a disability. Examples of such work or tasks include guiding people who are blind, alerting people who are deaf, pulling a wheelchair, and alerting/protecting a person who is having a seizure. The provision of emotional support, well-being, comfort, or companionship does not constitute a work or tasks for the purposes of defining a service animal. Under certain circumstances, miniature horses may also be trained as a service animal and be permitted within university buildings, where reasonable.

Def_000409 App'x 637

**WT** **Community Standards**
WEST TEXAS A&M UNIVERSITY.    **WTAMU Student Handbook 2025-2026**

**Service Animal in Training:** Under TAMU System SAP 08.01.02.M0.02, a Service Animal in Training is defined as a dog undergoing training by a trainer and/or their handlers. Under certain circumstances, miniature horses may also be trained as a service animal. For the purpose of this procedure, Service Animals in Training have the same rights and responsibilities as applicable to Service Animals.

**School Official:** A school official is a person employed by the University in an administrative, supervisory, academic, research or support staff position (including law enforcement unit personnel and health staff), a person or company with whom the University has contracted (such as an attorney, auditor, or collection agent), a person serving on the Board of Regents, or a student serving on an official committee, such as a disciplinary or grievance committee, or assisting another school official in performing their tasks.

**Significant Risk:** A high probability of substantial harm that is not just a slight increase, speculative or remote risk.

**Student:** All persons who have accepted their offer of admission, or who are taking courses at the University, either full-time or part-time, pursuing undergraduate, graduate, or professional studies and who are either currently enrolled, were enrolled the previous semester, or are registered for a future semester. Persons who withdraw after allegedly violating the Student Handbook, or who are not officially enrolled for a particular term but who have a continuing relationship with the University are considered students. In addition, persons who are living in University Residence Halls, although not enrolled in this situation, are subject to the rules outlined in their housing contract.

**Student Identification Cards:** More commonly called "Buffalo Gold Card" or "Buff ID", a student identification card is the personal identifier issued to the student upon initial registration with the University.

**Student of Concern:** This role defines an individual who is exhibiting behavior outside the typical scope, which leads others to worry about their safety and/or wellbeing.

**Victim:** A role that defines an individual as a person who was negatively impacted by the actions of another.

**Waste:** Intentional or unintentional, thoughtless or careless expenditure, consumption, mismanagement, use or squandering of resources to the detriment of the organization. Waste also includes incurring unnecessary costs as a result of inefficient or ineffective practices, systems or controls.

Wild Animal: Under TAMU SAP 08.01.02.M0.02, a wild animal is defined as a non-domesticated animal living in its natural habitat.

**Withdrawal:** When a student is no longer enrolled in current or upcoming courses with the University.

**Witness:** This role defines an individual who witnessed the incident being reported.

**Common Acronyms:**

AIC | Academic Integrity Code

BIP | Behavioral Intervention Plans

BIT | Behavioral Intervention Team

CIC | College Integrity Committee

# WT Community Standards
### WEST TEXAS A&M UNIVERSITY™

**WTAMU Student Handbook 2025-2026**

CTW | Criminal Trespass Warning

DA | Designated Administrators

DSA | Division of Student Affairs

EDCRTIX | Executive Director Civil Rights and Title IX

EVPP | Executive Vice President and Provost

FERPA | Family Educational Rights and Privacy Act

OSA | Office of Student Accessibility

SOAB | Student Organization Accountability Board

SOAP | Student Organization Accountability Process

VP | Vice President

VPSA | Vice President of Student Affairs

Def_000411 App'x 639



## 08.01    Civil Rights Protections and Compliance

Revised November 13, 2025 (MO -2025)
Next Scheduled Review:  November 13, 2030
Click to view Revision History.

### Policy Summary

This policy outlines the civil rights protections provided by The Texas A&M University System (system) to employees, students, applicants for employment and admission, and the public, and sets forth procedures and responsibilities for compliance with applicable laws and regulations.

### Definitions

Diversity, Equity, and Inclusion – means engaging in any of the following actions:

1. Influencing hiring or employment practices with respect to race, sex, color, or ethnicity, other than through the use of equal opportunity described in Section 1.1;
2. Promoting differential treatment of or providing special benefits to individuals in violation of Section 2.1;
3. Promoting policies or procedures about race, color, or ethnicity, except as expressly authorized by OGC in accordance with state law; or
4. Conducting trainings, programs, or activities about race, color, ethnicity, gender identity, or sexual orientation, other than those expressly authorized by OGC in accordance with state law.

Diversity, Equity, and Inclusion Office – means a member office, division, or other unit that is established for the purpose of engaging in a diversity, equity, and inclusion function.

Gender Ideology – means a concept that self-assessed gender identity should replace the biological category of sex or that biological sex has less value or legitimacy than self-assessed gender identity.

Race Ideology – means a concept that attempts to shame a particular race or ethnicity, accuse them of being oppressors in a racial hierarchy or conspiracy, ascribe to them less value as contributors to society and public discourse because of their race or ethnicity, or assign them intrinsic guilt based on the actions of their presumed ancestors or relatives in other areas of the world. This also includes course content that promotes activism on issues related to race or ethnicity, rather than academic instruction.

### Policy



EXHIBIT
100
tabbies®

Pl. App'x 640

Def_181891

1. AUTHORITY AND SCOPE OF THE EQUAL OPPORTUNITY PROGRAM

    1.1 The system provides equal opportunity for employment to all persons regardless of race, color, sex, religion, national origin, age, disability, genetic information, veteran status, or any other classification protected by federal, state or local law and strives to achieve full and equal employment opportunity throughout the system.

    1.2 The System Ethics and Compliance Office (SECO), in coordination with the Office of General Counsel (OGC), is responsible for the system's compliance with civil rights laws and regulations. This includes, but is not limited to, addressing charges or complaints filed with federal, state and local agencies, and audits or compliance reviews of policies and procedures carried out by the U.S. Department of Labor, the Equal Employment Opportunity Commission, the Texas Workforce Commission's Civil Rights Division, the U.S. Department of Education's Office of Civil Rights, and other state and federal civil rights compliance agencies.

    1.3 The system promotes equal employment opportunity through its procedures, training, compliance with applicable legal requirements, and other methods authorized by federal regulations.

2. PROHIBITED ACTIONS

    2.1 Prohibited Discrimination or Instruction

        a. System Employment. No individual will be subjected to discrimination in system employment on the basis of race, color, sex, religion, national origin, age, disability, genetic information, veteran status, or any other classification protected by federal, state or local law.

        b. Other System Programs and Activities. No individual will, on the basis of any classification protected by state, federal, or local law, be excluded from participation in, or be denied the benefit of, or be subjected to discrimination under any system program or activity. No system academic course will advocate race or gender ideology, or topics related to sexual orientation or gender identity, unless the course and the relevant course materials are approved in advance by the member CEO.

    2.2 Except as required by federal law, a member or member employee must not:

        a. establish or maintain a diversity, equity, and inclusion office, or hire or assign an employee or contractor to perform diversity, equity, and inclusion functions; or

        b. compel, require, induce, or solicit any person to provide a statement about diversity, equity, and inclusion or give preferential treatment to any person based on the provision of a statement about diversity, equity, and inclusion.

    2.3 Except as required by federal law, a member or member employee must not require, as a condition of enrollment at the member or performing any member function, any person to participate in a diversity, equity, and inclusion training that includes a training, program, or activity about race, color, ethnicity, gender identity, or sexual orientation, unless developed and approved by OGC in accordance with state law.

Pl. App'x 641

Def_181892

2.4 Retaliatory action of any kind is prohibited when taken against a complainant, respondent, witness or other person participating in a discrimination investigation, complaint, hearing or suit. Such retaliatory action is regarded as a separate and distinct cause for complaint and possible disciplinary action, including dismissal or expulsion.

2.5 The prohibitions in Sections 2.2 and 2.3 do not apply to the following:

   a)  Academic course instruction;
   b)  An employee or student's scholarly research or creative work;
   c)  An activity of a student organization registered with or recognized by a member;

   d)  A guest speaker or performer on a short-term engagement;
   e)  Policies, practices, procedures, programs, or activities to enhance student academic achievement or postgraduate outcomes without regard to race, sex, color, or ethnicity;
   f)  Data collection; or
   g)  Student recruitment or admissions.

3. RESPONSIBILITIES

   3.1 Each member chief executive officer (CEO) is responsible for equal opportunity and program accessibility in accordance with federal, state and local laws and regulations and system policy.

   3.2 SECO, in coordination with OGC, serves as the liaison between members and federal, state and local compliance agencies. SECO is also responsible for the coordination of all civil rights reporting requirements for the system and its members under applicable state and federal regulations.

   3.3 Each member CEO must appoint, a Title IX of the Education Amendments of 1972 Coordinator, a Section 504 of the Rehabilitation Act of 1973 Coordinator and other administrators who oversee the implementation of guidelines to ensure compliance with legal and regulatory provisions under this policy.

4. PROCEDURES

   4.1 The administrators appointed under Section 3.3 must inform SECO as soon as a charge or complaint of discrimination or notice of civil rights audit, compliance review or other inquiry is received from a federal, state or local agency.

   4.2 The system developed a regulation providing systemwide standards for the receipt and processing of complaints of discrimination.

   4.3 A member may not spend state funds appropriated for a fiscal year until the system submits a report to the legislature and the Texas Higher Education Coordinating Board certifying the system's compliance with Texas Education Code Section 51.3525 during the preceding state fiscal year. SECO implements monitoring processes to assess member compliance with Texas Education Code Section 51.3525 throughout the state fiscal year. The System Internal Audit Department includes DEI compliance in its systemwide risk assessment as part of the annual audit plan process. Audits are conducted as necessary based on the annual risk assessment. SECO annually provides a report to the Board of

Pl. App'x 642
Def_181893

Regents (board) for the August regular meeting and the board approves SECO's submission of this report on behalf of the system. This section takes effect January 1, 2024 for money appropriated for the state fiscal year beginning September 1, 2024.

4.4    The board designates the chancellor or designee to provide legislative testimony in accordance with Texas Education Code Section 51.3525. This section takes effect January 1, 2024.

## Related Statutes, Policies, or Requirements

The Equal Pay Act of 1963
Title VI of the Civil Rights Act
Title VII of the Civil Rights Act of 1964, as amended
The Age Discrimination in Employment Act of 1967
Title IX of The Education Amendments of 1972
The Rehabilitation Act of 1973, as amended
The Americans with Disabilities Act of 1990, as amended
The Genetic Information Nondiscrimination Act of 2008
Executive Order 14173
Tex. Educ. Code Sec. 51.3525
Tex. Educ. Code § 51.354
Tex. Lab. Code Ch. 21, Employment Discrimination
Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended
Uniformed Services Employment and Reemployment Rights Act
System Policy *07.01, Ethics*

## Member Rule Requirements

A rule is not required to supplement this policy.

## Contact Office

Ethics and Compliance
(979) 458-6203

Pl. App'x 643
Def_181894

sceenshot-www-wtamu-edu-2025-12-05-15-29-11 06 12 2025
https://www.wtamu.edu/admission/pre-university-program/pup-faq.html

EXHIBIT
103

**WT** WEST TEXAS A&M
U N I V E R S I T Y ™

PRE-UNIVERSITY PROGRAM (PUP)

HOME > ADMISSIONS > PRE-UNIVERSITY PROGRAM (PUP)
**PUP Frequently Asked Questions**

Pre-University Program (PUP)

Pre-University Programs & Applying

PUP FAQ's

[A][A] Español

| Info For | About | Admissions | Academics | Student Life | Athletics | Research | Giving |

| Apply | Visit | Quick Links | BuffConnect |

# Frequently Asked Questions (FAQs)

**Where do I go for help?**

**Office of Admissions:**
pup@wtamu.edu
806-651-2020

**Advising, Enrollment, Texas Success Initiative (TSI):**
Vanessa Vidana
vvidana@wtamu.edu
806-651-5370

**What is FERPA and how does it apply to me?**

The Family Educational Rights and Privacy Act (FERPA) assures students of certain privacy rights. In relation to the PUP Program, it limits the information the University may provide to 3rd parties, including parents and high school officials. A more complete explanation of this law and the related University policies can be found here.

**How does the Student Code of Conduct Apply to me?**

PUP students will be held to the same expectations as the rest of the student body. Particular care should be taken in respect to academic integrity. You can find a copy of the Student Code of Conduct here.

**What if I want to take courses that are not a part of the WT core curriculum (or foreign language)?**

Students who take courses outside of the WT core curriculum may have to pay the full tuition rate.

**How many courses can I take each semester?**

PUP students can take up to two (2) courses each semester. If a PUP student desires to take more than two courses, the request is evaluated on a case-by-case basis by the provost.

**Will these courses transfer to another university?**

Yes. For students who have completed the Texas 42-hour core requirements and are officially "core complete," it is required by law that the receiving Texas public institution accept the core credit block. However, it may still be necessary for students to take other courses required by their particular college major, making some dual enrollment courses "electives" or otherwise irrelevant to the achievement of a degree.

We highly encourage both in-state and out-of-state students to work closely with the college or university they plan to attend to be sure the courses taken will apply to the chosen degree plan.

**Can I complete all core courses and meet the Texas standard that guarantees transferability of dual credit between Texas public institutions?**

Yes. For students who have completed the Texas 42-hour core requirements and are officially "core complete," it is required by law that the receiving Texas public institution accept the core credit block. However, it may still be necessary for students to take other courses required by their particular college major, making some dual enrollment courses "electives" or otherwise irrelevant to the achievement of a degree.

We highly encourage students to work closely with the college or university they plan to attend to be sure the courses taken will apply to the chosen degree plan.

How do I decide the best courses to take?

We recommend working with Advising Services in conjunction with your high school counselors to decide appropriate coursework.

We also recommend browsing WT's degree checklists or degree checklists from your intended University to be sure the courses you take apply to your degree.

### What if I am having trouble passing a course?

WT offers a variety of tutoring options for students. Please reach out to your adviser if you are having difficulties in your class.

If you feel you are unable to succeed in the course and have exhausted tutoring options, students do have the ability to drop the course before the university drop date. Please reference WT's Registrar pages for additional information on the process and deadlines for dropping a course.

### If I drop a class will it count against me?

No. Per the Texas Education Code §51.907, an undergraduate student may not be permitted to drop a total of more than six courses. However, students who drop a course through PUP will not be penalized. Please reference WT's Registrar pages for additional information on the process and deadlines for dropping a course.

### Will taking these courses compromise my ability to get scholarships or grants after high school?

Taking PUP courses will not have an effect on your eligibility for scholarships at West Texas A&M University. PUP students are eligible for all Freshman Scholarships, provided they meet the necessary criteria.

### How do I make a payment?

Buff Connect - Student Finance - Make a Payment

### What is the refund policy?

Students who withdrawal by the end of the first week of classes will receive a full refund. If you are registered for more than one class you will receive a full refund for dropping one class before the 12th class date.



## Contacts

### Office of Admissions

**Phone:**
806-651-2020
1-800-99-WTAMU

**Email:**
pup@wtamu.edu

**Mail:**
West Texas A&M University
WTAMU Box 60907
Canyon, TX 79016

**In Person:**
Old Main, Room 124
2501 4th Ave
Canyon, TX 79016

Accessibility
Accreditation
Consumer Information
Contact WT
Counseling & Mental Health Services (HB289S)

Emergency Information
Energy Management Report (PDF)
Equal Opportunity & Nondiscrimination
Family Educational Rights and Privacy Act
Form Policy
GDPR

House Bill 2504
Legislative Appropriation Request
Link Policy and Privacy Statement
Online Institutional Resumes
Open Records/ Public Information Act
Risk, Fraud and Misconduct Hotline

SB18 Report
State of Texas
Statewide Search
Texas CREWS
Texas Homeland Security
Texas Veterans Portal

University Directory
University Organizational Chart (PDF)
Title IX

Pl. App'x 645

The page is essentially blank except for header, footer, and a side banner.

The page is essentially blank.



© West Texas A&M University | All Rights Reserved
Canyon, TX 79016 | 806 651-0000

WEST TEXAS A&M
U N I V E R S I T Y™

**PRE-UNIVERSITY PROGRAM Agreement for <u>Independent School Districts</u>**
**On Dual/Concurrent Enrollment Courses Offered by**

**West Texas A&M University and** _____

West Texas A&M University ("WTAMU") and _____
(_____) have chosen to offer, through this Pre-University Program (PUP), dual/concurrent enrollment opportunities to high school students with the purpose of providing excellent university-based higher education academic experiences for high school students who intend to pursue a university-level degree.

In accordance with an under the authority of Texas Administrative Code Title 19, Part 1, Chapter 4, Subchapter D, Rules §4.81-4.85, high school students may enroll in university courses and could receive academic credit from both the university and the high school. In order to ensure the quality of the courses and to facilitate communications and understanding between _____ and WTAMU, the following provisions are agreed to by WTAMU and _____.

# STUDENT ELIGIBILITY and APPLICATION

## ELIGIBILITY
High school students are eligible to participate if they
1) have achieved a GPA of 3.0 **OR** are in the top half of their high school class **OR** have achieved a score of 21 or higher on the ACT or a score of 1060 or higher on the SAT.
2) demonstrate college readiness by achieving the minimum passing standards under the provisions of the Texas Success Initiative (TSI) as set forth in TAC §4.57 on relevant section(s) of an assessment instrument approved by the Coordinating Board, as set forth in TAC §4.56, or by demonstrating that he or she is exempt under the provisions of the Texas Success Initiative as set forth in TAC §4.54. While students will not be required to be TSI complete in all areas of Reading and Writing (English Language Arts Reading) and Mathematics, students may only register for courses in which they have met the state standards or approved exemptions.

## APPLICATION
High school student applying for admission to PUP must submit the following:
1) PUP Application
2) PUP Approval Form / Semester Advising and Registration Form signed by the high school official, the student, and the student's parent or guardian.
3) Official high school transcript, indicating class rank in top half or 3.0 GPA.
4) Unofficial transcripts from early earned credit: community colleges, universities, and/or credit by examination.
   a. Examples of credit by examination: American College Test (ACT), Scholastic Aptitude Test (SAT), Advanced Placement Examinations (AP), College Level Examination Program (CLEP), and International Baccalaureate Diploma Program (IB)
5) TSI Scores or Proof of Exemption as required by Texas Success Initiative (TSI), unless exempt.
6) Proof of meningitis vaccination, if enrollment in on-campus courses is anticipated.

## ELIGIBLE COURSES
Students enrolling in certain PUP courses must meet University course prerequisites, unless prior prerequisite waivers have been obtained. Eligible courses will include those in the approved undergraduate course inventory of the University; they will not include remedial or developmental courses. Typically, these will be limited to those that satisfy general education requirements or foreign language courses. Courses may be offered on the WTAMU campus in Canyon, Texas or online. Students enrolling in WTAMU courses through PUP will take courses with regular WTAMU students.

Last updated 7-7-2023

**EXHIBIT 104**
tabbies

**Def_000858**

# FACULTY QUALIFICATIONS

The instructor for a PUP course will be employed by WTAMU. The instructor must meet credential requirements of WTAMU and the Southern Association of Colleges and Schools Commission on Colleges (SACSCOC).

# GRADING CRITERIA / PROCEDURES

At the end of each semester and if requested by the high school, WTAMU will provide a transcript to the high school principal or his/her designee for PUP courses.

Upon graduation from high school, students must submit an official high school transcript before WTAMU transcripts will be released to other colleges or universities.

The WTAMU courses offered through PUP are regular University courses with no variance in syllabi, course outlines, grading procedures, and other academic policies. Letter grades are given in accordance with academic policies printed in the University catalog and placed on the University transcript.

# TRANSFERABILITY OF CREDIT

WTAMU is a fully accredited institution and academic courses are widely transferable to other universities. However, because each university may have its own policy regarding the transferability of courses, each student considering attending a university other than WTAMU is strongly advised to verify transferability with the university which he/she plans to attend.

# STUDENT EXPECTATIONS / SERVICES

Students enrolled in PUP:
- are expected to follow University rules and regulations.
- are classified as students not seeking degrees (undeclared majors) until 15 semester credit hours (SCH) are completed. Students will then be required to file an official degree plan at WTAMU, in accordance with the Texas Administrative Code Rule §4.344.
- may be limited to WTAMU core curriculum or foreign language courses.
- will receive advising on course availability and selection from WTAMU Advising Services.
- must provide to the Office of Admissions, upon high school graduation, a final high school transcript showing rank in class and graduation date.
- may be responsible for purchasing textbooks and/or other required course materials.
- may be eligible to receive WTAMU PUP graduation cords to wear at their high school or home school graduation if they meet all of the following requirements:
  - be graduating from high school or homeschool,
  - earn at least 9 semester credit hours (SCH) from WTAMU, and
  - achieve a minimum cumulative 3.5 GPA from WTAMU.
  The Registrar's Office will automatically mail cords each May to students that meet these requirements.

# FEES

WTAMU fee waivers for students enrolled in PUP dual enrollment courses result in a price per course much lower than that paid by other WTAMU students. Students will pay $150 per course. This will provide students an ID card, email account, and access to library and computing services (Marmaduke Internet Innovation Center).

Other services are optional if students elect to purchase them, such as access to the Virgil Henson Activity Center, parking permit (required if parking on campus), and athletic events. Students may be responsible for purchasing textbooks and/or other required course materials.

Last updated 7-7-2023

**Def_000859**

Pl. App'x 648

# JOINT PLANNING

Annual renewal of this agreement is automatic unless one institution notifies the other in writing of its desire to modify the dual enrollment agreement.

More important than the stated provisions above is the spirit of cooperation between
_____ and WTAMU. Both parties endeavor to provide a positive university-level experience for those high school students with the maturity and academic preparation to benefit from university-level courses.

_____

**Printed name: Superintendent, Principal, (or) Authorized School Official**

_____

**Printed name: Executive Vice President and Provost (or) Authorized University Official**

_____

**Signature: Superintendent, Principal, (or) Authorized School Official**

_____

**Signature: Executive Vice President and Provost (or) Authorized University Official**

_____

**Name of High School or ISD**

**West Texas A&M University**

**Institution**

**Date:** _____

**Date:** _____

Last updated 7-7-2023

**Def_000860**

Pl. App'x 649

# Pre-University Program (PUP) – West Texas A&M University

## Student Approval Form
## Semester Advising and Registration Form

### Approval to Register by Term/Year

### STUDENT INFORMATION

Student Social Security Number OR Buffalo Gold Card #: _____

Name: _____
            Last                        First                    Middle Initial

Select one option:     ☐ High School Student      ☐ Homeschool Student

High School: _____
(If applicable)      School Name          Anticipated High School Graduation Date (month/year)

Homeschool: _____
(If applicable)      Anticipated Graduation Date (month/year)

### REGISTRATION INFORMATION

All applicable portions of this section must be completed by high school counselor or with guardian for homeschool students.

| Course Name<br>*Example: "ECON 2301"* | Preferred Day/Time<br>*Example: "MWF 10 am"* | Alternate Date/Time<br>*Example: "Online"* | Term/Year<br>*Example: "Fall 2024"* |
|---|---|---|---|
| **Preferred Courses Approved** | | | |
| | | | |
| | | | |
| | | | |
| **Alternative Courses Approved** | | | |
| | | | |
| | | | |
| | | | |

I certify that I approve the courses listed above for fulfillment of high school or homeschool graduation requirements.

_____      _____
Signature of High School Counselor or Guardian    Date    Counselor or Guardian Email/ Phone Number

_____      _____
Signature of Student               Date    Signature of Parent or Guardian      Date

P a g e | **1 of 3**

**EXHIBIT**
tabbies
105

Updated 9/8/2025

Pl. App'x 650
Def_017571

# Pre-University Program (PUP) – West Texas A&M University

## Student Approval Form
## Semester Advising and Registration Form

### Student and Parent/Guardian Agreement

## STUDENT INFORMATION

Student Social Security Number OR Buffalo Gold Card #: _____

Name: _____
      Last                         First                      Middle Initial

## HAZARDOUS COURSE INFORMATION

Courses at West Texas A&M University may be designated in the University Catalog as being hazardous (HAZ) for various reasons including, but not limited to, the following examples: animals, chemicals, equipment, extreme temperatures, extreme weather, fall hazards, and paint.

- I confirm that if I register for any course that is designated as hazardous (HAZ) in the **University Core Curriculum**, I am at least **16 years old by the first class day**.

- I confirm that if I register for any course that is designated as hazardous (HAZ) and includes participating in a **Biosafety 2 Lab** (Nursing, Sports & Exercise Science, Agriculture, etc.), I am at least **18 years old by the first class day**.

## STUDENT LABORATORY SAFETY TRAINING

I agree that to participate in these classes, an online "Student Laboratory Safety Training" is required and assigned through WTClass upon registration for the class. Once registered for the course, I agree to:

- Complete the assigned training by no later than the 12th class day for fall/spring terms or 5th class day for summer terms; and

- Acknowledge non-participation in activities if not completed by 18th class day for fall/spring terms; 10th class day for summer terms.

I wish to enroll in the Pre-University Program at West Texas A&M University and agree to the terms. My signature below indicates that I authorize the release of academic information between schools and to my parents while I am a participant in the Pre-University Program.

_____    _____        _____
Signature of Student                 Date              Printed Name of Parent or Guardian

                                                       _____
                                                       Signature of Parent of Guardian        Date

## Submit completed forms to West Texas A&M University – Advising Services
**In person:** Classroom Center 110    **Email:** advisingservices@wtamu.edu
**Mail:** WTAMU Box 60907, Canyon, TX 79016

**Questions?** Contact Advising Services (located in the Classroom Center – 1st floor, just west of the WT Bookstore)
**Phone:** 806-651-5300        **Email:** advisingservices@wtamu.edu

Updated 9/8/2025

Pl. App'x 651
Def_017572

# University Core Curriculum

University core curriculum requirements apply to all undergraduate degrees and are intended to provide students with the basis for establishing broad and multiple perspectives of the individual in relation to the larger society and world in which he or she lives. The core curriculum is predicated on the belief that basic intellectual competence in reading, writing, speaking, listening and critical thinking is essential to the learning process in any discipline. The West Texas A&M University core curriculum has been approved by the Texas Higher Education Coordinating Board and aligns with Core Objectives and includes Foundational Component Areas (FCA) and a Component Area Option (CAO).

Students transferring to WTAMU from another state-supported university or community college in Texas shall receive core-curriculum credit for the component areas successfully completed in the core curriculum of the sending institution. Following receipt of credit for these courses, a student will be required to satisfy the remaining course requirements in WTAMU's core. A student who has earned a baccalaureate degree from a Texas public institution of higher education is considered core complete. For a second degree, the entire 42-hour core from the sending institution must substitute completely for the receiving institution's core curriculum.

NOTE: Students should be aware that some majors specify particular courses to meet core-curriculum requirements when options are available. See specific information in the academic department section of this catalog in which the major is offered. Students should consult their academic adviser often, at least once a semester. Ideally, these courses should be completed by the end of the sophomore year.

| West Texas A&M University Core Curriculum | | | |
|---|---|---|---|
| **Foundational Component Areas (FCA)** | **Core Category** | **Core Curriculum Courses** | **Hours** |
| Communication | 010 | ENGL 1301 or ENGL 1311 (3) <br><br> COMM 1315, or COMM 1318, or COMM 1321 (3) | 6 |
| Mathematics | 020 | MATH 1314; MATH 1316; MATH 1324; MATH 1325; MATH 1332; MATH 1342; MATH 1350 ; MATH 2412; MATH 2413 <br> (overflow hour from a four-hour MATH course moves to CAO 090) | 3 |
| Life and Physical Sciences | 030 | ANSC 1319; BIOL 1406[1] or BIOL 1308[1]; BIOL 1407[2] or BIOL 1309[2]; BIOL 1411; BIOL 1413; CHEM 1305[3] or CHEM 1411[3]; CHEM 1412; ENVR 1407; GEOL 1301[4] or GEOL 1403[4]; GEOL 1302; GEOL 1404; PHYS 1401; PHYS 1402; PHYS 1311; PHYS 1312; PHYS 1371; PHYS 2425; PHYS 2426; PSES 1301; PSES 1307 <br> (overflow lab hours from four-hour courses move to CAO 090) | 6 |
| Language, Philosophy and Culture | 040 | ANTH 2351; ENGL 2321; ENGL 2326; ENGL 2331; ENGL 2341; ENGL 2343; HIST 2311; HIST 2323; HIST 2372; MCOM 1307; PHIL 1301; PHIL 2374; SPAN 2311; SPAN 2312 [or an equivalent course (second year or intermediate level) in a foreign language]; SPAN 2313; SPAN 2315; SPAN 2371 | 3 |
| Creative Arts | 050 | ARTS 1301; ARTS 1303; ARTS 1304; DANC 2303; MUSI 1306; MUSI 1307; MUSI 1310; THRE 1310 | 3 |
| American History | 060 | HIST 1301, HIST 1302, HIST 2301, HIST 2381, HIST 2382 | 6 |
| Government/Political Science | 070 | POSC 2305 and POSC 2306 | 6 |
| Social and Behavioral Sciences | 080 | AGBE 2317; COMM 2377; CRIJ 1301; ECON 2301; ECON 2302; GEOG 1302; PSYC 2301; SOCI 1301 | 3 |
| Component Area Option (CAO) | 090 | AGRI 2300; BIOL lab hours (from FCA 030); BUSI 1301; BUSI 1304; CHEM lab hours (from FCA 030); CIDM 1105; CIDM 1301 or CIDM 1315[5]; CS 1301; ECON 2331; EDUC 1300; ENGL 1101[6]; ENGL 1102[6]; ENGL 1302; ENGL 1312; ENGL 2311; ENVR lab hour (from FCA 030); GEOL lab hours (from Code 30); HSCI 2300; IDS 1071 (1-3 hours); Extra MATH hours (from FCA 020); MUSI 1053 (1-2 hours); PHIL 2303; PHYS lab hours (from FCA 030); SES 1120 | 6 |
| | | **Total Core Curriculum Requirements** | 42 |

Updated 9/8/2025

Pl. App'x 652 <br> Def_017573



EXHIBIT
106
tabbies

| Semester | PUP Enrollment Count | | | | Dual Credit | Both DC & PUP | TOTAL | Notes |
|---|---|---|---|---|---|---|---|---|
| | On-Campus | Online | Both On-campus & Online | Total PUP | | | | |
| Spring 2023 | 34 | 43 | 3 | 80 | | | 80 | |
| Summer I 2023 | | 12 | | 12 | | | 12 | |
| Summer II 2023 | 2 | 4 | | 6 | | | 6 | |
| Fall 2023 | 53 | 34 | 2 | 89 | | | 89 | |
| Spring 2024 | 51 | 30 | 1 | 82 | | | 82 | |
| Summer I 2024 | | 20 | | 20 | | | 20 | |
| Summer II 2024 | 1 | 10 | | 11 | | | 11 | |
| Fall 2024 | 42 | 52 | 1 | 95 | 119 | 2 | 216 | NOTE: the 2 students who are both DC & PUP, PUP is on-campus) |
| Spring 2025 | 42 | 69 | 1 | 112 | 119 | 3 | 234 | NOTE: the 3 students who are both DC & PUP, PUP is online) |
| Summer I 2025 | | 13 | | 13 | | | 13 | |
| Summer II 2025 | 1 | 13 | | 14 | | | 14 | |
| Fall 2025 | 51 | 82 | 2 | 135 | 171 | 2 | 308 | NOTE: the 2 students who are both DC & PUP, PUP is online) |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

SPECTRUM WT, et al,           )
                              )
            Plaintiffs,       )
                              )
VS.                           ) CIVIL ACTION
                              )
WALTER WENDLER, et al,        ) NO.: 2:23-cv-00048
                              )
            Defendants.       )
                              )
                              )

-----------------------------------

REMOTE ORAL AND VIDEOTAPED DEPOSITION OF

MARCUS STOVALL

DECEMBER 16, 2025

-----------------------------------

REMOTE ORAL AND VIDEOTAPED DEPOSITION OF MARCUS

STOVALL, produced as a witness at the instance of the

DEFENDANTS, and duly sworn, was taken in the

above-styled and numbered cause on December 16, 2025,

from 9:56 a.m. to 3:19 p.m., via Zoom teleconference,

before Vanessa J. Theisen, CSR in and for the State

of Texas, and RPR, reported by machine shorthand,

pursuant to the Federal Rules of Civil Procedure and

any provisions stated on the record or attached

hereto.

1                    A P P E A R A N C E S

2

3   FOR THE PLAINTIFF:

4        Mr. J.T. Morris
         Mr. Adam B. Steinbaugh
5        FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
         501 Walnut Street, Suite 900
6        Philadelphia, PA 19106
         (215) 717-3473
7        Jt.morris@fire.org
         Adam@fire.org

8

9   FOR THE DEFENDANTS WALTER WENDLER, et al:

10       Ms. Alexia Baker
         Mr. David Bryant
11       Assistant Attorneys General
         OFFICE OF THE ATTORNEY GENERAL
12       P.O. Box 12548 (MC-009)
         Austin, Texas 78711-2548
13       (512) 463-2120
         Alexia.baker@oag.texas.gov
14       David.bryant@oag.texas.gov

15
    ALSO PRESENT:
16
         Mr. Brian Christopher, Videographer
17       Mr. Marc Rietvelt, Texas A & M General Counsel

18

19

20

21

22

23

24

25

```
 1                          INDEX
                                                     PAGE
 2    Appearances..................................   2

 3    MARCUS STOVALL

 4        EXAMINATION BY MS. BAKER..................   5
          EXAMINATION BY MR. MORRIS................. 135
 5        FURTHER EXAMINATION BY MS. BAKER.......... 141

 6
      Reporter's Certificate........................ 143
 7

 8                         EXHIBITS

 9    NO.        DESCRIPTION                        PAGE

10
      1          Spectrum's Second Amended Complaint
11               ECF 28................................ 19

12    2          Campus Organizations Handbook
                 Spectrum 565.......................... 22
13
      3          The Constitution of Spectrum WT
14               Spectrum 2220 - 2226.................. 31

15    4          Photo
                 Spectrum 2066......................... 43
16
      5          Document ECF37-3 and Video ........... 43
17
      6          Photo
18               Spectrum 1918......................... 53

19    7          Wtamuspectrum Instagram Screenshot
                 Spectrum 834.......................... 57
20
      8          "A Fool's Drag Race" Drag Show Flyer
21               (Draft)
                 DEF 841............................... 63
22    9
                 2023 Drag Show Marketing Flyer
23               DEF 843............................... 64

24

25
```

Pl. App'x 656

```
 1                      INDEX (Continued)

 2                         EXHIBITS

 3   NO.        DESCRIPTION                        PAGE
```

```
 4   10         Spectrum's Official Statement Pt. I
                Spectrum 1183......................... 70
 5
     11         Spectrum's Official Statement Pt. II
 6              Spectrum 1186......................... 81

 7   12         Statement of Walter V. Wendler,
                March 2023
 8              DEF 53 - DEF 55....................... 84

 9   12(A*)     West Texas A & M University Code of
                Student Life
10              DEF 681 - 725......................... 88

11   13         WT's Jack B. Kelley Student Center
                Procedure and Guidelines Booklet
12              DEF 154 through 172................... 96

13   14         Document from Amarillo Parks and Rec
                Spectrum 1561.........................117
14
     15         Photo
15              Spectrum 1675.........................124

16   16         Photo
                Spectrum 1716.........................126
17
     17         Photo
18              Spectrum 1751.........................127

19   18         "Don't Be A Drag" Flyer
                DEF 96................................131
20
```

```
21   * Please note:  The exhibit Number 12 was used twice.
     The second document marked as Exhibit No. 12 is
22   referred to as 12(A).

23
     REPORTER'S NOTE
24   Quotation marks are used for clarity and do not
     necessarily reflect a direct quote.
25
```

```
 1                      MARCUS STOVALL,

 2   having been first duly sworn, testified as follows:

 3                      EXAMINATION

 4   BY MS. BAKER:

 5        Q.  Good morning, Marcus.

 6        A.  Good morning.

 7        Q.  How are you?

 8        A.  Doing all right.  How are you?

 9        Q.  I'm good.  Where are you Zooming in from

10   this morning?

11        A.  Albuquerque, New Mexico.

12        Q.  Okay.  Well, my name is Alexia Baker.  I am

13   -- I represent Defendants Walter Wendler and Chris

14   Thomas in this litigation, and I'll be conducting

15   your deposition today.

16                 So before we get into this, I just want

17   to go over some ground rules to make sure that we are

18   clear.

19                 Do you understand that you're testifying

20   under oath today and that you are legally obligated

21   to tell the truth?

22        A.  Yes, ma'am.

23        Q.  You must provide verbal responses to my

24   questions.  The court reporter can't record an

25   "huh-uh" or a shaking of the head, a nod.  And this
```

Pl. App'x 658

1    Spectrum participated in those events?

2        A.  Yes, ma'am.

3        Q.  **Do you remember how often those new student**

4    **orientations occurred?**

5        A.  I would have to guess.  Just over the

6    summer, a couple of times a month.

7        Q.  **Did Spectrum participate in any of those new**

8    **student orientations while you were vice president?**

9        A.  Yes, we did.

10       Q.  **So in 2023 and 2024, Spectrum participated**

11   **in those events?**

12       A.  Yes, I believe so.

13       Q.  **Where did Spectrum WT typically hold its**

14   **meetings?**

15       A.  In, I believe it's, the classroom center.

16       Q.  **And Spectrum had weekly meetings, right?**

17       A.  Yes, ma'am.

18       Q.  **Did you all ever host any off-campus events?**

19       A.  I believe we went -- did like hiking in the

20   canyon.  I don't think really anything else.

21       Q.  **How would you describe Spectrum's overall**

22   **mission?**

23       A.  Just to make students feel accepted and have

24   a community, where they might struggle to find people

25   elsewhere.

Pl. App'x 659

Marcus Stovall - 12/16/2025

18

1     Q.  How would you describe its purpose?  Is

2  there a distinction between the organization's

3  purpose and its mission?

4              MR. MORRIS:  Objection, compound.

5     Q.  (BY MS. BAKER)  What was the purpose of

6  Spectrum WT?

7     A.  I would say the purpose was just to make

8  people feel accepted and have a place where they feel

9  free to belong and be themselves without being

10  judged.

11     Q.  Would you agree that Spectrum WT

12  functions -- functions and functioned while you were

13  a leader to provide a sense of community and a safe

14  space for LGBTQ+ students at WT?

15     A.  Yes, ma'am.

16     Q.  Spectrum WT, at least while you were there,

17  served to educate members of the WT student body

18  concerning LGBTQ+ issues.  Would you agree with that?

19     A.  Yes.

20     Q.  So would you agree that the organization has

21  both a social and an educational purpose?

22     A.  I would.

23     Q.  I am going to pull up page 5 of ECF No. 28.

24  This is Spectrum WT's verified second amended

25  complaint, which we'll mark as Exhibit 1.

Pl. App'x 660

1              I am going to share my screen.

2   Actually, I am going to pull it up first and then

3   share my screen to make this easy.

4              (Exhibit 1 marked.)

5       Q.  (BY MS. BAKER)  Can you see my screen?

6       A.  Yes.

7       Q.  And you verified this complaint, correct?

8              MR. MORRIS:  Objection, mischaracterizes

9   the document.

10      Q.  (BY MS. BAKER)  Let me rephrase my question.

11             Marcus, can you confirm that you have

12  verified, under penalty of perjury, to have personal

13  knowledge to several of the factual allegations in

14  this complaint?

15      A.  Yes, I believe so.

16      Q.  Okay.  I'm going to read a line from

17  paragraph 13.  It reads, "In furtherance of its

18  mission, Spectrum WT hosts periodic events, including

19  Lavender Prom, Queer History Night, and Queer Movie

20  Night."

21             What is Lavender Prom?

22      A.  It was not an event we hosted while I was on

23  campus, so I can't really provide details on it.

24      Q.  What was that event intended to be?

25      A.  I believe it's just like a formal dance.

Marcus Stovall - 12/16/2025

20

 1    That would make me guess.

 2        Q.  **What about queer history night?  What is**

 3    **that?**

 4        A.  Where we would put together a slide show and

 5    teach facts about queer history in the United States.

 6        Q.  **So you-all had queer history nights while**

 7    **you were a leader in Spectrum WT, correct?**

 8        A.  Yes, ma'am.

 9        Q.  **And would you ever lead those discussions?**

10        A.  Yes, I would.

11        Q.  **What about queer movie nights?  What are**

12    **those?**

13        A.  Where we would pick a movie, either one with

14    queer content in it or one just liked by the

15    community, and just have popcorn and watch a movie.

16        Q.  **What do you mean when you say, "one liked by**

17    **the community"?**

18        A.  Things like animated, the Studio Ghibli

19    movies people tend to like.

20        Q.  **So were these events, such as the queer**

21    **history night and the queer movie night, were these**

22    **annual events?**

23        A.  It really just depended on when we needed

24    fillers.

25        Q.  **What do you mean by "fillers"?**

Pl. App'x 662

 1    pretty fast reader.

 2              And go to the second.  You can continue.

 3    All right.  All right.  All right.  All right.  I'm

 4    finished.

 5        Q.  So let's take a look at the section entitled

 6    "Service" that's on this page stamped Spectrum 2225.

 7              Section (1) says, "Spectrum should

 8    sponsor one service project per semester."

 9              Was the 2023 drag show considered a

10    service project or a fundraiser or something else?

11        A.  We considered it our service goal because we

12    were raising money for The Trevor Project.

13              THE REPORTER:  For the what project?

14              THE WITNESS:  The Trevor Project.

15              THE REPORTER:  Thank you.

16        Q.  (BY MS. BAKER)  Are you aware whether the

17    2024 drag show was also considered a service project?

18        A.  I do not know.

19        Q.  Now, Section (2) says -- Section (2),

20    immediately beneath that says, "Prior to any service

21    project, Spectrum WT should contact the organization

22    to ensure their group is accepting toward the

23    LGBTQIA+ community."

24              What criteria would you or other

25    Spectrum WT officers consider in determining whether

1       Q.  Why did the organization choose to donate to

2   The Trevor Project specifically?

3       A.  It was a queer support organization for

4   college students, trying to prevent suicide in queer,

5   younger individuals, young adults and teenagers, and

6   something we dealt with very individually.

7       Q.  Whose idea was it to -- who created the idea

8   of the drag show?  How did that come about?

9       A.  I do not know.  I would have to guess.

10      Q.  But it wasn't you who came up with the idea?

11      A.  It was not my original idea.

12      Q.  Was this something that -- let me rephrase.

13          Are you aware if any previous leaders of

14  Spectrum had considered hosting a drag show of this

15  sort on campus previously?

16      A.  Not to my knowledge.

17      Q.  So how would you describe the intended

18  message of the 2023 drag show?

19      A.  The message was just to let people

20  artistically express themselves and have fun and

21  express queer culture.

22      Q.  So self-expression, queer culture, and

23  having fun, is that how you would describe the

24  message of the 2023 drag show, the intended message?

25          MR. MORRIS:  Objection, mischaracterizes

1     A.  As it is, the performance at a club, I would

2  not consider PG-13.

3     Q.  What do you mean by "at the club"?  Does it

4  matter where it's being hosted?  Does that change

5  your answer?

6     A.  As far as I'm aware, the only location where

7  that particular performance was held, that specific

8  routine, was at the club.  It was not held in our

9  show.

10     Q.  So you all spoke with Myss Myka in planning

11  to ensure that there would be no lewd performances at

12  the show.  Is that correct?

13     A.  That is correct.

14     Q.  What kind of communications did you have?

15     A.  For sure in-person.  I believe over text as

16  well.

17     Q.  What did you all tell her?

18     A.  The show we're holding is PG-13, so no

19  explicitly vulgar, lewd content.

20     Q.  When you spoke with her, did you clarify

21  what you meant by "lewd"?

22     A.  To my recollection, we just used the

23  umbrella term as "PG-13" for general understanding.

24     Q.  But you specifically told her no lewd

25  conduct.  Is that correct?

Pl. App'x 665

1      A.  As that would fall under PG-13.

2      **Q.  May you repeat what you just said?  I didn't**

3  **quite capture it.**

4      A.  It was our understanding that lewd or

5  graphic content would fall under the umbrella label

6  of PG-13.

7      **Q.  So to clarify, you're saying lewd conduct**

8  **would fall under the umbrella of PG-13 or would not?**

9      A.  It would not.  We would consider lewd or

10 sexual content to be an R-rated, while our show was a

11 PG-13 rated.  So it would contain no lewd or sexual

12 content.

13     **Q.  I believe you clarified this, but I'm going**

14 **to ask you again to make sure I am absolutely clear:**

15 **It is your position -- is it your position that the**

16 **video of Myss Myka performing in the club is lewd?**

17             MR. MORRIS:  Objection, asked and

18 answered.  Objection as to speculation, legal

19 conclusion.

20     A.  Yes, I stand with what I've already said.

21     **Q.  (BY MS. BAKER)  And what did you say?**

22             MR. MORRIS:  Objection, asked and

23 answered.

24             If you would like to ask the court

25 reporter to go back and repeat Mr. Stovall's answer,

Pl. App'x 666

 1  you're welcome to, but you've asked this question

 2  several times.

 3              MS. BAKER:  Court Reporter, may you

 4  repeat what Mr. Stovall said for that question, how

 5  he answered that question?

 6              You're on mute.

 7              THE REPORTER:  What specifically are we

 8  looking for?

 9              MS. BAKER:  His answer to whether

10  Myss Myka's performance in February of 2023 was lewd.

11              (Record read as requested.)

12              MS. BAKER:  Court Reporter, do you see

13  any other answers from Mr. Stovall concerning that

14  question on the record?

15              THE REPORTER:  That's what I'm looking

16  for.  This is after the break.

17              (Record read as requested.)

18              THE REPORTER:  I'm going to go to the

19  next occasion of "lewd" performance.

20              (Record read as requested.)

21              THE REPORTER:  I'm searching for the

22  word "lewd," so that's what I'm finding.

23              (Record read as requested.)

24              MS. BAKER:  It doesn't seem like I ever

25  got a yes-or-no answer to my question, so I'm just

Pl. App'x 667

1      A.  Yes.

2      Q.  Do you agree that sometimes the message that

3 the audience member receives is different than what

4 the performer may have been trying to convey?

5      A.  It can be, yes.

6      Q.  But it's not always, right?

7      A.  It depends on the individual, on their

8 interpretation.

9      Q.  Did any of the performers reach out to you

10 or any of the other Spectrum leaders seeking clarity

11 as to what would be permissible under the PG-13

12 standard?

13      A.  Yes.

14      Q.  Can you explain or maybe provide an example

15 of a discussion that you had with a performer who was

16 seeking clarity as to what was permissible?

17      A.  I can't name specifics, but I know we had

18 discussions about particularly song lyrics for the

19 lip syncs.  I'm like if there's any curse words at

20 all, which words?  Like can we use a radio edit.  I

21 think we decided on just like censor it out, use a

22 clean radio edited version if needed.

23      Q.  Did you look to any MPAA standards in

24 determining what constituted PG-13?

25      A.  You mean like movie rating standards by

Pl. App'x 668

1  that?

2      Q.  Yes.

3      A.  Yes, those are the general rules we went by.

4      Q.  So under the MPAA standards, to your

5  understanding, a song with -- a performance with a

6  curse word would not be considered PG-13?

7      A.  To my best recollection, I believe the

8  understanding for PG-13 is like one curse word.

9      Q.  But you all told performers no curse words?

10     A.  Yes.  We decided to just go along, try not

11  to do any curse words just to be safe.

12     Q.  I want us to review another image stamped

13  DEF 841, which I'm going to mark as Exhibit 8.

14          (Exhibit 8 marked.)

15     Q.  (BY MS. BAKER)  Can you see this Marcus?

16     A.  Yes.

17     Q.  Okay.  I forgot that I was still screen

18  sharing.

19          This is an early iteration of the flyer

20  for Spectrum's 2023 drag performance, right?

21     A.  Yes, ma'am.

22     Q.  And are the people on this flyer meant to

23  represent drag performers?

24     A.  Yes.

25     Q.  Is there any mention of PG-13 on this flyer

 1    Q.   And there's a QR code on this flyer, right?

 2    A.   There is.

 3    Q.   Do you know where that QR code leads?

 4    A.   I would imagine to ticket sales.  I would be

 5  guessing, though.

 6    Q.   Do you see any mention of minors on this

 7  flyer?

 8    A.   Not on this flyer.

 9    Q.   But it does clarify that the event would

10  be -- would have a PG-13 rating, right?

11    A.   It does.

12    Q.   Could minors attend the 2023 drag show that

13  you all planned to host in Legacy Hall?

14    A.   Only if accompanied by a parent or guardian.

15    Q.   Why did they have to be accompanied by a

16  parent or guardian?

17    A.   Just because it's an event held at a college

18  campus, and not all parents are okay with their

19  children being exposed to drag shows, that type of

20  performance.

21    Q.   Spectrum would have had to pay some sort of

22  fee to use Legacy Hall for its 2023 drag show,

23  correct?

24    A.   I do not know.

25    Q.   So according to this flyer, any student with

Pl. App'x 670

1      Q.   (BY MS. BAKER)  Did you personally speak
2   with any WT staff or administrators after President
3   Wendler's decision in March of 2023?
4      A.   Can you expand on that?
5      Q.   Yes.  Let me clarify.
6           Did you communicate with any WT
7   administrators or faculty or staff after President
8   Wendler issued his March 2023 statement?
9           MR. MORRIS:  Objection, ambiguous.
10     A.   Are you including like professors, general
11  faculty, administrative, low-level.
12     Q.   (BY MS. BAKER)  Any faculty in W -- any WT
13  faculty, any WT staff, any administrator?
14     A.   Oh, yes.  I was still a student at the time.
15     Q.   Did you communicate with any of them
16  concerning President Wendler's decision?
17     A.   I would have to guess.  I can't remember.
18     Q.   So, essentially, in the aftermath of
19  President Wendler's decision not to allow the drag
20  show to go forward in Legacy Hall, Spectrum issued
21  some public statements in response to President
22  Wendler's decision.  Is that correct?
23     A.   Yes.
24     Q.   I'm going to introduce what I will call
25  Exhibit 10, stamped Spectrum 1183.

Pl. App'x 671

Marcus Stovall - 12/16/2025

1   what is drag as it is used in Spectrum's official

2   statement?

3        A.  As referred to in our statement, drag is a

4   form of artful performance that has a long history in

5   the queer community and queer culture.  It's a form

6   of performance used to bend and break gender roles

7   and ideas of expectation and reclaim individuality.

8        Q.  So you would agree that -- you would agree

9   that drag sometimes uses parody to undermine gender

10  norms, right?

11       A.  It can.

12       Q.  May you repeat that, please?

13       A.  It can.

14       Q.  "It can," was that your answer?

15       A.  Yes, ma'am.

16       Q.  But sometimes it doesn't, right?

17       A.  Yes, it's a very subjective experience.

18       Q.  It's a very subjective experience.

19            What makes drag, in your opinion, a

20  celebration of gender?

21       A.  I would say just because it's an entire form

22  of art based on playing around with those gender

23  roles and expectations and all of that, either

24  bending it or exaggerating it or just completely

25  deconstructing it.

1  beauty pageants.  Are those things the same or

2  different in your mind?

3       A.  They're different in my mind.

4       Q.  How so?

5       A.  I would argue that drag is more self-aware

6  and tends to be less exploitative.  But that's just

7  my opinion.

8       Q.  How is drag more self-aware?  What do you

9  mean by that?

10      A.  Whenever you say "beauty pageants," are you

11 talking about like in general or child pageants or

12 like --

13      Q.  General.  Just like the plain, ordinary

14 meaning.  Nothing -- nothing out of the ordinary.

15      A.  I would argue that drag puts a lot of

16 emphasis on individuality and growing into yourself

17 as a person and being authentic to yourself, while

18 beauty pageants typically press a more conformist

19 mindset of "hit this beauty role because that's

20 what's expected," while there is no inherent rules to

21 drag.

22      Q.  So -- and I'm asking these questions because

23 I'm genuinely trying to understand.

24            Is -- with drag, is it more about what

25 that -- what that performance means to the performer

Pl. App'x 673

 1    individual.  There's various different ways.

 2        Q.  Can you provide an example?

 3        A.  Can you rephrase the question?

 4        Q.  I'm trying to get a better understanding of

 5    how drag functions as an art form -- an art form of

 6    self-expression.

 7             So is it that the performers have the

 8    ability to express themselves in new and creative

 9    ways in their costumes or their routines?  That is

10    what I'm trying to understand.

11        A.  Yes.  Performers express themselves through

12    the costumes, through putting together routines,

13    choreographing, audio mixing.  Are you just doing one

14    song?  Are you splicing multiple together?  Are you

15    doing your own song?  Did you write one?  What are

16    you doing with the hair, the make-up, the costumes?

17             There's so much that goes into it that

18    the individual -- it's completely up to them.

19        Q.  So, essentially, a performer can be as

20    creative as they want in coming up with their

21    routines and their costumes and all of that, right?

22        A.  Yes.

23        Q.  And they are exercising this creativity so

24    that they can portray a certain message, whatever

25    message they want to portray to the world, right?

Marcus Stovall - 12/16/2025

84

```
 1        Q.  I'm going to turn to our next document,

 2  which is President Wendler's March 23rd, 2023,

 3  statement in which he articulates his reasons for

 4  forbidding drag shows in Legacy Hall.

 5              (Exhibit 12 marked.)

 6        Q.  (BY MS. BAKER)  Here is that statement.

 7              Marcus, would you like a minute to --

 8  would you want to review this whole thing before I

 9  ask you some questions about it, or would you prefer

10  me to just start asking you questions?

11        A.  I would prefer to read it.

12        Q.  Okay.  So take what time you need.

13        A.  All right.  If you could scroll.

14              All right.  Thank you.

15        Q.  So I'm going to scroll back up to the first

16  page marked DEF 53.  In that first paragraph, Marcus,

17  President Wendler praises Spectrum WT's intentions to

18  raise funds for The Trevor Project through the 2023

19  drag show, right?

20        A.  That is true.

21        Q.  And would you agree that the 2023 drag show

22  was intended to show support for The Trevor Project?

23        A.  It was.

24        Q.  And earlier when we were talking, you shared

25  that, when it comes down to drag, there's many
```

1    verified complaint.  We are going to be looking at

2    paragraph 123.

3                    So paragraph 123 of Exhibit 1 indicates

4    that, "In order to hold the event at an alternative

5    venue, plaintiffs were required to spend $2,130.13

6    from funds donated by members of the public in order

7    to rent a stage in a public park and hire off-duty

8    police officers to provide security."

9                    Marcus, do you remember how Spectrum was

10   able to raise the money from which this figure right

11   here was used to cover -- or let me rephrase that.

12                   Do you remember how Spectrum acquired

13   those donations, the donations that were used to

14   cover that expense?

15       A.  We received donations through GoFundMe.

16       Q.  Do you remember the total amount of funds

17   that Spectrum WT received from the public?

18       A.  Off the top of my head, I do not.

19       Q.  Do you remember whether it was more than

20   $5,000?

21       A.  I believe so.

22       Q.  Now, this $2,130.13, just to clarify on my

23   end, in selecting this alternative venue, did you

24   have to pay that money upfront, or did you pay it

25   after the show?

1       A.  We paid it before the show.

2       **Q.  So Spectrum already had received enough**

3   **donations to cover that amount before the show.  Is**

4   **that correct?**

5       A.  Through the GoFundMe, yes.

6                   THE REPORTER:  Can you repeat that,

7   please?

8                   THE WITNESS:  Through the GoFundMe, we

9   did.

10      **Q.  (BY MS. BAKER)  Do you recall when Spectrum**

11  **created that GoFundMe?  And to clarify, you don't**

12  **have to provide an exact date.  I'm just asking, was**

13  **it -- was that GoFundMe created very soon after**

14  **President Wendler's decision?**

15      A.  I'm not sure exactly.  Whenever we decided

16  we wanted to try to host it off-campus.

17      **Q.  But it was created before the Sam Houston**

18  **drag show, correct?**

19      A.  That is correct.

20      **Q.  I'm going to pull up Exhibit --**

21                  THE REPORTER:  14.

22                  MS. BAKER:  Court Reporter, are we on

23  Exhibit 14?

24                  THE REPORTER:  Yes, ma'am.

25                  (Exhibit 14 marked.)

Pl. App'x 677

1    printed on those documents?

2        A.   Yes.   I would say there are definitely areas

3    where the paper policy doesn't exactly match up with

4    how things actually ran.   I think the no glitter and

5    tape rule was a good example of that.

6        Q.   Okay.   Did Spectrum rely on Dr. Drumheller

7    to help them understand policies?

8        A.   Some of us would seek guidance, but we

9    wouldn't go to her for everything.

10       Q.   Okay.   At any time during the process,

11   Spectrum -- let me rephrase that.

12            Can you explain whether at any time

13   during the process for Spectrum reserving Legacy Hall

14   for the 2023 show, whether any WT faculty,

15   administration, or staff raised any concern about the

16   drag show violating a policy before President Wendler

17   issued his cancellation?

18       A.   There was not.

19       Q.   You discussed with Ms. Baker about Spectrum

20   insisting that its planned 2023 performance be PG-13.

21   Do you remember that?

22       A.   I do.

23       Q.   Can you explain whether or not Spectrum

24   would err on the side of caution in ensuring that it

25   maintained a PG-13 performance?

Pl. App'x 678

Marcus Stovall - 12/16/2025

138

1    A.  Yes.  We certainly wanted to just err on the

2  side of caution, being more appropriate over pushing

3  the line, just to make sure everyone felt comfortable

4  and no one felt offended if they chose to go to the

5  performance.

6    **Q.  Okay.  Can you explain whether or not, for**

7  **example, that extended to Spectrum's decision not to**

8  **allow profane words in the music choices for the**

9  **performance?**

10   A.  Can you say that one more time?

11   **Q.  Sure.  So in your experience -- I mean, have**

12 **you seen PG-13 movies before?**

13   A.  Yes.

14   **Q.  Okay.  And in your experience, do PG-13**

15 **movies sometimes have profane language?**

16   A.  Yes.

17   **Q.  Okay.  So in erring on the side of caution**

18 **then, can you explain whether or not, even though**

19 **PG-13 movies can have profane language, Spectrum**

20 **restricted its music to be non-profane to err on the**

21 **side of caution?**

22   A.  Yes.

23   **Q.  You talked about -- or you testified earlier**

24 **today about Myss Myka's participation, both in the**

25 **planned performance at Legacy Hall and the Sam**

Pl. App'x 679









UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

_____

PECTRUM WT, et al.,            §
                              §
                              §
        Plaintiffs,           §
                              §
s.                            § No. 2:23-cv-00048
                              §
ALTER WENDLER, et al.,        §
                              §
        Defendants.           §
_____

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

HYBRID VIDEOTAPED DEPOSITION OF

JOHNATHAN-JAYCE WALKER FANELLI-BURNETT

AS CORPORATE REPRESENTATIVE OF SPECTRUM WT

DECEMBER 18, 2025

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

```
 1        HYBRID VIDEOTAPED DEPOSITION OF JOHNATHAN-JAYCE
 2   WALKER FANELLI-BURNETT, produced as a witness at
 3   the instance of the Defendants, and remotely duly
 4   sworn by agreement of all counsel, was taken in the
 5   above-styled and numbered cause on December 18,
 6   2025, from 10:02 a.m. to 2:44 p.m., before Karen L.
 7   D. Schoeve, RDR, CRR, RSA, reported remotely by
 8   computerized stenographic machine shorthand, from
 9   West Texas A&M University, Old Main Building, Room
10   317, 2501 4th Avenue, Canyon, Texas, pursuant to
11   the Federal Rules of Civil Procedure and the
12   provisions stated on the record or attached hereto.
13
14
15        REPORTER'S NOTE:  Please note that due to the
16   quality of a Zoom videoconference, transmission of
17   data and overspeaking causes audio distortion and
18   unintelligible testimony which disrupts the process
19   of preparing a Zoom videoconferenced transcript.
20
21        Quotation marks are used for clarity and do
22   not necessarily reflect a direct quote.
23
24
25
```



1                    A P P E A R A N C E S

2        ************************************************

3                    SOME PARTIES APPEARED

4                    REMOTELY VIA ZOOM

5        ************************************************

6    FOR THE PLAINTIFFS and THE WITNESS:

7        J.T. MORRIS, ESQUIRE
         FOUNDATION FOR INDIVIDUAL RIGHTS AND
8            EXPRESSION
         700 Pennsylvania Avenue SE, Suite 340
9        Washington, DC 20003
         T: 215.717.3473
10       jt.morris@fire.org

11   - and -

12       ADAM STEINBAUGH, ESQUIRE
         FOUNDATION FOR INDIVIDUAL RIGHTS AND
13           EXPRESSION
         510 Walnut Street, Suite 900
14       Philadelphia, Pennsylvania 19106
         T: 215.717.3473
15       adam@fire.org

16

17   FOR THE DEFENDANTS:

18       DAVID BRYANT, ESQUIRE
         SPECIAL COUNSEL
19       OFFICE OF THE ATTORNEY GENERAL
         P.O. Box 12548 (MC-009)
20       Austin, Texas 78711-2548
         T: 512.463.2120
21       F: 512.320.0667
         david.bryant@oag.texas.gov

22

23

24

25

Pl. App'x 683

1              A P P E A R A N C E S (Continued)

2

3    ALSO PRESENT:

4        Marc Rietvelt | Assistant General Counsel
            Office of General Counsel
5            West Texas A&M University
            mrietvelt@tamus.edu

6

            Brad Snyder, Videographer
7            Integrity Legal Support Solutions

8

9    CERTIFIED STENOGRAPHIC MACHINE COURT REPORTER:

10        Karen L. D. Schoeve
            Certified Realtime Reporter
11            Registered Diplomate Reporter
            Realtime Systems Administrator

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Pl. App'x 684

```
 1                      I N D E X

 2                                            PAGE

 3   Appearances                                3

 4   Transcript designated "Confidential Pursuant   157

 5      to the Protective Order"

 6

 7

 8   JOHNATHAN-JAYCE WALKER FANELLI-BURNETT

 9          Examination By Mr. Bryant           9

10          Afternoon Session                  83

11          Examination (Continued) By Mr. Bryant   83

12          Examination By Mr. Morris         149

13          Further Examination By Mr. Bryant   159

14

15

16   Changes and Signature                    162

17

18   Certified Stenographic

19   Court Reporter's Certificate             164

20

21

22

23

24

25
```

1                        EXHIBIT INDEX

2

       NO.      DESCRIPTION                              PAGE
3

   Exhibit 1                                             17
4      Defendants' Notice of Oral Deposition
       Pursuant to Federal Rule of Civil
5      Procedure 30

6  Exhibit 2                                             51
       Plaintiff's Amended Responses to
7      Defendants Walter Wendler and
       Christopher Thomas's First Set of
8      Interrogatories

9  Exhibit 3                                             84
       Article over West Texas regarding its
10     general values

11 Exhibit 4                                             86
       University Mission, Vision and Core
12     Values

13 Exhibit 5                                             88
       University Statements, Mission
14     Statement, Vision Statement, Core Values

15 Exhibit 6                                             89
       The Constitution of Spectrum WT, signed
16     by Barrett Bright, dated 10/09/2023

17 Exhibit 7                                             92
       E-mail memo dated 03/20/23 from Walter
18     Wendler, President to Students, Faculty
       and Staff
19     Re: A Harmless Drag Show? No Such Thing.
       Bates stamped W_000085
20
   Exhibit 8                                             96
21     E-mail memo dated 03/18/23 from Walter
       Wendler, President to Students, Faculty
22     and Staff
       Re: WTAMU News: Spectrum WT Application
23     for On-Campus Drag Show
       Bates stamped W_000088

24

25

Pl. App'x 686

1    Exhibit 9                                          103
          Article entitled, "How drag degrades
2         women," dated 02/25/22
          Bates stamped W_000101
3
     Exhibit 10                                         106
4         Chicago-Kent Law Review, Article
          entitled "Drag = Blackface" by Kelly
5         Kleiman
          Bates stamped W_000110
6
     Exhibit 11                                         113
7         Article entitled, "Drag Shows ARE
          Blackface" by Sherry Sylvester, dated
8         04/05/23
9    Exhibit 12                                         114
          Article entitled, "Is Drag
10        Misogynistic?" By M.K. Fain, dated
          10/07/2019
11        Bates stamped W_000132
12   Exhibit 13                                         116
          Jack B. Kelley Student Center, West
13        Texas A&M University, Procedures and
          Guidelines, revised 03/05/25
14
     Exhibit 14                                         118
15        Campus Organizations Handbook
16   Exhibit 15                                         125
          Expressive Activity on Campus, approved
17        05/14/20, Rule Summary
          Bates stamped PX-005
18
     Exhibit 16                                         129
19        WTAMU Student Handbook 2025-2026,
          published 08/01/25
20        Bates stamped PX-006
21   Exhibit 17                                         131
          Facility Use Request Procedure, revised
22        03/01/17
          Bates stamped PX-004
23

24

25

```
 1              P R O C E E D I N G S

 2

 3         THE VIDEOGRAPHER:  This is the

 4    deposition of Johnathan-Jayce Fanelli in

 5    the matter of Spectrum WT versus Walter

 6    Wendler, et al.  Our location is 2501 4th

 7    Avenue in Canyon, Texas.  And we are now

 8    on the record at 10:02.

 9         My name is Brad Snyder, and my

10    business address for Integrity Legal

11    Support Solutions is 9901 Brodie Lane,

12    Austin, Texas 78748.

13         Would all persons present please

14    introduce themselves for the record.

15         MR. BRYANT:  My name is David

16    Bryant.  I represent the defendants in

17    this case.  I'm with the Office of the

18    Attorney General of Texas in Austin.

19         MR. MORRIS:  JT Morris on behalf of

20    Plaintiffs Spectrum WT and the witness.

21         THE WITNESS:  I'm Johnathan-Jayce

22    Fanelli-Burnett.  I represent Spectrum.

23         THE VIDEOGRAPHER:  Will the court

24    reporter please now administer the oath.

25         THE COURT REPORTER:  Did we have
```

Pl. App'x 688

1        one more?  Adam?

2               MR. STEINBAUGH:  Yeah.  My name is

3        Adam Steinbaugh, and I'm an attorney for

4        Spectrum.  I'm with the Foundation for

5        Individual Rights and Expression.

6        JOHNATHAN-JAYCE WALKER FANELLI-BURNETT,

7  having been first duly sworn to tell the truth, the

8  whole truth, and nothing but the truth, so help him

9  God, testified as follows:

10              THE COURT REPORTER:  Y'all may

11       proceed.

12                    EXAMINATION

13 BY MR. BRYANT:

14     Q.   Mr. Fanelli, my is name David Bryant.  I

15 represent the defendants in this case, so Walter

16 Wendler and Dr. Chris Thomas, in their official

17 capacities with West Texas A&M University.

18            We were introduced to each other just

19 before the deposition, and I understand it's okay

20 for me to refer to you as "Mr. Fanelli" during

21 this deposition.  Is that okay?

22     A.   Yes, sir.

23     Q.   Okay.  Have you ever given a deposition

24 before?

25     A.   No.

1  do, but I'm not -- I'm representing Spectrum, not

2  myself.

3  BY MR. BRYANT:

4      Q.   Okay.  Did you witness any events related

5  to the proposed drag show that Spectrum wanted to

6  hold on the WT campus in the spring of 2023?

7      A.   No.

8              MR. MORRIS:  Objection; vague.

9  BY MR. BRYANT:

10     Q.   And did you attend the drag show that

11 Spectrum held in Amarillo in the spring of 2023?

12     A.   No.

13     Q.   Did you have any involvement in the

14 planning of a proposed Spectrum drag show on the

15 WT campus in the spring of 2024?

16     A.   No.

17     Q.   Has Spectrum applied for reservation to

18 hold a drag show on the WT campus in 2026?

19     A.   Yes.

20     Q.   Were you involved in that application?

21     A.   Yes.

22     Q.   And what individual or individuals made

23 the decision to make that application?

24     A.   I did.

25     Q.   Did anybody else at Spectrum?

Pl. App'x 690

1    show in the fall of 2025 anytime in the first

2    month or so of the fall semester?

3         A.    Very briefly, but not any set in stone

4    plans.

5         Q.    Okay.  Now, at this point, my

6    understanding is that Spectrum has applied for a

7    reservation for space in Legacy Hall for a drag

8    show in late April of 2026; is that correct?

9         A.    Yes.

10        Q.    And to what extent, if any, have the

11   details of that drag show already been decided?

12        A.    We are in the very, very early planning

13   stages.

14        Q.    And is it fair to say that -- strike

15   that.

16              Do you know who will perform at that

17   drag show?

18        A.    Not yet, no.

19        Q.    Do you know what the performances or any

20   of them will consist of?

21        A.    Not yet, no.

22        Q.    Do you have any knowledge as to the

23   costumes or music that will be a part of that late

24   April 2026 drag show?

25        A.    Not yet, no.

Pl. App'x 691

1      Q.    Is it fair to say that at this time,

2    Spectrum has a general intention to have that drag

3    show, but none of the details have yet been worked

4    out?

5      A.    Yes.

6      Q.    Is it possible that the -- in the next

7    four or five months, that the precise date of the

8    drag show will be changed?

9      A.    If -- the only reason why that would be

10    changed is if we do not get our reservation at the

11    given date.

12            But currently, we have it set for a

13    specific date.  And we have -- we have an idea for

14    how we are to select our performers, which will

15    all be WT students, and our processes of which we

16    are to approve said students.

17      Q.    Okay.  Could you describe those

18    processes?

19      A.    Yes.  So first, we would have a

20    applyment [sic] -- like, they would apply to

21    perform.  They would briefly describe what they

22    want to do, what their costumes are, what music

23    they are to do, and we will go through and make

24    sure that it is appropriate.  We will consult with

25    them, if we have any concerns.  And we will select

Pl. App'x 692

1 our grouping that we are to have perform.  We are

2 expected to have anywhere from five to ten

3 performers, possibly more, probably not less than

4 that number.  And -- yeah.

5     **Q.   Okay.  Let's leave drag shows aside for**

6 **the moment.  We'll talk about them some more in**

7 **your deposition.**

8              **To your knowledge, has Spectrum been**

9 **allowed to hold its events on campus or off campus**

10 **without interference from the leadership of WT?**

11              MR. MORRIS:  Objection; compound.

12     A.   Can you repeat that again.

13 BY MR. BRYANT:

14     **Q.   Sure.**

15              **To your knowledge, has Spectrum been**

16 **allowed to hold its events on campus without**

17 **interference from the leadership or administration**

18 **of WT?**

19     A.   Our just normal meetings, yes.

20     **Q.   Okay.  Is that also true for social**

21 **events such as Queer Movie Night and Lavender Prom**

22 **and other social events that are aside from**

23 **regular meetings?**

24     A.   Our regular meetings do consist of those

25 events.

 1      Q.   Okay.  So -- and I'll pull out the

 2  interrogatory answers that Spectrum has provided.

 3  It lists, you know, quite a few events that

 4  Spectrum has held over the period that you've been

 5  in at WT.

 6           Is it fair to say that, again,

 7  leaving aside drag races, WT leadership has not in

 8  any way interfered with or harassed Spectrum in

 9  holding its events?

10           MR. MORRIS:  Objection; compound.

11      A.   We haven't had any issues with that, no.

12  BY MR. BRYANT:

13      Q.   And is that true also for the events that

14  Spectrum has chosen to hold off campus?

15           MR. MORRIS:  Objection; lacks

16       foundation.

17      A.   I know since I've, like, been in

18  Spectrum, I haven't been to any off-campus events,

19  really.  We don't host them primarily for

20  accessibility reasons.  We like to keep things on

21  campus, so the WT community can attend them.  And

22  also, for students that don't have cars, that it's

23  hard for them to get off campus, to make them as

24  accessible as possible.  We have had some

25  off-campus events, but they have been more kind of

Pl. App'x 694

Spectrum_WT - 12/18/2025

34

1   casual, like, hangouts, like, "Let's go eat at a

2   restaurant.  Let's go do this and that."

3           I do know that they had their

4   off-campus drag show.  I did not attend that.  But

5   once again, we like to keep things on campus for

6   accessibility reasons.

7   BY MR. BRYANT:

8       **Q.    Okay.  I understand that.  But is it fair**

9   **to say that Spectrum [sic-West Texas University]**

10  **has not in any way interfered with any off-campus**

11  **events, formal or informal, that Spectrum chose to**

12  **have?**

13      A.    We haven't had any issues, no.

14      **Q.    And is it fair to say that neither**

15  **Spectrum nor any of its members, to your**

16  **knowledge, have been subject to any kind of**

17  **discipline from WT by reason of any events that**

18  **Spectrum has held?**

19      A.    No.

20      **Q.    Is that correct to say or not correct to**

21  **say?**

22      A.    We haven't had any issues, no.

23      **Q.    Okay.  What is Spectrum's purpose in**

24  **wanting to hold a drag show in 2026?**

25      A.    So drag shows are a very central part of

Pl. App'x 695

1  queer culture.  They are a performance.  They are

2  art.  Spectrum wants to be able to uplift --

3  uplift artist and their voices.  Spectrum, as a --

4  as an organization, we are to provide a space for

5  queer voices and both queer and nonqueer people to

6  exist in a -- in a way that is fair, in a way that

7  they can be themselves without any restrictions.

8         Once again, as I said before, drag

9  shows are art.  A lot of people in Spectrum are

10  artists, including myself, and we would like to be

11  able to have this and host this.

12         We would also, in the future, like to

13  have charity drag shows again so we can raise

14  money for causes that we think are important and

15  to help other queer people that need funding so

16  that they can make it through the world,

17  especially in the current political climate.

18  **Q.  Does Spectrum intend to convey any**

19  **particular message through its proposed drag show**

20  **in April of 2026?**

21  A.  So art is subjective.  Every single

22  performer is a separate artist -- a separate

23  artist.  Each of the performances could mean

24  different things to them.  Spectrum isn't to say

25  what those things mean, because, once again, art

Pl. App'x 696

1    Q.    And is Spectrum going to make decisions
2    as to who can perform at that drag show based on
3    the message that the particular performer intends
4    to express at the drag show?
5    A.    So these -- this approval process would
6    be considered an audition.  So we are just trying
7    to select performers that we think are -- first of
8    all, we have limited time.  We have limited slots,
9    so we can't let everyone in.  So we want to try to
10   let in -- of course, we want to be able to have
11   everyone in, but as I said, we have limited time.
12            So with this approval process, first
13   of all, we are making sure that, for one, their
14   content is appropriate; it's not inappropriate in
15   any way, which that's just with anything.  And
16   then if we do have concerns, we are to talk to
17   said student about their performance and either
18   how we can try to fix that, or we can just say,
19   "Hey, we can't have you."
20            And also just making sure that we
21   have people that are passionate and want to be a
22   part of the show in order to just -- "I just want
23   to do it for fun for no reason."  Because we have
24   to plan these things.  We have to -- we have to
25   get the music situated.  We have to figure out

1  timing for everything.

2          This is -- like, it's -- it's a

3  performance.  So you can't just let people go on

4  just like any other performance.  You have to kind

5  of have some sort of order.

6      Q.    How will Spectrum determine whether it

7  considers a performer's proposed performance to be

8  appropriate or not?

9      A.    Very simple.  Does the music have

10  profanity?  Is their costume at all revealing at

11  all, in an insane degree?  Are they to be doing

12  any performing -- like, any profane actions during

13  said performance?  And if they're not doing any of

14  that, then, by all means, come perform.

15      Q.    And could you explain what you mean by

16  revealing to, quote, "an insane degree," end

17  quote?

18      A.    So obviously, some costumes, you may

19  show, you know, legs.  You may show your belly.

20  But obviously, we don't want to see their groin.

21  We don't want to see chest on people with said

22  chest or even without said chest.  And we don't

23  want it to be sexual.  So obviously, we just want

24  to be sure that those -- that it's appropriate.

25      Q.    Okay.  And you also said that you don't

Pl. App'x 698

1  hope not.  I would hope that people are nice and

2  kind, but sometimes people aren't.  So of course,

3  that could be a possibility.

4      Q.   Spectrum held a drag show off campus in

5  2023, although I understand you didn't attend it.

6           Did Spectrum have an option of

7  holding a drag show in 2026 off campus, had it

8  wished to do so?

9      A.   We would like to avoid holding it off

10  campus for accessibility.  We would like to have

11  as many of the members of the WT community to be

12  able to attend it as possible.  A lot of us, it's

13  hard for us to commute off campus.  It's -- so

14  it's just -- it's so much easier if we can do it

15  here and also just bring the entire community

16  together.

17           Because we -- we're a club at WT.  We

18  want to do things on campus.  We're not off

19  campus.  If we were a club off campus, then we

20  would do it off campus.  But we are a club on

21  campus.  So we want to be able to utilize that --

22  our facilities that we pay to use and have a right

23  to use as much as we can.

24      Q.   I think you just did -- as I understand

25  it, have just expressed why you don't believe that

Pl. App'x 699

1  an off-campus drag show is the best option for

2  Spectrum.

3            Is it, nevertheless, an option if

4  Spectrum wishes to do -- to use it -- to hold a

5  drag show off campus?

6      A.   If it would have been an option, we would

7  have been having drag shows off campus.  But

8  it's -- it's just not very easy to plan something

9  off campus because of funding, commuting.  It's so

10 much easier if we can do it on campus and utilize

11 the facilities that we pay for as much as we can.

12     Q.   Okay.  But it was an option for Spectrum

13 in 2023, right?

14     A.   Yes.

15     Q.   Is it an option in 2026?

16     A.   Yes, but we would not like to.

17     Q.   Is there -- are there any facilities in

18 Canyon that would be possible venues for a drag

19 show in 2026?

20            MR. MORRIS:  Objection; calls for

21      speculation.

22     A.   I mean --

23 BY MR. BRYANT:

24     Q.   Off campus.

25     A.   I mean, possibly.  But, once again, we do

Pl. App'x 700

1    attended drag shows in the past?

2        A.    I went to my very first one last weekend.

3        Q.    **Where did you go?**

4        A.    I went to the 806.

5        Q.    **Could you describe the 806?**

6        A.    The 806 is a coffee bar downtown.

7        Q.    **Downtown in what city?**

8        A.    Amarillo.  And it's -- it's a more adult

9    space, I'd say.  And that's where I went with some

10   friends.

11       Q.    **Okay.  Did you see a drag show?**

12       A.    I did.

13       Q.    **And when you say it was a -- that the 806**

14   **is "a more adult space," what do you mean?**

15       A.    They have a lot of nude art around.  They

16   serve alcohol.  It's very much a place I go with

17   my adult friends to hang out.

18       Q.    **It may be unfair to ask you this**

19   **question.  If so, please let me know, since you**

20   **have only been to the drag show that you**

21   **described.**

22             **What do you regard as the essential**

23   **features of a drag show?**

24       A.    So while I've only been to one drag show,

25   I am familiar with the art of drag.  So essential

1   features include putting together costumes,

2   possibly makeup, lip-synching to various music,

3   and having different choreography, possibly props.

4   It's very much a stage performance.

5       Q.   It's very much a what?

6       A.   A stage performance.

7       Q.   Are there any other essential elements of

8   a drag show that you can think of?

9       A.   Nope.  Drag is super broad.

10      Q.   Do you understand that Spectrum can

11  cancel or drop its current application for a 2026

12  drag show at some later date, if it wants to?

13      A.   Yes.

14      Q.   Did Spectrum's lawyers review its

15  application to reserve space in Legacy Hall for a

16  2026 drag show before the application was filed?

17          MR. MORRIS:  Objection.  I'll

18       instruct the witness not to answer,

19       because the only way he can answer that is

20       by revealing attorney/client

21       communications.

22      A.   I would not like to answer that.

23  BY MR. BRYANT:

24      Q.   It's a "yes" or "no" question.

25      A.   I would not like to answer that question.

Pl. App'x 702

1    A.    I -- with this list, I only know a few of

2    the people on the list and to -- and they were all

3    students at the time.  I don't know for a fact if

4    all of these people were students or not.

5        **Q.    Okay.  Have you ever heard of somebody**

6    **named Michael Arredondo, who is also known as Myss**

7    **Myka?**

8        A.    I have heard of this person.  I do not

9    know this person.

10       **Q.    Is it your understanding that Myss Myka**

11   **is not a WT student?**

12       A.    Yes.

13       **Q.    And is it your understanding that Myss**

14   **Myka is a Amarillo-based drag performer?**

15       A.    Yes.

16       **Q.    Under the heading of "Don't Be a Drag,**

17   **Drag Show 2024," Myss Myka also appears, right?**

18       A.    Yes.

19       **Q.    In the proposed 2026 drag show that**

20   **Spectrum has applied for, I believe it is correct**

21   **that you indicated that all of the performers**

22   **would be current WT students; is that right?**

23       A.    Yes.

24       **Q.    And why did Spectrum decide to limit the**

25   **performers in the proposed 2026 drag show to**

1  current WT students?

2      A.   Because this is for WT.  This is for the

3  WT community and also Spectrum.  We are a WT-based

4  club.  So we want to try to make more space for

5  our members and other students that go here.

6      Q.   Did your decision to exclude nonstudent

7  performers have anything to do with this

8  litigation?

9      A.   No.

10     Q.   Did anybody in the discussion within

11 Spectrum question why performers like Myss Myka

12 are to be excluded from the proposed 2026 drag

13 show?

14     A.   No.

15     Q.   In response to Interrogatory Number 8 --

16 I'm sorry -- yeah, Interrogatory Number 8 on page

17 23, there is a reference to "PG-13."

18          Do you have any understanding of what

19 that term means or how it's defined?

20     A.   Yes.

21     Q.   Would you give me that?

22     A.   PG-13 is a rating by the American Film

23 Association that can -- that considers content as

24 needing parental guidance for those over the age

25 of 13.  This can be a multitude of reasons,

Pl. App'x 704

```
 1      A.   No.  I had not been to one, but I have

 2   watched "Drag Race."  I've seen them on TV, but I

 3   hadn't been to one in-person.

 4      Q.   You had -- before you actually attended a

 5   drag show, did you have views about drag shows or

 6   opinions about drag shows?

 7      A.   I mean, as a queer person, I think

 8   it's -- it's an important art form in our

 9   community.  It's a way that we use to express

10   ourselves as colorfully as we would like to.  It's

11   a way to have fun.

12           So obviously, yes, I did have views

13   beforehand.  Yes.

14      Q.   And so you're the same as Dr. Wendler in

15   the sense that you had views on drag shows before

16   you had attended one, and he has views on drag

17   shows, although he has not attended one.  Is that

18   fair?

19           MR. MORRIS:  Objection; calls for

20       speculation.

21      A.   I mean, possibly.  I don't know for sure,

22   though.

23           MR. BRYANT:  Okay.  I think we're

24       at noon.  Let's take a lunch break.

25           MR. MORRIS:  Works for me.
```

1     Q.    Okay.

2     A.    (Examined exhibit.)

3     Q.    On the fourth paragraph of this Fanelli

4  Exhibit 11, there is -- beginning of the fourth

5  paragraph, there is a phrase in quotes -- comma, a

6  quote, "Comedic performances of women by men in

7  exaggerated costumes and make-up," unquote.

8           Is that something that you do see in

9  drag shows or drag culture?

10    A.    I mean, possibly, but primarily, what is

11 seen in drag shows is just a celebration of one's

12 own gender and one's own presentation.  Sometimes

13 someone just wants to get on stage and just feel

14 pretty for a little bit, and that's okay.

15          Blackface is and always has been a

16 way to demean a race of people.  As I said before,

17 it is entirely possible that someone can go and

18 make fun of women and dress in a female costume.

19 That's just with anything.

20          But with drag, that is not the

21 intention.  It is a way to express one's gender

22 and one's presentation, not to make fun of a

23 specific group of people.

24          (Exhibit 12 marked.)

25 BY MR. BRYANT:

```
1   BY MR. MORRIS:
2       Q.   Can you turn to Exhibit 6.
3       A.   (Complied.)
4       Q.   Okay.  Do you see Article 2 -- this is --
5   again, this is the constitution of Spectrum as it
6   currently stands.
7            Do you see on the front page,
8   "Article II: Purpose," it says, "The primary
9   purpose of this organization is to provide a safe
10  space for LGBTQ+ students and allies to come
11  together"?
12           Do you see that?
13      A.   Yes.
14      Q.   Okay.
15           MR. BRYANT:  (Unintelligible.)
16           MR. MORRIS:  I'm aware of the
17      situation.  It has nothing to do with
18      that.
19  BY MR. MORRIS:
20      Q.   So would you agree -- can you explain
21  whether or not Dr. Wendler's refusal to allow
22  Spectrum to host a drag show on campus has
23  hindered Spectrum in being able to meet this
24  primary goal?
25      A.   Yes.  So drag shows in the past were a
```

Pl. App'x 707

 1  very large primary not only way for us to get out

 2  there as an organization and express that queer

 3  organization on campus and express this mission

 4  here, but also in order to have fundraising events

 5  and be a charitable organization towards causes

 6  that are important to us like The Trevor Project.

 7            And with that -- with that being

 8  gone, it has been exceedingly hard for us to be

 9  able to do that on campus.

10      **Q.   If you look at here, "The secondary goal**

11  **of Spectrum WT is to raise awareness of the**

12  **LGBTQIA+ community."**

13            **Can you explain whether or not**

14  **Dr. Wendler's decision to prohibit drag shows on**

15  **campus has hindered Spectrum from meeting that**

16  **goal?**

17      A.   Once again, banning drag shows bans that

18  very large event that we would have, that would

19  basically be a way for us to be, like, "Hey, this

20  is a queer organization.  This is what queer

21  culture looks like," and being able to share that

22  with the surrounding community and educate others

23  on who we are as people.  So that being gone

24  directly hinders that.

25      **Q.   Okay.  I think you touched on this, but**

1  it says, "Thirdly, our organization will strive to

2  take every opportunity to educate WT and the

3  greater community on issues concerning LGBTQIA+

4  life."

5          Can you explain whether or not

6  Dr. Wendler's decision to prohibit drag shows on

7  campus has hindered Spectrum's efforts as to that

8  third point?

9      A.   Once again, very, very large event,

10  especially when it comes to fundraising.  So I

11  know in the past, we've fundraised for The Trevor

12  Project, which is queer suicide prevention, which

13  is a very prevalent issue in our community.

14          And not having that event, to be able

15  to educate the public on that further, both queer

16  and nonqueer people, has been a big problem.

17      Q.   Okay.  I think you touched on this

18  earlier.  I'm just -- I want to clarify.

19          So can you explain, is there a

20  difference between the message that individual

21  performers at the planned 2026 drag show would

22  convey versus any message Spectrum might convey as

23  a whole from hosting the drag show?

24      A.   I'm sorry.  As a whole, obviously,

25  Spectrum would be expressing support for the queer

1    community.

2              If we're able to do fundraising in

3    the future, then, obviously, we would be able to

4    educate the public on whatever charitable

5    organization that we're working with.

6              From individuals, that could vary, of

7    course, because they may have one message they

8    would like to convey or a different message they

9    would like to convey.  And it could just be their

10   support for the queer community.  Or it could be

11   something more personal.

12       **Q.   You testified a little bit earlier about**

13   **you planning to MC the 2026 planned drag show, and**

14   **I think you testified you would ask questions of**

15   **the crowd; is that right?**

16       A.   No.

17       **Q.   Okay.  I stand corrected.  What would you**

18   **do as an MC?**

19       A.   As an MC, I would just introduce

20   performers, explain who they are, what are the

21   characters that they made up.

22              If we do in the future do any sort of

23   charitable donation with any sort of just

24   ticketing sales or just general donation, in

25   general, educating the crowd, "Hey, this is what

1   this organization is.  This is what it does.  This

2   is where you can find them and donate further."

3   And just kind of -- just keeping the crowd

4   engaged.

5   BY MR. MORRIS:

6       Q.   **Can you explain whether or not**

7   **communicating support for queer culture is an**

8   **essential element of the drag show?**

9       A.   I think it can be for sure.  If Spectrum

10  was to do one, that would be what our essential

11  goal would be.  There's different drag shows for

12  different reasons at different places at different

13  times.

14              For Spectrum personally, that would

15  be our primary goal.  But, of course, that can

16  vary between other performances.  And one

17  performance is not like the other -- not like any

18  other performance.

19      Q.   **You testified earlier, Spectrum has not**

20  **assigned a rating yet for its 2026 drag show**

21  **planned at Legacy Hall.**

22              **Can you explain, based on, you know,**

23  **your position as president of Spectrum, what you**

24  **would expect that rating to be?**

25              MR. BRYANT:  Objection; calls for

1          speculation.

2      A.    I would expect it to be somewhere between

3  PG, possibly PG-13 but would not allow or expect

4  it to exceed that.

5  BY MR. MORRIS:

6      Q.    **Last question for you -- well, two more**

7  **questions.**

8            **Is Spectrum's -- what is Spectrum's**

9  **understanding of Dr. Wendler's March 2023 letter**

10 **in terms of whether or not it bans drag shows on**

11 **campus?**

12     A.    So from Spectrum's understanding, it was

13 very much the consensus of they're banned off

14 campus entirely.  Whether or not that's legally

15 true, I don't know for sure, but that was

16 Spectrum's understanding.

17     Q.    **Does Spectrum have any reason to believe**

18 **that Dr. Wendler will not ban its upcoming -- its**

19 **planned drag show for Legacy Hall in April 2026?**

20     A.    We don't have any reason to believe that

21 he won't ban it, no.

22            MR. MORRIS:  No further questions.

23            And I also want to -- because of

24        the questions about Mr. Fanelli's medical

25        history, I do want to designate the

Pl. App'x 712

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

AMARILLO DIVISION

Civil Action Number 2:23-cv-00048


SPECTRUM WT, et al.,           )

     Plaintiffs,              )

vs.                            )

WALTER WENDLER, et al.,        )

     Defendants.              )


REMOTE VIDEOTAPED DEPOSITION

BARRETT BRIGHT

FRIDAY, DECEMBER 19, 2025


Reported by:

Rebecca Callow, RMR, CRR, RPR

Job No. BB121925

1

2              REMOTE VIDEOTAPED DEPOSITION OF

3    BARRETT BRIGHT, produced as a witness at the

4    instance of the Plaintiffs and duly sworn, was taken

5    in the above-styled and numbered cause on the

6    19th day of December, 2025, from 10:03 a.m. to

7    3:22 p.m., before Rebecca J. Callow, Texas CSR-8925,

8    Registered Merit Reporter, Certified Realtime

9    Reporter, Registered Professional Reporter and

10   Notary Public for the State of Florida, reported by

11   computerized stenotype machine via Zoom

12   videoconference pursuant to the Federal Rules of

13   Civil Procedure.

14

15

16

17

18

19

20

21

22

23

24

25

Barrett Bright - 12/19/2025

3

<pre>
 1                       APPEARANCES

 2

 3   FOR PLAINTIFFS:

 4        FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION

 5        501 Walnut Street

 6        Suite 900

 7        Philadelphia, Pennsylvania 19106

 8        (215) 717-3473

 9             By:  Mr. J.T. Morris

10                  jt.morris@fire.org

11                  Mr. Adam B. Steinbaugh

12

13   FOR DEFENDANTS:

14        OFFICE OF THE ATTORNEY GENERAL - STATE OF TEXAS

15        P.O. Box 12548 (MC-009)

16        Austin, Texas 78711

17        (512) 463-2120

18             By:  Ms. Alexia Baker

19                  alexia.baker@oag.texas.gov

20                  Mr. David Bryant

21

22   ALSO PRESENT:

23        Mr. Brian Christopher, Videographer

24        Mr. Marc Rietvelt, Texas A&M General Counsel

25
</pre>

Pl. App'x 715

Barrett Bright - 12/19/2025

4

```
 1                    INDEX

 2                                        PAGE

 3   BARRETT BRIGHT

 4   Examination by Ms. Baker .........................10

 5   Examination by Mr. Morris .....................156

 6   Further Examination by Ms. Baker ...............160

 7

 8

 9

10   Changes and corrections  .......................163

11   Signature Page  ................................164

12   Court Reporter's Certificate ...................165

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Pl. App'x 716

Barrett Bright - 12/19/2025

5

```
 1                     EXHIBITS

 2  NO.              DESCRIPTION                PAGE

 3  Exhibit 1        The Constitution of Spectrum    27

 4                   WT (Bates SPECTRUM 0002220

 5                   through SPECTRUM 0002226)

 6  Exhibit 2        Campus Organizations            32

 7                   Handbook (Bates SPECTRUM

 8                   0000565 through SPECTRUM

 9                   0000587)

10  Exhibit 3        The President's Bible (Bates    42

11                   SPECTRUM 0000348 through

12                   SPECTRUM 0000362)

13  Exhibit 4        3/24/2023 email: Spectrum WT    46

14                   to Noel Fitchett, Re: Media

15                   Inquiry (Bates SPECTRUM

16                   0001380 through SPECTRUM

17                   0001381)

18  Exhibit 5        JBK Event Request Form;         56

19                   2/26/2023 email chain, Re:

20                   Risk Assessment for: A

21                   Fool's Drag Show?on March

22                   31st (REDACTED) (Bates

23                   SPECTRUM 0000786 through

24                   SPECTRUM 0000791)

25
```

Pl. App'x 717

```
 1                    EXHIBITS (cont.)

 2   NO.             DESCRIPTION                    PAGE

 3   Exhibit 6       West Texas A&M University       65

 4                   Risk Management and

 5                   Insurance Matrix - A Fool's

 6                   Drag Race (Bates SPECTRUM

 7                   0000776 through SPECTRUM

 8                   0000777)

 9   Exhibit 7       3/21/2023 text message chain    73

10                   (Bates SPECTRUM 0000829)

11   Exhibit 8       3/14/2023 email:  Fouts to      79

12                   Bright, et al., Re: A Fool's

13                   Drag Race 03.31.2023 (Bates

14                   SPECTRUM 0000860)

15   Exhibit 9       A Fool's Drag Race flier        82

16                   mock-up (Bates SPECTRUM

17                   0001782)

18   Exhibit 10      A Fool's Drag Race mock-up      85

19                   (Bates Def_000843)

20   Exhibit 11      3/22/2023 text message          90

21                   thread: Drumheller (Bates

22                   SPECTRUM 0001261)

23

24

25
```

7

1                    EXHIBITS (cont.)

2   NO.              DESCRIPTION                     PAGE

3   Exhibit 12       WTAMU Spectrum Instagram         92

4                    screenshot: Help Fund

5                    Spectrum WT's Drag Show

6                    (Bates SPECTRUM 0001444

7                    through SPECTRUM 0001446)

8   Exhibit 13       3/28/2023 text message           92

9                    thread:  Drumheller (Bates

10                   SPECTRUM 0001533)

11  Exhibit 14       3/25/2023 text message           96

12                   thread: Chandler (Bates

13                   SPECTRUM 0001458)

14  Exhibit 15       Instagram screenshot:           103

15                   Spectrum WT official

16                   statement regarding

17                   cancellation of A Fool's

18                   Drag Show (Bates SPECTRUM

19                   0001183)

20  Exhibit 16       3/20/2026 email:  Wendler to    112

21                   CURRENT_STUDENT@LISTS.WTAMU.

22                   EDU, Re: A Harmless Drag

23                   Show? No Such Thing. (Bates

24                   Def_000053 through

25                   Def_000055)

Pl. App'x 719

```
 1                    EXHIBITS (cont.)

 2   NO.            DESCRIPTION                    PAGE

 3   Exhibit 17     3/20/2023 email thread:        121

 4                  Fouts to Bright, et al, Re:

 5                  Music list for A Fool's Drag

 6                  Race (Bates SPECTRUM 0000983

 7                  through SPECTRUM 0000988)

 8   Exhibit 18     West Texas A&M Jack B.         127

 9                  Kelley Student Center

10                  Procedures and Guidelines

11                  (Bates Def_000154 through

12                  Def_000172)

13   Exhibit 19     Screenshot:  West Texas A&M    131

14                  University website:  Mission

15                  Statement (Bates SPECTRUM

16                  0003824 through SPECTRUM

17                  0003826)

18   Exhibit 20     West Texas A&M University -    135

19                  Campus Directory (Bates

20                  Def_182036)

21   Exhibit 21     3/13/2024 text message         147

22                  thread: Myss Myka (Bates

23                  SPECTRUM 0002453SPECTRUM

24                  0002453

25
```

Barrett Bright - 12/19/2025

9

```
 1                    EXHIBITS (cont.)

 2   NO.              DESCRIPTION                    PAGE

 3   Exhibit 22       3/1/2024 text message           149

 4                    thread:  Acrylica (Bates

 5                    SPECTRUM 0002405)

 6   Exhibit 23       3/28/2024 text message          153

 7                    thread: Chandler (Bates

 8                    SPECTRUM 0002647)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Pl. App'x 721

```
 1                 P R O C E E D I N G S

 2                    - - - - - -

 3                   BARRETT BRIGHT,

 4          called as a witness herein, having

 5        been first duly sworn by a Notary Public,

 6         was examined and testified as follows:

 7                    EXAMINATION

 8     BY MS. BAKER:

 9     Q.    Where are you joining us from?

10     A.    I'm joining y'all from Madison, Wisconsin.

11     Q.    Okay.  Well, my name is Alexia Baker.  I

12  represent defendants Walter Wendler and Chris Thomas

13  in this litigation, and I'll be deposing you today.

14           So before I get into the questions, I'm

15  just going to go over some basic rules to ensure that

16  today's deposition flows as seamlessly as possible.

17           Do you understand that you are

18  testifying under oath today and that you're legally

19  obligated to tell the truth?

20     A.    I understand.

21     Q.    You must provide verbal responses to my

22  questions, so no head nodding or anything like that.

23  This is particularly important because we are on

24  Zoom.  Does that make sense?

25     A.    Yes.  I understand.
```

Pl. App'x 722

1   **Spectrum recruited new members?**

2     A.   It was mainly through new student

3   orientation.

4     **Q.   Where did Spectrum typically hold its**

5   **meetings?**

6     A.   We typically held our meetings in the

7   Classroom Center.

8     **Q.   Where is that on campus?**

9         **I don't have a map in front of me, but**

10   **how would you describe that?**

11     A.   I would describe the Classroom Center as

12   being near the Buffalo fountain, near the

13   central-ish part of campus and attached to the JBK.

14     **Q.   And you met as an organization on a weekly**

15   **basis.  Right?**

16     A.   That is correct.

17     **Q.   And why was it important to meet on a**

18   **weekly basis?**

19     A.   It allowed us to touch base with members,

20   propose and talk about upcoming events, and plan for

21   future fundraising possibilities.

22     **Q.   And in your view, what was Spectrum's**

23   **primary mission?**

24     A.   Spectrum's primary mission was to help and

25   support LGBTQ+ members and other students on campus,

Pl. App'x 723

1    as well as do outreach with the campus community.

2    **Q.    And with that outreach, you -- Spectrum**

3    **collaborated with a lot of other student**

4    **organizations.  Right?**

5    A.    That is correct.

6    **Q.    In what way would you collaborate with**

7    **other student organizations?**

8    A.    We would help cohost or support other

9    student org's events, as well as, like, split up

10   certain tasks for other events.  And, finally, we

11   would also table -- sort of.  It's not truly

12   tabling; it was more like we would table with items

13   that were free for said event.

14   **Q.    So if you -- if Spectrum collaborated with**

15   **another student organization for an event, would it**

16   **typically be the case that they would use their**

17   **social media accounts to promote Spectrum's events**

18   **and you-all might use your social media accounts to**

19   **promote that org's event?  Is that how that would**

20   **work?**

21   A.    Yes.

22   **Q.    And would you say collaborating with other**

23   **student organizations allowed Spectrum to reach**

24   **members of the campus community that might not**

25   **otherwise come to Spectrum events?**

1  promote acceptance on campus?

2      A.   That would be through our tabling events

3  for outreach, and through our collaboration with

4  other student organizations.

5      Q.   **And how did the organization understand the**

6  **term "acceptance" as it is used in this document to**

7  **mean?**

8      A.   More so in the sense of tolerance.  As in

9  people know that we exist and that we are here, and

10  that we were also students of West Texas A&M

11  University.

12      Q.   **And according to this provision, another**

13  **one of Spectrum's goals is to educate members of the**

14  **WT community about LGBTQ+ issues.  Correct?**

15      A.   That is correct.

16      Q.   **What are some platforms of how Spectrum WT**

17  **educated members of the WT community concerning**

18  **these issues?**

19      A.   We had a National Coming Out Day panel that

20  we were part of that helped show light to LGBTQ+

21  issues on campus, as well as the queer history

22  nights that we hosted.

23      Q.   **Would you say that there are resources and**

24  **support for members of the LGBTQ+ community at WT?**

25      A.   Yes.

Pl. App'x 725

1    **was sufficiently accepting such that you would be**

2    **willing to work with them?**

3        A.    That would be either they are already an

4    LGBTQ+ support group, like PASO, or like the Trevor

5    Project; or in the case of the Ukrainian Bakery

6    service project.  The president at that time,

7    London Hughes, contacted her at that time and

8    confirmed with her that she was accepting of LGBTQ+

9    community people.

10       **Q.    So sometimes you could determine whether**

11   **that organization was accepting by just simply**

12   **asking them.  Right?**

13       A.    That is correct.

14       **Q.    And you would look at the kinds of**

15   **activities that they were involved with.  Right?**

16       A.    That is correct.

17            MS. BAKER:  I'm going to

18       introduce as Exhibit 2, a document called

19       SPECTRUM 565, is the WT Campus

20       Organizations Handbook.

21            (Deposition Exhibit 2

22            marked for identification.)

23       BY MS. BAKER:

24       **Q.    So, Bear, while you were president,**

25   **Spectrum was a registered student organization.  Is**

Pl. App'x 726

1    that correct?

2        A.    That is correct.

3        Q.    **And what does it mean to be a registered**

4    **student organization?**

5        A.    As a registered student organization, the

6    student org will have access to WT campus venues to

7    host events, as well as apply for their support

8    programs to student orgs.

9        Q.    **Are you familiar with this handbook?**

10       A.    I am familiar of it.

11       Q.    **So you don't recall reading its provisions?**

12       A.    I don't remember what are in the

13   provisions.

14       Q.    **To your knowledge, is this a legal**

15   **document?**

16                   MR. MORRIS:  Objection.  Calls

17       for a legal conclusion.

18       BY MS. BAKER:

19       Q.    **Is this something that was available to**

20   **students?**

21       A.    That is correct.

22       Q.    **So I want to draw your attention to the**

23   **section entitled "Privileges."**

24                   **The second bullet under that section**

25   **says:  "Access to Campus Organization Funds,"**

1    Q.    And is the individual identified on this

2    page the person whom you followed as president?  Did

3    you take leadership from this individual?

4    A.    Yes.  I took leadership from London Hughes

5    before I became president.

6    Q.    So I'm going to keep scrolling down here to

7    the table of contents.  And it appears to me that

8    this page lists out some events that Spectrum has

9    historically had.  Is that correct?

10   A.    As far as I know, yes.

11   Q.    Were any of those events on -- let me

12   rephrase.

13        Did Spectrum host any of the events

14   under this list called "The Gay Calendar"?

15   A.    Are you referring to my -- under my time as

16   leadership?

17   Q.    Yes.

18   A.    Yes.

19   Q.    Which events?

20   A.    We did the National Coming Out Day.  We

21   helped with PASO Turnabout.  We have done bake

22   sales.  And it wasn't under my leadership.  It was

23   when I was under London's leadership.  We also did a

24   Halloween party, a Holi"gay" Party and The Gay Prom.

25   Q.    The PASO Turnabout, what is that?

1    A.   Not about that event, I do not believe.

2              MS. BAKER:   I'm going to stop

3    sharing.

4    BY MS. BAKER:

5    **Q.   Spectrum started planning its 2023 drag**

6    **show in 2022.   Right?**

7    A.   That's correct.

8    **Q.   Who came up with the idea?**

9    A.   That would be me.   I came up with the idea.

10   **Q.   And why was it important in your mind that**

11   **the event would be a drag show?**

12   A.   I believed it would be important, because

13   drag shows are, like, inherently a part of LGBTQ+,

14   like, culture.   And it would be a great way for

15   showing LGBTQ+ support on campus by hosting the

16   student drag show, as well as raising money for a

17   charity project, which is what our members wanted to

18   see a little bit more of.

19   **Q.   You just mentioned that drag shows are**

20   **inherently a part of LGBTQ+ culture.   What do you**

21   **mean by that?**

22   A.   That as far as I was raised and informed of

23   LGBTQ+ and gay culture before I realized I was gay

24   and I immersed myself inside the culture, it was --

25   it, kind of, started with Marsha P. Johnson and,

1        Mischaracterizes prior testimony.

2        A.    I believe that drag is a very important

3   part of LGBTQ+ culture.

4               I'm not sure about what the greater

5   community thinks about it being separated from

6   LGBTQ+ culture.

7        BY MS. BAKER:

8        **Q.    Concerning the 2023 drag show and in**

9   **planning it, what was the message of the show?**

10       A.    The message of the show was -- well, it

11  depends on each of the performers' own personal

12  message, because they are performing on stage and

13  they all have their own ideas of what they want to

14  say.

15              But the overall purpose of the show

16  was to show support for the LGBTQ+ students on

17  campus and to raise funds for The Trevor Project.

18       **Q.    So there was a message that the individual**

19  **performers are trying to convey.  Correct?**

20       A.    Yes.  That's correct.

21       **Q.    And there's also -- are you saying there's**

22  **also a collective message as well?**

23       A.    I would say that the collective message of

24  the drag show was to -- like I said, to show support

25  for the LGBTQ+ community and as a way to, like, mess

Pl. App'x 730

1  with and bend gender norms, as well as raise money

2  for The Trevor Project.

3  **Q.   So if the message is determined by what the**

4  **performer is trying to convey, how does the audience**

5  **know what's in the performer's mind?  What --**

6           MR. MORRIS:  Objection.  Calls

7      for speculation.

8           I'm sorry, Ms. Baker.  Finish

9      your question.

10          MS. BAKER:  Let me rephrase.

11     BY MS. BAKER:

12     **Q.   Have you ever been to a drag show?**

13     A.   Yes, I have.

14     **Q.   And it's your view that those individual**

15     **performers have a unique message that they're trying**

16     **to convey.  Is that correct?**

17     A.   Yes.

18     **Q.   How do you, as a member of the audience**

19     **viewing a drag performer, know what message they are**

20     **trying to convey?**

21     A.   That's kind of hard to answer.  It's kind

22     of like saying you're looking at an art piece and

23     you're saying what did the artist intend with this.

24     And sometimes it's hard to tell.  I know that --

25     **Q.   So just --**

Pl. App'x 731

1    Q.   Were there any alternative venues

2    considered in the planning process?

3    A.   We also considered a -- the alumni banquet

4    hall room.  We were worried that it might be a bit

5    too small.  And that was also on campus.

6              And we also considered -- what's it

7    called? -- one of the spaces in the VHAC, the Virgil

8    Henson Activity Center.  I don't remember what it

9    was called at the Virgil Henson Activity Center.

10   Q.   And you worked -- you worked very closely

11   with Dr. Shawn Fouts during the reservation process.

12   Correct?

13   A.   I believe so.  Yes.

14   Q.   How would you describe the reservation

15   process?

16   A.   It starts with requesting the space and the

17   name of the event that you would like to use it for.

18   And then you would need to fill out a hazard matrix

19   and request in that -- or the -- what's it called?

20   It's been a bit.  I'm trying to remember the terms

21   of the documents.

22              The hazard matrix and the risk

23   request -- or not "request" -- the risk form.

24              And then once you've submitted that

25   and are -- or get tentative approval, you can start

Pl. App'x 732

1  marketing.  And then you would start sending in

2  posters and poster designs for approval, and cement

3  any other final documents, like the food request

4  form, the catering exemption form, and, I guess,

5  anything else required by the JBK before you get

6  full confirmation.

7  **Q.  And all the marketing materials have to**

8  **receive university approval.  Right?**

9  A.  Based on what the university requires, yes.

10  **Q.  So how does that work?  Spectrum creates a**

11  **document, a flier, and then what happens?**

12  A.  So specifically with the 2023 drag show, we

13  were working with a bunch of other orgs, and another

14  org was handling the marketing side.  So they

15  forwarded their poster ideas to us and we forwarded

16  it to the JBK.

17  And then the JBK went through those

18  documents, the posters, and then they said that some

19  of these documents are -- some of these posters have

20  kind of risky looking, like, injury-prone type of

21  activities, like doing the splits, and that we

22  weren't allowed to have those type of images on our

23  poster, and sent them back to us.  And we started

24  the review/rework process.

25  **Q.  What is the review/rework process?**

1    A.   Well, we sent it back to the RJ

2   organization who was in charge of marketing, and we

3   said, hey, this is what we weren't allowed to have

4   on there and we needed these certain requirements --

5   I can't remember the name of the requirements.

6              I know one of them was all the student

7   orgs had to have their logo on the poster and so RJ

8   started working on reworking the posters.  That way,

9   they fit the requirements set by the JBK.

10    **Q.   You mentioned a flier that was not approved**

11   **by the JBK, and you said it had someone doing splits**

12   **on it.  Correct?**

13    A.   That is correct.

14    **Q.   Why was that flier rejected?**

15    A.   Because it promoted the idea of doing a

16   risky action, such as doing the splits.  And that

17   that wasn't allowed, from what I remember.

18              MS. BAKER:  I'm going to

19         introduce Exhibit 5 as a document marked

20         SPECTRUM 786, and it is an event request

21         form.

22              (Deposition Exhibit 5

23               marked for identification.)

24    BY MS. BAKER:

25    **Q.   Do you recognize the fields in this form?**

Pl. App'x 734

1    A.    Are you referring to the -- is it the

2  questionnaire, answer, response things?

3    **Q.    Yes.  Yes.**

4    A.    Yes.  I do recognize those.

5    **Q.    And at what -- at which point in the**

6  **process would you have completed this?  At the very**

7  **beginning or toward the end?**

8    A.    This would be near the beginning with the

9  risk form.

10    **Q.    So here under the estimated attendance, you**

11  **indicated that you expected up to 100 or even more**

12  **attendees.  Correct?**

13    A.    That is correct.

14    **Q.    Had Spectrum ever had an event with that**

15  **many people?**

16    A.    Not in the past, as far as I remember.

17    **Q.    So why so -- why so many -- why did you**

18  **expect so many people to be there?**

19    A.    We were overestimating the amount of

20  people, just in case.

21          But we were also promoting it to,

22  like, family members of performers and the greater

23  LGBTQ+ population outside of WT.

24    **Q.    And this form also says "All ages are**

25  **welcome, 18 and under with a guardian."  Correct?**

1    A.    Yes.

2    Q.    **So only minors with a parent or guardian**

3    **present could attend.  Right?**

4    A.    That is correct.

5    Q.    **And part of this form indicates that there**

6    **were event or activity waivers.  Correct?**

7    A.    Yes.  That would be correct.

8    Q.    **And what were these waivers?**

9    A.    They would have been a waiver release form

10   in case -- if you got injured while performing.

11   Q.    **And who created those forms?**

12   A.    We never finished those forms.  The event

13   got canceled before we could print them out.

14   Q.    **But you --**

15   A.    I believe you were going -- oh, sorry.

16   Q.    **I was just going to ask whether Spectrum**

17   **would have created those forms.**

18   A.    We had asked Drumheller what we needed to

19   do about that.  And Drumheller, I believe, directed

20   us to -- oh, my gosh.  I can't remember.

21        It was some type of site, and we would

22   have either typed them up ourselves for the purpose

23   of risk release, or it was -- we would ask the JBK

24   what type of risk release.  I can't remember which

25   one it was, though.

Pl. App'x 736

 1    not sure if we've mentioned it yet.

 2              We were also checking student IDs at

 3    the door, besides just, like, regular legal IDs.

 4    And I know that the student org at Spectrum talked

 5    with Drumheller about allowing university students

 6    with -- access with their student ID.  But I'm not

 7    sure if that has been brought up on any of the

 8    documents.

 9        **Q.   So you're saying that all the student**

10    **needed was their student ID to get in?  Is that a**

11    **what you're explaining?**

12        A.   Yes.

13              And then if you were a nonstudent, you

14    would have needed your legal guardian with you if

15    you were a minor.

16        **Q.   So if you were a student, you didn't need**

17    **to be accompanied by a parent or guardian.  Right?**

18        A.   That is correct, if you had your WT student

19    ID.

20        **Q.   Why did -- why did Spectrum create -- why**

21    **did Spectrum decide to limit the event -- why did**

22    **Spectrum decide to require minors to attend with**

23    **parents or guardian?**

24        A.   That would be within the realm of, like,

25    context.

1          At that time, there was a lot of
2   outrage nationwide -- or not really outrage.  There
3   was a lot of news coverage nationwide about drag
4   shows.  And -- as such, and we were worried that we
5   would cause either a large protest or cancellation
6   if we didn't set requirements that restricted minors
7   from attending the event.
8       Q.   So Spectrum -- was Spectrum instructed to
9   do that by -- hold on.
10              (Pause in proceedings.)
11      BY MS. BAKER:
12      Q.   Was Spectrum instructed to do that by
13  administrators, or did it make that decision on its
14  own?
15      A.   We -- it made that decision on its own to
16  be extra cautious.
17      Q.   Now, this form also says that you
18  identified the event or activity as posing a risk of
19  impairment, humiliation, coercion, physical assault,
20  et cetera.  Right?
21      A.   Yes, initially.  And then the JBK informed
22  us that it wasn't -- it didn't -- it wasn't in that
23  realm of risk.
24      Q.   Why did you say "yes"?
25      A.   Once again, we were being extra cautious

Pl. App'x 738

1  because -- we were worried, being in a fairly

2  conservative area, about, like, protests and angry

3  people trying to shut down the event; a much bigger

4  risk than we thought was actually there.

5      Q.    So you were concerned about the risk to the

6  performers.  Correct?

7      A.    Yes.

8      Q.    And you were concerned that the performers

9  may feel embarrassed or harassed from other students

10  after the event.  Correct?

11     A.    Yes.

12     Q.    Did you ever consider whether attendees or

13  other students would feel embarrassed or harassed by

14  the event?

15     A.    No.

16     Q.    I'm going to -- here at the top of the

17  page, it says -- there's a question asking whether

18  minors are specifically invited to attend the

19  activity.  What does "specifically invited" mean?

20     A.    I interpreted that as if we reached out to

21  them and they wanted to come.

22            Like my siblings.  I reached out to

23  them and asked if they wanted to come, and they said

24  yes.  And so that was my personal belief of that's

25  what it was asking.  I'm not too sure if it was

Pl. App'x 739

1    referring to something else.

2    **Q.   Are you aware of any other events that have**

3    **happened in Legacy Hall that were limited to**

4    **individuals 18 and above?**

5    A.   I do not know the name of the events.

6              I do know that there have been events

7    where alcohol has been served in Legacy Hall, and

8    those were restricted to 18 and up.

9    **Q.   Would you agree, in your dealings with**

10   **Dr. Shawn Fouts during the reservation process, that**

11   **he was concerned about risk that the drag show may**

12   **pose to minors during that process?**

13   A.   He did not inform me of risk imposed to

14   minors during that time.

15   **Q.   I am going to scroll up in this document**

16   **marked SPECTRUM 788.**

17              **Have you ever seen this email**

18   **communication at all?**

19   A.   I believe I have seen this.

20   **Q.   And this is from Dr. Shawn Fouts.  Correct?**

21   A.   Yes.

22   **Q.   And here, he's asking whether participants**

23   **need to get prior approval for their dress and**

24   **performance before the event.  Correct?**

25   A.   Yes.  That is what he is asking.

1    Q.    Who were those people?

2    A.    You had -- we had drag queens from the

3    local Amarillo area, like -- oh, my gosh.  What's

4    their name?  Van Buren -- Valentine Van Buren.  And

5    I can't remember who we asked to be the other judge.

6    Q.    So you asked local drag queens to be judges

7    for the on-campus show.  Correct?

8    A.    That is correct.

9    Q.    Why?

10    A.    Who better to judge a drag race than drag

11    queens themselves.

12    Q.    Did you define any criteria that they would

13    use in judging student participants?

14    A.    We were going to have a planned list

15    dealing with makeup, character creation, like,

16    design of their clothes.  And then it was floated to

17    have, like, a questionnaire to ask -- for all the

18    performers to answer in character.

19    Q.    Can you discuss that questionnaire?

20    A.    It would have been along the lines of like

21    a beauty pageant style of the questions.  Like, what

22    do you plan to do in the future, this, that,

23    et cetera.

24    Q.    And would the judges select a winner?

25    A.    That is correct.

Pl. App'x 741

1    Q.    Would there be one winner?

2    A.    I believe so.  That was the initial plan.

3    Q.    And would each of the judges have a vote?

4          How would they go about selecting the

5  winner?

6    A.    We hadn't decided on that just yet.

7          I believe we were going to leave it up

8  to the judges.

9    Q.    And can you describe those categories that

10  the judges were going to consider again?

11    A.    It was going to be the performance, like

12  makeup, clothing design, and, like, how well they

13  created the character they're performing as.

14    Q.    And can you explain what you mean when you

15  say "the character they're performing as"?

16    A.    Sure.  Some performances will have, like, a

17  character who is like, quote, unquote, crazy

18  obsessed type of personality.  And so showing that

19  obsession in the performance would be part of, like,

20  that character creation.

21          Other performances are more about,

22  like, elegance.  And so showing off, like, elegance

23  in the performance would be part of the character

24  creation.

25          So you'd -- during the questions,

Pl. App'x 742

1   asking when you're asking in character -- or

2   responding in character.  There would be, like,

3   moments where, does this person respond in the way

4   that they're presenting their character to be?

5       **Q.   So the performer -- the performer decides**

6   **who their character is, and then the judges evaluate**

7   **whether that performer is sufficiently embodying**

8   **that character.  Right?**

9       A.   Um-hmm -- yes.

10      **Q.   So what kinds of characters have you seen?**

11      A.   Like I mentioned, there was the crazy

12  obsessed.  The, like, super-elegant, almost like

13  royalty style of drag queen.  I've seen, like, goth

14  punk style of characters, and I've also seen like

15  raunchy comedic characters.

16              MS. BAKER:  Let's go off the

17      record for a moment.  I'm having

18      notification issues here.  I don't want it

19      to disrupt me from being able to hear.

20              (Pause in proceedings.)

21              MS. BAKER:  I'm going to

22      introduce Exhibit 7, marked SPECTRUM 829.

23              (Deposition Exhibit 7

24              marked for identification.)

25      BY MS. BAKER:

1      BY MS. BAKER:

2      **Q.    Do you remember any other individuals**

3  **purchasing a table?**

4      A.    I do not remember.

5      **Q.    So I'd like to discuss President Wendler's**

6  **decision in 2023 to not -- to prohibit the 2023 drag**

7  **show from going forward in Legacy Hall.**

8              **After President Wendler's decision, did**

9  **he speak to you personally?**

10     A.    No, he did not.

11     **Q.    Did you speak with any WT staff or**

12 **administrators concerning the decision?**

13     A.    I remember speaking to -- I believe it was

14 the vice chancellor of student affairs where he

15 informed me of the cancellation decision.

16     **Q.    Was that Chris Thomas who you spoke with?**

17     A.    Yes.

18     **Q.    And do you remember what Chris Thomas said**

19 **during that conversation?**

20     A.    This was before the email went out.

21              But he informed me that Dr. Wendler

22 was canceling the drag show.  And when I asked him

23 why, he said that Dr. Wendler believes that the drag

24 show is degrading towards women and that's why he

25 canceled it.

1   would practice with our music and, if we could,

2   walking in heels to get better if we had heels to

3   wear.  And then Chip offered for them to come watch

4   one of our practices and help give pointers.

5        **Q.   So during these practices, each performer**

6   **was prepping for his or her individual routine.   Is**

7   **that correct?**

8        A.   That is correct.

9        **Q.   So did you have to review all of the**

10  **performances before they were set to go before the**

11  **audiences?**

12       A.   All of the ones that were the student

13  performers.  Yes.

14       **Q.   So you preapproved the student performers.**

15  **Correct?**

16       A.   Yes.

17       **Q.   But you did not preapprove the nonstudent**

18  **performers.**

19       A.   At the Sam Houston show, that is correct.

20       **Q.   Why?**

21       A.   It was a, like, one-week turnaround is what

22  it felt like.  We were all running on fumes along

23  with our classes, and we were accepting help

24  wherever we could get it.  And so we had a few spots

25  we needed to fill in to make the show longer, and so

 1   5 percent.  Let me charge it real quick -- or plug

 2   it in.

 3                   (Pause in proceedings.)

 4       BY MS. BAKER:

 5       Q.    Have you had a chance to review this?

 6       A.    Yes, I have.

 7       Q.    And you said you recognize this?

 8       A.    Yes, I do.

 9       Q.    Do you recall whether this was posted on

10   Spectrum's Instagram page?

11       A.    I believe it was.  Kay was in charge of

12   that.

13       Q.    And it would reflect Spectrum's official

14   position on the controversy surrounding the drag

15   show.  Right?

16       A.    Yes.  I believe so.  Yes.

17       Q.    The third sentence in this paragraph says:

18   "Drag is a celebration of many things; queerness

19   gender, acceptance, love, and especially

20   femininity."

21       A.    Yes.

22       Q.    Do you agree with that statement?

23       A.    Yes, I do.

24       Q.    What, in your view, makes drag a

25   celebration of gender?

1    A.    So in my view, drag is about, like,

2   breaking gender norms and what we perceive as, like,

3   masculine and feminine, and everything in between.

4              And so the idea is that when you are

5   breaking these gender roles and showing that, like,

6   society, you can see that there is much more beyond

7   just being man or female or in between.  The --

8   we're all just people, if that makes sense.

9    **Q.    So is it your view that drag challenges the**

10  **idea that gender is fixed?**

11   A.    Yes.

12   **Q.    And drag, in your view, suggests or allows**

13  **people to express the idea that gender is fluid.  Do**

14  **you agree with that?**

15   A.    Yes.  I do agree with that.

16   **Q.    The line immediately -- well, before I move**

17  **on to that.**

18              **Do you agree that drag is a celebration**

19  **of femininity?**

20   A.    I believe it can be, yes.

21   **Q.    Why do you say it can be?**

22   A.    Well, because not every person who is in

23  drag is a drag queen.  We -- there's also the

24  inverse, where you have female performers as drag

25  kings or nonbinary performers as drag royalty.  So

1   it's not -- it's not always specifically femininity;

2   it's just the baseline case of what you expect drag

3   to be is a celebration of femininity.

4       **Q.   When fraternities dress up as women for**

5   **pageants, is that -- would that be considered drag?**

6       A.   I would say it can be.  It really depends.

7       **Q.   The line immediately above that says:**

8   **"Drag is not a mockery.  It is a celebration."**

9               **In your view, are there any times when**

10  **drag could be used as a mockery?**

11              MR. MORRIS:  Objection.  Asked

12      and answered.

13      A.   I'm sorry.  What was that?

14      BY MS. BAKER:

15      **Q.   My question to you is, do you believe there**

16  **are instances in which drag could be used to mock**

17  **others?**

18              MR. MORRIS:  Same objection.

19      A.   I do believe there are instances where drag

20  can be used to mock others.

21      BY MS. BAKER:

22      **Q.   What's an example?**

23      A.   A drag queen dressing up as Donald Trump.

24      **Q.   And what would make that a mockery?**

25      A.   In the sense that when they dress up as

1    Donald Trump and start impersonating his ideas for

2    comedic relief.

3        Q.   Isn't parody part of drag?

4        A.   Yes.  Parody is part of drag.

5        Q.   Would you say that reasonable people can

6    disagree as to whether drag mocks others?

7        A.   I would say it depends on the context of

8    the show or the performance itself.

9        Q.   In what way?

10       A.   There can be performances that are more

11   along the lines of the -- like being elegant and

12   boisterous and in that sense.  And then there are

13   ones that are Elsa singing along to Frozen, but she

14   has bowel issues.  And that's making fun of both the

15   song "Let It Go" and Frozen, while still being

16   considered drag.

17       Q.   So you talked about this earlier, and I

18   want to clarify.  Drag -- in your understanding, the

19   message of drag depends on what the performer is

20   trying to convey.  Is that accurate?

21       A.   Yes.

22       Q.   So would you agree that there is really no

23   inherent message to drag; it's just whatever the

24   performer wants?

25       A.   No.

Pl. App'x 749

1          I would say there is still the

2    inherent message of it being, like, gender-bending

3    and breaking the gender norms in that same sense,

4    while also being able to convey the performer's own

5    personal message.

6         **Q.   Is it still gender-bending if it is a**

7    **biological or cisgender woman or man dressed up as a**

8    **woman or a man --**

9         A.   -- as their --

10        **Q.   -- is that still gender-bending?**

11             MR. MORRIS:  Objection --

12        A.   -- as their drag counterpart?

13             THE STENOGRAPHER:  Excuse me.  We

14   had a little crosstalk.

15             Mr. Morris, go ahead with your

16   objection, and I'm going to have the

17   witness answer.

18             MR. MORRIS:  Yes, ma'am.

19             Objection.  Vague and compound.

20        A.   I -- yes.  I do believe it is still either

21   playing into or breaking the stereotypical gender

22   norms.

23        BY MS. BAKER:

24        **Q.   How so?**

25        A.   You could have a straight man performing as

Barrett Bright - 12/19/2025

109

1  a drag king.  But instead of it being him as him on

2  stage, he creates a character that personifies what

3  is stereotypically considered male.  He will either

4  be, like, suave and, like, masc- -- extra masculine

5  to the point, or it could bend to the point where

6  it's still male but he has a lot more feminine,

7  like, design attribute character parts, if that

8  makes sense.  Like, wearing earrings, heavily made

9  up both for the super-masculine and the feminine

10  masculine.

11      **Q.   So would it be fair to compare a drag show**

12  **to something like a pageant?**

13      A.   Some drag shows are very pageant-like; some

14  are just a string of performances.

15      **Q.   Are you aware that -- strike that.**

16          **Some have compared drag to blackface.**

17  **Do you think that's a fair comparison?**

18      A.   I do not think that is a fair comparison.

19      **Q.   Why not?**

20      A.   One, which is the blackface compares -- you

21  typically have, from what I know, white men putting

22  on super-inflated stereotypical features, and then

23  playing it out as a mockery of the black race, while

24  I believe that drag is more focused on the what's

25  kind of wrong with society in a sense, at least from

Pl. App'x 751

1  dances, if that makes sense, that might not be

2  acceptable for the PG-13 rating.  And so we were

3  looking -- making sure that we didn't have, like,

4  those types of things.

5      Q.   So it was more of just -- was it you and

6  someone else making this -- making these judgment

7  calls, or was it only you?

8      A.   It was me and a few others that I

9  consulted.

10          And PG-13 was more of a guideline, if

11 that makes sense.

12     Q.   Explain what you mean by "guideline."

13     A.   In the sense that it's kind of hard to

14 define what stands as PG-13.  We were going off of,

15 like, what you would expect for a PG-13-ish movie,

16 but we were trying to keep it where there would be

17 no explicit sex style of scenes or anything like

18 that.  There was going to be no cuss words; it was

19 just going to be dancing and lip syncing in drag to

20 the music.

21     Q.   Were there ever any disagreements among you

22 and the other individuals who helped you make these

23 decisions about whether a performance was kind of on

24 the line and maybe not going to be appropriate?

25     A.   I can't remember exactly.

Pl. App'x 752

1    Q.    What do you mean by your "run-through"?

2    A.    We would have a run-through with just as --

3    without, like, all of the stuff on as a dry run.

4    And then we'd do another run-through with everyone

5    in makeup and costume or dress and stuff.  Run

6    through it with the music and the heels and make

7    sure everything's going good, and then we'll put on

8    the show after that run-through with people coming

9    in after the second one was done.

10    Q.    And to your remembrance, were there -- and

11    in addition to the student groups, were there also

12    drag performers that were going to be involved in

13    this show?

14    A.    I don't remember.  I can't -- I can't

15    recall.

16            I know the names we received were

17    from -- at least from AC were from AC's LGBTQ+

18    group.

19    Q.    But Spectrum at that point did have some WT

20    students who were signed up to be performers.

21    Correct?

22    A.    Yes.  That is correct.

23    Q.    Do you recall whether some of the

24    professional drag performers were helping or

25    assisting or providing lessons to student

1    Q.    Okay.  During the time you were planning

2  the drag show as Legacy Hall, did any JBK center

3  staff raise concerns about students feeling

4  embarrassed or harassed by the drag show?

5    A.    No, they did not.

6    Q.    Can you explain, did Spectrum reach out to

7  any minors to attend the show, other than siblings

8  or family members?

9    A.    No, we did not.

10    Q.    Okay.  Did JBK staff, or any other employee

11  of WT, ever raise concerns about the 2023 drag show

12  violating any university policy?

13    A.    They did not.

14    Q.    Okay.  What about for the 2024 drag show?

15    A.    They did not, as well.

16    Q.    If -- you testified earlier that you and

17  other members of the officer corps for Spectrum

18  reviewed performances before the planned show at

19  Legacy Hall.  Is that right?

20    A.    That is correct.

21    Q.    Okay.  If after reviewing the performance

22  it didn't meet Spectrum's understanding of what a

23  PG-13 performance would be, what would Spectrum have

24  done?

25    A.    We would have asked them to change it.  If

Barrett Bright - 12/19/2025

159

```
 1   it's just the music, then change the music.  If it
 2   was part of the performance, we would ask them to
 3   either change or tweak that part of the performance
 4   to, then, fit within what we believed was
 5   acceptable.
 6       Q.   Okay.  And you testified earlier you've
 7   attended drag shows.  Correct?
 8       A.   That is correct.
 9       Q.   Okay.  And you explained to Ms. Baker how
10   sometimes you might not readily understand what a
11   performer is trying -- is intending to convey.  Is
12   that right?
13       A.   That is correct.
14       Q.   Can you explain whether or not, as somebody
15   who's been to drag shows, that you understand the
16   performer trying to communicate something?
17       A.   Yes.  They -- I always -- every drag show I
18   attend, I always feel like each and every individual
19   performer is trying to convey something.  If it's
20   impersonating through Disney or, like, doing a
21   Disney song, it's to show how they are embodying the
22   character they're performing.
23            If it's for comedy, it would be trying
24   to make the audience laugh in whatever way they can.
25   And every show I've been to, there is a message to
```

1    each performance.

2                MR. MORRIS:  Okay.  That's all I

3        have.

4                Thank you, Mr. Bright.

5                (Pause in proceedings.)

6                THE STENOGRAPHER:  Anything else

7        from anyone?

8                MS. BAKER:  I have a few

9        follow-up questions.

10                    FURTHER EXAMINATION

11    BY MS. BAKER:

12    **Q.    Following President Wendler's letter in**

13    **March of 2023, did you personally, or Spectrum as an**

14    **organization, communicate with any students or**

15    **groups who agreed with Dr. Wendler's position?**

16    A.    I -- following the email that went out, and

17    particularly during the protests that happened on

18    campus, I did talk to quite a few people who did

19    agree with Wendler, at least on canceling the drag

20    show.

21    **Q.    So you would agree that reasonable**

22    **people -- a reasonable person could believe that a**

23    **drag show is mockery?**

24    A.    I can't say for certain if that was the

25    reason why, but yes.  I do believe that some people

Exhibit
Barrett Bright
**12**
12/19/25 RC
exhibitsticker.com

SPECTRUM 0001443



**Help Fund Spectrum WT's Drag Show**

$25 raised of $5,000 goal • 1 donor

Share

Donate now

wtamuspectrum · Follow

wtamuspectrum A Fool's Drag Race is now taking donations through GoFundMe. Help contribute to production costs and charity donations through the link in our story, or pasted here: https://gofund.me/f640c3e7.

#wtspectrum #wtamu #gofundme #drag #lgbt #lgbtrights #gay #gayrights #trans

137w

dwaynejaycox9 Feel good story of the day! https://www.foxnews.com/politics/federal-judge-refuses-allow-west-texas-am-drag-show-proceed-legal-battle

137w  Reply

— Hide replies

aur.naur.marc @dwaynejaycox9 the request for a temporary restraining order and preliminary injunction was pulled. I would recommend familiarizing yourself with what that means, because spamming that article really isn't the "owning the libs" moment you think it is. You saw a FOX News title (purposefully written to be clickbait and

168 likes

March 25, 2023

Add a comment...                     Post

screenshot-www-instagram-com-2025-11-09-33
https://www.instagram.com/p/CqQ7hJuRfe/
15 11 202_



**SPECTRUM 0001444**



wtamuspectrum · Follow

**nathanarussell** The students of @wtamuspectrum embody the very best of @WTAMU. They show forth the real "West Texas way."

137w   6 likes   Reply

— Hide replies

**bastroptxconservative_patriots** @nathanarussell no they definitely ain't that

137w   Reply

**waccelyria** The people of @waccelyria take great PRIDE in who you are and the work that you are doing on the campus of @WTAMU and throughout the world.

137w   4 likes   Reply

— Hide replies

**bastroptxconservative_patriots** @waccelyria 🚫🔞🚫

137w   Reply

**d.renzi** Where is the show going to be performed?

168 likes

March 25, 2023

Add a comment…                                              Post

## Help Fund Spectrum WT's Drag Show

$25 raised of $5,000 goal · 1 donor

Share

Donate now

*Instagram*

Home
Search
Explore
Reels
Messages
Notifications
Create
Profile
More
Also from Meta

SPECTRUM 0001445



SPECTRUM 0001446



Def_182279



**Requestor**
Kaye-breeze Fanelli Burnett ☆

**Scheduler**
Andrew Mangum ☆
Edit Contacts

**Head Count**
Expected 190 ☑   Registered 0 ☑

**Description**
This event is a way for Spectrum WT to share their art and expression with the WT Community. This is not only a fun event to build community but also create a space for all students, not just members of the LGBTQ+ community, to express and share their stories and things that are important to them through the art of performance.

**Comments**

**Internal Notes**

**Confirmation Text**

**Attached Files**
Drag and drop file here or click below to upload.
Upload a file

**Tasks Completed**
Approvals      2/2
Assignments    2/2
To Do          0/0
View this event's Task List

**Event Relationships**

---

✕ Is this event a UIL / 4H / FFA Event?:   No   Yes

✕ Will you be charging admission for your event?:   No   Yes

✕ Will your event host non-university attendees?:   No   Yes

✕ Will you have an auction at your event?:   No   Yes

✕ How will the event be advertised (and where)?:   This event will be advertised on our instagram account @spectrumwt via graphics.

✕ Will you be serving alcohol at your event?:   No   Yes

✕ Will you be serving food at your event?:   No   Yes

✕ Are minors (individuals less than 18 years of age) specifically invited to attend the event/activity?:   No   Yes

✕ Will cash be handled at your event?:   No   Yes

✕ Do you need to use the in-room equipment (aka, the Location Features) of this space?:   No   **Yes**

✕ Do you want/need the help of a Production Services A/V Tech for your event?:   No   **Yes**

✕ Please indicate which equipment (including quantities, e.g. 4 wireless mics) you need to use::   2 wireless mics

Add a Custom Attribute

Def_182280



**Tasks Completed**

| | |
|---|---|
| Approvals | 2/2 |
| Assignments | 2/2 |
| To Do | 0/0 |

View this event's Task List

**Event Relationships**

...for your event?:

✕ Please indicate **2 wireless mics** which equipment (including quantities, e.g. 4 wireless mics) you need to use::

Add a Custom Attribute

**Event Info**

**Requirements**          Add a Requirement

✕ PSQ - Equipment
Comment

✕ PSQ - Staffing
Comment

**Event Owner**       👤 Fanelli Burnett, Kaye-breeze

**Creation Date**      Mon Dec 15 2025

**Reference**           2025-AADLMG

**Cabinet**             Events Cabinet

**Folder**              Events Folder

Def_182281

**Thursday, December 18, 2025 at 14:45:14 Central Standard Time**

**Subject:** [EXTERNAL] Risk Assessment Review: Spectrum Drag Show Spring 2026 (2025-AADLMG)
**Date:** Tuesday, December 16, 2025 at 10:21:17 AM Central Standard Time
**From:** Smartsheet Automation
**To:** Haugen, Chance



Please review and approve this request.

**Open request**

## Details

| | |
|---|---|
| **Reservation Number** | 2025-AADLMG |
| **Date of Event** | Fri Apr 17 2026 |
| **Event Start Time** | 6:00 pm |
| **Event End Time** | 7:30 pm |
| **Estimated Attendance** | 190 |
| **Audience** | WTAMU Students    Faculty/Staff    Alumni    Non-University |
| **Facility** | JBK Legacy |
| **Description of Event** | <p>This event is a way for Spectrum WT to share their art and expression with the WT Community. This is not only a fun event to build community but also create a space for all students, not just members of the LGBTQ community, to express and share their stories and things that are important to them through the art of performance. </p> |
| **Primary Contact Name** | Johnathan-Jayce Fanelli-Burnett |
| **Sponsoring Department** | Spectrum WT |
| **Phone Number** | 8068084654 |
| **Email** | kbfanelliburnett1@buffs.wtamu.edu |

1 of 2

Def_182282

| | |
|---|---|
| **Contract Required Y/N** | No |
| **Property Damage Risk Y/N** | No |
| **Physical Injury Risk Y/N** | Yes |

+8 more fields

**Go to the sheet**

Sent by automation@smartsheet.com through the magic of Smartsheet
Unsubscribe from this workflow

© 2025 Smartsheet Inc. Privacy Notice | Report Spam | Provide Feedback

 

**Def_182283**

| Shawn's Comments | * designates required field - Person | * designates required field - Title* | * designates required field - Sponsoring Organization / Department: | * designates required field - Email* | * designates required field - Event Name* | * designates required field - Date of Event* | * designates required field - Event Location(s)* | (count) | (count) | * designates required field - Description of Event* |
|---|---|---|---|---|---|---|---|---|---|---|
| Needs Catering Exemption | Linda McMinn | Admin Assoc III | VPAA | lmcmin n@wtamu.edu | Thanksgiving Meal for WT Amarillo Center | 11/17/2025 | WTA 189 | 0 | 21+ | Thanksgiving Meal for WT Amarillo Center Staff & Faculty |
| Reviewed | Traci McMinn | Admin Assoc III | VPAA | lmcmin n@wtamu.edu | TDEM - J MINSHEW RETIREMENT RECEPTION | 6/6/2025 | WTA 189 | 50 | 21 | TDEM - JOE MINSHEW RETIREMENT RECEPTION |
| Reviewed | Steve Simpson | Administrative Assoc. | West Texas A&M University SOM | ssimpson@wtamu.edu | Faculty Piano Trio Recital | 09/01/2025 | May Moody Northen Recital Hall | 35 | 18-70 | Musical performances by two Faculty (Choong-ha Nam, piano and Rossitza Goza, violin) with guest artist (TBD) for students and the community to enjoy. |
| Reviewed | Steve Simpson | Administrative Assoc. | West Texas A&M University SOM | ssimpson@wtamu.edu | Fall Faculty Showcase | 08/26/2025 | May Moody Northen Recital Hall | 30 | 18-70 | School of Music faculty performing various musical selections |
| Reviewed | Blaine Barger | Administrative Associate of Communication | WT School of Music | bbarger@wtamu.edu | TBS Alumni Reunion | 6/21/25 | MMNH 1023 | 14 | 35-37 | TBS Alumni Reunion, opening a time capsule from 2009-2010. |
| Reviewed | Steve Simpson | Administrative Assoc. | West Texas A&M University SOM | ssimpson@wtamu.edu | All-State Help Session | 9/19-20/25 | Music Building rooms | 14-18 (High School) / 300 | | Rehearsal sessions for High School students to help them learn the All-State Band music. |
| Reviewed | Steve Simpson | Administrative Assoc. | West Texas A&M University SOM | ssimpson@wtamu.edu | Route 66 Writing Project Showcase | 6/18/25 | Fine Arts Complex Recital Hall | 38 | 15-40 | Showcase the participants who wrote as part of the Route 66 Writing Project - meeting, acknowledgments, lite lunch in the Grand Lobby |
| Reviewed | Monica Hart | Assoc Prof English | EPML | mhart@wtamu.edu | Route 66 Writing Project Showcase | June 18, 2025 | FAC Grand Lobby | 45 | 17-65 | Local high school graduating seniors who participated in the May-June 2025 Route 66 Place-Based Writing Project will present their work to their teachers, family, friends, WT faculty, WT donors, and Route 66 Writing Project supporters. |
| Reviewed | Steve Simpson | Administrative Assoc. | West Texas A&M University SOM | ssimpson@wtamu.edu | Zvonimkov Violin Studio recital | June 12 or 13 or 14, 2025 (TBD) | Fine Arts Complex Recital Hall | 40 | 10-30 | Students of WT violin faculty Evgeny Zvornikov performing musical selections for family and friends |
| Reviewed | Shannon Budd | Administrative Coordinator | COFAH Dean's Office | sbudd@wtamu.edu | FAH Advisory Board Meeting | 6/6/25 | Buffalo Council Room Amarillo Center | 4 | 40-70 | FAH Advisory Board meeting. |
| If not Aramark need Catering Exemption | Tracee Post | Assistant Vice President | Office of the President | tpost@wtamu.edu | University Council Lunch Mtg | 10/21/25 | JBK Legacy Hall | 0 | 18-70 | University Council Lunch Meeting |
| If not Aramark need Catering Exemption | Tracee Post | Assistant Vice President | Office of the President | tpost@wtamu.edu | University Council Lunch Mtg | 03.17.26 | JBK Legacy Hall | 0 | 18-70 | Lunch Meeting |

| Status | Name | Role | Organization | Email | Event | Date | Location | Count | Age | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| Reviewed | Steve Simpson | Administrative Assoc. | West Texas A&M University SOM | ssimpson@wtamu.edu | Dr. Goza Guest Artist Recital | Oct. 18, 2025 | Fine Arts Complex Recital Hall | 15 | 18-70 | Recital with Dr. Goza, violin, and Guest Artist performing various musical selections for students and guests. |
| Reviewed | Steve Simpson | Administrative Assoc. | West Texas A&M University SOM | ssimpson@wtamu.edu | Silent Film with Guest Organist Ben Kolodziej | Oct. 7, 2025 | May Moody Northen Recital hall | 50 | 10-70 | Guest Organist, Ben Kolodziej, plays live organ accompaniment for the showing of a silent film. |
| Reviewed | Steve Simpson | Administrative Assoc. | West Texas A&M University SOM | ssimpson@wtamu.edu | Fall Choir Concert | Oct. 16, 2025 | May Moody Northen Recital Hall | 50 | 18-70 | WT Choirs sing a variety of musical selections for students, friends and family |
| Reviewed | Steve Simpson | Administrative Assoc. | West Texas A&M University SOM | ssimpson@wtamu.edu | Region One UIL Choir Clinic and Concert | Nov. 8, 2025 | larger rooms in Fine Arts Complex and May Moody Northen | 140 | 14-18 | UIL Choir Clinic with Concert for area High School Choir students. Set up for rooms is Friday pm. Concert is Saturday 7:30pm |
| Reviewed | Steve Simpson | Administrative Assoc. | West Texas A&M University SOM | ssimpson@wtamu.edu | WT Brass Choir Concert | 11/11/25 | May Moody Northen Recital hall | 30 | 18-70 | The WT Brass Choir performing a variety of musical selections in concert - open and free general seating. |
| Reviewed | Deanna Moore | Admin Associate | TBR College of Edu & Social Sciences | dmoore@wtamu.edu | WTAMU/CEN Mtg & Training | 5/28/2025 | OM213 | 10 | 21-65 | Agenda: -Purpose of PTECH and the value of the WT/CEN Partnership (CEN/WT) -Discuss Programs of Study/Pathways (CEN) -Discuss processes in place or needed for effective communication amongst all stakeholders (Allison) -Advising Training (Trish) |
| Reviewed | Steve Simpson | Administrative Assoc. | West Texas A&M University SOM | ssimpson@wtamu.edu | WT Horn Choir Concert | 11/13/25 | May Moody Northen Recital Hall | 30 | 18-70 | WT Horn Choir performing various musical selections; free general seating |
| Reviewed | Sarah Rushing | Assistant Professor of Piano | School of Music | srushing@wtamu.edu | Faculty Recital: TRIOSARACHOPS | November 6, 2025 | Northen Recital Hall | 50 | 18-99 | Faculty recital (Rushing, Beckham-Turner, Manfredi) |
| Reviewed | Steve Simpson | Administrative Assoc. | West Texas A&M University SOM | ssimpson@wtamu.edu | School of Music Auditions - Nov. 22 | Sat. Nov. 22, 2025 | May Moody Northen several rooms | 40 | 16-18 | High School seniors auditioning for acceptance and scholarships to the WT School of Music |
| Reviewed | Steve Simpson | Administrative Assoc. | West Texas A&M University SOM | ssimpson@wtamu.edu | Symphonic Band Concert | 12/2/25 - Wednesday | May Moody Northen Recital Hall | 50 | 18-80 | WT Symphonic Band performing various musical selections for students and community to enjoy |
| Reviewed | Steve Simpson | Administrative Assoc. | West Texas A&M University SOM | ssimpson@wtamu.edu | WT Christmas Concert | Sunday, December 7, 2025 | May Moody Northen Recital Hall | 400 | 10-80 | The annual School of Music Christmas Concert with WT Choirs, Orchestra and Guests performing Christmas music for WT and community. |
| If Aramark not used need a Catering Exemption | Ella Vidmar | Events Coordinator | AG | evidmar@wtamu.edu | 4-H Volunteer Training | 8/9/2025 | AG Complex | 40 | 21+ | Volunteer Training |

Def_083069.xlsx

| Status | Name | Title | Department | Email | Event | Date | Location | # | Ages | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| Reviewed | Steve Simpson | Administrative Assoc. | West Texas A&M University SOM | ssimpson@wtamu.edu | Symphonic Band Concert | 12/6/25 | Mary Moody Northen Recital Hall | 50 | 18-70 | WT Symphonic Band performing a variety of musical selections |
| Reviewed | Steve Simpson | Administrative Assoc. | West Texas A&M University SOM | ssimpson@wtamu.edu | Concert Band Concert | 12/6/25 Wed. | Mary Moody Northen Recital Hall | 50 | 18-70 | WT Concert Band performing a variety of musical selections |
| Reviewed | Steve Simpson | Administrative Assoc. | West Texas A&M University SOM | ssimpson@wtamu.edu | Chamber Singers Concert | 12/6/2025 | Mary Moody Northen Recital Hall | 50 | 18-70 | WT Chamber Singers performing a variety of musical selections |
| If Aramark not used need Catering Exemption | Steve Simpson | Administrative Assoc. | West Texas A&M University SOM | ssimpson@wtamu.edu | School of Music Auditions | 11/22/25 | Mary Moody Northen rooms | 40 | 16-18 | High School seniors auditioning to be accepted by WTAMU School of Music and apply for scholarships |
| Reviewed | Bryan Vizzini | Director, Teaching Excellence Center | West Texas A&M University | bvizzini@wtamu.edu | Fall Faculty Development | August 20, 2025 | Legacy Hall | 0 | Over 21 | Annual August professional development program for WTAMU faculty and professionals. |
| If Aramark not being used need Catering Exemption | Caitlin Eastin | HR Generalist I | HR | ceastin@wtamu.edu | New Staff Orientation | June 17, 2025 | JBK West Texas 33 | 0 | 18-80 | This is an event providing new staff members with information about the University to help them be successful. |
| If Aramark not being used need Catering Exemption | Lisa Hoff Davis | University Events | OPEN (Comm & Marketing) | lhrdavis@wtamu.edu | Panhandle Press Ass. Convention | 7/18-7/19/2025 | Harrington Academic Hall | 50 | Unknown | Breakout/work sessions and meals |
| | Steve Simpson | Administrative Associate | West Texas A&M University SOM | ssimpson@wtamu.edu | UIL Solo & Ensemble - Instrumental | Sat. February 7, 2026 | School of Music larger rooms | 800 | 14-18 | High School instrumental/band students coming on campus to play solo or in an ensemble for UIL Competition |
| Reviewed | Misty MaGouirk | Administrative Associate | Education / Region 16 | mmagouirk@wtamu.edu | Curriculum Connections Breakout Sessions | July 15-16, 2025 | Old Main 204, 206, 207, 213, 218, 219, 220, 326, 326 | | 18+ | Region 16 Curriculum Connections breakout sessions |
| If Aramark not being used need Catering Exemption | Steve Simpson | Administrative Assoc. | West Texas A&M University SOM | ssimpson@wtamu.edu | School of Music Audition | 2/21/26 | SOM larger rooms | 30 | 16-18 | High School musicians Auditioning for acceptance to WT School of Music and Scholarships |
| Reviewed | Steve Simpson | Administrative Assoc. | West Texas A&M University SOM | ssimpson@wtamu.edu | WT Instrumental Band Clinic | Sat. 2/28/26 | School of Music rooms | 100 | 14-18 | High School band students coming for instruction and rehearsals - playing for WT School of Music faculty |
| Reviewed | Steve Simpson | Administrative Assoc. | West Texas A&M University SOM | ssimpson@wtamu.edu | Choir Pre-Tour Concert | 3/1/26 | Mary Moody Northen Recital Hall | 75 | 12-80 | WT Choir performing a variety of musical selections before they leave on tour the following Wednesday. |

| Status | Name | Title | Org | Email | Event | Date | Location | Count | Age | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| If Aramark not being used need a Catering Exemption | Traci McMinn | Admin Assoc III | VPAA | tmcminn@wtamu.edu | International Police Mountain Biking Association | 7/13/2025 | H4H WTA 189 | 250 | 21 | Safety and instruction course/training; classroom portion |
| Reviewed | Steve Simpson | Administrative Assoc. | West Texas A&M University SOM | ssimpson@wtamu.edu | Concert Band Concert | 3-1-26 | May Moody Northen Recital Hall | 75 | 18-70 | WT Concert Band performing a variety of musical selections for WT and community to enjoy |
| Reviewed | Steve Simpson | Administrative Assoc. | West Texas A&M University SOM | ssimpson@wtamu.edu | Symphonic Band Concert | 3-7-26 | May Moody Northen Recital Hall | 75 | 18-70 | WT Symphonic Band performing a variety of Musical selections for audience enjoyment |
| Reviewed | Steve Simpson | Administrative Assoc. | West Texas A&M University SOM | ssimpson@wtamu.edu | School of Music Auditions | 3/28/26 | May Moody/Fine Arts Complex rooms | 20 | 16-18 | High School student musicians auditioning for acceptance to School of Music and Scholarships |
| Reviewed | Steve Simpson | Administrative Assoc. | West Texas A&M University SOM | ssimpson@wtamu.edu | Choir UIL Contest | April 8-9, 2026 | May Moody Northen Rooms + Fine Arts Complex 227 Choir room | 1200 | 14-18 | Area choirs come to perform and compete in UIL Choir Contest - Each group is only on campus a couple hours. |
| Reviewed | Steve Simpson | Administrative Assoc. | West Texas A&M University SOM | ssimpson@wtamu.edu | Harrington String Quartet Concert | Friday, April 10, 2026 | May Moody Northen Recital Hall | 75 | 18-80 | Harrington String Quartet performing a variety of musical selections |
| Reviewed | Steve Simpson | Administrative Assoc. | West Texas A&M University SOM | ssimpson@wtamu.edu | Faculty Grand Recital | 1-30-26 | May Moody Northen Recital Hall | 50 | 18-70 | Showcasing of School of Music faculty performing a variety of music. |
| If Aramark not being used need a Catering Exemption | Steve Simpson | Administrative Assoc. | West Texas A&M University SOM | ssimpson@wtamu.edu | Music Career Day Auditions | 1/30/26 | May Moody Northen Hall plus other rooms | 80 | 16-18 | High School musicians Auditioning for acceptance to the School of Music and Scholarships, plus meetings with information, facult performances and orientation |
| If Aramark not being used need a Catering Exemption | Colton Atkins | Assistant Professor | College of Engineering | catkins@wtamu.edu | Strawberry Planning Workshop | 06/12/2025 | JBK Eternal Flame | 15 | 30 to 70 | Strawberry grant planning workshop meeting. |
| Reviewed | Steve Simpson | Administrative Assoc. | West Texas A&M University SOM | ssimpson@wtamu.edu | Spring Choir Concert | Tuesday, 4-28-26 | May Moody Northen Recital Hall | 50 | 12-80 | WT Choirs performing a variety of choral musical selections for the university and community to enjoy |
| Reviewed | Steve Simpson | Administrative Assoc. | West Texas A&M University SOM | ssimpson@wtamu.edu | Horn Choir Concert | Thursday, April 30, 2026 | May Moody Northen Recital Hall | 50 | 18-70 | WT Horn Choir performing a variety of musical selections for the audience to enjoy. |

| Status | Name | Title | Department/Org | Email | Event | Date | Location | # | Ages | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| Reviewed | KadenzeFoiwer | Administrative Associate II | District 1 4-H | kadenze.fowler@ag.tamu.edu | District 1 4-H Gold star banquet | 10/20/2025 | Alumni Banquet Facility | 250 | 15-70 | This event is for out district 1 4-H gold star recipients. I will highlight there achievements the have made in that year of their 4-H came. |
| Reviewed | Gwynne Walker | Honors Coordinator | Attebury Honors Program | gwalker@wtamu.edu | Attebury Honors Preview Event | June 5, 12, 26 & July 17, July 29th & Aug 18 | Senate Chamber JBK | 25 | 18-45 | Opportunity for incoming Freshman to learn about the program |
| If Aramark not being used need a Catering Exemption. Insurance. | Lorii Luchek | Asst. Professor | AGS | lluchek@wtamu.edu | USMEF Beef 101 Short Course | 6/4-6/6 | AGS 104 | 48 | 30-65 | Beef and pork educational sessions - powerpoint learning, sensory demonstration, meat lab tours and education |
|  | Chelsea Kuehler | Student Outreach Librarian | Cornette Library/EDU | ckuehler@wtamu.edu | School Librarians: The Missing Piece | 10/01/2025 | Legay Hall | 5 | 18-60 | This is a panel of Panhandle certified school librarians talking about the process of becoming a certified school librarian and what that means for a certified teacher. Panelist will also be asking questions from EDU students. |
| If Aramark not being used need a Catering Exemption | Evie Cnossen | Bride |  | ecnossen33@gmail.com | Wedding | 10/4/25 | WT Chapel |  | 4-85 | Wedding |
| Reviewed | Steve Simpson | Administrative Assoc. | West Texas A&M University SOM | ssimpson@wtamu.edu | A Muskrat Lullaby Children's Opera | April 14 & 15, 2026 | Fine Arts Complex Recital Hall, FAC140 | 80 | elementary grades age 8-10 | Performances of the Edward Barnes Children's Opera "A Muskrat Lullaby" by the WT Opera Department, under Sarah Beckham-Turner for area school children. |
| Insurance? Check with Richard Smith or Jesus Ramos | Paula Schlegel | Associate Lecturer | Communication | pschlegel@wtamu.edu | WT Storytelling Festival | 4/17/2026 | JBK Legacy Hall | 250 | 6-18 | WT Storytelling Festival hosting a guest storyteller to present stories to an audience, including elementary school "concerts" and masterclasses to university students. |
| Reviewed | Brock Blaser | Asst. Dean | CoANS | bblaser@wtamu.edu | VERO New Student meeting | 8/22/25 | AGS 215 | 25 | 21-25 | simple meeting to welcome students to VERO |
| If Aramark not being used need a Catering Exemption | Kimberly Herbet | Chief Vibe Officer | PVECOB | kherbet@wtamu.edu | College St Community Symposium | 04/23/2026 | JBK Legacy Hall | 50 | 0-100 | College Student & Community Symposium with food, music, PowerPoint, awards, gifts, honors |
| If Aramark not being used need a Catering Exemption | Traci McMinn | Admin Assoc III | TDEM | tmcmin@wtamu.edu | TDEM ISTF REGIONAL COORDINATORS QUARTERLY MEETING | 06/24/2025 | WTA 307 | 10 | 21 | TDEM ISTF REGIONAL COORDINATORS QUARTERLY MEETING |
| If Aramark not being used need a Catering Exemption | Heidi Brooks | Lead Education Academic Advisor | Education Preparation Program | hbrooks@wtamu.edu | EPP Advisory Council | 6-24-2025 | Senate Chambers | 25 | 18+ | EPP advisory council with community members and stakeholders present to receive updates on WT's EPP and share information. I will coordinate with Aramark to order light foods for this event. |

Def_083069.xlsx

| Question | Name | Title | Department | Email | Event Name | Date | Location | # | Age | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| Ask Richard Smith or Jesus Ramos about insurance? | Jessica Adame | Director, TRIO Talent Search | College Access and Academic Enrichment Programs | jadame@wtamu.edu | TRIO Talent Search Summer STEM Camp | 06/23-06/26 | Classroom Center 201, JBK Eternal Flame, Classroom Center 226, Classroom Center 217, computer lab | 35 | 13-17 | and explained camp expectations for the week. We will be having a team building activity/icebreaker where we will have the opportunity to learn about each other. After lunch in the dining hall, we will have special guest, Dr. Correa join us in the Eternal Flame room to give us a presentation on the Nursing field. After the talk, we will be having a WTAMU guided tour. Day 2: Northwest Texas Hospital will be joining us the Eternal Flame room to provide a presentation on the resources available for their nurses. After lunch in the dining hall, we will be touring the WT Nursing Learning Center, Campus for a tour of the nursing center. We will then be transported back to WTAMU. We will then be touring the job fair with Upward Bound. Day 3: We will be beginning the day at the Amarillo College West Campus for a tour of the nursing center. Day 4: WI will consist of college |
| If Animals not being used a Catering Exemption is needed | Zaida Cordova | Community Manager | WT Enterprise Center | zaida@wtenterprisecenter.com | GEW Fireside Chat With Alumni | 11/18/2025 | JBK Legacy Hall | 5 | 18-60 | This is a fireside chat-style panel discussion featuring alumni from WTAMU. The event will be hosted during Global Entrepreneurship Week and will include a moderated conversation with a small group of alumni who will share their post graduation experiences and career insights. There will also be allocated time for a audience Q&A and right networking. |
| Catering Exemption needed; General Liability Insurance; Food Permit. Some of these are already in place. | Amy Criss | Director of MVS | Military and Veteran Services | acriss@wtamu.edu | Panhandle Veterans Expo | 6/28/2025 | FUBC | 500 | 0-99 | Area vendors as well as the VA and TVC will be set up to help panhandle veterans with their VA benefits and claims, as well as other organizational benefits such as employers. There will be food served that is donated and grilled by Bell Helicopter, including burgers, sausage on a stick, chips and waterslides. The organizers intend to have little/easy games set up for entertainment (cornhole, inflatable games, there will be NO bounce houses). We will also have Kona Ice on site for snow cones. It is a family event, though the target attendees are veterans. The younger ones will be bringing their families along so there will likely be children as well. |
| for this event. Food permit needed (in place already). Insurance? We've never had insurance needed prior | Amy Criss | Director | Military and Veteran Services | acriss@wtamu.edu | MVS 4th of July Picnic | 7/4/2025 | OM South Lawn | 15 | 18-99 | MVS will be hosting veterans from the Ussery Roan Veterans home in Amarillo to watch the 4th of July parade and enjoy picnic foods. |

| Status | Name | Title | Department | Email | Event | Date | Location | Count | Age | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| If Aramark not being used a Catering Exemption is needed | Lance Keith | Associate Dean | Paul Engler College of Ag | lkeith@wtamu.edu | Texas Southern Cattle Raisers Leadership Workshop | July 14 & July 18 | Ag Science Complex | 20 | 14-18 | WT is proving leadership training, workshops to youth that are part of the Texas Southern Cattle Raiser Youth Leadership Tour. |
| Reviewed | Darci Hess | Administrative Associate | Paul Engler College of Agriculture and Natural Sciences | dhess@wtamu.edu | Ag Advisory Board Meeting | 9/6/25 | AGS 209 | 30 | 26-85 | The Ag Advisory Board will meet to discuss happenings of the Department, upcoming events and what is taking place in the future. |
| Reviewed | Arron Hughes | Director | Upward Bound | ahughes@wtamu.edu | French Movie Night | 7/10/2025 | NSB 101 | 9 | 14-17 | Upward Bound Summer Academy French Movie night, students will watch a movie in French for their final assignment. |
| Reviewed | Jolie Bond | Event Coordinating GA | AGS | jbond@wtamu.edu | TSCRA Leadership meeting | 7/14/25 | AGS 209 | 30 | 16+ | Leadership meeting |
| If Aramark not being used a Catering Exemption is needed | Chelsea Kuehler | Student Outreach Librarian | Cornette Library | ckuehler@wtamu.edu | TLA District 2 Fall Meeting | 09/23/2025 | JBK West Texas Room | | 25-70 | This event is for the Texas Library Association District 2 (Panhandle) Annual Fall Meeting. |
| Reviewed | Paula Schlegel | Associate Lecture Dept of Communication | Department of Communication | paula.schlegel@yahoo.com | WT Storytelling Festival | 4/17/2026 | JBK Legacy Hall | 150 | Preschool through Senior Citizens | The WT Storytelling Festival began in 1991 and has a longstanding history of connecting campus and community members to the art of storyteller. Professional storyteller Mary Grace Ketner will be performing 2 concerts open to all ages on Friday morning. The first concert starts at 10 and goes until 10:50. The second concert is 11:15 until 12:05. |
| Reviewed | Craig Bednarz | Professor | WTAMU | cbednarz@wtamu.edu | FFAR Team Meeting | 06/17/25 | AGS209 | 5 | 30-60 | FFAR team meeting |
| Reviewed | Jolie Bond | Event Coordinating GA | AGS | jbond@wtamu.edu | New World Screwworm Informational Update | July 1, 2025 | Ag 102 | 60 | 18+ | Informational update for org |
| Duplicate - see above | Amy Criss | Director | MVS | acriss@wtamu.edu | Panhandle Veterans Expo | 6/28/2025 | FUBC | 600 | 0-99 | Expo event with vendors for panhandle area veterans and their families. Includes resources for veteran issues. VA, TVC, VLB and TVN will be apart of it to help with medical claims and any other issues they may have. |
| If Aramark not being used need a Catering Exemption | Vicki Hamblen | Dean's Secretary | College of Nursing & Health Sciences | vhamblen@wtamu.edu | CONHS Awards & Recognition Reception | 04/30/2026 | Legacy | 50 | 40-80 | No activities planned |
| If Aramark not being used a Catering Exemption is needed | Tyson Willis | AVP of Development | WTAMU Foundation | twillis@wtamu.edu | AVP of Development Meeting | 6/19/2025 | Buffalo Council room at Harrington Academic Hall | 7 | 25+ | The Buffalo Council room at Harrington Academic Hall from noon – 4 pm on June 19th. Assistant Vice Pres of Development (Lesly Annen) will be bringing in sandwiches and tea for lunch. 12 people. |
| Reviewed | Shelby Ford | Assistant Director | WTAMU Foundation | sford@wtamu.edu | Terracon Interviews | 6/17/2025 | CC-109A | 2 | 20-55 | Interviewing students for open positions |
| Reviewed | Jolie Bond | Event Coordinating GA | AGS | jbond@wtamu.edu | TSCRA Speaking Contest | Jul 18 2025 | AGS 207, 209, 213, 215, 246 | 30 | 18+ | Speaking event/contest |

Def_083069.xlsx

| Status | Name | Title | Department | Email | Event | Date | Location | Count | Age | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| If Aramak not being used a Catering Exemption is needed | Jolie Bond | Event Coordinator GA | AGS | jbond@wtamu.edu | 4H Volunteer Training | Aug 9, 2025 | AGS 101, 102, 104, 207, 209, 213, 215, 246 | 40 | 18+ | Volunteer training for 4H club |
| If Aramak not being used. Alcohol needed. Request needed. Both may bein place already? | Jolie Bond | Event Coordinator GA | AGS | jbond@wtamu.edu | TCFA Showcase | sep 11, 2025 | Ag Pavilion and BEC Arena | 300 | 18+ | Contests/showcase |
| | Jaclyn Ferrel | Bride | Non-University Guest | jgferrel1@buffs.wtamu.edu | Day Rehearsal Dinner | 06/27/2025 | Jack B. Kelley Student Center 108 - Legends Club | 41 | 14 - 83 | Dinner, live music, mingling and talking. |
| If Aramak not being used a Catering Exemption is needed | Jolie Bond | Event Coordinator GA | AGS | jbond@wtamu.edu | District 6 4H | June 25, 2025 | AGS 209, 215 | 40 | 18+ | tours and workshop |
| Reviewed | Michael Reagan | Testing Survey | Information Tech. | mreagan@wtamu.edu | Just testing this survey | 6/17/2025 | MIIC-47 | 0 | 45 | Testing out this Qualtrics Survey |
| If Aramak not being used a Catering Exemption is needed | Jaye Jones | Admin. Coordinator II | VERO | jjayejones@tamu.edu | VERO Advisory Council Meeting | August 22, 2025 | Ag 209 | 20 | 40-50 | VERO Advisory Council Meeting |
| Reviewed | Jenny Torbert | Director | Upward Bound/Upward Bound Math-Science | mtorbert@wtamu.edu | UB/UBMS Summer Academy | 06/30/2025 | MIIC | 30 | 15-17 | As part of the UB/UBMS Summer Academy programming, the student participants will be offered an ACT Bootcamp. Students will utilize the computers in the MIIC during the bootcamp. The bootcamp will offer students the opportunity to have intensive ACT practice, learn about test day, and learn strategies to obtain a higher score. |
| Reviewed | Sherri Drinnon | Instructor | Nursing | sdrinnon@wtamu.edu | Nursing pinning and Sigma | 12/12/25 | Legacy | | 18-80 | Nursing pinning and Sigma banquet - we would like on Friday morning 12/12/25 from 8-12 and rehearsal on Thursday 12/11/25 12-3 but the system would not let me put Friday in |
| If Aramak not being used a Catering Exemption is needed. UPD? Insurance? | JT Cavender | Officer for FCA | WT Fellowship of Christian Athletes | jtcavender1@buffs.wtamu.edu | Night of Champions | 10/26/25 | Legacy Hall | 250 | 18-80 | A night to have donors interact with Athletics. here testimony's as to how FCA has impacted their time as an athlete at WT. Dinner will be served. |
| Reviewed | Shawn Burns | Chief of Police | University Police | sburns@wtamu.edu | UPD/Pantex Meetings | 10/13-16/2025 | JBK Senate, White, Thunder | 55 | Adult | Radiation Training Meetings |

# **<u>EXHIBIT 63</u>**

KAMR, Walter Wendler Full Interview (Apr. 27, 2023, at 16:28 CT),
produced at SPECTRUM0002019 and
*available at* https://myhighplains.com/video/walter-wendler-fullinterview/8598931.

Flash drive containing video sent to Court via UPS.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 30, 2025, a true and correct copy of the foregoing document was transmitted via using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

<div align="right">

/s/ JT Morris
JT Morris
FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION

</div>