UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

SPECTRUM WT, *et al.*,

                    Plaintiffs,

v.                                                          No. 2:23-cv-00048

WALTER WENDLER, *et al.*,

                    Defendants.

**DEFENDANT'S APPENDIX IN SUPPORT OF RESPONSE IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

| Ex No. | Description | App. 000 |
|--------|-------------|----------|
| 1 | Presidents of System Member Universities Policy Summary | 1 – 3 |
| 2 | March 20, 2023 Email from Wendler to Students, Faculty and Saff re: A Harmless Drag Show? No Such Thing. [W_000085] | 4 – 7 |
| 3 | November 13, 2025 08.02.01 Expressive Activity on Campus | 8 - 13 |
| 4 | Defendant Wendler's Second Amended Responses and Objections to Plaintiff's First Set of Interrogatories | 14 – 43 |
| 5 | SB 12 | 44 - 48 |
| 6 | Deposition designations of Chip Chandler | 49 - 50 |
| 7 | March 21, 2023 Chip Chandler text message | 51 |
| 8 | September 14, 2022 Email from Barrett Bright to Chip Chandler | 52 – 53 |
| 9 | March 1, 2017 Facility Use Request Procedure | 54 – 55 |
| 10 | Dr Shawn M. Fouts - Redacted Email Exhibit [SPECTRUM 0000786] | 56 – 61 |
| 11 | Campus Organizations Handbook [Def_000109] | 62 - |
| 12 | Office of Student Engagement and Leadership; Campus Resources [Def_000130] | 83 |
| 13 | March 20, 2023 Email from Shawn Fouts to Barrett Bright [SPECTRUM 0000983] | 84 – 89 |
| 14 | Deposition of Marcus Stovall | 90 - 96 |
| 15 | Plaintiffs' First Amended Complaint [Dkt. 28]; Marcus Stoval Deposition Exhibit 1 | 97 – 148 |

| 16 | Marcus Stoval Deposition Exhibit 5: Video of February 2023 Performance by "Myss Myka" | 149 |
|----|----|----|
| 17 | Jack B Kelley Student Center West Texas A&M University Procedures and Guidelines [Def_000154]; Marcus Stoval Deposition Exhibit 13 | 150 – 168 |
| 18 | Deposition of Johnathan-Jayce Walker Fanelli-Burnett | 169 – 333 |
| 19 | Plaintiffs' Amended Responses to Defendants Walter Wender and Christopher Thomas's First Set of Interrogatories; Fanelli Deposition Exhibit 2 | 334 – 368 |
| 20 | West Texas A&M University: An Emblem of Innovation, Excellence, and Values West Texas A&M University; Fanelli Deposition Exhibit 3 | 369 – 372 |
| 21 | University Mission, Vision and Core Values; Fanelli Deposition Exhibit 4 | 373 |
| 22 | Chicago-Kent Law Review: Volume 75, Art. 4, Issue 3 *Symposium on Unfinished Feminist Business;* June 2000; Drag = Blackface, Kelly Kleiman; Fanelli Deposition Exhibit 10 [W_000110] | 374 - 393 |
| 23 | Fanelli Deposition Exhibit 12 [W_000132] | 394 – 399 |
| 24 | Deposition of Barrett Bright | 400 – 566 |
| 25 | Help Fund Spectrum WT's Drag Show; Barrett Bright Deposition Exhibit 12 [SPECTRUM 0001443] | 567 – 570 |
| 26 | Jack B Kelly Student Center West Texas A&M University Procedures and Guidelines | 571 – 590 |
| 27 | Deposition of Shawn Fouts | 591 – 596 |
| 28 | Access 4 All, Inc. v. Wintergreen Commer. P'ship, LTD_ | 597 – 603 |
| 29 | Allied World Surplus Lines v. Blue Cross & Blue Shield of Miss_ | 604 – 606 |
| 30 | Burrell v. Twin Goose, LLC | 607 – 610 |
| 31 | Segovia v. Admiral Realty, Inc_ | 611 – 615 |
| 32 | Springer v. Grisham | 616 – 629 |
| 33 | Strojnik v. Teof Hotel GP, LLC | 630 – 634 |
| 34 | The Woodlands Pride, Inc. v. Paxton | 635 – 660 |



## 02.05    Presidents of System Member Universities

Revised August 26, 2021 (MO  -2021)
Next Scheduled Review:  August 26, 2026
Click to view Revision History.

App. 001

### Policy Summary

This policy provides that the Board of Regents (board) of The Texas A&M University System (system) appoints the presidents of the member universities who serve under the direction of the chancellor and establishes their duties and administrative responsibilities, in addition to other duties and responsibilities delegated by the chancellor or the board.

### Policy

1.    GENERAL

The presidents of member universities are appointed by the board on the recommendation of the chancellor, serve under the direction of the chancellor, and have the following duties and responsibilities and such others as may be duly delegated by the chancellor or the board.

2.    DUTIES OF THE PRESIDENT

Subject to, and under the general authority of the chancellor, the president of each member university:

2.1    Administers the total program of the member under the president's jurisdiction. Recommends to the chancellor and the board the appropriate goals, purposes and role and scope for the member.

2.2    Recommends an organizational structure necessary to implement the purpose and mission of the member and recommends the establishment of administrative offices appropriate thereto.  The president should do so in discussion with key campus stakeholders including administrators, faculty and staff; however, final recommendations to the chancellor are at the president's discretion.

2.3    Recommends to the chancellor the appointment of all personnel requiring appointment by the board.

2.4    Conducts regular periodic evaluations of each administrative officer.



EXHIBIT
2

2.5    Coordinates the planning, development and operation of all activities and programs of the member.

2.6    Develops legislative budget requests and submits to the chancellor for approval. The board is provided with summary information for review after submission of these requests.

2.7    Develops annual budgets for operation and construction and submits to the chancellor for recommendation and action by the board.

2.8    Administers the business and financial management of the member. The management function includes, but is not limited to, budget preparation and implementation, financial and property accounting, the auditing of all expenditures and bills presented for payment, and the preparation of such financial reports as may be required.

2.9    Develops guidelines and standards for personnel administration, including those for employment, wage and salary administration, pay plans and classification, termination and conditions of employment in conformity with policies, practices and procedures of the system.

2.10    Provides for the operation and maintenance of the physical plant, the purchase of supplies and equipment, and the maintenance of appropriate inventories and records of real and personal properties under the jurisdiction of the member.

2.11    Explains system policy to the staff and explains the member's program needs to the chancellor.

2.12    Serves as the member representative with appropriate former student associations and any institutionally related development foundations.

3.    ADMINISTRATIVE RESPONSIBILITIES OF THE PRESIDENT

The presidents provide for the following administrative functions within the structure of the member university.

3.1    General supervision of all personnel employed by or assigned to the member.

3.2    General supervision of all student programs and services. Such supervision includes, but is not limited to, recruitment of students, admissions, registration and records, academic advising, counseling, housing, scholarships and financial aid, student activities and services, placement, foreign students and the evaluation and certification of academic credit from other institutions.

3.3    Development and dissemination of information concerning programs and accomplishments.

3.4    Maintenance of a current rules and internal procedures website for the member.

App. 002

## Related Statutes, Policies, or Requirements

System Policy *01.03, Appointing Power and Terms and Conditions of Employment*

System Policy *02.01, Board of Regents*

System Policy *02.02, Office of the Chancellor*

## Member Rule Requirements

A rule is not required to supplement this policy.

## Contact Office

Chancellor
(979) 458-6000

**From:** President Walter V. Wendler
**Sent:** Monday, March 20, 2023 4:47 PM
**To:** CURRENT_STUDENT@LISTS.WTAMU.EDU
**Subject:** Message from President Wendler: A Harmless Drag Show? No Such Thing.



## Office of the President

*visio | veritas | valor*

**To:**    Students, Faculty and Staff

**From:**    Walter V. Wendler, President

**Date:**    March 20, 2023

**RE:**    A Harmless Drag Show? No Such Thing.

West Texas A&M University will not host a drag show on campus. It was advertised for March 31, 2023, as an effort to raise money for The Trevor Project. The nonprofit organization focuses on suicide prevention—a noble cause—in the LGBTQ community. Any person considering self-harm for any reason is tragic.

I believe every human being is created in the image of God and, therefore, a person of dignity. Being created in God's image is the basis of Natural Law. James Madison and Thomas Jefferson, prisoners of the culture of their time as are we, declared the Creator's origin as the foundational fiber in the fabric of our nation as they breathed life into it.

Does a drag show preserve a single thread of human dignity? I think not. As a performance exaggerating aspects of womanhood (sexuality, femininity, gender), drag shows stereotype women in cartoon-like extremes for the amusement of others and discriminate against womanhood. Any event which diminishes an individual or group through such representation is wrong. I registered a similar concern on campus when individuals debased Latinas

**EXHIBIT**

**3**

**W_000085**
App. 004

regarding a quinceañera celebration. Should I let rest misogynistic behavior portraying women as objects? While I am not a woman, my best friend I have been married to for over a half-century is. I am also blessed to have daughters-in-law and granddaughters. Demeaning any demeans all. This is not an intellectual abstraction but a stark reality.

WT endeavors to treat all people equally. Drag shows are derisive, divisive and demoralizing misogyny, no matter the stated intent. Such conduct runs counter to the purpose of WT. A person or group should not attempt to elevate itself or a cause by mocking another person or group. As a university president, I would not support "blackface" performances on our campus, even if told the performance is a form of free speech or intended as humor. It is wrong. I do not support any show, performance or artistic expression which denigrates others—in this case, women—for any reason. WT intends to provide fair opportunities to all based on academic performance. Ideas, not ideology, are the coin of our realm. A university campus, charged by the state of Texas to treat each individual fairly, should elevate students based on achievement and capability, performance in a word, without regard to group membership—an implacable and exacting standard based on educational mission and service to all, sanctioned by the legislature, the governor and numerous elected and appointed officials.

The WT community should live by the Golden Rule. As a Christian, I personally learned this in the book of Matthew, *"So in everything, do to others what you would have them do to you, for this sums up the Law and the Prophets."* Buddhism expresses it this way: "Hurt not others with that which pains yourself." Judaism states, "What you yourself hate, do to no man." The law of reciprocity is at work in every known religion and society on the planet. Colloquially speaking, it is a manifestation of Newton's Third Law of Motion, "For every action, there is an equal and opposite reaction."

Mocking or objectifying in any way members of any group based on appearance, bias or predisposition is unacceptable. Forward-thinking women and men have worked together for nearly two centuries to eliminate sexism. Women have fought valiantly, seeking equality in the voting booth, marketplace and court of public opinion. No one should claim a right to contribute to women's suffering via a slapstick sideshow that erodes the worth of women.

When humor becomes harassment, it has gone too far. Any reading of the U.S. Equal Employment Opportunity Commission's purpose, coupled with common

sense, affirms that acts of prejudice in the workplace and our campus is a workplace, even when not criminal, are harmful and wholly inappropriate. No amount of fancy rhetorical footwork or legal wordsmithing eludes the fact that drag shows denigrate and demean women—noble goals notwithstanding.

A harmless drag show? Not possible. I will not appear to condone the diminishment of any group at the expense of impertinent gestures toward another group for any reason, even when the law of the land appears to require it. Supporting The Trevor Project is a good idea. My recommendation is to skip the show and send the dough.

Offering respect, not ridicule, is the order of the day for fair play and is the WT way. And equally important, it is the West Texas way.

**Walter V. Wendler**
**President**
806.651.2100
president@wtamu.edu

If you need email content or attachments in alternate formats for accessibility, please send your contact information and the details of your request to accessibility@wtamu.edu.

######################################################################

**From:** President Walter V. Wendler <president@wtamu.edu>
**Sent:** Monday, March 18, 2024 3:33 PM
**To:** ALL <ALL@wtamu.edu>
**Subject:** WTAMU News: Spectrum WT Application for On-Campus Drag Show



# Office of the President

*visio | veritas | valor*

**To:**      Faculty, Staff, and Students

**From:**    Walter V. Wendler, President

**Date:**    March 18, 2024

**RE:**      Spectrum WT Application for On-Campus Drag Show

Spectrum WT asked three courts to prevent the denial of their pending application to conduct an on-campus drag show. I did not rule on the application out of respect for the judicial process. On March 15th, a unanimous United States Supreme Court rejected the attempt to prevent another denial.

And so, the Spectrum WT application to conduct an on-campus drag show is denied for the reasons given previously and for the reasons further explained in court filings and those provided by the courts themselves.

Moreover, it is denied because S.B. 12 went into effect as a Texas law in September 2023, as well as a number of other compelling considerations.

When the court makes a final decision, it will be implemented.

## Walter V. Wendler
**President**



EXHIBIT
4

W_000088
App. 007

# 08.02.01 Expressive Activity on Campus



Approved: November 13, 2025
Next Scheduled Review: November 13, 2030

## Regulation Summary

In accordance with System Policy *08.02, Expressive Activity on Campus*, this regulation outlines the rights and responsibilities regarding expressive activities at member campuses.

## Definitions

1. **Antisemitism** means a certain perception of Jews that may be expressed as hatred toward Jews. The term includes rhetorical and physical acts of antisemitism directed toward Jewish or non-Jewish individuals or their property or toward Jewish community institutions and religious facilities.[1] Antisemitic conduct comprised of behavior expressed in section 1.4.1 of this regulation will not be tolerated by the system or its members.

2. **Benefit** includes, but is not limited to, recognition by or registration with the member, the use of the member's facilities for meetings or speaking purposes, the use of channels of communication controlled by the member, and funding sources made generally available to student organizations at the member.

3. **Campus** means all land and buildings owned or leased by the member, including those at branch campuses and remote locations.

4. **Common outdoor areas** mean places located outside a building or facility that are accessible to the public, such as streets, sidewalks, plazas, lawns, and parks, unless closed by the member for a special event. This term does not include areas immediately adjacent to a private residence or secure facility.

5. **Designated public forums** include other parts of campus that may become temporarily available for expressive activity as designated by the member. These temporary locations, while in existence, will be treated similar to public streets, sidewalks, and parks in terms of access and availability for expressive activity. (Obstructing or impeding the flow of vehicular or pedestrian traffic is prohibited.)

6. **Disruptive Activity** is the obstruction, disruption or interference with classes, research, administrative functions, or other member activities, and is not permitted. Likewise, infringement on the rights of others is prohibited.

7. **Employee** means an individual employed by the member.

8. **Expressive activity** means any speech or expressive conduct protected by the First Amendment to the United States Constitution or by Section 8, Article     Texas Constitution,

---

[1] Tex. Gov't Code § 448.001.
08.02.01, Expressive Activity on Campus



App. 008

and includes but is not limited to assemblies, protests, speeches, the distribution of written material, the carrying of signs, and the circulation of petitions. The term does not include defamation, unlawful harassment, incitement to imminent unlawful activity, obscenity, or threats to engage in unlawful activity.

9. **Faculty** means any full or part-time employee of the member holding an academic appointment.

10. **Inciting or producing imminent lawless action** means speech or behavior that is directed to inciting or producing imminent unlawful action and is likely to incite or produce such action.

11. **Limited public forums** have limited open access for public expression, or they may be limited to particular groups or particular topics.

12. **Materially and substantially disrupt(s)** means interrupting a program or activity in a significant and consequential manner.

13. **Member** means a system academic institution or the System Offices (for purposes of the RELLIS Academic Alliance at the RELLIS Campus).

14. **Non-public forums** are areas that are not traditional public forums or designated public forums. These include areas that are not by tradition or designation forums for public communication. These forums will be restricted to use for their intended purpose and are not available for public expressive activity. Examples include, but are not limited to, classrooms, residence hall rooms, faculty and staff offices, academic buildings, administration buildings, medical treatment facilities, libraries, research and computer laboratories, and research facilities.

15. **Person** means students, faculty, staff, student organizations, and third parties.

16. **Reasonable time, place, and manner restrictions** means limitations that: (1) are narrowly tailored to serve a significant institutional interest; (2) employ clear, published, content-neutral, and viewpoint-neutral criteria; (3) provide for ample alternative means of expression.

17. **Staff** means an employee of the member that is not a faculty member.

18. **Student** means an individual currently enrolled at the member, full or part-time, pursuing undergraduate, graduate, or professional studies, including students who were enrolled the previous semester and registered for a future semester.

19. **Student Organization** means any organization that is composed mostly of students enrolled at an institution of higher education and that receives a benefit from the institution.

20. **Third party** means a person that is not a member student, student organization, or employee.

21. **Traditional public forum** means a place, widely recognized in law, which has been intended for the use of the public, and has been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions when the principal function of the location would not be disrupted by expressive activity. Examples of traditional public forums include public streets, sidewalks, plazas, lawns, and parks. These areas are generally available for expressive activity, planned or spontaneous, for the individual or small groups of individuals at any time without the need for reservation or prior approval. (Obstructing or impeding the flow of vehicular or pedestrian traffic is prohibited.)

22. **True Threats** means communication of a serious expression of intent to harm a specific person or group of people or commit unlawful violence.

23. **Unlawful Harassment** means conduct that is so severe and pervasive and objectively offensive that it denies or limits a person's ability to participate in or benefit from an educational program or activity. See System Regulation 08.01.01.

## Regulation

1.  EXPRESSIVE ACTIVITY RIGHTS & RESPONSIBILITIES

    1.1.    Any person is allowed, subject to the limitations in this regulation and a member's reasonable time, place, and manner restrictions, to engage in expressive activities on campus, including by responding to the expressive activities of others.

    1.2.    Students and employees must present proof of identity and status at the member on request by a member official on campus engaging in an official duty.

    1.3.    Student organizations and employees are allowed to invite speakers to speak on campus, subject to the restrictions outlined in this regulation. In determining the amount of a fee to be charged for use of the member's facilities for purposes of engaging in expressive activities, the member may consider only content-neutral and viewpoint-neutral criteria related to the requirements of the event, such as the proposed venue and the expected size of the audience, any anticipated need for campus security, any necessary accommodations, and any relevant history of compliance or noncompliance by the requesting student organization or employee with this regulation and other relevant member rules. The member may not consider any anticipated controversy related to the event.

    1.4.    The member may not take action against a student organization or deny the organization any benefit generally available to other student organizations at the member on the basis of a political, religious, philosophical, ideological, or academic viewpoint expressed by the organization or of any expressive activities of the organization.

    1.4.1.    The member may take action against persons who engage in expressive activity that is not protected by this regulation or the First Amendment.

    1.4.2.    Expressive activities that may result in sanctions and are not protected by this regulation or the First Amendment include the following: defamation, obscenity, physical abuse or assault, true threats, disruption of the academic environment or member-sponsored extracurricular event; inciting or producing imminent unlawful activity; or unlawful harassment.

    1.4.3.    Conduct described in 1.4.2 may be reviewed and adjudicated under System Regulation *08.01.01, Civil Rights Compliance*, including those related to actionable discrimination or harassment based on race, color, sex, religion, national origin, age, disability, genetic information, veteran status, or any other classification protected by federal, state, or local law.[2] Additionally, said conduct may also be reviewed and adjudicated under the member's student conduct code when the conduct does not rise to the level of a civil rights violation.

---

[2] This includes unprotected activities motivated by antisemitism and other forms of shared ancestry discrimination as listed in the Dear Colleague Letter (Nov. 7, 2023).

App. 010

1.5.    The common outdoor areas of the member's campus, unless otherwise identified by the member in its approved expressive activity rule, are deemed traditional public forums. Any person is permitted to engage in expressive activities in these areas freely, as long as the person's conduct: (a) is not unlawful; and (b) does not materially and substantially disrupt the functioning of the institution. Any person is allowed to assemble or distribute written material in common outdoor areas without a permit or other permission from the institution, subject to the restrictions outlined in this regulation.

    1.5.1.    As outlined in Section 2, members may require advance reservation of events in certain circumstances to ensure safety and to promote an environment conducive to study.

    1.5.2.    There are areas such as residences, secure facilities, utility buildings, etc., that have distance requirements, crowd placement restrictions, and security concerns that may vary depending on security needs, terror alerts, and other factors. Additionally, security needs, terror alerts, and local and national events may affect the availability of spaces that would otherwise be routinely available. Information about existing requirements, restrictions, or security concerns will be discussed at the time a reservation request is processed.

    1.5.3.    The members retain the right to adopt reasonable time, place, and manner restrictions in common outdoor areas if the restrictions: (a) are narrowly tailored to serve a significant member interest; (b) employ clear, published, content-neutral, and view-point neutral criteria; (c) provide for ample alternative means of expression; and (d) allow all persons to assemble or distribute written material without a permit or other permission from the member.

1.6.    Nothing in this regulation should be interpreted or construed as:

    1.6.1.    prohibiting faculty members from maintaining order in the classroom.

    1.6.2.    limiting or infringing on a person's right to freedom of speech or expression protected by the First Amendment to the U.S. Constitution or by section 8, Art. I, Texas Constitution.

    1.6.3.    prohibiting the member from maintaining rules differentiating between the rights of students and employees and the rights of those persons who are not students or employees.

1.7.    This regulation categorically ***prohibits*** the following expressive activity on campus:

    1.7.1.    Using a device to amplify sound that, as determined by the member, (a) intimidates others in a manner that rise to the level of a true threat or another exception to First Amendment protection; (b) interferes with campus operations in a matter that materially and substantially disrupts the functioning of the member; or (c) interferes with a member employee's or a peace officer's lawful performance of a duty.

    1.7.2.    During the last two weeks of a semester, engaging in the following expressive activities in a manner that materially and substantially disrupts the functioning of the member: (a) having events in the common outdoor areas; (b) inviting speakers to speak on campus; (c) using a device to amplify sound; or (d) using drums or other percussive instruments.

1.7.3.  At any time, camping or erecting tents or other living accommodations on campus.

1.7.4.  Wearing a disguise or other means of concealing a person's identity while engaging in expressive activities on campus *with the intent to*: (a) obstruct the enforcement of the member's rules or the law by avoiding identification; (b) intimidate others in a manner that rises to the level of a true threat or another exception to First Amendment protection; or (c) interfere with a member employee's or a peace officer's lawful performance of a duty.

1.7.5.  Lowering a member-owned or controlled flag, including the U.S. flag, Texas flag, or member's official flag, *with the intent to* raise the flag of another nation, state, or a flag representing an organization or group of people. Member-owned flag poles are not to be used for private expression.

1.7.6.  Engaging in expressive activity between the hours of 10:00 p.m. and 8:00 a.m. in a manner that materially and substantially disrupts the functioning of the member.

2.  ADVANCE RESERVATION REQUIREMENTS

Notwithstanding section 1.5.3, to ensure safety and to promote an environment conducive to study, research, and scholastic activity, an advanced reservation for expressive activity is required for events or activities that are near intersections, and/or in close proximity to academic or research buildings anytime classes, study activities, and/or research or scholarly activity are taking place.

3.  ADDITIONAL RESPONSIBILITIES

3.1.  <u>Other Member Rules</u>

All applicable system regulations and member rules must be followed whenever engaging in activities on campus.

3.2  <u>Compliance with Law</u>

All persons participating in expressive activity are expected to comply with state and federal law, and applicable municipal ordinances. Failure to do so may result in immediate removal from the campus and any other appropriate action by member officials and/or University Police.

4.  GRIEVANCE PROCEDURE

4.1.  Any person who believes that their campus expressive activity rights, as recognized by this regulation, have been unduly interfered with by a student, student organization, or employee has the right to file a grievance.

4.2.  Member rules will designate the appropriate office for grievances filed by staff, faculty, students, and third parties.

4.3.  Those who choose to observe and/or listen to expressive activities bear the responsibility of recognizing and honoring the right of free speech. Any acts that are disruptive to the normal operations of the member, including classes and member business, or that invade the rights of others will not be tolerated. A student, student organization, or employee who is found to have unduly interfered with another person's expressive activity rights, as recognized by this regulation, is subject to

App. 012

disciplinary action in accordance with the member's applicable rules and procedures. Any participant in a disruptive activity may also face criminal charges.

5. IMPLEMENTATION

5.1. A copy of this regulation and the member's expressive activity rule must be provided to students during new student orientation programs.

5.2. This regulation and the member's expressivity activity rule must be posted on the member's website.

5.3 A link to this regulation and the member's expressive activity rule must be included in student and employee handbooks, if maintained by the member.

## Related Statutes, Policies, or Requirements

Texas Education Code § 51.9315, *Protected Expression on Campus*.
Texas Government Code § 448.001
Executive Order GA-44 (March 27, 2024)

## Appendix

Member Rule Template

## Contact Office

General Counsel
(979) 458-6120

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

SPECTRUM WT, *et al.*,

    Plaintiffs,

v.              No. 2:23-cv-00048

WALTER WENDLER, *et al.*,

    Defendants.

## DEFENDANT WALTER WENDLER'S SECOND AMENDED RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Pursuant to Federal Rules of Civil Procedure 33 and 34, Defendant, Walter Wendler, in his official capacity, hereby submit his objections and responses to Plaintiff's First Set of Interrogatories to Defendant Wendler.

## GENERAL STATEMENT

Defendant Wendler's responses and objections are based on the information known to Defendant Wendler at this time and are made without prejudice to the assertion of additional responses and objections should Defendant identify additional grounds thereof. Defendant reserves the right to supplement, clarify, revise, or correct any or all their responses to Plaintiff's Interrogatories and Requests for Production. By answering any requests, Defendant does not concede the materiality of the subject to which it refers. Defendant's responses are made expressly subject to, and without waiving or intending to waive, any questions, or objections as to the competency, relevancy, materiality, privilege, or admissibility as evidence or for any other purpose, of any of the documents or information provided, or of the subject matter thereof, in any proceeding including the trial of this action or any subsequent proceeding.

## GENERAL OBJECTIONS

1. Defendant objects to Plaintiff's 11-prong definition of "identify" as overbroad and unduly burdensome to the extent that it demands information irrelevant to the ongoing litigation.

2. Defendant objects to each interrogatory directing it to "identify every person" it has communicated with concerning Plaintiff's drag shows to the extent that such requests seek

1


EXHIBIT
tabbies
21
App. 011

information collected in preparation for this litigation and communications protected by attorney-client privilege.

3. Defendant objects to each interrogatory directing it to "[s]tate all facts," "[i]dentify each reason," "[s]tate all bases," or something similar. Defendant is not obligated to furnish all its evidence at this stage of litigation. *See* Fed. R. Civ. P. 33; *see also Faykus-Orr v. Liberty Life Assur. Co. of Boston*, No. 3:06-cv-0750, 2006 WL 3734213, at *4 (N.D. Tex. Dec. 18, 2006) ("Defendant is not required to marshal plaintiff's evidence for her.").

4. Defendant objects to each interrogatory to the extent that it seeks publicly available information or information that is equally available to Plaintiff.

5. Defendant objects to each interrogatory to the extent that it is overbroad or unduly burdensome, requesting information neither proportional to the needs of this case nor within the scope of discovery.

6. Defendant objects to each interrogatory to the extent that it requests information about non-parties to the litigation who are beyond the scope of Defendant's control.

## RESPONSES AND OBJECTIONS TO INTERROGATORIES

### Interrogatory No. 1

Identify every person Wendler communicated with concerning Plaintiff, drag shows, A Fool's Drag Race, the Sam Houston drag show, the Don't Be A Drag Drag Show, the "Draggieland" performance(s) at Texas A&M University, the February 28, 2025 resolution of the Texas A&M University System entitled "Resolution Regarding Certain Public Events on the Campuses of Universities in the Texas A&M University System," or the Litigation since January 1, 2022.

**Response:**

Defendant objects to this interrogatory because it is multifarious, vague, overbroad, not within the scope of discovery, as it is not "proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *See* Fed. R. Civ. P. 26(b)(1). The Sam Houston drag show was an off-campus event planned and facilitated entirely by Plaintiff. President Wendler was not apprised of details concerning that event before or at the time of its occurrence. Moreover, no "Draggieland" performances have occurred at

App. 015

WTAMU or are at issue in this litigation.

Defendant further objects to the phrase "every person Wendler communicated with" to the extent it is vague, impermissibly overbroad, and potentially seeks information that is not only irrelevant to any party's claim or defense but also which concerns non-parties whose deliberations and activities are not within President Wendler's custody or control.

Subject to and without waiving the foregoing objections, President Wendler communicated with the following Texas A&M University ("TAMU") System and West Texas A&M University ("WTAMU," or "University") officials and employees regarding Plaintiff's proposed drag shows in 2023 or 2024:  WTAMU Vice Presidents Chris Thomas and Todd Rasberry; WTAMU Executive Vice President Neil Terry; WTAMU Chief of Staff Tracee Post; (former) WTAMU Communication and Community Outreach Specialist Amberly Winningham; WTAMU donor Alex Fairly; (former) TAMU System Chancellor John Sharp; and TAMU Assistant Vice Chancellor for Governmental Relations David Rejino.

On March 20, 2023, and March 18, 2024, President Wendler emailed memoranda discussing his decision not to permit Plaintiff's drag show in Legacy Hall to substantially all students, faculty, and staff on the University's listserv. The memoranda were likely forwarded to many others unknown to Defendant.

President Wendler's communication with Alex Fairly and David Rejino was limited to an "FYI" email putting them on notice of his 2023 memorandum after its publication.  President Wendler's communications with Todd Rasberry, Amberly Winningham and Tracee Post were for editing purposes.  Tracee Post and Amberly Winningham provided grammatical and stylistic editorial suggestions for President Wendler's 2023 memorandum before its publication. Todd Rasberry also reviewed the 2023 document and made non-substantive editorial suggestions.

## Interrogatory No. 2

Identify every person who provided input (or was provided a draft version of) President Wendler's March 20, 2023 statement on or before March 20, 2023.

## Response:

Defendant objects to the phrase "every person who provided input" to the extent it is vague, ambiguous, and potentially seeks information that is not relevant to any party's claim or defense. Moreover, the request for "every person who provided input" concerning President Wendler's March 20, 2023, statement imposes upon Defendant a burden to identify all people who may have set eyes on the statement on or before March 20, 2023, without regard to those individuals' degree of "input" or relationship to WTAMU.

Subject to and without waiving foregoing objections, Defendant responds as follows:

App. 016

Tracee Post (Chief of Staff) and Amberly Winningham (former WTAMU Communication and Community Outreach Specialist) provided grammatical and stylistic editorial suggestions for President Wendler's 2023 memorandum before its publication. Todd Rasberry (WTAMU Vice President for Philanthropy and External Relations) also reviewed the 2023 document and made non-substantive editorial suggestions.

## Interrogatory No. 3

Identify every person who participated in any decision to cancel any of Plaintiff Spectrum WT's proposed events.

**Response:**

Defendant objects to the phrase "every person who participated" as vague and ambiguous.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

It was President Wendler's decision alone to not permit Plaintiff's proposed drag shows at Legacy Hall, as reflected in his two memoranda to the University community dated March 20, 2023, and March 18, 2024. To President Wendler's knowledge, all other events sponsored by Plaintiff on the West Texas A&M University campus during his time at WTAMU were not cancelled but proceeded.

## Interrogatory No. 4

Identify every basis for canceling Plaintiff's drag shows at Legacy Hall.

**Response:**

Defendant objects to this interrogatory because it is unreasonably cumulative or duplicative of prior statements which have been produced in this lawsuit. Defendant objects to this request because the discovery requested can be obtained from some other source that is more convenient, less burdensome, or less extensive. *See* FED. R. CIV. P. 26(b)(2)(C)(i).

Subject to and without waiving the foregoing objections, Defendant responds as follows:

In deciding not to permit Plaintiff's drag shows at Legacy Hall in March 2023 and March 2024, President Wendler was guided by his obligation to ensure that West Texas A&M University remains a discrimination-free workplace and learning environment where all students, faculty, and staff are treated with dignity and respect. Respect is a core value of WTAMU. President Wendler believes all members of the campus community not only enjoy certain rights and privileges but also bear certain responsibilities. Among those responsibilities is the commonsense imperative to refrain from conduct that disrespects, demeans, or dehumanizes others. Legacy Hall is a limited public forum

4

App. 017

that should not be used for events that are inappropriate or inconsistent with WTAMU's core values and educational mission or that risk violations of law or exposure of minors to lewd conduct that may be obscene according to standards applicable to such minors. President Wendler's decisions were generally consistent with the following non-exhaustive list of statutes, policies, procedures, rules, and regulations (some of which have been enacted or placed in effect during the pendency of this action but after March 2024:

## I. Federal and State Statutes and Policies

    a. Title IX of the Educational Amendments Act of 1972 ("Title IX")
    b. Texas Senate Bill 12 ("S.B. 12"), enacted during the Legislature's 88th Regular Session.

When he did not permit Plaintiff's 2024 drag show at Legacy Hall, President Wendler was aware of proposed and later enacted legislation, S.B. 12, which criminalizes "'sexually oriented performances' on public property in the presence of minors." *The Woodlands Pride, Inc. v. Paxton*, No. 23-20480, 2025 U.S. App. LEXIS 29217, at *6 (5th Cir. Nov. 6, 2025) (citing TEX. HEALTH & SAFETY CODE ANN. § 769.002; TEX. LOC. GOV'T CODE ANN. § 243.0031; and TEX. PENAL CODE ANN. § 43.28).

    c. Texas Senate Bill 12 ("S.B. 12"), enacted during the Legislature's 89th Regular Session.

While this litigation has been pending, the Texas Legislature enacted "S.B. 12," which, in relevant part, prevents Texas public "school district[s][and] open-enrollment charter schools" from "provid[ing] or allow[ing] a third party to provide instruction, guidance, activities, or programming regarding sexual orientation or gender identity to [K-12] students . . . ." *See* TEX. EDUC. CODE §28.0043.

    d. Exec. Order No. 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, 90 Fed. Reg. 8615 (Jan. 20, 2025) (acknowledging the "biological reality of sex" and warning "[f]ederal funds shall not be used to promote gender ideology")
    e. Exec. Order No. 14190, Ending Radical Indoctrination in K-12 Schooling, 90 Fed. Reg. 8853 (Feb. 3, 2025) (empowering federal agencies to, among other things, "prevent or rescind [f]ederal funds . . . from being used by a[] . . . secondary school to directly or indirectly support or subsidize . . . a violation of . . . Title IX")
    f. Letter from Governor Abbott to University Systems (May 8, 2024) (ordering public universities in Texas "not to comply with President Biden's . . revision of Title IX")
    g. Letter from Governor Abbott to State Agencies (Jan. 30, 2025) (requiring state agencies to "reject[] radical sexual orientation and gender identity ideologies").
    h. "Resolution Regarding Certain Public Events on the Campus of Universities in the Texas A&M University System," dated February 28, 2025 (declaring on-campus drag shows "likely to create or contribute to a hostile environment for women contrary to

App. 018

System anti-discrimination policy and Title IX") and directive from Chancellor Sharp thereafter.

## II. TAMUS Policies and Regulations

i. TAMUS Regulation 08.01, entitled "Civil Rights Protections and Compliance"
j. TAMUS Regulation 08.01.01, entitled "Civil Rights Compliance"
k. TAMUS Policy 08.02, entitled "Expressive Activity on Campus"TAMUTAMU Regulation 08.02.01, entitled "Expressive Activity on Campus"
l. TAMUS Policy 13.02, entitled "Student Rights and Obligations"

## III. WTAMU Rules and Procedures

m. WTAMU Rule 07.03.01.W1, entitled "Political Campaign Events"
n. WTAMU Rule 08.01.01.W1, entitled "Civil Rights Compliance"
o. WTAMU Rule 08.99.99.W1, entitled "Expressive Activity on Campus"
p. WTAMU Rule 08.99.99.W1, entitled "Expressive Activity on Campus" (revised July 28, 2025)
q. WTAMU Procedure 24.01.01.W0.01, entitled "Facility Use Request Procedure"
r. WTAMU's Code of Student Life: Rules and Procedures for Students (Updated August 2020)
   - Relevant sections include, but are not limited to:
     1. General Purpose
     2. WTAMU Mission Statement
     3. WTAMU Core Values
     4. Student Centered Philosophy
     5. Affirmative Action/Equal Opportunity
     6. Procedures and Rules for Students
     7. Student Bill of Rights
     8. Students' Responsibilities
     9. Free Speech and Advocacy on Campus
     10. Section A: Student Conduct Mission and Policies
     11. Student Rules on (a) disorderly conduct; (b) disruptive activity; (c) harmful, threatening or endangering conduct; (d) harassment; and (e) sexual misconduct.
     12. Hazing
     13. Explosives, Fireworks, and Weapons
     14. Violation of Published University Rules or Regulations
     15. Violation of Federal, State, Local Law and/or University Procedures
     16. Civil Rights & Title IX Complaints
     17. Definition of "Gender-based Harassment," located in Appendix A
s. WTAMU Student Handbook 2022-2023
   - Relevant sections include, but are not limited to:
     1. Student Life Rules

6

App. 019

    2. Student Bill of Rights
    3. Community Standards
    4. Failure to Comply and Disorderly Conduct
    5. Food & Beverages
    6. Misuse of Skateboards, Rollerblades, Scooters, Bicycles, Self-Balancing Boards, or Similar Modes of Transportation
    7. Hazing
    8. Violation of Federal, State, Local Law and/or University Rules and Procedures
    9. Propose Revisions

t. WTAMU Student Handbook 2023-2024
- Relevant sections include, but are not limited to:
    1. Welcome Statement
    2. Foreword
    3. Student Life Rules
    4. Student Bill of Rights and Responsibilities
    5. Community Standards
    6. Explosives, Fireworks, and Weapons
    7. Failure to Comply and Disorderly Conduct
    8. Harassment
    9. Sexual Misconduct
    10. Food & Beverages
    11. Misuse of Transportation
    12. Hazing
    13. Violation of Federal, State, Local Law and/or University Rules and Procedures
    14. Propose Revisions

u. WTAMU Student Handbook 2025-2026
- Relevant sections include, but are not limited to:
    1. Welcome Statement
    2. Foreword
    3. Students' Rights and Responsibilities
    4. Community Standards
    5. Expressive Activity
    6. Failure to Comply and Disorderly Conduct
    7. Firearms, Ammunition, and Weapons
    8. Food and Beverages
    9. Harassment
    10. Hazing
    11. Misuse of Transportation
    12. Sexual Misconduct
    13. Soliciting on Campus
    14. Violation of Federal, State, Local and/or University Procedures
    15. Civil Rights and Title XI

App. 020

　　　　16. Propose Revisions
　　v. WTAMU Jack B. Kelley Student ("JBK") Center Procedures & Guidelines (2023 and 2025 editions)
　　　　• Relevant sections in the 2023 edition include, but are not limited to:
　　　　　　1. Mission Statements
　　　　　　2. General Policies
　　　　　　3. Decorations
　　　　• Relevant sections in the 2025 edition include, but are not limited to:
　　　　　　1. Mission Statements
　　　　　　2. General Policies
　　　　　　3. Buffaloes Traditions Program
　　　　　　4. Institutional Priority Events
　　　　　　5. Marketing/Advertising
　　w. WTAMU Statement on Equal Opportunity/Nondiscrimination (available at: https://www.wtamu.edu/about/information/equal-opportunity-nondiscriminatio n.html)
　　x. Campus Organizations Handbook
　　y. WTAMU Pre-University Program ("PUP") Frequently Asked Questions (available at: https://www.wtamu.edu/admissions/pre-university-program/pup-faq.html)
　　z. WTAMU PUP Program Agreement Forms (for Independent School Districts)
　　aa. WTAMU PUP Program Agreement Form (for Homeschool Students)

Hard copies of several materials in this list are already in Plaintiff's possession. Defendant included items d, e, f, h, i, j, t, v, w, x, y, bb, cc, and ee in the Exhibits Binder that it presented to Plaintiff during the parties' status conference on September 10, 2025.

Aside from the above-mentioned statutes, policies, procedures, and rules, please see President Wendler's memoranda to the campus community entitled "A Harmless Drag Show? No Such Thing," dated March 20, 2023, and "Spectrum WT Application for On-Campus Drag Show," dated March 18, 2024. Defendant has produced a non-exhaustive list of the many publications and materials he considered contemporaneously with his 2023 response. *See, e.g.,* Def_000749–Def_000821.

President Wendler also took into account both the custom of according respect to individuals of all races and genders in the University community, and the custom of not publicly disrespecting, denigrating, demeaning, or negatively caricaturing individuals of other races and genders. In his view, maintaining those customs is important to achieving the educational mission of WTAMU; to living up to WTAMU's core value of Respect; to attracting and retaining quality students, faculty, and employees at WTAMU; and to garnering and retaining critical public and private financial and community support for WTAMU.

**Interrogatory No. 5**

App. 021

State all facts known to Wendler individually that he relied on in deciding to cancel A Fool's Drag Race.

**Response:**

Defendant objects to the phrase "all facts known to Wendler individually" to the extent it is vague, ambiguous, and potentially seeks information that is not relevant to any party's claim or defense. Moreover, Plaintiff does not define the term "facts." Defendant objects to this interrogatory because it is unreasonably cumulative or duplicative of prior statements which have been produced in this lawsuit. Defendant further objects to this request because the discovery requested can be obtained from some other source that is more convenient, less burdensome, or less extensive. *See* FED. R. CIV. P. 26(b)(2)(C)(i).

Subject to and without waiving the foregoing objections, Defendant hereby incorporates Response to Interrogatory No. 4 above and further responds as follows. President Wendler was aware of the following facts:

- Plaintiff planned to host its drag performance in Legacy Hall, located in the JBK Student Center on the WTAMU campus.
- As President and CEO of WTAMU, President Wendler is obligated to create a discrimination-free learning and work environment for WTAMU students, faculty, and staff.
- WTAMU endeavors to ensure all individuals are treated with dignity and respect; indeed, respect is a core value of WTAMU, and it is the obligation of university leaders to safeguard and further that value.
- Executive university administrators must make difficult and important decisions with which some inevitably will disagree.
- WTAMU students have rights, privileges, and responsibilities as members of the University community, including the responsibility to treat each other with basic respect.
- WTAMU seeks to meet or exceed the expectations of its internal and external stakeholders, including the Panhandle community, the WTAMU community, and those who provide the public and private resources essential to WTAMU.
- WTAMU reserves the right to cancel on-campus events or programming that is inappropriate or inconsistent with the University's mission or policies.
- Drag performances commonly involve biological men dressing up as and impersonating women in an attempt to parody gender norms.
- Drag performances often may exaggerate aspects of femininity and womanhood in a manner that may reasonably be perceived as disrespectful to women.
- Drag performances often may include conduct reasonably deemed to be lewd or sexually risqué by community standards in the Texas Panhandle, especially those standards applicable to minors.
- Plaintiff planned to host a drag performance hosted by a non-student billed as Myss Myka, also known as Mr. Michael Arredondo, in WTAMU's Legacy Hall.
- Plaintiff did not initially advertise A Fool's Drag Race as a "PG-13" event.

9

App. 022

- Plaintiff did not specify what criteria it used in rating A Fool's Drag Race as "PG-13."
- Plaintiff stated that it would permit minors to attend A Fool's Drag Race if they were accompanied by a parent or guardian.
- Plaintiff stated that proceeds from Plaintiff's 2023 drag show would be donated to the Trevor Project, a non-profit organization focused on suicide prevention in the LGBTQ+ community.
- Off campus venues were expected to be available to Plaintiff for drag shows so that a restriction on the use of Legacy Hall would not prevent Plaintiff from exercising any claimed First Amendment rights to conduct drag shows.
- Plaintiff claimed that its drag shows express a message of LGBTQ+ acceptance, but Plaintiff has expressed that message through other events that do not disrespect others. Plaintiff remains free to do so on the WTAMU campus.

## Interrogatory No. 6

Identify every statute, policy, rule, regulation, or custom Wendler individually relied upon in deciding to cancel A Fool's Drag Race.

## Response:

Defendant objects to this request to the extent the terms "policy," "rule," "regulation," or "custom" are vague or ambiguous. Defendant further objects to this request because it is unreasonably cumulative or duplicative of the A&M System policies and regulations, and WTAMU rules and procedures themselves. *See* Fed. R. Civ. P. 26(b)(2)(C)(i). The requesting party's ability to obtain the information is similar to that of the responding party. *See* Fed. R. Civ. P. 26(b)(1).

Subject to and without waiving the foregoing objections, Defendant hereby incorporates Responses to Interrogatories 4 and 5 and further responds as follows:

In deciding not to permit A Fool's Drag Race at Legacy Hall, President Wendler was guided by his obligation to ensure that West Texas A&M University remains a discrimination-free workplace and learning environment where all students, faculty, and staff are treated with dignity and respect. As the President and CEO of WTAMU, President Wendler must make difficult and important decisions which balance students' needs with the needs of the larger campus community. These decisions inevitably are unpopular with some. He believes all members of the campus community not only enjoy certain rights and privileges but also bear responsibilities to refrain from conduct that disrespects, demeans or dehumanizes others. President Wendler's decisions were generally consistent with the following non-exhaustive list of statutes, policies, procedures, rules, and regulations:

### I. Federal and State Statutes and Policies
    a. Title IX of the Educational Amendments Act of 1972 ("Title IX")
    b. Texas Senate Bill 12 ("S.B. 12"), enacted during the Legislature's 88th Regular Session.

10

App. 023

c. Texas Senate Bill 12 ("S.B. 12"), enacted during the Legislature's 89th Regular Session.

d. Exec. Order No. 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, 90 Fed. Reg. 8615 (Jan. 20, 2025) (acknowledging the "biological reality of sex" and warning "[f]ederal funds shall not be used to promote gender ideology")

e. Exec. Order No. 14190, Ending Radical Indoctrination in K-12 Schooling, 90 Fed. Reg. 8853 (Feb. 3, 2025) (empowering federal agencies to, among other things, "prevent or rescind [f]ederal funds . . . from being used by a[] . . . secondary school to directly or indirectly support or subsidize . . . a violation of . . . Title IX")

f. Letter from Governor Abbott to University Systems (May 8, 2024) (ordering public universities in Texas "not to comply with President Biden's . . . revision of Title IX")

g. Letter from Governor Abbott to State Agencies (Jan. 30, 2025) (requiring state agencies to "reject[] radical sexual orientation and gender identity ideologies").

h. "Resolution Regarding Certain Public Events on the Campus of Universities in the Texas A&M University System," dated February 28, 2025 (declaring on-campus drag shows "likely to create or contribute to a hostile environment for women contrary to System anti-discrimination policy and Title IX")

## II. TAMU Policies and Regulations

i. TAMUS Regulation 08.01, entitled "Civil Rights Protections and Compliance"

j. TAMU Regulation 08.01.01, entitled "Civil Rights Compliance"

k. TAMUS Policy 08.02, entitled "Expressive Activity on Campus"

l. TAMUS Regulation 08.02.01, entitled "Expressive Activity on Campus"

m. TAMUS Policy 13.02, entitled "Student Rights and Obligations"

## III. WTAMU Rules and Procedures

n. WTAMU Rule 07.03.01.W1, entitled "Political Campaign Events"

o. WTAMU Rule 08.01.01.W1, entitled "Civil Rights Compliance"

p. WTAMU Rule 08.99.99.W1, entitled "Expressive Activity on Campus"

q. WTAMU Rule 08.99.99.W1, entitled "Expressive Activity on Campus" (revised July 28, 2025)

r. WTAMU Procedure 24.01.01.W0.01, entitled "Facility Use Request Procedure"

s. WTAMU's Code of Student Life: Rules and Procedures for Students (Updated August 2020)

- Relevant sections include, but are not limited to:
  1. General Purpose
  2. WTAMU Mission Statement
  3. WTAMU Core Values
  4. Student Centered Philosophy
  5. Affirmative Action/Equal Opportunity
  6. Procedures and Rules for Students
  7. Student Bill of Rights
  8. Students' Responsibilities

11

9. Free Speech and Advocacy on Campus
10. Section A: Student Conduct Mission and Policies
11. Student Rules on (a) disorderly conduct; (b) disruptive activity; (c) harmful, threatening or endangering conduct; (d) harassment; and (e) sexual misconduct.
12. Hazing
13. Explosives, Fireworks, and Weapons
14. Violation of Published University Rules or Regulations
15. Violation of Federal, State, Local Law and/or University Procedures
16. Civil Rights & Title IX Complaints
17. Definition of "Gender-based Harassment," located in Appendix A

t.  WTAMU Student Handbook 2022-2023
- Relevant sections include, but are not limited to:
   1. Student Life Rules
   2. Student Bill of Rights
   3. Community Standards
   4. Failure to Comply and Disorderly Conduct
   5. Food & Beverages
   6. Misuse of Skateboards, Rollerblades, Scooters, Bicycles, Self-Balancing Boards, or Similar Modes of Transportation
   7. Hazing
   8. Violation of Federal, State, Local Law and/or University Rules and Procedures
   9. Propose Revisions

u.  WTAMU Student Handbook 2023-2024
- Relevant sections include, but are not limited to:
   1. Welcome Statement
   2. Foreword
   3. Student Life Rules
   4. Student Bill of Rights and Responsibilities
   5. Community Standards
   6. Explosives, Fireworks, and Weapons
   7. Failure to Comply and Disorderly Conduct
   8. Harassment
   9. Sexual Misconduct
   10. Food & Beverages
   11. Misuse of Transportation
   12. Hazing
   13. Violation of Federal, State, Local Law and/or University Rules and Procedures
   14. Propose Revisions

v.  WTAMU Student Handbook 2025-2026
- Relevant sections include, but are not limited to:
   1. Welcome Statement

12

App. 025

2. Foreword
3. Students' Rights and Responsibilities
4. Community Standards
5. Expressive Activity
6. Failure to Comply and Disorderly Conduct
7. Firearms, Ammunition, and Weapons
8. Food and Beverages
9. Harassment
10. Hazing
11. Misuse of Transportation
12. Sexual Misconduct
13. Soliciting on Campus
14. Violation of Federal, State, Local and/or University Procedures
15. Civil Rights and Title XI
16. Propose Revisions

w. WTAMU JBK Student Center Procedures & Guidelines (2023 and 2025 editions)
- Relevant sections in the 2023 edition include, but are not limited to:
  1. Mission Statements
  2. General Policies
  3. Decorations
- Relevant sections in the 2025 edition include, but are not limited to:
  6. Mission Statements
  7. General Policies
  8. Buffaloes Traditions Program
  9. Institutional Priority Events
  10. Marketing/Advertising

x. WTAMU Statement on Equal Opportunity/Nondiscrimination (available at: https://www.wtamu.edu/about/information/equal-opportunity-nondiscriminatio n.html)
y. Campus Organizations Handbook
z. WTAMU Pre-University Program ("PUP") Frequently Asked Questions (available at: https://www.wtamu.edu/admissions/pre-university-program/pup-faq.html)
aa. WTAMU PUP Program Agreement Forms (for Independent School Districts)
bb. WTAMU PUP Program Agreement Form (for Homeschool Students)

Hard copies of several materials in this list are already in Plaintiff's possession. Defendant included items d, e, f, h, i, j, t, v, w, x, y, bb, cc, and ee in the Exhibits Binder that it presented to Plaintiff during the parties' status conference on September 10, 2025.

Aside from the above-mentioned statutes, policies, procedures, and rules, please see President Wendler's memoranda to the campus community entitled "A Harmless Drag Show? No Such Thing," dated March 20, 2023, and "Spectrum WT Application for On-Campus Drag

13

App. 026

Show," dated March 18, 2024. President Wendler has produced to Plaintiff a non-exhaustive list of the many publications and materials he considered contemporaneously with his 2023 response. *See, e.g.*, Def_000749–Def_000821.

President Wendler also generally took into account both the custom of according respect to individuals of all races and genders in the university community, and the custom of not publicly disrespecting, denigrating, demeaning, or negatively caricaturing individuals of other races or genders. In his view, maintaining those customs is important to achieving the educational mission of WTAMU; to attracting and retaining quality students, faculty, and employees at WTAMU; and to garnering critical public and private financial and community support for WTAMU.

Finally, President Wendler's decision was informed by his role, responsibilities, and experiences as the top administrative official of a university in the Panhandle community of Texas with thousands of students, some of whom are minors. He took into account his years of conversations and dealings with current and prospective WTAMU students, faculty, staff, parents, and community members in reaching his decision not to permit Plaintiff's on-campus drag performances at Legacy Hall.

### Interrogatory No. 7

State all facts known to Wendler individually that he relied on in deciding to cancel Don't Be A Drag Drag Show.

### Response:

Defendant objects to the phrase "all facts known to Wendler individually" to the extent it is vague, ambiguous, and potentially seeks information that is not relevant to any party's claim or defense. Defendant objects to this interrogatory because it is unreasonably cumulative or duplicative of prior statements which have been produced in this lawsuit. Defendant objects to this request because the discovery requested can be obtained from some other source that is more convenient, less burdensome, or less extensive. *See* FED. R. CIV. P. 26(b)(2)(C)(i).

Subject to and without waiving the foregoing objections, Defendant incorporates Responses to Interrogatories 4 through 6 and states as follows:

President Wendler was aware of the following facts:

- Plaintiff planned to host the Don't Be a Drag Drag Show at WTAMU's Legacy Hall, located in the JBK Student Center.
- As President and CEO of WTAMU, President Wendler is obligated to create a discrimination-free learning and work environment for WTAMU students, staff, faculty.
- Executive university administrators must make difficult and important decisions with which some inevitably will disagree.
- Because of WTAMU's PUP Program and otherwise, minors are enrolled in the University, credentialed as other students, and take courses on campus.
- WTAMU endeavors to ensure all individuals are treated with dignity and respect.

14

- WTAMU seeks to meet or exceed the expectations of its internal and external stakeholders, including the WTAMU community, the Panhandle community, and those who provide public or private support to WTAMU.
- WTAMU students have rights, privileges, and responsibilities as members of the University community, including the responsibility not to disrespect or demean others.
- WTAMU reserves the right to not permit on-campus events or programming that are inappropriate or inconsistent with the University's mission or policies.
- At the time of deciding not to permit Plaintiff's 2024 drag performance, Don't Be a Drag Drag Show, at Legacy Hall, President Wendler was aware of proposed and later enacted legislation, S.B. 12, which criminalizes "'sexually oriented performances' on public property in the presence of minors." *The Woodlands Pride, Inc. v. Paxton*, No. 23-20480, 2025 U.S. App. LEXIS 29217, at *6 (5th Cir. Nov. 6, 2025) (citing TEX. HEALTH & SAFETY CODE ANN. § 769.002; TEX. LOC. GOV'T CODE ANN. § 243.0031; and TEX. PENAL CODE ANN. § 43.28).
- Drag performances commonly involve biological men dressing up as and impersonating women in attempt to parody gender norms.
- Drag performances often may exaggerate aspects of femininity and womanhood.
- Drag performances often may feature conduct reasonably deemed to be lewd, sexually oriented, or obscene by community standards in the Texas Panhandle, especially those applicable to minors.
- Plaintiff advertised Don't Be a Drag Drag Show as a "PG-13" event.
- Plaintiff did not specify what criteria it used in rating Don't Be a Drag Drag Show as "PG-13."
- Plaintiff stated it would permit minors to attend Don't Be a Drag Drag Show if they were accompanied by a parent or guardian.
- Plaintiff stated that proceeds from Plaintiff's 2023 drag show would be donated to the Trevor Project, a non-profit organization focused on suicide prevention in the LGBTQ+ community.
- Off campus venues were expected to be available to Plaintiff for drag shows so that a restriction on the use of Legacy Hall would not prevent Plaintiff from exercising any claimed First Amendment rights to conduct drag shows.
- Plaintiff claimed that its drag shows express a message of LGBTQ+ acceptance, but Plaintiff has expressed that message through other events that do not disrespect others. Plaintiff remains free to do so on the WTAMU campus.

**Interrogatory No. 8**

Identify every statute, policy, rule, regulation, or custom Wendler individually relied on in deciding to cancel Don't Be A Drag Drag Show.

**Response:**

Defendant objects to this request to the extent the terms "policy," "rule," "regulation," or

App. 028

"custom" are vague or ambiguous. Defendant further objects to this request because it is "unreasonably cumulative or duplicative" of the A&M System policies and regulations, and WTAMU rules and procedures themselves. *See* Fed. R. Civ. P. 26(b)(2)(C)(i). The requesting party's ability to obtain the information is similar to that of the responding party. *See* Fed. R. Civ. P. 26(b)(1).

Subject to and without waiving the foregoing objections, Defendant incorporates Responses to Interrogatories 4 through 7, and for further response states as follows:

In deciding not to permit use of Legacy Hall for Plaintiff's Don't Be A Drag Drag Show, President Wendler was guided by his obligation to ensure that West Texas A&M University remains a discrimination-free workplace and learning environment where all students, faculty, and staff are treated with dignity and respect. As the President and CEO of WTAMU, President Wendler must make difficult and important decisions which balance students' needs with the needs of the larger campus community. He believes all members of the campus community not only enjoy certain rights and privileges but also bear certain responsibilities—among those responsibilities is the commonsense imperative to refrain from conduct that disrespects, demeans and dehumanizes others. President Wendler's decision is consistent with the following non-exhaustive list of statutes, policies, procedures, rules, and regulations:

## I. Federal and State Statutes and Policies

    a. Title IX of the Educational Amendments Act of 1972 ("Title IX")
    b. Texas Senate Bill 12 ("S.B. 12"), enacted during the Legislature's 88th Regular Session.

When he cancelled Plaintiff's 2024 drag show, President Wendler was aware of proposed and later enacted legislation, S.B. 12, which criminalizes "'sexually oriented performances' on public property in the presence of minors." *The Woodlands Pride, Inc. v. Paxton*, No. 23-20480, 2025 U.S. App. LEXIS 29217, at *6 (5th Cir. Nov. 6, 2025) (citing TEX. HEALTH & SAFETY CODE ANN. § 769.002; TEX. LOC. GOV'T CODE ANN. § 243.0031; and TEX. PENAL CODE ANN. § 43.28).

    c. Texas Senate Bill 12 ("S.B. 12"), enacted during the Legislature's 89th Regular Session.

While this litigation has been pending, the Texas Legislature enacted "S.B. 12," which, in relevant part, prevents Texas public "school district[s][and] open-enrollment charter schools" from "provid[ing] or allow[ing] a third party to provide instruction, guidance, activities, or programming regarding sexual orientation or gender identity to [K-12] students . . . ." *See* TEX. EDUC. CODE §28.0043.

    d. Exec. Order No. 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, 90 Fed. Reg. 8615 (Jan. 20, 2025) (acknowledging the "biological reality of sex" and warning "[f]ederal funds shall not be used to promote gender ideology")

16

e. Exec. Order No. 14190, Ending Radical Indoctrination in K-12 Schooling, 90 Fed. Reg. 8853 (Feb. 3, 2025) (empowering federal agencies to, among other things, "prevent or rescind [f]ederal funds . . . from being used by a[] . . . secondary school to directly or indirectly support or subsidize . . . a violation of . . . Title IX")

f. Letter from Governor Abbott to University Systems (May 8, 2024) (ordering public universities in Texas "not to comply with President Biden's . . . revision of Title IX")

g. Letter from Governor Abbott to State Agencies (Jan. 30, 2025) (requiring state agencies to "reject[] radical sexual orientation and gender identity ideologies").

h. "Resolution Regarding Certain Public Events on the Campus of Universities in the Texas A&M University System," dated February 28, 2025 (declaring on-campus drag shows "likely to create or contribute to a hostile environment for women contrary to System anti-discrimination policy and Title IX")

## II. TAMUS Policies and Regulations

    a. TAMUS Regulation 08.01, entitled "Civil Rights Protections and Compliance"
    b. TAMUS Regulation 08.01.01, entitled "Civil Rights Compliance"
    c. TAMUS Policy 08.02, entitled "Expressive Activity on Campus"
    d. TAMUS Regulation 08.02.01, entitled "Expressive Activity on Campus"
    e. TAMUS Policy 13.02, entitled "Student Rights and Obligations"

## III. WTAMU Rules and Procedures

    f. WTAMU Rule 07.03.01.W1, entitled "Political Campaign Events"
    g. WTAMU Rule 08.01.01.W1, entitled "Civil Rights Compliance"
    h. WTAMU Rule 08.99.99.W1, entitled "Expressive Activity on Campus"
    i. WTAMU Rule 08.99.99.W1, entitled "Expressive Activity on Campus" (revised July 28, 2025)
    j. WTAMU Procedure 24.01.01.W0.01, entitled "Facility Use Request Procedure"
    k. WTAMU's Code of Student Life: Rules and Procedures for Students (Updated August 2020)
        • Relevant sections include, but are not limited to:
            1. General Purpose
            2. WTAMU Mission Statement
            3. WTAMU Core Values
            4. Student Centered Philosophy
            5. Affirmative Action/Equal Opportunity
            6. Procedures and Rules for Students
            7. Student Bill of Rights
            8. Students' Responsibilities
            9. Free Speech and Advocacy on Campus
           10. Section A: Student Conduct Mission and Policies

App. 030

11. Student Rules on (a) disorderly conduct; (b) disruptive activity; (c) harmful, threatening or endangering conduct; (d) harassment; and (e) sexual misconduct.
12. Hazing
13. Explosives, Fireworks, and Weapons
14. Violation of Published University Rules or Regulations
15. Violation of Federal, State, Local Law and/or University Procedures
16. Civil Rights & Title IX Complaints
17. Definition of "Gender-based Harassment," located in Appendix A

l. WTAMU Student Handbook 2022-2023
   - Relevant sections include, but are not limited to:
     1. Student Life Rules
     2. Student Bill of Rights
     3. Community Standards
     4. Failure to Comply and Disorderly Conduct
     5. Food & Beverages
     6. Misuse of Skateboards, Rollerblades, Scooters, Bicycles, Self-Balancing Boards, or Similar Modes of Transportation
     7. Hazing
     8. Violation of Federal, State, Local Law and/or University Rules and Procedures
     9. Propose Revisions

m. WTAMU Student Handbook 2023-2024
   - Relevant sections include, but are not limited to:
     1. Welcome Statement
     2. Foreword
     3. Student Life Rules
     4. Student Bill of Rights and Responsibilities
     5. Community Standards
     6. Explosives, Fireworks, and Weapons
     7. Failure to Comply and Disorderly Conduct
     8. Harassment
     9. Sexual Misconduct
     10. Food & Beverages
     11. Misuse of Transportation
     12. Hazing
     13. Violation of Federal, State, Local Law and/or University Rules and Procedures
     14. Propose Revisions

n. WTAMU Student Handbook 2025-2026
   - Relevant sections include, but are not limited to:
     1. Welcome Statement
     2. Foreword
     3. Students' Rights and Responsibilities

4. Community Standards
5. Expressive Activity
6. Failure to Comply and Disorderly Conduct
7. Firearms, Ammunition, and Weapons
8. Food and Beverages
9. Harassment
10. Hazing
11. Misuse of Transportation
12. Sexual Misconduct
13. Soliciting on Campus
14. Violation of Federal, State, Local and/or University Procedures
15. Civil Rights and Title XI
16. Propose Revisions

o. WTAMU JBK Student Center Procedures & Guidelines (2023 and 2025 editions)
   - Relevant sections in the 2023 edition include, but are not limited to:
     1. Mission Statements
     2. General Policies
     3. Decorations
   - Relevant sections in the 2025 edition include, but are not limited to:
     1. Mission Statements
     2. General Policies
     3. Buffaloes Traditions Program
     4. Institutional Priority Events
     5. Marketing/Advertising

p. WTAMU Statement on Equal Opportunity/Nondiscrimination (available at: https://www.wtamu.edu/about/information/equal-opportunity-nondiscriminatio n.html)

q. Campus Organizations Handbook

r. WTAMU Pre-University Program ("PUP") Frequently Asked Questions (available at: https://www.wtamu.edu/admissions/pre-university-program/pup-faq.html)

s. WTAMU PUP Program Agreement Forms (for Independent School Districts)

t. WTAMU PUP Program Agreement Form (for Homeschool Students)

Hard copies of several materials in this list are already in Plaintiff's possession. Defendant included items d, e, f, h, i, j, t, v, w, x, y, bb, cc, and ee in the Exhibits Binder that it presented to Plaintiff during the parties' status conference on September 10, 2025.

Aside from the above-mentioned statutes, policies, procedures, and rules, please see President Wendler's memoranda to the campus community entitled "A Harmless Drag Show? No Such Thing," dated March 20, 2023, and "Spectrum WT Application for On-Campus Drag Show," dated March 18, 2024. President Wendler has produced a non-exhaustive list of the many publications and materials he considered contemporaneously with his 2023 response. *See, e.g.,*

19

<span style="color:red">App. 032</span>

Def_000749–Def_000821.

President Wendler also considered both the custom of according respect to individuals of all races and genders in the university community, and the custom of not publicly denigrating, demeaning, or negatively caricaturing individuals of other races or genders. In his view, maintaining those customs is important to achieving the educational mission of WTAMU; to attracting and retaining quality students, faculty, and employees at WTAMU; and to garnering critical public and private financial and community support for WTAMU.

Finally, President Wendler considered his role, responsibilities, and experiences as the top administrative official of a university in the Panhandle community of Texas with thousands of students, some of whom are minors. He took his years of conversations and dealings with current and prospective students, faculty, staff, parents, and community members into account in reaching his decision to cancel Plaintiff's on-campus drag performances.

**Interrogatory No. 9**

Identify each reason you contend that Plaintiff's intended uses of Legacy Hall for drag performances are inconsistent with the uses for which West Texas A&M makes the space available.

**Response:**

Defendant objects to this request to the extent it is unreasonably cumulative or duplicative of other requests.

Subject to and without waiving the foregoing objections, please see President Wendler's memoranda to the campus community entitled "A Harmless Drag Show? No Such Thing," dated March 20, 2023, and "Spectrum WT Application for On-Campus Drag Show," dated March 18, 2024. In addition, please see President Wendler's weekly op-ed article entitled "Ists, Isms and Free Will," dated June 12, 2022 (available at: https://walterwendler.com/2022/06/ists-isms-and-free-will/).

As a preliminary matter, President Wendler was generally aware of A&M System policies and regulations, as well as WTAMU rules and procedures, including those prohibiting discrimination or harassment on WTAMU's campus. Please see the TAMUS policies, WTAMU rules and SAPs, which are publicly available online at the URL: https://www.tamus.edu/legal/policy/. Defendant has produced a copy of the WT Student Handbook, Campus Organizations Handbook, JBK Student Center Policies Manual, JBK Student Center Procedures and Guidelines, and other documents.

Additionally, President Wendler reviewed and considered various publications, articles, scholarly works, and other materials on the matter prior to making his decision not to permit Plaintiff's drag shows in Legacy Hall. Defendant has produced a non-exhaustive list of the many publications and materials he considered contemporaneously with his 2023 response. *See, e.g.*, Def_000749–Def_000821.

App. 033

Finally, President Wendler regarded his role, responsibilities, and experiences as the top administrative official of a university in the Panhandle community of Texas with thousands of students, some of whom are minors. He also took his dealings with current and prospective WTAMU students, faculty, staff, parents, and community members into account.

President Wendler's view that Legacy Hall should not be used for Plaintiff's March 2023 and March 2024 drag performances was informed by both the custom of according respect to individuals of all races and genders in the university community, and the custom of not publicly disrespecting, demeaning, or negatively caricaturing individuals of other races and genders.

President Wendler believes maintaining these customs is important to achieving the educational mission of WTAMU and living up to its core value of respect; to attracting and retaining quality students, faculty, and employees at WTAMU; and to garnering critical public and private financial and community support for WTAMU.

**Interrogatory No. 10**

Identify every campus event Wendler individually refused to permit, reserve space for, or cancelled because it included sexual material or content.

**Response:**

Defendant objects to this request to the extent the phrase "every campus event" to the extent it is vague or ambiguous. Defendant further objects that the request is not reasonably specific or limited in scope or time.

Subject to the foregoing objections, Defendant incorporates Responses to Interrogatories 4 through 9, and further states as follows: aside from the March 2023 and March 2024 proposed drags shows, President Wendler in May of 2024 did not permit the signing of a contract for the requested use of WTAMU on-campus facilities for a proposed concert by what was described as a "rap" or "hip-hop" group. The group's concerts, performances and/or recordings were reasonably deemed inappropriate, disrespectful, offensive, and advocate or describe gun violence.

**Interrogatory No. 11**

Identify every campus event since 2020 that West Texas A&M University has refused to permit or cancelled because it included content that was offensive, divisive, demeaning, misogynistic, or mocking.

**Response:**

Defendant objects to this request to the extent the term "every campus event" is overly broad, vague or ambiguous.

21

App. 034

Subject to the foregoing objections, Defendant incorporates Responses to Interrogatories 4 through 10 and further states as follows:

Defendant understands this request to inquire about any campus event, since 2020, for which WTAMU has disallowed use of campus facilities, aside from the drag shows referred to above.

In May of 2024, President Wendler did not permit the signing of a contract for the requested use of one of WTAMU's campus facilities for a rap or hip-hop concert based on concern that the featured performer's music/lyrics were reasonably deemed inappropriate, disrespectful, offensive or advocated or described gun violence.

**Interrogatory No. 12**

Identify each reason you contend that Plaintiff's performances will be or would have been disruptive to the operations or educational functions of West Texas A&M University.

**Response:**

Defendant objects to this interrogatory because it is unreasonably cumulative or duplicative of prior statements which have been produced in this lawsuit. Defendant objects to this request because the discovery requested can be obtained from some other source that is more convenient, less burdensome, or less extensive. *See* FED. R. CIV. P. 26(b)(2)(C)(i). Defendant further objects because it is not possible to know at this time what will be the content or parameters of any future performance by Plaintiff.

Subject to and without waiving the foregoing objections, Defendant incorporates Responses to Interrogatories 4 through 11, and further states as follows:

Please see President Wendler's memoranda to the campus community entitled "A Harmless Drag Show? No Such Thing," dated March 20, 2023, and "Spectrum WT Application for On-Campus Drag Show," dated March 18, 2024. In addition, please see President Wendler's weekly op-ed article entitled "Ists, Isms and Free Will," dated June 12, 2022 (available at: https://walterwendler.com/2022/06/ists-isms-and-free-will/).

As a preliminary matter, President Wendler was generally aware of A&M System policies and regulations, as well as WTAMU rules and procedures, including those prohibiting discrimination or harassment on WTAMU's campus. Please see the TAMUS policies, WTAMU rules and SAPs, which are publicly available online at the URL: https://www.tamus.edu/legal/policy/. Defendant has provided to Plaintiff a copy of the WT Student Handbook, Campus Organizations Handbook, JBK Student Center Policies Manual, JBK Student Center Procedures and Guidelines, and other documents.

App. 035

President Wendler also reviewed and considered various publications, articles, scholarly works, and other materials on the matter prior to making his decisions not to permit use of Legacy Hall for Plaintiff's drag shows. Defendant has produced to Plaintiff a non-exhaustive list of the many publications and materials he considered contemporaneously with his 2023 response. *See, e.g.*, Def_000749–Def_000821.

President Wendler also regarded his role, responsibilities, and experiences as the top administrative official of a university in the Panhandle community of Texas with thousands of students, some of whom are minors. He also took into account his dealings with current and prospective students, faculty, staff, parents, and community members.

**Interrogatory No. 13**

Identify each reason you contend that Plaintiff's performances will amount to "harassment" as referenced in your March 2023 email announcing the cancellation of Plaintiff's first drag show.

**Response:**

Defendant objects to this interrogatory because it is unreasonably cumulative or duplicative of prior statements which have been produced in this lawsuit. Defendant objects to this request because the discovery requested can be obtained from some other source that is more convenient, less burdensome, or less extensive. *See* FED. R. CIV. P. 26(b)(2)(C)(i). Defendant further objects because it is not possible to know at this time what will be the content or parameters of any future performance by Plaintiff.

Subject to and without waiving the foregoing objections, Defendant incorporates Responses to Interrogatories 4 through 12, and further states as follows: please see President Wendler's memoranda to the campus community entitled "A Harmless Drag Show? No Such Thing," dated March 20, 2023, and "Spectrum WT Application for On-Campus Drag Show," dated March 18, 2024. In addition, please see President Wendler's weekly op-ed article entitled "Ists, Isms and Free Will," dated June 12, 2022 (available at: https://walterwendler.com/2022/06/ists-isms-and-free-will/).

As a preliminary matter, President Wendler was aware of A&M System policies and regulations, as well as WTAMU rules and procedures, including those prohibiting discrimination or harassment on WTAMU's campus. Please see the TAMU policies, WTAMU rules and SAPs, which are publicly available online at the URL: https://www.tamus.edu/legal/policy/. Defendant is providing a copy of the WT Student Handbook, Campus Organizations Handbook, JBK Student Center Policies Manual, JBK Student Center Procedures and Guidelines, and other documents.

Additionally, President Wendler reviewed and considered various publications, articles, scholarly works, and other materials on the matter prior to making his decision not to permit Plaintiff's drag shows in Legacy Hall. Defendant is producing a non-exhaustive list of publications and materials considered by President Wendler contemporaneously with this response.

23

Finally, President Wendler regarded his role, responsibilities, and experiences as the top administrative official of a university in the Panhandle community of Texas with thousands of students, some of whom are minors. He also took his dealings with current and prospective students, faculty, staff, parents, and community members into account.

**Interrogatory No. 14**

State all bases for your statement in your March 20, 2023, email that "West Texas A&M University will not host a drag show on campus."

**Response:**

Defendant objects to this interrogatory because it is unreasonably cumulative or duplicative of prior statements which have been produced in this lawsuit. Defendant objects to this request because the discovery requested can be obtained from some other source that is more convenient, less burdensome, or less extensive. *See* FED. R. CIV. P. 26(b)(2)(C)(i).

Subject to and without waiving the foregoing objections Defendant incorporates Responses to Interrogatories 4 through 13 and further states as follows:

President Wendler's statement that "West Texas A&M University will not host a drag show on campus" was based on the facts then presented to him in March 2023 as to the drag show proposed by Plaintiff and was not an "edict", "ban", or change in applicable WTAMU policies or rules. He was guided in making that statement by his obligation to ensure that West Texas A&M University remains a discrimination-free workplace and learning environment where all students, faculty, and staff are treated with dignity and respect. As the President and CEO of WTAMU, President Wendler must make difficult and sometimes unpopular decisions which balance students' needs with the needs of the larger campus community. He believes all members of the campus community not only enjoy certain rights and privileges but also bear certain responsibilities—among those responsibilities is the commonsense imperative to refrain from conduct that disrespects, demeans or dehumanizes others. President Wendler's decision is consistent with the following non-exhaustive list of statutes, policies, procedures, rules, and regulations:

**I. Federal and State Statutes and Policies**

a.  Title IX of the Educational Amendments Act of 1972 ("Title IX")
b.  Texas Senate Bill 12 ("S.B. 12"), enacted during the Legislature's 88th Regular Session.
c.  Texas Senate Bill 12 ("S.B. 12"), enacted during the Legislature's 89th Regular Session.
d.  Exec. Order No. 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, 90 Fed. Reg. 8615 (Jan. 20, 2025) (acknowledging the "biological reality of sex" and warning "[f]ederal funds shall not be used to promote gender ideology")

24

App. 037

   e.   Exec. Order No. 14190, Ending Radical Indoctrination in K-12 Schooling, 90 Fed. Reg. 8853 (Feb. 3, 2025) (empowering federal agencies to, among other things, "prevent or rescind [f]ederal funds . . . from being used by a[] . . . secondary school to directly or indirectly support or subsidize . . . a violation of . . . Title IX")

   f.   Letter from Governor Abbott to University Systems (May 8, 2024) (ordering public universities in Texas "not to comply with President Biden's . . . revision of Title IX")

   g.   Letter from Governor Abbott to State Agencies (Jan. 30, 2025) (requiring state agencies to "reject[] radical sexual orientation and gender identity ideologies").

   h.   "Resolution Regarding Certain Public Events on the Campus of Universities in the Texas A&M University System," dated February 28, 2025 (declaring on-campus drag shows "likely to create or contribute to a hostile environment for women contrary to System anti-discrimination policy and Title IX")

## II. TAMUS Policies and Regulations

   i.   TAMUS Regulation 08.01, entitled "Civil Rights Protections and Compliance"

   j.   TAMUS Regulation 08.01.01, entitled "Civil Rights Compliance"

   k.   TAMUS Policy 08.02, entitled "Expressive Activity on Campus"TAMUS Regulation 08.02.01, entitled "Expressive Activity on Campus"

   l.   TAMUS Policy 13.02, entitled "Student Rights and Obligations"

## III. WTAMU Rules and Procedures

   m.   WTAMU Rule 07.03.01.W1, entitled "Political Campaign Events"

   n.   WTAMU Rule 08.01.01.W1, entitled "Civil Rights Compliance"

   o.   WTAMU Rule 08.99.99.W1, entitled "Expressive Activity on Campus"

   p.   WTAMU Rule 08.99.99.W1, entitled "Expressive Activity on Campus" (revised July 28, 2025)

   q.   WTAMU Procedure 24.01.01.W0.01, entitled "Facility Use Request Procedure"

   r.   WTAMU's Code of Student Life: Rules and Procedures for Students (Updated August 2020)

- Relevant sections include, but are not limited to:
  1. General Purpose
  2. WTAMU Mission Statement
  3. WTAMU Core Values
  4. Student Centered Philosophy
  5. Affirmative Action/Equal Opportunity
  6. Procedures and Rules for Students
  7. Student Bill of Rights
  8. Students' Responsibilities
  9. Free Speech and Advocacy on Campus
  10. Section A: Student Conduct Mission and Policies

11. Student Rules on (a) disorderly conduct; (b) disruptive activity; (c) harmful, threatening or endangering conduct; (d) harassment; and (e) sexual misconduct.
12. Hazing
13. Explosives, Fireworks, and Weapons
14. Violation of Published University Rules or Regulations
15. Violation of Federal, State, Local Law and/or University Procedures
16. Civil Rights & Title IX Complaints
17. Definition of "Gender-based Harassment," located in Appendix A

s. WTAMU Student Handbook 2022-2023
- Relevant sections include, but are not limited to:
  1. Student Life Rules
  2. Student Bill of Rights
  3. Community Standards
  4. Failure to Comply and Disorderly Conduct
  5. Food & Beverages
  6. Misuse of Skateboards, Rollerblades, Scooters, Bicycles, Self-Balancing Boards, or Similar Modes of Transportation
  7. Hazing
  8. Violation of Federal, State, Local Law and/or University Rules and Procedures
  9. Propose Revisions

t. WTAMU Student Handbook 2023-2024
- Relevant sections include, but are not limited to:
  1. Welcome Statement
  2. Foreword
  3. Student Life Rules
  4. Student Bill of Rights and Responsibilities
  5. Community Standards
  6. Explosives, Fireworks, and Weapons
  7. Failure to Comply and Disorderly Conduct
  8. Harassment
  9. Sexual Misconduct
  10. Food & Beverages
  11. Misuse of Transportation
  12. Hazing
  13. Violation of Federal, State, Local Law and/or University Rules and Procedures
  14. Propose Revisions

u. WTAMU Student Handbook 2025-2026
- Relevant sections include, but are not limited to:
  1. Welcome Statement
  2. Foreword
  3. Students' Rights and Responsibilities

26

4. Community Standards
5. Expressive Activity
6. Failure to Comply and Disorderly Conduct
7. Firearms, Ammunition, and Weapons
8. Food and Beverages
9. Harassment
10. Hazing
11. Misuse of Transportation
12. Sexual Misconduct
13. Soliciting on Campus
14. Violation of Federal, State, Local and/or University Procedures
15. Civil Rights and Title XI
16. Propose Revisions

v. WTAMU JBK Student Center Procedures & Guidelines (2023 and 2025 editions)

- Relevant sections in the 2023 edition include, but are not limited to:

1. General Policies
2. Decorations

- Relevant sections in the 2025 edition include, but are not limited to:

1. Mission Statements
2. General Policies
3. Buffaloes Traditions Program
4. Institutional Priority Events
5. Marketing/Advertising

w. WTAMU Statement on Equal Opportunity/Nondiscrimination (available at: https://www.wtamu.edu/about/information/equal-opportunity-nondiscriminatio n.html)

x. Campus Organizations Handbook

y. WTAMU Pre-University Program ("PUP") Frequently Asked Questions (available at: https://www.wtamu.edu/admissions/pre-university-program/pup-faq.html)

z. WTAMU PUP Program Agreement Forms (for Independent School Districts)

aa. WTAMU PUP Program Agreement Form (for Homeschool Students)

Hard copies of several materials in this list are already in Plaintiff's possession. Defendant included items d, e, f, h, i, j, t, v, w, x, y, bb, cc, and ee in the Exhibits Binder that it presented to Plaintiff during the parties' status conference on September 10, 2025.

Aside from the above-mentioned statutes, policies, procedures, and rules, please see President Wendler's memoranda to the campus community entitled "A Harmless Drag Show? No Such Thing," dated March 20, 2023, and "Spectrum WT Application for On-Campus Drag Show," dated March 18, 2024. Defendant has produced a non-exhaustive list of the many publications and materials he considered contemporaneously with his 2023 response. *See, e.g.,*

App. 040

Def_000749–Def_000821.

President Wendler's decision was also informed by both the custom of according respect to individuals of all races and genders in the university community, and the custom of not publicly disrespecting, demeaning, or negatively caricaturing individuals of other races or genders. In his view, maintaining those customs is important to achieving the educational mission of WTAMU; to attracting and retaining quality students, faculty, and employees at WTAMU; and to garnering critical public and private financial and community support for WTAMU.

Finally, President Wendler considered his role, responsibilities, and experiences as the top administrative official of a university in the Panhandle community of Texas with thousands of students, some of whom are minors. He took his years of conversations and dealings with current and prospective WTAMU students, faculty, staff, parents, and community members into account in reaching his decision to cancel Plaintiff's on-campus drag performances.

Date: December 1, 2025

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

RYAN D. WALTERS
Deputy Attorney General for Legal Strategy

RYAN G. KERCHER
Chief, Special Litigation Division

/s/ David Bryant
DAVID BRYANT
Senior Special Counsel
Tex. State Bar No. 03281500

MUNERA AL-FUHAID
Special Counsel
Tex. State Bar No. 24094501

ZACHARY BERG
Special Counsel
Tex. State Bar No. 24107706

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 463-2120
Fax: (512) 320-0667
david.bryant@oag.texas.gov
munera.al-fuhaid@oag.texas.gov
zachary.berg@oag.texas.gov

Attorneys for Defendants

App. 041

## CERTIFICATE OF SERVICE

I hereby certify that on November 7, 2025, I electronically served the foregoing responses on all counsel of record.

/s/ David Bryant
DAVID BRYANT

App. 042

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

SPECTRUM WT, *et al.*,

                Plaintiffs,

v.

WALTER WENDLER, *et al.*,

                Defendants.

No. 2:23-cv-00048

**VERIFICATION**

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | |
| | § | |
| COUNTY OF RANDALL | | § |

    I, Walter Wendler, have read the foregoing amended answers to Plaintiff's October 8, 2025 Interrogatories and certify that the information contained therein is within my personal knowledge or was derived from a review of documents, and is true and correct.

    I declare under penalty of perjury that the foregoing is true and correct.

    Executed on December 1, 2025.

_____
Walter Wendler

S.B. No. 12

1                    AN ACT

2    relating to the authority to regulate sexually oriented

3    performances and to restricting those performances on the premises

4    of a commercial enterprise, on public property, or in the presence

5    of an individual younger than 18 years of age; authorizing a civil

6    penalty; creating a criminal offense.

7        BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

8        SECTION 1.   Subtitle A, Title 9, Health and Safety Code, is

9    amended by adding Chapter 769 to read as follows:

10            CHAPTER 769.  SEXUALLY ORIENTED PERFORMANCES

11       Sec. 769.001.  DEFINITIONS.  In this chapter:

12            (1)  "Premises" has the meaning assigned by Section

13   46.03, Penal Code.

14            (2)  "Sexually oriented performance" has the meaning

15   assigned by Section 43.28, Penal Code.

16       Sec. 769.002.  CERTAIN  SEXUALLY  ORIENTED  PERFORMANCES

17   PROHIBITED ON PREMISES OF COMMERCIAL ENTERPRISE; CIVIL PENALTY;

18   INJUNCTION.  (a) A person who controls the premises of a commercial

19   enterprise may not allow a sexually oriented performance to be

20   presented on the premises in the presence of an individual younger

21   than 18 years of age.

22            (b)  A person who violates this section is liable to this

23   state for a civil penalty of not more than $10,000 for each

24   violation.

1

**EXHIBIT**
**30**
tabbies

S.B. No. 12

1      (c)  The attorney general may bring an action to:

2          (1)  recover  the  civil  penalty  imposed  under  this

3  section; or

4          (2)  obtain  a  temporary  or  permanent  injunction  to

5  restrain the violation.

6      (d)  An  action  under  this  section  may  be  brought  in  a

7  district court in:

8          (1)  Travis County; or

9          (2)  a county in which any part of the violation occurs.

10      (e)  The  attorney  general  shall  deposit  a  civil  penalty

11  collected under this section in the state treasury to the credit of

12  the general revenue fund.

13      (f)  The  attorney  general  may  recover  reasonable  expenses

14  incurred in bringing an action under this section, including court

15  costs,  attorney's  fees,  investigative  costs,  witness  fees,  and

16  deposition expenses.

17      SECTION 2.  Chapter 243, Local Government Code, is amended

18  by adding Section 243.0031 to read as follows:

19      Sec. 243.0031.  AUTHORITY  TO  REGULATE  CERTAIN  SEXUALLY

20  ORIENTED PERFORMANCES.  (a)  In this section, "sexually oriented

21  performance" has the meaning assigned by Section 43.28, Penal Code.

22      (b)  Subject to Subsection (c), a municipality or county may

23  regulate  sexually  oriented  performances  as  the  municipality  or

24  county considers necessary to promote the public health, safety, or

25  welfare.

26      (c)  A municipality or county may not authorize a sexually

27  oriented performance:

2

App. 045

S.B. No. 12

1     (1) on public property; or

2     (2) in the presence of an individual younger than 18

3 years of age.

4     (d) Except as provided by Subsection (c), this section does

5 not limit the authority of a municipality to license, tax,

6 suppress, prevent, or otherwise regulate theatrical or other

7 exhibitions, shows, or amusements under Section 215.032.

8     SECTION 3. Subchapter B, Chapter 43, Penal Code, is amended

9 by adding Section 43.28 to read as follows:

10     Sec. 43.28. CERTAIN SEXUALLY ORIENTED PERFORMANCES

11 PROHIBITED. (a) In this section:

12     (1) "Sexual conduct" means:

13     (A) the exhibition or representation, actual or

14 simulated, of sexual acts, including vaginal sex, anal sex, and

15 masturbation;

16     (B) the exhibition or representation, actual or

17 simulated, of male or female genitals in a lewd state, including a

18 state of sexual stimulation or arousal;

19     (C) the exhibition of a device designed and

20 marketed as useful primarily for the sexual stimulation of male or

21 female genitals;

22     (D) actual contact or simulated contact

23 occurring between one person and the buttocks, breast, or any part

24 of the genitals of another person; or

25     (E) the exhibition of sexual gesticulations

26 using accessories or prosthetics that exaggerate male or female

27 sexual characteristics.

3

S.B. No. 12

1   (2) "Sexually oriented performance" means a visual

2 performance that:

3    (A) features:

4     (i) a performer who is nude, as defined by

5 Section 102.051, Business & Commerce Code; or

6     (ii) any other performer who engages in

7 sexual conduct; and

8    (B) appeals to the prurient interest in sex.

9  (b) A person commits an offense if, regardless of whether

10 compensation for the performance is expected or received, the

11 person engages in a sexually oriented performance:

12   (1) on public property at a time, in a place, and in a

13 manner that could reasonably be expected to be viewed by a child; or

14   (2) in the presence of an individual younger than 18

15 years of age.

16  (c) An offense under this section is a Class A misdemeanor.

17  SECTION 4. If any provision of this Act or its application

18 to any person or circumstance is held invalid, the invalidity does

19 not affect other provisions or applications of this Act that can be

20 given effect without the invalid provision or application, and to

21 this end the provisions of this Act are declared severable.

22  SECTION 5. This Act takes effect September 1, 2023.

4

App. 047

S.B. No. 12

_____        _____
   President of the Senate              Speaker of the House

    I hereby certify that S.B. No. 12 passed the Senate on April 5, 2023, by the following vote: Yeas 20, Nays 11; May 25, 2023, Senate refused to concur in House amendments and requested appointment of Conference Committee; May 26, 2023, House granted request of the Senate; May 28, 2023, Senate adopted Conference Committee Report by the following vote: Yeas 19, Nays 12.

                                          _____
                                      Secretary of the Senate

    I hereby certify that S.B. No. 12 passed the House, with amendments, on May 22, 2023, by the following vote: Yeas 93, Nays 45, six present not voting; May 26, 2023, House granted request of the Senate for appointment of Conference Committee; May 28, 2023, House adopted Conference Committee Report by the following vote: Yeas 87, Nays 54, two present not voting.

                                          _____
                                    Chief Clerk of the House

Approved:

_____
               Date

_____
           Governor

App. 048

1                 UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF TEXAS
2                      AMARILLO DIVISION

3   SPECTRUM WT,                )
                                )
4        Plaintiff,             )
                                )
5   v.                          )  Case No. 2:23-cv-00048
                                )
6   WALTER WENDLER, in his      )
    official capacity as the    )
7   President of West Texas     )
    A&M University, et al.,     )
8                                )
         Defendants.            )
9

10

11

12

13  ----------------------------------------------------------
                  ORAL DEPOSITION OF CHIP CHANDLER
14              DECEMBER 9, 2025 - CANYON, TEXAS
    ----------------------------------------------------------
15

16

17

18

19

20       ORAL DEPOSITION OF CHIP CHANDLER, produced as a
    witness at the instance of the PLAINTIFF and duly sworn,
21  was taken in the above styled and numbered cause on
    DECEMBER 9, 2025, from 1:00 p.m. to 2:59 p.m., at the
22  offices of WEST TEXAS A&M UNIVERSITY, Old Main Building,
    Room 317, Canyon, Texas, before SHARON D. LIVINGSTON,
23  CSR-RPR, in and for the State of Texas, reported by
    machine shorthand, and pursuant to the Federal Rules of
24  Civil Procedure.

25

1    "Azariah?"

2         A.   I see that, yes.

3         Q.   Do you know that person?

4         A.   I do.

5         Q.   Have you seen Azariah perform as a drag queen

6    at drag shows?

7         A.   Yes, I have.

8         Q.   Approximately how many times have you seen

9    Azariah perform as a drag queen in the Amarillo or

10   Canyon areas?

11        A.   Approximately more than five.

12        Q.   Now, you described the drag show that Spectrum

13   put on in Sam Houston Park that you attended.

14             Was that approximately two weeks after the

15   scheduled March 30th or 31st, 2023 drag performance that

16   did not occur in Legacy Hall?

17        A.   As I recall, I believe it was on the same

18   weekend that the planned show was supposed to happen,

19   but approximately a week or two weeks after it was

20   canceled.

21        Q.   Oh, okay.

22             So it would have been, to the best of your

23   recollection, within a week or so of March 31st, 2023?

24        A.   As I recall, it was that weekend.

25        Q.   And from your testimony, I know you helped

3:22 🔄 🔵

← 🔵 C  **Chip Chandler**    📞  ⋮

Tuesday, Mar 21, 2023 • 10:22 AM

Allexa gave your number to Teresa Burnett, whose husband is AATAG president. One of the tv stations is looking for a comment from you. You're free to give them a no comment, and you're free to give an interview representing yourself and Spectrum, not the University as a whole. If you choose to do an interview and do so on campus, I'd need to escort the reporter, so please let me know

And if you want everyone to leave you alone, that's fine too. Just tell me and I'll take care of it

> I can give a comment, but I can't do an interview. I want to do my part in all this as well.

I get that totally

Tuesday, Mar 21, 2023 • 7:53 PM

> Could you send me the names of the drag queens who were going to Mc and judge? Stage names work

Myss Myka was going to emcee. Either Lindsey Adams or Azariah were going to judge

Wednesday, Mar 22, 2023 • 8:35 AM

From Dr. Hunt:

Hey I know I haven't done the training yet, but if students in my College need support or anything at all, please send them to me or Pam. W̶ ̶e both here all the time and will be a ̶ ̶ e space. I hate to

⊕  RCS message          😊  🖼️  ⌁

SPECTRUM 0000829


EXHIBIT
50
App. 051

 Outlook

---

**RE: Leigh Anne- Judge!**

---

**From** Barrett Bright <babright1@buffs.wtamu.edu>
**Date** Wed 9/14/2022 6:21 PM
**To**    Chandler, Chip <cchandler@wtamu.edu>; esibley@wtamu.edu <esibley@wtamu.edu>

Sorry for responding so late, my computer is completely broken. I am unable to access anything on it. Back on topic, for the judging I was thinking we have 3 categories, performance i.e how they walk and personify their character, their make up, and their costume design. As for the M.C. they introduce the contestants via their stage name, with a catchphrase that the contestant gives them before the event. I.e. "with all that  frass and sass it's Sarsaparilla"

Sent via the Samsung Galaxy S21+ 5G, an AT&T 5G smartphone

-------- Original message --------
From: "Chandler, Chip" <cchandler@wtamu.edu>
Date: 9/14/22 11:25 AM (GMT-06:00)
To: esibley@wtamu.edu, Barrett Bright <babright1@buffs.wtamu.edu>
Subject: Re: Leigh Anne- Judge!

Great!

Bear, can you tell me more about what you have in mind for the event and what you'll want a judge and an emcee to do? I realized that I'm a little shaky on the details still.

**CHIP CHANDLER**
**SENIOR COMMUNICATIONS SPECIALIST**

Office of Communication and Marketing
O: 806.651.2124 | C: 806.654.7145
cchandler@wtamu.edu | Old Main 235
West Texas A&M University
Box 60766 | Canyon, Texas 79016





**EXHIBIT**
**37**

**From:** Sibley, Echo S. <esibley@wtamu.edu>
**Date:** Wednesday, September 14, 2022 at 11:24 AM
**To:** Barrett Bright <babright1@buffs.wtamu.edu>, Chandler, Chip <cchandler@wtamu.edu>
**Subject:** Leigh Anne- Judge!

HI,

Leigh Anne Crandall, costumer extraordinaire, has enthusiastically agreed to be a judge for the drag Race April 1ˢᵗ.

**Echo Sunyata Sibley, M.F.A., M.M.**
Assistant Professor of Theatre, (She, Her, Hers)
O: FAC 119 | P: 806-651-2813 | C: 806-476-8797
E: esibley@wtamu.edu
wtamu.edu/atd | @wtamuarttheatredance



**Theatre Program**
WEST TEXAS A&M UNIVERSITY

**App. 053**
SPECTRUM 0000546

## 24.01.01.W0.01
## Facility Use Request Procedure

Revised: March 1, 2017
Approved: December 1, 2013
Supplements WTAMU Rule #24.02.02.W1, Visitor Safety Access Control

---

### Procedure Statement

The purpose of this procedure is to outline the process to reserve and use West Texas A&M University (WTAMU) campus spaces, rooms, buildings and facilities. This procedure is for any special event (i.e. fundraising activity, social gatherings or functions, or advisory groups), including third party requests. WTAMU reserves the right to cancel an event and immediately remove access to campus if an event violates the policies and regulations of the Texas A&M University System, the rules and procedures of WTAMU, or if an event is deemed to be unsafe.

---

### Responsibilities

The request for facility use must be initiated by the department and/or event requestor, with a charge account number required if necessary, using the previously approved request-for-space reservation request site found at: https://reservations.wtamu.edu/

The request form must be routed to the specific departments responsible for event activities, including but not limited to:

a. The designated reservation coordinator for final reservation confirmation. Room and key access will be determined in coordination with the Lock Shop and the building coordinators. The following facilities have a designated reservation coordinator:

Academic Classroom Spaces, Activities Center, Ag Education, Amarillo Center, Athletics, Electronic Learning Center, Fine Arts, Jack B. Kelley Student Center, and Library.

b. University Police Department (UPD) for event security charges. Event requestor(s) and campus departments are responsible for all charges associated with required security.

c. Event Services staff for all concealed carry signage requirements (please refer to Rule #34.06.02.W1, Carrying Concealed Handguns on Campus).



*1*

Event requestor(s) and campus departments are responsible for all charges associated with required concealed carry signage, including start and end times designated on the request for timely signage removal.

d. The Physical Plant Director for accessible utilities (i.e. heating and air) and custodial services for clean-up.

e. The Food Services Director for approval, if the event includes food not provided by the approved campus caterer.

f. The Risk Management Office for required insurances, programs-for-minors requirements, and event risk reviews.

Alcohol is only allowed in previously approved and designated locations on campus. If alcohol is to be served, the requestor must route the request to the University President's Office to be approved before the event. The President's Office will then return the form to the event requestor. The approval form can be found at: http://www.wtamu.edu/home/faculty-staff.aspx

Campus visitors are not allowed in the designated academic classroom lab areas unless pre-approved by Environmental Health and Safety Office: http://www.wtamu.edu/environmental_safety/academic-research-environmental-safety.aspx

**PARKING**

For events involving large buses, including commercial and school buses, the buses can only access parking lots interior to campus for drop-off purposes only. Parked or standing buses are only allowed at the Event Center parking lot, the Sports Complex north parking lot, or other pre-approved event site, until they are ready for passenger pickup.

---

**Contact Office**

Director of the JBK Student Center
(806) 651-2394

---

**Approval**

*Walter V. Wendler*

President/CEO                                      05.17.17
                                                  Date

WEST TEXAS A&M UNIVERSITY





**WT** **DR. SHAWN M. FOUTS** Jack B. Kelley Student Center
SENIOR DIRECTOR OF CAMPUS COMMUNITY
806.651.2329 | sfouts@wtamu.edu | wtamu.edu



RECORD FOR RELEASE
ADAM STEINBAUGH
H000786

App. 056

WEST TEXAS A&M UNIVERSITY

███████████████████████

████████████████████████████████
████████████████████
█████████████████████████████
█████████████████████████
██████████████████████████████████████
████████████████████████████████████
████████████████████████████████
██████████
████

**From:** WTAMU Risk Assessments <risk@wtamu.edu>
**Sent:** Thursday, February 16, 2023 9:45 AM
**To:** ██████████████████████████ JBK <jbk@wtamu.edu>; WTAMU Risk
Assessments <risk@wtamu.edu>
**Subject:** Re: [EXTERNAL] Risk Assessment for : A Fool's Drag Show on March 31st

Thank you ██████, make sure on your marketing material that you mention that this is fund raiser
and the cost of admission. Please indicate on the marketing material that "may not be appropriate
for persons under the age of 13," or something similar. Angela Allen and the Office of Diversity,
Equity, and Inclusion may be a great resource as well. I appreciate your responsiveness.

Let us know how we can continue to offer assistance,
Shawn



**SHAWN M. FOUTS** Jack B. Kelley Student Center
SENIOR DIRECTOR OF CAMPUS COMMUNITY
806.651.2329 | sfouts@wtamu.edu | wtamu.edu

**WIN the Day** – What's Important Now

**From:** ████████████████████
**Date:** Thursday, February 16, 2023 at 9:35 AM
**To:** WTAMU Risk Assessments <risk@wtamu.edu>
**Subject:** RE: [EXTERNAL] Risk Assessment for : A Fool's Drag Show on March 31st

Good morning,

1.) Yes our advisor will be present as well multiple Buff Allies.

RECORD FOR RELEASE
ADAM STEINBAUGH
App. 057
SPECTRUM 0000787

WEST TEXAS A&M UNIVERSITY

2.) The show is planned to be pg13, so yes there will need to be content warnings up to that age.

3.) Yes all performers will have to get their song and dress pre-approved.

4.) The advisor for Spectrum and the Treasurer will account for the funds received, payed out, and donated

5.) Yes 100 chairs should be enough and thank you for having more in reserve just in case.

6 and 7.) We will get on that.

Sent via the Samsung Galaxy S21+ 5G, an AT&T 5G smartphone

-------- Original message --------
From: WTAMU Risk Assessments <risk@wtamu.edu>
Date: 2/14/23 2:49 PM (GMT-06:00)
To: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ "Drumheller, Kristina"
<kdrumheller@wtamu.edu>
Subject: Re: [EXTERNAL] Risk Assessment for : A Fool's Drag Show on March 31st

Good afternoon, we're trying to insure you have a great event without any unforeseen issues:

1. Will a Club Advisor be at the event? We always highly recommend it for all events.

2. Will the event contain material that may need "warning labels" for minors that may attend (song lyrics, for instance? We've had this happen before)? As an example, sometimes with a comedian signage will be posted that states that not all material may be appropriate for minors.

3. Are the participants required to get prior approval for their dress and performance prior to the event? Reference above.

4. For money received, will a transaction record be kept of money received and its use following the event (deposited, gifted, etc)? We want to ensure that the event organizers mitigate any perceived misuse of funds or funds not being accounted for.

5. Are 100 chairs enough? We will be prepared to add more if needed and may set up extra.

6. On your poster, please list BSU as a sponsoring club. Also, please show this as a fund raiser.

7. The Risk Assessment committee would ask you to consider changing one of your graphics on

RECORD FOR RELEASE
ADAM STEINBAUGH
LH000731
App. 058
SPECTRUM 0000788

WEST TEXAS A&M UNIVERSITY

your marketing, specifically the one on the right with the individual doing the splits.

We really do want you to have a successful event and generate a great donation for The Trevor Project. This event is a first of this nature so it generated questions in order to provide you with a great event experience.

Thank you for your responsiveness. I'm glad to help any way I can.

Shawn

**Error! Filename not specified.**

***WIN the Day*** *– What's Important Now*

---

**Recipient Data:**
**Time Finished:** 2023-02-13 19:34:37 CST
**IP:** 173.219.125.11
**ResponseID:** R_3UWtFnRJo33S4fL
**Link to View Results:** ▮▮▮▮
**URL to View Results:** ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮

---

**Response Summary:**

Please provide event information below:* designates required field
  Date of Request:  2/13/2023
  Person Requesting Approval*  ▮▮▮▮▮
  Title*  A Fool's Drag Race

RECORD FOR RELEASE
ADAM STEINBAUGH
App. 059
SPECTRUM 0000789

WEST TEXAS A&M UNIVERSITY

Sponsoring Organization / Department: *(if applicable)*   Spectrum
Phone (xxx-xxx-xxxx)*   ███████
Email*   ████████████████
Organization's Advisor*(if applicable)*   Dr. Drumheller
Advisor's Phone (xxx-xxx-xxxx)   8066261039

Does your Advisor know about the event and the risk(s) involved?
   Yes

Please provide the event information below: * designates required field
   Date of Event*   March 31st
   Event Start Time*   6pm
   Event Name* *No acronyms or abbreviations please*   A Fool's Drag Show
   Estimated Attendance*   Expected up to 100 may exceed number of people.
   Description of Event* *Describe in detail the planned activities that will take place during the event (e.g. sports, running games, dancing, live music, jump houses, fire pits, etc.)*   A student drag show with dancing on stage and performances by students. The performers will perform a song while in drag.
   Event End Time*   8pm
   Age Range of Participates*   All ages (18 and under with a guardian)
   Event Location(s)*   Legacy Hall
   # of Non-WTAMU Participates   20

Will food be served at your event/activity?
   Yes

What type of food will be served?
   Bottled water, soda cans, and a mocktail

Will alcohol be served at your event/activity?
   No

Will money be present at your event/activity?
   Yes

How will the money be secured?
   A lockbox

Does this event/activity require a contract to be signed by the organization?
   No

Does this event/activity, as currently planned, present a risk of damage to property?
   No

Does the event/activity, as currently planned, present more than an everyday risk of physical inj...

RECORD FOR RELEASE
ADAM STEINBAUGH
H000731
App. 060
SPECTRUM 0000790

WEST TEXAS A&M UNIVERSITY

No

Are minors (individuals less than 18 years of age) specifically invited to attend the event/activ...
  Yes

Please explain who will be onsite throughout the event/activity that will be directly responsible...
  Only minors with a legal guardian will be allowed to enter.

Does the event include any inherently dangerous activity?  Examples might be:  Fire, pyrotechnics...
  No

Does this event/activity pose a risk of embarrassment, humiliation, coercion, physical assault, o...
  Yes

Please explain the risk to participants AND what steps are being taken to mitigate those risks.
  Risks include dressing up in drag, which can lead to embarrassment and harassment from other students after the event. To mitigate this, when introducing the student in the performance, we will not state their legal name, just their stage name they gave us.

This event will be insured by which of the following:
  None

Please attach the completed Hazard Matrix.  This needs to be provided with each risk assessment s...
  https://proxy.qualtrics.com/proxy/?url=https%3A%2F%2Fwtamuuw.az1.qualtrics.com%2FWRQualtricsControlPanel%2FFile.php%3FF%3DF_1GE2prHFukYUdnT&token=ZTp31EADjNZ4BfzEqvfKWJqMpUpjuHreypJjrQgvgjs%3D

Are any of the activities the event contemplates specifically excluded from coverage by the terms...
  No

Is this event/activity co-sponsored?
  Yes

With whom is it co-sponsored?
  F1RSTGEN, RHA, WTK, BSU, Buff Allies

Does this event/activity require waivers to be signed by participants?
  Yes

It is the responsibility of the group/organization to ensure that the use of University facilitie...
  https://proxy.qualtrics.com/proxy/?url=https%3A%2F%2Fwtamuuw.az1.qualtrics.com%2FWRQualtricsControlPanel%2FFile.php%3FF%3DF_2ceC1oEmUK52d23&token=%2B3dBDUAQHO3L6wFyNcsLwm4qb7zAk5KRwAmJ9j6kEMU%3D

RECORD FOR RELEASE
ADAM STEINBAUGH
App. 061
SPECTRUM 0000791

**WT** Office of Student
Engagement and Leadership
WEST TEXAS A&M UNIVERSITY™





# Campus Organizations Handbook





## Office of Student Engagement and Leadership
JACK B. KELLEY STUDENT CENTER,
SUITE 103

806.651.2313
WTOSEL@WTAMU.EDU
WWW.WTAMU.CAMPUSLABS.COM





EXHIBIT 63

Def_000109
App. 062



**Office of Student Engagement and Leadership**
**WEST TEXAS A&M UNIVERSITY.**

# Table of Contents

This Handbook offers an overview of information relevant to student organizations. Please keep in mind:

- It doesn't cover all University rules, procedures, or regulations.
- The University can update any procedure, policy, or program in this Handbook without notice.
- Individual divisions or departments may have their own rules that also apply to student organizations.

Introduction & Purpose ...................................................................................................................... 3

Rights and Responsibilities ............................................................................................................... 3

    Privileges ........................................................................................................................................ 3

    Responsibilities............................................................................................................................. 3

    Advisor Selection and Responsibilities ................................................................................... 4

Student Organization Management ................................................................................................. 5

    Annual Re-Registration for Existing Student Organizations (REQUIRED) ..................... 5

    Registration of New Student Organizations ........................................................................... 6

    Herd Huddle – Student Organization Orientation/Training ............................................. 7

    Grade Point Release Form .......................................................................................................... 7

Student Organization Finances & Fundraising .............................................................................. 8

    Recommended Guidelines for the Management of Funds..................................................... 8

    Campus Organization Funding .................................................................................................. 9

    Raffles ........................................................................................................................................... 10

    Solicitations of Private Donations ........................................................................................... 11

Campus Services ............................................................................................................................... 11

    Office of Student Engagement and Leadership Services .................................................... 11

Events & Activities On-Campus ..................................................................................................... 13

    Reserving University Facilities ................................................................................................ 13

    Food Services/Catering ............................................................................................................ 13

Promotion & Publicity of Events ................................................................................................... 14

    Posting Marketing Guidelines - Any University Facility .................................................... 14

    University Graphics Standards ................................................................................................ 15

Risk Management .............................................................................................................................. 15

    Organizational Risk Management............................................................................................ 15

Def_000110
App. 063

**WT** **Office of Student**
**Engagement and Leadership**
**WEST TEXAS A&M UNIVERSITY.**

Alcohol and Illegal Substances.................................................................................................... 17

Equipment Safety .......................................................................................................................... 18

Hazing/Harassment ...................................................................................................................... 18

Insurance......................................................................................................................................... 20

Student Activity Release Form.................................................................................................... 20

Houses/Lodges, Fire Safety and Equipment ......................................................................... 21

Student Travel Procedures.......................................................................................................... 21

# Introduction & Purpose

This handbook serves as a comprehensive guide for student organizations at West Texas A&M University (WTAMU). It outlines the requirements, privileges, and resources available to support student-led groups in creating meaningful experiences, promoting leadership development, and engaging the campus community.

# Rights and Responsibilities

## Privileges

- Access to campus facilities
- Access to Campus Organization Funding
- Support from the Office of Student Engagement and Leadership (OSEL)
- Listing in the Buff Link Directory
- Use of West Texas A&M University name to signify campus affiliation
- Involvement opportunities such as; NSO Involvement Fairs, Buff Branding events, Join the Herd, the WT Block Party Tailgating experience, etc.
- Check-out equipment such as; yard games, popcorn machine, 360 rotating photo booth, karaoke machine, etc.
- Program planning, marketing, graphic design, and printing services

## Responsibilities

- Abide by procedures and regulations pertaining to campus organizations found in the current *Student Handbook* and *Campus Organizations Handbook* and to state and federal laws
  - Update your executives and advisor's contact information.
  - Complete the Risk Management process for all new advisors and presidents.
- Re-register **ANNUALLY** (starting in January) in Buff Link by February 27.

---

**Def_000111**
App. 064

**WT** Office of Student
Engagement and Leadership
WEST TEXAS A&M UNIVERSITY.

# Advisor Selection and Responsibilities

University regulations require each campus organization to have a primary advisor, a full-time WTAMU faculty or staff member. It is in the organization's best interest to have a secondary advisor if your primary advisor is frequently unavailable. We hope the following will help you select an advisor and understand his/her function in your organization.

## The Role of the Advisor

An advisor adds to the continuity of your organization by making sure that successive officers of the organization understand the responsibility they share with the officers, as well as explaining to the officers the policies established for campus organizations.

## Duties of an Advisor

- To be aware of and understand those rules pertaining to organizations at WTAMU and rules and procedures governing WTAMU students.
- To be aware of liability issues (i.e. hazing, alcohol, etc.) and advise the organization to make reasonable and prudent decisions regarding these issues in planning activities.
- To attend meetings of the organization whenever possible.
- To be available to the officers and members of the organization on a regular basis for advice and consultation.
- Take all necessary trainings that are required by the state of Texas.

## Hints for Recruiting an Advisor

- Before making a selection, keep in mind the following:
  - o Find someone who believes in the organization's mission and values.
  - o Find someone who will have the time to devote to your organization.
  - o Find someone who will take the role willingly and seriously.
- When approaching your potential advisor for the first time, make sure that he/she understands your organization's mission and values as well as what will be required of them in their role, duties and time commitment.
- Allow the person a reasonable length of time to consider his/her decision.
- If possible, choose someone who shares some of the same interests of your organization, and someone with which members are in contact.
- When starting a departmental club or organization, it can be helpful to find someone in that department as the advisor.

---

**Def_000112**
**App. 065**


**Office of Student Engagement and Leadership**
WEST TEXAS A&M UNIVERSITY.

## How to Work with Your Advisor
- It is best to meet with your advisor prior to your meetings to review the agenda and topics to be discussed.
- Be open to suggestions and criticisms from your advisor.  Their knowledge and experience will help in solutions and organizational procedures.
- If an advisor cannot attend all your meetings, be sure to meet with them after the meeting to provide an update on what happened.

# Student Organization Management
## Annual Re-Registration for Existing Student Organizations (REQUIRED)
Becoming a registered campus organization is a required process at West Texas A&M University.  It provides a terrific opportunity to serve the campus community, develop skills within a large group and have a good time in the process.  A WTAMU registration involves privileges and responsibilities as listed below.

Existing organizations **MUST** re-register once per year (February Deadline).
- Access your organization in BuffLink (Buff Connect > BuffLink  > Sign In > click on your org icon circle on the left-hand side of the page > Manage Home > click the blue Re-Registration button)
    - If the above steps don't work, it is possible that you don't have access to your organization because you are not listed on the current roster.  Email us at WTOSEL@wtamu.edu and we will get you set up.
    - Make sure to check your email. You will receive approval if all requirements are met, or you will be contacted by one of our Student Life Coordinators with the corrections needed for approval.
- You will have an opportunity to update the org profile, roster (must include all members), and the organization profile.

The president and any new advisors (depending on the semester) **MUST** also complete the Risk Management process. It's Texas Law!
- Risk Management Online training

**Constitution and By-Laws.**  Every campus organization must have an up-to-date constitution or by-laws (cannot be older than 3 years) uploaded in BuffLink.

---

Def_000113
App. 066

**WT** Office of Student
Engagement and Leadership
WEST TEXAS A&M UNIVERSITY™

- There is a template available on the Office of Student Engagement and Leadership's BuffLink profile.

# Registration of New Student Organizations

If there is not already an organization on campus that meets your needs, the Office of Student Engagement and Leadership can help you through the process required to create a new one.

These are the items you will need to collect and prepare prior to registering:

- Constitution and By-Laws. Every campus organization must have an up-to-date constitution and/or by-laws. This will help in the development of a new organization and in the stability of an existing one. Important things to remember about the constitution are (1) it must be voted on and approved by the general membership, and (2) it must be uploaded into Buff Link at the time of registration and anytime it is changed. You can find a sample constitution <u>here.</u>
- Secure an advisor for the organization. The University requires each campus organization to have at least one advisor. The advisor must be a full-time faculty or staff member at WTAMU.
- Secure four (4) WT students to be added to the organization roster. (You will need each members' WT email address and Student ID). Always, include all members on the roster.
- Of the above members you will need to elect three (3) officers: president, vice president, and treasurer.
- Become familiar with WTAMU policies concerning campus organizations.

When the above items are available you can register your new organization in Buff Link. (Buff Connect > Buff Link icon > Sign In > Organization icon (symbol of two people) > Register an Organization > Scroll down to the bottom of this page and you will see the blue Register a New Organization button)

- Make sure to check your email. You will receive approval if all requirements are met, or you will be contacted by one of our Student Life Coordinators with the corrections needed for approval.
- As soon as the organization is registered, it can begin operating and meeting.

The president and any new advisors (depending on the semester) **MUST** also complete the Risk Management process. It's Texas Law!

- <u>Risk Management Online training</u>

Def_000114
App. 067

**WT** Office of Student
**Engagement and Leadership**
WEST TEXAS A&M UNIVERSITY.

# Herd Huddle – Student Organization Orientation/Training

## Mission

The mission of the Herd Huddle is to enhance campus life and provide support to student organizations. We encourage the executive member whose role best relates to the session content to attend each Herd Huddle—for example, the treasurer attending the financial session. Monthly Herd Huddle sessions will be held to review the goals and objectives, listed below.

## Goals and Objectives

- To provide a network for organizations to support and promote themselves and other organizations.
- To market major campus events and promote joint programming efforts among organizations.
- To provide leadership training.
- To promote community awareness.
- To increase communication flow to organizations.
- To guide and direct through the *Campus Organizations Handbook*

## Grade Point Release Form

(Required **only** for groups that have GPA requirements in their constitution.)

The release of student grades to other students is prohibited unless written permission is obtained from each student, as indicated on the Grade Point Release Form. This form is available **here**.

Grade reports are compiled by the Office of Student Engagement and Leadership at the end of each semester. Groups submitting the Grade Point Release Form must do so by the established deadlines **(Fall: December 1; Spring: May 1)**.

Grades will not be disclosed unless the release section of the form is signed. Grades will only be released to the organization president, advisor and national office, as needed, to complete national reports, provide academic assistance, and recognize academic excellence. Grade reports released to organization president, advisor and national office may not be released to any other students.

Def_000115
App. 068

**WT** Office of Student
Engagement and Leadership
WEST TEXAS A&M UNIVERSITY.

# Student Organization Finances & Fundraising

## Recommended Guidelines for the Management of Funds

Most registered campus organizations at WTAMU are self-funded and do not receive direct financial support from the University. These organizations typically raise money through dues, donations, and fundraising activities.

All registered campus organizations are required to maintain an on-campus account for managing their funds. Exceptions apply for Greek and religious organizations that already have an established account with their state or national organization.

The Office of Student Engagement and Leadership (OSEL) can assist you in opening an on-campus account. Please reach out when you are ready to start.

Acceptable Financial Practices

- Debit cards are not available for student organization accounts. Instead, Procurement (Pro) Cards are available through the organization's advisor to assist with purchasing needs and to maintain a proper paper trail.
- Venmo and other cash apps are not permitted for collecting money. OSEL provides an online dues form (linked **here**) that will deposit funds directly into your organization's account.
- All financial obligations should be paid promptly.
- Deposits should be brought to OSEL to be made into your account. Cash will not be accepted. Cashier's checks, money orders, and checks made out to WTAMU are acceptable.
- Receipts should be issued for any money collected by the organization.
- Balance your account monthly.
- Always have a budget for each semester and stick to it. Establish a budget committee to set guidelines for dues and fines and to develop the semester budget. A budget template is available **here,** on the OSEL BuffLink page to help your organization plan effectively.
- The treasurer is strongly encouraged to submit monthly reports to the appropriate executive officer and/or the advisor.

Def_000116
App. 069

**WT** Office of Student
Engagement and Leadership
WEST TEXAS A&M UNIVERSITY.

# Third-Party Fundraising Vendors

Student organizations wishing to partner with any outside or third-party fundraising vendor must first receive approval from the **Office of Philanthropy and External relations.**

> IMPORTANT: Gifts collected through unapproved third-party vendors are not considered gifts to West Texas A&M University or the WT Foundation, are not charitable contributions for tax purposes, and do not provide donor credit to WT. In addition, most third-party vendors retain a percentage of each donation (some as high as 30%)

All third-party vendor agreements must go through the University contract process before any fundraising begins. Organizations that do not obtain proper approval may be required to notify donors that their gifts were not made to WT and offer refunds, including vendor fees.

The Office of Philanthropy and External Relations is available to assist student organizations in planning successful fundraising efforts using approved methods.

# Campus Organization Funding

Campus Organization Funding is available to support certain activities sponsored by recognized student organizations. To be eligible, an organization must:

- Be officially recognized by the University and in good standing with the Office of Student Engagement and Leadership.
- Not have received other forms of campus funding for the same activity.
- Demonstrate the benefit of the allocation to the University community.

How to Apply

- Requests must be submitted to OSEL at least two weeks prior to the event.
- The Student Judicial Board (SJB) reviews proposals for approval during its weekly meetings.
- Applications and funding guidelines are available on Buff Link under the Office of Student Engagement and Leadership page.

Funding Schedule

- Fall Activities: Requests accepted from the first day of class through the last day of finals in December.
- Spring Activities: Requests accepted from the first day of class through the last day of finals in May.

**Def_000117**
**App. 070**



**Office of Student Engagement and Leadership**
**WEST TEXAS A&M UNIVERSITY.**

Funding Priorities

Funding is awarded on a first-come, first-served basis. Higher consideration will be given to activities that:

1. Are widely publicized on the University Student Events Calendar and other campus-wide media (copies of flyers/advertisements should be submitted with the application).
2. Are predominately funded by the sponsoring organization.
3. Are held on campus.
4. Encourage academic enrichment.
5. Have no admission charge for WTAMU students.

Restrictions

Campus Organization Funds may not be used to purchase items intended for resale or fundraising events.

Allocation Process

Funds for all tiers are allocated based on demonstrated need as shown on the application and during your presentation to the Student Judicial Board.

- Presentations should address:
  - o A description of the organization and its purpose.
  - o The reason for funding and amount requested.
  - o The organization's retention rate.
  - o Other contributions the organization will make to the event.
  - o How the event will benefit the University and/or students.

Disbursement & Accountability

Once approved, funds will be deposited into the organization's on-campus account. Receipts for all expenditures must be submitted after the event; failure to do so will result in a hold on the organization's account.

# Raffles

Per the definition below, student organizations are NOT allowed to have raffles, "opportunity to win", etc. The ONLY way to have a raffle is by collecting participants information to win a prize but no money can be collected. For example, giving away a pair of earbuds for all guests at an event would be allowed. However, the organization cannot collect money as an entry to qualify for the drawing.

Def_000118
App. 071


**Office of Student
Engagement and Leadership**
WEST TEXAS A&M UNIVERSITY.

Raffles What is a raffle?

The Charitable Raffle Enabling Act defines a raffle as "the award of one or more prizes by chance at a single occasion among a single pool or group of persons who have paid or promised a thing of value for a ticket that represents a chance to win a prize."

- More information available **here.**

## Solicitations of Private Donations

To protect WT's donor relationships, all new fundraising efforts should be coordinated with the Assistant Vice President for Leadership Gifts & Development, Lesly Bosch Annen, at (806) 651-3252. This coordination ensures private support to WTAMU is not jeopardized.

# Campus Services

## Office of Student Engagement and Leadership Services

Programs offered through OSEL provide WTAMU students opportunities to engage on campus, build lasting relationships, develop support networks, and participate in educational and entertainment activities. The primary purpose of OSEL is to foster leadership development, cultural awareness, and community service.

## Hours of Operation

Jack B. Kelley Student Center, Suite 103
Monday-Friday: 8:00 am to 5:00 pm

## Copy Services

Each registered organization is eligible to have copies made by the OSEL (JBK 103) to copy minutes, agenda, flyers and other materials. The OSEL will provide the first 100 copies each long semester at no charge. If an organization wants colored paper, the organization must provide the colored paper. The cost for copies over the 100 limit is .10 per copy.

## Program Planning Assistance

If you need help planning an event or activity, your student life coordinator can offer you experienced advice. The staff can help find efficient means of publicity, budgeting, advice, less expensive means to obtain services, food services advice, and any other aspect of successful programming planning.

**Def_000119**
**App. 072**

**WT** Office of Student
Engagement and Leadership
WEST TEXAS A&M UNIVERSITY.

## Campus Organizations Directory

Each semester every organization is required to re-register on BuffLink. When the re-registration is complete then your organization is added back to the BuffLink directory. The purpose of this directory is to have an updated listing of all campus organizations, their presidents and advisors. This is available to all potential and current students. It may be viewed by going to www.wtamu.edu > click on Student Life > Student Orgs

## Standards of Excellence Checklist & Recognition Program

The Standards of Excellence (SOE) Checklist is a recognition framework designed to support student organizations in developing meaningful engagement, leadership growth, and organizational excellence.

Participation is not mandatory, but strongly encouraged for all registered student organizations. Groups that complete a majority of the checklist items will be recognized at the annual Honors Banquet and may qualify for Gold, Silver,or Bronze standings.

The checklist focuses on:
- Practical Skills
- Financial Responsibility
- Personal Well-Being
- Healthy Relationships & Community
- Community Engagement
- Reflection & Recognition

What You Need to Know:
- Orgs track their progress throughout the year using the checklist and optional templates provided by the Office of Student Engagement and Leadership.
- Documentation should be saved in the org's BuffLink folder for easy access.
- Final submission is made through the SOE Submission Form on BuffLink each spring.
- Groups falling below 50% completion may enter a support-based recovery process called *Path to Progress*.

Benefits of Participating:
- Recognition at Honors Banquet
- Stronger advisor engagement
- Improved event planning, member retention, and leadership development
- Early access to select leadership trainings and resources
- Access to campus organization funding

**Def_000120**

App. 073

**WT** Office of Student
Engagement and Leadership
WEST TEXAS A&M UNIVERSITY.

Helpful Links & Resources:
- Toolkit: https://wtamu.campuslabs.com/engage/submitter/form/start/690101
- Submission Form:
  [https://wtamu.campuslabs.com/engage/submitter/form/start/690101

## Check-out Items

Registered organizations can check out miscellaneous items from the OSEL free of charge unless the items are not returned or they are returned damaged. Here is a short list of items that we have but if you don't see what you need contact the OSEL at 806-651-2313 to inquire if we have what you need.

- Tablecloths
- Bose speaker
- Various board and card games
- Yard games
- Popcorn machine
- 360-degree rotating photo booth
- Canopy tent
- Chalk boards
- Large dry-erase board
- Miscellaneous decorations

# Events & Activities On-Campus

## Reserving University Facilities

Student organizations have priority access to reserve University facilities. The reservation book opens each year on **April 1** for the upcoming academic year, allowing organizations to secure preferred spaces early.

Reservations can be made at reservations.wtamu.edu. Directions for submitting a request are available on the BuffLink homepage once you are logged in (your name should appear in the top right corner).

For questions about the reservation process, contact the Jack B. Kelley Student Center at **JBK@wtamu.edu** or **(806) 651-2394**

## Food Services/Catering

By contract, ARAMARK Food Services shall provide, or provide and serve, all food items on the WTAMU campus. Student groups are not allowed to sell or distribute any food item on the campus unless written permission has been granted by the Director of Food Services (whose office is located in the Dining Hall). The On Campus Catering Exemption Form can be found **here**.

Def_000121
App. 074



**Office of Student
Engagement and Leadership
WEST TEXAS A&M UNIVERSITY.**

Arrangements for food and beverage requirements are to be made with the Catering Manager, Ollie Sims, in the Dining Hall, at 651-2707 or osims@wtamu.edu. The complete catering guide for student organizations, including menus and rates, is available from the Catering Manager.

# Promotion & Publicity of Events

## Posting Marketing Guidelines - **Any University Facility**

West Texas A&M University's visual identity reflects our shared beliefs, values, and commitment to academic excellence. Consistent, professional use of university marks, such as the seal and logo are essential for reinforcing that image.

- All materials displaying University marks must adhere to published graphic standards and obtain approval from the Office of Communication and Marketing.
- Official, ready-to-use artwork for the University seal and logo is available at wtamu.edu/graphicstandards.
- Recognized student organizations may use University marks, names, and logos as part of their materials.
- However, such organizations may not formally represent West Texas A&M University or speak on behalf of the institution.
- Student organizations are not authorized to enter into contracts on the University's behalf and are solely responsible for all financial and legal obligations tied to any agreements they sign.
- All contracts involving University entities must be reviewed and executed in coordination with the Contract Administration Office to ensure proper delegation and compliance.
- Student organizations must comply with the Student Handbook and related rules governing operations, recognition, and accountability.

To clarify the scope of authority and prevent misinterpretation, include the following clause in all contracts:
"(Organization Name) is a recognized student organization of West Texas A&M University and does not represent, nor has the authority to contractually obligate, the University. As (Position Title) of (Organization Name), I enter into this agreement solely on behalf of the organization."

Def_000122
App. 075



**Office of Student
Engagement and Leadership
WEST TEXAS A&M UNIVERSITY.**

## University Graphics Standards

West Texas A&M University's image reflects the collective beliefs, values, and impressions of our community. Consistent and professional use of University marks—such as the seal, logo, and wordmark—helps reinforce WTAMU's commitment to academic excellence, research, and community engagement.

To maintain this unified image, all materials using University marks must comply with the published graphic standards and receive approval from the Office of Communication and Marketing.

Official, ready-to-use artwork for the University seal and logo is available at wtamu.edu/graphicstandards

For questions, guidance, or assistance in promoting and marketing your event, contact: **Evelyn Montoya, Marketing Coordinator for Student Success and Engagement**
Jack B. Kelley Student Center, Suite 103
WTAMU Box 60775
Canyon, Texas 79016-0001
Phone: 806-651-2051
Fax: 806-651-2926
Email: emontoya@wtamu.edu

# Risk Management

## Organizational Risk Management

Effective risk management helps protect your members, guests, and organization. Leaders and advisors are responsible for minimizing risks during planning and programming, but proactive preparation is key.
West Texas A&M University encouráges student organizations to follow the **PREFF model** when planning events:
- **Physical** – Prevent injuries and ensure food, alcohol, and venue safety.
- **Reputational** – Avoid actions that may harm the image of your organization or the university.
- **Emotional** – Consider how events may affect the mental well-being of attendees.
- **Financial** – Plan realistic budgets and maintain accountability.
- **Facilities** – Use spaces appropriately and in line with university policies.

**Def_000123**
**App. 076**

# WT
**Office of Student
Engagement and Leadership**
WEST TEXAS A&M UNIVERSITY.

There is no substitute for good planning. Thinking through your event from start to finish allows you to anticipate challenges and create a safer experience for everyone. For a detailed overview of risk categories, insurance requirements, and event safety practices, refer to the **Risk Management and Insurance Matrix** (pictured below) and the full **WTAMU Social Events Practices** guide linked here.

### West Texas A&M University Risk Management and Insurance Matrix

Exposure To Be Reviewed: _____

Instructions: Step 1 - List all event activities and be as inclusive as possible. Step 2 - Honestly identify risks associated with each activity. Step 3 - Use the matrix below to assess your activities. Tally the severity and probability scores for evaluation. Step 4 - Brainstorm methods to manage risks. See if you can reduce the probability or severity of something going wrong. Step 5 - Submit the Risk Management and Insurance Matrix Form with your Risk Assessment Form for further review. If you have questions, please contact Richard Smith via email at rcsmith@wtamu.edu.

| List of Activities to Occur | Associated Risks* | Severity | Probability | Method to Manage Risks** |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

*Possible risks include: medical emergencies, food poisoning/allergens, damage to WTAMU reputation, accidents, injuries, and/or death

**Methods to manage risks include: Insuring risk, arranging for security, use of administrative procedures, and/or use of PPE or safety devices

| Severity | | Risk Matrix | | | | Probability |
|---|---|---|---|---|---|---|
| **I: May result in death** | Severity | A | B | C | D | **A: Likely to occur immediately or in a short period of time (6<months); expected to occur frequently** |
| **II: May cause severe injury, major property damage, significant financial loss, and/or result in negative publicity for WTAMU** | I | High Risk | High Risk | High Risk | Medium Risk | |
| | II | High Risk | High Risk | Medium Risk | Medium Risk | **B: Likely to occur in the near future (6 months – 1 year); expected to occur periodically over a relatively short timeframe; expected to occur over the life of an event or project** |
| **III: May cause a moderate illness, injury, property damage, financial loss, and/or result in negative publicity for WTAMU** | III | Medium Risk | Medium Risk | Medium Risk | Low Risk | |
| **IV: Presents a minimal threat to safety, property, operations, or reputation** | IV | Medium Risk | Medium Risk | Low Risk | Low Risk | **C: May occur if given enough time; probability of occurrence is equal to it not occurring** |
| | High risk areas may be sent to System Risk Management for additional review. Although insurance procurement may not be the answer, discussions should occur regarding self-retention so all parties are aware of the risks associated with the activity. | | | | | **D: Unlikely to occur at any point** |

*Form Updated 07/22/22*

Def_000124
App. 077



**WT** Office of Student
Engagement and Leadership
WEST TEXAS A&M UNIVERSITY.

| List of Activities to Occur | Associated Risks* | Seriousness | Probability | Method to Manage Risks** |
|---|---|---|---|---|
| BBQ for Private Event | Undercooked food | IV | D | Make sure all food is thoroughly cooked and kept at temperature |
| | Equipment catches on fire | III | D | Have fire extinguisher on site |
| BBQ for Open to Public Event | Undercooked food | IV | D | Have temporary food permit |
| | | | | Keep all food at proper temperature |
| Inflatables | Injury to participants | III | C | Choose items that are individually wrapped |
| Dunk Tank | Injury to person in tank | III | C | Waivers will be signed by all participants |
| | | | | Waivers will be signed by person in tank |
| | Injury to people behind tank | IV | D | Tank will be positioned on solid ground |
| Dodge Ball Tournament | Injury to participants | III | C | Will be positioned to point others walking behind |
| Cash money will be present | Cash is stolen | IV | D | Waivers signed by all participants |
| Minors will be present | Minors with no parent/guardians on site | III | C | Safety cash boxes will be used |
| Minors will be present | Minors and parents/guardians on site | III | D | At staff members will have background checks on file |
| 5K Race | Risk of Injury to participants | III | C | Parents/guardians must continually be in supervision |
| | | | | Waivers signed by all participants |
| | | | | UPD coordinated route with client |
| Alcohol Service | Alcohol consumption | | | Event Liability Insurance required |
| Non-University Event with Risk | Any risk event above or not detailed | | | Fill out the Alcohol Request Form |
| | | | | Event Liability Insurance is required |

*Form Updated 07/22/22*

# Alcohol and Illegal Substances

West Texas A&M University is committed to fostering a safe and responsible event environment. Alcohol and illegal substances are among the most common contributors to organizational risk and disciplinary issues. Student organizations are strongly encouraged to plan substance-free events whenever possible.

If your organization hosts events where alcohol is present, you must follow all federal, state, and local laws, as well as University and Social Events Practices policies. This includes:
- No person under the legal drinking age may possess, consume, or be provided alcohol.
- Alcoholic beverages must be provided by a licensed and insured third-party vendor or through a BYOB (bring your own beverage) system within the approved alcohol content limits.
- Alcohol cannot be purchased with organizational funds or pooled member contributions.
- Common sources (kegs, bulk containers, communal pour stations) are prohibited.

Illegal drugs or controlled substances are strictly prohibited at all student organization events, including their possession, use, sale, delivery, or distribution.

Def_000125
App. 078

**WT** Office of Student
Engagement and Leadership
WEST TEXAS A&M UNIVERSITY.

Violations of these policies may result in disciplinary action through the Office of
Community Standards and/or the appropriate governing council.
*More information and guidance on how to host an event with alcohol is available in
the WTAMU Social Events Practices Guide.*

## Equipment Safety

Equipment is another area where good risk management must be practiced.  A
careful check that equipment is in order is very important, as well as making sure
participating students know how to use the equipment.  All equipment, sport or non-
sport, should be checked and it should be documented that participants were
instructed in how to use each piece.

One way to document is by having everyone that attends a certain workshop or
demonstration sign a list and make sure that list is kept in the organization's file for
the remainder of the year.  There may be other types of equipment that have no
connection with a sport.  Please remember any type of equipment your organization
uses needs to be considered.

Another area where groups need to manage their risks is that which relates to
products your group may sell.  Baskets, which contain a variety of products,
architectural or medical equipment, food or any kind of sports equipment may be a
problem if someone is harmed.  Your group could be held liable for selling or giving
away a faulty product.  Make sure your supplier is reliable and use common sense
when deciding what products with which you may want to involve your group.

## Hazing/Harassment

Preventing hazing and sexual or racial harassment are not usually considered in the
context of risk management, but your organization can suffer great consequences if
hazing and harassment occur.  This is something this University simply will not
tolerate.  Please read this section carefully.

The Student Handbook states this about hazing:
- In accordance with the Campus Hazing Act (H.R. 5646), any intentional, knowing,
  or reckless act committed by a person (whether individually or in concert with
  other persons) against another person or persons, regardless of the willingness to
  participate, that is committed in the course of an initiation into, an affiliation with,
  or the maintenance of membership in, a registered student organization or
  student group (e.g., a club, athletic team, fraternity, or sorority) and causes or

**Def_000126**
**App. 079**

**WT** **Office of Student Engagement and Leadership**
**WEST TEXAS A&M UNIVERSITY.**

creates a risk above the reasonable risk encountered in the course of participation in the IHE or the organization, of physical or psychological injury. Examples of physical and psychological injury can include, but are not limited to:

- o Misuse of authority by virtue of one's class rank or leadership position, such as assigning acts of servitude.
- o Whipping, beating, striking, electronic shocking, placing of a harmful substance on someone's body, or similar activity.
- o Causing, coercing, or otherwise inducing sleep deprivation, exposure to the elements, confinement in a small space, extreme calisthenics, or other similar activity.
- o Causing, coercing, or otherwise inducing another person to consume food, liquid, alcohol, drugs, or other substances.
- o Causing, coercing, or otherwise inducing another person to perform sexual acts.
- o Any activity that places another person in reasonable fear of bodily harm through the use of threatening words or conduct.
- o Any activity that requires a violation of the WTAMU Student handbook.
- o Any activity that induces, causes, or requires another person to perform a duty or task that involves a criminal violation of local, State, Tribal, or Federal law.
- For purposes of this definition, a 'student group' means an organization at an institution of higher education in which two or more of the members are students enrolled at the institution of higher education, whether or not the organization is established or recognized by the institution. This is in alignment with the Campus Hazing Act (H.R. 5646).
- In alignment with WT's Amnesty policies, students who are recipients and/or victims of hazing (and who have not perpetrated hazing behavior on others involved in the fact pattern for which they are reporting) and who report the activities to the VP for Student Affairs, or designee responsible for oversight of the student conduct processes and/or the University Police Department, will not be charged with a violation of the hazing rule.
- Having firsthand knowledge of the planning or occurrence of a hazing incident and failing to report it to appropriate university officials (e.g., the Vice President for Student Affairs, at JBK Suite 102, 806-651-2389, Human Resource Office, 806-651-2114, or the University Police Department, 806-651-2300) is a violation.
- The hazing rule is not intended to prohibit the following conduct:
  - o Customary public athletic events, contests, or competitions that are sponsored by the University or the organized and supervised practices associated with such events; or

Def_000127
App. 080

**WT** Office of Student
Engagement and Leadership
WEST TEXAS A&M UNIVERSITY.

- o Activity or conduct that furthers the goals of a legitimate educational curriculum, a legitimate extracurricular program, or a legitimate military training program as defined and approved by the University.
- Hazing is a violation of Federal law (H.R. 5646), Texas state law under Texas Education Code Sections 37.151 and 51.936, and TAMU System Policy 07.01 - Ethics.

## Insurance

In many cases, your organization should require participants to have medical, accident, or injury insurance. Most students are covered under a family plan, but it is a good practice to request proof of insurance (such as a copy of their insurance card) or to secure event-specific insurance when needed.

The University does not provide insurance coverage for students and cannot be responsible for medical bills or related expenses.

For assistance with purchasing event insurance, contact Richard Smith, Assistant Vice President of Research, Risk & Compliance, at rcsmith@wtamu.edu or 806-651-2740.

## Student Activity Release Form

West Texas A&M University, in conjunction with The Texas A&M University System Office of Risk Management and Safety, is committed to the minimization of risk and protecting against unpredictable loss by promoting safety awareness on the part of all campus departments. This form is a legal document and should be stated as such. It is a good idea to have everyone sign it at the time they join or pay dues. It is important that participants are warned of any dangers inherent in an activity and that they sign a document stating that they understand this danger and will assume responsibility for themselves. It is also a good idea to have your members sign a more specific form before each event that carries some risk. This may seem like a lot of paperwork, but very important.

- Waiver, Indemnification, and Medical Treatment Authorization

Only students of WTAMU should participate in your activities.  If outsiders want to participate, be sure they sign all risk forms, too.  If you allow children to participate, it is a good idea for minors to have a release from their parents and require parents to be present at the event.

**Def_000128**

App. 081

**WT** Office of Student
Engagement and Leadership
WEST TEXAS A&M UNIVERSITY.

If your organization has questions regarding risk management or liability, please
don't hesitate to contact the Office of Student Engagement and Leadership.

## Houses/Lodges, Fire Safety and Equipment

Houses/Lodges, fire safety, and equipment are other areas where good risk
management must be practiced. A careful check of each is very important to the
overall safety of guests and users of a group's facilities and equipment. Guests and
users should be made aware of any potential hazard, taught how to use certain
equipment, and informed of proper fire evacuation plans. These measures are
necessary to safeguard groups from potential legal action stemming from the use of
their facilities or equipment. It is good practice to contact Fire Marshall's office to
have annual inspections of your facilities.

## Student Travel Procedures

West Texas A&M University (WTAMU) supports student activities both on and off
campus while prioritizing student safety. The requirements outlined in this rule apply
to student travel more than 25 miles from campus, or to Palo Duro Canyon, for any
activity organized, registered, funded, or sponsored by WTAMU. Students traveling
on behalf of the University must receive prior approval from the appropriate vice
president or department head.

Before taking any trips in regard to your organization, please make sure to review our
Social Event Procedure document the Student Travel website.

**If you have any questions about student travel and the process, please contact
the OSEL at 651-2313 or WTOSEL@wtamu.edu.**

Def_000129
App. 082



**WT** Office of Student
Engagement and Leadership
WEST TEXAS A&M UNIVERSITY.

# Campus Resources



**Office of Student Engagement and Leadership**
Office location: JBK 103
Phone Number: (806) 651-2313
Email: wtosel@wtamu.edu
Website: https://www.wtamu.edu/osel

**Student Affairs**
Office Location: JBK 102
Phone Number: (806) 651-2050
Website: https://www.wtamu.edu/studentaffairs



**Jack B. Kelly Student Center**
Phone Number: (806) 651-2394
Email: jbk@wtamu.edu
Website: https://www.wtamu.edu/jbk

**West Texas A&M Catering**
Phone Number: (806) 651-2709
Email: catering@wtamu.edu
Website: https://wt.catertrax.com/index.asp?
&intOrderID=&intCustomerID=



**Residential Living**
Phone Number: (806) 651-3000
Email: housing@wtamu.edu
Website: https://www.wtamu.edu/housing



**Career and Professional Development**
Office Location: Classroom Center, Suite 113
Phone Number: (806) 651-2345
Email: wtcareer@wtamu.edu
Website: https://www.wtamu.edu/career



Def_000130
App. 083



Redacted - ACP

**From:** Fouts, Shawn M.
**Sent:** Monday, March 20, 2023 9:01 AM
**To:** Barrett Bright; Mangum, Andrew
**Subject:** Re: Music list for A Fools Drag Race

Great, thank you.



**DR. SHAWN M. FOUTS** Jack B. Kelley Student Center
SENIOR DIRECTOR OF CAMPUS COMMUNITY
806.651.2329 | sfouts@wtamu.edu | wtamu.edu

**Strengths: Relator / Learner / Input / Belief / Competition**

**WIN the Day!** *What's Important Now*

**From:** Barrett Bright <babright1@buffs.wtamu.edu>
**Date:** Monday, March 20, 2023 at 9:01 AM
**To:** Fouts, Shawn M. <sfouts@wtamu.edu>
**Subject:** RE: Music list for A Fools Drag Race

Ok great. We also had another song added.

Pokerface - lady gaga

Sent via the Samsung Galaxy S21+ 5G, an AT&T 5G smartphone

-------- Original message --------
**From:** "Fouts, Shawn M." <sfouts@wtamu.edu>
**Date:** 3/20/23 9:00 AM (GMT-06:00)
**To:** Barrett Bright <babright1@buffs.wtamu.edu>
**Subject:** Re: Music list for A Fools Drag Race

1 / 6



**EXHIBIT**
tabbies
88

App. 084
SPECTRUM 0000983

Yes, I just wanted to pass on that if you need a presentation Andrew can give you guidance on the what his team needs to show it in Legacy.



**DR. SHAWN M. FOUTS** Jack B. Kelley Student Center
SENIOR DIRECTOR OF CAMPUS COMMUNITY
806.651.2329 I sfouts@wtamu.edu I wtamu.edu

**Strengths: Relator / Learner / Input / Belief / Competition**

**WIN the Day!** *What's Important Now*

**From:** Barrett Bright <babright1@buffs.wtamu.edu>
**Date:** Monday, March 20, 2023 at 8:58 AM
**To:** Fouts, Shawn M. <sfouts@wtamu.edu>
**Subject:** RE: Music list for A Fools Drag Race

Sorry, I thought to get the event from pending to approved, we had to send in the music list.

Sent via the Samsung Galaxy S21+ 5G, an AT&T 5G smartphone

-------- Original message --------
From: "Fouts, Shawn M." <sfouts@wtamu.edu>
Date: 3/20/23 8:55 AM (GMT-06:00)
To: Barrett Bright <babright1@buffs.wtamu.edu>, "Mangum, Andrew" <amangum@wtamu.edu>
Subject: Re: Music list for A Fools Drag Race

Barrett, are you creating a presentation with performances, performers, etc? Andrew is your contact for anything related to that.

Thanks,
Shawn



**DR. SHAWN M. FOUTS** Jack B. Kelley Student Center
SENIOR DIRECTOR OF CAMPUS COMMUNITY
806.651.2329 I sfouts@wtamu.edu I wtamu.edu

**Strengths: Relator / Learner / Input / Belief / Competition**

**WIN the Day!** *What's Important Now*

**From:** Barrett Bright <babright1@buffs.wtamu.edu>
**Date:** Friday, March 17, 2023 at 11:28 PM
**To:** Fouts, Shawn M. <sfouts@wtamu.edu>
**Subject:** Music list for A Fools Drag Race

These songs are currently what was listed by the performers and not all songs may make it to the final playlist. Some of the performers have not sent a specific song yet. I will keep you updated for when they do. Furthermore, some

2 / 6

**App. 085**
SPECTRUM 0000984

performers requested more than one song so I also put them on this list just incase.

Deep - Hyo
Girls - Aespa
Hype Boy - New Jeans
I wanna be your dog - John Mcrea
Tourner Dans le vide - Indila
Cold hearted - Paula Abdul
Dragula- Rob Zombie
Lose My Breath - Destiny's Child
Deja Vu - Beyonce

Plus more as we get them.
Also, here are the drag royalty names
Miss Rouge
Miss Mariposa
Cruello de Vil
Tru te Cosmetic
Vigor Mortis
Bidi Biti
Henryetta
Karma D'Angelo

Also sorry for the late email.

Sent via the Samsung Galaxy S21+ 5G, an AT&T 5G smartphone

App. 086
SPECTRUM 0000985

**Subject**: FW: Music list for A Fools Drag Race
**From**: Barrett Bright <babright1@buffs.wtamu.edu>
**To**: "adam@thefire.org" <adam@thefire.org>
**Date Sent**: Tuesday, March 21, 2023 10:57:36 PM GMT-04:00
**Date Received**: Tuesday, March 21, 2023 10:57:39 PM GMT-04:00


Sent from Mail for Windows

**From:** Fouts, Shawn M.
**Sent:** Monday, March 20, 2023 9:01 AM
**To:** Barrett Bright; Mangum, Andrew
**Subject:** Re: Music list for A Fools Drag Race

Great, thank you.



**DR. SHAWN M. FOUTS** Jack B. Kelley Student Center
SENIOR DIRECTOR OF CAMPUS COMMUNITY
806.651.2329 | sfouts@wtamu.edu | wtamu.edu
**Strengths: Relator / Learner / Input / Belief / Competition**

**WIN the Day!** *What's Important Now*

**From:** Barrett Bright <babright1@buffs.wtamu.edu>
**Date:** Monday, March 20, 2023 at 9:01 AM
**To:** Fouts, Shawn M. <sfouts@wtamu.edu>
**Subject:** RE: Music list for A Fools Drag Race

Ok great. We also had another song added.

Pokerface - lady gaga

Sent via the Samsung Galaxy S21+ 5G, an AT&T 5G smartphone


-------- Original message --------
From: "Fouts, Shawn M." <sfouts@wtamu.edu>
Date: 3/20/23 9:00 AM (GMT-06:00)
To: Barrett Bright <babright1@buffs.wtamu.edu>
Subject: Re: Music list for A Fools Drag Race

Yes, I just wanted to pass on that if you need a presentation Andrew can give you guidance on the what his team needs to show it in Legacy.



**DR. SHAWN M. FOUTS** Jack B. Kelley Student Center
SENIOR DIRECTOR OF CAMPUS COMMUNITY
806.651.2329 | sfouts@wtamu.edu | wtamu.edu
**Strengths: Relator / Learner / Input / Belief / Competition**

1 / 6

**App. 087**
SPECTRUM 0000986

**WIN the Day!** *What's Important Now*

---

**From:** Barrett Bright <babright1@buffs.wtamu.edu>
**Date:** Monday, March 20, 2023 at 8:58 AM
**To:** Fouts, Shawn M. <sfouts@wtamu.edu>
**Subject:** RE: Music list for A Fools Drag Race

Sorry, I thought to get the event from pending to approved, we had to send in the music list.

Sent via the Samsung Galaxy S21+ 5G, an AT&T 5G smartphone

-------- Original message --------
**From:** "Fouts, Shawn M." <sfouts@wtamu.edu>
**Date:** 3/20/23 8:55 AM (GMT-06:00)
**To:** Barrett Bright <babright1@buffs.wtamu.edu>, "Mangum, Andrew" <amangum@wtamu.edu>
**Subject:** Re: Music list for A Fools Drag Race

Barrett, are you creating a presentation with performances, performers, etc? Andrew is your contact for anything related to that.

Thanks,
Shawn



**DR. SHAWN M. FOUTS** Jack B. Kelley Student Center
SENIOR DIRECTOR OF CAMPUS COMMUNITY
806.651.2329 l sfouts@wtamu.edu l wtamu.edu
**Strengths: Relator / Learner / Input / Belief / Competition**

**WIN the Day!** *What's Important Now*

---

**From:** Barrett Bright <babright1@buffs.wtamu.edu>
**Date:** Friday, March 17, 2023 at 11:28 PM
**To:** Fouts, Shawn M. <sfouts@wtamu.edu>
**Subject:** Music list for A Fools Drag Race

These songs are currently what was listed by the performers and not all songs may make it to the final playlist. Some of the performers have not sent a specific song yet. I will keep you updated for when they do. Furthermore, some performers requested more than one song so I also put them on this list just incase.

Deep - Hyo
Girls - Aespa
Hype Boy - New Jeans
I wanna be your dog - John Mcrea
Tourner Dans le vide - Indila
Cold hearted - Paula Abdul
Dragula- Rob Zombie

**App. 088**
SPECTRUM 0000987

Lose My Breath - Destiny's Child
Deja Vu - Beyonce

Plus more as we get them.
Also, here are the drag royalty names
Miss Rouge
Miss Mariposa
Cruello de Vil
Tru te Cosmetic
Vigor Mortis
Bidi Biti
Henryetta
Karma D'Angelo

Also sorry for the late email.

Sent via the Samsung Galaxy S21+ 5G, an AT&T 5G smartphone

App. 089

SPECTRUM 0000988

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

SPECTRUM WT, et al,                )
                                   )
            Plaintiffs,            )
                                   )
VS.                                ) CIVIL ACTION
                                   )
WALTER WENDLER, et al,             ) NO.: 2:23-cv-00048
                                   )
            Defendants.            )
                                   )
                                   )

------------------------------------

REMOTE ORAL AND VIDEOTAPED DEPOSITION OF

MARCUS STOVALL

DECEMBER 16, 2025

------------------------------------

REMOTE ORAL AND VIDEOTAPED DEPOSITION OF MARCUS

STOVALL, produced as a witness at the instance of the

DEFENDANTS, and duly sworn, was taken in the

above-styled and numbered cause on December 16, 2025,

from 9:56 a.m. to 3:19 p.m., via Zoom teleconference,

before Vanessa J. Theisen, CSR in and for the State

of Texas, and RPR, reported by machine shorthand,

pursuant to the Federal Rules of Civil Procedure and

any provisions stated on the record or attached

hereto.

1   speculation.  It's vague.

2        A.  Can you rephrase the question?

3        Q.  (BY MS. BAKER)  Based on your reading of

4   this document, is access to campus facilities at WT a

5   privilege for registered student organizations?

6             MR. MORRIS:  Same objection, calls for

7   speculation and vague.

8        A.  It is listed as a privilege.

9        Q.  (BY MS. BAKER)  Do you agree that a

10  privilege is not something everyone can exercise?

11       A.  I would have to speculate.  I don't know the

12  dictionary definition off the top of my head.

13       Q.  Let me rephrase my question.

14            To put it in another way, can a

15  privilege be lost?

16            MR. MORRIS:  Objection, calls for

17  speculation, vague.

18       A.  Yeah.  Again, it depends on the context, I

19  believe.

20       Q.  (BY MS. BAKER)  Do you agree that registered

21  student organizations at WT have a responsibility to

22  comply with the university's procedures and policies?

23       A.  Within reason, yes.

24       Q.  What do you mean by "within reason"?

25       A.  For example, if a -- like a conduct or

1    different meanings and messages, right?

2        A.   That is correct.

3        Q.   And the message of a drag show depends on

4    what the performer intends it to mean, right?

5        A.   Yes.

6        Q.   I'm going to read from the first two

7    sentences of the paragraph.  The second paragraph on

8    the page marked DEF 54, it says, "WT endeavors to

9    treat all people equally.  Drag shows are derisive,

10   divisive and demoralizing misogyny, no matter the

11   stated intent."

12              So, Marcus, my question for you is,

13   based on your reading of this letter and that

14   sentence that I just read, is there anything in

15   President Wendler's statement that leads you to

16   believe he would allow a drag show of any kind to be

17   hosted in Legacy Hall?

18       A.   Can you rephrase the question?

19       Q.   Yes.  In other words, can you identify

20   anything in this letter, any statements that leads

21   you to believe that Spectrum -- to believe, excuse

22   me, that President Wendler would allow a drag show if

23   it weren't Spectrum who was intending to host it on

24   campus?

25       A.   I do not.

1    **Q.  Based on your reading of this letter, would**
2  **President Wendler allow a drag show in Legacy Hall if**
3  **its message was to ridicule members of the LGBTQ+**
4  **community?**
5    A.  No.
6    **Q.  President Wendler would not permit any drag**
7  **shows in Legacy Hall regardless of their intended**
8  **message, correct?**
9          MR. MORRIS:  Objection, calls for
10  speculation.
11    A.  Yes, it seems to be an overall ban on any
12  drag, regardless.
13    Q.  (BY MS. BAKER)  Do you agree, based on your
14  reading of -- let me go back up here so you can --
15  oh, actually, it is this paragraph.
16          So this same paragraph where my cursor
17  is circling, the second paragraph, excuse me, based
18  on your reading of that, would President Wendler
19  permit a black-face performance to be hosted in
20  Legacy Hall?
21          MR. MORRIS:  Objection, calls for
22  speculation.
23    A.  Based on the paragraph, no.
24    Q.  (BY MS. BAKER)  Do you agree that WT's
25  mission and values emphasize respect for others?

```
 1        A.  I believe it's right across.  It's right in
 2   between the old main building and the JBK.
 3        Q.  So would you say, if I were standing in this
 4   area that you're describing, I could look up -- could
 5   I look up and see the president's office?
 6        A.  I believe so.
 7        Q.  And you would agree that someone in the
 8   president's office could probably look out their
 9   window and see what was happening in the area that
10   you're describing?
11        A.  I believe so.
12        Q.  Do you believe that President Wendler has
13   censored drag on campus?
14        A.  I believe so.
15        Q.  Were any protestors during those
16   demonstrations dressed in drag?
17        A.  I believe so.
18        Q.  Did you see any people dressed in drag?
19        A.  To my best recollection -- I would have to
20   guess one way or the other.
21        Q.  Are you aware of any organizations who
22   instructed students to come to protest dressed in
23   drag?
24        A.  I believe our members talked about it.  I
25   would have to guess one way or the other.
```

1    A.  I do not recall specifically.

2    Q.  Do you recall whether minors could only

3    attend the event if accompanied by a parent or

4    guardian?

5    A.  Since we were forced to move off campus and

6    host the event at a public park, there was no way we

7    could restrict who was coming in or out, so we did

8    not have any kind of system in place for that.

9    Q.  So you would agree, based on your memory of

10   the event, that there were more than 50 people

11   present at that event?

12   A.  I would have to guess.

13   Q.  Do you remember whether you saw any children

14   at that event?

15   A.  I believe so, yes.

16   Q.  Do you agree that the nature of performances

17   at the Sam Houston drag show are probably on par with

18   the kinds of performances that someone might have

19   seen if Spectrum had been permitted to host its drag

20   show in Legacy Hall in 2023?

21   A.  It likely would have been similar.  However,

22   we would have been stricter with the -- on the actual

23   performance -- we would have been stricter with the

24   actual performances if it had been in Legacy Hall.

25   Q.  When you say "stricter," what do you mean?

1      A.   Just with like we would have been able to

2   actually check and see that no one was there without

3   a parent or guardian, that sort of thing.

4      Q.   Is that a conversation that you and

5   Mr. Bright or any other Spectrum leader had in

6   planning the 2023 drag shows?  Did you ever talk

7   amongst yourselves how you planned to check the ages

8   of attendees?

9      A.   Yes.  We were going to have a member of the

10  group by the doors checking either birth certificates

11  or IDs.

12      Q.   And any individual who didn't have that

13  would be turned away?

14      A.   Yes.  Anyone without a student ID who was

15  there because they were an adult, if they were under

16  the age of 18 and they did not have proof they were

17  with a parent or guardian, we would not allow them

18  entry.

19      Q.   I would like to introduce a document that I

20  will name Exhibit 18.  It is marked DEF 96.

21            (Exhibit 18 marked.)

22      Q.   (BY MS. BAKER)  Does this look familiar?

23      A.   Yes, it does.

24      Q.   What is this?  Is this the flyer for

25  Spectrum's --

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# AMARILLO DIVISION

SPECTRUM WT, BARRETT BRIGHT,
and LAUREN STOVALL,

          Plaintiffs,

      v.

WALTER WENDLER, in his individual
capacity and his official capacity as the
President of West Texas A&M University,

CHRISTOPHER THOMAS, in his official
capacity as Vice President for Student
Affairs at West Texas A&M University,

JOHN SHARP, in his official capacity as
Chancellor of the Texas A&M University
System,

ROBERT L. ALBRITTON, JAMES R.
BROOKS, JAY GRAHAM, MICHAEL A.
HERNANDEZ III, TIM LEACH, BILL
MAHOMES, ELAINE MENDOZA,
MICHAEL J. PLANK, CLIFF THOMAS,
and DEMETRIUS L. HARRELL, JR., in
their official capacities as members of the
Board of Regents of the Texas A&M
University System,

          Defendants.

Case No.: 2:23-cv-00048

**FIRST AMENDED VERIFIED
COMPLAINT FOR CIVIL RIGHTS
VIOLATIONS**

**JURY TRIAL DEMANDED**

## INTRODUCTION

1.    Walter Wendler, President of West Texas A&M University, is openly

defying the Constitution. In a published edict, President Wendler barred a recognized

student group, Spectrum WT, from exercising its clear First Amendment right to put

on a PG-13 charity drag show at a campus event hall with the aim of raising funds

for LGBTQ+ suicide prevention. In his edict, President Wendler confessed he is

censoring Spectrum WT based on his personal views, and unabashedly admitted that

doing so violates the Constitution: "A harmless drag show? Not possible. I will not

Exhibit
Marcus Stoval

App. 097    **1**

12/16/25 VT

appear to condone the diminishment of any group at the expense of impertinent gestures toward another group for any reason, ***even when the law of the land appears to require it***."[1]

2.      That "law of the land" is the First Amendment to the United States Constitution. And our Constitution prohibits public officials, including public university presidents, from silencing Americans because a public official dislikes certain points of view. Whether students gather on campus to study the Bible, host a political talk, or put on a drag show for charity, the First Amendment prohibits public university officials from suppressing the students' expression simply because the administrator (or anyone else) finds the message offensive. *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973).

3.      President Wendler's edict is textbook viewpoint discrimination and a prior restraint on student expression. Of course, as a private citizen, President Wendler enjoys the First Amendment right to criticize expression he finds offensive, distasteful, or immoral. But as a public official, he cannot bar Spectrum WT and its members from exercising their First Amendment rights merely because he believes his personal opinions override the Constitution. They don't. The notion that universities "do not endorse everything they fail to censor is not complicated." *Bd. of Educ. of Westside Cmty. Schs. v. Mergens ex rel. Mergens*, 496 U.S. 226, 250 (1990) (plurality opinion).

---

[1] A true and correct copy of President Wendler's edict emailed to the campus is attached to this First Amended Verified Complaint as **Exhibit A** (emphasis added).

2

App. 098

4.     President Wendler's betrayal of the First Amendment has caused and continues to cause Spectrum WT and its members irreparable harm. Not only did President Wendler block Spectrum WT's charity drag show just eleven days before its March 31 scheduled date—after Spectrum WT carefully followed the University's requirements for campus events—but his edict also makes clear: "West Texas A&M University will not host a drag show on campus."

5.     Not only does the First Amendment prohibit President Wendler's censorship, so too does the State of Texas, which mandates that a university not "deny [a student] organization any benefit generally available to other student organizations at the institution," on the basis of the "political, religious, philosophical, ideological, or academic viewpoint expressed by the organization or of any expressive activities of the organization." Tex. Educ. Code § 51.9315(g).

6.     Without injunctive relief from the Court, Spectrum WT will continue to suffer irreparable harm to its First Amendment right to use campus facilities for expressive activity just like other student groups do. The group wishes to proceed with specific events it has planned to hold on campus—including finally holding a charity drag show on campus—that convey a political, ideological, or academic message.

7.     But because President Wendler has not rescinded his edict, Plaintiffs cannot organize and host a drag show in campus venues open to recognized student groups or engage in similar expression on campus that Wendler personally deems

3

App. 099

offensive or inappropriate. In effect, President Wendler's edict has locked Plaintiffs out of a public forum.

8.      And President Wendler's superiors, including the Texas A&M University System Board of Regents and its Chancellor, John Sharp, have not stopped President Wendler from continuing to spurn the First Amendment.

9.      Section 1983 empowers federal courts to bring brazen constitutional violations like President Wendler's to a swift end. Plaintiffs file this lawsuit under Section 1983 to protect their expressive freedoms, enjoin Defendants from violating those freedoms, and remedy the constitutional harm Plaintiffs have endured and continue to endure.

## **PARTIES**

**The Plaintiffs**

10.      Plaintiff Spectrum WT is a recognized student organization in good standing at West Texas A&M University (West Texas A&M). Spectrum WT has around 20 members who are undergraduates and graduate students enrolled at West Texas A&M and has existed since around 2009.

11.      Spectrum WT's mission is to "provide a safe space for LGBT+ students and allies to come together," to "raise awareness of the LGBT+ community," and to "promote diversity, support, and acceptance on campus and in the surrounding community."

4

App. 100

12.     As the West Texas A&M website notes, Spectrum WT is a recognized student organization:[2]



13.     In furtherance of its mission, Spectrum WT hosts periodic events, including Lavender Prom, Queer History Night, and Queer Movie Night. In November 2022, Spectrum WT began planning a drag show to raise funds for an LGBTQ+ charity, scheduled for March 31, 2023, which Defendants have now banned from the West Texas A&M campus.

14.     Plaintiff Barrett "Bear" Bright, an undergraduate student enrolled at West Texas A&M, is the President of Spectrum WT and thus is the principal student organizer of the charity drag show that West Texas A&M is censoring. Bear intends to participate in future Spectrum WT events, including charity drag shows and other

---

[2] W. Tex. A&M Univ., *Spectrum GSA,* https://www.wtamu.edu/student-support/buff-allies/spectrum-gsa.html [https://perma.cc/E3P9-792Q].

5

App. 101

events where participants express messaging consistent with Spectrum WT's mission.

15.     Plaintiff Lauren "Laur" Stovall is an undergraduate student enrolled at West Texas A&M. Stovall is the Vice President of Spectrum WT and a primary organizer of the charity drag show that West Texas A&M is censoring. Stovall also intends to participate in future Spectrum WT events, including charity drag shows and other events in which participants express messaging consistent with Spectrum's mission.

**The Defendants**

16.     Defendant Walter Wendler is the President of West Texas A&M, a governmental entity under the laws of the State of Texas and governed by the Board of Regents of the Texas A&M University System. As President, Wendler is responsible for administering West Texas A&M and supervising all student programs and services.[3] Wendler has held this post since 2016. Plaintiffs sue President Wendler in his individual capacity only as to Plaintiffs' Fourth Cause of Action for damages. Plaintiffs sue President Wendler in his official capacity as President of West Texas A&M as to the rest of Plaintiffs' claims.

17.     Defendant Christopher Thomas is the Vice President of Student Affairs at West Texas A&M. As Vice President, Thomas is the principal authority for the administration of student conduct. In his capacity as Vice President of Student

---

[3] Tex. A&M Univ. Sys., Sys. Pol'y 02.05, *Presidents of Sys. Member Univs.* (Aug. 26, 2021), https://policies.tamus.edu/02-05.pdf [https://perma.cc/M73K-SDTL].

6

Affairs, Thomas implemented President Wendler's directive canceling Plaintiffs' event and on-campus drag shows generally. Plaintiffs sue Vice President Thomas in his official capacity as Vice President of Student Affairs at West Texas A&M.

18.     Defendant John Sharp is the Chancellor of the Texas A&M University System, a governmental entity under the laws of the State of Texas. As Chancellor, Sharp is the chief executive officer of the Texas A&M University System, endowed with the authority to "do all the things necessary" to ensure the "general management and success of the system," including delegating such duties to subordinate system members. In that role, he is President Wendler's superior and has the power and duty to stop President Wendler from continuing to violate Plaintiffs' constitutional rights, yet he has not done so. Plaintiffs sue Chancellor Sharp in his official capacity as Chancellor of the Texas A&M University System.

19.     The Board of Regents of the Texas A&M University System is empowered to make "bylaws, rules, and regulations it deems necessary and proper for the government of the university system and its institutions, agencies, and services." Tex. Educ. Code § 85.21(a).  In that role, the Board has the power and duty to stop President Wendler from continuing to violate Plaintiffs' constitutional rights, yet it has not done so.

20.     Defendant Tim Leach is Chairman, presiding officer, and a member of the Board of Regents of the Texas A&M University System. Plaintiffs sue Defendant Leach in his official capacity.

App. 103

21.     Defendant Bill Mahomes is Vice Chairman and a member of the Board of Regents of the Texas A&M University System. Plaintiffs sue Defendant Mahomes in his official capacity.

22.     Defendants Robert L. Albritton, James R. Brooks, Jay Graham, Michael A. Hernandez III, Elaine Mendoza, Michael J. Plank, Cliff Thomas, and Demetrius L. Harrell, Jr., are the remaining members of the Board of Regents of the Texas A&M University System. Plaintiffs sue each of these members in their official capacities.

23.     At all times relevant to the actions in the Complaint, Defendants acted under color of state law.

## JURISDICTION AND VENUE

24.     This action arises under the First and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, and the Declaratory Judgments Act, 28 U.S.C. §§ 2201–2202. Thus, this Court has subject matter jurisdiction over these federal causes of action under 28 U.S.C. §§ 1331, 1343.

25.     This Court has personal jurisdiction over all defendants because they reside in the State of Texas.

26.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because the acts and injuries alleged occurred in and continue to occur in this judicial district, at least one defendant resides in this district, and all defendants are residents of the State of Texas.

App. 104

## FACTUAL ALLEGATIONS

***West Texas A&M provides venues, funding, and resources to recognized student organizations.***

27.     West Texas A&M has established a system for the formal recognition of student organizations.

28.     Recognized student organizations are entitled to use university facilities, organizational funds, and administrative support.

29.     These facilities include the Jack B. Kelley Student Center ("JBK Student Center"), "the heart of campus life" at West Texas A&M and a "gathering place for students" and student events.[4]

30.     West Texas A&M represents that the "venue spaces" in the JBK Student Center are for "student-centered programs and services."[5]

31.     The university also holds out these spaces as "ideal for events, large and small," including "wedding ceremonies and receptions, rehearsal dinners, milestone celebrations, corporate receptions and conferences, holiday parties, board meetings, and much more."[6]

---

[4] W. Tex. A&M Univ., *Jack B. Kelley Student Ctr.*, https://www.wtamu.edu/student-life/jbk-student-center/index.html [https://perma.cc/L9UR-H5MB].

[5] W. Tex. A&M Univ., *Mission Statement*, https://www.wtamu.edu/student-life/jbk-student-center/jbk-about-us.html [https://perma.cc/W8WJ-MRTS].

[6] W. Tex. A&M Univ., *Events at WTAMU*, https://www.wtamu.edu/student-life/jbk-student-center/jbk-events.html [https://perma.cc/GX9F-EKG9].

9

32. To facilitate student and public events in these spaces, West Texas A&M provides resources like audio-visual support, including "light programming, concert sound and more" for "events like[] concerts, press conferences, proms and weddings."[7]

33. Among the JBK Student Center venue spaces available for use by student organizations (or rental by members of the public) is Legacy Hall, a "multi-purpose room capable of seating" 700 people for theatrical performances.[8]

34. West Texas A&M holds Legacy Hall out as "great for events with bands or live music" or to otherwise "entertain" others.[9]

35. JBK Student Center venue spaces also include the Legends Club, which the university makes available for performances and other events and is "perfect for events open to the public and larger receptions."[10]

36. In reserving space in the JBK Student Center, student organizations are presented with a list of the "type" of event to be held in this space.

37. According to the list, the types of events that may be held in these spaces include banquets, camps, competitions, concerts, dances, demonstrations, parties,

---

[7] W. Tex. A&M Univ., *Production Servs.*, https://www.wtamu.edu/student-life/jbk-student-center/JBK%20Production%20Services.html [https://perma.cc/V897-DMLB].

[8] *Mission Statement*, *supra* note 5.

[9] W. Tex. A&M Univ., *Events at WTAMU*, https://www.wtamu.edu/student-life/jbk-student-center/jbk-events.html [https://perma.cc/RK7N-BU9M].

[10] W. Tex. A&M Univ., *Meeting and Conference Rooms*, https://www.wtamu.edu/student-life/jbk-student-center/meeting-rooms.html. [https://perma.cc/PW4U-K6G5].

App. 106

performances, press conferences, programs, receptions, recitals, rehearsals, seminars, and socials.

38.    West Texas A&M Policy No. 24.01.01.W0.01 ("Facility Use Request Procedure") makes the JBK Student Center venue spaces available for "any special event," including "social gatherings or functions." A true and correct copy of the policy is attached to this First Amended Verified Complaint as **Exhibit B**.

39.    As suggested by the university's description, student organizations and members of the public use the JBK Student Center spaces, with West Texas A&M's approval, for a variety of events and expressive activity, including beauty pageants, weddings, church services, concerts, galas, and political events.

40.    For example:

    a)    Until the pandemic, "University Sing," a choreographed song-and-dance competition among student organizations, took place each spring semester in Legacy Hall;

    b)    Each January, the Randall County Junior Livestock show hosts a fundraising animal auction in Legacy Hall;

    c)    In January 2017, a West Texas A&M fraternity held its annual "Miss Black & Gold Scholarship Pageant," featuring "seven beautiful contestants" competing on stage in Legacy Hall;

    d)    In April 2019 and February 2020, a local high school, Ascension Academy, held a "Friendly Feud Gala" in Legacy Hall, featuring a cocktail reception, live auction, and gameshow-style competition;

    e)    In May 2019, four local churches held a communal "Community Night of Worship and Prayer," featuring a live band, in Legacy Hall;

    f)    In September 2019, "ONE Marriage & Family Ministries," a local (non-student) organization which promotes marriage as "a

App. 107

Covenant between one man and one woman under God," used Legacy Hall for a ministry event;

g) In September 2020, the student government at West Texas A&M hosted separate "Congressional Candidate Forum" events in Legacy Hall, featuring speaking engagements by now-Representative Ronny Jackson and Gus Trujillo;

h) In August 2022, Legacy Hall featured a concert by "The Band Monarch," a local rock and country music group;

i) In October 2022, a sorority held "Big Man on Campus," a "male beauty pageant" onstage in Legacy Hall;

j) On November 8, 2022, a student organization held a "Yule Ball" banquet in Legacy Hall;

k) On November 15, 2022, Ceta Canyon—a Christian camp and retreat center that promotes a traditional view of marriage—hosted a fundraiser dinner in Legacy Hall, as it does annually;

l) On January 28, 2023, an opera singer performed in Legacy Hall as part of a gala fundraiser for the university's opera program;

m) On February 25, 2023, Canyon High School hosted its spring dance, featuring a "Casino Night" theme, in Legacy Hall;

n) On March 18, 2023, a nonprofit organization held a "Shine for Autism" fundraiser gala in Legacy Hall, featuring live entertainment, dinner, and speeches; and

o) On March 23, 2023, a magician and illusionist performed "jaw-dropping magic and comedy" in Legacy Hall.

41. JBK Student Center spaces have even been used with approval by West Texas A&M for charity drag shows. For example:

a) In March 2012, a student organization held a charitable "cross-dressing fashion show," limited to male participants and entitled "Buff-A-Whoa Drag Show," in the JBK Student Center's commons area "to raise money for Relay for Life"; and

b) In April 2019, an academic fraternity at West Texas A&M held a fundraising drag pageant in Legacy Hall, promoting it as the "3rd consecutive Mr. & Miss West Texas Drag Show" and

App. 108

featuring a performance by drag performer Ivy Tran Kenney-Monroe.

42.    The JBK Student Center permits student organizations to co-sponsor events with off-campus organizations, recognizing that student organizations' missions may differ from that of the university administration.

43.    The JBK Student Center's "maintenance and operations" are funded "entirely" through a "University Center Fee" paid by West Texas A&M students.

44.    General revenue funding from the State of Texas does not fund the JBK Student Center or any of its operations.[11]

45.    As required by Texas state law, West Texas A&M policy prohibits the university from "deny[ing a student] organization any benefit generally available to other student organizations at the institution," including use of university facilities, based on the "political, religious, philosophical, ideological, or academic viewpoint expressed by the organization or any expressive activities of the organization." W. Tex. A&M Policy No. 08.99.99.W1 ("Expressive Activity on Campus Policy"), Rule 1.3; Tex. Educ. Code § 51.9315(g). A true and correct copy of this policy is attached to this First Amended Verified Complaint as **Exhibit C**.

46.    West Texas A&M's Expressive Activity on Campus policy, consistent with Texas state law, provides that any person may "engage in expressive activities" on "campus," including in "all land and buildings owned or leased by the university,"

---

[11] *Id.*; *see also* Tex. Educ. Code § 54.521(a) (authorizing "a regular, fixed student fee" for "operating" and "maintaining" a center for "activities . . . financed in whole or in part by the student center facility fee").

App. 109

subject only to "reasonable time, place, and manner restrictions." Ex. C, W. Tex. A&M Policy No. 08.99.99.W1, Rule 1.1 and Definitions 2 & 5.

47. West Texas A&M's Expressive Activity on Campus policy's protection of "expressive activities" encompasses "any speech or expressive conduct protected by the First Amendment." Ex. C, W. Tex. A&M Policy No. 08.99.99.W1, Definition 5; Tex. Educ. Code § 51.9315(a)(2).

48. West Texas A&M makes the spaces in the JBK Student Center, including Legacy Hall, available for use by student organizations for free, and for use by members of the public for a fee.

49. West Texas A&M's Expressive Activity on Campus policy prohibits the university from considering anything other than "content-neutral and viewpoint-neutral criteria" in "determining the amount of a fee to be charged for use of the university's facilities" for expressive activities. Exhibit C, W. Tex. A&M Policy No. 08.99.99.W1, Rule 1.2; Tex. Educ. Code § 51.9315(h).

50. West Texas A&M's Expressive Activity on Campus policy specifically forbids the university from considering "any anticipated controversy" in determining the amount of the fee to be charged. Ex. C, W. Tex. A&M Policy No. 08.99.99.W1, Rule 1.2; Tex. Educ. Code § 51.9315(h)(2).

***Spectrum WT plans "A Fool's Drag Race" for March 31, 2023.***

51. As a recognized student organization, Spectrum WT and its members are within the class of persons or groups for which West Texas A&M makes the event spaces in the JBK Student Center available.

14

App. 110

52.     In November 2022, Spectrum WT began to plan a charity drag show event, aiming to hold the show on April Fool's Day (April 1, 2023), calling it "A Fool's Drag Race."

53.     But because the university was holding an event on April 1, Spectrum WT agreed to hold the charity drag show one day earlier.

54.     Spectrum WT intended to use the facilities and resources available to all recognized student groups for expressive activities.

55.     So, Spectrum WT reserved Legacy Hall for the evening of Friday, March 31, 2023.

56.     Spectrum WT's intended use of Legacy Hall was consistent with Legacy Hall's past uses and the uses for which West Texas A&M makes the space available.

57.     Spectrum WT's planned event, to be held on a Friday evening, would not have been disruptive to the operations or educational functions of West Texas A&M.

58.     According to a statement issued by the West Texas A&M University Police Department, West Texas A&M did not receive any threats concerning Spectrum WT's planned event.

59.     The West Texas A&M University Police Department lauded students who demonstrated against Wendler's actions, explaining in a public statement that the students "have exercised their First Amendment rights the proper way" and "have shown that you can exercise your rights with decorum."

App. 111

60. From the time in January 2023 that Spectrum WT applied to use Legacy Hall, West Texas A&M's administration and staff knew that Spectrum WT intended to host a drag show.

61. To Plaintiffs' knowledge, West Texas A&M did not maintain any written policy purporting to limit the persons or groups who may utilize these event spaces (including Legacy Hall), or the subject matter for which they can use them.

***Spectrum WT's planned drag show follows a long history of drag as performance art.***

62. Drag performances encompass a range of expressive conduct taking different forms depending on the relevant audience, venue, or performer.

63. Individual drag performers make unique choices concerning their attire, makeup, choreography, music, and prefatory or concluding remarks, all of which convey artistic, theatric, and/or personal perspectives on gender, sex, and individuality.

64. Drag is often performed as entertainment, through some combination of singing, dancing, lip-synching, comedy, or spoken-word.

65. With origins at least as old as Shakespearean-era theater—when only men were permitted to perform onstage—drag has since been a recurring genre of theatrical performance.

66. During the Vaudeville era, famed actor Julian Eltinge used drag not to comedic effect, but as illusion, seeking to convince his audience that he was in fact a woman.

App. 112

67.     During the Second World War, military personnel staged drag shows as a form of entertainment. "This Is The Army," a 1943 film starring Ronald Reagan and raising money for the Army Emergency Relief fund, prominently featured military performers in drag.

68.     Drag has also been a feature of campus life. Indeed, West Texas A&M currently displays on the wall inside Legends Club a photograph of a "Powderpuff Football Game Cheerleaders," depicting male football players posing in cheerleader skirts.

69.     Today, drag has become a mainstream form of performance art and a commentary on identity. "RuPaul's Drag Race," a competitive television series on MTV, is now in its 15th season and has spawned spin-offs and international adaptations on at least three continents.

70.     Over the past half-century, the public has come to associate drag with advocacy in favor of LGBTQ+ rights.

71.     Drag performances carry an ideological message of support and acceptance for the LGBTQ+ community.

72.     Drag performances have, in the current political climate, taken on a renewed political tone, offering counter-messaging against efforts to ban or regulate expression relating to gender or sexual identity.

73.     These and related messages are part and parcel of Spectrum WT's other expressive activities, including (a) its planned Queer Movie Night, during which they will exhibit and perform alongside the cult-classic film "Rocky Horror Picture Show";

17

App. 113

(b) its annual celebration of National Coming Out Day each October; and (c) Queer History Night, during which students discuss political, social, and historical issues concerning the LGTBQ+ community.

74.     For Spectrum WT, putting on a charity drag show is important to convey messages advocating for and showing support for the LGBTQ+ community. The proceeds from the March 2023 drag show are earmarked for donation to an LGBTQ+ suicide-prevention group.

75.     Some drag performances are intentionally risqué, some comedic, some outlandish, and some would not give a moment's pause to a Motion Picture Association reviewer.

76.     Spectrum WT planned and intended its March 2023 charity drag show to be "PG-13."

77.     Spectrum WT informed West Texas A&M's administration and staff that the planned March 2023 drag show would be "PG-13."

78.     West Texas A&M's administration and staff understood that Spectrum WT planned and intended a "PG-13" drag show.

79.     Consistent with its commitment to a "PG-13" show, Spectrum WT instructed performers not to engage in any "lewd" conduct.

80.     Even so, Spectrum WT forbade anyone under 18 from attending the event unless accompanied by a parent or guardian (intended for family members of students who want to come with students' parents to show their support). And Spectrum WT remained committed to having an alcohol-free event.

App. 114

81.     Spectrum WT went so far as to instruct performers not to use music containing profanity at the planned event.

82.     Indeed, on Friday, March 17, nearly two weeks before the planned show, Spectrum WT submitted a list of planned songs to West Texas A&M's administration.

83.     Spectrum intends to make the same requirements for any future drag events it holds on campus.

***Spectrum WT navigates the event approval process with help from West Texas A&M staff.***

84.     West Texas A&M's "Campus Organizations Handbook" informs student groups that the campus event approval process encompasses three stages: (1) the "Request," during which spaces are temporarily reserved; (2) the "Tentative Confirmation," during which the significant logistics requirements (such as time, date, location, and audio-visual requirements) are arranged; and (3) Confirmed, which reflects that all details have been confirmed for the event[.]"

85.     Plaintiffs submitted a formal request to reserve Legacy Hall on or about January 27, 2023, identifying the event as "A Fool's Drag Race."

86.     Throughout the planning of the event, West Texas A&M's administration expressed support for the planning of the charity drag show and helped Plaintiffs navigate the logistical hurdles needed for the event to receive approval.

87.     On February 21, Dr. Shawn M. Fouts, a senior staff director at the JBK Student Center, praised Bright's work in an email, writing, "I appreciate your

App. 115

attention to the event as you navigate everything else a college student has going on. We want to help ensure you have a great event."

88.     The following day, Dr. Fouts shared again that the university was eager to "get this event through all the approval processes," thanking Bright for "leading the event process."

89.     Under West Texas A&M policy, an event receives a "Tentative Confirmation" only after the university has confirmed logistical details, including the time, date, and audio-visual needs, and the event has passed a risk assessment.

90.     To move the approval process along, Bright also agreed that student participants would be required to sign a waiver, provided by West Texas A&M, acknowledging that their participation was voluntary, that they could avoid any risks by simply not participating, and that their participation would in no way hinder their ability to obtain educational benefits from the Texas A&M University System.

91.     On February 27, staff from the JBK Student Center issued Spectrum WT a "Tentative Confirmation" that the event was ready to move forward.

92.     Only after an event's organizer receives a "Tentative Confirmation" can they begin advertising for the event.

93.     An event is moved into a final "Confirmed" status once all details have been confirmed for the event.

20

App. 116

94.    During the first week of March, West Texas A&M staff helped Bright and other event organizers put together flyers to promote the event:



95.    Soon, Spectrum WT put up posters in the JBK Student Center and shared the poster on Instagram.

96.    Spectrum WT also set up an Eventbrite page where attendees could purchase tickets and tables for the charity drag show.

97.    Spectrum WT began selling tickets through Eventbrite.

98.    Eventbrite charges organizers like Spectrum WT a service fee for each ticket sold.

99.    On March 14, Dr. Fouts informed Bright the event was "scheduled and approved as 'Tentative' as we await your performance verification and music."

App. 117

100.    On March 17, Bright emailed Dr. Fouts with a list of planned songs and drag performers' stage names. Dr. Fouts did not object to any song on the list, and instead, encouraged Bright to share the list of songs with the staff member in charge of helping groups present performances at Legacy Hall.

101.    On information and belief, the "performance verification" refers to a final list of anticipated performers. Spectrum WT was prepared to provide that list.

102.    But President Wendler prevented Spectrum WT from completing that final step needed to hold the charity drag show at Legacy Hall, when he issued his edict banning drag shows at West Texas A&M.

### President Wendler spurns the approval process, cancelling and condemning the charity drag show.

103.    Shortly after noon on March 20, Bright received an email from Vice President for Student Affairs Thomas, asking to "meet with you and discuss your upcoming event."

104.    Bright met with Dr. Thomas at approximately 4:15 p.m. Dr. Thomas told Bright that West Texas A&M was cancelling the charity drag show. When Bright asked why, Dr. Thomas said President Wendler believed that drag shows discriminated against women.

105.    Half an hour later, President Wendler sent an email to West Texas A&M's students, faculty, and staff announcing that West Texas A&M "will not host a drag show on campus." Wendler's email denounced drag as "divisive and demoralizing misogyny" for, in his view, "portraying women as objects," and

22

condemned any group that would "elevate itself or a cause by mocking another person or group." (Ex. A, Wendler Email).

106.    President Wendler also posted the announcement on his personal blog.

107.    President Wendler's statement is unambiguous that he cancelled the charity drag show because he personally opposes Plaintiffs' expression. For instance, Wendler opined that drag shows are contrary to the "basis of Natural Law," which "declared the Creator's origin as the foundational fiber in the fabric of our nation," because "every human being is created in the image of God and, therefore, a person of dignity." (*Id.*)

108.    President Wendler also claimed that drag shows are a form of humor (a "slapstick sideshow") that "becomes harassment" because, in his view, it is "sexism" and results in "[m]ocking or objectifying in any way members of any group." (*Id.*)

109.    Finally, President Wendler acknowledged that "the law of the land appears to require" him not to censor the charity drag show. (*Id.*)

110.    President Wendler's statement asserted that allowing the event would create the appearance that he personally "condone[s] the diminishment" of women. (*Id.*)

111.    Upon information and belief, West Texas A&M had not received any formal or informal complaints from students or staff that a drag show would constitute harassment of any individual or group.

112.    Indeed, between 2012 and 2019 at the latest, West Texas A&M students hosted drag shows in the JBK Student Center.

App. 119

113. When President Wendler sent the email canceling the event, Spectrum WT had completed, or was prepared to complete, all necessary steps for the event to move forward as planned.

114. Other than the assertions made in President Wendler's March 20 statement, neither President Wendler, the other Defendants, nor any other staff member at West Texas A&M, offered an explanation or rationale for canceling the charity drag show.

115. At no time did President Wendler—or any other West Texas A&M employee or Defendant—indicate Spectrum WT had failed to comply with university policy or any other condition necessary to proceed with the event.

116. On March 21, the Foundation for Individual Rights and Expression (FIRE), which now represents Plaintiffs, sent a letter to President Wendler, explaining that his conduct violated the First Amendment and calling on West Texas A&M to confirm that it would reinstate the event.

117. The same day, President Wendler acknowledged the letter, copying the general counsel for the Texas A&M University System.

118. But neither President Wendler, West Texas A&M, nor the Texas A&M University System responded substantively to FIRE's letter.

119. President Wendler has not rescinded his edict.

120. No other Defendant has disavowed Wendler's edict.

121. By issuing and maintaining his edict, President Wendler is claiming he can cancel events he deems "inappropriate" or personally offensive at will, imposing

App. 120

a viewpoint- and content-based restriction on the university's events registration process for campus facilities available for expressive activity.

***After President Wendler exiled the first drag show from campus, Plaintiffs' planned future events are in jeopardy.***

122. Because Plaintiffs were unable to plan for both the on-campus event and an alternative off-campus event, they had to commit to an alternative venue.

123. In order to hold their event in an alternative venue, Plaintiffs were required to spend $2,130.13 from funds donated by members of the public in order to rent a stage in a public park and hire off-duty police officers to provide security.

124. The $2,130.13 would otherwise have been contributed to the Trevor Project, an LGBTQ+ charity dedicated to suicide prevention, as part of Plaintiffs' fundraising efforts.

125. Because of President Wendler's cancellation of the event, Plaintiffs were unable to sell tickets purchased through Eventbrite, as there was no way to create a ticketed event by restricting entrance to a public park.

126. As a result of President Wendler's cancellation, Plaintiffs paid or owe Eventbrite $30.54 for fees for tickets that could not be used.

127. Plaintiffs intend to organize and put on drag shows and similar events on campus in the near future.

128. But even if university staff again determine that Plaintiffs' planned events meet the criteria for use of university facilities, Wendler claims an unfettered right to cancel those events at the last moment based on his personal views.

25

App. 121

129.   The risk posed by President Wendler's edict is exacerbated by the JBK Student Center's procedures and guidelines, which purport to authorize staff to "cancel, interrupt, or terminate any event" if it might "be viewed as inappropriate."

130.   The planned events include:

a)   Queer Movie Night, held by Spectrum WT several times annually, during which members watch and discuss films with LGBTQ+ themes. Plaintiffs have submitted a reservation for use of Legends Club, a venue in the JBK Student Center. On Halloween 2023, Plaintiffs intend to exhibit "The Rocky Horror Picture Show," a cult-classic 1975 film, popular in the LGBTQ+ community, starring Tim Curry, who is adorned in corset and fishnets. Because viewings of the film traditionally involve audience participation, Plaintiffs expect that participants will dress as Curry's gender non-conforming character. Plaintiffs' intended use of the Legends Club is consistent with the uses for which West Texas A&M holds out this venue. However, Plaintiffs' event will violate President Wendler's ban on drag shows and will express viewpoints Wendler disapproves of in his edict.

b)   A second-annual drag show, entitled "Don't Be A Drag Drag Show." Plaintiffs have submitted a reservation for use of Legacy Hall on the evening of Friday, March 22, 2024. This event violates President Wendler's ban on campus drag shows.

c)   Queer History Night, a program Spectrum WT holds several times a year, during which its members and panelists from the campus and local community discuss LGBTQ+ history, political, and social issues. Plaintiffs' event will express viewpoints Wendler disapproves of in his edict.

**INJURIES TO PLAINTIFFS**

131.   Plaintiffs are injured by President Wendler and West Texas A&M canceling the planned March 31, 2023, charity drag show—and all similar events—based on his personal disagreement with the messaging he believes drag shows convey. Viewpoint discrimination violates the First Amendment, and "loss of First

App. 122

Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

132.     In addition, Plaintiffs Bright and Stovall are West Texas A&M students. They pay tuition and student fees to West Texas A&M, which promises—as does the State of Texas[12]—Plaintiffs the ability to use venues on campus for expressive activities. Indeed, the JBK Student Center—the venue where Plaintiffs had been tentatively approved to host "A Fool's Drag Race"—is funded by fees paid by Plaintiffs Bright, Stovall, the members of Spectrum WT, and other West Texas A&M students.

133.     Thus, Defendants' drag show ban has also injured Plaintiffs because they cannot use campus venues for First Amendment expressive activity, despite those promises.

134.     President Wendler's ongoing edict works two harms to Plaintiffs' future expressive activity. First, it expressly prohibits any "drag show" at West Texas A&M, including the show students are planning for March 22, 2024 at Legacy Hall. Second, it imposes a viewpoint- and content-based restraint over the university's event registration process, indicating that if staff do not refuse or cancel an event that meets President Wendler's criteria for "inappropriate" expression, then Wendler will cancel it himself.

135.     Left in place, President Wendler's edict will continue to infringe and chill Plaintiffs' right to engage in planned expressive activity in campus spaces they

---

[12] Tex. Educ. Code § 51.9315(g).

27

App. 123

have a right to use, because their expression meets Wendler's criteria for "derisive," "demeaning," "inappropriate," or is otherwise incompatible with Wendler's edict.

136.   Plaintiffs, then, are injured in their ability to exercise their First Amendment rights by holding the scheduled October 2023 "Queer Movie Night," the scheduled March 2024 drag show, the planned "Queer History Nights," and similar events in the future.

137.   There is a concrete and imminent danger that university administrators and staff will deny Plaintiffs access to university facilities for those upcoming events on the belief that President Wendler will find the expressive content and messaging of Plaintiffs' events inappropriate.

138.   There is also a concrete and imminent danger that President Wendler will unilaterally deny Plaintiffs access to university facilities for those upcoming events because he will declare the expressive content and messaging of Plaintiffs' events inappropriate.

139.   Moreover, any student participant in Plaintiffs' future events— including, for example, its annual prom events—could dress in a manner President Wendler deems to be "drag," or otherwise engage in expression that President Wendler personally finds "inappropriate."

140.   Plaintiffs are also injured because they invested substantial time and organizational resources into planning and promoting the March 31 charity drag show and obtaining approval for the event from West Texas A&M staff, following the university's approval procedures.

App. 124

141. But for the ban against drag shows, Spectrum WT would have put on their March 31, 2023, charity drag show on West Texas A&M's campus. West Texas A&M staff provided Spectrum WT with "Tentative Confirmation" for the event, and just hours before President Wendler vetoed the event, Spectrum WT had submitted the final details that university staff confirmed were necessary for the event to be moved to the "Confirmed" stage.

142. Thus, Plaintiffs have been injured because President Wendler's refusal to permit the event to move forward defied the First Amendment, Texas state law, and West Texas A&M campus policy, depriving Plaintiffs of the benefits the Constitution, state law, and university policy confer to all student groups.

143. Plaintiffs, including Bright and Stovall, have been injured because they were not able to exercise their First Amendment right to engage in protected expression by performing at the charity drag show event at West Texas A&M—the focal point of Spectrum WT's advocacy.

144. Although Plaintiffs were able to locate, on short notice, an alternative venue, President Wendler's abrupt veto of their event and edict banning drag shows on campus has injured—and will continue to injure—Plaintiffs. For example:

    a) Spectrum WT's mission is to help LGBTQ+ students feel welcome at West Texas A&M, as well as to promote diversity and acceptance on campus. Exiling Plaintiffs' expressive activities to off-campus locations both burdens the students' ability to reach their intended audience and sends the message—as President Wendler intends—that their message is unwelcome.

    b) The new venue cost $1,000, a significant amount of money for a local student organization largely composed of undergraduate students. The expenses incurred by diverting donations that would otherwise have gone to Plaintiffs' charitable purposes are costs that would not have been

29

App. 125

incurred but for President Wendler's denial of access to the facilities made available at no cost to student organizations whose message he approves.

c) Because Wendler cancelled Plaintiffs' event in its final stages of preparation, Plaintiffs were required to make efforts to again locate a venue and other requirements to put on a show. As a result, the time, energy, and resources required of Plaintiffs were multiplied by President Wendler.

d) To organize a new event off-campus, where they would not have the security of West Texas A&M's on-campus police force, Plaintiffs were forced to retain private security at their own expense, spending $1130.13.

145.     Further, Plaintiff Bear has experienced anxiety, stress, and doubt about whether he or Spectrum WT should plan further events because of the likelihood that President Wendler will again censor those events and cause Spectrum WT to again spend time, energy, and organizational resources on events that will not happen.

## FIRST CAUSE OF ACTION
**First Amendment Violation (Injunctive and Declaratory Relief)**
**Freedom of Speech - Viewpoint Discrimination**
**(42 U.S.C. § 1983)**
**(All Plaintiffs against all Defendants in their official capacities)**

146.     Plaintiffs re-allege and re-incorporate paragraphs 1–145 as though fully set forth herein.

147.     The First Amendment protects expressive conduct, including performance theater (like drag shows), whether held in high regard by supporters or low esteem by detractors. *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 557–58 (1975) (stage performance); *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (burning the American flag); *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 633–34 (1943) (saluting or refusing to salute the American flag); *Iota Xi Chapter of Sigma Chi Fraternity v.*

App. 126

*George Mason Univ.*, 993 F.2d 386, 387 (4th Cir. 1993) (university fraternity's "ugly woman" contest).

148. Expression by students and student organizations at public universities is entitled to robust protection under the First Amendment, which applies with no "less force on college campuses than in the community at large." *Healy v. James*, 408 U.S. 169, 180 (1972).

149. An official acting under the color of state law cannot censor or restrict speech based on "its message" or the viewpoint expressed. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828–30 (1995).

150. It is "well settled that viewpoint discrimination is a clearly established violation of the First Amendment in any forum." *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 350 (5th Cir. 2001).

151. University officials cannot suppress student expression at public universities because they or others find it derisive, "no matter how offensive" others might find that expression. *Papish*, 410 U.S. at 670.

152. Plaintiffs sought and are seeking to exercise their First Amendment right to engage in on-campus expression but were prevented from doing so—and cannot do so now—because of President Wendler's personal objections to their message.

153. President Wendler engaged in unconstitutional viewpoint discrimination by prohibiting Plaintiffs from putting on a charity drag show because

App. 127

Wendler disagrees with the expressive message of the show and believes it is offensive.

154. President Wendler's subjective evaluation about what expression is offensive, inappropriate, or objectionable is not a viewpoint-neutral basis to restrict student expression.

155. To the contrary, "censorship based on a state actor's subjective judgment that the content of protected speech is offensive or inappropriate is viewpoint discrimination." *Robinson v. Hunt Cnty.*, 921 F.3d 440, 447 (5th Cir. 2019) (citing *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017)).

156. President Wendler's condemnation of drag shows makes clear that he understands drag shows convey a particularized message, as he identifies them as "artistic expression which denigrates others—in this case, women" and which amount to "ridicule." (Ex. A, Wendler Email.)

157. Vice President Thomas engaged in unconstitutional viewpoint discrimination by enforcing President Wendler's viewpoint-driven directive.

158. By not putting an end to President Wendler's actions, the Board of Regents and Chancellor Sharp evidence an intent to let Wendler's viewpoint discrimination against on-campus drag shows continue.

159. In addition to the harm to Plaintiffs' expressive freedoms caused by President Wendler's cancellation of the March 31 charity drag show, the general harm of the policy remaining in place continues to have a chilling effect on Plaintiffs' expressive freedoms.

App. 128

160.   President Wendler's promise to ignore "the law of the land" and his establishment of a policy that "West Texas A&M University will not host a drag show on campus" is chilling and will continue to chill Plaintiffs' ability to organize similar events—whether or not styled as a "drag show"—if they convey a political, ideological, or academic message that President Wendler believes to be demeaning.

161.   These include Plaintiffs' intended future drag shows, including one Plaintiffs are planning for March 24, 2024, and events Plaintiffs are planning for the fall semester, including an October 31, 2023 "Queer Movie Night" production of "The Rocky Horror Picture Show."

162.   Plaintiffs have no adequate legal, administrative, or other remedy by which to prevent or minimize the immediate, irreparable, and ongoing harm to their First Amendment rights from Defendants' unconstitutional viewpoint discrimination.

163.   Thus, Plaintiffs require preliminary injunctive relief, permanent injunctive relief, and declaratory relief to protect their fundamental expressive rights from ongoing harm.

164.   Absent injunctive and declaratory relief upholding Plaintiffs' First Amendment rights and returning President Wendler's focus to his constitutional obligations, President Wendler's pledge to continue to violate the constitutional rights of West Texas A&M's students will have ongoing chilling effects on Plaintiffs' protected expression.

App. 129

165.    Plaintiffs are likely to succeed on the merits of their claims. Moreover, there is substantial public interest in ensuring Defendants cease engaging in viewpoint-based restriction and censorship of speech on Texas's college campuses, where "the vigilant protection of constitutional freedoms is nowhere more vital[.]" *Healy*, 408 U.S. at 180 (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)).

166.    Recognizing this vital public interest, the Texas Legislature has codified the First Amendment's prohibition on viewpoint discrimination, barring public universities from "tak[ing] action against a student organization or deny[ing] the organization any benefit generally available to other student organizations at the institution on the basis of a political, religious, philosophical, ideological, or academic viewpoint expressed by the organization or of any expressive activities of the organization." Tex. Educ. Code § 51.9315(g).

167.    Because a justiciable controversy exists over Defendants' viewpoint-based discrimination against Plaintiffs' protected expression, Plaintiffs also seek declaratory relief against Defendants. A declaratory judgment will further resolve and clarify the parties' legal relationship.

### SECOND CAUSE OF ACTION
**First Amendment Violation (Injunctive and Declaratory Relief)**
**Freedom of Speech—Exclusion from a Public Forum**
**(42 U.S.C. § 1983)**
**(All Plaintiffs against all Defendants in their official capacities)**

168.    Plaintiffs re-allege and re-incorporate paragraphs 1–167 as though fully set forth herein.

App. 130

169.    West Texas A&M routinely provides facilities, funding, and resources for expressive activities of registered student organizations like Spectrum WT.

170.    By recognizing student organizations and providing them facilities, funding, and resources, West Texas A&M has created a public forum. *Widmar v. Vincent*, 454 U.S. 263, 267–70 (1981).

171.    Legacy Hall and other JBK Student Center spaces are designated public fora.

172.    Legacy Hall and other JBK Student Center spaces are held out by West Texas A&M as designated public fora, made available to student organizations and the general public.

173.    Legacy Hall, Legends Hall, and other JBK Student Center spaces are established as designated public fora by Tex. Educ. Code § 51.9315.

174.    Legacy Hall and other JBK Student Center spaces are established as designated public fora by West Texas A&M Policy Nos. 24.01.01.W0.01 ("Facility Use Request Procedure") and 08.99.99.W1 ("Expressive Activity on Campus").

175.    The existence of alternative venues, even if those venues were adequate, is not a basis to deny Plaintiffs access to the designated public fora at West Texas A&M. "[One] is not to have the exercise of his liberty of expression in appropriate place abridged on the plea that it may be exercised in some other place." *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 556 (1975) (quoting *Schneider v. New Jersey*, 308 U.S. 147, 163 (1939)).

App. 131

176. President Wendler's prohibition on student organizations' "drag shows" in university facilities is a content-based and viewpoint-based restriction.

177. Because West Texas A&M's content- and viewpoint-based restrictions on drag shows do not satisfy strict scrutiny—*i.e.*, "necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end"—they are unconstitutional restrictions on speech in public forums. *Widmar*, 454 U.S. at 270.

178. President Wendler's prohibition on student drag shows in campus public forums does not serve a compelling state interest nor is it the least restrictive means of achieving such an interest.

179. President Wendler's prohibition on student drag shows in campus public forums is not narrowly drawn to achieve a compelling state interest.

180. President Wendler's claim that his drag show ban prevents the appearance that he, or the university he shepherds, endorses that expressive activity is not a legitimate state interest, let alone a compelling one. *Id.* at 274 (a public university's "open forum . . . does not confer any imprimatur of state approval" on expression occurring within that forum).

181. President Wendler's claim that the drag show ban is necessary to prevent the creation of a hostile environment is not narrowly drawn because it is a prohibition on expressive activity voluntarily encountered in enclosed spaces and because President Wendler had no evidence suggesting Plaintiffs' charity drag show would create a "hostile environment."

App. 132

182.   Nor is the prohibition on drag shows reasonably related to the purpose of campus forums like Legacy Hall, which West Texas A&M holds out as available for a wide range of events, like weddings, parties, concerts, press conferences, and entertainment.

183.   The content-based and viewpoint-based prohibition, reflected in President Wendler's edict, excludes Plaintiffs from engaging in protected First Amendment activity in on-campus public forums, violating their First Amendment rights.

184.   Vice President Thomas also violated Plaintiffs' First Amendment rights by enforcing President Wendler's content- and viewpoint-based prohibition on student groups that would hold drag shows in campus public forums.

185.   By not putting an end to President Wendler's actions, the Board of Regents and Chancellor Sharp evidence an intent to let the unconstitutional prohibition against student groups holding drag shows in campus forums continue.

186.   President Wendler's edict reflects an ongoing ban against present and future drag shows on campus as well as similar events if they convey a political, ideological, or academic content that President Wendler believes to be demeaning, offensive, or otherwise objectionable. These include Plaintiffs' planned events for the Fall 2023 semester and intended future drag shows, including one Plaintiffs are planning for spring 2024.

37

187.   Plaintiffs have no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to their First Amendment right to use campus forums for First Amendment activity.

188.   Thus, Plaintiffs require preliminary injunctive relief, permanent injunctive relief, and declaratory relief to protect their fundamental expressive rights from ongoing harm.

189.   Absent injunctive relief and declaratory relief enjoining Defendants from excluding Plaintiffs from campus forums based on the content and viewpoints of their protected expression, the public university will continue to violate the constitutional rights of West Texas A&M's students, including Spectrum WT and its members.

190.   Plaintiffs are likely to succeed on the merits of their claims. Moreover, there is substantial public interest in ensuring Defendants cease engaging in content-based restrictions and censorship of speech on Texas' college campuses. *Healy*, 408 U.S. at 181; Tex. Educ. Code § 51.9315(g).

191.   Because a justiciable controversy exists over Plaintiffs' inability to use campus public forums for First Amendment expressive activity, Plaintiffs also seek declaratory relief against Defendants. A declaratory judgment will further resolve and clarify the parties' legal relationship.

App. 134

## THIRD CAUSE OF ACTION
### First Amendment Violation (Injunctive and Declaratory Relief)
### Prior Restraint on Freedom of Speech
### (42 U.S.C. § 1983)
### (All Plaintiffs against All Defendants in their Official Capacities)

192.    Plaintiffs re-allege and re-incorporate paragraphs 1–191 as though fully set forth herein.

193.    Government actions making "speech contingent on the will of an official . . . are unconstitutional burdens on speech classified as prior restraints." *Chiu v. Plano Indep. Sch. Dist.*, 339 F.3d 273, 280 (5th Cir. 2003).

194.    With his edict banning drag shows and "inappropriate" student expression based on content and viewpoint, President Wendler has created an unconstitutional prior restraint on speech against Spectrum WT, and effectively against any other student group seeking the benefit of using campus facilities.

195.    In making campus spaces available for use by student organizations, West Texas A&M requires student organizations to pre-register the event with campus officials.

196.    In addition to providing logistical details, student organizations registering planned events must provide a "full description" of the event.

197.    Student organizations are also required to identify certain "risks," including "damage to [West Texas A&M's] reputation" or "negative publicity for" West Texas A&M.

39

App. 135

198.     By establishing a system requiring prior registration of an event in order to engage in expressive activity in designated public fora, West Texas A&M has established a system of prior restraints.

199.     Prior restraints are presumptively unconstitutional. *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971).

200.     A university administrator may not restrict student expression before it occurs based on his prediction of its content and consequences. *Gay Student Servs. v. Tex. A&M Univ.*, 737 F.2d 1317, 1325 (5th Cir. 1984).

201.     President Wendler's edict does not provide "narrow, objective, and definite standards to guide" administrators in granting or denying access. *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 151 (1969).

202.     Instead, President Wendler's blanket ban on "drag shows" at West Texas A&M is a viewpoint- and content-based prior restraint on speech.

203.     President Wendler's edict also effectively requires event registration staff and administrators to consider if an event is "inappropriate" because it is "divisive," "harmful," "demeaning," "objectifying," "diminish[es]" others, "denigrate[s]" others, or "stereotype[s]" others.

204.     Examining a student organization event's anticipated content or message to determine whether to grant that organization access to public fora on campus is an unconstitutional prior restraint.

205.     These prior restraints infringe on and chill Plaintiffs' right to schedule, plan, and hold expressive events and activities on campus.

App. 136

206. These viewpoint- and content-based prior restraints deny Plaintiffs access to a designated public forum.

207. Even if these spaces are "limited" or "nonpublic forums," a prior restraint that lacks "neutral criteria to [e]nsure that the licensing decision is not based on the content or viewpoint of the speech being considered" violates the First Amendment. *Freedom from Religion Found., Inc. v. Abbott*, 955 F.3d 417, 427–29 (5th Cir. 2020).

208. Even if these spaces were limited or nonpublic fora, President Wendler's edict amounts to viewpoint discrimination, which is prohibited in every forum.

209. West Texas A&M also provides no procedural safeguards, such as providing student organizations with an administrative avenue of appeal or some means by which student organizations may contest a decision to deny expressive activity based on its content or message.

210. Faced with this prior restraint, Plaintiffs face a no-win choice: Alter their expression to meet the pre-registration requirements and access the benefit of a campus public forum, or risk losing that benefit at Wendler's whim.

211. Plaintiffs have no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to their First Amendment right to use campus forums for First Amendment activity.

212. Prior restraints on speech "are the most serious and the least tolerable infringement on First Amendment rights," *Nebraska Press Ass'n v. Stuart*, 427 U.S.

41

539, 559 (1976). But Defendants have taken no steps to remove the ongoing prior restraint on Plaintiffs' expressive rights.

213. Thus, Plaintiffs require preliminary injunctive relief, permanent injunctive relief, and declaratory relief to protect their fundamental expressive rights from ongoing harm.

214. Absent injunctive relief and declaratory relief enjoining Defendants from imposing an impermissible prior restraint on speech, the public university will continue to violate the constitutional rights of West Texas A&M's students, including Spectrum WT and its members.

215. Plaintiffs are likely to succeed on the merits of their claims. Moreover, there is substantial public interest in ensuring Defendants cease engaging in viewpoint- and content-based prior restraints on speech.

216. Because a justiciable controversy exists over Defendants imposing a prior restraint on Plaintiffs' ability to use campus public forums for First Amendment expressive activity, Plaintiffs also seek declaratory relief against Defendants. A declaratory judgment will further resolve and clarify the parties' legal relationship.

### FOURTH CAUSE OF ACTION
**First Amendment Violation (Damages)**
**Direct and Retaliatory Infringements of Freedom of Speech**
**(42 U.S.C. § 1983)**
**(All Plaintiffs against President Wendler in his individual capacity)**

217. Plaintiffs re-allege and re-incorporate paragraphs 1–216 as though fully set forth herein.

App. 138

218.    By barring Plaintiffs from organizing and putting on a charity drag show on campus based on his personal disagreement with Plaintiffs' viewpoints and message, President Wendler directly deprived Plaintiffs of their First Amendment rights.

219.    By continuing to ban Plaintiffs from organizing and putting on a charity drag show on campus based on his personal disagreement with Plaintiffs' viewpoints and message, President Wendler is directly depriving Plaintiffs of their First Amendment rights.

220.    President Wendler also retaliated and is continuing to retaliate against Plaintiffs because of their protected expression.

221.    Plaintiffs engaged in expression protected by the First and Fourteenth Amendments, including promoting, publishing, and organizing messaging about drag shows.

222.    At all relevant times, Plaintiffs have intended to engage in expression protected by the First and Fourteenth Amendments, including organizing and putting on charity drag shows and similar expressive events.

223.    President Wendler knew the Constitution protected Plaintiffs' expression and prohibited his actions.

224.    Plaintiffs' message was the motivating factor in President Wendler's decision to take retaliatory action against Plaintiffs.

App. 139

225.    President Wendler's retaliatory actions in response to Plaintiffs' message include:

  a)      Abruptly canceling Plaintiffs' March 31 charity drag show event;

  b)      Imposing a reactive, viewpoint- and content-based restriction on the expression of all students at West Texas A&M;

  c)      Prohibiting future student expressive activity, including events organized by Plaintiffs and their right to use campus forums for First Amendment activity; and

  d)      Declaring that Plaintiffs' expression, protected by the First Amendment, violates university policy on harassment.

226.    President Wendler's actions in response to Plaintiffs' message are sufficient to deter a person of ordinary firmness from continuing to engage in expressive activity.

227.    President Wendler's actions have caused Spectrum WT fear that the organization's good standing will be jeopardized when West Texas A&M, in conformity with President Wendler's assertion that "drag" expression violates university policy, enforces against Spectrum WT or its members the harassment policies maintained by West Texas A&M or the Texas A&M System.

228.    President Wendler's actions have chilled the expression of individual members of Spectrum WT as they relate to drag, sexual orientation, and gender identity.

229.    At the time of the events in question, it was clearly established that the Constitution prohibited President Wendler's actions. *See supra* paragraphs 147–51, 155, 170, 175, 177, 193, 199–201, 207, and 212.

App. 140

230.    At the time of the events in question, it was clearly established that the First Amendment protects stage performances, including drag shows, and the viewpoints those performances convey.

231.    At the time of the events in question, it was clearly established that the First Amendment prohibits university administrators from censoring student expression based on its viewpoint.

232.    At the time of the events in question, it was clearly established the First Amendment prohibits university administrations from censoring viewpoints some might find offensive or demeaning, including viewpoints conveyed through performances and similar expressive conduct.

233.    At the time of the events in question, it was clearly established that the First Amendment prohibits university administrators from censoring student expression in any public forum based on its viewpoint, even if the administrator perceives the viewpoint as offensive.

234.    At the time of the events in question, it was clearly established that the First Amendment prohibits university administrators from denying a student group access to any public forum based on the group's viewpoint, even if the administrator perceives the viewpoint as offensive.

235.    As the time of the events in question, it was clearly established that Texas law prohibits university administrators from denying student groups access to or use of university facilities generally available to other student organizations at the school, based on the political, religious, philosophical, ideological, or academic

App. 141

viewpoint expressed by the organization or any expressive activities of the organization.

236. At the time of the events in question, it was clearly established the First Amendment prohibits campus speakers from imposing prior restraints or other unconstitutional limits on the use of campus forums for First Amendment activity.

237. At the time of the events in question, it was clearly established that viewpoint-based prior restraints presumptively violate the First Amendment.

238. At the time of the events in question, it was clearly established that the First Amendment bars university administrators from restricting student expression before it occurs based on a prediction of its content and consequences.

239. At the time of the events in question, it was clearly established that the First Amendment prohibits an individual acting under color of state law from retaliating against speakers based on the viewpoint expressed.

240. A reasonable public university administrator would have had fair warning that the First Amendment prohibited banning Plaintiffs from hosting drag shows in a public forum on campus because of the viewpoints that a show conveyed or that the administrator perceived, even if the administrator believed the viewpoint to be offensive or demeaning to others.

241. It would have been obvious to any reasonable public university administrator that President Wendler's viewpoint-driven edict banning Plaintiffs' March 31 drag show violated the First Amendment.

App. 142

242. It would be obvious to any reasonable public university administrator that President Wendler's ongoing and viewpoint-driven edict banning drag shows on campus violates the First Amendment.

243. No reasonable public university administrator would have suppressed Plaintiffs' expression like President Wendler did and continues to do.

244. Plaintiffs are entitled to compensatory and nominal damages against President Wendler in his individual capacity for violating Plaintiffs' clearly established First Amendment rights.

245. Plaintiffs are also entitled to punitive damages against President Wendler in his individual capacity.

246. President Wendler knew that the First Amendment, as the "law of the land," prohibits him from censoring student expression, including censorship based on any personal disagreement he has with a speaker's message or viewpoint.

247. Due to his personal opposition to Plaintiffs' messages, President Wendler has deliberately violated Plaintiffs' First Amendment rights and his duty as a public official to avoid violating the First Amendment.

248. President Wendler's deliberate defiance of the Constitution was and remains malicious, oppressive, and in reckless and callous disregard of Plaintiffs' well-established rights.

249. Accordingly, punitive damages against President Wendler are appropriate and necessary to punish President Wendler for violating Plaintiffs' First Amendment rights and to deter similar violations in the future.

App. 143

## JURY DEMAND

Under Fed. R. Civ. P. 38, Plaintiffs demand a jury trial on all issues triable to a jury.

## PRAYER FOR RELIEF

Plaintiffs request that the Court enter judgment against all Defendants and award the following relief:

1.     Preliminary and permanent injunctive relief enjoining Defendants and their employees, agents, servants, officers, and persons in concert with Defendants, from enforcing President Wendler's prohibition on "drag shows" in campus facilities generally available for student group use;

2.     Preliminary and permanent injunctive relief enjoining Defendants and their employees, agents, servants, officers, and persons in concert with Defendants, from enforcing the viewpoint- and content-discriminatory prohibitions on expressive activity contained in Wendler's March 20, 2023 edict, when making West Texas A&M University facilities or spaces available to Plaintiffs or other student organizations;

3.     A declaratory judgment that President Wendler's cancellation of the March 31 charity drag show, and his pledge to prevent similar expressive activity at West Texas A&M, violated the First Amendment to the United States Constitution;

4.     Compensatory and nominal damages against President Wendler in his individual capacity in such amount as may be found, or as otherwise permitted by law;

5.     Punitive damages against President Wendler in his individual capacity in such amount as may be found, or as otherwise permitted by law, for his retaliatory

App. 144

and oppressive intent toward Plaintiffs in reckless and callous disregard for their clearly established constitutional rights;

6. Plaintiffs' attorneys' fees under 42 U.S.C. § 1988;

7. Plaintiffs' costs; and

8. Any other and further relief as the Court may deem just and proper.

Dated: April 18, 2023

Respectfully submitted,
/s/ JT Morris
JT MORRIS
TX Bar No. 24094444
FOUNDATION FOR INDIVIDUAL RIGHTS
   AND EXPRESSION
700 Pennsylvania Ave., SE; Ste. 340
Washington, DC 20003
Tel: (215) 717-3473
Fax: (267) 573-3073
jt.morris@thefire.org

CONOR T. FITZPATRICK*
MI Bar No. P78981
ADAM B. STEINBAUGH*
CA Bar No. 304829
JEFFREY D. ZEMAN*
MI Bar No. P76610
FOUNDATION FOR INDIVIDUAL RIGHTS
   AND EXPRESSION
510 Walnut St.; Ste. 1250
Philadelphia, PA 19106
Tel: (215) 717-3473
Fax: (267) 573-3073
conor.fitzpatrick@thefire.org
adam@thefire.org
jeff.zeman@thefire.org

* Admitted *Pro Hac Vice*

*Counsel for Plaintiffs*

49

## VERIFICATION OF BARRETT BRIGHT

Pursuant to 28 U.S.C. § 1746, I, BARRETT BRIGHT, declare as follows:

1.    I am a Plaintiff in the present case and a citizen of the United States of America.

2.    I am the President of Spectrum WT, a plaintiff in the present case.

3.    I have read the foregoing First Amended Verified Complaint for Civil Rights Violations.

4.    I have personal knowledge of the factual allegations in paragraphs 10–14, 27–37, 48, 51–57, 60–61, 68, 73–74, 76–83, 85–88, 90–92, 94–106, 111, 113–115, 119, 122–127, 130, 130(a), 130(b), 130(c), 133, 136, 139–141, 143–144, 144(a), 144(b), 144(c), 144(d), 145, and 196–197 of the First Amended Verified Complaint and know them to be true.

5.    I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Executed on 04/17/2023

_____
Barrett Bright

App. 146

## VERIFICATION OF LAUREN STOVALL

Pursuant to 28 U.S.C. § 1746, I, LAUREN STOVALL, declare as follows:

1.    I am a Plaintiff in the present case and a citizen of the United States of America.

2.    I am the Vice President of Spectrum WT, a plaintiff in the present case.

3.    I have read the foregoing First Amended Verified Complaint for Civil Rights Violations.

4.    I have personal knowledge of the factual allegations in paragraphs 10–13, 15, 27–37, 48, 51–55, 57, 60–61, 68, 73–74, 76–83, 85, 94–96, 105–106, 111, 113–115, 119, 122–125, 127, 130, 130(a), 130(b), 130(c), 133, 136, 139–140, 143–144, 144(a), 144(b), 144(c), 144(d), and 196–197 of the First Amended Verified Complaint and know them to be true.

5.    I also have personal knowledge of Exhibit A to the First Amended Verified Complaint. Exhibit A is a true and correct copy of an email I received on March 30, 2023 from President Wendler.

6.    I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on **4/18/23**

_____

Lauren Stovall

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 18, 2023, a true and correct copy of the foregoing

document was transmitted via using the CM/ECF system, which automatically sends

notice and a copy of the filing to all counsel of record.

/s/ JT Morris
JT Morris
Foundation for Individual
   Rights and Expression

Exhibit 3

Video of February 2023 Performance by "Myss Myka"

(Flash drive containing video sent to Court via FedEx)

Available at

https://www.youtube.com/watch?v=QR9BjFpPeK0

(last accessed May 5, 2023).



**Exhibit**
**Marcus Stoval**

App. 149    **5**

12/16/25 VT



**WT** Jack B. Kelley Student Center
WEST TEXAS A&M UNIVERSITY ™

# Procedures and Guidelines



© 2023

Exhibit
Marcus Stoval

**13**

12/16/25 VT

Def_000154

## Contents

**MISSION STATEMENTS** ................................................................................................................ 3

**GENERAL POLICIES** ................................................................................................................... 4

  **Reservations** ......................................................................................................................... 4

    Institutional Priority Events ................................................................................................ 5

    Buffaloes Traditions Program ............................................................................................. 6

    Scheduling ........................................................................................................................... 6

    Rates .................................................................................................................................... 8

    Exhibitor Space ................................................................................................................... 9

    Outdoor Space .................................................................................................................. 10

    Marketing/Advertising ..................................................................................................... 11

    Bulletin Boards ................................................................................................................. 12

    Posters and Sandwich Boards .......................................................................................... 12

    Outside Banners ............................................................................................................... 12

    Table Tents ........................................................................................................................ 12

    Electronic Signs ................................................................................................................ 13

    Floor Stickers .................................................................................................................... 13

  **Alcohol** ................................................................................................................................ 13

  **Amplification of Sound** ...................................................................................................... 14

  **Audio/Video – Production Services** ................................................................................... 14

  **Bicycles/Non-Motorized Vehicles** ..................................................................................... 15

  **Building Hours/After Hours** ............................................................................................... 15

  **Cleanliness** ......................................................................................................................... 15

  **Donation Boxes/Drives** ...................................................................................................... 15

  **Decorations** ....................................................................................................................... 16

  **Emergency Safety (buff alert, tornadoes, fire, etc.)** .......................................................... 17

  **Food/Catering** .................................................................................................................... 17

  **JBK Catering Kitchen** .......................................................................................................... 18

  **Event Liability Insurance** .................................................................................................... 18

  **Lost & Found** ...................................................................................................................... 19

  **Parking** ............................................................................................................................... 19

  **Political Activity** ................................................................................................................. 19

  **Sales** ................................................................................................................................... 19

  **Smoking/Tobacco** .............................................................................................................. 19

  **Illegal Weapons/Illegal Substances** .................................................................................. 19

Def_000155

## MISSION STATEMENTS

### Mission Statement

The mission of West Texas A&M University is to provide intellectually challenging, critically reflective, regionally-responsive, and inclusive *academic* programs that discover, interpret, apply, and disseminate knowledge for preparing the next generation of global citizens.

### Vision Statement

Guided by its pioneering spirit, West Texas A&M University is recognized for its excellence in teaching and learning, and a strong focus on engaging students in experiences that aid in the development of skills, capabilities, and insights. Our vision is to become a Regional Research University responsive to the forces that shape who we are. Our distinctive focus on the people and places of the Panhandle region will be acknowledged throughout Texas, across the country, and around the world.

### Division of Student Affairs Mission Statement

The Division of Student Affairs promotes an educational environment that enhances your involvement and development as a student by offering rich and varied programs, services and facilities that support lifelong learning. You are empowered to become an informed, responsible, creative and articulate decision maker who exercises good citizenship, appreciates diversity and is professionally competitive.

### Jack B. Kelley Student Center Mission Statement

The Jack B. Kelley Student Center is the gathering place for the entire West Texas A&M University community. We are dedicated to providing a premiere facility that inspires educational growth, diversity, social engagement and intellectual development through student-centered programs and services.

### Funding

The Jack B. Kelley Student Center is committed to remaining fiscally responsible and makes every effort to remain open and transparent. The JBK Student Center funds its maintenance and operations entirely through the University Center Fee.  General revenue funding (money from The State of Texas) is used for academic purposes and does not fund the JBK Student Center or any of the operations.

Def_000156

**GENERAL POLICIES**

**Reservations**

The use of the JBK facility, J.A. Hill Chapel, Alumni Banquet Hall, Buffalo Room/Isley Terrace, First United Bank Center, Bain-Schaeffer Buffalo Stadium, classrooms across campus or outside lawn areas (not including Buffalo Sports Park) will be scheduled through **www.reservations.wtamu.edu**

The reservation year is defined as:
The Friday before the Fall Semester starts through the Thursday before the next Fall semester starts. i.e., August 18, 2023, through August 15, 2024

- Institutional Priority and Buffaloes Traditions can make reservations for the next reservation year starting on January 1st. (Event Organizers must apply to have their event included in this category. Requirements can be found Below)
- Student Organizations can make reservations for the next reservation year starting on April 1st.
- Departments can make reservations for the next reservation year starting on May 1st.
- Non-University Clients can make reservations for August - December starting on May 1st and January – August on November 1st.

If these dates fall on a weekend or holiday, the book will open on the next business day.

Scheduling an event at least 2 weeks in advance is recommended. Meeting rooms and exhibitor tables must be reserved by 5pm the day before the event. 30 days' notice is required for Legacy Hall, Alumni Banquet Hall, First United Bank Center and Bain-Schaeffer Buffalo Stadium. Reservations outside of this timeframe must be approved by JBK Event Services Staff.

The JBK Student Center staff reserves the right to deny space usage for any group/event that is programmatically or operationally impractical to accommodate or that conflicts with the University's mission or policies.

The JBK Student Center reserves the right to cancel or interrupt any event in the interest of public safety, noncompliance with university policies, or if the event can be viewed as inappropriate or not consistent with the mission of West Texas A&M University.

All educational programs provided by an outside organization and open to the community at large will be required to pay an exhibitor fee.

Groups should not advertise their events until the tentative confirmation email has been received. If advertising is sent out prior to approval, it may result in denial of the request to use the space.

Def_000157

The University is not liable for problems that might occur prior to or during the rental period (i.e., power failure, air conditioning problems, sprinkler systems, etc.)

In case of University emergency, any event may be cancelled up to 24 hours in advance.

The University will not be responsible for acquiring any special equipment for any group unless agreed upon when the reservation is made.

Student Orgs and Departments can have up to 4 hours of free setup time for their events. This can be split from the event time or continuous. i.e., event from 5pm - 7pm; setup from 9am - 1pm. Hourly staffing charges will be applied if more time is needed.

## Institutional Priority Events

Institutional Priority Events are mission critical events that will be scheduled as far in advance as dates are available.  These events take priority over all other events and must be approved by the JBK Student Center Advisory Board.  When Institutional Priority Events are initially scheduled, it will only be for the actual day of the event.

Events to be considered for submission must meet three (3) of the following criteria:

- o Submission Criteria
    1. Attendance must exceed 200 or more
    2. Annual event which has occurred at least 3 years in a row
    3. Open to the entire campus community
    4. Requires a contract of 12 or more months in advance
    5. Will aid in recruitment and retention efforts
    6. Requires significant space utilization in the JBK Student Center
    7. Donor funded program at $500,000 or above

Any previously approved Institutional Priority event that fails to meet the criteria for two consecutive years will be removed from the list pending the JBK Student Center Advisory Board approval.  Any group that has been removed from the list, must wait one scheduling cycle before applying for reinstatement onto the list.

Def_000158

### Buffaloes Traditions Program

Buffaloes Traditions Program recognizes that some traditional events and programs should have precedence on the calendar. Buffaloes Traditions Program reservations are deemed to have priority status. Submission for this status shall be received no later than January 1 of the previous year. The Buffaloes Traditions Programs shall be booked into the JBK Student Center Building reservations calendar as soon as the University calendar has been approved and prior to Institutional Priority reservations being booked.

This procedure permits selection of a few programs that must happen annually on campus at a prescribed time. The programs should remain constant from year to year and if the event fails to remain constant, the space will be lost. Dates for the event may change as dictated by the University calendar. Once these have been selected, any new submissions will be submitted to the JBK Student Center Advisory Board for review.

- o  Submission Criteria
    1. Sponsorship by organization or University department
    2. Annual program at a specified time of year
    3. Open to the entire campus community
- o  Selection Criteria
    1. Significant student involvement in planning
    2. Resources required are unique to JBK Student Center
    3. Program will aid in student recruitment and retention efforts

### Scheduling

The following spaces are available in the Jack B. Kelley Student Center (JBK) for reservations:

| | |
|---|---|
| Legacy Hall | Eternal Flame Room |
| Legacy Foyer | Senate Chamber |
| The Legends Club | West Texas Room |
| Entire Commons area | Thunder Room |
| East Commons | Maroon Room |
| Hazel Kelley Wilson Room | White Room |
| Buff Branding Room | |

The following spaces in the JBK can be reserved for recurring meetings:

| | |
|---|---|
| Buff Branding Room | Thunder Room |
| Eternal Flame Room | Maroon Room |
| Senate Chamber | White Room |
| West Texas Room | |

Def_000159

The following spaces are available in the Alumni Banquet Facility (ABF):
   Alumni Banquet Hall
   Buffalo Room/Isley Terrace
   The ABF spaces may NOT be reserved for regularly scheduled meetings without approval from the director of the JBK.

The following spaces are available in the First United Bank Center (FUBC):
   Arena
   Buffalo room

The following spaces are available in Bain-Schaeffer Buffalo Stadium:
   Fairly Group Club
   Concourse
   Field

WTAMU departments and student organizations may not serve as fronts for off-campus organizations. If "fronting" is discovered, Non-University rental rates will apply.

Non-University organizations cannot make a reservation more than 6 months ahead of their event date.  If all Institutional Priority and Buffalo Traditions events have been confirmed for the upcoming summer, the JBK reserves the right to allow outside organizations to book events more than six months in advance.

Reservation space is critical space, and it is important to remain efficient.  "No shows" will not be tolerated and may jeopardize future opportunities to reserve space in the JBK.  Failure to cancel reservations for events involving special set-ups at least two business days in advance of the event date may result in a fee of $20/hour.  Showing up more than 1 hour late for your event will also result in a fee of $20/hour after the first hour.

- o   1st time – verbal and written warning
- o   2nd time – $25 fee
- o   3rd time – $100 fee
- o   4th time or more – lose scheduling privileges within the facilities under the JBK Event Services area of responsibility for duration of the academic year.

If the date of a confirmed event needs to be changed, it must be done so through reservations.wtamu.edu or by contacting the JBK Information Desk.  There is no guarantee that the new date will be available until the change is made.

Def_000160

In the JBK, classes may be scheduled on a one-time basis during each semester. Classes will not be allowed to use the JBK on a regular basis.

The entire Commons area may only be reserved by University departments and student organizations if planned during JBK regular business hours. Non-University groups may reserve the entire Commons area, but the event must occur outside the JBK's regular business hours.

Events held in the entire Commons area may not be scheduled prior to 5:00 p.m. on weekdays.

Legends Club: Reservations for private use may be made before 10 am or after 3 pm on weekdays. Reservations may not be made between 10 am and 3 pm.

## Rates

The four different groups for billing purposes are student organizations, University departments, WTAMU students, and Non-University individuals or groups.

Facility rental fees will be assessed for events accepting monetary donations or charging an admission and/or registration fees. The rental costs will be determined by 10% of the gross revenue collected or by the WTAMU student rate – whichever is less. Fees may be waived if the event is a fundraiser, or it has been approved by the student center director. Direct charges may be assessed for complex events.

All student organizations and university departments will be charged the Building Manager fee per hour for each JBK staff member required before or after the normal JBK operating hours.

Departments will be charged the Building Manager fee per hour for each JBK staff member required outside the hours of 8am – 5pm, Monday – Friday in the Alumni Banquet facility, Bain-Schaefer Buffalo Stadium, First United Bank Center, and J. A. Hill Chapel,.

Non-University groups will be charged the hourly staffing fees for each staff member required during the entire event.

Setup fees are addressed based on the size of the event and the number of staff and how long it will take to set the event. Non-University events will have a required setup fee for the event as determined by the JBK Staff.

To provide sufficient staffing, any University group that schedules an event in Legacy Hall, Alumni Banquet Facility, Bain-Schaeffer Buffalo Stadium or First United Bank Center with less than 7 days' notice will incur all setup charges along with all other staffing charges required to properly manage the event.

Def_000161

University departments and student organizations may co-sponsor events with off-campus organizations, as long as the mission of the off-campus organization relates to the mission of the on-campus sponsor and/or the mission of WTAMU.  Additionally, University sponsors must be present at the event to ensure that WTAMU policies and procedures are followed at all times.

The JBK fee schedule for any group required to pay for the facility is as follows:
- ½ the full rental fee is due at time of booking. The remainder is due by 30 days before the event.
- The full amount is refundable if cancelled up to 30 days before the event.
- If an event or any portion of the event is cancelled less than 30 days before the event, 50% will be refundable.
- Within 15 days there is no refund.

Refunds will be processed through our credit card system. If payment was made by check, refund checks will be mailed out approximately three weeks after an event is completed or cancelled.

## Exhibitor Space

Registered student organizations and University departments may reserve table space in the JBK at no cost.

Individuals and off-campus groups may rent a table space at the Non-University rate. Non-University Vendors are required to have a sales tax permit and abide by applicable state policies.

If an outside organization is sponsored by a student organization, but the student organization does not benefit, the exhibitor fee will remain. However, if an outside organization is sponsored by a student organization and the student organization benefits in some way, then the fee will be waived.

Table space in public areas and hallways of the JBK is limited to seven (7) six-foot tables in the Commons and two (2) six-foot tables in the hallway next to Legends Club.  A maximum of two (2) chairs per table is allowed.

Table space is limited to one (1) table per day per approved user.  Table space can be reserved for a maximum of two (2) five-day periods per semester. Additional table requests should be submitted for approval one week in advance and are contingent upon available table space.

Def_000162

Table space is not available on Dead Day and finals week.  Exceptions must be pursued through the student center director.

To keep the flow of traffic thru the commons area, literature may only be handed to persons who express an interest and are in an area immediately adjacent to the assigned table.
Any signs or banners used at a table may only be hung from the front of the table or hung from the metal poster strips above the table.

Table space permits for approved users will be affixed to assigned table(s) by the JBK staff.  The permit must remain prominently displayed on the table during the entire time the table space is reserved.

Any exhibitor space must be reserved by 5:00 pm the day before the reservation.

## Outdoor Space

Available outdoor spaces to reserve are:

| | |
|---|---|
| Vaughan Pedestrian Mall | Old Main South |
| Classroom Center North | Old Main East |
| Library East | Old Main West |
| Museum East | Terrill Lawn |
| Museum South | Sand Volleyball Court |
| Education South | Isley Terrace |
| Old Main North | 26th Street |

Due to the risk of damage to sprinkler systems and lawns, stakes cannot be used without approval of Physical Plant personnel.  No signs/stakes will be allowed to be placed anywhere within the Pedestrian Mall.

Any equipment ordered from Central Supply must be setup, torn down and cleaned after the event by the group reserving the outdoor space.

No unauthorized vehicles or trailers are allowed to drive and/or park on the Pedestrian Mall.

For reservations on 26th Street, it is the responsibility of the group to contact UPD to open the gates.

Portable BBQ grills may be permitted through the risk assessment process. Location and drought conditions will be taken into consideration.

Def_000163

No loud music or bands will be allowed to play on the Pedestrian Mall or areas adjacent to classroom buildings during class times.  Permitted times are during the week that the University has scheduled as a designated open period as well as Saturdays and Sundays.

Non-University groups must pay the hourly fee for rental of the outdoor space as well as the hourly fee for a staff member to be present during the entire event.

## Marketing/Advertising

Marketing space is available to campus organizations, academic and auxiliary departments. Reservations are only for those groups advertising events and services that are open to the entire campus community and respect the mission of the University and its endeavors.

Marketing reservations will follow same date availability as space reservations.
Providing space for an event or marketing of an event does not necessarily imply university endorsement or sponsorship of a product, issue, or idea.  Therefore, users may not state or imply University sponsorship or endorsement of their activities without the University's consent.  Promotional material and advertising for Non-University sponsored activities must include the following disclaimer: "This is not a West Texas A&M University program."

All posters, flyers, banners, or table tents must include the name of the registered student organization or University department and the name, date and time of the event. University Graphic standards must be followed.  Materials that do not include this information will be removed from the JBK.

Any written material placed within the JBK may not contain obscene words, promote alcohol or other drug usage or any unlawful activity; or violate University rules, Texas A&M University System policies or local, state or federal laws.

Posters, flyers or banners may not be attached to or placed on any unauthorized part of the JBK.  This includes doors, windows, ceilings, walls, tables or other surfaces.  Tacks must be used to post information on bulletin boards. No glue, tape, etc. will be allowed.

Information written on posters, flyers, banners and table tents must be written in English or have the English translation included.   If acronyms or abbreviations are used, the full translation must be printed.  The only exceptions are when acronyms or abbreviations are used for the name of the University, registered student organizations, or campus buildings.

Persons or organizations that post materials are responsible for the removal of these materials when the date of posting has expired.  An expiration date will be considered as one day following the date of the posted event. Any materials that are removed by the JBK will be

Def_000164

thrown away unless prior arrangements have been made.

## Bulletin Boards

A maximum of one (1) flyer per event may be posted on each bulletin board.

All boards will be cleared at the first of each month.

Student Government will approve all student election campaign materials for posting.

## Posters and Sandwich Boards

A maximum of two (2) signs per event or per organization may be hung from the metal poster strips from the ceiling in the main hallway of the JBK.  They may be no more than three (3) feet high and three (3) feet wide and must be hung back-to-back.  The JBK staff will display posters as space is available.

One outdoor sandwich board (two sides) is available for use in designated areas of the Pedestrian Mall.  It may be reserved online and picked up at the JBK Information Desk. Posters/signs must be weather resistant, i.e., vinyl, laminated.  Posters/signs must be attached with Velcro or bungee cords, and tape. No tacks, nails, etc. will be allowed.

The JBK will furnish a sandwich board sign in the Commons area.  An organization may use the sandwich board for publicizing its events the day before the event and the day of the event, pending availability.  It may be reserved online and picked up at the JBK Information Desk.  No other sandwich board or standing signs will be allowed in the Commons area or in the hallways of the JBK without student center staff approval.

## Outside Banners

There is space available for Four Banners (Banner A. B, C, & D) to be hung outside the northeast exit of the JBK.
Banners must be reserved online at reservations.wtamu.edu.
Banners must be weather resistant, i.e., vinyl.
Banners must be brought to the JBK Info Desk the week before they are to be hung.
Banners will be taken down after the date of the event.
If the group wants the banner returned, this must be arranged when the reservation is made.

## Table Tents

The table tents are available in the JBK Student Center Food Court. Space is available on a weekly basis (Sunday to Monday) only.
All artwork will be submitted electronically via email.
All ads must be received no later than the Monday prior to the week the ad is to run.

Def_000165

The required artwork dimensions are 6.5" wide x 3.75" tall with a .5 white space at the bottom making the finished dimensions 6.5" wide x 4.25" tall with the artwork at the top portion of the card.

All artwork submitted must be either .jpeg, .pdf, .psd, or .tif.  No other formats will be accepted.  Microsoft Publisher or Word documents are unacceptable.  All ads must be proofed and approved by you before sending to us.

## Electronic Signs

Electronic signage will not be allowed for political promotion.
The electronic signage content manager must approve all content of a questionable nature.
Content manager reserves the right to reject ads containing content that is in direct competition with JBK vendors or services.

## Floor Stickers

Floor stickers must be approved by JBK staff before putting them out. They can be put down the day before the event and must be picked up directly after the event is over. If the event is several days long, the stickers may remain overnight until the last day of the event.

## Alcohol

Alcohol is only allowed in:

| | |
|---|---|
| Alumni Banquet Hall | Hazel Kelley Wilson Room |
| Buffalo Room/Isley Terrace | Legends Club |
| Legacy Hall | First United Bank Center |
| Legacy Foyer | and Bain-Schaeffer Buffalo Stadium |

Prior approval must come from the President's Office, through the Alcohol request form, before alcohol will be permitted.
If alcohol is part of an official University function, the event must start after 5 p.m.

Any Student Organization that wants to host an event with alcohol must show that alcohol is not the primary focus of the event and must get prior approval from the Office of Student Engagement and Leadership and the Vice President for Student Affairs.

Cash bars and/or distribution of hard liquor at an event will require coordination with an approved licensed liquor provider.

If beer and/or wine are supplied for open distribution, it will be the responsibility of the event host to provide a TABC certified bartender for each station.

JBK can staff bartenders at any event on campus for an hourly fee for beer/wine service.

Def_000166

If alcohol is served, UPD will be contacted to determine if an officer will be required to attend the event. The fees associated with having an officer present will be billed to the client.

## Amplification of Sound

Sound levels of events in the JBK may not disrupt regular business operations and must remain at a level appropriate for the facility. The use and volume of p.a. systems, sound systems, stereo systems, or other musical/sound devices must have prior approval of the student center director.

## Audio/Video – Production Services

The JBK Student Center reserves the right to require technical service staff, including hours of call and crew sizes for meetings and events. All paying groups will be charged an hourly fee for an A/V technician(s) for large-scale events, multi-media presentations, and events using the A/V booth. The technician is there to assist but may not be able to accommodate last minute requests.

All A/V support equipment needs to be scheduled through the JBK Information Desk, and at least two weeks in advance. Further notice is preferable and helps ensure availability.
No other A/V service provider is allowed to provide services in the JBK Student Center without prior approval.

Size, type, and cost of audio and visual systems will be determined by Production Services after the venue and event details are presented by the requestor. Production Services is not responsible for satisfying entertainment contract requirements. It will not be presumed Production Services will provide any services until JBK staff is given the opportunity to study the tech rider information and it has been determined that the Production Services can satisfy event requirements.

Production Services staff will operate all lighting, sound, and video systems when necessary. No client setup, movement, or operation is allowed.

Smaller sound systems are available for use. JBK Production Services has a limited amount of equipment, so it is encouraged to plan ahead.

Production Services can provide support for events outside of the student center.   All university organizations will be charged hourly fees for A/V services along with other mandatory fees.

Production Services A/V Technicians will always deliver, setup, and operate equipment during off site events.

Def_000167

Weather that may damage equipment will result in cancellation of services during the event and/or during setup/teardown time.

Clients that do not cancel prior to event loading will be charged the entire amount of the A/V order.

## Bicycles/Non-Motorized Vehicles

No running, roller-skating, rollerblading, skateboarding, bike riding or scooters inside any WTAMU facility.

## Building Hours/After Hours

All events must end 15 minutes prior to regularly scheduled closing time if no prior arrangements have been made for extended hours. Any requests for extended hours must be made in advance and approved by the Student Center Staff.

Building and food court hours will be posted throughout the JBK.

## Cleanliness

Organizations or individuals using the JBK facilities or equipment will be held financially responsible for damage and/or cleaning.

The group hosting an event is responsible for cleanup, repair of damages and replacement of damaged equipment. If an excessive amount of trash has been left in the room, a charge will be billed to the customer for housekeeping.

The student center director or a student center staff member must approve all requests to move furniture in any part of the JBK. Individuals and groups will be held financially responsible for damages to furniture and facilities.

## Donation Boxes/Drives

All requests to provide donation boxes and/or drives in the JBK must be placed through the Information Desk.

All donation boxes must be checked regularly and have the following information on the box: contact person with phone number, University organization name, and date(s) of the event.

Def_000168

## Decorations

All decorations must be removed immediately following the activity.  Nothing may be left or stored in the JBK.  Any items left in the facility may be charged a storage fee.

The loading dock must be cleared of all debris.

A large-scale event is any event that will have more than two hundred (200) people in attendance.

Large-scale events scheduled outside the fall and spring semester, can reserve an extra setup day. During the fall and spring semesters, no setup days will be permitted without JBK Event Services Staff approval.

A florist/wedding consultant may be used to provide non-food items only. JBK Event Services must approve the set-up and decorations of the rented facility if the decorations are out of the norm. Centerpieces, tablecloths, and chair covers do not need prior approval. It is the responsibility of the client to confirm with JBK Event Services that their decorations are approved.

Items such as confetti, glitter, birdseed, rice and fireworks (i.e., sparklers) may not be utilized on WTAMU campus.

Biodegradable confetti is allowed outside, but not inside any WTAMU facility.

Bubbles are allowed outside, but not inside any WTAMU facility.

Double-sided tape of any kind shall not be used. Any damage and costs associated with repairing the damage will be billed to the group responsible for the event.

Items weighing more than 3,000 pounds will not be allowed inside the JBK Facility.  Dimensions of items must allow for easy access into facility.

All items must be clean and will be visually inspected and approved prior to entering the facility.

No battery-powered vehicles (i.e., Scooters, Golf Carts, etc.) will be permitted in WTAMU facilities.

Helium balloons are not allowed inside J. A. Hill Chapel, First United Bank Center, Fairly Group Club, Alumni Banquet Hall, and Legacy Hall or adjoining hallways.

Def_000169

Helium tanks are not permitted inside WTAMU facilities.

Fog/smoke machines may not be used in WTAMU facilities without prior permission. A Fire Marshal may be required at the hourly expense of the client.

If a lift is needed for decorations, the first two hours of its use will be provided free of charge. Any additional time will be charged at an hourly rate. The lift must be operated by a WTAMU Staff Member, Non-University persons are not allowed to use a WTAMU owned lift.

As per University policy, candles, incense, or any other flame effect devices may not be used in any University facility.

No decorations may be hung from any wall, drapes, acoustic panel, ceiling, door or other surface of University facilities.  All decorations must have advance approval of the JBK Event Services Staff.

Within the JBK facility: Signs designating the food court areas, Buffalo Gold Card office, offices in the building, or any permanent sign will be of a design and style first approved by JBK Staff. No other permanent-type signage is allowed.

## Emergency Safety (buff alert, tornadoes, fire, etc.)

In the event of an emergency during an event, the JBK Event Services staff will follow the proper procedures outlined in the JBK Student Center emergency manual. All building occupants are expected to follow all instructions given to them by a JBK staff member.

## Food/Catering

*In accordance with existing contracts and University rules, catering will be allowed within the following guidelines:*

All catering of food shown on the regular menu of the food court restaurants must be done through the food court restaurants. No outside caters are allowed in the Jack B. Kelley Student Center without prior approval.  All food must be contracted with the on-campus caterer - Aramark. The food service director must approve all other food requests via the online Catering Exemption Form.

The use of heating appliances (open-flame devices, toaster ovens, heating plates, sterno cans, fry cookers, etc.,) to prepare food or to warm food is not allowed in the JBK, the outer covered patio of the JBK, Alumni Banquet Hall, Isley Terrace, First United Bank Center, or Bain-Shaeffer Buffalo Stadium. Upon approval by the student center director, exceptions may be granted for certain events contracted through University food services and insured catering companies.

Def_000170

Any baked goods prepared for distribution in the JBK must be approved by Aramark, pre-portioned, and individually wrapped prior to the event.

Any person or group serving food on WTAMU Campus shall hold harmless WTAMU, its agent, employees, and representatives from any liability or action arising from personal injury or property damage caused by the negligent act of omission or commission of the group.

Food Safety:  The group hosting an event is liable for all food safety preparation and service. Individuals within the group are expected to follow standard food safety and hygiene practices for food served or sold.  WTAMU retains the right to require insurance, permits, or inspections as needed.

## JBK Catering Kitchen

The kitchen is available for groups bringing in and/or preparing food for special events only (non-reoccurring event).

The kitchen is equipped with electrical outlets, refrigerators, warming cabinets, microwave, ice machines, coffee/tea makers and counter space.  Equipment is not to be moved from its original location.

All items must be removed from the kitchen at the end of the event including food.

The kitchen must be left clean after the event is completed.  To clean the kitchen, you must use the approved cleaning chemicals provided by the JBK Student Center.  An additional cleaning fee may be charged if the kitchen requires cleaning beyond normal end of the day custodial service.

## Event Liability Insurance

All outside organizations and parties renting the facility, which are not directly administered by WTAMU, may be required (as determined by the Risk Assessment process) to provide proof of event liability insurance valued at one-million dollars specifically listing WTAMU as additionally insured.  Copies of the policy must be provided at the same time the balance is paid in full.

Student organizations and/or departments that are hosting an event may be required (as determined by the Risk Assessment process) to verify that all participants have a signed TAMUS liability waiver on file before participating in the event.

Def_000171

## Lost & Found

A lost and found will be operated at the JBK Information Desk for items found at the University. Each Friday, all items will be brought to the University Police Department.

## Parking

Parking is not allowed on 26th street without special permission.  All loading/unloading must occur at the available parking behind the Alumni Banquet Facility.

JBK Student Center visitor parking is for university visitors only.  No faculty, staff, or students are permitted to park in visitor parking.

30 minute parking may be used by faculty, staff or students for unloading and loading only.

Parking Services will provide specific parking instructions for all events on campus with non-university guests.

## Political Activity

Table space for candidates of political or student government elections is not allowed unless sponsored by a registered student organization.

## Sales

Registered student organizations, University departments, and outside vendors may be permitted to sell items in the JBK if they have an approved exhibitor's reservation.  No items may be sold that conflict with the sales of an auxiliary service (i.e., University Bookstore or Aramark without the auxiliary service director's approval. (See also *Table Reservations*)

Tickets to events sponsored by off campus groups or individuals may be sold upon approval of the Vice President for Student Affairs if a discount is offered to WTAMU students.

## Smoking/Tobacco

Smoking and use of any tobacco products (cigars, cigarettes, chewing tobacco, etc.) as well as e-cigarettes, vapes, etc are prohibited on the University campus.

## Illegal Weapons/Illegal Substances

Illegal substances, and/or illegal weapons (according to Texas law and the West Texas A&M Code of Student Life) are not permitted on University property.

**Def_000172**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

_____

PECTRUM WT, et al.,           §
                              §
          Plaintiffs,         §
                              §
s.                            § No. 2:23-cv-00048
                              §
ALTER WENDLER, et al.,        §
                              §
          Defendants.         §
_____


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

HYBRID VIDEOTAPED DEPOSITION OF

JOHNATHAN-JAYCE WALKER FANELLI-BURNETT

AS CORPORATE REPRESENTATIVE OF SPECTRUM WT

DECEMBER 18, 2025

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

1       HYBRID VIDEOTAPED DEPOSITION OF JOHNATHAN-JAYCE

2   WALKER FANELLI-BURNETT, produced as a witness at

3   the instance of the Defendants, and remotely duly

4   sworn by agreement of all counsel, was taken in the

5   above-styled and numbered cause on December 18,

6   2025, from 10:02 a.m. to 2:44 p.m., before Karen L.

7   D. Schoeve, RDR, CRR, RSA, reported remotely by

8   computerized stenographic machine shorthand, from

9   West Texas A&M University, Old Main Building, Room

10  317, 2501 4th Avenue, Canyon, Texas, pursuant to

11  the Federal Rules of Civil Procedure and the

12  provisions stated on the record or attached hereto.

13

14

15      REPORTER'S NOTE:  Please note that due to the

16  quality of a Zoom videoconference, transmission of

17  data and overspeaking causes audio distortion and

18  unintelligible testimony which disrupts the process

19  of preparing a Zoom videoconferenced transcript.

20

21      Quotation marks are used for clarity and do

22  not necessarily reflect a direct quote.

23

24

25

App. 170



 1                  A P P E A R A N C E S

 2      *********************************************

 3                  SOME PARTIES APPEARED

 4                  REMOTELY VIA ZOOM

 5      *********************************************

 6  FOR THE PLAINTIFFS and THE WITNESS:

 7      J.T. MORRIS, ESQUIRE
        FOUNDATION FOR INDIVIDUAL RIGHTS AND
 8        EXPRESSION
        700 Pennsylvania Avenue SE, Suite 340
 9      Washington, DC 20003
        T: 215.717.3473
10      jt.morris@fire.org

11  - and -

12      ADAM STEINBAUGH, ESQUIRE
        FOUNDATION FOR INDIVIDUAL RIGHTS AND
13        EXPRESSION
        510 Walnut Street, Suite 900
14      Philadelphia, Pennsylvania 19106
        T: 215.717.3473
15      adam@fire.org

16

17  FOR THE DEFENDANTS:

18      DAVID BRYANT, ESQUIRE
        SPECIAL COUNSEL
19      OFFICE OF THE ATTORNEY GENERAL
        P.O. Box 12548 (MC-009)
20      Austin, Texas 78711-2548
        T: 512.463.2120
21      F: 512.320.0667
        david.bryant@oag.texas.gov

22

23

24

25

1              A P P E A R A N C E S (Continued)

2

3   ALSO PRESENT:

4      Marc Rietvelt | Assistant General Counsel
          Office of General Counsel
5         West Texas A&M University
          mrietvelt@tamus.edu

6
       Brad Snyder, Videographer
7         Integrity Legal Support Solutions

8

9   CERTIFIED STENOGRAPHIC MACHINE COURT REPORTER:

10     Karen L. D. Schoeve
       Certified Realtime Reporter
11     Registered Diplomate Reporter
       Realtime Systems Administrator

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1                    I N D E X

2                                              PAGE

3    Appearances                                3

4    Transcript designated "Confidential Pursuant    157

5      to the Protective Order"

6

7

8    JOHNATHAN-JAYCE WALKER FANELLI-BURNETT

9          Examination By Mr. Bryant            9

10         Afternoon Session                    83

11         Examination (Continued) By Mr. Bryant    83

12         Examination By Mr. Morris            149

13         Further Examination By Mr. Bryant    159

14

15

16   Changes and Signature                     162

17

18   Certified Stenographic

19   Court Reporter's Certificate              164

20

21

22

23

24

25

App. 173

1                              EXHIBIT INDEX

2

         NO.      DESCRIPTION                              PAGE
3

    Exhibit 1                                            17
4        Defendants' Notice of Oral Deposition
         Pursuant to Federal Rule of Civil
5        Procedure 30

6   Exhibit 2                                            51
         Plaintiff's Amended Responses to
7        Defendants Walter Wendler and
         Christopher Thomas's First Set of
8        Interrogatories

9   Exhibit 3                                            84
         Article over West Texas regarding its
10       general values

11  Exhibit 4                                            86
         University Mission, Vision and Core
12       Values

13  Exhibit 5                                            88
         University Statements, Mission
14       Statement, Vision Statement, Core Values

15  Exhibit 6                                            89
         The Constitution of Spectrum WT, signed
16       by Barrett Bright, dated 10/09/2023

17  Exhibit 7                                            92
         E-mail memo dated 03/20/23 from Walter
18       Wendler, President to Students, Faculty
         and Staff
19       Re: A Harmless Drag Show? No Such Thing.
         Bates stamped W_000085
20
    Exhibit 8                                            96
21       E-mail memo dated 03/18/23 from Walter
         Wendler, President to Students, Faculty
22       and Staff
         Re: WTAMU News: Spectrum WT Application
23       for On-Campus Drag Show
         Bates stamped W_000088
24

25

| | | |
|---|---|---|
| 1 | Exhibit 9 | 103 |
| 2 | Article entitled, "How drag degrades women," dated 02/25/22 | |
| 3 | Bates stamped W_000101 | |
| | Exhibit 10 | 106 |
| 4 | Chicago-Kent Law Review, Article entitled "Drag = Blackface" by Kelly | |
| 5 | Kleiman | |
| | Bates stamped W_000110 | |
| 6 | | |
| | Exhibit 11 | 113 |
| 7 | Article entitled, "Drag Shows ARE Blackface" by Sherry Sylvester, dated | |
| 8 | 04/05/23 | |
| 9 | Exhibit 12 | 114 |
| | Article entitled, "Is Drag | |
| 10 | Misogynistic?" By M.K. Fain, dated 10/07/2019 | |
| 11 | Bates stamped W_000132 | |
| 12 | Exhibit 13 | 116 |
| | Jack B. Kelley Student Center, West | |
| 13 | Texas A&M University, Procedures and Guidelines, revised 03/05/25 | |
| 14 | | |
| | Exhibit 14 | 118 |
| 15 | Campus Organizations Handbook | |
| 16 | Exhibit 15 | 125 |
| | Expressive Activity on Campus, approved | |
| 17 | 05/14/20, Rule Summary | |
| | Bates stamped PX-005 | |
| 18 | | |
| | Exhibit 16 | 129 |
| 19 | WTAMU Student Handbook 2025-2026, published 08/01/25 | |
| 20 | Bates stamped PX-006 | |
| 21 | Exhibit 17 | 131 |
| | Facility Use Request Procedure, revised | |
| 22 | 03/01/17 | |
| | Bates stamped PX-004 | |
| 23 | | |
| 24 | | |
| 25 | | |

```
1              P R O C E E D I N G S

2

3         THE VIDEOGRAPHER:  This is the

4  deposition of Johnathan-Jayce Fanelli in

5  the matter of Spectrum WT versus Walter

6  Wendler, et al.  Our location is 2501 4th

7  Avenue in Canyon, Texas.  And we are now

8  on the record at 10:02.

9         My name is Brad Snyder, and my

10 business address for Integrity Legal

11 Support Solutions is 9901 Brodie Lane,

12 Austin, Texas 78748.

13        Would all persons present please

14 introduce themselves for the record.

15        MR. BRYANT:  My name is David

16 Bryant.  I represent the defendants in

17 this case.  I'm with the Office of the

18 Attorney General of Texas in Austin.

19        MR. MORRIS:  JT Morris on behalf of

20 Plaintiffs Spectrum WT and the witness.

21        THE WITNESS:  I'm Johnathan-Jayce

22 Fanelli-Burnett.  I represent Spectrum.

23        THE VIDEOGRAPHER:  Will the court

24 reporter please now administer the oath.

25        THE COURT REPORTER:  Did we have
```

```
 1          one more?  Adam?

 2               MR. STEINBAUGH:  Yeah.  My name is

 3          Adam Steinbaugh, and I'm an attorney for

 4          Spectrum.  I'm with the Foundation for

 5          Individual Rights and Expression.

 6          JOHNATHAN-JAYCE WALKER FANELLI-BURNETT,

 7    having been first duly sworn to tell the truth, the

 8    whole truth, and nothing but the truth, so help him

 9    God, testified as follows:

10               THE COURT REPORTER:  Y'all may

11          proceed.

12                    EXAMINATION

13    BY MR. BRYANT:

14       Q.   Mr. Fanelli, my is name David Bryant.  I

15    represent the defendants in this case, so Walter

16    Wendler and Dr. Chris Thomas, in their official

17    capacities with West Texas A&M University.

18               We were introduced to each other just

19    before the deposition, and I understand it's okay

20    for me to refer to you as "Mr. Fanelli" during

21    this deposition.  Is that okay?

22       A.   Yes, sir.

23       Q.   Okay.  Have you ever given a deposition

24    before?

25       A.   No.
```

1    Q.   Have you had an opportunity to receive

2  advice from your attorneys about the deposition

3  process and about how we will proceed today?

4    A.   Yes.

5             MR. MORRIS:   I caution the witness

6        not to reveal any privileged

7        communications.   You can answer "yes" or

8        "no."

9  BY MR. BRYANT:

10   Q.   And do you understand that you're under

11  oath, the same as if you were testifying in a

12  courtroom?

13   A.   Yes.

14   Q.   I'm gonna be asking questions for a

15  significant period today.   If at any point you

16  need a break for any reason, please let us know.

17  We'll be happy to take a break.   Please do not

18  take a break before you answer a pending question.

19  Please go ahead and answer the pending question.

20  Then if you want a break, just let us know, and

21  we'll accommodate that.

22            If my questions are for any reason

23  unclear or confusing to you, please ask me to

24  rephrase them or otherwise clarify them for you.

25  If you go ahead and answer, I'll assume that you

1    understand the question fully.  Okay?

2        A.    (Nodded head.)

3        Q.    That's another rule, which is the court

4    reporter can't take down a nod of the head.

5        A.    Yes.

6        Q.    You and I, we're about 5 feet apart.  At

7    times, it will feel we are having a conversation

8    in normal conversation.  There's a lot of

9    nonverbal communication where you nod or you -- or

10   you -- whatever you want to express you can.  But

11   the court reporter can't take that down, so your

12   answers need to be out loud in every instance.

13              What is your full name?

14       A.    Johnathan-Jayce Walker Fanelli-Burnett.

15       Q.    Okay.  You have more names than some of

16   us.  And I wonder, what -- what is the name on

17   your birth certificate, if you know?

18       A.    I recently got my name legally changed,

19   so it is previous name which is Kay-Breeze

20   Blessing Fanelli-Burnett.

21       Q.    I'm sorry --

22       A.    Kaye-Breeze Blessing Fanelli-Burnett is

23   the name on my birth certificate that I got

24   recently legally changed.

25       Q.    Okay.  And why did you change your name?

```
1        A.    I am transgender.

2        Q.    Okay.  And how long have you been

3  transgender?

4        A.    I've been out for probably six years now.

5        Q.    And how old are you?

6        A.    I am 21.

7        Q.    So where did you grow up?

8        A.    I grew up in Clarendon, Texas, primarily,

9  but I moved a lot around the Panhandle.

10        Q.    Did you grow up entirely within the

11  larger Panhandle area?

12        A.    Yes.

13        Q.    Okay.  Where'd you go to high school?

14        A.    I graduated from Clarendon, but once

15  again, I moved throughout the Panhandle, so I've

16  been to about three different high schools.

17        Q.    Have you attended college, other than at

18  West Texas A&M, which I'll sometimes refer to as

19  WT"?

20        A.    No.

21        Q.    And when did you first attend WT?

22        A.    I came here in fall of '23.

23        Q.    Have you continuously attended West Texas

24  A&M since the fall of 2023?

25        A.    Yes.
```

```
 1      Q.    Have you received any degrees -- college

 2  degrees yet?

 3      A.    Not yet.

 4      Q.    How far along are you on your path to a

 5  college degree at West Texas A&M?

 6      A.    I'm currently a junior.  I switched my

 7  major, so I'm a little bit behind, but I'm set to

 8  graduate in the next two years.

 9      Q.    So you expect to graduate sometime in

10  2027?

11      A.    Yes.

12      Q.    What is your current major?

13      A.    English education.

14      Q.    And what is your current minor, if you

15  have one -- any minors?

16      A.    I do not have one.

17      Q.    Okay.  And I understand that you're the

18  current president of Spectrum WT, the plaintiff in

19  this case; is that right?

20      A.    Yes, I am.

21      Q.    And do you belong to other student

22  organizations?

23      A.    Not currently, but I have done -- I've

24  been in multiple different student organizations,

25  including student government, the Residence Hall
```

1    Association and -- I believe that's it.

2        Q.    Since you've been in college, have you

3    had any jobs or operated any businesses?

4        A.    No.

5        Q.    I think I may be able to guess this, but

6    what are your plans after you complete your

7    college education?

8        A.    I am possibly -- probably going to move

9    to go move up north to go be with my fiancé and go

10   teach up there.  Possibly in Colorado, I'm looking

11   at.  I'm not super set in stone, but I do want to

12   teach, so ...

13       Q.    Do you know at what level you want to

14   teach?

15       A.    High school.

16       Q.    Have you ever met Dr. Walter Wendler?

17       A.    I haven't formally met Dr. Wendler, but

18   I've been -- like, I've seen him around.

19       Q.    Okay.  Have you ever communicated with

20   him?

21       A.    Not directly, no.

22       Q.    Have you ever communicated with him

23   indirectly?

24       A.    Hmm?

25       Q.    Have you ever communicated with

1  Dr. Wendler indirectly?

2      A.   I'm not sure I understand the question.

3      Q.   Well, I'm just trying to understand your

4  previous answer.  You said that you had not

5  communicated with Dr. Wendler directly, and that

6  made me think that perhaps you had in some way

7  communicated with him indirectly.  Is that true or

8  false?

9      A.   Once again, I'm not sure I understand the

10 question.

11     Q.   Okay.  Have you ever met or communicated

12 with Dr. Chris Thomas?

13     A.   Yes.

14     Q.   On how many occasions?

15     A.   A few.  I was in student government.

16     Q.   Have you ever communicated with Dr. Chris

17 Thomas as a -- an officer or member of Spectrum?

18     A.   I'm not sure I understand the question.

19     Q.   Okay.  You're the president of Spectrum

20 and have been a member, I assume, before you were

21 president; is that right?

22     A.   Yes.

23     Q.   And on some instances, you may have had

24 an opportunity to communicate with Dr. Thomas in

25 your role as a -- as the president of Spectrum or

1    on behalf of Spectrum.

2              Have there been any such occasions?

3        A.    No.

4        Q.    Do you know a gentleman named Chip

5    Chandler?

6        A.    Yes, briefly.

7        Q.    Okay.  In what context have you had an

8    opportunity to meet or communicate with Chip

9    Chandler?

10       A.    I was previously a theater major.  And he

11   has -- I'm not sure exactly what he has to do with

12   the theater program, but he helped organize our

13   awards ceremony one year.  And so I said "hi"

14   once.

15       Q.    Okay.  Aside from that, any communication

16   you've had with Chip Chandler?

17       A.    No.

18       Q.    Have you ever met or had communication

19   with a gentleman named Shawn Fouts?

20       A.    No.

21       Q.    Do you know who he is?

22       A.    No.

23       Q.    Have you ever heard of or communicated

24   with Chance Haugen?

25       A.    No.

1    Q.   Why did you choose to come to WT?

2    A.   First of all, it's local.  And second of

3  all, ever since I was, like, very, very young,

4  like, I have pictures of me on the Buff Fountain

5  at, like, 8.  I was, like, "I want to go to WT,"

6  and so I did.

7    Q.   Did any of your family members go to West

8  Texas A&M?

9    A.   Nope.  I'm first gen.

10            (Exhibit 1 marked.)

11  BY MR. BRYANT:

12    Q.   Mr. Fanelli, I'm going to hand you what

13  has been marked as Fanelli Exhibit 1.  And I will

14  provide this and all other exhibits that I use in

15  this deposition to the court reporter as soon as

16  possible after completion of the deposition.

17            Have you seen Fanelli Exhibit 1

18  before?

19    A.   I don't think so.

20    Q.   Are you aware that you are in part here

21  today as a representative of Plaintiff Spectrum

22  WT?

23    A.   Yes.

24    Q.   And do you understand that you're

25  required today to provide information in this

1    deposition regarding some topics that the

2    defendants had inquired about --

3        A.   Yes.

4        Q.   -- of Spectrum WT?

5        A.   Yes.

6        Q.   By the way, there's another deposition

7    rule I want to mention.  In normal conversation,

8    you will know what I'm asking before I can finish

9    my question, and it's very natural for you to go

10   ahead and answer it when you know what I'm asking

11   before I finish the question.

12                 But I would ask you to allow me to

13   complete the question before you answer it,

14   because then it's not confusing on a court

15   reporter's record.  You and I will understand each

16   other perfectly, but it can be confusing on a

17   record if you answered a question before I

18   complete the question.  Okay?

19       A.   Okay.

20       Q.   Now, if you look on the last page of

21   Fanelli Exhibit 1, there's a list of nine topics.

22                 Do you see those?

23       A.   Yes, I do.

24       Q.   Have you seen those -- that list of nine

25   topics before?

1      A.   Yes.

2      Q.   And I want to ask you first about Number

3   1, which is "Plaintiff's current and past

4   membership and membership rules, policies, and

5   practices since January 1, 2022."

6            Do you have any information on that

7   subject?

8      A.   Yes.

9      Q.   What information is it?

10     A.   I -- I came to school here in fall of

11  '23.  I became a member of Spectrum at that time.

12  I became president -- it would have been -- not

13  president, but vice president first before I was

14  president, and that was last fall.

15     Q.   That was the fall of 2024 or 2025?

16     A.   '24.

17            MR. MORRIS:  I'll just ask counsel

18       to let the witness finish his answer,

19       please.

20            MR. BRYANT:  Certainly.

21     A.   And I am president.  And that happened

22  this previous -- wait.  I'm so bad with time.

23  It's terrible.  It sucks.  Working on the time in

24  my head.

25  BY MR. BRYANT:

1      Q.    Take your time.  We're in no rush.

2      A.    Okay.  So I would have been vice

3   president fall of -- yeah, that would have been

4   '24.  And this previous fall -- or, no.  Oh, my

5   gosh.  When was I vice president.  I've had a lot

6   happen in my life.

7            It would have been spring, I believe.

8   I think it was in spring, I was vice president.  I

9   was only vice president for, like, a semester.

10  And then we had a bunch of people graduate, and so

11  I moved up.  Yeah.  So it would have been spring

12  of '24 -- no, in the spring of '23.  And then I

13  was president that following fall, I believe.

14     Q.    Okay.  Now, you -- I believe you

15  testified previously that you entered WT in the

16  fall of 2023.

17     A.    Um-hum.

18     Q.    So I assume you were not involved with

19  Spectrum in spring of 2023, right?

20     A.    Oh, yeah, yeah.  What the heck.  Yeah.

21  It was -- so I was -- I was -- I was on campus

22  for, like, a semester.  And then I went into my

23  role as vice president.  So I was there for that

24  fall and then following spring, so it would have

25  been '24, yeah, spring of 2024.

1    Q.    Okay.  And when were you -- when did you

2  become president of Spectrum WT?

3    A.    That would have been the semester after,

4  so it would have been fall of '24.

5    Q.    Okay.  And you were president of Spectrum

6  WT for the fall of 2024, the spring of 2025, and

7  the fall of 2025?

8    A.    Yes.

9    Q.    As president of Spectrum WT, do you have

10  access to any records that it has about its

11  current and past members?

12    A.    Yes.  Through Buff Link.

13    Q.    Okay.  And what is the current number of

14  members of Spectrum WT?

15    A.    I do not have an exact number.

16    Q.    Give me your best estimate.

17    A.    I'd say probably 30.

18    Q.    And if you look back to the spring of

19  2025 and I asked you the same question as to the

20  membership of Spectrum at that time, what would

21  your answer be?

22    A.    The same, about 30.

23    Q.    Okay.  And if we look back to the fall of

24  2024, what was the membership of Spectrum at that

25  time?

 1      A.   I'd say about 30.

 2      Q.   If we go back to the spring of 2024, what

 3  was the membership of Spectrum?

 4      A.   I'd say about 30 again.

 5      Q.   And if we go back to the fall of 2023

 6  when you joined Spectrum, what was its membership

 7  then?

 8            MR. MORRIS:   Objection; calls for

 9      speculation.

10  BY MR. BRYANT:

11      Q.   You can answer the question.  Your

12  attorney will -- or may state various objections

13  for the record.  But unless he instructs you not

14  to answer, just go ahead and answer the question.

15      A.   I'd say about 30.

16      Q.   Okay.  So the Spectrum membership has

17  been stable since you arrived on campus in the

18  fall of 2023?

19      A.   To my knowledge, yes.

20      Q.   Do you know if there are or have been any

21  members of Spectrum who are under 18?

22      A.   No, not that -- not that -- to my

23  knowledge.

24      Q.   Okay.  How does Spectrum determine

25  whether -- the age of its members?

App. 190

```
 1      A.   We do not determine any age.

 2      Q.   And you do not inquire; is that right?

 3      A.   No.

 4      Q.   It's not right?  Or is it --

 5      A.   Yeah, we don't inquire.  We're just an

 6   open organization to any WT students.  So if they

 7   can come to WT, they can be in Spectrum.

 8      Q.   Okay.  And you -- is it correct, then,

 9   that Spectrum has no policy or practice of

10   excluding minors from its membership?

11      A.   No.

12      Q.   It's not correct?

13      A.   Oh, we don't have, like, a direct policy

14   that excludes minors, no.

15      Q.   Okay.  Do you have an indirect policy?

16      A.   No.

17      Q.   Do you have any -- does Spectrum have any

18   policy or has it had any policy since you've been

19   involved with the organization of restricting its

20   events to persons over 18 -- 18 or over?

21           MR. MORRIS:  I'm gonna object just

22       because it's slightly outside the scope of

23       the topics for which Mr. Fanelli has been

24       designated.  He's been designated to

25       testify from June 2024 on on these topics.
```

```
 1   BY MR. BRYANT:

 2       Q.   I just want to get all the information

 3   you have -- information before June --

 4             MR. MORRIS:  Same objection.  He's

 5        not -- he was not served with the

 6        deposition notice of his individual

 7        capacity, so --

 8             MR. BRYANT:  He's going to be

 9        deposed today in his individual capacity.

10             MR. MORRIS:  You needed to serve a

11        deposition notice to that effect.  He's

12        here to testify on these 30(b)(6) topics

13        for the time periods that we designated.

14        I'll let you have some leeway, Mr. Bryant,

15        but I will state my objection as it

16        pertains to the scope of this 30(b)(6).

17             You can answer the question,

18        Mr. Fanelli.

19        A.   I don't have -- I don't have the capacity

20   to be able to answer that question.

21   BY MR. BRYANT:

22       Q.   You don't know.

23        A.   I do not --

24             MR. MORRIS:  That mischaracterizes

25        his testimony.  I object.
```

```
 1              MR. BRYANT:  I'm asking what his
 2         testimony is.  It's unclear.  So I'm not
 3         trying to characterize it.  I'm just
 4         trying to ask what he's intending to
 5         communicate.
 6     A.   I do not have the capacity to answer that
 7  question.
 8  BY MR. BRYANT:
 9     Q.   What -- what do you mean by that?
10     A.   I -- I -- I do not know the answer to
11  your said question.
12     Q.   Mr. Fanelli, since you arrived at WT in
13  the fall of 2023, is it correct to say that you
14  have no personal knowledge of anything that
15  occurred in the spring of 2023 with respect to
16  Spectrum?
17     A.   Can you repeat the question.
18     Q.   Sure.
19              Do you have any personal knowledge of
20  any events relating to Spectrum in the spring of
21  2023?
22              MR. MORRIS:  Same objection as to
23         scope.
24     A.   I represent Spectrum.  So I'm not here to
25  talk about my personal knowledge, but I mean, I
```

1    do, but I'm not -- I'm representing Spectrum, not

2    myself.

3    BY MR. BRYANT:

4        Q.   Okay.  Did you witness any events related

5    to the proposed drag show that Spectrum wanted to

6    hold on the WT campus in the spring of 2023?

7        A.   No.

8                MR. MORRIS:  Objection; vague.

9    BY MR. BRYANT:

10        Q.   And did you attend the drag show that

11    Spectrum held in Amarillo in the spring of 2023?

12        A.   No.

13        Q.   Did you have any involvement in the

14    planning of a proposed Spectrum drag show on the

15    WT campus in the spring of 2024?

16        A.   No.

17        Q.   Has Spectrum applied for reservation to

18    hold a drag show on the WT campus in 2026?

19        A.   Yes.

20        Q.   Were you involved in that application?

21        A.   Yes.

22        Q.   And what individual or individuals made

23    the decision to make that application?

24        A.   I did.

25        Q.   Did anybody else at Spectrum?

1    A.    We have a very small council, and we all

2  got together and talked about proposed dates and

3  times that would work with our schedule, and that

4  was -- and we all came to that conclusion

5  together.

6    Q.    **When did you have that meeting or**

7  **discussion?**

8    A.    It was probably about a month ago.

9    Q.    **Did you -- did Spectrum decide to have**

10 **that drag show or apply for reservation for that**

11 **drag show in 2026 because of this litigation?**

12          MR. MORRIS:  Objection.  Just

13      caution the witness not to reveal any

14      attorney/client communications.

15          But you can answer the question,

16      Mr. Fanelli.

17    A.    Can you repeat the question.

18 BY MR. BRYANT:

19    Q.    **Yes.  Did Spectrum decide to apply for a**

20 **drag show in 2026 at Legacy Hall because of this**

21 **litigation?**

22          MR. MORRIS:  Same caution not to

23      reveal any privileged communications.

24    A.    We applied for the drag show because

25  Spectrum wants to host a drag show.

```
 1   BY MR. BRYANT:
 2       Q.   Did your attorneys provide any assistance
 3   in applying for the drag show in 2026?
 4               MR. MORRIS:  Same objection.  I'm
 5          going to ask -- I'm going to caution the
 6          witness not to reveal any privileged
 7          communications as it relates to that
 8          question.
 9   BY MR. BRYANT:
10       Q.   It's a "yes" or "no" question.
11       A.   I primarily worked to apply for the
12   reservations and everything on my end.
13       Q.   Okay.  My question was whether your
14   attorneys participated in applying for the drag
15   show in 2026?
16               MR. MORRIS:  Same objection.  Same
17          caution to the witness, not to answer the
18          question to the extent it reveals
19          privileged communications.
20   BY MR. BRYANT:
21       Q.   Again, it's just a "yes" or "no"
22   question.
23               MR. MORRIS:  Same objection.  Same
24          caution to the witness.
25       A.   Yes.
```

1    BY MR. BRYANT:

2        Q.    And you recall that a panel of the Fifth

3    Circuit Court of Appeals in August of 2025 issued

4    a decision related to Spectrum's lawsuit?

5        A.    Can you repeat.

6        Q.    Do you recall that the Fifth Circuit

7    Court of Appeals panel issued a decision in August

8    of 2025 with respect to this lawsuit?

9        A.    Yes.

10       Q.    And as a result of that decision by the

11   panel, did you understand that Spectrum could

12   proceed with the drag show at Legacy Hall on the

13   WT campus?

14       A.    Yes.

15       Q.    And did Spectrum consider scheduling a

16   drag show in the fall of 2025 as a result of that

17   Fifth Circuit decision?

18       A.    Yes.  But due to timing, it just would

19   not have been able -- we would not have been able

20   to put on the performance that we would like to

21   put on.  So we decided to wait a bit so we had

22   more time to plan.

23       Q.    And when did Spectrum make that decision?

24       A.    Probably in October.

25       Q.    Okay.  Did Spectrum discuss having a drag

 1   show in the fall of 2025 anytime in the first

 2   month or so of the fall semester?

 3       A.   Very briefly, but not any set in stone

 4   plans.

 5       Q.   Okay.  Now, at this point, my

 6   understanding is that Spectrum has applied for a

 7   reservation for space in Legacy Hall for a drag

 8   show in late April of 2026; is that correct?

 9       A.   Yes.

10       Q.   And to what extent, if any, have the

11   details of that drag show already been decided?

12       A.   We are in the very, very early planning

13   stages.

14       Q.   And is it fair to say that -- strike

15   that.

16              Do you know who will perform at that

17   drag show?

18       A.   Not yet, no.

19       Q.   Do you know what the performances or any

20   of them will consist of?

21       A.   Not yet, no.

22       Q.   Do you have any knowledge as to the

23   costumes or music that will be a part of that late

24   April 2026 drag show?

25       A.   Not yet, no.

1    Q.    Is it fair to say that at this time,

2    Spectrum has a general intention to have that drag

3    show, but none of the details have yet been worked

4    out?

5    A.    Yes.

6    Q.    Is it possible that the -- in the next

7    four or five months, that the precise date of the

8    drag show will be changed?

9    A.    If -- the only reason why that would be

10   changed is if we do not get our reservation at the

11   given date.

12             But currently, we have it set for a

13   specific date.  And we have -- we have an idea for

14   how we are to select our performers, which will

15   all be WT students, and our processes of which we

16   are to approve said students.

17   Q.    Okay.  Could you describe those

18   processes?

19   A.    Yes.  So first, we would have a

20   applyment [sic] -- like, they would apply to

21   perform.  They would briefly describe what they

22   want to do, what their costumes are, what music

23   they are to do, and we will go through and make

24   sure that it is appropriate.  We will consult with

25   them, if we have any concerns.  And we will select

App. 199

1    our grouping that we are to have perform.  We are

2    expected to have anywhere from five to ten

3    performers, possibly more, probably not less than

4    that number.  And -- yeah.

5        **Q.   Okay.  Let's leave drag shows aside for**

6    **the moment.  We'll talk about them some more in**

7    **your deposition.**

8             **To your knowledge, has Spectrum been**

9    **allowed to hold its events on campus or off campus**

10   **without interference from the leadership of WT?**

11            MR. MORRIS:  Objection; compound.

12       A.   Can you repeat that again.

13   BY MR. BRYANT:

14       **Q.   Sure.**

15            **To your knowledge, has Spectrum been**

16   **allowed to hold its events on campus without**

17   **interference from the leadership or administration**

18   **of WT?**

19       A.   Our just normal meetings, yes.

20       **Q.   Okay.  Is that also true for social**

21   **events such as Queer Movie Night and Lavender Prom**

22   **and other social events that are aside from**

23   **regular meetings?**

24       A.   Our regular meetings do consist of those

25   events.

App. 200

1    Q.    Okay.   So -- and I'll pull out the

2  interrogatory answers that Spectrum has provided.

3  It lists, you know, quite a few events that

4  Spectrum has held over the period that you've been

5  in at WT.

6           Is it fair to say that, again,

7  leaving aside drag races, WT leadership has not in

8  any way interfered with or harassed Spectrum in

9  holding its events?

10           MR. MORRIS:   Objection; compound.

11    A.    We haven't had any issues with that, no.

12  BY MR. BRYANT:

13    Q.    And is that true also for the events that

14  Spectrum has chosen to hold off campus?

15           MR. MORRIS:   Objection; lacks

16     foundation.

17    A.    I know since I've, like, been in

18  Spectrum, I haven't been to any off-campus events,

19  really.   We don't host them primarily for

20  accessibility reasons.   We like to keep things on

21  campus, so the WT community can attend them.   And

22  also, for students that don't have cars, that it's

23  hard for them to get off campus, to make them as

24  accessible as possible.   We have had some

25  off-campus events, but they have been more kind of

1   casual, like, hangouts, like, "Let's go eat at a

2   restaurant.  Let's go do this and that."

3                    I do know that they had their

4   off-campus drag show.  I did not attend that.  But

5   once again, we like to keep things on campus for

6   accessibility reasons.

7   BY MR. BRYANT:

8       Q.    Okay.  I understand that.  But is it fair

9   to say that Spectrum [sic-West Texas University]

10  has not in any way interfered with any off-campus

11  events, formal or informal, that Spectrum chose to

12  have?

13      A.    We haven't had any issues, no.

14      Q.    And is it fair to say that neither

15  Spectrum nor any of its members, to your

16  knowledge, have been subject to any kind of

17  discipline from WT by reason of any events that

18  Spectrum has held?

19      A.    No.

20      Q.    Is that correct to say or not correct to

21  say?

22      A.    We haven't had any issues, no.

23      Q.    Okay.  What is Spectrum's purpose in

24  wanting to hold a drag show in 2026?

25      A.    So drag shows are a very central part of

1  queer culture.  They are a performance.  They are

2  art.  Spectrum wants to be able to uplift --

3  uplift artist and their voices.  Spectrum, as a --

4  as an organization, we are to provide a space for

5  queer voices and both queer and nonqueer people to

6  exist in a -- in a way that is fair, in a way that

7  they can be themselves without any restrictions.

8           Once again, as I said before, drag

9  shows are art.  A lot of people in Spectrum are

10  artists, including myself, and we would like to be

11  able to have this and host this.

12           We would also, in the future, like to

13  have charity drag shows again so we can raise

14  money for causes that we think are important and

15  to help other queer people that need funding so

16  that they can make it through the world,

17  especially in the current political climate.

18  **Q.   Does Spectrum intend to convey any**

19  **particular message through its proposed drag show**

20  **in April of 2026?**

21  A.   So art is subjective.  Every single

22  performer is a separate artist -- a separate

23  artist.  Each of the performances could mean

24  different things to them.  Spectrum isn't to say

25  what those things mean, because, once again, art

1  is objective.  So whatever a specific performer is

2  trying to convey, they are free to convey that

3  said message.

4      **Q.   And at this point, Spectrum doesn't know**

5  **who those performers are, right?**

6      A.   Not yet.

7      **Q.   And therefore, is it fair to say that at**

8  **this point, Spectrum doesn't know what messages**

9  **the performers, that it ultimately selects, will**

10 **intend to express or will, in fact, express?**

11     A.   Not yet.  But as I said before, we do

12 have an approval process.  We are not just letting

13 anyone perform.  We are asking of them to provide

14 an exact -- their choreography, what music they're

15 selecting, their costume, things like that.

16          And as I said before, art is

17 subjective, so their art can mean something

18 different to different people.

19     **Q.   That -- that is a good point.**

20          **But you've just described a process**

21 **by which Spectrum intends to determine in advance**

22 **some of the content of the performers --**

23 **performances at the proposed 2026 drag show,**

24 **right?**

25     A.   Yes.

1    **Q.    And is Spectrum going to make decisions**
2    **as to who can perform at that drag show based on**
3    **the message that the particular performer intends**
4    **to express at the drag show?**

5    A.    So these -- this approval process would
6    be considered an audition.  So we are just trying
7    to select performers that we think are -- first of
8    all, we have limited time.  We have limited slots,
9    so we can't let everyone in.  So we want to try to
10   let in -- of course, we want to be able to have
11   everyone in, but as I said, we have limited time.

12              So with this approval process, first
13   of all, we are making sure that, for one, their
14   content is appropriate; it's not inappropriate in
15   any way, which that's just with anything.  And
16   then if we do have concerns, we are to talk to
17   said student about their performance and either
18   how we can try to fix that, or we can just say,
19   "Hey, we can't have you."

20              And also just making sure that we
21   have people that are passionate and want to be a
22   part of the show in order to just -- "I just want
23   to do it for fun for no reason."  Because we have
24   to plan these things.  We have to -- we have to
25   get the music situated.  We have to figure out

1  timing for everything.

2           This is -- like, it's -- it's a

3  performance.  So you can't just let people go on

4  just like any other performance.  You have to kind

5  of have some sort of order.

6      Q.  **How will Spectrum determine whether it**

7  **considers a performer's proposed performance to be**

8  **appropriate or not?**

9      A.  Very simple.  Does the music have

10 profanity?  Is their costume at all revealing at

11 all, in an insane degree?  Are they to be doing

12 any performing -- like, any profane actions during

13 said performance?  And if they're not doing any of

14 that, then, by all means, come perform.

15     Q.  **And could you explain what you mean by**

16 **revealing to, quote, "an insane degree," end**

17 **quote?**

18     A.  So obviously, some costumes, you may

19 show, you know, legs.  You may show your belly.

20 But obviously, we don't want to see their groin.

21 We don't want to see chest on people with said

22 chest or even without said chest.  And we don't

23 want it to be sexual.  So obviously, we just want

24 to be sure that those -- that it's appropriate.

25     Q.  **Okay.  And you also said that you don't**

1    want the performers to engage in, quote, "profane

2    actions," unquote, if I understood you correctly.

3    What do you mean by that?

4        A.    Groping themselves or any sort of

5    simulated, profane masturbation.  Things like

6    that.

7        Q.    Would it be fair to call that lewd

8    conduct?

9        A.    Yes.

10                MR. MORRIS:  Objection; form.

11   BY MR. BRYANT:

12       Q.    Okay.  And I notice you glanced at your

13   watch.  Do you need to take a break?

14       A.    No.

15       Q.    Okay.  Now, as part of your previous

16   answer, you noted that whatever performances occur

17   in the proposed 2026 drag show, they may be

18   perceived as having many different messages or

19   meanings to the audience; is that correct?

20       A.    Yes.

21       Q.    And there's no way that Spectrum -- or

22   perhaps even the performers -- can control how

23   their performances are perceived by different

24   members of the audience, correct?

25       A.    Yes.

Q.    And do you understand that it is possible
that members of the audience may be offended by
some of the performances?

A.    With art, it is subjective.  Some people
may be offended by content.  That being said, they
are allowed to be offended by said content.  If
they are offended by said content, then "Just do
not come."

Q.    If -- strike that.

Is it fair to say that Spectrum does
not intend by its proposed 2026 drag show to
express any specific message?

A.    No.

Q.    It is not fair or is it fair?

A.    We are not trying to convey a specific
message, no.

Q.    Okay.  Now, has anybody at WT yet reacted
to your application for a reservation for a drag
show in April 2026?

A.    Not to my knowledge.

Q.    So you don't know at this point whether
WT will allow that proposed drag show or not?

A.    Not yet.  I am currently waiting on,
first of all, the approval.  And also, I recently
filled out the risk assessment form, so I'm just

1  waiting for all of that to get approved.

2      Q.   Okay.  And you have submitted that risk

3  assessment online?

4      A.   Yes, I have.

5      Q.   And what are the main risks that you

6  perceive Spectrum has in connection with the

7  proposed 2026 drag show?

8      A.   Probably the only risks is possible

9  performance injury -- performer injury.  Just as

10  simple run of the mill, when you're upstage

11  performing, there's always a chance to get hurt on

12  accident.

13      Q.   Now, in the previous 2023 drag show --

14  you may not be aware of this -- Spectrum listed as

15  a risk, possible embarrassment to members of the

16  WT community and possible harassment of performers

17  or -- or Spectrum members.

18           Do you believe that those are also

19  risks with the 2026 drag show that you proposed?

20      A.   It could possibly, yes.  And when I did

21  fill out the form, I did say that it could

22  possibly happen, just because it's -- people are

23  going to be mean.  That's just how people are.

24           So there's always a chance that it

25  could happen to one of the performers.  I would

1  hope not.  I would hope that people are nice and

2  kind, but sometimes people aren't.  So of course,

3  that could be a possibility.

4      **Q.   Spectrum held a drag show off campus in**

5  **2023, although I understand you didn't attend it.**

6            **Did Spectrum have an option of**

7  **holding a drag show in 2026 off campus, had it**

8  **wished to do so?**

9      A.   We would like to avoid holding it off

10  campus for accessibility.  We would like to have

11  as many of the members of the WT community to be

12  able to attend it as possible.  A lot of us, it's

13  hard for us to commute off campus.  It's -- so

14  it's just -- it's so much easier if we can do it

15  here and also just bring the entire community

16  together.

17            Because we -- we're a club at WT.  We

18  want to do things on campus.  We're not off

19  campus.  If we were a club off campus, then we

20  would do it off campus.  But we are a club on

21  campus.  So we want to be able to utilize that --

22  our facilities that we pay to use and have a right

23  to use as much as we can.

24      **Q.   I think you just did -- as I understand**

25  **it, have just expressed why you don't believe that**

1    an off-campus drag show is the best option for

2    Spectrum.

3            Is it, nevertheless, an option if

4    Spectrum wishes to do -- to use it -- to hold a

5    drag show off campus?

6        A.    If it would have been an option, we would

7    have been having drag shows off campus.  But

8    it's -- it's just not very easy to plan something

9    off campus because of funding, commuting.  It's so

10   much easier if we can do it on campus and utilize

11   the facilities that we pay for as much as we can.

12       Q.    Okay.  But it was an option for Spectrum

13   in 2023, right?

14       A.    Yes.

15       Q.    Is it an option in 2026?

16       A.    Yes, but we would not like to.

17       Q.    Is there -- are there any facilities in

18   Canyon that would be possible venues for a drag

19   show in 2026?

20            MR. MORRIS:  Objection; calls for

21       speculation.

22       A.    I mean --

23   BY MR. BRYANT:

24       Q.    Off campus.

25       A.    I mean, possibly.  But, once again, we do

1   not want to host it off campus.  We want to host

2   it on campus with facilities that we pay for and

3   facilities that we would like to use for a

4   multitude of reasons that I have listed.

5       **Q.   Are you familiar with a venue called The**

6   **Lumberyard?**

7       A.   Yes, I have familiarity --

8       **Q.   Can you describe that venue?**

9       A.   Yes.  I've had this brought up multiple

10  times.  We would not host there for a multitude

11  reasons.

12          First of all, they serve alcohol,

13  primarily, and we do not want to be in a venue

14  where that is a very, like, prevalent huge thing

15  that you can do.  I understand that it is a venue

16  that does host various performances including

17  concerts and stuff like that.

18          But, once again, it primarily serves

19  alcohol and things like that.  We do not want to

20  have that in our venue.

21      **Q.   Have you been to The Lumberyard?**

22      A.   I have not been there directly yet, but

23  I've, you know, had plans with friends to possibly

24  go after we get back from breaks.

25      **Q.   Aside from Spectrum drag shows, have you**

1    attended drag shows in the past?

2        A.    I went to my very first one last weekend.

3        Q.    **Where did you go?**

4        A.    I went to the 806.

5        Q.    **Could you describe the 806?**

6        A.    The 806 is a coffee bar downtown.

7        Q.    **Downtown in what city?**

8        A.    Amarillo.  And it's -- it's a more adult

9    space, I'd say.  And that's where I went with some

10   friends.

11       Q.    **Okay.  Did you see a drag show?**

12       A.    I did.

13       Q.    **And when you say it was a -- that the 806**

14   **is "a more adult space," what do you mean?**

15       A.    They have a lot of nude art around.  They

16   serve alcohol.  It's very much a place I go with

17   my adult friends to hang out.

18       Q.    **It may be unfair to ask you this**

19   **question.  If so, please let me know, since you**

20   **have only been to the drag show that you**

21   **described.**

22             **What do you regard as the essential**

23   **features of a drag show?**

24       A.    So while I've only been to one drag show,

25   I am familiar with the art of drag.  So essential

1  features include putting together costumes,

2  possibly makeup, lip-synching to various music,

3  and having different choreography, possibly props.

4  It's very much a stage performance.

5      Q.   It's very much a what?

6      A.   A stage performance.

7      Q.   Are there any other essential elements of

8  a drag show that you can think of?

9      A.   Nope.  Drag is super broad.

10      Q.   Do you understand that Spectrum can

11  cancel or drop its current application for a 2026

12  drag show at some later date, if it wants to?

13      A.   Yes.

14      Q.   Did Spectrum's lawyers review its

15  application to reserve space in Legacy Hall for a

16  2026 drag show before the application was filed?

17          MR. MORRIS:  Objection.  I'll

18       instruct the witness not to answer,

19       because the only way he can answer that is

20       by revealing attorney/client

21       communications.

22      A.   I would not like to answer that.

23  BY MR. BRYANT:

24      Q.   It's a "yes" or "no" question.

25      A.   I would not like to answer that question.

1          MR. MORRIS:  Same objection.  "Yes"

2      or "no" -- you're asking him "yes" or "no"

3      to reveal attorney/client communications.

4          MR. BRYANT:  No, I'm not at all.

5      I'm just asking whether the lawyers

6      reviewed the application.  I don't want to

7      know about any communications.

8          MR. MORRIS:  Whether --

9          MR. BRYANT:  Did you review the

10     application?

11         MR. MORRIS:  Whether or not we

12     reviewed the application -- let me object,

13     please, Mr. Fanelli.

14         Whether they reviewed the

15     application is a communication.  I'm

16     instructing the witness not to answer on

17     privileged grounds.

18  BY MR. BRYANT:

19     **Q.   Has Spectrum decided whether or not at**

20  **its proposed 2026 drag show it will have an MC?**

21     A.   Yes.  It will be one of our members.

22     **Q.   Do you intend to perform at the proposed**

23  **2026 drag show that Spectrum has applied to hold?**

24     A.   Possibly.  I'm looking to probably MC,

25  though.

1    Q.    Going back to the list of topics that is

2  on the last page of Fanelli Exhibit 1.  A second

3  topic is "Plaintiff's finances since January 1,

4  2022, including its annual revenues, expenses, and

5  its current assets and liabilities."

6             Do you have knowledge of the current

7  finances of Spectrum?

8    A.    So we get about, I believe, $800 a

9  semester through the school, and that's kind of

10 just what we work on with our current finances.

11   Q.    Do you know what the current assets, cash

12 or otherwise, of Spectrum are?

13   A.    We have a, like, supply bin with stuff

14 that we use when we table for freshman

15 orientation.

16   Q.    Does Spectrum have any cash?

17   A.    No.

18   Q.    Has Spectrum had any revenue, to your

19 knowledge, since you've been an officer, other

20 than funds from the -- from WT?

21   A.    We had a, like, craft, like, fundraiser

22 table that we had last year.  I believe we made

23 about a hundred dollars from that.

24   Q.    Anything else?

25   A.    No.

1    Q.    Does Spectrum have any liabilities or

2  debts?

3    A.    No.

4    Q.    Does Spectrum owe its attorneys any

5  money?

6    A.    No.

7    Q.    Are its attorneys providing services they

8  perform in this lawsuit without compensation from

9  Spectrum?

10    A.    Yes.

11    Q.    Topic Number 6 is, "The expressive

12  message(s) intended by Spectrum to be communicated

13  through its proposed or actual drag shows in 2023

14  or 2024."

15         Do you have any knowledge on that

16  topic?

17    A.    Do not.

18    Q.    Aside from the proposed drag show in

19  April 2026, does Spectrum have any other events

20  planned for the spring semester of 2026?

21    A.    Yes.  We meet biweekly.  And at every

22  single meeting, we have a different event, whether

23  that be craft night or a movie night.  And we have

24  that all planned out.

25    Q.    Do you recall what those events are,

1  other than just meetings?

2      A.   So once again, our meetings are those

3  events.  So at each meeting, we have a different

4  event.  So we'll have initial meeting, and then we

5  have a New Year's celebration party.  We have a

6  movie night.  We have a PowerPoint night.  We have

7  a potluck at the end of the year.

8              What else do we have?  I think we

9  have eight or nine meetings that -- I don't know

10  the schedule off the top of my head, but every

11  single meeting that we meet biweekly, we have a

12  different event.

13      Q.   Is it fair to say that you don't expect

14  WT to have any problems with any of the events

15  that it intends to hold in the spring semester of

16  2026, other than possibly the proposed drag show?

17      A.   No.

18      Q.   Is it fair or is it not fair to say that?

19      A.   I don't think that they have a problem.

20  They haven't, so ...

21              MR. BRYANT:  We've been going about

22       an hour.  Why don't we take a ten-minute

23       break.

24              THE VIDEOGRAPHER:  Going off the

25       record at 8:59 [sic-10:59].

```
 1                    (A recess was taken from 10:59 a.m. to
 2              11:10 a.m.)
 3                    THE VIDEOGRAPHER:   Going back on
 4          the record at 11:10.
 5                    (Exhibit 2 marked.)
 6   BY MR. BRYANT:
 7      Q.   Mr. Fanelli, let me ask you to take a
 8   look at what's been marked as Fanelli exhibit --
 9   maybe I -- let me see.   If I give you the right
10   one.   There you go.
11              This is a document that is entitled,
12   "Plaintiff's Amended Responses to Defendants
13   Walter Wendler and Christopher Thomas's First Set
14   of Interrogatories."
15              Have you seen this document before?
16      A.   Yes.
17      Q.   And does your signature appear on the
18   next to last page of Fanelli Exhibit 2?
19      A.   Yes.
20      Q.   Did you review these amended responses
21   before you signed Fanelli Exhibit 2?
22      A.   Yes, I did.
23      Q.   Okay.   Now, if we look at Interrogatory
24   Number 1, it inquiries about officers of plaintiff
25   Spectrum since November 1, 2022.
```

1          Is that answer true and correct to

2    the best of your knowledge?

3        A.   Yes.

4        Q.   Now, there is a -- on page 3, there's a

5    person named Audrey Pleming listed as the

6    president for the fall of 2024.

7               Did you know Audrey Pleming?

8        A.   Yes, I did.

9        Q.   Did Audrey Pleming graduate or leave WT

10   between the fall of 2024 and the spring of 2025?

11       A.   Yes.

12       Q.   Did Audrey Pleming graduate or leave

13   school?

14       A.   She graduated.

15       Q.   And was there a formal meeting at which

16   you were elected president of Spectrum?

17       A.   Yes, there was.

18       Q.   What's your best recollection as to when

19   that meeting occurred when you were first elected

20   president of Spectrum WT?

21       A.   Like, the end of the semester between

22   when she left and when I became president, we

23   had -- like, usually, we have elections at the end

24   of the year.  But we have to have it kind of at

25   that midway point, because she was graduating

1    during that semester.

2            So we have to kind of switch around

3    officers, so it would have been at the end of that

4    fall semester.

5        Q.    So did that occur in December of 2024?

6        A.    Yeah, it would have been about December.

7        Q.    The vice president in the spring of 2025

8    is listed as Keagan O'Toole; is that correct?

9        A.    Yes.

10       Q.    And did Keagan O'Toole graduate or leave

11   WT at the end of the spring of 2025?

12       A.    Keagan is technically still attending WT

13   but is doing it virtually.

14       Q.    Doing it ...

15       A.    Doing it virtually, um-hum.

16       Q.    Is he still a member of Spectrum?

17       A.    Yes.

18       Q.    And for the fall of 2025, you're listed

19   as president.  You're also listed as the

20   historian; is that right?

21       A.    Yes.

22       Q.    What -- what do you do as historian?

23       A.    Social media management.

24       Q.    When -- strike that.

25            Has there been any further election

1    of officers in December of 2025?

2    A.    No.

3    Q.    When do you next expect election of

4    officers at Spectrum?

5    A.    In May of 2026.

6    Q.    Are any of the current officers expected

7    to graduate or leave WT at the end of the spring

8    semester of 2026?

9    A.    Yes.  Izzy Fernandez.

10    Q.    Okay.  Let's go to Interrogatory Number 4

11    and the response beginning on page 9.

12            Do you see that?

13    A.    Yes.

14    Q.    Okay.  How did you assemble and verify

15    the correctness of these events beginning in the

16    spring of 2020?

17    A.    So on our social media, we have, like, a

18    list of events that happened per semester.  And so

19    we just went through and looked at those.

20    Q.    The list of events goes all the way from

21    pages 9 to 14, does it not?

22    A.    Yes.

23    Q.    And to the best of your knowledge, has WT

24    in any way interfered, harassed, or discriminated

25    against Spectrum or anybody else with respect to

1    any of these events?

2           MR. MORRIS:  Objection; vague,

3      compound.

4      A.   No, WT has not.

5    BY MR. BRYANT:

6      Q.   On page 13, in the spring of 2025, there

7    is an event referred to as the "Valentine's Lip

8    Sync Variety Show."

9           Did you attend that?

10     A.   I did.

11     Q.   And did that occur on February 21st,

12   2025?

13     A.   Yes, it did.

14     Q.   And could you describe that event in

15   general?

16     A.   Yes.  We worked with another organization

17   on campus, Open Space Brave Space, and we had

18   just -- it was a performance where we had various

19   performers from both the theater program and

20   Spectrum go up.  And they did choreographed dances

21   and different -- you know, lip-synching and things

22   like that.  It was very fun.

23     Q.   About how long was that performance?

24     A.   About an hour and a half.

25     Q.   And were any of the performances ones

App. 223

1    that you would describe as R-rated?

2        A.   We had one that was through a theater

3    person, which we had issue with.   We contacted

4    OSBS after the performance and expressed how we

5    did not like that at all, and we did not think

6    that that was okay.   And I'm not sure what

7    happened with that student, if they got

8    reprimanded at all or anything like that.   But we

9    did have that one.

10       Q.   And I think you referred in your answer

11   to "OSBS"?

12       A.   Yes.

13       Q.   Can you explain what you mean by that?

14       A.   Open Space Brave Space.   That is the

15   acronym version of that organization.

16       Q.   Okay.   I'm not familiar with that

17   organization.

18               Would you describe it, to the extent

19   you know it?

20       A.   They're through the theater department.

21   They host, like, discussion nights.   And I'm not

22   sure what else they do.   I just know about their

23   discussion nights that they do, where they just

24   have, like, open-table discussions about different

25   issues.

```
 1          But I'm not -- I'm not sure
 2   exactly -- other than that, I'm not sure exactly
 3   all that they do.
 4       Q.   Was "Valentine's Lip Synch Variety Show"
 5   in February of 2025 advertised as an R-rated show?
 6       A.   Yes.  We did that put that on our
 7   advertisements.
 8       Q.   And what did Spectrum expect would be the
 9   content of that show that -- that made it R-rating
10   appropriate?
11       A.   So the reason why we did an R-rating,
12   first of all, was just due to the political
13   climate surrounding any sort of performances like
14   that.  We didn't think that it would be R-rated.
15   We just did it as -- because of the political
16   climate, they think that these things are
17   inappropriate.  So we're like, "Okay.  We should
18   probably post it as R-rated, just to cover our
19   bases."
20          None of our performers did anything
21   R-rated at all.  We made sure of that.  But,
22   obviously, that one performer through the other
23   organization did, and we had issue with it.
24       Q.   Okay.  If I understand your answer
25   correctly, it is that Spectrum didn't expect the
```

1  **performance to be R-rated, but advertised it as**

2  **R-rated, and it turned out to be R-rated?**

3     A.   There was one performance that we had

4  issue with, yes.

5     **Q.   Can you describe that performance in**

6  **general?**

7     A.   There was one act -- there was an -- she

8  went up on stage and performed a sort of simulated

9  BDSM session thing with her partner.  It was very

10  uncomfortable.  And we did have issue with it and

11  brought it up after said performance.

12     **Q.   Did Spectrum -- strike that.**

13            **What -- what, if any, information had**

14  **Spectrum received about that anticipated**

15  **performance prior to the actual performance on**

16  **February 21st, 2025?**

17     A.   So we had rehearsals, and this same

18  performer did not do that during the rehearsal, so

19  this was something that she just decided to do on

20  a whim.  So I'm not sure what caused her to do

21  that.

22            But, once again, we had strong issue

23  with it, which has driven us not to work with that

24  same organization in the future.  But -- yes.

25     **Q.   And did you attend one or both of the**

1    rehearsals for that February 20 -- 20 -- 21st,

2    2025, performance?

3        A.    Yes.  I went to the first one.

4        Q.    Okay.  The one on February 11?

5        A.    Yes.

6        Q.    And did the performer that you have

7    referenced perform an entirely different routine

8    during that rehearsal?

9        A.    Yes.

10       Q.    Do you know what routine that performer

11   rehearsed on February 20th?

12       A.    So that was the tech rehearsal.  So tech

13   rehearsals are different than regular rehearsals.

14   Those are to where they'll have placeholder items

15   in place, and it's just to work on lighting.

16            So she did not actually -- we didn't

17   have any of our performers there for that.

18       Q.    So this performer whose performance was

19   problematic did not actually perform any routine

20   at the rehearsal on February 20th?

21       A.    Yes.

22       Q.    Has Spectrum participated in any other

23   events that were rated R?

24       A.    No.

25       Q.    You mentioned -- and I see on page 14 --

 1   a reference to something called, quote,

 2   "PowerPoint Night," unquote, on October 2nd, 2025.

 3                   Could you explain what that is?

 4       A.    So "PowerPoint Night" is just a night

 5   where we have different members of Spectrum.  They

 6   can put together, like, a PowerPoint of something

 7   that's interesting to them, whether that be a

 8   movie that they like or a video game that they

 9   like or just something like queer history or

10   something that they find interesting, and they are

11   able to present it.

12       Q.    All right.  Let's look to the response to

13   Interrogatory Number 5, which begins on page 16

14   and goes to page 17.

15       A.    (Examined exhibit.)

16       Q.    This list of eight events comprises

17   the Spectrum events that have taken place off

18   campus during the relevant time periods covered by

19   the interrogatory; is that right?

20       A.    Yes.

21       Q.    There's a reference to two events

22   described as, quote, "Bubble Bar Social," unquote,

23   one in October of 2024, one in February of 2025.

24                   Could you describe what those

25   consisted of?

```
 1      A.    Yes.   We went to the Bubble Bar, which is

 2   a drink/boba place that's attached to this

 3   restaurant that's, like, towards Downtown Canyon.

 4   And we just hung out and got drinks.

 5      Q.    Okay.  And there was referred to -- a

 6   reference to a, quote, "Tabletop Tavern Social" on

 7   March 6th, 2025.

 8              Could you describe that event?

 9      A.    Yes.   We went to the Tabletop Tavern,

10   which is in the square of Canyon, and we played

11   board games and ate and just hung out.

12      Q.    Now, we were talking a little bit about

13   the "Valentine's Lip Synch Variety Show."

14              Could -- would you describe that or

15   could it be described fairly as a drag show?

16      A.    It could be similar, but once again, drag

17   shows are broad, so they can be really a lot of

18   different things.  It's just a stage performance.

19      Q.    Okay.  And when you say "a safe

20   performance," what do you mean?

21      A.    Stage performance.

22      Q.    Stage performance.  Okay.

23              So the "Valentine's Lip Synch Variety

24   Show" that occurred earlier this year, did that

25   include what you consider the essential elements
```

1    of a drag show?

2        A.    As I stated before, the essential

3    elements of a drag show are costumes, different

4    music with lip-synching, choreographed dance,

5    which that also can apply to a lot of different

6    stage performances.  So yes, because it applies to

7    a lot of different stage performances.

8        Q.    To your knowledge, did WT express any

9    objection to the "Valentine's Lip Synch Variety

10   Show" that occurred on February 21st, 2025, either

11   before or after the performance?

12       A.    No.

13       Q.    And did that occur on campus at WT?

14       A.    Yes, it was on campus.

15       Q.    Let's look at the response to

16   Interrogatory Number 6.  It begins on page 17 and

17   goes to page 18.

18             Do you see that?

19       A.    Yes.

20       Q.    And on page 18, it lists performers and

21   invited performers at "A Fool's Drag Race."

22             Do you see that?

23       A.    Yes, I do.

24       Q.    And which persons listed, if any, were

25   not students of WT at that time?

1    A.    I -- with this list, I only know a few of

2    the people on the list and to -- and they were all

3    students at the time.  I don't know for a fact if

4    all of these people were students or not.

5    **Q.    Okay.  Have you ever heard of somebody**

6    **named Michael Arredondo, who is also known as Myss**

7    **Myka?**

8    A.    I have heard of this person.  I do not

9    know this person.

10    **Q.    Is it your understanding that Myss Myka**

11    **is not a WT student?**

12    A.    Yes.

13    **Q.    And is it your understanding that Myss**

14    **Myka is a Amarillo-based drag performer?**

15    A.    Yes.

16    **Q.    Under the heading of "Don't Be a Drag,**

17    **Drag Show 2024," Myss Myka also appears, right?**

18    A.    Yes.

19    **Q.    In the proposed 2026 drag show that**

20    **Spectrum has applied for, I believe it is correct**

21    **that you indicated that all of the performers**

22    **would be current WT students; is that right?**

23    A.    Yes.

24    **Q.    And why did Spectrum decide to limit the**

25    **performers in the proposed 2026 drag show to**

```
 1   current WT students?

 2       A.   Because this is for WT.  This is for the

 3   WT community and also Spectrum.  We are a WT-based

 4   club.  So we want to try to make more space for

 5   our members and other students that go here.

 6       Q.   Did your decision to exclude nonstudent

 7   performers have anything to do with this

 8   litigation?

 9       A.   No.

10       Q.   Did anybody in the discussion within

11   Spectrum question why performers like Myss Myka

12   are to be excluded from the proposed 2026 drag

13   show?

14       A.   No.

15       Q.   In response to Interrogatory Number 8 --

16   I'm sorry -- yeah, Interrogatory Number 8 on page

17   23, there is a reference to "PG-13."

18            Do you have any understanding of what

19   that term means or how it's defined?

20       A.   Yes.

21       Q.   Would you give me that?

22       A.   PG-13 is a rating by the American Film

23   Association that can -- that considers content as

24   needing parental guidance for those over the age

25   of 13.  This can be a multitude of reasons,
```

 1   including thematic elements, violence, mild sexual

 2   content, among other things.

 3       Q.   Do you believe that you -- strike that.

 4            Does Spectrum yet, at this early

 5   stage, have any assigned rating for its proposed

 6   2026 drag show?

 7       A.   Not yet.

 8       Q.   Do you anticipate that as the details of

 9   that proposed 2026 drag show are fleshed out, that

10   Spectrum will assign some rating to it?

11       A.   Yes, we will.

12       Q.   Do you have any approximate date as to

13   when you expect to assign a rating to the proposed

14   2026 drag show?

15       A.   It will be, of course, before our

16   performance.  It will probably be sometime in

17   March or April.

18       Q.   In response to Interrogatory Number 9 --

19   strike that.

20            Interrogatory Number 9 asked that

21   Spectrum identify "All alleged acts of retaliation

22   by President Wendler against the plaintiffs."

23            Do you believe that President Wendler

24   has in any way retaliated against Spectrum since

25   you have been a student, beginning in fall 2023?

1          MR. MORRIS:  Just to clarify, are

2      you asking him in his individual capacity

3      or in his capacity to testify on behalf of

4      Spectrum?

5          MR. BRYANT:  I'm -- it would

6      include both, whether, you know --

7      anything, you know, either as Spectrum's

8      president or otherwise.

9          MR. MORRIS:  And, again, I would

10     just note he has not been served with a

11     notice to testify on his own behalf,

12     so ...

13         You can go ahead and answer,

14     though, Mr. Fanelli.

15    A.   On the point of Spectrum, no.

16  BY MR. BRYANT:

17    Q.   **Would your answer be the same if I asked**

18  **you whether, since you've been at WT, to your**

19  **knowledge, President Wendler has in any way**

20  **retaliated against any individual members of**

21  **Spectrum?**

22    A.   I can't speak --

23         MR. MORRIS:  Objection; calls for a

24     legal conclusion.

25    A.   I can't speak for individual members.

```
 1  BY MR. BRYANT:
 2      Q.   I'm just asking to your knowledge.  I'm
 3  not saying that you know everything.
 4           But are you aware of any acts of
 5  retaliation by President Wendler against any
 6  members of Spectrum since you've been at WT?
 7      A.   As I said, I can't speak for individual
 8  members.  I -- I don't know.
 9      Q.   Since you've been at WT, are you aware of
10  any actions by President Wendler or Dr. Thomas to
11  prohibit Spectrum from promoting, publishing, or
12  organizing any messaging?
13           MR. MORRIS:  Objection; vague.
14      A.   We have not had any issues, no.
15  BY MR. BRYANT:
16      Q.   Do you have any reason to anticipate that
17  Dr. Wendler or Dr. Thomas are going to prohibit
18  any messaging by Spectrum in the future at this
19  point?
20           MR. MORRIS:  Objection; vague.
21      A.   Yes.
22  BY MR. BRYANT:
23      Q.   What's that reason?
24      A.   So as a whole, we are aware of Wendler's
25  views.  So at any moment in time, our -- our
```

1    message and who we are could be objected upon by

2    Wendler.

3        Q.   Okay.  Aside from that, do you have any

4    reason to believe that President Wendler or

5    Dr. Thomas are likely to prohibit or restrict any

6    messaging by Spectrum in the future?

7                MR. MORRIS:  Same objection.

8        A.   Could you repeat that again.

9    BY MR. BRYANT:

10       Q.   Sure.

11              Aside from the fact that you believe

12   you know Dr. Wendler's views, is there any reason

13   why you would anticipate the likelihood of any

14   restriction on any messaging or publication by

15   Spectrum WT in the future?

16               MR. MORRIS:  Objection; vague.

17       A.   Other than being aware of his views, no.

18   BY MR. BRYANT:

19       Q.   It's fair to say that the proposed 2026

20   drag show that Spectrum has reserved space for is

21   going to be different than the drag show that was

22   proposed in 2023 by Spectrum?

23       A.   I wasn't involved with the planning of

24   that, so I have no idea how ours will compare to

25   theirs.

1    Q.    Well, you know, for example, that the

2  2023 drag show special planned involved

3  invitations to nonstudents to participate in the

4  show, right?

5    A.    I know that now.

6    Q.    And you know that that is not what

7  Spectrum plans for the 20- -- 20- -- 2026 show,

8  right?

9    A.    Yes.

10    Q.    So that's the difference.

11         Do you know of any other differences

12  between the proposed 2023 drag show Spectrum

13  intended to hold and the 2026 drag show that

14  Spectrum intends to hold?

15    A.    I was not involved with the planning of

16  that drag show, so I cannot -- I -- I --

17  there's -- I -- I can't pick out differences

18  between the two.

19    Q.    Is there anybody in Spectrum now who was

20  involved in the planning of the 2023 drag show

21  that Spectrum intended to hold?

22    A.    I believe so.

23    Q.    Who is that?

24    A.    If -- possibly Izzy Fernandez.  Possibly.

25  I don't know for a fact.

1    Q.    Aside from Izzy Fernandez, is there

2    anyone in the current membership with Spectrum who

3    participated in the planning of the

4    Spectrum-proposed 2023 drag show at Legacy Hall?

5    A.    I do not know.

6    Q.    Is Ms. Fernandez involved in the planning

7    of the proposed 2026 Spectrum drag show that

8    Spectrum wants to hold at Legacy Hall in late

9    April?

10    A.    Yes, she is.

11    Q.    And will that be shortly before she

12    graduates?

13    A.    Yes.

14    Q.    And what is the role of Izzy Fernandez in

15    planning that proposed Spectrum 2026 drag show?

16    A.    Well, she is a part of our council as our

17    secretary, and she wants to perform, so ...

18    Q.    In your answers today, you have made

19    references to what you describe as the, quote,

20    "political climate," unquote.

21            Could you explain what you mean by

22    that?

23    A.    So currently, politically, queer people

24    are under fire for a multitude of reasons, notably

25    religious reasons, which Spectrum stands against.

1    We do not promote any sort of hate speech or
2    unacceptance to the queer community due to any
3    reason, whether that be religious or personal or
4    anything like that.  We believe that all people
5    should be accepted and be free to live and be
6    happy.  Yes.
7        **Q.   When you say that queer people are,**
8    **quote, "under fire," unquote, what do you mean by**
9    **that?**
10       A.   Queer people's rights are at risk of
11   being taken away by the current administration,
12   both statewide and nationwide, which, once again,
13   Spectrum does not stand for or agree with.
14       **Q.   What rights do you -- are you referring**
15   **to?**
16       A.   So recently -- first of all, recently we
17   had the case for same-sex marriage being heard
18   again.  Obviously, luckily, it did not get
19   overturned.
20            We also have a lot of people like
21   transgender individuals, both adults and minors --
22   primarily minors -- that are starting to be
23   threatened with or losing the rights to their own
24   bodily autonomy and their right to present how
25   they would like to present.

1    Q.    Are you aware of any laws in Texas that

2    you would describe as taking away the rights of

3    queer people?

4    A.    We have -- recently there has been the

5    law against transgender individuals from using the

6    bathroom that they would like to use, that's

7    associated with their gender identity in schools

8    and government offices.

9    Q.    Any others?

10    A.    Not off the top of my head, no.

11    Q.    The answer or response to Interrogatory

12    Number 11 on page 29 refers to "the chilling

13    effect on a person of ordinary firmness."

14            Have you personally felt any chilling

15    effect as a result of anything that Dr. Thomas or

16    Dr. Wendler have done?

17    A.    Yes.

18    Q.    Would you explain that?

19    A.    As a queer person myself, knowing that

20    the president of the university that I attend and

21    I enjoy attending has political views that go

22    against directly who I am as a person and how I

23    choose to present is very scary, it's stressful

24    knowing that at any given time, the president

25    could impose something that could impede me from

1    attending school and passing my classes and

2    thriving as an individual.

3        Q.   What do you fear that Dr. Wendler might

4    do that would prevent you from attending classes

5    or otherwise progression at WT?

6        A.   So for one, as I said, I'm a transgender

7    man.  I have been out for about five or six years

8    now.  I have -- I take hormones.  I've gotten my

9    name legally changed.  So obviously, I'm trying to

10    assimilate into society as a man as much as I can.

11    That includes living in male dormitories.

12            I do worry quite often that that

13    right for me to stay in those places could be

14    taken away, and I would be forced to either, A,

15    stay at a dormitory where I do not present female

16    at all or just not even be allowed to stay in the

17    dormitories which I have to.

18            So it's scary.  It's very scary.  And

19    it sucks.  And it's one of those things where that

20    basic right shouldn't be something that I should

21    have to worry about when I have a degree I'm

22    trying to get.

23        Q.   Okay.  You had said something about

24    fearing that Dr. Wendler would somehow prevent you

25    from attending classes or getting an education at

1  WT.

2        Did you mean by that anything other

3  than what you just described in your answer?

4   ██    ███████████████████████████

5  █████████████████████████████████████

6  ███████  ████████████████  █████████████

7  █████████████  █████████████████████████

8  █████████████████  █████████████████████████

9  █████████████████████████████

10  ████████████████████████████████████████

11  ████████████████████████████████████████

12  ████████████████████████████████

13        Q.   What do you know or think you know about

14  Dr. Wendler's political beliefs?

15        A.   I know quite a lot, primarily through his

16  weekly and biweekly e-mails that he sends out

17  regarding different views he has on different

18  things.  So I'd say I have a pretty decent amount

19  of knowledge regarding that.

20            It's not private information.  It's

21  public.  Everyone receives these e-mails.  And not

22  just me, but other members of Spectrum have also

23  expressed that these e-mails and some of the

24  things that he has said in them make them

25  uncomfortable and make them feel anxious about

1    their future, not only at WT, but just in society

2    as a queer person.

3        **Q.   Okay.  I was asking you about Spectrum's**

4    **response to Interrogatory 11, page 29.  And it**

5    **refers to "the chilling effect on a person of**

6    **ordinary firmness."**

7                **Has Dr. Thomas taken any action**

8    **that -- that has caused you to refrain from**

9    **expressing yourself?**

10       A.   Not Dr. Thomas, no.

11       **Q.   Has Dr. Wendler taken any action that**

12   **causes you to refrain from expressing yourself in**

13   **any way?**

14       A.   Banning drag shows.

15       **Q.   So it's this thing that happened in March**

16   **of 2023?  Or is there anything, since you've been**

17   **at WT, that Dr. Wendler has said, that has had a**

18   **chilling effect on you personally?**

19       A.   Yes, through his e-mail chains.  Yes.

20       **Q.   Okay.  What e-mail chains are you**

21   **referring to?**

22       A.   So he releases weekly or biweekly --

23   like, I don't even know how to describe them.

24   Sort of, like, letters that go out to everyone at

25   the University.  And they just kind of express his

1   personal views.

2            They have included things such as

3   talking about how, you know, religion should be at

4   the forefront.  Different -- how different things

5   are at odds with that.

6            And also, just knowing that he banned

7   drag shows and the different reasonings that he

8   expressed through that just -- in general, just

9   leaves a bad taste in my mouth, personally, and a

10  lot of other members of Spectrum.

11       **Q.   Okay.  And my question was a little more**

12  **specific about anything -- any expression of**

13  **yourself that Dr. Wendler has chilled, if you**

14  **understand what that means.**

15       A.   Can you explain what that means.

16       **Q.   Sure.  In general -- and your attorney**

17  **can explain further, if he wishes -- in general,**

18  **chilling means it makes you not willing to say or**

19  **do something that you would otherwise say or do**

20  **because of fear of consequences.**

21            **So is there anything that you --**

22  **since you've been at WT, that you have been**

23  **deterred or discouraged from saying or doing by**

24  **reason of anything Dr. Wendler has said or done?**

25       A.   Not me, personally.  I'm a very outspoken

1  individual, but there are other members of

2  Spectrum who have felt as though they can't fully

3  express their views as being a queer person and

4  things like that for fear of retaliation.

5      **Q.   Do you believe that it's inappropriate**

6  **for Dr. Wendler to express his religious beliefs?**

7      A.   No, I do not.

8      **Q.   Do you believe it is inappropriate for**

9  **Dr. Wendler to act on his religious beliefs in his**

10  **position as president of WT?**

11      A.   No.  Just as Spectrum would like to do

12  specific things, he's also protected under the

13  same rights that we are protected under, so he is

14  allowed to do these things.

15      **Q.   To your knowledge, has Dr. Wendler taken**

16  **any action that in any way jeopardizes Spectrum's**

17  **WT status as a recognized student organization at**

18  **WT?**

19      A.   No.

20      **Q.   Do you have any reason to believe that he**

21  **will do so or is likely to do so in the future?**

22      A.   Yes.

23      **Q.   What?**

24      A.   Due to his political beliefs and the way

25  that he has expressively shown his opinions on

1    queer people, I have reason to believe and

2    Spectrum has reason to believe that he could at

3    any moment take away Spectrum's ability to be a

4    recognized organization on campus.

5        **Q.   Okay.  And specifically, what has**

6    **Dr. Wendler said that causes you to believe that**

7    **at any moment he could take away Spectrum's status**

8    **as a recognized student organization at WT?**

9        A.   The first thing was banning drag shows as

10   a whole in general to start.  And then secondly,

11   with said -- said university-wide e-mail threads

12   and chains and also just general knowledge of

13   Dr. Wendler's position on queer people, it is --

14   it is very fair to believe that that could be the

15   case.

16       **Q.   Okay.  What do you know of Dr. Wendler's**

17   **position on queer people?**

18       A.   Dr. Wendler is not super supportive of

19   queer people.

20       **Q.   Okay.  Anything else?**

21       A.   No.

22       **Q.   Do you know of anything that Dr. Chris**

23   **Thomas has done to injure or threaten Spectrum?**

24       A.   (No response.)

25       **Q.   Do you have any understanding as to why**

1  Spectrum is suing Dr. Thomas?

2     A.   No, I do not.

3     Q.   Do you -- or does Spectrum, to your

4  knowledge, have any reason to believe that

5  Dr. Chris Thomas made any decisions regarding

6  Spectrum's proposed drag show?

7              MR. MORRIS:  Objection; outside the

8        scope of the deposition.

9              You can answer, Mr. Fanelli.

10    A.   I mean, I'm assuming that Chris Thomas is

11 associated with Wendler, so obviously, he would

12 probably work with Wendler.  So possibly, but I

13 don't know for a fact, no.

14 BY MR. BRYANT:

15    Q.   Do you know what Dr. Wendler's state of

16 rationale was for canceling the proposed drag show

17 at Legacy Hall in 2023?

18    A.   Yes.

19    Q.   Okay.  Could you describe what

20 Dr. Wendler said was his main reason for canceling

21 the drag show?

22              MR. MORRIS:  Objection; calls for

23        speculation.

24    A.   I don't know exactly.  All I know is what

25 was said, and what was said was that he equated

1  drag shows to blackface as well as being demeaning

2  to women.

3  BY MR. BRYANT:

4      **Q.   Okay.  Do you have any reason to believe**

5  **that Dr. Wendler was not being sincere in stating**

6  **that rationale, even if you don't agree with it?**

7      A.   I don't -- it does not feel very sincere,

8  no.  It feels like grasping at straws.

9      **Q.   Okay.  Could you explain why you feel**

10  **he'd -- why it seems to you like grasping at**

11  **straws?**

12      A.   So for one, I don't know if he has ever

13  been to a drag show.  Also, drag shows are in --

14  are -- it's costume.  It's just doing stuff.  It's

15  having fun.  And if someone doesn't like it, then

16  just do not go to event.  It is as simple as that.

17          And just it -- just trying to find

18  reasons like, "Oh, it's demeaning to women."

19          When -- where is proof of that?

20  Dr. Wendler is not a woman, so I don't know where

21  Dr. Wendler can express that.  It really just felt

22  like "Let's find reasons because I don't like gay

23  people very much."

24      **Q.   You had testified earlier that you had**

25  **not been to a drag show before last week?**

1    A.    No.  I had not been to one, but I have

2    watched "Drag Race."  I've seen them on TV, but I

3    hadn't been to one in-person.

4    **Q.    You had -- before you actually attended a**

5    **drag show, did you have views about drag shows or**

6    **opinions about drag shows?**

7    A.    I mean, as a queer person, I think

8    it's -- it's an important art form in our

9    community.  It's a way that we use to express

10   ourselves as colorfully as we would like to.  It's

11   a way to have fun.

12            So obviously, yes, I did have views

13   beforehand.  Yes.

14   **Q.    And so you're the same as Dr. Wendler in**

15   **the sense that you had views on drag shows before**

16   **you had attended one, and he has views on drag**

17   **shows, although he has not attended one.  Is that**

18   **fair?**

19            MR. MORRIS:  Objection; calls for

20       speculation.

21   A.    I mean, possibly.  I don't know for sure,

22   though.

23            MR. BRYANT:  Okay.  I think we're

24       at noon.  Let's take a lunch break.

25            MR. MORRIS:  Works for me.

1          MR. BRYANT:  Let's do that.  Thank

2    you.

3          Let's go off the record.

4          THE VIDEOGRAPHER:  We're off the

5    record at 12:02.

6

7          (A lunch recess taken from 12:02 p.m.

8           to 12:44 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  AFTERNOON SESSION
 2              THE VIDEOGRAPHER:  Back on the
 3         record at 12:44.
 4              EXAMINATION (CONTINUED)
 5   BY MR. BRYANT:
 6        Q.    Mr. Fanelli, do you expect to be a
 7   witness at trial in this case?
 8        A.    Can you repeat that?
 9        Q.    Do you expect to be a witness at the
10   trial of this case?
11        A.    Possibly.
12        Q.    Do you live in a dorm at West Texas?
13        A.    I do.
14        Q.    And has that been true throughout the
15   period that you've attended West Texas, beginning
16   in the fall of 2023?
17        A.    Yes.
18        Q.    What dorm do you live in?
19        A.    Currently Jones.
20        Q.    Okay.  You testified earlier that you
21   have long had your eye on going to West Texas A&M.
22              Are you familiar with the core values
23   of West Texas A&M?
24        A.    Somewhat, yes.
25        Q.    Do you agree with them, to the extent you
```

1  know them?

2      A.   Yeah.

3              (Exhibit 3 marked.)

4  BY MR. BRYANT:

5      Q.   Let me hand you what's been marked as

6  Fanelli Exhibit 3.

7      A.   (Examined exhibit.)

8      Q.   Could you describe what this exhibit is?

9  Take whatever time you need to review it.

10      A.   (Examined exhibit.)  It seems to be an

11  article over West Texas and its general values.

12  It's looks like Dr. Wendler also is mentioned here

13  as well.

14      Q.   Okay.  Have you ever seen this document

15  before or a similar document?

16      A.   I've never seen this document before, no.

17      Q.   Okay.  On the second page of Fanelli

18  Exhibit 3, there is a list of values introduced by

19  "The University's core values are reflective and

20  responsive to the people WT serves."

21              Now, the first is "Academic Freedom:

22  The free exchange of ideas."

23              Do you agree that that's a core value

24  of West Texas A&M?

25              MR. MORRIS:  Objection; outside the

1          scope.  And I'll just keep a running

2          objection to this document on that basis.

3                  Go ahead and testify, Mr. Fanelli.

4     A.   I -- I mean, I would say so.

5  BY MR. BRYANT:

6     Q.   Okay.  The next core value listed is

7  "Service: Putting the needs of others first."

8              Would you agree that that's a core

9  value that West Texas A&M's aspires to?

10    A.   I would say so.

11    Q.   The next core value is "Pragmatism: They

12 seek to apply what they learn for the betterment

13 of the community."

14             Is that a core value of West Texas

15 A&M that the university aspires to?

16             MR. MORRIS:  Objection;

17       speculation.

18    A.   I mean, just throughout -- I -- I would

19 say yes.  I'm just not sure what this is applying

20 to exactly.

21 BY MR. BRYANT:

22    Q.   Okay.  The next core value listed is

23 "Innovation: They embrace better ways to shape the

24 future."

25             Would you agree, based on your

1  two-plus years of attendance at WT, that that is a

2  core value of West Texas A&M?

3             MR. MORRIS:  Same objection, calls

4      for speculation.

5      A.   I -- yes.

6  BY MR. BRYANT:

7      Q.   Okay.  And the next core value is

8  "Respect."  Quote, "They treat others with dignity

9  which flows from the humanity of each individual,"

10 unquote.

11            Would you agree that that is a core

12 value of West Texas A&M that it aspires to?

13             MR. MORRIS:  Same objection.

14     A.   Yes.

15 BY MR. BRYANT:

16     Q.   And the final core value listed is

17 "Engagement: They promote citizenship in being

18 part of something larger than oneself."

19            Is that a core value of West Texas

20 A&M that it aspires to based on your two-plus

21 years of attendance at the university?

22             MR. MORRIS:  Same objection.

23     A.   Yes.

24            (Exhibit 4 marked.)

25 BY MR. BRYANT:

 1      Q.   Let me hand you what's been marked as

 2  Fanelli Exhibit 4.  Please review Fanelli

 3  Exhibit 4.

 4      A.   (Examined exhibit.)

 5      Q.   Have you ever seen Fanelli Exhibit 4 or a

 6  similar document describing West Texas A&M

 7  University's mission, vision, and core values?

 8      A.   Yes, a while ago, again.

 9      Q.   Okay.  And do you see that the same six

10  core values are listed in Fanelli Exhibit 4 as in

11  Fanelli Exhibit 3?

12      A.   Yes.

13      Q.   And so do you see again that "Respect" is

14  listed as a core value of West Texas A&M?

15      A.   Yes.

16      Q.   And it states, (as read) "We treat each

17  others with" -- "each others" -- I'm sorry.

18  Strike that.

19           It says, (as read) "We treat each"

20  other -- "others with dignity which flows from the

21  humanity of each individual."

22           What do you understand that term, "to

23  treat others with dignity," to mean?

24           MR. MORRIS:  Objection.  It's

25      outside the scope of the topics for which

```
 1        Mr. Fanelli has been designated.  Also

 2        calls for speculation.

 3             You can answer in your personal

 4        capacity, John.

 5    A.   I mean, respect is just a basic human

 6 right.  It's human decency just to treat others

 7 how you would like to be treated.  Love thy

 8 neighbor.  It's as simple as that.

 9 BY MR. BRYANT:

10    Q.   And is that a value that you believe in

11 personally?

12    A.   Yes.

13    Q.   And is that a value that Spectrum lives

14 by as well.

15    A.   Yes.

16             (Exhibit 5 marked.)

17 BY MR. BRYANT:

18    Q.   Let me hand you what's been marked as

19 Fanelli Exhibit 5.

20    A.   (Examined exhibit.)

21    Q.   Have you seen Fanelli Exhibit 5 or a

22 similar document before?

23    A.   Yes.

24    Q.   And does Fanelli Exhibit 5 also list the

25 core values of West Texas A&M University?
```

1      A.   Yes.

2      Q.   And I can see from this document that

3 those -- the first letters of each of those values

4 spell the word "aspire."

5           Do you see that?

6      A.   Yes.

7      Q.   Okay.  And do you see that in Fanelli

8 Exhibit 5, "Respect" is a core value of West Texas

9 A&M, just as in Exhibits 3 and 4?

10     A.   Yes.

11          (Exhibit 6 marked.)

12 BY MR. BRYANT:

13     Q.   I want to hand you what's been marked as

14 Fanelli Exhibit 6.

15          Can you identify Fanelli Exhibit 6

16 after you take whatever time you need to to review

17 it?

18     A.   Yes.  This is Spectrum's constitution.

19     Q.   And is that --

20          MR. MORRIS:  I'm just going to ask

21      the witness to review the document.  Take

22      your time to review.

23     A.   (Examined exhibit.)

24 BY MR. BRYANT:

25     Q.   Yeah.  And take as much time as you need

1  to review it, but my question will be whether that

2  is the current constitution of Spectrum WT, the

3  plaintiff in this action?

4      A.   (Examined exhibit.)  Yes.

5      Q.   Has this constitution been changed at any

6  time that you have been a student at WT?

7      A.   We reviewed it when I first became

8  president.  We didn't end up implementing any

9  crazy changes, other than a few grammatical

10 wordings.

11     Q.   So is it fair to say that during the time

12 that you've been at WT, there have been no

13 substantive changes to the constitution of

14 Spectrum that is Fanelli Exhibit 6?

15     A.   No.

16     Q.   Is it fair to say that?  "No" or "yes"?

17     A.   No.  We haven't changed it significantly

18 since I became president.

19     Q.   All right.  On the second page of Fanelli

20 Exhibit 6 in Article 3, Section 1 is introduced by

21 saying, "To maintain a safe and comfortable

22 atmosphere for every member, a Code of Conduct is

23 to be followed."

24          What do you understand the word

25 "safe" to mean in the context of the constitution

1  of Spectrum?

2      A.   In this case, "safe" is just somewhere to

3  feel comfortable and not to feel as though they're

4  being hurt or attacked.  It's more of a mental

5  safeness.

6      Q.   Okay.  It's not just limited to physical

7  safety, right?

8      A.   It's not just limited to that, though,

9  but obviously, we would -- we are sure to make

10  sure that all our members are physically safe as

11  well.

12      Q.   Yes.  But you want to go beyond physical

13  safety and provide an atmosphere in which people

14  don't feel like they are being mocked or

15  disrespected?

16      A.   Yes.

17      Q.   Okay.  And in order to achieve that, is

18  part of the Code of Conduct of Spectrum that that,

19  quote, "No racist, homophobic, xenophobic, or

20  hateful slurs or derogatory comments are to be

21  permitted at any time," end quote?

22      A.   Yes.

23      Q.   And in the -- that Section 1(b), there is

24  a reference to, quote, "hateful," unquote, slurs.

25              What do you understand the term

1  "hateful" to mean there?

2       A.   Hateful can -- is, in this term, in this

3  case, is just using a term in a way that is in

4  order to attack or to demean another party.

5       Q.   And, again, with the -- with the word

6  "attack," you don't limit that to physical

7  attacks, but does it have a broader meaning?

8       A.   Yes.

9       Q.   Could you explain that meaning?

10       A.   Mental or physical.  Just calling someone

11  a mean name is not permitted.

12       Q.   Would you include in -- would you include

13  misogynistic slurs as hateful slurs?

14       A.   Yes.

15       Q.   And Spectrum is against misogynistic

16  verbal and physical conduct?

17       A.   Yes.

18              (Exhibit 7 marked.)

19  BY MR. BRYANT:

20       Q.   Let me hand you what's been marked as

21  Fanelli Exhibit 7.

22       A.   (Examined exhibit.)

23       Q.   Have you seen Fanelli Exhibit 7 before?

24  And please take whatever time you want to take to

25  review Fanelli Exhibit 7 before you answer the

1    question.

2        A.    Yes, I have seen this before.

3        Q.    And what is it?

4        A.    It is Wendler's statement on the drag

5    show bans.

6        Q.    Okay.  On the second page of Fanelli

7    Exhibit 7, beginning at the first full paragraph,

8    Dr. Wendler stated, "WT endeavors to treat all

9    people equally.  Drag shows are derisive,

10   divisive, and demoralizing misogyny, no matter the

11   stated intent."

12            I assume you don't personally agree

13   with that statement; is that right?

14       A.    No, I do not.

15       Q.    Okay.  And is it your conclusion that no

16   one could believe that sincerely?

17       A.    I mean, if someone does, that's their --

18   that's their personal choice.  But both Spectrum

19   and I do not believe and do not intend that to be

20   the case.

21       Q.    If I understand you correctly -- your

22   answer correctly, you recognize that other people

23   may perceive drag shows just having

24   characteristics even that Spectrum did not intend?

25       A.    Yes.  This can go for a multitude of

1   things including, but not limited to -- for

2   instance, if we are to look at the first page,

3   we -- I see that Wendler here is being -- is

4   discussing being created in God's image in the

5   basis of natural law, which is a common tactic

6   used by people who are against the LGBTQ+

7   community, and they are using religion to go

8   against that.  Obviously, this is another personal

9   opinion of Wendler.  It's not fact.

10          So in that same case, as I'm saying

11  here, Spectrum, we are against misogyny.  We are

12  against any sort of hateful -- any -- any sort of

13  hateful language at all.  It would never, under

14  any circumstance, condone anything like that at

15  all.  If someone sees it as that way, simply don't

16  go to the performance.  Just don't.

17          And as I've said before, with Wendler

18  banning a very central part of queer culture is a

19  direct -- a direct harmful attack on the community

20  that Spectrum does not stand for.

21  **Q.   Okay.   If I understand your answer**

22  **correctly, you acknowledge that, regardless of**

23  **Spectrum's intent, some people may view drag**

24  **shows -- and specifically Spectrum's drag shows --**

25  **as misogynistic; is that correct?**

1    A.    Possibly, but once again, I'm not them,

2    so I don't know.

3    **Q.    And similarly, people may express**

4    **religious views that they do not intend to be**

5    **viewed as disrespecting the LGBTQ community but**

6    **may be perceived as such.**

7    **Do you agree with that?**

8    A.    Yes.

9    **Q.    Later in that same paragraph on the**

10   **second page of Fanelli Exhibit 7, Dr. Wendler**

11   **states, "I do not support any show performance or**

12   **artistic expression which denigrates others."**

13   **Do you agree with that statement, as**

14   **far as I've read it?**

15   A.    Yes.    Spectrum does not support

16   denigrating any -- any -- any group or person

17   individually at all.

18   **Q.    Okay.    In looking down at the last full**

19   **paragraph on the second page of Fanelli Exhibit 7,**

20   **Dr. Wendler stated, quote, "Mocking or**

21   **objectifying in any way members of any group based**

22   **on appearance, bias, or predisposition is**

23   **unacceptable," unquote.**

24   **You agree with that statement?**

25   A.    Yes, I do.

```
 1        Q.   The last paragraph of Fanelli Exhibit 7
 2   on the third page states, "Offering respect, not
 3   ridicule, is the order of the day for fair play
 4   and is the WT way."
 5             Do you agree with that statement?
 6             MR. MORRIS:  Objection; calls for
 7       speculation.
 8        A.   Yes.
 9   BY MR. BRYANT:
10        Q.   Thank you.
11             (Exhibit 8 marked.)
12   BY MR. BRYANT:
13        Q.   Let's look at what I've marked as Fanelli
14   Exhibit 8 briefly.
15        A.   (Examined exhibit.)
16        Q.   Have you seen Fanelli Exhibit 8 or a
17   similar document before?
18        A.   Yes.
19        Q.   Was this an e-mail that Dr. Wendler sent
20   out at a time when you were a student at WT?
21        A.   Yes.
22        Q.   And did you receive this around
23   March 2024?
24        A.   Yes.
25        Q.   In the next-to-last paragraph of Fanelli
```

```
 1   Exhibit 8, Dr. Wendler mentions something called
 2   "S.B. 12."
 3              Do you see that?
 4   A.   Yes.
 5   Q.   Do you have any understanding as to what
 6   "S.B. 12" is?
 7              MR. MORRIS:  Objection.  I'll just
 8       caution the witness not to reveal any
 9       attorney/client privileged communications.
10              You can answer, to the extent you
11       don't reveal those communications,
12       Johnathan.
13   A.   Yes.
14   BY MR. BRYANT:
15   Q.   What's your understanding?
16   A.   It has to do just with a court case in
17   general.  I'm not sure exactly the direct wording
18   of it, though.
19   Q.   Okay.  And I understand you're not a
20   lawyer, and I would not expect you to have a --
21   any kind of technical legal understanding.
22              Do you have a general understanding
23   here?
24   A.   Yes.  On --
25   Q.   What's your general understanding?
```

```
 1      A.   It bans drag shows from WT campuses as
 2   well as the -- like, the A&M system.
 3      Q.   Okay.  Let's look at the last paragraph
 4   of Fanelli Exhibit 8.  Dr. Wendler said, quote,
 5   "When the court makes a final decision, it will be
 6   implemented," unquote.
 7           Did you understand from that that
 8   Dr. Wendler intended to abide by whatever final
 9   court decision comes out of this litigation?
10      A.   Yes.
11      Q.   Do you have any reason to believe that
12   that's not true?
13      A.   I mean, you know, he could possibly at
14   any moment change his opinion.  Opinions change.
15   And just knowing Wendler's overall opinion on it,
16   I -- I don't see that as not being a possibility.
17      Q.   Well, is that any different than anyone
18   else who can change their mind?
19      A.   I mean, anyone could change their mind.
20   I'm not saying you're allowed to.  I'm just
21   saying --
22      Q.   Do you have any reason to --
23           MR. MORRIS:  Please let the witness
24      finish his answer, Mr. Bryant.
25      A.   I would just say that that is a
```

 1  possibility.

 2  BY MR. BRYANT:

 3      Q.   And do you have any reason to believe

 4  that Dr. Wendler will not fully comply with any

 5  order that the Court in this case or in any other

 6  case chooses to make?

 7      A.   Yes, due to his personal religious

 8  beliefs.

 9      Q.   Do you have any information that

10  Dr. Wendler has ever let his personal beliefs

11  override his obligation to obey court orders in

12  the past?

13      A.   To obey constitutional orders?  Yes.

14      Q.   Okay.  What does that mean?

15      A.   Okay.  Well, we all have the ability of

16  free speech and the freedom to do all -- we live

17  in America.  We're free to do a lot of incredible

18  things.  Him banning drag shows directly goes

19  against our ability to have free speech and to

20  have the ability to express ourselves in that way,

21  so yes.

22      Q.   Dr. Wendler didn't ban Spectrum's ability

23  to have the drag show, other than at Legacy Hall,

24  did he?

25              MR. MORRIS:  Objection.

 1      A.    We are an on-campus organization.    We

 2  should be allowed to have our events on campus

 3  that we pay for.

 4  BY MR. BRYANT:

 5      Q.    My question is about what Dr. Wendler

 6  did.

 7            Did Dr. Wendler ever take any action

 8  to prevent Spectrum from having a drag show, other

 9  than in Legacy Hall?

10      A.    Not off campus, but on campus, yes, and

11  that is the problem.

12      Q.    Okay.  If I understand your answer

13  correctly, Dr. Wendler has never taken any action

14  to prevent Spectrum from having a drag show off

15  campus if it wants it; is that correct?

16      A.    Not -- yes, but he has used language in

17  the past that demeans drag shows, which is a

18  central part of queer culture.

19      Q.    Okay.  And has Spectrum ever asked to

20  have a drag show at any place on the West Texas

21  campus, other than Legacy Hall, to your knowledge?

22      A.    Yes.

23      Q.    What?

24      A.    Well, we've tried other venues, but since

25  it's banned on campus, you can't have it on

1    campus.  It's as simple as that.

2        Q.   What other venues on West Texas campus,

3    besides Legacy Hall, has Spectrum applied or

4    otherwise sought to use to hold a drag show?

5        A.   I do not know.

6        Q.   So you don't know of any other locations

7    on the West Texas campus that Spectrum has sought

8    to have a drag show, other than Legacy Hall?

9        A.   No, I do not.

10       Q.   Now, we saw in Fanelli Exhibit 7 that he

11   expressed the view that drag shows are

12   disrespectful or degrading to women.

13           Did you or anybody else at Spectrum

14   do anything to see whether that is a more broadly

15   held view than just Dr. Wendler?

16           MR. MORRIS:  Objection; vague and

17       ambiguous.

18       A.   I'm sure it is a popular view.  From what

19   I've seen, it is.  It -- as I said before -- is a

20   central part of queer culture.  There's not just

21   drag queens.  There are also drag kings, so does

22   that logic also stand with demeaning men as well.

23   BY MR. BRYANT:

24       Q.   I'm sorry.  I can't answer questions.  I

25   only can ask --

```
 1      A.    Yeah.  So --

 2      Q.    But my question is --

 3            MR. MORRIS:  Please let the witness

 4        finish.

 5      A.    But as I said, President Wendler, in this

 6  document, directly demeans drag shows, which are a

 7  central part of queer culture, which in tandem

 8  makes it clear that his views on queer people and

 9  queer culture he does not like or agree with,

10  which also makes it to where the queer community

11  at WT feels unsafe, because the president of WT

12  does not like our culture because he does not

13  understand it.  This is the problem.

14  BY MR. BRYANT:

15      Q.    Okay.

16      A.    Now, we have not gone forward --

17  obviously, I know that this is a somewhat popular

18  view.  I have family members who are also

19  homophobic and have these similar views with drag

20  shows saying they demean women.

21            The queer community as a whole does

22  not agree with this, because the queer community

23  as a whole lives to uphold all people of all

24  different races, all different genders,

25  sexualities, religions.
```

1          We are a welcoming community, so we
2  would not, on purpose, demean a group of people.
3      Q.   Without naming names, would you describe
4  the members of your family who regard drag shows
5  as demeaning to women?
6      A.   My mother is one.  That's the main one,
7  and it's disheartening.  It sucks a lot when
8  someone in your family just refuses to understand
9  something that is important to you.
10     Q.   Are there other family members who share
11 that view?
12     A.   Yes.  I have some uncles that do as well.
13     Q.   And you believe your mother holds the
14 view that drag shows are demeaning sincerely or
15 just because she is homophobic?
16     A.   I'm not my mother, so I don't know.
17          (Exhibit 9 marked.)
18 BY MR. BRYANT:
19     Q.   Let me hand you what's been marked as
20 Fanelli Exhibit 9.
21     A.   (Examined exhibit.)
22     Q.   This appears to be a article entitled,
23 "How drag degrades women," dated 25 February 2022.
24          Have you ever seen this article
25 before?

1    A.    No.

2    Q.    **Have you ever sought out any articles**

3    **that express the view that drag degrades women to**

4    **see whether you agree or disagree with them?**

5    A.    Yes.  When I am researching any topic, I

6    like to see all points.

7    Q.    **So what did you do to -- in that**

8    **research?**

9    A.    I just looked around to see where the --

10   a lot of -- a lot of my personal research just was

11   where do these article come from, what kind of

12   people write these articles, what is the general

13   consensus.  And it all kind of comes down to

14   one -- one general consensus, and it's a lack of

15   understanding.

16           As I said before, drag shows are a

17   essential part of queer culture.  And -- and there

18   are drag kings.  There are drag queens.  There are

19   people who identify as women who are queens.

20   There are people that identify as men who are

21   queens.  There are people that identify and vice

22   versa.

23           Gender within the LGBTQ+ community is

24   so incredibly broad.  And you can't just pin it

25   down to one thing.

1          So for a cisgender person to say,

2    "Hey, this is demeaning, it" -- obviously, that's

3    their opinion.  It's just simply not the case.

4        **Q.   My question was about what research you**

5    **have done regarding people who have the viewpoint**

6    **that drag demeans women.**

7              **Could you tell me more specifically**

8    **what you did?**

9        A.   I looked online for various articles

10   written by various different sources, most of

11   which being blogs -- like, personal blogs by

12   people.

13       **Q.   When did you do that?**

14       A.   I did this quite a while ago, around the

15   time when I was coming out as trans, and I was

16   facing backlash from my family due to it.  And to

17   try to just understand why they felt that way, I

18   did a lot of research to try to understand it.

19   Still to this day, I don't understand it.

20             I don't under -- I just don't

21   understand how someone could have such a sheer

22   lack of understanding for a different culture and

23   then use that as cannon fodder to forward their

24   own personal view.

25       **Q.   Okay.  My recollection is that you -- you**

1  came out about roughly six years ago; is that

2  right?

3      A.   Yes.

4      Q.   So approximately when, compared to that

5  event, was it that you did this research that you

6  described?

7      A.   Not long after I came out, really,

8  because it was immediate backlash.  I went through

9  a lot because of my gender and my sexuality.  And

10 I just wanted -- I just needed answers.

11     Q.   Okay.  So was that more than four years

12 ago --

13     A.   Yes.

14     Q.   -- that you did the research?

15     A.   Yes, but I still continue research to

16 this day to try to continue to still understand my

17 family members and also due to the current

18 political climate surrounding queer people.

19               (Exhibit 10 marked.)

20 BY MR. BRYANT:

21     Q.   Okay.  Let me hand you what's been marked

22 as Fanelli Exhibit 10.  Please take whatever time

23 you need to review Fanelli Exhibit 10.  And then

24 I'm going to ask you if you've ever seen this

25 before?

1      A.    (Examined exhibit.)   This is somewhat

2   familiar, yes.

3      Q.    Okay.   This appears to be a -- an article

4   dated June 2000, entitled, quote, "Drag =

5   Blackface," end quote, by Kelly Kleiman.

6            Do you believe that you have read all

7   or part of this at some time in the past?

8      A.    At some point, yes.

9      Q.    Now, this comparison of drag being

10  similar to blackface is an idea that Dr. Wendler

11  also expressed; is that right?

12     A.    Yes.

13     Q.    That was in Fanelli Exhibit 7's

14  March 2023 communication to the WT community?

15     A.    Yes.

16     Q.    Do you see any of reasonableness to that

17  comparison?

18     A.    Absolutely not.

19     Q.    Could you explain why?

20     A.    First of all, this is a very common --

21  common tactic for homophobic people to use to

22  demean, once again, as I I said, a central part of

23  queer culture.

24            The difference here is that gender is

25  fluid.   You can identify as you would like to

1    identify whenever you would like at any point in

2    time.  That is a very common core belief of the

3    queer community.

4              When you are a specific race, you

5    cannot change that.  You are one race.  And that's

6    just how it is.

7              Now, when someone is using an art

8    form to demean someone, it is on purpose.  It's

9    never on accident.  If someone wanted to demean

10   women, they would be doing it on purpose.  If

11   someone finds offense in something, that is

12   completely different.

13             When people in the queer community

14   are using drag to express themselves, in the case

15   of if you are to look at the origins of drag, a

16   lot of it was to express the feminine side of

17   themselves.  With gay men, around the time when

18   drag was first created and in general, they just

19   wanted to be able to freely express their gender

20   and how they would like to present to the world.

21   They were not in any way trying to do it in a way

22   to demean.

23             Now, there are cases where that could

24   be the case, where someone could be doing it and

25   demeaning women, but for Spectrum, that is never

1    the case and never will be the case.

2        Q.    Is it possible that beliefs that you

3    describe as core beliefs of the LGBTQ community

4    might not be correct?

5        A.    Can you repeat that.

6        Q.    Sure.  Is it possible that some core

7    beliefs of the LGBTQ community might be incorrect?

8        A.    I'm -- that they may not -- that the core

9    beliefs of the LGBTQ+ community may not be correct?

10       Q.    Yes.

11       A.    Are you meaning, like, in reference to

12   being queer was not correct, or are you

13   referencing -- what are you referencing?

14       Q.    Well, here's -- let me be kind of clear

15   about it.

16            In your previous answer, you said

17   something others believe is incorrect because what

18   you believe is one of the core beliefs of the

19   LGBTQ community.

20            And I want to see whether you're such

21   a believer in the LGBTQ community that you believe

22   their -- their core beliefs cannot be incorrect?

23       A.    So respect for other people could not be

24   correct?

25            That -- to my understanding, that is

1  a very central part of humanity in general that we

2  have also expressed earlier.  The LGBTQ+ community

3  is primarily built on respect and respecting

4  others' wishes on what they would like to be

5  called, how they would like to present, and who

6  they would like to be.  It's genuinely as simple

7  as that.

8          I mean, I -- as -- I don't know

9  everything.  I don't know what's -- what's truly

10  correct and what's truly incorrect.  None of us

11  do.  So realistically, I can't completely say what

12  is correct and what's not correct.  Everyone is

13  going to have different -- different views on the

14  world around them, and that is completely okay.

15          But Spectrum, as a whole, has

16  specific beliefs that we will believe and uphold,

17  regardless of if another party sees them as

18  incorrect.

19  **Q.  Another thing that you said in your**

20  **previous answer, I want to understand, you spoke**

21  **of gender fluidity.**

22          **And if I understood you correct, you**

23  **said that -- correctly -- said that each person**

24  **can choose where they want to be on the gender**

25  **spectrum at any time; is that right?**

1        A.    That is correct, yes.

2        **Q.    Okay.  I've heard other people in the**

3    **past express the view that regardless of the**

4    **physical body that we're born in, they had a**

5    **certain inherent gender that might not match their**

6    **physical body, but it was inherent and**

7    **unchangeable.**

8              **Have you heard people express that**

9    **view?**

10       A.    I have.  And it is incorrect.

11       **Q.    Okay.  And how do you know?**

12       A.    So in my extensive research regarding

13   trans people, being a trans person myself, there

14   have been extensive studies regarding the fact

15   that -- it's, like, one study that I like to cite

16   quite often is there was a study where they put

17   various people of different gender identities out,

18   and they studied their brain.  They noticed that

19   trans men had similar brain -- brain compositions

20   to cisgender males, and that trans women had

21   similar brain compositions is cisgender women, and

22   that they -- and that vice versa, a cisgender man

23   did not have similar brain composition and

24   function as a transgender woman.

25              And they also did -- they did this

1  not only with people who were already on hormones,

2  but people that were also preop, prehormone as

3  well.  That is science.  So if we're arguing on

4  the basis of science, then, yes, you can be

5  whatever gender, you and your mind decides that

6  you are.

7            And then you also have people who are

8  intersex where gender is extremely complicated,

9  and you can't pinpoint one gender, because they're

10  not just one gender.  They're multiple, whether

11  that be because of their chromosomes or their

12  brain chemistry or their physical body.  Gender is

13  extremely complex and always will be extremely

14  complex.

15  **Q.   Okay.  And your answer there describing**

16  **some studies that you are familiar with, you used**

17  **the term "brain composition."**

18  **            Could you explain more specifically**

19  **what you mean by "brain composition" in that**

20  **context?**

21  A.   So as different genders, you have

22  different amounts of brain function in different

23  areas at different times.  So like, for instance,

24  men tend to have more when it comes to things like

25  decision-making and, like, here and now sort of

1    things as well as sex drive and similar things.

2    And women tend to have more on the emotional side

3    and et cetera, et cetera.

4            And this has just kind of just been a

5    common thing that has been found between

6    scientists for many years now.  This study is

7    somewhat new.  Because as, you know, being trans

8    is not a new thing, but it being normalized to be

9    trans is a new thing.

10           So there have been a lot more studies

11   towards this specific issue.

12   **Q.   Okay.  When you used the term "brain**

13   **composition," are you talking about chemical**

14   **composition, or are you talking more about the**

15   **morphology of the brain?**

16   A.   It's a mixture of both.

17           (Exhibit 11 marked.)

18   BY MR. BRYANT:

19   **Q.   Let me hand you what's been marked as**

20   **Fanelli Exhibit 11.**

21   A.   (Examined exhibit.)

22   **Q.   Please take whatever time you need to**

23   **review this document and tell me if you have seen**

24   **it before.**

25   A.   I have not seen it before now, no.

1      Q.    Okay.

2      A.    (Examined exhibit.)

3      **Q.    On the fourth paragraph of this Fanelli**

4  **Exhibit 11, there is -- beginning of the fourth**

5  **paragraph, there is a phrase in quotes -- comma, a**

6  **quote, "Comedic performances of women by men in**

7  **exaggerated costumes and make-up," unquote.**

8           **Is that something that you do see in**

9  **drag shows or drag culture?**

10     A.    I mean, possibly, but primarily, what is

11  seen in drag shows is just a celebration of one's

12  own gender and one's own presentation.  Sometimes

13  someone just wants to get on stage and just feel

14  pretty for a little bit, and that's okay.

15           Blackface is and always has been a

16  way to demean a race of people.  As I said before,

17  it is entirely possible that someone can go and

18  make fun of women and dress in a female costume.

19  That's just with anything.

20           But with drag, that is not the

21  intention.  It is a way to express one's gender

22  and one's presentation, not to make fun of a

23  specific group of people.

24           (Exhibit 12 marked.)

25  BY MR. BRYANT:

1    Q.   Let me show you what's been marked as

2   Fanelli Exhibit 12.  Why don't you take whatever

3   time you need to review Fanelli Exhibit 12.  And

4   I'm really talking about the article that begins

5   at the bottom of the first page of Fanelli

6   Exhibit 12, entitled, "Is Drag Misogynistic," an

7   article that appears to be dated October 7, 2019,

8   by M.K. Fain, F-a-i-n.

9             Could you take a look at that, and

10   when you have reviewed it, tell me whether you

11   have seen this article before.

12    A.   Yes, I have seen this article before.

13    Q.   And did you see it in your research that

14   you described earlier?

15    A.   Yes.

16    Q.   The author expressed the view in the

17   first paragraph of the article, which is actually

18   on the second page of the exhibit, quote, "The

19   truth is gay men have been getting away with

20   misogyny since the start of the gay liberation

21   movement," unquote.

22             Do you believe that that has any

23   validity at all?

24    A.   Both gay and straight men are capable and

25   have been capable of extreme misogyny, yes.

```
 1              (Exhibit 13 marked.)
 2   BY MR. BRYANT:
 3      Q.   Let me show you what's been marked as
 4   Fanelli Exhibit 13.  Now, I do want to advise you
 5   that this is a -- obviously a partial document.
 6   It includes a cover page, and then it includes
 7   paragraph 4 of that document.
 8              Have you seen the procedures and
 9   guidelines for the Jack B. Kelley Student Center
10   at West Texas A&M University before?
11      A.   Yes, I have.
12      Q.   And this one states that it is -- at the
13   bottom of the first page -- that it is revised
14   March 5th, 2025.
15              Have you seen the version of this
16   procedures and guidelines publication that is
17   currently in effect in December 2025?
18      A.   Yes.
19      Q.   Okay.  And is this the procedures and
20   guidelines pursuant to which Spectrum is seeking
21   to hold a April 2026 drag show?
22      A.   Yes.
23      Q.   Now let's look at the bottom of the
24   second page of Fanelli Exhibit 13.
25              The next-to-last paragraph states,
```

1  "The JB Kelley Student Center staff reserves the

2  right to deny space usage for any group/event that

3  has programmatically or operationally impractical

4  to accommodate or that conflicts with the

5  University's mission or policies."

6          Have you read that language before?

7      A.   Yes.

8      Q.   And what do you understand the term that

9  conflicts -- quote, "that conflicts with the

10 University's mission or policies," unquote, what

11 do you understand that means?

12     A.   It just conflicts with -- it's very

13 direct.  It conflicts with the university's

14 policies which we have discussed in length.

15     Q.   And so you understand and have

16 understand -- understood that an event that

17 conflicts with the university's mission or

18 policies is something that may be disallowed?

19          MR. MORRIS:  Objection; calls for

20     speculation.

21     A.   Yes.

22 BY MR. BRYANT:

23     Q.   The next paragraph says, quote, (as read)

24 "The" JPK -- "JBK Student Center reserves the

25 right to cancel or interrupt any event in the

1    interest of public safety, noncompliance with

2    university policies, or if the event can be viewed

3    as inappropriate or not consistent with the

4    mission of West Texas A&M University," unquote.

5              And have you seen that language in

6    the JBK student policies and procedures before?

7       A.   Yes.

8       Q.   **And you understand that that applies to**

9    **Spectrum like it does to any other student**

10   **organization?**

11      A.   Yes.

12      Q.   **And you understand that West Texas A&M**

13   **University has the right to cancel or interrupt**

14   **any event if the event can be viewed as**

15   **inappropriate or not consistent with the mission**

16   **of West Texas A&M University?**

17              MR. MORRIS:  Objection; calls for

18        speculation.

19      A.   Yes.

20   BY MR. BRYANT:

21      Q.   **And is Legacy Hall a part of the Jack B.**

22   **Kelley Student Center at West Texas A&M University**

23   **and subject to these procedures and guidelines?**

24      A.   Yes.

25              (Exhibit 14 marked.)

App. 286

1  BY MR. BRYANT:

2      **Q.   Let me hand you what's been marked as**

3  **Fanelli Exhibit 14.**

4      A.   (Examined exhibit.)

5      **Q.   Have you seen Fanelli Exhibit 14 before?**

6  **And please take whatever time you need to to**

7  **review the document before you answer the**

8  **question..**

9      A.   Yes, I have seen this before.

10     **Q.   What do you understand Fanelli Exhibit 14**

11 **to be?**

12     A.   This is just the guidebook that

13 organizations on campus use.  It contains

14 policies.  It contains different standards that we

15 need to follow.  Yeah.

16     **Q.   And on the first page of Fanelli**

17 **Exhibit 14, there is a section -- or a paragraph**

18 **entitled, quote, "Privileges," unquote.**

19              **Do you see that?**

20     A.   Yes.

21     **Q.   And it states that one of the privileges**

22 **of a campus organization is, quote, "Access to**

23 **campus facilities," unquote.**

24              **Do you see that?**

25     A.   Yes.

1    Q.    And do you understand that access to

2    campus facilities by Spectrum is a privilege?

3    A.    Yes.

4    Q.    And do you understand that access to

5    campus facilities for Spectrum is not a right?

6              MR. MORRIS:  Objection; calls for

7         speculation, mischaracterizes the

8         document.

9    A.    I mean, it's a privilege, but I would

10   assume it's a right as an organization to be able

11   to use these facilities that we pay for.

12   BY MR. BRYANT:

13   Q.    Does your organization pay for Legacy

14   Hall?

15   A.    No, but as a student, we pay dues to the

16   university, so we should be allowed to use these

17   facilities.

18   Q.    Why do you assume that it's a right for

19   Spectrum to have access to campus facilities when

20   the campus organization handbooks tell -- tells

21   you that it is a privilege?

22             MR. MORRIS:  Objection;

23        mischaracterizes the document.

24             You can answer.

25   A.    So we have these privileges here as being

1   a registered group.  Why would we not be allowed

2   to have these privileges if we are a registered

3   group that the University approved and that we, as

4   students, pay for to use these facilities?

5   BY MR. BRYANT:

6      **Q.   Again, I can't answer the questions.  I**

7   **have to ask them.**

8           **But my question was about why would**

9   **you believe that Spectrum has a right to access**

10  **the campus facilities when the campus**

11  **organizations handbook said -- describes access to**

12  **campus facilities as a privilege?**

13          MR. MORRIS:  Same objection.

14     A.   As -- as an organization on campus, in

15  order to host events, in order to do literally

16  anything, we have to have access to campus

17  facilities, or we are simply not an organization

18  on campus.

19  BY MR. BRYANT:

20     **Q.   Do you understand there to be any**

21  **different or distinction between a privilege and a**

22  **right?**

23     A.   Yes, but --

24     **Q.   What --**

25     A.   -- this document feels very vague.  This

 1  document feels very vague in that.

 2      Q.   What do you understand to be the

 3  distinction or difference between a privilege and

 4  a right?

 5      A.   A right is a nonnegotiable, and a

 6  privilege can be negotiable, but in this case, it

 7  seems as though it should be labeled as a right.

 8      Q.   Okay.  So you think that the campus

 9  organization handbook has mislabeled what Spectrum

10  believes to be its right as a privilege?

11      A.   I feel as though it's very, very, very

12  broad in that and that it can really be read as

13  either/or, for my personal understanding of the

14  document.

15      Q.   Okay.  Let's look at the fourth page of

16  the document under the general heading, quote,

17  "Reserving University Facilities."

18               Do you see that on Fanelli

19  Exhibit 14?

20      A.   Yes.

21      Q.   Okay.  And you see there's three boxes

22  under the term "event process timeline"?

23      A.   Yes.

24      Q.   First one is "Virtual EMS Request

25  (hold)."  It says, "When you submit your

App. 290

 1   reservation, starting April 1st, at the beginning

 2   of the academic year, it's only a request.  It

 3   will remain in virtual EMS (hold) status until we

 4   are sure there are no other conflicting events in

 5   that space."

 6              Is that the current status of

 7   Spectrum's application or request with respect to

 8   the 2026 drag show?

 9      A.   I believe we're under "tentative," yes.

10      Q.   Okay.  So you believe that Spectrum has

11   progressed past a request to a tentative status?

12      A.   Yes.

13      Q.   Has Spectrum received some kind of

14   communication from the West Texas University staff

15   to that effect?

16      A.   We have received an e-mail confirming

17   that the -- that it went through.  And we received

18   another e-mail that we needed to fill out a risk

19   assessment form, which has been filled out and

20   sent and received a confirmation of that.

21      Q.   Has -- in the "tentative" box, it says,

22   "Once we receive a request at JBK, event services

23   assistance will reach out to confirm details

24   regarding the date, time, and your AV needs."

25              Has that occurred with respect to the

1  proposed 2026 drag show?

2      A.    No, because all that information is

3  included on the application that you send to the

4  JBK.

5      Q.    Did the information that you provided to

6  the JBK center include Spectrum's AV needs for the

7  proposed drag show in April?

8      A.    Yes, it has.

9      Q.    And the next box is -- referred to as

10  "Confirmed," quote, "Once all details have been

11  confirmed for the event, the reservation will be

12  moved into confirmed status," unquote.

13          Has that occurred with respect to the

14  Spectrum proposed 2026 drag show?

15      A.    No.

16      Q.    Do you have any expectation as to when

17  that will happen?

18      A.    I would say it's probably a bit delayed

19  due to the holiday, but probably within the next

20  at least three or four weeks.

21      Q.    Okay.  Well, let me ask you about that,

22  because it says that in order to reach that point,

23  all details have to be confirmed for the event.

24          Do you see that in the first

25  introductory phrase under the "Confirmed" box?

1    A.   Yes.

2    **Q.   When do you expect all details to have**

3    **been confirmed for the proposed late April 2026**

4    **Spectrum drag show?**

5    A.   I'm not sure on an exact date.  In the

6    past, when I have worked with not just Spectrum,

7    but other organizations to -- to get space, the

8    amount of details that are needed is extremely

9    vague, and it can be as small as "Hey, we're

10   hosting an event.  Here's a brief description."

11         So if this is in reference to the

12   lack of details when it comes to planning the

13   event, I don't see that as a problem, no.

14   **Q.   I'm not asking if it's a problem.  I'm**

15   **asking when you expect all of the details to have**

16   **been confirmed for the proposed April 2026**

17   **Spectrum drag show?**

18   A.   Probably not until January or February.

19         (Exhibit 15 marked.)

20   BY MR. BRYANT:

21   **Q.   Let me hand you what's been marked as**

22   **Fanelli Exhibit 15.**

23   A.   (Examined exhibit.)

24   **Q.   Please take whatever time you need to**

25   **review this document before I ask if you've seen**

1  it before.

2      A.    (Examined exhibit.)   No, I have not seen

3  it before.

4      Q.    **Have you seen any other West Texas A&M**

5  **University policy regarding expressive activity on**

6  **campus?**

7      A.    No, I have not.

8      Q.    **Okay.   Now, looking at Fanelli**

9  **Exhibit 15, the first page of it, Rule 1.1 refers**

10 **to, quote, "reasonable time, place, and manner**

11 **restrictions," unquote.**

12              **Are you familiar with the concept of**

13 **time, place, and manner of restrictions on**

14 **expressive activities?**

15     A.    Somewhat.

16     Q.    **Do you have an understanding as to**

17 **whether Spectrum is subject to reasonable time,**

18 **place, and manner of restrictions if it engages in**

19 **expressive activity on the West Texas A&M campus?**

20              MR. MORRIS:   Objection; calls for a

21       legal conclusion.

22     A.    I do not know.

23 BY MR. BRYANT:

24     Q.    **On the second page, Rule 1.4, Fanelli**

25 **Exhibit 15 says, quote, "The common outdoor areas**

1  of the university's campus are deemed traditional

2  public forums," unquote.

3          Are you familiar with the concept of

4  a traditional public forum?

5     A.   Yes.

6     Q.   Would you explain what you understand it

7  to mean?  And I understand you're not a lawyer.

8  I'm not asking for a legal definition.  Just your

9  understanding.

10         MR. MORRIS:  Objecting to calling

11     for a legal conclusion, just to be safe.

12         But answer Mr. Bryant's question,

13     please.

14    A.   So can you repeat that again.

15  BY MR. BRYANT:

16    Q.   Sure.

17         What is your understanding of what a,

18  quote, "traditional public forum," unquote, is?

19         MR. MORRIS:  Same objection.

20    A.   Just a, like, traditional -- like, just

21  grouping, meeting up of people in a public place.

22  BY MR. BRYANT:

23    Q.   Okay.  And in this instance, this 1.4

24  says that "The common outdoor areas of the

25  university's campus are deemed traditional public

1    forums."

2              It continues, (as read) "Any person

3    permitted to engage in expressive activities in

4    these areas freely, as long as the person's

5    conduct" does not -- "is not unlawful and does not

6    materially and substantially disrupt the

7    functioning of the institution."

8              So would you agree that outdoor areas

9    on the campus are places where people can freely

10   express themselves?

11       A.   Yes.

12       Q.   And do you understand that the campus

13   buildings are not common outdoor areas of the

14   universities campus?

15       A.   Yes.

16       Q.   And, therefore, do you understand that

17   the campus buildings are not traditional public

18   forums?

19       A.   Yes.

20       Q.   For example, Legacy Hall is an indoor

21   building that is subject to various restrictions

22   and reservation procedures that we've looked at,

23   and you understand that Legacy Hall is not a

24   traditional public forum?

25              MR. MORRIS:  Objection; calls for a

```
 1      legal conclusion.

 2      A.   Yes.

 3   BY MR. BRYANT:

 4      Q.   On the next page, page 3 of 6 of Fanelli

 5   Exhibit 15, there is a reference to a complaint

 6   procedure.

 7           Do you see that?

 8      A.   Yes.

 9      Q.   To your knowledge, has Spectrum ever

10   attempted to use this complaint procedure with

11   respect to any expressive activity at West Texas

12   A&M University?

13      A.   I do not know.

14      Q.   The period -- during the period that

15   you've been a member of Spectrum, has Spectrum

16   used this complaint procedure at any time?

17      A.   Not to my knowledge, no.

18           (Exhibit 16 marked.)

19   BY MR. BRYANT:

20      Q.   Let me hand you what's been marked as

21   Fanelli Exhibit 16.

22      A.   (Examined exhibit.)

23      Q.   And, again, I would note that this is not

24   the complete document.  It is the beginning of the

25   document and then pages 45 through 49 of the
```

 1    document.

 2              Have you seen the WTAMU student

 3    handbook for 2025 and 2026 before?

 4        A.   Yes.

 5              MR. MORRIS:  Counsel, I just want

 6         to interject.  I have a copy with

 7         highlights on it.

 8              MR. BRYANT:  Yeah.  I'll talk about

 9         that in a minute.

10              MR. MORRIS:  I just want to

11         double-check.

12              MR. BRYANT:  And I do want to note

13         that there are a couple places that I'm

14         gonna ask about, that have highlights on

15         it.

16              MR. MORRIS:  I wanted to make sure

17         it wasn't a work product --

18              MR. BRYANT:  Okay.  Your comment is

19         appreciated.

20    BY MR. BRYANT:

21        Q.   Okay.  Beginning on page 45 of Fanelli

22    Exhibit 16, there is a section described as

23    "Expressive Activity."

24              Do you see that?

25        A.   Yes.

1    Q.    Have you reviewed that section of the

2    student handbook before?

3    A.    Yes.

4    Q.    Okay.  And looking at 2.18.F on page 46,

5    it states, "The common outdoor areas of the

6    university's campus are deemed traditional public

7    forums.  Any person is permitted to engage in

8    expressive activities in these areas freely, as

9    long as the person's conduct is not unlawful and

10   does not materially and substantially disrupt the

11   functioning of the institution."

12               And as we did with Fanelli

13   Exhibit 15, is it your understanding that it is

14   the common outdoor areas of the West Texas A&M

15   University campus that are deemed traditional

16   public forums and that Legacy Hall is not?

17               MR. MORRIS:  Objection; calls for a

18       legal conclusion.

19   A.    Yes.

20               (Exhibit 17 marked.)

21   BY MR. BRYANT:

22   Q.    Let me hand you what's been marked as

23   Fanelli Exhibit 17.

24   A.    (Examined exhibit.)

25   Q.    Have you seen Fanelli Exhibit 17 before?

App. 299

```
 1         A.   Yes.

 2         Q.   And is Spectrum subject to Fanelli

 3   Exhibit 17 when it requests use of the West Texas

 4   A&M facility?

 5         A.   Yes.

 6         Q.   And is -- does this facility use request

 7   procedure apply to proposed uses of Legacy Hall?

 8         A.   Yes.

 9         Q.   And do you understand that -- strike

10   that.

11              On the first page of Fanelli

12   Exhibit 17, in the procedures statement, about

13   midway down, it states, quote, "WTAMU reserves the

14   right to cancel an event and immediately remove

15   access to campus if an event violates the policies

16   and regulations of the Texas A&M University

17   System, the rules and procedures of WTAMU, or if

18   an event is deemed to be unsafe," unquote.

19              Do you understand that that language

20   is applicable to any request by Spectrum to use

21   West Texas A&M facilities?

22              MR. MORRIS:  Objection; calls for

23         speculation.

24         A.   Yes.

25   BY MR. BRYANT:
```

1      Q.   Okay.  Now, you testified earlier about

2   what you understand the right of free speech is.

3              Have you ever looked at the First

4   Amendment to the U.S. Constitution?

5      A.   Yes.

6      Q.   What does it say about free speech?

7              MR. MORRIS:  Objection.

8      A.   I don't know the exact wording.

9   BY MR. BRYANT:

10     Q.   Okay.  Does it say anything about drag

11   shows?

12     A.   No.

13     Q.   Does it say anything about the LGBTQ

14   community?

15     A.   No.

16     Q.   Does it say anything about public

17   universities?

18     A.   No.

19     Q.   Actually, the court reporter may have --

20     A.   I'm sorry.  No.

21     Q.   Do you understand that there are limits

22   to the First Amendment rights that people in

23   organizations have?

24              MR. MORRIS:  Objection; calls for a

25         legal conclusion.

1    A.    I do not know.

2  BY MR. BRYANT:

3    **Q.    Do you believe that Spectrum has an**

4  **unlimited First Amendment right to have a drag**

5  **show?**

6            MR. MORRIS:  Objection to the

7        extent it calls for a legal conclusion.

8    A.    I believe that Spectrum has First

9  Amendment rights to express themselves and to

10 express culture associated with the LGBTQ+

11 community.

12 BY MR. BRYANT:

13   **Q.    Okay.  I need for you to answer my**

14 **question.**

15           **Do you believe that Spectrum has an**

16 **unlimited right to hold a drag show anywhere it**

17 **wants to do so?**

18           MR. MORRIS:  Objection to the

19        extent it calls for a legal conclusion.

20           You can answer.

21   A.    Limited is very vague.  I don't think

22 anyone has unlimited rights.

23 BY MR. BRYANT:

24   **Q.    So you agree that Spectrum's rights under**

25 **the First Amendment are limited in some way?**

1    A.   I think everyone's rights are limited,

2  yes.

3    **Q.   Okay.  And do you know what those limits**

4  **are with respect to holding drag shows?**

5         MR. MORRIS:  Objection; calls for a

6      legal conclusion.  He's not a lawyer.

7         MR. BRYANT:  Now, we've been going

8      for over an hour.  Why don't we take a

9      short break and come back -- what?  10, 15

10     minutes will work for you, Mr. Morris?

11        MR. MORRIS:  The shorter the better

12     for me, but it's up to you, Counsel.  It's

13     your deposition.

14        MR. BRYANT:  Do you have any

15     preference, Mr. Fanneli?

16        THE WITNESS:  The shorter the

17     better.

18        MR. BRYANT:  Okay.  Let's do 10

19     minutes.

20        MR. MORRIS:  Okay.

21        MR. BRYANT:  Thanks.

22        THE VIDEOGRAPHER:  Going off the

23     record at 2:01.

24        (A recess was taken from 2:01 p.m. to

25          2:13 p.m.)

```
 1              THE VIDEOGRAPHER:  Going back on
 2       the record at 2:13.
 3  BY MR. BRYANT:
 4       Q.   Mr. Fanelli, would you say that Legacy
 5  Hall is the main venue on the West Texas campus
 6  for performances that are too small to happen in
 7  the First United Bank Center?
 8       A.   Yes.
 9       Q.   Would you agree that people in the
10  Panhandle community view performances in Legacy
11  Hall to be kind of endorsed or sanctioned by West
12  Texas?
13              MR. MORRIS:  Objection; calls for
14       speculation.
15       A.   I do not know.
16  BY MR. BRYANT:
17       Q.   I think you've already testified that
18  Spectrum believes that it owes respect to others,
19  including Black people and women; is that right?
20       A.   Yes.
21       Q.   And I assume that you believe that
22  Spectrum and its members in the LGBT community at
23  WT also deserve respect?
24       A.   Yes.
25       Q.   Would you agree that people deserve
```

1    respect -- strike that.

2                  Would you agree that people of other

3    races, genders deserve respect, not just in words,

4    but also in actions and activities?

5        A.    Yes.

6        Q.    If there were a recognized organization

7    in West Texas that was antisemitic, do you believe

8    it would have the right to have performances that

9    disrespect Jewish people?

10       A.    Well, Spectrum itself and me personally

11   do not agree with those views.  If the university

12   allows them to be on campus, then they should

13   allowed on campus.

14       Q.    And my question was not whether they

15   should be allowed on campus, but should they be

16   allowed to express their hatred of Jewish people

17   in performances at Legacy Hall?

18       A.    While we do not agree with that -- with

19   those views and see them as irreparable and

20   disgusting, if -- if they are -- if they go

21   through the process to book the space and book

22   their space and do it, then they -- they -- they

23   can do it.

24       Q.    Okay.  And would you also agree that if

25   there were a recognized student organization at

1  West Texas that was a Neo-Nazi organization, that

2  it would have a right to use Legacy Hall to

3  express its Nazi views?

4      A.   Once again, Spectrum does not -- does not

5  commend those views at all, thinks that they are

6  disgusting and terrible.  But if they go through

7  the process to book the space and the space is

8  approved, then they should be allowed to use the

9  space.

10     Q.   And would you believe that Dr. Wendler or

11 any other official of West Texas A&M University

12 would have no right to deny them the forum of

13 Legacy Hall to express support of the Holocaust,

14 for example?

15          MR. MORRIS:  Objection; ambiguous.

16     A.   I don't -- I don't understand.

17 BY MR. BRYANT:

18     Q.   You don't understand?

19     A.   Yes.

20     Q.   So let's say that there's a Neo-Nazi

21 student organization.  And they want to hold an

22 event at Legacy Hall.  And they go through the

23 self-risk assessment and all other procedures of

24 the staff and wish to express approval of the

25 Holocaust and a desire that another Holocaust

1    occur in the future.

2            **That the university president and**

3    **administration should be powerless to deny that**

4    **forum to them for those views?**

5    A.    As I a stated before, if they go through

6    and get approved -- because, as we have seen

7    before, you can be not approved for a space for a

8    multitude of reasons, and that the space can also

9    be canceled due -- as per the student handbook --

10   that they should be allowed.

11           But just like any other organization,

12   it can get canceled.  I'm not saying that that's

13   not something that can happen to anyone, including

14   Spectrum.  I'm just saying that they should be

15   allowed to, even though Spectrum, we do not agree

16   with those views.  We never will agree with those

17   views.

18   **Q.    And you agree that if the university**

19   **administration views those Neo-Nazi, pro-Holocaust**

20   **views as being inappropriate and inconsistent with**

21   **the educational mission of WT, that the University**

22   **can and should cancel the performance at Legacy**

23   **Hall in which those views are expressed?**

24           MR. MORRIS:  Objection; calls for

25       speculation, calls for a legal conclusion.

1      A.    I do not know.

2    BY MR. BRYANT:

3      **Q.    You don't have any opinion?**

4      A.    On behalf of Spectrum, I do not, no.

5      **Q.    Okay.  How about personally?**

6      A.    I do not know.

7      **Q.    Okay.  If a student organization**

8    **recognized at West Texas wants to hold an event at**

9    **Legacy Hall to -- specifically to denigrate and**

10   **mock the LGBTQ community and follows all required**

11   **procedures, do you believe that the president and**

12   **the University has any power to cancel that**

13   **performance as inconsistent with the educational**

14   **mission of WT?**

15            MR. MORRIS:  Objection to the

16        extent it calls for speculation and calls

17        for a legal conclusion.

18     A.    I -- as I mentioned before, Spectrum

19   would not agree with those views.  It never will

20   agree with those views.  But they should be

21   allowed to be on campus and do that, just like

22   Spectrum has the right to be outside of said event

23   protesting it.

24   BY MR. BRYANT:

25     **Q.    We've discussed the language in the JBK**

1  Student Center procedures document and elsewhere

2  that allows cancellation of an event that is

3  inconsistent with the educational mission of West

4  Texas A&M University.

5            Do you have any understanding at all

6  as to what that phrase encompasses?

7     A.    Yes.

8     Q.    What is your understanding?

9     A.    From what we reviewed thoroughly, it

10 encompasses the various pillars of the university

11 and its values as an institution.

12    Q.    So that would include those core values,

13 including respect?

14    A.    Yes.

15    Q.    Okay.  And let's talk about the various

16 drag shows that Spectrum has proposed to have or

17 in 2023 had.

18            I believe we established that you

19 don't have any knowledge as to what, if any,

20 expressive message Spectrum had with respect to

21 the 2023 or 2024 drag shows; is that correct?

22    A.    No.

23    Q.    It's not correct?  Or is it --

24    A.    No, I don't.

25    Q.    You don't have --

1      A.    I don't have that information.

2      Q.    Okay.  And I believe that we discussed

3   that the expressive message of the 2026 proposed

4   drag show is to be determined by the performers

5   who are ultimately chosen to participate in that

6   drag show, right?

7      A.    Yes.

8              MR. MORRIS:  Objection;

9        mischaracterizes prior testimony.

10     A.    Yes.  And we would also like to express

11  our support for the LGBTQ+ community, because

12  that's what Spectrum just stands for in general.

13  That's what we do all the time, 24/7, you know.

14  BY MR. BRYANT:

15     Q.    Okay.  Is there any harm that Spectrum

16  has suffered as a result of the cancellation of

17  the proposed 2023 or 2024 drag shows --

18     A.    Yes.

19     Q.    -- at West Texas?  And what -- and this

20  is before your time, but what do you believe that

21  is?

22     A.    This is both before my time and

23  currently.

24     Q.    Well, I'm just asking you right now about

25  2023 and 2024.

1    A.    Before, I do not know.

2    Q.    Okay.  And if -- obviously, Spectrum's

3    proposed 2026 drag show has not been canceled.

4             Do you -- so it has not suffered any

5    harm yet, right?

6             MR. MORRIS:  Objection.

7    BY MR. BRYANT:

8    Q.    With respect to that drag show?

9    A.    So the harm that was caused by the drag

10   show is still continuing.  That harm is

11   continuing.

12            Knowing that the president of the

13   university has these views towards something that

14   is very central to queer culture does direct harm

15   to both me personally, personal members of

16   Spectrum, and Spectrum as a whole, going against

17   our -- what we do and what we want to accomplish

18   on campus by providing a safe space for all queer

19   people.

20            It has caused different queer people

21   on campus to be scared to be out.  It has caused

22   different queer people on campus to be anxious

23   that their other rights and privileges can be

24   taken away just because of this one decision.

25            So it's, like, you start with one

 1   thing, that doesn't mean it's the end of it.

 2      Q.   Okay.  This one decision that you're

 3   referring to in your answer there is what

 4   decision?

 5      A.   Cancellation of drag shows.

 6      Q.   This is the cancellation in 2023?

 7      A.   Yes.

 8      Q.   And so that's still causing harm to you

 9   personally today?

10      A.   Yes.

11      Q.   Are you scared?

12      A.   Yes, I am scared.

13   ██   ████████████

14   ██   ████████  ███████████████

15   ██████████████    ████████████████

16   ██████████████████████████

17   █████████████████████████

18   ████████████████████████████

19   ██████████████████████████

20   ████████████████████

21      Q.   Okay.  Has anything that Dr. Wendler did

22   with respect to the 2023 drag show caused any

23   tangible damage to you or anyone else at WT that

24   you can describe?

25           MR. MORRIS:  Objection; vague.

1     A.   Yeah.   What -- what does "tangible" mean

2   in this context?

3   BY MR. BRYANT:

4     Q.   Well, it means that one can see or touch

5   it.  I can't see or touch your feelings.  I can't

6   see or touch anxiety or fear.  It doesn't mean

7   they don't exist.  I'm just saying it's not

8   tangible.  It's not observable, for example.

9         Is there any tangible damage that

10  Dr. Wendler's March 2023 decision with respect to

11  a drag show has caused, to your knowledge?



BY MR. BRYANT:

     Q.    Okay.  Can you say that Dr. -- anything

Dr. Wendler's done caused any physical harm to any

other Spectrum member?

     A.    I can't speak on that, but I'm sure I'm

not the only one, judging by other accounts that I

have heard.

     Q.    And can you describe any harm that has

been done to Spectrum, this organization, by

reason of anything that Dr. Wendler or Dr. Thomas

have ever done?

     A.    Spectrum is student-led.  When its

students suffer, it suffers.

     Q.    Aside from that view, is there any damage

to Spectrum that has been caused by Dr. Wendler or

1  **Dr. Thomas?**

2      A.    Not that I can think of.

3              MR. BRYANT:  I'll pass the witness.

4        Thank you very much for being here today.

5              MR. MORRIS:  All right.

6        Mr. Fanelli, I just have four or five

7        questions for you.

8                      EXAMINATION

9  BY MR. MORRIS:

10     **Q.    You were just discussing with Mr. Bryant**

11 **about harm.**

12             **Can you explain whether or not**

13 **Spectrum has faced harm for not being able to host**

14 **a drag show on campus?**

15     A.    I know the overall perception of Spectrum

16 has been somewhat swayed due to that.  Primarily

17 just because it's once you have big legislation

18 like that pass, you have issues arise where it

19 causes other students to feel like they have the

20 space to be able to be more hateful towards queer

21 people.

22             I know, according to friends that

23 I've had, that have been here both before and

24 after, they have noticed and increase in students

25 participating in more homophobic -- outright

1  homophobic behavior towards students.  Of course,

2  that could also have something to do with the

3  political climate currently, but it has not helped

4  knowing that you have that massive legislation

5  pass, kind of allowing these behaviors to

6  increase.

7  BY MR. MORRIS:

8       **Q.   Let me --**

9               MR. BRYANT:  Objection;

10      nonresponsive.

11  BY MR. MORRIS:

12      **Q.   Let me clarify.  I'm just asking**

13  **specifically about Dr. Wendler's decision to not**

14  **allow Spectrum to perform drag shows on campus.**

15              **Can you explain whether or not**

16  **Spectrum has suffered, as an organization, harm**

17  **from that?**

18      A.   Yes.

19              MR. BRYANT:  Objection; asked and

20      answered.

21              MR. MORRIS:  That was

22      nonresponsive.

23              MR. BRYANT:  I know.  I asked him

24      that question.  And he answered.

25  BY MR. MORRIS:

1    Q.    Go ahead.

2    A.    Can you repeat that again.  Sorry.

3    Q.    Sure.

4         **As a result of Dr. Wendler's decision**

5    **not to allow Spectrum to host drag shows on**

6    **campus, can you explain whether or not Spectrum**

7    **has faced harm?**

8         MR. BRYANT:  Objection; asked and

9      answered.

10    A.    With that -- with that banning on drag

11    shows, it has caused an increase in the culture of

12    homophobic just action towards Spectrum and its

13    members.  Spectrum is a student-led organization.

14    When its members suffers, it suffers in tandem.

15         I know we had issues with a lot of

16    people being scared to show up to Spectrum

17    meetings for fear of being outed and such,

18    which -- which directly causes harm to Spectrum,

19    because if we don't have people coming to

20    meetings, we can't have meetings.  Luckily, that

21    has somewhat kind of gone up.

22         But I know, like, when it first

23    happened, they had extreme issues with member

24    count staying super consistent with coming to

25    meetings.

1  BY MR. MORRIS:

2      Q.   Can you turn to Exhibit 6.

3      A.   (Complied.)

4      Q.   Okay.  Do you see Article 2 -- this is --

5  again, this is the constitution of Spectrum as it

6  currently stands.

7              Do you see on the front page,

8  "Article II: Purpose," it says, "The primary

9  purpose of this organization is to provide a safe

10 space for LGBTQ+ students and allies to come

11 together"?

12             Do you see that?

13     A.   Yes.

14     Q.   Okay.

15             MR. BRYANT:  (Unintelligible.)

16             MR. MORRIS:  I'm aware of the

17      situation.  It has nothing to do with

18      that.

19 BY MR. MORRIS:

20     Q.   So would you agree -- can you explain

21 whether or not Dr. Wendler's refusal to allow

22 Spectrum to host a drag show on campus has

23 hindered Spectrum in being able to meet this

24 primary goal?

25     A.   Yes.  So drag shows in the past were a

1   very large primary not only way for us to get out

2   there as an organization and express that queer

3   organization on campus and express this mission

4   here, but also in order to have fundraising events

5   and be a charitable organization towards causes

6   that are important to us like The Trevor Project.

7               And with that -- with that being

8   gone, it has been exceedingly hard for us to be

9   able to do that on campus.

10  **Q.   If you look at here, "The secondary goal**

11  **of Spectrum WT is to raise awareness of the**

12  **LGBTQIA+ community."**

13          **Can you explain whether or not**

14  **Dr. Wendler's decision to prohibit drag shows on**

15  **campus has hindered Spectrum from meeting that**

16  **goal?**

17  A.   Once again, banning drag shows bans that

18  very large event that we would have, that would

19  basically be a way for us to be, like, "Hey, this

20  is a queer organization.  This is what queer

21  culture looks like," and being able to share that

22  with the surrounding community and educate others

23  on who we are as people.  So that being gone

24  directly hinders that.

25  **Q.   Okay.  I think you touched on this, but**

1  it says, "Thirdly, our organization will strive to
2  take every opportunity to educate WT and the
3  greater community on issues concerning LGBTQIA+
4  life."
5          Can you explain whether or not
6  Dr. Wendler's decision to prohibit drag shows on
7  campus has hindered Spectrum's efforts as to that
8  third point?
9  A.   Once again, very, very large event,
10  especially when it comes to fundraising.  So I
11  know in the past, we've fundraised for The Trevor
12  Project, which is queer suicide prevention, which
13  is a very prevalent issue in our community.
14          And not having that event, to be able
15  to educate the public on that further, both queer
16  and nonqueer people, has been a big problem.
17  Q.   Okay.  I think you touched on this
18  earlier.  I'm just -- I want to clarify.
19          So can you explain, is there a
20  difference between the message that individual
21  performers at the planned 2026 drag show would
22  convey versus any message Spectrum might convey as
23  a whole from hosting the drag show?
24  A.   I'm sorry.  As a whole, obviously,
25  Spectrum would be expressing support for the queer

1  community.

2            If we're able to do fundraising in

3  the future, then, obviously, we would be able to

4  educate the public on whatever charitable

5  organization that we're working with.

6            From individuals, that could vary, of

7  course, because they may have one message they

8  would like to convey or a different message they

9  would like to convey.  And it could just be their

10  support for the queer community.  Or it could be

11  something more personal.

12     **Q.   You testified a little bit earlier about**

13  **you planning to MC the 2026 planned drag show, and**

14  **I think you testified you would ask questions of**

15  **the crowd; is that right?**

16     A.   No.

17     **Q.   Okay.  I stand corrected.  What would you**

18  **do as an MC?**

19     A.   As an MC, I would just introduce

20  performers, explain who they are, what are the

21  characters that they made up.

22            If we do in the future do any sort of

23  charitable donation with any sort of just

24  ticketing sales or just general donation, in

25  general, educating the crowd, "Hey, this is what

1 this organization is.  This is what it does.  This

2 is where you can find them and donate further."

3 And just kind of -- just keeping the crowd

4 engaged.

5 BY MR. MORRIS:

6     **Q.  Can you explain whether or not**

7 **communicating support for queer culture is an**

8 **essential element of the drag show?**

9     A.  I think it can be for sure.  If Spectrum

10 was to do one, that would be what our essential

11 goal would be.  There's different drag shows for

12 different reasons at different places at different

13 times.

14         For Spectrum personally, that would

15 be our primary goal.  But, of course, that can

16 vary between other performances.  And one

17 performance is not like the other -- not like any

18 other performance.

19     **Q.  You testified earlier, Spectrum has not**

20 **assigned a rating yet for its 2026 drag show**

21 **planned at Legacy Hall.**

22         **Can you explain, based on, you know,**

23 **your position as president of Spectrum, what you**

24 **would expect that rating to be?**

25         MR. BRYANT:  Objection; calls for

1          speculation.

2      A.   I would expect it to be somewhere between

3  PG, possibly PG-13 but would not allow or expect

4  it to exceed that.

5  BY MR. MORRIS:

6      **Q.   Last question for you -- well, two more**

7  **questions.**

8               **Is Spectrum's -- what is Spectrum's**

9  **understanding of Dr. Wendler's March 2023 letter**

10 **in terms of whether or not it bans drag shows on**

11 **campus?**

12     A.   So from Spectrum's understanding, it was

13 very much the consensus of they're banned off

14 campus entirely.  Whether or not that's legally

15 true, I don't know for sure, but that was

16 Spectrum's understanding.

17     **Q.   Does Spectrum have any reason to believe**

18 **that Dr. Wendler will not ban its upcoming -- its**

19 **planned drag show for Legacy Hall in April 2026?**

20     A.   We don't have any reason to believe that

21 he won't ban it, no.

22               MR. MORRIS:  No further questions.

23               And I also want to -- because of

24       the questions about Mr. Fanelli's medical

25       history, I do want to designate the

1    transcript at this time "Confidential

2    Pursuant to the Protective Order."

3          We will simply designate,

4    specifically after we get the transcript,

5    those that are confidential and

6    de-designate the rest.

7          But just for purposes of keeping

8    that under the Protective Order now, we're

9    going to designate the whole thing under

10   the Protective Order.

11         MR. BRYANT:  Okay.  Do I understand

12   correctly that when you get the

13   transcript, the only portions that will be

14   deemed -- that you'll designate as

15   confidential are those that relate to

16   Mr. Fanelli's specific medical issues?

17         MR. MORRIS:  I think the stuff

18   that -- the stuff about his medical

19   history, within, you know, probably 48 to

20   72 hours, we will send you an e-mail

21   designating specifically --

22         MR. BRYANT:  Okay.

23         MR. MORRIS:  -- these are subject

24   to the Protective Order, and we can agree

25   to treat the rest at that time as

1          de-designated.

2                  MR. BRYANT:  Just a couple more

3          questions, Mr. Fanelli.

4                       FURTHER EXAMINATION

5    BY MR. BRYANT:

6        Q.   Do you have any understanding as to

7    whether or not the off-campus drag show that

8    Spectrum held in 2023 was a financial success?

9        A.   I do not know.

10       Q.   And do you have any understanding as to

11   whether it was a success in terms of having a

12   higher attendance than was expected at the

13   proposed performance in Legacy Hall?

14       A.   I do not know.

15       Q.   Do you have any reason to believe today

16   that if Spectrum's primary goal were to raise

17   funds for The Trevor Project, that it would be

18   better off having a drag show off campus than at

19   Legacy Hall?

20       A.   Can you repeat that.

21               MR. MORRIS:  (Unintelligible.)

22   BY MR. BRYANT:

23       Q.   Yeah.  Do you have any understanding as

24   to whether or not Spectrum would be better off

25   having a drag show off campus if its priority aim

```
 1   were to maximize the amount of money it could

 2   raise for charity?

 3      A.   I do not know.

 4           MR. BRYANT:  Okay.  I'll pass the

 5      witness.  Thank you.

 6           MR. MORRIS:  Nothing for me.  We

 7      can go off the record.

 8           THE VIDEOGRAPHER:  Going off record

 9      at 2:44.  This concludes the deposition.

10

11           (Following discussion had for

12            administrative purposes.)

13

14           THE COURT REPORTER:  I have a

15      couple admin questions for the attorneys.

16           Mr. Bryant, do you know when you

17      would like the final transcript?

18           MR. BRYANT:  ASAP.  As soon as you

19      can get it done.

20           THE COURT REPORTER:  Does Monday

21      work for you?

22           MR. BRYANT:  Yes, that works just

23      fine for me.

24           THE COURT REPORTER:  Mr. Morris,

25      would you like a copy of the transcript?
```

1          MR. MORRIS:  Yes, I would like a

2   copy.

3          THE COURT REPORTER:  And do you

4   know when you would like delivery of your

5   copy?

6          MR. MORRIS:  I'd like the same as

7   Mr. Bryant, ASAP.  So Monday works for us

8   too.

9          THE COURT REPORTER:  Yes, sir.  Can

10  do.

11          And would you like to take

12  signature for the witness as well?

13          MR. MORRIS:  Yes, I can take

14  signature for the witness.  You can send

15  it to me.

16          THE COURT REPORTER:  Yes, sir.

17          Thank you, everyone.  With that,

18  that concludes our deposition today.

19

20          (Hybrid deposition concluded at

21           2:44 p.m., December 18, 2025.)

22

23

24

25

```
 1              CHANGES AND SIGNATURE

 2   WITNESS NAME:  JOHNATHAN-JAYCE WALKER

 3              FANELLI-BURNETT

 4   DATE:  DECEMBER 18, 2025

 5   PAGE/LINE    CHANGE              REASON

 6   _____

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____
```

1          I, JOHNATHAN-JAYCE WALKER FANELLI-BURNETT,

2     have read the foregoing deposition and hereby affix

3     my signature that same is true and correct, except

4     as noted above.

5

6          _____

7          JOHNATHAN-JAYCE WALKER FANELLI-BURNETT

8

      THE STATE OF _____)

9     COUNTY OF _____)

10

11         Before me, _____, on

12    this day personally appeared JOHNATHAN-JAYCE WALKER

13    FANELLI-BURNETT, known to me (or proved to me under

14    oath or through _____)

15    (description of identity card or other document) to

16    be the person whose name is subscribed to the

17    foregoing instrument and acknowledged to me that

18    they executed the same for the purposes and

19    consideration therein expressed.

20         Given under my hand and seal of office this

21    _____ day of _____, 202__.

22

23              _____

24              NOTARY PUBLIC IN AND FOR

25              THE STATE OF _____

```
 1              CERTIFIED STENOGRAPHIC

 2           COURT REPORTER'S CERTIFICATE

 3

 4       I, Karen L. D. Schoeve, Registered Diplomate

 5   Reporter, Certified Realtime Reporter, and Realtime

 6   Systems Administrator, residing in the State of

 7   Texas, do hereby certify that the foregoing

 8   proceedings were reported remotely by me on an

 9   electronic stenographic machine and that the

10   foregoing transcript constitutes a full, true, and

11   correct transcription of my stenographic machine

12   notes to the best of my ability, and I hereby

13   certify to the following:

14

15       By agreement of all attending attorneys, the

16   witness, JOHNATHAN-JAYCE WALKER FANELLI-BURNETT,

17   was remotely duly sworn by the officer and that the

18   transcript of the oral deposition is a true record

19   of the testimony given by the witness;

20

21       I further certify that pursuant to FRCP No.

22   30(f)(i), that signature of the witness was

23   requested by the witness or a party before the

24   completion of the deposition and the signature is

25   to be returned within 30 days from date of receipt
```

1   of the transcript.

2

3        If returned, the attached Changes and

4   Signature Page contains any changes and the reasons

5   therefor.

6

7        That the original deposition was delivered to

8   David Bryant, representing Defendants;

9

10       I further certify that I am neither counsel

11  for, related to, nor employed by any of the parties

12  in the action in which this proceeding was taken;

13  and further, that I am not financially or otherwise

14  interested in the outcome of the action.

15

16       Subscribed and sworn to on this the 22nd day

17  of December, 2025.

18

19

20       Karen L. D. Schoewe, CSR, RDR, CRR

21       Texas CSR 3354 - Exp Date: 10-31-27
         INTEGRITY LEGAL SUPPORT SOLUTIONS

22       Firm Registration No. 528
         9901 Brodie Lane

23       Austin, Texas 78748
         www.integritylegal.support

24       T: 512.320.8690

25

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

SPECTRUM WT,

                 Plaintiff,

     v.

WALTER WENDLER, in his official
capacity as the President of West Texas
A&M University, *et al.*,

                 Defendants.

Case No.: 2:23-cv-00048

**PLAINTIFF'S AMENDED
RESPONSES TO DEFENDANTS
WALTER WENDLER AND
CHRISTOPHER THOMAS'S FIRST
SET OF INTERROGATORIES**

         Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiff

Spectrum WT ("Plaintiff") provides the following amended objections and responses

to Defendants Walter Wendler and Christopher Thomas's First Set of Interrogatories

(the "Interrogatories").

<u>**PRELIMINARY STATEMENT**</u>

         Plaintiff's investigation and development of the facts and circumstances

relating to this action is ongoing. These responses and objections are made based on

Plaintiff's current knowledge, and are without prejudice to, and are not a waiver of,

its right to rely on other facts or documents at trial. Plaintiff expressly reserves the

right to supplement, clarify, revise, or correct any or all of the responses and

objections below, and to assert additional objections or privileges as permitted, in one

or more subsequent supplemental responses.



DEFENDANT'S
EXHIBIT
2

App. 334

## GENERAL OBJECTIONS

1.      Plaintiff objects to Defendants' instructions and definitions to the extent they seek disclosure of information protected by the attorney-client privilege and/or the attorney work product doctrine.

2.      Plaintiff objects to Defendants' definition of "you" and "your" to the extent that Defendant seeks to obtain information outside Plaintiff's personal knowledge and/or seek information protected by the attorney-client privilege and/or work product doctrine, and to the extent to which it would require Plaintiff to obtain information from persons purporting to act on Plaintiff's behalf, but over whom Plaintiff has no control.

3.      Plaintiff objects to these Interrogatories to the extent that they purport to impose duties and obligations which exceed or are different than those imposed by the Federal Rules of Civil Procedure or Court orders in this action.

4.      Plaintiff objects to these Interrogatories to the extent they overlap and are duplicative of other requests and are therefore overburdensome and vague.

## SPECIFIC OBJECTIONS AND RESPONSES

**Interrogatory No. 1**

Identify all persons who have served as officers of Spectrum WT from November 1, 2022 through the present and indicate the position each person held.

App. 335

**Response:**

Subject to and without waiving the foregoing general and specific objections, Plaintiff responds that, based on a review of records available to its current leadership, officers of the organization since November 1, 2022 include:

Fall 2022 through Summer 2023:

| | |
|---|---|
| President: | Barrett Bright |
| Vice President: | Marcus Stovall (f/k/a Lauren Stovall) |
| Treasurer: | Asher Nowak |
| Secretary: | Erin Klein a/k/a K |

Fall 2023 through Summer 2024: Ale

| | |
|---|---|
| President: | Barrett Bright |
| Vice President: | Marcus Stovall (f/k/a Lauren Stovall) |
| Treasurer: | Keagan O'Toole |
| Secretary: | Erin Klein a/k/a K |
| Historian/Media Officer: | Mandy Lawrence |

Fall 2024 through Summer 2025:

| | |
|---|---|
| President: | Audrey Pleming (Fall 2024) |
| | Johnathan-Jayce Fanelli (Spring 2025) |
| Vice President: | Johnathan-Jayce Fanelli (Fall 2024) |
| | Keagan O'Toole (Spring 2025) |
| Secretary: | Izzy Fernandez |
| Treasurer: | Margaret Murphy (Fall 2024) |

|  | Keagan O'Toole (Spring 2025) |
| Historian: | Elliott Lopez (Fall 2024) |
|  | Caiden Scott (Spring 2025) |

Fall 2025:

|  |  |
| President: | Johnathan-Jayce Fanelli |
| Vice-President: | Taylor Barrera |
| Secretary: | Izzy Fernandez |
| Treasurer: | Alex Ortho |
| Historian: | Johnathan-Jayce Fanelli |

**Interrogatory No. 2**

Identify all current members of Spectrum WT who are enrolled students at West Texas A&M University.

**Objections:**

Plaintiff objects to this Interrogatory on the basis that it invades a qualified First Amendment privilege against the disclosure of information impairing its members' right to associate for the purpose of political, social, educational, and cultural ends. *See Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984); *see also NAACP v. Alabama*, 357 U.S. 449 (1958). Defendants' interest in identifying members of a student organization does not meet the exacting scrutiny required by *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595, 607 (2021). *See also Doe v. Reed*, 561 U.S. 186, 196 (2010) (exacting standard requires "a substantial relation

4

between the disclosure requirement and a sufficiently important government interest"). Compulsory identification of individual members of a student organization supporting LGBTQ+ students may expose its members to reprisal, the threat of physical coercion, or other public hostility, chilling its members' ability to associate in furtherance of Plaintiff's mission. *See Young Conservatives of Texas Found. v. Univ. of N. Texas*, No. 20-973, 2022 WL 2901007, at *2–3 (E.D. Tex. Jan. 11, 2022); *see also Familias Unidas v. Briscoe*, 544 F.2d 182, 192 (5th Cir. 1976); *Hastings v. N.E. Indep. Sch. Dist.*, 615 F.2d 628, 631-32 (5th Cir. 1980).

Plaintiff further objects to this Interrogatory on the basis that the information sought is not proportional to the needs of the case in light of the parties' relative access to the information requested. *See* Fed. R. Civ. P. 26(b)(1). The information sought is equally available to Defendants, as West Texas A&M University requires recognized student organizations to regularly provide information about officer and/or members via the Buff Link system (or any predecessors to the Buff Link system). Additionally, information about officers and/or members is available to Defendants through employees that Defendants appoint or authorize to serve as advisor(s) to student organizations.

**Response:**

Subject to and without waiving the foregoing objections, Plaintiff refers Defendants to Plaintiff's response to Interrogatory No. 1 (identifying officers). Upon entry of, and subject to, an agreed-upon protective order, Plaintiff will provide Defendants with the list of members registered through the BuffLink system.

5

**Interrogatory No. 3**

Identify all on-campus buildings at West Texas A&M University that Spectrum WT has used in the last five years and the purpose for which they were used.

**Objections:**

Plaintiff objects to this Interrogatory on the basis that "used" is vague and ambiguous because it reaches any usage of campus facilities by its members, no matter how transitory.

Plaintiff further objects to this Interrogatory on the basis that the information sought is not proportional to the needs of the case in light of the parties' relative access to the information requested. *See* Fed. R. Civ. P. 26(b)(1). The information sought is equally available to Defendants, as West Texas A&M University requires student organizations to reserve campus facilities and maintains a sophisticated event management database tracking facility reservations by organizations.

**Response:**

Subject to and without waiving the foregoing general and specific objections, Plaintiff directs Defendants to the records Defendants produced, which contain information about registered events held by Plaintiff in campus buildings. *See, e.g.*, Def_000079–Def_000089, Def_000100–Def_000101, Def_000105–Def_000108, Def_000834, Def_000848, Def_000849–Def_000850, and Def_000852. Records produced by Plaintiff in response to Defendants' First Set of Requests for Production

6

(including flyers, PowerPoint presentations, minutes, and social media posts promoting particular events) also identify campus facilities used by Plaintiff.

Plaintiff further states that it has used facilities within the Jack B. Kelley Student Center, the Classroom Center, Virgil Henson Activities Center, the Fine Arts Complex, the Marmaduke Internet Innovation Center (f/k/a Hastings Electronic Learning Center (HELC)), and the Alumni Banquet Facility.

**Interrogatory No. 4**

Identify and describe all Spectrum WT events held on the West Texas A&M University campus from 2020 to the present time.

**Objections:**

Plaintiff objects to this Interrogatory on the basis that the information sought is not proportional to the needs of the case in light of the parties' relative access to the information requested. *See* Fed. R. Civ. P. 26(b)(1). The information sought is more readily available to Defendants, as West Texas A&M University requires student organizations to reserve campus facilities and maintains a sophisticated event management database tracking facility reservations by organizations.

Plaintiff further objects to this Interrogatory on the basis that "events" is vague and ambiguous because it is undefined. Plaintiff construes this Interrogatory to be limited to formal, registered events authorized by West Texas A&M University and exclusively organized by Plaintiff, as opposed to events in which Plaintiff was a co-

App. 340

sponsor. Plaintiff further construes "events" to exclude de minimis uses of campus spaces, such as tabling.

Plaintiff further objects to this Interrogatory because it seeks information over a period of nearly six years, beyond the typical time an undergraduate student member of the organization would be enrolled.

Plaintiff further objects to this Interrogatory's use of the term "describe" as overbroad, not proportional to the needs of the case, and vague and ambiguous. That term would require Plaintiff to identify the "identity of each person participating in" the event, the "nature and substance of all communications that occurred in connection with" the event, and the "identity of all materials referring to or reflecting" the event.

To the extent this Interrogatory would compel Plaintiff to identify individual members or participants in its events, Plaintiff objects on the basis that it invades a qualified First Amendment privilege against the disclosure of information impairing its members' right to associate for the purpose of political, social, educational, and cultural ends. *See Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984); *see also NAACP v. Alabama*, 357 U.S. 449 (1958). Compulsory identification of individual members of a student organization supporting LGBTQ+ students may expose its members to reprisal, the threat of physical coercion, or other public hostility, chilling its members' ability to associate in furtherance of Plaintiff's mission. *See Young Conservatives of Texas Found. v. Univ. of N. Texas*, No. 20-973, 2022 WL 2901007, at *2–3 (E.D. Tex. Jan. 11, 2022); *see also Familias Unidas v. Briscoe*, 544 F.2d 182, 192

(5th Cir. 1976); *Hastings v. N.E. Indep. Sch. Dist.*, 615 F.2d 628, 631-32 (5th Cir. 1980).

**Response:**

Subject to and without waiving the foregoing general and specific objections, Plaintiff directs Defendants to the records Defendants produced, which contain information about registered events held by Plaintiff. *See, e.g.*, Def_000079–Def_000089, Def_000100–Def_000101, Def_000105–Def_000108, Def_000834, Def_000848, Def_000849–Def_000850, and Def_000852. Records produced by Plaintiff in response to Defendants' First Set of Requests for Production (including events calendars, flyers, PowerPoint presentations, minutes, and social media posts promoting particular events) also identify the general nature of events held by Plaintiff.

Plaintiff further states that it generally holds and has held weekly meetings in CC335.

Plaintiff further states that, based on a review of its records, other events it has primarily organized include:

- Spring 2020
    - Bake Sale, Feb. 10, 2020
- Spring 2021
    - First Meeting, Jan. 27, 2021, CC335
    - Valentine's Day party, Feb. 10, 2021, CC335

App. 342

- Fall 2021
    - Game night, Sept. 16, 2021
    - Meeting, Oct. 7, 2021, CC335
    - Meeting, Oct. 14, 2021, CC335
    - Halloween Party, Oct. 28, 2021, CC335
    - Meeting, Nov. 11, 2021, CC335
- Spring 2022
    - Game Night, Jan. 27, 2022, CC335
    - Meeting and Headshots Night, Feb. 10, 2022, CC335
    - Game Night, Feb. 17, 2022, CC335
    - Potluck meeting, March 3, 2022, CC335
    - Trans Lunch and Learn, March 31, 2022
    - WT Prom, April 9 or 22, 2022, Alumni Banquet Hall
- Fall 2022
    - RA Resource Relay, Aug. 15, 2022
    - Festival of Lights, Dec. 1, 2022
- Spring 2023
    - Studio Ghibli and Soda Bar, Jan. 26, 2023
    - Drag Race Meeting, Jan. 26, 2023
    - Edible Play Dough Hangout, Feb. 2, 2023
    - Tabling, Feb. 9, 2023, JBK
    - Do Your Own Presentation, Feb. 9, 2023

10

- o  Game Night, Feb. 16, 2023

- o  Bob Ross Group Painting, Feb. 23, 2023, CC335

- o  Ice Cream and Imposters, March 2, 2023

- o  Queer Movie Night, March 9, 2023

- o  Jackbox Games, March 23, 2023, CC335

- o  Drag show practice, March 28, 2023

- o  Queer History Night, March 30, 2023

- o  Buffs for Drag Picnic, March 31, 2023

- o  Queer Movie Night, April 13, 2023

- o  Potluck, April 20, 2023

- o  End of Semester Study Breaks, May 4, 2023

- o  Back to Class Cookout, June 22, 2023

- o  Practices for the A Fool's Drag Race in March 2023

- o  Buffs for Drag Picnic, March 31, 2023, Old Main West Lawn

- Fall 2023

  - o  Board Game Night, Aug. 24, 2023

  - o  Studio Ghibli Movie Night, Aug. 31, 2023

  - o  Jackbox Games, Sept. 7, 2023

  - o  Do You Own Presentation, Sept. 14, 2023

  - o  Bob Ross Painting Night, Sept. 21, 2023

  - o  Queer History Night, Oct. 5, 2023

  - o  Ice Cream Social, Oct. 12, 2023

11

App. 344

- Frantic Fanfic, Oct. 19, 2023

- Jackbox Games, Oct. 26, 2023

- Potluck, Nov. 2, 2023

- Queer History Night, Nov. 9, 2023

- Craft Night, Nov. 16, 2023

- Secret Santa, Nov. 30, 2023

- Festival of Lights, Nov. 29, 2023

- Spring 2024

  - Tabling, Jan. 17, 2024, JBK

  - First Meeting, Jan. 18, 2024, CC335

  - Jackbox Night, Feb. 8, 2024, CC335

  - Tabling, Feb. 9, 2024, JBK

  - Drag Show Practice, Feb. 28, 2024

  - Drag Show Practice, March 1, 2024

  - Drag Show Practice, March 6, 2024

  - Drag Show Practice, March 13, 2024

  - Drag Show Practice, March 15, 2024

  - Drag Show Practice, March 20, 2024

  - Painting and Craft Night, March 7, 2024, CC335

- Fall 2024:

  - Game Night, Aug. 22, 2024, CC335

  - First Meeting, Aug. 29, 2024, CC335

App. 345

- Elections, Sept. 12, 2024

- Tabling, Sept. 26, 2024, JBK

- Studio Ghibli Night, Sept. 26, 2024, CC335

- Sand Volleyball Night, Oct. 3, 2024, Volleyball Court

- Study Night, Oct. 10, 2024, CC335

- Halloween Lip Sync Variety Show, Oct. 11, 2024, FAC Blackbox

- Allies Workshop, Oct. 18, 2024, FAC 177

- Jackbox Game Night, Oct. 24, 2024, CC335

- PowerPoint Night, Nov. 7, 2024, CC335

- Night at the AC, Nov. 14, 2024, Activity Center

- Bake Sale, Nov. 21, 2024, JBK

- Friendsgiving Potluck, Nov. 21, 2024, CC335

- Secret Santa, Dec. 5, 2024, CC335

- Spring 2025:

  - Jackbox Night, Feb. 13, 2025, CC335

  - Valentine's Lip Sync Variety Show Rehearsal, Feb. 11, 2025

  - Valentine's Lip Sync Variety Show Tech Rehearsal, Feb. 20, 2025

  - Valentine's Lip Sync Variety Show, Feb. 21, 2025, Happy State Bank Studio Theater (Black Box), Sybil B. Harrington Fine Arts Complex

  - PowerPoint Night, Feb. 27, 2025, CC335

  - Childhood Game Night, March 27, 2025, CC311

13

App. 346

- o Spectrum Movie Night, April 10, 2025, CC311
- o "A Funny Thing Happened on the Way to the Forum" Watch Party, April 24, 2025, Branding Iron Theatre
- o Spring Potluck Picnic, Saturday, May 3, 2025, Hazel Kelly Wilson Room (JBK 107)
- Fall 2025:
  - o Platonic Speed Dating, Aug. 22, 2025, Room CC335
  - o First meeting, Sept. 4, 2025, Room CC335
  - o Arts and Crafts Night, Thursday, Sept. 18, 2025, Room CC335
  - o PowerPoint Night, Monday, Oct. 2, 2025, Room CC335
  - o Midterms Kickback Game Night, Oct. 16, 2025, Room CC335
  - o Halloween Costume Party, Thursday, Oct. 30, 2025, Room CC335
  - o Movie Night, Thursday, Nov. 13, 2025, Room CC335
  - o Holiday Party, Thursday, Nov. 20, 2025, Room CC335

**Interrogatory No. 5**

Identify and describe all Spectrum WT events held off campus from 2020 to the present time.

**Objections:**

Plaintiff objects to this Interrogatory on the basis that the information sought is not proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1). The information sought pertains to events held at other locations, but the availability or

14

use of venues in other locations is not relevant to the question of whether Plaintiff is entitled to use West Texas A&M University venues. *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 556 (1975) ("[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.")

Plaintiff further objects to this Interrogatory on the basis that "events" is vague and ambiguous because it is undefined.

Plaintiff further objects to this Interrogatory because it seeks information over a period of nearly six years, beyond the typical time an undergraduate student member of the organization would be enrolled.

Plaintiff further objects to this Interrogatory's use of the term "describe" as overbroad, not proportional to the needs of the case, and vague and ambiguous. That term would require Plaintiff to identify the "identity of each person participating in" the event, the "nature and substance of all communications that occurred in connection with" the event, and the "identity of all materials referring to or reflecting" the event.

To the extent this Interrogatory would compel Plaintiff to identify individual members or participants in its events, Plaintiff objects on the basis that it invades a qualified First Amendment privilege against the disclosure of information impairing its members' right to associate for the purpose of political, social, educational, and cultural ends. *See Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984); *see also NAACP v. Alabama*, 357 U.S. 449 (1958). Compulsory identification of individual

members of a student organization supporting LGBTQ+ students may expose its members to reprisal, the threat of physical coercion, or other public hostility, chilling its members' ability to associate in furtherance of Plaintiff's mission. *See Young Conservatives of Texas Found. v. Univ. of N. Texas*, No. 20-973, 2022 WL 2901007, at *2–3 (E.D. Tex. Jan. 11, 2022); *see also Familias Unidas v. Briscoe*, 544 F.2d 182, 192 (5th Cir. 1976); *Hastings v. N.E. Indep. Sch. Dist.*, 615 F.2d 628, 631-32 (5th Cir. 1980).

**Response:**

Subject to and without waiving the foregoing general and specific objections, Plaintiff directs Defendants to the records Defendants produced, which contain information about registered events held by Plaintiff. *See, e.g.*, Def_000079–Def_000089, Def_000100–Def_000101, Def_000105–Def_000108, Def_000834, Def_000848, Def_000849–Def_000850, and Def_000852. Records produced by Plaintiff in response to Defendants' First Set of Requests for Production (including events calendars, flyers, PowerPoint presentations, minutes, and social media posts promoting particular events) also identify the general nature of events held by Plaintiff.

Plaintiff further states that, based on a review of its records, other off-campus events it has primarily organized include:

- Bowling night, April 22, 2021

- Kind House Bakery volunteering event, Feb. 25, 2022

- Palo Duro Hike (in 2022 or 2023)

16

- Drag performance in Sam Houston Park, March 31, 2023

- Bubble Bar Social, Oct. 17, 2024

- Bubble Bar Social, Feb. 22, 2025

- Coffee Chat, Palace Coffee Company, Feb. 28, 2025

- Tabletop Tavern Social, March 6, 2025

**Interrogatory No. 6**

Identify all persons who performed in the 2023 Drag Show or who Spectrum WT intended to perform in the 2024 Drag Show.

**Objections**:

Plaintiff objects to this Interrogatory on the basis that "performed" and "perform" are vague and ambiguous because contributions to an on-stage performance include a variety of roles, including actors, dancers, emcees, speakers, and persons involved in technical aspects of the performance (such as lighting, sound, and music). Plaintiff construes this Interrogatory to be limited to actors, dancers, and emcees.

**Response:**

Subject to and without waiving the foregoing general and specific objections, Plaintiff directs Defendants to Barrett Bright's March 17, 2023 email to Shawn M. Fouts at 11:28 P.M. providing a list of stage names. Plaintiff further states that, based on a review of its records, the performers in the 2023 "A Fool's Drag Race" and invited performers in the 2024 "Don't Be A Drag, Drag Show" include:

17

- A Fool's Drag Race (2023):
    - Barrett Bright
    - Marcus Stoval (f/k/a Lauren Stovall)
    - Henry Tarr
    - Cam (a/k/a Ferris)
    - Allexa Rea
    - Lymitra
    - Valentine Van Buren
    - Erin Klein (a/k/a K.)
    - Michael Arredondo (a/k/a Myss Mykah) (as emcee)
- "Don't Be A Drag, Drag Show" (2024):
    - Aaron Homfeld (a/k/a Finn Icky)
    - Barrett Bright
    - Chance Autry (a/k/a Frost Addams)
    - Izzy Fernandez
    - Jillian (a/k/a Judas Chariot)
    - Erin Klein (a/k/a K.)
    - Marcus Stoval (f/k/a Lauren Stovall)
    - Michael Arredondo (a/k/a Myss Mykah)
    - Micah Truong
    - Ricky Rose Shields (a/k/a Myss Acrylica Pourette)
    - Jesus Lopez (a/k/a Elliott Lopez)

18

**Interrogatory No. 7**

If you contend that "President Wendler. . .has caused and continues to cause Spectrum WT and its members irreparable harm" as described in Paragraph 4 of your Amended Complaint:

A. State the facts that support your contention; and

B. Identify all documents that support your contention.

**Response:**

Subject to and without waiving the foregoing general and specific objections, Plaintiff states that Defendant Wendler has and continues to exclude Plaintiffs from accessing a designated public forum on the basis of viewpoint and content, imposing a prior restraint on drag performances in venues Plaintiffs are entitled to use under the First Amendment, Texas state law, and Texas A&M System and West Texas A&M University policy and practice.

Plaintiff further states that documents supporting its contentions will be produced in response to Defendants' First Set of Requests for Production. Plaintiff further states that documents supporting Plaintiff's contention include, but are not limited to:

- Tex. Educ. Code § 51.9315.
- Texas A&M University System and West Texas A&M University policies and handbooks, including the current and prior versions of:
    - TAMUS Policy No. 08.02 (Expressive Activity on Campus)
    - TAMUS Policy No. 08.02.01 (Expressive Activity on Campus)

19

- o WTAMU Policy No. 08.9.99.W1 (Expressive Activity on Campus)

- o WTAMU Policy No. 24.01.01.W0.01 (Facilities Use Request Procedure)

- o WTAMU Policy No. 07.03.01.W1 (Political Campaign Events in Facilities Under the Control of West Texas A&M University)

- o Jack B. Kelley Student Center Policies Manual

- o Jack B. Kelly Student Center Procedures and Guidelines

- o West Texas A&M University "Code of Student Life," "Student Handbook," and "Student Rules"

- o Campus Organizations Handbook

- o West Texas A&M's risk assessment forms and matrices

- Communications and publications promoting the availability or suitability of Legacy Hall for use for expressive activity by students, student organizations, or the general public, including:

- o The JBK Student Center website, including the homepage, mission statement, event venues page, meetings and conference rooms descriptions, and production services page;

- o Pricing guides for the use of JBK Student Center spaces by students, student organizations, or the public;

- o The "25 Live" event reservations page and any forms utilized for the reservation of campus spaces (including Legacy Hall);

- o TheKnot.com entry promoting JBK venues;

20

- Prior uses of Legacy Hall, including those identified in Plaintiff's First Amended Complaint; Motion for Preliminary Injunction; exhibit list for the Sept. 10, 2025, status conference; briefing in the United States Court of Appeals for the Fifth Circuit; and briefing in the Supreme Court of the United States. Additional examples of prior uses of campus spaces may be found in Plaintiff's production of documents, which includes event calendars, news articles, flyers (or other promotional materials), photos of events, videos of events, and social media posts promoting or documenting past and future events.

- Web pages, social media posts and pages, and other promotional material for organizations or individuals that have held or will hold events in Legacy Hall.

- Examples of prior drag performances in Legacy Hall and other JBK facilities. Examples of prior drag performances may be found in Plaintiff's production of documents, which includes event calendars, news articles, flyers (or other promotional materials), photos of events, videos of events, and social media posts promoting or documenting past and future events.

- Walter Wendler's communications and public commentary (including that documented through news articles, recorded interviews, and public appearances) concerning drag performances (including but not limited to his statements of March 20, 2023, and March 18, 2024, drafts of the

21

App. 354

same, and research he conducted), LGBTQ+ issues, freedom of expression, the role of universities, Wendler's values, and West Texas A&M University's values.

- Records produced by West Texas A&M University in response to a Public Information Act request.

- West Texas A&M University's Event Management System database entries pertaining to cancelled events.

- West Texas A&M University's internal communications (including emails, text messages, and Event Management System entries) pertaining to the applications, processing, and institutional responses to Plaintiff's proposed drag performances.

- Records (including press releases, news articles, and emails) pertaining to the relationship between Alex Fairly, Walter Wendler, West Texas A&M University, and the West Texas A&M University Foundation.

- Documents relating to the costs incurred in arranging an off-campus venue in March 2023 (including invoices and receipts) and communications pertaining to efforts to locate off-campus venues and to coordinate with performers and prospective attendees concerning the venue for the off-campus performance.

- Defendants' responses to interrogatories.

22

**Interrogatory No. 8**

Explain what criteria Spectrum WT used in deciding that it considered its 2023 drag show was "PG-13."

**Response:**

Subject to and without waiving the foregoing general and specific objections, Plaintiff states that the "PG-13" movie rating serves as a cultural shorthand that may be informed by, among other things, the criteria established by the Motion Picture Association. Content ratings are an appropriate means to inform people about the content of performances, films, music, and other media. For example, "PG-13" may inform others that content is suitable for those 13 or older, but in all cases, leaves the decision to parents as to whether to make the content available to their children.

Plaintiff further states that in preparing its 2023 drag performance, Plaintiff directed performers to avoid vulgar music or music with profanity in the lyrics (or to utilize a sanitized, radio-friendly version of the song omitting profanity). Plaintiff further apprised performers and the event's emcee that the event would not involve lewd content. During rehearsals, performers and students discussed what to do and what not to do in providing feedback to one another. In evaluating whether his performance would satisfy a PG-13 rating and be appropriate for a drag show, Marcus Stovall considered that Patrick Starr (a male character from *Spongebob Squarepants*, a children's television program suitable for children ages 7 and up) wears fishnet stockings and high-heels.

23

<span style="color:red">App. 356</span>

<u>**Interrogatory No. 9**</u>

If you contend that "President Wendler also retaliated and is continuing to retaliate against Plaintiffs because of their protected expression," as described in Paragraph 220 of your Amended Complaint:

A. Identify all alleged acts of retaliation by President Wendler against the Plaintiffs; and

B. Identify all documents that support your contentions.

**Objections:**

Plaintiff objects to this Interrogatory on the basis that it is not relevant. Paragraph 220 of the Amended Complaint relates to Plaintiff's Fourth Cause of Action, which the United States District Court for the Northern District of Texas dismissed on Sept. 21, 2023. ECF No. 59 at 20. Plaintiff reserves the right to amend these responses in the event that the Fourth Cause of Action is restored.

Plaintiff further objects to this Interrogatory's use of the term "identify" as not proportional to the needs of the case. That term would require Plaintiff to describe documents that speak for themselves, the date of their creation, their creator/owner, their physical or digital location, and the person who has custody of the physical or digital document, the "identity of each person participating in" the event, the "nature and substance of all communications that occurred in connection with" the event, and the "identity of all materials referring to or reflecting" the event.

24

**Response:**

Subject to and without waiving the foregoing general and specific objections, Plaintiff states that, among other things, President Wendler has imposed a viewpoint-discriminatory prior restraint on Plaintiff's protected expressive activity. President Wendler's animus for Plaintiff's expression is stated in his repeated, public pronouncements published to the university community, to donors, and to the public. President Wendler has intentionally drawn negative public attention to Plaintiff and its members through his repeated public denunciations, which he has used to attract support from donors and political officials for West Texas A&M University.

**Interrogatory No. 10**

If you contend that "Plaintiffs engaged in expression protected by the First and Fourteenth Amendments, including promoting, publishing, and organizing messaging about drag shows," as described in Paragraph 221 of your Amended Complaint:

A. Identify all instances in which you contend Spectrum WT was prohibited from promoting, publishing, or organizing messaging about drag shows; and

B. Identify all documents that support your contentions.

**Objections:**

Plaintiff objects to this Interrogatory on the basis that it misstates Paragraph 221 of the Amended Complaint. That paragraph does not allege that Defendants prohibited Plaintiffs from "promoting, publishing, and organizing messaging about

25

drag shows." Instead, Paragraph 221 alleges that Plaintiff engaged in protected speech relating to drag shows.

Plaintiff objects to this Interrogatory on the basis that it is not relevant. Paragraph 221 of the Amended Complaint relates to Plaintiff's Fourth Cause of Action, which the United States District Court for the Northern District of Texas dismissed on Sept. 21, 2023. ECF No. 59 at 20. Plaintiff's remaining injunctive relief claims concern Plaintiff's intent or desire to engage in protected expression in the future.

Plaintiff further objects to this Interrogatory's use of the term "identify" as not proportional to the needs of the case. That term would require Plaintiff to describe documents that speak for themselves, the date of their creation, their creator/owner, their physical or digital location, and the person who has custody of the physical or digital document, the "identity of each person participating in" the event, the "nature and substance of all communications that occurred in connection with" the event, and the "identity of all materials referring to or reflecting" the event.

**Response:**

Subject to and without waiving the foregoing general and specific objections, Plaintiff states that the First Amendment protects drag performance, yet Defendants have prohibited drag performances on campus and canceled Plaintiff's on campus drag performances. West Texas A&M University also subjects students and student organizations to prior restraints on promotional material that may be distributed about an event. By way of example, West Texas A&M University staff denied

permission for Plaintiff to distribute posters, flyers, or other written material promoting the "A Fool's Drag Race" because of the content. In particular, at least one proposed (and rejected) mockup depicted a character doing the "splits" (a dance routine). This mockup, as well as other proposed promotional material submitted to university staff for review, will be produced in response to Defendants' First Set of Requests for Production.

Plaintiff further states that university staff removed chalk on campus on or about March 27, 2023, protesting Wendler's decision, as reflected in emails from Adriana Rademacher.

**Interrogatory No. 11**

If you contend that "President Wendler's actions in response to Plaintiffs' message are sufficient to deter a person of ordinary firmness from continuing to engage in expressive activity," as described in Paragraph 226 of your Amended Complaint:

A. List all expressive activities Spectrum WT has ceased because of President Wendler's actions; and

B. Identify all documents that support your contentions.

**Objections:**

Plaintiff objects to this Interrogatory on the basis that it is not relevant. Paragraph 226 of the Amended Complaint relates to Plaintiff's Fourth Cause of

27

App. 360

Action, which the United States District Court for the Northern District of Texas dismissed on Sept. 21, 2023. ECF No. 59 at 20.

Plaintiff further objects to this Interrogatory on the basis that whether Plaintiff has continued or discontinued particular expressive activities as a result of Defendant Wendler's conduct is not relevant and calls for a legal conclusion. A First Amendment retaliation claim turns on whether the defendant's conduct "would chill a person of ordinary firmness from continuing to engage in that activity." *Bailey v. Ramos*, 125 F.4th 667, 684–85 (5th Cir. 2025). Because that standard is objective, Plaintiff's subjective response is not relevant.

Plaintiff further objects to this Interrogatory's use of the term "identify" as not proportional to the needs of the case. That term would require Plaintiff to describe documents that speak for themselves, the date of their creation, their creator/owner, their physical or digital location, and the person who has custody of the physical or digital document, the "identity of each person participating in" the event, the "nature and substance of all communications that occurred in connection with" the event, and the "identity of all materials referring to or reflecting" the event.

**Response:**

Subject to and without waiving the foregoing general and specific objections, Plaintiff states that, among other things, President Wendler has imposed a viewpoint-discriminatory prior restraint on Plaintiff's protected expressive activity. President Wendler's animus for Plaintiff's expression is stated in his repeated, public pronouncements published to the university community, to donors, and to the public.

28

President Wendler has intentionally drawn negative public attention to Plaintiff and its members through his repeated public denunciations, which he has used to attract support from donors and political officials for West Texas A&M University.

Further, President Wendler has exercised unfettered discretion in censoring Plaintiff's protected expression, unbounded by any narrow, clear, and objective criteria, but based instead on Wendler's conjecture and personal beliefs about Plaintiff's expression. This underscores the chilling effect on a person of ordinary firmness, who, like Plaintiffs, would be left guessing about whether their protected expression is at odds with Wendler's views and authority.

President Wendler has cancelled two of Plaintiff's planned drag performances at West Texas A&M University.


**Interrogatory No. 12**

If you contend that "President Wendler's action have caused Spectrum WT fear that the organization's good standing will be jeopardized," as described in Paragraph 227 of your Amended Complaint:

A. State the facts that support your contention; and

B. Identify all documents that support your contention.

**Objections:**

Plaintiff objects to this Interrogatory on the basis that it is not relevant. Paragraph 227 of the Amended Complaint relates to Plaintiff's Fourth Cause of

App. 362

Action, which the United States District Court for the Northern District of Texas dismissed on Sept. 21, 2023. ECF No. 59 at 20.

Plaintiff further objects to this Interrogatory on the basis that whether Plaintiff has continued or discontinued particular expressive activities as a result of Defendant Wendler's conduct is not relevant and calls for a legal conclusion. A First Amendment retaliation claim turns on whether the defendant's conduct "would chill a person of ordinary firmness from continuing to engage in that activity." *Bailey v. Ramos*, 125 F.4th 667, 684–85 (5th Cir. 2025). Because that standard is objective, Plaintiff's subjective response is not relevant.

Plaintiff further objects to this Interrogatory's use of the term "identify" as not proportional to the needs of the case. That term would require Plaintiff to describe documents that speak for themselves, the date of their creation, their creator/owner, their physical or digital location, and the person who has custody of the physical or digital document, the "identity of each person participating in" the event, the "nature and substance of all communications that occurred in connection with" the event, and the "identity of all materials referring to or reflecting" the event.

**Response:**

Subject to and without waiving the foregoing general and specific objections, Plaintiff states that, among other things, President Wendler has imposed a viewpoint-discriminatory prior restraint on Plaintiff's protected expressive activity. President Wendler's animus for Plaintiff's expression is stated in his repeated, public pronouncements published to the university community, to donors, and to the public.

30

President Wendler has intentionally drawn negative public attention to Plaintiff and its members through his repeated public denunciations, which he has used to attract support from donors and political officials for West Texas A&M University.

Further, President Wendler has exercised unfettered discretion in censoring Plaintiff's protected expression, unbounded by any narrow, clear, and objective criteria, but based instead on Wendler's conjecture and personal beliefs about Plaintiff's expression. This underscores the chilling effect on a person of ordinary firmness, who, like Plaintiffs, would be left guessing about whether their protected expression is at odds with Wendler's views and authority, and whether their protected expression may later be viewed as violative of Wendler's subjective determinations about whether the expression is appropriate.

**Interrogatory No. 13**

If you contend that "President Wendler's actions have chilled the expression of individual members of Spectrum WT as they relate to drag, sexual orientation, and gender identity," as described in Paragraph 228 of your Amended Complaint:

A. State the facts that support your contentions; and

B. Identify all documents that support your contentions.

**Objections:**

Plaintiff objects to this Interrogatory on the basis that it is not relevant. Paragraph 228 of the Amended Complaint relates to Plaintiff's Fourth Cause of

31

Action, which the United States District Court for the Northern District of Texas dismissed on Sept. 21, 2023. ECF No. 59 at 20.

Plaintiff further objects to this Interrogatory on the basis that whether Plaintiff has continued or discontinued particular expressive activities as a result of Defendant Wendler's conduct is not relevant and calls for a legal conclusion. A First Amendment retaliation claim turns on whether the defendant's conduct "would chill a person of ordinary firmness from continuing to engage in that activity." *Bailey v. Ramos*, 125 F.4th 667, 684–85 (5th Cir. 2025). Because that standard is objective, Plaintiff's subjective response is not relevant.

Plaintiff further objects to this Interrogatory's use of the term "identify" as not proportional to the needs of the case. That term would require Plaintiff to describe documents that speak for themselves, the date of their creation, their creator/owner, their physical or digital location, and the person who has custody of the physical or digital document, the "identity of each person participating in" the event, the "nature and substance of all communications that occurred in connection with" the event, and the "identity of all materials referring to or reflecting" the event.

**Response:**

Subject to and without waiving the foregoing general and specific objections, Plaintiff states that Defendant Wendler cancelled multiple events at which individual students would have expressed themselves on the subjects of drag, sexual orientation and support for the LGBTQ+ community at WT, and gender identity. Defendant Wendler's conduct has also caused students, including members of Plaintiff, to

reconsider their participation in organizing or performing in planned drag performances because of potential repercussions.

Dated: December 4, 2025                    Respectfully submitted,

                                            /s/ JT Morris
                                            JT MORRIS
                                            TX Bar No. 24094444
                                            FOUNDATION FOR INDIVIDUAL RIGHTS
                                               AND EXPRESSION
                                            700 Pennsylvania Ave., SE; Ste. 340
                                            Washington, DC 20003
                                            Tel: (215) 717-3473
                                            Fax: (267) 573-3073
                                            jt.morris@thefire.org

                                            CONOR T. FITZPATRICK*
                                            MI Bar No. P78981
                                            ADAM B. STEINBAUGH*
                                            CA Bar No. 304829
                                            JEFFREY D. ZEMAN*
                                            MI Bar No. P76610
                                            FOUNDATION FOR INDIVIDUAL RIGHTS
                                               AND EXPRESSION
                                            510 Walnut St.; Ste. 900
                                            Philadelphia, PA 19106
                                            Tel: (215) 717-3473
                                            Fax: (267) 573-3073
                                            conor.fitzpatrick@thefire.org
                                            adam@thefire.org
                                            jeff.zeman@thefire.org

                                            * Admitted *Pro Hac Vice*

                                            *Counsel for Plaintiff*

App. 366

## VERIFICATION OF AMENDED INTERROGATORY RESPONSES

I, Johnathan-Jayce Walker Fanelli-Burnett, am the President of Spectrum WT, the Plaintiff in the matter of *Spectrum WT v. Wendler*, et al., No. 2:23-cv-00048 in the United States District Court for the Northern District of Texas. I believe, based on reasonable inquiry, that the foregoing amended answers to Defendants Walter Wendler and Christopher Thomas's First Set of Interrogatories to Plaintiff Spectrum WT are true and correct to the best of my knowledge, information, and belief.

Under 28 U.S.C. § 1746, I verify under penalty of perjury that the foregoing is true and correct. Executed on December 4, 2025.

_____

Johnathan-Jayce Walker Fanelli-Burnett

## CERTIFICATE OF SERVICE

I hereby certify that on December 4, 2025, I served the foregoing document by e-mail to the following:

David Bryant

David.Bryant@oag.texas.gov


Munera Al-Fuhaid

Munera.Al-Fuhaid@oag.texas.gov


Zachary Berg

Zachary.Berg@oag.texas.gov


Date:   December 4, 2025

/s/ Adam Steinbaugh
Adam Steinbaugh
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION





DEFENDANT'S
EXHIBIT

3

FANELLI

WEST TEXAS A&M
U N I V E R S I T Y ™

An Emblem of Innovation, Excellence,
and Values – West Texas A & M University

## WEST TEXAS A&M UNIVERSITY

Walter V. Wendler | President

theeducationinsights.com

# West Texas A&M University: An Emblem of Innovation, Excellence, and Values West Texas A&M University

A renowned author and inspirational persona, Clay P. Bedford has well asserted, *"You may teach a student a lesson for a day, but if you can teach them to learn by developing curiosity, they will continue the learning process as long as they live."* Education is the steppingstone for development and a solid platform to success for those who have the courage and dedication for it.

The Education Insights Magazine has been a strong supporter of all the initiatives that promote high-quality education and inspire students to pursue their ambitions. With regard to including several education-based platforms in our portfolio, we have an exceptional track record. And here again, we are back with another tale of excellence to introduce a well-established public university located in Canyon in Texas – West Texas A&M University.

West Texas A&M University, also known WT, and part of the Texas A&M University System, was established on September 20, 1910, as one of the seven state-funded teacher colleges in Texas.

Guided by its pioneering spirit, WT is renowned for its excellence in teaching, creating a positive learning environment, and placing a strong emphasis on involving students in experiences that facilitate the growth of skills, capabilities, and insights. WT's vision is to become a Regional Research University responsive to the rural forces that shape who they are, from the Panhandle to the world. WT's distinctive focus on the people and places of the Panhandle region is acknowledged throughout Texas, across the country, and around the world.

Factors that Make West Texas A&M University Stand Out

Dr. Walter V. Wendler affirms his views on the differentiating elements of the university by saying, *"We value above all else the ... of teaching and the impact that education has on the life aspirations of students. This certainty infuses every element of campus ... and*

FANELLI 3

Students, teachers, and alumni at this institution are making an impact through innovation and service. The University's teaching goes far beyond the classroom, involving business partners and practitioners to provide real-world experiences for students. Technology created through their research programs is reshaping the globe. WT can significantly increase the value of each student, their family, and the communities in which they live and work.

**The Latest Tech Evolution in the Higher Education**

Higher education's environment is continually changing. Institutions have undoubtedly evolved, but there is much more to achieve. Although traditional campuses and course delivery have persisted, online education has had the biggest impact on higher education. In addition, demographics of the student body have changed. The percentage of minority students in the student body has increased significantly. First-generation students are now more prevalent than ever, and the average age of students has continued to rise. Also, the cost of higher education continues to increase. Higher education will need to evolve to meet these challenges and address changing student needs.

**Dynamic Leadership**

*Dr. Walter V. Wendler – President*

Walter V. Wendler was appointed the 11th President of West Texas A&M University (WT) on September 1, 2016. He came to WT from Southern Illinois University Carbondale, where he served as Chancellor from July 1, 2001 to June 30, 2007. He returned to teaching Architecture until December 31, 2015.

Dr. Wendler received his Ph.D. from the University of Texas; the professional master of architecture from the University of California, Berkeley; the bachelor of environmental design from Texas A&M University; and the associate in applied science from the State University of New York at Farmingdale.

Walter V. Wendler was reared in Northport, New York. He graduated high school there in 1968. He married Mary L. Haney in 1973. They have two married sons, Walter III and Bradley, both graduates of Texas A&M University, and six grandchildren. They are active in their local church.

**The Institute Built on Values**

West Texas A&M University values are inspired by the people of the plains, towns, ranches, farms and communities of the Texas Panhandle. Regardless of background, family history, personal beliefs or aspirations, everyone who meeting the standards of performance will realize the benefits WT has to offer. WT will create in its students a commitment to being self-reliant, courageous, resourceful, and part of something bigger than one's self.

The University's core values are reflective and responsive to the people WT serves:

- **Academic Freedom:** The free exchange of ideas.
- **Service:** Putting the needs of others first.
- **Pragmatism:** They seek to apply what they learn for the betterment of the community.
- **Innovation:** They embrace better ways to shape the future.
- **Respect:** They treat others with dignity which flows from the humanity of each individual.
- **Engagement:** They promote citizenship and being part of something larger than oneself.

**The Future Outlook of West Texas A&M University**

West Texas A&M University has steadily expanded while pursuing its objective to offer academic programs that are intellectually demanding, critically introspective, geographically relevant, and inclusive to develop the next generation of global citizens. By 2035, when WT celebrates its 125th anniversary, the University aims to achieve a doctoral rank in the Carnegie classifications of institutions with a strong unique mission as a Regional Research University.

*For more than a century, West Texas A&M University has dedicated itself to comprehending the goals of the young people in our area. ng a regional institution, it has always been critical to fulfilling their aspirations, and for the next one hundred years, we will do so by pursuing*

*the students, professors, and staff, the Panhandle, and the world.*

A Plan for One

*"No silver bullet describes the best way to select a college to attend – no chatbot, algorithm, machine-driven artificial intelligence, or other means of sifting through various issues important to future college students provide a foolproof answer. There must be a "plan for one," created by one and supported by those who love the other." – Dr. Walter V. Wendler*

The point of developing a Plan for One is to allow aspirations and dreams, configured through strengths and weaknesses and responsive to potentials and opportunities, can chart and clear a path for the beginnings of a fulfilled life.

In no particular order, here are some Plan for One possibilities. Attending and completing a community college degree or certification program for a career-oriented course of study is practical and worthwhile. Service to our nation in one of the military branches can be very satisfying and is noble. Working on the family farm, ranch or business, can move an individual and a family forward, and it is a legacy. Trade, vocational school or an apprenticeship in a skilled trade can support a fine life and be very satisfying. Working in a personal business or startup company can use individual will and motivation to contribute to the very best of American free enterprise. And lastly, a carefully thought-out plan for university attendance can be empowering and satisfying.

A 2018 study by Eduventures Research surveyed 100,000 American high school students and their decisions to attend a particular college. Among other things, the top five considerations were, in this order: (1) affordability (2) desired programs (3) reputation/academic quality (4) career outcomes/job opportunities (5) the value of education for the cost of attending. In the business world, we call the last consideration a return on investment (ROI).

Previous Post

The 10 Best Universities in 2023

Next Post

The 10 Most Inspiring Leaders in Education 2023

f     𝕏     in     ⊙     ⊚     [/vc_column_inner][vc_column_inner width="5/12"][vc_custom_heading text="Recent News" font_container="tag:h2|text_align:left|color:%23ffffff" use_theme_fonts="yes"]

[/vc_row_inner][vc_empty_space height="22px"][vc_empty_space height="22px"][vc_separator][vc_row_inner][vc_column_inner width="4/12"][vc_custom_heading text="Copyright © 2025 – The Education Insights. All rights reserved." font_container="tag:p|font_size:14|text_align:left|color:%23ffffff" google_fonts="font_family:Source%20Sans%20Pro%3A200%2C200italic%2C300%2C300italic%2Cregular%2Citalic%2C600%2C600italic%2C700%2C700italic%2C900%2C9 [/vc_column_inner][vc_column_inner width="3/12"][/vc_column_inner][vc_column_inner width="5/12"]

[/vc_column_inner][/vc_row_inner][/vc_column][/vc_row]

App. 372

HOME > ABOUT > WT 125
University Mission, Vision and Core Values

## UNIVERSITY MISSION, VISION AND CORE VALUES



### MISSION STATEMENT

The mission of West Texas A&M University is to provide intellectually challenging, reflective, regionally responsive, and comprehensive academic programs that discover, interpret, apply, and disseminate knowledge for preparing the next generation of citizens in Texas, the nation, and the world.

### VISION STATEMENT

Guided by its pioneering spirit, West Texas A&M University is recognized for its excellence in teaching and learning, and a strong focus on engaging students in experiences that aid in the development of skills, capabilities, and insights. Our vision is to become a Regional Research University responsive to the forces that shape who we are. Our distinctive focus on the people and places of the Panhandle region will be acknowledged throughout Texas, across the country, and around the world.

### CORE VALUES STATEMENT

The core values of West Texas A&M University are reflective of, inspired by, responsive to the people we serve, regardless of background, family history, personal beliefs, or aspirations. The people of the plains, in towns and communities, on ranches and farms spend every day living out their commitment to family, faith, hard work, and service to neighbors—locally, regionally, and globally. From these same Panhandle values, grow WT's core values:

**Academic Freedom**
We champion the free exchange of ideas.

**Service**
We put the needs of others first.

**Pragmatism**
We seek to apply what we learn for the betterment of our community.

**Innovation**
We embrace better ways to shape the future.

**Respect**
We treat others with dignity which flows from the humanity of each individual.

**Engagement**
We promote citizenship and being part of something larger than oneself.

Accessibility
Accreditation
Consumer Information
Contact WT
Counseling & Mental Health Services (HB 2895)

Emergency Information
Energy Management Report (PDF)
Equal Opportunity & Nondiscrimination
Family Educational Rights and Privacy Act
Form Policy

DEFENDANT'S
EXHIBIT
4
App. 373
PENGAD 800-631-6989
FANELLI

# Chicago-Kent Law Review

Volume 75                                                                                          Article 4

Issue 3 *Symposium on Unfinished Feminist Business*

June 2000

# Drag = Blackface

Kelly Kleiman

Follow this and additional works at: https://scholarship.kentlaw.iit.edu/cklawreview

 Part of the Law Commons





## Recommended Citation

Kelly Kleiman, *Drag = Blackface*, 75 Chi.-Kent L. Rev. 669 (2000).

Available at: https://scholarship.kentlaw.iit.edu/cklawreview/vol75/iss3/4

This Article is brought to you for free and open access by Scholarly Commons @ IIT Chicago-Kent College of Law.
It has been accepted for inclusion in Chicago-Kent Law Review by an authorized editor of Scholarly Commons @ IIT

W 000110

App. 374

Chicago-Kent College of Law. For more information, please contact jwenger@kentlaw.iit.edu, ebarney@kentlaw.iit.edu.

# DRAG = BLACKFACE

KELLY KLEIMAN*

To most educated Americans, performance in blackface is an artifact of long ago, an embarrassing reminder of a distant past in which overt racism was tolerated, as obsolete a form of cultural expression as lawn jockeys or the Uncle Tom in the turn-of-the- century Cream of Wheat ads. In fact, though, the consensus that blackface performance is intolerably racist is of relatively recent vintage. Before that, analyses of blackface minstrelsy-even those that conceded its racism-concentrated on the meaning of the performance to the performers and the audience, ignoring or discounting its meaning to, and impact on, the people being portrayed.

That is the current state of scholarship about performance in drag. Why hasn't our understanding that blackface is insulting extended itself to drag? In this Essay, I hope to begin that extension, suggesting that the same arguments that forged the cultural consensus against blackface should forge a consensus against drag. We retain a salutary sense of shock when the BBC replaces James Earl Jones as Othello with a white actor in blackface.[1] What will it take to develop that sense of shock when a man plays Lady Bracknell?

In this Essay, "drag" means men dressing as women in public, especially in performance. I argue that a whole range of activities, from vaudeville "illusionists" to the pantomime dame, from *Mrs. Doubtfire* to *La Cage aux Folles,* from cross-dresser balls in Harlem to Hasty Pudding theatricals at Harvard, represent institutionalized male hostility to women on a spectrum running from prescription of desired behavior to simple ridicule. These performances may be glamorous or comic, and presented by gay men or straight men. Nonetheless, all of them represent a continuing insult to women, as is apparent from the parallels between these performances and those of white performers of blackface minstrelsy.

* The author would like to thank Professor Anita Bernstein of Emory University School of Law for her helpful comments and indispensable advice and support in the shaping of this Essay.

1. *See* WILLIAM TORBERT LEONARD, MASQUERADE IN BLACK 123-25 (1986).

669

W_000112
App. 376

My definition of drag excludes private transvestism precisely on the grounds of its privacy, though I invoke the arguments made for public acceptance of transvestism as examples of bad reasoning in support of drag. The definition also excludes women dressing up as men, for reasons that will become clear.

Drag and blackface in American culture are similar in a number of respects. First, each is a masquerade in which powerful or privileged people dress up as less powerful or less privileged people. Examples are legion though, pointedly, examples of drag are more current than those of blackface. Major contemporary Hollywood movies such as *Tootsie* and *The Birdcage* have drag as a central plot device, while the last use of blackface in American film is in movies of the 1950s that are almost never seen. Similarly, drag is pervasive on television, from *Flip Wilson* to *Monty Python's Flying Circus* to *Bosom Buddies* (in which Tom Hanks got his big break in a dress), while blackface is unknown: even the repulsive *Amos 'n' Andy*, originally written by and for two white comedians, was televised featuring African-American actors.

Second, drag and blackface originated when the impersonated people were excluded from the stage; however, each outlasted that original excuse for its practice.[2] That is, audiences were curious to see Africans and African-Americans on the stage long before they were permitted to appear, and plots required the inclusion of women long before women were permitted on the English-speaking stage. But even after African-Americans gained access to the minstrel stage, white performers continued to impersonate them. Similarly, long  after women were permitted on the stage-to this day, in fact-men continue to appear as women.

These practices led to expectations of what the impersonated person ought to look like. For instance, the convention of white performers impersonating African-Americans was so powerful that black performers were required to wear blackface.[3] It seems  ludicrous now that black performers had to "black up" to play themselves- that is, black people. But this is no different from women having their breasts enlarged so they will be sufficiently feminine. African-Americans had to be a particular kind of black to

---

2. For a history of blackface minstrelsy, see ROBERT C. TOLL, BLACKING UP: THE MINSTREL SHOW IN NINETEENTH-CENTURY AMERICA (1974). For a history of performance in drag, see ROGER BAKER, DRAG: A HISTORY OF FEMALE IMPERSONATION IN THE PERFORMING ARTS (1994).

3. *See* TOLL, *supra* note 2, at 200-01.

W_000113

App. 377

be black enough to satisfy white people; women have to be a particular kind of feminine to be woman enough to satisfy men.

Third, drag and blackface show the person(s) being impersonated in a restricted range of behaviors, characterized by exaggeration that is at least interpretable as insult. African- Americans were shown singing, dancing, being foolish, or longing for the old plantation; women are shown primping, nagging, or longing for male protection. With respect to blackface, at least, the scholarly consensus is clear: such "stereotyping was a primary example of the majority culture's desire to maintain political, social, and economic control by transferring false theories of racial inferiority into a form of comic theater designed to demean African-Americans."[4] As Marlon Riggs notes in his documentary *Ethnic Notions,* blackface made "the distinctive physical features of blacks not only laughable but grotesque."[5] The big lips assigned to African-Americans by blackface performers have a virtually exact parallel in the big breasts that are mandatory for drag performers.

Blackface presents its exaggerations through two standard "types," Zip Coon (an urban dandy out of his depth) and Sambo (a shuffling rural fool). The first makes fun of black people for being free while the second ridicules them for being slaves. Drag has a pair of "types" of its own, the glamour girl and the pantomime dame (an elderly harridan). The first makes fun of women because of their sexuality and the second for their lack of it.[6] This commonality-in which the aspirations of African-Americans and the sexuality of women are either exaggerated or ignored-suggests the parallel nature of the practices.

Both pairs of tropes are deeply reactionary, and both assert that the people imitated need controlling. Zip Coon is out of control, a menace loose in the city; Sambo is simply incapable of caring for himself. The glamour girl is either predatory or helpless; the pantomime dame is either an idiot or a harpy. One and all, they are people who cannot-or cannot be permitted to-care for themselves. And people who do not care for themselves do not get to represent themselves. If people are incompetent to represent themselves, in the political as well as artistic sense, they have to be represented-which

4. William J. Mahar, *Ethiopian Skits and Sketches, in* INSIDE THE MINSTREL MASK 179, 182 (Annemarie Bean et al. eds., 1996).

5. ETHNIC NOTIONS: BLACK PEOPLE IN WHITE MINDS (California Newsreel 1987).

6. *See generally* BAKER, *supra* note 2.

W_000114
App. 378

is to say governed-by others.

I am hardly the first person to notice the larger consequences of performance images. Toll summarizes the problem with minstrel images of black people: "[W]hen white Americans later came in contact with Afro-Americans, whites who were disposed to confirm the caricatures could do it by focusing on the familiar elements, like superstition, love of music and dance, and the 'childish' belief in 'silly' animal fables and by ignoring everything else about blacks."[7] Likewise, even those who defend drag as a valuable or privileged public expression are easily able to articulate the central objection to it. Journalist Holly Brubach, author of a sympathetic portrait of drag queens (men both gay and straight "who dress as women in public, on social occasions"),[8] prefaces her book by saying, "What impressed me about drag ... was that it articulates men's idea of women     [T]he men I found who dress in drag most often became babes if not outright bimbos, bearing little resemblance to the ideal most women have set for themselves."[9] Similarly, Sambo bore little resemblance either to the antebellum slave or the postbellum freed black man of the south.

More insidiously, to the extent that there was a resemblance between Sambo-who resists work, tells lies, and fails to take seriously matters of great concern to the master-and any actual African-Americans in a condition of captivity or dependence, that resemblance was attributable not to black people but to slavery. Thus, Sambo was a presentation of the way white people prefer their black people, that is, enslaved. Moreover, the repetition of the Sambo stereotype conditioned white audiences to recognize only Sambo-like behaviors in the actual African-Americans they met. Small wonder that eradication of the stereotype was a priority for civil rights leaders.

Likewise, to the extent that there is a resemblance between male "pantomime dames" or "glamour girls" and actual women, that resemblance is an indictment of the conditions in which real women struggle rather than a justification of the practice of performance. In this light, the current popularity of drag seems ominous. It means that men become more insistent on displaying the traditional roles of women as many women challenge them: "No, no, you don't get it,

---

7.  TOLL, *supra* note 2, at 51.
8.  HOLLY BRUBACH, GIRLFRIEND: MEN, WOMEN, AND DRAG xviii (1999).
9.  *Id.* at xviii-xix.

being a woman looks like *this.*"

Fourth, the forms of drag and blackface perform the same function: to ease the minds of an audience threatened by change (whether this pertains to the coming of abolition or the advent of sexual equality) by presenting the agents of that change as ridiculous rather than frightening. Precisely because the performances are about change, what they "mean" is not a fixed thing but changes over time. T. D. "Daddy" Rice, the man whose minstrel turn as "Jim Crow" lends its name to every aspect of American racism, intendeq and imagined himself as a respectful interpreter of the exotic culture of African-Americans. Even that original intention could not and should not have saved blackface from its critics. At a certain point white audiences had to acknowledge that it was unfair for black people to bear the burden of being misrepresented for the purpose, mostly, of other people's comfort. It is about time to acknowledge the same thing about women.

Clearly, the forms are not identical, and the parallels between oppression based on race and oppression based on gender are inexact. Because gender cross-dressing is also associated with anxiety about sexuality (as blackface is not, at least in any obvious way), drag carries multiple meanings in a way that blackface does not. These multiple meanings contribute to the most striking way in which blackface and drag are not alike: the continued, unapologetic practice of drag.

An account of the process by which blackface became anathema-a confluence of events including the rise of the twentieth century civil rights movement and the rise of realism in the arts, especially the movies-is beyond the scope of this Essay.[10] Instead, I will consider the ideas around which that process coalesced. There are two of them: (1) that the portrait of African-Americans contained in blackface minstrelsy was an insult and (2) that the fact of portraiture itself was unacceptable. The first idea is based on *what* is portrayed and revulsion at such a portrayal. The second idea is based on *who* is portraying. It rests on the understanding that any cross- racial performance constitutes an appropriation-a theft-of blackness by whites.

The second half of the consensus is weak enough that people occasionally defend (the very few) contemporary uses of blackface by

---

10. *See* DONALD BOGLE, TOMS, COONS, MULATTOES, MAMMIES, AND BUCKS (3d. ed. 1994).

adverting to the intentions of the performer. When Ted Danson blacked up for a public performance in 1993, he and his long-time lover Whoopi Goldberg imagined that his nonracist credentials ("lover of a black woman") would protect him from objections.[11] They were wrong. If the insult is simply to believe that the culture and experience of black people is trivial enough to be put on like a costume, the intentions of the performer are not relevant. The content of the performance may be respectful, but the very fact of the performance is disrespectful.[12]

Most people understand this point well enough to be appalled on re-reading Norman Mailer's essay *The White Negro,* in which he posits African-Americans as the repository of authenticity from whom white people must learn. "Only by cultivating his 'dark, romantic, and yet undeniably dynamic view of existence' can the white man reconnect with the primitive, vital 'Negro' within himself, and thereby recapture his own vaunted 'individuality.'"[13]

This is an embarrassment to read today-get in touch with your inner Negro?-but how is it any different from announcements by male cross-dressers of every stripe (from straight transvestites to gay drag queens to Dustin Hoffman in the movie *Tootsie)* that wearing women's clothing enables them to get in touch with their authentic inner woman, their feminine side?[14] Taking this claim at face value, one sees the whole problem: drag enables men to decide, and then to claim, what is "feminine"; and it permits men to ascribe certain characteristics to women and certain others to men, and then regard the remaining characteristics as problematic if they happen to show up in a member of the wrong gender.

---

11. *See* Thomas Huang, *When the Laughter Stops,* DALLAS MORNING NEWS, Apr. 13, 1995, at IC (noting that Danson and Goldberg had explained the act as "a parody of the racism they had run into during their relationship").

12. As bell hooks explains,

It is a sign of white privilege to be able to "see" blackness and black culture from a standpoint where only the rich culture of opposition black people have created in resistance marks and defines us. Such a perspective enables one to ignore white supremacist domination and the hurt it inflicts *via* oppression, exploitation, and everyday wounds and pains.

bell hooks, *Madonna: Plantation Mistress or Soul Sister, in* BLACK ON WHITE 307,308 (David R.

Roediger ed., 1998).

13. James S. Miller, Racial Imitations: White Subjects, Black Others and the Legitimation of American Culture, 1920-1950, at 3 (1998) (unpublished Ph.D. dissertation, University of Wisconsin-Madison) (on file with author).

14. *See, e.g.,* REBECCA BELL-METEREAU, HOLLYWOOD ANDROGYNY 200-04 (1993);
Virginia Prince, *Seventy Years in the Trenches of the Gender Wars, in* GENDER BLENDING 469,

475 (Bonnie Bullough et al. eds., 1997); Elaine Showalter, *Critical Cross-Dressing: Male Feminists and the Woman of the Year,* RARITAN, Fall 1983, at 130, 136-37.

The culture and experience of women is not a costume. Everything I do is feminine, by definition, because I am female, while any decree about what is feminine restricts my range of options. When RuPaul says, "we're born naked and the rest is drag,"[15] he is wrong. *He* is in drag because he is a man, and he can stop being a woman whenever it becomes inconvenient. When being a woman is inconvenient for me, I need to remove the inconvenience. Male ideas of "femininity" are a major inconvenience to those of us who are actually women and have to live our lives in that state.

Is drag the most important aspect of male discrimination against women? No, probably not; nor was the eradication of the big-lipped Gold Dust Twins the most important victory of the civil rights struggle. But images do matter; we learn to see and understand people according to what we have been told about them. The more white people portray black people, the less room there is for black people to speak for themselves. The more men portray women, the harder it is for women to be understood for themselves.

The parallels between drag and blackface are so obvious that it seems bizarre that the intellectual consensus against blackface has not formed against drag. Instead, defenses of the practice continue to appear. All four of the principal defenses are, in my opinion, false. Drag is not a liberating challenge to gender stereotypes, nor is it a timeless statement of gay pride, nor is it legitimated by female cross-dressing, a practice separate and unequal. Nor is it funny.

A number of scholars argue that drag contributes to women's liberation by subverting gender stereotypes, revealing the constructed nature of most gender-linked behavior.[16] At its most extreme, this argument disputes the reality of gender itself:

> [T]he arguments of modern theorists such as Garber, Butler, and Joan Riviere [are] that all gender is performative or, in Riviere's famous phrase, a "masquerade".... While [an earlier] account posits an interior self to be shaped and corrected by performance, modern accounts argue that this interiority is an effect produced by the masquerade, and that status as "woman" or "man" is achieved not by being born with a particular anatomy but by performing gendered behaviors successfully in accordance with prevailing social norms.[17]

15. BAKER, *supra* note 2, at 258 (quoting RuPaul).
16. *See, e.g.*, JUDITH BUTLER, BODIES THAT MATTER: ON THE DISCURSIVE LIMITS OF "SEX" 124-138 (1993) [hereinafter BUTLER, BODIES THAT MATTER]; JUDITH BUTLER, GENDER TROUBLE: FEMINISM AND THE SUBVERSION OF IDENTITY 137 (1990) [hereinafter BUTLER, GENDER TROUBLE]; MARJORIE GARBER, VESTED INTERESTS (1992).
17. Ellen Bayuk Rosenman, *"Just Man Enough to Play the Boy": Theatrical Cross-Dressing*

W_000118
App. 382

Thus: "Genders can be neither true nor false, neither real nor apparent, neither original nor derived."[18]

The argument that all gender is performative begins soundly enough with the observation that lots of things women "can't" do are actually merely things that women are not permitted to do, and that therefore it is wise to be skeptical of many essentialist claims. But it is quite a leap from there to saying that there is no such thing as a "woman," and therefore one may claim "womanhood" on any basis, including the possession of an evening gown. This latter argument means that cross-dressing eradicates women entirely. If anyone who puts on women's clothing is a woman, and many of those people do not have a problem with unequal pay or a lack of reproductive rights, then there must not be a problem.

The argument that the very recognition of the category "woman" validates male supremacy is, in this context, false and dangerous. This is clear from the analogy with race. There may be no such thing as "race" insofar as most of the attributes given to people based on their perceived skin color have little or nothing to do with skin color, but "race" certainly does exist if we are trying to understand the experience of people whose skin color puts them at a constant disadvantage in competing for opportunities in a larger society. That experience of "race" is actual and distinct, a fact we readily acknowledge in noting the difference between a white man "blacking up" and a black man. The experience of gender is similarly actual and distinct-if there is no such thing as a "woman," who is being paid seventy-three cents on the dollar?

The fact that women are already oppressed-instructed by men how to look and behave for male convenience-does not mean that the most extreme version of this is therefore inoffensive. Quite the contrary: we need to challenge the most public ways in which men specify women's conduct so we can overcome even their more subtle dictates. The acceptance of drag is one of those "most public ways," such an obvious imposition of male preference on female decision that it is practically invisible. Just as African-Americans were taught by blacked-up white minstrels that they ought to shuffle-and, more important, white people were taught to expect African-Americans to shuffle-women are taught by dolled-up male glamour girls and pantomime dames to be hyper-sexual, and shown that failure to do so

*in Mid-Victorian England, in* GENDER BLENDING, *supra* note 14, at 303, 306.

18.   BUTLER, GENDER TROUBLE, *supra* note 16, at 141.

W_000119

App. 383

renders them repulsive and superfluous.  Again more important, men are taught the same lesson.

Erika Munk dismissed the claims for drag's subversive status in a few pungent paragraphs in the *Village Voice:*

> At the moment, most men in drag are no more subversive than whites in blackface were when minstrel shows were America's most popular form of entertainment....The more women fight for autonomy, the less helpful become restatements of stereotype which have lost their critical edge and turned into means of putting women down and aside. Drag may be liberating when it's part of a wave of iconoclastic revolt, but when the culture is rigid and conformist, taking on feminine personae while edging women from  the stage is rigid and conformist too.  It doesn't have to be so-the radical possibilities remain-but it is.[19]

Many people understand "drag" to mean private cross-dressing for sexual satisfaction.  For the purposes of this Essay, I am indifferent to private cross-dressing (overwhelmingly an activity of straight men), just as I would be indifferent if burnt cork or black greasepaint suddenly gained currency as an aphrodisiac.  Private conduct is none of our business.  But the set of arguments marshaled by private cross-dressers in support of their call for public acceptance is a matter of  public concern, and these arguments are as  unpersuasive as those of the feminist scholars whose work (as well as bras) they are appropriating.

Straight men who cross-dress generally describe doing so as a compulsion.  If it is, then its victims should receive sympathy, not public approbation.  Some people who have Tourette's syndrome feel compelled to curse; that is not an argument for generalized public acceptance of profanity.

In *The Man in the Red Velvet Dress*, J. J. Allen, a private cross- dresser, makes an argument that he shares with those who affect or defend  performance  drag.  He argues that women  have a privilege- to wear satin evening gowns-from which men are unfairly barred.

> If men and women are to achieve true equality, everything should be up for grabs: miniskirts, boxer shorts, the office of the president of the United States, congressional seats, wearing cosmetics ....

> While the women's liberation movement of the sixties was not merely about wearing pants, smoking, or working as a riveter, it nevertheless had its roots in appropriating those artifacts that had once  been exclusively  associated  with  masculinity.  And  while

---

19.  Erika Munk, *Drag: I. Men*, VILLAGE VOICE, Feb. 5, 1985, at 89.

W_000120

App. 384

femininity is about more than simply wearing skirts and cosmetics, men, if they are to be truly equal with women, should be free to appropriate the artifacts of femininity.[20]

This is total sophistry. First, the women's movement "had its roots" in a demand for justice; the "artifacts ... of masculinity" were secondary. Second, men are not "equal" with women, they are privileged over them. Men who want to wear women's clothing simply cannot do it in the street without being stared at. This seems like a very small price to pay, hardly comparable to being unable to join the professions.

Allen continues, "[W]omen do not 'own' femininity any more than men 'own' masculinity. So in the same way that feminism wants to destroy the barriers to male privilege that men have erected, [cross-dressers] want to destroy the barriers to female privilege that women have erected."[21] Wrong again: "femininity" is not a female privilege-it is a construct designed to keep women in their place. And feminists are not trying to appropriate masculinity, that is, the state of being male or taken for male; we are trying to achieve equal rights. To argue that women's clothing is a mark of privilege, when so much else about being a woman is obviously a mark of disadvantage, is to willfully miss the point, as Allen makes clear when he falsely equates a woman's right to admission to the Citadel with his "right" to wear women's underpants.[22] This assumes that an identifying badge of status is the same thing as a privilege, which is only true if you assume what is obviously false, namely, that all statuses are equal. Allen likewise claims that there is no difference between women's cross-dressing (e.g., to be able to serve as a soldier) and men's cross-dressing.[23] He also asserts that there is no difference between the class of things men are expected not to do (e.g., wear evening gowns) and those women are expected not to do (e.g., get paid for their work).[24] When Allen refers to disapproval of cross-dressing as "another gender wrong that need[s] to be righted,"[25] he is trivializing all of feminism.

Allen borrows from academic theorists of gender-bending to argue that recognizing some clothes as "women's" and other clothes

20.  J. J. ALLEN, THE MAN IN THE RED VELVET DRESS 124-25 (1996).
21.  *Id.* at 125.
22.  *Id.* at 126.

23.  *Id.* at 137.
24.  *Id.* at 121-22, 138-39.
25.  *Id.* at 126.

as "men's" reinforces the oppressiveness of traditional categories.[26] In fact, though, those categories are precisely the point to a cross-dresser. If these were not specifically women's garments, he would not be interested in them. If there were no performed sex roles connected with a costume, then the entire activity of transvestism-

sexual excitement while spending time temporarily as "the other"- would be beside the point.[27]

Another group of scholars argues that dressing up in women's clothing is a privileged activity of gay men. For the most part, in fact, dressing up in women's clothing is an activity of straight men-and whether it is privileged when done in public is exactly what is in contention.

"Professional drag queens are ... professional homosexuals; they represent the stigma of the gay world," announces Esther Newton in her seminal study of drag, *Mother Camp.'28* "Not all gay people want to wear drag, but drag symbolizes gayness. The drag queen symbolizes an open declaration, even celebration, of homosexual- ity."[29] She continues: "[D]rag questions the 'naturalness' of the sex- role system *in toto;* if sex-role behavior can be achieved by the 'wrong' sex, it logically follows that it is in reality also achieved, not 'inherited,' by the 'right' sex."[30]

This is received wisdom, to the extent anything can be in the contentious world of gender studies; but it is, at best, a half-truth. The only way to argue that drag is gay is to exclude from its definition a whole range of activities in which men dress as women, including not only private cross-dressing but the lion's share of comic drag performance.

Even Judith Butler, who valorizes glamour drag as gay performance art, acknowledges this comic, and ostensibly heterosexual, side of drag, which she calls "high het entertainment."[31] This includes most people's exposure to drag before the mid-1980s:

26. *Id.* at 136.
27. As Annie Woodhouse notes in her feminist study of straight men's private cross- dressing, dismissing the claim that the condu ct is revolutionary: "Undoubtedly transvestism replicates gender divisions; it relies on images of women which have been used to objectify and oppress them. The transvestite uses this as fantasy for his own pleasure, always retaining the facility to return to the primary status of masculinity." ANNIE WOODHOUSE, FANTASTIC WOMEN: SEX, GENDER AND TRANSVESTISM 145 (1989).
28. ESTHER NEWTON, MOTHER CAMP 3 (1972).
29. *Id.* at 64.
30. *Id.* at 103.
31. BUTLER, BODIES THAT MATIER, *supra* note 16, at 126.

the Hope-Crosby *Road* movies, Flip Wilson as Geraldine in the *Flip Wilson Show,* Jonathan Winters as a washerwoman on the *Carol Burnett Show,* and Jack Lemmon and Tony Curtis in *Some Like It Hot.* Several of these performers are notorious for the fuss they made about their heterosexuality; and, though perhaps they protested too much, there seems little doubt that most comic drag performers (like most people) are straight. To argue that drag is a "queer practice[]" whose "radical specificity" protects it from objection, as Butler does,[32] is both ahistorical and unprincipled, resembling the argument that clitoridectomy is acceptable because it is practiced by Africans oppressed by colonialism-or that blackface was acceptable because it was practiced on stage largely by Jews.

In any case, as historian Marybeth Hamilton makes clear, the universal association of glamour drag with gay men dates in this country from 1928, specifically from the production of Mae West's play *Pleasure Man,* which purported to provide a realistic backstage look at female impersonators ("realistic" being a euphemism for "gay").[33] As Hamilton notes, through *Pleasure Man,* West almost single-handedly transformed female impersonation from a mainstream vaudeville specialty into an outre pleasure. "[T]hough we take female impersonation's inherent 'queerness' for granted, in fact that assumption is relatively recent. ... [F]or the fifty years prior to *Pleasure Man's* premiere, female impersonation had been viewed as wholesome amusement, particularly suitable for women and children."[34]

Vaudeville female impersonation owed its popularity to the notion that the differences between men and women were so enormous that a man who could pass for a woman was essentially a magician. Thus, it was about putting people-specifically women-in their deeply conventional places. "While vaudeville hailed imper- sonators as virile men transforming themselves through magical skills of performance, Mae West suggested a far more sensational reading: that female impersonation was a vehicle of homosexual self-expression, a means for gay men to flaunt their true sexual selves."[35]

Mae West didn't invent this notion; she derived it from an

---

32. *Id.* at 128.

33. Marybeth Hamilton, *"I'm the Queen of the Bitches," Female Impersonation and Mae West's Pleasure Man, in* CROSSING THE STAGE: CONTROVERSIES ON CROSS-DRESSING 107, 107-19 (Lesley Ferris ed., 1993).

34. *Id.* at 107.
35. *Id.* at 112.

W_000123
App. 387

underground tradition of female impersonation parallel to conventional vaudeville.

> The underworld impersonator    made no pretense of showcasing
>
> a skill of performance, of attempting to impress observers with impeccable recreations of feminine detail. The whole thrill of his stage appearances lay, on the contrary, in the fact that he was not, technically, performing at all. He was displaying his real, offstage, self-as (in turn-of-the-century terms) a "fairy," a "third sexer," a being who straddled the gender divide.[36]

However disingenuously, Mae West denied that she had done anything radical with her play, adverting to the existence of mainstream impersonation, which validated sexual stereotypes, to protect her presentation of "deviant" impersonation, which  challenged them. But instead of saving her play, she succeeded only in tagging all glamour female impersonation as gay and thus eliminating it from the vaudeville stage.

Once dressing in drag was "recognized" as gay (and then banned), it is not surprising that the gay community would claim appearing in drag as one of the privileges of being liberated,  especially when drag queens featured so prominently  as fighters in  the pivotal Stonewall riot.[37]  Like use of the word "nigger" in the African-American community, dressing in drag can be seen as an effort to transform a stigma into a badge of pride. But clearly being gay and being effeminate are not the same, and neither of them requires dressing in drag. The connection between drag and gay men is at best vestigial, like the appendix, and thus can be removed. Moreover, once we acknowledge  the fluidity of  drag's meaning-that it suggests different things to different audiences at different times-  we must also acknowledge the claim of women to decide what it means today. No prior claim of meaning can possibly take priority over that of the subject/object of the practice.  Some commentators imagine that the complaint of misogyny is directed at drag's gay practitioners rather than at the practice itself.

> The problem with the analysis of drag as only misogyny is, of course, that it figures male-to-female transsexuality, cross-dressing, and  drag  as male homosexual activities-which they  are  not always-and it further diagnoses male homosexuality as rooted in misogyny.  The feminist analysis thus makes male homosexuality *about* women    [38]

---

36.  *Id.* at 115-16.
37.  *See* SUSAN FALUDI, STIFFED: THE BETRAYAL OF THE AMERICAN MAN 500-02 (1999).
38.  BUTLER, BODIES THATMATfER, *supra* note 16, at 127.

W_000124
App. 388

In fact, it is just the reverse: this analysis makes male impersonation of women *about* homosexuals. Drag is misogynistic, no matter who performs it. The relevant fact about gay men dressing as women is that they are *men* dressing as women. As Kate Millett wrote:

> [T]he storm of outrage an insouciant queen in drag may call down is due to the fact that she is both masculine and feminine at once-or male, but feminine. [And thus] [s]he has ... challenged more than the taboo on homosexuality, she has uncovered what the source of this contempt implies-the fact that sex role is sex rank.[39]

Drag is not about gay men and their sexuality- not, that is, about the intentions of the performers. (As with blackface, the intentions of the performers are beside the point.) Drag is not about sexuality at all, but about gender, its images and stereotypes-and those always mean things that privilege men and injure women.

Much of the literature about this seems to miss the point, suggesting that the drag performer is the person oppressed. For instance, Rebecca Bell-Metereau is concerned about the stereotyping of drag performers:

> Just as film images of blacks, with rare exceptions, have tended to offer only two basic stereotypes-the evil, no-good Negro and the good-hearted Uncle Tom or nanny-movie depictions of female impersonation during the Code era fall into similarly constrained categories. Men are seldom allowed to take on feminine clothing or roles without being punished for betraying their sex.[40]

This focus on the performer rather than on the woman being portrayed is peculiar, the equivalent of a discussion about what blackface meant to its white working-class performers: possibly an interesting sidelight, but hardly the point. Bell-Metereau continues, "A film that defies society's codes of dress and sex roles implies that we can be liberated from superficial restrictions and sexual limitations, for in truly exploring androgyny the work taps the most profound psychological and mythic sources of art-the genderless human psyche."[41]

This is the conventional defense of drag: that it enables us to transcend restrictions imposed by gender, which is, after all, just a social invention. But I do not have a "genderless human psyche"-I have a woman's psyche, formed by my experience of                   being morphologically, biologically, sexually, and socially a woman. As Pat

---

39. KATE MILLETT, SEXUAL POLmcs 343 (1970).
40. BELL-METEREAU, *supra* note 14, at 65.
41. *Id.*

Schroeder said when asked if she were running for President "as a woman," "'Do I have an option?'"[42]  To impersonate gender is not to eradicate it but to reinforce it, to reify it and, more important, the power relations attached to it.

Imitation may be the sincerest form of flattery, but do not tell that to anyone whose work has been plagiarized.  Drag performers- gay or straight-plagiarize the appearance and behavior of women, just as minstrels plagiarized the appearance and behavior (or some facsimile) of African-Americans.  The historical moment for wearing blackface was over as soon as the larger society was prepared to acknowledge the authenticity of black people.  The historical moment for wearing drag should be over now if society is prepared to acknowledge the authenticity-that is, the independent validity-of women.

Some scholars suggest that dressing across gender lines is an equal-opportunity sport because there is a tradition of women  dressing as men (as there is not of black people masquerading as  white people).  Unless you ignore the power differential between men and women in society, this is nonsense.  Annie Woodhouse makes clear that all gender-bending is not created equal.

> The gender divide is not one of equal balance; the scales of power and control tip decisively to the side of masculinity, which is accordingly attributed primary status.  Thus, to deviate from this status is to take a step down; to adopt the trappings of the second sex is akin to slumming it, or selling out.[43]

Thus, women who dress as men are dressing *up*, seeking power, privilege, or even just protective camouflage from male violence; while men dressing as women are dressing down.  As Janice Raymond says in her critique of all things "trans,"

> [A] woman putting on a man's clothes is, in a sense, putting on male power status, whereas a man putting on women's clothes is putting on parody.  That drag queens and cross-dressers draw hoots and howls in audiences of mostly men says more about how women were and are perceived than it does about the supposed boundary- breaking behaviour of gender-bending men who wear women's clothes.[44]

In other words: masters making fun of slaves, or at most making fun of themselves, do not equal slaves poking fun at masters.  Humor

---

42.  LINDA WITT ET AL., RUNNING AS A WOMAN ix (1995).
43.  WOODHOUSE, *supra* note 27, at 6-7.
44.  Janice Raymond, *The Politics of Transgenderism, in* BLENDING GENDERS 215. 217 (Richard Ekins & Dave King eds., 1996).

is what masters get in addition to power and what slaves get instead of it. Raymond adds,

> Gender bending is gender identity condensed to the point of little or no feminist or lesbian politics ....................................................................The new gender outlaw is

> the old gender conformist, only this time we have men conforming to femininity and women conforming to masculinity....................................................................What good

> is a gender outlaw who is still abiding by the law of gender?[45]

But of course it is not the arguments of feminist or gay scholars that make drag acceptable to the wider public. Scholars in general, and feminist and gay scholars in particular, are held in low regard in American society. To the extent that their arguments have currency, it is because they serve the interests of those who are more powerful. The people keeping drag alive are the people who benefit somehow from the argument that being a woman is something you can just put on and take off. Their claim is very simple: drag is funny.

What exactly is funny about it? Perhaps it is the simple incongruity: you can always knock 'em dead with chest hair pouring out of the cleavage of an evening gown. Perhaps the contrast between the (male) performer and the (female) performance is, in and of itself, uproarious. But this seems like a pretty thin joke on which to hang years of amusement. Unless you think that men are from Mars and women are from Venus-that is, that differences in gender behavior are huge and immutable-the contrast does not hold much interest. Certainly, the contrast between white performers and black characters was not, in and of itself, enough to make blackface funny. There had to be something else-and there was.

There was ridicule of black people. No one rationalized blackface by suggesting that the very contrast between the (white) performer and the (black) performed was funny or interesting in and of itself. No, what was funny or interesting was the glimpse blackface purported to offer into the world of African-Americans. "Aren't they stupid?" "Don't they have weird physical features?" "But they sing good songs and dance funny dances, and doesn't that prove they're happy in the confinement in which we've placed them?"

Men who dress up as women and adopt stereotyped feminine behaviors are comical because of their stereotyped behavior, and the inference they encourage the audience to draw is not that stereotypes are comical but that women are; not that social restrictions are foolish but that the people restricted are. It would be hard to imagine as

---

45. *Id.* at 222-23.

W_000127

App. 391

685

clear an example of blaming the victim-if blackface had not already provided us with one.

This entire society reifies the concept that the behavior of women should be dictated by men because men know best. Men know that marriage is best for women; men know that child rearing is best for women; men know that getting paid and recognized less is best for women. I do not really think that men also need to be able to say that they know-and will demonstrate-how perfectly lean and curveless women should look in their evening gowns.

Glamour drag, which depends on downplaying the incongruity, minimizing the contrast between performer and performed, and concealing the "masculine" within the "feminine," makes clear the prescriptive nature of all drag. The point of glamour drag is not to tell jokes but to perform the feminine. The only reason to hire a man for this purpose-when there are plenty of women available, by definition more experienced and better qualified-is to give men the continued right and privilege to determine the content of the feminine. Just as white people in blackface announced and established the limits of African-Americans' behavior, men in dresses announce, establish, and enforce the limits of what will be expected of, and tolerated from, women.

Minstrel performances of cake-walking took the dance out of its compulsory context to present African-Americans as feckless and jolly in servitude. Similarly, glamour drag takes glamour out of its context, which is the need women have to use sexual attractiveness to secure male protection in a society that punishes women who are without it. And if even those sober-faced performances are funny, it must be because women themselves are a joke. "Look at how vain and foolish they are!" "Look how self-absorbed!" "Look how trivial!" "Aren't women funny when they want sex?" "And aren't they hilarious when they don't?"

Thus, drag's humor depends entirely on the audience's willingness to believe that women are rightfully the butt of every joke. Does it seem humorless to refuse to participate? Well, it was precisely the fact that blackface impersonation *was* a joke-played by white people, for white people, through the medium of and on black people- that led ultimately to its condemnation. In fact, Ralph Ellison's 1958 essay-perhaps the single most important scholarly contribution to the eradication of blackface-is called *Change the*

W_000128
App. 392

*Joke and Slip the Yoke.*[46] Ellison points out first that what have been taken by white audiences to be the archetypes of the black experience are, in fact, its stereotypes.[47] He then addresses the defense of high spirits and boyish fun, saying,

> Down at the deep dark bottom of the melting pot, where the private is public and the public private, where black is white and white black, where the immoral becomes moral and the moral is anything that makes one feel good (or that one has the power to sustain), the white man's relish is apt to be the black man's gall.

> It is not at all odd that this black-faced figure of white fun is for Negroes a symbol of everything they rejected in the white man's thinking about race, in themselves and in their own group.[48]

Likewise, the drag queen is a symbol of everything women reject in men's thinking about gender, and the relish of drag performance- by performer and audience alike-is every woman's gall.

## https://www.kpcc.org/show/airtalk/2015-02-19/drag-queen-asks-is-drag-degrading-to-women

**A debate about the significance of drag has been brewing on the internet since the beginning of the year and raising the question: is drag degrading to women?**

A debate about the significance of drag has been brewing on the internet since the beginning of the year and raising the question: is drag degrading to women?

It started when Mary Cheney, the openly lesbian and actively Republican daughter of former Vice President Dick Cheney, opined on her Facebook page, "Why is it socially acceptable—as a form of entertainment—for men to put on dresses, makeup and high heels and act out every offensive stereotype of women (bitchy, catty, dumb, slutty, etc.)—but it is not socially acceptable—as a form of entertainment—for a white person to put on blackface and act out offensive stereotypes of African Americans?"

The comparison roiled supporters of drag who see it as a subversive commentary that's both a means of self expression and empowerment. But as the drag queen Miz Cracker recently penned in a piece on Slate, the discussion has raised "a question all queens and conscientious drag fans must contend with at one point or another: Is drag degrading to women?"

Has drag lost some of its shock value with shows like RuPaul's Drag Race and is now a moment to ask whether drag performances truly celebrate femininity or mock it? Has the social significance of drag performance changed?

**Guests:**

W_000129

App. 393

While history does not support Cheney's comparison on the level of fact, the feelings behind her words are not necessarily illegitimate: As a woman, she finds contemporary drag offensive to her sex. In launching our countercritique, the drag community and its allies have ignored these feelings to our detriment.

In the *Huffington Post*, for example, theater professor and drag queen Domenick Scudera attempts to legitimize drag by pointing to the long history of cross-dressing in theater and other performative traditions. "Men dressing in female garb have been integral to the performing arts for thousands of years in a myriad of cultures," he writes. "Juliet, Lady Macbeth, Rosalind, Beatrice and so on—all were created by male actors." I'm not sure if these mainstream theatrical traditions can really be tied to drag, or why their existence should make Cheney or those who hold similar reservations feel more comfortable with drag as it manifests today. In the same publication, Walt Hawkins discounts Cheney's feelings altogether, insinuating that she's just confused because she's having a hard time in her political career: "To be fair, it must be tough to be Mary Cheney," he writes. "She desperately wants to be a conservative icon and has spent countless hours and dollars pandering to the same political party that wants absolutely nothing to do with her." The sharpest and most incisive response to Cheney comes from the *Advocate*'s Matt Baume, who addresses Cheney's questions in part by pointing to the many women who love drag, even take part in it. He's certainly right, but that doesn't change the fact that many do not feel part of the fun.

So what's to be done? Here's my proposal: In the same way that many queens listened to the transgender community's concerns last year over use of controversial terms like *tranny* within drag culture, we can listen to women this year. Without chilling drag's wonderful tradition of free expression, we can take this moment to ask if our drag personae and performances truly celebrate feminine gender expressions, or if they lazily mock them. I know that this kind of sensitivity is possible, because some queens are already excelling at it. Just last week, I saw Brooklyn queen Lady Bearica Andrews perform a number in which she literally threw off the marionette strings of domesticity to become an independent woman. It's rare and risky for a queen to create work that so directly addresses women's issues, but the audience was on its feet, screaming. Judging from that experience, I don't think that listening to women's concerns will hurt us. In fact, I think it may make our drag even richer.

## https://4w.pub/is-drag-misogynistic/

**Is Drag Misogynistic?**

M. K. Fain

Oct 7, 20199 min

It's time to stop letting sexist gay men off the hook.





Iam hardly the first one to pose this question, and I won't be the last. The truth is, gay men have been getting away with misogyny since the start of the gay liberation movement. As Nico Lang wrote in 2017, "Gay men, first and foremost, are men."

Women have long looked for allyship from gay men. In some ways, we find it. Being gay is, inherently, gender non-conforming and disrupts the patriarchal narrative of male/female, dominance/submission (despite the fact that this pattern may be replicated in same-sex partnerships). Many of us have gay male friends who have served as great allies to us on a personal level — myself included.

To criticize aspects of gay male culture is not to attack gay men as a whole. Many gay men are interested in being better allies to women and willing to engage in this discussion and learn from it. In fact, it was through conversations (and debate) with my good friend, Lucas, that I came to fully shape my opinion on drag.

**The History of Drag**

Men portraying women in entertainment goes back as far as ancient Greece, and Japanese Kabuki theater. Originally, this had nothing to do with subverting gender roles but rather enforcing them — women weren't allowed on stage.

In more modern history, drag has been an integral part of the gay male community since the mid-twentieth century. Sheila Jeffreys, lesbian feminist historian, wrote in her 1990 book, *Anticlimax*:

*"Drag is a phenomenon deeply rooted in gay male consciousness, so deeply rooted indeed that one might be persuaded to see it as the foundation of gay male culture."*

Within this culture, she explains, drag arose from a desire to be "gender-free." Some men adopted a behavior they called "radical drag," which involved wearing dresses, heels, and makeup and participating in gay community meetings by "knitting and chatting through some person's big ego-trip speech." (*Anticlimax*, pg. 169) They claimed this was their way of resisting the macho-masculine behavior of other gay men and struggling against male privilege in the community.

This behavior was, of course, highly offensive to the lesbians in the room — women who largely were working to shirk the expectations of oppressive femininity themselves. Women's interests in the gay community, as with all of society, were largely ignored.

Recently, drag has broken through mainstream consciousness in an unprecedented way. *Ru Paul's Drag Race* has become a cultural icon. Children are starting to do drag, like the 12-year-old Desmond Napoles who has been catapulted into recent fame and sparked controversy over the sexualization of children. Drag Queen story hours at local libraries are finding similar controversy across the country, facing backlash from conservatives and feminists alike.

**Drag and Role-Playing Womanhood**

In all other areas, it's generally accepted by progressives that members of a dominant/oppressor class should not dress up as and mock the members of a more marginalized class — especially when that costume involves harmful stereotypes.

Consider, for example, the recent backlash Canadian Prime Minister, Justin Trudeau, faced when it was revealed he had dressed in black and brown-face makeup. Critics, rightfully, pointed out that black-face

W_000133
App. 395

is rooted in a deep history of violence and oppression, including slavery, against black and brown people.

*The Indian Express* wrote in regards to Trudeau:

*"Despite its continuing existence in popular culture, blackface is a mocking, deeply offensive, racist portrayal of black people, whose dehumanising tropes strongly suggest the inherent superiority of white people, and reduce blackness itself to a joke."*

Similarly, Warren Kinsella of the *Toronto Sun* wrote, "blackface is literally about white people caricaturing black people."

Blackface isn't offensive simply because a person of one race is dressing up as another. The power dynamics and history of white supremacy are what make the act particularly harmful. The costume dehumanizes, mocks, and stereotypes a marginalized group at the hands of their oppressors — sound familiar?

When men dress up "like women" in overly feminine costumes, change their bodies to look more like women's (fake breasts, etc), and act in stereotypically female ways ("bitchy, catty, dumb, and slutty") they are perpetuating patriarchial and offensive expectations of women.

In 2015, the conversation around blackface and drag rose to public awareness when Mary Cheney, lesbian daughter of Dick Cheney, compared the two.

The backlash she faced was immediate. It was "foolish," people said, to compare blackface and drag. The difference, one gay man explained to her, is that "A blackface performer had no respect for the people he was caricaturing... Drag queens do not hate women. Drag queens view women as sisters and friends, as inspiration."

Another drag queen interviewed W. Fitzhugh Brundage, male author of *Beyond Blackface*, to come to his defense:

*"Minstrelsy was being performed by whites in positions of cultural and local power, whereas drag is performed by a marginalized group who are subject to fear and repression,"* Brundage said. *"To be a drag queen is not an act of privilege."*

Suspiciously missing from the public conversation were the voices of any *actual* women — just men talking to other men about how totally not sexist they are.

These criticisms missed two main points: drag queens *do* display disdain for the women they mock (more on this later), and drag queens are men playing women — an inherently privileged position.

A drag queen irons clothes, like a woman, at The Glory in London. (source)

To deny that men hold privilege over women in a debate that is deeply related to gender is to deny the existence of patriarchy entirely.

Black lesbians, of course, have had their voices consistently ignored in this debate (where is their HuffPo feature column?).

W_000134
App. 396

While the black radical feminist community seems torn on whether or not blackface and drag are comparable given their different histories, one thing is clear: black feminists overwhelmingly find drag offensive to women.

Multiple black women shared their personal experiences in a feminist forum on Reddit. The top comment, by u/AnyEmphasis, reads:

*"I am a black woman from the DC area where drag shows are common forms of entertainment and while I do NOT feel as degraded by drag shows as I am by blackface, I do see drag as an absurd interpretation on femininity, just like blackface is an absurd (yet markedly violent and offensive) interpretation on blackness."*

This feeling is repeated throughout the thread by hundreds of black women.

Charles Knipp as Shirley W. Liquor with fans, sfbayview.com

Of course, drag and blackface can more directly intersect. Black lesbian Jasmyne A. Cannick wrote in 2008 about Charles Knipp, better known as the "Mammy Welfare Queen," Shirley Q. Liquor.

Played by gay white man, Shirley is said to be, "a heavy-set, shoplifting, promiscuous, inarticulate, malt liquor drinking single parent Black woman that doesn't know who the fathers of her 19 children are. If that wasn't enough, many of the children are named after sexually transmitted infections, like Chlamydia."

When discussing Knipp, critics seem to be able to easily point out how his caricature is both racist and sexist.

Femininity is not an inherent aspect of womanhood. Femininity is a socially-constructed set of behaviors, attitudes, and aesthetics which women are expected under patriarchy to adhere to in order to keep us in the subservient position. Femininity, to any significant degree, is not a choice that many women have. It is a sign of our oppression.

Dressing in traditionally feminine outfits (dresses, heels, makeup, etc) is a choice that only men can actually freely make. Men do not face oppression for refusing to adhere to femininity, women do. Women are still persecuted at work and home for not presenting feminine enough. One survey found that more than half of employers would be less likely to hire a woman who didn't wear makeup, and admitted it would also have a detrimental effect on her promotion prospects.

Donning the shackles of another's oppression for fun is the very height of privilege.

Similarly, women are oppressed for our female bodies — bodies that drag performers simultaneously attempt to emulate and mock.

**Drag Culture, Itself, is Full of Misogyny**

In his article defending drag for *Slate*, drag performer Miz Cracker admits that drag culture is often misogynistic:

*"But the critics are right to sense a thinly veiled disdain for women among some of my fellow queens. At certain shows, women in the audience are given a particularly bad time. Backstage I have heard complaints that there's too much 'tuna' in the crowd."*

W_000135

**App. 397**

Cabaret performer, Miz Ima Starr, reports the same experience:

*"When I started doing drag 25 years ago, there wasn't anyone I knew doing drag that wasn't misogynistic, and it's something we continue to see today."*

In a 2014 article for *The Spectator*, feminist journalist Julie Bindel writes about iconic drag queen Divine:

*"Divine was born into a conservative, middle-class family and played on nasty stereotypes of trailer trash women to get a laugh. In his films Divine called his female co-stars 'sluts'."*

Likely, misogyny in the drag community is just an exaggeration of misogyny in the wider gay community. Despite the fact that gay men suffer under patriarchy (through their alignment with the "woman's position," a violation of gender norms), where men go, misogyny will follow. In some ways, since gay men do not need women for sex the same way straight men do, the sexism is more pointed — often related to our bodies (which straight men need to at least pretend to like).

The perpetuation of the "fish" narrative in gay male communities is the most prominent example of this. While gay men certainly have the right to not like vaginas (it should be noted, lesbians are rarely granted the same courtesy), the sheer disgust associated with female bodies in gay communities is often astonishing.

Despite claiming to be disgusted by our bodies, many in the gay male and drag cultures display a massive amount of entitlement to them. Sexual assault in the gay community is rampant and constantly brushed under the rug because "gay men can't assault a woman!" As someone who was personally sexually assaulted by a drag queen in college— I promise you, they can.

**Drag isn't inherently misogynistic**

Despite the overwhelming evidence to the contrary, I don't actually believe all drag is inherently misogynistic. It is still possible for drag to deliver on its initial promise of a "gender-free" space by bending what is culturally expected of both men and women. Men should be allowed to be feminine, bold, and divas if they so desire. So should women.

So what separates misogynistic drag from good gender-bending fun?

**1. A true appreciation for the female artists**

My friend, Lucas, recently exposed me to Alexia Twister, a Brazillian drag performer who makes nearly-perfect replications of Lady Gaga performances.

Twister's work stands out to me because it demonstrates a deep appreciation and respect for the woman he is emulating. There is no question in my mind that Twister respects Lady Gaga — he's not playing her for laughs. He's using his own body to share her work with the world, unlike the Liza Minelli drag impersonators that turn up every year at Pride.

**2. Comedy that isn't at the expense of women**

Although now there are many genres of drag ranging from serious to horror, drag, historically, has been a comedy act. Despite being a feminist kill-joy, I still appreciate a good joke. But when comedy performed by men comes at the expense of women, it crosses the line. If men in drag are supposed to

W_000136
**App. 398**

be acting in solidarity with women to take down the patriarchy, how about making men the butt of the joke?

**3. Female bodies aren't used as props**

By wearing fake breasts or otherwise artificially sculpting their bodies to look more "feminine," drag performers perpetuate the idea that female body parts are commodities and that womanhood is a costume that can be taken on or off — real women, though, don't have that privilege. Drag performers can gender-bend in dresses, wigs, heels, and makeup all without pretending to actually have a female body.

**4. Actual women are welcome**

Are *actual* women welcome at the drag venue, or will they be insulted and called names? What about as performers? More and more women are discovering that dressing up like a man and gyrating on stage can be fun — but these women ("drag kings") are still excluded from the more elite levels of drag performance. Some women even have an interest in participating as drag queens. Yet, Ru Paul states that "Drag loses its sense of danger and its sense of irony once it's not men doing it." If drag is truly about creating a gender-free world, women should be not only welcome but leading it.

Despite the fact that feminists have been making these same arguments for decades, it's hard to find drag that's not perpetuating the gender roles it claims to contradict. The shameful reality is that men have little motivation to listen to women they aren't trying to fuck. Our complaints largely go ignored.

If we want to see more good drag that truly allies with women, gay men need to hold their communities accountable for the sexism they perpetuate. Drag is just the start.

---

*The generous support of our readers allows 4W to pay our all-female staff and over 50 writers across the globe for original articles and reporting you can't find anywhere else. Like our work? Become a monthly donor!*

W_000137

App. 399

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

AMARILLO DIVISION

Civil Action Number 2:23-cv-00048


SPECTRUM WT, et al.,          )

    Plaintiffs,          )

vs.                          )

WALTER WENDLER, et al.,      )

    Defendants.          )


REMOTE VIDEOTAPED DEPOSITION

BARRETT BRIGHT

FRIDAY, DECEMBER 19, 2025


Reported by:

Rebecca Callow, RMR, CRR, RPR

Job No. BB121925

Barrett Bright - 12/19/2025

2

1

2            REMOTE VIDEOTAPED DEPOSITION OF

3   BARRETT BRIGHT, produced as a witness at the

4   instance of the Plaintiffs and duly sworn, was taken

5   in the above-styled and numbered cause on the

6   19th day of December, 2025, from 10:03 a.m. to

7   3:22 p.m., before Rebecca J. Callow, Texas CSR-8925,

8   Registered Merit Reporter, Certified Realtime

9   Reporter, Registered Professional Reporter and

10   Notary Public for the State of Florida, reported by

11   computerized stenotype machine via Zoom

12   videoconference pursuant to the Federal Rules of

13   Civil Procedure.

14

15

16

17

18

19

20

21

22

23

24

25

Barrett Bright - 12/19/2025

3

```
 1                    APPEARANCES

 2

 3  FOR PLAINTIFFS:

 4       FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION

 5       501 Walnut Street

 6       Suite 900

 7       Philadelphia, Pennsylvania 19106

 8       (215) 717-3473

 9            By:  Mr. J.T. Morris

10                 jt.morris@fire.org

11                 Mr. Adam B. Steinbaugh

12

13  FOR DEFENDANTS:

14       OFFICE OF THE ATTORNEY GENERAL - STATE OF TEXAS

15       P.O. Box 12548 (MC-009)

16       Austin, Texas 78711

17       (512) 463-2120

18            By:  Ms. Alexia Baker

19                 alexia.baker@oag.texas.gov

20                 Mr. David Bryant

21

22  ALSO PRESENT:

23       Mr. Brian Christopher, Videographer

24       Mr. Marc Rietvelt, Texas A&M General Counsel

25
```

App. 402

```
 1                        INDEX

 2                                          PAGE

 3   BARRETT BRIGHT

 4   Examination by Ms. Baker ........................10

 5   Examination by Mr. Morris ......................156

 6   Further Examination by Ms. Baker ...............160

 7

 8

 9

10   Changes and corrections ........................163

11   Signature Page  ................................164

12   Court Reporter's Certificate ...................165

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      EXHIBITS

 2  NO.              DESCRIPTION                  PAGE

 3  Exhibit 1        The Constitution of Spectrum      27

 4                   WT (Bates SPECTRUM 0002220

 5                   through SPECTRUM 0002226)

 6  Exhibit 2        Campus Organizations             32

 7                   Handbook (Bates SPECTRUM

 8                   0000565 through SPECTRUM

 9                   0000587)

10  Exhibit 3        The President's Bible (Bates     42

11                   SPECTRUM 0000348 through

12                   SPECTRUM 0000362)

13  Exhibit 4        3/24/2023 email: Spectrum WT     46

14                   to Noel Fitchett, Re: Media

15                   Inquiry (Bates SPECTRUM

16                   0001380 through SPECTRUM

17                   0001381)

18  Exhibit 5        JBK Event Request Form;          56

19                   2/26/2023 email chain, Re:

20                   Risk Assessment for: A

21                   Fool's Drag Show?on March

22                   31st (REDACTED) (Bates

23                   SPECTRUM 0000786 through

24                   SPECTRUM 0000791)

25
```

```
 1                    EXHIBITS (cont.)

 2   NO.              DESCRIPTION                    PAGE

 3   Exhibit 6        West Texas A&M University       65

 4                    Risk Management and

 5                    Insurance Matrix - A Fool's

 6                    Drag Race (Bates SPECTRUM

 7                    0000776 through SPECTRUM

 8                    0000777)

 9   Exhibit 7        3/21/2023 text message chain    73

10                    (Bates SPECTRUM 0000829)

11   Exhibit 8        3/14/2023 email:  Fouts to      79

12                    Bright, et al., Re: A Fool's

13                    Drag Race 03.31.2023 (Bates

14                    SPECTRUM 0000860)

15   Exhibit 9        A Fool's Drag Race flier        82

16                    mock-up (Bates SPECTRUM

17                    0001782)

18   Exhibit 10       A Fool's Drag Race mock-up      85

19                    (Bates Def_000843)

20   Exhibit 11       3/22/2023 text message          90

21                    thread: Drumheller (Bates

22                    SPECTRUM 0001261)

23

24

25
```

```
 1                    EXHIBITS (cont.)

 2   NO.              DESCRIPTION                    PAGE

 3   Exhibit 12       WTAMU Spectrum Instagram        92

 4                    screenshot: Help Fund

 5                    Spectrum WT's Drag Show

 6                    (Bates SPECTRUM 0001444

 7                    through SPECTRUM 0001446)

 8   Exhibit 13       3/28/2023 text message          92

 9                    thread:  Drumheller (Bates

10                    SPECTRUM 0001533)

11   Exhibit 14       3/25/2023 text message          96

12                    thread: Chandler (Bates

13                    SPECTRUM 0001458)

14   Exhibit 15       Instagram screenshot:          103

15                    Spectrum WT official

16                    statement regarding

17                    cancellation of A Fool's

18                    Drag Show (Bates SPECTRUM

19                    0001183)

20   Exhibit 16       3/20/2026 email:  Wendler to   112

21                    CURRENT_STUDENT@LISTS.WTAMU.

22                    EDU, Re: A Harmless Drag

23                    Show? No Such Thing. (Bates

24                    Def_000053 through

25                    Def_000055)
```

```
 1                    EXHIBITS (cont.)

 2   NO.              DESCRIPTION                   PAGE

 3   Exhibit 17       3/20/2023 email thread:       121

 4                    Fouts to Bright, et al, Re:

 5                    Music list for A Fool's Drag

 6                    Race (Bates SPECTRUM 0000983

 7                    through SPECTRUM 0000988)

 8   Exhibit 18       West Texas A&M Jack B.         127

 9                    Kelley Student Center

10                    Procedures and Guidelines

11                    (Bates Def_000154 through

12                    Def_000172)

13   Exhibit 19       Screenshot:  West Texas A&M   131

14                    University website:  Mission

15                    Statement (Bates SPECTRUM

16                    0003824 through SPECTRUM

17                    0003826)

18   Exhibit 20       West Texas A&M University -   135

19                    Campus Directory (Bates

20                    Def_182036)

21   Exhibit 21       3/13/2024 text message        147

22                    thread: Myss Myka (Bates

23                    SPECTRUM 0002453SPECTRUM

24                    0002453

25
```

```
 1                     EXHIBITS (cont.)

 2   NO.              DESCRIPTION                    PAGE

 3   Exhibit 22       3/1/2024 text message          149

 4                    thread:  Acrylica (Bates

 5                    SPECTRUM 0002405)

 6   Exhibit 23       3/28/2024 text message         153

 7                    thread: Chandler (Bates

 8                    SPECTRUM 0002647)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                P R O C E E D I N G S

 2                   - - - - - -

 3               BARRETT BRIGHT,

 4        called as a witness herein, having

 5       been first duly sworn by a Notary Public,

 6        was examined and testified as follows:

 7                   EXAMINATION

 8      BY MS. BAKER:

 9      Q.   Where are you joining us from?

10      A.   I'm joining y'all from Madison, Wisconsin.

11      Q.   Okay.  Well, my name is Alexia Baker.  I

12   represent defendants Walter Wendler and Chris Thomas

13   in this litigation, and I'll be deposing you today.

14            So before I get into the questions, I'm

15   just going to go over some basic rules to ensure that

16   today's deposition flows as seamlessly as possible.

17            Do you understand that you are

18   testifying under oath today and that you're legally

19   obligated to tell the truth?

20      A.   I understand.

21      Q.   You must provide verbal responses to my

22   questions, so no head nodding or anything like that.

23   This is particularly important because we are on

24   Zoom.  Does that make sense?

25      A.   Yes.  I understand.
```

1    Q.    If you don't quite hear a question that I'm

2    asking or you don't understand, please let me know

3    and I will repeat or rephrase the question.  And if

4    you answer a question, I'm going to assume that you

5    heard the question and that you understood the

6    question.  Does that make sense?

7        A.    Yes, it does.

8        Q.    So don't start answering a question until

9    I've finished asking it, and I'll try to extend the

10   same courtesy to you and wait until you have

11   finished answering before I start my next question.

12   Do you understand this?

13       A.    Yes, I do.

14       Q.    Concerning exhibits, I have them pulled up

15   on my computer screen, so occasionally you'll see me

16   looking to one side or the other.  That's just

17   because I am pulling up the exhibit on my computer,

18   and there may be a little bit of a pause as I do

19   that.  Does that make sense?

20       A.    Yes, it does.

21       Q.    If you want to take a break at any point,

22   please let me know and we'll take a break.  I want

23   you to be comfortable here, so just let me know if

24   you need to take a break.  Does that make sense?

25       A.    Yes, it does.

App. 410

Barrett Bright - 12/19/2025

12

1   Q.   If there's a question pending and you need
2   to take a break, I'll need an answer before we take
3   that break.  Is that fair?
4   A.   Yes.
5   Q.   Are you taking any medications today that
6   would prevent you from testifying truthfully and
7   accurately today.
8   A.   No, I'm not taking any medications that
9   would do that.
10   Q.   Have you consumed any drugs or alcohol
11   within the last 24 to 48 hours?
12   A.   No, I have not.
13   Q.   In preparing for this deposition, did you
14   review any documents?
15   A.   Yes.  I reviewed some documents.
16   Q.   Without disclosing any privileged
17   communications, did you speak with an attorney in
18   preparation for this deposition?
19           MR. MORRIS:  I'm just going to
20       caution the witness not to reveal any
21       privileged communications.
22           You can answer "yes" or "no,"
23       Mr. Bright.
24   A.   Yes.
25   \\\

1    BY MS. BAKER:

2        Q.    How long did you meet with an attorney?

3        A.    For about an hour-ish.

4        Q.    Are you accompanied by legal counsel at

5    your location?

6        A.    No, I am not.

7        Q.    Did you speak with any non-attorneys to

8    prepare for the deposition?

9        A.    No, I did not.

10       Q.    Have you been deposed before?

11       A.    No, I have not.

12       Q.    Have you ever testified in court?

13       A.    No, I have not.

14       Q.    Do you intend to testify in this case's

15   trial?

16       A.    Yes.

17       Q.    Have you ever been a party to a lawsuit,

18   aside from this action?

19       A.    No.  This is my first lawsuit.

20       Q.    Okay.  So I am about to proceed to the next

21   set of questions, but I'm just going to clarify a

22   few terms to ensure that we are completely on the

23   same page.

24             I am going to use the term "WT" or "the

25   university" to refer to West Texas A&M University.

1    Does that make sense?

2        A.    Yes, it does.

3        Q.    Whenever you hear me use the term

4    "communication" or any derivative of that word, I'm

5    speaking of any and all exchanges of information,

6    any dialogues, discussions, text messages, social

7    media posting, or messages, interviews and such.

8    Does that make sense?

9        A.    Yes.

10       Q.    I will mention "A Fool's Drag Race," or

11   "the 2023 drag show" to refer to the drag show that

12   Spectrum WT planned to host on WT's campus in 2023.

13   Does that make sense?

14       A.    Yes.

15       Q.    When I mention "the Sam Houston drag show,"

16   I'm referring to the off-campus drag show that

17   Spectrum WT hosted in 2023.  Do you understand?

18       A.    Yes, I do.

19       Q.    And, finally, when I mention "Don't Be a

20   Drag" drag show, or "the 2024 drag show," I'm

21   referring to the drag show that Spectrum WT planned

22   to host on campus in 2024.  Does that make sense?

23       A.    Yes, it does.

24       Q.    So I'm interested to hear a little bit more

25   about you and your background, so please state your

1    full name for the record.

2        A.    May name is Barrett Alexander Bright.

3        Q.    **Do you have any aliases?**

4        A.    I also go by "Bear."

5        Q.    **What is your date of birth?**

6        A.    January 14th, 2002.

7        Q.    **Where were you born?**

8        A.    Houston, Texas.

9        Q.    **Where were you raised?**

10       A.    Border, Texas.

11       Q.    **What part of Texas is that?**

12       A.    It is in the panhandle, about an hour north

13   of Amarillo.

14       Q.    **What is your highest level of educational**

15   **attainment?**

16       A.    I have graduated with my bachelor's, and

17   I'm currently in grad school.

18       Q.    **What degree did you receive for your**

19   **undergraduate education?**

20       A.    A bachelor's of science in civil

21   engineering.

22       Q.    **And what are you in graduate school**

23   **studying?**

24       A.    I'm getting my master's in civil

25   engineering with a focus on structural.

Barrett Bright - 12/19/2025

16

1    Q.    Are you currently employed, and if so

2  where?

3    A.    Yes, I am.  At Kwik Trip, with a "K."

4    Q.    Was WT the first degree-seeking university

5  you ever attended?

6    A.    Excluding dual-credit classes in high

7  school, yes.

8    Q.    And what drew you to that school after you

9  graduated from high school?  Why did you choose WT?

10    A.    It was nearby, so I was able to still visit

11  family, but far enough away where it wasn't

12  constantly near family, if that makes sense.

13    Q.    It makes sense.  I had the same logic when

14  I was choosing a university as well.

15          Were you a part of any sort of special

16  scholarship programs or academic programs while you

17  were enrolled at WT?

18    A.    Yes.  I was in the Attebury Honors Program.

19    Q.    And what is that?

20    A.    It was a program that focused on taking

21  honor classes and doing extra projects near your

22  senior year to graduate with honors --

23  Attebury Honors.

24    Q.    So you graduated with those Attebury

25  honors?

1      A.   Yes, I did.

2      **Q.   And you maintained your participation in**

3  **that scholarship program throughout the duration of**

4  **your time at WT?**

5      A.   Well, it wasn't a scholarship program; it

6  was an honors program.  And, yes, I did.

7      **Q.   An honors program.  Okay.**

8                 **Aside from Spectrum WT, were you**

9  **involved with any other student organizations?**

10      A.   Yes.  I was involved with ASCE student

11  chapter at West Texas A&M.

12      **Q.   What does "ASCE" stand for?**

13      A.   American Society for Civil Engineers.

14      **Q.   And you graduated from WT.  Correct?**

15      A.   Correct.

16      **Q.   When did you graduate?**

17      A.   May of 2024.

18      **Q.   When you graduated, did you wear, like, any**

19  **special graduation stoles reflecting your membership**

20  **in Spectrum, or any of the other orgs that you were**

21  **involved?**

22      A.   I did have -- it wasn't a stole; it was

23  like a braided cord for ASCE.  And I did receive a

24  stole, not for -- or through Spectrum but through

25  Buff Allies.

1    Q.    Is that a rainbow stole?

2    A.    That is correct.

3    Q.    Okay.  Do you have any mental or physical

4  disabilities?

5    A.    No, I do not have.

6    Q.    Are you currently under a doctor's care for

7  anything?

8    A.    No.

9          I do have a prescription for PrEP.

10   Q.    So I'm curious about your involvement in

11 Spectrum while you were at WT.  When did you first

12 get engaged with Spectrum?

13   A.    It was during the fall of 2020.  I -- I

14 don't remember how exactly I got into contact with

15 them.

16         I do know that I started attending

17 their meetings and enjoyed the meetings at the club,

18 and decided to join.

19   Q.    So you would say you joined because you

20 found a sense of community within the organization?

21   A.    That is correct.

22   Q.    When did you become president of Spectrum?

23   A.    That was in the fall of 2022.

24   Q.    Were you elected to your role?

25   A.    Yes, I was.

1    Q.    How did you meet Marcus Stovall?

2    A.    I met Marcus during a -- Join the Heard, a

3  student org event, where new students come in and

4  see all the student orgs on campus.

5              He stopped by our table and asked if

6  we were LGBTQ friendly.  We said yes, and he started

7  joining our meetings after that.

8    Q.    And what -- how would you describe your

9  duties as president?

10    A.    I would describe them as leading the

11  officer corps, ensuring that we put on events that

12  are helpful to the LGBTQ community and outreach

13  programs -- outreach out there for LGBTQ+ students

14  and allied members, and -- as well as create a place

15  that is -- feels safe and belonging to LGBTQ members

16  of the WT campus.

17    Q.    So you mentioned part of the

18  organization's -- I'm sorry.

19              You mentioned part of your role was

20  creating events that would help the LGBTQ+ community.

21  Is that correct?

22    A.    Yes.

23    Q.    What do you mean by that?

24    A.    We would put on charity events; we would

25  help post outreach programs, like coming out day

1    events type of thing, to show engagement and

2    involvement on campus.

3    **Q.    In your observation as the president of**

4    **Spectrum, did you have a lot of upper classmen**

5    **members, underclassmen, or was it kind of just a mix**

6    **of both?**

7    A.    I would describe it as a mix.

8    **Q.    Would you say that you knew all of the**

9    **members well, or were you constantly seeing new**

10   **faces at events?**

11   A.    We would have repeat members who would come

12   in every -- at every event, and we'd have a few new

13   faces every once in a while for certain events.

14   **Q.    So a few new faces every once in a while**

15   **would show up?**

16   A.    Um-hmm.

17   **Q.    Do you recall how many members Spectrum had**

18   **when you first became president of the organization?**

19   A.    I would not be able to recall that number.

20   **Q.    Do you -- would you agree that Spectrum's**

21   **membership increased under your leadership?**

22   A.    I believe so.  Yes.

23   **Q.    And Dr. Kristina Drumheller was the**

24   **organization's faculty advisor.  Correct?**

25   A.    That is correct.

App. 419

1      Q.    Was she the faculty advisor throughout the
2    duration of your presidency?

3      A.    Yes.

4      Q.    And what role did she play as Spectrum's
5    faculty advisor?

6      A.    As a sort of support and helpline where we
7    would be able to ask her questions and get help with
8    navigating the university systems, as well as
9    financial help dealing with the banks.

10     Q.    So you were the main -- would you say that
11   you were the main officer who was interacting with
12   her, or were there others too?

13     A.    There were others.  All the officers were
14   able to meet with her, if they needed to, for
15   anything.

16          I know a few of them did meet with her
17   without me being involved, and I have also met with
18   her without them being involved.

19     Q.    Chip Chandler was involved with Spectrum
20   too.  Right?

21     A.    That is correct.

22     Q.    In what capacity?

23     A.    Chip Chandler was one of the leaders of
24   Buff Allies while I was president, which is the
25   faculty LGBTQ+ support group.  And so we would be in

1  contact with him for some of the same reasons as

2  Kristina Drumheller.  But we would also, as just

3  another, like, outreach-type thing for support with

4  Buff Allies specifically.

5      Q.   So Buff Allies offered support to Spectrum.

6  Is that correct?

7      A.   Yes.

8      Q.   How did Buff Allies support Spectrum?

9      A.   Buff Allies would allow us to use their

10 table and table decorations for tabling events, as

11 well as help provide rides for when we did the

12 Palo Duro Canyon hike.

13     Q.   Would they offer any financial support to

14 you-all?

15     A.   Not as an organization.

16     Q.   But as individuals?

17          Would individuals within the

18 organization offer financial support?

19     A.   They did during the GoFundMe fundraising

20 for the 2023 drag show at Sam Houston Park.

21     Q.   And Spectrum participated in on-campus

22 activities like student org fairs.  Right?

23     A.   That is correct.

24     Q.   What did you do during those student org

25 fairs?

1    A.   The student org fair was a way for student

2  orgs to get reregistered with the university every

3  year and so --

4    **Q.   So you had to --**

5             **I'm sorry.  Go on.**

6    A.   I lost my train of thought.

7    **Q.   You were saying the student org fairs were**

8  **something that student organizations had to**

9  **participate to register with the university.**

10 **Correct?**

11   A.   That is correct.

12   **Q.   Would you say that participating in those**

13 **student org fairs was a way for the organization to**

14 **recruit new members?**

15   A.   No.

16   **Q.   What was the benefit, aside from it being**

17 **mandatory, of participating in the student org fair?**

18   A.   To make sure that all of your documents and

19 all of the risk requirements were completed before,

20 so your org could be reregistered.

21   **Q.   So the student org fair wasn't necessarily**

22 **a tabling-type event; it's more about actual**

23 **completing registration forms.  Is that right?**

24   A.   That is correct.

25   **Q.   Were there any events or programs that**

1  you-all participated in that allowed you to recruit

2  and interface with members of the campus community

3  and tell them about what Spectrum does and their

4  mission and values?

5      A.   Yes.   That would be the Join the Herd

6  student org thing.  I can't remember the exact term.

7  It was called Join the Herd, and that would be part

8  of new student orientation.

9      Q.   New student orientation.  And that's

10  something that happens on a yearly basis.  Right?

11     A.   That is correct.

12     Q.   Or did it happen -- did it happen each

13  semester?

14     A.   I can't remember.

15          I know specifically it always happened

16  in the fall.

17     Q.   And Spectrum participated in new student

18  orientation while you were the president.  Correct?

19     A.   That is correct.

20     Q.   After the controversy surrounding the drag

21  show events that Spectrum wanted to host on campus,

22  did you-all continue to participate in the new

23  student orientation?

24     A.   That is correct.

25     Q.   What was the main method through which

1  Spectrum recruited new members?

2      A.    It was mainly through new student

3  orientation.

4      Q.    Where did Spectrum typically hold its

5  meetings?

6      A.    We typically held our meetings in the

7  Classroom Center.

8      Q.    Where is that on campus?

9            I don't have a map in front of me, but

10 how would you describe that?

11     A.    I would describe the Classroom Center as

12 being near the Buffalo fountain, near the

13 central-ish part of campus and attached to the JBK.

14     Q.    And you met as an organization on a weekly

15 basis.  Right?

16     A.    That is correct.

17     Q.    And why was it important to meet on a

18 weekly basis?

19     A.    It allowed us to touch base with members,

20 propose and talk about upcoming events, and plan for

21 future fundraising possibilities.

22     Q.    And in your view, what was Spectrum's

23 primary mission?

24     A.    Spectrum's primary mission was to help and

25 support LGBTQ+ members and other students on campus,

1    as well as do outreach with the campus community.

2       Q.   And with that outreach, you -- Spectrum

3    collaborated with a lot of other student

4    organizations.  Right?

5       A.   That is correct.

6       Q.   In what way would you collaborate with

7    other student organizations?

8       A.   We would help cohost or support other

9    student org's events, as well as, like, split up

10   certain tasks for other events.  And, finally, we

11   would also table -- sort of.  It's not truly

12   tabling; it was more like we would table with items

13   that were free for said event.

14      Q.   So if you -- if Spectrum collaborated with

15   another student organization for an event, would it

16   typically be the case that they would use their

17   social media accounts to promote Spectrum's events

18   and you-all might use your social media accounts to

19   promote that org's event?  Is that how that would

20   work?

21      A.   Yes.

22      Q.   And would you say collaborating with other

23   student organizations allowed Spectrum to reach

24   members of the campus community that might not

25   otherwise come to Spectrum events?

```
 1        A.    That is correct.

 2              MS. BAKER:  I'm going to

 3        introduce what I'll call Exhibit 1.  This

 4        is the constitution of Spectrum, and it is

 5        marked SPECTRUM 2220.

 6              (Deposition Exhibit 1

 7              marked for identification.)

 8        BY MS. BAKER:

 9        Q.    Do you recognize this document, Barrett?

10        A.    Yes.

11        Q.    What is this document?

12        A.    This document is the constitution of

13   Spectrum WT.

14        Q.    And this is a governing document for the

15   organization.  Right?

16        A.    That is correct.

17        Q.    And you're somewhat familiar with its

18   provisions.  Right?

19        A.    That is correct.

20        Q.    So I'm going to zero in on Article II

21   entitled "Purpose."  The first line reads:

22              "The purpose of this organization is to

23   promote diversity support and acceptance on campus,

24   and in the surrounding community."

25              How, in your opinion, did Spectrum
```

1  promote acceptance on campus?

2      A.   That would be through our tabling events

3  for outreach, and through our collaboration with

4  other student organizations.

5      **Q.   And how did the organization understand the**

6  **term "acceptance" as it is used in this document to**

7  **mean?**

8      A.   More so in the sense of tolerance.  As in

9  people know that we exist and that we are here, and

10 that we were also students of West Texas A&M

11 University.

12     **Q.   And according to this provision, another**

13 **one of Spectrum's goals is to educate members of the**

14 **WT community about LGBTQ+ issues.  Correct?**

15     A.   That is correct.

16     **Q.   What are some platforms of how Spectrum WT**

17 **educated members of the WT community concerning**

18 **these issues?**

19     A.   We had a National Coming Out Day panel that

20 we were part of that helped show light to LGBTQ+

21 issues on campus, as well as the queer history

22 nights that we hosted.

23     **Q.   Would you say that there are resources and**

24 **support for members of the LGBTQ+ community at WT?**

25     A.   Yes.

1  Q.  Do you believe that members of the LGBTQ+

2  community at WT are marginalized in any way?

3              MR. MORRIS:  Objection.  Vague.

4  BY MS. BAKER:

5  Q.  I can rephrase it, if that would help.

6  A.  Yes.  Please rephrase it.

7  Q.  What I'm asking you is, do you -- in your

8  observation, while you were a student, did you feel

9  that members of the LGBTQ community at WT were

10  excluded or looked down upon by others and not given

11  the same opportunity that other members of the

12  campus community received?

13              MR. MORRIS:  Objection.

14  Compound.

15  A.  I would say that, at times com- -- or when

16  interacting with other students, yes.

17              I am not too sure about opportunities,

18  considering that each and every person had their own

19  stuff they were dealing with.

20  BY MS. BAKER:

21  Q.  So it wasn't anything that the

22  university -- strike that.

23              There isn't any specific example of

24  something that the university has done, in your

25  experience and time at WT, that made you feel that

1  the LGBTQ+ community was marginalized.  Is that

2  correct?

3      A.   That is incorrect.

4      Q.   Elaborate.

5      A.   The canceling of the Fool's Drag Race was

6  one of the things that definitely felt as if LGBTQ+

7  students weren't welcome at West Texas A&M.

8      Q.   Aside from that situation, are there any

9  other examples of -- that come to mind?

10     A.   Yes.

11          Our former president, London Hughes,

12  informed me to be wary of certain organization-wide

13  events that were hosted before COVID if they said

14  host them again, because Spectrum, in the past, had

15  received threats of violence and was told by the

16  university there was nothing that the university

17  could do to protect Spectrum in those cases, except

18  to not attend.

19     Q.   Do you know anything about the nature of

20  those on-campus events?

21     A.   Specifically, it was the organization's

22  sing-along musical event.  That was the specific

23  example that was provided to me.

24     Q.   Is that a -- is that a student organization

25  event?

1       A.   It was a university-wide student org event

2   that stopped being hosted after COVID.

3       **Q.   And you were told that this event was**

4   **something where LGBTQ+ students were not welcome?**

5       A.   By other student orgs or members of the

6   L- -- the WT community.

7       **Q.   But you didn't experience that while you**

8   **were --**

9       A.   I did not personally experience that.

10              Sorry.

11      **Q.   I'm going to turn to -- I'm going to**

12  **scroll, rather, to Article X entitled "Service."**

13              **Section 1 says:  "Spectrum WT should**

14  **sponsor one service project per semester."**

15              **Was the -- were the drag shows**

16  **considered service projects?**

17      A.   Yes.

18      **Q.   And Section 2 says:**

19              **"Prior to any service project,**

20  **Spectrum WT should contact the organization to ensure**

21  **that their group is accepting toward the LGBTQIA+**

22  **community."**

23              **In your experience, what kind of**

24  **criteria were you -- were you or other officers**

25  **considering and evaluating whether an organization**

1  **was sufficiently accepting such that you would be**

2  **willing to work with them?**

3      A.    That would be either they are already an

4  LGBTQ+ support group, like PASO, or like the Trevor

5  Project; or in the case of the Ukrainian Bakery

6  service project.  The president at that time,

7  London Hughes, contacted her at that time and

8  confirmed with her that she was accepting of LGBTQ+

9  community people.

10     **Q.    So sometimes you could determine whether**

11 **that organization was accepting by just simply**

12 **asking them.  Right?**

13     A.    That is correct.

14     **Q.    And you would look at the kinds of**

15 **activities that they were involved with.  Right?**

16     A.    That is correct.

17             MS. BAKER:  I'm going to

18         introduce as Exhibit 2, a document called

19         SPECTRUM 565, is the WT Campus

20         Organizations Handbook.

21             (Deposition Exhibit 2

22             marked for identification.)

23     BY MS. BAKER:

24     **Q.    So, Bear, while you were president,**

25 **Spectrum was a registered student organization.  Is**

 1  that correct?

 2      A.   That is correct.

 3      Q.   **And what does it mean to be a registered**

 4  **student organization?**

 5      A.   As a registered student organization, the

 6  student org will have access to WT campus venues to

 7  host events, as well as apply for their support

 8  programs to student orgs.

 9      Q.   **Are you familiar with this handbook?**

10      A.   I am familiar of it.

11      Q.   **So you don't recall reading its provisions?**

12      A.   I don't remember what are in the

13  provisions.

14      Q.   **To your knowledge, is this a legal**

15  **document?**

16              MR. MORRIS:  Objection.  Calls

17      for a legal conclusion.

18      BY MS. BAKER:

19      Q.   **Is this something that was available to**

20  **students?**

21      A.   That is correct.

22      Q.   **So I want to draw your attention to the**

23  **section entitled "Privileges."**

24              The second bullet under that section

25  says:  "Access to Campus Organization Funds,"

1    identifying that as a privilege for registered

2    student organizations.

3                    Did Spectrum have those funds?

4        A.    I do not believe that Spectrum ever applied

5    to those funds, based off of what I remember.

6        Q.    What exactly are those funds, to your

7    recollection?

8        A.    There is an initial startup fund for

9    brand-new organizations to get their, like, feet off

10   the ground with their programs, or what they plan on

11   running.  And then there was a reimbursement form

12   for specific events that you could apply for.

13       Q.    Did Spectrum receive any funds from the

14   university?

15       A.    Not that I remember.

16       Q.    How did the organization raise money?

17       A.    We did personal fundraisers through, like,

18   bake sales and such.

19                    I'm trying to think if we have done

20   anything else.  I can't remember if we have done

21   anything else.

22       Q.    So, to your recollection, Spectrum did not

23   receive any campus organization funds because it

24   didn't -- it never applied for any.  Correct?

25       A.    That is correct.

1    Q.    But it could have applied for those funds.

2    Correct?

3    A.    As long as we hosted a university event,

4    yes.

5    Q.    Why did Spectrum never apply for those

6    funds?

7    A.    Sometimes it wasn't a -- large enough for

8    us of a financial burden to apply for those funds.

9    Other times, our event got canceled.

10    Q.    What do you mean by that?

11    A.    We were planning on applying for the

12    reimbursement funds for a Fool's Drag Race.

13    Q.    And how would that reimbursement have

14    worked, to your recollection?

15    A.    We would have a cost list so that would

16    have been for the mocktails and for the rental venue

17    fee.  And then we would compile that and then send

18    it off with a request for reimbursement to the

19    university.

20    Q.    So Spectrum received no funds from WT.  Is

21    that correct?

22    A.    As far as I remember.

23    Q.    Are you aware whether they received --

24    whether the organization received funds from the

25    university in the past?

1    A.    I do not know about that.

2    Q.    A few bullet points down, there's a

3 sentence that says:  "Involvement opportunities such

4 as NSO Org fares, Buff Branding events, Join the

5 Herd 2.0."

6              What are Buff Branding events?

7    A.    Buff Branding was part of new student

8 orientation in which there would be, like, planned

9 events throughout the day, like tie-dyeing at the

10 park on -- like the grassy knoll on campus.

11              There would be a concert held at the

12 parking lot behind the stadium, and they would bring

13 out little stamps and stamp the shirts that people

14 have with the WT logo as a Buff Branding-type thing.

15    Q.    What about Join the Herd 2.0?  What is

16 that?

17    A.    That is like the new student orientation

18 tabling that I mentioned before, except it's not

19 specifically tied to the new student orientation

20 time; it's about two weeks into the semester.

21    Q.    When new students came to WT, was there any

22 sort of program or anything set up where if there

23 were LGBTQ+ students coming to the university, they

24 could be directed to speak with you or another

25 member of the Spectrum team?  Was there anything

1    like that?

2        A.   I do not remember.

3        Q.   Did Spectrum have a bank account?

4        A.   Yes.  That is correct.

5        Q.   Was that a university-affiliated bank

6    account?

7        A.   No, it was not.

8        Q.   What kind of bank account was it?

9        A.   It was a Wells Fargo business account.

10              Because at that time, the university

11   didn't have university org accounts.

12       Q.   So all student organizations had to have

13   their own bank accounts?

14       A.   As far as I can tell, yes.

15       Q.   If Spectrum received any donations, they

16   would go directly into that bank account.  Correct?

17       A.   That is correct.

18       Q.   And the university didn't -- the university

19   didn't have any sort of oversight or awareness as to

20   what would be in that bank account.  Is that

21   accurate?

22       A.   I would say somewhat accurate.

23              The advisors would have access to said

24   bank accounts.

25       Q.   What would the advisors do?

1    A.   I cannot say for what other org advisors

2    could or would do.

3              I know that Kristina Drumheller would

4    help us with -- and specifically also help the

5    treasurer with understanding how much is in there,

6    what we are allowed to do with it per university

7    standards.  I don't remember what those standards

8    were.

9    **Q.   So even though Spectrum had a bank account**

10   **that was not affiliated with the university, its use**

11   **of the funds within the account was still controlled**

12   **by university policy.  Is that correct?**

13              MR. MORRIS:  Objection.  Calls

14       for speculation.

15   A.   I don't remember, specifically.

16   BY MS. BAKER:

17   **Q.   And Spectrum didn't charge any membership**

18   **dues.  Correct?**

19   A.   That is correct.

20   **Q.   Why?**

21   A.   We didn't want to put up any barriers to

22   anyone who is LGBTQ+ or supportive from joining our

23   org.

24   **Q.   Another bullet point here talks about**

25   **support from the Office of Student Engagement and**

1  **Leadership.  Do you have any recollection of what**

2  **that office is and how they help students?**

3      A.   I know that outside of the student orgs, if

4  you had a -- what's it called? -- an emergency that

5  has happened, that -- like, your laptop broke, you

6  could apply for an emergency loan that you didn't

7  have to pay back, so it wasn't really a loan, from

8  the Office of Student Engagement and Leadership.

9  And they would help you with funds to procure broken

10 items, or if you had, like, your family member in

11 the hospital, they would help you with how to

12 navigate classes, and et cetera.

13     **Q.   Did Spectrum ever work with that office in**

14 **any way?**

15     A.   Not that I can recall.

16     **Q.   Was there any office or department at the**

17 **university that Spectrum worked with?**

18     A.   Yes.

19          We worked with the JBK help staff for

20 helping set up events and rent venues, as well as --

21 I can't remember her name.  She might have been with

22 the Office of Student Engagement and Leadership.

23 She would help us with our poster requests and

24 printouts for banners.

25     **Q.   I'm going to keep scrolling down to another**

1   page in this exhibit, and that page is marked 568.

2   SPECTRUM 568.

3              Okay.  So we're going to be looking at

4   the section entitled "Reserving University

5   Facilities."

6              I would like to ask you a few questions

7   about this event process timeline, so I want to give

8   you a moment to just read that chart and I'll ask you

9   a few questions about it.

10             MR. MORRIS:  Ms. Baker, I don't

11        think that's on the screen yet.  At least,

12        I don't see it now.

13             MS. BAKER:  Can you see it now?

14   A.   I can see it.

15             The Event Process Timeline?

16   BY MS. BAKER:

17   Q.   Yes.

18             (Document review.)

19   A.   All right.  I have read it.

20   BY MS. BAKER:

21   Q.   So based on your reading of this part of

22   the document, does WT have to accept a reservation

23   request?

24             MR. MORRIS:  Objection.  Calls

25        for speculation.

1    A.    I do not know the university policy on the

2    accepting or refusing of requests to host an event.

3    BY MS. BAKER:

4    **Q.    The first section of this chart indicates**

5    **that the university will have to keep certain**

6    **reservations on hold to ensure that there are no**

7    **other conflicting events in the space that a student**

8    **is seeking.  Correct?**

9    A.    Yes.  That is correct.

10   **Q.    And according to this chart, after a**

11   **tentative confirmation has been sent, a group can**

12   **start advertising for their event.  Correct?**

13   A.    That is what the document says.  Yes.

14   **Q.    And after the event details are confirmed**

15   **and the event receives a confirmed status, a student**

16   **group could still receive emails concerning the**

17   **status of the event after the fact.  Correct?**

18          MR. MORRIS:  Objection.

19   Mischaracterizes the document.

20   A.    I would say, based off of this document,

21   that it -- they would be able to give updates or

22   questions regarding the event that the staff may

23   have.

24   BY MS. BAKER:

25   **Q.    So you were -- so you agree that there**

1  **could be updates concerning the event after it has**

2  **been confirmed.  Right?**

3      A.   I would not know what type of updates those

4  would entail.

5      **Q.   Aside from what those updates would entail,**

6  **there still could be updates.  Right?**

7      A.   Yes.  That is what the document says.

8              MS. BAKER:  I'm going to stop

9      sharing this document so that we can take a

10     look at the next exhibit, which I believe

11     is Exhibit 3.

12             Exhibit 3 is marked SPECTRUM 348.

13     This is a copy of the Spectrum WT

14     President's Bible.

15             (Deposition Exhibit 3

16             marked for identification.)

17     BY MS. BAKER:

18     **Q.   Are you familiar with this document,**

19  **Barrett?**

20     A.   Yes.

21     **Q.   Can you tell me what this document is?**

22     A.   This document is a, sort of, guideline for

23  the president of Spectrum to follow and help give

24  advice type of information for the president or new

25  president coming in.

1    Q.    And is the individual identified on this

2    page the person whom you followed as president?  Did

3    you take leadership from this individual?

4    A.    Yes.  I took leadership from London Hughes

5    before I became president.

6    Q.    So I'm going to keep scrolling down here to

7    the table of contents.  And it appears to me that

8    this page lists out some events that Spectrum has

9    historically had.  Is that correct?

10    A.    As far as I know, yes.

11    Q.    Were any of those events on -- let me

12    rephrase.

13          Did Spectrum host any of the events

14    under this list called "The Gay Calendar"?

15    A.    Are you referring to my -- under my time as

16    leadership?

17    Q.    Yes.

18    A.    Yes.

19    Q.    Which events?

20    A.    We did the National Coming Out Day.  We

21    helped with PASO Turnabout.  We have done bake

22    sales.  And it wasn't under my leadership.  It was

23    when I was under London's leadership.  We also did a

24    Halloween party, a Holi"gay" Party and The Gay Prom.

25    Q.    The PASO Turnabout, what is that?

1    A.   That is a fundraising event for PASO,

2  Panhandle AIDS Support Organization, where they run

3  a charity drag show to raise funds.

4    **Q.   And would you agree that these events**

5  **helped members of WT's LGBTQ+ community feel welcome**

6  **and accepted on campus.  Right?**

7    A.   I would say for most of these events, yes.

8         PASO was more of a charity event, and

9  it was not hosted on campus.

10    **Q.   But most of these events occurred on**

11  **campus.  Correct?**

12    A.   That is correct.

13    **Q.   Did any of these events take place in the**

14  **JBK Student Center?**

15    A.   Yes.

16    **Q.   Which ones?**

17    A.   That would be the bake sale and the

18  National Coming Out Day.

19    **Q.   And the National Coming Out Day, what was**

20  **that like?**

21    A.   So we would -- as Spectrum, we would host

22  different events on National Coming Out Day.  One

23  was -- you could get, like, your headshot taken with

24  the "I'm gay," "I'm lesbian," "I'm queer," like,

25  sticker attached to it, like as if it was a Polaroid

1    type of photo.

2              And the other one we worked with, I

3    believe, Buff Allies.  And that was for, like, the

4    National Coming Out Day panel and party.

5        Q.   So would you agree -- excuse me.

6              Would you agree that several Spectrum

7    events took place in the JBK student center while you

8    were president?

9        A.   Yes.  I would agree.

10       Q.   And at these events, Spectrum was able to

11   table and interact with students.  Correct?

12       A.   Yes.  That's correct.

13       Q.   Would you agree that tabling was a good way

14   for Spectrum to recruit new members and gauge

15   students' interest in the organization and its

16   mission?

17       A.   I would say yes.

18       Q.   I'm going to now scroll down to page 13 of

19   this document.  I guess there is a faster way of

20   doing this.

21             Okay.  This section entitled "Drag

22   Queen."  It says:  We tend to go with Ivy Tran for

23   all things drag queen.  She's great."

24             I'm not going to read the rest of that.

25             Are you familiar with Ivy Tran?

1     A.   I have not met with Ivy Tran.  Our --

2  London has; I had not.

3     **Q.   Did Spectrum WT ever host any events with**

4  **Ivy Tran on campus?**

5     A.   Not while I was president.

6     **Q.   So you don't know if it had -- if Spectrum**

7  **did host such events with Ivy Tran before you were**

8  **president?**

9     A.   I do not know if they did.

10    **Q.   But according to this guidebook, Spectrum**

11  **has worked with Ivy Tran before.  Right?**

12    A.   That is what the document says.

13    **Q.   Are you aware of any other drag shows that**

14  **Spectrum has attempted to host on campus before in**

15  **the past?**

16    A.   I am aware that there have been.  I do not

17  know their names or who participated in them.

18          MS. BAKER:  I am going to stop

19     sharing my screen and introduce Exhibit 4,

20     which is marked SPECTRUM 1380.

21          (Deposition Exhibit 4

22           marked for identification.)

23          MS. BAKER:  I'm going to start

24     from the bottom of the document so that

25     everybody has full context of what this is.

1           BY MS. BAKER:

2           **Q.   So this is an email thread between a**

3   **Texas A&M student and some Spectrum officers.**

4                   **So I will pause, and let me know when**

5   **you've read it and I will scroll up.**

6                   MR. MORRIS:  Let me just -- I'm

7           just asking if the witness needs to see the

8           entire thread, just to let him read it,

9           please.  Just for full context.

10                  So, Bear, if you need to read the

11          entire document, just let Ms. Baker know.

12                  THE WITNESS:  Okay.

13          A.   May I please read the full document?

14          BY MS. BAKER:

15          **Q.   Yes.  And I encourage you to.**

16                  (Document review.)

17          BY MS. BAKER:

18          **Q.   So based on your reading of this document,**

19  **the Texas A&M student was inquiring whether Spectrum**

20  **has hosted a drag show in the past.  Right?**

21          A.   That is correct.

22          **Q.   And in this section, Spectrum secretary**

23  **says that there was an official drag show held on**

24  **campus a couple of years ago.  Correct?**

25          A.   Yes.  That is correct.

1    **Q.    And then London Hughes, in this email, says**
2    **there was a drag show prepandemic, shut down two**
3    **years ago.  Is that correct?**
4        A.    Shut down two years ago?  Give me a second,
5    please.
6                I do not fully understand what London
7    is saying in that sentence where it says that they
8    participated in the drag show prepandemic.  I don't
9    know what they mean by "shut down two years ago,"
10   unless if that meant where the prepandemic stopped
11   that event -- or the pandemic stopped that event
12   from occurring.
13       **Q.    So you're not aware of any sort of official**
14   **drag show that Spectrum hosted in the past that was**
15   **shut down two years ago.  Correct?**
16       A.    This would be two years ago from the time
17   of the email sent.
18       **Q.    Yes.  From the time that the email was**
19   **sent.**
20       A.    So I do -- I know that there was drag shows
21   in the past; I do not know the context surrounding
22   them.
23       **Q.    Have you had any follow-up conversations**
24   **with London Hughes or Spectrum's then secretary**
25   **about this event?**

1      A.   Not about that event, I do not believe.

2             MS. BAKER:   I'm going to stop

3      sharing.

4      BY MS. BAKER:

5      **Q.   Spectrum started planning its 2023 drag**

6  **show in 2022.   Right?**

7      A.   That's correct.

8      **Q.   Who came up with the idea?**

9      A.   That would be me.  I came up with the idea.

10     **Q.   And why was it important in your mind that**

11  **the event would be a drag show?**

12     A.   I believed it would be important, because

13  drag shows are, like, inherently a part of LGBTQ+,

14  like, culture.  And it would be a great way for

15  showing LGBTQ+ support on campus by hosting the

16  student drag show, as well as raising money for a

17  charity project, which is what our members wanted to

18  see a little bit more of.

19     **Q.   You just mentioned that drag shows are**

20  **inherently a part of LGBTQ+ culture.   What do you**

21  **mean by that?**

22     A.   That as far as I was raised and informed of

23  LGBTQ+ and gay culture before I realized I was gay

24  and I immersed myself inside the culture, it was --

25  it, kind of, started with Marsha P. Johnson and,

1  like, Stonewall, and she was a trans woman.  But it

2  was like that idea with drag being kind of, like, a

3  counterculture movement to standard straightness, if

4  that makes sense.

5      **Q.   So would you say that your perspective of**

6  **drag changed once you became immersed in the culture**

7  **of it, as you -- as you mentioned?**

8      A.   I didn't know much about drag until after I

9  realized I was gay and started looking stuff up that

10  dealt with gay culture.

11     **Q.   Do you ever -- do you believe that there's**

12  **ever a time when drag is not inherently -- or is not**

13  **a part of LGBTQ+ culture?**

14     A.   I would say that I don't really know about

15  that.  I could take a guess, but I don't think that

16  would be very accurate.

17     **Q.   Do you agree that there could be people who**

18  **dress in drag or perform drag in a way to ridicule**

19  **members of the LGBTQ community?**

20     A.   This would also be speculation, but I am

21  sure there probably are.

22     **Q.   But it's your opinion that drag is**

23  **inseparable from the LGBTQ community.  Is that what**

24  **you believe?**

25              MR. MORRIS:  Objection.

1    Mischaracterizes prior testimony.

2    A.    I believe that drag is a very important

3  part of LGBTQ+ culture.

4            I'm not sure about what the greater

5  community thinks about it being separated from

6  LGBTQ+ culture.

7    BY MS. BAKER:

8    **Q.    Concerning the 2023 drag show and in**

9  **planning it, what was the message of the show?**

10    A.    The message of the show was -- well, it

11  depends on each of the performers' own personal

12  message, because they are performing on stage and

13  they all have their own ideas of what they want to

14  say.

15            But the overall purpose of the show

16  was to show support for the LGBTQ+ students on

17  campus and to raise funds for The Trevor Project.

18    **Q.    So there was a message that the individual**

19  **performers are trying to convey.  Correct?**

20    A.    Yes.  That's correct.

21    **Q.    And there's also -- are you saying there's**

22  **also a collective message as well?**

23    A.    I would say that the collective message of

24  the drag show was to -- like I said, to show support

25  for the LGBTQ+ community and as a way to, like, mess

App. 450

1  with and bend gender norms, as well as raise money

2  for The Trevor Project.

3      Q.   So if the message is determined by what the

4  performer is trying to convey, how does the audience

5  know what's in the performer's mind?  What --

6                  MR. MORRIS:  Objection.  Calls

7      for speculation.

8                  I'm sorry, Ms. Baker.  Finish

9      your question.

10                 MS. BAKER:  Let me rephrase.

11     BY MS. BAKER:

12     Q.   Have you ever been to a drag show?

13     A.   Yes, I have.

14     Q.   And it's your view that those individual

15  performers have a unique message that they're trying

16  to convey.  Is that correct?

17     A.   Yes.

18     Q.   How do you, as a member of the audience

19  viewing a drag performer, know what message they are

20  trying to convey?

21     A.   That's kind of hard to answer.  It's kind

22  of like saying you're looking at an art piece and

23  you're saying what did the artist intend with this.

24  And sometimes it's hard to tell.  I know that --

25     Q.   So just --

1    A.    Oh, sorry.

2              MR. MORRIS:  Go ahead and finish.

3              Let Mr. Bright finish his answer.

4    A.    I have seen drag shows where one person's

5    message was, kind of, like TV and the idea of

6    communication being distorted, and they had really

7    big blocky hair and it was colored as if it was a TV

8    screen.  And I have seen others that was a

9    performance to Taylor Swift with backup dancers, and

10   that one was more of, like, breaking gender norms.

11             But I can't specifically say exactly

12   what was going through their head while they're were

13   performing.

14   BY MS. BAKER:

15   **Q.    Why the JBK?**

16   A.    The JBK would allow Spectrum a large enough

17   venue on campus to be able to put on an event.  We

18   would have been able to, like, control, in a sense,

19   who was coming in because we had the age requirement

20   with parental consent.

21             It was -- we were going to be able and

22   allowed to use it for the sense of the student org

23   funds allowing us to host it at the JBK, and it's

24   quite central.  So it would allow a lot of campus to

25   easily be able to reach it.

Barrett Bright - 12/19/2025

54

1      Q.    Were there any alternative venues

2   considered in the planning process?

3      A.    We also considered a -- the alumni banquet

4   hall room.  We were worried that it might be a bit

5   too small.  And that was also on campus.

6            And we also considered -- what's it

7   called? -- one of the spaces in the VHAC, the Virgil

8   Henson Activity Center.  I don't remember what it

9   was called at the Virgil Henson Activity Center.

10     Q.    And you worked -- you worked very closely

11  with Dr. Shawn Fouts during the reservation process.

12  Correct?

13     A.    I believe so.  Yes.

14     Q.    How would you describe the reservation

15  process?

16     A.    It starts with requesting the space and the

17  name of the event that you would like to use it for.

18  And then you would need to fill out a hazard matrix

19  and request in that -- or the -- what's it called?

20  It's been a bit.  I'm trying to remember the terms

21  of the documents.

22            The hazard matrix and the risk

23  request -- or not "request" -- the risk form.

24            And then once you've submitted that

25  and are -- or get tentative approval, you can start

1    marketing.  And then you would start sending in

2    posters and poster designs for approval, and cement

3    any other final documents, like the food request

4    form, the catering exemption form, and, I guess,

5    anything else required by the JBK before you get

6    full confirmation.

7        **Q.   And all the marketing materials have to**

8    **receive university approval.  Right?**

9        A.   Based on what the university requires, yes.

10       **Q.   So how does that work?  Spectrum creates a**

11   **document, a flier, and then what happens?**

12       A.   So specifically with the 2023 drag show, we

13   were working with a bunch of other orgs, and another

14   org was handling the marketing side.  So they

15   forwarded their poster ideas to us and we forwarded

16   it to the JBK.

17             And then the JBK went through those

18   documents, the posters, and then they said that some

19   of these documents are -- some of these posters have

20   kind of risky looking, like, injury-prone type of

21   activities, like doing the splits, and that we

22   weren't allowed to have those type of images on our

23   poster, and sent them back to us.  And we started

24   the review/rework process.

25       **Q.   What is the review/rework process?**

1    A.   Well, we sent it back to the RJ

2   organization who was in charge of marketing, and we

3   said, hey, this is what we weren't allowed to have

4   on there and we needed these certain requirements --

5   I can't remember the name of the requirements.

6             I know one of them was all the student

7   orgs had to have their logo on the poster and so RJ

8   started working on reworking the posters.  That way,

9   they fit the requirements set by the JBK.

10    **Q.   You mentioned a flier that was not approved**

11   **by the JBK, and you said it had someone doing splits**

12   **on it.  Correct?**

13    A.   That is correct.

14    **Q.   Why was that flier rejected?**

15    A.   Because it promoted the idea of doing a

16   risky action, such as doing the splits.  And that

17   that wasn't allowed, from what I remember.

18             MS. BAKER:  I'm going to

19        introduce Exhibit 5 as a document marked

20        SPECTRUM 786, and it is an event request

21        form.

22             (Deposition Exhibit 5

23             marked for identification.)

24   BY MS. BAKER:

25    **Q.   Do you recognize the fields in this form?**

1    A.   Are you referring to the -- is it the

2    questionnaire, answer, response things?

3    **Q.   Yes.  Yes.**

4    A.   Yes.  I do recognize those.

5    **Q.   And at what -- at which point in the**

6    **process would you have completed this?  At the very**

7    **beginning or toward the end?**

8    A.   This would be near the beginning with the

9    risk form.

10    **Q.   So here under the estimated attendance, you**

11    **indicated that you expected up to 100 or even more**

12    **attendees.  Correct?**

13    A.   That is correct.

14    **Q.   Had Spectrum ever had an event with that**

15    **many people?**

16    A.   Not in the past, as far as I remember.

17    **Q.   So why so -- why so many -- why did you**

18    **expect so many people to be there?**

19    A.   We were overestimating the amount of

20    people, just in case.

21         But we were also promoting it to,

22    like, family members of performers and the greater

23    LGBTQ+ population outside of WT.

24    **Q.   And this form also says "All ages are**

25    **welcome, 18 and under with a guardian."  Correct?**

1      A.    Yes.

2      Q.    **So only minors with a parent or guardian**

3  **present could attend.  Right?**

4      A.    That is correct.

5      Q.    **And part of this form indicates that there**

6  **were event or activity waivers.  Correct?**

7      A.    Yes.  That would be correct.

8      Q.    **And what were these waivers?**

9      A.    They would have been a waiver release form

10 in case -- if you got injured while performing.

11     Q.    **And who created those forms?**

12     A.    We never finished those forms.  The event

13 got canceled before we could print them out.

14     Q.    **But you --**

15     A.    I believe you were going -- oh, sorry.

16     Q.    **I was just going to ask whether Spectrum**

17 **would have created those forms.**

18     A.    We had asked Drumheller what we needed to

19 do about that.  And Drumheller, I believe, directed

20 us to -- oh, my gosh.  I can't remember.

21            It was some type of site, and we would

22 have either typed them up ourselves for the purpose

23 of risk release, or it was -- we would ask the JBK

24 what type of risk release.  I can't remember which

25 one it was, though.

Barrett Bright - 12/19/2025

59

1    Q.    So a 17-year-old would have had to be
2    accompanied by a parent or guardian to attend this
3    event.  Correct?
4    A.    Correct.
5    Q.    And how did Spectrum plan to confirm
6    whether attendees were truly accompanied by a parent
7    and not someone else, like a neighbor or friend?
8    A.    Well, we would have checked IDs at the
9    door.
10             However, I am not too sure how we
11   would have reacted to the situation you have
12   mentioned.
13   Q.    So if a 17-year-old student is
14   unaccompanied by a parent or guardian, they just
15   wouldn't be able to attend this event.  Right?
16   A.    I don't believe they would have been able
17   to attend the event.
18   Q.    While you were at -- while you were a
19   student at WT, did you ever meet any other students
20   whose families lived far away?
21   A.    Yes.  I have met a lot of students whose
22   families lived far away.
23   Q.    So, potentially, some students wouldn't be
24   able to be there --
25   A.    I need to correct something.  I know -- I'm

App. 458

1    not sure if we've mentioned it yet.

2                We were also checking student IDs at

3    the door, besides just, like, regular legal IDs.

4    And I know that the student org at Spectrum talked

5    with Drumheller about allowing university students

6    with -- access with their student ID.  But I'm not

7    sure if that has been brought up on any of the

8    documents.

9        **Q.   So you're saying that all the student**

10   **needed was their student ID to get in?  Is that a**

11   **what you're explaining?**

12       A.   Yes.

13               And then if you were a nonstudent, you

14   would have needed your legal guardian with you if

15   you were a minor.

16       **Q.   So if you were a student, you didn't need**

17   **to be accompanied by a parent or guardian.  Right?**

18       A.   That is correct, if you had your WT student

19   ID.

20       **Q.   Why did -- why did Spectrum create -- why**

21   **did Spectrum decide to limit the event -- why did**

22   **Spectrum decide to require minors to attend with**

23   **parents or guardian?**

24       A.   That would be within the realm of, like,

25   context.

1          At that time, there was a lot of

2   outrage nationwide -- or not really outrage.  There

3   was a lot of news coverage nationwide about drag

4   shows.  And -- as such, and we were worried that we

5   would cause either a large protest or cancellation

6   if we didn't set requirements that restricted minors

7   from attending the event.

8      **Q.   So Spectrum -- was Spectrum instructed to**

9   **do that by -- hold on.**

10          (Pause in proceedings.)

11   BY MS. BAKER:

12      **Q.   Was Spectrum instructed to do that by**

13   **administrators, or did it make that decision on its**

14   **own?**

15      A.   We -- it made that decision on its own to

16   be extra cautious.

17      **Q.   Now, this form also says that you**

18   **identified the event or activity as posing a risk of**

19   **impairment, humiliation, coercion, physical assault,**

20   **et cetera.  Right?**

21      A.   Yes, initially.  And then the JBK informed

22   us that it wasn't -- it didn't -- it wasn't in that

23   realm of risk.

24      **Q.   Why did you say "yes"?**

25      A.   Once again, we were being extra cautious

1  because -- we were worried, being in a fairly

2  conservative area, about, like, protests and angry

3  people trying to shut down the event; a much bigger

4  risk than we thought was actually there.

5       Q.   So you were concerned about the risk to the

6  performers.  Correct?

7       A.   Yes.

8       Q.   And you were concerned that the performers

9  may feel embarrassed or harassed from other students

10  after the event.  Correct?

11      A.   Yes.

12      Q.   Did you ever consider whether attendees or

13  other students would feel embarrassed or harassed by

14  the event?

15      A.   No.

16      Q.   I'm going to -- here at the top of the

17  page, it says -- there's a question asking whether

18  minors are specifically invited to attend the

19  activity.  What does "specifically invited" mean?

20      A.   I interpreted that as if we reached out to

21  them and they wanted to come.

22           Like my siblings.  I reached out to

23  them and asked if they wanted to come, and they said

24  yes.  And so that was my personal belief of that's

25  what it was asking.  I'm not too sure if it was

1    referring to something else.

2        Q.   Are you aware of any other events that have

3    happened in Legacy Hall that were limited to

4    individuals 18 and above?

5        A.   I do not know the name of the events.

6                 I do know that there have been events

7    where alcohol has been served in Legacy Hall, and

8    those were restricted to 18 and up.

9        Q.   Would you agree, in your dealings with

10   Dr. Shawn Fouts during the reservation process, that

11   he was concerned about risk that the drag show may

12   pose to minors during that process?

13       A.   He did not inform me of risk imposed to

14   minors during that time.

15       Q.   I am going to scroll up in this document

16   marked SPECTRUM 788.

17                 Have you ever seen this email

18   communication at all?

19       A.   I believe I have seen this.

20       Q.   And this is from Dr. Shawn Fouts.  Correct?

21       A.   Yes.

22       Q.   And here, he's asking whether participants

23   need to get prior approval for their dress and

24   performance before the event.  Correct?

25       A.   Yes.  That is what he is asking.

Barrett Bright - 12/19/2025

64

1    Q.    And he also asked whether the event is

2    going to need any warning labels concerning minors.

3    Correct?

4    A.    That is what he's asking.  Yes.

5    Q.    And as part of the reservation process, you

6    also had to complete a separate risk assessment

7    form.  Right?

8    A.    Are you referring to the hazard matrix?

9    Q.    Yes.

10    A.    Yes.

11    Q.    What is -- is there a distinction between

12    the hazard matrix and the risk assessment?

13          MR. MORRIS:  Objection to the

14      extent it calls for speculation.

15    A.    I know there is a physical difference with

16    the hazard matrix where there -- you were labeling

17    how risky your event will be on a scale, but I don't

18    know about any other differences between the two

19    documents.  I don't remember any difference -- any

20    other differences between the two documents.

21          MS. BAKER:  I am going to

22      introduce Exhibit 6.

23          MR. MORRIS:  Ms. Baker, before we

24      do that, we've been going for almost an

25      hour and a half.  Can we take a break?

1              MS. BAKER:  Sure.  How long of a

2      break do y'all need?

3              MR. MORRIS:  Five, ten minutes.

4      Whatever works for you.

5              MS. BAKER:  Okay.  Let's do ten

6      minutes.

7              MR. MORRIS:  Okay.  Come back at

8      11:40.

9              MS. BAKER:  Sounds good.

10              (Off record:  11:29 a.m. to 11:44 a.m.)

11              MS. BAKER:  So Exhibit 6 is the

12      WT risk management and insurance matrix,

13      marked SPECTRUM 776.

14              (Deposition Exhibit 6

15              marked for identification.)

16      BY MS. BAKER:

17      **Q.    You completed this form.  Correct, Barrett?**

18      A.    Yes.  That is correct.

19      **Q.    And what exactly is this document?**

20      A.    This document is the West Texas A&M

21      University Risk Management and Insurance Matrix.

22      **Q.    And which part of the res- -- during which**

23      **part of the reservation process would you have**

24      **completed this form?**

25      A.    Near the beginning.

1    Q.    Concerning the drag race, you mention

2    "performing in drag, possible bad press."

3                What do you mean by "bad press"?

4    A.    That was where we, as Spectrum, was worried

5    about, like, large negative protests on campus

6    against the show.

7    Q.    Against the show.

8                What -- what gave you reason to believe

9    that those protests would be against the show?

10    A.    Because, at the time, there was a lot of

11    news coverage about drag shows and a lot of protests

12    against those drag shows nationwide, from what I

13    remember.  And so that made us, as Spectrum, worried

14    that that might happen at our drag show.

15    Q.    And the method to manage the risk -- let me

16    zoom in -- is not allowing minors entry without a

17    legal guardian.  How does that help to manage the

18    risk of possible bad press?

19    A.    That would be because a lot of the news

20    coverage we saw about the drag stuff was the drag

21    reading at libraries and people worried about their

22    kids seeing drag.  And so we thought the best way to

23    mitigate that risk was to -- as best as we can --

24    reduce the number of minors at the show.

25    Q.    Now, earlier, you mentioned that you have

1    siblings.  Right?

2       A.    That is correct.

3       Q.    Are those younger or older?

4       A.    Younger siblings.

5       Q.    Younger siblings.  How old would they have

6    been around the time that all this was going on that

7    you would have completed this form?

8       A.    I believe around in the range between,

9    like, 12 and 16-ish.

10      Q.    So you would have wanted this to be an

11   event that they could attend.  Right?

12      A.    That is correct.

13      Q.    Now, you have identified the performing in

14   drag, possible bad press, and the possible

15   protestors as being medium risk -- well, actually,

16   strike that.  I misspoke.

17             The drag race, performing in drag,

18   possible bad press is identified as medium risk.

19   Correct?

20      A.    Yes.  That is correct.

21      Q.    And the possible protestors is identified

22   as being low risk.  Correct?

23      A.    That is correct.

24      Q.    Why did you say possible protestors was a

25   low-risk concern?

1    A.    If I remember right, this was while

2  consulting with either Drumheller or the JBK help

3  desk what I needed to put for that.  And I was

4  recommended to place it at low risk.

5    **Q.    And then what about the possible bad press,**

6  **medium risk?  Were you filling that out under --**

7  **with the assistance of your advisor as well?**

8    A.    That, I do not remember.

9        I might have had that already filled

10  out by the time I went for help.

11    **Q.    Now, on that other form we looked at a**

12  **little bit earlier, you also identified**

13  **embarrassment, humiliation, coercion, and physical**

14  **assault as potential risks.  Right?**

15    A.    Um-hmm.

16    **Q.    And why -- why doesn't that appear on this**

17  **form?**

18    A.    I believe that fell under the "performing

19  in drag" section.

20    **Q.    Do you remember how you planned to**

21  **alleviate the risk posed by the embarrassment, the**

22  **humiliation, and coercion?  How did you plan to**

23  **mitigate that risk?**

24    A.    We informed the performers that there --

25  that might be a risk involved when performing.  And

App. 467

1  that we would use the drag and stage names, and not

2  use real names during the performance.

3       Q.   So the stage names are what the drag

4  performers create themselves.  Right?

5       A.   That is correct.

6       Q.   And everybody gets to create their own

7  stage name.

8       A.   That is correct.

9                 MS. BAKER:  I am going to ...

10                (Pause in proceedings.)

11     BY MS. BAKER:

12      Q.   Excuse me.  My mistake.  I was looking at

13  the wrong page.

14                So who was going to participate in the

15  2023 drag show?

16                MR. MORRIS:  Objection.

17     Ambiguous.

18      A.   From what I can remember, it was going to

19  be me, Marcus, Henry, and there were a few -- Kim.

20  And there were a few others.  I can't remember their

21  names at the moment.

22                But I do know --

23     BY MS. BAKER:

24      Q.   So was it --

25      A.   -- we submitted -- oh.  Sorry.

1          I do know that we submitted a list of

2   the performers and their stage names to the JBK.

3      **Q.   So was this an event that members of the**

4   **public could participate in as performers, or only**

5   **students?**

6      A.   The main purpose was for student

7   performers.

8               However, we did have available the

9   option for either the judges of the drag show or the

10  emcee to perform a number.

11     **Q.   So the emcee could perform?**

12     A.   If needed.  Yes.

13     **Q.   What do you mean by "if needed"?**

14     A.   If we did not have enough student

15  performers to fill out the time slots.

16     **Q.   So if everything with the 2023 drag show**

17  **had gone -- proceeded as Spectrum initially planned,**

18  **would there have been only student performers, or**

19  **would there have been additional performers,**

20  **nonstudents?**

21     A.   There was -- there would have been only

22  been student performers.

23     **Q.   Were there any judges for the performance?**

24     A.   Yes.  There were some people we had reached

25  out to be judges.

1    Q.   **Who were those people?**

2    A.   You had -- we had drag queens from the

3  local Amarillo area, like -- oh, my gosh.  What's

4  their name?  Van Buren -- Valentine Van Buren.  And

5  I can't remember who we asked to be the other judge.

6    Q.   **So you asked local drag queens to be judges**

7  **for the on-campus show.  Correct?**

8    A.   That is correct.

9    Q.   **Why?**

10    A.   Who better to judge a drag race than drag

11  queens themselves.

12    Q.   **Did you define any criteria that they would**

13  **use in judging student participants?**

14    A.   We were going to have a planned list

15  dealing with makeup, character creation, like,

16  design of their clothes.  And then it was floated to

17  have, like, a questionnaire to ask -- for all the

18  performers to answer in character.

19    Q.   **Can you discuss that questionnaire?**

20    A.   It would have been along the lines of like

21  a beauty pageant style of the questions.  Like, what

22  do you plan to do in the future, this, that,

23  et cetera.

24    Q.   **And would the judges select a winner?**

25    A.   That is correct.

1    Q.    Would there be one winner?

2    A.    I believe so.  That was the initial plan.

3    Q.    And would each of the judges have a vote?

4          How would they go about selecting the

5    winner?

6    A.    We hadn't decided on that just yet.

7          I believe we were going to leave it up

8    to the judges.

9    Q.    And can you describe those categories that

10    the judges were going to consider again?

11    A.    It was going to be the performance, like

12    makeup, clothing design, and, like, how well they

13    created the character they're performing as.

14    Q.    And can you explain what you mean when you

15    say "the character they're performing as"?

16    A.    Sure.  Some performances will have, like, a

17    character who is like, quote, unquote, crazy

18    obsessed type of personality.  And so showing that

19    obsession in the performance would be part of, like,

20    that character creation.

21          Other performances are more about,

22    like, elegance.  And so showing off, like, elegance

23    in the performance would be part of the character

24    creation.

25          So you'd -- during the questions,

1    asking when you're asking in character -- or

2    responding in character.  There would be, like,

3    moments where, does this person respond in the way

4    that they're presenting their character to be?

5        **Q.   So the performer -- the performer decides**

6    **who their character is, and then the judges evaluate**

7    **whether that performer is sufficiently embodying**

8    **that character.  Right?**

9        A.   Um-hmm -- yes.

10       **Q.   So what kinds of characters have you seen?**

11       A.   Like I mentioned, there was the crazy

12   obsessed.  The, like, super-elegant, almost like

13   royalty style of drag queen.  I've seen, like, goth

14   punk style of characters, and I've also seen like

15   raunchy comedic characters.

16              MS. BAKER:  Let's go off the

17       record for a moment.  I'm having

18       notification issues here.  I don't want it

19       to disrupt me from being able to hear.

20              (Pause in proceedings.)

21              MS. BAKER:  I'm going to

22       introduce Exhibit 7, marked SPECTRUM 829.

23              (Deposition Exhibit 7

24              marked for identification.)

25       BY MS. BAKER:

1    Q.   Barrett, were you involved in this

2    conversation at all?

3                MR. MORRIS:  And, again, just if

4        the witness needs to see the document, I'd

5        ask that you let him see the whole thing,

6        because I think these are pretty long text

7        threads.

8    A.   It's a little bit too small for me to be

9    able to read it.

10   BY MS. BAKER:

11   Q.   I'll start from the bottom, if that --

12   well, actually, let me start from the top.

13               (Document review.)

14   A.   All right.  I do believe I was a part of

15   this conversation.  Yes.

16   BY MS. BAKER:

17   Q.   I'm going to scroll to the part of the

18   conversation that is of interest.

19               Is the -- is the blue message bubble

20   from you?

21   A.   Yes.

22   Q.   And what was this -- do you remember what

23   this conversation was about?

24   A.   If I remember correctly, this conversation

25   was about getting the names of the drag queens and

1  the judges.

2      Q.   **And the drag queens were going to be the**

3  **judges.  Correct?**

4      A.   Yes.

5           And Myss Myka was going to be the

6  emcee.

7      Q.   **So Lindsey Adams -- Lindsey Adams is a drag**

8  **queen?**

9      A.   Yes, I believe.

10          I do know when Chip sent me this, I

11  did not know the names of these drag queens that

12  were going to judge.  Those were on Chip's side.

13     Q.   **So he suggested these drag queens.**

14  **Correct?**

15     A.   As the ones to judge.  Yes.

16     Q.   **At that time, were you looking for judges?**

17     A.   I believe this is -- I think this was after

18  the cancellation.  So we were going to have them,

19  possibly, as judges, and then this might lead to --

20  to our referenced conversations that are

21  attorney-client priveledged.

22     Q.   **Chip Chandler recommended Lindsey Adams and**

23  **Azariah as potential judges for the on-campus drag**

24  **show.  Right?**

25     A.   I believe so.  Yes.

1    Q.   Were you familiar with Lindsay Adams or

2    Azariah?

3    A.   I believe that I recognize those names; I

4    just can't put the faces to the names.

5    Q.   So you don't recall whether, at -- at that

6    time, during the planning process, whether you were

7    already familiar with them?

8    A.   I don't remember about Lindsey Adams.  I

9    have seen Azariah before.

10    Q.   You've seen Azariah in drag performance?

11    A.   That is correct.

12    Q.   And when Chip Chandler recommended these

13    performers, did you have any alternatives in mind?

14    A.   I don't remember, at the time, if we were

15    set on those two being judges, or if we had

16    alternatives that we had asked that we were waiting

17    on responses for.  I don't fully remember.

18    Q.   And Myss Myka was going to emcee.  Right?

19    A.   That is correct.

20    Q.   And did Chip recommended Myss Myka to be

21    the emcee as well?

22    A.   I believe so.

23    Q.   So at some point in the planning process,

24    did you have a conversation with Chip and ask him to

25    help identify local drag performers who might be

1    willing to help?

2        A.   That is correct.

3        Q.   **Was the participation of these local drag**

4    **queens identified in the risk assessment anywhere?**

5        A.   I don't believe so.

6        Q.   **Was the participation of local drag queens**

7    **something that the JBK center staff was aware of at**

8    **any point?**

9        A.   I do believe so.  Yes.

10       Q.   **What is the basis of your belief?**

11       A.   I remember talking with both Chip and --

12   with both Chip and Dr. Drumheller about this as part

13   of the process.  And then I remember confirming with

14   them -- oh.  I'm sorry.  Give me a moment.  I'm

15   wracking my brain.

16              Maybe not confirming.  I remember

17   confirming that we were going to have local drag

18   queens at the show with them in total.  And I don't

19   believe I ever sent an email out to the JBK about

20   them.

21              However, I do believe I remember

22   having a conversation with the help desk about them

23   being -- emceeing and judging.

24       Q.   **Did you have a conversation with Dr. Shawn**

25   **Fouts about them emceeing and judging?**

1    A.    I don't believe so.  I don't think I ever

2   saw him in person.

3    **Q.    But you all emailed frequently about the**

4   **planning of this event.  Right?**

5    A.    That is correct.

6    **Q.    So Chip Chandler and Dr. Drumheller knew**

7   **that you were planning to have these local drag**

8   **queens emcee and judge.  Correct?**

9    A.    That is correct.

10    **Q.    Do you agree that student events may pose**

11   **additional risk when members of the public get**

12   **involved with them?**

13    A.    I would not know about that.

14    **Q.    Do you agree that there are risks to**

15   **student -- do you agree that there are risks**

16   **involved in student events?**

17    A.    Yes.  I do agree that there are risks

18   involved in student events.

19    **Q.    Do you believe that the university policies**

20   **are designed in such a way to mitigate risk?**

21              MR. MORRIS:  Objection.  Calls

22    for speculation.

23    A.    I wouldn't know if that is the case.

24    BY MS. BAKER:

25    **Q.    Did you have to complete a risk assessment**

1  in planning this event?

2      A.   That is correct.  I did have to complete

3  that.

4              MS. BAKER:  I'm going to

5      introduce as Exhibit 8 an email which is

6      stamped SPECTRUM 860.

7              (Deposition Exhibit 8

8              marked for identification.)

9      BY MS. BAKER:

10     Q.   Once I pull this up, I will give you a

11 moment to read the email in its entirety.

12             (Document review.)

13     A.   All right.  I've read the email.

14     BY MS. BAKER:

15     Q.   You and Dr. Fouts communicated a lot during

16 the reservation process.  Right?

17     A.   That is correct.

18     Q.   Would you say that you-all had -- you and

19 Dr. Fouts had a pretty positive working relationship

20 throughout this process?

21     A.   I would believe so.  Yes.

22     Q.   Now, in this email, he mentions on -- in

23 the second paragraph on the second line, he asks

24 that Spectrum send us the music to make sure it is

25 not on a prohibited JBK playlist.

1              **What is the prohibited JBK playlist?**

2       A.    I do not know what the prohibited JBK

3   playlist is.

4       **Q.    Would you agree that in this email**

5   **Dr. Fouts is asking you to send him music for JBK to**

6   **review in advance of the performance?**

7       A.    Yes.  I would agree that that is what he's

8   asking.

9       **Q.    But you don't know what the prohibited JBK**

10  **playlist is.  Correct?**

11      A.    That is correct.

12              My guess is it would be music that the

13  JBK has already marked as not allowed to be played.

14      **Q.    Are you familiar with any policies or rules**

15  **that the JBK center has concerning acceptable music**

16  **lyrics at all?**

17      A.    No.  I do not have any knowledge of what

18  they deem as acceptable or not.

19      **Q.    So in your -- in your knowledge of working**

20  **with the JBK center, they have to approve music for**

21  **events.  Is that accurate?**

22      A.    As far as I can tell, yes.

23      **Q.    Did anything in your dealings with**

24  **Dr. Fouts lead you to believe that your event could**

25  **move forward if it had music on the prohibited**

1   playlist?

2       A.   I do not know about that.

3       Q.   But getting the music approved is part of

4   the approval process.  Correct?

5       A.   Yes.  That is correct.

6       Q.   In the next line -- in the next paragraph,

7   rather, and the last line of that paragraph, he

8   says:  "We have your event scheduled and approved as

9   tentative as we await your performance verification

10  and music."

11               So he was waiting on Spectrum to send

12  its playlist.  Correct?

13      A.   That is correct.

14      Q.   And what was your understanding of the

15  performance verification?

16      A.   My understanding was, who was performing,

17  to what song.  And that's what I replied to him

18  with.

19      Q.   And you said earlier you don't recall

20  discussing the drag queen judges with Dr. Fouts.

21  Correct?

22      A.   I do not recall discussing that with him.

23               MS. BAKER:  I'm going to

24      introduce as Exhibit 9 an email thread

25      spanning from SPECTRUM 983 through

1          SPECTRUM 988.

2                    And I will start on SPECTRUM --

3          the document marked SPECTRUM 987.

4                    (Pause in proceedings.)

5                    MS. BAKER:  I'm going to proceed,

6          as it appears that I'll have to come back

7          to that one.

8                    So, instead, I'll introduce as

9          Exhibit 9 a document labeled SPECTRUM 1782.

10                    (Deposition Exhibit 9

11                    marked for identification.)

12          BY MS. BAKER:

13          **Q.   So I'd like to talk a little bit more about**

14    **the fliers and the promotional materials that were**

15    **prepared for the 2023 drag show.**

16                    **Do you recognize this flier at all,**

17    **Barrett?**

18          A.   Yes, I do.

19          **Q.   Can you tell me about this?  Can you tell**

20    **me about this flier?**

21          A.   Sure.  This flier was created by the

22    Resident Hall Association, which is one of their

23    mock-ups for JBK staff approval.

24          **Q.   You said the -- another student**

25    **organization created this flyer.  Correct?**

1    A.    That is correct.

2    Q.    **And why did another student organization**

3    **create this flier?**

4    A.    Because the Fool's Drag Race was a

5    collaboration with Spectrum and quite a few other

6    orgs.  And the Resident Hall Association was in

7    charge of marketing for the event.

8    Q.    **So did Spectrum have any say over whether**

9    **to move forward with the flier or not?**

10    A.    We would give our, like, approval or as --

11    like, suggestions for what we would like as well.

12    And then they would send us their mock-up that we

13    would then forward to the JBK help desk.

14    Q.    **Now, this mock-up that was created, did**

15    **Spectrum have any role in approving its appearance**

16    **and content?**

17    A.    I would say yes.  We approved that we liked

18    this design before we sent it to the JBK help desk.

19    Q.    **So the other organization created the**

20    **flier, and Spectrum approved it?**

21    A.    Yes.

22    Q.    **And then Spectrum sent it to the JBK center**

23    **staff.  Right?**

24    A.    That is correct.

25    Q.    **Why did Spectrum approve this flier?**

1    A.    We approved it because we thought it looked

2  nice.

3    **Q.    Were there any changes that Spectrum wanted**

4  **to see made to this flier?**

5    A.    I believe we originally asked, possibly, to

6  have that background changed from the checkered

7  pattern, so that way it's easy to read.  But it --

8  we did, like, the neon design.  And there were was

9  two other mockups they sent as well that we also

10  reviewed and made comments on.

11    **Q.    But this particular flier was never**

12  **published.  Right?**

13    A.    That is correct.

14    **Q.    Why?**

15    A.    I believe it was missing some key

16  information that the JBK help desk asked us to put

17  onto the fliers after we sent this in for approval,

18  as well as -- oh, I don't remember what the other

19  comments were.  I believe it was a dangerous pose,

20  possibly.

21    **Q.    So JBK took issue with the fact that the**

22  **poses were dangerous.  Is that accurate?**

23    A.    From what I remember.  Yes.

24    **Q.    Was this mock-up flier prepared before or**

25  **after the event was designated PG-13?**

1    A.    This was prepared after the event was

2    designated PG-13.

3    **Q.    And had this flier been approved by the**

4    **JBK, where would Spectrum post it?  Where does it**

5    **usually post its fliers?**

6                    MR. MORRIS:  Objection.

7    Compound.

8    BY MS. BAKER:

9    **Q.    Where does Spectrum typically post its**

10   **fliers on campus?**

11   A.    That would be in the campus -- or as many

12   campus buildings as we can.

13                    Most often it will be on the JBK.

14   There are a lot of spots to place student org

15   posters there.  And then in the specific college

16   buildings, they have designated spots to put posters

17   for campus events.

18                    MS. BAKER:  So I would like to

19          take a look at another poster; the

20          finalized poster.  I will mark as

21          Exhibit 10, the flyer labeled Def 843.

22                    (Deposition Exhibit 10

23                    marked for identification.)

24   BY MS. BAKER:

25   **Q.    This was the official flier for the 2023**

1    drag show.  Right?

2        A.    Yes.

3        Q.    **Is there any mention of minors on the**

4    **flyer?**

5        A.    No, there are not.

6        Q.    **It does say that it's PG-13.  Right?**

7        A.    That is correct.

8        Q.    **In your experience and your knowledge of**

9    **the PG-13 rating, do minors typically need a parent**

10   **or guardian to be present to attend a PG-13 movie?**

11       A.    As long as they are above the age of 13,

12   they do not require one, based off of my knowledge.

13       Q.    **And this event -- this poster also says**

14   **that the event was sponsored by several different**

15   **organizations.  Right?**

16       A.    That is correct.

17       Q.    **What exactly does a sponsor do?**

18       A.    The sponsors were the ones who helped set

19   up, create, and form the event.

20             So that was including F1rstGen, RHA,

21   us, Buff Allies, and K-Pop.

22       Q.    **Do the sponsors share any of the costs that**

23   **are associated with putting the event together?**

24       A.    I believe spectrum was the one who would

25   handle the costs for the event.

1    Q.    And as far as you're aware, these

2    organizations promoted the event.  Right?

3    A.    That's correct.

4    Q.    And that helps to draw a wider audience of

5    students.  Right?

6    A.    That is correct.

7    Q.    And Spectrum wanted to draw a large

8    audience of students.  Right?

9    A.    That is correct.

10    Q.    And individuals who were planning to

11    purchase tickets, how would they do that?

12    A.    They could either use the QR code to go to

13    the website that we -- event space -- event -- I

14    can't remember its name.

15            But it would go to the website and

16    they would could purchase tickets there, or they

17    could purchase tickets at the door.

18    Q.    And are you aware, or do you recall, anyone

19    purchasing a lot of tickets at once?

20    A.    I -- oh.

21            MR. MORRIS:  Objection.

22            Go ahead.

23    A.    I remember there was someone who bought, I

24    believe, a table of tickets.  But I don't remember

25    their name or how much that was at the time.

1    BY MS. BAKER:

2    **Q.    Do you remember any other individuals**

3    **purchasing a table?**

4    A.    I do not remember.

5    **Q.    So I'd like to discuss President Wendler's**

6    **decision in 2023 to not -- to prohibit the 2023 drag**

7    **show from going forward in Legacy Hall.**

8              **After President Wendler's decision, did**

9    **he speak to you personally?**

10   A.    No, he did not.

11   **Q.    Did you speak with any WT staff or**

12   **administrators concerning the decision?**

13   A.    I remember speaking to -- I believe it was

14   the vice chancellor of student affairs where he

15   informed me of the cancellation decision.

16   **Q.    Was that Chris Thomas who you spoke with?**

17   A.    Yes.

18   **Q.    And do you remember what Chris Thomas said**

19   **during that conversation?**

20   A.    This was before the email went out.

21             But he informed me that Dr. Wendler

22   was canceling the drag show.  And when I asked him

23   why, he said that Dr. Wendler believes that the drag

24   show is degrading towards women and that's why he

25   canceled it.

1      Q.   Did you have any conversation with

2   Dr. Thomas about finding an alternative venue for

3   the event?

4      A.   No, I did not.

5      Q.   Do you recall at any point Dr. Thomas

6   offering to help cover any expenses associated with

7   finding an alternative venue?

8      A.   I believe he mentioned along the lines of

9   offering support for Spectrum for the event that

10  happened, but not for finding an alternative venue.

11     Q.   What do you mean by "the event that

12  happened"?

13     A.   Or that got canceled.

14          Because we mentioned, like, the cost

15  for printing fliers and the -- like, fees for

16  Eventbrite -- that was the name of the ticket

17  site -- and I believe he said that he would be open

18  to helping Spectrum with those fees, but I don't

19  remember exactly.

20     Q.   And he said he would be open to helping

21  them -- helping Spectrum with those fees?

22     A.   Yes.  But the fees --

23     Q.   After --

24     A.   -- after the cancellation.  Yes.

25     Q.   So Dr. Thomas said he was willing to help

 1   **cover the Eventbrite fees after the event had been**

 2   **canceled?**

 3       A.   I don't believe it was specifically the

 4   Eventbrite fees; it was just, like, the printing

 5   fees through the university.  But then we didn't get

 6   charged for the printing fees.

 7                    MS. BAKER:  I'd like to introduce

 8        as Exhibit 11 a document marked

 9        SPECTRUM 1261.

10                    (Deposition Exhibit 11

11                    marked for identification.)

12   BY MS. BAKER:

13       **Q.   Were you at all involved in this**

14   **conversation?**

15                    **Let me let you read it.**

16                    (Document review.)

17       A.   All right.

18                    Oh --

19   BY MS. BAKER:

20       **Q.   Sorry.  I didn't start from the top.**

21                    (Document review.)

22       A.   All right.

23   BY MS. BAKER:

24       **Q.   Do you know what this conversation was**

25   **about?**

1    A.   This was after the cancellation notice went

2  out, and I believe it was when we were in the middle

3  of doing the turnaround to find an alternative

4  campus to still host a charity drag show.  And we

5  were talking with Chris and a few of the other

6  advisors for the orgs we were working with, and

7  Buff Allies, to see what we could do about -- in

8  setting of a plan to be able to put on the drag show

9  still.

10    **Q.  So who is this -- do you know who this**

11  **Chris she's mentioning?**

12    A.   I don't remember.  I think that's -- that

13  might be Chris Thomas.

14    **Q.  And to clarify, you said he offered to pay**

15  **for the printing of the fliers before Spectrum moved**

16  **to an alternative venue.  Correct?**

17    A.   Correct.

18    **Q.  Shortly after -- shortly after**

19  **President Wendler released his statement, Spectrum**

20  **created a GoFundMe account.  Right?**

21    A.   I wouldn't say immediately after.  I think

22  it took a little bit of time, but yes.

23          MS. BAKER:  I'd like to introduce

24    as Exhibit 12 a document marked

25    SPECTRUM 1443.

```
 1                 (Deposition Exhibit 12
 2                 marked for identification.)
 3      BY MS. BAKER:
 4      Q.   Is this Spectrum's Instagram page?
 5      A.   I believe so.  Yes.
 6      Q.   And it's dated March 25th, 2023.  Correct?
 7      A.   Yes.
 8      Q.   And that's just a few days after
 9  President Wendler's statement.  Right?
10      A.   Yes.
11      Q.   Did any of the sponsoring organizations
12  also share this information, to your recollection?
13      A.   I do not know.
14      Q.   Do you recall whether Spectrum received any
15  inquiries from the local media -- individuals from
16  the local media trying to assist with fundraising?
17      A.   I don't think so.
18                 MS. BAKER:  I'm going to
19           introduce as Exhibit 13 a screenshot
20           stamped SPECTRUM 1533.
21                 (Deposition Exhibit 13
22                 marked for identification.)
23      BY MS. BAKER:
24      Q.   I will start from the top -- actually, I'm
25  going to drop this in the chat.  That may make it
```

```
 1    easier.
 2              I'll also continue to share it on my
 3    screen.
 4              Were you a part of this conversation,
 5    Barrett?
 6       A.   Yes.  I believe so.
 7              Yes.
 8       Q.   Take a moment to read it if you need.
 9              (Document review.)
10       A.   All right.
11       BY MS. BAKER:
12       Q.   Do you remember the context of this
13    exchange between you and Dr. Drumheller?
14       A.   We were needing to go and pay for the park
15    reservation to be able to -- that was the
16    alternative venue we found was possibly through the
17    parks, so we needed to go to the park office and pay
18    them for the reservation, and we needed to have a
19    check.
20              We didn't have the -- it needed to be
21    a banker's check and not through the checkbook, so
22    we had to go to a nearby branch of Wells Fargo to
23    get the banker's check.
24       Q.   I'm going to scroll down to a message that
25    I think he sent on March 30th.  And it says -- this
```

1  top message says:  "Trayvon Gay from ABC, trying to

2  find a Spectrum student to interview about show and

3  fundraising, if anyone wants to talk to him."

4              Did you receive -- do you recall

5  receiving inquiries from local media offering to help

6  spread the word about Spectrum and its fundraising

7  efforts?

8      A.   I do remember this conversation, and I

9  would say yes.

10             But all of it had to go through either

11  Drumheller first, and then to, as the message says,

12  to vet.

13     Q.   Are you aware if Spectrum received any

14  large donations from outside organizations or news

15  associations or affiliates?

16     A.   I don't remember specifics.

17             I know that a lot of the donations

18  went through GoFundMe, and our officer, Kay, was in

19  charge of that.

20     Q.   Do you recall how much you made through the

21  GoFundMe?

22     A.   I remember it was a large amount.  I can't

23  tell you the exact amount.

24             My ballpark guess was around

25  $9,000-ish.

1    Q.    Was that a lot more than you expected?

2    A.    To the GoFundMe?  Yes.

3    Q.    Do you recall whether any local businesses

4  or organizations offered to provide donations to

5  support Spectrum as it was finding and transitioning

6  to an alternative venue?

7    A.    I'm not too positive about specifically

8  donations.

9             I do know that we received offers for

10  certain places to act as venues for us.

11    Q.    Can you tell me a little bit more about

12  that?

13    A.    Sure.  There is the 806 Coffee Bar in

14  Amarillo.  And they offered to be a venue for the

15  show, but it was too small of a space for us to be

16  able to host everyone who had informed us they

17  wanted to go.

18             And I believe there was the 212, which

19  is the gay drag bar.  But that would have restricted

20  it to everyone being over the age of 21, like,

21  regardless; nothing else.  And so that one also

22  didn't suit our purposes.

23             And I believe there was one more, but

24  I can't remember the name of it.

25    Q.    Who helped you-all find the venue that you

1  ultimately ended up having the show at?

2      A.   At Sam Houston park?  I don't remember who

3  suggested it, because we were looking at alternative

4  venues.  But someone brought up the idea of renting

5  a public park.  And so we looked into that, and

6  that's what made us decide on Sam Houston.

7                MS. BAKER:  I will introduce as

8      Exhibit 14, a document labeled

9      SPECTRUM 1458.

10               (Deposition Exhibit 14

11               marked for identification.)

12               MS. BAKER:  I will also drop it

13     in the chat for ease of review.

14     BY MS. BAKER:

15     Q.   Let me know when you've read enough of it

16 to have a sense of context.

17               (Document review.)

18     A.   All right.  Is there any more to it?

19               Could you scroll?  Thank you.

20               (Document review.)

21     A.   Okay.

22     BY MS. BAKER:

23     Q.   So I want to ask you about this first

24 message from Chip Chandler.  He says the Bad Magic

25 folks are donating their sound system and a

1    technician.

2        A.    Yes.

3        Q.    So for the show, Spectrum was able to make

4    use of a donated sound system and technician --

5    technician services.  Correct?

6        A.    That is correct.

7        Q.    Were there any other pieces of equipment,

8    to your recollection, that were donated for the

9    show?

10        A.    Give me a second.

11            Someone donated their inflatable toy

12    guitar for the show for a performance.  And I don't

13    remember if there are others.

14        Q.    I'm going to scroll down a little here.

15    And he's discussing rehearsal.  Is this rehearsal

16    related to the Sam Houston drag show?

17        A.    Yes.  I think so.

18            Yes.

19        Q.    Can you talk about those rehearsals with

20    me?

21        A.    Sure.  We asked for help with K-Pop, who

22    has a rented dance room in the Virgil Henson

23    Activity center, if we could use their space to

24    practice parts of the drag show.

25            And so we would go up to the room, we

1  would practice with our music and, if we could,

2  walking in heels to get better if we had heels to

3  wear.  And then Chip offered for them to come watch

4  one of our practices and help give pointers.

5      **Q.   So during these practices, each performer**

6  **was prepping for his or her individual routine.  Is**

7  **that correct?**

8      A.   That is correct.

9      **Q.   So did you have to review all of the**

10  **performances before they were set to go before the**

11  **audiences?**

12      A.   All of the ones that were the student

13  performers.  Yes.

14      **Q.   So you preapproved the student performers.**

15  **Correct?**

16      A.   Yes.

17      **Q.   But you did not preapprove the nonstudent**

18  **performers.**

19      A.   At the Sam Houston show, that is correct.

20      **Q.   Why?**

21      A.   It was a, like, one-week turnaround is what

22  it felt like.  We were all running on fumes along

23  with our classes, and we were accepting help

24  wherever we could get it.  And so we had a few spots

25  we needed to fill in to make the show longer, and so

1    we accepted them.

2        **Q.   So does that mean you didn't -- did**

3    **Spectrum know what the nonstudent performers were**

4    **going to do once they got on the stage?**

5        A.   Not fully, no.

6        **Q.   Did anyone know?**

7        A.   The performers that performed their show

8    bit -- or their performances.

9        **Q.   And this was an event that was promoted on**

10   **campus.   Correct?**

11       A.   The information about the Sam Houston was

12   distributed on WT campus for the purpose of hosting

13   it at Sam Houston.

14       **Q.   And there were WT students in attendance,**

15   **to your recollection?**

16       A.   I believe so.  Yes.

17       **Q.   Did Spectrum receive any donations, aside**

18   **from the funds placed in the GoFundMe account?**

19       A.   No.  I don't think so.

20            Well, there was the PASO Turnover

21   event that we helped -- where we did help with them

22   and stuff.  And our -- that was after the drag show,

23   though, I believe.

24            And I do know that because of -- we

25   were able to help them with running their charity

1    drag show, they gave us thanks.  And then when we

2    asked if they had any donations possible for

3    Spectrum -- this was before the 2024 drag show, I

4    believe -- they donated an amount.  And I can't

5    remember the exact amount.

6        Q.    Was the Sam Houston drag show promoted as

7    being a PG-13 event?

8        A.    I believe that's what we tried to do.  Yes.

9        Q.    What do you mean by you "tried to do"?

10       A.    That's what we told people that that's what

11   we were putting on was a PG-13 show, and that it

12   was -- we were going to try and keep the same rating

13   as we were doing it on campus, but we didn't have as

14   much control over it as we did for the on-campus

15   stuff.

16       Q.    So it was a PG-13 event, even though

17   Spectrum wasn't aware what some of the performances

18   were going to be.  Right?

19       A.    That is correct.

20             We did inform the drag help that was

21   going to come and fill in the spots that we would

22   like it to be a 13 -- or a PG-13 show.

23       Q.    And was this an event where minors were

24   permitted to be present?

25       A.    Well, there wasn't much we could do about

1  it, being a public park, open to the public.  So we

2  didn't have control over who came and watched the

3  show.

4      Q.   Why did Spectrum advertise this as a PG-13

5  event with the knowledge that it didn't have control

6  over whether it was going to be able to confirm that

7  information?

8      A.   We promoted it as a PG-13 event because

9  that's what -- at least all of the student

10 performers that were going to be performing knew

11 about and what the drag queens we informed knew

12 about.

13     Q.   But you also lost --

14     A.   Sorry.

15     Q.   Go on.

16     A.   It was just that that was the information

17 we put out there and believed would be followed.

18     Q.   And you all lost some performers when you

19 made the transition to Sam Houston.  Correct?

20     A.   That is correct.

21     Q.   And how did you find replacement

22 performers?

23     A.   We asked through Chip Chandler if he knew

24 if any could come and help fill out spots.  And we

25 also asked Myss Myka if she knew anyone who could

1  come and help and fill out spots.

2      Q.    So Myss Myka and Chip Chandler were

3  resources in identifying performers for the drag

4  show.  Right?

5      A.    That is correct.

6      Q.    The performers that Myss Myka and

7  Chip Chandler recommended, did they actually end up

8  participating in the drag show?

9      A.    Some of them, yes.

10      Q.    Do you know who?

11      A.    I believe -- oh, it's been a while.  I

12  believe it was Limitra, Valentine Van Buren, and I

13  believe -- not Finicky.  Oh, my gosh.

14            I can't remember her name.  Lark.  It

15  was Lark.

16      Q.    Lark is the performer's name?

17      A.    Yes.  Well, Lascivious Lark, but ...

18      Q.    And inviting these performers, Myss Myka

19  and Chip Chandler were aware that you-all were

20  aiming to make this a PG-13 event --

21      A.    I believe so.  Yes.

22      Q.    -- right?

23            What makes you not 100 percent certain

24  that they were aware of that?

25      A.    That would be because of -- it would be --

1    I -- I don't know.

2              I don't know why I don't know.

3    **Q.    In the aftermath of President Wendler's**

4    **March 23rd email, Spectrum issued some public**

5    **statements concerning President Wendler's email.  Is**

6    **that accurate?**

7    A.    Yes.

8              MS. BAKER:  I'm going to

9         introduce as Exhibit 15 a document marked

10        SPECTRUM 1183.

11              (Deposition Exhibit 15

12              marked for identification.)

13   BY MS. BAKER:

14   **Q.    Do you recognize this statement, Barrett?**

15   A.    Give me a second.

16              (Document review.)

17   A.    Yes.  I believe so.  I do recognize it.

18   BY MS. BAKER:

19   **Q.    And this is -- is this Spectrum's official**

20   **statement -- part of its official statement in**

21   **response to --**

22   A.    Yes.

23   **Q.    -- the decision?**

24   A.    Also -- sorry.  Real quick.

25              My phone is about to die.  It's at

```
 1  5 percent.  Let me charge it real quick -- or plug

 2  it in.

 3               (Pause in proceedings.)

 4     BY MS. BAKER:

 5     Q.   Have you had a chance to review this?

 6     A.   Yes, I have.

 7     Q.   And you said you recognize this?

 8     A.   Yes, I do.

 9     Q.   Do you recall whether this was posted on

10  Spectrum's Instagram page?

11     A.   I believe it was.  Kay was in charge of

12  that.

13     Q.   And it would reflect Spectrum's official

14  position on the controversy surrounding the drag

15  show.  Right?

16     A.   Yes.  I believe so.  Yes.

17     Q.   The third sentence in this paragraph says:

18  "Drag is a celebration of many things; queerness

19  gender, acceptance, love, and especially

20  femininity."

21     A.   Yes.

22     Q.   Do you agree with that statement?

23     A.   Yes, I do.

24     Q.   What, in your view, makes drag a

25  celebration of gender?
```

1    A.    So in my view, drag is about, like,

2  breaking gender norms and what we perceive as, like,

3  masculine and feminine, and everything in between.

4              And so the idea is that when you are

5  breaking these gender roles and showing that, like,

6  society, you can see that there is much more beyond

7  just being man or female or in between.  The --

8  we're all just people, if that makes sense.

9    Q.    So is it your view that drag challenges the

10  idea that gender is fixed?

11    A.    Yes.

12    Q.    And drag, in your view, suggests or allows

13  people to express the idea that gender is fluid.  Do

14  you agree with that?

15    A.    Yes.  I do agree with that.

16    Q.    The line immediately -- well, before I move

17  on to that.

18              Do you agree that drag is a celebration

19  of femininity?

20    A.    I believe it can be, yes.

21    Q.    Why do you say it can be?

22    A.    Well, because not every person who is in

23  drag is a drag queen.  We -- there's also the

24  inverse, where you have female performers as drag

25  kings or nonbinary performers as drag royalty.  So

1  it's not -- it's not always specifically femininity;

2  it's just the baseline case of what you expect drag

3  to be is a celebration of femininity.

4      **Q.   When fraternities dress up as women for**

5  **pageants, is that -- would that be considered drag?**

6      A.   I would say it can be.  It really depends.

7      **Q.   The line immediately above that says:**

8  **"Drag is not a mockery.  It is a celebration."**

9              **In your view, are there any times when**

10 **drag could be used as a mockery?**

11             MR. MORRIS:  Objection.  Asked

12     and answered.

13     A.   I'm sorry.  What was that?

14     BY MS. BAKER:

15     **Q.   My question to you is, do you believe there**

16 **are instances in which drag could be used to mock**

17 **others?**

18             MR. MORRIS:  Same objection.

19     A.   I do believe there are instances where drag

20 can be used to mock others.

21     BY MS. BAKER:

22     **Q.   What's an example?**

23     A.   A drag queen dressing up as Donald Trump.

24     **Q.   And what would make that a mockery?**

25     A.   In the sense that when they dress up as

1  Donald Trump and start impersonating his ideas for

2  comedic relief.

3      Q.    Isn't parody part of drag?

4      A.    Yes.  Parody is part of drag.

5      Q.    Would you say that reasonable people can

6  disagree as to whether drag mocks others?

7      A.    I would say it depends on the context of

8  the show or the performance itself.

9      Q.    In what way?

10     A.    There can be performances that are more

11 along the lines of the -- like being elegant and

12 boisterous and in that sense.  And then there are

13 ones that are Elsa singing along to Frozen, but she

14 has bowel issues.  And that's making fun of both the

15 song "Let It Go" and Frozen, while still being

16 considered drag.

17     Q.    So you talked about this earlier, and I

18 want to clarify.  Drag -- in your understanding, the

19 message of drag depends on what the performer is

20 trying to convey.  Is that accurate?

21     A.    Yes.

22     Q.    So would you agree that there is really no

23 inherent message to drag; it's just whatever the

24 performer wants?

25     A.    No.

1          I would say there is still the

2   inherent message of it being, like, gender-bending

3   and breaking the gender norms in that same sense,

4   while also being able to convey the performer's own

5   personal message.

6       **Q.   Is it still gender-bending if it is a**

7   **biological or cisgender woman or man dressed up as a**

8   **woman or a man --**

9       A.   -- as their --

10      **Q.   -- is that still gender-bending?**

11          MR. MORRIS:  Objection --

12      A.   -- as their drag counterpart?

13          THE STENOGRAPHER:  Excuse me.  We

14      had a little crosstalk.

15          Mr. Morris, go ahead with your

16      objection, and I'm going to have the

17      witness answer.

18          MR. MORRIS:  Yes, ma'am.

19          Objection.  Vague and compound.

20      A.   I -- yes.  I do believe it is still either

21   playing into or breaking the stereotypical gender

22   norms.

23      BY MS. BAKER:

24      **Q.   How so?**

25      A.   You could have a straight man performing as

1    a drag king.  But instead of it being him as him on

2    stage, he creates a character that personifies what

3    is stereotypically considered male.  He will either

4    be, like, suave and, like, masc- -- extra masculine

5    to the point, or it could bend to the point where

6    it's still male but he has a lot more feminine,

7    like, design attribute character parts, if that

8    makes sense.  Like, wearing earrings, heavily made

9    up both for the super-masculine and the feminine

10   masculine.

11       **Q.   So would it be fair to compare a drag show**

12   **to something like a pageant?**

13       A.   Some drag shows are very pageant-like; some

14   are just a string of performances.

15       **Q.   Are you aware that -- strike that.**

16            **Some have compared drag to blackface.**

17   **Do you think that's a fair comparison?**

18       A.   I do not think that is a fair comparison.

19       **Q.   Why not?**

20       A.   One, which is the blackface compares -- you

21   typically have, from what I know, white men putting

22   on super-inflated stereotypical features, and then

23   playing it out as a mockery of the black race, while

24   I believe that drag is more focused on the what's

25   kind of wrong with society in a sense, at least from

1    our perspective -- my perspective dealing with

2    gender.  And then bending it and breaking it as

3    compared to making fun of and belittling others.

4        **Q.   So from what you've just said, would you --**

5    **is it your position that blackface is inherently**

6    **mockery, while drag is not inherently mockery?**

7        A.   Yes.

8        **Q.   And do you think it's unreasonable for**

9    **people to believe that both drag and blackface are**

10   **mockery?**

11       A.   In my opinion, I do believe that there are

12   people out there who do both believe that they are

13   both mockeries in their entirety.  I also believe

14   that they -- I don't think they have a full

15   understanding of what drag is.

16       **Q.   So it sounds to me like sometimes you can't**

17   **get the full message of drag unless someone kind of**

18   **explains it to you.  Would you agree with that?**

19              MR. MORRIS:  Objection.

20       Mischaracterizes prior testimony.

21       A.   I believe that that can be the case

22   sometimes.

23       BY MS. BAKER:

24       **Q.   And when would it not be the case?**

25       A.   When you -- art is up to the person when

1     determining what that art means to them.  There are

2     cases where, if you're looking at a certain

3     performance that's making fun of Frozen, again, for

4     example, you can blatantly see that that's the --

5     it's a comedic act and that that's the purpose of

6     the drag show is to make people laugh at that

7     character doing funny things.  And so that one's

8     very easily -- you can easily see the message behind

9     that performance.

10          And then there are others that are a

11     lot more nuanced that you might need a little bit

12     more understanding and, like, either gay culture or

13     the music that they're singing to or the performance

14     that they're giving to kind of understand the

15     message behind it.

16     **Q.   I want to move a few lines down on the**

17     **statement.  We've talked about its mention of --**

18     **well, actually, I want to get clarity on this.**

19          **This line that says "To call it mockery**

20     **or misogynistic is to miss the entire point of what**

21     **drag is and what drag means."**

22          **Does drag have a single meaning?**

23     A.   I would say it's more of like a kind of

24     envelope term, if that -- or an envelope of ideas

25     and meanings that incorporate what drag is.  And

1   that calling it mockery and misogynistic kind of

2   shoots outside of that envelope.

3       **Q.   The next line says:  "We also find the use**

4   **of religion by a university official disturbing and**

5   **unprofessional and believe that separation of church**

6   **and state is essential to our country."**

7               **Is it your position that**

8   **President Wendler's decision was guided by his**

9   **religious beliefs?**

10      A.   Yes.

11      **Q.   Why?**

12      A.   In his email that he sent out -- I can't

13  remember exactly where it says on it, but I do know

14  that he had mentioned that it goes against his

15  beliefs, and that -- we interpreted that as a

16  religious beliefs.

17              MS. BAKER:  I'm going to

18          introduce as Exhibit 16 President Wendler's

19          March 23rd statement that's stamped Def 53

20          through Def 55.

21              (Deposition Exhibit 16

22              marked for identification.)

23      BY MS. BAKER:

24      **Q.   I'll give you a moment to read.**

25              (Document review.)

1    A.    Okay.

2    BY MS. BAKER:

3    **Q.    First off, I want to ask what in this**

4    **letter serves as the basis of your position that**

5    **this decision arose entirely from**

6    **President Wendler's religious beliefs?**

7            MR. MORRIS:    Objection.

8        Mischaracterizes the witness's prior

9        testimony.

10            MS. BAKER:    Let me rephrase that.

11    BY MS. BAKER:

12    **Q.    What forms the basis of your view that**

13    **President Wendler was led by religion in issuing**

14    **this statement?**

15    A.    That would be here in the middle of this

16    current page where it says:    "The WT community

17    should live by the golden rule.    As a Christian, I

18    personally leaned this -- learned this in the Book

19    of Matthew."

20            And then later, he states that, even

21    though he knows that it's against the law -- or

22    against the -- where is that.

23            I believe it's on the third page.

24            (Document review.)

25    A.    Could you scroll down real quick?    Let's

1  see.  There it is:  "I will not appear to condone

2  the diminishment of any group at the expense or

3  impertinence towards another group for any reason,

4  even when the law of the land appears to require

5  it."

6            It was those two sections.

7     BY MS. BAKER:

8     Q.   So to clarify, it was the statement that

9  says "as a Christian I personally learned this in

10  the Book of Matthew," that quote --

11     A.   Specifically --

12     Q.   -- is one of the reasons?

13     A.   Specifically, it was "the WT community

14  should live by the golden rule," "as a Christian,"

15  and then followed by the quote.  Yes.

16     Q.   Do you agree that this letter references

17  secular principles as well?

18     A.   Yes, I do.

19     Q.   And you acknowledge that President Wendler

20  is not an attorney.  Correct?

21     A.   Yes.

22     Q.   Is it your view that public officials

23  cannot make any references to their faith in

24  decision-making?

25     A.   No.

1        I believe that they can make

2   references to religion, but I do believe that they

3   shouldn't make official, like, guidance or rules or

4   rulings based off of those beliefs.

5        **Q.   Do you agree that policies are also**

6   **discussed in this letter?**

7        A.   Yes.

8        **Q.   Which ones?**

9        A.   That's a good question.

10        I believe he makes mention towards

11  WT's discrimination policy.

12        **Q.   Do you agree that -- in your experience as**

13  **student at WT that the university emphasizes**

14  **treating all people equally?**

15        A.   Well, I will say that I believe that that

16  is their official stance.

17        **Q.   What leads you to doubt that?**

18        A.   There was a situation that happened on

19  campus during the international students day where

20  there were students using an app, I believe, called

21  Yik Yak to make very negative and racist comments

22  towards other students.  And when the university

23  found out about that, they didn't do anything about

24  it until it reached the university newspaper and got

25  wider -- like, more light on the subject before they

1    decided to issue any statements.

2        Q.   Does that undermine your belief that the

3    school endeavors to treat all people equally?

4        A.   Yes.

5        Q.   Based on your reading of this letter, if a

6    student group tried to put on a blackface show,

7    would President Wendler allow it?

8                    MR. MORRIS:  Objection.  Calls

9        for speculation.

10       A.   Based on the reading of the letter, that is

11   what he says; that he would not allow it.

12       BY MS. BAKER:

13       Q.   Is there anything in this letter that leads

14   you to believe another student organization with

15   different -- let me put it a different way.

16                Is there anything in this letter that

17   leads you to believe that if another student

18   organization, aside from Spectrum, tried to host a

19   drag show that President Wendler would allow it to go

20   forward?

21       A.   There is not anything in that letter that I

22   saw that would -- that President Wendler would allow

23   another student org to go through with a drag show.

24   I don't believe he would.

25       Q.   And would you agree that part of the

1  message of Spectrum's drag show was to show support

2  for The Trevor Project?

3      A.   Yes.   That was part of the message.

4      Q.   And would you agree that that message is

5  echoed in this letter?

6              MR. MORRIS:   Objection.   Vague.

7      A.   I'm sorry?

8  BY MS. BAKER:

9      Q.   Do you see anything in this letter that

10  praises the work of The Trevor Project?

11      A.   Yes.   Near the end, it states that "You

12  should still donate to The Trevor Project."

13              And at the beginning, he states that

14  The Trevor Project is an ideal goal to donate to.

15      Q.   So does anything in this -- does anything

16  in this statement ...

17              Does anything in this statement express

18  a disagreement with the message of Spectrum's 2023

19  drag show?

20      A.   I would say yes.   Specifically, him

21  disregarding -- not disregarding -- stating that

22  drag is misogynistic and goes against the principles

23  of women and femininity.

24      Q.   And you say that statement -- that

25  statement contradicts the message of the drag show?

1    A.   That is correct.

2    **Q.   How?**

3    A.   Because it wasn't just only male performers

4 dressing up as female drag queens, we also had

5 nonbinary performers dressing up as nonbinary

6 representation of what they wanted to perform as.

7 We had female performers dress up as men and drag

8 kings.

9           And so it didn't feel accurate in that

10 sense that the whole message of a drag show is being

11 misogynistic, which it's not even for when men are

12 dressed as drag queens.  And so that goes directly

13 against the message that we were trying to put

14 forward with being open to LGBTQ+ students and

15 showing that we are safe and allowed to be on

16 campus.

17   **Q.   So having this drag show -- let me**

18 **rephrase.**

19           **How does having this drag show help**

20 **students to feel safe?**

21   A.   The premise is there are a lot of, like,

22 trans people that will come to university or are

23 very worried about being trans at the university.

24 And I've met quite a few people who are trans, and I

25 know that when we do -- when we were planning on

1    putting forward the drag show, it was, like, should

2    it go through and everything gets accepted and fine.

3    And even if there were protests, just the support

4    shown from the community showing that we were

5    accepting and open to the LGBTQ+ community and

6    culture shows that it's -- it will make them feel

7    much safer on campus.

8        **Q.   So is your position that -- is your**

9    **position that -- strike that.**

10           **Is it your position that an**

11   **individual's -- an individual's disagreement with**

12   **drag constitutes a rejection of the LGBTQ+ community**

13   **members?**

14           **I don't want to put words in your**

15   **mouth; I'm asking you to clarify.**

16       A.   I do not believe necessarily that being

17   against drag means that you're against the LGBTQ+

18   community.  But when you use being against drag as

19   the reason to shut down, like, LGBTQ -- or the drag

20   show, then that does feel like an affront to the

21   LGBTQ+ community.  If that makes sense.

22              MS. BAKER:  I'm going to stop

23       sharing.

24       BY MS. BAKER:

25       **Q.   To your recollection, has there been any**

1    other event that Spectrum has hosted that

2    President Wendler has stopped from going forward or

3    in any way -- either President Wendler, WT staff.

4              Has there ever been an instance where

5    they have prevented Spectrum from carrying on with

6    its events?

7        A.   I will say, yes, kind of.

8              There was The Rocky Horror Picture

9    Show we were trying to put on and do a -- and have,

10   like, the -- not the, like, shadow cast section, but

11   with, like, the bits and the props with the -- that

12   go along with the movie.  But we weren't able to

13   host it, because to go through the university, we

14   would have to get screening rights for the movie,

15   and that was too expensive.  And that's what the

16   university informed us why we weren't allowed have

17   it, unless we paid for -- the price for the

18   screening, which we weren't able to.

19       Q.   So the -- that event not going forward was

20   about screening rights.  Correct?

21       A.   That is correct.

22       Q.   It wasn't something that the university in

23   any way prohibited you from hosting on campus if you

24   wanted.  Correct?

25       A.   That is correct.

1    Q.    If you could have gotten the screening

2    rights.  Right?

3    A.    Yes.

4              MS. BAKER:  I want to introduce

5         as Exhibit 17, a document marked Def 154

6         through Def 172.

7              MR. MORRIS:  Ms. Baker, is it a

8         good time to take a quick lunch break?

9              MS. BAKER:  Yes.

10              MR. MORRIS:  We've been going

11         almost an hour and 45 minutes.

12              MS. BAKER:  Yes.  Thank you for

13         the reminder, Counsel.  Let's take a break.

14              (Off record:  1:31 p.m. to 2:08 p.m.)

15              MS. BAKER:  I'm going to

16         introduce as Exhibit 17 an email thread

17         spanning from SPECTRUM 983 to SPECTRUM 988.

18              (Deposition Exhibit 17

19              marked for identification.)

20    BY MS. BAKER:

21    Q.    I'm going to start on the page marked

22    SPECTRUM 987.

23              I'm going to start here, Barrett, and

24    just kind of scroll up so that you can get the

25    greater context of this document.  Does that work?

1      A.   Yes.

2                  (Document review.)

3      A.   Is it repeating again?

4      BY MS. BAKER:

5      **Q.   Yes.  Okay.  But I just want to make sure**

6  **that you see what's in this entire document.**

7      A.   Got it.

8      **Q.   Do you recall this exchange with Dr. Fouts?**

9      A.   Yes, I do.

10     **Q.   What was the context of this conversation?**

11     A.   To send in the list of music to be approved

12  to go from tentative to final confirmation.

13     **Q.   So the JBK staff was provided with a list**

14  **of songs that Spectrum planned to use for the drag**

15  **show in advance.  Correct?**

16     A.   Correct.

17     **Q.   And you reviewed performances for the 2023**

18  **drag show in advance.  Correct?**

19     A.   Correct.  Yes.

20     **Q.   How did you do that?**

21     A.   That was through the practices.  And then

22  there was no presentation, because we didn't need a

23  PowerPoint running behind the performance.

24     **Q.   So the presentation would have been a**

25  **PowerPoint?**

Barrett Bright - 12/19/2025

1        A.    That's what I got away from the email,

2    asking if we needed a presentation to go with the

3    performers.

4        Q.    **Did you tell the performers to make sure**

5    **that they kept it PG-13 --**

6        A.    Yes.

7        Q.    **-- in terms of their dances?**

8        A.    Yes.

9        Q.    **And did you-all have a discussion about**

10   **what that meant?**

11       A.    We did not have a specific discussion about

12   what "PG-13" meant.

13       Q.    **But you just trusted the performers'**

14   **judgment.  Right?**

15       A.    That is correct.

16       Q.    **I'm going to scroll to your email.  Okay.**

17   **Here it is.**

18              It's from March 17th.  You said, "Some

19   of the performers have not sent a specific song yet."

20              Was that because some of the performers

21   were still developing their routine?

22       A.    Some of them still had songs that they were

23   wanting to look at.  Yes.

24       Q.    **So they were still developing their routine**

25   **at that point?**

1    A.   That is correct.

2    **Q.   Do you remember whether you developed a**

3    **cutoff point or a deadline by which the performers**

4    **had to complete their routine or finalize their**

5    **routine?**

6    A.   I do not have a -- we did not have a

7    deadline, besides the run-through for the

8    performance.

9         We had to have everything finalized --

10   and it was a little bit loose in the sense that we

11   were still waiting on some performers to send stuff

12   in.  We were trying to get everything in, so that

13   way we could do our run-through.

14   **Q.   So some performers were sending their**

15   **things in at the last minute.  Correct?**

16   A.   That is correct.

17   **Q.   And you still would have needed to review**

18   **what they sent at the last minute.  Right?**

19   A.   That is correct.

20   **Q.   And it was you -- was it you who determined**

21   **whether the performances were sufficiently PG-13?**

22   A.   Yes.

23        We didn't get the complete -- all of

24   them yet, as we were waiting on the -- before the

25   show was canceled.  We were waiting on a few of them

1    to run through.

2        Q.    **What do you mean you were waiting on a few**

3    **of them?**

4        A.    For the songs.  Specifically, we got the

5    songs in, and then it was spring break.  And we

6    were -- or just after spring break.  So we were

7    going to start double-checking everything, and that

8    was when the show got canceled.

9        Q.    **So the JBK reviewed the songs that Spectrum**

10   **planned to use, but it didn't review the**

11   **performances.  Is that correct?**

12       A.    That is correct.

13       Q.    **Would you agree that the JBK trusted your**

14   **judgment as to what was considered PG-13?**

15       A.    Yes.

16       Q.    **And what criteria did you consider?**

17       A.    For what is PG-13?

18       Q.    **Yes.**

19       A.    I considered whether there was cuss words

20   in the music; we were trying to keep it cuss word.

21   Even though that doesn't necessarily fall within the

22   purview of PG-13, we were trying to keep it our --

23   as conservative as possible to avoid backlash where

24   we could.

25                    And so that would include certain

1  dances, if that makes sense, that might not be

2  acceptable for the PG-13 rating.  And so we were

3  looking -- making sure that we didn't have, like,

4  those types of things.

5      Q.   So it was more of just -- was it you and

6  someone else making this -- making these judgment

7  calls, or was it only you?

8      A.   It was me and a few others that I

9  consulted.

10           And PG-13 was more of a guideline, if

11  that makes sense.

12      Q.   Explain what you mean by "guideline."

13      A.   In the sense that it's kind of hard to

14  define what stands as PG-13.  We were going off of,

15  like, what you would expect for a PG-13-ish movie,

16  but we were trying to keep it where there would be

17  no explicit sex style of scenes or anything like

18  that.  There was going to be no cuss words; it was

19  just going to be dancing and lip syncing in drag to

20  the music.

21      Q.   Were there ever any disagreements among you

22  and the other individuals who helped you make these

23  decisions about whether a performance was kind of on

24  the line and maybe not going to be appropriate?

25      A.   I can't remember exactly.

1              I know that me and the officer corps

2    did have conversations and consultations with

3    Buff Allies as well for what we're expecting.  And

4    there were certain songs we had to say "no" to, I

5    believe, because of having cuss words in them.  But

6    other than that, we were all pretty much on the same

7    page.

8        **Q.   And just to clarify, for the 2023 drag**

9    **show, there would have been drag queen judges.**

10   **Correct?**

11       A.   That is correct.

12       **Q.   But only student performers.  Right?**

13       A.   Yes.

14             MS. BAKER:  I'm going to

15   introduce as Exhibit 18 a document that is

16   marked Def 154 through Def 172.

17             (Deposition Exhibit 18

18             marked for identification.)

19   BY MS. BAKER:

20       **Q.   Have you ever seen this document?**

21       A.   I don't think so.

22       **Q.   This is the JBK student center policies --**

23   **excuse me -- procedures and guidelines booklet.**

24       A.   All right.

25       **Q.   I'm going to turn --**

1          MR. MORRIS:  Just for the record,

2     Ms. Baker, this is the procedures and

3     guidelines from 2023.  Is that right?

4          MS. BAKER:  Yes.  That's correct.

5          MR. MORRIS:  Okay.

6     BY MS. BAKER:

7     **Q.   Okay.  Let's zero in on the paragraph that**

8  **starts with "JBK student center staff reserves the**

9  **right ..."**

10          So, Barrett, if you could just read

11  **that paragraph and the next paragraph, and I'll ask**

12  **you a few questions about it.**

13          (Document review.)

14     A.   All right.

15     BY MS. BAKER:

16     **Q.   So as a general matter in planning for the**

17  **2023 drag show, was Spectrum aware that its event**

18  **would be subject to JBK's -- the JBK student**

19  **center's procedures and guidelines?**

20     A.   I would say that I wasn't aware of the

21  specific guidelines at the time, but knew that

22  Spectrum needed to follow specific guidelines that

23  Fouts gave to us -- or through the correspondence

24  I've had with Fouts.

25     **Q.   And what were those guidelines?**

1    A.   It was dealing with sending in all of the

2  promotional materials, sending in the risk and

3  hazard matrices, making sure that we had stuff in by

4  the deadlines that were set.  And I believe that was

5  about it.

6    **Q.   So Spectrum was -- you personally, and**

7  **Spectrum as an organization, was aware of all of the**

8  **procedures that needed to be followed in the**

9  **event -- the event registration process.  Correct?**

10            MR. MORRIS:  Objection.  It

11       mischaracterizes testimony.

12            Go ahead, Bear.

13    A.   Yes.  From what we were told through the

14  JBK help staff.

15    BY MS. BAKER:

16    **Q.   Would you agree that this document and its**

17  **content was not something that you were aware of at**

18  **the time of planning the event?**

19    A.   I would say we were not fully aware of what

20  was in this document, or that this document existed

21  at the time.

22    **Q.   Based on your reading of those two**

23  **paragraphs that I identified, would you agree that**

24  **the JBK student center reserves the right to refuse**

25  **to allow some events in its space?**

1    A.    And I would say that is what the document

2    says.

3        Q.    **So would you agree that the JBK center is**

4    **limited to groups and events that comply with the**

5    **university's mission and policies?**

6                MR. MORRIS:  Objection.  Calls

7        for speculation.

8        A.    I would say that is what the document says.

9        BY MS. BAKER:

10       Q.    **Do you see anything on this document that**

11   **suggests that JBK can only cancel an event if they**

12   **have first received a complaint concerning that**

13   **event?**

14       A.    I do not see that.

15                Is it stated in the document?

16       Q.    **It is not plainly stated in the document,**

17   **but I want you to make your -- I don't want to put**

18   **words in your mouth.**

19       A.    I would not know if -- about that, then; if

20   they're allowed -- if they're allowed to cancel an

21   event based off of a complaint.

22       Q.    **But you don't see any language that plainly**

23   **states that only events that have been complained**

24   **about can be canceled.  Correct?**

25       A.    I do not see that in the document.

1    Q.   Do you see anything -- do you see anything

2  there that suggests events that have received

3  initial approval cannot be interrupted?

4    A.   I do not see that in the document.

5    Q.   Do you see anything in the document to

6  suggest that events that have received initial

7  approval cannot be canceled?

8    A.   I also do not see that in the document.

9    Q.   The document -- the document states that

10  the JBK can cancel events for noncompliance with the

11  university policies.  Correct?

12    A.   That is correct.

13         MS. BAKER:  I'm going to move to

14      introduce Exhibit 19.  Exhibit 19 is a

15      document spanning from SPECTRUM 3824

16      through SPECTRUM 3826.

17         (Deposition Exhibit 19

18         marked for identification.)

19  BY MS. BAKER:

20    Q.   Did you ever visit this website in planning

21  the event?

22    A.   I can't say if I have or haven't.

23         I have seen this website web page

24  before, but I'm not sure if I ever fully read it in

25  the sense of trying to move in to the next, like,

1    tabs there on the left side.

2        Q.    Let's take a look at the mission statement.

3            Based on your reading of the mission

4    statement, would you agree that the JBK student

5    center is a gathering place, a place for all WT

6    students?

7        A.    That is correct.

8        Q.    Is there any language in particular there

9    that makes you say that?

10       A.    "The Jack B. Kelley Student Center is a

11   gathering place for the entire West Texas A&M

12   University."

13       Q.    And in your experience as a WT student,

14   would you say a lot of student activities happen

15   there?

16       A.    Yes.

17       Q.    Like what?

18       A.    I know that a lot of tabling happens in the

19   commons of the JBK, and quite a few student orgs

20   have their meetings in the JBK in rented rooms

21   downstairs.

22       Q.    And you've mentioned that even Spectrum has

23   used the JBK for tabling and speaking to students.

24   Right?

25       A.    That is correct.

Barrett Bright - 12/19/2025

133

1    Q.    Has it used the JBK for any other events?

2    A.    We used the JBK for National Coming Out

3    Day, and we attempted to use it for Rocky Horror

4    before that fell through.

5    Q.    And that falling through was, again,

6    related to the licensing issue --

7    A.    Yeah.  Right.

8    Q.    -- is that correct?

9          And you said you hosted the National

10   Coming Out Day celebration or event in the JBK.

11   Right?

12   A.    That is correct.

13   Q.    What was that like?

14   A.    We had two events that I can remember.  One

15   was headshot day, which was in the commons where we

16   had the big Polaroid printout thing with the "I am

17   gay", "I am queer," "I am lesbian" sticker thing for

18   people to do photos with.

19          And then the other one was we had a

20   coming out day panel in the JBK, I believe it's the

21   Congress room, where the student org- -- the student

22   government organization met and we had a panel of

23   people and we told our coming out day stories.

24   Q.    Are there any other events, aside from the

25   2023 and 2024 drag shows that Spectrum has attempted

App. 532

1    to schedule in the JBK and for whatever reason not

2    been able to?

3        A.    I do not think so.

4        Q.    I'm going to scroll down to the next page

5    which discusses the goals of the JBK.

6              So you can just take a quick moment to

7    scan that.

8              (Document review.)

9        A.    All right.

10    BY MS. BAKER:

11        Q.    So would you agree, based on your reading

12    of the JBK's stated goals, that the JBK aims to

13    cultivate a sense of community on the WT campus?

14        A.    Yes.

15        Q.    And you agree it's -- it is a space where

16    all students -- excuse me.

17              You would agree that it's a space where

18    all WT students should feel respected and treated

19    with dignity.  Correct?

20              MR. MORRIS:  Objection.  Calls

21        for speculation.

22        A.    Based on what I've read, it appears that

23    may be the case.

24              MS. BAKER:  I'm going to

25        introduce as Exhibit 20 a document marked

1      Def 182036.

2              (Deposition Exhibit 20

3              marked for identification.)

4      BY MS. BAKER:

5      Q.    This document is a map of WT's campus.   Did

6   you see any maps like this while you were a student

7   there?

8      A.    Yes, I have.

9      Q.    Is there any area of campus that you can

10   identify for me that either you as an individual,

11   Spectrum as an organization, or its members, were

12   prohibited from meeting or organizing or

13   experiencing as students as a result of the

14   controversy surrounding the drag shows?

15      A.    I would say that we had the same access to

16   buildings, rooms, et cetera, as we did before the

17   controversy.

18      Q.    And would you agree that Spectrum continued

19   to meet as normal and carry on its business as usual

20   despite the controversy surrounding the drag shows?

21      A.   I would say that there were some issues and

22   hiccups that we hit along the way because of that.

23   But, yes, we were able to keep holding meetings.

24      Q.   What were those issues and hiccups?

25      A.   We had had -- a few members expressed

1  concern about staying in Spectrum because of the

2  controversy, and they didn't want, like, their

3  information or their family to find out about what

4  was happening at WT with possibly their involvement.

5  And a few of our meetings became chaotic because of

6  the controversy dealing with the drag show.

7      Q.   So just to clarify, you say -- you agree

8  that there's no place on this campus that you were

9  prohibited from entering or lost privileges to as a

10 student -- as a registered student organization, as

11 a -- excuse me -- following the drag show

12 controversies?

13     A.   That is correct.

14          As a student and as a student org, we

15 did not lose access to any spaces because of the

16 university's controversy.

17     Q.   But you did say that some members felt

18 very -- they felt very uneasy and somewhat

19 unwelcomed on campus as a result of this decision?

20 Is that -- am I --

21     A.   Yes.

22     Q.   -- am I misunderstanding?

23     A.   No.  That is correct.

24     Q.   And why is that?

25          Why did they feel that way?

1    A.    I -- some of them were worried about their

2    name getting out on the news and their parents

3    finding out that they were part of the LGBTQ

4    community because of the controversy, and was

5    worried about staying in Spectrum because of that.

6            Others said that they felt unsafe.

7    They didn't necessarily tell me the reason why.  And

8    I know another person sent an email to the student

9    body government about their decision, talking about

10   the drag show where they -- the person said the

11   email explained why they felt unsafe.  I don't

12   remember the exact contents of that email.

13   **Q.    Is there any -- are there any privileges**

14   **that other student organizations -- any privileges**

15   **or spaces that other students, student**

16   **organizations, make use of that Spectrum hadn't been**

17   **able to?**

18   A.    Not that I know of.

19   **Q.    And do you have reason to believe that WT**

20   **has selectively enforced its policies, and**

21   **Spectrum -- against Spectrum in a way that it**

22   **wouldn't enforce them against another student**

23   **organization?**

24   A.    I will say that we only got notice about

25   the no drag show stuff after we tried to put it on,

1  but know of other student orgs that have put on

2  similar-ish events or -- in maybe the same kind of

3  vein type of events that didn't get canceled.

4         But that could also just be because of

5  the publicity of our event, but I am not too sure.

6     Q.   Okay.  I want to -- we talked about the

7  Sam Houston drag show earlier, but I do want to jump

8  back to that to get clear on a few points hereby.

9         Did you pay any out-of-pocket expenses

10 to secure the park?

11    A.   Spectrum out-of-pocket, or my personal

12 out-of-pocket?

13    Q.   Personal.

14    A.   No.  Not my -- not that I remember.

15    Q.   And the expenses that Spectrum paid were

16 eventually covered by donations.  Right?

17    A.   That is correct.

18    Q.   Would you agree that the Sam Houston drag

19 show was a successful event?

20    A.   Yes.  I would agree.

21    Q.   And a lot of people turned out to that

22 event.  Right?

23    A.   That is correct.

24    Q.   And you would say it was more people than

25 you even expected.  Right?

App. 537

1        A.    That is correct.

2        Q.    **Would you say it was the largest or best**

3   **attended Spectrum event that you've ever been to?**

4        A.    That is correct.

5        Q.    **Were there any admission costs?**

6        A.    There were not.

7        Q.    **Why not?**

8        A.    Because it was an open park and we didn't

9   have a way to restrict people from entering the

10  park.  And so it was -- there was no way to charge

11  an admission cost, so we did not charge an admission

12  cost.

13       Q.    **And students just needed their IDs to --**

14  **did students need their IDs to get in, or could they**

15  **just walk in with it being an open park?**

16       A.    They could just walk in with it being an

17  open park.

18       Q.    **And you performed during that show.  Right?**

19       A.    That is correct.

20       Q.    **And would you say the nature of the**

21  **performances that happened that evening are similar**

22  **to what audience members or students would have seen**

23  **if it had been able to go through at Legacy Hall?**

24       A.    Yes.  But the student performers did --

25  would have been similar to what would have happened

1    at Legacy Hall.  We would not have had the

2    professional drag queens and their performances at

3    the one at Legacy Hall.

4        **Q.    And I know you mentioned that you all lost**

5    **some performers; some of the drag queens stepped in**

6    **and helped.  Did -- did they help in any other**

7    **capacity during the show?**

8        A.    Yes.

9            We -- Buff Allies did our face makeup

10   for me and a few of the other drag performers.  And

11   then we got final touch-ups and help with the makeup

12   at the venue before we put on the show.

13       **Q.    And then in the period where you were --**

14   **where Spectrum was trying to assess how it was going**

15   **to get enough performers to put on a good show for**

16   **everyone, did you-all receive different inquiries**

17   **from various different performers asking to**

18   **participate?**

19       A.    I believe we received some, but I don't

20   remember who asked.  And I also don't remember who

21   was in charge of making -- of checking who asked, if

22   that makes sense.

23       **Q.    So are you aware of what criteria was**

24   **assessed or used in confirming who was -- which of**

25   **those performers was going to be selected versus**

1  which were going to be turned away?

2      A.    I did not -- I don't remember about the

3  criteria, if there was a criteria; and I wasn't in

4  charge of it at that point.

5      Q.    How would you describe the audience that

6  night during the Sam Houston drag show?

7      A.    From on stage, the audience seemed

8  ecstatic.

9      Q.    Were the performers very interactive with

10  the audience members?

11              MR. MORRIS:  Objection.  Vague.

12      A.    I would say it was hard to tell from the

13  wings.

14              I know that my performance, I mainly

15  stayed on stage and, at most, like, collected tips

16  from the edge of the stage.

17              And I know that during Henry's

18  performance as Henrietta, there were -- he had a few

19  backup dancers come on stage with him.  But I don't

20  know about the rest, as I was in the wings.

21      BY MS. BAKER:

22      Q.    And other -- the other performers were

23  collecting tips too.  Right?

24      A.    That is correct.

25      Q.    And the audience members were going up and

1  handing them tips.  Right?

2     A.   That is correct.

3     Q.   **What became of the tips?**

4     A.   They were all collected and counted and

5  then added to the donation pool for The Trevor

6  Project.  And there were a few $2 bills that were

7  kept as, like, little, tiny remembrance things for

8  the show.

9     Q.   **Were any of the performers paid?**

10    A.   No.

11    Q.   **So because it was a public park, Spectrum**

12 **didn't attempt to really enforce the policy that**

13 **only -- that only minors with a parent or guardian**

14 **could attend.  That wasn't really enforced.**

15 **Correct?**

16    A.   We weren't able -- oh.

17          MR. MORRIS:  Objection.

18    A.   We weren't really able to enforce it.  We

19 didn't have the means to block off the park.

20    BY MS. BAKER:

21    Q.   **So it would have taken you being -- it**

22 **would have taken Spectrum being in an enclosed space**

23 **to verify that information?**

24    A.   Yes.

25    Q.   **So why did Spectrum attempt to host its**

1  **2024 drag show again, despite not being able to in**

2  **2023?**

3  A.   We wanted to try and host it again on

4  campus for the purpose of -- because we -- besides

5  the drag show ban, specifically, we should be

6  allowed to host events on campus.

7           And going forward, it was still going

8  to be the cheapest option, and we were waiting to

9  hear, hopefully, back about either the preliminary

10 injunction going through or not.  And if it did go

11 through, we will host it regardless, as per plans.

12 **Q.   And given some of the details were pending,**

13 **especially considering litigation, did Spectrum**

14 **consider any off-campus venues for the shows?**

15 A.   We talked with the AC Pride Group at

16 Amarillo College about possible off-campus venues,

17 but we weren't able to confirm anything before it

18 got canceled again.

19 **Q.   And what would the message of this show**

20 **have been?**

21 A.   That show, it was called "Don't Be a Drag"

22 drag show.  And it was kind of aimed a bit towards

23 the decision to cancel the first drag show.

24           And the message would have been one

25 of, like, defiance, in a sense.

1    Q.    And Myss Myka was invited as the emcee for

2    this event as well, too.  Right?

3    A.    That is correct.

4    Q.    And why was she reinvited?

5    A.    Because we thought she did a good job at

6    the first one.

7    Q.    And what -- what -- let me rephrase this.

8              What about the -- her performance

9    during the initial drag show made you-all say we want

10   to invite her back again?

11   A.    Well, we really liked her dress.  We

12   thought she did a very good job introducing people.

13   She had a fun personality when asking questions

14   about our -- how we came into drag, why this, that,

15   what we chose for our characters.

16   Q.    And was the 2024 drag show limited to WT

17   students?

18   A.    No.

19              We were having help from AC, and we

20   were going to have some performers from

21   Amarillo College also perform from their student

22   their -- LGBTQ+ student group.

23   Q.    I didn't quite -- I couldn't hear the

24   second group that you mentioned.

25              Who was all involved -- who was going

1   to be involved?

2      A.   The LGBTQ+ group from Amarillo College.

3   Their student group.

4      **Q.   So this was not limited to WT students?**

5      A.   It was not limited to WT students.

6      **Q.   And how did you -- how did Spectrum recruit**

7   **performers for this?**

8      A.   We -- we -- I know that we got into contact

9   with ACs -- the Amarillo College's LGBTQ+ student

10   leader and asked them if they had any perform --

11   people who wanted to perform in the show.  And I

12   can't remember what we did on campus for recruiting.

13      **Q.   Were there going to be any judges?**

14      A.   I can't remember.  I don't think we were

15   doing a drag race; I think we were doing a regular

16   string of drag shows.  I don't know if we were going

17   to have judges or not.

18      **Q.   Were there performances -- I'm sorry --**

19   **practices.**

20      A.   Yes.  There were practices.

21      **Q.   And was this like the earlier drag show**

22   **where you would have had to preapprove or preview**

23   **the performances?**

24      A.   We would have reviewed them on our

25   run-through before doing the full show.

1    Q.    What do you mean by your "run-through"?

2    A.    We would have a run-through with just as --

3  without, like, all of the stuff on as a dry run.

4  And then we'd do another run-through with everyone

5  in makeup and costume or dress and stuff.  Run

6  through it with the music and the heels and make

7  sure everything's going good, and then we'll put on

8  the show after that run-through with people coming

9  in after the second one was done.

10    Q.    And to your remembrance, were there -- and

11  in addition to the student groups, were there also

12  drag performers that were going to be involved in

13  this show?

14    A.    I don't remember.  I can't -- I can't

15  recall.

16          I know the names we received were

17  from -- at least from AC were from AC's LGBTQ+

18  group.

19    Q.    But Spectrum at that point did have some WT

20  students who were signed up to be performers.

21  Correct?

22    A.    Yes.  That is correct.

23    Q.    Do you recall whether some of the

24  professional drag performers were helping or

25  assisting or providing lessons to student

1  performers?

2      A.    I do not know what was happening on AC's

3  side.

4              We didn't have that same -- or any

5  assistance in that manner on WT's side.

6              MS. BAKER:  I am going to

7      introduce as Exhibit 21 a document -- the

8      document labeled SPECTRUM 2453.

9              (Deposition Exhibit 21

10             marked for identification.)

11  BY MS. BAKER:

12     **Q.  Have you ever seen this before?**

13     A.    Not this, specifically, I don't think.

14     **Q.  Are you familiar with any practices that**

15  **were happening or planned to happen during the 2024**

16  **drag shows?**

17     A.    Yes.  I am aware of practices that happened

18  during the -- or for the 2024 drag show.

19     **Q.  But you're not aware of any conversations**

20  **with Myss Myka concerning those practices?**

21     A.    I do believe that I was told that she might

22  come, but I don't remember any of the practices

23  during the 2024 cycle where she did come.

24              Because I remember she came and

25  helped -- or gave us a few pointers for the 2023

App. 546

1  practices, but I don't remember any in the 2024

2  practices where she came by again and gave pointers.

3      Q.   Now, when you say "gave pointers," was it

4  correct with respect to the routine or the

5  personality that we discussed earlier how performers

6  have their own personality; what kind of pointers

7  were they?

8      A.   A good chunk of it was about lip-syncing,

9  and to, as a hint, like, practice in a mirror so you

10  can see how your lips move to the sound of the

11  music.

12          And then another way was how to walk

13  in the sense when -- either for those in heels to --

14  how to walk better in heels or to -- what was it? --

15  like you have to put in time during your performance

16  to go pick up tips if you are picking up tips.

17      Q.   Time in your performance to pick up tips?

18      A.   Yep.  So if you had -- like, your song, you

19  tend to either have -- during the chorus is where

20  you would, like, do your set routine.  And then

21  outside of the chorus, during the -- what's it

22  called? -- like one of the verses, you would still

23  lip sync, but you would walk around the edge of the

24  stage and pick up tips.  And so you've got to have

25  walk-off time to do that if you plan to pick up

1    tips.

2                    MS. BAKER:  I'm going to move to

3        introduce as Exhibit 22 a document marked

4        SPECTRUM 2405.

5                    (Deposition Exhibit 22

6                    marked for identification.)

7        BY MS. BAKER:

8        Q.    Were you a part of this conversation?

9        A.    I think so.  I am not too sure.

10                   I believe I -- I remember seeing, "Are

11   you a king or queen.  Love," section.

12       Q.    Do you have any recollection as to what

13   this conversation was about or the context?

14       A.    That we were putting on performances and we

15   had the room reserved at the VHAC for people who

16   wanted to come in and practice.  And this was

17   following that, I believe.

18       Q.    So the students would go there to practice

19   their routines, but, while there, they could also

20   get tips and pointers from more experienced drag

21   performers.  Right?

22       A.    I believe so.  Yes.

23       Q.    So in preparation of the 2024 drag show,

24   did you purchase any space in the JBK?  Were there

25   any costs associated with that?

1    A.    With renting the spa- --

2    **Q.    Yes.**

3    A.    -- hall?

4          Yes.  There is a cost specifically for

5    the -- visual-audio systems, and also buying a

6    technician -- buying -- renting a technician from

7    the JBK.  They have their own set rates, and we pay

8    them directly.  And they would also run the lights.

9    **Q.    And you would have had to make those**

10   **payments up front.  Correct?**

11   A.    Yes.  Before the show was put on.

12   **Q.    Did any organizations or groups or**

13   **individuals donate or assist to help cover those**

14   **production costs?**

15   A.    I don't remember, but I don't think so.

16         I believe it was going to come out of

17   Spectrum's account.

18   **Q.    And did you-all anticipate having to**

19   **purchase any risk insurance?**

20   A.    We did not anticipate it.

21         We were informed about it, and that

22   was -- Drumheller helped us buy the form insurance.

23   **Q.    So you did -- you purchased the insurance?**

24   A.    We did, if I'm remembering correctly.  I

25   can't remember the name.  I think it was Daisy

1    "something," but yes.

2        Q.   Now, following President Wendler's

3    March 18th, 2024, statement announcing that

4    Spectrum's application to host the on-campus drag

5    show was denied, did you speak with

6    President Wendler?

7        A.   Not personally, no.

8             Not at all, actually.

9        Q.   What about Dr. Thomas?  Did you have any

10   communications with him?

11       A.   I don't think so.  I don't remember any

12   conversations with him.

13       Q.   Did you have any conversations with

14   Dr. Fouts?

15       A.   I don't know.

16             There is a chance that there might

17   have been an email conversation with him, but I

18   don't remember it.

19       Q.   What about the organization's faculty

20   advisor?

21       A.   With Drumheller?

22       Q.   Yes.

23       A.   Yes.  Yes.  I do remember talking with her

24   about it.

25       Q.   And what were the nature of those

1    communications?

2        A.    It was pertaining to the cancellation of

3    the drag show, how I wasn't sure if we were going to

4    be able to move it off campus because it was my

5    senior year and I was already neck deep in 1 million

6    things.  And I can't remember if we talked about

7    anything else.

8        Q.    **Do you recall whether any faculty or staff**

9    **attempted to help Spectrum find an alternative**

10   **venue?**

11       A.    I believe we probably received some, but I

12   don't remember which venues offered -- or were

13   proposed.

14       Q.    **Did you communicate with Chip Chandler?**

15       A.    Yes.

16       Q.    **Do you recall whether he proposed any**

17   **particular venues or sites?**

18       A.    I don't remember if he proposed one for the

19   2024.

20             I know that he proposed some for the

21   2023 show, but I'm not sure if I remember if he

22   proposed one after the 2024 cancellation.

23       Q.    **So what became of Spectrum's 2024 drag**

24   **show?**

25       A.    After the cancellation, it fell apart.  We

1    weren't able to find an alternative venue.  There

2    was some -- there was poor communication between us

3    and the other performers, and I was too busy trying

4    to graduate to help lead it.  And I know that

5    everyone else was also really, really busy at that

6    same time, so it just fell apart and didn't

7    continue.

8                    MS. BAKER:  I'm going to

9          introduce as Exhibit 23 a document marked

10         SPECTRUM 2647.

11                   (Deposition Exhibit 23

12                   marked for identification.)

13         BY MS. BAKER:

14         **Q.   If you'd like to read this entire thing, I**

15    **can scroll to give you the full context.**

16                   (Document review.)

17         A.    Okay.

18         BY MS. BAKER:

19         **Q.   Do you now remember the context of this**

20    **conversation?**

21         A.    Yes.  The first half was trying to find

22    alternative venues, asking around for what was

23    available.  And then I asked him about the

24    Sunset Center, which is a down -- or an Amarillo

25    center where PASO has their charity drag show.  And

1  so we were going to try and see if we could host it

2  there, and I don't believe we were able to get back

3  from them -- or hear back from them.

4              And then after that, that's when we

5  decided to full-on cancel it, since we were -- no

6  one was able to help keep it up at that point.  And

7  so this was the -- was talking about the final event

8  for Spectrum while I was still the president.

9      Q.   **So people looking to attend the event would**

10  **have purchased tickets through the Eventbrite.**

11  **Correct?**

12     A.   Yes.

13              I'm trying to remember if we had any

14  Eventbrite tickets for the 2024 show, or if we were

15  just going to have it be open admission.  I can't

16  remember.  Definitely for the 2023 show.  My senior

17  year was -- is hard to remember.  I'm sorry.

18     Q.   **I think a lot of us feel that way.**

19              **So what expenses did you incur in**

20  **planning for the 2024 show?**

21     A.   That would be paying for the visual

22  equipment, renting a technician for running the

23  show, the cost of printing out -- fliers for the

24  show to be printed out.  And I don't believe there

25  was a cost for renting the space, since it was a

1    student org request.  And all the other fees -- or,

2    like, costs would be small, or paying for gas to get

3    everyone to WT and -- I'm trying to think if there's

4    anything else.

5                    If we needed to get any decorations,

6    which I don't think we were going to have any

7    required decorations.  So I believe that would have

8    covered the expenses.  And the insurance.  The

9    insurance also cost money.

10   **Q.    Are you aware, or do you recall, whether**

11   **any faculty or staff member or administrator offered**

12   **to assist with expenses?**

13   A.    I do not remember, if so.

14                    I do know that, like mentioned

15   previously, there is the reimbursement form through

16   the orgs.  But we weren't ever able to get to that

17   point to submit a reimbursement form.

18   **Q.    And ticket purchasers could choose to roll**

19   **over tickets.  Right?**

20   A.    Yes.  If we were able to get the --

21   **Q.    And what exactly --**

22   A.    Sorry.

23   **Q.    Go ahead.**

24   A.    If we were able to get the show up and

25   running at a new venue.

Barrett Bright - 12/19/2025

156

1      Q.    And what exactly would that have meant?

2  What does the rollover mean?

3      A.    The idea was, on Eventbrite, we would have

4  changed the name, location, and date.  And if anyone

5  wanted to keep their tickets, we would just move

6  that over onto the new Eventbrite.  And anyone who

7  wanted a refund, we would refund.

8      Q.    Are you aware of any future or ongoing

9  plans by Spectrum to host a drag show on campus at

10 WT?

11     A.    Not that I'm currently aware of.

12            MS. BAKER:  Okay.  That's all I

13     have for you.  Thank you.

14            MR. MORRIS:  Just a few questions

15     for you, Mr. Bright, from me.

16                      EXAMINATION

17     BY MR. MORRIS:

18     Q.    You testified earlier a little bit about

19 Spectrum losing access to spaces on campus that

20 other RSOs have access to.  Do you recall that?

21     A.    Yes.

22     Q.    Can you explain whether or not Spectrum has

23 ever lost access to Legacy Hall?

24     A.    We did lose access to Legacy Hall for the

25 drag show that we were planning.

App. 555

1    Q.   Okay.  That was the 2023 drag show?

2    A.   Yes.  That is correct.

3    Q.   Could you explain, would your answer be the

4  same for the 2024 drag show?

5    A.   Yes.  It would be the same.

6    Q.   Okay.  When you were planning the 2023 drag

7  show for Legacy Hall, did anybody -- any staff or

8  administration with WT raise any concerns about WT

9  students who were under the age of 18 attending the

10  show?

11    A.   Yes.  We -- I believe it was -- Drumheller

12  did raise concerns about that.  And that was when we

13  decided to do the access with the student ID card,

14  or you would need to be above the age of 18 with --

15  or have a legal guardian with you.

16    Q.   And did that satisfy Dr. Drumheller's

17  concerns?

18    A.   Yes.

19    Q.   Did anybody from the JBK center staff,

20  including Dr. Fouts, raise any concerns about WT

21  students under the age of 18 attending the show?

22    A.   Not that I can remember.

23    Q.   Okay.  If so, can you explain, would you

24  have worked with them to alleviate their concerns?

25    A.   Yes.  That is correct.

1    Q.   Okay.  During the time you were planning

2    the drag show as Legacy Hall, did any JBK center

3    staff raise concerns about students feeling

4    embarrassed or harassed by the drag show?

5    A.   No, they did not.

6    Q.   Can you explain, did Spectrum reach out to

7    any minors to attend the show, other than siblings

8    or family members?

9    A.   No, we did not.

10    Q.   Okay.  Did JBK staff, or any other employee

11    of WT, ever raise concerns about the 2023 drag show

12    violating any university policy?

13    A.   They did not.

14    Q.   Okay.  What about for the 2024 drag show?

15    A.   They did not, as well.

16    Q.   If -- you testified earlier that you and

17    other members of the officer corps for Spectrum

18    reviewed performances before the planned show at

19    Legacy Hall.  Is that right?

20    A.   That is correct.

21    Q.   Okay.  If after reviewing the performance

22    it didn't meet Spectrum's understanding of what a

23    PG-13 performance would be, what would Spectrum have

24    done?

25    A.   We would have asked them to change it.  If

Barrett Bright - 12/19/2025

1    it's just the music, then change the music.  If it

2    was part of the performance, we would ask them to

3    either change or tweak that part of the performance

4    to, then, fit within what we believed was

5    acceptable.

6        **Q.   Okay.  And you testified earlier you've**

7    **attended drag shows.  Correct?**

8        A.   That is correct.

9        **Q.   Okay.  And you explained to Ms. Baker how**

10   **sometimes you might not readily understand what a**

11   **performer is trying -- is intending to convey.  Is**

12   **that right?**

13       A.   That is correct.

14       **Q.   Can you explain whether or not, as somebody**

15   **who's been to drag shows, that you understand the**

16   **performer trying to communicate something?**

17       A.   Yes.  They -- I always -- every drag show I

18   attend, I always feel like each and every individual

19   performer is trying to convey something.  If it's

20   impersonating through Disney or, like, doing a

21   Disney song, it's to show how they are embodying the

22   character they're performing.

23            If it's for comedy, it would be trying

24   to make the audience laugh in whatever way they can.

25   And every show I've been to, there is a message to

1    each performance.

2                    MR. MORRIS:  Okay.  That's all I

3        have.

4                    Thank you, Mr. Bright.

5                    (Pause in proceedings.)

6                    THE STENOGRAPHER:  Anything else

7        from anyone?

8                    MS. BAKER:  I have a few

9        follow-up questions.

10                    FURTHER EXAMINATION

11        BY MS. BAKER:

12        **Q.   Following President Wendler's letter in**

13    **March of 2023, did you personally, or Spectrum as an**

14    **organization, communicate with any students or**

15    **groups who agreed with Dr. Wendler's position?**

16        A.   I -- following the email that went out, and

17    particularly during the protests that happened on

18    campus, I did talk to quite a few people who did

19    agree with Wendler, at least on canceling the drag

20    show.

21        **Q.   So you would agree that reasonable**

22    **people -- a reasonable person could believe that a**

23    **drag show is mockery?**

24        A.   I can't say for certain if that was the

25    reason why, but yes.  I do believe that some people

1  can believe that drag is a mockery.

2     **Q.  And you agree that if a student**

3  **organization attempted to host a blackface**

4  **performance on campus, that would not be permitted.**

5  **Correct?**

6           MR. MORRIS:  Objection.  Calls

7    for speculation.

8     A.  I don't believe that Wendler would allow

9  said event to happen.  However, if an event was

10  happening, I do believe the students would have to

11  protest said event happening.

12    BY MS. BAKER:

13     **Q.  And members of Spectrum were very engaged**

14  **with on-campus protests.  Correct?**

15     A.  That is correct.

16     **Q.  And some of those protesters were dressed**

17  **in drag.  Correct?**

18     A.  That is correct.

19     **Q.  And none of those protestors were prevented**

20  **from exercising that right.  Correct?**

21     A.  That is correct.

22     **Q.  And Dr. -- President Wendler nor WT did not**

23  **disrupt those drag demonstrations.  Correct?**

24           MR. MORRIS:  Objection.  Form.

25    Objection.  Calls for speculation.  Lacks

App. 560

1    foundation.

2    A.    I don't know if there were any attempts to

3    cancel the protests.

4    BY MS. BAKER:

5    **Q.    Were any of the protests that you were**

6    **involved in disrupted?**

7    A.    Not through university means.

8         I know that there were

9    counter-protesters there and then there were news

10    recordings there as well.  And all of the chalk art

11    we put in and around the building were routinely

12    washed away every night.

13    **Q.    And Spectrum has continued to use the JBK**

14    **despite the controversy surrounding the drag shows.**

15    **Correct?**

16    A.    That is correct.

17         MS. BAKER:  Okay.  No further

18    questions for me.

19         (Pause in proceedings.)

20         THE VIDEOGRAPHER:  Is that it for

21    everyone?

22         MR. MORRIS:  Yes.  Sorry.

23         (Proceedings concluded at 3:22 p.m.)

24

25

1           CHANGES AND CORRECTIONS

2    WITNESS NAME: BARRETT BRIGHT

3    DATE: FRIDAY, DECEMBER 19, 2025

4    Reason Codes:  (1) to clarify the record; (2) to
     conform to the facts; (3) to correct a transcription
5    error; (4) other (please explain).

6    PAGE LINE  CHANGE                      REASON CODE

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

App. 562

1                              SIGNATURE

2

3

4            I, BARRETT BRIGHT, have read the foregoing

5    deposition or have had it read to me, and hereby

6    affix my signature that same is true and correct,

7    except as noted above.

8

9                    _____

10                            BARRETT BRIGHT

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

App. 563

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                FOR THE NORTHERN DISTRICT OF TEXAS

 3                       AMARILLO DIVISION

 4              Civil Action Number 2:23-cv-00048

 5   SPECTRUM WT, et al.          )

 6         Plaintiffs,            )

 7   vs.                          )

 8   WALTER WENDLER, et al.       )

 9         Defendants.            )

10                    REPORTER'S CERTIFICATE

11      REMOTE VIDEOTAPED DEPOSITION OF BARRETT BRIGHT

12                 FRIDAY, DECEMBER 19, 2025

13

14              I, Rebecca J. Callow, Registered Merit

15   Reporter, Certified Realtime Reporter, Registered

16   Professional Reporter and Notary Public in and for

17   the State of Florida, hereby certify to the

18   following.

19              That the witness, BARRETT BRIGHT, was duly

20   sworn by the officer and that the transcript of the

21   oral deposition is a true record of the testimony

22   given by the witness;

23              That the original deposition was delivered

24   to Alexia Baker.

25              That a copy of this certificate was served
```

1  on all parties and/or the witness shown herein on

2  December 23, 2025.

3

4        I further certify that pursuant to FRCP

5  Rule 30(f)(1) that the signature of the deponent:

6        [ X ] was requested by the deponent or a

7  party before the completion of the deposition and is

8  to be returned within 30 days from date of receipt

9  of the transcript.  If returned, the attached

10 Changes and Signature Page contains any changes and

11 the reasons therefor;

12        [   ] was not requested by the deponent or

13 a party before the completion of the deposition.

14        I further certify that I am neither

15 counsel for, related to, nor employed by any of the

16 parties or attorneys to the action in which this

17 proceeding was taken.  Further, I am not a relative

18 or employee of any attorney of record in this cause,

19 nor am I financially or otherwise interested in the

20 outcome of the action.

21

22

23

24

25

1

2          SUBSCRIBED AND SWORN TO under my hand and

3    seal of office on this the 23rd day of

4    December, 2025.

5

6

7    _____
         Rebecca J. Callow, RMR, CRR, RPR
8        Notary Public, Miami-Dade, Florida
         My Commission No. HH 409626
9        Expires:  June 12, 2027
         Integrity Legal Support Solutions
10       9901 Brodie Ln. #160-400
         Austin, Texas 78748
11       (512) 320-8690
         www.integritylegal.support

12

13

14

15

16

17

18

19

20

21

22

23

24

25

www-instagram-com-2025-11-15-11-09-14
https://www.instagram.com/p/CqOI7hJuRfe/
15.11.2025



SPECTRUM 0001443

Exhibit
Barrett Bright

12

App. 566

www-instagram-com-2025-11-15-11-09-33
https://www.instagram.com/p/CqOl7hJuRfe/
15.11.2025



**Help Fund Spectrum WT's Drag Show**

$25 raised of $5,000 goal • 1 donor

Share

Donate now

wtamuspectrum · Follow

aur.naur.marc @dwaynejaycox9 the request for a temporary restraining order and preliminary injunction was pulled. I would recommend familiarizing yourself with what that means, because spamming that article really isn't the "owning the libs" moment you think it is. You saw a FOX News title (purposefully written to be clickbait and misleading, as confirmed by academic study discerning political bias and informational accuracy) without reading or understanding the contents of the article.
137w   Reply

nathanarussell The students of @wtamuspectrum embody the very best of @WTAMU. They show forth the real "West Texas way."
137w   6 likes   Reply

Hide replies

bastroptxconservative_patriots @nathanarussell no they definitely ain't that
137w   Reply

168 likes
March 25, 2023

Add a comment...                    Post

App. 568

SPECTRUM 0001444

www-instagram-com-2025-11-15-11-09-52
https://www.instagram.com/p/CqOI7hJuRfe/
15.11.2025



www-instagram-com-2025-11-15-11-10-04
https://www.instagram.com/p/CqOl7hJuRfe/
15.11.2025



App. 570

SPECTRUM 0001446



**WT** Jack B. Kelley Student Center
WEST TEXAS A&M UNIVERSITY ™

# Procedures and Guidelines



**Revised March 5, 2025**

Defendants'
Exhibit

6

App. 571

## Contents

**MISSION STATEMENTS** ................................................................................................ 3

**GENERAL POLICIES** ..................................................................................................... 4

    Reservations ............................................................................................................... 4

    Sponsored/Hosted Events .......................................................................................... 6

    Building Hours/After Hours ......................................................................................... 6

    Decorations ................................................................................................................ 6

    Cleanliness .................................................................................................................. 7

    Lost & Found .............................................................................................................. 8

    Parking ....................................................................................................................... 8

    Political Activity .......................................................................................................... 8

    Prohibited Events ....................................................................................................... 8

    Smoking/Tobacco ...................................................................................................... 8

    Illegal Weapons/Illegal Substances ............................................................................ 8

**Buffaloes Traditions Program** ....................................................................................... 9

**Institutional Priority Events** ......................................................................................... 9

**Production Services** .................................................................................................... 10

    Off-Campus University Events ................................................................................... 11

**Event Liability Insurance** ............................................................................................ 11

**Alcohol** ....................................................................................................................... 11

    Reservable Indoor Spaces ........................................................................................ 12

    Reservable Outdoor Spaces ..................................................................................... 13

**Rates and Billing** ........................................................................................................ 14

**Emergency Safety (buff alert, tornadoes, fire, etc.)** .................................................... 15

    Bicycles/Non-Motorized Vehicles ............................................................................. 15

**Food/Catering** ............................................................................................................ 15

    Catering Kitchen at Legacy Hall ................................................................................ 16

**Marketing/Advertising** ............................................................................................... 17

    Bulletin Boards ......................................................................................................... 17

    Posters and Sandwich Boards ................................................................................... 18

    Outside Banners ....................................................................................................... 18

    Table Tents ............................................................................................................... 19

    Electronic Signs ........................................................................................................ 19

    Floor Stickers ........................................................................................................... 19

    Exhibitor Tables ....................................................................................................... 19

    Sales ........................................................................................................................ 20

    Donation Boxes/Drives ............................................................................................ 20

App. 572

# MISSION STATEMENTS

### Mission Statement

The mission of West Texas A&M University is to provide intellectually challenging, critically reflective, regionally-responsive, and inclusive *academic* programs that discover, interpret, apply, and disseminate knowledge for preparing the next generation of global citizens.

### Vision Statement

Guided by its pioneering spirit, West Texas A&M University is recognized for its excellence in teaching and learning, and a strong focus on engaging students in experiences that aid in the development of skills, capabilities, and insights. Our vision is to become a Regional Research University responsive to the forces that shape who we are. Our distinctive focus on the people and places of the Panhandle region will be acknowledged throughout Texas, across the country, and around the world.

### Division of Student Affairs Mission Statement

The Division of Student Affairs promotes an educational environment that enhances your involvement and development as a student by offering rich and varied programs, services and facilities that support lifelong learning. You are empowered to become an informed, responsible, creative and articulate decision maker who exercises good citizenship, and is professionally competitive.

### Jack B. Kelley Student Center Mission Statement

The Jack B. Kelley Student Center is the gathering place for the entire West Texas A&M University community. We are dedicated to providing a premiere facility that inspires educational growth, social engagement and intellectual development through student-centered programs and services.

### Funding

The Jack B. Kelley Student Center is committed to remaining fiscally responsible and makes every effort to remain open and transparent. The JBK Student Center funds its maintenance and operations entirely through the University Center Fee.  General revenue funding (money from The State of Texas) is used for academic purposes and does not fund the JBK Student Center or any of the operations.

App. 573

# GENERAL POLICIES

### Reservations

The use of the JBK facility, J.A. Hill Chapel, Alumni Banquet Hall, Buffalo Room/Isley Terrace, First United Bank Center, Bain-Schaeffer Buffalo Stadium, classrooms across campus or outside lawn areas (not including Buffalo Sports Park) will be scheduled through **www.reservations.wtamu.edu**

Reservations can be made up to 1 reservation year in advance. The reservation year is defined as: The Friday before the Fall Semester starts through the Thursday before the next Fall semester starts. (i.e., August 23, 2024 – August 21, 2025)

- **Buffaloes Traditions** can make reservations for the next reservation year starting the first Monday in January.
- **Institutional Priority** can make reservations for the next reservation year starting the first Monday in February. Event Organizers must apply to have their event included in this category. Requirements can be found below.
- **Student Organizations** can make reservations for the next reservation year starting on April 1st*.
- **Departments** can make reservations for the next reservation year starting on May 1st*.
- **Non-University Clients** can make reservations for August – December and the following Summer starting on May 1st* and January – May on November 1st*.
  *If the start date falls on a weekend or holiday, the book will open on the next business day.

Scheduling an event at least 2 weeks in advance is recommended. Meeting rooms and exhibitor tables must be reserved by 5pm the day before the event. Setups cannot be guaranteed in meeting rooms with less than 18 hours notice. 30 days' notice is required for Legacy Hall, Alumni Banquet Hall, First United Bank Center, and Bain-Schaeffer Buffalo Stadium. Reservations outside of this timeframe must be approved by JBK Event Services Staff.

The JBK Student Center staff reserves the right to deny space usage for any group/event that is programmatically or operationally impractical to accommodate or that conflicts with the University's mission or policies.

The JBK Student Center reserves the right to cancel or interrupt any event in the interest of public safety, noncompliance with university policies, or if the event can be viewed as inappropriate or not consistent with the mission of West Texas A&M University.

App. 574

All educational programs provided by an outside organization and open to the community at large will be required to pay an exhibitor fee.

Groups should not advertise their events until the tentative confirmation email has been received. If advertising is sent out prior to approval, it may result in denial of the request to use the space.

The University is not liable for problems that might occur prior to or during the rental period (i.e., power failure, air conditioning problems, sprinkler systems, etc.)

The University will not be responsible for acquiring any special equipment for any group unless agreed upon when the reservation is made.

Large-scale events scheduled outside the fall and spring semester, can reserve an extra setup day. During the fall and spring semesters, no setup days will be permitted without JBK Event Services Staff approval. A large-scale event is any event that will have more than two hundred (200) people in attendance.

Reservation space is critical space, and it is important to remain efficient. "No shows" will not be tolerated and may jeopardize future opportunities to reserve space in the JBK. Failure to cancel reservations for events involving special set-ups at least two business days in advance of the event date may result in a fee. Showing up more than 1 hour late for your event will also result in a fee.
- o 1st time – verbal and written warning
- o 2nd time – $25 fee
- o 3rd time – $100 fee
- o 4th time or more – lose scheduling privileges within the facilities under the JBK Event Services area of responsibility for duration of the academic year.

If the date of an event needs to be changed, it must be done so through reservations.wtamu.edu or by contacting JBK Event Services. There is no guarantee that the new date will be available until the change is confirmed.

App. 575

### Sponsored/Hosted Events

University departments and student organizations may sponsor events with off-campus organizations, as long as the mission of the off-campus organization relates to the mission of the on-campus sponsor and/or the mission of WTAMU. Additionally, university sponsors must be present at the event to ensure that WTAMU policies and procedures are followed at all times.  University departments and student organizations may not serve as fronts for off-campus organizations. If "fronting" is discovered, Non-University rental rates will apply.

### Building Hours/After Hours

All events must end 15 minutes prior to regularly scheduled closing time if no prior arrangements have been made for extended hours.  Any requests for extended hours must be made in advance and approved by the Student Center Staff.

Building and food court hours will be posted throughout the JBK.

### Decorations

All decorations must be removed immediately following the activity.  Nothing may be left or stored in the JBK.  Any items left in the facility may be charged a storage fee.

The loading dock must be cleared of all debris after the event is concluded.

A florist/wedding consultant may be used to provide non-food items only. JBK Event Services must approve the set-up and decorations of the rented facility if the decorations are out of the norm. Centerpieces, tablecloths, and chair covers do not need prior approval.

Items such as confetti, glitter, birdseed, rice and fireworks (i.e., sparklers) may not be utilized on WTAMU campus.

Biodegradable confetti is allowed outside, but not inside any WTAMU facility.

Bubbles are allowed outside, but not inside any WTAMU facility.

Candles, incense, or any other flame effect devices may not be used in any University facility.

No decorations may be hung from any wall, drapes, acoustic panel, ceiling, door or other surface of University facilities.  All decorations must have advance approval of the JBK Event Services Staff.

Double-sided tape of any kind shall not be used. Any damage and costs associated with repairing the damage will be billed to the group responsible for the event.

App. 576

Items weighing more than 3,000 pounds will not be allowed inside the JBK Facility.  Dimensions of items must allow for easy access into facility.

All items must be clean and will be visually inspected and approved prior to entering the facility.

Helium balloons are not allowed inside J. A. Hill Chapel, First United Bank Center, Fairly Group Club, Alumni Banquet Hall, and Legacy Hall or adjoining hallways.

Helium tanks are not permitted inside WTAMU facilities.

Fog/smoke machines may not be used in WTAMU facilities without prior permission. If a fog/smoke machine is approved, a Fire Marshal may be required at the hourly expense of the client.

If a lift is needed for decorations, the first two hours of its use will be provided free of charge. Any additional time will be charged at an hourly rate. The lift must be operated by a WTAMU Staff Member, Non-University persons are not allowed to use a WTAMU owned lift, hourly fees for staffing will be charged.

Within the JBK facility: Signs designating the food court areas, Buffalo Gold Card office, offices in the building, or any permanent sign will be of a design and style first approved by JBK Staff. No other permanent-type signage is allowed.

## Cleanliness

Organizations or individuals using the JBK facilities or equipment will be held financially responsible for damage and/or cleaning.

The group hosting an event is responsible for cleanup, repair of damages and replacement of damaged equipment.  If an excessive amount of trash has been left in the room, a charge will be billed to the customer for housekeeping.

The student center director or a student center staff member must approve all requests to move furniture in any part of the JBK.  If Individuals and groups move furniture themselves, they will be held financially responsible for damages to furniture and facilities.

App. 577

**Lost & Found**

A lost and found will be operated at the JBK Information Desk for items found at the University.

Each Friday, all items will be brought to the University Police Department.

All items found left behind at events in Events Services spaces will be brought back to the JBK after the event.

**Parking**

Parking is not allowed on 26th street without special permission.  All loading/unloading must occur at the available parking behind the Alumni Banquet Facility.

JBK Student Center visitor parking is for university visitors only.  No faculty, staff, or students are permitted to park in visitor parking.

30 minute parking may be used by faculty, staff or students for unloading and loading only.

Parking Services will provide specific parking instructions for all events on campus with non-university guests through EMS. This will be communicated with clients on their confirmations.

**Political Activity**

Table space for candidates of political or student government elections is not allowed unless sponsored by a registered student organization.

**Prohibited Events**

In accordance with the Texas A&M University System's Board of Regents resolution regarding Certain Public Events on the Campuses of Universities in the Texas A&M University System, dated February 28, 2025, Drag Show Events are prohibited at Special Event Venues on the campus of West Texas A&M University.

**Smoking/Tobacco**

Smoking and use of any tobacco products (cigars, cigarettes, chewing tobacco, etc.) as well as e-cigarettes, vapes, etc are prohibited on the University campus.

**Illegal Weapons/Illegal Substances**

Illegal substances, and/or illegal weapons (according to Texas law and the West Texas A&M Code of Student Life) are not permitted on university property.

App. 578

## Buffaloes Traditions Program

Buffaloes Traditions Program recognizes that some traditional events and programs should have precedence on the calendar.  Buffaloes Traditions Program reservations are deemed to have priority status.  Submission for this status shall be received no later than January 1 of the previous year.  Buffaloes Traditions Program Event Organizers will be allowed to make these reservations starting the first Monday in January

This procedure permits selection of a few programs that must happen annually on campus at a prescribed time.  The programs should remain constant from year to year and if the event fails to remain constant, the space will be lost.  Dates for the event may change as dictated by the University calendar.  Once these have been selected, any new submissions will be submitted to the JBK Student Center Advisory Board for review.

Submission Criteria
1. Sponsorship by organization or University department
2. Annual program at a specified time of year
3. Open to the entire campus community

Selection Criteria
1. Significant student involvement in planning
2. Resources required are unique to JBK Student Center
3. Program will aid in student recruitment and retention efforts.

## Institutional Priority Events

Institutional Priority Events are mission critical events that take priority over regular university and non-university events and must be approved by the JBK Student Center Advisory Board. When Institutional Priority Events are initially scheduled, it will only be for the actual day of the event, unless significant setup is required. Event Organizers will be allowed to make these reservations starting the first Monday in February.

Events must meet three (3) of the following criteria to be considered for Institutional Priority status:
1. Attendance must exceed 200 or more
2. Annual event which has occurred at least 3 years in a row
3. Open to the entire campus community
4. Requires a contract of 12 or more months in advance
5. Will aid in recruitment and retention efforts
6. Requires significant space utilization in the JBK Student Center
7. Donor funded program at $500,000 or above

App. 579

Any previously approved Institutional Priority event that fails to meet the criteria for two consecutive years will be removed from the list pending the JBK Student Center Advisory Board approval.  Any group that has been removed from the list, must wait one scheduling cycle before applying for reinstatement onto the list.

## Production Services

The JBK Student Center reserves the right to require Production Service staff, including hours of call and crew sizes for meetings and events. All groups will be charged an hourly fee for an A/V technician(s) for large-scale events, multi-media presentations, and events using the A/V booth in Legacy Hall.  The technician is there to assist but may not be able to accommodate last minute requests.

All A/V support equipment needs to be scheduled through the JBK Information Desk, and at least two weeks in advance.  Further notice is preferable and helps ensure availability.
No other A/V service provider is allowed to provide services in the JBK Student Center without prior approval.

Size, type, and cost of audio and visual systems will be determined by Production Services after the venue and event details are presented by the requestor. It will not be presumed Production Services will provide any services until JBK staff is given the opportunity to study the tech rider information and it has been determined that the Production Services can satisfy event requirements. Production Services is not responsible for satisfying entertainment contract requirements.

Production Services staff will operate all lighting, sound, and video systems when necessary. No client setup, movement, or operation is allowed.

Smaller sound systems are available for use.  JBK Production Services has a limited amount of equipment, so it is encouraged to plan ahead. Sound levels of events in the JBK may not disrupt regular business operations and must remain at a level appropriate for the facility.  The use and volume of p.a. systems, sound systems, stereo systems, or other musical/sound devices must have prior approval of the student center director.

Weather that may damage equipment will result in cancellation of services during the event and/or during setup/teardown time.

Clients that do not cancel prior to event loading will be charged the entire amount of the A/V order.

**App. 580**

## Off-Campus University Events

Production Services can provide support for university events outside of the student center.   All university organizations will be charged hourly fees for A/V services along with other mandatory fees. Production Services A/V Technicians will always deliver, setup, and operate equipment during off-site events.

## Event Liability Insurance

All outside organizations and parties renting the facility, which are not directly administered by WTAMU, may be required (as determined by the Risk Assessment process) to provide proof of event liability insurance valued at one-million dollars specifically listing WTAMU as additionally insured.  Copies of the policy must be provided at the same time the balance is paid in full.

Student organizations and/or departments that are hosting an event may be required (as determined by the Risk Assessment process) to verify that all participants have a signed TAMUS liability waiver on file before participating in the event.

## Alcohol

Alcohol is allowed only in the following JBK Event Services Spaces:

- 26th Street
- Alumni Banquet Hall
- Bain-Schaeffer Buffalo Stadium
- Buffalo Room/Isley Terrace
- First United Bank Center
- Hazel Kelley Wilson Room
- Legacy Hall
- Legacy Foyer
- Legends Club
- Pedestrian Mall
- Terrill Lawn

Prior approval must come from the President's Office, through the Alcohol request form, before alcohol will be permitted.

If alcohol is served, UPD will determine if an officer will be required to attend the event.  The fees associated with having an officer present will be billed to the client.

If alcohol is part of an official University function, the event must start after 5 p.m.

Any Student Organization that wants to host an event with alcohol must show that alcohol is not the primary focus of the event and must get prior approval from the Office of Student Engagement and Leadership and the Vice President for Student Affairs.

JBK can staff bartenders at any event on campus for an hourly fee for beer/wine/pre-mixed drink service.

Self-services of alcohol is not allowed on campus. Cash bars and/or distribution of hard liquor at an event will require coordination with an approved licensed liquor provider. If beer and/or wine are supplied for open distribution, it will be the responsibility of the event host to provide or hire TABC certified bartenders for each bar. If the client would like to allow guests to bring their own alcohol, all alcohol must be turned in to and served by the bartender.

App. 581

**Reservable Indoor Spaces**

The following spaces are available in the Jack B. Kelley Student Center (JBK):

- **Legacy Hall**
- **Legacy Foyer**
- **The Legends Club**
- **Entire Commons area**
- **East Commons**
- **Hazel Kelley Wilson***

- **Eternal Flame***
- **Senate Chamber***
- **West Texas***
- **Thunder***
- **Maroon***
- **White**

*\*Can be reserved for recurring meetings.*

The following spaces are available in the Alumni Banquet Facility* (ABF):

- **Alumni Banquet Hall**
- **Buffalo Room/Isley Terrace**

*\*ABF spaces may NOT be reserved for regularly scheduled meetings
without approval from the director of the JBK.*

The following spaces are available in the First United Bank Center (FUBC):

- **Arena**
- **Buffalo Room**

The following spaces are available in Bain-Schaeffer Buffalo Stadium:

- **Fairly Group Club**
- **Concourse**
- **First United Bank Field**

Classrooms across campus are also available for reservations for non-academic events, however, academic classes take priority and may bump the reservation from the room. If this happens, please reach out to JBK Event Services for help finding a new space.

In the JBK, classes may be scheduled on a one-time basis during each semester.  Classes will not be allowed to use the JBK on a regular basis.

The entire Commons area may only be reserved by university departments and student organizations if planned during JBK regular business hours.  Non-University groups may reserve the entire Commons area, but the event must occur outside the JBK's regular business hours.

Events held in the entire Commons area may not be scheduled prior to 5:00 p.m. on weekdays.

Reservations for private use of Legends Club may be made before 10am or after 3pm Mon – Thurs. Reservations may only be made between 10am and 3pm on Fri or with special approval.

**App. 582**

## Reservable Outdoor Spaces

- Library East
- Museum East
- Museum South
- Education South
- Old Main North
- Old Main South
- Old Main East
- Old Main West

- Terrill Lawn
- Sand Volleyball Court
- Isley Terrace
- 26th Street
- Thunder Island
- Vaughan Pedestrian Mall
- Classroom Center North

Due to the risk of damage to sprinkler systems and lawns, stakes cannot be used without approval of Physical Plant personnel. No signs/stakes will be allowed to be placed anywhere within the Pedestrian Mall.

Any equipment ordered from Central Supply must be set up, torn down and cleaned after the event by the group reserving the outdoor space unless arrangements are made to hire JBK staff to set up, teardown and clean.

No unauthorized vehicles or trailers are allowed to drive and/or park on the Vaughan Pedestrian Mall.

For reservations on 26th Street, it is the responsibility of the group to contact UPD to open the gates when they are ready for them to be opened.

Portable BBQ grills may be permitted through the risk assessment process. Location and drought conditions will be taken into consideration.

No loud music or bands will be allowed to play on the Pedestrian Mall or areas adjacent to classroom buildings during class times. Permitted times are during the week that the University has scheduled as a designated open period as well as Saturdays and Sundays.

Non-University groups must pay the hourly fee for rental of the outdoor space as well as the hourly fee for a staff member to be present during the entire event.

App. 583

## Rates and Billing

The different groups for billing purposes are:

- Student Organizations
- University Departments
- Faculty, Staff, Student individuals
- Non-University clients

Student orgs and university departments will be charged facility rental fees for events accepting monetary donations or charging an admission and/or registration fees.  The rental costs will be determined by 10% of the gross revenue collected or by the WTAMU student rate – whichever is less.  Fees may be waived if the event is a fundraiser, or it has been approved by the student center director.  Direct charges may be assessed for complex events.

All student organizations and university departments will be charged an hourly staffing fee for each JBK staff member required before or after the normal JBK operating hours in all facilities managed by JBK Event Services.

University departments will be charged an hourly staffing fee for each JBK staff member required at events in the Alumni Banquet Facility, Bain-Schaefer Buffalo Stadium, First United Bank Center, and J. A. Hill Chapel.

Student orgs can have up to 4 hours of free setup/teardown time for their events. This can be split from the event time or continuous. i.e., event from 5pm - 7pm; setup from 9am - 12pm, teardown from 7-8 pm. Hourly staffing charges will be applied if staffing is required and more time is needed.

Non-University groups will be charged hourly staffing fees for each staff member required during the entire reservation period.

Setup fees are addressed based on the size of the event, the number of staff required, and how long it will take to set the event. Non-University events will have a required setup fee for the event as determined by the JBK Staff. Student orgs and Departments may be required to pay setup fees depending on the complexity of their event.

To provide sufficient staffing, any University group that schedules an event in Legacy Hall, Alumni Banquet Facility, Bain-Schaeffer Buffalo Stadium or First United Bank Center with less than 7 days' notice will incur all setup charges along with all other staffing charges required to properly manage the event.

App. 584

The payment schedule for non-university reservations is as follows:
- ½ the full rental fee is due at time of booking. The remainder is due by 30 days before the event.
- The full amount is refundable if cancelled up to 30 days before the event.
- If an event or any portion of the event is cancelled less than 30 days before the event, 50% will be refundable.
- Within 15 days there is no refund.

The payment schedule for university departments and student org. reservations is as follows:
- Reservations will be invoiced the month after the event takes place.
- Payment is due within 30 days of the invoice date.
- If payment is not received within 30 days, a reminder will be sent.
- If payment is not received within an additional 30 days, future reservations could be cancelled at the discretion of the JBK Director.

Refunds will be processed through our credit card system as soon as possible after the event is completed or cancelled. If payment was made by check, refund checks will be mailed out approximately three weeks after an event is completed or cancelled.

## Emergency Safety (buff alert, tornadoes, fire, etc.)

In the event of an emergency during an event, the JBK Event Services staff will follow the proper procedures outlined in the JBK Student Center emergency manual. All building occupants are expected to follow all instructions given to them by a JBK staff member.

In case of University emergency, any event may be cancelled up to 24 hours in advance.

### Bicycles/Non-Motorized Vehicles

No running, roller-skating, rollerblading, skateboarding, bike riding or scooters inside any WTAMU facility.

No battery-powered vehicles (i.e., Scooters, Golf Carts, etc.) will be permitted in WTAMU facilities.

## Food/Catering

*In accordance with existing contracts and University rules, catering will be allowed within the following guidelines:*

All food must be contracted with the on-campus caterer – Aramark. No outside caterers are allowed in the Jack B. Kelley Student Center, Alumni Banquet Facility, First United Bank Center, or Bain-Shaeffer Buffalo Stadium without prior approval from the food service director via the online Catering Exemption Form. (Food court is run by Aramark, no exemption is necessary.)

App. 585

The use of heating appliances (open-flame devices, toaster ovens, heating plates, sterno cans, fry cookers, etc.,) to prepare food or to warm food is not allowed in the JBK, the outer covered patio of the JBK, Alumni Banquet Facility, Isley Terrace, First United Bank Center, or Bain-Shaeffer Buffalo Stadium. Upon approval by the student center director, exceptions may be granted for certain events contracted through University food services and insured catering companies.

Any baked goods prepared for distribution in the JBK must be approved by Aramark, pre-portioned, and individually wrapped prior to the event.

No food will be allowed inside J.A. Hill Chapel without prior approval from the student center director.

Any person or group serving food on WTAMU Campus shall hold harmless WTAMU, its agent, employees, and representatives from any liability or action arising from personal injury or property damage caused by the negligent act of omission or commission of the group.

Food Safety:  The group hosting an event is liable for all food safety preparation and service. Individuals within the group are expected to follow standard food safety and hygiene practices for food served or sold. Groups are expected to comply with all city, county, and state regulations related to food preparation, handling, and permits. WTAMU retains the right to require insurance, permits, or inspections as needed.

## Catering Kitchen at Legacy Hall

The kitchen is available for groups bringing in and/or preparing food for special events only (non-reoccurring event).

The kitchen is equipped with electrical outlets, refrigerators, freezer, warming cabinets, microwave, ice machines, coffee/tea makers and counter space.  Equipment is not to be moved from its original location.

All items must be removed from the kitchen at the end of the event including food.

The kitchen must be left clean after the event is completed.  To clean the kitchen, you must use the approved cleaning chemicals provided by the JBK Student Center.  An additional cleaning fee may be charged if the kitchen requires cleaning beyond normal end of the day custodial service.

App. 586

## Marketing/Advertising

Marketing space is available to campus organizations, academic and auxiliary departments. Reservations are only for those groups advertising events and services that are open to the entire campus community and respect the mission of the University and its endeavors.

Marketing reservations will follow same date availability as space reservations.
Providing space for an event or marketing of an event does not necessarily imply university endorsement or sponsorship of a product, issue, or idea.  Therefore, users may not state or imply University sponsorship or endorsement of their activities without the University's consent.  Promotional material and advertising for Non-University sponsored activities must include the following disclaimer: "This is not a West Texas A&M University program."

All posters, flyers, banners, or table tents must include the name of the registered student organization or University department and the name, date and time of the event. University Graphic standards must be followed.  Materials that do not include this information will be removed from the JBK.

Any written material placed within the JBK may not contain obscene words, promote alcohol or other drug usage or any unlawful activity; or violate University rules, Texas A&M University System policies or local, state or federal laws.

Posters, flyers or banners may not be attached to or placed on any unauthorized part of the JBK.  This includes doors, windows, ceilings, walls, tables or other surfaces.  Tacks must be used to post information on bulletin boards. No glue, tape, etc. will be allowed.

Information written on posters, flyers, banners and table tents must be written in English or have the English translation included.   If acronyms or abbreviations are used, the full translation must be printed.  The only exceptions are when acronyms or abbreviations are used for the name of the University, registered student organizations, or campus buildings.

Persons or organizations that post materials are responsible for the removal of these materials when the date of posting has expired.  An expiration date will be considered as one day following the date of the posted event. Any materials that are removed by the JBK will be thrown away unless prior arrangements have been made.

## Bulletin Boards

A maximum of one (1) flyer per event may be posted on each bulletin board. All bulletin boards will be cleared at the first of each month.

All student election campaign materials must have Student Government approval visible on the poster.

App. 587

## Sandwich Boards

One outdoor sandwich board (two sides) is available for use in designated areas of the Pedestrian Mall.  It may be reserved online and picked up from and returned to the JBK Information Desk.  Posters/signs must be weather resistant, i.e., vinyl, laminated.  Posters/signs must be attached with Velcro or bungee cords, and tape. No tacks, nails, etc. will be allowed.

One indoor sandwich board sign is available for the Commons area.  An organization may use the sandwich board for publicizing its events the day before the event and the day of the event, pending availability.  It may be reserved online and picked up at the JBK Information Desk.  No other sandwich board or standing signs will be allowed in the Commons area or in the hallways of the JBK without student center staff approval.

## Outside Banners

There is space available for Four Banners (Banner A. B, C, & D) to be hung outside the northeast exit of the JBK.

Banners must be reserved online at reservations.wtamu.edu.

Banners must be weather resistant, i.e., vinyl.

Banners must be brought to the JBK Info Desk the week before they are to be hung.

Banners will be taken down after the date of the event.

If the group wants the banner returned, this must be arranged when the reservation is made.

App. 588

## Table Tents

The table tents are available in the JBK Student Center Food Court. Space is available on a weekly basis (Monday - Sunday) only.

All artwork will be submitted electronically via email.

All ads must be received no later than the Monday prior to the week the ad is to run.

The required artwork dimensions are 6.5" wide x 3.75" tall with a .5 white space at the bottom making the finished dimensions 6.5" wide x 4.25" tall with the artwork at the top portion of the card.

All artwork submitted must be either .jpeg, .pdf, .psd, or .tif.  No other formats will be accepted.  Microsoft Publisher or Word documents are unacceptable.  All ads must be proofed and approved by you before sending to us.

## Electronic Signs

Electronic signage will not be allowed for political promotion.
The electronic signage content manager must approve all content of a questionable nature. Content manager reserves the right to reject ads containing content that is in direct competition with JBK vendors or services.

## Floor Stickers

Floor stickers must be approved by JBK staff before putting them out. They can be put down the day before the event and must be picked up directly after the event is over. If the event is several days long, the stickers may remain overnight until the last day of the event.

## Exhibitor Tables

Registered student organizations and University departments may reserve exhibitor table space in the JBK at no cost and must be reserved by 5:00 pm the day before.

Individuals and non-university groups may rent a table space for a daily fee. Non-University Vendors are required to have a sales tax permit and abide by applicable state policies.

If an outside organization is sponsored by a student organization, but the student organization does not benefit, the exhibitor fee will remain. However, if an outside organization is sponsored by a student organization and the student organization benefits in some way, then the fee will be waived.

Exhibitor Table space in the JBK is limited to seven (7) six-foot tables in the Commons.  A

App. 589

maximum of two (2) chairs per table is allowed.

Exhibitor Table space is limited to one (1) table per day per group. Exhibitor tables can be reserved for a maximum of two (2) five consecutive day periods per semester. Additional requests should be submitted for approval one week in advance and are contingent upon available space.

Table space is not available on Dead Day and finals week. Exceptions must be pursued through the VP for Student Affairs.

To keep the flow of traffic thru the commons area, literature may only be handed to persons who express an interest and are in an area immediately adjacent to the assigned table. Any signs or banners used at a table may only be hung from the front of the table or hung from the metal poster strips above the table.

All groups must check in at the JBK Info desk the day of their reservation to obtain their Exhibitor Table permit. The permit must remain prominently displayed on the table during the entire time the exhibitor table space is occupied.

## Sales

Registered student organizations, University departments, and outside vendors may be permitted to sell items in the JBK if they have an approved Exhibitor Table reservation. No items may be sold that conflict with the sales of an auxiliary service (i.e., University Bookstore or Aramark without the auxiliary service director's approval. (See also *Exhibitor Table Reservations*)

Tickets to events sponsored by off campus groups or individuals may be sold upon approval of the Vice President for Student Affairs if a discount is offered to WTAMU students.

## Donation Boxes/Drives

All requests to provide donation boxes and/or drives in the JBK must be placed through the JBK Information Desk.

All donation boxes must be checked regularly and have the following information on the box: contact person with phone number, University organization name, and date(s) of the event.

App. 590

```
 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF TEXAS
 2                  AMARILLO DIVISION

 3   SPECTRUM WT,                )
                                 )
 4        Plaintiff,             )
                                 )
 5   v.                          )   Case No. 2:23-cv-00048
                                 )
 6   WALTER WENDLER, in his      )
     official capacity as the    )
 7   President of West Texas     )
     A&M University, et al.,      )
 8                               )
          Defendants.            )
 9

10

11

12

13

14   ---------------------------------------------------------
              ORAL DEPOSITION OF SHAWN FOUTS
15         DECEMBER 10, 2025 - CANYON, TEXAS
     ---------------------------------------------------------
16

17

18

19

20        ORAL DEPOSITION OF SHAWN FOUTS, produced as a
     witness at the instance of the PLAINTIFF and duly sworn,
21   was taken in the above styled and numbered cause on
     DECEMBER 10, 2025, from 9:04 a.m. to 2:41 p.m., at the
22   offices of WEST TEXAS A&M UNIVERSITY, Old Main Building,
     Room 317, Canyon, Texas, before SHARON D. LIVINGSTON,
23   CSR-RPR, in and for the State of Texas, reported by
     machine shorthand, and pursuant to the Federal Rules of
24   Civil Procedure.

25
```

```
 1                    A P P E A R A N C E S

 2   FOR THE PLAINTIFF:
          Mr. JT Morris
 3        FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
          700 Pennsylvania Avenue, SE, Suite 340
 4        Washington, DC 20003
          (215) 717-3473
 5        Jt.morris@thefire.org
     - and -
 6        Mr. Adam Steinbaugh
          FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
 7        510 Walnut Street, Suite 900
          Philadelphia, Pennsylvania 19106
 8        (215) 717-3473
          Adam@thefire.org
 9
     FOR THE DEFENDANTS:
10        Mr. David Bryant
          Ms. Munera Al-Fuhaid
11        OFFICE OF THE TEXAS ATTORNEY GENERAL
          300 West 15th Street
12        Austin, Texas 78701
          (512) 463-2100
13        David.bryant@oag.texas.gov
          Munera.al-fuhaid@oag.texas.gov
14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                      INDEX
                                              PAGE
2    Appearances ------------------------------------   2

3    Index ------------------------------------------   3

4    Index of Exhibits ------------------------------ 3-5

5    SHAWN FOUTS
         Examination by Mr. Steinbaugh -----------------   6
6        Examination by Mr. Bryant --------------------- 152
         Re-examination by Mr. Steinbaugh ------------- 162
7        Re-examination by Mr. Bryant ----------------- 166

8    Changes and Signature --------------------------- 169

9    Reporter's Certification ------------------------ 171

10                  INDEX OF EXHIBITS

11   NUMBER       DESCRIPTION                         PAGE

12    51     Amended Notice of Rule 30(b)(6) Deposition -   7

13    52     Expressive Activity on Campus Policy 08.02
             Approved 11-13-25 -------------------------  18
14
      53     Expressive Activity on Campus Policy
15           08.02.01 Approved 11-13-25 ----------------  19

16    54     Expressive Activity on Campus Policy
             08.99.99.W1 Revised 7-28-25 ---------------  20
17
      55     Events Listing for Various Years ----------  28
18
      56     Facility Use Request Procedure Policy
19           24.01.01.WO.01 Revised 3-1-17 -------------  31

20    57     Political Campaign Events in Facilities
             Under the Control of West Texas A&M Policy
21           07.03.01.W1 Revised 3-22-18 ---------------  32

22    58     West Texas A&M Mission Statement ----------  33

23    59     West Texas A&M Venues at WTAMU ------------  36

24    60     Theknot.com Website West Texas A&M University
             Wedding Venues ----------------------------  38
25
```

PANHANDLE COURT REPORTERS, LLC - 806.373.0602

App. 593

INDEX OF EXHIBITS (CONTINUED)

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 61 | 25 Live Screenshots ----------------------- | 39 |
| 62 | Jack B. Kelly Student Center Procedures and Guidelines Revised 3-5-25 ------------------ | 41 |
| 63 | WT Campus Organizations Handbook ----------- | 55 |
| 64 | Video of University Sing ------------------- | 66 |
| 65 | First Amended Verified Complaint for Civil Rights Violations ------------------------- | 66 |
| 66 | Defendant's Answer to Plaintiffs' Amended Complaint --------------------------------- | 67 |
| 67 | Spreadsheet Listing Reservations Made and Status --------------------------------------- | 72 |
| 68 | The Prairie Article Herdsmen Hearts Hosts Buff-A-Whoa Drag Show --------------------- | 76 |
| 69 | Screenshots from Flickr Website ----------- | 77 |
| 70 | Presidential Actions Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government - | 79 |
| 71 | Video of Jingle Mingle --------------------- | 81 |
| 72 | WT Get Involved Instagram Post for Gabriel Holmes Event ------------------------------- | 81 |
| 73 | WT Get Involved Instagram Post for Events Schedule ------------------------------------ | 82 |
| 74 | WTAMU Student Event Calendar 9-13-24 ------- | 84 |
| 75 | Email Chain 3-21-24 through 3-27-24 With Chari Hill, Shawn Fouts, and Chris Thomas -- | 91 |
| 76 | Series of Chats 4-23-25 with Chari Hill and Shawn Fouts --------------------------- | 93 |
| 77 | A Fool's Drag Show Reservation Comments ---- | 99 |

App. 594

1  information to the event are included on the marketing

2  material.

3      Q.   I want to turn back to this chat.

4           You said, "It's not much of a fundraiser

5  with an anticipated audience of 100, and after all

6  expenses as Barrett lists them, there is not much left

7  to send to the Trevor Project."

8           What did you mean by that?

9      A.   When looking at the projected maximum audience

10  and the expenses that could possibly be incurred, it

11  seemed that their fundraising efforts weren't generating

12  much of a return.

13      Q.   What kind of expenses would you be concerned

14  that they were incurring here?

15      A.   They were originally providing snacks and

16  drinks free of charge, and knowing the cost of buying

17  snacks and drinks for 100 people, it can be pretty

18  expensive.

19      Q.   Is that sort of the logistics that JBK staff

20  can work with student organizations to resolve?

21      A.   Oftentimes it would just be brought to their

22  attention; "if this is a fundraiser, have you considered

23  all costs involved?"

24      Q.   You then say, "A broader issue is whether or

25  not this event is going to cause more division rather

1      A.   Yes.

2      Q.   Is it correct that the verification of the

3  performances for the 2023 drag show was entirely up to

4  Spectrum?

5      A.   Yes, sir.

6      Q.   There wasn't any review of that by you or

7  anybody on your staff?

8      A.   No.   Barrett had agreed to be the one

9  responsible.

10      Q.   Did you know that he was a drag performer

11  himself?

12      A.   No.

13      Q.   And assuming he was, it was a drag performer

14  saying the drag performances were acceptable?

15      A.   Could have been, yes.

16      Q.   Was it also true that you and your staff took

17  Spectrum's word on the issue of whether or not the

18  performances would be suitable for minors over 13?

19      A.   Yes.

20      Q.   You didn't do any determination of that

21  yourself, or any verification of any kind?

22      A.   No, sir.

23      Q.   There was a reference in your testimony to

24  "mandatory LGBTQ-plus training."

25          Do you know who provided or was to provide

## *Access 4 All, Inc. v. Wintergreen Commer. P'ship, LTD.*

United States District Court for the Northern District of Texas, Dallas Division

November 7, 2005, Decided ; November 7, 2005, Filed

CIVIL ACTION NO. 3:05-CV-1307-G

### Reporter

2005 U.S. Dist. LEXIS 26935 *; 2005 WL 2989307

ACCESS 4 ALL, INC., a Florida not for profit corporation, and FELLX ESPOSITO, Individually, Plaintiffs, VS. WINTERGREEN COMMERCIAL PARTNERSHIP, LTD., a Texas Limited Partnership, Defendant.

## Case Summary

### Procedural Posture

In an action seeking injunctive relief under Title III of the Americans with Disabilities Act, *42 U.S.C.S. § 12181 et seq.*, defendant limited partnership moved to dismiss the claims of plaintiffs, an individual and a non-profit corporation, for lack of standing.

### Overview

The individual traveled to the Dallas area and stayed at the partnership's property. He encountered architectural barriers that allegedly endangered his safety. The partnership presented the court with a facial attack on the standing of each plaintiff, asserting the individual lacked standing because he had not suffered an injury in fact, and the non-profit corporation could not establish either organizational or associational standing. The court concluded the individual did not establish the requirements for standing in a suit for injunctive relief. His alleged past injury--suffered during a single visit to a property--alone was not sufficient. The definitiveness of his intent to return did not weigh in the individual's favor. The complaint merely alleged that he planned to return to the property to avail himself of the goods and services offered to the public at the property. Finally, the individual did not present evidence that he travelled to the area often. The non-profit corporation also did not establish standing. Inter alia, it did not allege any injury to itself as an organization, such as the need to divert funds in order to challenge the allegedly illegal conduct.

### Outcome

The motion to dismiss was granted.

**Counsel:** [*1] For Access 4 All, Inc, a Florida not for profit corporation, Felix Esposito, Plaintiffs: John Paul Fuller, Tracie Lynn Dickerson, Fuller Fuller & Associates, North Miami, FL; Gerald J Smith, Sr, Smith Law Firm, Dallas, TX.

For Wintergreen Commercial Partnership, Ltd, A Texas Limited Partnership, Defendant: Sherry L Travers, Thompson Coe Cousins & Irons -- Dallas, Dallas, TX; Kevin S Mullen, Thompson Coe Cousins & Irons -- Dallas, Dallas, TX.

**Judges:** A. JOE FISH, CHIEF JUDGE.

**Opinion by:** A. JOE FISH

## Opinion

### MEMORANDUM OPINION AND ORDER

Before the court is the motion of the defendant Wintergreen Commercial Partnership, Limited

2005 U.S. Dist. LEXIS 26935, *1

("Wintergreen") to dismiss the plaintiffs' claims against it for lack of standing. For the reasons stated below, the motion is granted.

I. <u>BACKGROUND</u>

The plaintiff Felix Esposito ("Esposito") is a Florida resident and a member of the plaintiff Access 4 All, Inc. ("Access 4 All"), a non profit corporation formed under the laws of Florida. Plaintiff's [sic] Original Complaint ("Complaint") PP 1, 2; Felix Esposito's Affidavit ("Esposito Affidavit") P 6, *attached to* Response to Defendant's Motion to Dismiss and Brief in Support Thereof ("Response") as **[*2]** Exhibit 1. Because Esposito suffers from a neuro-psychological disorder, he requires the use of a wheelchair for ambulation. Esposito Affidavit P 1. As an organization whose members include "individuals with disabilities as defined by the [Americans with Disabilities Act]," Access 4 All's stated purpose is "to represent the interest of its members by assuring places of public accommodation are accessible to and usable by the disabled and that its members are not discriminated against because of their disabilities." Complaint P 11.

In April 2005, Esposito traveled to the Dallas area and stayed at Wintergreen's property, the Holiday Inn at 1515 North Beckley Drive in De Soto, Texas. Esposito Affidavit PP 3, 4; Complaint P 3. There Esposito encountered architectural barriers that allegedly endangered his safety. Esposito Affidavit P 4; Complaint P 13. Shortly thereafter, Esposito and Access 4 All filed this suit seeking injunctive relief under Title III of the Americans with Disabilities Act, *42 U.S.C. § 12181 et seq.* ("ADA"). [1] Complaint P 28. Wintergreen then filed the instant motion to dismiss for lack of standing. Docket Sheet; Defendant's Motion to **[*3]** Dismiss and Brief in Support ("Motion

to Dismiss").

II. <u>ANALYSIS</u>

A.  Standard  for  *Rule 12(b)(1)* Motion  to Dismiss

*Rule 12(b)(1) of the Federal Rules of Civil Procedure* authorizes the dismissal of a case for lack of jurisdiction over the subject matter. *See FED. R. CIV. P. 12(b)(1)*. A motion to dismiss pursuant to *Rule 12(b)(1)* for lack of subject matter jurisdiction must be considered by the court before any other challenge because "the court must find jurisdiction before determining the validity of a claim." *Moran v. Kingdom of Saudi Arabia, 27 F.3d 169, 172 (5th Cir. 1994)* (internal citation omitted); see also *RuhrgasAG v. Marathon Oil Company, 526 U.S. 574, 577, 119 S. Ct. 1563, 143 L. Ed. 2d 760 (1999)* ("The requirement that jurisdiction be established as a threshold matter . . . is inflexible and without exception") **[*4]** (citation and internal quotation marks omitted). On a *Rule 12(b)(1)* motion, which "concerns the court's very power to hear the case . . . [,] the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case.'" *MDPhysicians & Associates, Inc. v. State Board of Insurance, 957 F.2d 178, 181 (5th Cir.)* (quoting *Williamson v. Tucker, 645 F.2d 404, 413 (5th Cir.)*, *cert. denied*, *454 U.S. 897, 102 S. Ct. 396, 70 L. Ed. 2d 212 (1981)*), *cert. denied*, *506 U.S. 861, 113 S. Ct. 179, 121 L. Ed. 2d 125 (1992)*. In ruling on a motion to dismiss under *Rule 12(b)(1)*, the court may rely on: "1) the complaint alone; 2) the complaint supplemented by undisputed facts; or 3) the complaint supplemented by undisputed facts and the court's resolution of disputed facts." *MCG, Inc. v. Great Western Energy Corporation, 896 F.2d 170, 176 (5th Cir. 1990)* (citing *Williamson, 645 F.2d at 413*).

The standard for reviewing a motion under *Rule 12(b)(1)*, however, depends on whether

---

[1] Under Title III, only injunctive relief is permitted. *42 U.S.C. § 12188(a)*; *28 C.F.R. § 36.501*.

Case 2:23-cv-00048-Z    Document 152    Filed 01/06/26    Page 601 of 663    PageID 3207

Page 3 of 7
2005 U.S. Dist. LEXIS 26935, *4

the defendant makes a facial or factual attack on the plaintiffs' complaint. *Paterson v. Weinberger, 644 F.2d 521, 523 (5th Cir. 1981)*. The **[*5]** defendant makes a facial attack by the mere filing of a *Rule 12(b)(1)* motion. *Id.* In that case, the trial court must look at the sufficiency of the allegations in the complaint, which are presumed to be true. *Id.* The defendant makes a factual attack, on the other hand, by providing affidavits, testimony, or other evidentiary materials challenging the jurisdiction of the court. *Id.* In a factual attack, the plaintiffs are also required to submit facts in support of jurisdiction and have the burden of proving, by a preponderance of the evidence, that the trial court has subject matter jurisdiction over the claims. *Middle South Energy, Inc. v. City of New Orleans, 800 F.2d 488, 490 (5th Cir. 1986)*.

Importantly, lack of Article III standing is a defect in subject matter jurisdiction. *See Bender v. Williamsport Area School District, 475 U.S. 534, 541-42, 106 S. Ct. 1326, 89 L. Ed. 2d 501 (1986)*; *O'Shea v. Littleton, 414 U.S. 488, 493-95, 94 S. Ct. 669, 38 L. Ed. 2d 674 (1974)*. Therefore, when a plaintiff lacks standing to sue in federal court, it is appropriate for the court to dismiss the action, pursuant to *Rule 12(b)(1)*, for want of subject matter jurisdiction. *See Chair King, Inc. v. Houston Cellular Corporation, 131 F.3d 507, 509 (5th Cir. 1997)*; **[*6]** *Bender, 475 U.S. at 541*.

In the instant motion, Wintergreen has presented the court with a facial attack on the standing of each plaintiff, asserting (without evidentiary support) that Esposito lacks standing because "he has not suffered an injury in fact," Motion to Dismiss at 3, and Access 4 All cannot establish either organizational or associational standing. *Id.* at 6. For the reasons discussed below, the court finds that neither Esposito nor Access 4 All have met the requirements for Article III

standing, and therefore Wintergreen's motion to dismiss must be granted.

B. Plaintiff Esposito's Standing

Article III of the United States Constitution limits federal courts' jurisdiction to "cases" and "controversies." *U.S. CONST. art. III § 2*. Standing -- *i.e.*, the need to show that the plaintiffs have a direct, personal stake in the outcome of the suit -- is an "essential and unchanging part" of this case-or-controversy requirement. *Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)*. "The federal courts are under an independent obligation to examine their own jurisdiction, and standing is perhaps the most important of [the jurisdictional] **[*7]** doctrines." *United States v. Hays, 515 U.S. 737, 742, 115 S. Ct. 2431, 132 L. Ed. 2d 635 (1995)* (quoting *FW/PBS, Inc. v. Dallas, 493 U.S. 215, 230-31, 110 S. Ct. 596, 107 L. Ed. 2d 603 (1990))* (internal quotation marks omitted). As the Supreme Court explained in *Lujan*, the "irreducible constitutional minimum of standing" has three elements:

> First, the plaintiff[s] must have suffered an "injury in fact" -- an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not conjectural' or hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of -- the injury has to be "fairly . . . trace[able] to the challenged action of the defendant[s], and not . . . the result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*504 U.S. at 560-61* (internal citations and footnote omitted); see also *Vermont Agency of Natural Resources v. United States ex rel. Stevens, 529 U.S. 765, 771, 120 S. Ct. 1858, 146 L. Ed. 2d 836 (2000)*; *Public Citizen, Inc.*

*v. Bomer, 274 F.3d 212, 217-18 (5th Cir. 2001).* **[*8]** All three elements must exist to establish Article III standing. *Vermont Agency, 529 U.S. at 771.* Because these elements "are not mere pleading requirements but rather an indispensable part of the plaintiff[s'] case, each element must be supported in the same way as any other matter on which the plaintiff[s] bear[] the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of litigation." *Lujan, 504 U.S. at 561.*

In addition, standing must exist at the time an action is commenced. See *Lujan, 504 U.S. at 569-70 n.4* ("The existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed."). Thus, "belated efforts to bolster standing are futile." *Equal Access for All, Inc. v. Hughes Resort, Inc.*, **No**. 5:04-CV-178-MCR, 2005 WL 2001740, at *5 (N.D. Fla. Aug. 10, 2005) (quoting *Moyer v. Walt Disney World Company, 146 F. Supp. 2d 1249, 1253 (M.D. Fla. 2000)).*

Standing is also required to obtain injunctive relief. *Johnson v. Moore, 958 F.2d 92, 94 (5th Cir. 1992).* The plaintiff must show that he " **[*9]** has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged . . . conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical.'" *Id.* (quoting *City of Los Angeles v. Lyons, 461 U.S. 95, 102, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983)).* In the context of ADA claims, courts evaluate whether future injury is probable by determining whether the plaintiff is likely to return to the defendant's business. See, *e.g., Cortez v. National Basketball Association, 960 F. Supp. 113, 117-18 (W.D. Tex. 1997)* (finding that the plaintiff lacked standing to seek injunctive relief because she did not allege that she intended to return to the defendant's events in the future). When

analyzing this likelihood of return, courts have examined such factors as: (1) the proximity of the defendant's business to the plaintiff's residence, (2) the plaintiff's past patronage of the defendant's business, (3) the definitiveness of the plaintiff's plans to return, and (4) the plaintiff's frequency of travel near the defendant. *D'Lil v. Stardust Vacation Club, 2001 U.S. Dist. LEXIS 23309, No. 2:00-CV-01496, 2001 WL 1825832, at *3 (E.D. [*10] Cal. Dec. 21, 2001);* see also *Molski v. Mandarin Touch Restaurant, 385 F. Supp. 2d 1042, 1045 (C.D. Cal. 2005)* (citing *Molski v. Arby's Huntington Beach, 359 F. Supp. 2d 938, 947 n.10 (C.D. Cal. 2005)).* Otherwise, "such someday intentions' -- without any description of concrete plans, or indeed even any specification of *when* the some day will be -- do not support a finding of the actual or imminent' injury that our cases require." *Lujan, 504 U.S. at 564* (emphasis in original).

In the case *sub judice*, Esposito has not shown that he satisfies the requirements for standing in a suit for injunctive relief. Regarding the first factor -- proximity -- Esposito is a resident of Florida and defendant's business is in Texas. Although some courts have found that proximity bears heavily on the standing analysis, see *Parr v. L&L Drive-Inn Restaurant, 96 F. Supp. 2d 1065, 1079-80 (D. Haw. 2000)* (court found future return visits sufficient to confer standing where the plaintiff lived near fast food restaurant, the plaintiff patronized other franchised locations, and the impulse nature of visiting such establishments did **[*11]** not necessitate reservations), *Delil v. El Torito Restaurants, Inc., 1997 U.S. Dist. LEXIS 22788, No. C 94-3900-CAL, 1997 WL 714866, at *4 (N.D. Cal. June 24, 1997)* (court found the plaintiff lacked standing because she lived over 100 miles from restaurant and had not, in the four years since the incident of discrimination, attempted to visit the restaurant), in the instant context involving a hotel, this factor is not similarly applicable.

Therefore, this factor neither bolsters nor undermines Esposito in his effort to establish standing. As for Esposito's past patronage of Wintergreen's De Soto business, "past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by continuing, present adverse effect." *Lyons, 461 U.S. at 102* (citation omitted). Therefore, Esposito's alleged past injury -- suffered during a single visit to a De Soto Holiday Inn in April 2005 -- alone is not sufficient. See *Equal Access*, 2005 WL 2001740, at *6. Nor does the third factor, the definitiveness of plaintiff's intent to return, weigh in Esposito's favor. The complaint merely alleges that Esposito "plans to **[*12]** return to the property to avail himself of the goods and services offered to the public at the property." Complaint P 12. Esposito indeed has a confirmed reservation to return to the De Soto hotel on December 23, 2005. *See* Esposito Affidavit P 5. However, this reservation was not made until August 19, 2005, after both the complaint and this motion to dismiss were filed. *See* Defendant's Reply to Plaintiffs' Response to Defendant's Motion to Dismiss at 3 n.2. As standing is determined at the time the complaint is filed, the court will not construe this "belated effort[] to bolster standing" as beneficial to Esposito. See *Moyer, 146 F. Supp. at 1253* (the plaintiff's visit to the defendant's business after the complaint was filed did not confer standing); *Brother v. Tiger Partner, LLC, 331 F. Supp. 2d 1368, 1373 (M.D. Fla. 2004)* (the fact that the plaintiff made a reservation at the defendant's hotel after the complaint was filed was immaterial because standing is determined as of the date the suit is filed). The final factor looks to the plaintiff's frequency of travel near the defendant. Esposito has not presented any evidence that he travels **[*13]** often to the De Soto area. He merely asserts that, as a retiree, he "frequently travel[s]." Esposito Affidavit P 2. Without additional evidence or allegations that

Esposito travels frequently to this area and would have need to stay at this particular hotel, this factor does not favor Esposito, either. See, *e.g., Disabled in Action of Metropolitan New York v. Trump International Hotel & Tower, 2003 U.S. Dist. LEXIS 5145, No. 01 Civ. 5518 (MBM), 2003 WL 1751785, at *8 (S.D.N.Y. Apr. 2, 2003)* (court found standing where the plaintiffs live in New York and have been to the defendant's restaurant in the past); *Association for Disabled Americans, Inc. v. Claypool Holdings LLC, 2001 U.S. Dist. LEXIS 23729, No. IP-00-0344-C-T/G, 2001 WL 1112109, at *20 (S.D. Ind. Aug. 6, 2001)* (court found standing where the plaintiff visited the area regularly for family occasions and expressed a desire to stay at the defendant's hotel); *Rosenkrantz v. Markopoulos, 254 F. Supp. 2d 1250, 1253 (M.D. Fla. 2003)* (court found that the plaintiff lacked standing because he traveled only twice a year and other hotels were closer to his destination). In sum, Esposito has not sustained his burden of establishing "actual **[*14]** or imminent injury" necessary for a finding of standing. Therefore, the court does not have subject matter jurisdiction over Esposito's claims against Wintergreen, and his claims must be dismissed.

C. Plaintiff Access 4 All's Standing

An organization may assert standing either on its own behalf (organizational) or as the representative of its members (representational). See *Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333, 341-42, 97 S. Ct. 2434, 53 L. Ed. 2d 383 (1977)*. A plaintiff choosing to assert organizational standing must be able to demonstrate some injury it has suffered that meets the constitutional standing requirements as well as the prudential limitations on standing, unless Congress evidenced a clear intent to eliminate those prudential limitations under the statute in question. See *Havens*

Case 2:23-cv-00048-Z    Document 152    Filed 01/06/26    Page 604 of 663    PageID 3210

Page 6 of 7
2005 U.S. Dist. LEXIS 26935, *14

*Realty Corporation v. Coleman, 455 U.S. 363, 378-79, 102 S. Ct. 1114, 71 L. Ed. 2d 214 (1982)*; *Association for Retarded Citizens of Dallas v. Dallas County Mental Health & Mental Retardation Center Board of Trustees, 19 F.3d 241, 243-44 (5th Cir. 1994)*. The court must determine whether the group has "alleged such a personal stake in the outcome of the controversy as to warrant **[*15]** [] invocation of federal-court jurisdiction." *Havens Realty, 455 U.S. at 378-79* (internal quotation marks and citations omitted). A "personal stake" includes an organization challenging "conduct that impedes its ability to attract members, to raise revenues, or to fulfill its purposes." *Kessler Institute for Rehabilitation, Inc. v. Mayor and Council of Borough of Essex Fells, 876 F. Supp. 641, 656 (D.N.J. 1995)*. On the other hand, a plaintiff has representational standing when (1) at least one of its members would otherwise have standing to sue in his own right, (2) the interests at stake are germane to the organization's purpose, and (3) neither the claim asserted nor the relief requested requires the participation of the individual members in the lawsuit. See *Hunt, 432 U.S. at 343*; *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc., 517 U.S. 544, 552-53, 116 S. Ct. 1529, 134 L. Ed. 2d 758 (1996)*.

Access 4 All has failed to make a showing of an injury-in-fact sufficient to confer organizational standing. [2] Although Access 4 All alleges that it and its members "have suffered and will continue to suffer direct and indirect injury **[*16]** as a result of the Defendant's discrimination," Complaint P 11,

this bare assertion is not enough to articulate an "invasion of a legally-protected interest," *Lujan, 504 U.S. at 560*, affecting *itself* in its own right, rather than its members. See also *Equal Access for All*, 2005 WL 2001740, at *7 (an allegation of "frustration" of the organization's stated institutional purpose is insufficient to confer standing); *Kessler, 876 F. Supp. at 656* (standing is not established by the organization's mere allegation that "it has an ideological or abstract social interest that is adversely affected by the challenged action"). Access 4 All has not alleged any injury to itself as an organization, such as the need to divert funds in order to challenge Wintergreen's allegedly illegal conduct. See *Kessler, 876 F. Supp. at 656*. As a result, Access 4 All has not established organizational standing.

**[*17]** Regarding representational standing, Access 4 All has mentioned only one member of its organization with individual standing to bring this suit against Wintergreen: Esposito. As discussed above, however, Esposito has not been shown to have standing. In the absence of other members with individual standing, Access 4 All cannot satisfy the constitutional requirements for representational standing. Wintergreen's motion to dismiss Access 4 All's claims is therefore granted. [3]

**[*18]** III. <u>CONCLUSION</u>

For the reasons stated above, Wintergreen's motion to dismiss for lack of standing is

---

[2] While Wintergreen contests Access 4 All's organizational standing in its motion to dismiss, Access 4 All did not address those arguments. *See generally* Response; Plaintiffs' Surreply to Defendant's Reply to Plaintiffs' Response to Defendant's Motion to Dismiss; Complaint P 11. Instead, Access 4 All addresses its standing under the *Hunt* test analyzing representational standing. Response at 6-9. Consequently, Access 4 All has not shown that it has organizational standing.

[3] All is not lost, though, as *42 U.S.C. § 12188(b)(1)(B)* permits the Attorney General to bring a civil suit to enforce Title III. See *Delil, 1997 U.S. Dist. LEXIS 22788, 1997 WL 714866, at *5* (the Attorney General may bring a civil action "if the Attorney General has reasonable cause to believe that . . . any person or group of persons has been discriminated against . . . and such discrimination raises an issue of general public importance"). Therefore, dismissal of this action does not preclude remediation of any alleged discrimination by Wintergreen.

**GRANTED**.

**SO ORDERED**.

November 7, 2005.

A. JOE FISH

CHIEF JUDGE


## JUDGMENT

This judgment is entered pursuant to *F.R. CIV. P. 58* and the memorandum opinion and order of this date. For the reasons stated in that memorandum opinion and order, it is **ORDERED** that this case is **DISMISSED**, at the plaintiffs' cost, for lack of subject matter jurisdiction.

November 7, 2005.

A. JOE FISH

CHIEF JUDGE

---

**End of Document**

## *Allied World Surplus Lines v. Blue Cross & Blue Shield of Miss.*

United States District Court for the Southern District of Mississippi, Northern Division

January 18, 2018, Decided; January 18, 2018, Filed

CIVIL ACTION NO. 3:17-CV-251-DPJ-FKB

**Reporter**

2018 U.S. Dist. LEXIS 8021 *; 2018-1 Trade Cas. (CCH) P80,253; 2018 WL 476064

ALLIED WORLD SURPLUS LINES, PLAINTIFF v. BLUE CROSS & BLUE SHIELD OF MISSISSIPPI, DEFENDANT

**Counsel:** **[*1]** For Allied World Surplus Lines Insurance Company, formerly known as Darwin Select Insurance Company, Allied World Specialty Insurance Company, formerly known as Darwin National Assurance Company, Plaintiffs: Markham R. Leventhal, LEAD ATTORNEY, CARLTON FIELDS JORDEN BURT, PA - Miami, Miami, FL; Heidi Hudson Raschke - PHV, PRO HAC VICE, CARLTON FIELDS JORDEN BURT, PA - Tampa, Tampa, FL; Steven J. Brodie - PHV, PRO HAC VICE, CARLTON FIELDS JORDEN BURT, PA - Miami, Miami, FL.

For Blue Cross & Blue Shield of MS, a Mutual Insurance Company, Defendant: James A. McCullough, II, LEAD ATTORNEY, BRUNINI, GRANTHAM, GROWER & HEWES, PLLC-Jackson, Jackson, MS.

**Judges:** Daniel P. Jordan III, CHIEF UNITED STATES DISTRICT JUDGE.

**Opinion by:** Daniel P. Jordan III

## Opinion

ORDER

Blue Cross and Blue Shield of Mississippi ("Blue Cross") asks the Court to stay or dismiss this declaratory judgment action due to underlying multi-district litigation ("MDL") involving over fifty antitrust actions. The insurer, Allied World Surplus Lines Insurance Company ("Allied"), opposes the request.

I. Background

Blue Cross is a defendant in multiple lawsuits filed by subscribers and medical providers alleging that its business practices violated federal antitrust **[*2]** laws. Am. Compl. [14] at 2. These lawsuits were consolidated and transferred to the United States District Court for the Northern District of Alabama, creating the MDL, *In Re: Blue Cross Blue Shield Antitrust Litigation. Id.* at 3.

Allied filed this declaratory-judgment action seeking a determination of its coverage obligations under two policies issued to Blue Cross. In very general terms, Allied takes the position that it does not owe coverage for any losses or defense expenses under either policy, primarily because the MDL is related to a prior case. *Id.* at 18-20. Since the filing of the declaratory-judgment action and the instant motion, Allied advised Blue Cross of its determination that no coverage exists under the policies and ceased advancing defense expenses. June 14, 2017 Letter [18-1].

II. Analysis

Blue Cross presents essentially two arguments in favor of its motion to stay or dismiss the declaratory-judgment action. First, it says the parties' obligation to engage in alternative dispute resolution prior to filing suit has not been satisfied. Second, it argues that because the MDL is ongoing, the question of Allied's indemnity obligations is premature. The Court

finds the second argument persuasive but declines to dismiss the action. Instead, **[\*3]** a stay is appropriate.

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co., 299 U.S. 248, 254, 57 S. Ct. 163, 81 L. Ed. 153 (1936)*. In the same vein, a district court has broad discretion "whether and when to entertain an action under the Declaratory Judgement Act." *Wilton v. Seven Falls Co., 515 U.S. 277, 282, 115 S. Ct. 2137, 132 L. Ed. 2d 214 (1995)*; *see also id. at 287* ("We have repeatedly characterized the Declaratory Judgment Act as 'an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant.'" (quoting *Public Serv. Comm'n of Utah v. Wycoff Co., 344 U.S. 237, 241, 73 S. Ct. 236, 97 L. Ed. 291 (1952)))*. And district courts have routinely opted to stay a declaratory judgment action, or otherwise decline to rule on coverage issues, while the underlying lawsuit is pending. This is particularly true with respect to the duty to indemnify. *See Greenwich Ins. Co. v. Capsco Indus., Inc., No. 1:14-CV-297, 2015 U.S. Dist. LEXIS 183068, 2015 WL 12697093, at \*2 (S.D. Miss. Apr. 13, 2015)* (staying declaratory-judgment action during pendency of underlying state-court action); *Deviney Constr. Co. v. Ace Util. Boring & Trenching, LLC, No. 3:11-CV-468, 2014 U.S. Dist. LEXIS 88658, 2014 WL 2932169, at \*7 (S.D. Miss. June 30, 2014)* (denying summary judgment as to the duty to indemnify, noting "the Court cannot tell whether [the insured] has incurred liability in any of the underlying cases" **[\*4]** and "[a] determination on [the insurer's] indemnity obligations necessarily awaits the outcome of the underlying lawsuits"); *Nationwide Mut. Ins. Co. v. Kavanaugh Supply, LLC, No. 2:11-CV-232, 2013 U.S. Dist. LEXIS 25944, 2013 WL 704924, at \*4 (S.D.*

*Miss. Feb. 26, 2013)* (denying summary judgment as to the duty to indemnify, noting no judgment had been entered in the underlying state-court action); *see also Estate of Bradley v. Royal Surplus Lines Ins. Co., 647 F.3d 524, 531 (5th Cir. 2011)* ("Unlike the duty to defend, which can be determined at the beginning of the lawsuit, an insurer's duty to indemnify generally cannot be ascertained until the completion of litigation, when liability is established, if at all.").[1]

Admittedly, the parties disagree as to whether the duty to indemnify depends on facts yet to be developed in the MDL action. But even Allied admits in a footnote "that issues related to whether any settlement or judgment in the MDL Action constitutes Loss . . . cannot yet be wholly determined" and concedes that it would not oppose a stay "as to those issues." Resp. [17] at 11 n.2.[2] Staying some—but not all—claims usually raises more disputes than it resolves. And it bears repeating that Allied discontinued payment of defense expenses, minimizing the risk of prejudice resulting from a stay of the declaratory-judgment action.

### III. **[\*5]** Conclusion

Accordingly, the Court exercises its discretion to stay the instant declaratory-judgment action, pending further development of the MDL antitrust action. Blue Cross's motion to stay [15] is granted.[3]

---

[1] Of course, district courts retain the authority to decide questions of indemnity while the underlying case is pending when appropriate. *See Allstate Ins. Co. v. Melton, 482 F. Supp. 2d 775 (S.D. Miss. 2007)*.

[2] At least one other district court has partially stayed Allied's declaratory-judgment action on the loss issue, while going forward on the related-claim issue. *Allied World Specialty Ins. Co. v. Independence Blue Cross, No. 17-1463, 2017 U.S. Dist. LEXIS 179962, 2017 WL 4922177, at \*5 (E.D. Pa. Oct. 31, 2017)*.

[3] As mentioned, Blue Cross also says the parties have not satisfied the policy's requirement of non-binding mediation or

**SO ORDERED AND ADJUDGED** this the 18th day of January, 2018.

/s/ *Daniel P. Jordan III*

CHIEF UNITED STATES DISTRICT JUDGE

---

**End of Document**

---

arbitration administered by the American Arbitration Association (AAA). In 2016, the parties participated in non-binding mediation before a retired federal judge, but Blue Cross complains it was not administered by the AAA. Allied responds that Blue Cross waived strict compliance with the policy. It is not clear whether Blue Cross advances this argument because it wants to revisit mediation or it simply wants a stay. Because the Court finds that a stay is appropriate based on the MDL, it declines to address this argument. Of course, if the parties wish to attempt mediation again, or continue their settlement negotiations with Judge Ball, they are encouraged to do so. This Order in no way prohibits either approach.

App. 606

## *Burrell v. Twin Goose, LLC*

United States District Court for the Northern District of Texas, Dallas Division

September 25, 2017, Decided; September 25, 2017, Filed

Civil Action No. 3:16-CV-1079-L

**Reporter**

2017 U.S. Dist. LEXIS 156669 *; 2017 WL 4230499

LEE BURRELL, Plaintiff, v. TWIN GOOSE, LLC and JIAMUL CORPORATION d/b/a MAMA'S DAUGHTERS' DINER, Defendants.

**Prior History:** *Burrell v. Twin Goose, LLC, 2017 U.S. Dist. LEXIS 159924 (N.D. Tex., Jan. 19, 2017)*

**Counsel:** [*1] For Lee Burrell, Plaintiff: Palmer D Bailey, LEAD ATTORNEY, Law Office of Palmer Bailey, Plano, TX.

**Judges:** Sam A. Lindsay, United States District Judge.

**Opinion by:** Sam A. Lindsay

## Opinion

### ORDER

On January 19, 2017, United States Magistrate David L. Horan's entered the Findings, Conclusions and Recommendation of the United States Magistrate Judge ("Report"), recommending that the court deny without prejudice Plaintiff's Motion for Default Judgment and to Dismiss Remaining Claims (Doc. 11), filed August 30, 2016. Plaintiff filed objections to the Report.

Plaintiff moved for default judgment with respect to his claim for alleged violations of *42 U.S.C. § 12182(a)* of the Americans with Disabilities Act ("ADA") for Defendants' alleged failure to accommodate where removal of architectural barriers is readily achievable. In his motion for default judgment, Plaintiff requests in his motion and objections to the Report that the following remaining claims be dismissed without prejudice: (1) discrimination under *section 121.003(a) of the Texas Human Resources Code* for failure to make public accommodations; and (2) violation of the *ADA* for improper alterations.

For relief, Plaintiff requests in his Complaint, with respect to the claim for which he seeks entry of a default judgment, that the court [*2] order Defendants to bring their business into compliance with state and federal law and cease discriminating against Plaintiff now and in the future. He requests that the court "enjoin the Defendants from maintaining [sic] and . . . require that the Defendants remove the architectural barriers that interfere with [his] right to the full and equal enjoyment of the goods, services, facilities, privileges, or accommodations of the Defendants at this Business." Pl.'s Compl. 1. "Plaintiff also seeks a permanent injunction to prevent the Defendants from engaging in these unlawful practices, as well as declaratory relief and attorney's fees and costs of litigation." *Id.* Plaintiff alleges that "the parking" at Mama's Daughter's Diner "is not accessible"; "the route in from the parking is not accessible," "the seating inside the [restaurant] is not accessible"; and "there is no accessible route to the sidewalk next to the [restaurant]." *Id.* at 5. Plaintiff does not elaborate on why he believes the parking, the route from the parking area to the entrance of the restaurant,

Case 2:23-cv-00048-Z   Document 152   Filed 01/06/26   Page 610 of 663   PageID 3216

Page 3 of 4
2017 U.S. Dist. LEXIS 156669, *2

or the seating inside the restaurant are not accessible.

In his motion for default judgment, Plaintiff requests injunctive relief **[*3]** in the form of an order requiring Defendants to:

> remove the architectural barriers and make the modifications necessary to bring the Property that is the subject of this suit into compliance with the standards set forth in the ADAAG within six (6) months from the date of this order in the following ways:
>> 1. Provide accessible parking in the required amount and an accessible route from that parking through the front door of the Restaurant.
>> 2. Provide accessible seating in the Restaurant in the required amount and type.
>> 3. Provide access to an accessible restroom for the disabled patrons.
>> 4. Provide an accessible route from the sidewalk to the front door of the Restaurant.

Pl.'s Mot. 5-6.

The magistrate judge recommended that Plaintiff's motion for default judgment and request for injunctive relief be denied without prejudice because Plaintiff has not established the requirements for a permanent injunction under federal law.

In his objections to the Report, Plaintiff contends that he is not required to prove the four requirements for injunctive relief under federal law. Plaintiff contends that he need only prove Defendants violated the ADA by failing to modify the property in question, which **[*4]** is deemed discriminatory as a result of the violations alleged.

*Title III of the ADA* prohibits discrimination against persons with disabilities in places of public accommodation. *42 U.S.C. § 12182(a)*. The ADA provides a private right of action for injunctive relief for "any person who is being

subjected to discrimination on the basis of disability in violation of" *section 12182(b)(2)(A)(iv)* of the ADA. *Id.* § *12182(a)(1)-(2)*. Under *Title III of the ADA*, "discrimination" specifically includes "failure to remove architectural barriers . . . in existing facilities . . . where such removal is readily achievable." *Id. § 12182(b)(2)(A)(iv)*. The ADA defines "readily achievable" as "easily accomplishable and able to be carried out without much difficulty or expense." *Id. § 12181(9)*. The following factors are considered in determining whether removal of architectural barriers is readily achievable: (1) nature and cost of the action; (2) overall financial resources of the facility or facilities involved; (3) number of persons employed at such facility; (4) effect on expenses and resources; (5) impact of such action upon the operation of the facility; (6) overall financial resources of the covered entity; (7) overall size of the business of a covered entity with respect to the number of its **[*5]** employees; (8) the number, type, and location of its facilities; (9) type of operation or operations of the covered entity, including composition, structure, and functions of the workforce of such entity; and (10) geographic separateness, administrative or fiscal relationship of the facility or facilities in question to the covered entity. *Id. § 12181(9)(A)-(D)*.

*Title III of the ADA* is silent as to which party bears the burden of proving that removal of an architectural barrier is, or is not, readily achievable. The Fifth Circuit previously addressed the burden of proof in a case involving a reasonable modification claim under *§ 12182(b)(2)(A)(ii)* and held that a plaintiff bears the initial burden of proving that a modification was requested and that the requested modification was reasonable. *Johnson v. Gambrinus Co./Spoetzl Brewery, 116 F.3d 1052, 1059 (5th Cir. 1997)*. Applying the reasoning in *Johnson* to Plaintiff's claims for alleged violations of *§ 12182(b)(2)(A)(iv)*,

the court concludes that Plaintiff in this case has the initial burden of establishing that he requested the modifications at issue, and the requested modifications are readily achievable.

Even if the court accepts as true the allegations in Plaintiff's Complaint, the allegations regarding the architectural barriers, requested modifications, the reasonableness **[*6]** of the requested modifications, and whether the requested modifications are readily achievable are entirely conclusory and lacking in factual detail and, therefore, insufficient to support entry of a default judgment against Defendants on his claim for violation of § 12182(b)(2)(A)(iv). Moreover, Plaintiff's Complaint does not address all of the specific accommodations that are requested in his motion for default judgment.

The court was unable to find any Fifth Circuit case that supports Plaintiff's contention that he need only prove Defendants violated the ADA by failing to modify the property in question to be entitled to a permanent injunction. Ordinarily, injunctive relief is not awarded automatically in all cases, even when a violation of the law or statute is established. *Winter v. NRDC, Inc., 555 U.S. 7, 32, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008)* ("An injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course."); *Weinberger v. Romero-Barcelo, 456 U.S. 305, 320, 102 S. Ct. 1798, 72 L. Ed. 2d 91 (1982)* (explaining that the "exercise of equitable discretion . . . must include the ability to deny as well as grant injunctive relief," and the specific authority to ensure compliance with a state statute does not require a federal judge exercising equitable power to mechanically grant an injunction for every **[*7]** violation of the law); *Simmons v. Conger, 86 F.3d 1080, 1085 (11th Cir. 1996)* ("Simply because prospective injunctive relief

is available . . . does not mean that such equitable relief is appropriate.").

Here, even assuming, as Plaintiff contends, that he need only establish a violation of the ADA, the court concludes that he has failed to establish a violation because, as explained, his pleadings are inadequate in this regard, and no evidence was submitted in support of his motion for default judgment. On the other hand, the court sees no reasons to deny Plaintiff's request to dismiss without prejudice his other claims. Thus, having reviewed the motion, pleadings, file, Report, and record in this case, and having conducted a de novo review of that portion of the Report to which objection was made, the court determines that the findings and conclusions of the magistrate judge are correct, and **accepts** them as those of the court **as modified** by this order.

Accordingly, the court and **overrules** Plaintiff's objections; **denies without prejudice** Plaintiff's Motion for Default Judgment (Doc. 11) with respect to his ADA claim for alleged violations of § 12182(b)(2)(A)(iv); **grants** his Motion to Dismiss Remaining Claims (Doc. 11); and **dismisses without prejudice** the following **[*8]** claims: (1) discrimination under *section 121.003(a) of the Texas Human Resources Code* for failure to make public accommodations; and (2) violation of the ADA for improper alterations. Any amended motion for default judgment must be filed by **October 23, 2017**, and cure the deficiencies noted in this order. The motion must also include legal authority, preferably from the Fifth Circuit or United State Supreme Court, that supports Plaintiff's contention that proof alone of a violation of § 12182(b)(2)(A)(iv) of the ADA mandates entry of a permanent injunction against Defendants. *Failure to comply with this order will result in dismissal without prejudice of this action under Federal Rule of Civil Procedure 41(b) for failure to comply with a court order or failure to prosecute.*

**It is so ordered** this 25th day of September, 2017.

/s/ Sam A. Lindsay

Sam A. Lindsay

United States District Judge

---

**End of Document**

## *Segovia v. Admiral Realty, Inc.*

United States District Court for the Northern District of Texas, Dallas Division

August 4, 2022, Decided; August 4, 2022, Filed

Civil No. 3:21-cv-2478-L

**Reporter**

2022 U.S. Dist. LEXIS 138621 *; 2022 WL 3104849

RAFAEL SEGOVIA, Plaintiff, v. ADMIRAL REALTY, INC., Defendant.

**Counsel:** **[\*1]** For Rafael Segovia, individually, Plaintiff: Duncan Harold Strickland, LEAD ATTORNEY, Strickland Law Firm PLLC, Grapevine, TX; K Michael Sturgill, Matthew Brantley Sapp, Sapp & Sturgill PLLC, Fort Worth, TX.

For Admiral Realty Inc, a domestic incorporated company, Defendant: Richard M Hunt, LEAD ATTORNEY, Hunt Huey PLLC, Dallas, TX.

**Judges:** Sam A. Lindsay, United States District Judge.

**Opinion by:** Sam A. Lindsay

## Opinion

### MEMORANDUM OPINION AND ORDER

Before the court are Defendant Admiral Realty, Inc.'s Motion to Dismiss Pursuant to *Federal Rule of Civil Procedure 12(b)(1)* and *12(b)(6)* (Doc. 14) ("Motion to Dismiss"), filed on January 11, 2022; and Plaintiff Rafael Segovia's Motion to Strike Defendant's Supplemental Brief (Doc. 24) ("Motion to Strike"), filed on July 7, 2022. After careful consideration of the motions, pleadings and briefs, and applicable law, the court, for the reasons herein explained, **grants** Defendant's Motion to Dismiss (Doc. 14); and **denies as**

**moot** Plaintiff's Motion to Strike (Doc. 24).[*]

### I. Factual and Procedural Background

Plaintiff Rafael Segovia ("Plaintiff" or "Mr. Segovia") initiated this action on October 8, 2021, pursuant to the *Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq.*, and the Americans With Disability Act Accessibility Guidelines ("ADAAG"), 28 C.F.R. 36, against Defendant Admiral Realty, **[\*2]** Inc. ("Defendant" or "Admiral Realty") for its alleged failure to make its property—Shop & Save Mart located at 8110 Harry Hines Blvd., Dallas, Texas 75235 ("Subject Property")— accessible to him, as a wheelchair user. Mr. Segovia filed his First Amended Complaint (Doc. 13) ("Amended Complaint") on December 28, 2021. In his Amended Complaint, he asserts that he "uses a wheelchair for mobility purposes" and is "an independent advocate of the rights of similarly situated disabled persons and is a "tester" for the purpose of enforcing Plaintiff's civil rights, monitoring, determining and ensuring whether places of public accommodation are in compliance with the ADA." Doc. 13 ¶¶ 6-7. He alleges that he "patronized" the Subject Property on or about "July of 2021" and "December of 2021" but was "unable to gain equal access as a disabled patron" due to

---

[*] Mr. Segovia seeks to strike Admiral Realty's supplemental briefing concerning its Motion to Dismiss. The court, in reaching its decision on the Motion to Dismiss, did not consider or rely upon the supplemental briefing. Accordingly, Mr. Segovia's Motion to Strike is moot.

2022 U.S. Dist. LEXIS 138621, *2

physical barriers to access and dangerous conditions in violation of the ADA. Doc. 13 ¶¶ 9-10, 22. Specifically, Mr. Segovia alleges he experienced or observed thirteen ADA violations that prevented him from having "full and equal enjoyment of the goods, services, facilities, privileges, advantages and accommodations of the Subject Property," **[*3]** including "slope variations at the purported accessible parking spaces with changes in direction that have caused an excessive cross slop" and there not being an "accessible route provided within the site from the public sidewalk which serves the facility." *Id.* ¶ 27.

On January 11, 2022, Admiral Realty filed its Motion to Dismiss seeking to dismiss Mr. Segovia's Amended Complaint and its sole cause of action—a claim for injunctive relief. In its Motion to Dismiss, Admiral Realty argues that Mr. Segovia does not have Article III standing to bring this lawsuit. Admiral Realty further argues that even if Mr. Segovia is found to have standing, he has not alleged an imminent future injury that would support injunctive relief, and, thus, he failed to state a claim that complies with *Rule 8 of the Federal Rule of Civil Procedure* and *Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*.

After briefing on the Motion to Dismiss concluded, Admiral Realty filed a supplemental brief (Doc. 21) on June 21, 2022. The supplemental brief advised the court of the Second Circuit's nonbinding opinion in *Calcano v. Swarovski N.A. Ltd., 36 F.4th 68 (2d Cir. June 2, 2022)*. Mr. Segovia filed his Motion to Strike on July 7, 2022, seeking to strike Defendant's supplemental brief for its failure to comply with *Local Civil Rule 56.7*, which requires leave of court to file supplemental pleadings and briefs. **[*4]**

## II. Applicable Law

*Federal Rule of Civil Procedure 12(b)(1)* allows a party to assert lack of subject-matter jurisdiction as a defense to suit. *Fed. R. Civ. P. 12(b)(1)*. Federal district courts are courts of limited jurisdiction and may only exercise such jurisdiction as is expressly conferred by the Constitution and federal statutes. *Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377, 114 S. Ct. 1673, 128 L. Ed. 2d 391 (1994)*. A federal court properly dismisses a case for lack of subject matter jurisdiction when it lacks the statutory or constitutional power to adjudicate the case. *Home Builders Ass'n of Miss., Inc. v. City of Madison, 143 F.3d 1006, 1010 (5th Cir. 1998)*. "The burden of proof for a *Rule 12(b)(1)* motion to dismiss is on the party asserting jurisdiction." *Ramming v. United States, 281 F.3d 158, 161 (5th Cir. 2001)*. "Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Id.* In ruling on a *Rule 12(b)(1)* motion, the court may consider any one of the following: (1) the complaint alone; (2) the complaint plus undisputed facts evidenced in the record; or (3) the complaint, undisputed facts, and the court's resolution of disputed facts. *Lane v. Halliburton, 529 F.3d 548, 557 (5th Cir. 2008)*.

To establish standing, a plaintiff must allege (1) that he/she has suffered an injury in fact, which is both (a) concrete and particularized, meaning it "must affect the plaintiff in a personal and individual way" and (b) actual or imminent, as opposed to conjectural or hypothetical; (2) the existence of a causal connection **[*5]** between the asserted injury-in-fact and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Spokeo, Inc. v. Robins, 578 U.S. 330, 337-41, 136 S. Ct. 1540, 194 L. Ed. 2d*

Case 2:23-cv-00048-Z    Document 152    Filed 01/06/26    Page 615 of 663    PageID 3221

Page 3 of 5
2022 U.S. Dist. LEXIS 138621, *5

*635 (2016)*, *as revised* (May 24, 2016); *Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)*. When a plaintiff seeks injunctive relief, like here, a plaintiff must also show a significant possibility of future harm; it is insufficient to demonstrate only past injury. *See O'Shea v. Littleton, 414 U.S. 488, 495, 94 S. Ct. 669, 38 L. Ed. 2d 674 (1974)*. Mere "'someday intentions'—without any description of concrete plans, or indeed even any specification of when the [someday] will be— do not support a finding of the 'actual or imminent' injury that our cases require." *Lujan, 504 U.S. at 564*.

## III. Analysis

### A. *Rule 12(b)(1)* Motion to Dismiss

In its Motion to Dismiss, Admiral Realty asserts that Mr. Segovia's "abstract interest in the enforcement of the ADA is not a concrete and personal interest sufficient for him to suffer an injury meeting the requirements of Article III." Doc. 15 at 5. In support, Admiral Realty relies on *Laufer v. Mann Hospitality, LLC, 996 F.3d 269 (5th Cir. 2021)*. In response, Mr. Segovia argues that he adequately pleaded that he suffered an injury in fact because he **[*6]** was unable to access and enjoy the services of the Subject Property due to the physical barriers. Doc. 16 at 4. Additionally, he avers that the injury in fact is traceable to the Admiral Realty's conduct because the injury suffered was caused by "Defendant's failure to maintain the premises in compliance with ADA regulations and standards." *Id.* The court determines that the Fifth Circuit's opinions in *Laufer* and *Deutsch v. Annis Enterprises, Inc., 882 F.3d 169, 174 (5th Cir. 2018)*, are instructive to its determination that Mr. Segovia lacks standing.

In *Laufer*, Deborah Laufer sued the owner of a motel under the ADA. *996 F.3d 269*. Ms. Laufer alleged that the motel's website failed to identify rooms that were accessible to disabled persons like her. *Id. at 271*. In affirming the district court's dismissal of Ms. Laufer's claims for lack of standing for want of an injury in fact, the Fifth Circuit held that Ms. Laufer failed to show "how the alleged violations affect[ed] her in a concrete way." *Id. at 272*. Specifically, the Fifth Circuit reasoned that Ms. Laufer visited the online reservation system for the motel "to see if it complied with the law, and nothing more," and failed to adequately allege that her "concrete interest" in the motel was "'at risk from the purported statutory deprivation.'" *Id. at 272-73* (citing **[*7]** *Lee v. Verizon Comm'cns, Inc., 837 F.3d 523, 530 (5th Cir. 2016)*).

Similarly, in *Deutsch*, the plaintiff, who relied on a wheelchair for mobility, sued the owner of a hair salon for its alleged failure to make its store accessible to him and others similarly situated. *882 F.3d at 172*. The Fifth Circuit affirmed the lower court's decision to dismiss for lack of standing because the plaintiff had "not shown how the supposed ADA violations at [the subject property] will negatively affect his day-to-day life." *Id. at 174* (internal quotations omitted). The court further held that "[a]s the district court found, there is **no** evidence that Deutsch has any intent to return—nor is there any reason to believe that Deutsch is affected by [the subject property's] alleged ADA violation in any way, let alone some concrete way." *Id.* (internal quotations omitted).

Mr. Segovia is similarly situated to the plaintiffs in *Laufer* and *Deutsch*. He alleges that he is unable to "unable to gain equal access as a disabled patron" to the Subject Property due to physical barriers preventing his access. Mr. Segovia, however, does not allege that he is affected by the alleged violations in a concrete

Case 2:23-cv-00048-Z    Document 152    Filed 01/06/26    Page 616 of 663    PageID 3222

Page 4 of 5
2022 U.S. Dist. LEXIS 138621, *7

way that will negatively affect his day-to-day life. Further, Mr. Segovia does not allege facts detailing why **[*8]** he visited the Subject Property or how visiting the Subject Property is central to his day-to-day life. Stated another way, Mr. Segovia does not allege how being unable to access the Subject Property disrupts his daily activities. Instead, he only alleges that his "motivation to return to a location, in part, stems from a desire to utilize ADA litigation to make his home community more accessible for Plaintiff and others . . . ." Doc. 13 ¶ 7. In short, Mr. Segovia's plan to return and "patronize" the Subject Property is not related to his day-to-day activities, but instead related to his role as a "tester." This is insufficient to confer standing as he has not shown that being unable to access the Subject Property affects his activities in some concrete or particularized way. *See Laufer, 996 F.3d 269 (5th Cir. 2021)* ("Likewise, Laufer's assumed status as an "ADA tester" does not absolve her of the need to show an injury in fact for standing purposes."). As Mr. Segovia lacks standing, the court will dismiss the action without prejudice for lack of subject matter jurisdiction. Because the court lacks subject matter jurisdiction, it declines to address Admiral Realty's argument made pursuant to *Federal Rule of Civil Procedure 12(b)(6)*.

## B. Further Amendment of [*9]  Pleadings

The provision of *Rule 15(a)(2) of the Federal Rules of Civil Procedure* that states "[t]he court should freely give leave when justice so requires" is not without limitation. The decision to allow amendment of a party's pleadings is within the sound discretion of the district court. *Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962)*; *Norman v. Apache Corp., 19 F.3d 1017, 1021 (5th Cir. 1994)* (citation omitted). In determining whether to allow an amendment of the pleadings, a court considers the following:

"undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." *Foman, 371 U.S. at 182*; *Schiller v. Physicians Res. Grp. Inc., 342 F.3d 563, 566 (5th Cir. 2003)* (citation omitted).

Mr. Segovia did not request to further amend his Amended Complaint. In any event, the court believes that permitting a second pleading attempt would be an inefficient use of the parties' and the court's resources, cause unnecessary and undue delay, and be futile. Moreover, Plaintiff stands by his pleadings and argues that the allegations of his Amended Complaint are adequate to state the claim asserted. The court, therefore, concludes that Mr. Segovia has stated his "best case." *See Schiller, 342 F.3d at 567*. Further, "[a] party who neglects to ask the district court for leave to amend cannot **[*10]**  expect to receive such a dispensation from the court of appeals." *U.S. ex rel. Willard v. Humana Health Plan of Texas Inc., 336 F.3d 375, 387 (5th Cir. 2003)*. For these reasons, the court will not allow Plaintiff a further opportunity to amend his pleadings.

## IV. Conclusion

For the reasons explained, Mr. Segovia has failed to demonstrate that he has "suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical;" therefore, he lacks standing. *Laufer, 996 F.3d at 272* (internal citation and quotations omitted). Accordingly, the court, lacking subject matter jurisdiction to hear this action, **grants** Admiral Realty's Motion to Dismiss (Doc. 14) and **dismisses without prejudice** this action for lack of subject matter jurisdiction. Further, because the court lacks subject jurisdiction, the court **denies as moot**

2022 U.S. Dist. LEXIS 138621, *10

Plaintiff's Motion to Strike (Doc. 24).

**It is so ordered** this 4th day of August, 2022.

/s/ Sam A. Lindsay

Sam A. Lindsay

United States District Judge


## JUDGMENT

The court issues this judgment pursuant to its Memorandum Opinion and Order issued earlier today. It is therefore **ordered, adjudged**, and **decreed** that this action against Admiral Realty, Inc. is **dismissed without prejudice** for lack of standing; and that all reasonable **[*11]** costs of court are assessed against Plaintiff Rafael Segovia.

**It is so ordered** this 4th day of August, 2022.

/s/ Sam A. Lindsay

Sam A. Lindsay

United States District Judge

**End of Document**

## *Springer v. Grisham*

United States Court of Appeals for the Tenth Circuit

October 1, 2025, Filed

Nos. 23-2192 & 23-2194

**Reporter**

2025 U.S. App. LEXIS 25445 *; 2025 LX 470510; 2025 WL 2793787

JAMES SPRINGER, Plaintiff - Appellee Cross-Appellant, v. MICHELLE LUJAN GRISHAM; PATRICK ALLEN; NEW MEXICO DEPARTMENT OF HEALTH, Defendants - Appellants Cross-Appellees, and OFFICE OF THE GOVERNOR, Defendant - Cross-Appellee.BRADY CENTER TO PREVENT GUN VIOLENCE; GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE, DISTRICT OF COLUMBIA; ILLINOIS; CALIFORNIA; COLORADO; CONNECTICUT; DELAWARE; HAWAII; MAINE; MARYLAND; MASSACHUSETTS; MICHIGAN; MINNESOTA; NEVADA; NEW JERSEY; NEW YORK; OREGON; RHODE ISLAND; VERMONT; WASHINGTON; WISCONSIN, Amici Curiae.

**Prior History: [*1]** (D.C. No. 1:23-CV-00781-KWR-LF). (D. N.M.).

*Springer v. Grisham, 704 F. Supp. 3d 1206, 2023 U.S. Dist. LEXIS 217447 (D.N.M., Dec. 5, 2023)*

## Case Summary

### Overview
### Key Legal Holdings

- Springer's vague statement that he 'wishes to carry firearms in playgrounds' without identifying specific playgrounds or dates for visits failed to establish the imminent injury required for Article III standing.

- Even if the New Mexico Department of Health ("NMDOH") public health order were enjoined, Springer would still be prohibited from carrying firearms in parks and playgrounds by unchallenged local ordinances, making his injury non-redressable by a favorable decision.

### Material Facts

- New Mexico Department of Health ("NMDOH") issued a public health order prohibiting firearms in public parks and playgrounds in Albuquerque and Bernalillo County.

- Springer, a Torrance County resident, challenged the order.

- Springer stated he had been prohibited from carrying his firearm at parks he attends but did not identify specific parks or concrete plans.

- Overlapping local ordinances already prohibited firearms in the same locations.

- Springer did not challenge these local ordinances.

### Controlling Law

- Article III standing requirements (injury in

fact, traceability, redressability); Susan B. Anthony List v. Driehaus (pre-enforcement standing); Lujan v. Defenders of Wildlife ('someday intentions' insufficient); Summers v. Earth Island Institute (concrete plans required); California v. Texas (judicial power operates on cases, not abstract legal rules).

## Court Rationale

The court determined Springer lacked standing because: (1) he failed to demonstrate concrete plans to visit specific parks or playgrounds with a firearm, offering only vague intentions without dates or locations; and (2) even if successful in his challenge, overlapping local ordinances would still prohibit him from carrying firearms in these locations, making his injury non-redressable by a favorable decision.

## Outcome
## Procedural Outcome

The Tenth Circuit affirmed the district court's denial of preliminary injunction regarding the playgrounds restriction, reversed the grant of preliminary injunction regarding the parks restriction, and remanded with instructions to dissolve the injunction.

**Counsel:** For JAMES SPRINGER, Plaintiff - Appellant (23-2194): Zachary J. Cook, Zach Cook Law Office, Ruidoso, NM; A. Blair Dunn, WARBA, Albuquerque, NM.

For MICHELLE LUJAN GRISHAM, PATRICK ALLEN, NEW MEXICO DEPARTMENT OF HEALTH, Defendants - Appellees (23-2194): Holly Agajanian, Office of the Governor, Santa Fe, NM; Kyle P. Duffy, State of New Mexico, Santa Fe, NM; Carina Bentata Gryting, William James Taylor, Everytown Law, New York, NY; Cody R. Rogers, Serpe Andrews, Las Cruces, NM.

For OFFICE OF THE GOVERNOR, Defendant - Appellee (23-2194): Holly Agajanian, Office of the Governor, Santa Fe, NM; Kyle P. Duffy, State of New Mexico, Santa Fe, NM; Cody R. Rogers, Serpe Andrews, Las Cruces, NM.

For BRADY CENTER TO PREVENT GUN VIOLENCE, Amicus Curiae (23-2194): Thomas Mark Bondy, Orrick Herrington & Sutcliffe, Washington, DC; Douglas Neal Letter, Brady Center to Prevent Gun Violence, Washington, DC; Robert Hunter Owen, Orrick Herrington & Sutcliffe, Wheeling, WV.

For GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE, Amicus Curiae (23-2194): Kelly Marita Percival, Giffords Law Center to Prevent Gun Violence, San Francisco, CA.

For DISTRICT OF COLUMBIA, Amicus Curiae **[*2]** (23-2194): Marcella Coburn, Office of the Attorney General for the District of Columbia, Washington, DC.

For ILLINOIS, Amicus Curiae (23-2194): Sarah A. Hunger, Jane Elinor Notz, Kwame Raoul, Office of the Attorney General for the State of Illinois, Chicago, IL.

For CALIFORNIA, Amicus Curiae (23-2194): Robert Bonta, Office of the Attorney General for the State of California, Sacramento, CA.

For COLORADO, Amicus Curiae (23-2194): Phil Weiser, Office of the Attorney General for the State of Colorado, Denver, CO.

For CONNECTICUT, Amicus Curiae (23-2194): William Tong, Office of the Attorney General for the State of Connecticut, Hartford, CT.

For DELAWARE, Amicus Curiae (23-2194): Kathleen Jennings, Office of the Attorney General for the State of Delaware, Wilmington, DE.

For HAWAII, Amicus Curiae (23-2194): Anne E. Lopez, Office of the Attorney General for the State of Hawaii, Honolulu, HI.

For MAINE, Amicus Curiae (23-2194): Aaron

M. Frey, Office of the Attorney General for the State of Maine, Augusta, ME.

For MARYLAND, Amicus Curiae (23-2194): Anthony G. Brown, Office of the Attorney General for the State of Maryland, Baltimore, MD.

For MASSACHUSETTS, Amicus Curiae (23-2194): Andrea Joy Campbell, **[*3]** Office of the Attorney General for the State of Massachusetts, Boston, MA.

For MICHIGAN, Amicus Curiae (23-2194): Dana Nessel, Office of the Attorney General for the State of Michigan, Lansing, MI.

For MINNESOTA, Amicus Curiae (23-2194): Keith Ellison, Office of the Attorney General for the State of Minnesota, St. Paul, MN.

For NEVADA, Amicus Curiae (23-2194): Aaron D. Ford, Office of the Attorney General for the State of Nevada, Carson City, NV.

For NEW JERSEY, Amicus Curiae (23-2194): Matthew J. Platkin, Office of the Attorney General for the State of New Jersey, Trenton, NJ.

For NEW YORK, Amicus Curiae (23-2194): Letitia James, Office of the Attorney General for the State of New York, Albany, NY.

For OREGON, Amicus Curiae (23-2194): Ellen F. Rosenblum, Office of the Attorney General for the State of Oregon, Salem, OR.

For RHODE ISLAND, Amicus Curiae (23-2194): Peter F. Neronha, Office of the Attorney General for the State of Rhode Island, Providence, RI.

For VERMONT, Amicus Curiae (23-2194): Charity R. Clark, Attorney General for the State of Vermont, Montpelier, VT.

For WASHINGTON, Amicus Curiae (23-2194): Robert Ferguson, Office of the Attorney General for the State of Washington, Olympia, **[*4]** WA.

For WISCONSIN, Amicus Curiae (23-2194):

Joshua L. Kaul, Office of the Attorney General for the State of Wisconsin, Madison, WI.

For PENNSYLVANIA, Amicus Curiae (23-2194): Michelle A. Henry, Office of the Attorney General for the State of Pennsylvania, Harrisburg, PA.

For JAMES SPRINGER, Plaintiff - Appellee (23-2192): Zachary J. Cook, Zach Cook Law Office, Ruidoso, NM; A. Blair Dunn, WARBA, Albuquerque, NM.

For MICHELLE LUJAN GRISHAM, PATRICK ALLEN, NEW MEXICO DEPARTMENT OF HEALTH, Defendants - Appellants (23-2192): Holly Agajanian, Office of the Governor, Santa Fe, NM; Janet Carter, Carina Bentata Gryting, William James Taylor, Everytown Law, New York, NY; Kyle P. Duffy, State of New Mexico, Santa Fe, NM; Freya Jamison, Lawyers' Committee for Civil Rights Under Law, Washington, DC; Cody R. Rogers, Serpe Andrews, Las Cruces, NM.

For BRADY CENTER TO PREVENT GUN VIOLENCE, Amicus Curiae (23-2192): Thomas Mark Bondy, Orrick Herrington & Sutcliffe, Washington, DC; Douglas Neal Letter, Brady Center to Prevent Gun Violence, Washington, DC; Robert Hunter Owen, Orrick Herrington & Sutcliffe, Wheeling, WV.

For GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE, Amicus Curiae (23-2192): Kelly Marita Percival, **[*5]** Giffords Law Center to Prevent Gun Violence, San Francisco, CA.

For DISTRICT OF COLUMBIA, Amicus Curiae (23-2192): Russell Bogue, Marcella Coburn, Ashwin P. Phatak, Brian L. Schwalb, Caroline S. Van Zile, Office of the Attorney General for the District of Columbia, Washington, DC.

For ILLINOIS, Amicus Curiae (23-2192): Sarah A. Hunger, Jane Elinor Notz, Kwame Raoul, Office of the Attorney General for the State of Illinois, Chicago, IL.

For CALIFORNIA, Amicus Curiae (23-2192):

Robert Bonta, Office of the Attorney General for the State of California, Sacramento, CA.

For COLORADO, Amicus Curiae (23-2192): Phil Weiser, Office of the Attorney General for the State of Colorado, Denver, CO.

For CONNECTICUT, Amicus Curiae (23-2192): William Tong, Office of the Attorney General for the State of Connecticut, Hartford, CT.

For DELAWARE, Amicus Curiae (23-2192): Kathleen Jennings, Office of the Attorney General for the State of Delaware, Wilmington, DE.

For HAWAII, Amicus Curiae (23-2192): Anne E. Lopez, Office of the Attorney General for the State of Hawaii, Honolulu, HI.

For MAINE, Amicus Curiae (23-2192): Aaron M. Frey, Office of the Attorney General for the State of Maine, Augusta, ME.

For MARYLAND, **[*6]** Amicus Curiae (23-2192): Anthony G. Brown, Office of the Attorney General for the State of Maryland, Baltimore, MD.

For MASSACHUSETTS, Amicus Curiae (23-2192): Andrea Joy Campbell, Office of the Attorney General for the State of Massachusetts, Boston, MA.

For MICHIGAN, Amicus Curiae (23-2192): Dana Nessel, Office of the Attorney General for the State of Michigan, Lansing, MI.

For MINNESOTA, Amicus Curiae (23-2192): Keith Ellison, Office of the Attorney General for the State of Minnesota, St. Paul, MN.

For NEVADA, Amicus Curiae (23-2192): Aaron D. Ford, Office of the Attorney General for the State of Nevada, Carson City, NV.

For NEW JERSEY, Amicus Curiae (23-2192): Matthew J. Platkin, Office of the Attorney General for the State of New Jersey, Trenton, NJ.

For NEW YORK, Amicus Curiae (23-2192):

Letitia James, Office of the Attorney General for the State of New York, Albany, NY.

For OREGON, Amicus Curiae (23-2192): Ellen F. Rosenblum, Office of the Attorney General for the State of Oregon, Salem, OR.

For RHODE ISLAND, Amicus Curiae (23-2192): Peter F. Neronha, Office of the Attorney General for the State of Rhode Island, Providence, RI.

For VERMONT, Amicus Curiae (23-2192): Charity R. Clark, **[*7]** Attorney General for the State of Vermont, Montpelier, VT.

For WASHINGTON, Amicus Curiae (23-2192): Robert Ferguson, Office of the Attorney General for the State of Washington, Olympia, WA.

For WISCONSIN, Amicus Curiae (23-2192): Joshua L. Kaul, Office of the Attorney General for the State of Wisconsin, Madison, WI.

For PENNSYLVANIA, Amicus Curiae (23-2192): Michelle A. Henry, Office of the Attorney General for the State of Pennsylvania, Harrisburg, PA.

**Judges:** Before HARTZ, EID, and FEDERICO, Circuit Judges.

**Opinion by:** Allison H. Eid

# Opinion

## ORDER AND JUDGMENT[*]

The New Mexico Department of Health ("NMDOH") issued a public health order that, with limited exceptions, prohibited the possession of firearms in public parks and

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with **Fed. R. App. P. 32.1** and **10th Cir. R. 32.1**.

playgrounds within the City of Albuquerque and Bernalillo County. Shortly thereafter, James Springer, a resident of nearby Torrance County, New Mexico, sued various state officials in federal district court, seeking to enjoin enforcement of that order. He argued that the public health order violated his *Second Amendment*, *First Amendment*, and substantive due process rights.

In the proceedings below, the district court preliminarily enjoined enforcement of the portion of the public health order prohibiting the possession of firearms [*8] in public parks (the "parks restriction") but declined to enjoin enforcement of the order as it related to the prohibition on carrying firearms in playgrounds (the "playgrounds restriction"). The state officials appealed the grant of the preliminary injunction, and Springer cross-appealed the order to the extent it denied him full injunctive relief.

Because Springer lacks standing to challenge the public health order, we affirm in part, reverse in part, and remand with instructions to dissolve the injunction.

**I.**

On September 7, 2023, New Mexico Governor Michelle Lujan Grisham issued an executive order declaring a public health emergency due to increased rates of gun violence in New Mexico. The executive order directed various state agencies and departments, including the NMDOH, to coordinate "an effective . . . response to this public health emergency." App'x at 29. The very next day, pursuant to the executive order, the NMDOH issued the first in a series of public health orders prohibiting firearm possession in certain locations within New Mexico. With certain exceptions, the first public health order prohibited any person from possessing a firearm within New Mexico cities or counties [*9] experiencing high rates of gun violence as well as on state property, at public schools, and in public parks.

Immediately following the issuance of that order, James Springer filed a lawsuit in federal court, seeking an emergency temporary restraining order as well as a preliminary injunction enjoining enforcement of the NMDOH's public health order.[1] In his complaint, he named Governor Michelle Lujan Grisham, the Office of the Governor, Secretary Patrick Allen, and the NMDOH as defendants. But before the district court could rule on Springer's request for a temporary restraining order, the NMDOH amended its public health order. The new order, which the NMDOH issued on October 6, 2023, eliminated many of the restrictions on firearm possession that the original public health order had imposed and narrowed the scope of the remaining restrictions. Because the amended order superseded all prior orders, including the one challenged, the district court denied Springer's request for a temporary restraining order as moot.

Springer then filed a new motion for a preliminary injunction on October 26, 2023, challenging the October 6 public health order. In particular, Springer sought to enjoin [*10] enforcement of the portion of the amended public health order that prohibited the possession of "a firearm . . . in public parks or playgrounds within the City of Albuquerque or Bernalillo County" as facially unconstitutional under the *First Amendment*, the *Second Amendment*, and the *Due Process Clause of the Fourteenth Amendment*. *Id.* at 52.[2] He

---

[1] Springer also sought other forms of relief, including damages, declaratory judgments, and a permanent injunction—none of which are at issue here. *See* App'x at 19-20.

[2] The full text of the challenged provision provides:

No person, other than a law enforcement officer or licensed security officer, or active duty military personnel

argued that there is no "historical tradition of firearm regulation" in public parks or playgrounds sufficient to justify the public health order's complete prohibition of firearms under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022)*. App'x at 44.

In support of the motion, Springer filed a declaration indicating that (1) he is "a resident of Torrance County, New Mexico," (2) he has "been prohibited" by the public health order "from lawfully carrying [his] **[*11]** firearm for [his] and [his] family's protection for most of the months of September and October at the parks that [he] attend[s] for non-scholastic youth sporting events or just to enjoy the beautiful fall weather in Albuquerque during the balloon fiesta," and (3) he "planned to organize and attend a rally in support of the *Second Amendment* to exercise [his] *First Amendment* rights by engaging in the expressive conduct of openly carrying a firearm in Civic Plaza but ha[s] been prohibited from doing so" by the order. *Id.* at 55.

The district court reached a mixed result with respect to Springer's motion. The court first concluded that Springer "ha[d] established standing to challenge the restriction on carrying firearms in public parks" because he "clearly assert[ed] . . . that he intends to carry firearms in public parks in Albuquerque [and] Bernalillo County" but is prohibited from doing so by the order. *Id. at 91-92*. It then granted a "preliminary injunction enjoining the public health order to the extent it prohibits carrying firearms in public parks in Bernalillo County and Albuquerque, New Mexico," after concluding Springer was likely to succeed on his *Second Amendment* claim. *Id. at 85*. The court explained that the defendants did "not demonstrate **[*12]** a historical tradition of prohibiting the carrying of firearms in public parks" as was their burden under *Bruen. Id.* With respect to the remaining restriction, however, the court declined "to enjoin the public health order to the extent it prohibits firearms in playgrounds" because Springer had not established standing. *Id.* According to the district court, Springer lacked an injury—a necessary element for standing—because he did "not assert that he has ever, or intends to, carry firearms in playgrounds." *Id. at 91*. "Even if he had," the district court explained, "the [g]overnment ha[d] demonstrated that playgrounds are analogous to 'sensitive places' where there is a longstanding history of firearm regulation." *Id. at 86*. The court also held that Springer failed to demonstrate a likelihood of success on his *First Amendment* and due process claims because his argument "lack[ed] sufficient citation to case law or analysis" to put the issues before the court. *Id. at 100-01*. It therefore denied Springer's motion as to those two claims.[3]

The defendants appealed the grant of a preliminary injunction against the public parks restriction, and Springer cross-appealed the order to the extent it concluded he lacked standing and denied the full **[*13]** extent of injunctive relief requested. The defendants also sought a stay of the preliminary injunction pending appeal, but both the district court and our Court denied the defendants' request.

During the pendency of the appeal, our Court decided *We the Patriots, Inc. v. Grisham, 119*

---

shall possess a firearm, as defined in *NMSA 1978, Section 30-7-4.1*, either openly or concealed, in public parks or playgrounds within the City of Albuquerque or Bernalillo County, except in the City of Albuquerque's Shooting Range Park and areas designated as a state park within the state parks system and owned and managed by the New Mexico Energy, Minerals and Natural Resources Department State Parks Division, or the State Land Office.

App'x at 52.

---

[3] Springer "does not challenge that determination here," Aple. Op. Br. at 6, and therefore, we do not address that portion of the district court's ruling.

_F.4th 1253 (10th Cir. 2024)_, which involved a nearly identical challenge to the same NMDOH public health order. In _We the Patriots_, we held that the plaintiffs lacked standing to challenge the playgrounds restriction because of the existence of "several unchallenged City and County restrictions which appear to limit firearm possession in playgrounds." _Id. at 1259_. As the panel explained, our Court could not "provide any meaningful relief" because, "regardless of our decision," the plaintiffs would "continue to be barred from carrying firearms in the proscribed places." _Id. at 1260_. Therefore, the plaintiffs' injury was not redressable, and they lacked standing. _Id._ With respect to the parks restriction, we held that the request for a preliminary injunction was moot because a district court in a different proceeding[4] had already universally "enjoined the full scope of the . . . public parks restriction"—the precise relief requested by the plaintiffs. _Id. at 1257_.[5]

We consequently ordered the parties to file supplemental **[*14]** briefing addressing how our decision in _We the Patriots_ affected this appeal. _See_ Order, Nos. 23-2192, 23-2194, at 2 (10th Cir., filed Dec. 4, 2024). In their supplemental filing, the defendants argued that

_We the Patriots_ "compels the conclusion that Springer lacks standing to challenge" the public health order because the same overlapping firearm restrictions at issue in _We the Patriots_ are still in place, meaning that Springer's injury is not redressable. Aplt. Supp. Br. at 1. Springer disagreed. While acknowledging _We the Patriots_'s general reasoning, he argued that _We the Patriots_ is distinguishable because the overlapping firearm restrictions are not currently being enforced. According to Springer, without a credible threat of enforcement, these separate firearm prohibitions do not deny him standing.

**II**.

We begin—and end—with standing. Before addressing the constitutionality of the public health order, we must first ensure that Springer has standing to challenge the public parks and playgrounds restrictions. He does not. We therefore lack jurisdiction to reach the merits of his _Second Amendment_ challenge.

**A**.

Article III of the Constitution confines the jurisdiction of federal courts to the resolution of "Cases" and "Controversies." "For there to be a case or controversy under Article III, the plaintiff must have a personal stake in the case—in other words, standing." _TransUnion LLC v. Ramirez, 594 U.S. 413, 423, 141 S. Ct. 2190, 210 L. Ed. 2d 568 (2021)_ (cleaned **[*15]** up). Standing, in turn, requires the plaintiff to "have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant[s], and (3) that is likely to be redressed by a favorable judicial decision." _Spokeo, Inc. v. Robins, 578 U.S. 330, 338, 136 S. Ct. 1540, 194 L. Ed. 2d 635 (2016)_.

Moreover, it is the plaintiff—as the party

---

[4] The parallel district court proceeding referenced in _We the Patriots_ is the district court proceeding at issue in this appeal. _119 F.4th at 1257_ (citing _Springer v. Grisham, 704 F. Supp. 3d 1206, 1221-22 (D.N.M. 2023)_).

[5] The conclusion that the grant of an injunction to a plaintiff in one case always moots a different plaintiff's subsequent request for a similar injunction in a different case may have been significantly undermined by the Supreme Court's recent decision in _Trump v. CASA, Inc., 606 U.S. 831, 145 S. Ct. 2540, 222 L. Ed. 2d 930 (2025)_. In _CASA_, the Court held that federal courts lack the statutory authority to issue universal injunctions—equitable relief that "prohibits the [g]overnment from enforcing the law against _anyone_, anywhere." _Id. at 2548 n.1_. We need not decide the extent to which _CASA_ may have abrogated _We the Patriots_, but we do note that the existence of other injunctions enjoining enforcement of the parks or playgrounds restriction against some plaintiffs does not moot Springer's request for injunctive relief here.

invoking federal jurisdiction—who "bears the burden of establishing standing." *Carney v. Adams, 592 U.S. 53, 59, 141 S. Ct. 493, 208 L. Ed. 2d 305 (2020)*. That burden, the Supreme Court has explained, tracks the showing required for other elements of a plaintiff's claim at different stages of the litigation. *See Lujan v. Defs. of Wildlife, 504 U.S. 555, 561, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)*. "At the preliminary injunction stage, then, the plaintiff must make a 'clear showing' that []he is 'likely' to establish each element of standing." *Murthy v. Missouri, 603 U.S. 43, 58, 144 S. Ct. 1972, 219 L. Ed. 2d 604 (2024)* (quoting *Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008)*).

**B**.

Springer has not satisfied his burden of establishing standing for two independent reasons: (1) he does not allege concrete plans to visit a single specific park or playground subject to the public health order with a firearm, meaning he lacks an actual or imminent injury in fact, and (2) he has not shown that our Court can redress his alleged injury because separate, overlapping laws already prohibit the carrying of firearms in parks and playgrounds.[6]

---

[6] Although the public health order only "remain[ed] in effect for the duration of the public health emergencies declared," App'x at 53, Governor Grisham's decision to allow the public health order to expire on October 13, 2024, does not moot this case. Pursuant to "the voluntary cessation exception to mootness, a defendant cannot automatically moot a case simply by ending its unlawful conduct once sued." *Robert v. Austin, 72 F.4th 1160, 1164 (10th Cir. 2023)* (quoting *Prison Legal News v. Fed. Bureau of Prisons, 944 F.3d 868, 880 (10th Cir. 2019)*). However, voluntary actions may nevertheless moot a case "if the defendant carries the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* (quoting *Prison Legal News, 944 F.3d at 881*). The defendants do not contend that the public health order will not be re-issued in the future. *See* Aplt. Supp. Br. at 2. Therefore, the case is not moot.

**1**.

As noted above, Springer must show an "injury in fact" **[*16]** to establish standing. To satisfy the strictures of Article III, an injury must be "concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical.'" *Lujan, 504 U.S. at 560* (some internal quotation marks omitted). Moreover, "[a]n allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk that the harm will occur.'" *Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158, 134 S. Ct. 2334, 189 L. Ed. 2d 246 (2014)* (quoting *Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409, 414 n.5, 133 S. Ct. 1138, 185 L. Ed. 2d 264 (2013)*).

Where, as here, the alleged injury is the threatened enforcement of a law or executive order, the Supreme Court has "held that a plaintiff satisfies the injury-infact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [law], and there exists a credible threat of prosecution thereunder.'" *Id. at 159* (quoting *Babbitt v. Farm Workers, 442 U.S. 289, 298, 99 S. Ct. 2301, 60 L. Ed. 2d 895 (1979)*). The Supreme Court, however, has instructed that "'some day' intentions . . . do not support a finding of the 'actual or imminent' injury that our cases require." *Lujan, 504 U.S. at 564*. Instead, a plaintiff must describe "concrete plans" and not merely a "vague desire" to undertake the proscribed conduct. *Summers v. Earth Island Inst., 555 U.S. 488, 496, 129 S. Ct. 1142, 173 L. Ed. 2d 1 (2009)*.

Here, Springer's allegations fall well short of establishing "concrete plans" to visit any park or playground subject to the public health **[*17]** order. Start with the playgrounds restriction. Nothing in Springer's complaint or in his declaration evinces an intent to visit a

playground with a firearm. He does not identify a single specific playground that he intends to visit, nor does he specify a date upon which he plans to make such a visit. In fact, neither document even mentions the word "playground." The closest Springer gets is in his verified motion where he states that he "wishes to carry firearms in . . . playgrounds" at some unspecified point in the future. App'x at 46.

But that statement is nowhere near the level of specificity required to show imminence. As we have held, "[s]peculative plans or vague intentions to *potentially* violate the challenged [law] are" simply "insufficient" to satisfy the requirement of imminent injury. *Rocky Mountain Gun Owners v. Polis, 121 F.4th 96, 110 (10th Cir. 2024)* (emphasis in original); *see Lujan, 504 U.S. at 564* (holding that a mere "intent" to visit certain countries with threatened species in the future was insufficient to confer standing because "such some day intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the actual or imminent injury" required for standing (internal quotation **[*18]** marks omitted)); *Summers, 555 U.S. at 496* (concluding that a "vague desire" to visit several unnamed national forests in the future is not an imminent injury to confer standing). Without more, we are left to speculate whether Springer will actually visit a playground covered by the public health order and, consequently, whether he faces an imminent injury.

We therefore agree with the district court that Springer "lacks standing to challenge the restriction on carrying firearms in playgrounds." App'x at 89.[7]

_____

[7] Springer contends that the district court "misapprehend[ed] the facts surrounding the existence of the playgrounds at issue being an internal feature of the parks frequented by Plaintiff"

We, however, part ways with the district court's standing conclusion as it relates to the parks restriction. As noted above, the district court concluded that Springer demonstrated a sufficient injury in fact because he "clearly asserts that . . . he intends to carry firearms in public parks in Albuquerque or Bernalillo County" subject to the order and "there exists a credible threat of prosecution." *Id.* at 91-92. That conclusion was error. While Springer does mention that he visited and plans to visit parks in New Mexico, he does not allege any facts that establish a "concrete" plan to do so. Instead, his declaration merely states that he has "been prohibited" by the public health order "from lawfully carrying [his] **[*19]** firearm . . . for most of the months of September and October at the parks that [he] attend[s] for non-scholastic youth sporting events or just to enjoy the beautiful fall weather in Albuquerque during the balloon fiesta." *Id.* at 55.

At most, this statement establishes that he has visited parks subject to the order in the past. But the mere fact that Springer "had visited" the parks in the past "proves nothing" about

_____

when it concluded that he lacked standing. Aple. Op. Br. at 6. In Springer's view, he has standing because he "plans to attend parks in the future where playgrounds are an internal feature." Aple. Reply Br. at 6. But these two fleeting statements are insufficient to adequately present this argument. He does not cite legal authority, identify relevant allegations, or explain how playgrounds being an "internal feature" of some parks establishes an imminent injury. Because "we consider only those arguments in favor of standing that the plaintiffs have adequately briefed," we need not address this argument. *Colo. Outfitters Ass'n v. Hickenlooper, 823 F.3d 537, 544 (10th Cir. 2016)*.

In any event, the mere suggestion that playgrounds are located within certain parks does not automatically provide Springer with standing. One can visit a park containing a playground without also entering the area consisting of the playground. Therefore, whether a playground is an internal feature of some parks Springer intends to visit makes no difference. Springer still must demonstrate a "concrete plan" to step foot on a playground subject to the order. *Summers, 555 U.S. at 496*. Because he has not done so, he lacks an imminent injury—an indispensable element of standing.

**App. 624**

whether Springer will visit the parks in the future. *Lujan, 504 U.S. at 564*. As the Supreme Court has explained, when a plaintiff seeks forward-looking relief, past events "are relevant only for their predictive value." *Murthy, 603 U.S. at 59*. And here, Springer does not link his past visits to future visits in any meaningful way. He has not stated that the sports competitions or balloon fiesta are recurring events, nor has he assured us that future iterations of these recreational activities will take place in a park subject to the order. In fact, he has not identified "any particular [park]" where these activities occur, significantly undermining his claim of imminent injury. *Summers, 555 U.S. at 495*. Therefore, this statement alone does not establish standing.

Springer's other assertion fares no better. He stated that he "planned to organize **[*20]** and attend a rally in support of the *Second Amendment* to exercise [his] *First Amendment* rights by engaging in the expressive conduct of openly carrying a firearm in Civic Plaza but ha[s] been prohibited from doing so" by the order. App'x at 55. But even assuming that Civic Plaza is a park subject to the order (something that Springer does not explicitly allege), this "some day intention" is plainly insufficient. *Lujan, 504 U.S. at 564*. He does not provide a "description of concrete plans" for the rally or even identify when he plans to hold such a gathering. *Id.* These failures are fatal to the injury-in-fact requirement, just as they were in *Lujan*. *Id. at 564-67*; *see also LaFave v. Cnty. of Fairfax, 149 F.4th 476, 485 (4th Cir. 2025)* (holding that gun owners lacked standing to challenge a sensitive places restriction because they failed to identify an "event, or an area adjacent to one, that they've wanted to visit while armed since the ordinance's enactment").

Springer resists this conclusion. In his view, the fact that he mentioned his plan to visit

parks subject to the order is enough. However, the Supreme Court has squarely rejected that position, explaining that "accepting a[] [mere] intention to visit . . . as adequate to confer standing to challenge any government action . . . would be tantamount to eliminating **[*21]** the requirement of concrete, particularized injury in fact." *Summers, 555 U.S. at 496*. Moreover, if a mere self-serving statement is all that is needed, then "any citizen could obtain standing . . . by merely 'self-declaring'" an intention to visit one of the regulated parks. *Sibley v. Obama, No. 12-5198, 2012 U.S. App. LEXIS 25050, 2012 WL 6603088, at *1 (D.C. Cir. Dec. 6, 2012)* (per curiam) (unpublished). We decline to support a view of Article III that would allow litigants to transform any generalized grievance into a particularized and imminent injury with a flick of the pen. Article III, we believe, demands more. A party invoking our jurisdiction must show an actual "personal, particularized injury," *Hollingsworth v. Perry, 570 U.S. 693, 715, 133 S. Ct. 2652, 186 L. Ed. 2d 768 (2013)*, and not just an artificially manufactured one so that we remain in our properly limited role of deciding "Cases" or "Controversies." Springer has not done so.

Consequently, we hold that Springer failed to demonstrate a sufficiently imminent injury in fact to challenge the public parks or playgrounds restriction.

**2**.

Besides failing to show an injury, Springer failed to demonstrate redressability because all of the playgrounds and parks that Springer alleges he intends to visit are "already subject to independent and unchallenged firearm carry prohibitions." *We the Patriots, 119 F.4th at 1261*.

When multiple laws overlap in the conduct they prohibit—and therefore cause **[*22]** the same injury—that injury may not be

redressable when only one of the laws is challenged. *See Renne v. Geary, 501 U.S. 312, 319, 111 S. Ct. 2331, 115 L. Ed. 2d 288 (1991)* (suggesting that an injunction against enforcement of a statute would not redress a plaintiff's injury where there were "[o]verlapping enactments"); *We the Patriots, 119 F.4th at 1260-61*; *Bishop v. Smith, 760 F.3d 1070, 1078 (10th Cir. 2014)* ("[P]laintiffs fail to establish redressability [ ] when an unchallenged legal obstacle is enforceable separately and distinctly from the challenged provision.").

This principle of redressability holds true where, as here, the plaintiff does not allege that he is willing to violate the separate, overlapping restrictions. If a plaintiff challenges only one of several overlapping restrictions, he must demonstrate a willingness to violate the other restrictions to overcome the presumption that litigants "will conduct their activities within the law and so to avoid prosecution and conviction." *O'Shea v. Littleton, 414 U.S. 488, 497, 94 S. Ct. 669, 38 L. Ed. 2d 674 (1974)*. Otherwise, a favorable decision will fail to redress the injury complained of because the plaintiff ultimately will remain unable to engage in the desired conduct due to the separate, unchallenged restrictions.

Here, several overlapping laws appear to already prohibit the possession of firearms in public parks and playgrounds within the City of Albuquerque **[*23]** and Bernalillo County. As we recently explained in *We the Patriots*, state and local law ban firearm possession on playgrounds in these localities:

First, a County ordinance plainly prohibits possession of firearms in "recreation facilit[ies]." *Bernalillo Cnty. Ord., § 58-12(b)(27)*. Playgrounds are included in the definition of "recreational facilit[ies]." *Id.* at *§ 58-5.* Also, the City applies New Mexico state law prohibitions on firearm carry in

schools and universities to at least 25 playgrounds. City of Albuquerque Administrative Instructions No. 5-19 & 5-20; *N.M. Stat. Ann. §§ 30-7-2.1(A)* & *(B)(2)* (also prohibiting firearm carry in "any other public buildings or grounds, including playing fields and parking areas that are not public school property, in or on which public school-related and sanctioned activities are being performed."); *id.* at *§ 30-7-2.4(A)* & *(C)(2)(b)* (also prohibiting firearm carry in "any other public buildings or grounds, including playing fields and parking areas that are not university property, in or on which university-related and sanctioned activities are performed."). Thus, we are faced with an apparent City prohibition.

*119 F.4th at 1259* (emphasis omitted). And as the defendants point out, "multiple other restrictions prohibit firearms in city and county parks," including the parks Springer allegedly intends to **[*24]** visit. Aplt. Supp. Br. at 5. For instance, a Bernalillo County ordinance generally prohibits firearms in "any park," *Bernalillo Cnty. Ord. § 58-12(b)(27)*, and the City of Albuquerque also prohibits firearms on "Open Space Lands," Albuquerque Code of Ords. § 5-8-6(G). Additionally, as discussed above, state law prohibits firearm carry on "any . . . grounds, including playing fields . . . that are not public school property . . . or university property." *N.M. Stat. Ann. §§ 30-7-2.1(A), (B)(2)*; *id. § 30-7-2.4(A), (C)(2)(b)*. Therefore, both the City of Albuquerque and Bernalillo County appear to already prohibit firearms in public parks.

As a result, even if Springer prevailed, he "could not legally carry [firearms] on playgrounds [or parks] because the municipal and county ordinances" would still bar him from doing so. *We the Patriots, 119 F.4th at 1260*. And because there is no indication in the record that he will voluntarily violate those

local ordinances, *see* App'x at 46 (Springer acknowledging, in his verified motion, that he is "a law-abiding citizen"), a favorable decision by this Court would not redress his alleged injury. In other words, even if we were to hold the public health order unconstitutional, Springer would still be unable to carry firearms in the playgrounds and parks he wishes to visit.

Springer does not dispute that these unchallenged **[*25]** state statutes and local ordinances also restrict firearm possession on the playgrounds and parks he intends to visit. Instead, he makes two arguments in an attempt to establish redressability in spite of these overlapping laws.

First, Springer argues that a decision enjoining enforcement of the public health order would redress his injury because local authorities have stated that they will not enforce these local ordinances restricting gun possession on playgrounds and parks. As his argument goes, without a credible threat of prosecution under the overlapping restrictions, injunctive relief would allow him to carry a firearm in a park or playground. For support, Springer cites a statement made by Bernalillo County Sheriff Josh Allen to the media following the issuance of the NMDOH's public health order in which Allen stated that a firearm ban at playgrounds would not be enforceable. *See* Aple. Supp. Br. at 1. Additionally, Springer references an email that the Bernalillo County Sheriff's Office sent to a reporter which stated that the department "will not enforce the [firearm] ban in playgrounds or parks." *Id.*[8]

But Springer's reliance on these statements is misplaced. For one thing, **[*26]** the statements made by local police do not appear in the record. Instead, Springer provides a link to a news article containing the purported statements. Our review, however, is limited to the evidence and allegations included in the record. *See Regan-Touhy v. Walgreen Co., 526 F.3d 641, 648 (10th Cir. 2008)*; *see also Mansfield, C. & L.M. Ry. Co. v. Swan, 111 U.S. 379, 382, 4 S. Ct. 510, 28 L. Ed. 462 (1884)* (concluding that facts supporting jurisdiction—standing included—must "affirmatively appear in the record"). Thus, we cannot consider these extrajudicial statements when determining whether Springer has standing. Instead, in the absence of anything to the contrary, we must presume that the government will enforce its laws as written. *See Cayuga Nation v. Tanner, 824 F.3d 321, 331 (2d Cir. 2016)*.

In any event, these statements actually undercut Springer's argument. The firearm ban mentioned in these statements appears to refer to the NMDOH's public health order and *not* any local laws. The statements were made in response to the public heath order and made no mention of the overlapping ordinances. In fact, the first paragraph of the article provided by Springer explicitly states that the no-nenforcement policy is in reference to "Gov. Michelle Lujan Grisham's temporary ban on carrying firearms at public parks and playgrounds." *See* Nash Jones, *Sheriff's Department Won't Enforce Gun Ban at* **[*27]** *Bernalillo County Parks and Playgrounds* (Oct. 12, 2023), https://www.kunm.org/local-

---

[8] Springer's supplemental brief also includes a statement by the Albuquerque Police Chief that "APD will investigate all criminal offenses involving a firearm," and "[w]hen officers encounter individuals who violate the state's emergency order and possession is the only violation, they will forward those cases to the New Mexico State Police." Aple. Supp. Br. at 2. According to Springer, this statement implies that APD will not enforce local firearm restrictions in parks and playgrounds. But

we fail to see how that conclusion flows from this lone statement. In the cited statement, the Albuquerque Police Chief does not declare an intention to implement a non-enforcement policy of any law, let alone the local firearm restrictions Springer contends are not being enforced. In fact, the Police Chief states that APD will investigate *all* criminal offenses involving a firearm—a category which presumably includes violations of local laws.

news/2023-10-12/sheriffs-department-wont-enforce-gun-ban-at-bernalillo-county-parks-and-playgrounds. As the Supreme Court has made clear, in order to establish standing in pre-enforcement challenges, a plaintiff must demonstrate a "credible threat of prosecution." _Susan B. Anthony List, 573 U.S. at 159_. Thus, the Sheriff's Office statement that it would refuse to enforce the NMDOH's public health order tends to negate any showing of a credible threat of prosecution under the public health order at issue. Put another way, Springer's claim that the Sheriff will not enforce gun restrictions in parks and playgrounds renders his injury here—namely, not being able to carry in parks or playgrounds without penalty—entirely illusory. Apparently, at this very moment, Springer can possess a firearm in a park or playground without fearing prosecution by the Sheriff's Office under the public health order.

Even if we were to give these statements a generous reading and conclude that "the ban in playgrounds or parks" referred to all firearm prohibitions in playgrounds or parks—including the overlapping local laws—the result is the same. Without a credible **[*28]** threat of prosecution under the public health order, Springer cannot show an injury. Therefore, he lacks standing to challenge the public health order even if we were to consider these extrajudicial statements.

Second, Springer suggests that the existence of separate, overlapping firearm restrictions does not deny him standing because the restrictions are currently being challenged in New Mexico state court. Springer does not elaborate on this argument beyond implying that the fates of the overlapping laws are intertwined, such that they rise and fall together based on the merits of Springer's _Second Amendment_ claim. Thus, although by no means explicit, Springer seems to suggest that a favorable decision by our Court would

allow him to carry firearms in parks and playgrounds because invalidation of the public health order would "impugn the validity" of the other, resulting in a victory in state court. _Renne, 501 U.S. at 319_. Springer points out that the "state district court acknowledged that guidance from this Court was likely forthcoming and stayed" the matter. Aple. Supp. Br. at 3. Thus, Springer implies that winning this case would solve his problems.

That reasoning, however, misapprehends what redressability requires **[*29]** and cannot be squared with the nature of judicial review. Contrary to Springer's argument, a favorable judgment in this case would have no effect on the validity of the separate, overlapping laws. Judicial power does not "operate on legal rules in the abstract." _California v. Texas, 593 U.S. 659, 672, 141 S. Ct. 2104, 210 L. Ed. 2d 230 (2021)_. Instead, it provides only "the power to render judgments in individual cases." _Murphy v. NCAA, 584 U.S. 453, 488, 138 S. Ct. 1461, 200 L. Ed. 2d 854 (2018)_ (Thomas, J., concurring). And here, the judgment Springer seeks—an injunction against the enforcement of the public health order—would not alter the enforcement of the local firearm restrictions. Federal courts do not render judgments that toggle all similarly worded laws from "operative" to "inoperative." Instead, their judgments only apply to the law at issue in the case before them.

Thus, what Springer appears to need is not a favorable judgment, but an opinion declaring a ban on firearms in public parks and playgrounds unconstitutional to use in the parallel state court proceedings. However, "it is a federal court's judgment, not its opinion" that must provide relief for an injury to be redressable. _Haaland v. Brackeen, 599 U.S. 255, 294, 143 S. Ct. 1609, 216 L. Ed. 2d 254 (2023)_. In other words, "[r]edressability requires that the court be able to afford relief _through the exercise of its power_, not through

the persuasive **[\*30]** or even awe-inspiring effect of the opinion explaining the exercise of its power." *Id.* (quoting *Franklin v. Massachusetts, 505 U.S. 788, 825, 112 S. Ct. 2767, 120 L. Ed. 2d 636 (1992)* (Scalia, J., concurring in part and concurring in judgment) (emphasis in original)). Because Springer seeks nothing more than an advisory opinion that "might persuade actors who are not before the [C]ourt," he cannot establish redressability in the face of separate, overlapping laws that he is not willing to violate. *Id.*

**III**.

For the foregoing reasons, we AFFIRM the portion of the district court's order denying the motion to enjoin enforcement of the playgrounds restriction, REVERSE the portion of the district court's order enjoining enforcement of the parks restriction, and REMAND with instructions to dissolve the injunction and to conduct further proceedings consistent with this order.

Entered for the Court

Allison H. Eid

Circuit Judge

**End of Document**

# *Strojnik v. Teof Hotel GP, LLC*

United States District Court for the Northern District of Texas, Dallas Division

August 31, 2020, Decided; August 31, 2020, Filed

Civil No. 3:19-CV-01336-E

**Reporter**

2020 U.S. Dist. LEXIS 158287 *; 2020 WL 5211063

PETER STROJNIK, Plaintiff, v. TEOF HOTEL GP, LLC A/K/A TEOF HOTEL LP A/K/A TEOF HOTEL GP, LP D/B/A LORENZO HOTEL, Defendant.

**Counsel:** **[*1]** Peter Strojnik, Plaintiff, Pro se, Phoenix, AZ.

For Teof Hotel GP LLC, also known as Teof Hotel LP, also known as Teof Hotel GP LP, also known as Lorenzo Hotel, Defendant: Jerry Lee Ewing, Jr, LEAD ATTORNEY, Walters Balido & Crain, Dallas, TX; Jonathan L Davenport, Walters, Balido & Crain, Dallas, TX.

**Judges:** ADA BROWN, UNITED STATES DISTRICT JUDGE.

**Opinion by:** ADA BROWN

## Opinion

### MEMORANDUM OPINION AND ORDER

Before the Court is Defendant's Motion to Dismiss Plaintiff's Complaint (Doc. *No*. 9). Defendant asserts Plaintiff's amended complaint should be dismissed pursuant to *Rule 12(b)(1)* for lack of subject matter jurisdiction. For reasons that follow, the Court grants the motion.

### Background

In his complaint, Plaintiff Peter Strojnik alleges that Defendant Teof Hotel GP, LLC owns, operates, or leases a hotel in Dallas. He asserts claims against Defendant for violations of the *Americans with Disabilities Act* (ADA) and for negligence based on the alleged ADA violations. *Title III* of the ADA provides:

> *No* individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, **[*2]** leases (or leases to), or operates a place of public accommodation.

*42 U.S.C. § 12182(a)*; *PGA Tour, Inc. v. Martin, 532 U.S. 661, 676, 121 S. Ct. 1879, 149 L. Ed. 2d 904 (2001)*. Under the ADA, "disability" means "a physical or mental impairment that substantially limits one or more major life activities." *42 U.S.C. § 12102(1)(A)*. A plaintiff who sues under the ADA is limited to seeking "injunctive relief, and a restraining or other similar order." *Deutsch v. Annis Enters., Inc., 882 F.3d 169, 173 (5th Cir. 2018)* (quoting *Plumley v. Landmark Chevrolet, Inc., 122 F.3d 308, 312 (5th Cir. 1997)*); *see* *42 U.S.C. § 12188(a)*. ADA regulations provide that a public accommodation that owns, leases, or operates a place of lodging shall, with respect to reservations made by any means, identify and describe accessible features in hotels and guest rooms offered through its reservations service in enough detail to reasonably permit individuals with disabilities to assess

independently whether a given hotel or guest room meets his accessibility needs. *28 C.F.R. § 36.302(e)(1)(ii)*.

Strojnik, a resident of Maricopa County, Arizona, is proceeding pro se. He was licensed as an attorney in Arizona, but was disbarred on May 10, 2019.[1] Strojnik filed his original complaint in this case on June 4, 2019. He later amended his complaint to correct the name of the Defendant. Strojnik alleges that he is a disabled person as defined by the ADA. He asserts he is "legally disabled by virtue of a severe right-sided neural foraminal [*3] stenosis with symptoms of femoral neuropathy, prostate cancer and renal cancer, degenerative right knee and arthritis." He alleges these physical impairments substantially limit his major life activities. He states that he "walks with difficulty and pain and requires compliant mobility accessible features at places of public accommodation." He further alleges that his "impairment is constant, but the degree of pain is episodic ranging from dull and numbing pain to extreme and excruciating agony." He alleges, "By virtue of his disability, Plaintiff requires an ADA compliant lodging facility particularly applicable to his mobility, both ambulatory and wheelchair assisted."

_____

[1] According to the website for the Arizona State Bar:

Beginning in 2016, Strojnik filed thousands of lawsuits against small businesses alleging minor violations of the Americans with Disabilities Act (ADA) and the *Arizonans with Disabilities Act (AzDA)* in state and federal courts. Typically, he demanded approximately $5,000 in attorney's fees regardless if the business remedied the purported violations. In all cases Strojnik alleged vague violations.

The Arizona Bar alleged that Strojnik violated various rules of professional conduct. Its website states that "Strojnik did not contest the allegations and consented to his disbarment."

*See* STATE BAR OF ARIZONA, https://azbar.legalserviceslink.com/attorneys-view/PeterStrojnik (last visited August 27, 2020).

According to the amended complaint, Strojnik is retired and "likes to spend his retirement years traveling [*4] the United States." Strojnik alleges he intended to visit Dallas between February 20-22, 2019. He reviewed vacation booking websites and noted that the websites "failed to identify and describe mobility related accessibility features and guest rooms offered through its reservations service in enough detail to reasonably permit [him] to assess independently whether Defendant's Hotel meets his accessibility needs as more fully documented in Addendum A." Addendum A appears to be images taken from the booking website Hotels.com about Defendant's hotel and from the hotel's own website. There are pictures of the hotel and descriptions of the rooms and amenities. As part of the addendum, Strojnik describes the purported ADA deficiencies as follows: (1) failure to identify and describe accessible features in the hotel and guest rooms in enough detail to reasonably permit [him] to assess independently whether the hotel or guest room meet his accessibility needs, and (2) insufficient dispersion of accessible rooms, if any.

Strojnik alleges that Defendant has violated the ADA by denying him equal access to its public accommodation. He contends the violations described in Addendum A relate to his [*5] disability and interfere with his "full and complete enjoyment of the Hotel." As a result of the deficiencies, he declined to book a room at Defendant's hotel. Strojnik alleges he is "deterred from visiting the Hotel based on [his] knowledge that the Hotel is not ADA or State Law compliant as such compliance relates to [his] disability." He further alleges that he "intends to visit Defendant's Hotel at a specific time when Defendant's noncompliant Hotel becomes fully compliant with ADAAG [ADA Accessibility Guidelines for Buildings and Facilities]." Strojnik seeks injunctive relief ordering Defendant to alter the hotel to make it

2020 U.S. Dist. LEXIS 158287, *5

accessible and usable to individuals with disabilities, equitable nominal damages, and costs and attorney's fees.

Strojnik also asserts a claim for negligence. He alleges Defendant owed him a duty to remove ADA accessibility barriers so that he could have equal access to the public accommodation. He further alleges Defendant breached this duty and that the breach caused him damages, including "the feeling of segregation, discrimination, relegation to second class citizen status[, and] the pain, suffering and emotional damages inherent to discrimination and segregation **[*6]** and other damages to be proven at trial."

Defendant has moved to dismiss Strojnik's amended complaint under *Federal Rule of Civil Procedure 12(b)(1)*. A motion to dismiss filed under *Rule 12(b)(1)* challenges a federal court's subject matter jurisdiction. Defendant contends that Strojnik's complaint should be dismissed because he lacks standing.

Federal courts have subject matter jurisdiction only over a "case" or "controversy." *Deutsch, 882 F.3d at 173*; *see U.S. Const. art. III, § 2, cl. 1*. To establish a case or controversy, a plaintiff must show he has standing to sue. *Deutsch, 882 F.3d at 173*. Standing has three elements: (1) the plaintiff must have suffered an "injury in fact"; (2) there must be a causal connection between the injury and the conduct complained of; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)*. The party invoking federal jurisdiction bears the burden of establishing these elements. *Id. at 561*.

In addition, because he sues under the ADA, Strojnik must meet the standing requirements for equitable relief. *Deutsch, 882 F.3d at 173*. A plaintiff seeking equitable relief must show

that there is a real and immediate threat of repeated injury. *Id.* (citing *City of Los Angeles v. Lyons, 461 U.S. 95, 102, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983))*. Merely having suffered an injury in the past is not enough; the plaintiff must show a real or immediate threat **[*7]** that he will be wronged again. *Id.* Standing requires a plaintiff seeking injunctive relief to allege an "actual and imminent" and not merely "conjectural or hypothetical" injury. *Frame v. City of Arlington, 657 F.3d 215, 235 (5th Cir. 2011)*. "Mere 'some day' intentions, 'without any description of concrete plans,' does not support standing." *Id.*

Defendant asserts Strojnik lacks standing because he cannot demonstrate (1) that he suffered an injury in fact as he does not contend he visited or attempted to visit Defendant's hotel, nor does he have any genuine intent to return, and (2) causation as the websites involved are not Defendant's websites nor are they under its control. In addition, Defendant argues that Strojnik complains of the website, not the hotel itself, and websites are not a place of public accommodation under the ADA. Defendant asks the Court to dismiss the complaint in its entirety with prejudice.

Defendant asserts there are two currently recognized ways for an ADA plaintiff to establish injury in fact. Defendant contends Strojnik cannot demonstrate an injury in fact under either approach. First, Strojnik can show he intends to return to the allegedly noncompliant public accommodation and therefore faces a real and imminent threat **[*8]** he will again be harmed by the noncompliance. Defendant contends Strojnik must demonstrate a plausible intention to return to the hotel in the future such that he will be harmed by the alleged ADA noncompliance. Defendant asserts the Court should consider (1) Strojnik's proximity to the Hotel; (2) his past patronage; (3) the

definitiveness of his plan to return to the hotel; and (4) his frequency of nearby travel. *See Access 4 All, Inc. v. Wintergreen Commercial P'ship, Ltd., No. 3:05-CV-1307-G, 2005 U.S. Dist. LEXIS 26935, 2005 WL 2989307, at *3 (N.D. Tex. Nov. 7, 2005)*. Defendant argues that Strojnik has not alleged any concrete plan to return to the Hotel. It maintains that "a mere someday intention" to return is insufficient.

Second, citing *Deutsch v. Annis Enterprises*, Defendant argues that an ADA plaintiff can show the inaccessibility of a place of public accommodation actually affects his activities in some concrete way. In *Deutsch*, the plaintiff was a paraplegic who uses a wheelchair for mobility. *882 F.3d at 172*. He filed 385 ADA lawsuits in 306 days. *Id.* He sued the owner of a women's hair salon, alleging he visited the salon and "experienced difficulty and discomfort" because the salon did not have the number of parking spaces required by the ADA or access ramps, **[*9]** and because its threshold exceeded one-half inch. *Id.* The plaintiff's complaint did not indicate that he would ever visit the salon again. Instead, he alleged that he will continue to experience unlawful discrimination as a result of the salon owner's failure to comply with the ADA. *Id.* As here, the business owner moved to dismiss for lack of standing. The district court granted the motion, reasoning that the plaintiff failed to demonstrate he suffered an actual or imminent injury or that he had concrete plans to patronize the salon in the future. *Id. at 173*.

The Fifth Circuit affirmed, holding the plaintiff had not established standing because he had not shown that any alleged ADA violation threatened him with future injury. *Id.* Like Strojnik, the plaintiff argued that he had satisfied the future-injury standing requirement. *Id. at 174*. The Fifth Circuit disagreed, stating that Deutsch had not shown how the alleged ADA violations at the salon will negatively affect his day-to-day life. The

court noted he had only visited the business once. There was **no** evidence he had any intent to return, nor was there any reason to believe he was affected by the alleged violation in "some concrete way." *Id.; see Frame, 657 F.3d at 236*.

Strojnik **[*10]** argues that under any approach to ADA standing his amended complaint sufficiently alleges injury in fact. He urges the Court to apply the "deterrent effect doctrine" in determining whether he has standing. Under this approach, a disabled individual suffers a cognizable injury if he is deterred from visiting a noncompliant public accommodation because he has encountered barriers related to his disability there. *See Chapman v. Pier 1 Imports, 631 F.3d 939, 949-50 (9th Cir. 2011)*.[2]

The Court notes a disconnect between the allegations in Strojnik's complaint and much of the relief he seeks. Strojnik complains about not being able to tell from booking websites if Defendant's hotel meets his accessibility needs, but it seems the injunctive relief he seeks—"to alter Defendant's place of public accommodation"—is physical removal of accessibility barriers at the hotel. In any event, the Court determines that Strojnik lacks standing.

As in *Deutsch*, Strojnik has not established standing because he has not shown that any alleged ADA violations at the hotel threaten him with future injury. First, Strojnik has not sufficiently pleaded a concrete intent to return. His complaint alleges that he intends to visit the hotel when it becomes fully compliant. **[*11]** His "mere some day" plans are insufficient. Nor has he sufficiently pleaded that the alleged violations negatively affect his

_____

[2] Several district courts in other Texas districts have also used the deterrent effect doctrine. *See, e.g., Betancourt v. Ingram Park Mall, L.P., 735 F. Supp. 2d 587, 602-04 (W.D. Tex. Aug. 10, 2010)*.

2020 U.S. Dist. LEXIS 158287, *11

day-to-day life or affect him in "some concrete way." Strojnik lives hundreds of miles from Dallas. His plan to visit the hotel or even its website in the future is indefinite. He pleadings indicate he has not been to the hotel and are silent on how often he travels to the area. Even under the broader "deterrent effect" analysis Strojnik seeks to apply, he still needs to prove that he would visit the hotel in the future. See *Hunter v. Branch Banking & Trust Co., No. 3:12-cv-2437-D, 2013 U.S. Dist. LEXIS 113102, 2013 WL 4052411, at *3 (N.D. Tex. Aug. 12, 2013)*. Again, Strojnik's mere some day plans are insufficient. See *Strojnik v. Landry's, Inc., No. 4:19-cv-01170, 2019 U.S. Dist. LEXIS 223873, 2019 WL 7461681, at *5 (S.D. Tex. Dec. 9, 2019)* (Strojnik's same vague allegation of intent to return is insufficient to demonstrate plausible intent); cf., e.g., *Kennedy v. Sai Ram Hotels LLC, No., 2019 U.S. Dist. LEXIS 80111, 2019 WL 2085011 (M.D. Fl. May 13, 2019)* (plaintiff alleged she frequently travels near hotel and alleged she planned to return to hotel and its website within eight months.).

Strojnik's lack of standing extends to his negligence claim. The negligence claim is based on a duty created by the ADA to remove accessibility barriers. For **[*12]** the same reasons discussed above, Strojnik's complaint does not establish standing to bring his negligence claim.

In his response to the motion to dismiss, Strojnik requests leave to conduct discovery to determine the "entire scope of ADA violations" at Defendant's hotel. Because Strojnik has not shown he has standing, his request is denied. Cf. *Doran v. 7-Eleven, Inc., 524 F.3d 1034, 1043-44 (9th Cir. 2008)*.

For the foregoing reasons, the Court grants Defendant's motion to dismiss. In his response to the motion to dismiss, Strojnik does not ask for leave to amend his complaint should the

Court find a lack of standing. Further, nothing in the record or Strojnik's arguments suggest that he could amend his pleadings to set forth allegations that would give him standing to assert an ADA claim against Defendant at this time. See *Landry's, Inc., 2019 U.S. Dist. LEXIS 223873, 2019 WL 7461681, at *5*. Accordingly, Strojnik's amended complaint is dismissed without prejudice. See *Williams v. Morris, 614 F. App'x 773, 774 (5th Cir. 2015)* (when complaint dismissed for lack of standing, it should be without prejudice).

**SO ORDERED**.

Signed August 31, 2020.

/s/ Ada Brown

ADA BROWN

UNITED STATES DISTRICT JUDGE

_____

*End of Document*

## *The Woodlands Pride, Inc. v. Paxton*

United States Court of Appeals for the Fifth Circuit

November 6, 2025, Filed

No. 23-20480

**Reporter**

2025 U.S. App. LEXIS 29217 *; 157 F.4th 775; 2025 LX 494325; 2025 WL 3096979

THE WOODLANDS PRIDE, INCORPORATED; ABILENE PRIDE ALLIANCE; EXTRAGRAMS, L.L.C.; 360 QUEEN ENTERTAINMENT, L.L.C.; BRIGITTE BANDIT, Plaintiffs—Appellees, versus WARREN KENNETH PAXTON, In an official capacity as Attorney General of Texas; Brett Ligon, In an official capacity as District Attorney of MONTGOMERY COUNTY; MONTGOMERY COUNTY, TEXAS; JAMES HICKS, In an official capacity as District Attorney of Taylor County; TAYLOR COUNTY, TEXAS; CITY OF ABILENE, TEXAS, Defendants—Appellants.

**Prior History:** *Woodlands Pride, Inc. v. Paxton, 694 F. Supp. 3d 820, 2023 U.S. Dist. LEXIS 171268 (S.D. Tex., Sept. 26, 2023)*

## Case Summary

**Overview**
**Key Legal Holdings**

- Only 360 Queen Entertainment demonstrated standing by showing it intended to conduct performances with prosthetic breast gesticulations and audience contact with performers' buttocks that were arguably proscribed by S.B. 12's definition of 'sexually oriented performances,' and this injury was traceable only to the Attorney General who enforces Section One.

- The district court failed to apply the proper

Moody framework for facial challenges to S.B. 12, requiring remand for reconsideration of whether Section One's unconstitutional applications substantially outweigh its constitutional ones.

**Material Facts**

- S.B. 12 regulates 'sexually oriented performances' defined as visual performances featuring a performer who is nude or engages in sexual conduct, and appeals to the prurient interest in sex.

- The law prohibits such performances on public property where children might view them and in the presence of minors.

- The Attorney General enforces Section One, which prohibits commercial enterprises from allowing sexually oriented performances in the presence of minors.

- 360 Queen Entertainment hosts drag performances where performers use revealing breastplates, pulse their chests in front of people, and invite audience members to spank performers.

**Controlling Law**

- Standing requirements for pre-

enforcement *First Amendment* challenges (Susan B. Anthony List v. Driehaus, Turtle Island Foods v. Strain).

• Moody v. NetChoice framework for facial *First Amendment* challenges requiring assessment of whether unconstitutional applications substantially outweigh constitutional ones.

• *Texas Health & Safety Code Ann. § 769.002* (Section One of S.B. 12).

## Court Rationale

The court analyzed each plaintiff's standing separately, finding most plaintiffs failed to show they intended to engage in conduct arguably proscribed by S.B. 12. Only 360 Queen Entertainment demonstrated standing against the Attorney General by showing it intended to conduct performances with prosthetic breast gesticulations and audience contact that arguably constituted 'sexual conduct' under the statute. The court determined the district court failed to apply the proper Moody framework for facial challenges, which requires measuring unconstitutional applications against constitutional ones.

## Outcome
## Procedural Outcome

The Fifth Circuit vacated the district court's injunction and remanded with instructions to (1) dismiss claims against Brett Ligon, James Hicks, Montgomery County, Taylor County, and the City of Abilene for lack of standing; and (2) reconsider the plaintiffs' facial challenge to Section One of S.B. 12 under the Moody framework.

**Counsel:** **[*1]** For Woodlands Pride, Incorporated, Abilene Pride Alliance, Extragrams, L.L.C., 360 Queen Entertainment, L.L.C., Brigitte Bandit, Plaintiffs - Appellees: Brian Klosterboer, Thomas Paul Buser-Clancy,

Adriana Cecilia Pinon, American Civil Liberties Union of Texas, Houston, TX; Madeleine Rose Dwertman, Esq., Katherine Elise Jeffress, Derek Raymond McDonald, Baker Botts, L.L.P., Austin, TX; Brandt Thomas Roessler, Baker Botts, L.L.P., New York, NY; Emily Rohles, Baker Botts, L.L.P., Houston, TX.

For Warren Kenneth Paxton, In an official capacity as Attorney General of Texas, Defendant - Appellant: Monroe David Bryant, Jr., P.O. Box 12548, Austin, TX; William Francis Cole, Esq., P.O. Box 12548 (MC-059), Austin, TX; Taylor McCarty, 611 W. 15th Street, Austin, TX.

For Brett Ligon, in an official capacity as District Attorney of Montgomery County, Montgomery County, Texas, Defendants - Appellants: Daniel Plake, County Attorney's Office, Conroe, TX.

For James Hicks, in an official capacity as District Attorney of Taylor County, Taylor County, Texas, Defendants - Appellants: Robert Burgess Wagstaff, McMahon Surovik Suttle, P.C., Abilene, TX.

For City of Abilene, Texas, Defendant - Appellant: Ramon **[*2]** Gustave Viada, III, Viada & Strayer, The Woodlands, TX.

For Fiesta Youth, Amicus Curiae: Z. Gabriel Arkles, Advocates for Trans Equality Education Fund, New York, NY.

For Foundation for Individual Rights and Expression, Amicus Curiae: Adam Steinbaugh, Foundation for Individual Rights & Expression, Philadelphia, PA; JT Morris, Foundation for Individual Rights & Expression (FIRE), Washington, DC.

For Transgender Education Network of Texas, Amicus Curiae: Z. Gabriel Arkles, Advocates for Trans Equality Education Fund, New York, NY.

For Equality Texas, Amicus Curiae: Holt M. Lackey, Holt Major Lackey, P.L.L.C., Austin,

2025 U.S. App. LEXIS 29217, *2

TX.

For Frankie Gonzales-Wolfe, Amicus Curiae: Z. Gabriel Arkles, Advocates for Trans Equality Education Fund, New York, NY.

For Texas Freedom Network, Amicus Curiae: Holt M. Lackey, Holt Major Lackey, P.L.L.C., Austin, TX.

For Barbie Hurtado, Amicus Curiae: Z. Gabriel Arkles, Advocates for Trans Equality Education Fund, New York, NY.

For Dale Carpenter, Professor, Amicus Curiae: Eugene Volokh, Stanford University, Stanford, CA; Holt M. Lackey, Holt Major Lackey, P.L.L.C., Austin, TX.

For Verniss McFarland, III, Amicus Curiae: Z. Gabriel Arkles, Advocates for Trans Equality Education **[*3]** Fund, New York, NY.

For Erwin Chemerinsky, Dean, Amicus Curiae: Eugene Volokh, Stanford University, Stanford, CA.

For Pidge Stanley, Amicus Curiae: Z. Gabriel Arkles, Advocates for Trans Equality Education Fund, New York, NY.

Eugene Volokh, Professor, Amicus Curiae, Pro se, Stanford, CA.

For Era Steinfeld, Amicus Curiae: Z. Gabriel Arkles, Advocates for Trans Equality Education Fund, New York, NY.

For Stanton Foundation *First Amendment* Clinic, at Vanderbilt Law School, Amicus Curiae: Eugene Volokh, Stanford University, Stanford, CA.

For Jay Thomas, Aimee Villarreal, Amicus Curiaes: Z. Gabriel Arkles, Advocates for Trans Equality Education Fund, New York, NY.

For Roy L. Austin, Jr., Former Deputy Assistant Attorney General, Civil Rights Division, U.S. Department of Justice Former Deputy Assistant to President Obama for the Office of Urban Affairs, Justice, and Opportunity (White House Domestic Policy Council, Wesley Bell, Prosecuting Attorney, St. Louis County, Missouri, Amicus Curiaes: Omar Jesus Alaniz, 2850 N. Harwood Street, Dallas, TX.

For B, Amicus Curiae, UTA: Biberaj: Omar Jesus Alaniz, Dallas, TX.

For Shay Bilchik, Former Associate Deputy Attorney General, U.S. Department of Justice Former Administrator **[*4]** of the Office of Juvenile Justice and Delinquency Prevention, U.S. Department of Justice, Chesa Boudin, Former District Attorney, City and County of San Francisco, California, Amicus Curiaes: Omar Jesus Alaniz, Dallas, TX.

For Childrens Defense Fund, Amicus Curiae: Janice Mac Avoy, Samuel Mark Light, Fried, Frank, Harris, Shriver & Jacobson, L.L.P., New York, NY.

For Actors' Equity Association, Amicus Curiae: Megan Stater Shaw, Cohen, Weiss & Simon, L.L.P., New York, NY; Andrea Friedenauer Hoeschen, Actors' Equity Association, New York, NY.

For National Coalition Against Censorship, American Booksellers for Free Expression, Authors Guild, Comic Book Legal Defense Fund, Fashion Law Institute, Woodhull Freedom Foundation, Amicus Curiaes: Peter Steffensen, Southern Methodist University Dedman School of Law, Dallas, TX; Thomas S. Leatherbury, Esq., Thomas S. Leatherbury Law, P.L.L.C., Dallas, TX.

For Pastor Reverend Heather P. Tolleson, First Christian Church, Amicus Curiaes: Peter Drew Kennedy, Graves, Dougherty, Hearon & Moody, P.C., Austin, TX.

For Dramatists Legal Defense Fund, Amicus Curiae: Bruce Edward Johnson, Seattle, WA.

For Texas Civil Rights Project, Amicus Curiae: Meghan Berglind, **[*5]** Elizabeth Poche, Wheeler Trigg O'Donnell, L.L.P., Denver, CO;

Travis Walker Fife, Texas Civil Rights Project, Houston, TX.

For Dramatists Guild of America, Amicus Curiae: Bruce Edward Johnson, Seattle, WA.

**Judges:** Before DENNIS, SOUTHWICK, and ENGELHARDT, Circuit Judges. JAMES L. DENNIS, Circuit Judge, concurring in the judgment in part and dissenting in part.

**Opinion by:** KURT D. ENGELHARDT

# Opinion

KURT D. ENGELHARDT, *Circuit Judge*:

A Texas law regulates sexually oriented performances on public property and in the presence of minors. A drag performer and others in the drag industry brought a pre-enforcement challenge, alleging that the law facially violates the *First Amendment*.[1] After a two-day bench trial, the district court agreed with the plaintiffs and permanently enjoined the appellants from enforcing the law. We vacate that injunction and remand.

I.

A.

Texas Senate Bill 12 ("S.B. 12") regulates "sexually oriented performances" on public property and in the presence of minors. *See* TEX. HEALTH & SAFETY CODE ANN. § 769.002; *Tex. Loc. Gov't Code Ann. § 243.0031*; *Tex. Penal Code Ann. § 43.28*. A "sexually oriented performance" is "a visual performance" that (1) features a performer who "is nude" or "engages in sexual conduct," and (2) "appeals to the prurient interest in sex." *Tex. Penal Code Ann. § 43.28(a)(2)*.

---

[1] Plaintiffs use the word "drag" to describe their activities and they call the law that they challenge a "drag ban." The text of the law does not include the word "drag."

For the first prong, *S.B. 12* defines the relevant conduct. "Nude" **[*6]** means "entirely unclothed" or "clothed in a manner that leaves uncovered or visible through less than fully opaque clothing any portion of the breasts below the top of the areola of the breasts, if the person is female, or any portion of the genitals or buttocks." *Tex. Bus. & Com. Code Ann. § 102.051(1)*. "Sexual conduct" means: (1) "the exhibition or representation, actual or simulated, of sexual acts, including vaginal sex, anal sex, and masturbation"; (2) "the exhibition or representation, actual or simulated, of male or female genitals in a lewd state, including a state of sexual stimulation or arousal"; (3) "the exhibition of a device designed and marketed as useful primarily for the sexual stimulation of male or female genitals"; (4) "actual contact or simulated contact occurring between one person and the buttocks, breast, or any part of the genitals of another person"; or (5) "the exhibition of sexual gesticulations using accessories or prosthetics that exaggerate male or female sexual characteristics." *Tex. Penal Code Ann. § 43.28(a)(1)*.

As for the second prong, Supreme Court precedent is instructive.[2] To appeal to the

---

[2] When interpreting undefined terms in state statutes, the Supreme Court of Texas "presume[s] that the Legislature uses statutory language with complete knowledge of the existing law and with reference to it." *Amazon.com, Inc. v. McMillan, 625 S.W.3d 101, 106-07 (Tex. 2021)* (cleaned up). "Prurient interest in sex" is a term of art coined by the United States Supreme Court as one part of the "obscenity" definition. *See Roth v. United States, 354 U.S. 476, 487, 77 S. Ct. 1304, 1 L. Ed. 2d 1498 (1957)* ("Obscene material is material which deals with sex in a manner appealing to prurient interest."); *Miller v. California, 413 U.S. 15, 24, 93 S. Ct. 2607, 37 L. Ed. 2d 419 (1973)* (building on *Roth* to clarify three-part test for obscene material, including "appeal[s] to the prurient interest in sex" as one element). We conclude the Texas Legislature invoked the Supreme Court's description of a "prurient interest in sex" by using this phrase, and that jurisprudence guides what conduct is arguably proscribed by S.B. 12. *See infra* Section II.A (explaining injury-in-fact analysis for Article III standing in pre-enforcement *First Amendment* challenges).

"prurient interest in sex," material, at a minimum, must be "in some sense erotic." *Ashcroft v. ACLU, 535 U.S. 564, 579, 122 S. Ct. 1700, 152 L. Ed. 2d 771 (2002)*.

B.

S.B. 12 regulates sexually **[*7]** oriented performances in three ways. Section One prohibits a "person who controls the premises of a commercial enterprise" from "allow[ing] a sexually oriented performance to be presented on the premises in the presence of an individual younger than 18 years of age." *TEX. HEALTH & SAFETY CODE ANN. § 769.002(a)*. It is enforced by the Attorney General of Texas, *see id. § 769.002(c)*, who is an appellant here.

Section Two authorizes municipalities and counties to "regulate sexually oriented performances as the municipality or county considers necessary to promote the public health, safety, or welfare." *Tex. Loc. Gov't Code Ann. § 243.0031(b)*. In exercising this power, municipalities and counties may not authorize a sexually oriented performance on public property or in the presence of individuals under the age of 18. *Id. § 243.0031(c)*. Montgomery County, Taylor County, and the City of Abilene are the appellants to which Section Two confers authority.

Section Three establishes a Class A misdemeanor for engaging in a sexually oriented performance either (1) "on public property at a time, in a place, and in a manner that could reasonably be expected to be viewed by a child"; or (2) "in the presence of an individual younger than 18 years of age." *Tex. Penal Code Ann. § 43.28(b)*. In Texas, district and county attorneys enforce **[*8]** state criminal laws. *See State v. Stephens, 663 S.W.3d 45, 49-51 (Tex. Crim. App. 2021)*. Two appellants are authorized to enforce Section Three in their respective jurisdictions: Brett Ligon, the district attorney for Montgomery

County; and James Hicks, the district attorney for Taylor County.

II.

A.

S.B. 12 has not been enforced yet. The plaintiffs—The Woodlands Pride, Inc.; Abilene Pride Alliance; 360 Queen Entertainment, LLC; Extragrams LLC; and Brigitte Bandit—brought a pre-enforcement challenge under *42 U.S.C. § 1983*, alleging that the law facially violates the *First* and *Fourteenth Amendments*. The district court held a two-day bench trial, concluded that *S.B. 12* is a facially unconstitutional restriction on speech, and enjoined the Attorney General of Texas, the City of Abilene, Taylor County, Montgomery County, and four district attorneys from enforcing it. *See Woodlands Pride, Inc. v. Paxton, 694 F. Supp. 3d 820, 851 (S.D. Tex. 2023)*. The appellants ask us to vacate the injunction.[3] Their first argument on appeal is that the plaintiffs lack standing. We review a district court's ruling on standing *de novo*. *Turtle Island Foods, S.P.C. v. Strain, 65 F.4th 211, 215 (5th Cir. 2023)*.

Standing "is not dispensed in gross." *TransUnion LLC v. Ramirez, 594 U.S. 413, 431, 141 S. Ct. 2190, 210 L. Ed. 2d 568 (2021)*. Plaintiffs "must demonstrate standing for *each claim* that they press against *each defendant*, and for *each form of relief* that they seek." *Murthy v. Missouri, 603 U.S. 43, 61, 144 S. Ct. 1972, 219 L. Ed. 2d 604 (2024)* (emphasis added) (quotation marks and citation omitted). When plaintiffs seek **[*9]** injunctive relief, "for every defendant, there must be at least one plaintiff with standing to seek [the] injunction." *Id.* So for each appellant here, at least one plaintiff must have "(1) an

---

[3] Two defendants at the district court—Travis County district attorney, Delia Garza, and Bexar County district attorney, Joe D. Gonzalez—did not appeal the district court's injunction.

'injury in fact' that is 'concrete and particularized' and 'actual or imminent'; (2) is fairly traceable to th[at] defendant's actions; and (3) is likely to be redressed by a favorable decision." *Turtle Island Foods, 65 F.4th at 215* (citing *Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)*).

In pre-enforcement free speech challenges, a plaintiff "need not have experienced 'an actual arrest, prosecution, or other enforcement action' to establish standing." *Barilla v. City of Houston, 13 F.4th 427, 431 (5th Cir. 2021)* (quoting *Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158, 134 S. Ct. 2334, 189 L. Ed. 2d 246 (2014)*). Chilled speech or self-censorship is an injury in fact if a plaintiff shows that (1) he intends to engage in a course of conduct arguably affected with a constitutional interest; (2) the course of action is arguably proscribed by statute; and (3) there is a credible threat of prosecution under the statute. *Turtle Island Foods, 65 F.4th at 215-16* (citing *Susan B. Anthony List, 573 U.S. at 159*).

A plaintiff "must support each element of standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" *Murthy, 603 U.S. at 58* (quoting *Lujan, 504 U.S. at 561*). When a case has proceeded to final judgment, standing "must be supported adequately by the evidence adduced at trial." *El Paso County v. Trump, 982 F.3d 332, 338 (5th Cir. 2020)* (cleaned up).

**B.**

We start **[*10]** with whether—and to what extent—each plaintiff has standing. To make this determination, we rely on the evidence presented at trial. *See id.*

**1.**

The Woodlands Pride, Inc. hosts an annual

pride festival in Montgomery County, Texas. Children attend the festival, which includes on-stage drag performances. Woodlands Pride often says that its festival is "a reflection of a family-oriented community." It "want[s] to make sure" that this message of "family-oriented community" is "pushed out through [the] music that's played, [and] through everything you see," including "what's happening on the stage." To achieve this objective, a Woodlands Pride board member approves the music playlists and meets with all performers to "talk about dos and don'ts."

When asked by the district court whether the drag performances are "specifically tailored to a family aspect," the Woodlands Pride representa-tive testified: "Our performances aren't specifically tailored to a family aspect, but they are tailored to mostly ensuring that there's **_no_** bad language in music and that it is a festival for everybody." "For lack of better terms," the representative testified, "this is a family friendly drag performance." And **[*11]** he confirmed that this is true for all Woodlands Pride performances.

The Woodlands Pride representative also testified that he could "confidently describe to [the drag performers] how to avoid making a performance appear that it appeals to the prurient interest in sex." There has never been any nudity at any of Woodland Pride's performances,[4] **_no_** exhibition or representation of actual or simulated sexual acts or genitals, and **_no_** sexual gesticulations with exaggerated prosthetic penises. The performers "do a

_____

[4] After testifying several times that there is **_no_** nudity during the performances, including as defined by *Tex. Bus. & Com. Code Ann. § 102.051(1)(B)*, the representative testified on redirect that some performers exhibited nudity as defined by *S.B. 12* because the performers showed cleavage and a portion of their buttocks. Only one exhibit introduced into evidence at trial depicts a Woodlands Pride drag performer's outfit. The performer is wearing what appears to be a long-sleeved leotard with fishnet tights.

Conga line type thing and put their hands on each other's hips," and sometimes touch each other—including a "portion of their buttocks"—while dancing, but the representative testified that it is "just a dance routine" and does not appeal to the prurient interest in sex. He also testified that some of the performers may "twerk."

The Woodlands Pride festival also has vendors, including STI and STD testing vendors who hand out condoms and sexual lubricant. The plaintiffs argue that passing out condoms and sexual lubricant is arguably "the exhibition of a device designed and marketed as useful primarily for the sexual stimulation of male or female genitals."

None of the Woodlands Pride conduct **[*12]** introduced at trial arguably amounts to a "sexually oriented performance." A vendor handing out condoms and sexual lubricant is not "a visual performance," nor are STD and STI testing vendors "performers." *See Tex. Penal Code Ann. § 43.28(a)(2)*. As to the drag performances, even if making contact with another performer's buttocks is arguably "sexual conduct" under *S.B. 12*, it is not proscribed if it does not appeal to the prurient interest in sex. None of the trial evidence indicates that the performances are "in some sense erotic." *See Ashcroft, 535 U.S. at 579*. Because Woodlands Pride does not intend to engage in conduct that is arguably proscribed by *S.B. 12*, it does not have standing to seek an injunction against any of the appellants.

2.

Abilene Pride Alliance is an organization based in Abilene, Texas, which is in Taylor County. Abilene Pride hosts various community-based and fundraising events, including drag brunches, drag bingo, and a pride parade and festival. There is *no* age restriction for Abilene Pride's events and Abilene Pride asks all performers to "[p]lease

be age appropriate."

There is *no* nudity, as defined by *S.B. 12*, at Abilene Pride's drag performances. Nor is there actual or simulated sex or masturbation. Drag performers for Abilene Pride's **[*13]** events wear a variation of sequins, big hair, wigs, breastplates, hip pads, packers, and exaggerated jewelry.[5] A typical Abilene Pride drag performance involves "dancing, lip syncing, engaging with the audience by hugging, kissing on the cheek, [and] sometimes bumping hips." A drag performer's buttocks have "come into contact with attendees" on a "a few occasions where the venue has been crowded and as the entertainer was moving to engage with the crowd, they [sic] bumped into some folks." Performers also "[o]ccasionally" "do a hip bump with one of the audience members." Performers may have sat in audience members' laps too, but the Abilene Pride president provided conflicting testimony on this.[6] Drag performers' breasts or breastplates come into contact with attendees only when giving front-facing hugs or during "accidental bumping."

Abilene Pride's president testified that he does not think that Abilene Pride's performances involve sexual gestures or gesticulations. He is nonetheless concerned that others might think that the performances violate S.B. 12 because Abilene Pride has had protestors at its events before and, on one occasion, someone called

---

[5] Breastplates are prosthetic breasts. Hip pads are prosthetics that exaggerate the appearance of the performer's buttocks. Packers are prosthetics that drag performers wear under clothing to create the appearance of male genitalia.

[6] He testified that drag performers have never sat in the laps of attendees at any of the events that he has attended. His written declaration, however, stated: "On some occasions our drag performers give front-facing hugs or hip bumps to audience members or even sit in their laps." After the attorney read him this statement on cross-examination, he testified that performers "usually will just sit and continue lip syncing," and that he has never observed lap dances.

the police.[7] The public health department **[*14]** has also attended Abilene Pride's festival to share information and hand out free condoms and sexual lubricant. As with the Woodlands Pride vendors who passed out condoms and sexual lubricant, the plaintiffs contend that this is arguably proscribed by *S.B. 12*.

None of the Abilene Pride conduct introduced at trial arguably amounts to a "sexually oriented performance." First, that people have protested Abilene Pride's events before has ***no*** bearing on whether S.B. 12 arguably proscribes the performances. Second, giving front facing hugs and accidentally bumping into others are common interactions that do not inherently appeal to the prurient interest in sex. Nor does the trial record contain evidence indicating that under the circumstances described here, these common interactions are "in some sense erotic." *See Ashcroft, 535 U.S. at 579*. So even if these actions constitute "actual . . . or simulated contact occurring between one person and the buttocks, breast, or any part of the of the genitals of another person," they are not arguably proscribed by *S.B. 12*. *Tex. Penal Code Ann. § 43.28(a)(1)(D)*. And like the STI and STD testing vendors at Woodlands Pride's events, handing out condoms and sexual lubricant is not "a visual performance," nor is the public health **[*15]** department a "performer."

Because Abilene Pride does not intend to engage in conduct that is arguably proscribed by S.B. 12, it does not have standing to seek an injunction against any of the appellants.

3.

360 Queen Entertainment, LLC is a drag production company that books drag queens to perform on the patio of Tomatillos Restaurant & Bar in San Antonio. Tomatillos is owned by the father of 360 Queen's owner. The restaurant is in a strip mall with several other businesses that can view the patio "very clearly." 360 Queen and Tomatillos have an agreement that on show days, 360 Queen "controls" the patio from the morning until the show ends. Tomatillos provides restaurant service to the audience but is not otherwise involved. 360 Queen sells the tickets and decides who enters the show through the patio's primary entrance. While 360 Queen tries to restrict restaurant customers from entering the patio via the dining room, it has "had instances where children have run into the patio through [the] show; not because they have any interest in watching the drag show itself, but because there's a field in the back where a lot of kids tend to go and play while their parents are dining."

360 Queen **[*16]** does not typically allow children to attend its shows. This is not because the shows are "sexual in nature" or "detrimental to children," but rather to "create an environment where adults [can] enjoy dinner, enjoy drinks, enjoy entertainment, but not necessarily have to do it around other people's kids." It makes exceptions to this rule, however. The owner testified: "There have been situations where there are families dining inside and they have children with them . . . these families are very well aware of what drag is. And they have pleaded with us to allow them to come out onto the patio. And we have made exceptions in the past and allowed children to observe our drag show."

A picture introduced at trial depicts a 360 Queen drag performer who is fully clothed in a red dress and holding dollar bills. A different picture shows a 360 Queen drag performer who is wearing what appears to be a leotard. The 360 Queen owner described this outfit as "a very short leotard" and explained that the performer is "wearing butt pads that reveal her

---

[7] The police arrived and asked questions but left without taking further action.

buttocks." Both images also demonstrate how the public can easily view the patio.

360 Queen performances include twerking—"a form of expression where **[*17]** you put your hands on your knees essentially and move your buttocks up and down rapidly"—and "death drops"—a dance move "where a performer will tuck one of their [sic] feet or legs behind their [sic] butt and then fall to the floor with the other leg extended." When asked whether the performers "simulate contact with the buttocks of another person," the owner testified that the performers sit on customers' laps while wearing thongs and one performer invited a "handsome" male customer "to spank her on the butt." When asked whether the performers "ever perform gesticulations while wearing prosthetics," the owner testified that in 360 Queen's most recent show, a drag queen "wore a breastplate that was very revealing, pulsed her chest in front of people, [and] put her chest in front of people's faces."

As to whether 360 Queen performances include nudity, the owner testified that a performer once had a wardrobe malfunction where a breastplate fell out and that some performers "wear sort of string bikinis that will cover the nipples but be very, very revealing around the buttocks."

Based on the evidence introduced at trial, 360 Queen's performances arguably include proscribed conduct. The **[*18]** owner described one performance where a drag queen, who was wearing a "very revealing" breastplate pulsed the breastplate in front of people and put the breastplate in people's faces. This arguably constitutes "the exhibition of sexual gesticulations using . . . prosthetics that exaggerate . . . female sexual characteristics." *See Tex. Penal Code Ann. § 43.28(a)(1)(E)*. He also described a second performance where an audience member was invited to spank a performer's buttocks. This

arguably constitutes "actual contact or simulated contact occurring between one person and the buttocks . . . of another person." *Id. § 43.28(a)(1)(D)*. Both performances are arguably "in one sense erotic," *see Ashcroft, 535 U.S. at 579*, and the owner testified that minors are sometimes present.

Because 360 Queen only holds performances in San Antonio, its claimed injury is not traceable to Abilene, Taylor County, Montgomery County, or the district attorney appellants. The Attorney General is the only appellant who 360 Queen could have standing to assert its claims against. Recall that the Attorney General enforces Section One, which prohibits a "person who *controls* the premises of a commercial enterprise" from "allow[ing] a sexually oriented performance to be presented on the premises **[*19]** in the presence of an individual younger than 18 years of age." *Tex. Health & Safety Code Ann. § 769.002(a)* (emphasis added).

The Attorney General argues that 360 Queen does not "control" the premises because a third party owns Tomatillos. Control is not necessarily synonymous with ownership, however. *See Control*, Black's Law Dictionary (11th ed. 2019) (defining "Control" as, *inter alia*, "[t]o exercise power or influence over"). Again, for a pre-enforcement *First Amendment* challenge, the question is whether a plaintiff's conduct is *arguably* proscribed by the statute. *Turtle Island Foods, 65 F.4th at 215-16*. "Arguably proscribed" does not require that the plaintiff's interpretation of the challenged law be the *best* interpretation. *Id. at 218*. The owner of 360 Queen testified that 360 Queen controls the patio on show days, sells the tickets, and decides who enters the show through the patio's primary entrance. Put otherwise, 360 Queen "exercise[s] power or influence" over the premises. *See supra* Black's Law Dictionary. That is sufficient for

this posture.[8]

Our determination that 360 Queen seeks to engage in arguably proscribed conduct does not conclude the standing inquiry. It does not even conclude the injury-in-fact inquiry. To satisfy the injury-in-fact requirement, the conduct [*20] must be arguably affected with a constitutional interest and there must be a credible threat of enforcement. *Turtle Island Foods, 65 F.4th at 215-16*. If an injury in fact is established, it must also be traceable to the Attorney General and redressable by the injunction sought. *Id. at 215*. "In pre-enforcement *First Amendment* challenges like this one, we assume a credible threat of prosecution in the absence of compelling contrary evidence, so long as the challenged law is non-moribund." *Inst. for Free Speech v. Johnson, 148 F.4th 318, 329 (5th Cir. 2025)* (cleaned up).

Although it "falls only within the outer ambit of the *First Amendment's* protection" and is subject to restrictions, *Tex. Ent. Ass'n, Inc. v. Hegar, 10 F.4th 495, 509 (5th Cir. 2021)* (quoting *City of Erie v. Pap's A.M., 529 U.S. 277, 289, 120 S. Ct. 1382, 146 L. Ed. 2d 265 (2000)*), nude dancing generally constitutes expressive conduct, *id.* (citing *Barnes v. Glen Theatre, Inc., 501 U.S. 560, 566, 111 S. Ct. 2456, 115 L. Ed. 2d 504 (1991)*). 360 Queen's performances are therefore *arguably* affected with a constitutional interest.[9] We also assume a credible threat of enforcement, given the lack of evidence demonstrating otherwise and because *S.B. 12* is non-moribund. *See Inst. for Free Speech, 148 F.4th at 329*. 360 Queen has established an injury in fact.

Traceability and redressability are the final hurdles for standing. 360 Queen satisfies these "dual elements" if its claimed injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court" and it is "likely, as [*21] opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id. at 330* (cleaned up); *see also Lujan, 504 U.S. at 560-61*.

360 Queen's claimed injury is traceable to the Attorney General, who enforces Section One, and its desired injunction would eliminate the threat of enforcement. *See supra* note 8; *see also Air Evac EMS, Inc. v. Tex., Dep't of Ins.,*

---

[8] In a footnote, the Attorney General asserts this same position—that 360 Queen does not "control" Tomatillos—to argue that 360 Queen's claims against him run afoul of sovereign immunity. He correctly states that for *Ex parte Young* to apply, the defendant-official "must have '*some* connection with the enforcement of the [challenged] act.'" *Tex. All. for Retired Ams. v. Scott, 28 F.4th 669, 672 (5th Cir. 2022)* (emphasis in original) (quoting *Ex parte Young, 209 U.S. 123, 157, 28 S. Ct. 441, 52 L. Ed. 714 (1908)*). But the Attorney General has more than *some* connection with the enforcement of Section One. He has the sole authority to (1) recover civil penalties for Section One violations and (2) obtain injunctions to restrain Section One violations. *See* TEX. HEALTH & SAFETY CODE ANN. § 769.002(c)*. He therefore has the "particular duty" to enforce—that is, to compel or constrain compliance with—Section One, so the injunction 360 Queen seeks would prevent the purported constitutional violation that 360 Queen fears. *See Tex. All. for Retired Ams., 28 F.4th at 672*.

[9] We have genuine doubt, however, that pulsing prosthetic breasts in front of people, putting prosthetic breasts in people's faces, and being spanked by audience members are actually constitutionally protected—especially in the presence of minors. While nude dancing receives *some* constitutional protection, "intentional contact between a nude dancer and a bar patron is conduct beyond the expressive scope of the dancing itself. The conduct at that point has overwhelmed any expressive strains it may contain. That the physical contact occurs while in the course of protected activity does not bring it within the scope of the *First Amendment*." *Hang On, Inc. v. City of Arlington, 65 F.3d 1248, 1253 (5th Cir. 1995)*. "It is possible to find some kernel of expression in almost every activity a person undertakes . . . but such a kernel is not sufficient to bring the activity within the protection of the *First Amendment*." *Id.* (quoting *City of Dallas v. Stanglin, 490 U.S. 19, 25, 109 S. Ct. 1591, 104 L. Ed. 2d 18 (1989)*). Even though the performers here are not fully nude, *Hang On's* reasoning is persuasive. At a minimum, *Hang On* confirms that each action in a performance is not necessarily protected even if the performance as a whole may embody some constitutional protection.

*Div. of Workers' Comp., 851 F.3d 507, 513-14 (5th Cir. 2017)* (noting "significant overlap" between the redressability and traceability inquiries and *Ex parte Young*'s application). 360 Queen therefore has standing to seek an injunction against the Attorney General. Because one plaintiff with standing for a given defendant is sufficient, we need not determine whether the remaining two plaintiffs have standing to seek an injunction against the Attorney General. *See Murthy, 603 U.S. at 61*.

4.

Extragrams LLC is a drag telegram company that provides drag entertainment for celebrations, events, and parties, and hosts drag bingo. Extragrams' performances are primarily in Austin, Texas but it has also performed in San Antonio, Dallas, Houston, Fredericksburg, Round Rock, and Pflugerville.

This list does not include Abilene. Nor are any of these cities located in Taylor or Montgomery County. Because Extragrams does not seek to engage in arguably proscribed conduct in Abilene, Taylor County, **[*22]** or Montgomery County, its claimed injury is not traceable to these appellants or the district attorney appellants. Accordingly, Extragrams does not have standing to seek an injunction against the remaining appellants.

5.

The final plaintiff, Brigitte Bandit, is a drag performer who lives in Austin, Texas, which is in Travis County.[10] Most of her performances are in Travis County but she has performed in Houston, San Marcos, San Antonio, and Dallas. As of September 9, 2023, Bandit had performances scheduled in Denton and Abilene.

Bandit typically performs in bars and nightclubs that are restricted to ages 21+, but she also performs at drag brunches (that are sometimes restricted to ages 21+ and sometimes open to all ages) and at "all-ages shows like drag story time." Most of Bandit's performances are not sexual, but she does have "some sexual shows." She testified that she would not perform one of her sexual shows at an all-ages event, however.

Bandit changes her performance and appearance depending on the audience. When performing for children, she "want[s] to appeal to something that would be interesting to kids." She has dressed as characters from *Toy Story* and *The Little Mermaid*, **[*23]** and "like a big pink princess." She testified that, when performing before kids, her costumes are "typically pretty covered," presumably meaning modest.

Bandit does not have standing to seek an injunction against the remaining appellants. Bandit has not performed, nor expressed an intent to perform, in Montgomery County, so her claimed injury is not traceable to Montgomery County or its district attorney. While Bandit testified that she had a performance scheduled in Abilene, her testimony did not include any information about this performance. Nor does the plaintiffs' brief reference Bandit's intent to perform in Abilene. Bandit's testimony stressed that her sexual performances are restricted to 18+ or 21+ audiences, and **_no_** evidence indicates that an Abilene performance would be any different. Bandit's claimed injury therefore is not traceable to the City of Abilene, Taylor County, or the Taylor County district attorney either.

III.

---

[10] The district court granted this plaintiff permission to proceed under the pseudonym "Brigitte Bandit." *See Woodlands Pride, 694 F. Supp. 3d at 829 n.3.* "Bandit" is a drag character who dresses as a female. Because the actual gender of this plaintiff is not disclosed in the record, and "Bandit" portrays a female character, we refer to the character "Bandit" as a female.

Because the plaintiffs only have standing to assert their claims against the Attorney General, and the Attorney General only has the authority to enforce Section One, the sole remaining issue on appeal is whether the plaintiffs have established that Section **[*24]** One, on its face, violates the *First Amendment*.

The choice to litigate a facial challenge "comes at a cost": facial challenges are "hard to win." *Moody v. NetChoice, LLC, 603 U.S. 707, 723, 144 S. Ct. 2383, 219 L. Ed. 2d 1075 (2024)*. But this is a feature, not a bug. "Claims of facial invalidity often rest on speculation about the law's coverage and its future enforcement." *Id.* (internal quotation marks and citation omitted). Such claims also "threaten to short circuit the democratic process by preventing duly enacted laws from being implemented in constitutional ways." *Id.* (internal quotation marks and citation omitted). The *Moody* framework for facial free speech challenges safeguards the democratic will and states' interests while still "provid[ing] breathing room for free expression." *Id.* (cleaned up).

To determine if a law, on its face, violates the *Free Speech Clause of the First Amendment*, we must ask whether "a substantial number of the law's applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* (alterations adopted) (quoting *Ams. for Prosperity Found. v. Bonta, 594 U.S. 595, 615, 141 S. Ct. 2373, 210 L. Ed. 2d 716 (2021)*). This inquiry begins with an assessment of the law's scope: "What activities, by what actors," does the law "prohibit or otherwise regulate?" *Id. at 724*. We then determine which of the law's applications violate the *First Amendment*. *Id. at 725*. And finally, we take the unconstitutional **[*25]** applications and "measure them against the rest." *Id.* The law is not facially invalid unless its "unconstitutional applications substantially outweigh its constitutional ones." *Id. at 724*.

The district court did not conduct this analysis, nor did the parties brief the proper standard or adequately develop the record.[11] Consequently, we are unequipped to undertake this task in the first instance, and remand for the district court to do so. *See Ficher v. Bickham, 70 F.4th 257, 260 (5th Cir. 2023)* ("[W]e are a court of review, not first view.").

* * *

We VACATE the injunction against the appellants and REMAND. On remand, the district court is instructed to (1) dismiss the claims against Brett Ligon, James Hicks, Montgomery County, Taylor County, and the City of Abilene; and (2) reconsider the plaintiffs' facial challenge to Section One of S.B. 12 under the *Moody* framework. The pending motion for stay pending appeal is denied as moot.

**Concur by:** DENNIS (In Part)

**Dissent by:** DENNIS (In Part)

## Dissent

JAMES L. DENNIS, *Circuit Judge*, concurring in the judgment in part and dissenting in part:

I concur in the judgment that (1) 360 Queen has standing to sue the Attorney General; (2) Woodlands Pride and Abilene Pride lack standing to sue Montgomery and Taylor Counties and the claims **[*26]** against those Defendants should be dismissed without

---

[11] To be fair, the Supreme Court decided *Moody* after the parties briefed this appeal, and the Attorney General promptly filed a *Rule 28(j)* letter to notify us of its relevance. And while *Moody* espoused existing law, that existing law had frequently been overlooked. *See Moody, 603 U.S. at 743-45* (vacating judgments from this court and the Eleventh Circuit because neither court applied the proper standard for facial free speech challenges).

prejudice; (3) sovereign immunity does not bar Plaintiffs' claims against the Attorney General; and (4) remand is appropriate for the district court to reconsider Plaintiffs' facial challenge under *Moody v. NetChoice, LLC, 603 U.S. 707, 144 S. Ct. 2383, 219 L. Ed. 2d 1075 (2024)*. But in concluding that all other Plaintiffs do not intend to engage in conduct arguably proscribed by Senate Bill 12, the majority misapprehends the governing pre-enforcement standing principles, disregards unrebutted testimony and record evidence, and turns a blind eye to the Texas Legislature's avowed purpose: a statewide "drag ban." In place of meaningful review, the opinion offers a strained and wooden account of injury and traceability that ignores the statute's text and the practical realities of its enforcement. Worse still, the majority intimates in passing that it harbors "genuine doubt" whether Plaintiffs' drag performances are protected *First Amendment* expression. That gratuitous dictum runs headlong into settled *First Amendment* jurisprudence and threatens to mislead on remand. Accordingly, I concur in the judgment in part and dissent in part.

I

S.B. 12 traces its origins to late 2022, when Texas lawmakers expressed outrage over reports of a private "drag" **[*27]** [1] performance at a Plano, Texas restaurant with minors among the audience. Shortly thereafter, Lieutenant Governor Dan Patrick identified S.B. 12 as a legislative priority, characterizing

---

[1] "Drag" is a theatrical performance in which a performer overdramatizes a character or gender. The performer typically dresses as a celebrity or fictional persona—often, though not always, of the opposite sex or gender—and uses costumes, wigs, makeup, and other accessories to exaggerate their physical characteristics. These accessories may include prosthetics worn under their clothing, such as "packers" to simulate male anatomy or "breastplates" to appear female. Performances often incorporate singing, dancing, comedy, and physical interactions with audience members. Drag shows are held in a variety of settings, including weddings, corporate events, holiday parties, and birthday celebrations.

it as a measure to prohibit children's exposure to drag shows. When Senator Bryan Hughes introduced S.B. 12 in March 2023, he described it as prohibiting "sexually explicit performances like drag shows." Following swift legislative approval, both Governor Greg Abbott and Lieutenant Governor Patrick publicly celebrated the law as a ban on drag performances in public spaces and in the presence of minors.

S.B. 12 prohibits "sexually oriented performance[s]" from occurring in the "presence of an individual younger than 18 years of age" through three main enforcement mechanisms: (1) civil penalties on those who control commercial enterprises; (2) authorization for counties and municipalities to regulate and prohibit such performances; and (3) criminal penalties. These substantive provisions of *S.B. 12* appear across three sections.

*Section One* establishes a civil penalty for any person who "controls a premises of a commercial enterprise" that "allow[s] a sexually oriented performance to be presented on the premises **[*28]** in the presence of an individual younger than 18 years of age." TEX. HEALTH & SAFETY CODE § 769.002(a). Section One is enforced by the Texas Attorney General who may bring an action to recover a civil penalty of up to $10,000 for each violation and obtain a temporary or permanent injunction to restrain violations. *Id.* § 769.002(b)-(c).

*Section Two* prohibits Texas municipalities and counties from authorizing sexually oriented performances on either (1) public property, or (2) in the presence of an individual younger than 18 years of age. *Tex. Loc. Gov't Code § 243.0031(c)*. A municipality or county may, subject to the above prohibition, regulate sexually oriented performances as the municipality or county deems necessary to

promote the public health, safety, or welfare. *Id.* *§ 243.0031(b)*. Municipalities and counties retain broad authority to license, tax, suppress, prevent, or otherwise regulate theatrical or other exhibitions, shows, or amusements. *Id.* *§ 243.0031(d)*

*Section Three* creates a criminal offense for engaging in a sexually oriented performance, regardless of whether compensation is expected or received, if the performance (1) occurs on public property at a time, in a place, and in a manner that could reasonably be expected to be viewed by a child, or (2) takes place in the presence of an **[*29]** individual younger than 18 years of age. *Tex. Penal Code § 43.28(b)*. A violation constitutes a Class A misdemeanor that is punishable by up to one year in jail, a fine of up to $4,000, or both. *Id.* *§§ 43.28(c)*, *12.21*.

Section Three defines "sexually oriented performance" used across *S.B. 12*'s substantive provisions as a "visual performance" that (A) features (i) a performer who is "nude" or (ii) a performer who engages in "sexual conduct," and that (B) "appeals to the prurient interest in sex." *Id.* *§ 43.28(a)(2)*. The definition of "nude" is borrowed from *§ 102.051(1)(A)-(B) of the Texas Business and Commerce Code* to mean either (A) "entirely unclothed" or (B) "clothed in a manner that leaves uncovered or visible through less than fully opaque clothing any portion of the breasts below the top of the areola of the breasts, if the person is female, or any portion of the genitals or buttocks."

Section Three then defines five categories of "sexual conduct" to include:

(A) The exhibition or representation, actual or simulated, of sexual acts, including vaginal sex, anal sex, and masturbation;
(B) The exhibition or representation, actual or simulated, of male or female genitals in a lewd state, including a state of sexual

stimulation or arousal;

(C) The exhibition of a device designed and marketed as useful primarily **[*30]** for the sexual stimulation of male or female genitals;
(D) Actual contact or simulated contact occurring between one person and the buttocks, breast, or any part of the genitals of another person; or
(E) The exhibition of sexual gesticulations using accessories or prosthetics that exaggerate male or female sexual characteristics.

*Id.* *§ 43.28(a)(1)(A)-(E)*. Several words and phrases are left undefined by *S.B. 12* and Texas law. For example, **no** Texas law defines, *inter alia*, "lewd," "performer," "visual performance," or "prurient interest in sex." *See, e.g., id.* *§ 43.28(a)(1)-(2)*.

B

Shortly before S.B. 12 took effect, Plaintiffs brought a pre-enforcement challenge through *42 U.S.C. § 1983* alleging the law facially violated the *First* and *Fourteenth Amendments* and seeking declaratory and injunctive relief. Plaintiffs are Brigitte Bandit, 360 Queen Entertainment LLC, Extragrams, LLC, The Woodlands Pride, Inc., and Abilene Pride Alliance.

Brigitte Bandit, a pseudonym, resides in Travis County, Texas where she hosts, produces, and performs in drag shows as a full-time profession. Bandit performs in a variety of venues including restaurants, bars, private residences, and public parks. 360 Queen Entertainment LLC is a drag production company in Bexar County, Texas owned by Richard Montez, **[*31]** Jr. 360 Queen produces drag performances exclusively for a restaurant in San Antonio, Texas owned by Montez's father. Extragrams, LLC is a drag production and entertainment company in

Travis County that offers drag entertainment for various events including bingo, parties, weddings, and corporate and holiday events. The Woodlands Pride, Inc. is a nonprofit LGBTQ+ community organization in The Woodlands Township in Montgomery County, Texas. Woodlands Pride organizes a free yearly festival in a Montgomery County public park, which includes drag performances, and is attended by thousands of patrons and hundreds of exhibitors to support and highlight the LGBTQ+ community. Abilene Pride Alliance is also a nonprofit LGBTQ+ organization in the City of Abilene in Taylor County, Texas. Abilene Pride provides meeting spaces for social support groups and holds community-based and fundraising events. These events occur on public and private property and often feature drag performers.

Each Plaintiff sued Kenneth Warren Paxton in his official capacity as the Attorney General for the State of Texas, but named different cities, counties, or district attorneys also as defendants. Bandit and Extragrams [*32] asserted claims against Travis County District Attorney Delia Garza; 360 Queen asserted claims against Bexar County District Attorney Joe D. Gonzales; Woodlands Pride asserted claims against The Woodlands Township, Montgomery County, and Montgomery County District Attorney Brett Ligon; and Abilene Pride asserted claims against the City of Abilene, Taylor County, and Taylor County District Attorney James Hicks.

Following a two-day bench trial, the district court entered a permanent injunction against S.B. 12's enforcement, concluding that Plaintiffs had standing to seek injunctive relief against each Defendant and that the law facially violates the *First Amendment*. This appeal followed.[2]

II

"Article III standing requires a plaintiff to show: (1) an injury in fact (2) that is fairly traceable to the actions of the defendant and (3) that likely will be redressed by a favorable decision." *Cibolo Waste, Inc. v. City of San Antonio, 718 F.3d 469, 473 (5th Cir. 2013)* (quotations and citation omitted). In the majority's view, Plaintiffs' claims—save for 360 Queen's against the Attorney General—meet their end at Article III's injury-in-fact prong. That result rests on a cramped view of pre-enforcement injury, a selective view of the record, and an unduly narrow construction of *S.B. 12*'s sweeping text and enforcement [*33] scheme.

A

In the context of a pre-enforcement *First Amendment* challenge, the chilling of speech—whether by self-censorship or the reasonable fear of official sanction—constitutes an injury sufficient to confer Article III standing. *Turtle Island Foods, S.P.C. v. Strain, 65 F.4th 211, 215 (5th Cir. 2023)* (quoting *Barilla v. City of Houston, 13 F.4th 427, 431 (5th Cir. 2021)*). A plaintiff alleging such an injury must demonstrate (1) an intention to engage in conduct that is arguably protected by the Constitution, (2) that the conduct is at least arguably proscribed by the challenged statute, and (3) that there exists a credible threat of prosecution under that statute. *Id. at 215-16* (citing *Susan B. Anthony List v. Driehaus, 573 U.S. 149, 159, 134 S. Ct. 2334, 189 L. Ed. 2d 246 (2014)*). We must assume at this stage of the analysis that the conduct at issue—Plaintiffs' drag performances—falls within the ambit of protected *First Amendment* expression. *Young Conservatives of Tex. Found. v. Smatresk, 73 F.4th 304, 309 (5th Cir. 2023)*. So, this dispute concerns the second and third elements.

---

[2] Travis County District Attorney Delia Garza and Bexar County District Attorney Joe D. Gonzales did not appeal.

*1. Arguably Proscribed*

To satisfy the arguably proscribed standard, Plaintiffs need only show that their interpretation of *S.B. 12* is "*arguable*," not that it is "the *best* interpretation" of the statutory text. *Turtle Island Foods, 65 F.4th at 218* (emphasis in original). Contrary to the majority's conclusion, Plaintiffs have shown that their drag performances arguably fall within *S.B. 12*'s definition of "sexually oriented performance"—*i.e.*, a visual performance that features either nudity or at least one of five **[*34]** categories of "sexual conduct" that "appeal[s] to the prurient interest in sex"—and those performances will arguably occur in the presence of minors. *Tex. Penal Code § 43.28(a)(2)*.

I begin with what the majority ignores: S.B. 12's legislative history. While *S.B. 12* does not on its face purport to ban "drag performances" by name, even a cursory review of the law's legislative history reveals several indicia that this was undoubtedly the legislature's intent.[3] Consider what prompted lawmakers to introduce S.B. 12: a private drag performance in Plano, Texas, during which a performer allegedly lifted her skirt and danced suggestively before an audience that included minors.[4] Senator Hughes, the bill's author,

cited this isolated anecdote to justify a sweeping legislative conclusion, namely that "sexually oriented performances sometimes occur in venues generally accessible to the public, including children."[5]

From this premise, state officials characterized S.B. 12 as a targeted response to drag performances. Lieutenant Governor Patrick designated the legislation a priority and avowed **[*35]** its express purpose as "Banning Children's Exposure to Drag Shows." In presenting the bill to the State Affairs Committee, Senator Hughes likewise warned of a perceived risk that children were being exposed to "sexually explicit performances like drag shows." S.B. 12's legislative sponsors in the Texas House of Representatives promoted the statute as a means of "protecting children from explicit, hyper-sexualized drag performances in Texas," "restricting sexually oriented performances also known as 'drag shows' in the presence of children," and "protect[ing] a child's innocence" by banning such events. Governor Abbott affirmed this understanding when he announced the bill's signing: "Texas Governor Signs Law Banning Drag Performances in Public. That's right." The legislative record leaves little doubt that *S.B. 12* was crafted with the specific aim of restricting drag performances.

So, it should come as ***no*** surprise that the statute's operative language "arguably" reaches the very conduct lawmakers intended to stymie. To begin, extensive trial testimony demonstrates that each Plaintiff either engages in or produces performances that arguably fall within the statute's definition of "sexual conduct" **[*36]** or nudity. Bandit

---

[3] Legislative history is a valid inquiry for the purposes of standing. *See United States v. One Parcel of Real Prop., 831 F.2d 566, 567 (5th Cir. 1987)* (relying on legislative history to determine statute's scope for purposes of standing). And Texas law permits courts to "consider legislative history in construing a statute" even where that statute "is not ambiguous." *City of Rockwall v. Hughes, 246 S.W.3d 621, 626 n.6 (Tex. 2008)* (citing *Tex Gov't Code § 311.023(3)*).

[4] BRYAN HUGHES, Bill Analysis: C.S.S.B. 12, 88th Leg., R.S., at 1 (2023), https://capitol.texas.gov/tlodocs/88R/analysis/pdf/SB00012H.pdf [https://perma.cc/CSR4-MLVU]; Mark Lungariello, *Video of Drag Queen Gyrating in Front of Child has Texas Pols Pushing for Legislative Action*, N.Y. POST (Oct. 18, 2022), https://nypost.com/2022/10/18/video-of-drag-queen-gyrating-

next-to-child-sparks-bac-klash/ [https://perma.cc/D2R2-9P8Z].

[5] HUGHES, *supra* note 4 ("In cities around Texas, sexually oriented performances sometimes occur in venues generally accessible to the public, including children. For instance, on October 18, 2022, the New York Post reported an all ages lunch at the Ebb & Flow restaurant in Plano, Texas.").

**App. 650**

described the use of elaborate costuming in her performances, including corsets, high heels, wigs, prosthetic breastplates, false eyelashes, and makeup. In her words, these features are intended to "exaggerate" her "female characteristics" and are integral to her expressive presentation. Bandit regularly incorporates into her performances choreography that includes hip thrusts, breast touching, and stylized body contact with audience members—for instance, the widely accepted custom of having audience members place tips into her prosthetic chest. Her use of prosthetics and sexually suggestive bodily movements arguably implicates the statutory prohibition against "the exhibition of sexual gesticulations using accessories or prosthetics that exaggerate male or female sexual characteristics." *Tex. Penal Code § 43.28(a)(1)(E)*.

Representatives of 360 Queen and Extragrams offered similar testimony. Both entities produce drag performances in which artists frequently wear prosthetic breastplates, padded undergarments, and packers to simulate or accentuate secondary sex characteristics. While wearing these accessories, performers engage in highly stylized dance routines that involve twerking,[6] body rolls, splits, **[*37]** and other gestures that one 360 Queen representative described as "pulsing [their] chest in front of people's faces." These expressive elements—when viewed in combination—arguably fall within the statute's prohibition on gesticulations that utilize prosthetics to exaggerate sexual characteristics. *Tex. Penal Code § 43.28(a)(1)(E)*. Extragrams's director also reported that wardrobe malfunctions "happen[] often" during performances, such as the accidental exposure of cleavage or buttocks during energetic choreography (*e.g.*, jumping into a split or leotards riding up), which arguably constitutes nudity.[7] *Id.* § *43.28(a)(2)(A)(i)*; *Tex. Bus. & Com. Code § 102.051(1)(B)*.

The same is true of drag performances hosted by Woodlands Pride and Abilene Pride. The president of Woodlands Pride testified that performers at its annual outdoor festival routinely appear in gendered attire including wigs, stylized makeup, and prosthetic breastplates. Their choreography often includes movements such as hip thrusts, body rolls, and other exaggerated gestures that accentuate sex characteristics. Abilene Pride's representatives offered similar testimony. At its events, drag performers often wear packers or breastplates and padded undergarments to shape or accentuate the **[*38]** appearance of sexual characteristics. These performers also engage in stylized choreography that, in the view of the organization's director, may at times carry sexual overtones or be perceived as suggestive by members of the public. When viewed in context, the combination of simulated anatomy, expressive movement, and costuming arguably amount to "the exhibition of sexual gesticulations using accessories or prosthetics that exaggerate male or female sexual characteristics." *Tex. Penal Code § 43.28(a)(1)(E)*.

Plaintiffs also have demonstrated that their

---

[6] *Twerking*, MERRIAM-WEBSTER, https://perma.cc/W2S7-SKQD (defining "twerking" as "sexually suggestive dancing characterized by rapid, repeated hip thrusts and shaking of the buttocks especially while squatting").

[7] The Attorney General conceded at trial that such wardrobe malfunctions would expose Extragrams, Woodlands Pride, and Abilene Pride to liability under *S.B. 12*. *See* Trial Tr. Day 2, ECF-78, 80:18-81:5 ("[O]ne of the responses to that was 'Well, one of our performers might have a wardrobe malfunction.' I don't really understand what they think that gets them If they're wearing a costume that might result in exposure of their private parts, they should not be performing in front of children wearing that costume. You can't just recklessly wear something that might expose yourself and then have a get out of jail free card and say, 'Oh, it was a wardrobe malfunction.'").

performances arguably satisfy the second component of a "sexually oriented performance" under S.B. 12: that the conduct "appeal[s] to the prurient interest in sex." *Id. § 43.28(a)(2)(B)*. The statute itself offers **no** definition of this phrase, which the Attorney General concedes.[8] He and the majority instead turn to obscenity jurisprudence, invoking language from *Roth v. United States, 354 U.S. 476, 487, 77 S. Ct. 1304, 1 L. Ed. 2d 1498 & n.20 (1957)*, and *Ashcroft v. ACLU, 535 U.S. 564, 579, 122 S. Ct. 1700, 152 L. Ed. 2d 771 (2002)*, to suggest that the standard is satisfied by material that is "in some sense erotic" or has a "tendency to excite lustful thoughts." *See ante*, at 3 & n.2.

Even accepting that construction for present purposes, common sense and the record demonstrate that Plaintiffs' performances arguably meet the standard. *S.B. 12* **[*39]** 's statutory framework remains notably open-ended; the law does not require proof of specific intent to arouse, nor does it identify any objective criteria for who determines whether a performance is erotic or how that judgment is to be made. In that interpretive vacuum, it is easy to see how "sexual conduct"—here, Plaintiffs' performances involving simulated or exaggerated sexual characteristics combined with stylized or suggestive physical gestures—is arguably "in some sense erotic" or has the potential to "excite lustful thoughts." *Roth, 354 U.S. at 487 & n.20*; *Ashcroft, 535 U.S. at 579*. The record supports this inference. Multiple Plaintiffs testified to receiving audience complaints or

facing law enforcement responses from individuals who perceived their performances as sexual in nature. Others explained that the phrase "prurient interest" was itself subjective and indeterminate—often tied to a viewer's own "independent moral code," or whatever that observer "thinks and feels."

The Attorney General resists this conclusion by arguing that Plaintiffs have repeatedly disclaimed any intention of conveying sexually explicit messages. But his argument misconstrues the present inquiry. The question is not whether Plaintiffs seek to violate **[*40]** the law or whether they subjectively view their performances as erotic; rather, it is whether those performances could *arguably* be interpreted by a factfinder as falling within the statute's scope. *See Turtle Island Foods, 65 F.4th at 217* (explaining that a plaintiff "need not establish that [they] openly intend[] to violate the law" (alterations in original) (quoting *Driehaus, 573 U.S. at 163 (2014)*); *see also Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 301, 99 S. Ct. 2301, 60 L. Ed. 2d 895 (1979)* (holding a case justiciable even though the plaintiffs disavowed any intent to "propagate untruths"). It is entirely plausible that Plaintiffs' gendered expressions, costuming, prosthetics, and choreography could be viewed by factfinders and officials empowered to enforce S.B. 12 as appealing to the prurient interest in sex.

Finally, Plaintiffs' performances arguably occur "in the presence of an individual younger than 18 years of age" or "in a manner that could reasonably be expected to be viewed by a child." *Tex. Penal Code § 43.28(b)(1)-(2)*; *Tex. Local Gov't Code § 243.0031(c)(1)-(2)*. This element is satisfied in at least two distinct settings reflected in the record: first, those performances expressly open to all ages, where drag prosthetics, choreography, or wardrobe mishaps could expose performers to liability regardless of intent; and second, those

---

[8] Although "prurient interest in sex" suggests the Texas Legislature may have intended to invoke the Supreme Court's formulation in *Miller v. California, 413 U.S. 15, 24, 93 S. Ct. 2607, 37 L. Ed. 2d 419 (1973)*, Senator Hughes rejected that interpretation, and the Act omits the other two elements of the *Miller* test. *See Hearing on S.B. 12 before the Texas Senate*, 88th Leg., R.S. at 7:20-7:35 (April 4, 2023) (Statement of Senator Bryan Hughes), https://perma.cc/9W2D-ULUY; *Tex. Penal Code § 43.28(a)(2)*.

performances tailored for adult audiences where minors may **[*41]** still be present or capable of observing the event.

Extragrams, Woodlands Pride, and Abilene Pride fall within the first category. Each regularly organizes public-facing performances, including festivals, community gatherings, and private events, where children are either expressly invited or routinely present. Extragrams's drag entertainers perform at a variety of private and public gatherings including parties, weddings, holiday events, and bingo nights where children may be in attendance. Woodlands Pride and Abilene Pride hosts events—most notably, large-scale festivals—on public property where minor attendees are not only permitted but welcomed. Because children are routinely present at these events, the performances will occur "in the presence of" minors. *Tex. Penal Code § 43.28(b)(1)*; *Tex. Local Gov't Code § 243.0031(c)(2)*. And even if Plaintiffs confirmed that **no** minors were in the audience, the accessible nature of these public venues makes it at least arguable that the performances occur "in a manner that could reasonably be expected to be viewed by a child." *Tex. Penal Code § 43.28(b)(1)*.

Bandit and 360 Queen fall into the second, adult-oriented category. Bandit testified that she cannot ensure all audience members at her adult-oriented performances are over the age of **[*42]** eighteen. Admission to her performances is typically controlled by the hosting venue, which may admit minors with parental consent. And Bandit recalled instances where parents brought their seventeen-year-old children to her shows. She also described performing at venues with outdoor stages or transparent façades, where her shows could be seen from adjacent sidewalks, nearby hotels or apartments, or public thoroughfares. Similarly, 360 Queen's drag performances take place on a restaurant

patio, which is separated from the indoor dining room only by a long wall made entirely of windows. While access to the patio show is ticketed and generally restricted to adults, minors are permitted with parental approval. Moreover, the patio is visible to patrons dining inside the restaurant, which is separated only by a wall of windows. The patio itself is

*No*. 23-20480 bordered on three sides by a parking lot, and nearby commercial establishments also have a clear line of sight into the venue. Although Bandit and 360 Queen's events are intended for adult audiences, these structural features make it likely that a minor will observe a performance even without formal admission. In such circumstances, **[*43]** it is at least arguable that the performances occur in a manner reasonably expected to be viewed by a child.

The Attorney General counters that a minor's unintentional or incidental exposure is insufficient to trigger liability under *S.B. 12*, positing that "presence" requires both physical proximity and conscious awareness. In other words, a minor must be knowingly situated in the audience—not a passerby, remote observer, or otherwise unaware onlooker. But the statute provides **no** definition of "presence," and Plaintiffs offer a competing reading grounded in alternative dictionary definitions; namely, "[t]he quality, state, or condition of being in a particular time and place," with **no** requirement of perception or attentiveness. *See Presence*, BLACK'S LAW DICTIONARY (11th ed. 2019).[9] On this textual

---

[9] When interpreting an undefined term in a Texas statute, we look to its ordinary meaning informed by dictionary definitions and relevant legal usage. *Malouf v. State, 694 S.W.3d 712, 718 (Tex. 2024)*; *Tex. State Bd. of Exam'rs of Marriage & Fam. Therapists v. Tex. Med. Ass'n, 511 S.W.3d 28, 34-35 (Tex. 2017)*; *see also* Antonin Scalia & Bryan A. Garner, *A Note on the Use of Dictionaries*, *16 Green Bag 2d 419, 423, 428 (2013)* (noting that BLACK'S LAW DICTIONARY is among "the most useful and authoritative for the English language

ambiguity alone, it is at least arguable that *S.B. 12* applies when a performance is observable by a minor from an adjacent sidewalk, parking lot, restaurant interior, or public thoroughfare.

I also would reject the Attorney General's claim that the statute implicitly incorporates a scienter requirement—specifically, criminal negligence—such that **[*44]** performers would not be liable under Sections One or Three absent a failure to perceive a substantial and unjustifiable risk. *See Tex. Penal Code § 6.03(d)*. Section Three is silent with respect to *mens rea* and under Texas law, such silence supports the presumption of strict liability. *See id. § 6.02(b)*; *Aguirre v. State, 22 S.W.3d 463, 470 (Tex. Crim. App. 1999)* ("The typical strict liability statute is 'empty'—it simply says nothing about a mental state."), *as modified on denial of reh'g* (Dec. 8, 1999).[10] The same is true of the civil penalty provision. As the Texas Supreme Court has explained, where a civil penalty statute "makes **no** provision for knowledge or intent," it "does not include culpability as an element." *State v. Houdaille Indus., Inc., 632 S.W.2d 723, 729 (Tex. 1982)*. Nothing in the statutory text necessarily precludes strict criminal or civil liability where a minor is present or capable of viewing the proscribed performances. That includes settings where minors are admitted by parental choice, or where performances are observable through glass façades, from public sidewalks, or in other accessible spaces.

In sum, Plaintiffs' testimony, credited by the district court and consistent across each Plaintiff, amply establishes that their intended course of conduct is arguably proscribed by *S.B. 12*. Their shows feature costuming, choreography, **[*45]** and physical expression that plausibly constitute "sexual conduct" or "nudity" that may be seen to "appeal to the prurient interest in sex," particularly under the statute's ambiguous terms. These performances also occur in settings where minors are arguably present or could reasonably be expected to view them. This is sufficient to satisfy the "arguably proscribed" standard for pre-enforcement standing. *See Turtle Island Foods, 65 F.4th at 217*.

## 2. Credible Threat of Prosecution

Plaintiffs also have established a credible threat of prosecution under S.B. 12. In the context of a pre-enforcement challenge to a law regulating speech, we assume such a threat exists where the statute "facially restrict[s] expressive activity by the class to which the plaintiff belongs," unless the government offers "compelling contrary evidence" to rebut that presumption. *Id. at 218* (alteration in original) (quoting *Speech First, 979 F.3d at 335*). Plaintiffs here engage in protected *First Amendment* expression for the purposes of standing and fall within the class of speakers S.B. 12 was enacted to reach. Accordingly, the presumption of a credible enforcement threat attaches, and the burden shifts to Defendants to rebut it with evidence that is not merely speculative or conclusory, but "compelling." **[*46]** *Id.*

The record contains **no** such rebuttal. Defendants point to the absence of prior prosecutions or explicit statements of intent to apply the statute to Plaintiffs. But Defendants refused to disavow an intention to enforce the statute against Plaintiffs. In fact, counsel for Bexar County District Attorney Joe D. Gonzales emphasized at trial that "**no** district attorney or prosecutor in the state can

---

generally and for law").

[10] Indeed, *Aguirre* noted a tradition in Texas criminal law of "finding statutes to impose strict liability as to entire offenses affecting public health and safety, and as to the element of a child's age in statutes that protect children." *22 S.W.3d at 475* (collecting cases).

basically disavow an intent to prosecute any criminal offense in the state." Even if Defendants had disavowed enforcement, that would not suffice to defeat standing as the "lack[] [of] any intention to penalize the intended conduct" is not compelling contrary evidence. *Id.* (quoting *Speech First, 979 F.3d at 336*). Nor does the fact that the statute has not yet been enforced foreclose a finding of standing. As we have long held, "[t]hat the statute has not been enforced and that there is **no** certainty that it will be does not establish the lack of a case or controversy." *KVUE, Inc. v. Moore, 709 F.2d 922, 930 (5th Cir. 1983)*. Because *S.B. 12* arguably targets the expressive conduct in which Plaintiffs routinely engage, and because **no** Defendant has provided compelling evidence to the contrary, the threat of enforcement is credible.

B

I turn next to the causation prong of standing: whether **[*47]** Plaintiffs have shown that their *First Amendment* injuries—manifested in chilled speech and self-censorship—are fairly traceable to the enforcement authority of the Defendants named in this suit.

Beginning with the Attorney General, his enforcement authority under Section One of S.B. 12 is limited to "a person who *controls* the premises of a commercial enterprise." *TEX. HEALTH & SAFETY CODE § 769.002(a)-(c)* (emphasis added). He contends that **no** Plaintiff exercises such control. But as with his other objections to standing, this argument can be distilled to a disagreement over the meaning of statutory language, and we ask only whether Plaintiffs' interpretation of "controls" is arguably correct. *Turtle Island Foods, 65 F.4th at 218*. "Control" commonly means to "exercise power or influence over," or to "regulate or govern." *Control*, BLACK'S LAW DICTIONARY (11th ed. 2019); *see also In re Int. of H.S., 550 S.W.3d 151, 157 (Tex. 2018)*.

The Attorney General urges a narrow interpretation that equates "controls" with legal ownership or proprietorship of a venue. Like the majority, I view this reading as arguably too narrow. Section One proscribes "allow[ing]" a minor to attend a performance on commercial premises and predicates liability on those who "control[]" the premises. *TEX. HEALTH & SAFETY CODE § 769.002(a)*. This statutory structure suggests "controls" and the transitive **[*48]** verb "allow" must be read together. *Cf. Cruz v. Abbott, 849 F.3d 594, 599 (5th Cir. 2017)*. The plain meaning of "allow" is "[t]o give consent to" or "to approve." *Allow*, BLACK'S LAW DICTIONARY (12th ed. 2024). It follows that a person arguably controls the premises of a commercial enterprise if they "regulate" that premises such that it gives "consent" or otherwise "approve[s]" of a minor's attendance to a sexually oriented performance. *Id.* The meaning of "controls," then, is not necessarily limited to *only* owners or proprietors of a business. This reading finds further support in the legislature's decision not to use more precise terms such as "owner" or "operator." *See Seals v. State, 187 S.W.3d 417, 421 (Tex. Crim. App. 2005)* (en banc).

On this reading, 360 Queen arguably exercises control over the premises of a commercial enterprise during its performances. The company's owner testified that it books drag artists to perform on the patio of a local restaurant and that, under a written agreement with the restaurant, it enjoys exclusive use of the performance area during the show. 360 Queen manages ticket sales, staff placement, and audience admission, while the restaurant restricts its role to food and beverage service. These facts support that 360 Queen plausibly "controls" the premises **[*49]** within the meaning of the statute, and that its *First Amendment* injury is therefore fairly traceable to the Attorney General's enforcement authority under Section

One.[11]

Woodlands Pride and Abilene Pride also have shown that their injuries are fairly traceable to the threat of criminal prosecution by Montgomery County District Attorney Brett Ligon and Taylor County District Attorney James Hicks, respectively. Liability under Section Three extends to any "person" who "engages in a sexually oriented performance" in the presence of a minor. *Tex. Penal Code § 43.28(b)*. The Texas Penal Code defines "person" to include not only individuals but also corporations, limited liability companies, and other legal entities. *Id. § 1.07(38)*; *see also Vaughan & Sons, Inc. v. State, 737 S.W.2d 805, 811 (Tex. Crim. App. 1987)* (en banc). The term "engage," though undefined, carries its ordinary meaning: "[t]o employ or involve oneself," "to take part in," or "to embark on." *Engage*, Black's Law Dictionary (12th ed. 2024).

Both organizations operate as nonprofit corporations and routinely sponsor public drag performances arguably proscribed by S.B. 12 within Montgomery and Taylor Counties. Their organizational role in producing and facilitating these events places them within the class of "persons" who may be held liable under Section **[*50]** Three. *Tex. Penal Code §§ 1.07(38)*, *7.02(a)(2)*; *see also Vaughan & Sons, 737 S.W.2d at 811*. Moreover, Texas law imposes criminal liability on entities that aid, direct, or encourage the commission of an offense. *See Tex. Penal Code § 7.02(a)(2)*. Woodlands Pride and Abilene Pride, then, plausibly faces a dual risk of criminal liability under Section Three traceable to Ligon and

Hicks's enforcement of that provision. Woodlands Pride also explained that its expressive mission depends on the participation of performers who now fear prosecution. That fear has already caused disruptions to the organization's programming. Abilene Pride similarly expressed that it has considered abandoning drag altogether "to keep [its performers] as safe as [possible]." These injuries are *__no__* less traceable—they are the predictable result of the threat of enforcement by the district attorneys charged with applying Section Three and are thus sufficient to support standing. *See Dep't of Com. v. New York, 588 U.S. 752, 768, 139 S. Ct. 2551, 204 L. Ed. 2d 978 (2019)*. I thus part from the majority opinion's conclusions here.

The showing of traceability, however, is more limited with respect to the municipality and county Defendants charged with enforcing Section Two: the City of Abilene, Taylor County, and Montgomery County. Woodlands Pride and Abilene Pride contend their injuries are traceable **[*51]** to these Defendants by virtue of Section Two's negative command, which provides that municipalities and counties "may not *authorize*" a sexually oriented performance on public property or in the presence of a minor. *Tex. Local Gov't Code § 243.0031(c)* (emphasis added). These Plaintiffs allege that Section Two's blanket prohibition has compelled them to alter or forgo drag performances planned for public festivals and similar events, thereby chilling their speech. The relevant inquiry, then, is whether these municipal and county Defendants bear some connection to authorizing the events in question. If they do, then Section Two imposes a legal obligation that links their refusal or inability to authorize those events with the constitutional injuries Plaintiffs allege.

That connection is plainly established with respect to Abilene Pride's claims against the

---

[11] Because I agree that 360 Queen has standing to enjoin the Attorney General's enforcement of Section One, the remaining Plaintiffs also have standing to press their *First Amendment* claims against the Attorney General. *Horne v. Flores, 557 U.S. 433, 446-47, 129 S. Ct. 2579, 174 L. Ed. 2d 406 (2009)*; *Crawford v. Marion Cty. Election Bd., 553 U.S. 181, 189 n.7, 128 S. Ct. 1610, 170 L. Ed. 2d 574 (2008)*.

City of Abilene. The organization hosts an annual pride parade on city property that includes performances arguably proscribed by S.B. 12. City approval is required before the event may proceed,[12] and Abilene Pride credibly fears that, in light of Section Two, the City of Abilene must revoke or deny the necessary permits. That concern has already led the organization to **[*52]** adopt contingency measures, including the removal of a drag float from its parade and the relocation of drag performances from its all-ages festival to a private venue. These acts of self-censorship, compelled by the City of Abilene's statutory obligations, render Abilene Pride's injuries fairly traceable to the City's enforcement of Section Two.

By contrast, neither Plaintiff identifies evidence sufficient to establish a similar link to Taylor County or Montgomery County, so I join the majority's judgment as to these Defendants. Abilene Pride's only asserted connection to Taylor County involves a planned pride festival at the Taylor County Expo Center. That facility is leased and operated by a nonprofit organization, and while Taylor County owns the underlying property, the City of Abilene—not the county—handles all permitting decisions related to the event. There is **_no_** evidence that Taylor County exercises any authority to approve or prohibit the event itself, nor is there any indication that it plays a role in enforcing Section Two against Abilene Pride's use of the venue.

Woodlands Pride's situation is similar. It holds its annual pride festival at Town Green Park, a public park **[*53]** owned and operated by The Woodlands Township—a non-party special-purpose district within Montgomery County. The Township owns the park, issues permits for events hosted there, and exercises sole

responsibility over its use.[13] At trial, Woodlands Pride confirmed that the organization has never sought nor required permission from Montgomery County to use the park for its festival. On this record, there is **_no_** indication that Montgomery County plays any role in the permitting process, nor any showing that it exercises the kind of approval authority that would implicate Section Two. I thus agree with the majority that Montgomery County should be dismissed without prejudice.

Woodlands Pride offers two additional grounds to support a traceable injury to Montgomery County, but neither suffices on the present record. First, the organization argues that Section Two endangers its ability to obtain a temporary event permit to sell alcohol at its festivals, which it claims must be approved by the county sheriff. That assertion, however, misapprehends the relevant statutory framework. Under Texas law, the Texas Alcoholic Beverage Commission—not county officials—has exclusive authority over such **[*54]** permits. See _Tex. Alco. Bev. Code §§ 11.31_, _30.02_. Even assuming Montgomery County had some role in that process, Woodlands Pride presented **_no_** evidence that the denial of an alcohol permit would interfere with its ability to hold a public festival or that expressive activity depends on such sales. Second, Woodlands Pride claims that its ability to obtain a festival permit from The Woodlands Township is threatened by its reliance on a county contract for off-duty officers to fulfill a required security plan. Yet Woodlands Pride conceded that it contracts directly with off-duty officers, not the county itself, and that Township regulations do not require security to be provided by county law enforcement.

---

[12] _See_ ABILENE, TEX., CODE ch. 29, art. IX, § 29-162(a) (2013).

---

[13] _See_ The Woodlands Township, Tex., Order 019-09 (Nov. 16, 2009) (amended 2023). Plaintiffs stipulated as to the dismissal of The Woodlands Township upon its representation that it is "not a 'municipality' within the scope of the Texas Local Government Code that Senate Bill 12 seeks to amend."

Moreover, the organization presented **_no_** evidence that its ability to proceed with its public events would be meaningfully impaired absent that particular arrangement. This evidence is insufficient to show that Woodlands Pride's injury is fairly traceable to Montgomery County's obligations under Section Two.

At bottom, I would find that Woodlands Pride and Abilene Pride have not demonstrated that their injuries are fairly traceable to any enforcement authority exercised by Montgomery County or Taylor County under Section **[*55]** Two of S.B. 12. I otherwise see **_no_** error in the district court's determination that Plaintiffs have standing to pursue their claims.[14]

III

The district court ruled that Plaintiffs' performances constitute protected expression and that _S.B. 12_ facially violates the _First Amendment_. Since then, the Supreme Court decided _Moody v. NetChoice, LLC_, clarifying the framework for _First Amendment_ facial challenges. _603 U.S. 707, 724-26, 144 S. Ct. 2383, 219 L. Ed. 2d 1075 (2024)_. In light of _Moody_, I agree with the majority that remand is appropriate so the district court can apply the

Court's comparative inquiry across the statute's full range of applications. I am far less persuaded, however, that vacating the injunction is necessary to accomplish that task; a limited remand without vacatur would suffice and better preserves the status quo while the court undertakes the analysis _Moody_ now requires.

In any event, the majority's vacatur does not disturb the portion of the district court's injunction barring Travis County Attorney Delia Garza and Bexar County District Attorney Joe D. Gonzales from enforcing Section Three of S.B. 12 because (1) neither appealed; (2) as to the district attorneys who did appeal, the majority dismisses on standing and never reaches the merits **[*56]** of injunctive relief; and (3) the majority expressly limits its analysis to the Attorney General's enforcement of Section One. _See, e.g., United States v. City of Miami, 664 F.2d 435, 445 (5th Cir. 1981)_ (en banc) (plurality op.) (Rubin, J., concurring) ("[A]n appellant may not appeal on behalf of others who have chosen not to intervene or to appeal."); _Tompkins v. Cyr, 202 F.3d 770, 786-87 (5th Cir. 2000)_ (vacating erroneous damages calculation only as to "the losing defendants who have appealed" but declining to "vacate the damage award against the non-appealing defendants" despite the error's effect on the common verdict); Wright & Miller's Federal Practice & Procedure § 3950.7 (5th ed. 2025) ("[O]ther parties who have not joined in [an] initial notice of appeal must file their own notices of appeal if they wish to attack all or a portion of the judgment below and to be relieved of the consequences thereof."). The district court's injunction therefore remains operative as to those non-appealing Defendants.

\* \* \*

Finally, the majority makes a passing remark that it harbors "genuine doubt" whether

---

[14] I agree with the majority that sovereign immunity does not bar Plaintiffs' claims against the Attorney General, who is a proper _Ex parte Young_ defendant given his specific enforcement authority under Section One of S.B. 12. _See City of Austin v. Paxton, 943 F.3d 993, 997 (5th Cir. 2019); Tex. All. for Retired Americans v. Scott, 28 F.4th 669, 672 (5th Cir. 2022)_. The same bottom line applies to the district attorney Defendants because they are not protected by the _Eleventh Amendment_ in the first place. District Attorneys Ligon and Hicks are _county_ officials rather than _state_ officials. And as our court recently held, "'Texas district attorneys [are] not protected by the _Eleventh Amendment_' precisely because they are county officials, not state officials." _Nat'l Press Photographers Ass'n v. McCraw, 90 F.4th 770, 780 (5th Cir. 2024)_ (alteration in original) (quoting _Hudson v. City of New Orleans, 174 F.3d 677, 682 (5th Cir. 1999)_). Sovereign immunity does not bar this suit.

Plaintiffs' drag performances are protected by the *First Amendment*. *Ante*, at 14 n.9. That aside is dictum, contrary to settled *First Amendment* precedent, and it should not be read to constrain the district court's analysis on remand.

The *First Amendment's* protection "does not end at the spoken or written word," **[*57]** *Texas v. Johnson, 491 U.S. 397, 404, 109 S. Ct. 2533, 105 L. Ed. 2d 342 (1989)*, and it embraces conduct "sufficiently imbued with elements of communication," *Spence v. Washington, 418 U.S. 405, 409, 94 S. Ct. 2727, 41 L. Ed. 2d 842 (1974)* (per curiam). Live performance, dance, theater, satire, and costuming falls comfortably within that ambit. *See, e.g., Se. Promotions, Ltd. v. Conrad, 420 U.S. 546, 557-58, 95 S. Ct. 1239, 43 L. Ed. 2d 448 (1975)*. The Court has repeatedly safeguarded a "wide array of conduct that can qualify as expressive, including nude dancing, burning the American flag, flying an upside-down American flag with a taped-on peace sign, wearing a military uniform, wearing a black armband, conducting a silent sit-in, refusing to salute the American flag, and flying a plain red flag." *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n, 584 U.S. 617, 657, 138 S. Ct. 1719, 201 L. Ed. 2d 35 & n.1 (2018)* (THOMAS, J., concurring) (collecting cases). And under *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, a "narrow, succinctly articulable message is not a condition of constitutional protection." *515 U.S. 557, 569, 115 S. Ct. 2338, 132 L. Ed. 2d 487 (1995)*; *see also Brown v. Ent. Merchs. Ass'n, 564 U.S. 786, 790, 131 S. Ct. 2729, 180 L. Ed. 2d 708 (2011)* ("[W]e have long recognized that it is difficult to distinguish politics from entertainment, and dangerous to try.").

Drag—a costumed, choreographed, and frequently parodic performance that speaks in the idiom of gender—plainly participates in that protected tradition. *See Spectrum WT v. Wendler, 151 F.4th 714, 729 (5th Cir. 2025)* (SOUTHWICK, J.) ("Because theatrical performances plainly involve expressive conduct within the protection of the *First Amendment*, and because we find the plaintiffs' **[*58]** drag show is protected expression, discrimination among such shows must pass strict scrutiny."), *reh'g en banc granted, op. vacated, No. 23-10994, 2025 U.S. App. LEXIS 28102, 2025 WL 3008019 (5th Cir. Oct. 27, 2025)*; *HM Fla.-ORL, LLC v. Governor of Fla., 137 F.4th 1207, 1227 (11th Cir. 2025)* (finding substantively identical Florida law aimed at restricting drag shows and venues "reaches *First-Amendment*-protected speech, not just unprotected obscenity"); *Naples Pride, Inc. v. City of Naples, 2025 U.S. Dist. LEXIS 89399, 2025 WL 1370174, at *10 (M.D. Fla. May 12, 2025)* (collecting persuasive authorities finding "that drag performances can be protected by the *First Amendment*"); *Luke A. Boso, Exclusionary Expressive Conduct, 66 B.C. L. Rev. 295, 298 (2025)* ("How could a . . . federal judge conclude that a traditional lesbian, gay, bisexual, transgender, and queer (LGBTQ) form of art, entertainment, and political resistance is not sufficiently expressive to warrant *First Amendment* analysis?"); *Mark Satta, Shantay Drag Stays: Anti-Drag Laws Violate the First Amendment, 25 Geo. J. Gender & L. 95, 104 (2023)* ("[D]rag performances are expressive conduct in virtue of being artistic performances that express a variety of messages, similar to those the Supreme Court has already recognized."). The majority's effort to collapse an entire art form into a few salacious acts turns these principles on their head.

Nor does the presence of sexual expression or purported goal of protecting minors remove *First Amendment* protections. The Court has insisted that "sex and obscenity are not synonymous." *Roth, 354 U.S. at 487*. Although obscenity—defined and cabined by *Miller v.*

*California, 413 U.S. 15, 93 S. Ct. 2607, 37 L. Ed. 2d 419 (1973)*—may fall beyond the *First Amendment's* scope, "sexual expression which is indecent but not obscene **[\*59]** is protected," *Sable Commc'ns of Cal. Inc. v. FCC, 492 U.S. 115, 126, 109 S. Ct. 2829, 106 L. Ed. 2d 93 (1989)*, and a state's power to shield minors is circumscribed by *Ginsberg v. New York, 390 U.S. 629, 88 S. Ct. 1274, 20 L. Ed. 2d 195 (1968)*. Texas already possesses those tools by prohibiting "obscene" performances and the "exhibition" of "harmful material" to minors. *Tex. Penal Code §§ 43.23(c)(2)*, *.24(b)(1)*. What it may not do—and what *S.B. 12* does—is discard *Miller* and *Ginsberg*'s guardrails and suppress protected performances through undefined, sweeping terms like "prurient interest," a path that *Roth*'s author found unworkable. *See Paris Adult Theatre I v. Slaton, 413 U.S. 49, 73, 93 S. Ct. 2628, 37 L. Ed. 2d 446 (1973)* (Brennan, J., dissenting) ("I am convinced that the approach initiated 16 years ago in *Roth* . . . cannot bring stability to this area of the law without jeopardizing fundamental *First Amendment* values."); *see also City of Houston v. Hill, 482 U.S. 451, 480, 107 S. Ct. 2502, 96 L. Ed. 2d 398 (1987)* (Powell, J., concurring in part) ("[T]he ambiguous terms of this ordinance confe[r] on [the state] a virtually unrestrained power to arrest and charge persons with a violation.... The opportunity for abuse, especially where a statute has received a virtually open-ended interpretation, is self-evident." (internal quotations and citation omitted)). The majority's dictum invites precisely that instability.

Accordingly, I respectfully concur in the judgment in part and dissent in part.

---

End of Document

Date: January 6, 2026

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

RYAN D. WALTERS
Deputy Attorney General for Legal Strategy

RYAN G. KERCHER
Chief, Special Litigation Division

Respectfully submitted.

*/s/ David Bryant*

DAVID BRYANT
Special Counsel
Tex. State Bar No. 03281500

MUNERA AL-FUHAID
Special Counsel
Tex. State Bar No. 24094501

ZACHARY BERG
Special Counsel
Tex. State Bar No. 24107706

ALEXIA K. BAKER
Assistant Attorney General
Tex. State Bar No. 24149596

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 463-2120
Fax: (512) 320-0667
david.bryant@oag.texas.gov
munera.al-fuhaid@oag.texas.gov
zachary.berg@oag.texas.gov
alexia.baker@oag.texas.gov

COUNSEL FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I hereby certify that on January 6, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

*/s/ David Bryant*

DAVID BRYANT

3