1     UNITED STATES DISTRICT COURT
      NORTHERN DISTRICT OF TEXAS
2       AMARILLO DIVISION

3 SPECTRUM WT,     )
            )
4   Plaintiff,   )
            )
5 v.         ) Case No. 2:23-cv-00048
            )
6 WALTER WENDLER, in his  )
 official capacity as the )
7 President of West Texas  )
 A&M University, et al.,  )
8         )
   Defendants.   )
9

10

11

12

13

14 --------------------------------------------------------
     ORAL DEPOSITION OF SHAWN FOUTS
15   DECEMBER 10, 2025 - CANYON, TEXAS
 --------------------------------------------------------
16

17

18

19

20   ORAL DEPOSITION OF SHAWN FOUTS, produced as a
 witness at the instance of the PLAINTIFF and duly sworn,
21 was taken in the above styled and numbered cause on
 DECEMBER 10, 2025, from 9:04 a.m. to 2:41 p.m., at the
22 offices of WEST TEXAS A&M UNIVERSITY, Old Main Building,
 Room 317, Canyon, Texas, before SHARON D. LIVINGSTON,
23 CSR-RPR, in and for the State of Texas, reported by
 machine shorthand, and pursuant to the Federal Rules of
24 Civil Procedure.

25

```
 1                    A P P E A R A N C E S
 2  FOR THE PLAINTIFF:
         Mr. JT Morris
 3       FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
         700 Pennsylvania Avenue, SE, Suite 340
 4       Washington, DC 20003
         (215) 717-3473
 5       Jt.morris@thefire.org
    - and -
 6       Mr. Adam Steinbaugh
         FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
 7       510 Walnut Street, Suite 900
         Philadelphia, Pennsylvania 19106
 8       (215) 717-3473
         Adam@thefire.org
 9
    FOR THE DEFENDANTS:
10       Mr. David Bryant
         Ms. Munera Al-Fuhaid
11       OFFICE OF THE TEXAS ATTORNEY GENERAL
         300 West 15th Street
12       Austin, Texas 78701
         (512) 463-2100
13       David.bryant@oag.texas.gov
         Munera.al-fuhaid@oag.texas.gov
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          INDEX
                                                    PAGE
 2   Appearances --------------------------------    2

 3   Index --------------------------------------    3

 4   Index of Exhibits -------------------------- 3-5

 5   SHAWN FOUTS
             Examination by Mr. Steinbaugh ----------------    6
 6           Examination by Mr. Bryant --------------------  152
             Re-examination by Mr. Steinbaugh -------------  162
 7           Re-examination by Mr. Bryant -----------------  166

 8   Changes and Signature ---------------------- 169

 9   Reporter's Certification ------------------- 171

10                      INDEX OF EXHIBITS

11   NUMBER        DESCRIPTION                      PAGE

12     51     Amended Notice of Rule 30(b)(6) Deposition -    7

13     52     Expressive Activity on Campus Policy 08.02
              Approved 11-13-25 --------------------------   18
14
       53     Expressive Activity on Campus Policy
15            08.02.01 Approved 11-13-25 -----------------   19

16     54     Expressive Activity on Campus Policy
              08.99.99.W1 Revised 7-28-25 ----------------   20
17
       55     Events Listing for Various Years -----------   28
18
       56     Facility Use Request Procedure Policy
19            24.01.01.WO.01 Revised 3-1-17 --------------   31

20     57     Political Campaign Events in Facilities
              Under the Control of West Texas A&M Policy
21            07.03.01.W1 Revised 3-22-18 ----------------   32

22     58     West Texas A&M Mission Statement -----------   33

23     59     West Texas A&M Venues at WTAMU -------------   36

24     60     Theknot.com Website West Texas A&M University
              Wedding Venues -----------------------------   38
25
```

1                    INDEX OF EXHIBITS (CONTINUED)

2     NUMBER          DESCRIPTION                              PAGE

3      61     25 Live Screenshots ----------------------    39

4      62     Jack B. Kelly Student Center Procedures and
              Guidelines Revised 3-5-25 ------------------    41
5
       63     WT Campus Organizations Handbook -----------    55
6
       64     Video of University Sing -------------------    66
7
       65     First Amended Verified Complaint for Civil
8             Rights Violations -------------------------    66

9      66     Defendant's Answer to Plaintiffs' Amended
              Complaint ---------------------------------    67
10
       67     Spreadsheet Listing Reservations Made and
11            Status ------------------------------------    72

12     68     The Prairie Article Herdsmen Hearts Hosts
              Buff-A-Whoa Drag Show ---------------------    76
13
       69     Screenshots from Flickr Website -----------    77
14
       70     Presidential Actions Defending Women From
15            Gender Ideology Extremism and Restoring
              Biological Truth to the Federal Government -    79
16
       71     Video of Jingle Mingle --------------------    81
17
       72     WT Get Involved Instagram Post for Gabriel
18            Holmes Event ------------------------------    81

19     73     WT Get Involved Instagram Post for Events
              Schedule ----------------------------------    82
20
       74     WTAMU Student Event Calendar 9-13-24 -------    84
21
       75     Email Chain 3-21-24 through 3-27-24 With
22            Chari Hill, Shawn Fouts, and Chris Thomas --    91

23     76     Series of Chats 4-23-25 with Chari Hill
              and Shawn Fouts ---------------------------    93
24
       77     A Fool's Drag Show Reservation Comments ----    99
25

INDEX OF EXHIBITS (CONTINUED)

NUMBER          DESCRIPTION                              PAGE

78    WTAMU Risk Management and Insurance Matrix
      Form for A Fool's Drag Race --------------- 102

79    Email Chain 2-14-23 with Shawn Fouts and
      Chance Haugen ---------------------------- 104

80    Marketing Material for A Fool's Drag Race -- 106

81    1-2-1 Meeting Notes with Chance Haugen ----- 111

82    Email Chain 2-13-23 through 2-16-23 with
      Shawn Fouts and Kris Drumheller ----------- 116

83    Briefing with Dr. Thomas and Chance Haugen
      2-21-23 ----------------------------------- 120

84    Kimberly 1-on-1 6-6-22 -------------------- 138

85    JBK and OSEL 3-6-23 ----------------------- 139

86    Email Chain 2-21-23 through 3-9-23 with
      Evelyn Montoya, Chip Chandler, Ransom
      Colette, Barrett Bright, Shawn Fouts ------- 139

87    Email 3-14-23 from WTAMU Risk Assessments
      to Barrett Bright and Chip Chandler -------- 141

88    Email Chain 3-17-23 through 3-20-23 with
      Shawn Fouts, Barrett Bright, Andrew Mangum - 142

89    WTAMU Risk Management and Insurance Matrix
      Form for Don't Be a Drag Drag Show --------- 145

90    Outlook Post 1-8-24 Don't Be a Drag Drag
      Show on March 22nd ------------------------ 146

91    Outlook Post 3-8-24 Re:  Please Proof Drag
      Show -------------------------------------- 147

92    Don't Be a Drag Drag Show Flier ----------- 147

93    Outlook Post 3-12-24 Confirm Final Details
      for Reservation Scheduled 3-22-24 --------- 148

1                          SHAWN FOUTS,

2      having been first duly sworn, testified as follows:

3                          EXAMINATION

4      BY MR. STEINBAUGH:

5          Q.   Good morning, Dr. Fouts.  It's Dr. Fouts,

6      correct?

7          A.   Yes.

8          Q.   You understand that you are here for your

9      deposition in a lawsuit involving the cancellations of

10     student drag shows?

11         A.   Uh-huh.

12         Q.   Have you ever been deposed before?

13         A.   No.

14         Q.   Well, I have three kind of broad rules for us

15     today.  Please listen and answer the question that was

16     asked.  If you don't understand the question, please let

17     me know.  I will probably ask some questions that don't

18     make sense, and I want to make sure there's a clean

19     record, so if it doesn't make sense to you, then the

20     answer is not going to make sense to other people.

21              Please don't talk over me, and I won't talk

22     over you.  We want to make sure that she creates a clean

23     written record.

24              Please give verbal answers because it's hard

25     to tell from a transcript when someone nods or says

1    to the witness.

2        Q.    (BY MR. STEINBAUGH)    This is the Amended Rule

3    30(b)(6) Deposition Notice.    Have you seen this before?

4        A.    Yes.

5        Q.    I want to talk through some of the topics that

6    you're designated to testify about today just to make

7    sure that you are aware of what the topics are and that

8    you're prepared to testify about them.

9        A.    Yes.

10        Q.    And you understand that the lawyers have talked

11    about this and negotiated this so that the topics are a

12    little bit more limited than what's in this document, a

13    little bit more narrower?

14        A.    Okay.

15        Q.    Do you understand that?

16        A.    I do.

17        Q.    And I'm going to read my understanding of what

18    the topics are based on the negotiations with the

19    lawyers, so let me know if there's anything about that

20    that isn't correct.

21        A.    Okay.

22        Q.    Topic Number 1 on the third page is:    "The

23    proposed and actual uses of Legacy Hall, including drag

24    performances, between January 1st, 2022 and the

25    present," involving a list of specific events that

1    should be listed there, and the lawyers have also

2    added -- or at least I have added the Chicago

3    performance in the Branding Iron Theater in 2017, the

4    Peter and the Starcatcher performance in the Fine Arts

5    Complex in 2018, the Representative Ronny Jackson

6    Candidate Forum, the title of Show Performance, the One

7    Marriage and Family Ministries event, and the Community

8    Night of Worship and Prayer.

9            Is that correct.

10        A.    I'm not familiar with those events.

11        Q.    Okay.  So you're not prepared to discuss those

12    particular events?

13        A.    I do not have any knowledge of those particular

14    events.

15        Q.    Okay.  What did you do to prepare for this

16    topic?

17        A.    I reviewed the ones prior to 2022.  And just

18    for clarification, Topic 1 says "January 2012," but you

19    said "2022?"

20        Q.    Correct.  So it should be narrower, so you

21    don't have to go that far back.

22        A.    Okay.  I reviewed specifically the reservation

23    for the Fool's Drag Race and Don't Be a Drag Drag Show.

24    The other ones don't -- we've narrowed it, so those were

25    pre-2022.

1    Q.   Okay.   Topic Number 2 on Page 4 is:  "The
2    proposed and actual uses of Legacy Hall, including drag
3    performances, and the Fine Arts Complex, between January
4    1st, 2022 and the present for a list of particular
5    events:  A Fool's Drag Race, Don't Be a Drag Drag Show,
6    Queer Movie Night, the March 2012 Buff-A-Whoa Drag Show,
7    and each Mr. And Miss West Texas Drag Show since January
8    2015," and then we limited the particular events with
9    the words "drag show," "drag," "pageant," "dance," or
10   "talent" in the title or description, or the words
11   "Miss," "Ms.," "Mister," or "Mr." In the title.
12              Does that make sense?
13   A.   Yes, sir.
14   Q.   And what did you do to prepare for this
15   topic?
16   A.   Since they were before my tenure, I spoke with
17   Chance Haugen, as I assumed he would have the most
18   knowledge of any event prior to 2022.
19   Q.   And how long has Chance Haugen been at the
20   university, to your knowledge?
21   A.   Since 2007 or '8.  I'm not sure when he assumed
22   the role of director of the JBK.
23   Q.   Okay.  Does the university maintain a database
24   or an event-planning system to keep track of these types
25   of events?

1    A.    I cannot tell you the date that the Electronic

2  Management System was put into place.    That was

3  discontinued within the last 12 months, and we no longer

4  have access to that system, as we've switched to a new

5  management system.

6    Q.    And you say you no longer have access to that.

7         Who does?    What happened to that system?

8    A.    We made the transition from -- the previous

9  system was called EMS, Electronic Management System.

10  That particular company was no longer servicing that

11  product, and we were forced to switch to what is 25

12  Live, which is now the reservation process.    I could not

13  answer who may have access to EMS at this point.

14    Q.    Okay.    For Topic 4 on Page 4, you're going to

15  talk about the proposal, registration, and university

16  response to a list of events that are listed.    If you

17  want to take a moment to review those, let me know when

18  you have.

19    A.    Has anything been added to this list?

20    Q.    No.

21    A.    I'm fine, sir.

22    Q.    Are you prepared to discuss this topic?

23    A.    Yes.

24    Q.    Are there any limitations on your ability to

25  testify about this topic?

1       A.    They would be limited to prior to my tenure.

2       Q.    So information you gathered from Chance?

3       A.    Yes.

4       Q.    Topic 5 on Page 6 is:  "The policies,

5  procedures, practices, and customs concerning the

6  reservation or use of Legacy Hall."

7               Are you prepared to testify about that?

8       A.    Yes, sir.

9       Q.    Topic 7 on Page 6 is:  The university's efforts

10  between January 1st, 2020 and the present to promote" --

11  meaning advertise or draw publicity -- "the availability

12  of Legacy Hall for the use, reservation, or rental by

13  students, student organizations, faculty, or the

14  public."

15               Are you prepared to testify about that?

16      A.    My knowledge would be limited to 2022 and

17  forward, but yes.

18      Q.    Topic Number 9 on Page 6 is:  "The university's

19  policies, rules, and practices for student expression,

20  registered student organizations, the student use of

21  campus facilities, and the reservation process for

22  reserving those facilities."

23               Are you prepared to testify about that?

24      A.    Yes.

25      Q.    And Topic Number 10 is:  "The university's

1    processing" -- meaning the decision-making, who made the

2    decision about the application, when those decisions

3    were made, and the basis for those decisions up to and

4    including Wendler's decision to cancel the 2023 and 2024

5    shows -- "of any application by plaintiff to host an

6    event on campus since January 1st, 2023."

7           Are you prepared to testify about that?

8    A.    Yes.

9    Q.    All right.   How long have you been at West

10   Texas University (sic)?

11   A.    I began in October of 2022.

12   Q.    What were you doing before that?

13   A.    I was in private practice as a business coach

14   and sports consulting coach.

15   Q.    Tell me about your educational background.

16   A.    My undergraduate degree is in religion, and my

17   doctorate is in higher education administration.

18   Q.    Okay.   You said that you were doing consulting.

19   What were you doing before that?

20   A.    Pastoring a church.

21   Q.    Where at?

22   A.    Here in Amarillo and various place in Texas,

23   but my last senior pastorate was in Amarillo.

24   Q.    Were you at West Texas University before then,

25   or were you in higher --

```
 1        A.   I was.

 2        Q.   -- education before then?

 3             What were you doing then?

 4        A.   I was here between 2005 and, I believe 2007,

 5   early 2008, as an associate director of the Jack B.

 6   Kelley Student Center.  Mostly my role revolved around

 7   leadership education programs.

 8        Q.   So you left the university and then came back

 9   sometime later.  Why come back?

10        A.   I had the opportunity to return.  I just had a

11   great opportunity to return to the university.

12        Q.   What is your current role at West Texas

13   University?  I'm borrowing that from JT.  Sorry.

14             What is your current role at West Texas

15   A&M University?

16        A.   I'm senior director of Campus Community.  The

17   major part of my role revolves around senior director of

18   Residential Living.

19        Q.   Does your role involve overseeing the

20   activities and events at the JBK?

21        A.   No longer.

22        Q.   When did that end?

23        A.   Officially, October of this year.  I was asked

24   to move into Residential Living October of 2024.

25        Q.   So your duties no longer involve overseeing
```

1    events in the JBK?

2        A.    No.

3        Q.    Who does have those duties currently?

4        A.    The assistant director of the Jack B. Kelley

5    Student Center is Andrew Mangum.  The new senior

6    director of the JBK, which is broader than just the

7    reservation process, is Kelsey McGee.

8        Q.    Who would be the final authority on approving

9    events at Legacy Hall?

10        A.    I would say ultimately, Chance Haugen.

11        Q.    How many people work in the JBK?

12        A.    There are typically four professional staff

13    within the JBK itself.  In the reservation and

14    operations side, there are currently two full-time as

15    just turnover and roughly 20 to 30 student workers.

16        Q.    And what, in a broad sense, are the roles of

17    the student workers?  What do they do?

18        A.    Student workers will serve as an event service

19    assistant, and they help process reservation events.

20    There are audiovisual technicians that will ensure if an

21    event needs video, microphones, sound, lighting, then

22    there are event managers that serve as a supervisor of

23    the event.

24              If there's an issue or problem, lighting

25    doesn't work, something happens, they're there to help

1    solve those issues.  Those are the primary roles.  And

2    then the JBK operates an information desk, and there are

3    student workers who man the information desk during the

4    hours that the JBK is open.

5        Q.   Can you describe the basic organizational

6    structure of the JBK Team?  You said that there were

7    four professional staffer roles.

8        A.   Yeah.  So there will be a director of the JBK.

9    It's been restructured so that Andrew, as the assistant

10    director, operates the day-to-day operations of the Jack

11    B. Kelley.

12            There is someone who is in charge of

13    event reservations, and that position is currently

14    vacant, but they would answer to Andrew Mangum.  They

15    have an Event Service Team, which are student workers

16    under them, to help make sure the students are on-track

17    processing events.

18            There is the audiovisual or production

19    specialist who makes sure that if an event needs

20    particular lighting, sound -- some events may need no

21    sound; others may need up to 10 or 12 microphones

22    depending on what they're doing -- they will maintain

23    that.  They will set up events all over campus.

24            And then we have a JBK coordinator, and

25    that person really supervises the building in the

1    evening hours, and it's kind of a catch-all position.
2    Reservations during certain times of the year,
3    particularly end of semester, are very heavy, and they
4    may help catch up on reservations or help ensure that if
5    the building is dirty, that it's being cleaned.
6                    So they'll maintain those kind of building
7    operations.  They may help serve as an event manager if
8    student workers are not available.  If there's events
9    happening outside of the JBK during those hours, they
10   will generally move to those events to ensure everything
11   is okay and that there's no issues involved.  So it's
12   kind of a catch-all position.
13       Q.   Okay.  You said that the Event Services Team
14   kind of works with the students to make sure they're
15   caught up on things or helps them through that process.
16                    Is that sort of an iterative process
17   where they go back and forth with students to make sure
18   events are being planned?
19       A.   Yes.
20       Q.   Is that kind of like "herding cats" sometimes?
21       A.   Yes.  Their role is really to ensure that if,
22   for instance, they're having food but not choosing to
23   use the on-campus food service, that they've completed a
24   catering exemption.
25                    If they have specified they're going to

1   need audiovisual technicians, but they have not

2   specified the reason as to why, they'll follow up and

3   ask, "How many audiovisual technicians do you think you

4   need?"  "Are you just showing a movie?"  That could be

5   one audiovisual technician.  For instance, if it's a new

6   student orientation, they may need four microphones.

7       Q.  So essentially, it is helping students identify

8   boxes that have not been checked, checking those boxes,

9   identifying issues the university might have with an

10   event, and working through ways to overcome those

11   obstacles?

12       A.  It's usually facilitating to make sure that

13   everything is in place for the day of the event, and

14   there's no last-minute things that have not been

15   completed prior to the event taking place.

16       Q.  And your answer to that question is "yes?"

17   You nodded, but I'm just making sure.

18       A.  Okay.  Thank you.  Yes.

19           (Exhibit 52 marked.)

20           MR. STEINBAUGH:  I want to mark and hand

21   the witness Exhibit 52.

22           THE WITNESS:  Is this yours?

23           MR. BRYANT:  Thank you.

24       Q.  (BY MR. STEINBAUGH)  Are you familiar with this

25   policy?

```
 1        A.   I am familiar with the policy.  The current
 2  version of this policy I would be less familiar with,
 3  but yes.
 4        Q.   This is a policy dated November 13th, 2025, but
 5  this is the current policy?
 6        A.   As far as I know.
 7        Q.   Are you aware of any plans to amend or change
 8  this policy?
 9        A.   No.
10             (Exhibit 53 marked.)
11             MR. STEINBAUGH:  I want to mark and hand
12  the witness Exhibit 53.
13        Q.   (BY MR. STEINBAUGH)  Are you familiar with this
14  policy?
15        A.   No.
16        Q.   Can you identify what this policy is?
17        A.   The Expressive Activity Policy.
18        Q.   This is the Expressive Activity Policy of the
19  Texas A&M System?
20        A.   As I can tell from the logo, I would say yes.
21             MR. BRYANT:  Dr. Fouts, I'd instruct you
22  that when counsel asks you to identify a document, you
23  should tell him what it is if you know what it is, but
24  if it's a document you've never seen before, you should
25  so advise him.
```

```
 1              THE WITNESS:  Thank you.
 2         A.   I have not seen this policy before.
 3         Q.   (BY MR. STEINBAUGH)  So you don't know whether
 4    or not this is the current Expressive Activity on Campus
 5    Policy for the A&M System?
 6         A.   I do not.
 7         Q.   Are you aware of any other Expressive Activity
 8    on Campus Policy for the A&M System other than this one?
 9         A.   No.
10              MR. BRYANT:  And other than Exhibit 52,
11    which appears to be an Expressive Activity on Campus
12    Policy of the Texas A&M System.
13              (Exhibit 54 marked.)
14              MR. STEINBAUGH:  I will mark this as
15    Exhibit 54 and hand it to the witness.  This has been
16    previously submitted by the defendants in a September
17    status conference as Defendants Exhibit 4.
18         Q.   (BY MR. STEINBAUGH)  Dr. Fouts, have you seen
19    this document before?
20         A.   I have not seen this current version.
21         Q.   Do you know if this is the current Expressive
22    Activity on Campus Policy for West Texas A&M University?
23         A.   I do not know that.
24         Q.   Do you know if there is a different version of
25    this that is the current policy for West Texas A&M
```

1    University?

2        A.    There is an Expressive Activity Policy.

3        Q.    Do you know of any plans to amend or change or

4    replace that policy?

5        A.    No.

6        Q.    Do you know whether or not there is a version

7    of that policy on the university's website?

8        A.    No.

9        Q.    Assuming that that is the current university

10    policy, can you turn to Page 2?

11                Let me back up.    Are you familiar with

12    the university's policy on Expressive Activity On Campus

13    in general?

14        A.    Yes.

15        Q.    Okay.    Does this appear to be the university's

16    policy on Expressive Activity on Campus as you are

17    familiar with it?    And you can take time to read through

18    the document.

19                MR. BRYANT:    Please review the document as

20    much as you need to before you answer the question.

21        Q.    (BY MR. STEINBAUGH)    And if you need me to ask

22    it again after you've reviewed it, we can do that.

23        A.    Can you repeat the question?

24        Q.    Does this appear to be the university's current

25    policy on Student Expressive Activity on Campus?

```
 1        A.   Yes.
 2              MR. BRYANT:  And by "the university," you
 3   mean West Texas A&M?
 4              MR. STEINBAUGH:  West Texas A&M, correct,
 5   not West Texas University.
 6              MR. BRYANT:  Or even the Texas A&M
 7   University System?
 8              MR. STEINBAUGH:  Correct.
 9        Q.   (BY MR. STEINBAUGH)  Are you aware of any plans
10   to amend or change this policy?
11        A.   No.
12        Q.   Do you know whether or not the university is
13   waiting for the chancellor's signature on this policy?
14        A.   I do not know.
15        Q.   Can you turn to Page 2?  You'll see Section
16   1.3.1.  Do you see that?
17        A.   Yes, sir.
18        Q.   Can you read that to yourself just to make sure
19   you're aware of it?
20        A.   Yes, sir.
21        Q.   Is it fair to say that this states that
22   university policy is that when it restricts the
23   expressive activity by students and registered student
24   organizations, it must do so consistent with the First
25   Amendment?
```

1    Q.    Does that reservation process apply to spaces

2  in public, like sidewalks or the area around the

3  fountain?

4    A.    Public space that is open, it's not required to

5  make a reservation.

6    Q.    Does the Advance Reservation Requirement of

7  this policy apply to Legacy Hall?

8    A.    Yes.

9    Q.    And if you'll turn to the next page, you'll see

10  Section 3, Reservation Procedures.    If you want to read

11  through 3.1 and 3.2, let me know when you're done.

12    A.    Yes, sir.

13    Q.    Is this the procedure that governs the

14  requirement to request the use of Legacy Hall?

15    A.    Yes.

16    Q.    And that's the Live 25 system?

17    A.    Yes.

18    Q.    Or 25 Live?

19    A.    25 Live.

20    Q.    I'm going to make that mistake all day long.

21  And is that generally a first-come-first- serve basis

22  for reserving spaces in Legacy Hall?

23    A.    Yes, sir.

24    Q.    What's a university priority event?

25    A.    It's an institutional event that is reoccurring

1  every year.  The easiest example is graduation or such

2  an institutional event that has been recognized as a

3  reoccurring institutional event.  It receives priority

4  over other events.

5      Q.  And in general, how early are those planned?

6  How far do you see those coming?

7      A.  Six to 12 months.

8      Q.  You'll see in Section 3.1 at the very tail end

9  there, it says, "The university reserves the right to

10  locate any assembly so as to ensure that the activity

11  does not interfere with the normal operation of the

12  university or interfere with the rights of others."

13          Is Legacy Hall and the JBK situated away

14  from classrooms or academic buildings on campus?

15      A.  It is adjacent to the classroom center.

16      Q.  How far away?

17      A.  The buildings are connected, and they're

18  divided by a courtyard between the west wing, Legacy

19  Hall, and the west entrance to the classroom center.

20      Q.  Is Legacy Hall an enclosed space?

21      A.  Yes, sir.

22      Q.  Are the walls fairly soundproof?

23      A.  Yes.

24      Q.  The doors can be closed?

25      A.  Yes, sir.

1    Q.    Are there windows on the doors?

2    A.    No.

3    Q.    The location of Legacy Hall, is it fair to

4    assume that the university put it in a place where

5    events can be held so they do not disrupt classes?

6    A.    I could not answer why it was built where it

7    was built.

8    Q.    Do events in Legacy Hall frequently disrupt

9    classes?

10    A.    No.

11    Q.    Does the university take steps to ensure that

12    events in Legacy Hall do not disrupt academic classes?

13    A.    Yes.

14    Q.    What kind of steps do you take?

15    A.    Considering class schedule, considering Legacy

16    has reservable rooms underneath of it that classes will

17    sometimes reserve for exams, so just ensuring that on

18    the calendar there is no academic program within the

19    building that the event at Legacy may interfere with.

20    Q.    And you're familiar with the 2023 and 2024 drag

21    show applications by Spectrum?

22    A.    Yes.

23    Q.    Were either of those events taking place during

24    exams or classes that it might have interfered with?

25    A.    I do not believe so.

1      Q.    If they were, the university would have raised

2  that concern or accommodated the event or moved it so

3  that it could happen without interfering with classes,

4  correct?

5      A.    Yes.

6      Q.    You can set that aside for now, but we'll come

7  back to this document.

8      A.    Okay.

9            (Exhibit 55 marked.)

10           MR. STEINBAUGH:  I want to mark as Exhibit

11  55 a spreadsheet.  This is derived from a document that

12  was identified as Defendants 088565, which was an Excel

13  spreadsheet.

14      Q.    (BY MR. STEINBAUGH)  Have you seen this before?

15      A.    Yes.

16      Q.    What is this?

17      A.    This is a recap of events that have been held

18  in each of the facilities in those particular years.

19      Q.    If you look at the first box that says "Legacy

20  Hall 151," what is that?

21      A.    Legacy Hall 151 is the room number of Legacy

22  Hall, and then this is a breakdown, from 2017 to 2024,

23  of the number of events that occurred in Legacy Hall by

24  designation.

25      Q.    And those designations are student

1   organizations, departments, students, and

2   non-university?

3        A.    Yes, sir.

4        Q.    "Student organization" refers to recognized

5   student organizations?

6        A.    Yes, sir.

7        Q.    "Departments," I assume, refers to

8   administrative departments or faculty departments of the

9   university?

10        A.    Yes, sir.

11        Q.    "Students" refers to individual students?

12        A.    Yes, sir.

13        Q.    And "non-university," what does that mean?

14        A.    An example would be the city of Canyon may use

15   that space.

16        Q.    So groups with no formal connection to the

17   university?

18        A.    Yes, sir.

19        Q.    And under the column 2024, it says there were

20   34 student organization events in Legacy Hall in 2024.

21              Is that accurate?

22        A.    As far as I know.

23        Q.    And 137 department uses of Legacy Hall?

24        A.    Yes, sir.

25        Q.    And 14 non-university uses?

1      A.   Yes, sir.

2      Q.   If you turn to the fourth page, it says "25

3   Live Data 2024" at the top there?

4      A.   Yes, sir.

5      Q.   Are these events that were in addition to the

6   events in the first box?

7      A.   Yes, sir.

8      Q.   So it had 18 additional student organization

9   events in addition to the 34 from the first box?

10      A.   Yes, sir.

11      Q.   And same with non-university?  There were three

12   more in addition to the 14 uses?

13      A.   Yes, sir.

14      Q.   And this is because of the transition to 25

15   Live?

16      A.   Yes.

17      Q.   Are these fairly typical uses of Legacy Hall

18   year over year, just as a ballpark, setting aside the

19   COVID era?

20      A.   Yes, sir.

21      Q.   I want to go back to the Expressive Activities

22   Policy that we were looking at.

23            MR. BRYANT:  Which exhibit is that?

24   There are several of them.

25            MR. STEINBAUGH:  That would have been

1    Exhibit 54.

2          THE WITNESS:  Okay.

3    Q.   (BY MR. STEINBAUGH)  Can you look at Section

4    3.2?

5    A.   Yes, sir.

6    Q.   3.2 governs the process to reserve spaces in

7    Legacy Hall?

8    A.   Yes, sir.

9          (Exhibit 56 marked.)

10          MR. STEINBAUGH:  I want to mark and hand

11    the witness Exhibit 56.  This should be Bates stamped

12    Defendants 000412.

13          MR. BRYANT:  Thank you.

14    Q.   (BY MR. STEINBAUGH)  Have you seen this

15    document before?

16    A.   I'm not sure how to answer.  I've seen the

17    content of the document.

18    Q.   Okay.  Can you describe this document?

19    A.   Yes.  It is the basic facility use and the

20    responsibilities of those who would use a given facility

21    on campus.

22    Q.   And the paragraph under "Responsibilities"

23    where it references the "request-for-space reservation

24    website," that is again the 25 Live website?

25    A.   Yes, sir.

1    Q.    So this policy governs the process for

2    reserving Legacy Hall?

3    A.    Yes, sir.

4    Q.    And you see under Paragraph A, it says, "The

5    following facilities have a designated reservation

6    coordinator," and that includes the Jack B. Kelley

7    Student Center?

8    A.    Yes, sir.

9    Q.    Who is that?

10    A.    That would be, currently, Andrew Mangum and his

11    staff.

12    Q.    And during the 2023-2024 year, that would have

13    been you?

14    A.    Yes, sir.

15    Q.    And you see at the top under "Procedure

16    Statement," it says, "The process to reserve and use

17    WTAMU rooms and facilities applies for any special

18    event, including fundraising activity, social gatherings

19    or functions, or advisory groups, including third-party

20    requests."

21            Are those events that can be held in

22    Legacy Hall?

23    A.    Yes, sir.

24            (Exhibit 57 marked.)

25            MR. STEINBAUGH:  I want to mark and hand

1    the witness Exhibit 57.

2                    MR. BRYANT:  Thank you.

3        Q.   (BY MR. STEINBAUGH)  Are you familiar with this

4    policy?

5        A.   Yes, sir.

6        Q.   What is this policy?

7        A.   This is a policy that explains the

8    responsibilities and procedures for events generally of

9    a political nature.

10       Q.   And you see under Paragraph 3, it says,

11   "Student organizations may sponsor partisan political

12   activities or events on campus."

13                   Does that mean that a student group can

14   choose to invite, say, a Republican speaker?

15       A.   Yes, sir.

16       Q.   Would they be obligated to invite a Democrat as

17   well, like that particular student organization?

18       A.   No, sir.

19       Q.   So would it be fair to say this policy

20   reiterates that the university has to be neutral and

21   can't choose sides, but student organizations can choose

22   what types of speakers to bring?

23       A.   Yes, sir.

24                   (Exhibit 58 marked.)

25       Q.   (BY MR. STEINBAUGH)  I'm going to mark this as

1   Exhibit 58.  Are you familiar with this document?

2     A.   Yes, sir.

3     Q.   What is this?

4     A.   This is a copy of the website of the Jack B.

5   Kelley.

6     Q.   And is this the Mission Statement website?

7     A.   Yes, sir.  It includes a brief history, who

8   makes up the JBK, the goals.

9     Q.   It describes the JBK as the "living room for

10  campus?"

11     A.   Yes, sir.

12     Q.   What does that mean?

13     A.   The JBK has been the place where students

14  gather.  It has restaurants that students or the public

15  can utilize.  It's the place where students outside of

16  the classroom or their residence hall, provides a place

17  for them to socialize.

18     Q.   Okay.  So the JBK and the facilities there are

19  about educational growth, social engagement, and

20  intellectual development?

21     A.   Yes, sir.

22     Q.   So it's broader than just academic or

23  educational purposes?  It's also a social function?

24     A.   Yes, sir.

25     Q.   Do student events have to have an express

1    educational purpose?

2        A.    No, sir.

3        Q.    Is it fair to say that allowing students the

4    opportunity to have diverse events -- and I mean that in

5    a sense of having a range of social, academic, political

6    types of events -- contributes to a vibrant community on

7    campus?

8                    MR. BRYANT:    Objection; vague.

9        Q.    (BY MR. STEINBAUGH)    You can answer.

10       A.    Could you repeat the question?

11       Q.    Is it fair to say that allowing students or

12   facilitating students' ability to organize a range of

13   events on campus contributes to a vibrant culture on

14   campus?

15                   MR. BRYANT:    Same objection.

16       A.    Yes, sir.

17       Q.    (BY MR. STEINBAUGH)    You'll see on this

18   document that it mentions that Legacy Hall is a

19   "multi-purpose room."

20                   Can you describe some of its purposes?

21       A.    Which document are you referring to?

22       Q.    The Mission Statement document.

23       A.    Okay.

24       Q.    And the "Legacy Hall multi-purpose room" part

25   is in the second paragraph here, kind of in the middle.

1      A.    Yes.  Could you repeat the question?

2      Q.    What are some of the purposes of that room when

3    it refers to "multi-purpose room?"

4      A.    Could you clarify "purpose?"

5      Q.    I mean when it's saying to the public it's a

6    "multi-purpose room," what is the purpose of making that

7    representation to the public?

8      A.    Legacy Hall has served as a place for weddings,

9    concerts.  The public may use it for their events when

10   there's not a space large enough as an event center,

11   let's say.  There are meetings of large groups that need

12   that size meeting space that are not available to them

13   in their own facilities.

14              (Exhibit 59 marked.)

15     Q.    (BY MR. STEINBAUGH)  I want to mark this as

16   Exhibit 59.  Are you familiar with this document?

17     A.    Yes, sir.

18     Q.    What is this?

19     A.    It's a continuation of the Jack B. Kelley

20   website.

21     Q.    And you'll see at the top under "Event Venues

22   at WTAMU," it says that it's "home to several venue

23   spaces that are ideal for events, large and small

24   wedding ceremonies and receptions, rehearsal dinners,

25   milestone celebrations, corporate receptions and

1    conferences, holiday parties, board meetings, and much

2    more."

3                    Are those all events that can be held in

4    Legacy Hall?

5        A.    Yes, sir.

6        Q.    And on Page 2, in the middle there under "Jack

7    B. Kelley Student Center Legacy Hall," it says it's "a

8    large modern hall that is equipped with some of the best

9    technology in the Texas Panhandle."

10                   Is that accurate?

11       A.    Yes, sir.

12       Q.    What kind of technology is that?

13       A.    Sound equipment, lighting equipment, acoustics.

14       Q.    Is there a stage that can be put in there?

15       A.    There is a permanent stage with two large

16    drop-down screens, and there are temporary stages that

17    can be brought in as well.

18       Q.    Is there a back-stage area, like a changing

19    room or a green room?

20       A.    No, not in Legacy Hall.

21       Q.    Are there places adjacent to it that can be

22    used for a changing room?

23       A.    There is a green room across the hall.

24       Q.    So you could put anything from a low-tech kind

25    of press conference or lecture to a full rock musical in

1    Legacy Hall?

2        A.    Yes, sir.

3        Q.    Page 2 also says, "It's great for events with

4    bands or live music."

5                Is that accurate?

6        A.    Yes, sir.

7        Q.    Is it fair to say that the university, through

8    this document, is holding out the space as suitable for

9    a stage performance involving music?

10       A.    Yes, sir.

11       Q.    It also says, "It's completely customizable, as

12   you can see from the photos."  The photo here is of a

13   wedding.

14               Is that accurate?

15       A.    Which photo are you referring to?

16       Q.    The one adjacent to "Student Center Legacy

17   Hall."

18       A.    Could you repeat the question?

19       Q.    Is that a wedding in that photo?

20       A.    Yes, sir.

21       Q.    And that is a wedding that was staged at Legacy

22   Hall?

23       A.    Yes, sir.

24               (Exhibit 60 marked.)

25       Q.    (BY MR. STEINBAUGH)  I'm going to mark this as

1    Exhibit 60.  Are you familiar with this?

2         A.   Yes, sir.

3         Q.   What is this?

4         A.   Speaking of the picture?

5         Q.   Not the picture.  The website itself or the

6    document.

7         A.   Oh, no, sir.

8         Q.   Are you familiar with theknot.com website?

9         A.   No, sir.

10        Q.   Do you know whether or not the university

11   promotes the availability of Legacy Hall on websites for

12   advertising wedding locations?

13        A.   No, sir.

14        Q.   Okay.  That photo, is that Legacy Hall?

15        A.   No, sir.

16        Q.   Is that another space at West Texas A&M?

17        A.   Yes, sir.  It's the chapel.

18        Q.   Okay.

19             (Exhibit 61 marked.)

20        Q.   (BY MR. STEINBAUGH)   I'll mark this as Exhibit

21   61.  Take a look at this, and let me know if you're

22   familiar with it.

23        A.   I'm familiar with the screenshots, yes, sir.

24        Q.   And what is this?

25        A.   This is information that a client would fill

1   out in 25 Live.

2        Q.    So this is the registration process to register

3   for Legacy Hall?

4        A.    Yes, sir.

5        Q.    On Pages 4, 5 and 6, there's a drop-down menu

6   showing all of the options on it.

7                    Is that accurate?

8        A.    Yes, sir.

9        Q.    And from this list, I want to go through some

10  of these and get a "yes" or "no" response as to whether

11  or not these are the types of events a student

12  organization or members of the public could hold in

13  Legacy Hall.

14                    So a ceremony?

15       A.    Yes, sir.

16       Q.    A meeting?

17       A.    Yes, sir.

18       Q.    A social/reception?

19       A.    Yes, sir.

20       Q.    Advertising?

21       A.    Yes, sir.

22       Q.    A banquet?

23       A.    Yes, sir.

24       Q.    An exhibit or fair?

25       A.    Yes, sir.

1    Q.    A performance?

2    A.    Yes, sir.

3    Q.    A presentation?

4    A.    Yes, sir.

5    Q.    A seminar or conference?

6    A.    Yes, sir.

7    Q.    That's the end of the list.  You can set that

8    one aside.

9              (Exhibit 62 marked.)

10    Q.    (BY MR. STEINBAUGH)   I'll mark as Exhibit 62 a

11    document entitled "Jack B. Kelley Student Center West

12    Texas A&M University Procedures and Guidelines, Revised

13    March 5th, 2025."

14              Are you familiar with this?

15    A.    Yes, sir.

16    Q.    We are going to return to this document a

17    couple of times, so we'll keep hold of that one.

18              What is this document?

19    A.    This is the procedures and guidelines for use

20    of the Jack B. Kelley.  It serves as a tool for the Jack

21    B. Kelley workers as a resource.

22    Q.    Is this the current version of this policy?

23    A.    As far as I know.

24    Q.    Do you know whether this is the version on the

25    university's website?

1      A.    That, I do not know.

2      Q.    So this is a policy governing the JBK.

3            Do you know who developed this policy?

4      A.    The JBK staff and the advisory committee.

5      Q.    And we reviewed earlier the university's

6  Expressive Activities Policy that was adopted this year.

7            Is this policy subordinate to the

8  Expressive Activities Policy, meaning if there's a

9  conflict between the two, does the Expressive Activities

10 Policy win out, if that makes sense?

11           MR. BRYANT:  Objection; calls for

12 speculation.

13           If you know, you can answer.

14     A.    I can't answer.

15     Q.    (BY MR. STEINBAUGH)    Okay.    If you turn to Page

16 3, at the bottom under "Funding," it says, "The JBK

17 Student Center funds its maintenance and operations

18 entirely through the university center fee."

19           Is that also described as the "complex

20 fee?"

21     A.    Yes, sir.

22     Q.    Do you know whether the university center fee

23 is part of the student services fee?

24     A.    No, sir.

25     Q.    It is not?

1          A.   No, sir.

2          Q.   What is the difference between them, if you

3     know?

4          A.   The student service fee funds student

5     activities and departments.  The university center fee

6     is specific to funding the Jack B. Kelley and other

7     venues of that nature.

8          Q.   And the complex fee or the university center

9     fee, how is that calculated or charged to a student?

10         A.   That I do not know.

11         Q.   Do you know whether or not it's based on the

12    credit hour?

13         A.   I do not know.

14         Q.   Okay.  Do you know whether the university

15    center fee is waived for any class of students?  Is

16    there any group of students that don't have to pay that?

17         A.   That, I do not know.

18         Q.   On Page 4, you'll see in the last two

19    paragraphs there -- and we'll start with the first

20    one -- it says, "The JBK Student Center staff reserves

21    the right to deny space usage for any group or event

22    that is programmatically or operationally impractical to

23    accommodate or that conflicts with the university's

24    mission or policies."

25              Setting aside the "policies" part, are

1    there any particular criteria for determining when an

2    event conflicts with the university's mission?

3         A.   In my experience, I cannot point to one.

4         Q.   So there's no list somewhere saying, "A, B, and

5    C, if you violate these, you violate the university's

6    mission?"

7         A.   Not that I'm aware of.

8         Q.   Can you recall any events that were canceled

9    because they conflicted specifically with the

10   university's mission?

11        A.   No, sir.

12        Q.   The next paragraph says, "The JBK Student

13   Center reserves the right to cancel or interrupt any

14   event in the interest of public safety, noncompliance

15   with university policies, or if the event can be viewed

16   as inappropriate."

17             With respect to the 2023 and 2024 drag

18   shows, was there any concern that it would be contrary

19   to public safety?

20        A.   The risk assessment process revealed that there

21   could be particular people opposed to the event; and

22   therefore, the university police department requested to

23   have two officers.

24        Q.   But that was a risk that could be mitigated by

25   having police there?

```
 1        A.   Yes.
 2        Q.   And the people that are opposed to an event
 3   like this are exercising their own First Amendment
 4   rights?
 5        A.   Yes, sir.
 6        Q.   Is there any university policy that identifies
 7   what could be viewed as inappropriate?
 8        A.   I do not know.
 9        Q.   Do you know if there are criteria for whether
10   or not an event might be viewed as inappropriate?
11        A.   No, sir.
12        Q.   Can you recall any events that were canceled
13   specifically because they might be viewed as
14   inappropriate?
15             MR. BRYANT:  Is this limited to Legacy Hall
16   or anywhere on campus?
17             MR. STEINBAUGH:  Anywhere in the JBK,
18   because this is the policy referring to it.
19             MR. BRYANT:  Okay.
20        A.   Outside of the two drag shows in question?
21        Q.   (BY MR. STEINBAUGH)  Correct.
22        A.   Within the JBK specifically?
23        Q.   Right.
24        A.   Not to my knowledge.
25        Q.   On Page 8, you'll see the section entitled
```

1  "Prohibited Events?"

2      A.   Yes, sir.

3      Q.   Are you familiar with this Texas A&M University

4  System board of regents resolution that it's referring

5  to here?

6      A.   Yes, sir.

7      Q.   And this policy states that because of that

8  resolution, "drag show events are prohibited at special-

9  event venues on the campus of West Texas A&M

10 University?"

11     A.   Yes, sir.

12     Q.   Does that include Legacy Hall?

13     A.   Yes, sir.

14     Q.   Are you aware that a federal district court has

15 issued an order prohibiting the A&M System employees

16 from enforcing that resolution?

17     A.   No, sir.

18     Q.   Do you know whether or not there are plans to

19 remove this policy from this document?

20     A.   No, sir.

21     Q.   Have you heard any discussion about removing

22 this policy from this document aside from discussion

23 with lawyers?

24     A.   No, sir.

25     Q.   As far as you're aware, is this policy being

1  enforced by the university?

2      A.  Yes, sir, as far as I'm aware.

3      Q.  I want to go to Page 10.  You'll see where it

4  says, "Smaller sound systems are available for use.

5  Sound levels of events in the JBK may not disrupt

6  regular business operations and must remain at a level

7  appropriate for the facility."

8              Do you see that?

9      A.  Yes, sir.

10     Q.  How do you do that?

11     A.  The JBK is wired for sound through the commons

12  area, and we maintain the volume level so that students

13  can enjoy being together, having conversations,

14  socializing, and if students are studying in quiet

15  areas, that sound system does not disrupt their study

16  habits.

17     Q.  Was there any concern with respect to any of

18  the drag shows plaintiff proposed in 2023 or 2024, that

19  sound might disrupt business operations or educational

20  opportunities or activities?

21     A.  No, sir.

22     Q.  If we go to Page 12, it says "Reservable Indoor

23  Spaces" at the top.  I want to confirm that Legacy Hall

24  is a reservable space on that list.  Is it?

25     A.  Yes, sir.

```
 1        Q.   I want to go down towards the bottom.
 2              It says, "In the JBK, classes may be
 3   scheduled on a one-time basis during each semester.
 4   Classes will not be allowed to use the JBK on a regular
 5   basis."
 6              Is that accurate?
 7        A.   Yes, sir.
 8        Q.   Why?
 9        A.   The space is designated primarily for student
10   use, and then department classroom is secondary.
11        Q.   Going back to the top, are you aware of any
12   plans to change or alter the availability of Legacy Hall
13   as a space students can reserve?
14        A.   No, sir.
15        Q.   Okay.  So we have the JBK, which is set up to
16   allow or to facilitate social and entertainment events
17   for students and for the campus community and the
18   broader community.
19              Is that accurate?
20        A.   Yes, sir.
21        Q.   Is it fair to say that the use of Legacy Hall
22   for expressive events is the normal operation of the
23   university?
24              MR. BRYANT:  Objection; vague.
25        Q.   (BY MR. STEINBAUGH)  You can answer.
```

```
 1        Q.   Do you know if anyone would be checking IDs?

 2        A.   Yes.

 3        Q.   Do you know who that would be?  Is there a

 4   designated person doing that?

 5        A.   Yes.

 6        Q.   Would it be JBK staff doing that?

 7        A.   It could be.

 8        Q.   Does the university ever restrict access to

 9   events based on age because of the availability of

10   alcohol, so they'll say, you know, "This is a 21-up

11   event?"

12        A.   Could you expound further on "restricting

13   access to events?"

14        Q.   Let's say we assume that there are spaces that

15   people are reserving on campus.  Does the university

16   ever say, "This space can only be accessed by people

17   above the age of 21 because we're serving alcohol here?"

18   And I'm referring specifically to the JBK.  I know your

19   knowledge may not go outside of that.

20        A.   No, sir.

21        Q.   Does the university ever restrict access to

22   other events in the JBK based on age, meaning people

23   under a particular age are not permitted in that event?

24        A.   Not to my knowledge.

25        Q.   Does the university limit student organizations
```

1    Q.    They are?

2    A.    Yes, sir.

3    Q.    I think you mentioned earlier -- correct me if

4    I'm mischaracterizing you at all -- that Legacy Hall is

5    a community resource because there are not that many

6    resources or venues that other people could use, so they

7    come to Legacy Hall from outside the community to be

8    able to use that space?

9    A.    Yes, sir.

10    Q.    Do you know whether or not there are spaces

11    comparable to Legacy Hall in Canyon?

12    A.    There are now.

13    Q.    When you say "now," what does that mean?

14    A.    Many event venue spaces have developed in the

15    last couple of years.

16    Q.    Can you name some of those?

17    A.    The new facility right next to the campus, the

18    Lumberyard.

19    Q.    What is the Lumberyard?

20    A.    It's a multi-purpose facility that holds

21    outdoor concerts, and they have a large space that

22    groups and other event venues could use that seem to

23    have become popular in the last couple of years.

24    Q.    Do you know what they charge for use of that

25    space?

1     A.    I could not tell you a price.    The JBK does a

2    market analysis to make sure that their pricing is

3    within or less than competitive spaces.

4     Q.    But a student organization would pay more at

5    the Lumberyard than for Legacy Hall?

6     A.    I can't answer that.

7     Q.    But if a student organization is paying nothing

8    for Legacy Hall, and they're paying something for

9    Lumberyard, that's more?

10     A.    Yes, sir.

11     Q.    I want to go to Page 17.    Do you see that it

12    says in the second paragraph, "Providing space for an

13    event or marketing of an event does not necessarily

14    imply university endorsement or sponsorship of a

15    product, issue, or idea?"

16     A.    Yes, sir.

17     Q.    Is it fair to say that that reflects the

18    university's policy that holding events or expressive

19    events in Legacy Hall doesn't mean that the university

20    endorses the content of those events?

21         MR. BRYANT:    Objection; the document speaks

22    for itself.

23     A.    Yes.

24         (Exhibit 63 marked.)

25     Q.    (BY MR. STEINBAUGH)    I want to mark as Exhibit

 1  organizations at the university, is that an accurate

 2  statement?

 3       A.  Yes, sir.

 4       Q.  Do you have any involvement in the funding of

 5  student organizations or managing their bank accounts at

 6  all?

 7       A.  No, sir.

 8       Q.  I want to go to Page 15.  You see the section

 9  "Risk Management?"

10       A.  Yes, sir.

11       Q.  Can you describe the risk management process

12  and its purpose?

13       A.  Yes, sir.

14            MR. BRYANT:  Is this risk management as

15  used in this document?  We've also talked about the risk

16  management or assessment process in connection with

17  Legacy Hall and JBK.  What are we asking about here?

18            MR. STEINBAUGH:  With Legacy Hall and the

19  process of reserving Legacy Hall by student

20  organizations.  I don't mean risk management like --

21            MR. BRYANT:  Organizational risk

22  management?

23            MR. STEINBAUGH:  Not organization or

24  dealing with traffic somewhere on campus.

25       A.  So would you be speaking about a particular

1    reservation that's made and the risk management

2    associated with it?

3        Q.   (BY MR. STEINBAUGH)  Yeah.

4        A.   Okay.  Yes, sir.

5        Q.   Can you describe that process and its purpose?

6        A.   The purpose is to ensure that the reserving

7    party and the university are mitigating risk to the

8    greatest extent and providing if insurance is needed.

9    There are multiple people that are involved in the risk

10   review process.

11              For instance, the Risk Office will review

12   for if this is an event that would potentially need

13   additional insurance or a participation waiver.

14   Fire and Life Safety would review to make sure that

15   there's nothing that's violating state fire code.

16       Q.   In your role at the JBK, were you often

17   involved in the risk management process?

18       A.   I facilitated the risk management process.

19       Q.   So you're familiar with how that office works?

20       A.   Yes, sir.

21       Q.   And you're familiar with kind of its goals and

22   purposes?

23       A.   I'm familiar with the process of risk

24   management as it pertains to a reservation.

25       Q.   Is it fair to say that that process is

1  iterative, meaning you go back and forth with students

2  to identify risks and try to mitigate those?

3      A.   Yes.

4      Q.   Is it fair to say also that risks can only be

5  mitigated; they can't be eliminated in most cases or in

6  some cases?

7      A.   Yes, sir.

8      Q.   If you look on this list here, one of the risks

9  they identify is "Physical:   Prevent injuries and ensure

10  food, alcohol, and venue safety."

11          Were there any concerns with the 2023 or

12  2024 shows, that there would be a risk of injuries?

13      A.   The client identified a risk involving dance.

14      Q.   And that's sort of a typical risk for dancing

15  on stage?

16      A.   Yes, sir.

17      Q.   And there are dances on stage at Legacy Hall?

18      A.   Yes, sir.

19      Q.   It also says it looks at the reputational risk.

20  It says, "Avoid actions that may harm the image of your

21  organization or the university."

22      A.   Yes, sir.

23      Q.   Is the image of the university more important

24  than a student's First Amendment rights?

25      A.   I can't answer that.

1    Q.  Do you watch the news a lot?

2    A.  No, sir.

3    Q.  That's a wise idea.

4        Do you know whether or not universities

5 that limit or censure speech are popular with the

6 American public?

7        MR. BRYANT:  Objection; vague, speculative.

8    A.  I can't answer that question.

9    Q.  (BY MR. STEINBAUGH)  Do you know whether or not

10 campus free speech is an important issue with the

11 American public?

12    A.  Again, I can't answer that question.

13    Q.  Are you aware of any student events that may

14 have been canceled or denied by the university because

15 it might hurt the image of the university?

16    A.  I have no knowledge.

17    Q.  I want to go down to the emotional risk here.

18 It says, "Consider how events may affect the mental

19 well-being of attendees."

20    A.  Yes, sir.

21    Q.  Was there ever a concern that Spectrum's events

22 would hurt the mental well-being of attendees?

23    A.  The client identified a potential risk of

24 embarrassment.

25    Q.  Other than that, was there any concern?

1      A.   Yes, sir.

2      Q.   And those primarily serve students at the

3  university?

4      A.   Yes, sir.

5      Q.   There are a number of events at Legacy Hall and

6  other JBK facilities that are worship events.

7              Is that accurate?

8      A.   There are some.

9      Q.   Do you know whether or not the worship center

10 or the facility adjacent to the university is called

11 "the Wesley?"

12     A.   "The Wesley," yes, sir.

13     Q.   Okay.  Are you familiar with an event called

14 "University Sing?"

15     A.   Yes, sir.

16     Q.   What is University Sing?

17     A.   University Sing has been a competition among

18 fraternities and sororities, most recently involving

19 student orgs.  A theme is generally chosen.

20              In 2024, the theme was Disney musicals.

21 Student orgs can register, and they will choose a scene

22 usually involving a skit, maybe a song that they will

23 lip-sync, and they will compete in front of an audience

24 and judges.  I don't believe there's a prize, but it's

25 just a competition.

```
1          Q.   Have you attended those before?

2          A.   Not since 2006.

3          Q.   Okay.  Do you remember what the theme was for

4     that one?

5          A.   I have no idea.  Legacy wasn't even in

6     existence then.

7          Q.   When was Legacy built?

8          A.   It opened December of 2012, I believe.

9               MR. STEINBAUGH:   I want to show you a

10    video.  This was produced at SPECTRUM 0003004, and I

11    will mark this video as Exhibit 64.  It's a short video.

12              (Exhibit 64 marked.)

13         Q.   (BY MR. STEINBAUGH)  Are you able to see that?

14         A.   Yes, sir.

15              (Video plays.)

16         Q.   (BY MR. STEINBAUGH)  Do you know if the JBK

17    produced that video?

18         A.   I do not know.

19         Q.   Is that video an accurate representation of

20    what University Sing is?

21         A.   Yes.

22         Q.   Do you know how long this event has been held,

23    just as a ballpark?

24         A.   It was postponed during COVID, and I'm not sure

25    how long of a break, but I know it was brought back in
```

1    2024.

2    Q.   Okay.   But if the university has held this

3    repeatedly, is it safe to assume that Legacy Hall is

4    compatible with this type of use?

5    A.   Yes, sir.

6              (Exhibit 65 marked.)

7    Q.   (BY MR. STEINBAUGH)   I'm going to mark as

8    Exhibit 65 the First Amended Complaint.

9              Have you ever been sued before?

10   A.   No, sir.

11   Q.   Are you familiar with what a Complaint and

12   Answer are?  Totally fine if you're not.

13   A.   No, sir.

14   Q.   So as a general overview, what happens in a

15   lawsuit is the plaintiff, the person suing, will file

16   the First Amended Complaint, and then the person who is

17   the defendant will sometimes have to file what's called

18   an Answer.

19              In the Answer, they will say, "Yes, I admit

20   this," or "No, I deny this, and you need to prove this

21   particular allegation?"

22              Exhibit 66 marked.)

23   Q.   (BY MR. STEINBAUGH)   I also want to mark as

24   Exhibit 66 the Answer of Walter Wendler.  As part of

25   this process, when we filed the lawsuit against

```
 1        Q.   Are you familiar with the show "As You Like
 2   It"?
 3        A.   No, sir.
 4        Q.   I'm not either.
 5              If a student theater troupe, one that is
 6   disconnected from any faculty members and just composed
 7   of students -- maybe they have a faculty advisor, but
 8   it's not put on by the theater department -- if that
 9   troupe asked to use Legacy Hall to stage Shakespeare's
10   "As You Like It," would the university permit that?
11              Is that an acceptable use of Legacy Hall?
12        A.   Yes.
13        Q.   Are you familiar with the theatrical tradition
14   of adapting Shakespeare plays to a new context, like
15   having "Romeo and Juliet" take place in a different
16   country or in the future?
17        A.   No, sir.
18              (Exhibit 70 marked.)
19        Q.   (BY MR. STEINBAUGH)  I'll mark as Exhibit 70
20   SPECTRUM 0003011.  This is an Executive Order issued by
21   President Trump.
22              Are you familiar with this Executive Order
23   at all?
24        A.   No, sir.
25        Q.   You'll see, towards the bottom of the second
```

1  page in Subsection G, it says, "Federal funds shall not

2  be used to promote gender ideology.  Each agency shall

3  assess grant conditions and grantee preferences and

4  ensure grant funds do not promote gender ideology."

5         Do you see that?

6     A.   Yes, sir.

7     Q.   Is West Texas A&M University an agency of the

8  federal government?  It's okay if you don't know.

9     A.   I don't know.

10    Q.   Is it an agency of the state government?

11    A.   Yes, sir.

12    Q.   Do you know whether or not this policy limits

13 student expression at West Texas A&M University?

14    A.   No, sir.

15    Q.   Nobody has ever suggested that this Executive

16 Order limits student expression?

17         MR. BRYANT:  You mean nobody has ever

18 suggested to the witness?

19         MR. STEINBAUGH:  Correct, excluding any

20 lawyers.

21    A.   No, sir.

22    Q.   (BY MR. STEINBAUGH)  Are you familiar with an

23 Event called "The Jingle and Mingle" or "the Jingle

24 Mingle?"

25    A.   Yes, sir.

```
 1        Q.   Do you know who organized that?

 2        A.   City of Canyon.

 3        Q.   What was that event?

 4        A.   I have no knowledge.

 5        Q.   Do you know if it was held in 2022 or 2023?

 6   Were there two iterations of that?

 7        A.   Yes, sir.

 8        Q.   In 2022 and 2023?

 9        A.   I believe so.

10        Q.   Were you present at either of the Jingle

11   Mingles?

12        A.   No, sir.

13        Q.   Are you aware of any complaints or policy

14   violations involving either of the Jingle Mingles?

15        A.   No, sir.

16             (Exhibit 71 marked.)

17             MR. STEINBAUGH:   I want to mark as Exhibit

18   71 a video.   This was produced at SPECTRUM 0002282.

19        Q.   (BY MR. STEINBAUGH)   Are you able to see that?

20        A.   Yes, sir.

21             (Video plays.)

22        Q.   (BY MR. STEINBAUGH)   Does that appear to be

23   Legacy Hall?

24        A.   Yes, sir.

25        Q.   Are you familiar with an event involving a
```

1        A.    I can't speak to the reason for its

2   cancellation.

3        Q.    Do you know if Christopher Thomas was involved

4   in that cancellation?

5        A.    That, I do not know.

6        Q.    Do you know who made the decision to cancel it?

7        A.    No, sir.

8        Q.    Do you know whether or not the university

9   issued a statement about the cancellation?

10       A.    I don't recall.

11       Q.    I want to go back through some of the events

12  that have previously occurred or could occur in Legacy

13  Hall.  I just want to get a yes or no answer about

14  whether or not this event could be held in Legacy Hall.

15            MR. BRYANT:  Whether it could be held?

16            MR. STEINBAUGH:  Yeah.  I'll rephrase it.

17       Q.    (BY MR. STEINBAUGH)  So I want to get a yes or

18  no about whether or not it would be acceptable under JBK

19  policies and whether or not Legacy Hall is suitable for

20  this type of event.

21            Does that make sense?

22       A.    Yes, sir.

23       Q.    Wedding ceremonies?

24       A.    Yes, sir.

25       Q.    Wedding receptions?

1     A.   Yes, sir.

2     Q.   Meetings?

3     A.   Yes, sir.

4     Q.   Socials?

5     A.   Describe.

6     Q.   That was one of the types of events that was

7   listed on the 25 Live.

8     A.   Yes, sir.

9     Q.   So yes?

10    A.   Yes, sir.

11    Q.   Banquets?

12    A.   Yes, sir.

13    Q.   Performances?

14    A.   Yes, sir.

15    Q.   Presentations?

16    A.   Yes, sir.

17    Q.   Seminars?

18    A.   Yes, sir.

19    Q.   Conferences?

20    A.   Yes, sir.

21    Q.   Holiday parties?

22    A.   Yes, sir.

23    Q.   Movie screenings?

24    A.   Yes, sir.

25    Q.   Dances?

```
 1        A.    Yes, sir.

 2        Q.    Dance-off competitions?

 3        A.    Yes, sir.

 4        Q.    Fashion shows?

 5        A.    Yes, sir.

 6        Q.    Talent shows?

 7        A.    Yes, sir.

 8        Q.    Male beauty pageants?

 9        A.    Yes, sir.

10        Q.    Female beauty pageants?

11        A.    Yes, sir.

12        Q.    Press conferences?

13        A.    Yes, sir.

14        Q.    Worship services?

15        A.    Yes, sir.

16        Q.    Concerts?

17        A.    Yes, sir.

18        Q.    Rock concerts?

19        A.    Yes, sir.

20        Q.    Christian music concerts?

21        A.    Yes, sir.

22        Q.    Opera music concerts?

23        A.    Yes, sir.

24        Q.    Rap music concerts?

25        A.    Yes, sir.
```

1    Q.    Country music concerts?

2    A.    Yes, sir.

3    Q.    Magicians?

4    A.    Yes, sir.

5    Q.    Hypnotists?

6    A.    Yes, sir.

7    Q.    Fundraisers?

8    A.    Yes, sir.

9    Q.    Political candidates?

10    A.    Yes, sir.

11            (Exhibit 75 marked.)

12    Q.    (BY MR. STEINBAUGH)  I'll mark this as Exhibit

13    75.  It's a long email chain, so take your time to look

14    through it, and once you're done reading it, let me

15    know.

16    A.    Yes, sir.

17    Q.    Does this refresh your recollection about

18    whether or not Christopher Thomas was involved in

19    discussions about canceling this concert?

20    A.    Yes, sir.

21    Q.    Does this refresh your recollection about

22    whether or not the university issued -- if you'll look

23    at the first page -- a statement along the lines of "the

24    vice president denied this event due to the risk

25    associated with it?"

 1   had the most knowledge.

 2       Q.   (BY MR. STEINBAUGH)  Look at the last page of

 3   the exhibit.

 4       A.   Yes, sir.

 5       Q.   In the very middle is a chat from you on April

 6   23rd at 8:16 p.m.

 7            Is that right?

 8       A.   Yes.

 9       Q.   You say, "Frustrating at times."

10            What did you mean by that?

11       A.   Chari had never been involved in anything like

12   this before, and she was feeling stressed.

13            MR. STEINBAUGH:  Do we want to take a break

14   for lunch?

15            MR. BRYANT:  Let's go off the record.

16            (Recess 11:41 a.m. to 12:29 p.m.)

17       Q.   (BY MR. STEINBAUGH)  All right.  We are getting

18   there.  Not too much longer.  I appreciate your patience

19   in being here with us today.

20            I want to talk about the drag show that

21   Spectrum WT proposed to be held in March of 2023.

22            Do you recall that?

23       A.   Yes, sir.

24       Q.   And before we get to that, I want to talk

25   about, in general, the steps that are required for a

1    student organization to register and hold an event in

2    Legacy Hall.

3                As I understand it, there are five broad

4    steps to doing so.  Number 1 is submitting an online

5    reservation request through the 25 Live website.

6                Is that correct?

7        A.    Yes, sir.

8        Q.    Number 2 is completing and submitting a risk

9    assessment?

10        A.    Yes, sir.

11        Q.    Number 3 is reviewing the marketing to ensure

12    it aligns with the marketing requirements for student

13    organizations?

14        A.    Yes, sir.

15        Q.    Number 4 is completing and submitting the

16    catering exemption form if you're serving food?

17        A.    Yes, sir.

18        Q.    And Number 5 is receiving event confirmation

19    from the JBK Event Services Team?

20        A.    Yes, sir.

21        Q.    Are there any other significant or major steps

22    that I'm missing there that a student organization would

23    have to go through?

24        A.    They would be subsidiary steps, such as if you

25    need liability insurance, or sometimes there may be a

1    request of -- for example, if a student org is having a

2    Pie In the Face Fundraiser, you need to ensure that

3    participant waivers are signed, and everyone wears a

4    goggle, but they're all part of those particular areas.

5        Q.    With respect to the 2023 proposed drag show,

6    did Spectrum WT satisfy all of those steps?

7        A.    Yes, sir.

8        Q.    So they had received confirmation for holding

9    the event?

10       A.    I do not recall if it was moved from tentative

11   to confirmed.  I don't know where in the timeline the

12   cancellation of the event occurred in relationship to

13   moving it from tentative to confirmed.

14       Q.    Were there any steps that they would have had

15   to take in order to move it from tentative to confirmed?

16       A.    No, sir.

17       Q.    So essentially, moving it from tentative to

18   confirmed was purely ministerial in that it was someone

19   on the JBK Team that would have to click a button or

20   something?

21       A.    Yes, sir.  To the best of my knowledge, the

22   last thing remaining was proof of liability insurance.

23   That can actually happen up until the day of the event.

24   That insurance is a three to five-minute process to

25   secure, so sometimes that is the last thing that will

1    happen.

2    Q.    Okay.    And there's no question that the

3    students would have been able to get that?

4    A.    No, sir.

5    Q.    When did you first hear about the proposed drag

6    show in 2023?

7    A.    When the reservation itself was made, best of

8    my recollection, late December, early January.

9    Q.    That reminds me.    During the break, your

10    counsel asked me to give you an opportunity to address a

11    mistake in one of the dates, I guess, about employment

12    or something like that?

13    A.    Not employment.    I was reassigned to

14    Residential Living October of 2023, and I believe I said

15    "October of 2024."

16    Q.    Okay.    I appreciate that.    Thank you.

17    When did you first hear about the proposed

18    drag show?

19    A.    When the original reservation came in.

20    Q.    And that's how you first heard about it?

21    A.    Yes, sir.

22    Q.    Would that have been the risk assessment

23    itself, or did it come later?

24    A.    The risk assessment came after the reservation.

25    Q.    Okay.    When you received the reservation, what

1    did you do with it?

2    A.    It was being processed by the JBK Event

3    Services Team as any other reservation.

4    Q.    But you read that reservation request?

5    A.    I don't remember if I actually read the

6    reservation.

7    Q.    Do you recall whether that reservation request

8    referenced it being a drag show?

9    A.    Yes.

10    Q.    So at the moment the reservation request was

11    made, the university understood that this was a drag

12    show that was being proposed?

13    A.    Yes.

14            (Exhibit 77 marked.)

15    Q.    (BY MR. STEINBAUGH)    I'll mark as Exhibit 77 a

16    redacted document stamped SPECTRUM 0000762.

17            Let me know when you've had a chance to

18    read through this.

19    A.    Yes, sir.

20    Q.    Are you familiar with this document?

21    A.    Yes, sir.

22    Q.    I want to start towards the end where it's

23    stamped 768 at the bottom.

24    A.    Yes, sir.

25    Q.    Do you see where it says "Response Summary" and

100

```
 1   the text that follows over the next two pages?
 2        A.   Yes, sir.
 3        Q.   What is that?
 4        A.   Are you referring to the description of the
 5   event or the entire paragraph?
 6        Q.   What kind of document or email is it?  Is this
 7   something you get for a lot of events?
 8        A.   Every risk assessment is identical.
 9        Q.   So this is the risk assessment that the
10   students submitted?
11        A.   Yes, sir.
12        Q.   And starting at the bottom of 768, part of the
13   Description of Event says, "A student drag show with
14   dancing on stage and performances by students.  The
15   performers will perform a song while in drag."
16             Is that correct?
17        A.   Yes, sir.
18        Q.   Is that your understanding of what the show was
19   going to be?
20        A.   Yes, sir.
21        Q.   And is that the type of activity that Legacy
22   Hall is capable of facilitating?
23        A.   Yes, sir.
24        Q.   You see it says here twice that "it will be a
25   student drag show with performances by students."
```

 1              Was there an indication at this time that
 2   anyone other than a student would be involved in this
 3   event?
 4       A.   As a participant?
 5       Q.   Yes.
 6       A.   No.
 7       Q.   Any indication that anyone other than a student
 8   would be on stage for this event?
 9       A.   No.
10       Q.   I want to look at the first four pages in the
11   exhibit that are redacted.  Do you have any recollection
12   of who this communication might have been with?
13              And I know I'm asking you to look beyond
14   redacted text.
15       A.   Yes, sir.
16       Q.   Do you know who it might have been?
17       A.   It's the same people every time.
18       Q.   Okay.
19       A.   I may have the blocks out of order, but I know
20   the first block is Richard Smith.  There's a space for
21   Fire and Life Safety.  There's a space for myself.
22   There's a space for, at this time, Kimberly Cornelsen,
23   who was over Office of Student Engagement and
24   Leadership.  Her role was to verify they were a
25   registered org.

```
 1        Q.    Are you aware of a drag performer who goes by
 2   the stage name "Myss Myka?"
 3        A.    No, sir.
 4        Q.    You've never heard that name before?
 5        A.    No, sir.
 6              (Exhibit 78 marked.)
 7        Q.    (BY MR. STEINBAUGH)   I'm going to mark as
 8   Exhibit 78 what is stamped SPECTRUM 0000776.
 9              Are you familiar with this?
10        A.    I'm familiar with the document.   I don't recall
11   the specific contents of the document.
12        Q.    Okay.   Have you seen this risk assessment
13   before?
14        A.    Yes.
15        Q.    This is the risk assessment that the students
16   submitted or the matrix the students submitted in
17   connection with the 2023 drag show?
18        A.    Yes, sir.
19        Q.    Do you see on this first table here, with the
20   "List of Activities to Occur and Associated Risks," that
21   next to "drag race," it says "performing in drag
22   (possible bad press)?"
23        A.    Yes, sir.
24        Q.    Is the possibility of negative media attention
25   one of the risks that the university advises students to
```

1  report on these forms?

2      A.  We don't advise students what to put.  They

3  fill it in themselves.

4      Q.  Do you see the three boxes on the bottom?

5      A.  Yes, sir.

6      Q.  Under Severity, Number 2 says, "may result in

7  negative publicity for West Texas A&M University."

8              Is that right?

9      A.  It's printed, so yes, sir.  To clarify, we

10  don't verbally tell students what to fill in.  They open

11  this document and fill it in.

12      Q.  Thank you for clarifying.  I see how that

13  question was uncertain.

14              So this document, which is a standard form,

15  apprises students that they should report the

16  possibility of negative publicity for the university as

17  a risk?

18      A.  Yes, sir.

19      Q.  And the "possible bad press" here on that same

20  line, the method to manage that risk was by "not

21  allowing minors without a legal guardian."

22              Is that correct?

23      A.  That's what the document says, yes, sir.

24      Q.  Were you aware, in 2023, that there were a

25  number of media reports or controversies involving drag

1    Q.    And in your opinion, is there?

2    A.    Again, I could only refer to comments in the

3    risk assessment.

4    Q.    Do those fliers depict any nudity?

5    A.    No, sir.

6    Q.    Do they depict any sexual conduct?

7    A.    No, sir.

8    Q.    Do they suggest any nudity?

9    A.    No, sir.

10    Q.    If you look at the very front page with the

11    redacted information on it, do you see the file names up

12    there?

13    A.    Yes, sir.

14    Q.    Does that suggest that these were drafts that

15    were being pitched as potential promotional material?

16    A.    I don't know.

17    Q.    Is it typical for student organizations, in

18    coming up with promotional materials, to send drafts to

19    JBK?

20    A.    It's not untypical.

21    Q.    And JBK works with student organizations to

22    send designs back and forth?

23    A.    Generally, the purpose is to ensure that

24    they've included their logo, pertinent information,

25    co-sponsors, that all logos and any pertinent

1    information to the event are included on the marketing

2    material.

3        Q.    I want to turn back to this chat.

4              You said, "It's not much of a fundraiser

5    with an anticipated audience of 100, and after all

6    expenses as Barrett lists them, there is not much left

7    to send to the Trevor Project."

8              What did you mean by that?

9        A.    When looking at the projected maximum audience

10   and the expenses that could possibly be incurred, it

11   seemed that their fundraising efforts weren't generating

12   much of a return.

13       Q.    What kind of expenses would you be concerned

14   that they were incurring here?

15       A.    They were originally providing snacks and

16   drinks free of charge, and knowing the cost of buying

17   snacks and drinks for 100 people, it can be pretty

18   expensive.

19       Q.    Is that sort of the logistics that JBK staff

20   can work with student organizations to resolve?

21       A.    Oftentimes it would just be brought to their

22   attention; "if this is a fundraiser, have you considered

23   all costs involved?"

24       Q.    You then say, "A broader issue is whether or

25   not this event is going to cause more division rather

1    than foster diversity, especially since OSEL is already
2    receiving student concerns."
3              What is OSEL?
4    A.    Office of Student Engagement and Leadership.
5    Q.    Is that part of the JBK?
6    A.    It is now.  It's in the building, but it was
7    two separate departments.
8    Q.    What did you mean about "student concerns?"
9    A.    Kimberly Cornelsen was over Office of Student
10   Engagement and Leadership, and she had expressed that
11   students had found out about the event and were coming
12   to her.
13              That office does a lot of student
14   programming, and quite often, the natural assumption is
15   that that office is responsible for this event, which it
16   was not.
17   Q.    And did she characterize the nature of those
18   concerns?
19   A.    No, sir.
20   Q.    This chat was with Chance Haugen.
21              Is that correct?
22   A.    I do not recall who the original email
23   correspondence was with.
24   Q.    Other than this chat, do you recall telling
25   anyone about there having been student concerns?

```
 1       A.   No.
 2       Q.   Did you report student concerns to the Title IX
 3   office?
 4       A.   No.
 5       Q.   And given your concerns, you were involved
 6   further with the processing of this event, correct?
 7       A.   Yes.
 8       Q.   Would you say that you stayed abreast of the
 9   processing of this event any more than other
10   reservations?
11       A.   No.
12       Q.   Would you say that you were intimately involved
13   in the processing of this event?
14       A.   I was communicating with Barrett Bright.
15       Q.   Were you the primary conduit of communication
16   with him?
17       A.   I believe so.
18       Q.   Who was Chance Haugen at this time?  What was
19   his role at the JBK?
20       A.   He is the assistant vice president, so he was
21   my direct supervisor.
22       Q.   He is or was?
23       A.   Is.
24       Q.   What was he then?
25       A.   Assistant vice president.
```

```
 1              (Exhibit 81 marked.)
 2      Q.   (BY MR. STEINBAUGH)  I'm going to mark this as
 3  Exhibit 81.  I don't need you to go through the entire
 4  document, but I want to start with that first page
 5  there.
 6      A.   Yes, sir.
 7      Q.   Do you recognize this?
 8      A.   Yes, sir.
 9      Q.   What is a "1-2-1?"
10      A.   That's our biweekly meeting just touching base.
11      Q.   Do you take these notes?
12      A.   Yes, these are my notes.
13      Q.   And this is a running log of those 1-2-1s with
14  Chance Haugen?
15      A.   Yes.
16      Q.   And the dates on here, like 10-31-23, that's
17  the date that meeting occurred?
18      A.   Yes.
19      Q.   Do you take these notes contemporaneously, like
20  are you typing them there, or do you write them down
21  afterwards?
22      A.   General practice is I have my laptop, and I
23  record them as we go.
24      Q.   Do you have a Bates stamp at the bottom of each
25  page?
```

12

```
 1        A.   No, sir.

 2        Q.   If you can go to the 22nd page.  We're looking

 3   for the date 2-14-23.

 4        A.   Yes, sir.

 5        Q.   Are you able to get there?

 6        A.   Yes, sir, I'm there.

 7        Q.   Are these your notes from a 1-2-1 meeting with

 8   Chance Haugen on February 14th, 2023?

 9        A.   Yes, sir.

10        Q.   Who had you talked to about the proposed drag

11   show by that point?  I know you talked to Kimberly

12   Cornelsen.

13             Is that correct?

14        A.   Yes, sir.

15        Q.   Who else had you talked to?

16        A.   The risk assessment had just come through, so I

17   was facilitating comments between those people involved

18   in reviewing the risk assessment.  Outside of that and

19   this normal conversation with Chance, nobody that I

20   recall.

21        Q.   What do you mean on here by "we have nothing in

22   place to address moral appropriateness?"  Was this in

23   response to a complaint or concern?

24             MR. BRYANT:  Again, testify from your

25   recollection rather than just from reading the document.
```

113

```
 1        A.    It was in response to Kimberly Cornelsen's
 2   question on marketing.
 3        Q.    (BY MR. STEINBAUGH)    What was her question on
 4   marketing?
 5        A.    "Is it appropriate or suggestive?"
 6        Q.    Had she seen the three proposals we have
 7   previously discussed here?
 8        A.    I can't answer that definitively.
 9        Q.    Had you sent her the proposed marketing?
10        A.    Not that I recall.
11        Q.    If you had sent it to her, would it have been
12   in an email?
13        A.    Most likely.
14        Q.    Then you say, "It's more than 'free speech.'"
15              What does that mean?
16        A.    This particular event was not something anyone
17   in the office at the time had dealt with, so we were
18   working through the comments on the risk assessment,
19   First Amendment, and an event that the people that were
20   currently in the office had never processed, so free
21   speech was one of those among various issues that were
22   being addressed.
23        Q.    So was free speech or the First Amendment
24   listed in that redacted document that we had discussed
25   earlier in which the various constituents in the risk
```

114

1  assessment had discussed potential risks?

2      A.    Yes.

3      Q.    It would have been discussed there?

4      A.    Yes.

5      Q.    So that was an important issue in dealing with

6  the processing of this event?

7      A.    The risk assessment process wanted to make sure

8  that right was not violated.

9      Q.    What does "campus well-being" refer to, to your

10 recollection?

11     A.    That, I don't recall.

12     Q.    What about "appropriate dress and behavior,"

13 what does that note refer to, to your recollection?

14     A.    We did not have any knowledge at that time of

15 how the participants would be dressed or what the

16 content of the dance would be.

17     Q.    Did you later develop that knowledge?

18     A.    Yes.

19     Q.    And how did you develop that knowledge?

20     A.    Conversation with Barrett Bright.

21     Q.    And did those conversations with Barrett Bright

22 satisfy your concerns?

23     A.    Yes.

24     Q.    Did you share what Barrett Bright had told you

25 about the appropriate dress and behavior with anyone

```
 1        A.   Chance had asked, if and when the marketing
 2   material is altered, to share.
 3        Q.   Why would it be altered?
 4        A.   Adding the logos.  At the time, there were no
 5   identifiers of the group putting on the event, there was
 6   no reference to it being a fundraiser, there was no
 7   reference to minors being allowed, and so it was a
 8   continuous dialogue with Barrett on just making sure
 9   everything that needs to be included is included.
10        Q.   And is that pretty typical of trying to work
11   with students on putting together materials?
12        A.   Yes.
13        Q.   Sort of "herding cats?"
14        A.   Yes.
15        Q.   Okay.  Hold on to that document because we're
16   going to wind up coming back to it.
17        A.   Okay.
18             (Exhibit 82 marked.)
19        Q.   (BY MR. STEINBAUGH)   I'll mark this as Exhibit
20   82.  Take a few minutes to look through this.
21        A.   Yes, sir.
22        Q.   Let's start off with the first page and this
23   redacted text.  Do you know who this email would have
24   been sent to or from?
25        A.   I can't tell you.
```

 1          Q.   Going to the next page, is that Bates stamped

 2    787 on the bottom?

 3          A.   Yes, sir.

 4          Q.   That email in the center there, is that an

 5    email you sent?

 6          A.   Yes, sir.

 7          Q.   Do you know if that would have been with

 8    Barrett Bright?

 9          A.   To the best of my recollection.

10          Q.   Starting at Page 789 and continuing through the

11    end, is that the same risk assessment the students had

12    submitted?

13          A.   Yes.

14          Q.   On Pages 788 to 789, is that an email that you

15    sent to Bear and to Kristina Drumheller?

16          A.   Yes, sir.

17          Q.   Who is Kristina Drumheller?

18          A.   She is the faculty advisor for Spectrum.

19          Q.   You asked a number of different questions of

20    Bear here, and I want to make sure I'm characterizing

21    them correctly.

22               Number 1 says, "Will a club advisor be at

23    event?"

24               You're referring to Kristina Drumheller?

25          A.   Yes.   Chip Chandler is also -- I'm not sure if

1  he's an advisor, but he was actively involved with the
2  group, but it was primarily Kristina.

3      Q.    Do you know Kristina well?

4      A.    No.

5      Q.    Do you have any reason to doubt her ability to
6  work with the students to facilitate an event?

7      A.    No.

8      Q.    Number 2, you ask, "Will the event contain
9  material that may need 'warning labels' for minors that
10  may attend (song lyrics, for instance)?  We've had this
11  happen before.  As an example, sometimes with a
12  comedian, signage will be posted that states that not
13  all material may be appropriate for minors?"

14          Do you recall asking that?

15      A.    Yes.

16      Q.    Does this refresh your recollection as to
17  whether or not the university uses signage to warn
18  potential visitors about content of events?

19      A.    I believe that's placed on the person making
20  the reservation.

21      Q.    Is it your understanding that the university
22  has asked other events to post that kind of signage?

23      A.    Yes, sir.

24      Q.    The third question is:  "Are the participants
25  required to get prior approval for their dress and

1  performance prior to the event?"

2              Was that your way of asking about the

3  clothing and performance concerns and addressing those

4  concerns?

5       A.   That was in response to a comment in the risk

6  assessment review process.

7       Q.   So this was your way of getting more

8  information from Bear to get that assurance?

9       A.   Yes.

10      Q.   And then if you turn to Page 787 going on to

11  Page 788, does this appear to be a response from Bear,

12  or Barrett, to your email?

13      A.   Yes.

14      Q.   Is it your understanding that he confirmed that

15  Kristina Drumheller will be present for the event?

16      A.   Yes.

17      Q.   And he confirmed the event is planned to be

18  PG-13, so he did suggest or take up the suggestion that

19  there be content warnings?

20      A.   Yes.

21      Q.   And third, that the performers will have to get

22  their song and dress pre-approved?

23      A.   Yes.

24      Q.   And then jumping back to your email, if you

25  look at 789, at the very top, it asks to "change one of

1    A.    I believe so.

2    Q.    (BY MR. STEINBAUGH)    And you thanked Bear for

3    his responsiveness, correct?

4    A.    Yes.

5    Q.    Did you perceive Bear as being responsive to

6    inquiries?

7    A.    For a full-time student that also worked on

8    campus, yes.

9    Q.    Do you have any recollection of who you would

10    have forwarded this to other than a lawyer?

11    A.    No.

12                (Exhibit 83 marked.)

13    Q.    (BY MR. STEINBAUGH)    I'll mark this as Exhibit

14    83.    Take a couple minutes to look at this.

15    A.    Yes, sir.

16    Q.    Do you recognize this document?

17    A.    Yes, sir.

18    Q.    What is this?

19    A.    This was a meeting between myself, Dr. Thomas,

20    and Chance Haugen.

21    Q.    Would anyone else have been present for this

22    meeting?

23    A.    No.

24    Q.    What was this meeting about?

25    A.    It was in response to a comment made in the

```
 1       A.   Yes.
 2       Q.   At the top under "Red Flags," there's a bullet
 3   point that says, "Why is RHA sponsoring this event?
 4   Student orgs?  Yes."
 5            Do you see that?
 6       A.   Yes.
 7       Q.   What is RHA?
 8       A.   Residence Hall Association.
 9       Q.   What was the concern with RHA sponsoring this?
10       A.   That, I do not know.  It was brought up in the
11   risk assessment review.
12       Q.   And then there's a bullet point down here:
13   "Who's monitoring/approving performances (if anyone, if
14   needed)?"
15            Do you see that?
16       A.   Yes.
17       Q.   And the two responses are referring to
18   "approval for music?"
19       A.   Yes.
20       Q.   It says, "JBK has an approved list of music,
21   and Barrett said they would submit music for approval in
22   advance?"
23       A.   Yes.  Barrett had sent music that he had
24   reviewed.
25       Q.   So this is reflecting that Barrett had provided
```

```
 1   the list of music?
 2       A.   Yes.
 3       Q.   And the university had approved that list of
 4   music?
 5       A.   The risk assessment review does not approve or
 6   disapprove, it just reviews the process.  But in
 7   requesting who was reviewing the music, Barrett said he
 8   and another person were.  And I do not remember who that
 9   other person was, but he had sent our AV technician the
10   music so they could pre-program it for the event so that
11   the program would flow, and there would not be any
12   disconnect.
13       Q.   I see.  And I understand elsewhere, that JBK
14   has a list of songs that cannot be played.
15                   Is that accurate?
16       A.   It's not accurate that it's a list of songs.
17   It would just be key words or themes within the music.
18       Q.   Who makes that determination?
19       A.   That, I can't answer.
20       Q.   And within the JBK, is there somebody who
21   researches songs and prints out lyrics or something like
22   that?
23       A.   Not that I know of.  The general practice would
24   be to put it back on the person making the reservation.
25   In this case, Barrett was very cooperative and seemed to
```

1  be in complete agreement with that statement.

2      Q.   Is there like a published list or set of

3  requirements about what music will or will not be

4  approved?

5      A.   Not that I know of.

6      Q.   How do they make that determination?

7              MR. BRYANT:  I believe he's already

8  answered that question.

9      Q.   (BY MR. STEINBAUGH)  By listening to the music

10  and reading the lyrics?

11      A.   I would say so.

12      Q.   So the individual staffer who is listening to

13  the music or reading the lyrics would make a

14  determination about their content?

15      A.   Again, it's generally put back on the student

16  making the reservation to make that call.

17      Q.   The music that Barrett submitted had been

18  reviewed by the university?

19      A.   It had been submitted.  That's as far, I

20  believe, as it got in the process.

21      Q.   I want to jump down to the next bullet point.

22  "The students have a First Amendment right to have this

23  event."

24              That was the consensus of the risk

25  assessment?

130

1      A.   Yes.   This portion contains comments that may

2  have been brought up in the meeting with Dr. Thomas.

3      Q.   Okay.   There's a line here that says, "If WT

4  does not have a written Expressive Activity Policy, now

5  is the time to develop one."

6             What does that reflect?

7      A.   Dr. Thomas was new, and he wasn't familiar

8  with all the policies.

9      Q.   I see.   Did you know that there was an

10  Expressive Activity Policy at the time?

11      A.   Yes.

12      Q.   And you told him that there was an Expressive

13  Activity Policy?

14      A.   Yes.

15      Q.   It says, "Why hasn't the VPSA been brought in

16  sooner?"

17             Was that Chris Thomas?

18      A.   Yes.

19      Q.   What was the concern there?

20      A.   I don't recall.

21      Q.   It says, "This event should have gone through

22  WT's Office of DEI."

23             What does that reference?

24      A.   At the time, we had an Office of Diversity,

25  Equity, and Inclusion.   Part of the risk review was:

1  Has the director of that office been brought into the

2  discussion?

3       Q.   Okay.  Further down, it says, "The org advisor

4  should be more actively involved, beyond just risk."

5            Is that referring specifically to Kristina

6  Drumheller?

7       A.   Yes.

8       Q.   Why?

9       A.   She had made a comment that she was aware of

10 the event, but was not actively involved in the

11 development of the event.

12      Q.   And was that a concern?

13      A.   It was brought up in the risk review.

14      Q.   And did she become more actively involved in

15 the event?

16      A.   Yes.

17      Q.   So the concerns would have been satisfied if

18 she was sufficiently active in the event?

19      A.   Yes.

20      Q.   Turn to the next page.

21      A.   Yes, sir.

22      Q.   See the bullet point "Possible Fallout from

23 Event?"

24      A.   Yes.

25      Q.   What does "unwanted publicity" refer to here?

1    A.    That was a comment within the risk review.

2    Q.    Is that referring to the students' matrix

3 referencing potential publicity, or was this a concern

4 that the university independently identified?

5    A.    This was a concern that was brought up by one

6 of the reviewers of the risk.

7    Q.    Do you remember who?

8    A.    I do not.

9    Q.    What was the concern about unwanted publicity?

10    A.    I can't answer that question.

11    Q.    It says "community responses."

12          What does that refer to?

13    A.    I can't answer that.

14    Q.    Under "student protests," do you know whether

15 or not there had been indications that students would

16 protest this event?

17    A.    I don't recall at this time hearing of any

18 students protesting the event.

19    Q.    And then it says "civil unrest."

20          Is that referring to the potential for

21 violence?

22    A.    That was a response to the risk review of the

23 number of police officers that may or may not be needed.

24    Q.    And then it says, "This event can be an

25 opportunity for student diversity development."

 1     A.   Yes.

 2     Q.   And was it sufficient to satisfy any concerns

 3 about their marketing?

 4     A.   Yes.

 5     Q.   And another step to mitigate risk was signage

 6 stating "may not be appropriate for minors under the age

 7 of 13."

 8              Was that sufficient to satisfy the

 9 university's assessment of the risk of minors seeing

10 this?

11     A.   That, along with who would verify that a minor

12 was with their guardian or parent.

13     Q.   And who would do that?

14     A.   Spectrum was going to take that responsibility.

15     Q.   And the university trusted them to be able to

16 undertake that responsibility?

17     A.   Yes.

18     Q.   And is that because Kristina Drumheller and

19 Chip Chandler were participating in the organization of

20 the event?

21     A.   Yes.   And we would not have a reason not to

22 trust a registered student org.

23     Q.   "JBK will have two event managers present."

24              Is that typical?

25     A.   It's not untypical for 100 people.

1    Q.   It also says, "JBK will be ready with ops crew

2    to add more chairs if needed."

3             Is that an indication that you thought the

4    event might be more popular than the students

5    anticipated?

6    A.   That's common practice for us.  If the facility

7    will hold more chairs, we always have chairs set aside

8    for more people than they anticipated.

9    Q.   Okay.  So that list is essentially the

10   resolution of the university's risk assessment and the

11   steps taken to mitigate those risks.

12            Is that correct?

13   A.   Up until that day, yes, sir.

14   Q.   Is there anything about the days that followed

15   that changed that risk assessment?

16   A.   Not that I'm aware of.

17   Q.   To your knowledge, do you have any indication

18   of when President Wendler first learned about the drag

19   show?

20   A.   I do not.  It would have been after this

21   meeting, as far as I know.

22   Q.   What makes you think that he would have learned

23   about it for the first time after this discussion?

24   A.   This is when I was asked to elevate it to the

25   Executive Committee.  If he had heard about it, it would

1    have not been through this process.

2        Q.    And that was Randy Rikel who asked you to

3    elevate it?

4        A.    No.    Richard Smith.

5        Q.    Okay.  I want to go back to the "1-2-1 With

6    Chance" document.

7        A.    Yes, sir.

8        Q.    Can you find the 2-28-23 date?

9        A.    Yes, sir.

10       Q.    Do you see where it says "Fool's Day Drag

11   03-31-23?"

12       A.    Yes.

13       Q.    Are these notes from a meeting with Chance

14   Haugen on February 28th, 2023?

15       A.    Yes.

16       Q.    Is this sort of a regular meeting with Chance

17   Haugen about the status of particular events?

18       A.    Yes.

19       Q.    The first line says, "Barrett is responding as

20   of February 27th about marketing.  Colette Ransom doing

21   marketing."

22             Who is Colette Ransom?

23       A.    Colette Ransom was a member of Spectrum.  I've

24   never met either student personally.

25       Q.    You've never met Barrett?

 1      A.   Not in person that I recall.

 2      Q.   The next line says, "Kyle Hawbaker, two

 3 officers assigned."

 4           Did this reflect a further conversation

 5 with the chief?

 6      A.   No.  Kyle is the assistant chief of police, and

 7 he is on the Risk Review Team.  He made a comment that

 8 he would assign two officers.

 9      Q.   So this is you updating Chance about that?

10      A.   Yes.

11      Q.   I see.  Line C says "03-17-2023 - deadline for

12 approval."

13           What does that reference?

14      A.   We generally need an event to be completely

15 finalized two weeks in advance so that the JBK Team can

16 make sure they have student workers that they schedule a

17 week at a time.  So just to make sure they can schedule

18 sufficient staff, we generally always ask for an event

19 to be finalized two weeks in advance.

20      Q.   Line D says, "Chip Chandler becoming more

21 involved and helping steer Barrett and Colette Ransom."

22           Did you ask Chip Chandler to take a more

23 active role?

24      A.   I did not.  He works in marketing.  I believe

25 it was Kristina.

1    Q.    Is this a reflection that you trusted Chip

2  Chandler to help advise the students about this event?

3    A.    Yes.

4    Q.    Line E says "03-14 LGBTQ-plus training

5  mandatory."  What does that refer to?

6    A.    That was in response to the risk review, that

7  we make sure all students and staff are aware of any

8  particular needs that would arise.  We ask the same

9  training of an event we've never held before, and our

10  students are not familiar, so maybe we need training on

11  a particular event.

12    Q.    When you talk about students and the training

13  here, is this referring to student employees?

14    A.    I don't recall.

15    Q.    Was the university asking for training of all

16  students at the university about this?

17    A.    I don't recall.

18    Q.    Do you know whether or not you took this

19  particular training?

20    A.    I really don't recall.

21    Q.    I can't remember most of the trainings I've

22  taken.

23    A.    Yeah.

24          (Exhibit 84 marked.)

25    Q.    (BY MR. STEINBAUGH)  I want to mark this as

1      Q.    Are you familiar with this?

2      A.    Yes, sir, I believe so.

3      Q.    Are these notes that you took about a meeting

4  with JBK and OSEL?

5      A.    I couldn't tell you if I generated these or if

6  they were generated from OSEL.

7      Q.    Would you have been present at this meeting?

8      A.    Yes.

9      Q.    Do you recall this meeting?

10     A.    Not necessarily.

11     Q.    You can set that one aside.

12           (Exhibit 86 marked.)

13     Q.    (BY MR. STEINBAUGH)   I'll mark this document as

14  Exhibit 86.   Take a minute to look at this.

15     A.    Yes, sir.

16     Q.    Do you recognize this thread?

17     A.    Yes.

18     Q.    What is this?

19     A.    This is a correspondence between Evelyn

20  Montoya, who works with Chip Chandler in marketing, and

21  I was included, along with Barrett Bright and Ransom

22  Colette, who were doing the marketing for the event.

23     Q.    I want to turn your attention to the second

24  page, the email about two-thirds of the way down at 9:34

25  a.m.

```
 1              Do you see that?
 2      A.   Yes, sir.
 3      Q.   You had received what appears to be the final
 4  versions of the marketing material for the drag show.
 5              Is that correct?
 6      A.   I can't confirm that it was the final version,
 7  but yes, it was revisions to the marketing.
 8      Q.   But you are informing them that "it looks
 9  great?"
10              MR. BRYANT:  Objection; the document speaks
11  for itself.
12      Q.   (BY MR. STEINBAUGH)  Is it fair to say that
13  this is your confirmation that this material is
14  approved?
15      A.   I never said "approved," but in my reviewing it
16  as a non-expert in marketing, it looked good.
17      Q.   But the university ultimately did approve the
18  marketing material here?
19      A.   Yes.
20      Q.   Okay.  You can set that aside.
21              (Exhibit 87 marked.)
22      Q.   (BY MR. STEINBAUGH)  I'll mark this as Exhibit
23  87.  Let me know when you've had a chance to look at
24  that.
25      A.   Yes, sir.
```

142

1        Q.   What is this?

2        A.   This is just correspondence over spring break

3    with Barrett needing a couple things completed and the

4    food exemption if he was not going to use Aramark.  He

5    had said that they would send the music, and this is

6    prior to him having sent the playlists.

7             It's just reminding him that we would like

8    to wrap this up two weeks prior to the event, so it was

9    mostly just a reminder because he was on spring break,

10   and it had been a couple weeks since I had heard

11   anything back.

12       Q.   Is it fair to say that this is sort of the last

13   couple checkboxes that he needed to have the event moved

14   from tentative to confirmed?

15       A.   Yes.

16       Q.   All right.  You can set that aside.

17            (Exhibit 88 marked.)

18       Q.   (BY MR. STEINBAUGH)  I'll mark this as Exhibit

19   88.  Let me know when you've had a chance to look at

20   that.

21       A.   Yes, sir.

22       Q.   What is this?

23       A.   This is a correspondence after the last run.

24   Barrett had sent songs and performers' names.  They were

25   not using real names.  They were using pseudonyms.

1          And then part of this is our AV runs some

2   programs better than others.  For example, PowerPoint

3   runs better than Canva.

4       Q.   What is "RAV"?

5       A.   "Our AV."

6       Q.   Oh, "our AV."

7       A.   Yeah, audiovisual.

8       Q.   Okay.

9       A.   At that time, Andrew Mangum was over Production

10  Services, and we would encourage students to work with

11  him because he could give good guidance on what programs

12  to use, how to save the music, or if they'd like us to

13  save the music.

14          If they're embedding it into a program,

15  some programs do not embed well, and they cause glitches

16  in the presentation.  So if they are going to build

17  that, we always recommend that they talk to our

18  audiovisual technicians on how to build the best

19  presentation.

20      Q.   So this is the list of performers and songs

21  that Barrett needed to submit?

22      A.   As of that date, yes.

23      Q.   And looking at these songs, are there any that

24  jump out to you as inappropriate, if you recognize them?

25  I confess I don't.

```
 1         A.   I have no knowledge of any of these songs.
 2         Q.   But someone would have reviewed these songs?
 3         A.   Yes, Andrew Mangum.
 4         Q.   And if there were concerns about them, to your
 5    knowledge, he would have raised those concerns?
 6         A.   Yes.
 7         Q.   Jumping back to the first page on this
 8    document, do you see the email dated 3-20-23 at 9:01
 9    a.m.?
10         A.   Yes.
11         Q.   Is that the same date that Dr. Wendler canceled
12    the show?
13         A.   Yes.
14         Q.   So just a couple of hours before he canceled
15    the show, Barrett had already submitted the performers'
16    names and list of music?
17         A.   Yes, sir.
18         Q.   At that point, did you know that the show was
19    going to be canceled?
20         A.   No.
21         Q.   When did you first learn the show would be
22    canceled?
23         A.   I believe when I received the email that the
24    campus received.
25         Q.   So you didn't hear it from Dr. Thomas?
```

1      A.    Not that I recall.

2      Q.    What was your reaction to it?

3      A.    We process thousands of events.  It was just

4    another event that didn't make it.

5      Q.    When you say "another event that didn't make

6    it," are you familiar with others other than the rap

7    show that Dr. Wendler has canceled?

8      A.    No.  They could be canceled for any number of

9    reasons; student lack of interest; the organization

10    couldn't make it happen like they thought they could.

11      Q.    If Dr. Wendler had not canceled it, the event

12    would have moved forward?

13      A.    As far as I know.

14      Q.    And just to confirm, despite the risks that

15    were identified in the risk assessment process, those

16    risks were accounted for and substantially mitigated

17    sufficient for JBK to issue a confirmation of the event?

18      A.    Yes.

19      Q.    I want to move to the 2024 show.  When was the

20    first time you heard about the planning of the 2024 drag

21    show?

22      A.    When the reservation came through at the end of

23    December, early January.

24      Q.    Did you ask Barrett and Marcus Stovall, also

25    known as Lauren Stovall, to submit a risk assessment for

1    that planned performance?

2         A.   I do not remember if I asked or if it triggered

3    it.  Key words automatically trigger a risk assessment.

4    The computer is programmed to pick up on key words.

5              (Exhibit 89 marked.)

6         Q.   (BY MR. STEINBAUGH)  I'll mark this as Exhibit

7    89.  Do you recognize this document?

8         A.   I recognize the document but not necessarily as

9    pertaining to the drag show.

10        Q.   Do you recall whether or not the students

11   submitted this risk matrix?

12        A.   They would be the only ones I know that would

13   have submitted it.  It's usually the person making the

14   reservation that submits this.

15        Q.   Do you see down in the corner where it says

16   "DEF 000049?"

17        A.   Yes, sir.

18        Q.   If the university had it, would this document

19   have come through the JBK?  In other words, if a student

20   submitted this document or submitted a risk matrix,

21   would it have gone to the JBK?

22        A.   A copy of it would eventually end up at the

23   JBK.

24        Q.   To your knowledge, did the students submit a

25   risk assessment matrix or a risk assessment for the 2024

247

1  show?

2      A.   I believe so.

3      Q.   Do you have any reason to believe they did not

4  submit a risk assessment for the 2024 show?

5      A.   No.

6              (Exhibit 90 marked.)

7      Q.   (BY MR. STEINBAUGH)  I'll mark this as Exhibit

8  90.  Take a few minutes to review this document.

9      A.   Yes, sir.

10     Q.   Do you recognize this?

11     A.   Yes.

12     Q.   What is this?

13     A.   I can't say it was the initial conversation

14  with Barrett, but it was an early conversation with

15  Barrett in response to submitting the risk assessment

16  and a reminder of some of the early things that they

17  could submit to facilitate the process moving forward.

18     Q.   Does this refresh your recollection about

19  whether or not they submitted a risk assessment?

20     A.   If I responded with this, they had submitted a

21  risk assessment.

22     Q.   Okay.  Thank you.  You can set that aside.

23              (Exhibit 91 marked.)

24     Q.   (BY MR. STEINBAUGH)  I'll mark this as Exhibit

25  91.  Let me know when you've had a chance to look at

 1   this.

 2        A.   Yes, sir.

 3        Q.   What is this?

 4        A.   The original conversation is between Barrett

 5   and Evelyn.  They had asked for her help in 2024 with

 6   the marketing, and she does Student Affairs marketing,

 7   so she was corresponding with them back and forth.

 8             When they had reached a point that they

 9   felt it was good, Barrett forwarded it to me to be

10   reviewed, and he had further questions about using the

11   TVs in the JBK for marketing, how to go about that, and

12   how to pay for the student AVs that would be needed for

13   the event.

14        Q.   On the very first page, do you see the email at

15   3:02 p.m.?

16        A.   Yes.

17        Q.   Is that your confirmation approving the flier

18   that they had designed?

19        A.   Yes.

20        Q.   You can set that aside.

21             (Exhibit 92 marked.)

22        Q.   (BY MR. STEINBAUGH)   I'll mark this as Exhibit

23   92.  Do you recognize this?

24        A.   Yes.

25        Q.   Is that the flier you approved?

```
 1        A.    Yes.
 2        Q.    You can set that aside.
 3                    (Exhibit 93 marked.)
 4        Q.    (BY MR. STEINBAUGH)    I'll mark this as Exhibit
 5   93.   Let me know when you've had a chance to look at
 6   that.
 7        A.    Yes, sir.
 8        Q.    Are you familiar with this?
 9        A.    Yes, sir.
10        Q.    What is this?
11        A.    This is a confirmation that their event is
12   ready and just confirming the information they had
13   entered.   It's common that they reprint that just to
14   make sure that nothing has changed.   So it's a final
15   confirmation and the bill or the invoice that would be
16   associated with the event.
17        Q.    Did you send this?
18        A.    No.
19        Q.    But you have no reason to doubt its
20   authenticity?
21        A.    No.
22        Q.    And on the last page under "Aramark 2-13-24,"
23   what is that?
24        A.    That is a catering exemption.   Michael Ives is
25   on the risk assessment review only as it pertains to
```

1    food, and he approved their catering, that they could

2    buy their own stuff.

3        Q.    So this 2024 event had cleared the risk

4    assessment process?

5        A.    Yes.

6        Q.    Is it accurate that the students had submitted

7    a risk assessment form for the 2024 show?

8        A.    Yes.

9        Q.    And they had cleared the risk assessment

10    process for the 2024 show?

11        A.    Yes.

12        Q.    They had obtained marketing material from the

13    university or gotten it approved by the university?

14        A.    Yes.

15        Q.    They had completed and submitted the catering

16    exemption form?

17        A.    Yes.

18        Q.    When did you first learn that Dr. Wendler was

19    canceling the 2024 show?

20        A.    I don't recall.

21        Q.    Did you ever talk to Dr. Wendler about the drag

22    shows at all?

23        A.    No.

24        Q.    Is it your understanding that it was his

25    decision alone to cancel the 2023 and 2024 drag shows?

```
1        A.    Yes.
2        Q.    I know that you are no longer the director of
3   the JBK, but have you talked to Chance Haugen about a
4   potential 2026 drag show?
5        A.    No.
6        Q.    Have you ever talked to him about the potential
7   for future drag shows?
8        A.    No.
9        Q.    Given your experience as director of JBK, if
10  Spectrum submits or has submitted an application to use
11  Legacy Hall for a drag show, let's say it submits a risk
12  assessment form consistent with the prior two shows,
13  let's say it completes the risk assessment process
14  consistent with the prior two shows, let's say it gets
15  approval of marketing materials just like it has done
16  the previous times, and let's say they also get the
17  catering exemption form.
18              Are you aware of any other reason why JBK
19  would not give them final approval?
20              MR. BRYANT:  Objection; calls for
21  speculation, improper hypothetical.
22        A.    Referring back to the policies and guidelines
23  of the February 2025 Texas A&M University board of
24  regents' decision not to allow drag shows, that may be
25  the only reason.
```

155

```
 1   scheduled drag show that Spectrum wanted to have on, I
 2   believe, March 30th or 31st?
 3        A.   Of 2023?
 4        Q.   Yes.
 5        A.   Yes, sir.
 6        Q.   In the third paragraph of the document, you
 7   state, "Generally, all events must have gone through the
 8   complete approval process two weeks prior to the event."
 9             Had Spectrum gone through the complete
10   approval process as of March 14th, 2023?
11        A.   No.
12        Q.   Did Spectrum ever go through the complete
13   approval process for the 2023 drag show that they wanted
14   to have?
15        A.   To the best of my knowledge, they had submitted
16   everything required.
17        Q.   Now, the rest of that sentence that I was
18   reading says, "But we have your event scheduled and
19   approved as tentative as we await your performance
20   verification and music."
21             What is the performance verification that
22   you were referring to and was still outstanding as of
23   March 14th, 2023?
24        A.   Barrett Bright had agreed to review the
25   performances to maintain a PG-13 rating because minors
```

1  were invited, and he had agreed to review the music.

2      Q.   Okay.  At some date after March 14th, 2023, did

3  Mr. Bright complete the performance verification that's

4  referred to in Exhibit 87?

5      A.   I believe he had reviewed what he had up to

6  that date.

7      Q.   That's not quite my question.  My question is:

8  Do you know whether he completed the performance

9  verification for the proposed drag show, which I would

10  assume means the entire drag show?

11     A.   I believe he had completed everything we had

12  asked for.

13     Q.   And what causes you to have that belief?

14     A.   He had been responsive with everything, and we

15  were at a place to move forward with the event because

16  he had submitted these things, as far as I recall, after

17  this date.

18     Q.   What did he submit to JBK or to you with

19  respect to "performance verification" as opposed to

20  music?

21     A.   I believe he just made a comment that he had

22  reviewed the performances being brought forward.

23     Q.   So basically, his performance verification was

24  just telling you or someone on your staff "yeah, I did

25  it?"

```
 1        A.   Yes.
 2        Q.   Is it correct that the verification of the
 3   performances for the 2023 drag show was entirely up to
 4   Spectrum?
 5        A.   Yes, sir.
 6        Q.   There wasn't any review of that by you or
 7   anybody on your staff?
 8        A.   No.   Barrett had agreed to be the one
 9   responsible.
10        Q.   Did you know that he was a drag performer
11   himself?
12        A.   No.
13        Q.   And assuming he was, it was a drag performer
14   saying the drag performances were acceptable?
15        A.   Could have been, yes.
16        Q.   Was it also true that you and your staff took
17   Spectrum's word on the issue of whether or not the
18   performances would be suitable for minors over 13?
19        A.   Yes.
20        Q.   You didn't do any determination of that
21   yourself, or any verification of any kind?
22        A.   No, sir.
23        Q.   There was a reference in your testimony to
24   "mandatory LGBTQ-plus training."
25             Do you know who provided or was to provide
```

1    that mandatory training?

2        A.   I do not.

3        Q.   Do you have any understanding as to why someone

4    deemed such training mandatory in connection with the

5    proposed drag show in 2023?

6        A.   I do not.

7        Q.   In your testimony, you mentioned a Richard

8    Smith.  What was Richard Smith's role in the first

9    quarter of 2023 at West Texas A&M University?

10       A.   He's responsible for risk for the entire

11   university.

12       Q.   And therefore, was he involved in the

13   assessment of risk or in evaluating Spectrum's

14   assessment of risk for the proposed 2023 drag show?

15       A.   Yes.

16       Q.   And as a result of his involvement in the risk

17   assessment for the 2023 drag show, did he request that

18   there be some elevation of assessment of the risk of

19   that event?

20       A.   Yes.

21       Q.   And what do you recall specifically that

22   Mr. Smith said regarding a need or desire to elevate the

23   risk assessment of the proposed Spectrum 2023 drag show?

24       A.   My recollection is his statement was that this

25   needs to be elevated to the Executive Committee.

1  believe you testified that this was from Mr. Bright?

2      A.    I believe so, yes, sir.

3      Q.    Okay.  I'm going to ask you whether I'm

4  following the chain correctly.  Looks like there was a

5  response by Mr. Bright to a previous inquiry, and it's

6  numbered 3.  He says, "Yes, all performers will have to

7  get their song and dress pre-approved."

8              Do you see that?

9      A.    Yes, sir.

10     Q.    Is that the same pre-approval by Spectrum or by

11  Mr. Bright as opposed to from any university employees

12  or officials?

13     A.    Yes.

14     Q.    And if I understand it correctly, this was a

15  response to Number 3 in the email just below it on Page

16  3 of Exhibit 82 that says, "Are the participants

17  required to get prior approval for their dress and

18  performance prior to the event?"

19     A.    Yes.

20     Q.    Is that the question that Mr. Bright answered

21  by saying, "Yes, all performers will have to get their

22  song and dress pre-approved," meaning approved by

23  Spectrum?

24     A.    Yes.

25     Q.    But at all times, all the way up to the point

1  at which Dr. Wendler canceled it, no one employed by the

2  university, no university officials, actually had any

3  knowledge of what the performance or dress for the

4  proposed '23 drag show would be except what Mr. Bright

5  told them?

6      A.    That's correct.

7            MR. BRYANT:  That's all the questions I've

8  got.  Thank you very much.

9            THE WITNESS:  Yes, sir.

10            MR. STEINBAUGH:  Just a couple more

11  questions, Dr. Fouts.

12                      RE-EXAMINATION

13  BY MR. STEINBAUGH:

14      Q.    With respect to that last question by my friend

15  from the other side, he said that "no one employed by

16  the university, no university officials, had any

17  knowledge about what the performance would entail in

18  terms of clothing or performance."

19            You had testified earlier that you and the

20  university were relying on Chip Chandler and Kristina

21  Drumheller to interact with the students in assessing

22  that performance.

23            Is that correct?

24      A.    Yes.

25      Q.    Is Chip Chandler a university employee?

1      A.    Yes.

2      Q.    Is his role in the university to further the

3  university's image and communications?

4      A.    I can speak to the communications.    Yes.

5      Q.    Do you know what his title is?

6      A.    I don't know his formal title.

7      Q.    That's fine.

8           Kristina Drumheller, you were also relying

9  on her to assess the performance and the clothing and

10  the interaction with the students about the propriety of

11  that performance?

12      A.    I was relying on Barrett, and if Kristina and

13  Chip had been involved, then --

14      Q.    But to your knowledge, they were involved?

15      A.    I believe so, yes.

16      Q.    With respect to the question about whether or

17  not Spectrum WT had satisfied the university's

18  requirements in order to perform the 2023 show, do you

19  have any knowledge that Dr. Wendler was informed of any

20  requirements that were left unfulfilled?

21      A.    No.

22      Q.    With respect to the question about the 2024

23  Buff-A-Whoa Drag Show, there was a little bit of

24  discussion about the name of the event on the

25  confirmation page.

 1          MR. BRYANT:  Objection; calls for

 2   speculation.

 3       A.   Not necessarily.

 4       Q.   (BY MR. STEINBAUGH)  If there were an error on

 5   the number of event attendees, is that something that

 6   could be discussed with the students in that interactive

 7   process for facilitating the logistics for the event?

 8       A.   Yes.

 9       Q.   Are you aware of any event that has been

10   applied for at the JBK or Legacy Hall that was canceled

11   in advance because a university employee thought that it

12   might violate a university policy or rule?

13       A.   No.

14          MR. STEINBAUGH:  I have no further

15   questions.

16                     RE-EXAMINATION

17   BY MR. BRYANT:

18       Q.   Dr. Fouts, earlier in the day counsel asked you

19   a long series of questions about a lot of events and

20   asked whether you were aware of complaints about them.

21             Do you recall that question and your

22   testimony?

23       A.   Yes.

24       Q.   Could you explain what, if any, role you had in

25   fielding or dealing with complaints about events in

1    Legacy Hall when you had any responsibility with respect
2    to Legacy Hall?
3        A.    The only complaint that I would have fielded is
4    if it dealt with my staff or student staff.
5        Q.    So if somebody had a complaint about what
6    happened in an event, that would not have been a
7    complaint that would have gone to you unless it involved
8    the conduct of your student staff?
9        A.    Correct.
10        Q.    Also, counsel asked you a bunch of questions
11    today about whether the university approved this or the
12    university approved that.
13            You and your staff at JBK did not comprise
14    all of the university, did you?
15        A.    No.
16        Q.    In fact, there are officials, including
17    Dr. Thomas and Dr. Wendler, who are also part of the
18    university and have ultimate university approval of
19    basically what goes on at the university and certainly
20    what goes on at Legacy Hall.
21            Is that correct?
22        A.    Yes.
23            MR. BRYANT:  Pass the witness.
24            THE WITNESS:  Thank you.
25            MR. STEINBAUGH:  Give me one minute.  I'm

1                          CHANGES AND SIGNATURE
                  ORAL DEPOSITION OF SHAWN FOUTS
2                         DECEMBER 10, 2025

3       PAGE/LINE          CHANGE          REASON

4       _____

5       _____

6       _____

7       _____

8       _____

9       _____

10      _____

11      _____

12      _____

13      _____

14      _____

15      _____

16      _____

17      _____

18      _____

19      _____

20      _____

21      _____

22      _____

23      _____

24      _____

25      _____

1       I, SHAWN FOUTS, have read the foregoing
deposition and hereby affix my signature that same is
2  true and correct except as noted above.

3

4

5                        _____

6                        SHAWN FOUTS

7  THE STATE OF _____ )

8  COUNTY OF _____ )

9

10      Before me, _____, on this day

11  personally appeared SHAWN FOUTS, known to me (or proved

12  to me under oath or through _____)

13  (description of identity card or other document) to be

14  the person whose name is subscribed to the foregoing

15  instrument and acknowledged to me that they executed the

16  same for the purposes and consideration therein

17  expressed.

18      Given under my hand and seal of office this _____

19  day of _____, _____.

20

21

22                        _____

23                        NOTARY PUBLIC IN AND FOR
                        THE STATE OF _____
                        COMMISSION EXPIRES: _____
24

25

```
 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF TEXAS
 2                   AMARILLO DIVISION

 3   SPECTRUM WT,                )
                                 )
 4        Plaintiff,             )
                                 )
 5   v.                          )   Case No. 2:23-cv-00048
                                 )
 6   WALTER WENDLER, in his      )
     official capacity as the    )
 7   President of West Texas     )
     A&M University, et al.,      )
 8                               )
          Defendants.            )
 9
                    REPORTER'S CERTIFICATION
10             ORAL DEPOSITION OF SHAWN FOUTS
                    DECEMBER 10, 2025
11

12        I, SHARON D. LIVINGSTON, Certified Shorthand

13   Reporter in and for the State of Texas, hereby certify

14   to the following:

15        That the witness, SHAWN FOUTS, was duly sworn by

16   the deposition officer and that the transcript of the

17   deposition is a true record of the testimony given by

18   the witness;

19        That pursuant to information given to the

20   deposition officer at the time said testimony was taken,

21   the following includes counsel for all parties of

22   record:

23        Mr. JT Morris and Mr. Adam Steinbaugh, Attorneys

24   for Plaintiff;

25        Mr. David Bryant and Ms. Munera Al-Fuhaid,
```

1   Attorneys for Defendants;

2       That the amount of time used by each party at the

3   deposition is as follows:

4       MR. STEINBAUGH - 04 HOURS: 04 MINUTES

5       MR. BRYANT - 00 HOURS: 20 MINUTES

6        That the sworn deposition transcript was duly

7   submitted on DECEMBER 22, 2025 to the witness or to the

8   attorney for the witness for examination, signature, and

9   return to the deposition officer by JANUARY 24, 2026;

10      That the original deposition was/was not returned

11  to the deposition officer on JANUARY 24, 2026;

12      If returned, the attached Changes and Signature

13  page contains any changes and the reasons therefor;

14      If returned, the original deposition was delivered

15  to Mr. Adam Steinbaugh, Custodial Attorney, and

16  $2,473.00 is the deposition officer's charges to the

17  PLAINTIFF for preparing the original deposition and any

18  copies of exhibits;

19      I further certify that I am neither counsel for,

20  related to, nor employed by any of the parties or

21  attorneys in the action in which this proceeding was

22  taken, and further, that I am not financially or

23  otherwise interested in the outcome of the action.

24

25

1      Certified to by me this _____ day of _____,

2  2025.

3

4

5

6                  _____

7                  SHARON D. LIVINGSTON, TEXAS CSR 3798
                   Expiration Date:  04-30-26
                   PANHANDLE COURT REPORTERS, LLC

8                  Firm Registration No. 10057
                   P.O. Box 1564

9                  Amarillo, Texas 79105
                   (806) 373-0602

10                 Janice@pcramarillo.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25