1
          UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF TEXAS
2
            AMARILLO DIVISION

3  SPECTRUM WT,           )
                   )
4      Plaintiff,     )
                   )
5  v.               )   Case No. 2:23-cv-00048
                   )
6  WALTER WENDLER, in his  )
  official capacity as the )
7  President of West Texas  )
  A&M University, et al.,  )
8                   )
    Defendants.     )
9

10

11

12

13  ----------------------------------------------------------
          ORAL DEPOSITION OF CHRIS THOMAS
14       DECEMBER 11, 2025 - CANYON, TEXAS
  ----------------------------------------------------------
15

16

17

18

19

20      ORAL DEPOSITION OF CHRIS THOMAS, produced as a
  witness at the instance of the PLAINTIFF and duly sworn,
21  was taken in the above styled and numbered cause on
  DECEMBER 11, 2025, from 9:01 a.m. to 12:31 p.m., at the
22  offices of WEST TEXAS A&M UNIVERSITY, Old Main Building,
  Room 317, Canyon, Texas, before SHARON D. LIVINGSTON,
23  CSR-RPR, in and for the State of Texas, reported by
  machine shorthand, and pursuant to the Federal Rules of
24  Civil Procedure.

25

1                    A P P E A R A N C E S

2    FOR THE PLAINTIFF:
         Mr. Adam Steinbaugh
3        FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
         510 Walnut Street, Suite 900
4        Philadelphia, Pennsylvania 19106
         (215) 717-3473
5        Adam@thefire.org

6    FOR THE DEFENDANTS:
         Ms. Munera Al-Fuhaid
7        OFFICE OF THE TEXAS ATTORNEY GENERAL
         300 West 15th Street
8        Austin, Texas 78701
         (512) 463-2100
9        Munera.al-fuhaid@oag.texas.gov

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                           INDEX
                                                      PAGE
2    Appearances ----------------------------------    2

3    Index ----------------------------------------     3

4    Index of Exhibits ----------------------------- 3-4

5    CHRIS THOMAS
            Examination by Mr. Steinbaugh ----------------    5
6           Examination by Ms. Al-Fuhaid ------------------ 113
            Re-examination by Mr. Steinbaugh ------------- 114
7
     Changes and Signature ---------------------------- 118
8
     Reporter's Certification ------------------------ 120
9
                       INDEX OF EXHIBITS
10   NUMBER        DESCRIPTION                        PAGE

11     94   Expressive Activity on Campus Policy 08.02
            Approved 11-13-25 -------------------------   13
12
       95   Expressive Activity on Campus Policy
13          08.02.01 Approved 11-13-25 ----------------   13

14     96   Expressive Activity on Campus Policy
            08.99.99.W1 Revised 7-28-25 ---------------   15
15
       97   First Amendment:  Dear Colleague 7-28-03 ---   18
16
       98   WTAMU Student Handbook 2025-2026 -----------   22
17
       99   WT Campus Organizations Handbook -----------   27
18
      100   Civil Rights Protections and Compliance
19          Policy 08.01 Revised 11-13-25 --------------   36

20    101   Civil Rights Compliance Policy 08.01.01
            Revised 8-15-22 ----------------------------   38
21
      102   WTAMU Equal Opportunity/Nondiscrimination --   39
22
      103   WTAMU PUP Frequently Asked Questions -------   45
23
      104   Pre-University Program Agreement for
24          Independent School Districts on Dual/
            Concurrent Enrollment Courses --------------   47
25
```

```
 1                    INDEX OF EXHIBITS (CONTINUED)
       NUMBER         DESCRIPTION                            PAGE
 2
```

```
 3      105    Pre-University Program Student Approval
               Form ------------------------------------   51

 4      106    PUP Enrollment Count by Semester ----------   53

 5      107    Handwritten Notes -------------------------   76

 6      108    The Heart and Soul of the Texas Panhandle
               Ists, Isms, and Free Will 6-12-22 ---------   80
 7
        109    Briefing with Dr. Thomas and Chance Haugen
 8             2-21-23 -----------------------------------   91

 9      110    Kimberly 1-on-1 6-6-22 --------------------   93

10      111    JBK and OSEL 3-6-23 -----------------------   97

11      112    Email Chain 3-24-25 with TAMUS Senior Student
               Affairs Officers, Chris Thomas, Chance Haugen
12             and Amber Black ---------------------------   98

13      113    Jack B. Kelly Student Center Procedures and
               Guidelines Revised 3-5-25 ----------------- 100
14
        114    Email Chain 3-24-25 with TAMUS Senior Student
15             Affairs Officers, Chris Thomas, and
               Walter Wendler ---------------------------- 103
16
        115    Calendar Appointment Reminder 3-24-25 ------ 104
17

18

19

20

21

22

23

24

25
```

```
 1                        CHRIS THOMAS,
 2   having been first duly sworn, testified as follows:
 3                        EXAMINATION
 4   BY MR. STEINBAUGH:
 5       Q.   Good morning, Dr. Thomas.  It's Dr. Thomas,
 6   correct?
 7       A.   Yes.
 8       Q.   Do you understand that you are here today for a
 9   deposition over the university's cancellation of two
10   student drag shows?
11       A.   Yes.
12       Q.   Have you ever been deposed before?
13       A.   No, sir.
14       Q.   Okay.  I have three broad rules for us.  Please
15   listen to and answer the question that I'm asking.  If
16   you don't understand the question, let me know;
17   otherwise, I will assume that you know what I am asking.
18            Lawyers are prone to being mealy-mouthed. I
19   will probably ask some questions that are confusing, and
20   I'd rather get clean answers and something that everyone
21   reading this will understand.
22            I'm going to do my best not to talk over
23   you.  Please don't talk over me.  We want to give the
24   court reporter the ability to create a clean record.
25            Please give verbal answers, no nods, no
```

1  uh-huhs, because it's ambiguous.

2            Do you understand that you are under oath

3  today?

4      A.  Yes.

5      Q.  And you understand what that means?

6      A.  Yes.

7      Q.  Is there any reason you can't give truthful

8  testimony today?

9      A.  No.

10     Q.  What did you do to prepare for today's

11 deposition?

12     A.  I read through the documents that we've had,

13 the things I received from the AG's office.

14     Q.  And please don't tell me anything that you

15 discussed with your attorneys.

16     A.  Well, I'm not an attorney, so I tried to read

17 as much as I could and ask questions and be prepared.

18     Q.  When you say "read as much as you could," what

19 do you mean?

20     A.  I've been here for three years, and I knew we

21 would talk about policies or what had happened with the

22 show, and so I wanted to try to go back and think about

23 it.

24     Q.  Okay.  You also understand that in addition to

25 testifying on your own personal behalf or with your

1    experiences being an employee of the university, you're
2    also testifying on behalf of the university with respect
3    to two topics?
4         A.    Yes, sir.
5         Q.    And Topic Number 6 is:  "Policies, procedures,
6    practices, and customs concerning 'sexualized' speech or
7    conduct."
8              What did you do to prepare for your
9    testimony on that topic?
10        A.    We have an Expressive Activity Policy for the
11   university, so I went back and looked at that.
12        Q.    Are you prepared to testify on that topic
13   today?
14        A.    Yes, sir.
15        Q.    And Topic Number 8 is:  "The university's
16   dual-enrollment programs, including its policies and
17   practices with respect to dual-enrollment students'
18   access to campus resources, programs, and events."
19              Are you prepared to testify on that topic
20   today?
21        A.    Yes, sir.
22        Q.    What did you do to prepare for that topic?
23        A.    Primarily, I spoke with a colleague to learn
24   more -- she is more in direct contact of oversight --
25   and I read through our website.

1    Q.    Who is that colleague?

2    A.    Amy Anderson.

3    Q.    How long have you been in higher education?

4    A.    I started my graduate assistantship in '98.

5    I had one year where I was substitute teaching, and

6    then I got my first job at UNT in 2001, and that was

7    full-time.

8    Q.    Where did you start out at?

9    A.    Where I was being paid?

10    Q.    Yeah.

11    A.    Texas State University.

12    Q.    Okay.  And what is your educational background?

13    A.    All of it?

14    Q.    Sure.  I mean not like high school.  Just

15    college and post-college.

16    A.    I started at my community college, Lamar State

17    College in Orange.  Had a year there.  I transferred to

18    Westminster College in Fulton, Missouri.  I finished my

19    undergraduate degrees there.

20         I went to Texas State University and

21    received a Masters in education and counseling and

22    guidance, with an emphasis in student affairs.  Then I

23    went to North Texas and got my Doctorate in higher

24    education.

25    Q.    I was a community-college kid myself.

1                  So you were working at McNeese State

2    University, correct?

3         A.    Yes, sir.

4         Q.    And when was that?

5         A.    I started in 2006, and I left in '22.

6         Q.    What was your role there?

7         A.    I started in campus activities, had multiple

8    title changes and progressions, and left as the vice

9    president for Student Affairs.

10        Q.    And during that time, you were working with

11   Fire on some speech-related policies.

12                  Is that right?

13        A.    Yes.

14        Q.    Whose idea was that?

15        A.    I received communication from Fire saying that

16   McNeese could become a green-light campus.  I spoke with

17   my president, and he recommended that I look at it, so I

18   started communicating with Fire, our Executive Team, and

19   our system attorneys, and we all came to agreements, and

20   then we received the green-light status.

21        Q.    So First Amendment or free speech issues, were

22   they of particular interest to you?

23        A.    Not inherently, no, sir.

24        Q.    So tell me about your role here at West Texas.

25   When did you start, and what is your role or your

1    responsibilities here?

2        A.   I started December 1st of 2022, and I'm the

3    vice president for Student Affairs here at WT.

4        Q.   And in that role, what are your

5    responsibilities?  What are you responsible for?

6        A.   Housing, dining, campus activities, rec

7    complex, counseling, medical, the typical Student

8    Affairs portfolio.

9        Q.   Okay.  Do your responsibilities include Title

10   IX at all?

11       A.   No, sir.

12       Q.   Do you get Title IX reports or complaints?

13       A.   I'm on a list for our Maxient reporting form,

14   so a person may report something, and then it goes into

15   Maxient, and then it's sent.  So I may receive things

16   that start one way and then end up being referred to

17   Title IX or to counseling or to police.

18       Q.   But if there's a Title IX report on campus, you

19   would receive it?

20       A.   Not necessarily, no, sir.

21       Q.   In what circumstances would you receive one?

22       A.   If a faculty staff, student, or anyone goes and

23   fills out the web form, that goes kind of to the group,

24   and then the group would determine.

25       Q.   Are you a member of that group?

1      A.    I am.

2      Q.    So would you receive a report even if you're

3  not the person acting on it?

4      A.    No.

5      Q.    How many people do you have reporting directly

6  to you?

7      A.    Direct reports?

8      Q.    Yes, just a ballpark.

9      A.    Five.

10     Q.    Is Chance Haugen one of those people?

11     A.    He is.

12     Q.    What is his role?

13     A.    He is my assistant vice president for Campus

14  and Community.

15     Q.    And what does he do?

16     A.    Housing, campus activities, student union

17  organizations, that side.

18     Q.    Is he responsible for the JBK?

19     A.    It's in his portfolio.

20     Q.    And I know nobody has an average day, but what

21  does your average day look like?

22     A.    I check my email first thing in the morning.

23  I go through the police reports that come in the public

24  crime log.  I go through my calendar.

25           Depending on what meetings or what's

1    happening, my day would be working through emails,

2    continuing projects that are larger and take time, have

3    meetings with people, schedule meetings with staff, and

4    deal with any campus emergency or issue that comes up

5    that may change those other things.

6        Q.    Would you know whether a student organization

7    is in good standing with the university?

8        A.    I could look.

9        Q.    Do you know whether or not Spectrum is in good

10   standing with the university?

11       A.    As of today?

12       Q.    Correct.

13       A.    The last time I looked, I believe they were.

14       Q.    Do you have any reason to believe they would

15   not be?

16       A.    No.

17       Q.    To your knowledge, does Spectrum discriminate

18   against students on the basis of a protected class in

19   their membership or activities?

20       A.    Not to my knowledge.

21       Q.    Have you had any complaints that they do?

22       A.    No, sir.

23       Q.    Have you had any complaints alleging that

24   Spectrum has violated any university policy?

25       A.    No, sir.

 1      A.   Oh, my apologies.

 2      Q.   That's all right.

 3      A.   Then yes.

 4      Q.   Okay.  And this is the version that is revised

 5 July 28th, 2025?

 6      A.   Yes, sir.

 7      Q.   And it's fair to say that the university is

 8 waiting on the chancellor's signature.

 9           Is that correct?

10      A.   I don't know.

11      Q.   I know that the policies have recently changed,

12 so I'm just trying to figure out where in the process

13 everyone is.

14      A.   Yes, sir.

15      Q.   But this is the university's current policy?

16      A.   Yes, sir.

17      Q.   Turn to Section 1.3.1 on the second page.

18      A.   Yes, sir.

19      Q.   Do you see where it says, "The university may

20 take disciplinary or remedial action against individuals

21 or groups that engage in expressive activity not

22 protected by this rule or the First Amendment?"

23      A.   Yes.

24      Q.   Is that the university's policy essentially

25 saying that it will not penalize speech that is

1  protected by the First Amendment?

2      A.   Yes.

3      Q.   Do you see that there's a marking for a

4  footnote there?

5      A.   Yes, sir.

6      Q.   If you turn to the next page, do you see that

7  Footnote Number 1?

8      A.   Yes, sir.

9      Q.   It says, "This rule must be applied in a manner

10 consistent with the Dear Colleague Letter of July 28th,

11 2003."

12          Do you see that?

13     A.   Yes, sir.

14     Q.   Are you familiar with what a Dear Colleague

15 Letter is?

16     A.   Any Dear Colleague Letter?

17     Q.   Yes.

18     A.   Yes, sir.

19     Q.   And what is that?

20     A.   It's a letter or document that's written that

21 says, "This is the direction that currently we want

22 people to go."   As I understand it, it's not been

23 codified by law, but that's the direction on that

24 particular topic.

25     Q.   Okay.  Are you familiar with this Dear

1    Colleague Letter at all?

2        A.   I don't remember it.

3        Q.   But in applying the university's Expressive

4    Activities Policy, that's a document you would look to

5    in interpreting how to apply that policy, given that the

6    footnote directs that the rule will be applied in a

7    manner consistent with that letter?

8        A.   I would contact our university attorney.

9        Q.   But you would assume that the attorney would

10   look at that?

11       A.   Yes, sir.

12       Q.   All right.

13            (Exhibit 97 marked.)

14       Q.   (BY MR. STEINBAUGH)  We'll come back to that

15   one in a minute, but for now, we'll mark this as Exhibit

16   97.  Take a moment to review that.

17       A.   Yes, sir.

18       Q.   Are you familiar with this at all?

19       A.   No, not really.

20       Q.   Does this appear to be a Dear Colleague Letter

21   from the United States Department of Education?

22       A.   It does.

23       Q.   Do you see, on the second page in the last full

24   paragraph, where it says, "Harassment, however, to be

25   prohibited by the statutes within OCR's jurisdiction

1  must include something beyond the mere expression of

2  views, words, symbols, or thoughts that some person

3  finds offensive?"

4      A.   Yes, sir.

5      Q.   Is that your understanding of "hostile

6  environment" and "harassment?"

7              MS. AL-FUHAID:  Objection; calls for a

8  legal conclusion.

9              You may answer.

10     A.   Can you ask me that again?

11     Q.   (BY MR. STEINBAUGH)  Is it your understanding

12  that "hostile environment" or "harassment" requires --

13  in order for expression to amount to harassment, it has

14  to be something more than the mere expression of views,

15  words, symbols, or thoughts that someone believes

16  offensive?

17             MS. AL-FUHAID:  Same objection.

18     A.   The question is:  What do I understand

19  "harassment" to mean?

20     Q.   (BY MR. STEINBAUGH)  Correct.

21     A.   I would have to write down all the facts and

22  put those things in summary form, then make a

23  determination if it rose to the level of harassment.

24     Q.   But that would mean something more than just

25  some person is offended by speech, correct?

```
 1            MS. AL-FUHAID:  Objection; calls for a
 2   legal conclusion.
 3       A.    Being offended wouldn't inherently mean that
 4   someone had been harassed.
 5       Q.   (BY MR. STEINBAUGH)  But I assume, in your
 6   role, you have attorneys who would be able to advise you
 7   on that?
 8       A.   I would ask for legal advice, yes, sir.
 9       Q.   And they would look to -- well, you probably
10   don't know what they would look to.
11               If we can go back to the university's
12   Expressive Activities Policy that we were looking at.
13       A.   Yes, sir.
14            MS. AL-FUHAID:  Is that 96?
15            MR. STEINBAUGH:  That is 08.02.01 for West
16   Texas A&M.
17            MS. AL-FUHAID:  Oh, that's 95.
18            MR. STEINBAUGH:  Oh, I'm sorry.
19   08.99.99.W1.
20            MS. AL-FUHAID:  Okay.  That's 96.
21       A.   Exhibit 96.  Yes, sir.
22       Q.   (BY MR. STEINBAUGH)  Can you go to Section 3.2?
23       A.   3.2, yes, sir.
24       Q.   Can you read through 3.2 to yourself and let me
25   know when you've had a chance to review that?
```

1    A.    Yes, sir.

2    Q.    This is referring to decisions by the

3    university to deny student organizations' requests for

4    use of particular spaces.

5              Is that right?

6    A.    Yes, sir.

7    Q.    And you see where it says, "If a request is

8    denied, the rationale for the decision will be provided

9    in writing.  The denial of a reservation request can be

10    appealed to the vice president for Student Affairs or a

11    designee."

12              Do you see that?

13    A.    Yes, sir.

14    Q.    And that's referring to you as the person who

15    would receive that appeal?

16    A.    Yes, sir.

17    Q.    If President Wendler decided to refuse or to

18    deny a request for space, would a student be able to

19    appeal to you?

20    A.    According to this policy, yes.

21    Q.    Would you have any authority to overturn

22    President Wendler?

23    A.    I would not have authority to overturn

24    President Wendler's decision.

25    Q.    If we could turn now to Section 6.

1    Q.    (BY MR. STEINBAUGH)    I'll mark as Exhibit 98

2    the WTAMU Student Handbook.    I'm not going to ask you to

3    read through this whole thing right now.

4                I just want to ask if you're familiar with

5    this document.

6        A.    Yes, sir.

7        Q.    What is this?

8        A.    This is our Student Handbook.

9        Q.    What does the Student Handbook do?

10        A.    It's a collection of policies and -- well, the

11    system has policies, and we have procedures -- I believe

12    that's the nomenclature for how WT says it -- that talk

13    about code of conduct, plagiarism, student rights and

14    responsibilities, those kind of things.

15        Q.    Are you responsible, in your role as vice

16    president, for enforcing or adjudicating the violations

17    of the code of conduct or community standards?

18        A.    Not directly.

19        Q.    Who is?

20        A.    We have a person that is charged with being the

21    conduct officer.    That would be the primary person for

22    that.

23        Q.    Do you oversee that person?

24        A.    I oversee the person who does.

25        Q.    But ultimately, you would be responsible for

1  ensuring that they were enforcing the policies?

2      A.   Yes, sir.

3      Q.   Do you receive appeals from those?

4      A.   I have not.

5      Q.   Does that mean nobody has appealed?

6      A.   Yes, sir.  I believe there are cases where it

7  could be appealed to me.

8      Q.   Got it.  Turn to Section 2.3(c) on Page 28.

9      A.   Yes, sir.

10     Q.   Let me know when you've had a chance to read

11  that.

12     A.   Yes, sir.

13     Q.   Is it fair to say that the university has a

14  robust disciplinary process to penalize students who

15  violate the code of conduct?

16     A.   Robust?  I mean, there is a process, yes.

17     Q.   There's a process?

18     A.   For the university to adjudicate, yes.

19     Q.   And the university regularly applies that

20  process?

21     A.   Yes, sir.

22     Q.   Were there any allegations, to your knowledge,

23  that the 2023 drag show -- do you know what I'm

24  referring to by "the 2023 drag show?"

25              I'm referring to the on-campus proposed

1    event.

2        A.   Yes, sir.

3        Q.   Were there any allegations that the 2023

4    on-campus proposed drag show was going to violate a

5    particular provision of the code of conduct or the

6    community standards?

7                 MS. AL-FUHAID:  Objection; calls for a

8    legal conclusion.

9        A.   Please say that again.  I want to understand

10   that.

11       Q.   (BY MR. STEINBAUGH)  I appreciate, if my

12   questions are confusing, you letting me know, and I'll

13   make sure we get a clean answer.

14       A.   Yes, sir.

15       Q.   Was there a concern that a particular provision

16   of the code of conduct or community standards would be

17   violated by the planned drag show in 2023?

18       A.   That was not communicated to me.

19       Q.   Did you communicate any concern about that to

20   anyone else?

21       A.   No.

22       Q.   With respect to the 2024 planned performance,

23   do you know what I'm speaking about?

24       A.   Yes, sir.

25       Q.   Was there any concern or allegation that that

 1  performance would violate any particular provision of

 2  the Student Handbook or community standards?

 3       A.   Expressed to me?

 4       Q.   Correct.

 5       A.   No.

 6       Q.   And you didn't express a concern to anyone

 7  else?

 8       A.   I did not.

 9       Q.   Is there any particular concern that students

10  would violate some provision of the code of conduct or

11  community standards with respect to any future drag

12  performances?

13            MS. AL-FUHAID:   Objection; calls for

14  speculation.

15       A.   Please ask that again.

16       Q.   (BY MR. STEINBAUGH)  Let me back up.

17       A.   Yes, sir.

18       Q.   Are you aware that Spectrum has filed an

19  application to hold a drag show in 2026 at West Texas

20  A&M?

21       A.   I'm not aware.

22       Q.   Okay.  You can set that one aside.

23       A.   Okay.  I want to make sure I answer that

24  question.

25       Q.   Sure.

1      Q.    Are you familiar with the risk management

2  process as it pertains to planned events by registered

3  student organizations?

4      A.    Yes, sir.

5      Q.    What is the purpose of that process?

6      A.    The university will work with the organization

7  to try to mitigate risk to the organization, the

8  institution, guests.

9      Q.    And do you see under the bullet points here

10 where it says, "Reputational:  Avoid actions that may

11 harm the image of your organization or the university?"

12     A.    Yes, sir.

13     Q.    Why is it important to protect the image of the

14 university?

15     A.    Are you asking my opinion?

16     Q.    Sure, yeah, as part of the risk management

17 process.

18     A.    Why is it important to protect the image of the

19 university?  I would think that everyone would want to

20 be mindful of how they're portrayed or conveyed in the

21 public eye.

22     Q.    Are you aware of any student events that have

23 ever been canceled, or the request to use campus space

24 was denied because it might hurt the image of the

25 university?

1    A.   I am not.

2    Q.   Take a look at Pages 16 and 17.

3    A.   Yes, sir.

4    Q.   Are you familiar with what these tables are?

5    A.   No, sir.

6    Q.   Are you familiar with the risk management

7    matrix?

8    A.   No, sir.

9    Q.   Turn to page 20.

10   A.   Yes, sir.

11   Q.   Do you see the last paragraph at the very

12   bottom?

13   A.   Yes, sir.

14   Q.   Are these recommendations that the university

15   is making to registered student organizations about

16   their events?

17   A.   Yes.

18   Q.   Is it fair to say, then, that parental consent

19   is an advisable way to manage risks to minors?

20   A.   Yes.

21   Q.   You mentioned earlier that this document may

22   have been updated, given the August 2026 date.

23         Do you have any estimation as to when this

24   would have been updated?

25   A.   Typically, we do that during the summer.  We

1    Q.    (BY MR. STEINBAUGH)  Including among staff?

2    A.    Including among staff.

3    Q.    If a staff member or employee said, "I do not

4  want to attend the show," would they be compelled to

5  attend the show, or would the university find a

6  different role for them?

7    A.    Your question to me is:  Would the university

8  make someone attend the show?

9    Q.    Yeah.

10    A.    I can't speak on what the university would do

11  in relation to every employee.

12    Q.    And I'm asking for your opinion here.

13    A.    Okay.

14    Q.    Do you think that students at public

15  universities should expect to encounter ideas they find

16  wrong or offensive?

17    A.    I think a public university is a place of open

18  discourse.

19          MR. STEINBAUGH:  Why don't we take a

20  five-minute break.

21          THE WITNESS:  Okay.

22          (Recess 9:50 a.m. to 10:02 a.m.)

23          (Exhibit 100 marked.)

24    Q.    (BY MR. STEINBAUGH)  I will mark as Exhibit 100

25  what is Bates stamped DEF 181891.

```
 1              Take a moment to review this, and let me
 2    know when you're done.
 3         A.   Yes, sir.
 4         Q.   Are you familiar with this?
 5         A.   Yes, sir.
 6         Q.   Is this the current policy?
 7         A.   Yes, sir.
 8         Q.   What is this?
 9         A.   Civil Rights Protections and Compliance.
10         Q.   And what is the purpose of this document?
11         A.   It's the system's policy for Civil Rights
12    Protections and Compliance.
13         Q.   Can you turn to Page 2 and take a look at
14    Section 2.1(b)?
15         A.   Yes.
16         Q.   Are you familiar with that?
17         A.   Yes.
18         Q.   Are you aware of any allegation that Spectrum
19    WT discriminates its membership on the basis of a
20    protected class?
21         A.   No.
22         Q.   Are you aware of any concerns that they
23    discriminate on the basis of membership of a protected
24    class in terms of their membership of members?
25              MS. AL-FUHAID:  Are you asking about
```

1    Spectrum?

2              MR. STEINBAUGH:  Yes.  And let me rephrase

3    that.

4        Q.   (BY MR. STEINBAUGH)  Are you aware of any

5    concern that Spectrum discriminates in admitting its

6    members on the basis of a protected class?

7        A.   No.

8        Q.   Was there ever a concern raised that Spectrum

9    would refuse to allow students to attend either the 2023

10   or the 2024 drag shows due to sexual orientation?

11       A.   Was a concern raised?

12       Q.   Yes.  Was a concern raised that Spectrum would

13   refuse to let people into a drag show based on their

14   sexual orientation?

15       A.   I'm not aware.

16       Q.   Are you aware of any concern that Spectrum

17   would refuse to allow people to attend a drag show based

18   on their gender?

19       A.   I do not know.

20       Q.   Are you aware of any allegation that Spectrum

21   discriminates on the basis of gender?

22       A.   I am not aware.

23       Q.   You can set that aside.

24              (Exhibit 101 marked.)

25       Q.   (BY MR. STEINBAUGH)  I'll mark as Exhibit 101

1    Policy on Expressive Activities.

2              Is that accurate?

3        A.    Yes.

4        Q.    And that is the policy that we looked at

5    earlier today?

6        A.    The Expressive Activity?  Yes.

7        Q.    Are you aware of any other policies dealing

8    with sexualized speech, or is that the policy?

9        A.    I'm not aware.

10        Q.    Are you aware of any Title IX complaints or

11    student disciplinary complaints concerning any drag show

12    or proposed drag show at West Texas A&M University?

13        A.    Yes.

14        Q.    What complaint?

15        A.    There were multiple complaints that were levied

16    after the drag show.

17        Q.    By whom?

18        A.    The majority of them were anonymous.

19        Q.    Do you recall the nature of those complaints?

20    Were they concerning the cancellation of the drag show?

21        A.    There were complaints on both sides.

22        Q.    Okay.  Let's start with the ones concerning the

23    cancellation of the drag show.

24              Were those alleging that the cancellation

25    was discriminatory?

1  A.  People were upset on both sides and complained.

2  Q.  And they filed formal Title IX complaints?

3  A.  Not to my knowledge, no.

4  Q.  When you say that you're aware of Title IX

5  complaints, you're not talking about formal complaints?

6  A.  I'm aware of people complaining, but I'm not

7  aware of a formal Title IX complaint.

8  Q.  Are you talking about sort of the public

9  discourse around this?

10  A.  People complaining that it was canceled and

11  people supporting it?

12  Q.  Correct.

13  A.  When I talk about receiving complaints, that's

14  what I was talking about.

15  Q.  So you're talking about the public discourse

16  around whether or not drag shows are discriminatory, and

17  the cancellation of this drag show was proper?

18  A.  Yes.

19  Q.  Are you aware of the university treating any of

20  that public discourse as a Title IX complaint?

21  A.  I am not.

22  Q.  Are you aware of the university conducting any

23  investigation into the cancellation of the drag show or

24  the proposal of the drag show to determine whether or

25  not it would have been harassing or discriminatory?

1      A.    I am not.

2      Q.    Have you ever seen the film "Friday the 13th,"

3   the original one?

4      A.    Yes.

5      Q.    Do you recall when that might have been?

6      A.    No.

7      Q.    Probably around the time that it came out?

8      A.    It's been some time, yes, sir.

9      Q.    Do you recall whether or not there is nudity in

10   that film?

11     A.    No.

12     Q.    Do you know what that film is rated?

13     A.    No.

14     Q.    Can you tell me about the PUP program?

15     A.    The Pre-University Program?

16     Q.    Correct.

17     A.    Yes, sir.

18     Q.    What is it?

19     A.    It's part of our dual-enrollment to help

20   students come to campus and take college-level courses.

21     Q.    When you say "part of our dual-enrollment," are

22   there other aspects of dual-enrollment?

23     A.    Yes, sir.

24     Q.    What are those that are not the PUP program?

25     A.    The dual-enrollment students primarily receive

1    the education at their high school.

2        Q.    Are there any of those classes that take place

3    at the university?

4        A.    For the PUP students.

5        Q.    Just the PUP students?

6        A.    Yes, sir.

7        Q.    And the dual-enrollment students are separate

8    from the PUP program?

9        A.    Yes, sir.

10       Q.    Is that where university faculty go to those

11   campuses and teach?

12       A.    Primarily, it's high school and teachers who

13   have been certified to teach the college-level courses.

14       Q.    I see.  So the teachers at those high schools,

15   they don't otherwise teach university courses here?

16       A.    That's correct.

17       Q.    When they're teaching those courses, they're

18   teaching university courses, not K through 12 courses?

19       A.    Yes, sir.

20       Q.    So they're providing a university education at

21   those separate institutions?

22       A.    At those high schools, yes, sir.

23       Q.    Okay.  Thank you.

24              (Exhibit 103 marked.)

25       Q.    (BY MR. STEINBAUGH)  I'll mark this as Exhibit

1  103.   Let me know when you've had a chance to take a

2  look at that.

3       A.   Yes, sir.

4       Q.   Are you familiar with this document?

5       A.   Yes, sir.

6       Q.   Is this one of the documents you reviewed

7  before today?

8       A.   Yes, sir.

9       Q.   What is this document?

10      A.   The PUP Frequently Asked Questions documents.

11      Q.   And this is made available to the public?

12      A.   It's on our website.

13      Q.   Do you see where it says, "How does the student

14  code of conduct apply to me?"

15      A.   Yes, sir.

16      Q.   And it says, "PUP students will be held to the

17  same expectations as the rest of the student body."

18           Is that accurate?

19      A.   Yes, sir.

20      Q.   Is that accurate academically as well?

21      A.   Yes, sir.

22      Q.   And it's accurate that PUP students are also

23  subject to the student code of conduct?

24      A.   Yes, sir.

25      Q.   So they're treated just like any other member

1    of the university community?

2        A.    Yes, sir.

3        Q.    And do you see the question:  "How many courses

4    can I take each semester?"

5        A.    Yes, sir.

6        Q.    And it says, "PUP students can take two courses

7    each semester."  Is that right?

8        A.    Correct.

9        Q.    How many classes does your average college

10    student take?  What's a full load for an undergraduate?

11        A.    A full load would be 12.

12        Q.    12 classes?

13        A.    No.  12 hours, 4 classes.

14        Q.    Okay.  So a PUP student probably spends less

15    time on campus than your average undergraduate student?

16        A.    Yes.

17        Q.    You can set that aside.

18            (Exhibit 104 marked.)

19        Q.    (BY MR. STEINBAUGH)  I'll mark as Exhibit 104

20    what's Bates stamped DEF 000858.

21            Let me know when you've had a chance to look

22    at that.

23        A.    Yes, sir.

24        Q.    Are you familiar with this document?

25        A.    I am.

1    Q.   Is this one of the documents you reviewed to
2  prepare for today?
3    A.   I did not review this one.
4    Q.   Have you seen it before?
5    A.   Yes, sir.
6    Q.   I want to look at the second full paragraph
7  that starts with "in accordance with."
8         Do you see that?
9    A.   Yes, sir.
10   Q.   It says, "High school students may enroll in
11 university courses."
12        Is the PUP program limited to high school
13 students or students of high school age?
14   A.   Yes, PUP is for high school students.
15   Q.   If you look under "Eligibility," do you see
16 where it says, "High school students are eligible to
17 participate if they have achieved a GPA of 3.0 or are in
18 the top half of their high school?"
19   A.   Yes.
20   Q.   Is it fair to say that PUP students have to be
21 high school students who have been academically
22 successful?
23   A.   Yes.
24   Q.   And down at the bottom under "Eligible
25 Courses," it says, "Eligible courses will include those

```
 1    in that section says, "The PUP courses are regular

 2    university courses with no variance in syllabi, course

 3    outlines, grading procedures, and other academic

 4    policies."

 5              Is that accurate?

 6      A.   Yes.

 7      Q.   Does that mean that PUP students are taking

 8    university courses, not secondary school courses?

 9      A.   Yes.

10      Q.   Does the university offer any secondary school

11    courses?

12      A.   What do you mean by "secondary?"

13      Q.   Is West Texas A&M a secondary school?

14      A.   No.

15      Q.   So these are the same courses an undergraduate

16    student takes?  It's not watered down to accommodate

17    younger students?

18      A.   Correct.

19      Q.   And then under the section "Fees" at the

20    bottom, do you see where it says, "Students will pay

21    $150 per course?"

22      A.   Yes.

23      Q.   Are you aware of whether or not that depends on

24    the number of hours per course, or is it just a flat fee

25    of $150 whether or not the course is one credit or three
```

1    credits?

2        A.   I do not know.

3        Q.   Do you have any reason to believe that it does

4    vary based on the number of credit hours?

5        A.   The sentence says that they'll pay $150 per

6    course.

7        Q.   And do you see where it says, "WTAMU fee

8    waivers for students enrolled in PUP result in a price

9    per course much lower than that paid by other WTAMU

10    students?"

11        A.   Yes.

12        Q.   So the other fees that WT students pay are

13    waived, and PUP students just pay $150 per course, a

14    flat rate?

15        A.   Yes.

16        Q.   Do you know whether or not that fee waiver

17    includes the university complex fee?

18        A.   I do not.

19        Q.   Do you have any reason to believe that PUP

20    students have to pay the university complex fee?

21        A.   This says that those fees are waived, and they

22    pay the $150.

23        Q.   Okay.  Do you have any reason to believe that

24    the policies outlined in that document vary for

25    home-schooled students admitted into the PUP program?

```
 1        A.    No.

 2        Q.    Okay.  You can set that aside.

 3              (Exhibit 105 marked.)

 4        Q.    (BY MR. STEINBAUGH)   I'll mark as Exhibit 105

 5   what is Bates stamped DEF 017571.

 6              Let me know when you've had a chance to

 7   look at this.

 8        A.    Yes, sir.

 9        Q.    Are you familiar with this document?

10        A.    Yes, sir.

11        Q.    Is this one of the documents you reviewed

12   before today?

13        A.    No, sir.

14        Q.    But you've seen this before?

15        A.    Yes, sir.

16        Q.    What is this?

17        A.    The Student Approval Form Semester Advising and

18   Registration Form.

19        Q.    Do PUP students have to turn this in in order

20   to enroll each semester?

21        A.    Yes.

22        Q.    Turn to Page 2.  Do you see the paragraph under

23   "Hazardous Course Information?"

24        A.    Yes, sir.

25        Q.    Is it accurate that "PUP Students can enroll in
```

1    classes designated as hazardous by the university for

2    reasons including, but not limited to, the following

3    examples; animals, chemicals, equipment, extreme

4    temperatures, extreme weather, fall hazards, and paint?"

5        A.    Yes.

6        Q.    And to do so, it requires the printed name and

7    signature of a parent or guardian?

8        A.    Yes.

9        Q.    So PUP students can enroll in hazardous courses

10   if the parent signs off on that?

11       A.    Yes.

12       Q.    So is it fair to say, by that, that the

13   university is referring to parental determinations about

14   whether or not their son or daughter is mature enough to

15   enroll in a university program that may be hazardous?

16            MS. AL-FUHAID:  Objection; calls for

17   speculation.

18       A.    A person who is not of age has to have their

19   parent sign it and give them permission.

20       Q.    You can set that aside.

21            (Exhibit 106 marked.)

22       Q.    (BY MR. STEINBAUGH)  I'll mark as Exhibit 106

23   what is Bates stamped DEF 181906.

24            Let me know when you've had a chance to

25   look at that.

```
 1       A.   Yes, sir.

 2       Q.   Are you familiar with this document?

 3       A.   Yes.

 4       Q.   Did you review this before today?

 5       A.   I did.

 6       Q.   If you look at the "PUP Enrollment Count" where

 7   it says "on campus," that column, is it fair to say that

 8   the university's average PUP enrollment count for

 9   on-campus students is between 30 and 50 PUP students in

10   a fall or spring semester?

11       A.   That's what this shows.

12       Q.   Have you ever met a PUP student?

13       A.   I have.

14       Q.   Do you recall any in particular?

15       A.   My daughter.

16       Q.   Okay.  Anyone other than your daughter?

17       A.   Not that I can recall.

18            MR. STEINBAUGH:  Why don't we take a

19   five-minute break.

20            THE WITNESS:  Okay.

21            (Recess 10:32 a.m. to 10:38 a.m.)

22       Q.   (BY MR. STEINBAUGH)  When did you first hear

23   about the plans for the 2023 Spectrum drag show on

24   campus?

25       A.   Sometime before the show was supposed to
```

1  happen, maybe a couple of weeks.

2       Q.    Do you recall how you first heard about it?

3       A.    I first heard about it through the reservation

4  system.  It was talking about events that were coming

5  up.

6       Q.    Did that jump out at you?

7       A.    It did.  There were other ones that I would

8  look at as well.

9       Q.    What do you mean "other ones you would look

10 at?"

11      A.    There were other events that I would look at.

12      Q.    What stood out about it to you?

13      A.    The drag show?

14      Q.    Yeah.

15      A.    That it was a drag show.

16      Q.    So was that the initial registration request,

17 or was it like a calendar of events?

18      A.    Yeah, it's like a calendar.

19      Q.    When you first saw it, did you contact anyone

20 about it, or did you do anything with it?

21      A.    I spoke with my two AVPs.

22      Q.    And who were they?

23      A.    Chance Haugen and Amber Black.

24      Q.    And what did you speak to them about?

25      A.    Being within 100 days of starting, I asked them

```
 1   about the event.
 2        Q.   What did you ask them?
 3        A.   "What is it?"   "Who is it?"   "Where is it?"
 4        Q.   Were you familiar with Spectrum at all?
 5        A.   Yes.
 6        Q.   And what did they tell you about the planned
 7   event?
 8        A.   They told me the date, time, and location.
 9        Q.   Did they express any concerns about it?
10        A.   We had a general discussion about the event.
11        Q.   And what was the nature of that general
12   discussion?
13        A.   About hosting a drag show.
14        Q.   And what did you discuss?
15        A.   That we hadn't had one.   I'd been here about
16   100 days at that point, so I asked a lot of questions.
17        Q.   What kind of questions were you asking other
18   than about date, time, and location?
19        A.   "Where is this?"   "Who is this?"
20        Q.   Was there any discussion about the content of
21   it at all?
22        A.   I asked for a historical context.
23        Q.   Any other discussion about the content of the
24   event beyond the historical context?
25        A.   No, sir.
```

1      Q.    Did they raise any concerns about the content
2  at that point?
3      A.    I asked them to understand about the Panhandle,
4  as a person that was new to the area.
5      Q.    Why ask about the Panhandle?
6      A.    Because I had only been here a short amount of
7  time.
8      Q.    Sure.  But why was it important that you
9  understand the Panhandle with relation to this
10 particular event?
11     A.    I wanted to understand the institution.
12     Q.    When you say "the institution," are you
13 referring to questions about how a drag show would be
14 perceived in the community?
15     A.    Yes.
16     Q.    Was that one of your concerns?
17     A.    I asked to understand.
18     Q.    What do you mean?
19     A.    I had been at my prior institution for 17 years
20 and did not have that depth of knowledge of the
21 institution and the history.
22     Q.    Why would that be important?
23     A.    I wanted to have an understanding of West Texas
24 A&M University.
25     Q.    How so?

1    A.    For example, what is the culture, and what are

2  the policies?

3    Q.    What do you mean by "culture?"

4    A.    The culture of the region.

5    Q.    And why would that be important?

6    A.    We're a regional institution.

7    Q.    And why would the culture of the region bear on

8  holding a drag show?

9    A.    I wanted to understand, so I asked questions.

10    Q.    Were you trying to understand whether or not

11  the university would allow this to go forward?

12    A.    I wanted to understand the drag show in the

13  context of the university.

14    Q.    Were you trying to gauge what the community

15  reaction would be to the drag show?

16    A.    I wanted to expand my understanding and

17  appreciation of where I was at.

18    Q.    And you said you met with Chance and Amber?

19    A.    Yes, sir.

20    Q.    And what did they convey to you?

21    A.    We talked about the history.  They have a long

22  employment history at the institution.  We talked about

23  the event.

24    Q.    Did they share any concerns about the nature of

25  the event?

```
 1        A.    We discussed the potential for people to be for

 2   it and against it.

 3        Q.    Were there any concerns about the folks who

 4   would be against it?

 5        A.    We were concerned about following university

 6   policy, understanding time, place, and manner.

 7        Q.    Were there any concerns that the university

 8   staff within your department or within the JBK were

 9   opposed to this event?

10        A.    Please ask that again.

11        Q.    Were there any concerns that the employees or

12   the staff in your division, which includes the JBK, were

13   within the group that were opposed to this event?

14        A.    My discussions with them were holistic.

15        Q.    What do you mean by that?

16        A.    People that thought it was the right thing to

17   do and people that thought it was the wrong thing to do.

18        Q.    And by "it," you mean the drag show?

19        A.    Yes, sir.

20        Q.    Were there people within your division or the

21   JBK who thought it was the wrong thing to do, to your

22   knowledge?

23        A.    No.

24        Q.    Did you ever talk to Kimberly Cornelsen about

25   the drag show?
```

1      A.    Yes.

2      Q.    Do you recall what the nature of those

3   conversations was?

4      A.    She was concerned about the show.

5      Q.    And what is her role?

6      A.    At that time, she was the director for the

7   Office of Campus Activities.

8      Q.    And what were her concerns?

9      A.    That students had expressed to her that they

10  were upset by the idea of a drag show.

11     Q.    Did she come to you?  Did she set up a meeting?

12  Did she email you?  How did she convey those concerns?

13     A.    I don't remember specifically how it was

14  conveyed to me.

15     Q.    Did she convey the nature of the students'

16  concerns to you?

17     A.    We met and had a discussion about her concerns.

18     Q.    And the students' concerns?

19     A.    And the students' concerns.

20     Q.    And can you elaborate on what those concerns

21  were and why they had a problem with the drag show?

22     A.    You mean what people told me?

23     Q.    What Kimberly told you.

24     A.    That people thought it was offensive.

25     Q.    Why?

```
 1      A.   Because they were offended by it.

 2      Q.   Was she offended by it?

 3           MS. AL-FUHAID:  Objection; calls for

 4  speculation.

 5      Q.   (BY MR. STEINBAUGH)  Did she tell you she was

 6  offended by it?

 7      A.   She was offended by it.

 8      Q.   Did she explain why she was offended by it?

 9      A.   I don't remember specifically.

10      Q.   Did she or any of the students complain that

11  this event was harassment?

12      A.   Students complained to me, yes.

13      Q.   Who were those students?

14      A.   I don't remember the names.

15      Q.   They complained that the event was harassing,

16  or are you speaking about the general public discourse?

17      A.   Again, we're talking about general public

18  discourse.

19      Q.   So it was not a student coming to you or to the

20  university saying, "This event is harassing?"

21      A.   I had students that met with me on both sides.

22      Q.   And they said, "This event is harassing?"

23      A.   Yes.

24      Q.   Did you report that to the Title IX office?

25      A.   No.
```

1    Q.   Why not?

2    A.   I was listening to students tell me that they

3  were upset.

4    Q.   Do you have any reason to believe any of these

5  students would have been required to go to the show?

6    A.   No.

7    Q.   So you did not treat these as formal complaints

8  of harassment?

9    A.   They were not filed as formal complaints.

10    Q.   And if you believed that a student was coming

11  to you to complain that this event was harassing and a

12  violation of the university's policies, you would have

13  filed a complaint or reported that to the Title IX

14  office?

15    A.   I work to try to remind students of all of

16  their rights that are entitled to them.

17    Q.   So if a student comes to you and reports that

18  they're being harassed, do you have an obligation to

19  report that to the Title IX office yourself?

20    A.   It would depend on the nature of the complaint.

21    Q.   How so?

22    A.   It would depend on what I was told.

23    Q.   What do you mean?

24    A.   If a student reported to me something that was

25  to the level of reporting to Title IX, then yes, I have

1    an obligation to report it.

2        Q.    So none of these complaints rose to the level

3    of having an obligation to report to the Title IX

4    office?

5        A.    I listened to students complain.

6        Q.    But none of those complaints, in your view,

7    rose to the level of having to report that to the Title

8    IX office, correct?

9        A.    I do not remember reporting specifically to the

10    Title IX office.

11        Q.    Would you recall reporting to the Title IX

12    office?

13        A.    Potentially.

14        Q.    Is that something you do often?

15        A.    No.

16        Q.    But it would stand out to you if you had to

17    report it to the Title IX office?

18        A.    That was a pretty chaotic time.

19        Q.    And if there were a report to the Title IX

20    office, would they have an obligation to create a record

21    of that report?

22        A.    I'm not exactly sure of their policies and

23    processes.

24        Q.    When you report to the Title IX office, is that

25    in writing, or do you pick up the phone?

1      A.   It would depend.  I would communicate with a

2   Title IX officer.

3      Q.   Would you do that by phone?

4      A.   I have communicated by phone.

5      Q.   When you do so, do you follow that up with

6   something in writing?  And I'm referring to when you're

7   reporting a Title IX complaint.

8      A.   If I'm making a formal Title IX complaint, then

9   I follow the process to do so.

10      Q.   In writing?

11      A.   In writing.

12      Q.   Are you familiar with the requirement that

13   staff within the JBK or your division were required to

14   take an LGBTQ training during this period?

15      A.   I don't remember that.

16      Q.   Did you ever get a sense that the staff members

17   within the JBK or your division were discriminating

18   against Spectrum or its event because of Spectrum's

19   sexual orientation?

20      A.   Please say that again.

21      Q.   Was there ever a concern that the employees in

22   the JBK or within your division were making decisions

23   about this event based on sexual orientation?

24      A.   I don't understand what it is you're asking.

25      Q.   Was there ever a concern that employees were

1  acting in a homophobic nature with respect to this

2  event?

3      A.    No.

4      Q.    Was there ever a sense that employees needed

5  training on LGBTQ issues as a result of the planning of

6  this event?

7      A.    I wouldn't be able to speak to that.

8      Q.    You're not aware of any training that was

9  required as a result of this event?

10     A.    I do not remember that.

11     Q.    Did you ever talk to Shawn Fouts about the

12  planned event?

13     A.    I did meet with Dr. Fouts.

14     Q.    And do you remember how many times you met with

15  him?

16     A.    No, sir.

17     Q.    One time?  Two times?  Five times?

18     A.    About this event in particular?

19     Q.    Yeah.

20     A.    At least a couple.

21     Q.    Do you remember when you first met with him

22  about it?

23     A.    I don't remember the time frame.

24     Q.    Do you remember what that conversation was

25  about?

1    A.    I remember talking with him about the process.

2    Q.    And what about the process specifically?

3    A.    Being new and trying to understand the process

4    at WT for reserving spaces for student events.

5    Q.    And did he convey to you any concerns about the

6    content of the event or the marketing of the event?

7    A.    We did discuss conversations that he was having

8    with the organization, and marketing was part of that

9    conversation.

10    Q.    Can you tell me more about that conversation?

11    A.    Dr. Fouts was meeting with the students and

12    communicating with Chance Haugen and myself, so I was

13    learning about their conversations from Dr. Fouts.

14    Q.    I know that you ultimately did meet with

15    Barrett Bright, but other than that ultimate meeting

16    where you were conveying that the show was canceled, did

17    you ever meet with him at all?

18    A.    No, sir.

19    Q.    So when you met with him, that was your first

20    time?

21    A.    To the best of my recollection, that was my

22    first time to meet him.

23    Q.    I don't mean like saying "hello" on campus.

24    A.    Right.

25    Q.    When you had conversations with Dr. Fouts, were

1  there questions about the appropriate dress and behavior

2  for the event?

3      A.    Again, I was speaking with Dr. Fouts, who was

4  then speaking with the students, so it was a bit of a

5  game of telephone because I'm asking questions, and he's

6  asking questions, and they're answering him, and then

7  he's answering me.

8      Q.    What kind of questions were you asking him?

9      A.    Time, place, manner, process, protocol,

10 policies.

11     Q.    Were you asking questions pertaining to the

12 content of the event?

13     A.    No.

14     Q.    Did he raise concerns or convey any concerns

15 about the content of the event?

16     A.    I remember a conversation about an age

17 restriction.

18     Q.    And what was your response to that?

19     A.    I wanted to understand how the university

20 approached events.

21     Q.    What did he tell you about how the university

22 approached events?

23     A.    That they were meeting with the students and

24 going through the handbook, those kinds of things.

25     Q.    And did you discuss the age restrictions beyond

1  their existence?

2       A.   That was something I was notified of.

3       Q.   And did you discuss that further other than

4  being notified of it?

5       A.   Not inherently, no.

6       Q.   You didn't ask any questions about why they

7  were limiting it by age?

8       A.   No.

9       Q.   Did that concern you?

10      A.   At that point in time, I was trying to

11 understand how things worked at WT.

12      Q.   But did it concern you that they were limiting

13 it by age?

14      A.   I had no context.

15      Q.   And what kind of context would you have needed?

16      A.   My time at my prior institution gave me more

17 knowledge and context.

18      Q.   What do you mean?

19      A.   I spent 17 years there, and I was here for 100

20 days.

21      Q.   Sure.  Are you familiar with Kristina

22 Drumheller?

23      A.   Yes.

24      Q.   Do you know her?

25      A.   I do.

1    Q.    What is your impression of her?

2    A.    She's a tenured faculty member here at WT.

3    Q.    Responsible?

4    A.    I have found her to be a nice woman.

5    Q.    Any concerns about her character or judgment?

6    A.    I have no concerns about her character.

7    Q.    Do you know how long she has been here?  Well,

8  you said she's tenured, so awhile.

9              Do you know Chip Chandler?

10    A.    I do.

11    Q.    What's your impression of Chip Chandler?

12    A.    I know Chip well.  I like Chip.  I work with

13  Chip.

14    Q.    Is he mature?

15    A.    Yes.

16    Q.    Is he professional?

17    A.    Yes.

18    Q.    Does he have good judgment?

19    A.    I believe so.

20    Q.    Any questions about his character?

21    A.    No.

22    Q.    Were you aware of whether or not Chip Chandler

23  was working with the students on this event?

24    A.    I was.

25    Q.    And do you know what he was doing with them?

1       A.   It's my understanding he was an advisor with

2  the organization.

3       Q.   Like an informal advisor?

4       A.   I'm not sure if he was formal or informal.

5       Q.   And do you know what he was advising them on?

6       A.   Not specifically, no.

7       Q.   Do you know whether or not he was advising them

8  on this event?

9       A.   That, I do not know.

10      Q.   Did you know that he was involved in this

11 event?

12      A.   Yes.

13      Q.   Did you know at the time that he was involved?

14      A.   Not necessarily, no.

15      Q.   When did you learn that he was involved in the

16 event?

17      A.   I couldn't tell you.

18      Q.   Do you know why you learned he was involved in

19 the event or what the circumstances were?

20      A.   When I learned?

21      Q.   Yeah.

22      A.   After Dr. Wendler's memo to the campus

23 community, the conversation about the drag show became

24 much bigger, so I would say it was probably then.

25      Q.   Did you know that Kristina Drumheller was

 1  advising the students at the time?

 2      A.   At the time, I probably didn't know who the

 3  advisor for the group was.  Three years later, I know.

 4      Q.   Of course.  What is the Risk Assessment

 5  Committee?

 6      A.   I'm not inherently sure.

 7      Q.   Are you on the Risk Assessment Committee?

 8      A.   I don't believe I am.

 9      Q.   So I know that you had conversations with Shawn

10  Fouts, Amber Black, and Chance Haugen.

11      A.   Yes, sir.

12      Q.   Before Dr. Wendler canceled the show, were

13  there any other people you had conversations with about

14  the show?  And I also know about Kimberly.

15      A.   No.

16      Q.   Did you speak to Dr. Wendler about the show

17  before he decided to cancel it?

18      A.   I did.

19      Q.   How many times?

20      A.   Once.

21      Q.   When was that conversation?

22      A.   I'd have to look at the calendar to tell you

23  the exact date.

24      Q.   And my recollection from one of your affidavits

25  is that the morning that it was canceled, he had a

1  meeting with the vice presidents and informed the vice

2  presidents that it was being canceled.

3             Is that correct?

4      A.   That sounds correct.

5      Q.   So you had a meeting before that?

6      A.   Yes, sir.

7      Q.   And do you recall if it was a couple of days

8  beforehand?

9      A.   I feel like it was a couple of days.

10     Q.   Okay.  And tell me about this meeting.  Was it

11  just you and Dr. Wendler?

12     A.   Yes, sir.

13     Q.   Nobody else was there?

14     A.   No, sir.

15     Q.   What was the nature of that conversation?

16     A.   I asked him if I could meet with him, and I

17  told him that I had become aware of the drag show.

18     Q.   Did you ask to meet with him, or did he ask to

19  meet with you?

20     A.   I asked to meet with Dr. Wendler.

21     Q.   Why?

22     A.   Being new in my position, I wanted to make sure

23  that I provided him with information.

24     Q.   Tell me about that conversation.

25     A.   We met.  I said, "The students are planning to

1    have a drag show."

2        Q.    Did he indicate that he was already aware of

3    that?

4        A.    That, I don't remember.

5        Q.    How did he respond to that?

6        A.    He listened.

7        Q.    What did he say?

8        A.    We had a conversation about the basics of the

9    event.

10        Q.    How long was this conversation?

11        A.    20 minutes or so.

12        Q.    What else did you talk about?

13        A.    That was primarily the purpose of the meeting.

14        Q.    Was about when the event would be?

15        A.    That it was planned to happen.

16        Q.    And why was it a concern about when it was

17    planned to be, or was that just the opening of the

18    conversation?

19        A.    That it was set to happen on campus in the

20    spring or in the near future.

21        Q.    And what was his response to that?

22        A.    He listened.

23        Q.    Did he say anything?

24        A.    Not inherently to me, no.

25        Q.    So for 20 minutes you spoke to him, and he

PANHANDLE COURT REPORTERS, LLC - 806.373.0602

1  didn't say anything?

2      A.   Being new in my position, I met with him on

3  different events.   This was like those other

4  conversations.

5      Q.   What do you mean?

6      A.   "How does this work here at WT?"

7      Q.   So was this 20-minute conversation exclusively

8  about the drag show, or were you talking about a number

9  of different events?

10     A.   To my recollection, that one was about the drag

11 show.

12     Q.   Okay.   Did he ask you any questions about it?

13     A.   "Who is doing it?"   "Where is it?"   "When is

14 it?"

15     Q.   Did you discuss the content of the show?

16     A.   No, we did not discuss the content.

17     Q.   Did you discuss the marketing of the show?

18     A.   That I don't remember.

19     Q.   Did you discuss the purpose of the show?

20     A.   I don't remember the specifics of that

21 conversation.

22     Q.   Did you discuss the age restrictions at all?

23     A.   Again, things became kind of a blur after the

24 show got canceled, so I don't remember that.

25     Q.   What was his general demeanor during that

1  discussion?

2        A.    He was open.

3        Q.    What do you mean "open?"

4        A.    It seemed like other conversations that he and

5  I had had.

6        Q.    Did he express any concern about the show?

7        A.    He did.

8        Q.    How so?

9        A.    I asked him about drag shows at WT.  He said he

10  wasn't familiar with them and that none had happened

11  since he had been president.  We had a conversation

12  about that.

13        Q.    Did you have a discussion about drag in

14  general?

15        A.    Not really.

16        Q.    Did you have a discussion about homosexuality?

17        A.    No.

18        Q.    LGBTQ issues?

19        A.    No.

20        Q.    Did he express any concern about the

21  appropriateness of holding a drag show on campus?

22        A.    What I remember from that conversation was

23  notifying him of the show, him listening, and that was

24  it.

25        Q.    Did he suggest that he might not allow the show

1  to happen?

2       A.   He did not tell me that he was going to allow

3  it or not allow it at that meeting.

4       Q.   Did he suggest that that might be a

5  possibility?

6       A.   I felt like it was a possibility.

7       Q.   Why?

8       A.   Being ignorant of the new place that I worked

9  and the history and the context, it just felt like a

10 possibility.

11      Q.   So you felt like it might be canceled during

12 that conversation?

13      A.   During the 100 days that I had been here, I

14 felt like this was a relatively conservative part of

15 Texas.

16      Q.   What gave you that impression?

17      A.   My interactions with people.

18      Q.   Do you recall anything else from that

19 conversation at all?

20      A.   No, sir.

21               (Exhibit 107 marked.)

22      Q.   (BY MR. STEINBAUGH)  I'll mark this as Exhibit

23 107.  This is Defendants 000099.

24               Are you familiar with this document?

25      A.   Yes, sir.

```
 1        Q.   And then it has an arrow to "Wendler?"

 2        A.   Yes.

 3        Q.   Was Todd the conduit to Wendler about this?

 4        A.   Todd is over media.  He's the public

 5   information officer that's in this area.

 6        Q.   Why would you have a note saying "talk with

 7   Todd, arrow, Wendler?"

 8        A.   Because I had worked here for 99 days, and I

 9   was trying to understand.

10        Q.   So what would you be talking with Todd

11   about?

12        A.   About the announcement or the press release.

13        Q.   Do you recall having a conversation with Todd

14   Rasberry about the cancellation?

15        A.   After the cancellation?

16        Q.   Before the cancellation.

17        A.   Before?  No.

18        Q.   Do you recall having a conversation with

19   Rasberry after the cancellation?

20        A.   Yes.

21        Q.   How many conversations?

22        A.   That I don't recall.

23        Q.   One or two or a dozen?

24        A.   We talked about the cancellation and the

25   announcement.
```

1    Q.   Did you ever talk with him beyond discussing

2    the mechanics of the cancellation and the announcement?

3    A.   Not really.

4    Q.   Did you talk with him about this drag show

5    other than how to implement the cancellation?

6    A.   I don't remember talking with Todd about the

7    cancellation.

8    Q.   During the meeting at which Dr. Wendler

9    informed the vice presidents that he was canceling the

10   event, how long did that meeting last?

11   A.   To my recollection, 30 minutes.

12   Q.   Was that like a regular staff or vice

13   presidents meeting, or was it specifically about this

14   event?

15   A.   That meeting was specifically about this event.

16   Q.   Did it take place in person?

17   A.   It did.

18   Q.   Do you know if those are recorded?

19   A.   I do not know.

20   Q.   Do you know if anyone takes notes or minutes?

21   A.   I don't know.

22   Q.   Tell me about that conversation.

23   A.   When Dr. Wendler notified us?

24   Q.   Yes.

25   A.   We met in the president's conference room, and

```
 1    A.   No.

 2    Q.   Have you heard the name "Myss Myka" before?

 3    A.   I have now.

 4    Q.   When was the first time you heard that name?

 5    A.   After the drag show, and then with this

 6  lawsuit.

 7    Q.   So it would have been after President Wendler

 8  canceled the show?

 9    A.   Oh, yeah.

10    Q.   Would it have been in 2024?

11    A.   No.

12    Q.   Did you recently learn name of "Myss Myka"?

13    A.   No.

14    Q.   Do you have a ballpark estimate of when you

15  learned the name?

16    A.   I believe after the off-campus show, of which I

17  believe they were a performer.

18    Q.   How did you learn about the name "Myss Myka"?

19    A.   Either from the media or the lawsuit.

20    Q.   Do you know who Alex Fairly is?

21    A.   I do.

22    Q.   Who is that?

23    A.   He owns an insurance company in Amarillo.

24    Q.   Are you aware of his relationship with the

25  university?
```

1      A.   We have rooms on campus named after him.

2      Q.   Did his name come up at all in connection with

3   the 2023 drag show or its cancellation?

4      A.   No.

5              MR. STEINBAUGH:  Why don't we take a short

6   break.

7              THE WITNESS:  Okay.

8              (Recess 11:26 a.m. to 11:37 a.m.)

9      Q.   (BY MR. STEINBAUGH)  So you had conversations

10  with Dr. Wendler up until the cancellation of the event.

11             Do you recall any conversations with him

12  after the cancellation of the event about the drag show

13  or about drag shows in general?

14     A.   Not really.

15     Q.   Did you have a conversation with him about the

16  2024 drag show or the proposal to hold a drag show?

17     A.   I would have informed him.

18     Q.   Do you recall when that might have been?

19     A.   No, sir.

20     Q.   You don't recall any particulars of that

21  conversation?

22     A.   No, sir.

23     Q.   Are you aware of what the United States Court

24  of Appeal for the Fifth Circuit is?

25     A.   A little.

1  whether or not the students had submitted an application

2  and gone through that process?

3      A.   He would have been in more direct contact with

4  that process than I would have been.

5      Q.   So you had little to no involvement in the 2024

6  show application or the decision to cancel it?

7      A.   Correct.

8      Q.   Did you have any involvement in that decision?

9      A.   To cancel the drag show?

10     Q.   Yes.

11     A.   No, sir.

12     Q.   Have you had any discussions with Dr. Wendler

13 about whether or not he would cancel drag shows in the

14 future?

15     A.   No, sir.

16     Q.   Let's assume that Spectrum applies for and gets

17 through the process to hold a drag show in 2026, and

18 President Wendler again decides to cancel it.

19          If he instructs you to cancel it, would you

20 cancel it?

21          MS. AL-FUHAID:  Objection; calls for

22 speculation.

23     A.   I think I would talk with an attorney this time

24 before I did anything.

25     Q.   (BY MR. STEINBAUGH)  Do you have the ability to

1    concert.  Primarily, it was about that only the business

2    office has the authority to sign the contract.

3        Q.    Are you aware of the involvement of the campus

4    or the university police department in discussions about

5    that event?

6        A.    No, sir.

7        Q.    This is an exhibit we have previously marked as

8    Exhibit 64.  It's a video.

9              Are you familiar with the event University

10   Sing?

11       A.    Here at WT?

12       Q.    Yes.

13       A.    Yes, sir.

14       Q.    Can you describe what that is?

15       A.    The student organizations team up, and they do

16   songs and skits.

17       Q.    I'll play this short video.

18              Are you able to see that?

19       A.    Yes, sir.

20              (Video plays.)

21       Q.    (BY MR. STEINBAUGH)  Did you see at the very

22   end it showed "Office of Student Engagement and

23   Leadership?"

24       A.    Yes, sir.

25       Q.    That's your office?

1        A.    That's OSEL, yes.

2        Q.    Do you know whether or not your office produced

3   this video?

4        A.    I don't.

5        Q.    Okay.  Have you been in Legacy Hall?

6        A.    I have.

7        Q.    Have you seen one of these University Sing

8   events?

9        A.    I have.

10        Q.    Does that appear to be an accurate

11   representation?

12        A.    Yeah.

13        Q.    Would it surprise you if your office had

14   produced a video like that?

15        A.    No, sir.

16        Q.    It produces videos like that pretty routinely?

17        A.    Yes, sir.  They work with other offices too.

18        Q.    So is this material that the university

19   produced?

20        A.    Yes.

21        Q.    Jumping back to the 2023 show, when you had the

22   conversation with Bear, was there any way for him to

23   appeal that, anyone he could have gone to to say "No,

24   this is wrong?"

25        A.    Not really.  I mean there's always a level of

1    appeal.

2        Q.    What do you mean?

3        A.    Well, I mean that's the cornerstone of due

4    process in American higher education.

5        Q.    Sure, but who would he appeal to?

6        A.    That's a fair question.

7        Q.    Are you aware of an opportunity he would have

8    had beforehand to contest President Wendler's decision

9    to cancel it?

10       A.    No, sir.

11       Q.    Your meeting with him was just informing him

12   about the decision, correct?

13       A.    Yes, sir.

14       Q.    Was there ever, to your knowledge, a Title IX

15   investigation or guidance concerning the proposed show

16   before it was canceled?

17       A.    Title IX I don't know about.

18       Q.    During your meeting with President Wendler when

19   he informed the vice presidents he was canceling the

20   show, do you recall whether or not he said that he

21   believed drag shows were demeaning to women?

22       A.    I remember that phrase specifically in the

23   Harmless Drag Show memo.  I don't know if he mentioned

24   it at that particular meeting.

25       Q.    When you met with Bear, do you recall conveying

1
                        CHANGES AND SIGNATURE
                  ORAL DEPOSITION OF CHRIS THOMAS
2                        DECEMBER 11, 2025

3       PAGE/LINE        CHANGE          REASON

4       _____

5       _____

6       _____

7       _____

8       _____

9       _____

10      _____

11      _____

12      _____

13      _____

14      _____

15      _____

16      _____

17      _____

18      _____

19      _____

20      _____

21      _____

22      _____

23      _____

24      _____

25      _____

1      I, CHRIS THOMAS, have read the foregoing
deposition and hereby affix my signature that same is
2 true and correct except as noted above.

3

4

5                    _____

                     CHRIS THOMAS
6

7 THE STATE OF _____ )

8 COUNTY OF _____ )

9

10     Before me, _____, on this day

11 personally appeared CHRIS THOMAS, known to me (or proved

12 to me under oath or through _____)

13 (description of identity card or other document) to be

14 the person whose name is subscribed to the foregoing

15 instrument and acknowledged to me that they executed the

16 same for the purposes and consideration therein

17 expressed.

18     Given under my hand and seal of office this _____

19 day of _____, _____.

20

21

22                    _____

                     NOTARY PUBLIC IN AND FOR
23                   THE STATE OF _____
                     COMMISSION EXPIRES: _____
24

25

```
 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF TEXAS
 2                   AMARILLO DIVISION

 3  SPECTRUM WT,                )
                                )
 4       Plaintiff,             )
                                )
 5  v.                          )  Case No. 2:23-cv-00048
                                )
 6  WALTER WENDLER, in his      )
    official capacity as the    )
 7  President of West Texas     )
    A&M University, et al.,      )
 8                              )
         Defendants.            )
 9
                    REPORTER'S CERTIFICATION
10              ORAL DEPOSITION OF CHRIS THOMAS
                     DECEMBER 11, 2025
11

12       I, SHARON D. LIVINGSTON, Certified Shorthand

13  Reporter in and for the State of Texas, hereby certify

14  to the following:

15       That the witness, CHRIS THOMAS, was duly sworn by

16  the deposition officer and that the transcript of the

17  deposition is a true record of the testimony given by

18  the witness;

19       That pursuant to information given to the

20  deposition officer at the time said testimony was taken,

21  the following includes counsel for all parties of

22  record:

23       Mr. Adam Steinbaugh, Attorney for Plaintiff;

24       Ms. Munera Al-Fuhaid, Attorney for Defendants;

25       That the amount of time used by each party at the
```

1 deposition is as follows:

2     MR. STEINBAUGH - 02 HOURS: 57 MINUTES

3     MS. AL-FUHAID - 00 HOURS: 03 MINUTES

4     That the sworn deposition transcript was duly

5 submitted on DECEMBER 23, 2025 to the witness or to the

6 attorney for the witness for examination, signature, and

7 return to the deposition officer by JANUARY 15, 2026;

8     That the original deposition was/was not returned

9 to the deposition officer on JANUARY 15, 2026;

10     If returned, the attached Changes and Signature

11 page contains any changes and the reasons therefor;

12     If returned, the original deposition was delivered

13 to Mr. Adam Steinbaugh, Custodial Attorney, and

14 $1,951.00 is the deposition officer's charges to the

15 PLAINTIFF for preparing the original deposition and any

16 copies of exhibits;

17     I further certify that I am neither counsel for,

18 related to, nor employed by any of the parties or

19 attorneys in the action in which this proceeding was

20 taken, and further, that I am not financially or

21 otherwise interested in the outcome of the action.

22

23

24

25

```
 1        Certified to by me this _____ day of _____,

 2   2026.

 3

 4                     _____
                       SHARON D. LIVINGSTON, TEXAS CSR 3798
 5                     Expiration Date:  04-30-26
                       Panhandle COURT REPORTERS, LLC
 6                     Firm Registration No. 10057
                       P.O. Box 1564
 7                     Amarillo, Texas 79105
                       (806) 373-0602
 8                     Janice@pcramarillo.com

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```