UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

SPECTRUM WT, et al.,         )
   Plaintiffs,  )
        )
vs.                          )Cause No. 2:23-CV-00048-Z
        )
WALTER WENDLER, et al.,   )
   Defendants.  )

_____

TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE

JANUARY 14, 2026
AMARILLO, TEXAS

_____

**A P P E A R A N C E S**

FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
700 PENNSYLVANIA AVENUE, SE
SUITE 340
WASHINGTON, DC 20003

BY  MR. JT MORRIS
 MR. ADAM STEINBAUGH
 MR. SAMUEL RUDOVSKY

    FOR THE PLAINTIFFS;

ATTORNEY GENERAL OF TEXAS
P.O. BOX 12548
AUSTIN, TX  78711

BY:  MR. DAVID BRYANT
MS. MUNERA AL-FUHAID
MS. ALEXIA BAKER
    FOR THE DEFENDANTS.

FEDERAL OFFICIAL COURT REPORTER:
CHRISTINE M. ORR, 205 SE 5TH AVENUE
AMARILLO, TEXAS, 79101, (806)468-3816
PROCEEDINGS RECORDED BY STENOGRAPHY; TRANSCRIPT
PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

**INDEX**

**PROCEEDINGS**                                    **PAGE**

**January 14, 2026**

OPENING STATEMENTS
          On behalf of the Plaintiff...        8
          On behalf of the Defendant...       19

              * * * * * * *

**WITNESSES**                                      **PAGE**

DR. WALTER WENDLER
          Direct.......................        27
          Cross........................        84
          Redirect.....................       129
          By the Court.................       140

BARRETT BRIGHT
          Direct.......................       154
          Cross........................       175
          Redirect.....................       214
          By the Court.................       224

JONATHAN JAYCE FANELLI
(DEPOSITION READ INTO THE RECORD)
          Direct.......................       251

**PROCEEDINGS**                                    **PAGE**

CLOSING ARGUMENTS
          On behalf of the Plaintiff...       281
          On behalf of the Defendant...       326
          Rebuttal Argument...........       342

              * * * * * * *

**EXHIBITS**                                       **PAGE**

All exhibits pre-admitted in
January 9, 2026, Pre-trial Hearing.


              * * * * * * *

REPORTER'S CERTIFICATE.................       347

[CALL TO THE ORDER OF THE COURT.]

THE COURT:  The Court calls civil action number 2:23-CV-048-Z, *Spectrum WT versus Wendler*, for trial on the merits.  Are the parties ready to proceed?

MR. MORRIS:  Plaintiff is ready, your Honor.

MR. BRYANT:  Defendant Wendler is ready.

THE COURT:  And for the Plaintiff, Mr. Morris, will you please identify the Court -- for the court reporter the personnel that are seated at counsel table.

MR. MORRIS:  Yes, your Honor.  With me is Adam Steinbaugh and Samuel Rudovsky.

THE COURT:  And Mr. Fitzpatrick is not with your team today; is that correct?

MR. MORRIS:  He is not.

THE COURT:  And for the Defendants, will the Office of the Attorney General identify your personnel for the court reporter.

MR. BRYANT:  Yes, your Honor.  I'm David Bryant.  Next to me is Alexia Baker and next to Alexia is Munera Al-Fuhaid.

THE COURT:  And did you submit your names and spellings to the court reporter as ordered by

the Court?

Okay. At this time, I'll just ask counsel both for the Plaintiff and Defendant if you'll supply those names. And then as you are speaking either from counsel table or taking a witness, we'll just make sure to keep that record clean. So if you haven't already done so, please submit your name for counsel and any attorneys present. Make sure those business cards or lists are submitted to the court reporter. You may approach if you've not done so at this time. And we'll just briefly pause so the court reporter can take that information.

[PARTIES COMPLY.]

THE COURT: Counsel for the Plaintiff is present. Counsel for the Defendant is now present. As a reminder to the parties, the exhibits were litigated at the pretrial conference and were pre-admitted as a result of that hearing. You don't need to lay the necessary foundation for any exhibits pre-admitted. And for that reason, you don't have to go through the usual process in offering exhibits during your case in chief.

Also, because this is a bench trial, the parties do not need to ask to publish exhibits. It may do so without leave at appropriate times.

Now, the deadline to accept exhibits was Wednesday, January 7, 2026.  The purpose of this deadline is so that we could pre-litigate any objections during that pretrial conference and to afford the Court time to review and ask questions prior to trial.  And here, I believe Defendant's exhibit list has changed since that deadline, and I'll just ask if the Court is moving -- I'm sorry, if the Defendant is moving for leave of Court to admit those exhibits and number them accordingly.

MR. BRYANT:  Your Honor, my understanding is that Defendants provided the same exhibits but added Bates numbers and identifying indicia that previously were not present, so we do ask for leave to have done that.  We wanted to make it more apparent both to the Court and opposing counsel precisely where they could find the exhibits that we had previously identified as -- on our admitted exhibit list.

THE COURT:  And Mr. Morris, any objection to that request for leave of Court to amend that list and to reconcile those numbers?

MR. MORRIS:  No objection.

THE COURT:  So that motion is granted, and the Court will consider that amended list just to

make certain that we're on the same exhibit list in taking witnesses and presenting those to the Court.

Now, is there any additional housekeeping for the Plaintiff?

MR. MORRIS:  Not at this time, your Honor.

THE COURT:  Any additional housekeeping for the Defendant?

MR. BRYANT:  None, your Honor.

THE COURT:  Okay.  At this time, we'll begin the trial.  Are there any motions to invoke The Rule?

MR. BRYANT:  Your Honor, the Defendant would invoke The Rule.  I believe Mr. Bright is present in the -- in the courtroom, and we would therefore request that he -- he may be the first witness; but if he's not the first witness, we would like for him to be excluded from the courtroom.

THE COURT:  Okay.  And at this time, The Rule is invoked.  This is Federal Rule of Evidence 615.  Except for the parties, respective representatives, any persons who are witnesses or potential witnesses who will be testifying in this case must now leave the courtroom.  I'll ask that you coordinate with the Court security officers and the marshals.  So the Court grants that invocation

of The Rule, and I'll just ask that you coordinate with counsel both for the Defendant and the Plaintiff to ensure that that is maintained. If you have any questions, please follow the instructions of the court security officers. They'll maintain any spaces outside the gallery.

Now, so both parties have requested 15 minutes with a three-minute warning for opening statements. I'm assuming that the parties would prefer to make their opening statements before their case in chief, or we can do back-to-back opening statements.

Plaintiff, do you have a preference on that order?

MR. MORRIS: We don't have a preference, your Honor.

THE COURT: Okay. And for the Defendant, this would affect you more, but do you intend to follow with Opening or wait for your case in chief?

MR. BRYANT: Your Honor, we prefer to follow the Plaintiff's Opening because the nature of this is such that Mr. -- or President Wendler's probably going to get called on Direct. So we'd like to go ahead and have our opening statement at the beginning of the case.

THE COURT: Understood. So we'll proceed with opening statements. As I instructed at the pretrial conference, my courtroom deputy and clerks will be your timekeeper. I'll give you a three-minute warning. I otherwise will aspire not to interrupt those statements. We'll begin with Plaintiff's opening statement, and again, this doesn't count against your time.

We're just going to pull the screen a little bit closer so that counsel have a direct sightline and also that it's available to both sides.

So the attorneys understand the configuration of the courtroom, I at all times will have a screen that displays anything that is projected on the larger courtroom screen. With that, you may proceed.

OPENING STATEMENT

ON BEHALF OF THE PLAINTIFF:

MR. STEINBAUGH: Good morning. And if it would please the Court, we are here for one simple reason. The president of a public university believes that he and he alone can separate the inoffensive speech from offensive speech, but the First Amendment means no official on campus or off

can make that determination.

Every generation offers up some form of art or entertainment that others may not grasp, and I confess that as I'm getting older, I'm -- I'm one of them. And some people may find that art offensive. Recall a Florida judge telling Elvis that if he swivels his hips on stage, he'll wind up in handcuffs. And on college campuses, courts have repeatedly turned back administrators' efforts to impose speech codes against so-called hate speech or discrimination or to deplatform conservative speakers unpopular on left-leaning campuses.

Wendler's trial brief points out that most people in the Panhandle agree with him. But he turns the First Amendment on its head. The whole point is to protect speech when it is unpopular. Whether it's drag, religious practitioners or political speakers, the Constitution makes sure that governments can't suppress unpopular perspectives and that includes performative conduct. Drag is stage performance. People get up on stage in costumes. They create characters and they act out routines, choreographed dances to curated music. Like any artistic performance, that context alerts viewers that the performance intends to convey

something, even if the people exiting the theater might disagree about what that message actually was.

Today the Court will hear from Barrett Bright, the longtime president of Spectrum, who planned the 2023 and 2024 shows.  He will testify about what drag performances hosted by an LGBT -- LGBTQ+ student group mean, how performers craft characters and individually and collectively convey messages, purposefully bending gender norms.  He will testify how drag performances, like the one Spectrum is currently planning, use costumes, makeup, music, lyrics and dance to bring these characters to life.

Barrett's testimony, who is also known as Bear, will show that Spectrum's performance conveyed to LGBTQ+ students that their views and culture have a place at even the most conservative public university in Texas.  And it will show that under any test for expressive conduct, Spectrum's performances meet that test.

The Fifth Circuit majority agreed in this case and the dissent did not challenge it.  That's meaningful.  Spectrum is now attempting for a third time to use the same venue that is available to every other student organization and to members of

the public.  They have submitted an application describing the show and explaining it will only involve West Texas A&M University students.  That's Plaintiff's Exhibit 40.  They submitted a risk matrix form reiterating as much.  That's Exhibit 41.  They have a date; April 17th; a time, a venue and plans for auditions and selecting performers based on proposed costumes and music.

Jonathan Fanelli's designated deposition testimony shows that Spectrum uses drag to communicate messages about femininity and gender.  That's his testimony at page 108.  And I also -- it also shows that they use that -- use drag to express support for the LGBTQ+ community on campus.  This was not a someday aspiration.  Spectrum has a present intent to engage in artistic expression on a particular date, a particular time, in a particular venue.  And that is more concrete than in September 2025, when this Court rightly found an ongoing injury from a drag show ban, even though the next show had not even been scheduled or proposed.  President Wendler's motivations for prohibiting campus drag performances are not a mystery.  He wrote them down in his March 2023 email.  That was his explanation.  It was deliberate.  He explained

that he takes a message away from drag shows based on what he had read online without learning about the details of Spectrum's show, without knowing it was even PG-13.  And the message he takes away from drag shows is that they advance a perspective and an ideology that denigrates women; that they are a form of expression that is offensive and demeaning to women.  That is the message he takes away from Spectrum's shows, and he has not retreated from that position in three years.  That is viewpoint discrimination and it is per se unconstitutional, no matter the classification of the public forum.  And even if he could protect everyone from offense and do it evenhandedly, the Supreme Court said in *Matal* that rejected offensiveness as a basis for suppressing speech.  You can't warn or you can't say that we will suppress all offensive speech.  That is always viewpoint discrimination.  So consistently regulating speech because it is offensive is still viewpoint discrimination.

All Spectrum is asking for is access to the same space, Legacy Hall, that every other student organization and any member of the public can use under written policy and longstanding practice for expressive events on a first-come,

first-serve basis.

As our Motion for Summary Judgment explained, the University places minimal limits on student organizations' expressive uses of Legacy Hall and without concern to content.  It does so in the Texas A&M System-wide Expressive Activities Policy.  That's Plaintiff's Exhibit 9.  And in the campus' Expressive Activities Policy, the policy is particularly directed at West Texas A&M University.  That is Plaintiff's Exhibit 6.  Those policies prohibit restricting student organizations' uses of campus buildings based on content or viewpoint.  That is the same language that the Fifth Circuit in *Justice for All versus Faulkner* help create a designated public forum.  And as the University's representative testified, there is no requirement that events in Legacy Hall have any academic or educational purpose.  That's Dr. Shawn Fouts' testimony at pages 34 and 35.  University says that Legacy Hall is great for events with bands or live music or for folks who love to entertain; Plaintiff's Exhibit 24.

In practice, student organizations and non-university groups hold dozens of entertainment and community events in Legacy Hall each year.

That's Plaintiff's Exhibit 21.  That's Dr. Fouts' testimony at pages 28 -- 28 through 30 and 88 through 91.  And that is consistent with what -- West Tex -- or A&M System Policy says about the University's mission, that unfettered student expression is central to the University's mission, not subordinate to it.  And practice follows policy, illustrating that there are no meaningful limits on who can use Legacy Hall or how they can use it. Dr. Fouts testified to a laundry list of events that can be held in Legacy Hall, including beauty pageants, weddings, banquets, performances, holiday parties, movie screenings, dance-off competitions, fashion shows, talent shows, worship services, rock concerts, magicians and hypnotists.  That's at pages 89 to 91 of his testimony.  And in practice, student organizations and non-university groups hold dozens of these events each year.  Two videos underscore the point.  One of them is "University Sing".  I would like to take a moment to play that now.  This is a themed singing competition with judges, and that's at Plaintiff's 25.  And Dr. Fouts testified about that at pages 65 and 67.

          [PLAINTIFF'S EXHIBIT NO. 25 PLAYED.]

          MR. STEINBAUGH:  Credit to the

University's production team, I'm going to have that song stuck in my head all day.

Another video, and I won't play it here, but the Court is free to look at, it shows an event called the "Jingle Mingle".  It's an event organized by the City of Canyon's Chamber of Commerce which is not a student group.  And -- Pardon me.  That event, again organized by the City of Canyon's Chamber of Commerce, which is not a student organization event, features models dancing on stage so that they can sell clothing and engage in a fashion show.  These are not academic events, and they illustrate that Legacy Hall is compatible with this type of expressive activity; people dancing on stage, entertaining.  By using Legacy Hall for events having little to do with the University's educational mission, the University creates a designated, not limited, public forum.  That's *Concerned Women for America, Incorporated*, from the Fifth Circuit 883 F.2d at 34.

Wendler will point to a staff handbook claiming the right to cancel any event, but a handbook cannot override the A&M System Policy and the West Texas A&M University Policy that limit officials' ability to censor speech based on

viewpoint or content.  And a standard that allows an official to cancel an event based on whether it shows respect cannot survive strict scrutiny. Strict scrutiny applies here no matter the forum's classification even if this is a limited public forum.  Spectrum is within the class of groups that may use Legacy Hall, and drag shows fit comfortably within the types of entertainment events that Legacy Hall facilitates.  That means that restrictions on Spectrum's access and content trigger strict scrutiny.  That's from Justice for all, 410 F.3d at 766 to 67.  There still another problem with Wendler's ban.  It is a prior restraint in two respects.  First is a complete ban on speech before it occurs.  That is a classic prior restraint. Second, the reservation process also creates a prior restraint.  And to the extent that process creates narrow objective and definite standards like filling out a reservation form or getting a catering exemption, that's fine.  Those are narrow, objective and definite standards.  People can look at those and figure out whether or not the group complied with it.  But we do not allow officials to impose standards that are not narrow, objective and definite because that opens the door to viewpoint

discrimination.  And there's no dispute here, your Honor, that the students completed those steps in 2023 and 2024.  The problem is the extra step that President Wendler has grafted onto that process; a subjective respect test.  Those expectations are not narrow, objective or definite.  They are malleable and amorphous, and according to Wendler, vested in his subjective determination alone.  That is a First Amendment harm and it is happening now.  Regardless of what the show's content turns out to be.  And it is dangerous in the hands of any university president.  There is no good faith exception to the First Amendment.  Every official who has censored speech thought that he had a good reason for doing so.  Colorado's officials in *303 Creative* thought they were protecting against discrimination.  The university officials in *Widmar* thought they were avoiding religious discrimination on a conflict with the First Amendment.  Wendler may argue that he is acting in good faith to prevent harassment, but a once-a-year drag show is not harassment under University policy or any conception of harassment. Harassment is unwelcome conduct.  Choosing to attend a performance is not unwelcome.  And nobody complained or filed a report.  Not even the

University officials like Wendler who are obligated to report harassing conduct.

THE COURT:  You are at your three-minute mark.

MR. STEINBAUGH:  Wendler's decision may be popular in the local community.  He says he's being responsive to the values of the Panhandle community, but rights to do not depend on geography, and it is unpopular speech that most needs First Amendment protection.

So let me close with this.  The authority we leave to President Wendler today will not be his alone.  It will be wielded against conservative student groups on blue campuses by administrators who also claim to act in good faith to prevent offensive speech.  I see it every day in my day job defending conservative groups when they are censored, but they have the First Amendment to fall back on as a line of last resort.

The First Amendment protects Wendler's right as a citizen to express his views about drag, but he cannot use his role as a government official to limit speech he thinks might be offensive.  Thank you.

THE COURT:  Thank you.  Now I'll turn to

defense counsel for your opening statement.  And you've also requested a three-minute warning.  Do you need to reconfigure any of the courtroom technology?

MR. BRYANT:  We'll not need that.

THE COURT:  Okay.  You may proceed and I will give you a three-minute warning.

OPENING STATEMENT

ON BEHALF OF THE DEFENDANT:

MR. BRYANT:  Thank you, your Honor. Before I begin, I want to thank the Court and all the Court's personnel for all that you have done to make this trial today possible on an at times challenging timeline, and I also want to thank very sincerely my opposing counsel here.  I've tried cases for a lot of years, and these attorneys have been very reasonable, very cooperative and frankly made it possible for us to have what I think is a streamlined and effective trial today.

THE COURT:  Well, welcome to the First Amendment space where the attorneys tend to be more collegial.

MR. BRYANT:  Well, it's very much appreciated.

As the Court mentioned, we have the great

benefit that a great majority of the evidence is already before the Court by reason of preadmission of exhibits and pre-admission of designated deposition testimony.  So it's not like many trials where in an opening statement you're forecasting what may or may not be before the Court.  We know a lot of what is before the Court, and the Court has had the opportunity to understand the basic facts of this case for a couple of months short of three years at this point.  So the Court's extremely familiar with both the facts and the law.  The first and major issue here is whether any of the drag shows that Spectrum wanted to present at Legacy Hall in the past and recently has applied online to do in April, 2026, involve speech protected by the First Amendment.  I think the evidence shows that it does not.  There is no particularized message that Spectrum seeks to communicate by its drag show.  Mr. Bright in his deposition said the message will be whatever the individual performers wish to express.  Spectrum doesn't have a specific message of its own.  It does have a purpose.  It had actually two purposes.  It had a purpose of raising funds for the Trevor Project, a purpose which Dr. Wendler certainly supported.  And it had a

generalized purpose to support LGBTQ+ students at West Texas A&M.  But a purpose is not the same as a message that qualifies for First Amendment protection.  I dare say that Spectrum has that same purpose of supporting LGBTQ+ students at West Texas in every activity that it undertakes, many of which occur on campus in Legacy Hall and is -- it's in, in fact, the organization's Constitution.  So we don't think there's a particularized message.

The current president of Spectrum who is not present today also has admitted that with respect to the proposed April 2026 drag show, Spectrum has no specific message that it intends to communicate; the as-yet unknown performers will express whatever they want to express if they can through their performances.  But it's not the rights of any possible unknown performers that are at stake here.  It is -- the issue is whether or not Spectrum has a specific message that it is being -- or will be prevented from expressing at a 2026 drag show.  Obviously, it's impossible to know what the actual content of that drag show will be.  As Mr. Fanelli testified in his deposition, it's a very, very early planning stage.  They have no -- identified no performers, no music, no choreography, and it's

really an unformed project at this point that may or may not come to pass.  So I think the evidence will show that there is no Constitutionally-protected speech either that was at stake back in '23 or 2024 or will be in 2026.

Second is that Legacy Hall is a limited public forum.  I don't think there is any serious question about it.  We'll present the policies of the University, policies -- procedures and guidelines of the JBK Student Center that have at all times since at least 2017 made it clear that performance -- the University reserves the right to cancel or interrupt any performance that is either inappropriate or inconsistent with the educational mission of West Texas A&M.  Judgments have to be made as to what that -- those standards are and how they're met.  It's ultimately up to the leadership of the University to make those judgments, and Dr. Wendler had the courage to do so.  So the fact that there are many performances that have occurred in Legacy Hall that were not inappropriate and did not conflict with the educational mission of West Texas A&M does not in any way indicate that Legacy Hall has been anything other than a limited public forum.  In a limited public forum situation, the --

there can be time, place and manner restrictions. President Wendler made a restriction as to place. He did not ban drag shows by Spectrum as often has been alleged.  Spectrum was in 2023 free to have whatever drag show it wanted to have that didn't violate state law anywhere but the campus of West Texas A&M University which is the place that Dr. Wendler has the charge to pursue its educational mission, and of course, the evidence shows that Spectrum exercised its First Amendment right to have the drag show that it wanted to have in Sam Houston Park.

I believe the Court will see what Spectrum believed was a First Amendment exercise because we'll play the Court about eight minutes of video of that show.  I think the Court will see a sexualized drag show that reasonably can be deemed as demeaning to women.  Obviously, there will be differences of opinion about that, but it's President Wendler's job to conscientiously exercise his judgment, and he did so.

Spectrum remains free today in 2026 to have a drag show of its choice anywhere other than the West Texas A&M campus and, in fact, there are additional venues much closer to the campus that are

available in 2026 that were not available in 2023 and 2024, and evidence will be presented to that effect.  I don't believe that opposing counsel addressed Judge Ho's dissent in the Fifth Circuit panel opinion of this which I think is very important.  We do believe that the *Christian Legal Society* case is highly relevant to this case, if not controlling.  The *Christian Legal Society* case makes it clear that public university officials do have a right to further the policies of the university as long as they do so in a neutral manner that doesn't pick on one group or another.  And I think the evidence will show to the Court that that's exactly what West Texas A&M and Dr. Wendler are doing.  They would not allow a Neo-Nazi rally that celebrates the holocaust in Legacy Hall.  They would not allow a blackface minstrel show.  They would not allow a show that mocks and denigrates LGBTQ people in Legacy Hall in that special place.  And on the other hand, the current president of Spectrum testified in his deposition that in his understanding of the First Amendment, Dr. Wendler and the University must allow Neo-Nazi shows, blackface shows, shows that denigrate LGBTQ people.  We disagree and we think the proper interpretation of the First Amendment the

Court has mentioned its historical perspective that we think is appropriate in adjudging the true meaning of the First Amendment would allow Dr. Wendler to further the educational policies and mission of West Texas A&M as he has done.  And we believe that the *Christian Legal Society* case and other cases validate the tough judgments that Dr. Wendler had to make.  You'll hear just a little bit about the level of negative reaction, hate mail, et cetera, that Dr. Wendler received as a result of his decision, but he made that decision applying his principles in the interest of West Texas A&M University as is his responsibility, and we hope that at the conclusion of the trial, the Court will recognize that Dr. Wendler both acted appropriately in '23 and 2024, but more importantly as the Court indicated in its ruling on our -- on the Motion for Summary Judgment, what's strictly at issue here is 2026, this only prospective relief is sought in this case and the question is whether the Plaintiff can show that it is likely that President Wendler will violate the First Amendment in whatever decision he ultimately makes with respect to the yet indeterminate proposed drag show in April.  For the Court to make that judgment, it'd have to predict

Dr. Wendler's ultimate action as well as the content of the show, but we really think it's pretty -- not that difficult because the president of Spectrum has admitted that Spectrum has no specific message that it seeks to accomplish through that show or to convey. And certainly there's no evidence and can be no evidence about whether any potential audience for that drag show would understand whatever Spectrum may claim might be its expressive message. Thank you very much.

THE COURT: Thank you, counselor. At this time, we'll begin Plaintiff's case in chief. And Mr. Morris, or any member of your team, you may call your first witness.

MR. MORRIS: Thank you, your Honor. Plaintiff calls Dr. Walter Wendler. Before Dr. Wendler approaches, may we place the exhibit binders at the witness stand --

THE COURT: You may do so.

MR. MORRIS: -- so that he may have access to them. Thank you.

THE COURT: At this time, I'll instruct the court security officers and marshals to allow the first witness, Mr. Wendler, to proceed to the courtroom.

MR. BRYANT:  Your Honor, is it okay if Dr. Wendler has his bottle of water?

THE COURT:  Yes, he may.  That's consistent with the courtroom policy.  Dr. Wendler, please remain standing in the witness well.  My courtroom deputy will administer the oath.  Raise your right hand.  My Courtroom Deputy will administer the oath.

[WITNESS SWORN.]

THE COURT:  If you need access to any of the exhibits, we might be able to provide them electronically or in written form.  With that, Mr. Morris, you may proceed.

MR. MORRIS:  Thank you, your Honor.

DR. WALTER WENDLER, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. MORRIS:

Q   Good morning, Dr. Wendler.  It's good to see you again.

A   Good morning, Mr. Morris.

Q   Could you state your current job title, please.

A   President, West Texas A&M University.

Q    And how long have you held that role?

A    I'm in my tenth year.

Q    What was your job before that?

A    I was retired.

Q    Okay.  Before you were -- formally retired?

A    The last job I had, I was the director of the School of Architecture at Southern Illinois University in Carbondale.

Q    Okay.  And before that, you held a role with the Texas A&M University System; is that correct?

A    Well, immediately before I was the director of the School of Architecture, I was also -- I was the chancellor of Southern Illinois University-Carbondale.

Q    Okay.  And in the past, you held a role at the A&M System?

A    For 20 years I was with the A&M System.

Q    And what was your role there?

A    I started as an assistant professor and left the vice chancellor's role to take the chancellor's role at Southern Illinois University-Carbondale.

Q    You've never been an employee of the City

of Canyon, correct?

A    Correct.

Q    And you've never been an employee of the City of Amarillo; is that right?

A    That's correct.

Q    Okay.  And in your time as president at West Texas A&M, you would agree with me that you've never had power or authority to control who accesses parks and other public spaces in those towns?

A    That's correct.

Q    Okay.  Well, just briefly for the Court, could you describe what your duties are as president at West Texas A&M University?

A    Well, my primary duty is to sustain an educational environment that supports student, faculty and staff aspirations to provide a challenging, thoughtful, high-energy educational experience.

Q    Anything else you would want to add to that?

A    That's the general rule.

Q    Okay.  You take those duties seriously, right?

A    Very.

Q    And you also take in your role as

president in complying with the law seriously, correct?

A    Very.

Q    Okay.  You agree that all public officials have a duty to comply with the law?

A    I would.

Q    Okay.  And you take that duty personally seriously, correct?

A    I do, sir.

Q    All right.  Dr. Wendler, you're familiar with Legacy Hall, right?

A    I am.

Q    Okay.  That's a multi-purpose venue in the JBK Student Center at West Texas A&M?

A    Yes, sir.

Q    Okay.  It has a stage, correct?

A    Yes, it does.

Q    And you have to -- to go into Legacy Hall, you have to enter into a -- one of a set of big wooden doors; is that right?

A    That's correct.

Q    Okay.  Would you agree with me it's a unique space on campus in terms of its ability to host larger events?

A    Actually, we have some other ones, but

this is by far the most desirable.  The technology is new and the space is fresh in every way.

Q    And recognized student organizations at West Texas A&M can reserve Legacy Hall for events, correct?

A    That's correct.

Q    Okay.  And that's on a first-come, first-serve basis?

A    I believe it is.  I don't handle reservations.

Q    And to your knowledge, Spectrum since 2003 has been an RSO in good standing; is that right?

A    That's correct.

Q    And the public can also reserve Legacy Hall for events; is that true?

A    That's correct.

Q    And in recent years, you would agree with me, there's been many events at Legacy Hall?

A    Yes, sir.

Q    Okay.  And those have included concerts?

A    Yes, sir.

Q    Kind of like the "University Sing" performance we just saw on the video?

A    Yes, sir.

Q    Okay.  They've included plays?

A    I believe so.

Q    And they've included beauty pageants?

A    I haven't attended one, but I believe so.

Q    Okay.  They've included parties?

A    I think so.

Q    You held a Christmas party there this past season, didn't you?

A    Yes, we did.

Q    Okay.  They've included political talks and political speeches?

A    Yes, they did.

Q    Okay.  They've included worship services?

A    Yes, sir.

Q    Fashion shows?

A    I think so.

Q    Legacy Hall has even hosted weddings, correct?

A    I believe so.

Q    Okay.  And you agree with me that at least some of those events that we just went over in Legacy Hall lack an academic purpose, right?

A    Absolutely.

Q    Okay.  And you're also unaware of any specific University regulation that limits the type of content for events in Legacy Hall, true?

A    I'm sorry.  Can you repeat that, please.

Q    You're -- to your knowledge, you are unaware of any specific University regulation that limits the type of content that events can convey in Legacy Hall, correct?

A    That's correct.

Q    Okay.  Dr. Wendler, if you can turn to the Binder 1 out of 3 in front of you, and please turn to Exhibit 6.

A    Very carefully marked.  Thank you.

Q    Trying to make it easy on everybody here. And let me know when you've had a chance to turn to that exhibit.

Okay, Dr. Wendler.  You would agree with me, this is West Texas A&M University's Expressive Activity on Campus Policy, yes?

A    Yes, sir.

Q    Okay.  And to the best of your knowledge, this is the current version of that policy?

A    I believe it is, yes, sir.

Q    Okay.  And let's look at where it says rule summary.  And the rule summary states:  It is a matter of statewide concern that all public institutions of higher education officially recognize freedom of speech as a fundamental right.

Did I read that correctly?

A    Yes, you did.

Q    Okay.  And it continues:  Freedom of speech and assembly is central to the mission of institutions of higher education, and persons should be permitted to assemble peacefully on the campuses of institutions of higher education for expressive activities, including to listen to, observe the expressive activities of others.  Based on that, would you agree with me that freedom of speech and assembly is central to the mission of West Texas A&M?

A    I believe it is.

Q    And if you continue, you go down to rule, and you see Rule 1, expressive activity rights.  And it states:  Any person is allowed, subject to reasonable time, place and manner restrictions, to engage in expressive activities on campus, including by responding to the expressive activities of others.  You would agree with me that's current University policy, right?

A    I would.

Q    And you would agree with me that because of this policy, that criteria for groups seeking to reserve Legacy Hall have to be content-neutral;

time, place, manner restrictions, correct?

A    It would seem so.

Q    Okay.  And if you go down to the second page and you see Section 1.3, it states:  The University may not act against a student organization or deny the organization any benefit generally available to other student organizations at the University based on a political, religious, philosophical, ideological or academic viewpoint expressed by the organization or any expressive activities of the organization.  And you would agree with me, that's also part of the University's policy, correct?

A    Yes, sir.

Q    Okay.  And would you agree with me that that Section 1.3 covers a registered student organization seeking to reserve space at Legacy Hall?

A    Yes, sir.

Q    Okay.  And that would include Spectrum, an RSO in good standing, seeking to reserve Legacy Hall for a drag performance, correct?

A    Yes, sir.

Q    And this language to the best of your knowledge in 1.3 was the University's policy in

Case 2:23-cv-00048-Z    Document 174    Filed 02/02/26    Page 36 of 347    PageID 4129

2023, right?

A    Yes, sir.

Q    And it was the University's policy in 2024, too, correct?

A    I believe so, yes, sir.

Q    And you're aware that the Texas A&M System recently in November 2025 adopted a new system-wide policy for expressive activities, correct?

A    Correct.

Q    Okay.  Can you turn to Exhibit 9 in that first binder.  And just turn to the first page, Dr. Wendler.  Is this the November 13th, 2025, policy that the A&M System adopted?

A    It is.

Q    Okay.  If you can turn down to page three, and you see Section 1.1 states:  Any person is allowed, subject to the limitations in this regulation, any member's reasonable time, place, manner restrictions, to engage in expressive activities on campus, including by responding to the expressive activities of others.  You would agree with me that's substantially the same as the time, place, manner language in the West Texas A&M Policy we just looked at in Exhibit 6?

A    Seems to be very similar, yes, sir.

Q   Okay.  And if you go down to Section 1.4, you see the System policy states:  A member may not take action against a student organization or deny the organization any benefit generally available to other student organizations on the basis of a political, religious, philosophical, ideological or academic viewpoint.  Would you agree with me that's similar to the language we just looked at in Exhibit 6, the University's policy?

A   Yes, sir.

Q   And these policies in the System policy we just looked at, those would apply with equal force at West Texas A&M, correct?

A   Yes, sir.

Q   West Texas A&M is a member -- system of the Texas -- member University of the Texas A&M University System, correct?

A   It is.

Q   And these policies in Exhibit 9 that we just discussed, they would apply to RSOs like Spectrum seeking to use Legacy Hall for an expressive activity, correct?

A   Correct.

Q   Okay.  And so you would agree with me that under these policies, these expressive activities

include drag performances like the one Spectrum has applied for, correct?

A    It would seem so.

Q    Okay.  President Wendler, I would like to turn to your decision to cancel Spectrum's planned drag performance in 2023 at Legacy Hall.  Fair to say you cancelled their performance in advance, correct?

A    Correct.

Q    Okay.  Do me a favor and turn to Exhibit 1 in that first binder, and that's Plaintiffs Exhibit 1 to be precise for the record.  All right.  Now, Dr. Wendler, this is an email you sent to the campus community in -- on March 20th, 2023, explaining your reasons for deciding to cancel Spectrum's 2023 drag show at Legacy Hall, right?

A    That is true.

Q    Okay.  Now, you chose every word in this email carefully, correct?

A    To the best of my ability.

Q    Okay.  And in fact, you spent three to four days drafting it; is that true?

A    Probably even a little bit longer, but I don't recall exactly.

Q    Okay.  So you look at the first line of

this email:  West Texas A&M will not host a drag show on campus.  You chose those words carefully?  You would say that's right?

A    Yes, sir.

Q    Okay.  And you see if you go down to the third paragraph, you say as a performance exaggerating aspects of womanhood, paragraph -- parentheses, sexuality, femininity, gender, in parentheses, drag shows stereotype women in cartoon-like extremes.  Agree that you chose those words carefully?

A    Yes, sir.

Q    And you would agree that reflects your belief about drag performances, correct?

A    Yes, sir.

Q    If you go down to the next page and you see on the second paragraph, you state:  Drag shows are derisive, divisive and demoralizing misogyny no matter the stated intent.  Fair to say you chose those words carefully?

A    Yes, sir.

Q    And is it fair to say that in your view, even if a group performing the drag show doesn't intend to offend, you still believe it's misogyny?

A    Please repeat that question.

Q    Sure.  Based on what you wrote here, is it fair to say that in your view, even if a group performing a drag show does not intend to offend anyone, you still view it as misogyny?

A    Yes.

Q    All right.  You also write -- and I'm sorry.  I'm taking you back to the first page.  Drag shows stereotype women.  You chose those words carefully?

A    Yes.

Q    And you believe that -- that reflects your belief about drag performances, correct?

A    Yes, sir.

Q    Okay.  Move back down to the second page. Sorry to keep taking you back and forth here.

A    It's okay.

Q    And you say:  I do not support -- or you write in this email:  I do not support any show, performance or artistic expression which denigrates others; in this case, women.  You chose those words carefully, right?

A    Yes, sir.

Q    Okay.  Fair to say that when you wrote this email, you believed that Spectrum's planned drag show at Legacy Hall fell within show

performance or artistic expression which denigrates others?

A    As I understand drag shows, yes, sir.

Q    Okay.  You also write in here -- you use the phrase:  Mocking another person or group.  Fair to say this reflects your view that drag shows mock women?

A    Yes.

Q    You also write at the bottom of this page: Women's suffering via a slapstick sideshow that erodes the worth of women.  You chose those words carefully, correct?

A    I did.

Q    Okay.  Fair to say this reflects your view that drag shows are a slapstick sideshow?

A    Yes, sir.

Q    And you say here that drag shows denigrate and demean women.  You chose those words carefully?

A    Yes, sir.

Q    And that reflects your belief about drag shows, correct?

A    Correct.

Q    You also reference here, and I've seen this in quite a few of your writings:  Ideas, not ideology, are the coin of our realm.  You chose

those words carefully, correct?

A    Very.

Q    You would agree with me that based on this, your view is that drag conveys some ideology, right?

A    Correct.

Q    Okay.  And that's because in your view, demeaning women, disrespecting women and offending women promotes some sort of an ideology, right?

A    Correct.

Q    And that ideology in your view also includes your belief that drag shows create a monolithic view of what a woman is and her purpose; is that true?

A    That's what I've stated.

Q    Okay.  Now, on the first page, you reference the Trevor Project right?

A    I did.

Q    Okay.  And you write here you understand how Spectrum's 2023 performance was intended to raise money for the Trevor Project.

A    Yes, sir.

Q    Okay.  And you are aware that the Trevor Project is a charity aimed at preventing suicide in the LGBTQ+ community?

A   A noble charity.

Q   And you would agree with me that based on that, you would understand that one purpose of Spectrum's planned 2023 performance was to convey support for that charity and for the LGBTQ+ community, right?

A   I believe that to be the case, yes.

Q   On the last page, if you go down to the last page of Plaintiff's 1, you also state:  I will not appear to condone the diminishment of any group at the expense of impertinent gestures towards another group for any reason, even when the law of the land appears to require it.  And you chose those words carefully, too, right?

A   Very carefully.

Q   Okay.  And we're talking about the law of the land.  You base those words on your understanding of people's conception about free speech and the First Amendment; is that fair to say?

A   Popular conceptions of free speech, yes, sir.

Q   Okay.  So overall, would you agree with me this email reflects your view that drag shows are disrespectful and demeaning to women?

A   Yes, sir.

Q    Okay.  Is it also fair to say that this email explains to the campus community that you cancelled Spectrum's 2023 performance at Legacy Hall because you believed drag shows demean, disrespect and disparage women?

A    Yes, sir.

Q    And it's fair to say also that this 2023 email is the best representation of your reasons for canceling Spectrum's planned 2023 performance at Legacy Hall, right?

A    It was on March 20th, yes, sir.

Q    Okay.  So that's a yes?

A    That's a yes.

Q    And you would agree with me that this email does not specifically cite a University policy, right?

A    No specific policy is cited.

Q    Okay.  You would agree with me that this email does not cite any specific federal law, correct?

A    Not a specific law, but it addresses workplace environments that can create hostility towards in this case women, but it could be other groups.

Q    Sure.  You even provide a link to the

U.S. Workplace Commission; is that correct?

A    Correct.

Q    Okay.  But you don't specifically cite any federal law in your email, right?

A    No, sir, I don't.

Q    Okay.  And this email does not contain the word lewd or lewdness, correct?

A    Not -- not directly, but the --

Q    That answers my question.  Thank you, Dr. Wendler.  This email does not have -- mention any concern of minors being in the audience at the 2023 show in Legacy Hall, correct?

A    That's correct.

Q    Okay.  Dr. Wendler, can you turn now to -- in that same binder before you, Plaintiff's Exhibit 3.  And looking at that first page, fair to say this is a document outlining some talking points for an April 2023 interview you gave on Fox News Lubbock radio?

A    I believe that's correct, yes, sir.

Q    Okay.  And if you turn down to page four of four.

THE COURT:  For record purposes, that's four of four, not 404.

MR. MORRIS:  Four of four.  And just to be

clear, that's Bates stamped 028055.  Thank you, your Honor, for clarifying that.

BY MR. MORRIS:

Q    And you say here in the second to last bullet point:  It has been said recently that WT is not a place that welcomes diversity other than my decision to cancel a drag show for reasons I clearly stated as demeaning to women.  So here, you're again, you would agree with me that you're repeating your reason for canceling the 2023 drag show at Legacy Hall is because it was demeaning to women; is that correct?

A    That is correct.

Q    And these talking points mention no other -- or give no other reason for canceling the drag show other than it being demeaning to women in your view?

A    Correct.

Q    Okay.  Dr. Wendler, go ahead and turn to -- well, let me ask you this.  You're aware, of course, Spectrum applied to hold another show at Legacy Hall in 2024, correct?

A    Correct.

Q    And you cancelled that one, too, right?

A    I did.

Q    And you cancelled it in advance of the show?

A    I did.

Q    Okay.  Go ahead and turn to Plaintiff's Exhibit 2 in that same binder.  And this exhibit is the email you sent to the campus community on March 18th, 2024, alerting them that you were canceling Spectrum's planned performance for 2024 of Legacy Hall, correct?

A    Correct.

Q    And you state in this email that the 2024 application is denied for the reasons given previously.  Do you see that?

A    Correct.

Q    And you would agree with me that those reasons given previously refer to the same reasons you provided in your March 2023 email that we just looked at in Plaintiff's 1?

A    That's right.

Q    And you see here, you mentioned another of other compelling considerations.  And to you, those other compelling considerations include what's important in the educational and work environment at West Texas A&M; is that true?

A    Yes.

Q    Okay.  And that would include stopping performances that you view as disrespectful and demeaning to women, correct?

A    Correct.

Q    You would agree with me that the 2024 show would not have disrupted University operations, right?

A    I'm not sure.

Q    Okay.  Would you agree with me that the 2023 show would not have disrupted University operations?

A    Don't know for sure.

Q    Okay.  You make no mention in your email here about any concern that it would disrupt University operations, correct?

A    That's correct.

Q    Okay.  Now, you would agree with me that no one complained to you that Spectrum's planned 2024 show would harm them, right?

A    That's correct.

Q    And you would agree with me that no one complained to you before you cancelled the 2023 show that Spectrum's planned performance would harm them, correct?

A    That's correct.

Q    All right, Dr. Wendler.  I would like to now turn to discuss a little bit more about the criteria you relied on to cancel Spectrum's planned shows for 2023 and 2024 at Legacy Hall.  So let me ask you first.  You're unaware of any events planned for Legacy Hall other than Spectrum's drag shows that the University cancelled due to content; is that true?

A    To my knowledge.

Q    Okay.  Now, you believe you have a duty to lead and guide West Texas A&M based on information available to you, correct?

A    Correct.

Q    But before you decided to cancel Spectrum's 2023 performance at Legacy Hall, you never talked to Spectrum's members or officers about what their performance would involve, right?

A    That's true.

Q    Okay.  And the same is true when you -- before you decided to cancel the 2024 show, right?

A    Correct.

Q    Okay.  So you cancelled those shows without first talking to Spectrum's members about what music they would play during the performances, right?

A    Correct.

Q    Okay.  And you cancelled those shows without first talking to them about what the emcee might be doing, correct?

A    Correct.

Q    Okay.  Or what costumes performers might be wearing, right?

A    Correct.

Q    Okay.  And you cancelled the shows without talking to Spectrum's members about the specific people who planned to perform on stage, right?

A    Correct.

Q    Okay.  Or you even talked -- you didn't talk to them with -- about learning if they actually intended to offend anyone, right?

A    Correct.

Q    Let me rephrase that.  I just want to make sure it's clear for the record.  So you also did not talk to Spectrum's members before you cancelled their planned shows at Legacy Hall about whether they intended to offend anyone, right?

A    Correct.  I didn't talk to Spectrum about any of the issues that you've raised.

Q    You're aware that Spectrum intended its 2023 show at Legacy Hall to be a PG-13 show,

correct?

A    I guess that was their intent.

Q    Okay.  And you also cancelled their shows without first talking to Spectrum about what they intended by PG-13 performance, correct?

A    Correct.

Q    In fact, you decided to cancel a 2023 show before you even knew they intended it to be PG-13, true?

A    When I cancelled it, I believe that it was not yet rated but stipulated that it would be for only those 18 and over.  There were I think three versions of their marketing materials, and the versions changed over time.

Q    Let me ask you again, President Wendler. You decided to cancel Spectrum's 2023 show before you even knew it was labeled PG-13, right?

A    Correct.

Q    And that's because you had decided that drag shows are demeaning and disrespectful to women, fair?

A    That's fair.

Q    West Texas A&M's Theatrical Department and its Public Relations Department assigns PG-13 and even R ratings to theatrical performances on campus;

is that your understanding?

A    That's my understanding.

Q    Okay.  And you would agree with me the University has never told theatrical performers they would cancel a performance just because it's rated PG-13 or even R, right?

A    The Theater Department is not an RSO.

Q    Okay.  Let me ask my question and please try to answer it.

A    Please.

Q    You would agree with me that the University has never told theatrical performers that they would cancel a performance just because it's rated R or PG-13, correct?

A    Correct.

Q    Now, you also decided to cancel the 2023 show without talking to JBK staff or any other staff at the University about the context of Spectrum's planned performance, right?

A    Correct.

Q    That's true for your decision to cancel the 2024 show as well?

A    Correct.

Q    Now, before you decided to cancel the 2023 show at Legacy Hall, you didn't talk to any

students, staff or faculty about whether they considered drag shows offensive, right?

A    Correct.

Q    And before you made the decision to cancel the 2023 Legacy Hall show, no students had complained to you about the show, correct?

A    Correct.

Q    And no staff had complained to you --

A    Correct.

Q    -- about the -- same rules we had in our deposition.

A    I'm getting used to saying correct.  I apologize.

Q    I want to make a clean record here for the Court, so I'm going to ask again.  No staff had complained to you about the 2023 Legacy Hall show before you made the cancellation decision, correct?

A    That's right.

Q    It's also true that no donor complained to you about the 2023 Legacy Hall show before you decided to cancel it, correct?

A    Correct.

Q    Okay.  And to your knowledge, no female student had complained to you or anybody else at the University that Spectrum's 2023 Legacy Hall show

would harm them before you made the decision to cancel it, correct?

A    That's correct.

Q    Now, Dr. Wendler, you did have some criteria you used in deciding to cancel Spectrum's drag performances; fair to say?

A    Fair to say.

Q    Okay.  For example, you looked at the whole concept of drag, correct?

A    Yes, tried to.

Q    And you determined based on your efforts that drag is demeaning and disrespectful to women, right?

A    Correct.

Q    You also looked at the general tradition of drag; is that right?

A    Correct.

Q    Okay.  And you determined in your efforts to figure out what the general tradition of drag is that drag shows and your view are disrespectful and demeaning to women, correct?

A    Correct.

Q    And the general -- the whole concept of drag and the general tradition of drag guided your decision to cancel Spectrum's planned drag shows at

Legacy Hall; is that true?

A    Please repeat that.

Q    Yes.  The -- your investigation into the whole concept of drag and the general tradition of drag guided your decision to cancel the 2023 show at Legacy Hall, right?

A    Correct.

Q    And it also guided your decision to cancel the 2024 show at Legacy Hall, correct?

A    Correct.

Q    Okay.  Dr. Wendler, do me a favor.  Stick in that first binder and turn to Plaintiff's 12. And Dr. Wendler, this is a document you created compiling research you did to gain an understanding of the whole concept and general tradition of drag performance; is that right?

A    Yes, partly.

Q    Okay.  And you did this research either just before or while you were drafting your 2023 email canceling Spectrum's drag show at Legacy Hall; is that true?

A    Correct.

Q    You compiled this primarily through internet searches?

A    Primarily.

Q    Okay.  And it's true that in compiling this research, you did not research heavily, at least, whether the First Amendment protects drag performances; is that true?

A    Correct.

Q    You would agree with me that some of the commentary you compiled in this document opines that drag shows are demeaning and disrespectful to women, correct?

A    Correct.

Q    And some of it even compares drag shows to blackface, right?

A    Correct.

Q    Okay.  But you would also agree with me that some of the commentary in this document you created opines that drag shows are not demeaning and disrespectful to women, correct?

A    Correct.

Q    Okay.  But still, based on this research, it helped you come to believe that drag performances are disrespectful and demeaning to women, right?

A    Correct.

Q    And this research helped cement your view that led you to cancel Spectrum's shows, correct?

A    Repeat the question, please.

Q    Sure.  This research helped you cement your view that drag is demeaning and disrespectful to women, correct?

A    This is part of the research that I used to determine that drag is demeaning and disrespectful to women, a portion of it.

Q    And so based on this research, you would agree with me that at least in part, this research led you to cancel the 2023 show?

A    It helped inform my opinion.

Q    Okay.  Let's turn to the same binder, Plaintiff's 4.

A    Four?

Q    Yes, please.  And this is the flier that Spectrum published to advertise its 2023 drag show at Legacy Hall; is that right?

A    It's one of them, yes.

Q    Okay.  Are you aware of any other flier that they actually published?

A    I saw three copies.

Q    But this is the only one to your knowledge that they actually published, made available to the public, right?

A    I can't say for sure.

Q    Okay.  In your view, this flier depicts a

man dressed as a woman, correct?

A    These are cartoons, so it's difficult for me to determine that.

Q    Okay.  I'm going to ask again.  In your view, does it depict a man dressed as a woman?

A    Yes.

Q    Okay.  And does the fact that this flier depicted a man dressed as a woman, did that help you -- did that inform your determination that Spectrum's 2023 show would be demeaning and disrespectful to women?

A    No.

Q    Why not?

A    My decision had been rendered before I saw this particular version of a poster.

Q    Okay.  Let's talk a little bit about what you used to determine whether something is demeaning, okay.  To you, an activity is demeaning -- whether an activity is demeaning is a question of whether it demonstrates respect for others, right?

A    Correct.

Q    And that's true even when people hold different perspectives over the activity, right?

A    Absolutely.

Q    Okay.  You would consider criteria like campus culture and the various groups on campus to determine if a campus event is disrespectful, right?

A    That's true.

Q    Okay.  And when determining whether a campus event might disrespect a group on campus, you might look at various criteria like the group's history, the group's current status in society and cultural issues that define the group; fair to say?

A    Yes.

Q    Okay.  You would also look at the Texas Panhandle's -- what you understand to be the Texas Panhandle's custom of respect in deciding whether a campus event is disrespectful, true?

A    Local standards, community standards impact my view of what's appropriate on the University campus.

Q    Okay.  So that's a yes to my question?

A    Yes.

Q    And if you did find -- actually, let me ask you a question, Dr. Wendler.  What's the law of reciprocity?

A    The law of reciprocity is the concept -- the very simple concept in every major religious -- system of religious belief on the face of the earth,

everyone.  That the expectation of reciprocal treatment is seen as something that's to be held in high regard.  I know it as the Golden Rule.  That just happens to be because I'm a Christian.  But Jews know it by other names.

Q    Sure.  And even Buddhists?

A    Buddhists, Shintos, Taoists, they all have the Golden Rule.  Native American communities have the Golden Rule, so -- that's -- this concept -- I'm going to say it again just so I'm clear about it. It's the concept of the expectation that what treatment you render, you receive back.

Q    Okay.  And if you did find an upcoming campus event might be offensive to others, you might apply the law of reciprocity in deciding to cancel it, correct?

A    I would ask myself the question does this activity demean another group of people or another individual, period.

Q    Okay.  And you would apply the law of reciprocity in making that determination?

A    I would do my best to do so, yes, sir.

Q    Okay.  As a public university president, you don't know if the law of reciprocity trumps the Constitution, though, do you?

A    I do not.

Q    But you applied the law of reciprocity in making your decision to cancel Spectrum's 2023 show at the Legacy Hall, true?

A    Yes, I'm hired as the CEO of the University and it's necessary --

Q    That's a yes?

THE COURT:  Mr. Morris, you will be instructed by the Court to allow the witness to complete his response.

MR. MORRIS:  Understood, your Honor.

THE COURT:  And I will ask -- I'll be generous, but please allow -- do not interrupt the witness.  Allow him to complete his response.

BY MR. MORRIS:

Q    Doctor, would you like me to ask my question again?

A    That would be very kind of you.

Q    You applied the law of reciprocity in making your decision to cancel Spectrum's planned shows at Legacy Hall, right?

A    I did.

Q    Okay.  Did you also apply it in making your decision to cancel the 2024 show?

A    I did.

Q    Now, you and you alone made the decision to cancel Spectrum's 2023 show at Legacy Hall, correct?

A    Correct.

Q    And you and you alone made the decision to cancel Spectrum's 2024 drag show at Legacy Hall, correct?

A    Correct.

Q    And as president of Texas A&M, you believe you have the authority, the exclusive authority to determine if a proposed campus event is disrespectful or demeaning; is that true?

A    That's one aspect; but as the CEO of the organization, I have to look at the highest and most global principles of the University, and our job is to create -- my job is to help create a responsive and thoughtful educational environment.  And I don't believe it can be done when disrespect fills the air.

Q    So you believe that as President of West Texas A&M University, ultimately, you hold the responsibility and the authority to determine whether something is disrespectful or demeaning on campus, correct?

A    I have to present my view.  It's part of

my job description.

Q    Is that a yes?

A    That's a yes.

Q    In fact, you consider respect your top value at West Texas A&M; is that fair?

A    It's not the first on our list, but I don't differentiate between the different values. They're all equally important.  So to claim it's the top one, to use your characterization, is -- it's one of the top ones.

Q    Okay.  Do you -- you believe that creating an environment of mutual respect supersedes any other concern of the University; is that true?

A    After the health, safety and welfare of the population that use the campus; faculty, student staff, I think this is at the -- almost at the top of the pyramid.

Q    Okay.  So it would supersede other concerns other than the health, welfare and safety of the campus community?

A    Yes.

Q    So earlier we talked about the West Texas and System Campus Expressive Policies.  Do you remember that?

A    I do.

Q   And you acknowledge that those extend to drag shows.  But here you didn't apply that policy because you believed it would send the wrong message about the University or yourself being associated with something demeaning or disrespectful to women; is that right?

A   Please say that again so I can reflect on it.

Q   Sure.  So you didn't apply those Expressive Activity Policies because you didn't want to convey that the University or you as president was associated with something demeaning or disrespectful to women; is that true?

A   Yes.  And if I might, because Spectrum is an RSO, they become a branch of the University and people assume or could assume that they speak for the University.  And I think we have to be careful to make sure that the University perspectives and values that we hold dear are clearly communicated.

So to your question, I would have a concern that it would appear if an event was disrespectful to people, that it might appear -- if it's by an RSO, it might appear that the University condones any form of disrespect.

Q   And diminishing a group, that's just

simply not something you accept at West Texas A&M, correct?

A    I'm sorry.

Q    I said diminishing a group is simply not something that you as the president accept at West Texas A&M, right?

A    That's correct.

Q    Okay.  So to that end, it's your belief that you can punish mere words if they're disrespectful or demeaning enough to a group or even a segment of the population, right?

A    I'm not sure what the word punish means in this context.

Q    Okay.  You believe you could discipline somebody for uttering mere words that you believe were disrespectful or offensive to a segment of the population, correct?

A    Again, I have to refer back to the fact that Spectrum is an RSO.  There have been in the past instances of behavior on the campus in Exhibit 1.  You know what they say.  You know what that memo says as well as I.  And we had a situation at a quinceañera event.  It wasn't actually a quinceañera.  It was a celebration of the various nationalities and so on and this becoming a woman,

reaching the age of womanhood, as expressed in many Latin cultures, very important. And there were derogatory remarks made by students on social media regarding that whole celebration and they used derogatory terms to refer to women and so on and so forth. I found that objectionable. I didn't seek to punish anyone. But as an educator, I told people why that was unacceptable. Because I've been an educator for a long time and that's what I do, and I didn't seek somebody out for 30 seconds of stupidity. But I made it clear that that kind of behavior I did not believe sustained a good University or learning environment.

Q    Right, so you expressed your view that that language was offensive and demeaning to those who engaged in quinceañeras, correct?

A    I did.

Q    Yeah, but you didn't seek anybody out to punish them for it, correct?

A    Did not. It was on a website or social media type. I think it might be Instagram. One that disappears after a while, so we had no way of knowing who it was.

Q    The University didn't even try to investigate that, correct?

A    Oh, we did.

Q    You did?

A    Yeah, but we couldn't -- we asked IT and so on if there was some way to be able to track that, and we could not.

Q    So would -- would you have punished that person if you had --

A    Don't know.  I might have talked to them.

Q    You might have talked to them?

A    Yeah.  I had -- which is my way.  I had somebody -- I come and go all day long and I have a reserved parking lot because -- parking spot because of that.  Well, there was a student in my -- that I didn't know it was a student, but I kind of assumed it was.  So I took a picture of the license plate, sent it to police.  Sure enough, it was a student parked in my space.  And the chief of police said do you want the car towed.  I said no, just have the student come and see me.  Tell him that he needs to come and see the president.  Well, he came to see me, and I told them how silly it was to park in a space that he knew -- and he said well, he came -- he was late to class and so on and so forth.  Well, I was leaving when he left.  And when I walked out to my car, he was parked in the space reserved for

the executive vice president and provost right next to mine, and I thought to myself this fella is dense.  I took the time to talk with him and I told him.  I said I can't believe you've done that.  He said are you going to give me a ticket.  I said no, not worth it.  So I don't know if that's punishment or not, and I don't know why I'm telling the story.

Q    Yeah.

A    There you go.

Q    But you didn't talk to Spectrum's members here before you decided to cancel their shows, right?

A    Did not.

Q    You believe as president of West Texas A&M, you and you alone can decide to cancel a campus event you decide is disrespectful or demeaning to a group on campus, right?

A    If it's inconsistent with the University's mission and purpose.

Q    And mission and purpose as we testified, one of those primary values is respect, correct?

A    Correct.

Q    And that's true that you believe you have the authority to cancel an event that's demeaning or disrespectful enough to a group on campus, even if

no student, staff or faculty complains it will offend them, correct?

A    Correct.

Q    And you would agree with me you exercised that authority here, canceling Spectrum's planned shows for Legacy Hall based on your view that drag shows are disrespectful to women, right?

A    I did.

Q    Okay.  Even if Spectrum wanted to host its show in a dark room without promoting it, that still wouldn't make it any less disrespectful to women in your view, correct?

A    Correct.

Q    Okay.  So Dr. Wendler, do you remember in your March 2023 email that we looked at at Plaintiff's Exhibit 1, and feel free to refer to it if you need to, you mentioned concerns over harassment and discrimination, correct?

A    Correct.

Q    Okay.  And you had the same concerns over Spectrum's 2024 show, right?

A    Correct.

Q    Okay.  Do me a favor and turn back to the Expressive Activities Policy we looked at in Plaintiff's Exhibit 6.  And go down to Page 4 of 6,

and that's Defendant's --

A    Counselor, I'm sorry.  I don't mean to interrupt you.  What exhibit number was that, please.

Q    That's Exhibit 6.

A    Six.  And Page 4?

Q    And Page 4 of 6, and that's Bates stamped Defendant's 000453.

A    I'm there.

Q    Okay.  And you see at the bottom of that page, there's a definition of illegal harassment.  It defines illegal harassment as expressive conduct that is so severe and pervasive and objectively offensive that it denies or limits a person's ability to participate in or benefit from an educational program or activity.  You would agree with me that this is the definition of illegal harassment currently in place at West Texas A&M?

A    Yes.

Q    And this is the same one that was in place in 2023?

A    I believe so.

Q    And 2024, right?

A    I believe so.

Q    Okay.  Now, when you were making the

decision to cancel Spectrum's 2023 show for Legacy Hall, you didn't specifically consider this definition of harassment, right?

A   Not that definition, but the challenge here is that activities like this that demean people, if they don't identify a particular individual, can be perceived by a class of people, and I take that seriously.

Q   Let me ask again.  You didn't specifically consider this --

A   Did not.

Q   I ask you to let me finish my question. We want to make a clean record for the court reporter.

A   Yes, sir.

THE COURT:  And the witness is also instructed.  I know we can get into these familiar colloquies; but for record purposes, I'm going to insist that the question be asked, complete and then the response so that we don't have what shows up in the transcript as cross-talk.

THE WITNESS:  Yes, sir.

THE COURT:  That's the reason for that rule.

THE WITNESS:  Okay.

THE COURT:  So let's follow that courtesy on both sides of the microphone.

BY MR. MORRIS:

Q    So let me -- let me start again.  You would agree with me that you did not specifically consider this definition of illegal harassment when making your decision to cancel a 2023 show at Legacy Hall?

A    Correct.

Q    Okay.  Same in 2024, right?

A    Correct.

Q    Now, go up to Page 2 of 6, and you'll see at 1.1.2, it says:  Expressive activities which may result in sanctions include illegal harassment.  You would agree with me that sanctions are something the University would impose only after conduct occurs, right?

A    Correct.

Q    But you decided to stop Spectrum's shows before they occurred, right?  We covered that?

A    Correct.

Q    Now, in paragraph 1.1.3, it says that conduct described in 1.3.2 may be reviewed and adjudicated under A&M System Regulation 08.01.01, Civil Rights Compliance, including those related to

actionable discrimination or harassment based on sex.  Do you see that?

A    I do.

Q    Okay.  So fair to say that the University's Expressive Activity Policy points to that System Civil Rights Compliance Regulation in terms of what it asks for to comply with an investigation -- or a review and adjudication process for sex-based harassment?

A    Yes.

Q    Do me a favor, and you're going to have to get the Binder 2 out of 3 for this one, Dr. Wendler, and turn to Plaintiff's 36.  I mean -- excuse me, 37 in that document -- in that binder.

A    Sir, will I need a Binder Number 1 again or can I put it aside?

Q    You can put that aside for now.

And again, Dr. Wendler, that is Plaintiff's Exhibit 37 I'm asking you to turn to.

A    Yes.

Q    All right.  And this is the West Texas A&M Student Handbook for the current academic year; is that right?

A    Correct.

Q    All right.  I'm going to get you a page

number here because I know this is a very large document.  Okay.  If you turn to -- it's page 45. It's Bates stamp Defendant's 000372.  And let me know when you've gotten to that page.

A    I'm there.

Q    Okay.  And you see the section marked 2.18.B?

A    I do.

Q    Okay.  And you see it says:  The University may consider only content-neutral and viewpoint-neutral criteria related to the requirements of the event.  It was discussing expressive activities.  It's fair to say that's part of the University's Policy?

A    2.18.B?

Q    Yes.

A    Yes.

Q    Go to the next page.  Section 2.18.D.  It states:  The University may take disciplinary or remedial action against individuals or groups that engage in expressive activity not protected by WT Rule 0899W2.  That's the Expressive Activities Policy.  And it includes here unlawful harassment. Do you see that?

A    Is 2.18.E?

Q    "D".

A    Oh, "D", I'm sorry.

Q    "D" as in Delta.

A    Yes.  That would be number seven.

Q    Correct.  And you see disciplinary or remedial action.  You would agree with me like the word sanctions in the policy we just looked at, that would mean University action only after conduct occurs, correct?

A    Would seem so.

Q    Okay.  And this handbook, like the Expressive Activities Policy, also refers to System Regulation 08.01.01, right?

A    Yes, it does.

Q    Okay.  Let's look at that regulation quickly and that is at Plaintiff's 43 in the same binder.

A    I'm there.

Q    Okay.  If you turn to Page 5 of 18, it's the Section 4.2.6.

A    Section?

Q    4.2.6.

A    Yes, sir.  I'm there.

Q    You would agree with me this describes an investigation and adjudication process for sex-based

harassment on campus, including expression alleged to be harassing to others, right?

A    Correct.

Q    Okay.  But you would agree with me that the University did not follow any investigation or adjudication process before or after you decided to cancel Spectrum's drag shows in 2023, right?

A    Correct.

Q    And nor did it do so before or after you decided to cancel the 2024 show, correct?

A    Correct.

Q    And you personally received no Title IX complaint that the 2023 drag show would discriminate based on sex?

A    Correct.

Q    And you received no Title IX complaint that the 2023 drag show would sexually harass anybody or create a hostile work environment, correct?

A    Correct.

Q    Same is true for the 2024 show.  No Title IX complaints about sexual harassment or workplace discrimination?

A    Correct.

Q    You received no Title IX complaints or

inquiries from the Government about Spectrum's planned drag show at Legacy Hall, correct?

A    Correct.

Q    And you're not aware of any Title IX complaint the University has received about drag shows being sexually harassing or creating workplace discrimination, correct?

A    Correct.

Q    Despite this System policy detailing a review and adjudication process for campus harassment and discrimination, you still believe you have the authority to stop expression in advance if it's -- if it's demeaning or disrespectful to a group on campus, true?

A    That's true.

Q    Okay.  Do you recall the protests in the wake of your 2023 decision to cancel Spectrum's show?

A    I do.

Q    You could see those out your office window and your home windows, correct?

A    Outside of my office window, correct.

Q    Some of the protestors you saw were dressed in drag, correct?

A    I think so, but I couldn't tell for sure.

Q    Okay.  Do you know if some of those protesters were acting in a way that was demeaning to women?

A    I didn't sense that.

Q    Did you alert Title IX office about any protesters being dressed in drag?

A    That's -- that space is an open public forum.  They proceeded to get permits to conduct their demonstration out there through the Office of the Chief of Police.

Q    Sure.  Wasn't my question, though.

A    Oh.

Q    Did you alert any title -- the Title IX Office about any protesters --

A    No, I did not.

Q    And to your knowledge, none of your employees did either, correct?

A    I did not, although I did have two employees quit over it.

Q    Sure.  Now, after you cancelled Spectrum's 2023 show, do you recall they put out a statement on social media?

A    I -- I'm not sure I remember that.  Do you have it in one of these books?

Q    Sure.  You're going to have to go back to

Binder 1.

A    Okay.

Q    Turn to Plaintiff's 11.

A    Eleven?

Q    Yes, sir.

A    I'm there.

Q    Okay.  And this is -- you would agree with me this is an Instagram post with the title WT Spectrum Official Statement, dated March 21st, 2023?

A    Yes, sir.

Q    Okay.  And if you turn to the second page, you see here Spectrum telling the public:  We would like to state that drag is not designed to be offensive.  Drag is not a mockery.  Drag is a celebration of many things.  Do you see that?

A    I do.

Q    Okay.  But you would agree with me that this statement did not cause you to reevaluate your views when canceling their 2024 show, right?

A    Please repeat that.

Q    Sure.  You would agree with me that this statement from Spectrum didn't cause you to reevaluate your views on drag shows when canceling the 2024 show planned for Legacy Hall?

A    I agree.

Q    Okay.  It didn't change your opinion that drag shows are offensive, demeaning and disrespectful to women, correct?

A    It did not.

Q    Okay.  And your opinion that drag shows are offensive, demeaning and disrespectful to women would play a substantial role in any decision you made about whether to allow a future drag show on campus, yes?

A    That would be one of a number of factors.

Q    Now, of December, you had never been presented with a drag show you did not think was demeaning to women, correct?

A    Correct.

Q    Is it fair to say that hasn't changed?

A    I haven't seen one.

Q    Okay.  And as of December, nothing at that point that you had seen had changed your opinion that drag is offensive, disrespectful and demeaning to women, correct?

A    Correct.

Q    And fair to say that's still true?

A    Correct.

Q    Okay.  And you are aware that Spectrum has applied to host a drag show at Legacy Hall in spring

2026?

A    I am aware of it.

Q    Okay.  You haven't spoken with any Spectrum officers or members about their plans for the drag show?

A    I have not.

Q    Okay.  The subject line of Plaintiff's 1, your email canceling the 2023 show, you state a harmless drag show, no such thing, right?

A    I did.

Q    You chose those words carefully like every other word in that email, right?

A    I did.

MR. MORRIS:  Okay.  I have nothing more at this time, Dr. Wendler.  Appreciate your time this morning.

THE WITNESS:  Thank you.

MS. BAKER:  And to afford counsel and also court staff a brief moment to reconfigure the space and also for any restroom breaks, we will briefly recess until 10:45.

MR. MORRIS:  One housekeeping matter, your Honor.

THE COURT:  Yes.

MR. MORRIS:  Can we ask during the trial

where we're at in terms of time.

THE COURT:  Yes, I was going to give you a time-check immediately after this instruction.

MR. MORRIS:  Okay.  Appreciate it.

THE COURT:  For use of this space, we're going to reconfigure this to allow for Defendant's Cross-Examination and also to prepare any materials that the witness will need alongside our IT technology.

At this time, using the chess clock system, Plaintiff has used approximately an hour of its time and precisely you have one hour and 56 minutes remaining.  And consistent with that chess clock approach that we discussed at the pretrial conference, your time will now start even though this witness may not necessarily be averse to the defense.  So we'll keep time.  If you ever need a time-check at the close of any examination, we can do that through the clerks or the CRD.

So we'll reconvene at 10:45.  Mr. Wendler, you may briefly step down.  All persons affiliated with the parties are advised to make any restroom breaks or if they need additional water and then we'll resume with Cross-Examination of this witness at 10:45.

[PROCEEDINGS RESUMED AFTER BREAK.]

THE COURT:  Just briefly, I'll admonish counsel that Exhibit 43 wasn't in the list of proposed exhibits for Plaintiff's presentation today, so let's try to follow that only because we're dealing with so many binders.  I know not everything is uploaded to the screen.  So let's try to preview any of those problems so that the Court will have at its ready any materials.  And I know everybody's worked diligently.  We have the materials.  I just need to be able to access them so I can read the document that you're reading to the witness.

MR. MORRIS:  My apologies, your Honor. We'll go through right now and make sure everything we emailed yesterday is on the list.

THE COURT:  It's also something good to do during the lunch break.  Just make sure that we're all agreed.  We're going to see these witnesses. You don't have to preview your order or anything like that.  These witnesses, these exhibits should come in.  That way, my court staff can have that that at the bench and I can follow with you as you're reading to the witness.

So with that, we'll settle in, and

Mr. Bryant, you may begin your Cross-Examination of this witness.  I'll admonish, Dr. Wendler, you're still under oath at this time.  So all those rules still apply to your testimony.

With that, you may proceed.

MR. BRYANT:  Thank you your Honor.

CROSS-EXAMINATION

BY MR. BRYANT:

Q    Dr. Wendler, I want to ask a few questions about your background.  Where did you grow up?

A    I grew up on the North Shore of Long Island about 40 miles out from Manhattan.

Q    And where did you get your undergraduate education?

A    Two years at a community college in New York and two years -- I completed a baccalaureate degree at Texas A&M.

Q    And in what subject did you receive your baccalaureate?

A    Architecture.

Q    Are you -- did you become professionally licensed as an architect?

A    I did.  I was a registered architect in Texas, Illinois and Louisiana.

Q    After you graduated from Texas A&M with a

bachelor's degree, what was your next educational effort?

A    Well, after I got married, I went to the -- that's been an education.  I went to the University of California at Berkeley for a master's degree, professional degree in architecture.

Q    And when did you receive a master's degree at the University of California at Berkeley?

A    1975.

Q    What was your next professional activity after completing your master's degree at Berkeley?

A    I accepted a position at Louisiana State University in Baton Rouge, Louisiana.

Q    And what was your position initially there?

A    Faculty member.  Started as an instructor which was the habit there.  Did two years and then got moved into a tenure-track slot, commonly referred to as an assistant professor.

Q    In general, what subjects did you teach at Louisiana State University?

A    Various aspects of architecture, mostly design studios but also heating, ventilating and air conditioning systems in buildings.

Q    And what was your next position after your

time at Louisiana State?

A    I was six years at LSU, and I was approached to come back to Texas A&M and moved there 1981.

Q    What position did you accept there in 1981?

A    Assistant professor of architecture.

Q    How long did you actually teach architecture at Texas A&M University?

A    From '81 until about '92.  A little over ten years.

Q    And at some point during your time at Texas A&M University, did you become involved in the administration of the University?

A    I did.

Q    Could you describe that?

A    I will.  I was an assistant or associate department head.  I can't even remember now.  But I helped schedule classes and so on.  And I did that same thing at LSU.  Then I became an associate dean for academic affairs in the College of Architecture which had 2,000 students in it and -- do you want me to continue on with my --

Q    Yes, please.

A    Okay.  Then I became a dean of the

college.  Took a year off and went to the University of Texas and finished a PhD there.  Became the dean of the college, served five years.  Then did long-range planning for Texas A&M University in -- from '97 to '99.  And then I was asked to become the vice chancellor of planning for the Texas A&M University System.  And that was from '99 to 2001.  2001, I left and went to Southern Illinois University-Carbondale and was a chancellor there six years.  Then I got fired.  Then I went back to teaching.  Then I got -- I became a faculty member in architecture and then became the director of the School of Architecture.  Did that for eight years, I believe it was, and then I retired.

Q   So approximately how long have you had as your primary duties the administration of public universities?

A   From I think '92 until the present at various -- in various assignments and roles.

Q   Now, on Direct, you testified significantly about the reasons for the actions you took with respect to the 2023 and 2024 proposed drag shows at Legacy Hall.  I'm not going to repeat that testimony, but I do want to talk to you about the core values of West Texas A&M University and like to

call up Defendant's Exhibit 31.

MS. BAKER:  Defendant has exhibits prepared on the computer and asks for the Court's assistance.

MR. BRYANT:  I'll tell you what.  Let's try 139.  Oh, you got it, okay.

BY MR. BRYANT:

Q    This is a portion of Defendant's Exhibit 31.  And on the page before you, do you see a series of bullet points that are in the faculty handbook?

A    I do see those, yes, sir.

Q    Okay.  And do you see that about the middle of the bullet points, one of the points listed is, quote:  Respect for the dignity of all individuals, unquote?

A    That is correct.

Q    Is that one of the core values of West Texas A&M University?

A    It is.

Q    Could we bring up briefly Defendant's Exhibit 139.  Okay.  And you see in Defendant's Exhibit 139 a list of bullet points depicting the University's core values?

A    I do.

Q    And do you see that one of those is highlighted.  Could you read that for the Court?

A    Respect:  They treat others with dignity which flows from the humanity of each individual.

Q    Is it -- and is that also a reflection of the core values of West Texas A&M?

A    It is.

Q    Okay.  Let's take a look briefly at Defendant's Exhibit 140.  Before you is part of Defendant's Exhibit 140 is a paragraph regarding the core values of West Texas A&M.  Could you just read for the Court that paragraph.

A    Under core values?

Q    Yes.

A    The core values of West Texas A&M University are reflective of, inspired by, responsive to the people we serve, regardless of background, family history, personal beliefs or aspirations.  The people of the Plains, in towns and communities, on ranches and farms spend every day living out their commitment to family, faith, hard work and service to neighbors; locally, regionally and globally.  From these same Panhandle values grow WT's core values.  Shall I continue?

Q    Yes, please.

A    Academic freedom.  We champion the free exchange of ideas.  Service.  We put the needs of others first.  Pragmatism.  We seek to apply what we learn for the betterment of our community. Innovation.  We embrace better ways to shape the future.  Respect.  We treat others with dignity which flows from the humanity of each individual. And finally, engagement.  We promote citizenship and being part of something larger than themselves.

Q    Thank you.  Why is the core value of respect important to the educational mission of West Texas A&M University?

A    I think without it, the whole learning experience is compromised.  If students don't respect each other, if faculty don't respect students or students don't respect faculty, and I can go on and on, but I believe without respect, the conditions for learning and studying are compromised, diluted.

Q    Now, I know that you presented your email to the West Texas A&M community on March 20th, 2023, but I would like to give you an opportunity to explain today in your own words.  Why in your judgment do drag shows violate the core value of respect that is a part of West Texas A&M University?

A     The drag shows that I'm familiar with are demeaning to women as they present women as caricatures and the notion of womanhood as a purely sexual experience or expression.  And by that nature, those activities in my mind, the drag show activities are demeaning and denigrating to women. They're also very frequently from my experience of studying drag shows, they're lewd and can be seen as inappropriate for many people, myself included.  And I just -- you know, that -- those things to me give me great concern because they diminish respect for half of our population on the campus.

Q     In your concern about the drag shows that Spectrum applied to conduct at Legacy Hall in 2023, did you have any concern about the presence of minors at those drag shows?

A     Yes, because the over-sexualization of womanhood, the way they're presented with prosthetic devices, frequently emcees and others involved in these performances engaging the audience.  You know, gestures that they make.  You know, I don't know how to say this but grabbing their crotches, you know, just -- and then getting involved with audience members and activities that I think are absolutely inappropriate for young people.

Q    Now, was your concern about drag shows in any way related to any dislike or distaste for LGBTQ people or lifestyles?

A    No.

Q    Would you apply the same principles of respect to other proposed performances at Legacy Hall that would demean or denigrate in your judgment other groups?

A    I would.

Q    If an RSO applied to hold a performance or rally to express support for the holocaust or advocate anti-Semitic views, is that something that you would have a concern with and would cancel?

A    I would.

Q    If a registered student organization at West Texas A&M wanted to conduct a blackface performance or other performance at Legacy Hall that mocked or denigrated racial groups, is that a performance that you would allow or that you would cancel?

A    I would not allow it.

Q    And if an RSO at West Texas A&M wanted to put on a performance in Legacy Hall that mocked or denigrated LGBTQ+ people, is that a performance that you would allow or would not allow?

A    I would not allow it.

Q    Now, is there ever -- has there been an instance in which you have either refused or declined to permit a performance in an on-campus venue at West Texas A&M other than the Spectrum drag shows at Legacy Hall?

A    I think not.  I'll say no.

Q    Okay.  I want to ask you about a proposed concert by a gentleman named Kevin Gates.  Do you recognize that name?

A    I do recognize that name.

Q    And did Kevin Gates or a company associated with him seek to use a campus venue at West Texas A&M University for a performance within the last few years?

A    They did, and they're not an RSO.  It was a commercial enterprise that wanted to use the first United Bank Center.

Q    And when Kevin Gates' organization wanted to use that on-campus venue, did you refuse to sign a contract to allow it -- that performance to go forward?

A    I did.

Q    And I'm going to ask you whether at the point when you declined to sign the contract, other

people within the West Texas A&M University staff had at least tentatively given a go-ahead on that concert?

A    They did.

Q    Okay.  And I want to ask why you took action at that time to decline to sign a contract to permit Kevin Gates and his organization to present a concert on the West Texas A&M campus?

A    I did -- I'll call it research.  I checked with the Chief of Police, Shawn Burns, on our campus who is a very distinguished professional and asked him to do a little research on what this gentleman's concerts were like in other settings, and there were -- there were in many cases fistfights.  In some -- I think there was gunplay at one of these, and that is not consistent with the values of West Texas A&M University.  And even though they're not an RSO, I did not want to -- and I'll use language -- appear to condone or endorse that kind of stuff affiliated with West Texas A&M University which, counselor, the appearance would be if it happened in the First United Bank Center.

Q    And could you describe what -- for the Court what the First United Bank Center is?

A    I'm sorry.  I should have done that.  The

First United Bank Center is the basketball arena. It's our graduation center. It's a large venue, 4,000 seats. And it's fairly new. It's clean. And it's home to two basketball teams that are in the top 20 nationally.

Q   Dr. Wendler, did you cancel either the 2023 or 2024 drag shows proposed for Legacy Hall because you disagreed with any viewpoints that you thought would be expressed at those drag shows by Spectrum?

A   What I disagreed with was demeaning a significant portion of our population as I see these drag shows to be, and I don't technically in legal terminology know if that's a viewpoint or just a fact of the matter. But that was my motivation.

Q   It's been suggested that you cancelled those drag shows proposed for Legacy Hall because you disagreed with some expressive message Spectrum intended to convey in those drag shows. Do you know what, if any, expressive message or specific expressive message Spectrum intended to convey in those drag shows?

A   I do not.

Q   Spectrum has suggested that at least its general purpose or idea in its proposed drag shows

at Legacy Hall was support of LGBTQ students at West Texas A&M University.  Do you disagree with that message?

A    I'm sorry, counselor.

Q    Sure.

A    Just say that again for me.

Q    Okay.  It's been suggested that you may have taken these actions because -- well, strike that.  There's testimony in the record that at least a motivation or purpose of Spectrum was to promote acceptance of LGBTQ students at West Texas A&M University.  Do you agree with the purpose of supporting LGBTQ+ students at West Texas A&M University?

A    We support all students at the University.

Q    So if that was the purpose of Spectrum in the drag shows that they proposed for Legacy Hall, do you have a disagreement with the purpose of supporting LGBTQ students or people?

A    I do not.

Q    Despite the cancellation of the proposed drag show at Legacy Hall in March 2023, did Spectrum nevertheless proceed to put on a drag show off campus the same weekend as the Legacy Hall show had been planned?

A    They did.

Q    Did you attend that show?

A    I did not.

Q    Did you cancel, attempt to cancel or in any way interfere with Spectrum holding a drag show off campus in March, 2023?

A    No.

Q    Have you attempted to interfere with or prevent any drag show that Spectrum would like to hold off campus at any time since 2023?

A    I have not.

Q    Is it fair to say that your action in canceling the proposed drag shows at Legacy Hall and in 2023 and 2024 was just a restriction on the place at which Spectrum could hold a drag show but not a prohibition or ban on Spectrum holding a drag show?

A    That's correct.

Q    Now, did you propose or seek in any way any kinds of sanctions or punishment on Spectrum or its members for holding a drag show off campus in March 2023?

A    That did not occur.

Q    Spectrum we've noted is a long-time recognized student organization on the West Texas A&M campus.  Have you made any efforts or issued any

threats to remove Spectrum status as an RSO at West Texas A&M at any time?

A    I have not.

Q    Does Spectrum enjoy full access to the campus facilities for meetings and events?  Does it hold on-campus meetings and events on a regular basis?

A    It does.

Q    You're aware that Spectrum holds something or has held it several times called Queer Movie Night?

A    I was not aware of it before all of this started.  But now I have seen a listing of the things that they do hold and I have no -- no -- no objection to them.

Q    Are -- have you heard of an event that was called Lavender Prom that Spectrum sponsored?

A    I've heard of it.  I don't know what it means, though.

Q    Okay.  Have you heard of Queer History Nights that Spectrum has had on the West Texas A&M campus?

A    I'm aware they have Queer History Night, yes, sir.

Q    And at any time, have you objected to or

attempted in any way to interfere with any of those on-campus activities of Spectrum?

A    I have not.

Q    At any time have you taken any action in retaliation against Spectrum for holding drag show off campus or for wanting to hold drag shows on campus?

A    No in both cases.

Q    And at any time have you taken any action in retaliation against Spectrum because of this lawsuit that you've been engaged in since 2023?

A    No.

Q    Is Legacy Hall a part of the Jack B. Kelley Student Center at West Texas A&M University?

A    Correct.

MR. BRYANT:  I would like to bring up Defendant's Exhibit 11.  Thank you.

THE COURT:  And just very quickly, Mr. Bryant, just to reiterate the admonishment that we have these exhibits prepared both for witness and the Court.  I believe this exhibit was off of your list so just as we go through the lunch break, let's just reconcile all of our lists to make sure they're at the ready for the witness and the Court.

MR. BRYANT:  Yes, your Honor.

THE COURT:  With that, you may continue your Cross-Examination.

BY MR. BRYANT:

Q    Okay.  And this Defendant's Exhibit 11 appears to be the Jack B. Kelley Student Center Procedures and Guidelines.  Could we look at page 11 of that exhibit or the page marked as page 11.  Okay.  Now, Dr. Wendler, could you look at the bottom left of that page.  Do you see a copyright indication.

A    On page 11?  I do.  Copyright 2017.  I see that.

Q    As I recall, you became the president of West Texas A&M University in 2016?

A    That's correct.

Q    And so these were the guidelines that were published in 2017.  I would like for you to look at the section under Reservations.  Could you please read the first paragraph under Reservations on page 11 of Defendant's Exhibit 11 into the record.

A    The JBK Student Center staff reserves the right to deny space usage for any group or event that is programmatically or operationally impractical to accommodate or that conflicts with the University's mission or policies.

Q    And could you also read into the record the next paragraph.

A    The JBK Student Center reserves the right to cancel, interrupt or terminate any event in the interest of public safety, noncompliance with University policies or if the event can be viewed as inappropriate or not consistent with the mission of West Texas A&M University.

Q    Okay.  Could we look at Defendant's Exhibit 4.  Thank you.  This has a copyright mark on the cover of those Procedures and Guidelines indicating that this version of the guidelines was copyrighted in 2023.  Could we go to page four of that exhibit.  Now, looking at the bottom left corner of that page, can you see specifically when this document was copyrighted.

A    I can.

Q    What is it?

A    March 2025.

Q    Could you take a closer look.

A    March 2025.

Q    Okay.  Fine.  Let's look at the language in the bottom two paragraphs on page four.  Could you read those into the record.

A    Yes, sir.  The JBK Student Center staff

reserves the right to deny space, usage for any group/event that is programmatically or operationally impractical to accommodate or that conflicts with the University's mission or policies. Continuing, the JBK Student Center reserves the right to cancel or interrupt any event in the interest of public safety, noncompliance with University policies or if the event can be viewed as inappropriate or not consistent with the mission of West Texas A&M University.

Q    Does this exhibit apply today?  This is the most current version of the Procedures and Guidelines?

A    To my knowledge, it does.

Q    And is that -- are those the Procedures and Guidelines that specifically apply to Legacy Hall with respect to any possible application to use Legacy Hall in 2026?

A    That's correct.

Q    Okay.  Could we also briefly look at Defendant's Exhibit 3.  Okay.  This appears to be another version of the Procedures and Guidelines for the Jack B. Kelley Student Center at West Texas A&M. Appears to bear a copyright date of 2023.  Could we look at page four of that document, that exhibit.

In the fourth paragraph from the bottom, could you please read that paragraph into the record.

A    The JBK Student Center staff reserves the right to deny space usage for any group/event that is programmatically or operationally impractical to accommodate or that conflicts with the University's mission or policies.  Continuing.  The JBK Center Student Center reserves the right to cancel or interrupt any event in the interest of public safety, noncompliance with the University policies or if the event can be viewed as inappropriate or not consistent with the mission of West Texas A&M University.

Q    To the best of your knowledge, has that same language been in effect continuously and applicable to Legacy Hall since -- from 2017 to the present?

A    I don't detect any change.

Q    Okay.  Now, let's look -- or think for a second about the proposed drag show that Spectrum wanted to hold at Legacy Hall in 2023.  Was it your judgment that that drag show was inappropriate or inconsistent with the educational mission of West Texas A&M?

A    Yes, sir.

Q    And I want to ask the same question with respect to the proposed 2024 drag show at Legacy Hall.  Was it your judgment that the drag show that Spectrum proposed to hold at Legacy Hall in 2024 was inappropriate or inconsistent with the educational mission of West Texas A&M University?

A    Yes, sir.

Q    Now, there was mention on Direct about different types of events that have in fact occurred in Legacy Hall.  We've seen some footage from the musical event, the "Sing" singing event, reference to beauty pageants, Shakespearean plays.  To your knowledge, were any of those events ones that were inappropriate or inconsistent with the educational mission of West Texas A&M University?

A    Not to my knowledge.

Q    Now, there are a lot of events that occur at West Texas A&M and specifically at Legacy Hall that you never become aware of; is that right?

A    That's correct.

Q    What are the circumstances in which you might become aware of a proposed event at Legacy Hall?

A    I think if the vice president for Student Affairs or staff in the offices of Student Affairs

had some questions or concerns, they might elevate to my attention.

Q    Now, in some policies of West Texas A&M that I've seen, there are reference to outdoor common areas as being traditional public forums. Are you familiar with those -- in general with those policies?

A    I am in general.

Q    Okay.  And in your judgment, is Legacy Hall a common outdoor area of West Texas A&M campus?

A    No, it's an indoor space.

Q    And in your judgment, as you understand the term and understand it's a legal term, is Legacy Hall a limited public forum?

A    I believe that to be the case.

Q    And has that been true throughout your tenure as president of West Texas A&M?

A    I believe it has.

Q    Okay.  Now, there's a resolution of the Texas A&M University System Board of Regents, I believe, that counsel referred to in his Direct Examination of you.  I believe it is -- I may need to check it, but are you familiar with a resolution that was adopted by the A&M University System Board of Regents on November 13th, 2025.

A   Yes, and I believe counsel shared that with me.

Q   Yes.  I just don't have the number in front of me at the moment.  But is it your understanding that as a result of that resolution, each of the member universities within the Texas A&M System will need to adopt some implementing rules within the six months following the November 13th, 2025 adoption of that policy?

A   That's my understanding.

Q   And do you anticipate that West Texas A&M University will indeed adopt such rules or regulations within that six-month period?

A   Our policies will line up with the mandates from the Texas A&M University System, yes, sir.

Q   And do you anticipate that in the rules and regulations, that West Texas A&M University will adopt to implement the November 13th, 2025, policy of the A&M's University System that West Texas A&M will formally designate Legacy Hall as a limited public forum?

A   I do believe that.

Q   And is that your intention?

A   That's my intention.

Q    And do you anticipate that that'll be completed prior to April 2026?

A    I do.

Q    Do you know whether there are any alternative venues available if Spectrum wants to hold a drag show in 2026?

A    There are a number of venues in Canyon and Amarillo.

Q    Okay.  I want to ask you about one specific venue in the City of Canyon that's referred to as The Lumberyard.  Are you familiar at all with The Lumberyard?

A    I've had lunch there one time.

Q    Okay.  And is that a venue that existed in March of 2023 or March of 2024?

A    No, sir.

Q    Does it exist today?

A    Yes, sir.

Q    Does it have space for events?

A    I believe it does.

Q    And where is The Lumberyard located?

A    It's about a mile from campus.

Q    From the West Texas A&M campus in Canyon?

A    Yes, sir.

Q    Now, counsel asked you on Direct about the

proposed 2026 drag show, that Spectrum has made an online application for reservation in Legacy Hall. Do you know any of the specific parameters for what Spectrum says it would like to do?

A    I do not, and I think it's in the very preliminary stages.

Q    Given that the event is in the very preliminary stages, have you prejudged how you will act with respect to that application if it is completed and an event is apparently going to proceed?

A    I have not.

Q    Does West Texas A&M have the same core values in 2026 that it had in 2023 and 2024?

A    I think they're exactly the same; but if they're not, they're very close.

Q    And are your views with respect to drag shows as demeaning to women, have they changed any in 2026 as compared to 2023 or 2024?

A    No, sir.

Q    Now, if the Spectrum application to hold a drag show at Legacy Hall proceeds forward, there's some -- are you aware of some things that you'll need to consider in evaluating it in 2026 that you didn't have to consider in 2023 and 2024?

A    Yes, sir.

Q    In particular, is one of the things that you'll have to consider if it gets to a decision point any rulings that this Court may make between now and then?

A    Yes, sir.

Q    Is one of the things that you'll have to consider if the application gets this far, any rulings the Fifth Circuit makes on in appellate proceedings during the time between now and the time you have to make a decision on that application?

A    Yes, sir.

Q    Are you aware of a court injunction that was issued in a case involving the Texas A&M University System sometime within the last year or so?

A    I am.

Q    And will you have to consider whether that injunction remains in place at the time you have to make a decision; and if so, the effects of that injunction?

A    I'm sorry, counselor, can you repeat -- I'm not sure what --

Q    Sure.  It was kind of a compound question. I'll try to do a better one.

A    Okay.

Q    If you get to the point of having to make a decision on the proposed April 2026 drag show that Spectrum has applied to hold, will you have to consider whether that injunction that has been put in place is still in effect at that time?

A    I would have to consider it. But if I may, counselor, I would because it's pending, because it's in the process of decision-making, no matter what stage of the process it's in, it would give me some concern and I would have to factor that into the decisions that I would make. Even if it was not completed, the process was not completed.

Q    And if you -- if you deem it necessary, you're going to get some good legal advice to assist you with assessing the legal landscape that it might affect your ultimate decision as to whether to allow a 2026 drag show in Legacy Hall?

A    Yes, I would seek counsel on that.

Q    Okay. Now, another -- is it true that another factor that was not present in 2023 or 2024 but is present today is that President Trump in early 2025 issued some executive orders that might possibly have some effect on this situation?

A    I'm aware of those.

Q     Okay.  And I'm not going to ask you to interpret or parse those executive orders, but could we briefly look at Defendant's Exhibit 49.  And this is -- appears to be an executive order issued by the White House on January 20th, 2025.  And it refers to ideologues across the country who deny the biological reality of sex.  Is this at least an executive order that you would have to perhaps get legal advice about and consider in making any decision regarding a proposed 2026 drag show that Spectrum might want to have in Legacy Hall?

A     I would seek counsel about how to deal with the President's executive order at West Texas A&M University.

Q     And could we look briefly at Defendant's Exhibit 50.  This is -- appears to be an executive order issued by the President in January of 2025.  And could we see the title of it.  Briefly.  If I'm reading it correctly, it says:  Ending Radical Indoctrination in K through 12 Schooling.  Is that executive order, Defendant's Exhibit 50, something that you would want to consider before making a decision with respect to a proposed 2026 drag show at Legacy Hall that Spectrum might want to have?

A     I would consider that in my

decision-making process.

Q    Okay.  Are there minor students who are K through 12 students who are regularly on the campus of West Texas A&M University?

A    Every day.

Q    And how does it come about that young people who are also high school students are on the campus of West Texas A&M University every day?

A    We have a program, a fairly rigorously structured program called the PUP, P-U-P, Program, and it is oriented towards students from local high schools who come on the campus.  They don't take the courses online as many dual credit experiences provide.  They're actually on the campus.  They have ID cards, University ID cards, and even the faculty members in the class do not know that they're high school students unless by some -- you know, if there's a conversation, but the ID card does not distinguish them as high school students, nor do any of our IDs include the age of the individual.

Q    So if these students went to a Spectrum drag show or any other event at -- on the West Texas A&M University campus and showed their student IDs, would Spectrum or anybody else be able to determine from that that they are high school students?

A    Not from the ID card.  And we did -- I was presented with evidence -- the poster on -- and it talked about ID cards, but I didn't see anything about age checks.  But I may have -- I may not have been looking for that or anything.

Q    Okay.  The Court will have that poster to consider as to whether or not -- my recollection is it said that, you know, if you have a student badge, you're in free.  But the Court will have an opportunity to determine the content of that and its relevance.

If there were a drag show at Legacy Hall in 2026 and students who were in this PUP Program presented their student IDs, would that tell Spectrum or whoever was handling the drag show that they were minors?

MR. MORRIS:  Objection.  Calls for speculation.

THE COURT:  Overruled to this extent. Counsel, can you -- counsel for the Defendant, can you present Defendant with any exhibit that would help him ascertain the contours of the question.

MR. BRYANT:  Okay.  Your Honor, I'll just rephrase the question.

THE COURT:  Okay.

BY MR. BRYANT:

Q    I think you have already testified the student ID doesn't disclose age; is that correct?

A    That is correct.

Q    So I think the question that I asked was kind of obvious.  If they show up with just a student ID, that would not tell whoever's running an event that the person was a minor?

A    I don't think so.  I -- I have an ID. Mine is labeled Staff.  And it, thank God, does not show my age on there.  It just says Staff.

Q    Could we briefly look at Defendant's Exhibit 51.  Dr. Wendler, Exhibit 51 appears to be a letter from Governor Greg Abbott to the chairman and executive directors of state agencies dated January 30th, 2025.  Have you seen that letter before?

A    I have.

Q    And can you generally describe in summary what that letter is about?

A    I would summarize it, and this is my summary, that it -- it says that the State of Texas recognizes that there are two genders and I believe asks agencies of the state to share that view of gender, that there are two.

Q    And before you make a final decision with respect to any application by Spectrum to hold a drag show in Legacy Hall, would you want to consider the effect, if any, of Exhibit 51 on your decision?

A    It would be part of the decision-making matrix.

Q    Now, let's look at Defendant's Exhibit 45. I am sorry.  That is not the resolution that I wanted to ask about.  Dr. Wendler, are you aware of a resolution that was passed by the Board of Regents of the University of -- of the Texas A&M University System on or about February 28, 2025, relating to drag shows?

A    Yes.

Q    Could you describe for the Court generally what the Board of Regents of the Texas A&M University System adopted as a policy in February of 2025 related to drag shows?

A    I believe, and this is a crass summary, but I believe that they said they did not want drag shows on the University's -- of the Texas A&M University System.

Q    Does that include West Texas A&M University?

A    It would.

Q    And do you recall if you received a directive along with other member universities directing you to implement that resolution shortly after it was adopted?

A    We did.

Q    And is this the resolution whose implementation is subject to a court injunction at the current time?

A    To the best of my knowledge, that's correct.

Q    Do you recall whether in the whereas clauses prior to adopting the policy the Board of Regents of the Texas A&M University expressed a view that drag shows are inconsistent with the value of respect that is held by the entire Texas A&M University System?

A    I do recall that.

Q    Do you know if the Board of Regents has ever changed its view on that subject since February of 2025?

A    Not to my knowledge.

THE COURT:  And Mr. Bryant, I believe you're referring to Defendant's Exhibit 29.

MR. BRYANT:  Thank you, your Honor.  Can we pull that up.

THE COURT:  And also, I think you were referencing as a relevant injunction to this Defendant's evaluation of any applications the *Texas A&M Queer Empowerment Council versus Mahomes* case.

MR. BRYANT:  Yes, your Honor.

THE COURT:  District Court injunction that issued in February of 2025.  I don't have the case cite, but that's the case I think you were referencing; is that correct?

MR. BRYANT:  Yes, your Honor.

THE COURT:  Okay.

MR. BRYANT:  We now have that Board of Regents action on February 28th, 2025.  And in the whereas clause -- by my count, the seventh -- sixth whereas clause.  The Board recognizes special interest in maintaining the University's special event venues as limited forums for the purpose of promoting the mission of the System, to provide education, conduct research, commercialize technology, offer training and deliver services for the people of Texas and beyond.  There's -- that term, special event venues, do you have an understanding as to what that means within the A&M University System?

A    I do.  I think that Legacy Hall as a

working example would be considered such a venue.

Q    Okay.  Could you read into the record the next whereas clause that begins with:  A finding of the Board of Regents of the Texas A&M University System?

A    Counselor, I'll start, and if it's incorrect, stop me, but I think I'm with you.

Q    Okay.

A    Whereas the board finds that it is inconsistent with the System's mission and core values of its universities, including the value of respect for others, to allow special event venues of the Universities to be used for drag shows that involve biological males dressing in women's clothing, wearing exaggerated female makeup and/or exaggerated prosthetics meant to parody the female body type and that are open to the public, involves sexualized, vulgar or lewd conduct and involve conduct that demeans women, open parentheses, drag show events, close parentheses, colon, and.

Q    Dr. Wendler, did you write that paragraph?

A    No -- no, but it's similar to my perspective I will say.

Q    And could you read into the record the next paragraph?

A    Following the and:  Whereas the Board finds that drag show events are likely to create or contribute to a hostile environment for women, contrary to System anti-discrimination policy and Title IX of the Education Amendments of 1972, open parentheses, Title IX, close parentheses, as these events often involve unwelcome and objectively offensive conduct based on sex for many members of their respective communities and of the universities, particularly when they involve mockery or objectification of women, and.

Q    Could you go ahead and read the next paragraph on the following page.

A    And whereas the Board is advised that there are alternative locations for such events at off-campus venues and private facilities near the universities, and.

Q    Could you go ahead and read the next paragraph into the record.

A    The Board acknowledges President Trump's executive order issued January 20th, 2025, entitled Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government.  The Board further acknowledges that the executive order recognizes two sexes; male and

female, and specifies that the federal government shall not promote gender ideology.

Q    Now, the Court can read the rest of the document, but this material that you've read into the record is all in the preamble, the whereas clauses prior to the policy that the Texas A&M University System Board of Regents adopted on February 28th, 2025; is that correct?

A    To my knowledge, that is correct.

Q    And although there's an injunction in place that would prevent you from carrying out whatever policy was adopted at that time, are you still aware of all of the findings and views of the Texas A&M University System Board of Regents that preceded that policy?

A    I am.

Q    And if the time comes when you need to make a decision regarding the proposed drag show of -- that Spectrum wants to hold at Legacy Hall in April 2026, would you at least -- at least give some consideration to what -- the Board of Regents who are along with the chancellor ultimately -- your superiors in the System have expressed?

A    Absolutely.  The Governor of the State of Texas nominates Board of Regents members.  They're

confirmed by the state legislature, and they take the role that they take as regents. And for that reason alone, I personally believe that their commentary and thoughts on all subjects should be attended to. Doesn't mean I would always agree, but they should be attended to.

Q    Dr. Wendler, when you made the decision to cancel the proposed Legacy Hall drag show Spectrum wanted to hold in March 2023, did you anticipate that it would be a university -- a universally popular decision?

A    No, I did not.

Q    And did you expect that you might receive negative publicity and public commentary?

A    I did.

Q    And did that, in fact, happen?

A    It did.

Q    Did you expect that you might receive negative emails and mails and even hate mail?

A    I did. By the hundreds.

Q    I'm not going to go through them, but I believe Defendant's Exhibit 32 and Defendant's Exhibit 202 are compilations of some of that negative reaction to your decision. I think you mentioned this earlier in your testimony. Did you

122 Case 2:23-cv-00048-Z    Document 174    Filed 02/02/26    Page 122 of 347    PageID 4215

lose employees because of the adverse reaction to your 2023 decision to cancel the drag show at Legacy Hall?

A    To be clear --

Q    And I'm going to ask you to explain what happened.

A    Yes.  To be clear, it wasn't because of the decision, but the reaction of the decision caused significant consternation in the office because we were receiving very vulgar phone calls and so on.  And I told all the folks in the office put the phones on hold, on record, and don't -- because that way we could just skip past that stuff. And we saved many of the calls.  Not all of them. Some were so vulgar I told them don't save them. They suggested what I should do and you know, so on and so forth, and I said don't say that.  That's -- that's childish.  It actually is stupid.  And some --

Q    Specifically why did you lose employees as a result of --

A    The stress --

Q    -- that decision?

A    In one case for sure, it was the stress of all this, and I think in another case -- well, I'll

just say it was a very stressful environment. Let me just -- I think that's the best way to characterize it. And that's what they told us. They did not want to deal with the stress of that environment.

Q    As a result of your decision in March of 2023, were there protests outside your office?

A    Yes, there were.

Q    As a result of your decision in March of 2023, were there protests at your home?

A    Yes, there was. One.

Q    And why in the face of such expected adverse reaction were you willing to make the decision to cancel the March 2023 proposed drag show at Legacy Hall?

A    I'm handsomely paid as the CEO to make decisions, even when they're painful, and I believe that's the case here. That these very difficult decisions are actually the very decisions that I'm paid to make. Following a particular rule or regulation, as important as it may be, is not the same as these overarching decisions that affect the culture of the learning environment at West Texas A&M University. And I believe those are the ones that are critically important to be made and I make

two or three of those a year.  The rest of the time, I'm eating fried chicken, hugging babies and going to football games.

Q    I don't want to leave the impression that you only receive negative reaction to your decision to cancel the March 2023 Legacy Hall drag show, did you receive any positive responses?

A    About three times as many positive responses as negative responses and they were frequently representative of groups of people.  For example, I received responses from Sunday school classes and preachers and public leaders, elected officials from around the state.  Not many.  I can't recall exactly.  As I reviewed my depositions, I think I said I had three or four.  And that's what it was like.  It wasn't dozens.  But there was a lot of commentary that said look, we agree with this, but I know not everybody does.  But the fact of the matter is there are a group of people that agree with the decision that was made, and I'm not -- I don't lead the University by polls.  It's not what I do or even try to anticipate polls.  I try to do what's right.

Q    And we won't take the time, given our time parameters, to go through all of the exhibits that

are expressions of support for your decision, but I do want to ask you a last couple of questions. One of the things that the Court can consider, may consider in this case is where the public interest lies in this matter. As a university president with decades of experience in public university administration, do you believe that your decisions with respect to the proposed 2023 and 2024 drag shows at Legacy Hall were or were not in the public interest?

A    I believe they were in the public interest.

Q    Could you describe for the Court why you believe that?

A    Well, I visited every high school in Texas north of Klondike to talk with students about their aspirations. I visited with faculty. I visited with school board members. I had county commissioners come to those meetings. We invited everybody we knew. All our alumni. And in some cases, the turnouts were interesting because they'd never had a university president come to the high school in Paducah, for example. I don't know if any of the university could find the high school in Paducah. And the -- some of those meetings was my

opportunity to get to meet people of various kinds around the Texas Panhandle, and I'm not a cultural anthropologist or any of that, but I'm -- I breathe. I watch the news. I read. I study things. And I wanted to better understand the kinds of aspirations that exist in the Texas Panhandle. Because not much of it is on the 6:00 o'clock news. And I have from that and I'm -- I don't claim any special capacity in this, but I have from those experiences been able to understand and internalize some of the values of the people of the Texas Panhandle in a fairly short period of time and in a very intentional way. I mean, I wasn't just going to Dairy Queens around the Panhandle. I was talking with students and teachers and families and so on. So I would say -- and I'm rambling a little bit, and I apologize, but I would say that that's where I gleaned my sense of I'll call it the community perspective on things in the Panhandle and almost half of our students are from the Panhandle and then the South Plains but mostly the Panhandle.

Q    And why do you believe that your decisions with respect to the 2023 proposed drag show were in the public interest?

A    I think the values of the people of this

part of Texas -- and they're not monolithic, to be sure -- but are substantially recognized by me in this decision-making process. I tried to understand. I didn't formally ask myself what would the people of Pampa say or what would the people of Texline say, but those are experiences that I'm the prisoner of now. I can't forget those just like I can't forget my experiences as a young man in New York City. And I believe this is a very special place and it needs special care. Not -- not that I'm a caregiver, but it needs special attention. Because of the nature of the history and the people that live here. Sorry. That sounds like the beginning of a bad sermon, but anyway.

Q    Not at all. A couple of minor points to cover before we leave. Are you a lawyer?

A    No, sir.

Q    Do you consult and parse all of the Texas A&M University System regulations and the -- West Texas A&M University regulations before you make decisions?

A    No, not in detail. But at 30,000 feet, every one of them.

Q    In your testimony, you were asked some questions that you used words like, quote,

expressive activity. Do you have any specific understanding of exactly what is or is not expressive activity?

A    Well, if I was to raise my voice at you right now, for example, and yell, somebody might say well, that's an expressive activity. And maybe it is. I understand that in a colloquial way that somebody offers their opinion or their insight. And I know there's a lot of discussion about whether -- that art is an expressive activity. And I would say that from my perspective, not all art is expressive activity or the expression is so simpleminded as to be almost worthless.

Q    Do you have any knowledge or judgment as to whether the drag shows that Spectrum wanted to put on at Legacy Hall in 2023 or 2024 was or was not artistic?

A    I don't believe they were artistic, but that's my personal opinion, obviously. Obviously, because I just said that. I don't believe they're artistic.

MR. BRYANT:  Dr. Wendler, thank you very much. Defense has no further questions of Dr. Wendler at this time.

THE COURT:  And a Redirect from

Plaintiff's counsel.

MR. MORRIS:  Briefly, your Honor.

REDIRECT EXAMINATION

BY MR. MORRIS:

Q    Just to reiterate, Dr. Wendler, you used the words artistic expression in your 2023 email, correct?

A    I did.

Q    And you chose those words carefully, correct?

A    Very carefully.

Q    Now, you would agree with me that drag performances based on your understanding convey a perspective about women, right?

A    Correct.

Q    One you disagree with, of course, correct?

A    Correct.

Q    Okay.  And you would agree with me that they portray women in a certain way, one that you disagree with, correct?

A    Correct.

Q    Did you ever read the Court's decision in joining the System resolution banning drag shows?

A    Honestly, I did not read it in detail.

Q    You've been to a drag show, correct?

A    Have I ever been to a drag show?

Q    You never attended a drag show, correct?

A    No, I have not.

Q    Never hosted a drag show?

A    No, sir.

Q    Now, no one before you decided to cancel the 2023 show in Legacy Hall, raised concerns with you that it would violate the University mission, correct?

A    No one conveyed that to me.

Q    Right.  You made that decision alone, correct?

A    Correct.

Q    Okay.  And if you -- Mr. Bryant presented you with some hypotheticals about Neo-Nazi rallies and blackface performances.  You alone could make that decision that those events were disrespectful and demeaning if they were ever to occur at West Texas A&M, correct?

A    I would come to that decision, yes, sir.

Q    Okay.  So you believe you have the authority, the exclusive authority to cancel an event on campus that you find is antithetical to the University's mission?

A    Not to parse words, but I would say not

authority but responsibility.

Q    Okay.  Would that responsibility include exercising that authority to cancel that event if you find it disrespectful?

A    If it demeaned a group on campus, I would exercise my responsibility to cancel it.

Q    Okay.  And that's what you did here with Spectrum's drag shows, correct?  You exercised your power or your responsibility to cancel their shows because you found them demeaning and disrespectful?

A    That's correct.

Q    Okay.  And you and you alone made the determination that it was disrespectful and demeaning because it was contrary to University's mission?

A    Correct.

Q    Okay.  And your view is you have the responsibility and authority to cancel any event on campus that might be demeaning or disrespectful in your view to women or any other group, correct?

A    And I would only add, counselor, and inconsistent with the University's stated mission.

Q    Okay.  But otherwise a yes to my question, right?

A    Yeah.

Q    Okay.

A    Sorry.

Q    It's okay.  I appreciate you clarifying. You talked about a cancellation of a rap show on campus.  Did you have any concerns that there would be fistfights at any of Spectrum's drag performances?

A    No.

Q    Any concern there would be violence?

A    No.

Q    Okay.

A    Counsel, could I just add one thing.  I didn't cancel that show.  I never approved it which is a different thing --

Q    Okay?

A    -- in my mind and I hate to be so -- but --

Q    Yeah.  So you didn't approve the contract for the rap concert?

A    Exactly.

Q    Based on expectations that there might be fistfights or violence?

A    Right.

Q    You didn't have any of those expectations for Spectrum's 2023 or 2024 shows, right?

A    Correct.

Q    Okay.  Now, currently it's not written anywhere in University policy, procedures, guidelines that Legacy Hall is a limited public forum, correct?

A    I believe that's correct.

Q    Okay.  Now, you testified that you expect in the future Legacy Hall will be formally designated as a limited public forum.  What do you expect that formal designation will say?

A    I expect that we'll say something like groups who utilize that limited public forum need to understand that it's a very particular kind of place and there may be restrictions on what can be done in that place, differently than in -- I think the -- your terminology would be open public forum.

Q    Any restrictions different than restrictions in place now?  For example, in the facility use request, procedure or other documents we looked at today?

A    It's hard for me to speculate on that, but there might be some differences because it will cause us to focus very carefully on the special nature and differentiation between a limited public forum and an open public forum.

Q    Hmm.  You talked about the special nature of Legacy Hall.  Is that what we're referring to?

A    Yes, because it's a -- it's a space where approval has to be -- people can't just walk in and start to use that.  It would be very, you know, disorganized and so on.

Q    Sure.  And we talked earlier about how Legacy Hall doesn't have to your knowledge any restrictions on content in terms of whether or not people get an event approved, correct?

A    Correct.

Q    Okay.  And again, it's subject to -- let me ask you this.  Do you expect that the University will change its expressive policy -- Expressive Activities Policy as to granting students the right to speak on campus subject only to time, place, manner, content neutral criteria?

A    Just say that one more time, counselor, if you don't mind.

Q    So you remember this morning we looked at the Expressive Activities Policy?

A    We did.

Q    And you and I agree that it says students can express themselves anywhere on campus subject to content-neutral, time, place, manner material,

correct?  Criteria, I'm sorry, correct?

A    Right.  I think I did say that yes, sir.

Q    That's also baked into the System policy that was passed in November 2025, right?

A    Yes, sir, it seems to be.

Q    So you would agree with me that because it's baked into System policy, West Texas A&M couldn't change that time, place, manner, content neutrality provision of the Expressive Activities Policy, correct?

A    I think that's correct.  I do think that's correct.

Q    You would also agree with me that it couldn't change the policy we looked at this morning that prohibits West Texas A&M University from denying benefits or access to facilities based on a group's ideological expressed view, right?

A    Please repeat that.  I'm wrestling with it.

Q    You and I looked at the System and the University Expressive Activities Policy this morning.  We covered a provision that said: University cannot deny benefits to registered student -- recognized student organizations based on their ideology that they express or an expressive

activity that conveys that ideology, correct?

A    Correct.

Q    That's also baked into the new System Expressive Activities Policy, right?

A    I think so.

Q    Okay.  So it's fair to say that West Texas A&M couldn't revise that policy anytime in the near future unless the System says they can, right?

A    Yes, I think that's the way the chain of command would work.

Q    Okay.  I want to ask you just one question about the PUP Program.  You testified -- the P-U-P Program?

A    Yes, sir.

Q    You testified that professors don't even know that these high school students are enrolled in the PUP Program, right?

A    That's correct.

Q    So it's fair to say that the University treats these PUP students that are in high school like any other University student, correct?

A    Correct.

Q    Okay.

A    Except we have a discounted tuition and fee structure.

Q    And these are high-achieving high school students, isn't it?

A    Typically.

Q    Very special program?

A    Yes, it is, and typically we have -- tens of students that come through that program and enter for example our very fine engineering programs on campus and they're taking calculus and physics and so on, ahead of time, and it's not a -- it's a face-to-face course with other college students, so it's a real University experience.

Q    Right.  I think we'll hear from one of West Texas A&M's recent engineering graduates later in this trial.

A    And by the way, a very good one, I would add.

Q    West Texas A&M, it's not a public charter school, right?

A    No, it is not.

Q    Not a public school district?

A    No.

Q    Not a secondary school?

A    It is not.

Q    An institution of higher education, correct?

A    Correct.

Q    Okay.  You would agree with me that if a student -- a PUP student came to a University event with their birth certificate, that would allow somebody checking age at the door to verify whether that PUP student is a minor?

A    I see no reason why that couldn't be the case.

Q    Okay.

A    But it would seem to me we would need to ask every student that entered the event to bring a birth certificate.

Q    Sure.

A    Or driver's license.

Q    Treat everybody the same.

A    Treat everybody the same.

Q    If they couldn't produce a birth certificate, it would be reasonable to turn that student away if there was age restrictions at the door, correct?

A    Correct.  I've never seen that on the University campus, but correct.

Q    Your counsel referred earlier to the Trump executive order; is that correct?

A    He did.

Q    Okay.  The 2025 one.

A    Yes.

Q    Now, that executive order refers to gender ideology?

A    Correct.

Q    Right.  Would the reason you would seek guidance from counsel about whether that applies to a drag show is because in your view, drag performances might promote a gender ideology?

A    The environment is changing very rapidly on these issues, and I would just seek as much counsel and wisdom from as many sources as I could muster to understand what would be the right conclusion to draw in the future.

Q    Sure.  But the reason that would be -- that EO would be relevant in your view is because drag shows promote some sort of gender ideology, right?

A    Quite frankly, I don't necessarily see that.

Q    Okay.  You testified this morning that you believe drag performances do convey some ideology, correct?

A    Correct.

Q    And they convey ideology because it's

demeaning, disrespectful and offensive to women, right?

A     Correct.

Q     Okay.  President, would you agree with me that parents should have the right to make decisions about whether to allow their child to see something that's rated PG-13?

A     Yes.

Q     Okay.

MR. MORRIS:  Thank you for your time this morning, Dr. Wendler.  I really do appreciate it.

THE WITNESS:  Thank you.

THE COURT:  Any Redirect from Defendant?

MR. BRYANT:  No, your Honor.

THE COURT:  Okay.  So pursuant to Rule of Evidence 614, I will now ask a series of questions. This is different than a jury trial, although the Court retains some authority to do so even in that setting.  So to clarify your testimony today, I'm just going to ask a series of questions directly.

EXAMINATION

BY THE COURT:

Q     So lawyers in the First Amendment space have to deal with many intersecting taxonomies of First Amendment law.  So as we analyze this case, we

have to first decide whether the relevant performance or production is expressive conduct.  So you've already given us some of your understanding of terms like expressive conduct, expressive activity.  Then with regard to forum analysis, there's a hierarchy from traditional public forum to designated public forum to limited public forum and then of course nonpublic forum.  So that's why you hear the lawyers asking all of these questions.  And even within that framework, we have to answer some questions about content versus viewpoint.  And so in an earlier Direct Examination by Plaintiff, counsel asked:  You would agree with me that because of this policy and criteria -- and I believe this was preceded by a series of WT manuals and policies -- that those criteria require groups seeking to reserve Legacy Hall, any restrictions have to be content-neutral; time, place, and manner restrictions.  So this is yet another category.  So time, place and manner restrictions are a type of exception to some general rules of First Amendment law.  On Redirect, you were asked a second question: Legacy Hall doesn't have to your knowledge any restrictions on content?  So you're not an attorney, and I believe counsel for the Defendant asked some

similar questions, so the Court must make its own independent inquiry on forum analysis to ascertain whether Legacy Hall is a designated public forum which I think Plaintiffs aver -- or a limited public forum which Defendants aver and some of that analysis turns on whether it is designated for a particular content and if the governmental entity reserves the right to restrict certain content. So I will -- that's distinct from the viewpoint discrimination question which is another inquiry. So content and viewpoint are sort of separate concepts in First Amendment law. So with an eye towards those colloquies with counsel both for the Plaintiff and the Defendant, I want to ask a series of questions about your understanding of Texas A&M System and West Texas A&M University System restrictions as to Legacy Hall and what content you would or would not allow as you read and apply those policies. So for each of these questions, keep at the forefront that we start with Texas A&M University System, manuals, policies and codes and then West Texas as a school within that system which also has its own campus codes and manuals.

As you read those Texas A&M and WT manuals, with an eye towards the content that is

permitted at Legacy Hall, would you allow the following?  Would Texas A&M University allow a blackface performance by a Caucasian man imitating African-Americans in stereotypical ways reminiscent of minstrelsy?

A    No.

Q    And would Texas A&M University allow George Carlin to perform his Seven Dirty Words skit if he signed a waiver promising not to use the seven dirty words at the event even though every prior performance featured his articulation of the seven dirty words?  And if you need me to recite the seven dirty words for record purposes, I can.

A    I can imagine.

Q    You're from New York City.  I am sure you've heard all seven, maybe even in the same day.

A    Not in one breath, but anyway.  I might be prone to if it was up to me to exercise responsibility to say yeah, you're an A, I might be prone to allow that.

Q    Okay.  So no to the first hypothetical, yes to the second.

Now, regarding a proposed performance by a Pro-Life group.  So assuming it was a registered student organization, would West Texas

A&M University allow Operation Rescue to use fetal remains to demonstrate dilation and evacuation or D & E abortion procedures to raise awareness even if it potentially violated binding Texas law as to the use and disposal of fetal remains?

A    That's very difficult.  I would -- I would -- and I'm -- I would have to consult counsel about that.  That's outside of my -- so far outside of my area of understanding how things work.

Q    Okay.  So let's use an example that may be closer to the case *sub judice*, the case before the bar now.  Assuming it is a registered student organization, would Texas A&M University allow the Palestine Solidarity Committee to perform in Shakespearean Shylock Costumes caricaturing Jews with prosthetic noses and other stereotypical costumery to raise awareness about the alleged Gaza genocide or the war in Gaza?

A    I would be prone to say no on that one.  I would also probably consult counsel.  My concern would be they're denigrating a group of students on the campus or -- faculty and staff.

Q    And ripped from the headlines a bit like the old *Law and Order* TV show.  Would West Texas A&M University allow in Legacy Hall a white supremacist

Unite the Right Rally inside Legacy Hall?  And I'm referring to some of the parades that took place in or near the University of Virginia.  If you are unfamiliar with the terminology, I can further define the terms.

A    I'm familiar with the terminology, and I would say I would be prone to say no to that.

Q    Okay.  And then I've got one last hypothetical.  Again, assuming it is a registered student organization, would West Texas A&M University allow Pro-Life aggies to mimic disabled characters from various movie types:  Simple Jack in *Tropic Thunder*; Karl Childers in *Sling Blade* or even Beth in the movie *Riding the Bus with My Sister,* to express solidarity with the mentally disabled and to argue that they should not be subject to selective abortion?  So here, I selected a group that is registered within the A&M System; the design is we're going to use exaggerated stereotypes of the mentally disabled to raise awareness about certain policies that would selectively abort such people.  And I would -- consistent with some of -- other hypos assume a caricature and a costuming that some might find offensive.  In fact, in some of these movie examples, advocates for the mentally disabled

actually protested some of these movies for the reasons of that caricature.

A    It's a very difficult question because there is a purpose in that messaging -- I've never thought about that -- those -- some of these that -- these hypos that you are providing, your Honor.  I never thought about those in Legacy Hall and so on and so forth.

Q    But in your role at West Texas A&M University, you would have to discern whether that performance was consistent with Texas A&M University or WT System policies for that forum; is that correct?

A    No, no, I understand what I would need to do.  I'm just not sure what I would do and I would -- that's one that I have to look at very, very carefully.

Q    Okay.  Understood.  But you do understand that in your role within that System and I think you referred to a chain of command.  I'm from a military family, so I'm familiar with the concept.  Within your chain of command, you would exercise some discretion in ascertaining whether that performance as presented through application was consistent with that forum?

A    That's what I would try to ascertain, yes, sir.

Q    Okay.

A    And I can't honestly tell you exactly what I would do.  I mean, I would need to reflect on it.  That's a complicated scenario.

Q    Well, welcome to law school where we just throw hypos at you endlessly.

Now, regarding your implementation of policy, did you consult each of those WT policies or other WT policies before the 2023 show was disapproved?

A    I did -- I did review the policies, but I -- I stay away from the details and try to ascertain the global perspective sometimes.  People refer to that as the 30,000-foot perspective rather than the details of the policy.  What is the intent is the question I ask myself all the time.  And that's not always clear in the enumerated rules and mandates that typically accompany a policy, that are the policy actually.

Q    Understood.  And we heard -- and by the way, many of these forum cases and faculty -- I'm sorry, facility use cases often descend into comparator analysis, so I think we've heard about

events ranging from "University Sing", "Jingle Mingle", worship services, an art show with plaster nudes and even a rock concert.  But there have been other iterations of similar performances that were not approved.  Is it your recollection and testimony that under your leadership, Legacy Hall did not approve an R-rated movie on at least one occasion?

A    I thought they did approve it, but I could be mistaken.  I don't know that a decision was ever made.  This might be this *Rocky Horror Picture Show*, which I have not seen, and I'm not even sure that's the correct name of it.  But it came to my attention during these -- not the proceedings today but the -- all of the deliberation about all of this, thinking about R-rated movies that there was one shown.  But I did not believe it was disallowed.  I actually believe it was allowed, but I'm not sure.

Q    Okay.

A    The record would reveal that, but I don't remember.

Q    Okay.  But you do recall the proposed rap concert, I believe --

A    Yes.

Q    I'm not familiar with the performer, but -- I think -- I wrote down Kevin Gates.  That

concert was --

A    That is correct.  That is his name.

Q    Okay.

A    I looked at counsel because he just said it and I don't -- may not recall the exact name.

Q    Okay.  And regarding JBK which is the larger facility holding Legacy Hall, does funding for that facility and activities come from student fees?

A    Correct.

Q    And do all WT students pay these fees to support that facility?

A    Correct.

THE COURT:  And with that, Dr. Wendler, you may step down.  I will ask first for the party that called you.  Mr. Morris, may this witness be excused from the case, or is he subject to call-back?

MR. MORRIS:  As far as we're concerned, he's excused, your Honor.

THE COURT:  Okay.  And for the Defendant, may this witness be excused, or is he subject to any call-back purposes.

MR. BRYANT:  Your Honor, I want to adapt that I will do it, but I do want to reserve the

right to call him in our case.

THE COURT:  Okay.  So you may step down, but you are subject to call-back should counsel request any additional testimony.  So I just ask that you remain in the vicinity of the courtroom subject to that call-back.

THE WITNESS:  Yes, sir.  I understand.

THE COURT:  With that, you may step down and we will now take our planned lunch break.  And let me give the parties a time-check so you'll be ready to proceed when we resume promptly at 1:30.

When we return, Plaintiff has one hour and 56 minutes remaining.  Defendant has one hour and 15 minutes remaining.  So when we resume promptly at 1:30, we'll begin with the next witness.

MR. MORRIS:  Your Honor, just -- I'm probably cutting my own throat here, but I want to make sure Plaintiff and Defendant were right there because I'm pretty sure we've used more time than they have.

THE COURT:  Okay.  Let me --

MR. MORRIS:  Just want to be open palms.

THE COURT:  None of my law clerks are doctors, but a few of them write notes like doctors. So this may be a "D" and this may be a "P", or it

might be an attempt at drawing a Delta.  So let me make sure.  But when I said that aloud, I thought the same question.  So let me be confident that I haven't reversed the "D" and the "P".

MR. MORRIS:  Okay.

THE COURT:  Like many counsel sitting at table today, I spent most of my time in the appellate courts and you just get 20 minutes.  It's easy.  The red light goes off and you're done.  So here we have to do something like algebra to keep track of time.  So I apologize for the delay.  My clerks are recalculating.

So upon further review, it is actually counter-intuitive here, but Defendant has less time left but not as little as I first stated.  So Defendant has one hour, 25 minutes remaining. Plaintiff has one hour, 46 minutes remaining.  And as a reminder, we alternate that clock when parties are taking witnesses on Direct or Cross.  So based on that timekeeping, you should plan for one hour and 25 minutes if you're the Defendant.  And one hour and 46 minutes if you are the Plaintiff.  And Mr. Bryant, I saw that you were raising -- you were rising in your seat.  Any other housekeeping or questions?

MR. BRYANT:  No, your Honor.  My recollection was that Plaintiff's counsel got -- we got a count when he had completed his Direct examination of Dr. Wendler.  And I had thought it was this one, 46, so I was going to ask the question whether or not counsel's Redirect was included.  The revised number of one, 46, I'm guessing may include that so.

THE COURT:  Yeah, so --

MR. BRYANT:  I'm satisfied with the count that we have here.  Thank you.

THE COURT:  Yeah, I'll just look to my clerk table there and confirm that these calculations alternated for Direct, Cross, Redirect; is that correct?  Oh, and I should say Mr. Stewart is a mathematician major, so we actually have the right guy keeping time.  Most of us went to law school to avoid math, but he's actually a trained mathematician in some way.  So I think we've got the right clerk doing the time.  So that is the time as it stands.  Let's work to get exhibits in order.  If they're not available in digital form, that -- those should be at the ready in any paper forms.  And we will resume promptly at 1:30.  Counsel may use any courtroom technology to prepare their space in their

next examination.  Please consult with the CSOs about any facilities that you need to avail yourself of, but remain close enough that we can start promptly at 1:30.  With those instructions in place, we are in recess until 1:30 in continuation of Plaintiff's case in chief.

[PROCEEDINGS RESUMED AFTER LUNCH.]

THE COURT:  Am I correct that my law clerks worked with counsel both for Plaintiff and Defendant to finally recalibrate the time remaining.

MR. MORRIS:  Yes, your Honor.

THE COURT:  And is it one hour, 46, for the Plaintiff and one hour, 25, for the Defendant? Is that your understanding?

MR. MORRIS:  That's my understanding.

THE COURT:  Is that your understanding?

MR. BRYANT:  Yes, your Honor.

THE COURT:  Let's proceed.  And Plaintiff may call its next witness.

MR. STEINBAUGH:  Plaintiff will call Mr. Barrett Bright.

[WITNESS SUMMONED.]

THE COURT:  Mr. Bright, please approach the witness chair.  Remain standing in that area, raise your right hand.  My courtroom deputy will

administer the oath.

[WITNESS SWORN.]

THE COURT:  Okay.  You may take your place in the witness chair.  You are now under oath. Please pull the microphone close for voice amplification.  If you require access to any exhibits, we can provide those in paper or digital form.  Just signal to the Court that you need those exhibits.

MR. BRYANT:  Your Honor, just want to note that Ms. Baker will provide the -- any objections and cross-examination for this witness.

THE COURT:  Okay.  Understood.  So with that, Plaintiff, you may proceed with your Direct Examination.

BARRETT BRIGHT,

having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. STEINBAUGH:

Q    Good afternoon.  Can you please state your name.

A    My name is Barrett Bright.

Q    Do you go by any aliases?

A    I also go by Bear.

Q    What is your date of birth?

A    January 14th, 2002.

Q    Is that today?

A    That is correct.

Q    Are you having a happy birthday?

A    We'll see.

Q    Where were you born?

A    I was born in Houston, Texas.

Q    Where were you raised?

A    Borger, Texas.

Q    Where's -- I'm from out of Texas.  Where is that specifically?

A    About an hour north specifically.

Q    About an hour north of here.  Is that part of the Panhandle?

A    That is correct.

Q    Would you count yourself a member of the LGBTQ+ community?

A    Yes.

Q    Why is that?

A    Because I am gay.

Q    Have you seen drag shows before?

A    Yes, I have.

Q    Did Spectrum attempt to host a drag show in 2023?

A    Yes, we did.

Q    And whose idea was that?

A    That was my idea.

Q    Why?

A    Because we wanted to host a drag show specifically because we thought that was the best way for us to connect with the campus community as our goal at Spectrum was like outreach and connection with the campus community and with the idea of like bending gender roles and messing with that core concept that deals with drag was our main goal and then also raising money for the Trevor Project.

Q    So what was your role within Spectrum?

A    I was the president of Spectrum.

Q    When did you become president of Spectrum?

A    It was from 2023 to 2024.  Well, 2022, 2023.  School year, 2023, 2024.

Q    Were you president during the proposed drag shows that Spectrum attempted to hold?

A    Yes, that is correct.

Q    Do you see the binders adjacent to you or up on -- up here.  We're going to look for Exhibit 65.  And I don't recall which binder that's in.  But it should say on the front.  It's probably

the second binder.  That's a three or two on --

A    Volume 3.

Q    Look for Volume 2.

A    Is it 65?

THE COURT:  Mr. Steinbaugh, you may approach to assist the witness with the exhibits if that would prove helpful.

BY THE WITNESS:

A    This one goes up through 50.

BY MR. STEINBAUGH:

Q    Is that number two?

A    Uh-huh, 26 through 50.

Q    There it is.

A    Thank you.  What number was it again?

Q    Sixty-five.  Before that, can you tell us about your experience at WT.  When did you start at WT?  By that, I mean -- or West Texas A&M University?

A    I came into West Texas A&M University in the fall of 2020.

Q    What was your major?

A    Civil engineering.

Q    And did you graduate with a degree in civil engineering?

A    Yes, that is correct.

Q    When did you graduate?

A    May 2024.

Q    What are you doing now?

A    I'm currently attending graduate school in Madison, Wisconsin, for structural civil engineering.

Q    Okay.  Can you turn to Exhibit 65, please.

A    Yes.

Q    And take a look on the very first page there.  Do you see article -- I'm sorry.  Do you see Article II?

A    Yes, I do.

Q    Can you read that for us?

A    Yes.  The purpose of this organization is to promote diversity, support and acceptance on campus and in the surrounding community.  The primary goal of this organization is to provide a safe space for LGBTQIA+ students and allies to come together.  The secondary goal of Spectrum WT is to raise awareness of the LGBT+ community.  Thirdly, our organizational strive to take every opportunity to educate WT and the greater community on issues concerning LGBTQIA+ life.

Q    And this is the Constitution of Spectrum?

A    Yes, that is correct.

Q    This is the Constitution of Spectrum throughout your tenure as president?

A    Yes, that is correct.

Q    That section that we just read, can you describe your own words what that is?

A    That is the main goal of what Spectrum plans to do as a student organization. And so the idea of being that we wanted to make a safe space for LGBTQ+ and ally students on campus as well as provide outreach and education towards the greater community and help improve awareness towards LGBTQ+ issues.

Q    Why is it important as part of this mission to do outreach at West Texas A&M as opposed to, say, Canyon or Amarillo or some other part of the Panhandle?

A    Well, so -- the Panhandle is a fairly conservative area and WT I would say is a more conservative type of University. But it's also a University where all the students can come together and like learn from each other in a sense the idea of doing outreach specifically towards the campus community was to help promote like on-campus culture and ideas and spreading of those ideas.

Q    So there's been in this case some

discussion about whether or not there are alternative venues at which a drag show could be held in Canyon or the City of Amarillo?

THE COURT:  Mr. Steinbaugh, I'll interrupt that question because we're having technical difficulties with the court reporter and the LiveNote.  So let me just recess briefly, consult with IT and make sure we're back on line.

[PROCEEDINGS RESUMED AFTER BREAK.]

THE COURT:  Okay.  So Mr. Steinbaugh, I apologize for the interruption.  That was the fault of our IT system, but we are back online and back on the record.

MR. STEINBAUGH:  All right.  Thank you.

BY MR. STEINBAUGH:

Q    Mr. Bright, we were discussing, there's been some discussion in this case and generally about the potential availability of venues off campus.  After the cancellation of the 2023 drag show, can you briefly discuss your efforts, if any, to find an alternative location?

A    Yes.  So when the drag show got cancelled, we were panicking.  We were trying to see how else we can still host our charity drag show.  We received help from people like Chip Chandler who

offered that certain venues have reached out offering places or other suggestions that might fit our needs for the drag show we were trying to host.

Q    And did you consider those venues?

A    Yes, we did consider the venues.

Q    And why didn't you hold it at those venues?

A    Some of the venues were too small, so we weren't going to be able to host the number of people we were expecting.  Other ones were restricted, either 18 plus or 21 plus, like the bars, which would not allow my siblings to come watch me perform which was one of the main reasons why we wanted to allow minors allowed in with their parents so my siblings could come watch.  And then other ones were just too expensive to be able to rent out and hold on.

Q    And were these venues -- would you say that they were adjacent to campus?  Would they have been easy to get to?

A    No, not really.  Most of them were in Amarillo.

Q    What is a drag performance?

A    A drag performance involves a person making a character, coming up with like the music,

the thought process to like convey what they want to do as their message.  Generally it involves messing or manipulating like what are considered gender norms.  And either breaking them or changing them to fit whatever message you're trying to convey as a drag performer.  Usually involve lip-syncing to music and dancing to music as well as dress, hair and makeup.  And normally drag performers will take on a stage name that they will have on stage.

Q    Can you describe what the stage names are like, what's the purpose of them?

A    Sure thing.  So they help like add to the identity of what the performer is conveying.  So in a sense, some stage names are like punny and interesting in a way of one of our performers was going to go as Cardi Ac Arrest to be like kind of a heart-stopper type of character.  Some of them are more traditional in the sense like Trixie Mattel would be considered a more traditional drag name, stage name.

Q    Would it be fair to say or would you consider drag to be -- how would you compare drag to other theater-type performances?

A    So I would say that there are a lot of similarities.  You'll tend to have music.  You'll

have choreography.  You'll have a set routine.  But drag tends to lean more towards the idea of, like I said before, like manipulating and breaking what are considered standard gender roles and conveying those types of ideas to the audience.

Q    How does drag challenge gender norms or gender roles?

A    So normally you'll -- what people seem to take as stereotypical drag would be a man dressing up as -- women.  But we also have women who dress up as men.  We have cis men and women dressing up as their own like drag kings and drag queens.  And we also have nonbinary people dressing up as nonbinary royalty.  So those are like the manipulations.

Q    And do drag performances -- I think I got this, but do drag performances always cross the gender divide?  Do they always challenge gender norms?

A    I would say they always challenge gender norms, but they don't always cross the divide.  You can have a straight man dress up as a drag king, but they would mess with the idea of what makes a man with -- either they'll present more femininely as a man with like earrings or like how they decide to do their makeup or their dress or they'll form more of

a critique of masculinity by going hypermasculine and playing into those ideas.

Q    What -- are you familiar with the -- what would you say the LGBTQ community's relationship is with drag?

A    I would say there is like a long history with the two being closely tied together.  I know that like when the protest started out -- at Stonewall with Marsha P. Johnson who was a trans woman, the idea of drag became as a protest towards the current state of things at the time where cross-dressing was not allowed and it allowed for like performances and like this culture to build up around the idea of like the resistance towards what people stereotypically consider as man and woman.

Q    What's the purpose of a drag performance on stage?  Why put it on stage?

A    Because you would like people to see it. You want people to interact with the ideas that the performer is putting forward.  So that way if there's the main message they're trying to like pass on to the audience compared to the underlying message of messing with gender, having an audience there allows the audience to interact, draw their own ideas, get a better understanding of what drag

is.

Q    And in your experience, can you tell us do drag shows typically consist of one performer or multiple performers?

A    They typically consist of multiple performers.

Q    So if you have multiple performers and they are each conveying -- I think you described a character, how -- do people come away with a singular message or particular message from the group?

A    So -- yes, so each performer would be trying to convey their own message in a sense. Either it being to be comedic or to be a critique of something happening in current society.  And then the -- a whole underlying message between all of these performances would be messing with gender in the sense because you'll still have the men dressing up as women, women dressing up as men, etc., to the performances, to the music and that's manipulating the idea of what we consider as gender.

Q    Did Spectrum intend to convey a collective message in its 2023 and 2024 shows?

A    Yes.  So like I mentioned before, the main like underlying message would be messing and

manipulating stereotypical gender roles.  The next one would -- was our idea to -- we wanted to still outreach to the community of West Texas A&M University, interact with other students, show a building of like conversations with those students, towards leading to LGBTQ+ rights.  And finally, we wanted to raise money for the Trevor Project as a charity goal.

Q    Do you think President Wendler agreed or disagreed with all of those messages?

A    I would believe he agreed with the donating to charity and raising money for charity, but I don't believe he agreed with the other messages we were trying to send.

Q    On what basis do you come to that conclusion?

A    That would be based off of the email Dr. Wendler sent out.

Q    Walk me through in planning the 2023 and 2024 drag shows.  If you are the average audience member who -- what would the average person before attending the 2023 or 2024 drag shows, according to Spectrum's plans, what would they have seen before going to the theater?

A    So they would have seen the posters that

Spectrum and the other student groups that were formed together to build the drag show.  They would have seen the posters put up.  They would have seen that it was going to be a charity drag show.  They would have seen like the rainbow flag on those posters as well.

Q    What does the rainbow flag signify?

A    The rainbow flag is considered a symbol of like the LGBTQ+ population.  There are a lot of people who have assigned the colors different meanings.  But what I come across is that, it's we have people from different genders, sexual orientations and backgrounds, and they all come together as one group.

Q    Are there variations on that flag?

A    Yes, there is the pride flag and then there is the Philadelphia flag.

Q    Can you describe what the Philadelphia flag is.

A    So the Philadelphia flag has the rainbow on it and then a -- I think it's called chevron with black and brown and then the trans colors to represent other minority communities within the LGBTQ+ community.

Q    So in terms of what a performer does when

they are preparing for a performance, what goes into planning that?  What are they thinking about, and what are they doing?

A    So the first step is to -- like what type of message they want to convey in a sense.  If they wanted it to be a more elegant performance, like a ballad or if they want it to be a more energetic or funny type of performance, then they'll tend to pick a song that will match with like the idea that they're trying to get across with their performance. Then once they have the song and the message they want to convey, they'll start working on routine and lip-syncing and practicing how they're going to walk and act on stage.  And then they'll start getting their outfit together.  They'll start doing their makeup.  They'll get their hair design in a way that will try and match that same idea.  And then they'll have their stage name, of course.

Q    And what role does music play in the drag performer's act?

A    I believe it plays one of the most important like parts of it in a sense that along with the message they want to sing, sometimes there's certain lyrics they want to accentuate in the song as part of their performance either to play

into what the lyrics are saying or make a juxtaposition of those lyrics. A good example of that would be "Born This Way by Lady Gaga". It tends to have very LGBTQ+ friendly style of like lyrics and those get very -- gets played quite often during Pride. And then another one would be like if you're doing a ballad, the -- like you'd have like a soft, flowy song like "My Heart Will Go On" and then like playing up and acting to those lyrics as they're lip-syncing to it helps convey the message that they're trying to get across.

Q    Tell me about Henrietta.

A    So Henrietta was one of our performers for the 2023 drag show and his name is -- his real name is Henry. His stage name is Henrietta. He came over from the planned drag show to the Houston drag show. He's one of our straight members -- or he was when I was president. He was one of our straight members at Spectrum. And his performance to a Green Day song as a form of protest towards the cancellation of the drag show. He had still dressed in drag as a feminine woman side of things. He performed it as a protest, had protesters come up on stage as part of the performance as well.

Q    How might a drag show or drag race be

comparable or different from a beauty pageant?

A    So a beauty pageant in my opinion focuses on what we consider as what is beautiful for women, what like -- gratifying features, talented, beautiful, sometimes skinny is a main -- like a focus of it.  And then drag race tends to break those ideas.  You don't necessarily have to be skinny.  You don't necessarily have to be like pretty.  You don't necessarily have to fit into what the mold of a woman is.  And there's still like this talent aspect of it.  And then that's how you're getting compared with your performance that you've done on stage compared to other performers and how well y'all did in conveying your message across.

Q    So when you have audience members coming into a show, we've discussed sort of the routines.  You said they would perform choreographed dance.  What happens after that?

A    After the performance?

Q    Yeah.

A    So if we're considering as like what happened at the 2023 performance.  The first performer would perform and then they would get announced by their stage name and then they would get asked questions to respond to in character.

Q    Can you elaborate on what in-character means and what kind of questions would they would be asking?

A    So if you had -- theoretically if you had a performer create a character that was -- the idea was a crazy woman -- like you want to convey the idea of someone who's overreaching, someone who's trying to manipulate, then they would show aspects of like the craziness in their character design.  A famous one was on *RuPaul's Drag Race*, a character lifted off her wig to show shower petals as she was going insane.  And so that would add to like the idea of her character being unhinged.  And so that would be a -- like something they would want to carry through during the talking portion.

Q    Would it be fair to say that they are acting during this talking portion?

A    Yes.  You wouldn't expect someone to behave the same way in drag as you would when they're out of drag.

Q    And why would they be acting?  Who were they attempting to convey that to?

A    They are trying to convey it to, at least at our drag show, the judges who would be judging and of course the audience who would be interacting

and watching it.

Q    What are the judges looking for?

A    They're looking for how well the makeup was done, how well the hair was done, how well the outfit and the performance matches the idea of the person trying to convey the -- like their character across.

Q    Would the audience look for that kind of -- would the audience in your opinion, in your experience, having been to drag shows, is that what the audience is looking for, too?

A    Yes.  I do believe so.  Especially with -- if it's humorous, like the audience wants to laugh. They want to laugh at the jokes that are being made on the stage.  If it's like a beautiful performance, they want to -- or an elegant performance, they want to kind of get like swayed with the performer and the music.  So I very much hope so that the audience is interacting in that same manner.

Q    What would you say would be the integral attributes to identifying a drag show; so what -- what would you look for to say this is a drag show, but this other theater performance is not?

A    So you would want our -- I would say that it would be focused with like it's an LGBTQ+ group

trying to put it on, so that way you've got like that connection to the culture and then the idea of gender being messed with and broken, so you would have people either changing what they consider as like the stereotype of what is a man, what is a woman, and bending and breaking those ideas. So you'll definitely see that on the posters for what you would expect, you tend to expect it to be at a like LGBTQ+ friendly venue, and then it's like all of those combined into the idea of this is what a drag show that's happening is.

Q    I want to shift for a moment to the purpose of putting it on a drag show on campus. And I'm going to ask two different questions that are going to sound similar. I'm going to emphasize different parts of them, so listen carefully. Why is it important for Spectrum to host a drag show on campus as opposed to somewhere else down the road, down the street, in another town?

A    So Spectrum is a student org at WT. We have access to like places like Legacy Hall or other -- like the Alumni Banquet Hall, and those would be free for us. So that way, we wouldn't have to pay at least for renting the space. So money was a very big important factor for trying to host on

campus as well as reaching the campus community, since that's one of our main goals is outreach and education of LGBTQ+ issues.  Being able to host the drag show on campus helps us like further that message as well.  And of course, it's right on campus, so it's not like we're trying to have to move people farther away to be able to host this event.

Q    How does it further Spectrum's mission to have a drag show as opposed to some other type of event?

A    So I would say that the drag show was the best way to convey the messages that we were trying to cross -- or trying to get across, specifically with messing with and breaking gender norms, like connecting to the community and raising money for the charity projects.  You can't really convey those same messages at like the Lavender Prom we hosted. Sure, some people would dress up for it, but it's not that underlying message of that being we're breaking the gender binary in that sense.  And like with our coming out day, National Coming Out Day, that really focused on people and their stories of how they came out to their friends and family which also doesn't convey that same message.

MR. STEINBAUGH:  That's -- those are the only questions that I have.  Thank you.

THE COURT:  And now, any cross-examination from the Defendant, and I believe Ms. Alexia Baker, you are taking this witness, correct?

MS. BAKER:  Yes, that's correct, your Honor.

THE COURT:  You may proceed.  Please signal to court staff if you require any exhibit in digital or paper form.

MS. BAKER:  Defendant will be presenting exhibits digitally.

THE COURT:  Okay.

CROSS-EXAMINATION

BY MS. BAKER:

    Q    Good afternoon, Mr. Bright.

    A    Good afternoon.

    Q    It's a pleasure to meet you in person. And happy birthday?

    A    Thank you.

    Q    This is an interesting way to spend a birthday.

    A    Yes, very much so.

    Q    I know you have a very busy schedule, and today's a particularly special day for you, so I'll

try to be efficient as possible.  So to give you a bit of a roadmap of my questions, I'm going to ask you some questions about your involvement in Spectrum as well as your involvement in the planning of Spectrum's 2023 and 2024 drag shows.  Is that fair?

A    Yes.

Q    Mr. Bright, you first became president of Spectrum WT in the fall of 2022, correct?

A    That's correct.

Q    And you remained president up until 2024 when you graduated from WT, correct?

A    That is correct.

Q    As president of Spectrum, one of your primary duties was to lead the organization's officers, right?

A    Yes, that is correct.

Q    Another one of your key responsibilities was to ensure Spectrum's officers, organized events and outreach programs designed to serve members of the LGBTQ+ community; is that right?

A    Yes, that is correct.

Q    And those outreach programs engaged LGBTQ+ students and other allies of the LGBTQ+ community on campus, correct?

A    Yes, that is correct.

Q    And the events and outreach programs that Spectrum WT organized were meant to help members of the LGBTQ+ community find a sense of safety and belonging on the campus of WT, right?

A    Yes, that is correct.

Q    While you were president of Spectrum, it was a registered student organization in good standing, right?

A    Yes, that is correct.

Q    And as a recognized student organization, Spectrum WT participated in on-campus activities, right?

A    Yes, that is correct.

Q    More specifically, Spectrum participated in activities like Join the Herd which is part of WT's new student orientation; is that correct?

A    Yes.

Q    New student orientation was the primary method through which Spectrum recruited new members; is that right?

A    Yes, it was.

Q    And to your knowledge, Mr. Bright, involvement in programs like Join the Herd is a privilege enjoyed by recognized student

organizations, correct?

A    Yes.

Q    And recognized student organizations also have the privilege of accessing on-campus facilities, right?

A    Yes.

Q    Spectrum met with its members on campus each week in the classroom center which is attached to the JBK, correct?

A    Yes.

Q    Spectrum even advertised its weekly meetings on its University-affiliated web page; is that right?

A    Yes.

Q    In fact, Spectrum included a screenshot of that web page in its Amended Verified Complaint. Let's turn to paragraph 12 on page four of Plaintiff's Amended Verified Complaint. Page four: One more page. There we go. You recognize this web page, right?

A    Yes, that is correct.

Q    Spectrum has hosted multiple events in the JBK Student Center, right?

A    Yes, we have.

Q    And Spectrum has used the JBK student

center as a venue for its National Coming Out Day event, right?

A    Yes.

Q    And Spectrum used its National Coming Out Day event as a platform to educate members of the campus community about LGBTQ+ plus issues, right?

A    Yes, we did.

Q    One of Spectrum's main goals is to educate members of the campus community about LGBTQ+ plus issues, right?

A    Yes.

Q    And Spectrum has also used the JBK Student Center for fund-raising events like bake sales; is that right?

A    Yes, we did.

Q    Spectrum has used the JBK Student Center for tabling events that allowed it to interact with WT students and recruit new members, correct?

A    Yes.

Q    On campus, right?

A    Yes.

Q    So you agree that Spectrum has utilized the JBK Student Center to host activities that help LGBTQ+ students feel welcome at WT, right?

A    That is correct.

Q    And during your presidency of Spectrum, one of the organization's main missions was to help and support LGBTQ+ members on campus, right?

A    Yes.

Q    Spectrum typically posted its event fliers in the JBK center, correct?

A    Yes, we did.

Q    And there are many places -- there are many areas to place student organization posters in the JBK, correct?

A    Yes, there are a few.

Q    Okay, Mr. Bright.  I would like to get a better understanding of the message of the drag shows Spectrum hosted and intended to host on campus.  First off, you take the position that drag is inherently part of LGBTQ+ culture, right?

A    Yes, I do.

Q    And drag shows are a way for members of the LGBTQ+ community to exhibit LGBTQ+ culture, right?

A    Yes.

Q    Spectrum didn't intend to express a particular message through its proposed 2023 drag show, did it?

A    I'm sorry, could you clarify that for me.

Q    Yes.  Would you agree that Spectrum did not intend to express a particular message through the proposed 2023 drag show?

A    Well, we did want to express the idea of messing with like the gender idea and the gender norms with that drag show and raise money for the Trevor Project.  Those were our two like main ideas for that 2023 show.

Q    I am going to pull up a portion of the transcript.  We are going to turn to transcript of Barrett Bright, page 51, and I'm going to be looking at lines ten through 17.  You were deposed for this case, correct, Mr. Bright?

A    Yes.

Q    And the testimony that you gave during that deposition was truthful, correct?

A    Yes.

Q    I am going to read from the transcript.  During the deposition, I asked you concerning the 2023 drag show and planning it:

        "Q    "What was the message of the show?"
              And your answer was:
        "A    The message of the show was -- well,
        it depends on each of the performer's own
        personal message because they're performing on

stage and they all have their own ideas of what they want to say.  But the overall purpose of the show was to support -- was to show support for the LGBTQ+ students on campus and to raise funds for the Trevor Project."

Did I read that correctly?

A    Yes, you did.

THE COURT:  Let me briefly interrupt, Ms. Baker, because we are having IT issues once again.  That's still on the record at 14:11:09.

[PROCEEDINGS RESUMED AFTER BREAK.]

THE COURT:  With that, just for record purposes and also for the benefit of the witness, just reask your last question.  And again, I apologize for the technical glitch.

BY MS. BAKER:

Q    Okay, Mr. Bright.  I'm going to reask my question, my most recent question.  Do you agree that Spectrum did not intend to express a particular message through its proposed 2023 drag show?

A    I believe Spectrum -- we did have a message for the 2023 drag show and that was to mess with what is considered the gender norms of what we consider stereotypical gender norms and to raise money for the Trevor Project as our two main goals.

Q    So I am going to proceed to read from the transcript.  I am reading from page 51, lines ten through 17.  You were deposed in this case, correct, Mr. Bright?

A    Yes, that is correct.

Q    And you swore to tell the truth in that testimony, correct?

A    Yes, that is correct.

Q    So during the deposition, I asked:

"Q    "Concerning the 2023 drag show and planning it, what was the message of the show?"

And your answer was:

"A    "The message of the show was -- well, it depends on each of the performer's own personal message because they are performing on stage and they all have their own ideas of what they want to say.  But the overall purpose of the show was to show support for the LGBTQ+ students on campus and to raise funds for the Trevor Project."

Did I read that correctly, Mr. Bright?

A    Yes, you did.

Q    And that was your testimony under oath, right, Mr. Bright?

A    Yes, it was.

Q    And it was true and correct when you gave that testimony on December 19th, 2025, right?

A    Yes, that is correct.

Q    You differentiated in your answer here between the message of the performances in the drag show and the general purposes of the drag show, right?

A    Yes, in a way.

Q    So would you -- so you agree that it's fair to say Spectrum had a general purpose in the proposed 2023 drag show to show support for LGBTQ+ students on campus?

A    Yes, that is correct.

Q    But Spectrum WT had no particularized message that it intended to convey, right?

A    I would still say that the show for the LGBTQ+ community, specifically for the trans students at WT, being able to mess with the gender norms was a way of helping support them in their like journey through transitioning.

Q    So you agree that the message of the show depended on the message of the individual performers, correct?

A    Yes.

Q    So you would agree that Spectrum left it up to the drag performers to come up with whatever message they intended to convey through their own individual performances, right?

A    Yes, that is correct.

Q    So for example, Spectrum didn't tell the drag performers that Spectrum wanted them to perform particular routines, right?

A    That is correct.

Q    Spectrum didn't tell performers to convey particular messages through individual routines, right?

A    That is correct.

Q    I am going to pull up for us Defendant's Exhibit 207 which is Plaintiff's Amended Responses to Defendant's First Set of Interrogatories.  I am going to read from page 18.

According to this document, Mr. Bright, there were a list of -- there were several individuals slated to perform or participate in Spectrum's proposed 2023 on-campus drag show, right?

A    That is correct.

Q    I am going to read from this list the list of names.  Barrett Bright, Marcus Stovall,

Henrietta, Cam AKA Ferris, Alexia Rey.  Lymitra, Valentine Van Buren, Aaron Kline AKA K, Michael Arredondo AKA Myss Myka as emcee.

Mr. Bright, is that list correct and complete as far as you're aware?

A    This list was for the show at Sam Houston. These were the performers except for K at Sam Houston.

Q    So this list is different than the individuals slated to perform on campus, correct?

A    That is correct.

Q    But you would agree that the drag show planned to occur at Legacy Hall in 2023 never happened, right?

A    The planned show that we planned for 2023 never happened.

Q    So it's not possible for us to know today whether the audience in that 2023 on-campus show would have understood the particular message that the individual performers in that show were intending to convey, right?

A    I would say for some of the performers, however, we do have a few performers on this list that were planned for that show and attended the show at Sam Houston and performed there.

Q    So you are of the mind that their message could not have changed in-between those shows?

A    No, I do believe that the message could have changed between the shows depending on what the performers originally planned to do.

Q    Okay.  Let's talk briefly about the 2024 drag show that Spectrum proposed to present at Legacy Hall.  So the less -- so the message of the 2024 drag show would have also been the individual messages of the individual performers and what they intended to convey, right?

A    Yes, that is correct.

Q    And the proposed 2024 drag show had a general purpose to show support for LGBTQ+ rights, correct?

A    Yes, that is correct.

Q    I'm going to pull up for us -- we're still on Defendant's Exhibit 207.  So I am going to read the list that is immediately below what I just read. As far as you are aware, Mr. Bright, there were several individuals planning to be involved with the 2024 drag show, correct?

A    Yes, that is correct.

Q    I'm going to read from this list.  A Finn Icky, Barrett Bright, Chance Autry AKA Frost Adams;

Izzy Fernandez, Jillian AKA Judas Chariot.  Aaron Kline AKA Marcus Stovall FKA Lauren Stovall, Michael Arredondo also known as Myss Myka.  Michael Truong, Ricky Rose Shields AKA Myss Acrylica Pourette and Jesus Lopez AKA Elliott.

THE COURT:  And Ms. Baker, I'm going to have to interrupt again.  We're going to take a brief IT break.  For some reason, the courtroom technology is not transcribing your question or the witness' answer.  We're going to work with IT and the court reporter to get those systems back on line.  I will work through the CRD and court staff to notify you when those preparations are complete.  So we'll stand in recess until such time as the IT technology is operational.

[PROCEEDINGS RESUMED AFTER BREAK.]

THE COURT:  Just as -- I'm just going to have a running apology to the parties, any witnesses affected, that our systems are not fail-proof.  Actually they are fail-proof in that it is without failure that things fail.  So they're fail-proof in that way.  Never has it been this bad, but I apologize for that.  That's a systems failure.  We are going to proceed without various software capability at the bench, but there will be an

appellate record at all time.  So my understanding is one system interfaces with my LiveNote.  If we have to power that down, we just will so we can just go with the record that you will need for your appellate review.  So at all times, we will have a standard court reporter-generated record on appeal, even if I don't have various screen technology available.  So we will just power through.  You will always have your record.  That's my understanding.  Ms. Baker, apologies to you.  Apologies to the witness.  I'll instruct the witness to take his seat in the witness stand.

MS. BAKER:  Before I proceed, I do ask whether the Court could clarify where we left off.

THE COURT:  Okay.  I'll instruct the court reporter to read aloud the last line recorded, the last question and answer.  The last question and answer that I reviewed on screen before the IT issues was:

"Q   Question:  And the proposed 2024 drag show had a general purpose to show support for LGBTQ+ rights, correct?

"A   Yes."

And then you had begun your next question.  We'll proceed from that point.  It may not perfectly

reflect the court reporter's record, but that is the last question.  You may reask that, if necessary, and then continue your Cross-Examination.

MS. BAKER:  Thank you, your Honor.

BY MS. BAKER:

Q    I'm going to reread the list of names and then continue with further questions.  This is a list of names from the 2024 drag show.  Aaron Homfeld AKA Finn Icky, Barrett Bright, Chance Autry, AKA Frost Adams, Izzy Fernandez, Jillian AKA Judas Chariot.  Aaron Kline, AKA K.  Marcus Stovall FKA Lauren Stovall.  Michael Arredondo AKA Myss Myka. Michael Truong, Ricky Rose Shields AKA Ms. Acrylica Pourette, Jesus Lopez AKA Elliott Lopez.  This list is complete and correct as far as you're aware, right, Mr. Bright?

A    That is correct.

Q    But the 2024 proposed drag show didn't happen, correct?

A    That is correct.

Q    So there's no way for us to know today whether the audience at that proposed on-campus 2024 show would have understood whatever the particular messages the individual performers intended to convey, right?

A    That is correct.

Q    And there's no way for us to know today whether the audience at the proposed on-campus 2024 drag show would have understood the message that the drag performers as a group were intending to convey either, is there?

A    I would say that there is still like the underlining message of like support and -- for the on-campus focus for the LGBTQ+ student community. But for the individual message, for -- of each performer, that is not known, or would have -- now is not known.

Q    But that show never happened, so we'd just be speculating, right?

A    That is correct.

Q    I'm going to pull up for us Defendant's Exhibit 3.  This is the Jack B. Kelley Student Center Procedures and Guidelines document.  This is a copy of the guidelines booklet for the JBK Student Center at WT, right, Mr. Bright?

A    That is correct.

Q    And Legacy Hall is in the JBK Student Center, right?

A    Yes, it is.

Q    And this guidelines document was in effect

in March of 2023 and in March of 2024 when Spectrum sought to use Legacy Hall for its drag shows, right?

A    Yes, I believe so.

Q    Let's scroll to page four of this document.  I'm going to read two paragraphs toward the bottom of page four.  The JBK Student Center staff reserves the right to deny space usage for any group or event that is programmatically or operationally impractical to accommodate or that conflicts with the University's mission or policies. The JBK Student Center reserves the right to cancel or interrupt any event in the interest of public safety, noncompliance with University policies or if the event can be viewed as inappropriate or not consistent with the mission of West Texas A&M University.

Mr. Bright, this document says that the University reserves the right to cancel or interrupt events that could be viewed as inappropriate or inconsistent with the educational mission of WT, right?

A    That is what the document says.

Q    And you strongly disagree with President Wendler's decisions concerning Spectrum's 2023 and 2024 drag shows, right?

A    That is correct.

Q    But you agree that under the provisions of the JBK Student Center Policies and Guidelines document, University administrators can cancel or interrupt events that could be viewed as inappropriate or inconsistent with the University's mission, right?

A    That is what the document says.

Q    Okay, Mr. Bright.  I want to take a few step backwards here and ask you questions about Spectrum's proposed on-campus drag shows as well as its off-campus drag show.  Mr. Bright, you were the primary organizer of Spectrum's proposed 2023 drag show, right?

A    That is correct.

Q    In fact, it was your idea to host -- to host the drag show, correct?

A    Yes, that is correct.

Q    And you wanted Spectrum to host a drag show because you believed drag is inherently a part of the LGBTQ+ culture, right?

A    Yes, that is correct.

Q    Spectrum applied to reserve Legacy Hall for its proposed on-campus drag show scheduled on March 31st, 2023, correct?

A    Yes, that's correct.

Q    You worked closely with the JBK help staff and Dr. Shawn Fouts specifically during the reservation process, correct?

A    Yes, that is correct.

Q    And the reservation process as far as you can remember, Mr. Bright, involves multiple stages, right?

A    Yes.

Q    Early on in the reservation process, you had to complete a risk assessment or a hazard matrix form, correct?

A    Yes.

Q    And on that hazard matrix, you identified some risks that the proposed 2023 drag show may pose to performers in the show, correct?

A    That is correct.

Q    I'm going to pull up Defendant's Exhibit 58.  This is the West Texas A&M Risk Management and Insurance Matrix for A Fool's Drag Race.  According to this form, you identified possible bad press as a potential risk of the show, right, Mr. Bright?

A    Yes, that is correct.

Q    And at the time of completing this form,

you were aware of nationwide news coverage highlighting parental concerns about minors being exposed to drag shows, right?

A    That is correct.

Q    And Spectrum planned to mitigate the risk of bad press or potential bad press by limiting the presence of minors at the on-campus show, correct?

A    Yes, that is correct.

Q    And when you completed that reservation application for the 2023 drag show, you indicated that minors were specifically invited to attend, correct?

A    That is correct.

Q    And at that time, you understood specifically invited to mean Spectrum members could reach out to minors and ask them whether they wanted to attend the event, right?

A    Yes, that is correct.  I wanted to reach out to my siblings and have them watch me perform.

Q    And your younger siblings, they would have been around 12 and 16ish around that time, right?

A    Yes, that is correct.

Q    But your reservation application also indicated that minors could attend only if accompanied by a parent or guardian, right?

A    Yes, that is correct.

Q    So a 17-year-old minor would have had to be accompanied by a parent or guardian to attend the 2023 drag show, correct?

A    Yes, that was the plan.

Q    But if a 17-year-old minor had a student ID, he or she could attend the event without a parent or guardian; is that correct?

A    I -- hmm.  I guess technically, we were going to have one of the -- our advisor or one of our allies also up front during the check-in process, so I'm not sure how they would have handled that situation.

Q    Would it help you if I presented a document to refresh your memory on this topic?

A    Yes, please.

Q    Let's pull up the transcript and we're going to look at page 60, lines 16 through 19.  When you were deposed, I asked:

"Q    So if you were a student, you didn't need to be accompanied by a parent or guardian, right?"

And you said:

"A    That is correct, if you had your WT student ID."

Does that refresh your memory?

A    Yes, it does.

Q    Mr. Bright, you're not sure whether Spectrum determined how it would ensure adults accompanying minor attendees were truly those minors' parents or guardian, are you?

A    That is correct.  I was -- I am -- was not sure how we were handling that situation.

Q    Spectrum's proposed 2023 drag show would have featured only student performers, correct?

A    Yes.

Q    And Spectrum's fliers marketed the show as PG-13, right?

A    That is correct.

Q    And you told the performers to keep their routines PG-13, right?

A    That is correct.

Q    But Spectrum used the PG-13 film rating as more of a guideline than a strict criterion, right?

A    That is correct.

Q    Because as far as you are aware, Mr. Bright, it's difficult to -- it's difficult to define precisely what conduct may be considered PG-13, right?

A    That is correct.

Q    To your understanding, a minor would not need to be accompanied by a parent or guardian to attend a PG-13 film, right?

A    That is correct.

Q    Yet Spectrum imposed that requirement because of its concerns about negative repercussions the organization could face if minors were allowed to enter without a guardian, right?

A    That is correct.

Q    Spectrum invited professional drag performers to judge student participants in the 2023 show, correct?

A    That is correct.

Q    And judges were going to rank performances based on certain criteria, correct?

A    That is correct.

Q    And the judges would have asked the participants beauty pageant style questions, right?

A    Yes, that is correct.

Q    And they would have selected one winner, right?

A    That is correct.

Q    And Myss Myka was invited to emcee the show, correct?

A    Yes, that is correct.

Q    And Myss Myka's a local drag performer, right?

A    Yes, she is.

Q    You're not sure whether you identified the participation of experienced drag queens and risk assessment required during the reservation process, correct?

A    That is correct.

Q    And the JBK staff left it up to you to review the performances before the show and determine whether they would be sufficiently PG-13; is that correct?

A    That is correct.

Q    And you never established a cut-off period or deadline by which the 2023 drag show performers had to have their routines finalized, right?

A    That is correct.

Q    You reviewed the performances in advance through practices, right?

A    Yes.

Q    But you did not have specific discussions with student performers about what PG-13 meant, right?

A    That is correct.

Q    And the drag show was a cosponsored event,

right?

A    Yes, it was.

Q    So several other student organizations were involved in the show's planning and practices, correct?

A    Yes, that is correct.

Q    And the JBK staff tentatively confirmed the 2023 drag show, correct?

A    Yes, that is correct.

Q    And as far as you're aware, Mr. Bright, under University policy, a group can only advertise an event after tentative confirmation, correct?

A    Yes, I believe so.

Q    But as far as you can recall, a tentatively approved event has not reached the final confirmed status, has it?

A    I don't believe so, no.

Q    Spectrum created multiple drafts of the fliers advertising its proposed 2023 drag show, right?

A    That is correct.

Q    And the WT risk assessment committee rejected some of Spectrum's fliers, right?

A    That is correct.

Q    Let's pull up Defendant's Exhibit 350.

This is an earlier iteration of Spectrum's 2023 drag show flier.  Mr. Bright, this is one of the fliers that the risk assessment committee rejected, right?

A    Yes, that is correct.

Q    And Spectrum didn't create this flier, but it approved the flier and sent it to the JBK for further review, right?

A    Yes, that is correct.

Q    And as far as you know, Mr. Bright, this flier which depicts a character doing some sort of split was rejected because it shows risky or injury-prone activity, right?

A    Yes, that is correct.

Q    Let's pull up Defendant's Exhibit 93, and please scroll to the page Bates stamped 984.  This is an email thread between Mr. Bright and Dr. Shawn Fouts about the finalized music list for the 2023 drag show.  You recognize this email thread, don't you, Mr. Bright?

A    Yes, I do.

Q    And it's timestamped March 20th, 2023, correct?

A    Yes, it is.

Q    And here, Dr. Fouts is asking you to clarify some logistical details concerning the

proposed March 31st, 2023, on-campus drag show, correct?

A    Yes, that is correct.

Q    But as far as you're aware, an event cannot receive final confirmed status until all the details of the event have first been finalized and confirmed, correct?

A    Yes, that is correct.

Q    Okay, Mr. Bright.  I'm going to ask you a few questions now about Spectrum's off-campus drag show in Sam Houston Park in 2023.  So after learning of President Wendler's decision, Spectrum decided to host its drag show off campus, right?

A    Yes, that is correct.

Q    And Chip Chandler suggested some alternative venues for the event, right?

A    Yes, he did.

Q    And Mr. Chandler suggested the 806 or Palace as alternative venues for the show, right?

A    Yes, he did.

Q    And you recall local businesses -- a local business owner reaching out and offering facilities for Spectrum's off-campus drag show, correct?

A    Yes, I believe so.

Q    Let's pull up Defendant's Exhibit 108.

This is a March 22nd email from the owner of Chill Natural Bar. You're involved in this email thread, right, Mr. Bright?

A    Yes, I am.

Q    And the business owner in this email said she'd be willing to work with Spectrum to find a solution with respect to an alternative venue, correct?

A    Yes.

Q    And as far as you know, a restaurant is an enclosed space, correct?

A    Yes.

Q    The Amarillo Area Trans Advocacy Group or AATAG was willing to help Spectrum host its student drag show, too, right?

A    Yes, that is correct.

Q    But Spectrum ultimately decided to host the event in Sam Houston Park on March 31st, 2023, correct?

A    Yes.

Q    And March 31st is the same day that the proposed on-campus drag show would have occurred, correct?

A    Yes.

Q    I am going to pull up Defendant's

Exhibit 234, and please scroll to the page marked Spectrum 642.  I am going to zero in on a message that you sent Mr. Bright on March 23rd.  You recognize this conversation, right, Mr. Bright?

A    Yes, I do.

Q    And I'm going to read what you said in this thread:  Laur, go ahead and start the paperwork and let me know if you need any help with that.  I think we can definitely get support from the community to be able to get the required equipment and money.  You sent this message, right, Mr. Bright?

A    Yes, I did.

Q    And you thought Spectrum could definitely get community members to pitch in and help with securing an alternative venue, correct?

A    Yes, that is correct.

Q    The expenses that Spectrum paid to secure the park venue were eventually covered by donations, correct?

A    Yes, that is correct.

Q    As far as you're aware Spectrum advertised its Sam Houston drag show on campus, correct?

A    Yes, we did.

Q    And you would say overall the Sam Houston

drag show was a success, wasn't it, Mr. Bright?

A    Yes, it was.

Q    And there were a lot of attendees at that event, right?

A    That is correct.

Q    More people than you expected, correct?

A    Yes, that is correct.

Q    In fact, it was the best attended Spectrum event that you had ever been to, right?

A    Yes.

Q    And the event was advertised as PG-13, correct?

A    Yes.

Q    I would like to pull up Defendant's Exhibit 283.  283.

MR. BRYANT:  For the record, this is a screenshot of the Sam Houston drag show flier posted on Spectrum's Instagram account.

BY MR. BRYANT:

Q    Mr. Bright, this Instagram post is stamped March 30th, 2023, right?

A    Yes.

Q    And that was one day before the show, correct?

A    That is correct.

Q    So one day before the show, Spectrum represented to others that minors could attend the show only if accompanied by a parent or guardian, correct?

A    That is correct.

Q    And there were student performers in the Sam Houston drag show, right?

A    Yes, there were.

Q    You performed in the Sam Houston drag show, right?

A    Yes, I did.

Q    And for that drag show, there were performance practices in a rented dance room on campus, correct?

A    Yes, that is correct.

Q    Professional drag performers also participated in the Sam Houston Park show, correct?

A    Yes, that is correct.

Q    Mr. Bright, you previewed and preapproved all of the student performances in advance of the show, correct?

A    Yes, I did.

Q    But you did not preview or preapprove all of the professional drag performers' routine before they were allowed to go before the audience, right?

A    That is correct.

Q    You told the drag performers that it would be a PG-13 show, right?

A    Yes.

Q    And you trusted the professional performers' judgments and their ability to keep their acts PG-13, right?

A    Yes.

Q    But you agree PG-13 is kind of hard to define, right?

A    Yes, I do.

Q    Let's pull up Defendant's Exhibit 371. This is a video clip of Valentine Van Buren performing doing -- during the Sam Houston drag show.

MR. BRYANT:  Defendant will play all four minutes and 18 seconds of the video.

[DEFENDANT'S EXHIBIT NO. 371 PLAYED.]

BY MS. BAKER:

Q    Mr. Bright, the performer in that video is an experienced drag performer, correct.

A    That is correct.

Q    Is that Valentine Van Buren?

A    Yes, that is correct.

Q    So Mr. Bright, you hadn't viewed that

performance in advance of the show, had you?

A    I had not.

Q    Children were handing Valentine tips in that video, correct?

A    Yes.

Q    Now, we'll turn to Defendant's Exhibit 375 which is another video clip from the Sam Houston drag show.

MR. BRYANT:  Defendant will play all three minutes and ten seconds of this video.

[DEFENDANT'S EXHIBIT NO. 375 PLAYED.]

BY MS. BAKER:

Q    Mr. Bright, you didn't know that was going to happen, did you?

A    I did not.

Q    There was a child in that video collecting tips from the audience, right?

A    That is correct.

Q    Spectrum didn't check IDs during the show, did it?

A    Not that I was aware of.  I was back stage at that time.

Q    Spectrum did not confirm minors' attendance at the event with a parent or guardian, correct?

A    As far as I know.

Q    Spectrum made no effort to restrict people from entering the park, correct?

A    That is correct.

Q    Mr. Bright, I would like to shift our discussion to Spectrum's proposed 2024 drag show. After hosting its Sam Houston drag show off campus, Spectrum wanted to host another drag show, correct?

A    That is correct.

Q    But it wanted to host this drag show on campus, right?

A    That is correct.

Q    Myss Myka was reinvited to emcee the proposed on-campus show, right?

A    That is correct.

Q    And the proposed 2024 drag show was not limited to WT students, right?

A    That is correct.

Q    And as far as you are aware, Mr. Bright, some WT students planned to participate in the event, correct?

A    That is correct.

Q    Just as during the 2023 drag show, you were responsible for previewing performances in advance of the show, right?

A    That is correct.

Q    And Spectrum hosted practices where performers could run through their routines, correct?

A    Correct.

Q    And these practices were held on campus, right?

A    That is correct.

Q    And experienced drag queens were also involved in these on-campus practices, correct?

A    I'm trying to remember.  I can't remember if we had anyone invited that showed up to our practices.

Q    Would it help if I presented a document and sort of refresh your memory on that?

A    Yes, please.

Q    Let's look at the transcript, page 149, lines 18 through 22.  During your deposition, I asked:

"Q    So students would go there to practice their routines; but while there, they could also get tips and pointers from more experienced drag performers, right?"

And your response was:

"A    I believe so, yes."

Does this refresh your memory, Mr. Bright?

A    Yes.  And was this a question referring to the 2024 show?

Q    Yes.

A    All right.

Q    As far as you are aware, Mr. Bright, Spectrum did not check IDs during those on-campus performance practices, right?

A    That is correct.

Q    After President Wendler issued his March 18th, 2024, statement preventing Spectrum from hosting its 2024 drag show on campus, Spectrum considered a few alternative venues for the show, correct?

A    That is correct.

Q    Chip Chandler suggested the 806 Bar and Lounge and the R&R as potential alternative venues, correct?

A    That is correct.

Q    And Chip Chandler advised you to contact the 806 and R&R as off-campus venue options, right?

A    Yes, that is correct.

Q    Spectrum did not utilize either of those suggested venues for its show, right?

A    That is correct.

Q    Spectrum never hosted its 2024 drag show because everything fell apart, right?

A    Yes, that is correct.

Q    And you were preparing to graduate by that point, right?

A    Yes, I was.

Q    And no one else was able to keep up with the planning process, right?

A    That is correct.

Q    Mr. Bright, you're not aware of any future or ongoing plans by Spectrum to host an on-campus drag show in 2026, are you?

A    I am aware that there is a plan for one. I am not aware about anything else about it.

Q    Mr. Bright, you haven't been a student at WT for last year and a half, right?

A    That is correct.

Q    And you're currently in graduate school now, right?

A    That is also correct.

Q    After President Wendler's decision concerning Spectrum's proposed 2024 and 2023 drag shows, Spectrum continued to use the JBK for its events, correct?

A    As far as I know.

Q    And after President Wendler's decision concerning Spectrum's proposed drag shows, Spectrum still had access to the same buildings and rooms on campus that it did before the controversy surrounding the drag shows, correct?

A    Yes, except for Legacy Hall for the purpose of the drag show.

Q    But aside from Legacy Hall for the purpose of the drag show, Spectrum continued to utilize the campus facilities that it was privileged to as a registered student organization, right?

A    That is correct.

Q    And after President Wendler's decision concerning Spectrum's drag shows, Spectrum continued to hold meetings in on-campus facilities, correct?

A    That is correct.

Q    And as a registered student organization, Spectrum did not lose access to any on-campus spaces because of the controversy surrounding on-campus drag shows, correct?

A    That is correct.

Q    Mr. Bright, you agree that there are resources and support for members of the LGBTQ+ community on the campus of WT, correct?

A    Yes, that is correct.

MS. BAKER:  I have no further questions at this time.

THE COURT:  Thank you, Ms. Baker.  At this time, I'll consult with my CRD and clerks to provide a time-check to both parties and counsel before turning to any Redirect and Recross so you know how much time you have remaining.  So Defendant has 28 minutes remaining, and Spectrum as Plaintiff has one hour and 22 minutes remaining.  Any Redirect of this witness, Mr. Steinbaugh?

MR. STEINBAUGH:  Yes, your Honor.

THE COURT:  You may proceed.  And because I don't have LiveNote, be extra careful in identifying exhibits by number so that we have a clean appellate record.

MR. STEINBAUGH:  I will.

REDIRECT EXAMINATION

BY MR. STEINBAUGH:

Q    Mr. Bright -- excuse me one moment.

MR. STEINBAUGH:  I need to set up the screen here.  I'm not able to see the screen.

May be life.  Maybe not.

THE COURT:  It was there for a moment.

MR. STEINBAUGH:  That was not mine.  Yep,

that's hopefully me.

THE COURT:  Well, looks like Sicily.

MR. STEINBAUGH:  That looks like -- yep, there we go.

THE COURT:  There you are.

MR. STEINBAUGH:  Eagle has landed.

BY MR. STEINBAUGH:

Q    Mr. Bright, you will recall during your testimony earlier, my colleague on the other side brought up some of your testimony at pages 51 and 52 of your deposition about the message that Spectrum was going to collectively convey about the 2023 -- or through the 2023 drag show.  Do you recall that testimony?

A    Yes, I do.

Q    Will you read your testimony on pages 51 and 52 following that exchange.  Will you read the orange highlighted part.

A    At 21, the question is:

"Q    And there's also -- are you saying there's also a collective message as well?"

And I replied:

"A    I would say that the collective message of the drag show was to, like I said, to show support for the LGBTQ+ community and as

a way to, like, mess with and bend gender norms as well as raise money for the Trevor Project."

Q    And is that consistent with your testimony today?

A    Yes, it is.

Q    Why would someone perform in a drag show hosted by an LGBTQ+ student group if they did not intend to communicate something about gender norms?

A    I would -- I would not know about that.

Q    Do you recall in Defendant's Exhibit 58 there was the form, the matrix that was shown and it asks that you -- let me back up.  You had testified about your siblings being present or invited to the 2023 drag show; is that correct?

A    Yes, that is correct.

Q    Would your parents have been there?

A    Yes, they were.

Q    Were they present at the off-campus show?

A    Yes, they were.

Q    Do you think your parents would have been upset if there had been something inappropriate during that performance and your siblings had seen it?

A    Yes.

Q    Were they upset?

A    No.

Q    You also mentioned during the exchange about checking IDs.  I think you mentioned that the groups' advisor or someone from Buff Allies would be involved in that.  Could you tell me more about who would have been checking IDs?

A    Yes.  So along with the lockbox for collecting money for tickets, we were going to have either Kristina Drumheller or someone from Buff Allies to check IDs at the door for the Fools' Drag Race on campus.

Q    So that would have been a professor of the University checking IDs?

A    Yes, that is correct.

Q    And you mentioned someone from Buff Allies being there.  Would that have been Chip Chandler?

A    Chip Chandler or Echo Sibley or another member of Buff Allies.

Q    Who is Chip Chandler?

A    Chip Chandler is one of the heads of Buff Allies and -- I believe the communications director at WT.

Q    Do you recall working with Dr. Fouts in planning the 2023 drag show?

A    Yes, I do.

Q    Would you say you had a good working relationship with him?

A    I believe so, yes.

Q    If he had said to you we need to make sure that we check state IDs or birth certificates, is that something you would have done?

A    Yes.

Q    Did he ever raise that question with you?

A    No.

Q    There's been a lot of exchanges today about professional drag queens from the local community.  Who communicated with them?

A    Chip Chandler.

Q    Who put you in touch with them?

A    Chip Chandler.

Q    And you said that he was the director of communications for the University?

A    Yes, I believe so.

Q    I'm trying to find my mouse here.  Unplug it -- how many reviews did you conduct of the students' performances before the 2023 drag show?

A    I would say multiple.

Q    Multiple, more than one?

A    Yes.

Q    More than two?

A    Yes.

Q    Was Chip Chandler present for those?

A    Yes.

Q    Talk to me a little bit about what happened in the immediate aftermath of the cancellation of the show and then the transition to try to plan the Sam Houston Park show.  Was that -- did you keep -- what happened with the student performers between those two shows?

A    So we had some performers drop out of the Sam Houston show that we would have had on the 2023 on-campus show.  Some of them were worried about like the -- their parents finding out they're part of the LGBTQ+ community, about some, like of the backlash of all the news being built up around it and they wouldn't have been able to transition to the Sam Houston show.

Q    So is it fair to say you lost a number of student performers between shows?

A    Yes, we lost quite a few.

Q    Were you concerned about being able to put on a show because of the loss of performers?

A    Very much so.

Q    Did you mention that to Chip Chandler?

A    Yes, I did.

Q    What was his response to that?

A    I believe he said he was going to reach out to some of the local drag queens to see if we can fill in some spots.

Q    It was his idea to bring in the local drag queens for the off-campus show?

A    Yes, that's correct.

Q    Would they have performed at the on-campus show?

A    No, they would have not.

Q    There was a -- some mention about the success of the show despite the cancellation.  Being a member of the LGBTQ+ community in Amarillo and in Canyon, would you say that Wendler's email angered the community?

A    I would say yes, it did.

Q    Did it receive substantial media coverage?

A    Yes, it did.

Q    Do you think that had an impact on the attendance?

A    Very much so.

Q    There was also mention about the flier for the off-campus show talking about the presence of minors in the public park.  Did Spectrum have any control over who would be in a public park?

A    No, we could not.

Q    Why did you tell people that?

A    We were hoping to discourage minors from showing up with the idea that we would still be able to check for IDs.

Q    Now, there were two videos that we saw. One of them -- the first one with someone, sort of a teal dress.  Do you recall that video that we just watched?

A    Valentine Van Buren's performance?

Q    Yes.  What was that style of dancing?

A    It was very fluid.  It felt like it had Hispanic roots to it, in that style.

Q    And is she Hispanic?

A    Yes.

Q    Do you think that was intentional?

A    Yes, a hundred percent.

Q    And I -- I know that there was also a child in that video.  Do you recognize that child?

A    I believe that is Echo Sibley's child.

Q    And who is Echo Sibley?

A    She is one of the leaders of Buff Allies and one of the people who wanted to bring their children to the drag show.

Q    And did you also see her in that video?

A    Yes, I did.

Q    Was she -- can you describe her?

A    She has blond hair.  She'll normally have like whacky glasses as well, and I believe she was up front on one of the chairs.

Q    So she was up front and center?

A    Yes.

Q    Did you also see police officers in that video?

A    I did.

Q    Did Spectrum hire those officers?

A    Yes, we did.

Q    And those are Amarillo or Canyon police officers?

A    Amarillo, yes.

Q    Did they do anything?

A    No.

Q    They didn't respond to any of this?

A    No, they did not.

Q    Do you think a police officer would respond if he saw lewd conduct in a public place?

A    Yes, I believe so, yeah.

Q    There was also in the second video -- I believe it was a second performer.  Is that something about -- well, can you describe what that

style of dance was?

A    That was a burlesque performance.

Q    And is burlesque the same thing as drag?

A    No.

Q    So if that performer had come to you during one of the rehearsals and said this is my planned routine, what would Spectrum have done?

A    We would have said we're not doing -- we can't do a burlesque performance.  If you could do a drag performance instead, that would be very helpful.

Q    And was that performer wearing a body suit?

A    That is correct.

Q    So there was no nudity here?

A    There was no nudity.

Q    And was this one of the performers that Chip Chandler invited?

A    Yes, that is correct.

MR. STEINBAUGH:  I have no further questions at this moment.

THE COURT:  Redirect, Ms. Baker?

MS. BAKER:  No further questions from Defendant.

THE COURT:  Okay.  So Mr. Bright, in

federal court, as distinct from other courts, the Court itself is allowed to examine witnesses.  So I will ask you a series of questions.  You should just respond as -- as you have been doing in a question-answer format.

EXAMINATION

BY THE COURT:

Q   So you have repeatedly stated as a purpose of the proposed drag show, the quote, bending of gender roles, quote; messing with that core concept, quote; breaking gender roles; and I think in one exchange, you stated they always challenge gender norms but don't always cross the gender divide.  And would you say from that testimony that drag shows are intentionally transgressive of norms as your organization understood it?

A   Yes, that is correct.

Q   And would some other -- I'm going to list a series of terms that appears in some of the literature submitted as exhibits by both the Government and the Defendant but also from Queer Theory Specialists.  Words like destabilizing, provocative, transgressive.  Are these characteristic of the purpose of a drag show?

A   I believe they can be, yes.

Q    Okay.  And was that one of your purposes in applying for the 2023 drag show?

A    Yes, that is correct.

Q    Okay.  And in other places in the exhibits, there is a focus on exaggerating or accentuating characteristics typical to a particular gender, and is this what you mean when you've testified about bending gender roles; that you are challenging or attempting to challenge or accentuate characteristics that are stereotypically male and female by alternating those roles?

A    Yes.

Q    Okay.  And do you agree that humans are a sexually dimorphic species?

A    As in there's a range of gender expressions that humans can present?

Q    No, I'm referring specifically to sexual dimorphism as distinct from any gender identity.  I know you're a scientist.  So male, XY; female, XX. Sex as strictly limited to sexual dimorphism?

A    I would say for most of the human population, that is correct.

Q    Okay.  Other than maybe select intersex categories and things of that sort?

A    Yes.

Q    Okay.  Understood.  And understanding that various expressions of some of these sexualities distinguish sex from gender or even gender identity, in being transgressive or provocative, is it necessary to exaggerate or accentuate women as the XX half of our usually sexually dimorphic species?

A    I'm sorry.  Could you repeat that one more time.

Q    If you are going to transgress and break gender roles as you've repeatedly testified, is it necessary through drag show to exaggerate female characteristics, specifically the sex female denominated XX by chromosome assignment?

A    I would say not always, but yes.

Q    So in the Fifth Circuit's review of this case, at least the first opinion authored by Judge Southwick, he stated that Spectrum did not dispute that at least one professional drag performer invited to at least two of these drag shows simulated masturbation before the audience and frottaged in other performances.  And here the Court takes judicial notice of the Webster -- Merriam Webster online dictionary definition of frottage to include the, quote, act of obtaining sexual stimulation by rubbing against a person.  Was it --

is it your understanding that drag performances will often include both of these acts in a simulated form?

A    I would say for performances targeted towards adults or for an adult audience that that can be the case, yes.

Q    Ask was it for that reason that you were insisting on a PG-13 rating?

A    Yes, that is correct.

Q    Or at least part of the reasoning for that rating.  I know you also had siblings in the audience and you were being mindful of them as well, but is part of the PG-13 rating focused on the fact that many drag shows do include highly sexualized, simulated masturbation, frottage and other activities that are indeed transgressive but maybe not appropriate to the forum?

A    Yes.

Q    Okay.  And Defendant's Exhibit 156 -- and we can provide a copy on screen, if necessary -- includes the historical MPAA definition of PG-13.

Now, I previously taught First Amendment law as an adjunct and thereby learned that there is an MPAA rating scale which is distinct from an MPA rating scale.  Some of these defamations have

changed historically, but here I'm just referring to that one exhibit, Exhibit 156, and this is the MPAA definition of PG-13, which includes, quote, full frontal nudity in limited circumstances and may include nudity like naked back sides or breasts. Were that to occur at one of your proposed drag shows, would that be outside of the Spectrum purpose in staging that event?

A    Yes, that would have been outside of what we expected for a performance.

Q    Okay.  And in presenting the proposed drag show in 2023 or the one applied for later, was it your intention to exclude minors because of the potential for highly sexualized content that would be outside or even on the barrier of PG-13?

A    No, our purpose for excluding minors was due to the cultural backlash of what people perceive as a drag show, not specifically for our drag show.

Q    Okay.  And I'm going to read now from a *New York School of Law Law Review* written by Simma Birnbaum:  Obscenity in the Art of Drag, and she defines drag in various ways and notes that historical regulation of such show is rooted or stems from the association between drag show and such sexualization.  And she explains, quote:  It

sometimes exaggerates and accentuates characteristics typical of a particular gender, most often with male identifying individuals doing comedic routines while dressed in exaggerated feminine attire and characteristics.

And another political scientist, Gerasimos Kakoliris expounded on Judith Butler's theory of gender performativity and says:  It is necessarily subversive and destabilizing of gender norms and will -- in furtherance of that provocation will often focus on sexual practices and desire.

You have repeatedly stated that drag shows are inherently part of LGBTQ+ culture.  Is it frequently sexualized in nature, these performances?

A    Are you asking that?  Are these performances of drag shows --

Q    Frequently sexualized?  Do they involve some of the conduct that Judge Southwick made reference to because they are intentionally transgressive and provocative, this is why you will -- you may expect or anticipate simulated masturbation before an audience, frottage and other things?

A    Yes, for an adult audience.

Q    Understood.  So the PG-13 rating and some

of the other materials in Plaintiff's portfolio of exhibits represents your attempt as president to control some of those boundaries so that the presentation would be transgressive, provocative, maybe even breaking some gender norms but without breaking any rules regarding the forum and age appropriateness.

A    That is correct.

Q    Okay.  Now, understanding what you know of the forum status of Legacy Hall, is it your understanding that a sexualized show using some of the things cited by Judge Southwick as examples would not be appropriate to that forum?

A    I believe so, yes.

Q    Okay.  And using a hypothetical, there is an entire different category of law specific to SOBs -- not what you're thinking -- sexually oriented businesses, sometimes including strip clubs and things of that sort.  It's sometimes referred to as SOB jurisprudence.  Would you agree that no amount of parental identification or presence would gain a 13-year-old access to a strip club or other sexually oriented business?  Is that your understanding?

A    Yes, that is correct.

THE COURT: Okay. With that, this witness may step down. May he be excused?

THE WITNESS: Thank you, your Honor.

MR. STEINBAUGH: Yes.

THE COURT: Okay. And from the Defendant, may this witness be excused, or is he subject to call-back?

MS. BAKER: Yes, he may be excused.

THE COURT: So let me explain what that means. You may not only step down, but you are also excused from this hearing. At this point, you may remove yourself from the courtroom and get on with your birthday plans.

THE WITNESS: All right. Thank you so much.

THE COURT: So this witness is excused. With that, I'll turn to Plaintiff. Do you have any additional witnesses or evidence in your case in chief, or do you need a time-check?

MR. MORRIS: If we can get a time-check, your Honor. Then I think we have some limited deposition testimony to read in. I think Mr. Rudovsky's going to handle that as well. Just alert the Court to some deposition designations that we would urge the Court to look at in making a

ruling.

THE COURT: All right. You'll get your time-check and then we'll proceed. Check this against your own calculations, but by our inventory, Plaintiff has one hour and 13 minutes remaining. And Defendant, 28 minutes.

So with that, Mr. Morris or Mr. Rudovsky, you may proceed with your next witness, whether through live testimony or in the form of deposition designations. Mr. Rudovsky, you may proceed.

MR. RUDOVSKY: Thank you, your Honor. Your Honor, at this time, Plaintiff would respectively draw the Court's attention to portions of the deposition designations. Parties have agreed the designations are admissible.

Dr. Fouts who oversaw the JBK during the relevant time testified at his deposition to some of the characteristics of Legacy Hall, to West Texas A&M's practices in opening the space to its students and surrounding community and to Spectrum reservation of Legacy Hall in accordance with the University's event approval process.

He testified that Legacy Hall's offered on a first-come, first-serve basis. That's at page 25 of the deposition transcript. That Legacy Hall's an

enclosed space, fairly soundproofed, with no windows on the doors. It's at pages 26 to 27 of the deposition transcript.

That the events in Legacy Hall do not disrupt classes and that the '23 and 2024 drag shows would not have disrupted classes. That's at page 27.

MR. BRYANT: Your Honor, it appears that Mr. Rudovsky's just doing his summary of the testimony and we would object to the testimony being presented other than by Q and A.

THE COURT: Okay. So we can read these in Q and A format, but I know I have imposed the time restrictions in this case and counsel for both sides have worked diligently to comply with those restrictions. Any objection to offering selected designations for further review and we can do that by page and line number, or we can read Q and A for effect.

MR. MORRIS: I think just for time purposes, your Honor, if Mr. Rudovsky can just point the Court to exactly the page and line numbers, we would urge the Court to pay attention to, I think we would be fine with that and --

THE COURT: Any objection, Mr. Bryant, to

a designation format for this evidence?

MR. BRYANT:  No, your Honor.

THE COURT:  So let's do it by designation. Let me make certain that I have the necessary exhibits before the bench.  We will carefully flag each and all designations highlighted by Plaintiff: Because I'm lacking LiveNote simulcast of this testimony, I am going to strictly instruct all three law clerks to write down these designations to accurately record for further judicial review every deposition transcript excerpt you would have this Court review.  And just so you know, my frame of mind, I know binding Fifth Circuit case law says that the District Court need not go on a fishing expedition to hunt for exhibits.  This is your attempt to prevent such an expedition and instead to highlight specifically those portions of the evidence you think are relevant to your case and should be reviewed in adjudicating the pending motion.

Mr. Rudovsky, you may proceed.

MR. RUDOVSKY:  And your Honor, would it be okay if I read in the specific deposition designations without giving a summary?  I'll point the Court to the specific --

THE COURT:  Yes.

MR. RUDOVSKY:  -- line and page numbers.

THE COURT:  And I think that was the essence of Mr. Bryant's objection.  We were summarizing instead of getting the exact word-by-word testimony at the -- from the deposition transcript.  This represents the compromise.  We'll do it by designation.

MR. RUDOVSKY:  Understood.  Thank you, your Honor.  Starting with Dr. Fouts' testimony.

THE COURT:  Okay.

MR. RUDOVSKY:  Okay.  Page 25, lines 21 through 23.

Page 26, lines -- line 20 to page 27, line two.

Page 27, line 20 to page 28, line five.

Page 28, line 14 to page 29, line 22, in addition to Plaintiff's Exhibit 21.

Page 33, line 25 to page 34, line five.

THE COURT:  And that was page 33, line 25 through page 34, line 5?

MR. RUDOVSKY:  Yes.

THE COURT:  So as we typically write it, 33, colon, 25 through 34, colon, five, correct?

MR. RUDOVSKY:  Correct.

THE COURT:  Okay.

MR. RUDOVSKY:  Page 44:8 to 11.

Page 45:20 through 24.

Page 88:17 to page 91:10.

95:24 to 97:4.

128:13 to 129:5.

And Plaintiff's Exhibit 32.

129:21 to 130:2.

162:19 to 163:4.

145:14 to 18.

THE COURT:  And could you repeat that.  I was starting a new note.

MR. RUDOVSKY:  Sorry.  Yes.  145:14 through 18.

THE COURT:  Okay.

MR. RUDOVSKY:  And two more for Dr. Fouts. 146:6 to 147:5, Plaintiff's Exhibit 33.  And 149:8 to 21, Plaintiff's Exhibit 35.

THE COURT:  Okay.  Is that the entirety of your deposition excerpts?

MR. RUDOVSKY:  That is the entirety of Dr. Fouts' excerpts.

THE COURT:  Okay.  At the close of today's hearing, I will ask my clerks and CRD to confer with Plaintiff's counsel to make certain we have all of

these accurately since we've had trouble with the LiveNote today.  But between the four of us, we should have a list that matches your list.  Okay.  So the next witness.

MR. RUDOVSKY:  Thank you, your Honor.  The next witness is Chip Chandler.

THE COURT:  Please proceed.

MR. RUDOVSKY:  16:17 to 21.

21:7 to 19.

28:9 to 29:18.  And Plaintiff's Exhibit 14, 9 to 29.

32:16 to 23.

32:24 to 33:3.

33:21 to 34:10.

34:11 to 15.

34:25 to 36:2.

47:9 to 14.

36:24 to 37:13.

Plaintiff's Exhibit 15, 16, 17, and 18.

55:12 to 19.  57:17 to 19.  58:18 to 59:1.

And 68:11 to 19.  That completes --

THE COURT:  That is it for Chandler?

MR. RUDOVSKY:  Correct.

THE COURT:  Okay.

MR. RUDOVSKY:  With the Court's

indulgence, I will next read a few excerpts from Dr. Thomas' deposition designation.

THE COURT:  Please proceed.

MR. RUDOVSKY:  25:15 to 26:8.

THE COURT:  This begins with the question: Was there a concern that a particular provision of the code of conduct, et cetera?

MR. RUDOVSKY:  Correct.

THE COURT:  You may proceed and read that into evidence.  Please use the question-answer format and not a summary.

MR. RUDOVSKY:  One moment, your Honor. Was there any concern or allegation -- sorry.

"Q    Was there any concern or allegation that the performance would violate any particular provision of the student handbook or community standards?

"A    Expressed to me?

"Q    Correct.

"A    No.

"Q    And you didn't express a concern to anyone else?

"A    I did not."

42:19 to 44:1.

51:7 to 15.

52:4 to 10.

And 52:25 to 53:11.  And 54:6 through 11.

61:21 to 63:10.

109:21 to 110:13.

And that concludes the designations for Dr. Thomas.

THE COURT:  Okay.  And your next witness for evidence by designation?

MR. RUDOVSKY:  Just one designation for Mr. Stovall, your Honor.  That is 131:4 through 11.

THE COURT:  I'm almost there. 131:4 through 11.  And most of the designations are already highlighted, so I think we've matched these well, but is that your last witness for designations?

MR. RUDOVSKY:  And your Honor, Plaintiff would propose reading in segments of Fanelli's, Jonathan Fanelli's deposition that have been designated.

THE COURT:  Correct, and this transcript is dated 12/18/2025; is that correct?  I believe --

MR. RUDOVSKY:  That's correct, your Honor.

THE COURT:  Okay.  I want to make sure we're dealing with the right -- I think they inverted page one with the cover page, but okay.  So

I'm tracking with you.  Let's start with your call-out if you can give me the page/line designation.

MR. RUDOVSKY:  Okay.  Starting with page 52:

"Q    What's your best recollection as to when that meeting occurred when you were first elected president of Spectrum WT?

"A    Like the end of the semester between when she left and when I became president, we had -- like usually we have elections at the end of the year.  But we have to -- it kind of at the midway point because she was graduating during that semester.  So we have to kind of switch around officers, so it would have been at the end of the fall semester."

THE COURT:  So that statement is in evidence as read aloud in open court and by my counting, that should be the Fanelli deposition, 52:18 through 53:4, correct?

MR. RUDOVSKY:  Correct, your Honor.

THE COURT:  Okay.  I have your evidence. I'll give it the weight to which it is due.  Any other witnesses?

MR. RUDOVSKY:  I apologize, your Honor.  I

have a few more designations to read for

Mr. Fanelli.

THE COURT:  Okay.  Understood.

MR. RUDOVSKY:  This is 152:2 to 13.

"Q    Can you turn to Exhibit 6.  (Witness

complies.)  Okay.  Do you see Article II?  This

is -- again, this is the Constitution of

Spectrum as it currently stands.  Do you see on

the front page, Article II purpose:  It says

the primary purpose of this organization is to

provide a safe space for LGBTQ+ student and

allies to come together.  Do you see that?

"A    Yes."

And then it skips down to 152:20.

"Q    So would you agree, can you explain

whether or not Dr. Wendler's refusal to allow

Spectrum to host a drag show on campus has

hindered Spectrum in being able to meet this

primary goal?

"A    Yes.  So drag shows in the past were

a very large primary not only way for us to get

out there as an organization and express that

queer organization on campus and express this

mission here but also in order to have

fund-raising events and be a charitable

organization towards causes that are important to us like the Trevor Project.  And with that, with that being gone, it has been exceedingly hard for us to be able to do that on campus.

"Q    If you look at here, the secondary goal of Spectrum WT is to raise awareness of the LGBTQIA+ community.  Can you explain whether or not Dr. Wendler's decision to prohibit drag shows on campus has hindered Spectrum from meeting that goal?

"A    Once again, banning drag show bans that very large event that would basically be a way for us to be like hey, this is a queer organization, this is what queer culture looks like.  And being able to share with the surrounding community and educate others on who we are as people, so that being gone directly hinders that.

"Q    Okay.  I think you touched on this, but it says thirdly:  Our organization will strive to take every opportunity to educate WT and the greater community on issues concerning LGBTQIA+ life.  Can you explain whether or not Dr. Wendler's decision to prohibit drag shows on campus has hindered Spectrum's efforts as to

that third point?

"A    Once again, very, very large event, especially when it comes to fund-raising.  So I know in the past, we fund-raised for the Trevor Project which is queer suicide prevention which is a very prevalent issue in our community.  And not having that event to be able to educate the public on that further, both queer and non-queer people, has been a big problem.

"Q    Okay.  I think you touched on this earlier.  I'm just -- I want to clarify.  So can you explain, is there a difference between the message that individual performers at the planned 2026 drag show would convey versus any message Spectrum might convey as a whole from hosting the drag show?

"A    I'm sorry.  As a whole, obviously Spectrum will be expressing support for the queer community.  If we're able to do fund-raising in the future, then obviously we would be able to educate the public on whatever charitable organization that we're working with."

        Page 156:6 to 156:15.

"Q    Can you explain whether or not

communicating support for queer culture is an essential element of the drag show?

"A    I think it can be for sure.  If Spectrum was to do one, that would be what our essential goal would be.  There's different drag shows for different reasons at different places at different times.  For Spectrum personally, that would be our primary goal."

        Page 156, line 19 to 24.

"Q    You testified earlier Spectrum has not assigned a rating yet for its 2026 drag show planned at Legacy Hall.  Can you explain based on, you know, your position as president of Spectrum what you would expect that rating to be?"

        157, line 2 to 4.

"A    I would expect it to be somewhere between PG, possibly PG-13, but would not allow or expect it to exceed that."

        157:6 through 21.

"Q    Last question for you.  Well, two more questions.  Is Spectrum's -- what is Spectrum's understanding of Dr. Wendler's March 2023 letter in terms of whether or not it bans drag shows on campus?

"A    So from Spectrum's understanding, it was very much the consensus of they're banned off campus entirely.  Whether or not that's legally true, I don't know for sure, but that was Spectrum's understanding."

Does Spectrum have any reason to believe -- sorry.

"Q    Does Spectrum have any reason to believe that Dr. Wendler will not ban its upcoming -- it's planned drag show for Legacy Hall in April 2026?

"A    We don't have any reason to believe he won't ban it, no."

THE COURT:  I have your evidence as read aloud at the hearing today.  It will receive the weight to which it is due.  Any additional witnesses through deposition designations or additional excerpts?  Mr. Rudovsky, you may proceed.

MR. RUDOVSKY:  Your Honor, Plaintiffs would respectfully request a five-minute recess to go over our material and make sure we have all our exhibits and evidence in record.

THE COURT:  That's anticipating Plaintiffs closing its case; is that correct?

MR. MORRIS:  I think after that, we'll

identify the exhibits we want to point the Court's attention to. I think we might have a video to play and I think after that we will be closing our case in chief, your Honor.

THE COURT: Okay. Understood. To allow for that efficiency and to offset any technical issues we have had today, let's take a five-minute recess. I'll give you a little more time. Eight minutes. Let's resume at 4:35. And if you need to coordinate with my clerks or CRD about any designations, exhibit numbers, please do so. You can do so through the CRD.

[PROCEEDINGS RESUMED AFTER BREAK.]

THE COURT: I'll give you a time-check and then we'll proceed with what remains with Plaintiff's case in chief. It's like the movie *Apollo 13* where all the control room engineers have to give the thumbs up and come up with the same number. So we have Plaintiff's remaining time at 51 minutes and Defendant's remaining time at 28 minutes. And Mr. Morris, Steinbaugh or Rudovsky, any additional evidence or witnesses to present?

MR. RUDOVSKY: Yes, your Honor, just a handful more exhibits.

THE COURT: Okay. You may proceed. Let's

do it this way.  Start with the exhibit number and then give me those page and line designations so we can keep exhibits and pages straight.

MR. RUDOVSKY:  Your Honor, these are just exhibits, no more deposition designations.

THE COURT:  Okay.  Understood.

MR. RUDOVSKY:  Plaintiff's Exhibit 7, 28, 30, 32, 35, 40, 41; 42 is a video that we will play momentarily, and 49.

THE COURT:  And am I correct that all of these were preadmitted through the pretrial conference?

MR. RUDOVSKY:  Yes, your Honor.

THE COURT:  Okay.  Admitted without objection.  They will be given the weight they are due, and you may play any portion of that video or any other excerpt from that range.

[PLAINTIFF'S EXHIBIT NO. 42 IS PLAYED.]

MR. STEINBAUGH:  And the timestamp for that was 25:05 to 28:30.

THE COURT:  And this is Defendant's Exhibit 42 in video form.

MR. STEINBAUGH:  Plaintiff's Exhibit 42.

THE COURT:  Oh, this is Plaintiff's Exhibit 42.  Understood.  Okay.  I have your

evidence.  It was played aloud at the sentencing (sic) hearing.  It will be given the weight to which it is due.  Any additional evidence from Plaintiff during your case in chief?

MR. MORRIS:  Well, I'm somewhat saddened to learn that your Honor has considered this a sentencing hearing.  Just a joke.  But no, we close our case in chief, your Honor.  We have no more evidence.

THE COURT:  Did I say sentencing?  No, the Plaintiff/Defendant thing keeps getting me because of the way we often configure criminal cases.  And so yes, I understand that this is not a sentencing hearing.  I've occasionally switched Defendant for Plaintiff because of the configuration of this civil case.  But with that, does Defendant rest?

MR. MORRIS:  We do.  Plaintiff rests, your Honor.

THE COURT:  Plaintiff rests, yes.  Plaintiff rests.

MR. MORRIS:  I don't want to speak for Mr. Bryant.

THE COURT:  We have had enough technical glitches.  You don't need any glitchery from me as well.  So yes, the Court understands Plaintiff

rests.  At this time, Defendant may present its case in chief, and you have 28 minutes on the clock.

MR. BRYANT:  Your Honor, in our 28 minutes or less, Ms. Al-Fuhaid will present deposition excerpts that are already in evidence from the Fanelli deposition that we have designated.  I'll leave it to Ms. Al-Fuhaid to describe how she would propose to present those to the Court.

THE COURT:  Okay.  Ms. Al-Fuhaid, you may do that from counsel table or the podium.

MS. AL-FUHAID:  Thank you, your Honor.  I think what we propose to do is I will read the questions from our designated portions of Jonathan Jayce Fanelli's transcript, and I propose that Ms. Baker take the witness stand and read the answers.  Would that approach be acceptable to the Court?

THE COURT:  It's acceptable unless there is an objection from the Plaintiff.

MR. MORRIS:  No objection, your Honor.

THE COURT:  Okay.  We'll take it in that question/answer format.

MS. AL-FUHAID:  Thank you, your Honor.

THE COURT:  And Ms. Baker, you may assume your position in the witness well.  Because we are

going to do this type of colloquy configuration, let's have Ms. Baker at the podium. I'm sorry. Ms. Al-Fuhaid at the podium; Ms. Baker in the witness well.

MS. AL-FUHAID:  Thank you, your Honor. Can you hear me okay?

THE COURT:  Yes, we can.  The microphones actually worked today.  So of all the courtroom technology that failed, the microphones were not on that list.

MS. AL-FUHAID:  For now.  And your Honor -- your Honor, I will -- I will read some confidential excerpts that Plaintiff has designated confidential under the protective order, and I will alert the Court to that beforehand if the Court wishes to clear the courtroom.

THE COURT:  I'll instruct court security officers and marshals personnel to be available to instruct any members of the gallery who are not part of a party to remove themself from the courtroom and to also monitor the hallway so they can communicate that this portion of the proceeding is sealed.  With that, you may proceed.

MS. AL-FUHAID:  Thank you, your Honor.  We will begin on page 9, lines 14 to 22.

[THE FOLLOWING WITNESS IS PRESENTED  ]

[THROUGH DEPOSITION TESTIMONY.     ]

JONATHAN JAYCE FANELLI,

having been sworn, was examined and testified as follows by testimony being read into this record:

DIRECT EXAMINATION

BY MS. AL-FUHAID

Q   Mr. Fanelli-Burnett, my name is David Bryant.  I represent the Defendants in this case; so Walter Wendler and Dr. Chris Thomas in their officials capacities with West Texas A&M University. We were introduced to each other just before the deposition, and I understand it's okay for me to refer to you as Mr. Fanelli during this deposition. Is that okay?

A   Yes, sir.

MS. AL-FUHAID:  Page 11, 13 -- lines 13 to 25.

[DEPOSITION READING CONTINUES.]

BY MS. AL-FUHAID:

Q   What is your full name?

A   Jonathan Jayce Walker Fanelli-Burnett.

Q   Okay.  You have more names than some of us and I wonder what -- what is the name on your birth certificate, if you know?

A    I recently got my name legally changed, so it is -- so it is previous name which is K Breeze Blessing Fanelli-Burnett.

Q    I'm sorry?

A    K Breeze Blessing Fanelli-Burnett is the name on my birth certificate that I got recently legally changed.

Q    Okay.  And why did you change your name?

A    I am transgender.

Q    Okay.  And how long have you been transgender?

A    I've been out for probably six years now.

MS. AL-FUHAID:  And your Honor, we have moved to page 12 and are reading lines one to 25 on that page.

[DEPOSITION READING CONTINUES.]

BY MS. AL-FUHAID:

Q    And how old are you?

A    I am 21.

Q    So where did you grow up?

A    I grew up in Clarendon, Texas, primarily, but I moved around a lot.  The Panhandle.

Q    Did you grow up entirely within the larger Panhandle area?

A    Yes.

Q    Okay.  Where did you go to high school?

A    I graduated from Clarendon, but once again, I moved throughout the Panhandle.  So I've been about -- I've been to about three different high schools.

Q    Have you attended college other than at West Texas A&M which I'll sometimes refer to as WT?

A    No.

Q    And when did you first attend WT?

A    I came here in fall of '23.

Q    Have you continuously attended West Texas A&M since the fall of 2023?

A    Yes.

MS. AL-FUHAID:  Page 13, lines 1 to 20.

[DEPOSITION READING CONTINUES.]

BY MS. AL-FUHAID:

Q    Have you received any degrees, college degrees yet?

A    Not yet.

Q    How far along are you on your path to a college degree at West Texas A&M?

A    I'm currently a junior.  I switched my major.  So I'm a little bit behind, but I'm set to graduate in the next two years.

Q    So you expect to graduate sometime in

2027?

A    Yes.

Q    What is your current major?

A    English education.

Q    And what is your current minor if you have one, any minors?

A    I do not have one.

Q    Okay.  And I understand you are the current president of Spectrum WT, the Plaintiff in this case; is that right?

A    Yes, I am.

MS. AL-FUHAID:  And page 14, lines 6 to 21.

[DEPOSITION READING CONTINUES.]

BY MS. AL-FUHAID:

Q    What are your plans after you complete your college education?

A    I am possibly probably going to move to go up north to go be with my fiance and go teach up there, possibly in Colorado, I'm looking at -- I'm not too superset in stone, but I do not -- but I do want to teach, so --

Q    Do you know at what level you want to teach?

A    High school.

Q    Have you ever met Dr. Walter Wendler?

A    I haven't formally met Dr. Wendler but I've been like -- I've seen him around.

Q    Okay.  Have you ever communicated with him?

A    Not directly, no.

MS. AL-FUHAID:  Page 17, lines 1 through 6.

[DEPOSITION READING CONTINUES.]

BY MS. AL-FUHAID:

Q    Why did you choose to come to WT?

A    First of all, it's local.  And second of all, ever since I was like very, very young, like I have pictures of me at the Buff Fountain at like eight.  I was like I want to go to WT and so I did.

MS. AL-FUHAID:  Page 21, lines 1 through 25.

[DEPOSITION READING CONTINUES.]

BY MS. AL-FUHAID:

Q    Okay.  And when were you -- when did you become president of Spectrum WT?

A    That would have been the semester after -- so it would have been fall of '24.

Q    Okay.  And you were president of Spectrum WT for the fall of 2024, the spring of 2025 and the

fall of 2025?

A    Yes.

Q    As president of Spectrum WT, do you have access to any records that it has about its current and past members?

A    Yes, through Buff Link.

Q    Okay.  And what is the current number of members of Spectrum WT?

A    I do not have an exact number.

Q    Give me your best estimate.

A    I'd say probably 30.

Q    And if you look back to the spring of 2025 and I asked you the same question as to the membership of Spectrum at that time, what would your answer be?

A    The same, about 30.

Q    Okay.  And if we look back to the fall of 2024, what was the membership of Spectrum at that time?

          And now, your Honor, we're moving on to page 22, lines 1 to 19.

          [DEPOSITION READING CONTINUES.]

BY THE WITNESS:

A    I'd say about 30.

BY MS. AL-FUHAID:

Q    If we go back to the spring of 2024, what was the membership of Spectrum at that time?

A    I would say about 30 again.

Q    And if we go back to the fall of 2023 when you joined Spectrum, what was its membership then? You can answer the question.  Your attorney will or may state various objections for the record, but unless he instructs you not to answer, just go ahead and answer the question.

A    I'd say about 30.

Q    Okay.  So the Spectrum membership has been stable since you arrived on campus in the fall of 2023?

A    To my knowledge, yes.

MS. AL-FUHAID:  And we'll also get page -- lines 24 to 25 of page 22.

[DEPOSITION READING CONTINUES.]

BY MS. AL-FUHAID:

Q    Okay.  How does Spectrum determine whether the age of its members?

And now we're moving to page 20, 23, lines 1 to 16.

BY THE WITNESS:

A    We do not determine any age.

BY MS. AL-FUHAID:

Q    And you do not inquire; is that right?

A    No.

Q    It's not right or is it --

A    Yeah, we don't inquire.  We're just an open organization to any WT students.  So if they can come to WT, they can be in Spectrum.

Q    Okay.  And do you -- is it correct then that Spectrum has no policy or practice of excluding minors from its membership?

A    No.

Q    It's not correct?

A    Oh, we don't have like a direct policy that excludes minors, no.

Q    Okay.  Do you have an indirect policy?

A    No.

MS. AL-FUHAID:  Page 26, lines 4 through 7.

[DEPOSITION READING CONTINUES.]

BY MS. AL-FUHAID:

Q    Okay.  Did you witness any events related to the proposed drag show that Spectrum wanted to hold on the WT campus in the spring of 2023?

A    No.

MS. AL-FUHAID:  And page 26, lines 17 to 24.

[DEPOSITION READING CONTINUES.]

BY MS. AL-FUHAID:

Q    Has Spectrum applied for reservation to hold a drag show on the WT campus in 2026?

A    Yes.

Q    Were you involved in that application?

A    Yes.

Q    And what individual or individuals made the decision to make that application?

A    I did.

MS. AL-FUHAID:  Page 28, lines 13 to 25.

[DEPOSITION READING CONTINUES.]

BY MS. AL-FUHAID:

Q    Okay.  My question was whether your attorneys participated in applying for the drag show in 2026.  Again, it's just a yes-or-no question.

A    Yes.

MS. AL-FUHAID:  Page 29, lines 6 to 24.

[DEPOSITION READING CONTINUES.]

BY MS. AL-FUHAID:

Q    Do you recall that the Fifth Circuit Court of Appeals panel issued a decision in August of 2025 with respect to this lawsuit?

A    Yes.

Q    And as a result of that decision by the

panel, did you understand that Spectrum could proceed with the drag show at Legacy Hall on the WT campus?

A    Yes.

Q    And did Spectrum consider scheduling a drag show in the fall of 2025 as a result of that Fifth Circuit decision?

A    Yes, but due to timing, it just would not have been able -- we would not have been able to put on the performance that we would like to put on, so we decided to wait a bit until we had more time to plan.

Q    And when did Spectrum make that decision?

A    Probably in October.

MS. AL-FUHAID:  Page 30, lines 5 to 25.

[DEPOSITION READING CONTINUES.]

BY MS. AL-FUHAID:

Q    Okay.  Now, at this point, my understanding is that Spectrum has applied for a reservation for space in Legacy Hall for a drag show in late April of 2026; is that correct?

A    Yes.

Q    And to what extent, if any, have the details of that drag show already been decided?

A    We are in the very, very early planning

stages.

Q    And is it fair to say that -- strike that. Do you know who will perform at that drag show?

A    Not yet, no.

Q    Do you know what the performances or any of them will consist of?

A    Not yet, no.

Q    Do you have any knowledge as to the costumes or music that will be a part of that late April 2026 drag show?

A    Not yet, no.

Q    Page 31, lines one through five.  Is it fair to say that at this time, Spectrum has a general intention to have that drag show, but none of the details have yet been worked out?

A    Yes.

MS. AL-FUHAID:  Page 33, line 6 to 11.

[DEPOSITION READING CONTINUES.]

BY MS. AL-FUHAID:

Q    Is it fair to say that, again, leaving aside drag races, WT leadership has not in any way interfered with or harassed Spectrum in holding its events?

A    We haven't had any issues with that, no.

MS. AL-FUHAID:  Page 34, lines 8 to 22.

[DEPOSITION READING CONTINUES.]

BY MS. AL-FUHAID:

Q    Okay.  I understand that.  But is it fair to say that Spectrum -- misspoke -- West Texas University has not in any way interfered with off-campus events, formal or informal, that Spectrum chose to have?

A    We haven't had any issues, no.

Q    And is it fair to say that neither Spectrum nor any of its members to your knowledge have been subject to any kind of discipline from WT by reason of any events that Spectrum has held?

A    No.

Q    Is that correct to say or not correct to say?

A    We haven't had any issues, no.

MS. AL-FUHAID:  Page 35, lines 18 to 25. Actually the answer will go on to page 36 and end at line 3.

[DEPOSITION READING CONTINUES.]

BY MS. AL-FUHAID:

Q    Does Spectrum intend to convey any particular message through its proposed drag show in April of 2026?

A    So art is subjective.  Every single

performer is a separate artist, a separate artist. Each of the performances could mean different things to them.  Spectrum isn't going to say what those things mean because, once again, art is objective. So whatever a specific performer is trying to convey, they are free to convey that said message.

MS. AL-FUHAID:  Now, continue on page 36, lines 4 to 18.

[DEPOSITION READING CONTINUES.]

BY MS. AL-FUHAID:

Q    And at this point, Spectrum doesn't know who those performers are, right?

A    Not yet.

Q    And therefore, is it fair to say that at this point, Spectrum doesn't know what messages the performers that it ultimately selects will intend to express or will, in fact, express?

A    Not yet.  But as I said before, we do have an approval process.  We are not just going -- we are not just letting anyone perform.  We are asking them to provide an exact -- their choreography, what music they're selecting, their costumes, things like that.  And as I said before, art is subjective.  So their art can mean something different to different people.

MS. AL-FUHAID:  Page 37, lines 1 to 25.

[DEPOSITION READING CONTINUES.]

BY MS. AL-FUHAID:

Q    And is Spectrum going to make decisions as to who can perform at that drag show based on the message that the particular performer intends to express at the drag show?

A    So these -- this initial approval process would be considered an audition.  So we are just trying to select performers that we think are -- first of all, we have limited time.  We have limited slots, so we can't let everyone in.  So we want to try to let in -- of course, we want to be able to have everyone in.  But as I said, we have limited time.  So with this approval process, first of all, we're making sure that for one, their content is appropriate, it's not inappropriate in any way, which that's just with anything.  And then if we do have concerns, we are able to talk to said student about their performance and either how we can try to fix that or we can just say hey, we can't have you. And also, just making sure that we have people that are compassionate and want to be a part of the show in order to just -- I just want to do it for fun for no reason.  Because we have to plan these things.

We have to -- we have to get the music situated.  We have to figure out timing for everything.  This is -- like it's -- it's a performance, so you can't just let people go on just like any other performance.  You have -- you have to kind of have some sort of order.

MS. AL-FUHAID:  And that answer continued on to page 38, lines 1 through five.  Now, 39, lines -- page 39, lines 15 to 25.

[DEPOSITION READING CONTINUES.]

BY MS. AL-FUHAID:

Q   Okay.  Now, as part of your previous answer, you noted that whatever performances occur in the proposed 2026 drag show, they may be perceived as having many different messages or meanings to the audience; is that correct?

A   Yes.

Q   And there's no way that Spectrum or perhaps even the performer can control how their performances are perceived by different members of the audience, correct?

A   Yes.

Q   Page 40 lines, one through eight and ten through 25.  And do you understand that it is possible that members of the audience may be

offended by some of the performances?

A    With art, it is subjective.  Some people may be offended by content.  That being said, they are allowed to be offended by said content.  If they are offended by said content, they just do not come.

Q    Is it fair to say that Spectrum does not intend by its proposed 2026 drag show to express any specific message?

A    No.

Q    Is it not fair, or is it fair?

A    We are not trying to convey a specific message, no.

Q    Okay.  Now, has anybody at WT yet reacted to your application for reservation for a drag show in April 2026?

A    Not to my -- not to my knowledge.

Q    So you don't know at this point whether WT will allow that proposed drag show or not?

A    Not yet.  I'm currently waiting on, first of all, the approval.  And also, I recently filled out the risk assessment form so I'm just waiting for all of that to get approved.

MS. AL-FUHAID:  That answer continued until page 41, line 1.  And now we continue on page 41, lines 2 to 4.

THE COURT:  And Ms. Al-Fuhaid, you have ten minutes left on the clock.

MS. AL-FUHAID:  Thank you, your Honor.

[DEPOSITION READING CONTINUES.]

BY MS. AL-FUHAID:

Q   Okay.  And you have submitted that risk assessment online?

A   Yes, I have.

MS. AL-FUHAID:  Now, 41 lines 13 to 25.

[DEPOSITION READING CONTINUES.]

BY MS. AL-FUHAID:

Q   Now, in the previous 2023 drag show, you may not be aware of this.  Spectrum listed as a risk possible embarrassment to members of the WT community and possible harassment of performers or Spectrum members.  Do you believe that those are also risks with the 2026 drag show that you proposed?

A   It could possibly, yes.  And when I did fill out the form, I did say that it could possibly happen just because it's -- people are going to be mean.  That's just how people are.  So there's always a chance that it could happen to one of the performers.  I would hope not.  I would hope that people are nice and kind, but sometimes people

aren't.  So of course, that could be a possibility.

MS. AL-FUHAID:  And that answer continued onto page 42, lines 1 to three.  And now, we're moving to page 44, line 25 to page 45, line seven.

[DEPOSITION READING CONTINUES.]

BY MS. AL-FUHAID:

Q    Aside from Spectrum drag shows, have you attended drag shows in the past?

A    I went to my very first one last weekend.

Q    Where did you go?

A    I went to the 806.

Q    Could you describe the 806?

A    The 806 is a coffee bar downtown.

Q    Downtown in what city?

And it looks like we mistakenly did not designate that answer, your Honor, so I'll just move on.

THE COURT:  The Court will take judicial notice of the fact that the often referred to Club 806 is in the City of Amarillo, Texas.

MS. AL-FUHAID:  Thank you, your Honor. Page 48, lines 6 to 25.

[DEPOSITION READING CONTINUES.]

BY MS. AL-FUHAID:

Q    Do you have current -- do you have

knowledge of the current finances of Spectrum?

A    So we get about I believe $800 a semester through the school and that's kind of just what we work on with our current finances.

Q    Do you know what the current assets, cash or otherwise, of Spectrum are?

A    We have a, like, supply bin with stuff that we use when we table for freshman orientation.

Q    Does Spectrum have any cash?

A    No.

Q    Has Spectrum had any revenue, to your knowledge, since you've been an officer other than funds from -- from WT?

A    We had a, like, craft, like, fund-raiser table that we had last year.  I believe we made about a hundred dollars from that.

Q    Anything else?

A    No.

        MS. AL-FUHAID:  Moving to 49, page 49, lines 1 to 10 and 18 to 25.

        [DEPOSITION READING CONTINUES.]

BY MS. AL-FUHAID:

Q    Does Spectrum have any liabilities or debts?

A    No.

Q    Does Spectrum owe its attorneys any money?

A    No.

Q    Are its attorneys providing services they perform in this lawsuit without compensation from Spectrum?

A    Yes.

Q    Aside from the proposed drag show in April 2026, does Spectrum have any other events planned for the spring semester of 2026?

A    Yes.  We meet bi-weekly; and at every single meeting, we have a different event, whether that be craft night or a movie night, and we have that all planned out.

MS. AL-FUHAID:  So this will go from 49:25 to page 50, line 20.

THE COURT:  Ms. Al-Fuhaid, you are approaching the two-minute mark.

MS. AL-FUHAID:  Thank you.

[DEPOSITION READING CONTINUES.]

BY MS. AL-FUHAID:

Q    Do you recall what those events are other than just meetings?

A    So once again, our meetings are those events.  So at each meeting, we have a different event.  So we'll have initial meeting and then we

have a New Year celebration party.  We have a movie night.  We have a Power Point night.  We have a potluck at the end of the year.  What else do we have.  I think we have eight or nine meetings that -- I don't know the schedule off the top of my head, but every single meeting that we meet bi-weekly, we have a different event.

Q    Is it fair to say that you don't expect WT to have any problems with any of the events that it intends to hold in the spring semester of 2026 other than possibly the proposed drag show?

A    No.

Q    Is it fair or is it not fair to say that?

A    I don't think that they have a problem.  They haven't set -- they haven't, so.

MS. AL-FUHAID:  Thank you.  Your Honor, for the remainder of the deposition, we'll refer the Court to the designated sections.

THE COURT:  Okay.

MS. AL-FUHAID:  Thank you, your Honor.

THE COURT:  Can you read those back into the record.

MS. AL-FUHAID:  Yes, we can, your Honor.

THE COURT:  Did we need to seal -- I didn't --

MS. AL-FUHAID:  We did not reach the confidential portions.

THE COURT:  Okay.  Understood.

MS. AL-FUHAID:  The remaining excerpts are 52, 15 to 17.

53:5 to six.

53:18 to 23.

54:1 to 25.

55:1 to 25.

56:1 to 3.

57:4 to 7, and 24 to 25.

58:1 to 10.

60:12 to 25.

61:12 to 18.

62:8 to 14.  63:5 to 18.

THE COURT:  That's 63:5 to 18?

MS. AL-FUHAID:  Yes.  65:4 to 7 and 20 to 25.

66, line 15.

67:9 to 14.

68:11 to 18.

72:11 to 25.

73:1 to 25.

74:1 to three.

And then also within page 74, lines 4 to

12 are designated, and those are confidential.  We have also designated page 74, lines 13 to 25.

THE COURT:  Did you say 13 through 25 or 35?

MS. AL-FUHAID:  Twenty-five.

THE COURT:  So that's 74:13 through 25.

MS. AL-FUHAID:  Yes.  Page 75, lines 1 to 25.  Page 76, lines 1 to six, and 21 to 25.

Page 77, line 1 to line 19.

Page 78, line 16 to 21.

Page 79, lines 16 to 21.

Page 80, lines 1 to 2.

Page 86, lines 7 to 14.

Page 87, lines 5 to 23.

Page 88, lines 5 to 25.

Page 89, lines 1 to 10.

Page 92, lines 1 to 4, and lines 12 to 17.

Page 93, lines 22 to 25.

Page 94, lines 22 to 25.

Page 95, lines 1 to 25.

Page 96, lines 1 to 5 and line 8.

Page 100, lines 7 to 16.

Page 103, lines 3 to 16.

Page 104, lines 2 to 15.

Page 105, lines 4 to 25.

Page 106, lines 1 to 25.

Page 107, lines 1 to 25.

Page 111, lines 1 to 10.

Page 115, lines 1 to 25.

Page 116, lines 3 to 25.

Page 117, lines 1 through 7, and 15 to 25.

THE COURT:  So that's 117:1 through 7.
And what's the other line?

MS. AL-FUHAID:  Fifteen to 25.

THE COURT:  So that should read 117:1
through 7, 15 through 25.

MS. AL-FUHAID:  Yes, that's correct, your
Honor.

Page 118, lines 1 to 25.

Page 119, lines 1 to 25.

Page 120, lines 118 to three.

Page 121, lines 20 to 22.

Page 122, lines 2 to 7.

Page 126 26, lines 24 to 25.

Page 127, lines 1 to 5.

Page 128, line 12 to 24.

Page 129, line 2.

Page 131, lines 1 to 25.

Page 132, lines 2 to 24.

Page 134, lines 15 to 25.

Page 135, lines 1 to two.

And page 136, lines 17 to 24.

Page 137, lines 2 to 5 and 24 to 25.

Page 138, lines 1 to 9.

149 -- page 140, lines 7 to 25.

Page 141, lines 1 to 25.

Page 142, line 1.

Page 144, lines 2 to 12 are not confidential.  And lines 13 to 20 are designated and are confidential.  That's at page 144.

Then page 145, lines 9 to 10 are not confidential.  Lines 20 to 25 are confidential.

Page 146, lines 1 to 25, all of those are confidential.

Page 147, lines 1 to 25 are confidential.  I'm sorry.  One to 18 are the designated portions.  One to 25 are confidential.

Page 148, lines 6 to 10 are designated and are confidential.

And also on Page 148, lines 18 to 25, are designated and are not confidential.  And lines -- page 149 lines 1 to 2.

That's it, your Honor.  Thank you for the Court's indulgence.

THE COURT:  Okay.  So the NASA engineers

to my left will compare their notes, make sure they arrive at the same numbers.  I'll also instruct counsel to confer with those clerks and court staff at the end to make sure all of those designations are properly recorded given the transcript and technology issues that we've had today.

MS. AL-FUHAID:  Thank you, your Honor, but the microphone continued to work.

THE COURT:  Those have worked.  The lights have worked, too.  We actually had a criminal case where the lights went out.  So nothing like searching -- the marshals searching for the defendant in a dark room.  So with that, does the Defendant rest?

MR. BRYANT:  Your Honor, Defendant Wendler rests.

MR. RUDOVSKY:  Your Honor, just one quick note on one of the pages from the designations from Mr. Fanelli.

THE COURT:  Yes.

MR. RUDOVSKY:  I just wanted to confirm that page 145, lines 12 through 25, are confidential.  I apologize if I misheard that, but --

THE COURT:  I have 145:9 through 10 and 20

through 25, but I don't think I heard a confidential designation within that range. I have then 146:1 through 25 as confidential.

MR. RUDOVSKY: From the document that Plaintiff has, we have 9 to 11 as nonconfidential and -- but designated. And lines 12 through 25 designated but confidential.

MS. AL-FUHAID: I think that's correct, your Honor.

THE COURT: Okay. All right. So we're on the same page with that. Yes, that matches the notes that my clerk took on those designations. So those -- well, let me ask.

Mr. Rudovsky, any further clarification before I take those deposition designations and consider that part of the evidence submitted at the hearing?

MR. RUDOVSKY: No, your Honor. Thank you.

THE COURT: Okay. The aforementioned deposition designations submitted by the Defendant, specifically the transcript -- the Fanelli transcript, will be given the weight to which they are due. And the Court at all times will carefully monitor those sections that are subject to the protective order and confidentiality.

Now, with that, I have from the -- well, I have had Plaintiff rest.  Defendant rests.

Does Plaintiff now close, and are you prepared to enter closing arguments?

MR. MORRIS:  We are, your Honor.  Just one housekeeping matter.  During the pretrial conference, the Court made a number of rulings on our objections to a number of social media posts and videos without prejudice for us to renew those.  I don't believe any of those have been introduced today, so I would assume the Court's going to give them the weight to which they are going to be afforded, but I just didn't want to state to the record our running objection to those.  That would be Defendant's 291 through 318, 340 through 342. 363 to -- and 381 to 404, 408.  And finally, Defendant's 433 to 436.  Again, these weren't introduced today, so certainly they have no bearing on Dr. Wendler's state of mind.  And again, just for the record, we want to restate that objection.

THE COURT:  So here, as our pretrial conference records reflect, they were tentatively -- those objections were tentatively overruled as to relevance, but the Court sustained your objection as to hearsay.  They're still admissible for

non-hearsay purposes.  The Court ruled that that range of documents and material is relevant to an administrator's expectations or anticipation of future drag show, but it may not be used for any hearsay purposes, and the Court can consider it for any non-hearsay under the Rules of Evidence.  So the Court continues to so rule on the aforementioned exhibit range and will give those exhibits the weight to which they're due subject to that order and ruling.

Is that sufficient to preserve any running objection you have, Mr. Morris?

MR. MORRIS:  It is, your Honor.  Just noting again our running objection, but I take the Court's advisement well.  Thank you.

THE COURT:  So noted, and the Court finds that you have zealously urged that objection in written form and at now two hearings and you have preserved it for further appellate review.

Now, are we to Closing?  Does Plaintiff with that close its case?

MR. MORRIS:  We are prepared to present Closing Argument, your Honor.

THE COURT:  Okay.  But you're closed and now ready to present your Closing?

MR. MORRIS:  Yes.

THE COURT:  Okay.  And same for Defendant?

MR. BRYANT:  Yes, your Honor.

THE COURT:  Did counsel require any time to set up the room?  We have roughly an hour of closing allotted for this.  Tell me how you would like to proceed.  I've instructed court personnel to prepare for a long hearing that may run late.  So any proposals for this next hour of presentation?

MR. MORRIS:  We have no exhibits, your Honor.  Based on your indication, this was going to be sort of like an appellate argument.  I'm just prepared to discuss the case for the Court.

THE COURT:  Okay.  Do you need any prep time before we begin?

MR. MORRIS:  Do not.

THE COURT:  So as I have it, Plaintiff has reserved 30 minutes with five held back for rebuttal.  And then Defendant has requested 30 minutes.  So with that, who's taking the Closing Argument for the Plaintiff?  At the podium or at counsel table?

MR. MORRIS:  I will take it, your Honor, and I will take it at the podium.

THE COURT:  Okay.  You may proceed.  You

may approach.  And I'll instruct my clerks to serve as time-keepers.  I'll give you a three-minute warning.

CLOSING ARGUMENT

ON BEHALF OF THE PLAINTIFF:

MR. MORRIS:  Thank you, your Honor.  And on behalf of Plaintiff, I want to extend my gratitude to the Court and the staff for working through today's trial and including all the hiccups we've had with the technical issues, but we really do appreciate it.

I think this trial has confirmed certainly one thing, and that's President Wendler's motivation.  I don't think either side disagrees what that is.  He believes drag shows are demeaning and offensive to women.  And he believes he has the authority to stop them in advance because of that.  This agreement I think, your Honor, is on the parties' vision of free expression at public universities.  President Wendler's vision is one in which public university presidents can single-handedly deem what expression is appropriate, what expression is offensive, what expression is demeaning and restrict it on that basis.  But that's a vision the Supreme Court has rejected.  Several

times.  Including in *Healy v. James*, including in cases like *Rosenberger*.  Our vision is the one that's faithful Supreme Court precedent in which university presidents nor any government official can deem what is offensive, can deem what is disrespectful.  Can even look to discrimination policies, admission statements and campus culture just to say I don't like this unpopular speech, so I'm going to silence it.  That's what is at stake today.  It's these competing visions of the First Amendment.  And the Supreme Court has made clear that ours has to prevail.

Now, your Honor, I want to focus most of my closing today on I think what are few issues that the Court has expressed interest in.  One is First Amendment protection for expressive conduct and particularly the drag performances at issue here.  Next is the public forum analysis.  I do want to touch a little bit more on President Wendler's motivations and then I want to discuss *CLS v. Martinez*.  I see the Court nodding its head, so I assume we'll get there soon enough.

Let me turn first to expressive conduct.  The First Amendment protects Spectrum's drag performances.  Drag is stage performance.  It's not

an empty room.  It's not refusing to pay one's taxes and saying well, I'm doing that because I'm protesting.  Drag is people getting up on stage in costumes, in created characters with clever names and performed choreographed dances to curated music. We heard Mr. Bright talk about that in detail today. Sometimes as Mr. Bright explained as would have happened at Spectrum's shows and Legacy Hall, there are spoken words, too.  The characters are asked questions.  They're acting in character when they answer those questions.  All of that is performative.  It's artistic.  It's things that the First Amendment squarely protects.  Like any artistic performance, the context here reasonably informs people watching it that they know Spectrum and any drag performer is trying to convey something.  That's enough for First Amendment protection.  It's what *Hurley* makes clear.  It's what the Eleventh Circuit interpreted *Hurley* to make clear in Holloman v. Hartman case and *Food, not Bombs*, case that we cite in our briefing.  Some, they might perceive a pro-LGBTQ+ message.  Others might see it as commenting on gender norms and roles, just as President Wendler has, calling it artistic expression and a sideshow and ideology.

You heard him testify today yes, I believe drag shows convey an ideology.  That is expressive by any measure.  And if you read his March 2023 letter, it's clear.  He sees Spectrum expressing a perspective on gender.  He might disagree with it, but his words acknowledge they are expressing something.

The Fifth Circuit panel got this right.  The majority noted that all expressive conduct needs to do to meet the Fifth Circuit test -- the First Amendment test for protection is express something in that the audience would understand that.  And the dissent did not disagree.

THE COURT:  We've heard -- and I apologize.  We are going to do this like oral argument and this will count against your time, so I'll try to be --

MR. MORRIS:  That's fine.  I welcome your questions, your Honor.

THE COURT:  I will try to be efficient.  So I have heard, you know, the elements are long-standing.  They echo in *Spense* and *Texas v. Johnson* and cases like that.  Number one, an intent to convey a message.  And then number two, the message would be understood by those who viewed it.

I detailed that in my memorandum opinion. I heard a lot of testimony or cross-talk about whether the message was particularized and where does the Supreme Court and Fifth Circuit stand on how particularized a message must be where there is a potential disconnect between the message identified by the programmers and the planners and that presented to an audience. And then we can get into minors and things like that.

MR. MORRIS: Sure.

THE COURT: But how close do those things have to be and does that relate to the particularized nature of the message, or if there is a potential disconnect, I know in like establishment clause cases of yore, we had reasonable observer test and things like that. So how should this Court referee that potential disconnect. There's a message to support the Trevor Project antisuicide initiatives versus arguable expressive conduct, some of which drifts into sexualized territory such as simulated masturbation and frottage and how an objective observer would perceive that.

MR. MORRIS: Well, let's make one thing clear. I'll address your last point first. There's absolutely no evidence in the record that Spectrum

shows would have involved any of that. I think Mr. Bright made that clear today. Defendants certainly haven't shown any of that. Even videos of the Sam Houston Park show they showed today, that involved no simulated masturbation, no simulated frottage, no nudity, no prosthetics. You can look at Mr. Chip Chandler's testimony, again, their director of communications who attended the show. He said there was no lewdness, none of that sexualized content. This was a PG-13 show.

Going back to your question, your Honor, about how to sort of reconcile this language about particularized messages and you might have different interpretations. I think that starts with *Hurley*. The Eleventh Circuit I think in Holloman put it well that *Hurley* liberalized the *Spence* test. It recognized that look. There are certain types of expressive conduct that are inherently open to interpretation. But by their same inherent nature, they are expressing something. If you think about movies, you think about art, you think about historical re-enactments. When people watch those, they might come away with ten different interpretations. It's the whole reason we have art critics. It's the whole reason people go on Twitter

and talk about, you know, the latest episode on HBO or even the latest political debate. When it comes to stage performance, people are going to interpret it differently. No different than you might go to a violin concerto, I might feel evoked to anger. You might feel evoked to happiness. My colleagues might feel evoked to sadness. That's the whole point of performance. That's the whole point of art. So what *Hurley* makes clear, when it's talking about the art of Jackson Pollack and the music of Shoayan and the jabberwocky verse of Lewis Carroll is that when you have art that's open to interpretation or any sort of expressive conduct, that particularized message isn't required. All that's required is that a reasonable audience member -- and I know you and I discussed this at the September 10th hearing about that reasonable audience member. That comes again from the Eleventh Circuit's interpretation and I think the rightful interpretation in Holloman. Where it says look, in the context of the performance, as long as the reasonable audience member knows that the performers are trying to communicate something, that qualifies for First Amendment protection, and that makes sense.

THE COURT: If the outrebounds of it --

it's like a -- it's a child's diorama of the universe.  This works concentrically.  You do eventually hit some outrebounds.  Even Justice Scalia who is something of a free speech absolutist drew the line at nude dancing.  And then of course, the ever-present overlay of time, place, manner.  What do you make of the cases that I cited in my order dated August 26th, 2025?  This would be ECF number 104.  There are now a line of cases from this Court, this Supreme Court indicating that minors are a different category and might serve as an exception to what is a general rule about expressive conduct.  Even in a related Fifth Circuit opinion in *Woodland's Pride*, the Court said quote:  We have genuine doubt, however, that pulsing prosthetic breasts in front of people, putting prosthetic breasts in peoples' faces and being spanked by audience members are actually constitutionally protected, especially in the presence of minors.

So number one, my boss at the Fifth Circuit has now hinted that when you combine these elements which your witnesses admit are fairly inherent and regular to drag shows, despite their attempts to impose rating systems, with minors, you might have something like nonspeech or something

that is obscene for minors but not adults.  That's something that was echoed in Free Speech Coalition. I think it sounds in *United States versus Skrmetti*. And then, of course, I cited to you recent S.B. 12 Legislation.  So does the presence of minors which at all times was contemplated by this Plaintiff change the calculation?

MR. MORRIS:  With these shows, absolutely not.  These were calculated to be PG-13.  You heard Mr. Bright testify --

THE COURT:  But I've quoted you the PG-13 definition which could include temporary exposure of breasts and buttocks and things of that sort.  I used to teach this subject matter.  I understand that MPAA changed to MPA.  Those ratings have changed over time.  But using the exhibit available to the Court, in very limited release, it could include that exposed conduct.  So your self-definition of PG-13 does not necessarily guide a university's assessment when PG-13 often includes conduct that would be inappropriate for minors.

MR. MORRIS:  Well, let's take President -- first, let's focus on Mr. Bright's testimony.  He responded to the Court's question today that his -- Spectrum's definition of PG-13 was to exclude

anything within that definition that you recited that might involve brief nudity.  Mr. Chandler -- even Mr. Wendler said today that he had no reason to believe there would be nudity in this show, and I would point the Court also to President Wendler's testimony.  The University here -- at least President Wendler who's the one making this decision -- those details don't matter to him. They're not informed about that because they're not talking to the students.  They're not trying to find out what happened and the JBK Center staff, as you'll see when you read Dr. Fouts' testimony, had no reason to believe this would exceed anything that I think a common person's interpretation of PG-13 would be.  I walked down the street -- you know, maybe as the woman on the performance said, you might see something that you see at a public pool. That was the extent of the performances here.  And if we turn to the case law your Honor just cited.

THE COURT:  With all due respect, I observed the video.  I reviewed it before the hearing.  Not a public pool.  Maybe a pole, dancing. That's mostly -- I don't know if I missed something in the audio.  It doesn't resemble anything that I have seen at a public pool, but maybe a pole, which

is why I keep referencing SOB jurisprudence, sexually-oriented businesses.  We even have this sort of tweener category in zoning ordinances for restaurants; Hooters and Twin Peaks and places like that.  So at every interval, I believe your witnesses have testified that drag shows do trend towards sexualized conduct.  It's part of gender bending.  It's part of the necessarily provocative nature of it.  And if we do determine that this is a limited forum and that's not the type of content for which this forum is designated, would the presence of minors not tip the scale in Defendant's favor when that is the essence of the performance?

MR. MORRIS:  It wouldn't, your Honor, and let me cover the three cases you raised.  Let me dispose of *Skrmetti*.  *Skrmetti* is about a medical procedure, a state, right, deciding to restrict certain medical procedures for transgender youth or, you know, youth who are --

THE COURT:  But that impacts --

MR. MORRIS:  -- want that procedure.

THE COURT:  That impacts your *Troxel* analogy, parental rights which have been waived about in your briefs, also at this hearing.  The State has a coterminous obligation and police power

under the Tenth Amendment to protect children even where there is a coterminous parental right to expose children.

MR. MORRIS:  Sure.

THE COURT:  Transfusion cases, there are all sorts of instances where you have that right up to a point.  And so this is a classic Constitutional law case where parental rights are in potential collision with the State's coterminous police power under the Tenth Amendment to restrict access to minors.  We do it with tobacco, alcohol, tattoos, all sorts of things here.  So I understand *Skrmetti's* not directly on point because it is in a much more -- it's in a category of medical procedures which carries a much greater gravity than any sort of artistic or alleged artistic presentation, but it does stand for the proposition that there are limits to the invocation of parental rights.  Here, this would -- here, the proposed limit would sound more in the police power to protect children from certain images.  That bleeds into Free Speach Coalition and what the Supreme Court said there, what the Fifth Circuit said there.  But that's the reason I put it in that list is parental rights do have an outer limit and sometimes

that limit is the State's power to protect minors.

MR. MORRIS:  Yeah.  Let me address two things there.  One, parental rights in the context of medical procedures are fundamentally different under the Constitution than parental rights when it comes to speech.  This is something that Justice Scalia made clear in *Brown versus Entertainment*.  The Government, unless you approach something that is categorically unprotected or the Government can show and meet strict scrutiny, particularly in a content-based regulation like this one, Justice Scalia made clear in *Brown*, the Government has no business telling parents what their children want to see.  Let me move on to Free Speech Coalition.

THE COURT:  Okay.  Please do.

MR. MORRIS:  Justice Thomas was very clear that this case does not extend to PG-13 or even R-rated content.  This is a narrow decision.  It's about an incidental burden on speech which is not what we have here.  This is a direct prior restraint on speech.  Moreover --

THE COURT:  Listen, I understand -- I work in the First Amendment space.  I had the same pattern of calling things speech.  But here, it's a bit of begging the question when we're trying to

decide if this is expressive conduct. As I said in my memorandum opinion, you have to keep -- you know, it's the *Gitlow* opinion I quote all the time. You have to think things, not words. Thoughts are different than speech are different than conduct. There's this space between speech and conduct that we call expressive conduct, but you can't just label things speech repeatedly. We are talking about conduct and whether it falls in that gap space between speech and conduct. Thoughts are inviolable. Speech is limited in the amount of regulations that can be opposed on that. And for the most part, conduct is regulable. Especially anything of a sexual nature, anything obscene, anything affecting minors, so we're talking about that space between speech and conduct. So --

MR. MORRIS: So --

THE COURT: -- you can't just label things speech. We are talking about expressive conduct analysis.

MR. MORRIS: Right. Expressive conduct, right? We are not talking about pure conduct here. These are stage performances. I think the -- the idea that minors being present somehow transfers something from expressive conduct to non-expressive

conduct defies what the Supreme Court has said, even in cases like *Barnes* and *Pap's*, and your Honor referenced --

THE COURT:  They did in Free Speach Coalition with something that's even more ironclad rules with obscenity rules under *Miller*.

MR. MORRIS:  Obscenity's not an issue here.  They have conceded that twice.

THE COURT:  No, but the Court -- point being is there's a trajectory in the *Roberts* court and its current members that where minors are involved, sometimes we adjust those calculations. And so the obscenity test is older than most of the attorneys in this courtroom.  But even there in Free Speach Coalition, they say obscenity for minors might be different than obscenity for adults.  So that's my only point here.  How does the admitted presence and invitation of minors change your expressive conduct analysis?

MR. MORRIS:  It doesn't.  Stage performance is expressive conduct.  This is not obscenity, so it's not categorically unprotected. Obscenity for minors is not a categorical unprotected category of speech.  It's a weird nuance in the First Amendment parlance because you're

talking about speech that might be unprotected for minors, but it's fully protected for adults. But here, we don't even reach that category. This is a PG-13 show. Again, there's nothing in the record to show that these students were going to use anything, for example, that's defined as sexual conduct under S.B. 12. No nudity, no prosthetics, no simulated sex. Again, the University's director of communications who saw the show at Sam Houston Park said there was none of that, and he would have expected any show at Legacy Hall to be that or even less.

THE COURT: And so the touching of minors which I understand in the Sam Houston Park version of the 2023 drag show, the touching with minors there was for collection of contributions to the Trevor Project. This is not a strip club simulation where people are paying the stripper as I'm trying to apply maximal charitable interpretation and to the testimony I heard today. The child with the bucket collecting dollars in that video of that 2023 presentation, that is to collect Trevor Project donations, not throwing dollars at a stripper?

MR. MORRIS: Yes.

THE COURT: Okay. That is at least your

argument?

MR. MORRIS:  And I'm not sure what touching there was other than that, if you look -- if you go to the *Woodlands Pride* opinion, your Honor, they talked about drag performances where performers were bumping buttocks and going in and interacting with the crowd.  They even had performers or vendors there who were handing out prophylactics and lubricant.  Fifth Circuit majority said that doesn't fall within this definition of sexual conduct under S.B. 12.  If that doesn't, certainly what the students had planned or what they did at Sam Houston Park doesn't.

THE COURT:  Okay.  I have your argument on that.  So what was the message Spectrum -- okay.  We'll leave 2023.  I think that's been briefed extensively and expertly by both parties and counsel.  Let's talk about the proposed 2026 case which is the subject of the injunctive request at issue.  What does -- or what -- strike that.  What message does Spectrum intend to convey with its proposed 2026 drag show and then explain to me how that attaches to an audience that would receive it.

MR. MORRIS:  Sure.  I think it's the same message that Mr. Bright said that is common.  A

common thread to every drag show.  When you are getting up on stage in costume, often in gender flipping roles, you're expressing a perspective, you are sending a message that hey, we're here to challenge gender norms.  Mr. Fanelli also testified in his deposition yes, we are -- we are intending this drag show in 2026 to express support of the LGBTQ+ community.  And he explains on pages 104 and 156.  I know we didn't read those in today, but they are designated.  At least 104.  Drag shows are a unique way for the LGBTQ+ community to convey not only that message but perspectives about gender.  So again, a reasonable audience member, again, and these are people volunteering to go to these shows that they know an LGBTQ+ student organization are putting on and in an enclosed space, those audience members are going to understand, yes, they are communicating a message of LGBTQ+ support.  Yes, they are sending a perspective about gender roles.

Again, I would urge the Court to just read Dr. Wendler's 2023 letter.  It's all the evidence you need.  He's saying yes, I understand.  They are -- they are conveying artistic expression, a performance, a slide -- slapstick side show that exaggerates aspects of womanhood.  He understands

they are conveying a message about gender.

THE COURT:  And so lets go through the hypos that I asked of your witness today.  So a registered student organization, specifically Palestine Solidarity Committee, which I know is registered at Texas A&M University in College Station, proposes to perform an exaggerated Shakespearian depiction of Shylock caricaturing Jews with prosthetic noses to raise awareness about the alleged Gaza genocide.  Would your analysis require that this Defendant admit that performance in this forum?

MR. MORRIS:  Our analysis would say that the Defendant cannot restrict that performance on the basis of viewpoint, and they cannot impose a subjective-based prior restraint over it.  Let me be clear.  I want to make one thing clear for the Court, your Honor, that I don't think we've -- either party has stressed enough.  We're not seeking -- the relief we're seeking is not asking the Court to tell President Wendler and tell West Texas A&M University you have to allow every single drag show applied for on campus.  Our injunction is narrow.  We are saying:  Court, please enjoin President Wendler and his staff and his agents from

applying these viewpoint- and content-based criteria to restrict access to a forum open to student expression.  That's what this case is about.  So yes, if the University is saying we're denying this Shakespearian play, whether -- you know -- if they deem it offensive to Jews, that's viewpoint discrimination.  That's *Matal*.  They might have other non-viewpoint reasons for denying it.  They might have other non-content based --

THE COURT:  And this is why I had lines of questions about disruption, campus safety, things like that.  Again, those are some of those outer-rim exceptions to these general rules.  But in general, as the hypo matches this case, you would -- you would argue to the Court that West Texas A&M University would need -- assuming all of the student registration requirements and all that -- would need to open Legacy Hall to the Palestinian Solidarity Committee performance of Shylock with all the prosthetics and things to match because their message is core political speech or something similar?

MR. MORRIS:  Yes.

THE COURT:  Okay.

MR. MORRIS:  And I want to make clear,

again, we're not saying, you know, there's not -- some basis out there they can restrict it.  What we're saying is that those criteria have to be viewpoint neutral.  They have to be content-neutral.  They can't say this one single official at a University deems that speech inappropriate.

THE COURT:  Okay.

MR. MORRIS:  That is *Healy versus James* where you have the president of a public university saying I'm denying you access to this forum because you are associated with a group whose speech I find reprehensible, inappropriate and inconsistent with campus culture.

THE COURT:  So let's -- I agree.  You have correctly summarized viewpoint discrimination, jurisprudence and campus setting.  We'll table for now content because if they say something like a limited public forum, then content is treated differently than viewpoint.  But let's go to the core hypo in this case which is blackface.  It's actually referenced in Defendant Wendler's letter.  I believe it's earmarked Exhibit 1.  I even referenced it in footnote one to my memorandum opinion and order, ECF number 59, and I'm quoting from a different court.  This is the Court of --

Northern District of Alabama.  We call -- what we call blackface minstrelsy is a specific performance genre that developed in the early 19th Century America with the earliest performances documented in 1830 featuring characters with names like Jim Crow, Zip Coon and Mammy.  These performances compromise skits, monologues, songs and dances that supposedly imitated those of enslaved people or of the recently freed.  Blackface is used to mock or ridicule black people.

Is it your argument to this Court, assuming all the premises we've discussed, it's a registered student organization; they've made the requisite applications; they've done the risk assessment under the matrices that are applied, would West Texas A&M University be required to hold a black -- or allow a blackface performance by a Caucasian man imitating African-Americans in stereotypical ways reminiscent of minstrelsy?

MR. MORRIS:  Your Honor, I have no doubt that every single person in this room finds blackface reprehensible, but my answer is the same. The University cannot impose viewpoint-based criteria.  They cannot say we find this speech offensive, which again, the Supreme Court has made

clear is textbook viewpoint discrimination to deny access to a public forum, whether it's designated or a limited public forum.

THE COURT:  So your answer is yes, blackface at West Texas A&M University in Legacy Hall?

MR. MORRIS:  That's not -- I want to be clear, your Honor.

THE COURT:  No, I know.  Listen --

MR. MORRIS:  I feel like you are putting words in my mouth here.

THE COURT:  I think everybody in this room would oppose blackface for all the reasons well-documented.  But as a legal proposition and as this Court makes comparator analysis, if it were a registered student organization, filed all the appropriate paperwork which very similar to this case, it's your reading of the law, Supreme Court, Fifth Circuit and even University -- let's just leave it at the Supreme Court and Fifth Circuit.  That West Texas University must allow a blackface performance by a Caucasian man imitating African-Americans in stereotypical way, reminiscent of minstrelsy, because to do otherwise would be viewpoint discrimination and that would be

constitutionally impermissible?

MR. MORRIS:  If the reasons were that it is demeaning, disrespectful, offensive, yes, that is viewpoint discrimination.

THE COURT:  Okay.  I have your argument, that that sort of terminology as you have discerned in Defendant Wendler's statement, that is enough to trigger the viewpoint taxonomy and from that point forward, it's viewpoint discrimination.  I have your argument on that.

So let's turn to forum analysis.  And I think this is a linchpin issue in the case.  It's certainly echoed in Judge Southwick's opinion which made certain assumptions about designated public forum versus limited public forum.  Let me hear your best argument on forum analysis and just to frame the issue and the record on appeal, we can forgo traditional public forum.  I haven't heard any serious argument that Legacy Hall is that.  Let's focus on designated public forum and limited public forum and why you think it's the former.

MR. MORRIS:  Sure, your Honor.  So let's look first at *Walker*.  Tells us we analyze forums by policy and consistent practice, right, what's compatible with the speech at issue.  We start with

consistent practice. No one disputes that West Texas A&M has opened Legacy Hall up both to RSOs and the public alike for a range of events, including ones similar to drag shows, singing competitions beauty pageants, fashion shows. If you look at Plaintiff's Exhibit 55, you see hundreds and hundreds of events at Legacy Hall over the years open to everybody from students, faculty, to the public. There's just no limit on speakers here. And President Wendler said today he's not aware of any policy that imposes a limit on content. In fact, when we looked at Plaintiff's exhibit, at the student handbook, it says, students -- students can use these -- are allowed to reserve these facilities without -- without regard to the content or the viewpoint they want to express. So they're telling students there's no limit on topics here. And then we turn -- so that's part of their policies. You look at the Expressive Activity Policies. We looked at both University's and the System's that it just passed in November, they say we are not going to -- we are not going to restrict your right to speech, including in campus buildings, except subject to reasonable content-neutral, time, place, manner restrictions. The policy goes on: Students have

the right and University cannot deny benefits to them based on the ideological perspective that student groups express in their expressive activities. All of those. Point to a forum that is open for indiscriminate speech from both the public and RSOs. It is not limited to speakers. It is not limited to topics. I think a particular piece of deposition testimony is from Dr. Fouts, and he explains, your Honor, the University opens public -- opens Legacy Hall to the public because there are so few venues in the Panhandle that can do what Legacy Hall and provide what Legacy Hall provides to the public. And that's on page 54 of his deposition testimony. I think President Wendler's best argument is is while it's a time, place, manner restriction because I didn't cancel -- I didn't retaliate against them when they took their show off campus after I cancelled it, that's just kind of defies commonsense here, and I hate to put it so glibly, but he doesn't have any power to restrict the public park in Amarillo. He doesn't have any power to restrict The Lumberyard, a venue you heard about. This case is about whether a public University president can restrict access to a public forum on campus. This is --

THE COURT:  What about that last category, because you're a seasoned First Amendment practitioner and expert; time, place, manner, historically involved noise ordinances, loud music in the dead of night, stuff like that.  What of that last category, though, manner?  So tell me --

MR. MORRIS:  Uh-huh.

THE COURT:  -- how.  Just give me your best argument for why this isn't a manner restriction.

MR. MORRIS:  I think manner restriction relates to what you said earlier.  It's things like the level of noise, what's the decibel level, things along, you know, that nature.  How big is -- of a sign you can use, right, we're talking like *Reed versus Town of Gilbert*.  What you can put on your sign versus how big your sign might be.  Those are manner restrictions.  Here, again, assuming the Court accepts that this is expressive conduct as it should for the reasons we've explained, a prohibition against expressive conduct isn't a manner restriction.  It's a content-based restriction on protected speech.  And I think, you know, they also try to argue here, they have this reservation clause that says well, we can cancel an

event any time we deem it inconsistent.

THE COURT:  Let's camp out on manner for a bit.

MR. MORRIS:  Sure.

THE COURT:  And so where your best exhibit, Defendant's Exhibit 1, the letter published by Defendant Wendler, expresses support for the Trevor Project.  Attend the show, you know, pay the dough, skip the show, something of that sort.  I think all of the evidence is reflected that in making this decision, Defendant Wendler wasn't categorically opposed to the message.  I think he would understand his objection to go to the manner. So you could give a speech on the enduring legacy of drag as transgressive of gender binary and things like that, if -- I think your examples have included "University Sing", "Jingle Mingle", rock concerts, things of that sort.  Why is it not the case that that catchall language that appears in most university codes and boilerplate, time, place and manner, why is it not manner where the evidence reflects that the university president isn't opposed to the message?

MR. MORRIS:  Well, number one, I would disagree that he's not opposed the message.  He made

it very clear he is opposed to the perspective that gender norms that Spectrum is expressing through its drag shows.  That's *Rosenberger*, right, with the Government expresses disagreement with a perspective and restricts speech on that basis.  That's a view discrimination.  I disagree he's not opposing the message.  Number two, the fact that President Wendler hasn't stopped Spectrum from meeting, hasn't stopped Lavender Prom, hasn't stopped things like them tabling it, you know, to recruit new students.  That's -- that doesn't make it constitutional difference.  This is exactly -- I know I keep going back to *Healy*, but it's the same argument the president in *Healy* made.  Well, they can go speak elsewhere, Supreme Court said no.  The same --

THE COURT:  Elsewhere.  Now, let's focus on elsewhere.  So there's one category of elsewhere which is off campus.  So we've heard references to The Lumberyard, different private venues, things of that sort.  So let's put that to one side.  What about elsewhere on campus, just as we focus on forum analysis.  As many universities do, they have something that expressly designated public forum so this might be the tower area around the University of Texas during --

MR. MORRIS:  Right.

THE COURT:  -- during certain times.  This typically looks like a yard.  Classic examples would be outdoor areas of a university campus, *Justice For All versus Faulkner,* fairgrounds, plazas at university of the campus.  That's the *Pro-Life Cougars versus University of Houston* case.  *So* if President Wendler has made other spaces available to the club and testified today that he had no issue necessarily with the drag show elsewhere on campus, how would that affect your forum analysis if President Wendler understands that there's a version of this drag show that might be appropriate to a different section of campus.  Doesn't that support the Defendant's argument that he understood Legacy Hall to be a limited public forum?  Is that -- doesn't mean that it is --

MR. MORRIS:  Sure.

THE COURT:  But that he is cognizant of certain forums with different rules.

MR. MORRIS:  Well, let me say this first.  I don't think it's anywhere in the record that President Wendler thinks they could hold a drag show anywhere else on campus.

THE COURT:  Okay.  We can go through the

testimony.

MR. MORRIS:  I might be missing something, your Honor.  But I'm pretty sure their argument and his testimony today boiled down to they are welcome to go to The Lumberyard.  They are welcome to go to Sam Houston Park.  They are welcome to go hold it in Palo Duro Canyon if they want to, but they can't hold it in the four corners --

THE COURT:  That's going to be a factual --

MR. MORRIS:  I don't think there's anything in the record to support that.  If the distinction here is between outdoor spaces and indoor spaces, I think that's a meaningless distinction.  Indoor spaces can be designated public forums.  For example, the Fifth Circuit's decision and *Concerned Women for America* where they held a library was a designated public forum even though the library had some restrictions on speakers because they didn't obey those policies and they let pretty much anybody come in and use for a wide variety of purposes, they might have unwittingly --

THE COURT:  And that --

MR. MORRIS:  -- practice turn it into a designated public forum.

THE COURT: Yeah, that's *Little versus LLano County*. That's a recent Fifth Circuit case. Once you kind of open it to the public --

MR. MORRIS: Yeah, it's not *Little*. It's a very different case I'm talking about. The *Concerned Women versus America*. I don't know the end of the "V" we cite in our motion.

THE COURT: It's *CWA*. *CWA v. Lafayette County*. Okay. I will review that case.

MR. MORRIS: I think that's a particularly controlling case here. Again, it's from the Fifth Circuit, but it's also talking about an indoor space, a library. Here we are talking about a stage performance venue, right, with lights, with large you know, seating capacity. Again, a place the University has opened to everyone because there are so few venues like this in the Panhandle region. And we are talking about weddings, stage performances, you know, magic shows, beauty pageants. It's simply hard to see how this is -- there's any limitation on speaker here.

Now, we might be arguing about, you know, the regulation elsewhere, this is a TPM regulation or something like that. And for the reasons I have explained, it's not. But we are talking about the

forum analysis. Two criteria. Is there a limit on speakers. The evidence shows no. Does the policy show any limits on speakers or topics. The evidence shows no. President Wendler said today; I'm not aware of any topic-based limitation in Legacy Hall and the student handbook says we're not allowed to consider those topics -- those criteria. So at best, you have a forum under the Expressive Activities Policy of both the University and the System that is subject only -- the only restrictions it is subject to are reasonable time, place, manner restrictions, and I want to add one more thing to your manner question, your Honor. This reminds me of the argument that the Government made in *Texas v. Johnson*, saying well, okay, if you want to disagree with the Government or you want to criticize America, you can do so with pure speech. We have a lot more power to regulate it when you do it through conduct, and Supreme Court said no. That's not a compelling enough interest to try to turn this into, you know, regulable conduct. Expressive conduct in pure speech, they send the same message. In -- particularly in the context in that case, a political flag burning right and the context of a demonstration, the Government couldn't justify it

simply by saying there's a difference between pure speech and expressive conduct. Same here. Whether it's Spectrum standing out in the quad talking about the history of drag or whether on Legacy Hall's stage performing to get across their point support for the LGBTQ+ community, of challenging gender norms, the message is the same. And the Government can't say well, we're trying to separate out the conduct from the expression. *Johnson* forecloses that and I would say strongly so, your Honor.

THE COURT: Okay. And I know our reporter has taken down a lot of abbreviations, case names, things like that. When you say TPM, you are talking about time, place, manner.

MR. MORRIS: Time, place, manner. I apologize. That's the long-time First Amendment term, your Honor.

THE COURT: Yes.

MR. MORRIS: I tend to forget.

THE COURT: To be clear, you would not perceive from any evidence submitted through written work product or heard through testimony today that it falls within *Summum* or some of the tailoring exceptions that apply. You don't see any case that --

MR. MORRIS:  Not at all.  To me, *Summum* is a government speech case.  I don't think everyone -- it's an RSO speaking on their speech priority in *Widmar*, right, the Government said well, we are -- we're violating establishment clause case.  Your Honor probably knows better than I do and the Court said there's no evidence to show that and there's no evidence here that anybody would consider a drag show at Legacy Hall --

THE COURT:  I only asked the question because I heard on Direct and Cross about alternatives and so it triggered some recollection of *Summum* and some cases like that where as long as there's ample alternative channels for communication.

MR. MORRIS:  Right.  And that's part of the TPM test, right, if you have a content-neutral TPM regulation, one of the criteria the Government has to satisfy is their alternative communications.  But when you have a content- or viewpoint-based restriction or prior restraint, *Healy* says that's not enough.  *Southeastern Promotions* -- again, I am paraphrasing it.  But it says one is to not have his speech abridged just on the basis that he can exercise it somewhere else.  So if that's President

Wendler's argument, and I think in large part it is, Supreme Court has foreclosed that as well.

THE COURT:  And I do think I agree.  I haven't heard anybody argue that it's Government speech so that -- that sort of category of exception is mostly --

MR. MORRIS:  Puts my mind at ease just a bit.

THE COURT:  -- off the field.  Let me hear the rest of your forum argument.

MR. MORRIS:  I think that is our forum argument, your Honor.  You know, I think what they're essentially arguing here is that we can impose one-off enforcement of this.  We reserve the right to cancel an event if we find it inconsistent with the University's mission or violate government policies, but that's just constitutionally unacceptable for a number of reasons.  One as -- the a Fifth Circuit made clear in *Hays County v. Supple*, the Government can't use this circular reasoning, enforce a policy one time against a certain type of expression and say oh, that turns it into a limited public forum.  That would be self-justifying restrictions on speech and Hays County says it's the consistent practice.  It's not one-off enforcement

of regulation.  Number two, the way they -- even if they are -- you know, looking to this clause where they say we reserve the right to cancel or stop any event in Legacy Hall if its inconsistent with University's mission or violates a policy, that's vested in the power of President Wendler and his subjective determinations.  Again, that's *Healy v. James*.  You have a president saying I and I alone can determine whether this speech is appropriate.  And that's a word they use in that clause.  Is it inappropriate?  You heard a lot of that today.  *Healy v. James* tells us the university presidents can't use that as a criteria to deny access to a campus public forum.  Third, your Honor, there's simply no evidence here.  This is all speculation.  And you heard President Wendler testify today both before the 2023 and 2024 decisions to cancel the show.  He didn't talk to Spectrum.  He didn't talk to his staff.  He talked to no one about the details of the show.  That sort of undifferentiated fear and apprehension, Supreme Court made clear, again in *Healy*, doesn't cut it.  And they use the word empirical evidence in *Widmar*.  If a university is proceeding just on conjecture, they cannot -- that does not satisfy their constitutional burden to

justify restricting speech at a public university, particularly when it comes to denying access to a campus public forum.

THE COURT:  Okay.  I'm fairly familiar with *Santa Fe* and some of the limited public forum cases that have applied that analysis to religious expression.

Tell me why Legacy Hall does not fall within that category of cases that deal with public facilities, classically its graduation ceremonies, school libraries, even board meeting rooms, there is -- and I'm intimately familiar with *Chiu* --

MR. MORRIS:  Sure.

THE COURT:  There's this recurring category of cases designated that designate certain spaces as limited public forums.  I think those are potentially analogous here.  Give me your best argument why things like *Chiu* and *Santa Fe*, and I think we mentioned *Little*.

MR. MORRIS:  Uh-huh.

THE COURT:  There are these government buildings that are deserving of this designation. Tell me why that's a mismatch here.

MR. MORRIS:  Now, let's start with *Chiu*. You are talking about an after-hours forum for

parents to come and talk about -- I think was the mathematics program. So automatically you have limited to the type of speaker, limited to the kind of topic. Parents after -- you know, parents coming to talk about the mathematics program. Designated hall -- I mean Legacy Hall has no such limits on it. It is open to the public in registered student organizations and faculty, students alike. Again, not only is there no evidence there's content-based restrictions in any written policy at Texas A&M, but you heard President Wendler testify today he's not aware of any, and I think again it's consistent practice of the University says this isn't like *Chiu*, where we're just letting in parents to come talk about math. It's not even like a City Council meeting, right, where they open up city hall to come talk about government business and its citizens can come talk, this is open to everybody, to come put on all these expressive events.

THE COURT: Which -- I'll take your arguments under advisement on *Chiu* and *Fairchild* and cases like that, so let's talk about the school graduation ceremony, *Doe versus Santa Fe*.

MR. MORRIS: Again, I think school graduation ceremony, it's limited to certain topics.

People are there to talk about graduation.  It's limited to certain speakers.  The speakers who are there to for that limited purpose to address the graduation ceremony.

THE COURT:  Okay.

MR. MORRIS:  Far removed from -- again, what the evidence shows the consistent practice and policies at the University has been with Legacy Hall.

THE COURT:  Okay.  So you have five minutes remaining unless you want to just forgo your rebuttal time and then you have ten minutes remaining.  And let's talk about Judge Ho's -- do you want to use five minutes now and then hold back five or do you want to --

MR. MORRIS:  I think your Honor, if it's okay with you, and can discuss *CLS* for five minutes and I'll reserve five minutes for rebuttal.

THE COURT:  I'll have my law clerks set the clock at five minutes.  Let's discuss Judge Ho's dissent and how *CLS versus Martinez* affects this case.

MR. MORRIS:  Sure.  So bottom line from our perspective and I think this is the right one. *CLS* is a narrow case.  It doesn't come into play

unless three things are true. One, that Legacy Hall is a limited public forum. Two, there's no viewpoint discrimination here. And I think for all the reasons we've said, there is -- again, there's no disagreement what Wendler's -- Wendler's motivation is here. He's trying to prevent offensive and demeaning speech on campus. Under *Matal*, under *Healy*, under *Papish*, that's viewpoint discrimination, per se, no matter what forum type it is. Three, *CLS* only comes into play if there was no singling out of a group or a genre of speech from the type. The class of speaker or speech that -- the University has opened Legacy Hall for. That's *Widmar*. That's how *CLS* describes *Widmar* in affirming it in distinguishing cases like *Widmar*, *Healy* are discontinuing. Because it's viewpoint discrimination. And because President Wendler's prohibition has singled out a group of speakers and speech that fall into the class for which the University has opened Legacy Hall, *CLS* simply isn't relevant.

Now, if we want to talk about the line I think between *CLS* and this case, there's two fundamental distinctions. Let me make one thing clear before I get into that. I think I heard and I

don't want to misquote Mr. Bryant, but essentially the gist of what I heard him saying is that *CLS* sort of hands campus officials broad discretion to restrict speech to comply with University admissions or policy or code.  *CLS* does no such thing.  The *CLS* makes very clear that our cases like *Healy*, like *Widmar*, like *Rosenberger*, are still very much alive and well.  At least twice if not three times, the *CLS* majority makes that distinction.  It tells the Courts like this one and courts of appeals don't overread our case.  This is a case based on a stipulation of content-neutral and this is the first distinction I'm going to get to, your Honor. All-comers policy in *CLS* left no discretion to campus officials.  It was simply the RSO letting all members join or are they turning members away.  If it's the former, they get to go into this limited public forum.  If it's the latter, they don't.  That is night and day from the restriction we are talking about here.  Where you have a single university president saying I have the authority and you've heard President Wendler testify to this today.  I have the authority and the responsibility to determine what is respectful and what is offensive in my campus.  And if I determine it's

disrespectful, offensive, I'm going to stop it. And I keep going back to this, but it's exactly what the university president in *Healy* did and exactly what the Supreme Court said the First Amendment prohibits. Second on *CLS*, your Honor, and I know my time is getting short here. I'm just going to end with this. The majority of *CLS* used the analogy about the carrot and stick. Carrot of subsidy and stick of prohibition. There's no carrot of subsidy here. Spectrum has that carrot because University has already granted RSO status. What they are doing is wielding and President Wendler is wielding the stick of prohibition denying them access to a forum to which the University is opened exactly for the type of speaker and expression at issue here.

With that, your Honor, I'm going to reserve the rest of my time for rebuttal unless you have any questions about my explanation of CLS.

THE COURT: Your red light's on, but I'll hold. I used to hate that when I was an appellate division AUSA. And I hated it. I thought I was done but the red light --

MR. MORRIS: I always welcome it because I get to talk more. As you can tell, I like to talk.

THE COURT: If you have been to the Fifth

Circuit, Judge Higginson will go 20 minutes past the 20 minutes.  So just if you draw that panel, just know 20 minutes doesn't mean 20 minutes.  Okay.

So just real quick on *CLS versus Martinez*.  So there in *Martinez*, the Supreme Court is starting with an all-comers policy and finding application to a broader governmental purpose of fostering inclusiveness, so the policy is all-comers.  The purpose is inclusiveness.  Don't we have in this case a policy of respecting all students in furtherance of the stated WT mission of respect and what Defendant Wendler colloquially refers to as the law of reciprocity?  And I know that's an individual colloquial term.  Doesn't show up in any policy, but it's his reading of this general principle of respect.  So why is that a mismatch?

MR. MORRIS:  Because it's the way they are trying to meet that aspiration.  Again, in *CLS*, it was a viewpoint-neutral according to the majority and I know Justice Alito raised questions about that in his dissent, but we're bound by the majority opinion here.  We're bound by the petitioner's stipulation that this all-comers policy alluded to everybody it was viewpoint-neutral.  Here, it is not, right?  We are talking about a subjective

determination from one official about whether something is offensive or not. That's exactly *Matal* says the Government cannot do in any single forum, and it's that subjective sort of prior restraint where one official gets to determine access to a forum that invites viewpoint discrimination. I think -- imagine, your Honor, if the restriction in *CLS*, if the president of, you know, University of Hastings College of Law had said you know what, I'm going to look at every -- at every single RSO applicant's message and it's going to be me who determines whether or not they meet my standard of respect, my standard of what's appropriate, my standard of what meets the campus culture here. I think *CLS* comes out a lot different because, again, the Court there affirmed approvingly its past decisions in cases like *Healy*, *Rosenberger* and *Widmar*.

THE COURT: Okay. I have your argument.

MR. MORRIS: Thank you, your Honor.

THE COURT: With that, I'll invite -- who is taking this for the Defendant, Mr. Bryant.

MR. BRYANT: Yes, your Honor.

THE COURT: Mr. Bryant, you may approach the podium. You have got 30 minutes on the clock.

CLOSING ARGUMENT

ON BEHALF OF THE DEFENDANT:

MR. BRYANT:  Thank you, your Honor.  I don't plan to take 30 minutes.  For a couple of reasons.  One is that I have found it is extremely difficult to persuade anybody of something after 6:30 at night after a long, hard day of trial.

THE COURT:  You.  You have no idea what a night owl I am.  I heard Doctor say he gets up at 4:00 a.m.  That's usually when I go to bed.  So I'm actually a night owl.  You can take as much time as you are allotted.

MR. BRYANT:  I appreciate that, and I'll go to the second reason why I won't take 30 minutes and that is in a -- it pains me to admit, but the Court knows a whole with lot more First Amendment law than I do and --

THE COURT:  But I bet you know a whole bunch more about congressional redistricting.

MR. BRYANT:  I do know --

THE COURT:  -- which your office has been working on at the same time.  So understood.  You may proceed.

MR. BRYANT:  Okay.  I also want to express my appreciation for the I think very fair and

despite the tech glitches very efficient trial that we've had today.  This is a case that we all -- always need to remind ourselves, Plaintiff has the burden of proof on every aspect of this case.  And factually, we don't believe that the Plaintiff has carried that burden.  This is a very unusual case. We have Plaintiff organization.  That organization presented no live witnesses from the organization and had no member of the organization present.  So what we do have with respect to the 2026 proposed drag show is no live witness could really testify about that, but we do have the deposition testimony of Mr. Fanelli that both parties have provided excerpts from and what the Court heard relatively recently in the day is Mr. Fanelli's testimony that Spectrum has no specific message for the 2026 drag show.  At this point, there are no performers, no choreography, no music, no message; a purpose; i.e., we would like to support LGBTQ+ students is not the message of a drag show.  Again, the cases require not only that there be a relatively particularized message, but that it be one that the audience would understand.  There's no evidence in this record that, first of all, as to what the content of the 2026 drag show would be, much less that that content

would cause a reasonable audience to understand a message that Spectrum has not -- has not specifically even articulated. At most, Mr. Fanelli testified that Spectrum has at this point only a general intention to hold a drag show. That's all we got. And that does not carry the burden of showing that Spectrum is threatened with a constitutional violation by an action that it admits. Not only has not been taken by Dr. Wendler, but Mr. Fanelli admitted in his testimony, it was read to the Court. That it doesn't know what the decision will be. So this is a case that cannot be sustained on the very scanty evidence of the 2026 drag show, which the Court correctly noted in its order with respect to the Motion for Summary Judgment which really at issue at this point is only prospective relief and therefore only the burden that the Plaintiff had with respect to showing the 2026 drag show would violate the constitution. Or that Dr. Wendler would violate the constitution by canceling it, it's just not there. In addition --

THE COURT: Let's do forum analysis.

MR. BRYANT: I'm sorry.

THE COURT: Let's do forum analysis. Give me your best -- go ahead.

MR. BRYANT:  One of the few things that Mr. Fanelli said in his testimony was the 2026 drag show will be quite a bit different than any -- either the '23 or 2024 drag show in that he said oh, we're only going to have student performers and every act will be totally appropriate.  And you know, it is not -- and we are absolutely not going to have any minors, so the predictive value of the 2023 and 2024 drag shows on what will happen with respect to the 2026 drag show is belied by Mr. Fanelli's deposition testimony.

THE COURT:  Very quickly, on *Spense*, so this is *Spense versus State of Washington*.  It's a case that's often paired with *Texas v. Johnson*.

MR. BRYANT:  Yes.

THE COURT:  *Spense* is 418 U.S. 405.  *Texas v. Johnson* is 491 U.S. 397.  So on expressive conduct, is it enough under *Spense* that Spectrum wants to express some message or does it have to have a message already in mind to have its application reviewed and adjudicated by the University.  That's why I ask questions about how particularized a message has to be, I don't even know how to congregate that.  It would be particularization or something like the

particularized nature of it.  Is that enough here?

MR. BRYANT:  Your Honor, it does have to be reasonably particularized message at -- and not just a general purpose or for example, trying to raise money for the Trevor Project is not a message that is conveyed by a drag show.  It may be the purpose of the drag show, but it is not any kind of specific message nor is a general purpose which is the purpose of the whole organization in virtually all of its events to express support for LGBTQ+ students at West Texas A&M.  Those -- I don't know exactly where the boundary is of particularizationiaty (sic), but it's on the other side of what the Plaintiff has showed with respect to the 2026 drag show.  Now, I do think that *Christian Legal Society* is -- and Judge Ho's dissent in the Fifth Circuit are controlling here ultimately based on these facts.  What the evidence shows is that West Texas A&M University and Texas A&M University have always or at least as long as the evidence goes back had a particularly strong core value of respect.  And it's not just an arbitrary core value of respect, but it's one that directly relates to the educational mission of those two universities.  And so Dr. Wendler as he testified,

his job is to provide the educational environment in which West Texas A&M can accomplish that core -- that educational mission including the core value of respect.  So I know the Plaintiff seems to think that if you had a group of five or ten or a hundred, make those judgments rather than one person that it somehow would be more constitutionally permissible, but that's not in the Constitution as far as I know. Someone has to make the decision and the A&M University System has granted that responsibility, not just that authority, but that responsibility as well as authority for Dr. Wendler to try to preserve the core value of respect on the campus.

Dr. Wendler has not singled out Spectrum for the enforcement of that core value.  As he testified, he would apply that core value to a Neo-Nazi rally, to a blackface performance in Legacy Hall, to a performance whether on stage or not on stage, we don't see any magic in that in which a student organization tried to express mockery and denigration of the LGBTQ+ community.  The evidence shows no indication that Dr. Wendler is anti-LGBTQ or anti-queer culture or has in any way restricted Spectrum from conducting any of its activities in support of LGBTQ+ students on the West Texas A&M

campus.  What he has done, and I'm really glad the Court brought it up, what he has fundamentally done is express in a sense of place restriction but also a manner restriction.  If Spectrum wants to take action to -- whether it's in a stage performance or otherwise to support queer culture or the LGBTQ students on campus, it has many, many ways that it can do it.  It's not that Dr. Wendler has singled out their message or supposed message to express a -- a hostility to their viewpoint, his only issue is that in his judgment, that form of performance, not speech, is against the core value of West Texas A&M and he would apply that restriction to any manner of performance by any student organization. The fact that in Legacy Hall there have been many, many events that did not involve denigration or demeaning of other students or community members has -- is irrelevant to whether or not Dr. Wendler has fairly and consistently preserved the core value of respect and he's -- there's no evidence whatsoever that he would do so any differently for Spectrum than for any other student organization.

THE COURT:  So reading *CLS versus Martinez*, I believe Plaintiff's counsel's correct, the case has been narrowed by subsequent courts'

reading of that case.  Even when they are enforcing it, they're cautioning that it has narrow application.  You have to meet the different elements and match cases that's similarly situated. If I look through your exhibits, where will I find something roughly analogous to the all-comers policy in *CLS versus Martinez*.  So there that is University of California System.  Here, within the Texas A&M System, what is the document or the policy that comes closest to the all-comers Nondiscrimination Policy in *Martinez*?

MR. BRYANT:  Your Honor, the only set of exhibits that come to mind is the consistent emphasis at every point in West Texas A&M on the importance of the educational mission and the core value of respect and respecting the dignity of other students and members of the community.  And that is -- what I believe is the closest analogy to an all-comers policy.

THE COURT:  And where as in *Martinez* the denied activity would have prejudiced or discriminated LGBT applicants?  Here, the relevant performance would have discriminated against or potentially harmed women on campus?  Would that be how you would argue *Martinez* applies to the

University's exclusion decision?

So as I read the elements, you have to have something approaching an all-comers policy, number one.  Number two, you have to have the adverse action or denial.  Number three, there has to be something like an explicit finding by the University or University official that the performance or the club or the activity would have discriminated or excluded members of the University community.  And then of course you have to have a limited public forum which we've already -- we're going to have to decide that question anyway.

MR. BRYANT:  Yes, your Honor.

THE COURT:  On that third element, what is your argument that your case is like *Martinez* and this Court can find that Defendant made a decision that the performance would have discriminated or excluded women as a protected class?  Is that -- I notice there were Title IX materials among -- among the exhibits submitted both by Plaintiff and Defendant.  Is it your argument that you satisfied the *Martinez* requirement because you found this necessary pursuant to something like Title IX?

MR. BRYANT:  Your Honor, Dr. Wendler did not allege a formal Title IX violation.  But the

drag shows as he explained create an environment in which is analogous to hostile work environment or hostile environment in sexual harassment law.  And whether that is attributed to the University or simply operates as such, it is whether -- regardless of whether or not it's a formal violation of any statute, it is contrary to the core value of respect for women, whether it results in complaints in the future or in the past or not, it is a condition on the campus that Dr. Wendler is entitled and the University is entitled to try to avoid as well as remedy after it happens.

THE COURT:  Did I hear any testimony -- I think -- I think I do recall Dr. Wendler testifying to potential hostility to women.  We can go back and check the transcript on that.  I did not recall that the decision to deny Spectrum's application was grounded in years and years of experience, or is that the point of Defendant's testimony about his educational background then pairing with his work in the community, going from Panhandle to Pampa to all these smaller towns?  Do I hear Defendant to argue that the decision was in part rooted on years of experience as an educator which is sort of the language of *Martinez* and the decision-maker there?

MR. BRYANT:  Yes, that's exactly one of the important points that I wanted to try to get across, and that is that Dr. Wendler has literally decades of public university administration experience.  He's been chancellor or vice chancellor of multiple institutions as well as the president of West Texas A&M University.  And he is -- has just as Judge Ho argued in his dissent, a person who has -- to whom that educational responsibility is given is entitled to use his best judgment to carry out the purposes of the institution, the policies of the institution.  And in this instance, President Wendler did so without singling out any group or any viewpoint or any content in -- in our judgment.  He simply wants to not have at the limited public forum of Legacy Hall any performances, events, conduct -- it's not about speech -- that is contrary to the core value of respect at the University.

THE COURT:  Okay.  And you do have ten minutes left.

MR. BRYANT:  Okay.  And do want to point out a couple of other problems that we see with the Plaintiff's argument.  Apparently, the Plaintiff believes that if a member of Spectrum says or forecasts that they're going to have a certain kind

of show, that Dr. Wendler has to just assume that that is correct. But in fact, the record before the Court shows multiple instances in which Spectrum said a performance would have certain characteristics and then it didn't. The Sam Houston Park show was not a PG show at which -- from which children were excluded. In addition, a piece of evidence that the Court has not heard, but is in the record that there was a show on the West Texas campus called the Valentine Lip-Sync show and this is one that Mr. Fanelli testified was viewed as being appropriate for the students but -- and would not involve sexual performance but, in fact, one of the performers according to Mr. Fanelli unexpectedly went on the stage and performed a sadomasochistic bondage routine that was contrary to what Spectrum itself expected. So the fact that Mr. Fanelli or any other member of Spectrum says that well, it's going to be an appropriate performance, it's not gospel by any means.

THE COURT: I'm going to drop a line you did not expect to hear today. I'm glad that you raise sadomasochistic bondage as a concept. Because in teaching First Amendment law just as an adjunct, I recalled a series of controversies involving the

National Endowment for the Arts and the Artist Robert Mapplethorpe. Also an icon to the LGBTQ community. He was an AIDS activist in addition to being an LGBT activist also and he's most famous for a series of photographs that caused controversy in many cities and even at the National Endowment for Arts, the most famous photograph or the one that appears in all the textbooks at least by reference is one of Mr. Mapplethorpe inserting a bullwhip into his anus. That's his most famous black and white. That's usually the photo that caused public outcry when the exhibition came to various cities. As I try to outline in my memorandum opinion and order, we do have to think things, not words. Thought is different than speech is different than conduct. Our jurisprudence navigates the space between those. I take it that Defendant Wendler would not object to any of Mr. Mapplethorpe's ideas about AIDS advocacy, HIV advocacy, LGBTQ civil rights campaigns, things of that sort. Thoughts are invaluable. I don't know anyone who wants a thought police. I would imagine in a proper forum, he would be allowed to give a speech maybe in a gender studies department or an anthropology department on the enduring legacy of some of these images as public protest. And with

some curating specific to time, place, manner some of the forum analysis, he can probably give a speech on this subject to a classroom. But I doubt Dr. Wendler would allow the performance of the act itself. And that's the sort of distinction that Dr. Wendler tried to draw in this case. I didn't think that you would get to sadomasochistic bondage and varies artistry related to that, but it did remind me of that analogue. So am I correct that the Defendant would never even think of policing thought, would allow a speech on that subject matter even if he would never permit the performance of the act itself?

MR. BRYANT: Your Honor, on the record before the Court, there's no evidence whatsoever that Dr. Wendler has ever -- in any way limited any of the academic departments, including the gender studies department, in West Texas A&M University or any academic activity or for that matter speech, so I think it is a very reasonable conclusion that his issue and only his issue was this conduct that the student group intended to provide -- perform at Legacy Hall and of course, we also heard about the Kevin Gates performance or proposed performance that involved potential violence and public safety

issues.

THE COURT:  The 1980s and 1990s also feature some extreme public protests where HIV activists would cut themselves, throw blood on the audience, things like that.  I'm sure there's University policy specific to health and safety and things like that.  So is it your argument to the Court that whether -- this Court engages in viewpoint analysis or forum analysis, that Dr. Wendler was at least attempting to be supportive of the message and in the viewpoint.  He simply took issue with the conduct and of course these two blend because of expressive conduct jurisprudence but he was at least attempting to draw that line.

MR. BRYANT:  Absolutely, your Honor.

THE COURT:  Okay.  I think --

MR. BRYANT:  That's our argument, and we believe that's what the facts in the record before the Court show.

THE COURT:  Okay.  I think I have your argument.  You are at two minutes.  Give me your best zinger.

MR. BRYANT:  Your Honor, I'm not sure I have a zinger, but I do want to point out that there was testimony about people appearing in drag outside

Dr. Wendler's office in protest of his decision and Dr. Wendler said as he -- as is correct that those are common outdoor areas of the West Texas A&M campus and he does not have authority over anything that happens there where -- whether it be someone dressing in drag or someone conducting a drag show, that he does at the limited public forum in which since he came to campus consistently there has been limitation on use of that forum that the Court saw in the 2017, 2023 and 2025 policies and procedures of the JBK Center.  And therefore, this -- the argument that Plaintiff's counsel made about, well, there was really no place on the campus where a drag show can occur.  There are large areas of the West Texas A&M campus that Dr. Wendler does not claim to have any control over or to have any ability to police even disrespectful conduct, that he does have the right to control in the limited public forum of Legacy Hall.

The only other point that I wanted to mention briefly that we hadn't mentioned yet is the aspect of the minors because clearly there were minors who were to be present at the drag shows. There would be sexualized performance whether you can argue about whether it would be what's shown on

all of the Myss Myka exhibits that are in evidence or more like the Sam Houston Park show, but that is sexualized conduct in the presence of minors and that's something that President Wendler has a right to consider in his actions with respect to whatever performances will go on in Legacy Hall.

Thank you very much, your Honor.

THE COURT:  I have your argument.  And Mr. Morris, or any member of your team, you have held back five minutes for any final submission to the Court.

REBUTTAL ARGUMENT

ON BEHALF OF THE PLAINTIFF:

MR. MORRIS:  Yeah, two things, your Honor. I want to get to the 2026 show because I don't think you and I have discussed that in the prior time I was up here.  But I want to point one thing outright.  The way the First Amendment, the Constitution works, is we presume the Government doesn't punish expression before it occurs.  If there's conduct at West Texas A&M University, whether it's on the Legacy Hall stage or outside, they can punish it after the fact.  In fact, that's exactly what Dr. Wendler showed in the policies that West Texas A&M expects.  If a drag show violates a

constitutional policy of the University, against lewdness or disorderly conduct, they can punish it then.  What they cannot do is stop speech in advance based one on the subjective determination of President Wendler about what's disrespectful or inappropriate or offensive.  Whatever catch review you want to use that we've all seen in the jurisprudence and the courts have struck down time and time again and what he can't do is especially stop that speech in advance based on speculation.

As your Honor was asking Mr. Bryant, there's no evidence of harassment.  There's no evidence of discrimination.  It's simply sort of these vague concerns.  You draw the analogy between this case and *Widmar*, you have the University saying they are saying oh, my goodness, if we open up our student meetings spaces to religious statements, Supreme Court said no.  You have no empirical evidence that, you know, religious speech is not going to entangle itself and I apologize for using that word, but it's, you know, entangle itself with the University.

THE COURT:  *Lemon* is dead.

MR. MORRIS:  Well, I don't want to say it because I don't know my personal -- our

institutional position on it, but I think you know where I'm going. There was no empirical clause violation. So too here, there's no empirical evidence that would -- there would be any Title IX violation, any actual harassment, nobody complained to President Wendler about any possible policy violation, any Title IX violation, any concerns about lewdness before it happened. In that instance, public officials have to let the show go on. If it violates something after the fact and that policy is constitutional, it violates and they have the evidence, they can punish it. But they can't stop it. That's a classic prior restraint.

THE COURT: And because I hear your argument, dissent and prior restraint, the Court does find that there's no evidence that the proposed drag show would involve the disclosure of classified fleet deployments or anything in like a department of defense type context. So I'm aware of the prior restraint cases. And I hear your argument. It will receive the weight to which it is due. What was your second point?

MR. MORRIS: My second point is I just want to turn to the 2026 show. This goes back to my point earlier about what we're seeking. The other

side is making a big deal out of the fact that we don't know -- Spectrum doesn't know what performers are going to be there.  They don't know what music they're going to have -- they don't know what time it's going to be at, but they don't know the particulars of the show.  But here's the thing the testimony and the record establishes.  The sole concern for Dr. Wendler is his view that drag shows as a concept -- you heard him use that phrase today. The general concept, the general tradition of drag shows is demeaning and disrespectful to women.  Is that violates core mission of West Texas A&M University and that's why he cancelled or stopped the shows in 2023 and 2024.  And it's why he's likely to it do it again.  So the -- the specifics don't matter.  What mattered here, what this case is about is enjoining a public university official from imposing viewpoint- and content-based criteria to stop speech in advance.  This is -- you know, we heard Mr. Bryant talk about experience and deference to educational officials, the Fifth Circuit in *Speech First. Spence*, we don't do that.  Courts are guardians against campus officials from coming in and saying trust me, just as President Fenves in that case said well, I've -- I've reskinned part of

the hate speech policy. I'm not going to do it again. Fifth Circuit said no. The fact that you did in the past is pretty good evidence you're going to do it again. And the fact that President Wendler twice without learning any details about the show has said I am canceling this show because I find the concept of drag demeaning and disrespectful to women is strong, strong evidence he'll do it again, your Honor. And I'll close with that unless the Court has any questions.

THE COURT: You have two seconds left, so you hit your mark.

MR. MORRIS: I'm good. Thank you.

THE COURT: Okay. So I once again want to thank counsel for enduring a series of technical glitches and difficulties. You were already working on an expedited time schedule imposed by the Court. So we had to use sticky notes instead of different electronic equipment, but we did get across the finish line.

So for Plaintiff, Mr. Morris, Mr. Steinbaugh, Mr. Rudovsky, thank you for your patience. Thank you for enduring and persevering through all the technical glitches.

For the Defendant, Mr. Bryant, Ms. Baker,

and Ms. Al-Fuhaid, thank you also for enduring what was a challenging environment. I think all of you persevered. You represented your clients well and effectively. I will take everything under submission. All evidence will be given the weight it is due, and you should expect my written opinion as soon as practicable but not within the next two hours. So everybody can break from here and please Godspeed in your travels and let's just quickly coordinate with my CRDs -- with my CRD and make sure we have those deposition designations correct and we are all on the same page. With that, the Court stands adjourned. You are excused.

[PROCEEDINGS CONCLUDED AT 7:10 P.M.]

* * * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. I further certify that the transcript fees format comply with those prescribed by the Court and the Judicial Conference of the United States.

*/s/ Christine M. Orr, RPR,*          2/2/26
Official Court Reporter              Date